UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 15 CR 379 (PKC)

JUAN ANTONIO HERNANDEZ ALVARADO,

Defendant.

------------------------------x

New York, N.Y.
October 3, 2019
10:02 a.m.

Before:

HON. P. KEVIN CASTEL,

District Judge

APPEARANCES

GEOFFREY S. BERMAN,
United States Attorney for the Southern District of New York
EMIL J. BOVE, III
AMANDA HOULE
JASON RICHMAN
Assistant United States Attorneys

OMAR MALONE
MICHAEL R. TEIN
Attorneys for Defendant

ALSO PRESENT: HUMBERTO GARCIA, Interpreter (Spanish)
CRISTINA WEISZ, Interpreter (Spanish)
MERCEDES AVALOS, Interpreter (Spanish)
MARCIA GOTLER, Interpreter (Spanish)
BRIAN FAIRBANKS, DEA
MORGAN HURST, Paralegal, USAO

(Jury not present)

THE COURT: Please be seated, but don't get too comfortable because you're be standing for the jury in one moment.

Please stand for the jury.

(Jury present)

THE COURT: We're standing for you, so you sit down as soon as you get to your seat.

Please be seated. Good morning, ladies and gentlemen. It's good to see you back with smiles on your faces, and I particularly appreciate the special effort to get here on time given the weather conditions, so now we can get to a prompt start as promised.

The government may call its first witness, Mr. Richman.

MR. RICHMAN: Thank you, your Honor. The government calls Miguel Reynoso.

THE COURT: All right.

(Continued on next page)

MIGUEL REYNOSO,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. RICHMAN:

DEPUTY CLERK: State your name and spell it for the record.

THE WITNESS: Good morning. My name is Miguel Reynoso. Do I have to spell it out?

THE COURT: Please.

THE WITNESS: M-I-G-U-E-L R-E-Y-N-O-S-O.

THE COURT: All right. Thank you. You.

May inquire, Mr. Richman.

MR. RICHMAN: Thank you, your Honor.

BY MR. RICHMAN:

Q. Good morning. Where do you work?

A. For the prosecutor's office in Honduras.

Q. Are you assigned to any particular unit within the prosecutor's office in Honduras?

A. Direccion De Lucha Contra El Narcotrafico. The Office for the Fight against Drug Trafficking.

Q. What is your title?

A. Detective.

Q. Approximately how long have you been a detective?

A. Two years, eleven months.

Q. What are some of your job responsibilities as a detective?
A. To investigate the trafficking of illegal drugs and other related crimes.
Q. Do you have a particular area of geographic focus?
A. Yes, the Departments of Cortes, Santa Barbara, part of the Department of Yoro, part of Department of Atlantida and Comayagua.
Q. Directing your attention to June 6, 2018, were you working that day?
A. Yes.
Q. Did there come a time that day when you received a call to conduct a vehicle search?
A. Yes.
Q. Did you receive any instructions prior to that search?
A. Yes, I was told that I had to go to the third battalion in Naco where I was supposed to search three vehicles looking for evidence of drugs, weapons and money laundering.
Q. Where is Naco?
A. In the Cortes Department.
MR. RICHMAN: Your Honor, permission to approach?
THE COURT: You may.
Q. Detective Reynoso, if you could start with the first folder marked as Government Exhibit 350, please.
Do you recognize that photo?
A. Yes.

Q. What does it depict?
A. The three vehicles that were inspected and myself conducting the inspection of the engine of the Volkswagen Amarok.
Q. Is it a fair and accurate depiction of the three vehicles you inspected?
A. Yes.
MR. RICHMAN: Your Honor, the government offers Government Exhibit 350.
THE COURT: Any objection?
MR. TEIN: No, your Honor.
THE COURT: Received.
(Government's Exhibit 350 received in evidence)
MR. RICHMAN: Your Honor, permission to publish Government Exhibit 350?
THE COURT: Yes.
MR. RICHMAN: Thank you, Judge.
THE COURT: Ladies and gentlemen, you should be able to see that on your screens. If you can't, please raise your hand.
Okay.
BY MR. RICHMAN:
Q. Detective Reynoso, I think you mentioned this, but who is the individual who is inspecting one of the vehicles?
A. Myself.

Q. If you could now please turn to the folder labeled GX351.
Do you recognize that photo?
A. Yes.
Q. What does it depict?
A. Myself conducting the inspection of the engine area of the Volkswagen Amarok.
Q. Is it a fair and accurate depiction of yourself conducting that inspection?
A. Yes.
MR. RICHMAN: Your Honor, the government offers Government Exhibit 351.
THE COURT: I'm just going to direct that when you display an item to the witness, not to the jury quite yet, but that you display it also to the Court and to the defense so they have it up on their screens at the same time, because I don't, so I should.
MR. RICHMAN: Thank you.
THE COURT: All right. Any objection?
MR. TEIN: No, your Honor.
THE COURT: Received.
(Government's Exhibit 351 received in evidence)
MR. RICHMAN: Thank you. Permission to publish to the jury, Judge?
THE COURT: Standard permission to publish anything that's in evidence to both sides.

MR. RICHMAN: Thank you, your Honor.
Q. Detective Reynoso, what are you doing in this picture?
A. I'm inspecting the engine area of the Volkswagen Amarok.
MR. RICHMAN: Your Honor, I would now like to read a stipulation between the parties into the record.
THE COURT: It's a stipulation of fact or of testimony?
MR. RICHMAN: Of fact, your Honor.
THE COURT: Ladies and gentlemen, a stipulation of fact is an agreement by the parties to this case that a certain fact is so or true, proven. You must accept that fact as true and proven. However, the weight or significance of that fact is entirely up to you as the jury to decide at the close of the case.
You may proceed.
MR. RICHMAN: Thank you, your Honor. And given that the stipulation will be entered into evidence, is it okay if we display it to the jurors as I read?
THE COURT: Well, why don't you offer the stipulation right now, which is --
MR. RICHMAN: Government Exhibit 1005, your Honor.
THE COURT: Any objection?
MR. TEIN: No, your Honor.
THE COURT: Received. You may publish it now.
(Government's Exhibit 1005 received in evidence)

MR. RICHMAN: Thank you.

On June 6, 2018, officers with the Policia Militar del Orden Public, or, in English, Honduran Military Police Law Enforcement, lawfully stopped two vehicles traveling in tandem in Cortes, Honduras: A Toyota with license plate number PDX-4705, and a Volkswagen with license plate number PDX-4704.

Following the stop of the Toyota and the Volkswagen, officers with La Direccion De Lucha Contra El Narcotrafico, or, in English, the Honduran Antidrug Trafficking Directorate, lawfully searched the Toyota and the Volkswagen and lawfully detained the occupants of both vehicles.

Nery Orlando Lopez Sanabria, a/k/a Wilson Lopez, a/k/a Magdaleno Meza Funez, was one of the passengers from the Toyota who was lawfully detained by officers from La Direccion De Lucha Contra El Narcotrafico. In connection with that detention, the officers discovered that Lopez Sanabria was carrying false identification in the name of Magdaleno Meza Funez. Magdaleno Meza Funez is listed as deceased in Honduran law enforcement databases

Government Exhibits 250A through 250K are ledgers that were lawfully seized from a hidden compartment inside the Volkswagen.

Government Exhibit 250T is a true and accurate English translation of six pages from Government Exhibit 250A

And your Honor, I already offered the stipulation and

I now offer Government Exhibit 250A through 250K and 250T.

THE COURT: Any objection to those three exhibits?

MR. TEIN: No, your Honor.

THE COURT: All right. They are received.

(Government's Exhibits 250A through 250K and 250T received in evidence)

MR. RICHMAN: Thank you, your Honor.

BY MR. RICHMAN:

Q. Detective Reynoso, during the course of your search of the Volkswagen, did you locate any hidden compartments?

A. Yes.

Q. If you could please open the folder labeled GX352, and if you could please display that for the judge and for co-counsel.

Do you recognize that photo?

A. Yes.

Q. What does it depict?

A. The evidence that was found and was marked as Number 1 and which was found in the first hidden compartment of the Volkswagen.

Q. Is it a fair and accurate depiction of the evidence found in the first hidden compartment in the Volkswagen?

A. Yes.

MR. RICHMAN: Your Honor, the government offers Government Exhibit 352.

MR. TEIN: No objection.

THE COURT: Received.

(Government's Exhibit 352 received in evidence)

THE COURT: Ms. Hurst, if you could please publish to the jury.

Q. Where was this hidden compartment located within the Volkswagen?

A. Underneath the rear seat of the vehicle.

Q. How did you access this compartment?

A. Using tools we cut through the pin that had been welded by hand, and then we lifted the cover, which had also been welded temporarily.

Q. Detective Reynoso, there's a ruler and a Number 1 in the picture, were those there when you opened the compartment?

A. That ruler and the Number 1 were placed there by us. The ruler is to determine the size of the evidence and the Number 1 was placed there to number the collected evidence as a Number 1.

MR. RICHMAN: Ms. Hurst, if we could zoom in on the portion of the photo below the black bag, below Number 1.

Q. Detective Reynoso, what's depicted in this portion of the photograph?

A. Two grenades.

Q. How were the grenades packaged?

A. They were taped up on the pin part of it, sort of like to keep them safely so that they would not explode.

MR. RICHMAN: Ms. Hurst, if we could zoom back out, please.
Q. Detective Reynoso, at the top of the compartment did you have to count the U.S. currency that was found inside?
A. Yes.
Q. Approximately how much money was found inside the compartment?
A. $193,200 U.S.
Q. Detective Reynoso, inside, what, if anything, did you find inside the black bag that's under the Number 1 in this picture?
A. There were notebooks. There were nine notebooks -- nine spiral large notebooks and two small spiral notebooks.
Q. Detective Reynoso, did you find any other hidden compartments inside this Volkswagen?
A. Yes.
Q. If you could please turn to the folder labeled Government Exhibit 353.
MR. RICHMAN: And Ms. Hurst, if you could please pull up Government Exhibit 353 for the judge and defense counsel.
Detective Reynoso, do you recognize this photograph?
A. Yes.
Q. What does it depict?
A. Cell phones and weapons.
Q. Is it a fair and accurate depiction of cell phones and weapons?

A. Yes.

MR. RICHMAN: Your Honor, the government offers Government Exhibit 353.

MR. TEIN: No objection.

THE COURT: Received.

(Government's Exhibit 353 received in evidence)

MR. RICHMAN: Ms. Hurst, if you could please publish to the jury.

Q. Detective Reynoso, where were these firearms and cell phones located when you first found them?

A. They were under the airbag on the dashboard by the co-pilot side of the Volkswagen Amarok.

THE INTERPRETER: Interpreter correction: By the passenger side of the Volkswagen Amarok.

Q. How were you able to access that compartment?

A. By using a circuit or rather a switch that was in the Toyota Hilux that Mr. Magdaleno Meza Funez was driving.

Q. Focusing on the middle of these three firearms in the picture, what, if any, special accessories did it have?

A. Apparently a silencer.

THE INTERPRETER: Interpreter correction: It appears to be a silencer.

Q. Thank you. Detective Reynoso, if you could please turn to the folder marked Government Exhibit 354.

MR. RICHMAN: Ms. Hurst, if you could please display

that to the judge and defense counsel.

Q. Detective Reynoso, do you recognize this photograph?

A. Yes, they are the weapons and the cell phones that were found in the second hidden compartment.

Q. Is it a fair and accurate depiction of the weapons and cell phones found in the second hidden compartment?

A. Yes.

MR. RICHMAN: Your Honor, the government offers Government Exhibit 354.

MR. TEIN: No objection.

THE COURT: Received.

(Government's Exhibit 354 received in evidence)

MR. RICHMAN: Ms. Hurst, if you could please publish that to the jury.

Q. Detective Reynoso, if you could please turn to folder marked Government Exhibit 355.

MR. RICHMAN: Ms. Hurst, if you could please display that for the judge and defense counsel.

Q. Detective Reynoso, do you recognize this photograph?

A. Yes.

Q. What does it depict?

A. Yes, a black two-way radio, the brand is Hytera, with writing on it that says User 08, and then also writing that says PD602.

Q. Is it a fair and accurate depiction of that black radio?

A. Yes.

MR. RICHMAN: Your Honor, the government offers Government Exhibit 355.

MR. TEIN: No objection.

THE COURT: Received.

(Government's Exhibit 355 received in evidence)

MR. RICHMAN: Ms. Hurst, please display it to the jury.

BY MR. RICHMAN:

Q. Detective Reynoso, where did you first encounter this two-way radio?

A. It is on the driver's side on the floor of the driver's seat.

Q. Turning to the second car searched, to the Toyota, during your search of the Toyota, what, if anything, did you recover?

A. I recovered the switch that I mentioned previously that opened the compartment and that was found in the --

THE INTERPRETER: Interpreter correction: I located the switch that I mentioned earlier that worked to open the hidden compartment in the Volkswagen. I also located the two-way radio -- interpreter correction: A two-way radio, a watch, and jewelry that appeared to be gold.

Q. Starting with the switch, how did it open the hidden compartment in the other vehicle?

A. Upon the inspection of the Amarok, a round hole was located

inside it, and inside the hole there was an electric female switch, and then through the inspection of the Volkswagen -- I'm sorry, no, of the Toyota, we found the male switch. Upon connecting them, they both activated and they opened the second compartment.

Q. You mentioned that you located a radio also inside the Toyota. What, if anything, do you recall about the labeling on that radio?

A. It is similar or rather almost the same to the radio located in the Volkswagen. It is also of the same brand, Hytera, it is black with gray around the edge, and it had writing on it that says User 8 -- no, I apologize, User 9, and then also a writing that said PD602.

Q. If you could please turn to the folder marked 356.

MR. RICHMAN: Ms. Hurst, please display it to defense counsel and the judge, Government Exhibit 356.

Q. Detective Reynoso, do you recognize this photo?

A. Yes.

Q. What does it depict?

A. The evidence found in both vehicles.

Q. Is it a fair and accurate depiction of the evidence that was located in both vehicles?

A. Yes.

MR. RICHMAN: Your Honor, the government offers Government Exhibit 356.

MR. TEIN: No objection.

THE COURT: Received.

(Government's Exhibit 365 received in evidence)

MR. RICHMAN: Ms. Hurst, if you could please display for the jury.

Ms. Hurst, if we could please zoom in on the front half of that table.

Q. Detective Reynoso, in those plastic packets, is that the United States currency that you found inside of the Volkswagen?

A. The clear wrapping does contain the American currency.

MR. RICHMAN: Your Honor, permission to approach?

THE COURT: Yes.

Q. Detective Reynoso, earlier you testified about locating some notebooks inside that black pouch in the vehicle. Did there come a time when you reviewed these ledgers during the course of your investigation?

A. Yes.

Q. How soon after you completed the vehicle search did you review the ledgers?

A. As soon as I got to the office.

MR. RICHMAN: Your Honor, we're now going to display some pictures from one of the ledgers and also from GX250T, which were both admitted into evidence pursuant to stipulation.

THE COURT: All right.

MR. RICHMAN: Ms. Hurst, can you please display the

last page, page 98, of GX250A on one side of the screen and then page 6 of GX250T on the other side of the screen.

Q. Detective Reynoso, on my left side of the screen, is that the back page of one of the ledgers you reviewed?

A. Yes.

MR. RICHMAN: Ms. Hurst, can you please display page 13 of GX250A, and on the other side of the screen can you please display page 1 of GX250T.

Ms. Hurst, can you please highlight where it says Tony Hernandez.

Now Ms. Hurst, if we could please display page 16 of GX250A. And on the other side of the screen, could you please display page 4 of GX250T.

And Ms. Hurst, if you could please highlight where it says Tony Mondo 650, and Tony sent 650.

And Ms. Hurst, please next display page 29 of GX250A. On the other side of the screen please display page 5 of GX250T.

And again, Ms. Hurst, if you could please highlight in the middle of the page where it says Tony Mondo, that whole line. And on the other side if you could please highlight where it says: Tony sent equals 650 minus 160 ours.

Q. Detective Reynoso, how did GX250A through GX250K, the ledgers in front of you, get to the United States?

A. I brought them by plane.

MR. RICHMAN: Your Honor, may I have one moment?
THE COURT: You may.
MR. RICHMAN: Thank you.
No further questions, sir.
THE COURT: All right. You may cross-examine, Mr. Tein.

CROSS-EXAMINATION

BY MR. TEIN:

Q. Good morning.
A. Good morning.
Q. My name is Mike Tein, and I speak for Tony Hernandez.
THE COURT: All right, ask your questions.
Q. Have we met before?
A. Never.
Q. Have I had any chance to ask you any questions before?
A. Never.
Q. So forgive me if I don't know all of what you might say. This is the first time --
THE COURT: No, no. You're here to ask questions, ask questions.
MR. TEIN: Yes, your Honor.
Q. So the money that you seized, when did you count it?
A. At the end of the operation.
Q. When was that?
A. June 7, 2018.

Q. What time?
A. In the afternoon.
Q. Did you count it right there at the scene in one of those pictures that we saw?
A. No.
Q. Where did you count it?
THE INTERPRETER: Sorry, counselor, could you repeat that for the interpreter?
Q. Where did you count it?
A. At the office.
Q. And who counted it?
A. Myself and my other colleague who was doing the search of the vehicles.
Q. Did you count it by hand or did you have one of those cash counting machines that the banks have?
A. By hand.
Q. And were you the one, sir, who physically counted the bills?
A. Yes.
Q. And there was another person in your office watching you or did that person count behind you to double-check?
A. Only the two of us were counting it.
Q. Right, but could you explain to the jury, sir, how is it that two of you were counting, was one -- were you counting some of the packets and your colleague was counting the others,

or were you counting and then was he or she counting behind you to make sure the count was accurate?

MR. RICHMAN: Objection to form, your Honor.

THE COURT: Yeah, rephrase it, please.

Q. Okay. Can you describe to the jury, did you count all the money yourself or did you split up that task with a colleague?

A. I counted it, and then subsequently he counted it to corroborate whether the number that I had told him was the same as his.

Q. And it was?

A. Yes.

Q. And you're sure that the money that you brought back to the office was $193,200, the amount that you counted, right?

A. Right.

Q. Was it mostly 20s?

A. Yes.

Q. Was it all 20s?

A. I don't recall whether all of it was in 20s, but most of it, a great deal of it was in 20s.

Q. 99 percent 20s, is that fair?

A. I couldn't say that precisely 99 were, but approximately 90 percent was in 20-dollar bills.

Q. Okay. So what was the other 20 percent, were those smaller or larger denominations?

MR. RICHMAN: Objection, your Honor.

THE COURT: Basis?

MR. RICHMAN: Form.

THE COURT: I think it's understandable. Go ahead, you may answer it.

A. Not 20 percent, 10 percent, because if I said 90 percent, out of that 10 percent the rest -- I believe the rest was in other denominations. As I said before, I don't recall how many of the bills were in another denomination, but the majority of them was in 20s.

THE INTERPRETER: Judge, may this interpreter confer with her colleague?

THE COURT: Yes.

THE INTERPRETER: Thank you.

(Interpreters conferred)

THE INTERPRETER: Thank you, Judge.

THE COURT: All right.

BY MR. TEIN:

Q. Let me ask it again, sorry.

So you initially said it might be around 90 percent, do you think it was probably -- it might have been less than that now of 20s?

A. I will repeat this again: The great majority of the bills were in 20-dollar denominations.

Q. Okay. Did you write down anywhere the breakdown of bills, such and such amount of 20s, such and such amount of other

denominations?
A. Yes, but I do not recall exactly what the amount of the denominations were.
Q. So let's put aside for a moment the fact that you testified that the majority of the bills were 20s. Were the rest of the bills in denominations that were less than 20 or denominations that were more than 20 or was it both?
A. I don't remember.
Q. Did you write that down in your report?
A. There was an official record made of the money counted.
Q. By who?
A. By us, the detectives who were counting the money.
Q. Did you put those denominations in your report?
A. I believe so.
Q. And you did do a -- you did write up a report of the search and seizure from June 6 and 7, right?
A. Yes.
Q. When did you write your report?
A. After carrying out all of the procedures which had to be done.
Q. Who was with you counting the money, sir?
MR. RICHMAN: Objection, your Honor, asked and answered.
MR. TEIN: I don't think I asked the name.
MR. RICHMAN: Your Honor, may I consult with defense

counsel for one second, please?

THE COURT: Yes.

(Counsel conferred)

THE COURT: Do you want to rephrase your question?

MR. TEIN: I'm waiting to see if there's a stipulation.

MR. RICHMAN: Your Honor, I think we need to approach.

THE COURT: Ladies and gentlemen, you may stand up and stretch.

Let me see the attorneys at sidebar.

(Continued on next page)

(At sidebar)

MR. RICHMAN: Thank you, your Honor. Our concern is with the use of the detective's real name, which is where counsel was going. We have safety concerns, although it's not the testifying detective. We have two other concerns. The first is the chain of custody. Cross can certainly be accomplished, I understand that's where counsel was going, without using any names, and maybe more pointedly we don't see the relevance of this. This money is not in evidence and we don't know where defense counsel is going.

MR. TEIN: I am doing chain of custody. The money is important because I think there was a big gap between when the money and the ledgers were seized and when he showed up on scene. And this is part of -- you'll see that there's a report that he did that is dated June 7 at 3:55 a.m. and contains the dollar amount of money, but he just testified that he didn't count the money -- I mean sorry, first of all, the picture that they showed, GX354, showed that the money was still wrapped and it was daylight out. So that leads me to think that the money could not have been counted at 3:55 in the morning, and there are additional problems with the chain of custody.

I did not know that they wanted to protect the name of the -- first of all, I didn't know who counted the money with him, but now that I do know, that is the person who appears to have put the money into evidence 13 days -- the money and the

ledgers, I'm sorry -- into evidence 13 days after the seizure. And so I want to ask him: What was that person doing and where is the record of what he was doing during that time?

I believe --

THE COURT: You should be able to ask the question without using the officer's name.

MR. TEIN: Okay. Can we use a pseudonym or something?

THE COURT: Or do you want to --

MR. MALONE: Your partner?

THE COURT: Yeah, your partner. Is it multiple?

MR. MALONE: Just one as to the counting.

THE COURT: So the officer with whom you were counting the money.

MR. TEIN: Okay.

THE COURT: Yeah.

MR. TEIN: In order to make sure the witness doesn't disclose the name, that's how I will ask it.

THE COURT: Right. You can tell him I don't need the name, but.

MR. TEIN: Yes, your Honor.

THE COURT: I think that would be enough.

MR. RICHMAN: Thank you, Judge.

THE COURT: I don't want to underscore this needlessly in front of the jury.

MR. MALONE: Right.

THE COURT: So you should put it in your question: I don't need the name, but the partner who was, or your partner who was counting the money with you, what did he do next, et cetera, whatever you want to ask.

MR. TEIN: Okay, yes, your Honor.

MR. MALONE: Thank you, Judge.

(Continued on next page)

(In open court)

BY MR. TEIN:

Q. Sir, I would like to show you what's been marked for identification as a document number 3519-02.

MR. RICHMAN: Objection, your Honor. What's the basis for showing the witness the document?

MR. TEIN: The basis is what I said.

THE COURT: You may proceed.

MR. TEIN: May I approach the witness?

THE COURT: Yes.

Q. Sir, is that one of the reports that you wrote?

A. Yes.

Q. Is that your signature at the bottom?

A. Yes.

Q. When did you write the report?

A. June 7.

Q. At what time?

A. 3:55, that is, 15:55.

Q. 15:55 or 3:55?

A. 3:55 p.m. and 15:55 are the same time.

THE COURT: Let me ask you, is this exhibit in evidence?

MR. TEIN: No.

THE COURT: You can't have the witness read from the document then. You can ask him a question. If he says he

doesn't recall something, you may show him a document to refresh his recollection, but he may not testify from a document not in evidence and you may not ask questions from a document not in evidence.

Go ahead.

MR. TEIN: Please turn the document over.

Q. Without looking at the document, do you have a memory, sir, of what time you wrote this report entitled Acta De Incautacion, document 3519-02.

MR. RICHMAN: Objection, your Honor.

THE COURT: Basis?

MR. RICHMAN: Counsel is reading from a document that's not in evidence.

THE COURT: Counsel is allowed to frame his questions with knowledge of the content of the document. Neither he nor you may imply to the fact finder here, the jury, that there is a document that contains this information. That only may be done if the document is offered into evidence and received into evidence and then the jury may see it for themselves. If it's not offered into evidence, it's not being received, it's not evidence, but certainly a question could be inspired from having read something. That something is not necessarily true, ladies and gentlemen, it's not in evidence, it's just not before you. You may ask your question.

(Continued on next page)

MR. TEIN: Thank you, your Honor.

THE COURT: Please restate it.

MR. TEIN: Thank you, your Honor.

BY MR. TEIN:

Q. Sir, did you, in fact, write a report in this matter that you just testified about earlier, the seizure, called Acta de Incautacion?

A. Yes.

Q. Did you write that report in your own handwriting?

A. It is not --

THE INTERPRETER: The interpreter needs to seek a clarification, Judge.

THE COURT: Yes.

THE WITNESS: It is not my handwriting but rather that of my colleague who counted the money with me and carried out the search with me also and it has my signature.

THE COURT: Are you seeking to offer this document?

MR. TEIN: After I ask him some more questions.

THE COURT: Go ahead.

Q. The names of your colleagues, I'm not asking about that level of detail right now but the -- you're saying that it was your colleague who counted the money who wrote the report called Acta de Incautacion?

THE COURT: Rephrase the question.

Q. The report called Acta de Incautacion, first, madam

translator can I ask you to please or can the court please ask the translator to translate the words Acta de Incautacion?

THE COURT: Yes, you may.

THE INTERPRETER: Official seizure record.

Q. So, this official seizure record that concerns the seizures of money and booklets that you testified about, it was handwritten by your colleague; is that correct?

A. Yes. That's correct. But I would like to add that in Honduras there are two parties who engage in the search and although the record is not in my handwriting it does contain my signature which is also reflected on it. So both of us signed it.

MR. RICHMAN: We'll stipulate to the admission of this document subject to redaction.

THE COURT: All right. Well it hasn't been offered yet. Do you want to offer it?

MR. TEIN: We'll offer it.

The document number is 3519-02 perhaps we could identify it as Defendant's 1.

THE COURT: As Defendant's 1?

MR. TEIN: Yes, your Honor.

THE COURT: No objection. Received. You may publish if you wish.

(Defendant's Exhibit 1 received in evidence)

MR. TEIN: Before I do, may I ask a few questions?

THE COURT: Go ahead right ahead. Ask a few questions.

BY MR. TEIN:

Q. Where were you when you signed this report?

A. The official record of the counting of the money at the office.

Q. And where were the people who got arrested that night?

A. A lineup and identification procedure was carried out at the office.

Q. In your office?

A. At the prosecutor's office in San Pedro Sula.

Q. That's your office?

A. The Direccion de Lucha Contra Narcotrafico in San Pedro Sula.

Q. I'm just trying to understand. Were the suspects in the same office building where you were when you signed the report that your colleague wrote? Or were they in a different building?

A. In the same building.

Q. Have you received any training on writing reports?

A. Yes.

Q. As part of that training you've been taught that it's important to be accurate in writing police reports, right?

A. Yes.

Q. And is that because details about the evidence are

important in criminal cases?
A. Yes.
Q. And you try to be accurate when you write or sign a report, right?
A. Yes.
Q. Do you simply sign reports because your colleagues ask you to? Or do you read the reports first and make sure they're correct?
A. I read them to make sure what it is I'm signing.
Q. Before you sign you make sure that what you're signing is true, correct?
A. Yes.
Q. Now, I believe you testified earlier that this report was written at 3:55 in the afternoon. Did I get that right?
A. Yes.
Q. In fact, that's not when the report was written? Right?
A. That's the time it says. If that's the time that appears on the record that is when we did the money count.
Q. OK. Let's look at the -- let's look at Defense 1, that document, your official seizure record.
MR. TEIN: Permission to publish?
THE COURT: You may.
MR. TEIN: Your Honor, can we -- let's just for efficiency sake, can -- you don't have it up there -- we'll publish it up there because they don't have it on the screen.

THE COURT: I understand.
Q. Take a look at the report. Please. It's one page, isn't it?
A. Yes.
Q. Is that your signature at the bottom?
A. Yes.
Q. And also your colleague, right?
A. Yes.
Q. Now, at the top there is a space for what time the report was written, what time and what date the report was written, isn't there?
A. Yes.
Q. What time and date does this report that you signed say?
A. June 7, 2018.
Q. And what time on June 7, 2018?
A. 3:55.
Q. A.m. or p.m.?
A. It must be the morning because that was the time when the first piece of evidence was found.
Q. OK. So this report indicates not 3:55 in the afternoon. The time on this report is 3:55 in the morning, right?
A. We're talking about the counting of the money right now. At this time we are talking about the evidence itself.
Q. I'll ask again. When did you sign this report?
A. What I have in my hand right now, at this time it was

3:55 a.m.
Q. And you know that because it's written in military time, right?
A. Correct.
Q. So when I first asked you -- handed you a report and I asked you when it was written and you said 3:55 in the afternoon, were you just mistaken?
A. We were talking about the money. We were not talking about the evidence itself. We were not talking about bombs or grenades. We were talking about money and documents.
Q. This report here that's in your hand, Defense 1, it concerns money, among other things, right?
A. Correct.
Q. And some -- and the other evidence that you seized on the early morning -- in the early morning hours of June 7, right?
A. The money with the documents and the grenades.
Q. And that's written in the report?
A. What is written here is nine sealed packages, double column; one package of just one column; and two clear wrappings with a total of $793,220.

THE INTERPRETER: May the interpreter confer with her colleague.

THE COURT: You may.

THE INTERPRETER: Interpreter's correction. $193,220.

MR. TEIN: I thought that's what you said.

THE COURT: Is that a question?
Q. Is it 193 --
THE COURT: No. No. Was that a question? Withdraw it or --
MR. TEIN: I'll withdraw.
THE COURT: Thank you.
BY MR. TEIN:
Q. So, this report per my question that I just asked that was -- we had the issue on translation concerns a bunch of things that were seized in the early morning hours by you, correct? Not just the money?
A. That's correct.
Q. And we know the report, the time that's written on the report is 0355 horas or hours, right?
A. Yes.
Q. And that's military time, right?
A. Yes.
Q. And you use military time in order to distinguish between morning and afternoon so there is no confusion, right?
A. Yes.
Q. So we can be sure that this report is -- has 3:55 in the morning as the time that it was written, correct?
A. Yes.
Q. Now that's not the only report that you wrote, sir, correct?

A. No.
Q. Did you write another report?
A. Yes.
Q. And that report was a report that listed out how you inventoried the car after you got to the scene of the vehicle stops, right?
A. This official record lists the evidence that was found, evidence no. 1, in the Volkswagen vehicle.
Q. In addition to the report that we've -- that you have up in front of you, Defendant's 1, you wrote another report, correct?
A. Yes.
Q. What was that report called?
A. I think it's Acta de Incautacion official report -- official seizure report, but it is for the Toyota Hilux vehicle.
Q. Did you handwrite a report at the scene of the vehicle stop and inspection?
A. Yes.

MR. TEIN: Can we please pick up Government Exhibit 356.

THE COURT: All right, ladies and gentlemen, I hate to hold you in suspense but we're going to take a midmorning break. Please do not discuss the case among yourselves in any way, shape, or form and please keep an open mind. We'll be back in action in ten minutes. Thank you.

(Jury exiting the courtroom)

THE COURT: Persons in the back please remain in place while the jurors are exiting the courtroom.

See you in ten minutes.

MR. TEIN: Your Honor, the witness is in the box.

THE COURT: The witness may step down. We're in recess.

(Jury not present)

(Recess)

THE COURT: Please remain standing for our jurors.

(Jury present)

THE COURT: Please be seated. Mr. Tein, you may continue.

MR. TEIN: Thank you, your Honor.

BY MR. TEIN:

Q. Sir, I was asking you did you --

THE COURT: Just put a question.

BY MR. TEIN:

Q. Did you write a report at the scene?

A. Yes.

Q. And you wrote it in your own hand, right?

A. The Toyota Hilux one.

Q. So at the scene you wrote a report, in addition to Defense 1, you wrote another report and you handwrote it at the scene, right?

A. Yes.
Q. And the reason you wrote it, you handwrote it out at the scene was because you didn't have your computer with you at the scene or a printer, right?
A. Yes. But they can also be prepared, typewritten at the scene.
Q. In this situation that you're testifying about today is it true that you handwrote out a report at the scene?
A. Yes.
Q. And you signed it, right?
A. Yes.
Q. Before your testimony when was the last time you read over your reports of this incident?
A. Over a year ago.
Q. And the reason that you write reports, one reason that you write reports is because if you write the reports right at the time that the things happen, you don't have to worry about remembering them months or maybe a year later, right?
A. They are written at the moment when the incident takes place, in this case at the moment when the search was conducted.
Q. What time did you find the money in the car?
A. I do not recall the exact time but -- just allow me to be a little more clear on this. The money was counted on the scene, the $193,220, and then subsequently at the office an official

record was created of the counting of the money that describes the denomination of the bills.
Q. You're saying there's a report that lists out the denomination of the bills?
A. Yes.
Q. Where is that report?
A. It must be part of the general record, the general record that is prepared for the prosecutors, prosecutor's office.
Q. You don't mean these prosecutors, do you?
A. No. The San Pedro Sula prosecutors.
Q. You gave some reports to these prosecutors, right?
A. Yes.
Q. They asked you to give you their -- they asked you to give you -- sorry. Withdrawn.
They asked you to give them your reports on this incident, right?
A. The official reports are turned in. Each report is turned in in a general file of the incident, of the results.
Q. Is it true that these prosecutors asked you --
THE COURT: Rephrase that when you say "these prosecutors."
MR. TEIN: Sorry. Withdrawn.
Q. Is it true that the United States Attorney's Office here in New York asked you to give them your reports on this incident?
A. No.

Q. Do you know how it was that the United States Attorney's Office for this district came into possession of the reports that you and others wrote about these seizures from the Volkswagen and the other cars?
A. No.
Q. Have you seen a report in this case that actually lists the denominations of the money that you seized on June 6?
A. An official record of the counting of the money was turned in at the prosecutor's office in Honduras.
Q. Have you seen that record?
A. Which one? The one for the counting of the money?
Q. Have you seen the record that you just testified lists the denominations of the bills that you seized on June 6?
A. On an official record separate and apart from this seizure official record that you just handed over to me.

MR. TEIN: Your Honor I'm not sure if he's asking me a question or if that's a statement.

THE COURT: I think that's a statement. Ask your next question.

Q. Sir, have you seen a record or any piece of paper that is official that lists out the denominations of the money that you seized in the early morning hours of June 7, 2018?

MR. RICHMAN: Objection, your Honor. Asked and answered.

THE COURT: I'm going to allow the question. Go

ahead.

THE WITNESS: The official seizure report was prepared.

Q. When did you see that?

A. The official record was prepared on the 7th of June 2018.

Q. By whom?

A. By the detective who was with me during the search of the vehicle and myself.

Q. And that report was prepared on June 8, 2018, right?

A. The official record of the money counting was prepared on the 7th of June 2018.

MR. TEIN: May I approach the witness, your Honor?

THE COURT: You may.

Q. Sir, I've handed you what's been marked for identification as Defense 2.

Is that the seizure report that you are referring to?

A. This, which I have in my hand right now, is the general report of the results that arose from the search of the vehicles.

Q. So, is that the report you were referring to or not?

A. For the counting of the money, this is not the one.

Q. OK.

MR. TEIN: May I approach, your Honor?

THE COURT: You may.

Q. I'm now showing you what's been marked for identification

purposes only as Defense 3. It is -- it was previously numbered at 3519-01.

Is that the report that you're talking about?

A. This is the official record of the vehicle search. Attached to the general report of results there is the official record of money count amongst others.

THE INTERPRETER: Interpreter correction. Amongst many others.

Q. And is that on page 11? Page 12?

A. Ten.

Q. OK. Is it under the heading that says attachments?

A. Attached.

MR. TEIN: Your Honor, we at this time offer Defense 2 and Defense 3 into evidence.

MR. RICHMAN: Your Honor, subject to redactions which we can discuss the government has no objection.

THE COURT: All right. Proceed.

(Defendant's Exhibits 2 and 3 received in evidence)

Q. So you're saying that this report that lists out the denominations was attached to this report, Defense 2?

A. Yes. Just like this one, this one is an attachment to this one.

Q. So when you say "this one is an attachment to this one," you mean the handwritten Defense 3 is one of the attachments to the typed-up Defense 2?

A. Yes. They are added to the --

THE INTERPRETER: Correction. They are annexed to the general results report.

Q. And the general results report is Defense 2, the typewritten thing in front of you, right?

A. I did not understand. Can you repeat that, please.

MR. TEIN: I'll move on.

Q. Is Defense 2, this general report, is it accurate? Is it true?

A. Yes.

Q. When was the last time you read it?

A. Over a year.

Q. Did you know -- this is just do you know who wrote it. I'm not asking you the name.

A. Yes.

Q. Was it you?

A. The person that accompanied me during the search.

Q. And that's the same person who counted the money with you, right?

A. Yes.

Q. And that's the same person that put the money and the ledgers into your evidence locker, right?

A. Yes.

Q. Where is your evidence locker?

A. Well, there are several. They could be in Tegucigalpa.

The prosecutor's office has an evidence warehouse.
Q. The ledgers that were admitted in your direct testimony when the prosecutor was asking questions, where did you get those from?
A. From the Volkswagen Amarok vehicle and it was marked as evidence 1.
Q. You brought the ledgers from Honduras to New York City before this trial in September, correct?
A. Well, it's October and yes, I did bring them with me.
Q. Did you bring them with you in September or October?
A. In September, late September.
Q. Did you make two trips up here or did you come up in late September with the ledgers and stay here in New York for your testimony today?
A. Yes. I did come here to New York City and I brought the ledgers with me.
Q. Did you make one trip or two?
A. Two flights. Are you referring to two flights?
Q. I don't mean a stopover -- it's all right.
When you gave the ledgers to -- you gave these ledgers to the prosecutors in New York City, the federal prosecutors, correct?
A. Yes.
Q. And when you did that you were careful to make sure that you got a signed certificate from them showing that on this day

you delivered the records to them and you signed and they signed; is that correct?

A. Yes.

MR. TEIN: May I approach, your Honor?

THE COURT: You may.

Q. I'm showing you what's been marked for identification purposes as Defense 4. Is that a scope of the certificate that you had the staff of the United States Attorney's Office for the Southern District of New York sign when you delivered the ledgers in this case to them?

A. Yes.

MR. TEIN: We offer Defense Exhibit 4 into evidence.

THE COURT: Any objection?

MR. RICHMAN: Subject to redaction, your Honor, no.

THE COURT: All right. Received.

(Defendant's Exhibit 4 received in evidence)

THE COURT: Redaction, ladies and gentlemen, is a term that is used when there is some material in a document that ought not come into evidence, in this case by the agreement of the parties, then a copy of the document is prepared which eliminates the irrelevant words, usually it marks it out so that you can see something was marked out, sometimes it's a name or some such thing that is not relevant in this case, and that's what a redacted document is.

OK. Next question.

BY MR. TEIN:
Q. And you had the U.S. Attorney's Office staff sign that certificate because it's important to you to maintain the chain of custody of evidence between the moment that it's seized from the scene of the crime until the time that you come into court and talk about it, correct?
A. Yes.
Q. And one reason that's important is to make sure that none of the evidence that's being used for trial is manipulated in any way before it gets to trial, correct?
A. Yes.
Q. Now, you testified earlier, didn't you, that this report, the general report of the seizure marked Defense 2 was true, correct?
A. Yes.
Q. Please turn to page -- it starts on page one of the Spanish original and under the title of events. Under the subtitle second. It says that the packages had their wrapping somewhat tampered with containing U.S. currency in twenty dollar bills; is that correct?
A. Allow me, please.
Yes. What this is referring to here is that there was some packaging that was open.
Q. Some packaging that contained the seized money that was already opened?

A. When we started looking at the evidence we noticed that the packaging for one of them was -- well, it was not the same as the others. That's what I mean.

THE INTERPRETER: May the interpreter have a moment to consult with her colleague?

THE COURT: Yes.

THE INTERPRETER: All right. Thank you, your Honor.

THE COURT: Thank you.

(Continued on next page)

BY MR. TEIN:

Q. So when you arrived at the scene, you found hidden in the car money in sealed packages, some of which were sealed and a couple of which appeared to have been manipulado, manipulated is the word in the report, correct?

A. It did not have the same amount of money, it was smaller. That's what I am referring to by manipulated. All of the others were larger and this one was smaller.

Q. If I showed you the picture from before that you identified as the picture of the evidence, would you be able to point out to us which packages had been manipulated and which ones had not been?

A. Yes.

MR. TEIN: Your Honor, may your Honor ask the government to put Exhibit 345 on the screen, please?

THE COURT: You may ask them. Yeah, I think they got the gist of it. Put it up, please.

What's the exhibit number?

MR. TEIN: 356.

THE COURT: All right. 356.

BY MR. TEIN:

Q. Does this photo or any of the others that -- if you want to see another one, let us know, depict -- show the packages that had been manipulated?

A. You can see it a little bit.

Q. Is it better to look at the other photos that you were shown? Would they show the manipulated packages more clearly or is this one sufficient?
A. You can't see it very well, but it is next to -- towards the left next to the gun with the silencer.
Q. So it's to the left of the gun with the silencer?
A. Yes.
Q. I'm circling on the screen and -- or could you circle on your screen, I think it works, what part you're talking about that was manipulated?
A. I'm sorry, it's the upper one.
Q. Thank you. Why did you -- did you lay the evidence out bit by bit on the table like this or did someone else do it?
A. No, I did.
Q. Why are there armed guards in the picture?
A. Well, remember, they are the ones who pulled over the vehicle. They were the ones who carried out the personal searches of the people who were in the vehicles and who seized those people's property, and they are standing separately. And you can see that from where you can see the evidence that we collected.
Q. And the man on the right looks to be taking a picture, is that correct?
A. I don't know.
Q. Did you take this picture, Exhibit 356, or did someone else

take it?
A. I don't remember.
MR. TEIN: Can we please put up 350 for a moment. 351, please. And 352, please.
Q. Are any of these packages in 352 manipulated?
A. Just as they appear in the photographs, that's how it was found.
THE INTERPRETER: Interpreter's correction: That's how they were found.
Q. Are you able to tell, sir, by looking at this picture of the money as it was found, as opposed to the money on the table, as to which one of these packets -- which two of these packets had been manipulated?
A. You can't see that here. The way that this photograph is here, you cannot see that.
Q. When were the packets manipulated, packs of money?
THE INTERPRETER: Sorry, counselor, could that question be repeated?
MR. TEIN: Withdrawn.
Q. When were the packets of money manipulated?
A. Once again, sir, this is how they were found, just as you see them in the photograph. This is how the evidence was found. I have no idea who might have manipulated them.
Q. Do you know when they were manipulated?
A. No.

Q. This picture, Government Exhibit 352, does it appear to show on the right-hand side the material of the back seat being rolled over to the right-hand side? Am I seeing that correctly or describing it correctly?
A. That is part of the carpeting of the vehicle that was covering the hidden compartment.
Q. Did you find the hidden compartment?
A. Yes. Yes, I did.
Q. Were you the first one to open that compartment?
A. Yes, together with my other colleague who carried out the search with me.
Q. Who brought with them the tools to cut into these compartments?
A. We did.
Q. Did you yourself?
THE COURT: I'm sorry, was that a question?
MR. TEIN: Yes.
THE COURT: Rephrase your question. The witness testified we brought them. You were referring to your colleague, is that correct, you and your colleague?
THE WITNESS: Correct.
THE COURT: So rephrase your question.
Q. Did you ride in one car or two?
A. The work car?
Q. When you arrived at the scene of the three vehicles in

Naco, Cortes, Honduras, were you driving by yourself or were you driving with one of your partners?
A. We arrived --
THE INTERPRETER: Interpreter's correction: Three of us detectives arrived together, the detective who carried out --
Q. I'm not asking you to name them, I'm asking you how many people are in the car.
A. I drove together with my colleague who created the official record.
THE INTERPRETER: Interpreter's correction: My colleague who carried out the vehicle search with me, and my colleague who created the official record of the search -- I'm sorry, I mean the official record -- the official search record -- interpreter's correction, the colleague who carried out the official seizure record, no, I mean the colleague who carried out the official search record.
Q. How long a drive is it from your office in San Pedro, Sula, Honduras to Naco, Cortes, Honduras where you searched the cars?
A. Between approximately one half hour and one hour.
THE COURT: Speaking of how long, Mr. Tein, how much longer do you have for your cross-examination?
MR. TEIN: Should be another 15 minutes.
THE COURT: Move it along, please.
MR. TEIN: Yes.

Q. How long were the cars sitting there before you got there?
A. I do not know.
Q. Would it refresh your memory to look at the report, Defense 2, that you said was an accurate report of the -- accurate general report of the incident?
A. I don't know which one 2 is. This one?
Q. Isn't it a fact, sir, that the cars had been stopped by the military police of Honduras at about 6:15 p.m.?
A. I have no idea. What I know about is what I did.
Q. So now if you look at what you -- your report, which is Defense 3, a handwritten report that you did at the scene, it appears to say that a K-9 dog alerted at about 2:20 in the morning. Does that refresh your memory at all as to about when -- as to the events such that you might remember about when you arrived at the scene?
A. We arrived there at the nighttime.
Q. Was it one in the morning or two in the morning?
Do you remember what time?
A. The time when we arrived at the battalion, what I recall, I believe it was approximately -- my idea would be sometime around 10 at night.
Q. Okay. So between 6:15 at the stop and the time that you arrived there was a little less than three hours?
MR. RICHMAN: Objection, your Honor.
THE COURT: Basis?

MR. RICHMAN: The 6:15 reference, there's been no testimony to that.

THE COURT: Rephrase your question.

Q. On the very first line of the general report, Defense 2, doesn't it say the time that the military police stopped the cars?

A. The first line?

Q. The very first line under henchos, events, then says primero, first?

A. Yes.

Q. So the military police stopped the car at 18:15 hours, which is 6:15 p.m., right?

A. Yes.

Q. And then there's another heading that says segundo, second, do you see that in bold?

A. Yes.

Q. And the first line of that says that at 20:08 hours the northern regional coordinator -- the DLCN northern regional coordinator was informed of the arrest and support was requested. Do I read that correctly?

A. Yes.

Q. Having directing your attention there, my question is: Is it correct that at 20:08 hours your office was told about the arrest and asked to come to the scene in order to support a search?

A. It says here that the coordinator was informed.
Q. At 20:08 hours, right?
A. Yes.
Q. That's 8:00 p.m., right?
A. 8:08 p.m.
Q. Thank you. And you say you arrived at around 10:00 p.m., right?
A. Approximately 10, I don't remember the exact time.
Q. And the K-9 alerted, it says, first alerted at 2:02 in the morning, right?
A. I don't know. Oh, yes, at 2:00 a.m.
Q. So can we agree that for approximately two or three hours the scene of this search was in the custody of the military police before you had arrived?
A. Yes.
Q. Do you know when your colleague put the ledgers --
THE COURT: I don't think that's a complete question.
MR. TEIN: Sorry, I was getting the ledgers.
Q. Do you remember these ledgers, Government Exhibit 250?
A. Yes, those were the ledgers that were in the vehicle, evidence Number 1 from the vehicle.
Q. Can we please go back to Government Exhibit 356.
Now you say that these ledgers were contained in the black -- in a black envelope, I think you said, or black bag, some type of a black container when you found them, isn't that

right?
A. Yes.
Q. Can you circle the container that contained these ledgers when you found them?
Thanks.
Why didn't you spread these out on the table, too?
A. No, we do not remove them. We picked up the evidence just as it was.
Q. So that black bag that you just circled didn't get opened until when, when you were at the station?
A. Yes.
MR. RICHMAN: Your Honor, if we could put on the record what the defendant has circled on the picture, please.
THE COURT: Yes. In the lower left-hand corner of 356 there is a black rectangular object that has been circled. Thank you.
BY MR. TEIN:
Q. Who put -- it was your colleague who signed the report who was the one who put these ledgers into the evidence locker that the police and the prosecutors in Honduras used to secure the evidence, right?
A. Yes.
Q. When did he do that?
A. After the operation he started the bagging process.
Q. How many days passed between -- or how much time passed in

between June 7th, 2018, and when your colleague put these ledgers in your evidence locker?

A. I don't know.

THE COURT: How are we doing on time, Mr. Tein?

MR. TEIN: I need to confer with Mr. Malone. I'm almost done, but with this area I'd like to confer with him in order to answer your question.

MR. RICHMAN: Your Honor, we would note it's been 15 minutes since there was a 15-minute warning. The direct was 30 minutes. We have been on this topic for almost two hours at this point.

MR. TEIN: Could I have three more minutes?

THE COURT: Go right ahead.

MR. TEIN: I'm not sure if I -- may I have the last answer read back, please?

THE COURT: No, put your next question.

MR. TEIN: May I approach the witness?

THE COURT: You may.

BY MR. TEIN:

Q. I handed you what has been marked for identification purposes as Defense Exhibit 5. Is that a copy of the chain of custody log for these ledgers and other evidence?

A. Yes.

Q. Can you tell, from looking at that, the date that your colleague -- the date and time that your colleague deposited

these ledgers into your evidence locker?
A. Can you please repeat the question?
Q. Can you tell from looking at this chain of custody log the exact date and time that your colleague signed these ledgers into evidence, Government Exhibit 250, for the very first time?
A. June 20, 2018.
Q. Thirteen days after the seizure?
A. Yes.
MR. TEIN: I have no further questions.
THE COURT: All right. Any redirect?
MR. RICHMAN: Very briefly, your Honor.
THE COURT: Sure.
REDIRECT EXAMINATION
BY MR. RICHMAN:
Q. Detective Reynoso, you were asked some questions on cross-examination about locating the compartment in the back of the Volkswagen. Do you recall those questions?
A. Yes.
Q. Was the compartment welded shut when you first started to review it?
A. Yes.
Q. And Detective Reynoso, you were asked some questions about the ledgers on cross-examination. How soon after you completed the search did you first review these ledgers?
A. Immediately after the search concluded we got to the

office, we moved on to the verification of information, and then they were bagged.
Q. Did you review them at that point?
A. Yes.
Q. And we looked at the name Tony Hernandez in one of the ledgers. Did that stand out to you during your review?
A. Yes.
Q. Why?
A. Well, at the time the Tony Hernandez case was very well-known in Honduras, so as soon as I found -- so upon the verification or the review of the ledgers, I found the name Tony Hernandez.

MR. RICHMAN: No further questions, your Honor, thank you.

THE COURT: All right. You may step down.

Ladies and gentlemen, it's nine minutes to 1:00. We're going to break early for lunch today. Please do not discuss the case among yourselves or with anyone. Please keep an open mind. We'll be back in action for a 2 o'clock sharp start. Thank you.

All rise.

(Jury not present)

THE COURT: Have a pleasant lunch. Thank you.

(Luncheon recess taken)

(Continued on next page)

AFTERNOON SESSION

(2:00 p.m.)

(Jury present)

THE COURT: Ms. Houle, you may call your next witness.

MS. HOULE: Thank you, your Honor, the government calls Special Agent Gregg Mervis.

GREGG MERVIS,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. HOULE:

THE WITNESS: Gregg G-R-E-G-G, Mervis, M-E-R-V-I-S.

THE COURT: All right. You may inquire.

MS. HOULE: Thank you, your Honor.

BY MS. HOULE:

Q. Sir, where do you work?

A. Drug Enforcement Administration.

Q. Is that commonly referred to as the DEA?

A. Yes.

Q. What is your title there?

A. Group supervisor.

Q. When did you first begin working at the DEA?

A. In 1997.

Q. When you first joined the DEA, what position did you hold?

A. I was a linguist.

Q. What did you do as a linguist?
A. I translated recorded communications from Spanish to English.
Q. Are you fluent in Spanish?
A. Yes.
Q. Do you have a degree in the Spanish language?
A. Yes.
Q. What degree is that?
A. Bachelor's of arts from George Mason University.
Q. After serving as a linguist what was your next position at the DEA?
A. I entered the DEA academy in Quantico, Virginia in 1998.
Q. What title did you hold after you completed the academy?
A. Special agent.
Q. Can you describe generally for the jury the type of training that you received at the DEA academy.
A. Yes, basic investigative techniques training, report writing, firearms, confidential source handling, physical fitness, legal training.
Q. Have you also participated in complex conspiracy training?
A. Yes.
Q. Approximately when did you attend that training?
A. 2001.
Q. Is that also provided by the DEA?
A. Yes, it is.

Q. What did that training consist of?
A. That training focused more on instruction how to expand our investigations from a local, regional level, to other locations within the U.S., and then internationally back to the countries where the narcotics were originating.
Q. When you finished the DEA academy, where were you stationed?
A. Imperial County, California.
Q. Where is imperial within California?
A. It's about two hours east of San Diego right on the U.S./Mexico border.
Q. For how long were you stationed in Imperial?
A. About six years.
Q. What were your general responsibilities there?
A. Our focus was on the transportation organizations operating on the Mexican border, on the Mexicali/Baha California Mexico side that were involved in transporting and shipping narcotics from Baha California, Mexico to Los Angeles, primarily through Imperial County.
Q. What was the primary narcotic that you investigated being shipped into the United States?
A. Cocaine.
Q. While you were stationed in Imperial, did you investigate any international drug trafficking organizations?
A. Yes. Being so close to the Mexican border there, our

investigations quickly took us into Mexico, back to the interior of Mexico, and then south back to Central America and then Colombia.

Q. If you were stationed on the Mexican/California border, why were you investigating organizations in Central and South America?

A. Because our goal as investigators is to try to trace back the narcotics, the chain of narcotics back to our source to go after the highest level traffickers in the quote, unquote, food chain there.

Q. As a special agent in Imperial, approximately how many investigations were you involved in?

A. Hundreds.

Q. What are some of the investigative techniques that you used while you were working on those investigations?

A. We dealt a lot with confidential sources, information obtained from cooperating defendants. We made a lot of seizures there on the border, so information that came from those seizures, whether it be documents or electronic devices, we frequently use wiretaps, we coordinated with our office, we had an office in Tijuana, Baha California, Mexico, so we frequently worked joint cases with that office there.

Q. As part of that coordination with the DEA office in Mexico, did you also receive information from Mexican law enforcement?

A. Yes.

Q. Were you briefed by Mexican law enforcement on their investigations?
A. Yes.
Q. Turning your attention to early 2005, did you leave your post in Imperial, California?
A. Yes.
Q. Where were you next stationed?
A. The Caracas country office in Caracas, Venezuela.
Q. I put in front of you a folder marked for identification as Government Exhibit 1.
MS. HOULE: Ms. Hurst, if you could pull up that exhibit for the Court and the parties as well, please.
Q. Special Agent, what is shown in Government Exhibit 1?
A. That is a map of the northern part of South America, Central America, Mexico, the Caribbean, and then the southern part of the United States.
Q. Does this map fairly and accurately show the geographic regions you just described?
A. Yes.
MS. HOULE: Your Honor, the government moves to admit Government Exhibit 1.
MR. TEIN: No objection.
THE COURT: Received.
(Government's Exhibit 1 received in evidence)
MS. HOULE: Ms. Hurst, if you could publish for the

jury.
Q. Special Agent, you said you were stationed in Caracas, Venezuela. Could you indicate for the jury where that is located on this map?
Looks like you have drawn a circle over the right-hand side of the screen just about the word Venezuela in the city of Caracas.
A. Yes.
Q. What were your responsibilities while you were stationed in Caracas?
A. We worked out of the U.S. embassy in Caracas. A big responsibility was to coordinate and liaison with the Venezuelan law enforcement counterparts.
Q. What are some of the investigative techniques that you used while you were working there?
A. We had a number of confidential sources operating within Venezuela. We worked, like I said, closely with the Venezuelan counterparts. We also coordinated investigations with our DEA offices in Bogota, Colombia and Cartagena, Colombia.
Q. If you were stationed in Venezuela, why were you coordinating with Colombian law enforcement?
A. During my tour of Venezuela it became clear that the drug traffickers that were calling the shots in Venezuela were Colombians, and Venezuela served as a transshipment point for the Colombian traffickers to send their narcotics shipments

out. Rather than sending them from Colombia they would send them through Venezuela and out from Venezuela.
Q. Through that coordination did you learning about cocaine production abilities in Colombia?
A. Yes.
Q. Did you also investigate the routes and methods used to transport cocaine throughout that region?
A. Yes.
Q. What was the primary type of narcotic that was involved in your investigations in Venezuela?
A. Cocaine.
MS. HOULE: Thank you, Ms. Hurst, you can take that down.
Q. You testified that you first began working in Venezuela in 2005. Turning your attention to 2008, did you move to a new station?
A. Yes.
Q. Where were you next stationed?
A. Baltimore, Maryland.
Q. What were your responsibilities in Baltimore?
A. Baltimore was the target, drug traffickers, drug traffic activities within the Baltimore/Washington metropolitan area.
Q. For how long were you stationed there?
A. One year.
Q. Where did you go next?

A. I went to the Washington division office, Annandale HIDTA office in Annandale, Virginia.
Q. What does HIDTA stand for?
A. High Intensity Drug Trafficking Area.
Q. For how long were you stationed at that office?
A. About five years.
Q. While you were stationed in Baltimore and Annandale, did you stay apprised of information related to international drug trafficking?
A. Yes.
Q. How so?
A. I still had contact with confidential sources that were operating down in Venezuela and that region there. I also kept in close contact with co-workers, former co-corkers of mine at the Caracas country office, and also working in Colombia. I read briefings and other intelligence reports that were circulated within DEA regarding seizures and other intelligence gained through investigations.
Q. Turning your attention to March 2014, did you join a different component of the DEA at that time?
A. Yes.
Q. Which one?
A. The special operations division, bilateral investigation unit.
Q. What is the special operations division?

A. It's essentially a conglomerate of various law enforcement agencies, DEA, FBI, HSI, ATF all come together and work out of one office to coordinate and investigate activity.
Q. You mentioned the bilateral investigations unit, what is that?
A. That's a specialized unit that focuses on drug traffickers operating abroad.
Q. Were you in any particular unit within the bilateral investigations unit?
A. Yes, I was in the Latin America unit.
Q. Did you focus on any countries in particular within Latin America?
A. Yes.
Q. Which ones?
A. Colombia, Venezuela, Honduras, Guatemala and Mexico.
Q. Did these investigations focus on any particular type of narcotic?
A. Cocaine.
Q. What are some of investigative techniques you used during those investigations?
A. Once again confidential sources were key. We had sources operating throughout Latin America in those countries I mentioned. We coordinated frequently with our office in Bogota and Cartagena. We also coordinated with other DEA offices in Latin America. Seizure information that would come across,

communications devices seized in connection with these narcotic seizures, financial investigations.
Q. You mentioned coordination with offices in Bogota and Cartagena. Where are those cities located?
A. In Colombia.
Q. And through that coordination, did you attend any presentations from Colombian law enforcement?
A. Yes.
Q. What types of information was presented at those presentations?
A. They would provide intelligence briefings regarding information they obtained through their wiretaps in Colombia, their sources within Colombia, as well as seizures they made within Colombia.
Q. And was Colombia the primary foreign counterpart that you coordinated with?
A. Yes.
Q. While you were working at the bilateral investigations unit, did you also work in coordination with an organization called PANEX?
A. Yes.
Q. What is PANEX?
A. PANEX is a joint law enforcement group consisting of DEA agents and other agencies that is focused on maritime narcotics shipments, vessels carrying narcotics.

Q. And does PANEX focus its operations in any particular region of the world?
A. Yes.
Q. Which one?
A. They focus on both on the Pacific side as well as the Caribbean gulf of Mexico, that area.
Q. When did you leave the bilateral investigations unit?
A. I left in the summer of 2015.
Q. What was your next assignment?
A. Group supervisor at the Annandale office where I'm currently assigned.
Q. Do you keep apprised of information related to international drug trafficking in your current assignment?
A. Yes.
Q. How so?
A. I maintain contact with former co-workers that are working at the bilateral investigation unit. I also keep abreast of intelligence reports and briefings that come across my desk from other offices, seizure reporting, both abroad and domestically, exploitation of communication devices, wiretap info.
Q. Using all of the investigatory methods that you described this afternoon, have you learned about the routes used to transport cocaine to the United States from South and Central America?

A. Yes.
Q. And have you used those same methods to learn about the methods used by drug traffickers to manufacture the cocaine that's transported along those routes?
A. Yes.
Q. In testifying today, will you be relying on a syntheses of all the different types of information that you described so far in your testimony?
A. Yes.
Q. Have you testified previously as an expert in a federal trial?
A. Yes.
Q. What generally was the subject matter of that testimony?
A. It was regarding the transportation of cocaine from South America through Central America to Mexico and the United States.
MS. HOULE: Your Honor, at this time the government moves to qualify Special Agent Mervis as an expert in drug trafficking routes and counter narcotics methods.
THE COURT: Any objection?
MR. TEIN: No, your Honor.
THE COURT: All right. So qualified.
BY MS. HOULE:
Q. Special Agent, what country is the greatest producer of cocaine?

A. Colombia.
Q. What country consumes the most cocaine in the world?
A. United States.
Q. Roughly what percentage of the cocaine that is consumed in the United States is produced in Colombia?
A. Upwards of 90 percent.
Q. In what types of facilities is cocaine produced within Colombia?
A. Laboratories.
Q. Where are these laboratories typically located?
A. In the remote jungle or mountainous areas of Colombia.
Q. In what types of facilities are these labs located?
A. These are makeshift clandestine buildings that have the materials used to process cocaine.
Q. Generally speaking, what is that process through which cocaine is produced in these labs?
A. It starts with the coca leaf. The coca leaf is soaked in gasoline and other chemicals to extract the coca base from it. Once you have the coca base, various chemicals are added to it to include ammonia, and you have cocaine base, the cocaine base is poured through a cloth to remove the impurities, hydrochloric acid and acetone are added to that substance. A heating process, typically used or done with microwaves, and a pressing process to remove some of the solvents there. And this pressing process also forms the rectangular brick-shaped

kilogram.
Q. And that press that you just described, can it be used for any other purpose than removing the solvents?
A. Yes, it could be used to imprint an insignia or symbol on the kilogram.
Q. What is the unit of cocaine that results from that process?
A. A kilogram.
Q. Approximately how much does a kilogram of cocaine weigh?
A. 2.2 pounds.
Q. Approximately how many individual doses of cocaine are contained in one kilogram?
A. Approximately 8,000.
Q. You testified that 90 percent of the cocaine consumed in the United States is produced in Colombia. Is that cocaine typically sent directly from Colombia to the United States?
A. No.
MS. HOULE: Ms. Hurst, if you could publish again Government Exhibit 1, please.
Q. Special Agent, using the map on the screen, could you please explain to the jury the primary route that is used to transport cocaine from Colombia to the United States identifying the countries along the way.
A. Okay. We'll start here with Colombia. The cocaine is shipped over across the border to Venezuela. And then from Venezuela the cocaine goes -- the primary route being the

Central American route is what we call it. So cocaine is brought over to Venezuela and shipped via air up to the eastern side of Honduras. In Honduras it is moved west across the Honduran/Guatemala border and then through Guatemala, and then its crossed into Mexico and moved north through Mexico to the U.S./Mexico border where it is eventually moved into the U.S. at various locations along the U.S./Mexico border.

Q. When, approximately, did the Central American route that you just described emerge as the primary route to ship cocaine from Colombia to the United States?

A. Early 2000s.

Q. What are some of the circumstances that led to the emergence of the Central American route?

A. What happened was the U.S. justice system, law enforcement agents began targeting the Colombian traffickers. When I say "targeting," they were extraditing the Colombian traffickers to the U.S. So the Colombian traffickers thought of a way to sort of create a layer in between themselves and the U.S. So rather than shipping the cocaine directly to the U.S., they would sell their cocaine to Honduran traffickers, Guatemalan traffickers, Mexican traffickers, to create almost a plausible deniability, and to potentially, and in their hopes, I guess, in their eyes, to avoid prosecution in the U.S. Although along the way, all these traffickers, all these people working together knew that the ultimate destination was the United States.

Q. Were there any other circumstances that led to the emergency of the Central American route?

A. Yes. The narcotic traffickers in Central America and Mexico became much more sophisticated and organized, and therefore began forming these partnerships with the Colombian traffickers. Additionally, with the emergence of NAFTA, which is the North American Free Trade Agreement, the Mexican traffickers started to take advantage of the open boarders that came about when NAFTA was created.

Q. I'm showing you what has been marked for identification as Government Exhibit 2.

MS. HOULE: And Ms. Hurst, if you could put that on the screen for the Court and the parties.

Q. Special Agent, could you please look at the document in front of you, Government Exhibit 2. What is shown there?

A. That is a map of Central America and the southern part of Mexico.

Q. Does the map fairly and accurately show the geographic area you just described?

A. It does.

MS. HOULE: The government moves to admit Government Exhibit 2.

MR. TEIN: No objection.

THE COURT: Received.

(Government's Exhibit 2 received in evidence)

MS. HOULE: Ms. Hurst, please publish that exhibit on the screen for the jurors.

Q. Special Agent, you described the route, the Central American route as moving from the Colombian/Venezuela area into Honduras. Can you focus the jury on where Honduras is located on this map?

A. (Indicating)

Q. When cocaine is brought into Honduras from Colombia, on which side of Honduras does it typically arrive?

A. The eastern side.

Q. After arriving on the eastern side, in which direction is the cocaine typically transported?

A. West.

Q. You mentioned earlier that there are air shipments of cocaine. Are there any other ways that cocaine is transported into Honduras from Colombia?

A. Yes.

Q. How so?

A. Maritime shipments.

Q. And what do you mean by a maritime shipment?

A. Maritime shipment is via sea. It could be via fishing vessel, for instance, or go-fast vessel.

(Continued on next page)

BY MS. HOULE:
Q. What's a go-fast vessel?
A. A go-fast vessel is basically a speedboat that has -- high powered speedboat with extra gas tanks that allow it to make the journey from South America to Honduras.
Q. In terms of the air shipments that you described, how are those transported?
A. They're transported via smaller private aircraft. There are no passengers onboard these planes. It's essentially the pilots and the narcotics shipment.
Q. Are you familiar with the concept of aircraft registration numbers?
A. Yes.
Q. What does a registration number signify?
A. It's an identification number for that ship or plane.
Q. If a registration number starts with the letter N what does that indicate?
A. It indicates it's registered in the U.S.
Q. When a cocaine shipment is being sent by aircraft to Honduras from where does it typically depart?
A. Apure region of Venezuela.
Q. From what types of airfields do these cocaine shipments typically depart?
A. These are clandestine runway strips that are in a remote area of Apure Venezuela. They are essentially created by

bulldozers and other equipment. These aren't commercial airports that these shipments are leaving from.
Q. Why is the cocaine flown from Venezuela instead of directly from Colombia into Honduras?
A. In Colombia there exists a strong partnership between DEA and the Colombian counterparts. There's a lot of sharing of information. There's a DEA and other U.S. law enforcement specific presence in Colombia which is not the case in Venezuela.
Q. After the cocaine lands in Honduras to which country does it typically go next?
A. Guatemala.
Q. From there which country does it typically go next to?
A. Mexico.
MS. HOULE: Ms. Hurst, you can take that exhibit down. Thank you.
Q. Who typically is responsible for the cocaine once it reaches Mexico?
A. Mexican cartel.
Q. In the time period of approximately 2004 through 2016 what was the largest cartel in Mexico?
A. The Sinaloa cartel.
Q. During that time period who was one of the primary leaders of the Sinaloa cartel?
A. Joaquín Guzmán Loera a/k/a Chapo Guzmán.

Q. During that time period between 2004 and 2016 was Chapo Guzmán arrested at any point by Mexican authorities?
A. Yes.
Q. Approximately when was that?
A. February 2014.
Q. I'm showing you what's been marked for identification as Government Exhibit 110.

MS. HOULE: And Ms. Hurst, if you could please pull that up for the Court and the parties.

Q. Special agent, who is shown in Government Exhibit 110?
A. Joaquín Guzmán Loera.
Q. Based on your research is this a fair and accurate depiction of Mr. Loera?
A. Yes.

MS. HOULE: Government offers Government Exhibit 110.

MR. TEIN: No objection.

THE COURT: Received.

(Government's Exhibit 110 received in evidence)

MS. HOULE: Ms. Hurst, if you could please publish that to the jury.

Q. What do the Mexican cartels do with the cocaine once it arrives from Guatemala?
A. They move it north to the U.S./Mexico border and then into the U.S.
Q. Approximately what percentage of the cocaine transported

along this Central American route is destined for the United States?

A. I'd say upwards of 90 percent.

MS. HOULE: Thank you, Ms. Hurst. You can take that down.

Q. You've testified about the different countries through which cocaine is transported from Colombia to the United States. Why isn't the cocaine sold in the countries through which it is transported along that route?

A. These countries have smaller populations. They don't have the population to support the quantities of cocaine.

Also, it comes down to money. It's more profit to sell it in the U.S. than it is -- would be in those countries.

Q. What approximately is the population size in Honduras?

A. It's about 9 million.

Q. And what happens to the price of cocaine as it moves north to the United States along that Central American route that you described?

A. Incrementally increases.

Q. What approximately is the price of cocaine -- a kilogram of cocaine in Colombia?

A. 2,500 to $3,000.

Q. Generally at what interval does the price increase as it moves from Colombia to Honduras?

A. Five to six thousand dollars per kilogram.

Q. Approximately how much does a kilogram cost in Mexico near the border with Guatemala?
A. Twelve to $16,000 per kilogram.
Q. Approximately how much does a kilogram of cocaine cost here in the United States?
A. Thirty to $35,000 per kilogram.
Q. What about here in New York? What's the price of a kilogram of cocaine?
A. Around $30,000.
Q. Before we finish today I have just a few quick questions about the tools that the DEA has used to target traffickers in Central America. What is the Office of Foreign Asset Control?
A. That office operates under the Department of Treasury. It works closely with law enforcement agencies such as the DEA to target and identify assets linked to drug traffickers that are abroad. It seeks to deny these drug traffickers access to the assets and access to the U.S. financial institutions.
Q. And when OFAC has identified a particular of trafficker and seeks to block assets -- access to assets as you've just described, how is that typically announced?
A. It's made public through the media, both print media as well as TV. Also, there's also a OFAC website that is -- can be accessed that has a list of the people that are sanctioned.
Q. Why is that a useful law enforcement tool?
A. Because the traffickers need access to dollars, need access

to the U.S. financial institutions. A lot of times they're dealing with entities that work in dollars and they need this money to make purchases, to deal with these entities.

Q. Does the DEA have any ability to order Honduran banks to seize assets?

A. No.

Q. Can the DEA compel businesses in Honduras to provide evidence to the DEA?

A. No.

Q. Is the DEA authorized to conduct searches in Honduras?

A. No.

Q. Can the DEA conduct arrests in Honduras?

A. No.

Q. Is the DEA authorized to conduct arrests in any foreign country?

A. No.

Q. If a person located abroad is charged with crimes in the United States, what can the DEA do to try and locate that person?

A. Typically we would go through Interpol. We'd get a professional arrest warrant first and then coordinate with Interpol to try and locate and apprehend that individual in a particular country.

Q. What does Interpol stand for?

A. International Police Organization; basically coordinates

and fosters cooperation primarily with the location and apprehension of fugitives that are abroad.
Q. If a person is located abroad what can the DEA do to try and have that person arrested?
A. They can send down the provisional arrest warrant and coordinate with the Interpol representative for that particular country.
Q. Are you familiar with the term provisional arrest request?
A. Yes.
Q. What is that?
A. That's essentially an arrest warrant that's issued here in the United States that is sent through the embassy -- U.S. embassy for that particular country and coordinated through Interpol to attempt to locate and apprehend that individual.
Q. Who decides whether to grant the provisional arrest request submitted by the United States?
A. The particular country's judicial system and their government.
Q. If someone is arrested on U.S. charges in a foreign country, are they automatically sent to the United States for prosecution?
A. No.
Q. What is the general legal process that may follow once someone is arrested in a foreign country?
A. There is an extradition process that is unique to each

country so it depends on what country that person or that fugitive is apprehended.

Q. Does every country have an extradition agreement with the United States?

A. No.

MS. HOULE: No further questions, your Honor.

THE COURT: All right. Cross-examination.

MR. TEIN: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. TEIN:

Q. Good afternoon, Special Agent Mervis?

A. Good afternoon.

Q. In your last 40 minutes of testimony how many times did you mention the name Juan Antonino Hernandez Alvarado?

A. None.

Q. And in your entire career at the DEA how many days have you actually spent physically inside the Country of Honduras?

A. Three.

MR. TEIN: No further questions.

THE COURT: All right. Any redirect?

MS. HOULE: No. Thank you, your Honor.

THE COURT: All right. You may step down.

(Witness excused)

THE COURT: Call your next witness.

MS. HOULE: Thank you, your Honor. The government

calls -- one moment, your Honor.

The government calls Victor Hugo Diaz Morales.

(Reporter's Note: Through an interpreter.)

VICTOR HUGO DIAZ MORALES,

called as a witness by the Government, having been duly sworn, testified through the Spanish-language interpreter as follows:

THE COURT: You may inquire.

MS. HOULE: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. HOULE:

Q. Sir, where do you currently live?

A. At the MCC in New York.

Q. Is that a prison?

A. Yes.

Q. For approximately how long have you been in prison in the United States?

A. Approximately 17 months.

Q. Where were you arrested before you were brought to the United States?

A. In Guatemala City.

Q. Were you living in Guatemala at that time?

A. Yes.

Q. Have you lived in any other countries?

A. Yes.

Q. Which ones?
A. In Colombia, Honduras, and Guatemala.
Q. Have you entered into a cooperation agreement with the U.S. Government?
A. Yes.
Q. Under that agreement did you plead guilty to any crimes?
A. Yes.
Q. What types of crimes have you pled guilty to?
A. Trafficking cocaine and methamphetamine into the United States, carrying firearms, assault rifles and explosive devices in order to traffic cocaine into the United States, conspiring with others to use firearms, assault rifles and explosive devices in the trafficking of the cocaine into the United States and.

THE INTERPRETER: Interpreter's correction. In the trafficking of cocaine and methamphetamines into the United States.

Q. In connection with your guilty plea have you admitted to participating in any murders?
A. Yes.
Q. How many murders?
A. Approximately 18 murders.
Q. Have you also taken responsibility for injuring other people in connection with those attacks?
A. Yes.

Q. How many injured people?
A. Four people.
Q. Do you see anyone in the courtroom today with whom you trafficked cocaine?
THE COURT: You may stand up, sir.
THE WITNESS: Yes.
Q. Who is that?
A. Tony Hernandez.
Q. Could you please identify him based on where he's sitting and a piece of clothing that he's wearing?
A. He is seated over there with a blue suit.
THE COURT: Well where is he seated?
THE WITNESS: Ahead and to the left.
THE COURT: And is that in the back of the courtroom? Is it over here? Is it over there? Where in the courtroom is he seated? Please put it into words.
THE WITNESS: He is at the second table behind the prosecutors.
THE COURT: And where at the second table?
THE WITNESS: The middle of it.
THE COURT: All right. Identification noted.
Q. During what period of time approximately did you engage in cocaine trafficking with the defendant?
A. Approximately from 2004 to 2016.
Q. How, generally, did the defendant participate in cocaine

trafficking with you during that time period?
A. The defendant, Tony Hernandez, provided information about police checkpoints and investigations related to cocaine trafficking throughout Honduran territory.
Q. Did the defendant also supply you with cocaine for trafficking?
A. Yes.
Q. During the time period of approximately 2004 through 2016 approximately how many kilograms of cocaine did you distribute with assistance from the defendant?
A. Approximately 140,000 -- 140,000-kilos.
Q. What was the ultimate destination of that cocaine?
A. Into the United States.
Q. Have you seen the defendant with any type of firearm?
A. Yes.
Q. What types?
A. I have seen the defendant with pistols and assault rifles.
Q. I'm showing you what's been marked for identification as Government Exhibit 301.
MS. HOULE: Ms. Hurst, if you could pull that up please for the Court and the parties.
Q. Sir, if you could pick up the folder in front of you that's labeled 301.
What is shown in that photo?
A. A pistol.

Q. Does this photo fairly and accurately depict the type of pistol you saw the defendant carry?
A. Yes.
MS. HOULE: The government offers 301.
MR. MALONE: No objection.
THE COURT: Received.
(Government's Exhibit 301 received in evidence)
MS. HOULE: Ms. Hurst, if you could please publish that for the jury.
Q. Now, sir, if you could please turn to the folder in front of you that's labeled 303.
MS. HOULE: And Ms. Hurst, if you could pull 303 up for the Court and the parties.
Q. What is shown in the photo labeled Government Exhibit 303?
A. An assault rifle.
Q. Does this photo fairly and accurately depict the type of assault rifle you saw the defendant carry?
A. Yes.
MS. HOULE: The government moves to admit 303.
THE COURT: Any objection?
MR. MALONE: No objection, Judge.
THE COURT: Received.
(Government's Exhibit 303 received in evidence)
MS. HOULE: Ms. Hurst, if you could please publish that for the jury.

Thank you, Ms. Hurst. You can take that down.

Your Honor the jury just indicated that the photo did not publish to the jury's screen.

Ms. Hurst, if you could --

THE COURT: Let's just see. Sometimes the equipment is sluggish. If you see something, signal so we know. OK. There you go. Thank you.

MS. HOULE: Thank you, Ms. Hurst. You can take that down.

Q. Sir, do you go by any nicknames?
A. Yes.
Q. What name?
A. Rojo.
Q. Approximately when did you first become involved in cocaine trafficking?
A. In approximately 1999 to 2000.
Q. Turning your attention to approximately 2001, at that time did you work with any cocaine traffickers in particular?
A. Yes.
Q. Which cocaine traffickers?
A. I trafficked cocaine with Hector Emilio Fernandez Rosa, with Juancho Leone and Antonio Santos.
Q. I'm showing you what's been marked for identification as Government Exhibit 108.

MS. HOULE: And Ms. Hurst, if you could please pull

that up for the parties and the Court.
Q. Who is shown in that photo?
A. Hector Emilio Fernandez Rosa.
Q. Does this fairly and accurately depict Mr. Fernandez Rosa?
A. Yes.
MS. HOULE: The government offers 108, your Honor.
MR. MALONE: No objection, Judge.
THE COURT: Received.
(Government's Exhibit 108 received in evidence)
MS. HOULE: Ms. Hurst, could you please publish that for the jury.
Q. Who is Hector Emilio Fernandez Rosa?
A. He is a Honduran cocaine trafficker with whom I worked and we would transport cocaine into -- from Colombia into Honduras --
THE INTERPRETER: Interpreter's correction. Through Honduras and into the United States.
Q. Does Mr. Fernandez Rosa go by any other names?
A. Yes.
Q. What names?
A. Don H.
MS. HOULE: Thank you, Ms. Hurst. You can take that down.
Q. You also mentioned Antonio Santos. If you could please turn to the exhibit in front of you marked for identification

as 118.

MS. HOULE: And Ms. Hurst, if you could pull that up for the Court and the parties, please.

Q. Who is shown in that photo?

A. Antonio Santos.

Q. Does this photo fairly and accurately depict Antonio Santos?

A. Yes.

MS. HOULE: The government offers Exhibit 118.

MR. MALONE: No objection, Judge.

THE COURT: Received.

(Government's Exhibit 118 received in evidence)

MS. HOULE: Ms. Hurst, if you could please publish that for the jury.

Q. Who is Antonio Santos?

A. He is a Honduran cocaine trafficker with whom I worked and we would traffic cocaine that came from Colombia through Honduras and into the United States.

MS. HOULE: Thank you, Ms. Hurst. You can take that down.

Q. Sir, you also mentioned a trafficker named Juancho Leon. Who is that?

A. He is a powerful and well known cocaine trafficker from Guatemala who would traffic cocaine from Colombia into Honduras, Guatemala, Mexico, and into the United States.

Q. In approximately 2001 when you were trafficking cocaine with these individuals, what was your primary role in cocaine trafficking?
A. During that time I was Hector Emilio Fernandez Rosa's bodyguard and driver.
Q. As you continued to work with Hector Emilio did your role expand?
A. Yes.
Q. How so?
A. I acquired greater responsibilities and I was handling the coordination of the trafficking of cocaine through Honduras to Guatemala with the final or ultimate destination into the United States.
Q. Approximately when did you first meet the defendant?
A. I meet the defendant, Tony Hernandez, in approximately 2004.
Q. Who introduced you to the defendant?
A. Carlos Toledo.
Q. I'm showing you what's been marked for identification as Government Exhibit 119?
MS. HOULE: And Ms. Hurst if you could please pull that up for the Court and the parties.
Q. Who is shown in that photo?
A. Carlos Toledo.
Q. Does this photo fairly and accurately depict Carlos Toledo?

A. Yes.

MS. HOULE: Government moves to admit Exhibit 119.

MR. MALONE: No objection, Judge.

THE COURT: Received.

(Government's Exhibit 119 received in evidence)

MS. HOULE: Ms. Hurst, could you please publish that for the jury and zoom in on the photo, please.

Q. In 2004 what was your relationship to Carlos Toledo?

A. Carlos Toledo and I trafficked cocaine through Honduran territory into Guatemala with an ultimate destination of the United States.

Q. Where did Carlos Toledo first introduce you to the defendant?

A. At Carlos Toledo's home in San Pedro Sula.

Q. What, if anything, did Toledo tell you about how Toledo came to know the defendant?

A. Carlos Toledo told me that he knew the defendant, Tony Hernandez, because they came from the same town, Gracias Lempira, and because they had attended college together at the Universidad Nacional, the National University, in Tegucigalpa, Honduras.

Q. Who were some of the other people who were present at this meeting in 2004 when you met the defendant?

A. The defendant, Tony Hernandez, Carlos Toledo, Oscar Martinez, Mario Jose Calix and I were present.

Q. What was your relationship to Oscar Martinez at that time?
A. Oscar Martinez was trafficking cocaine through Honduran territory, cocaine that came from Colombia with an ultimate destination of the United States.
Q. You also mentioned an individual Mario Jose Calix. I'm showing you what's been marked for identification as Government Exhibit 105.
MS. HOULE: And Ms. Hurst, if you could please pull that up for the Court and the parties.
Q. Who is shown in that photo?
A. Mario Jose Calix.
Q. Does the photo fairly and accurately depict Mario Jose Calix?
A. Yes.
MS. HOULE: Government offers 105.
MR. MALONE: No objection, Judge.
THE COURT: Received.
(Government's Exhibit 105 received in evidence)
MS. HOULE: Ms. Hurst, could you please publish that for the jury.
Q. Does Mario Jose Calix have any involvement in cocaine trafficking?
A. Yes.
Q. How so?
A. Mario Jose Calix traffics cocaine that comes from Colombia

through Guatemala, with an ultimate destination into the United States, and he does this with me and the defendant, Tony Hernandez.
Q. During this meeting in 2004 was anyone armed?
A. Yes.
Q. Who was armed?
A. The defendant, Tony Hernandez, was armed. Carlos Toledo was armed. Oscar Martinez was armed. Mario Jose Calix was armed. And I was armed.
Q. What type of gun were you carrying?
A. A pistol.
Q. Why were you armed?
A. Anytime that I attended a cocaine trafficking meeting I was always armed to protect my safety because cocaine trafficking meetings are dangerous.
Q. What type of gun was the defendant carrying?
A. A pistol.
MS. HOULE: Ms. Hurst, you can take down that photo. Thank you.
Q. Was cocaine trafficking discussed at this meeting?
A. The defendant, Tony Hernandez, said that he could provide us with information regarding checkpoints and investigations of cocaine trafficking throughout Honduran territory, information that would be useful to us in preventing the seizure of the cocaine and the arrest of the people involved in the

trafficking of the cocaine throughout Honduran territory into Guatemala.

Q. What, if anything, did you say to the defendant during this meeting about the route you were using to transport cocaine at that time?

A. I told the defendant, Tony Hernandez, that I was trafficking cocaine from the north region of Honduras which was received on the Atlantic Coast going to the western region of Honduras towards the Guatemalan border.

Q. What, if anything, did you say at this meeting about the ultimate destination of that cocaine?

A. I told the defendant, Tony Hernandez, that that cocaine was transported to Guatemala, then to Mexico, with an ultimate destination into the United States.

Q. What, if anything, did you say about the size of the cocaine shipments you were trafficking?

A. I told the defendant, Tony Hernandez, that we were trafficking cocaine in amounts of five hundred to one thousand kilos of cocaine.

Q. You said that the defendant offered to provide information about checkpoints. What is a checkpoint?

A. A checkpoint is a controlled station by the Honduran national police or the Honduran army where searches of vehicles and persons that travel Honduran roads are taken -- are conducted.

Q. Why were you interested in information about checkpoints?
A. For me the information about the checkpoints was important so that I could avoid the seizure of cocaine shipments and the arrest of persons.
Q. You said that the defendant also offered to provide information about narcotics investigations. Why were you interested in that information?
A. To me the information that the defendant, Tony Hernandez, could provide regarding narcotics investigations or narcotics trafficking investigation was important in order to avoid the searches of property or home searches and then prevent having cash money or assault rifles there.
Q. Did the defendant request anything in exchange for that assistance?
A. Can you please repeat the question.
Q. Did the defendant request anything in exchange for his assistance?
A. The defendant, Tony Hernandez, requested five thousand U.S. dollars in order to provide information and to help with cocaine trafficking.
Q. Following this meeting in 2004 did you begin to make those five-thousand-dollar payments to the defendant?
A. Yes.
Q. Did you provide payment each time you had a cocaine shipment?

A. Yes.
Q. During approximately what period of time did you make those five-thousand-dollar payments to the defendant?
A. From approximately 2004 until 2010.
Q. How did you earn the money that you used to pay the defendant?
A. I made the money that I used to pay the defendant, Tony Hernandez, in cocaine trafficking. It was from my profits from cocaine trafficking.
Q. Did you hand those payments directly to the defendant?
A. No.
Q. Who coordinated those payments?
A. Carlos Mauricio Toledo would get those payments to him.
Q. Between 2004 and approximately 2010 did you speak with the defendant about those payments?
A. Yes.
Q. Did the defendant confirm that he received them?
A. Yes.
Q. Following this meeting in 2004, did you continue to have meetings with the defendant?
A. Yes.
Q. How often?
A. Approximately three to four times a year.
Q. During what years?
A. Between 2004 and 2010.

Q. What was the purpose of these meetings?
A. The purpose of those meetings with the defendant, Tony Hernandez, was to confirm that the payments had been made and also to provide him with information about my cocaine shipments and also for Tony Hernandez, the defendant, to give me police information so that I could avoid seizures of cocaine that was being transported through Honduran territory.
Q. And when you say that one of the purposes was to confirm the payments, are you referring to those five-thousand-dollar payments you just described?
A. Yes.
Q. Who are some of the other people who typically attended these meetings with the defendant?
A. Usually the people who would attend these meetings with the defendant, Tony Hernandez, included Carlos Toledo, Oscar Martinez, Juan Carlos Valenzuela, Mario Jose Calix, Juan Carlos Valenzuela's bodyguard and me.
Q. How regularly did Calix attend these meetings with the defendant?
A. Mario Jose Calix would attend them most of the time.
Q. You mentioned someone named Juan Carlos Valenzuela. I'm showing you what's been marked for identification as Government Exhibit 120?

MS. HOULE: And Ms. Hurst, if you could please pull that up.

Q. Who is shown in the photo at Government Exhibit 120?
A. Juan Carlos Valenzuela.
Q. Does the photo fairly and accurately depict Juan Carlos Valenzuela?
A. Yes.

MS. HOULE: The government offers 120, your Honor.

MR. MALONE: No objection, Judge.

THE COURT: Received.

(Government's Exhibit 120 received in evidence)

MS. HOULE: Ms. Hurst could you please publish that for the jury.

Q. Who is Juan Carlos Valenzuela?
A. Juan Carlos Valenzuela is a Honduran cocaine trafficker who is currently a member of the National Congress of Honduras and of the National Party.

THE INTERPRETER: Interpreter's correction. And is a member of the National Party.

MS. HOULE: Thank you, Ms. Hurst. You can take that down.

BY MS. HOULE:
Q. Were you typically armed at these meetings with the defendant?
A. Yes.
Q. What type of gun would you typically carry?
A. A pistol.

Q. Did you ever observe the defendant armed at these meetings?
A. Yes.
Q. What did you see?
A. The defendant, Tony Hernandez, would be armed with pistols and at times assault rifles.
Q. Did the defendant ever bring security to these meetings?
A. Yes.
Q. Was that security armed?

MR. MALONE: Could we have a timeframe, Judge.

THE COURT: Yes.

Q. During what period of time did these meetings with the defendant take place?
A. Approximately 2004 to 2010.
Q. And during that timeframe approximately how many times did you see the defendant bring security to these meetings?
A. More than three times approximately.
Q. And each time that you observed that security, were they armed?
A. Yes.
Q. What did you see them carrying?
A. The defendant Tony Hernandez's security would carry pistols and assault rifles.
Q. Are you familiar with an individual with the last name Portillo P-O-R-T-I-L-L-O?
A. Yes.

Q. Who is that?
A. Portillo is the bodyguard for the defendant's brother, Juan Orlando Hernandez, who is the current president of Honduras and sometimes he would also come along with the defendant, Tony Hernandez, also as a bodyguard.
Q. And when you say that he would come along with Tony Hernandez, are you referring to Portillo?
A. Yes.
Q. During what years approximately did you see Portillo accompany the defendant to these meetings?
A. From approximately 2004 until 2010.
Q. Turning your attention to approximately 2005, did you participate in a meeting at the ranch of Antonio Santos?
A. Yes.
Q. Who are some of the other people who were present for this meeting?
A. At that meeting at Antonio Santos' ranch with the defendant, Tony Hernandez, were Carlos Toledo, Antonio Santos, Juan Carlos Valenzuela, Juan Carlos Valenzuela's bodyguard, Oscar Martinez and me.

MS. HOULE: One moment, your Honor.

(Counsel confer)

MS. HOULE: Your Honor, could I ask the interpreter to please repeat her answer.

THE INTERPRETER: May the interpreter ask the

defendant to repeat the answer as well?

MS. HOULE: That's fine.

THE WITNESS: Please repeat the question.

Q. Who were some of the people who were present at this meeting?

A. At that meeting at Antonio Santos' ranch, the defendant, Tony Hernandez, Carlos Toledo, Juan Carlos Valenzuela, Oscar Martinez, Juan Carlos Valenzuela's bodyguard and I were present.

Q. And you said this meeting was held at the ranch of Antonio Santos. Did he participate in any of the meeting?

A. Yes.

Q. Was cocaine trafficking discussed during this meeting?

A. Yes.

Q. During this meeting did the topic of the Sinaloa cartel come up?

A. It was discussed at that meeting that that cocaine was being trafficked from Colombia through Honduran territory and then delivered in Guatemala to Juancho Leon, who handed it over to Mexicans from the Sinaloa cartel with an ultimate destination of the United States.

Q. During this meeting did the defendant make any request of you?

A. Tony Hernandez, the defendant, requested the amount of $40,000 from me.

Q. What did the defendant say about what this $40,000 was for?
A. The defendant, Tony Hernandez, said that he needed that $40,000 payment for the election campaign of his brother, Juan Orlando Hernandez, to the -- to be a congressman in the -- the Congress of the Republic.
Q. What, if anything, did the defendant say about why you should make that $40,000 payment to Juan Orlando's campaign?
A. The defendant, Tony Hernandez, said that by paying that $40,000 that would -- there would then be greater.
THE INTERPRETER: Interpreter's correction. There would be more important connections and greater access to information for trafficking cocaine through Honduran territory.
Q. Did you make the 40,000-dollar payment?
A. Yes.
Q. Directing your attention to 2006. Did you participate in any meetings where an individual named Cinco was discussed?
A. Yes.
Q. Where was that meeting held?
A. That meeting was held at Carlos Toledo's house in San Pedro Sula.
Q. Who are some of the people who were present for that meeting?
A. At that meeting the defendant, Tony Hernandez, Carlos Toledo, Oscar Martinez, Mario Jose Calix, Juan Carlos Valenzuela and I were present.

BY MS. HOULE:

Q. What, if anything, did the defendant say during this meeting about who Cinco was?

A. The defendant, Tony Hernandez, said that Cinco was a Colombian cocaine trafficker who had laboratories, and with whom the defendant, Tony Hernandez --

THE INTERPRETER: Interpreter's correction: With whom the defendant, Tony Hernandez, and Cinco had laboratories in Colombia for producing cocaine.

Q. During this conversation with the defendant regarding Cinco, did the topic of cocaine stamps come up?

A. Yes.

Q. What, if anything, did the defendant say about cocaine stamps?

A. The defendant, Tony Hernandez, said that the cocaine that he was having produced in the lab in Colombia with Cinco, which belonged to the defendant, Tony Hernandez and to Cinco, was being marked with the initials TH for Tony Hernandez, which looked similar to the Tommy Hilfiger brand logo.

Q. I'm showing you what has been marked for identification as Government Exhibit 306.

MS. HOULE: And Ms. Hurst, if you could please pull that up for the Court and the parties.

Q. Sir, have you seen the Tommy Hilfiger logo before?

A. Yes.

Q. What is shown in Government Exhibit 306?
A. A Tommy Hilfiger brand logo.
Q. Does this fairly and accurately depict the logo that you have seen before for Tommy Hilfiger?
A. Yes.
MS. HOULE: The government offers 306.
MR. MALONE: No objection, Judge.
THE COURT: Received.
(Government's Exhibit 306 received in evidence)
MS. HOULE: Ms. Hurst, please publish that for the jury.
BY MS. HOULE:
Q. Sir, have you ever seen a kilogram of cocaine stamped with a TH stamp?
A. Yes.
Q. I put a folder in front of you marked for identification as Government Exhibit 305. Could you turn to that folder, please.
MS. HOULE: Ms. Hurst, please pull it up for the Court and attorneys.
Q. What is shown in that photo?
A. A kilogram of cocaine with the initials TH, the initials of the defendant, Tony Hernandez.
Q. Does this photo fairly and accurately depict the TH stamped kilo that you saw?
A. Yes.

MS. HOULE: The government offers Government Exhibit 305.

THE COURT: Any objection?

MR. MALONE: No, sir.

THE COURT: Received.

(Government's Exhibit 305 received in evidence)

MS. HOULE: Ms. Hurst, could you publish that for the jury and please zoom in on the photo.

Q. Approximately when did you see a kilogram of cocaine stamped with this TH stamp?

A. Approximately 2008.

Q. Where did you see the kilogram of cocaine stamped with the TH stamp?

A. At a transshipment point at a blind crossing where cocaine was crossed over from Honduras to Guatemala in a place in Santa Barbara called Tras Cerros.

Q. And that kilogram of cocaine that you were looking at in Tras Cerros, was that part of one of your cocaine shipments?

A. Yes.

Q. Who had sold you that cocaine?

A. That cocaine had been sold to me by the defendant, Tony Hernandez, by the Colombian drug trafficker Cinco and by Wilson Gongora, Pablo.

Q. For whom did Pablo work?

A. Pablo worked for Cinco, the Colombian drug trafficker, and

for the defendant, Tony Hernandez.

MS. HOULE: Your Honor, could I ask the witness please repeat his answer to who had sold the cocaine? I think there may be some discrepancy in the translation.

THE COURT: Did you understand the question, sir?

A. Could you please repeat it to me?

Q. Who sold you the cocaine that was part of that shipment that you inspected at Tras Cerros?

A. The defendant, Tony Hernandez, and the Colombian drug trafficker Cinco sold it to me.

THE COURT: All right. Ladies and gentlemen, we'll take our mid-afternoon break. Please do not discuss the case among yourselves with anyone. We'll be back in action in ten minutes. Thank you.

Silence in the courtroom while the jury is exiting.

Silence.

(Jury not present)

THE COURT: See you in ten minutes. The witness may step down.

(Recess taken)

(Jury present)

THE COURT: Please be seated.

I'm judging by the outerwear that some of you are wearing that the temperature in the jury box could be adjusted, and we'll see what we can do about that. You're not the first

jurors to have noticed that. And no, it is not a sinister plot to keep you all awake. I know you're paying close attention and the temperature is not the reason.

So anyway, Ms. Houle, you may continue when you are ready.

MS. HOULE: Thank you, your Honor.

BY MS. HOULE:

Q. Sir, when we left off before the break we were describing a shipment of cocaine that you inspected that contained a TH stamped kilogram. Is that correct?

A. Yes.

Q. How big, approximately, was that shipment of cocaine that you were inspecting at Tras Cerros?

A. Approximately 450 kilos.

Q. What was the ultimate destination of that cocaine?

A. The ultimate destination of that cocaine was into the United States.

Q. We'll turn back to that shipment shortly.

You testified that shipment had been sold to you by the defendant and an individual named Cinco. Did you later meet Cinco?

A. Yes.

Q. I'm showing you what's been marked for identification as Government Exhibit 311.

MS. HOULE: And Ms. Hurst, if you could please pull

that up for the Court and the parties.
Q. Do you recognize any of the individuals in that photo?
A. Yes.
Q. Who do you recognize?
MS. HOULE: The government offers Government Exhibit 311, your Honor.
THE COURT: Any objection?
MR. MALONE: No, sir.
THE COURT: Received.
(Government's Exhibit 311 received in evidence)
INTERPRETER: May the interpreter have the opportunity to render the utterance?
MS. HOULE: I apologize.
A. I recognize Arnulfo Valle, I recognize Colombian Cinco, I recognize Luis Valle and Jose Manuel, Che.
MS. HOULE: Could you please publish Government Exhibit 311 and zoom in on the photo.
Q. Now that we have the photo on the screen for the jurors, could you please indicate the men who you recognize, moving from the left side of the screen to the right.
A. Arnulfo Valle, the Colombian Cinco, Luis Valle, Jose Manuel, Che.
MS. HOULE: For the record, the witness has just drawn circles over the male faces moving from the left side of the page to the right.

THE COURT: All right.

Q. I'm showing you what has been marked for identification as Government Exhibit 114.

MS. HOULE: Ms. Hurst, if you could please pull that up for the Court and the parties.

Q. Who is shown in that photo?

A. Guatemalan drug trafficker Jose Manuel, Che.

Q. Does the photo fairly and accurately depict Jose Manuel a/k/a Che?

A. Yes.

MS. HOULE: The government offers 114.

MR. MALONE: Without objection.

THE COURT: All right. Received.

(Government's Exhibit 114 received in evidence)

MS. HOULE: Ms. Hurst, please publish that for the jury.

Q. Who is Che?

A. Che is a Guatemalan cocaine trafficker who would buy from the Valle Valles to transport the cocaine to Guatemala with an ultimate destination into the United States.

Q. Who are the Valle Valles?

A. The Valle Valles are two brothers, Luis Valle Valle and Arnulfo Valle Valle, who are the leaders of the cocaine trafficking cartel called the Valle Valles.

Q. I put a folder in front of you marked Government

Exhibit 121. Could you please look at that photo.

MS. HOULE: And Ms. Hurst, could you please publish that for the Court and the parties.

Who is shown in that photo?

A. Honduran drug trafficker Luis Valle Valle.

Q. Does the photo fairly and accurately depict Luis Valle Valle?

A. Yes.

MS. HOULE: The government offers 121.

MR. MALONE: Without objection.

THE COURT: Received.

(Government's Exhibit 121 received in evidence)

MS. HOULE: Ms. Hurst, please publish that for the jury.

Q. Sir, you said that the individual on the screen, Luis Valle Valle, worked in coordination with his brother, is that correct?

A. Yes.

Q. And is that Miguel Arnulfo Valle Valle who you mentioned earlier?

A. Yes.

Q. I put a folder in front of you marked for identification as Government Exhibit 122. Could you please look at the photo in that exhibit.

Who is shown in that photo?

A. Honduran cocaine trafficker Arnulfo Valle Valle.
Q. Does that fairly and accurately depict Arnulfo Valle Valle?
A. Yes.
MS. HOULE: The government offers 122.
MR. MALONE: Could I see it on the screen?
MS. HOULE: Please pull up 122 for the Court and the parties.
MR. MALONE: No objection.
THE COURT: Received.
(Government's Exhibit 122 received in evidence)
MS. HOULE: Ms. Hurst, please put up 121 and 122 at the same time for the jury on the screen.
Q. Sir, are these the Valle brothers who you indicated were the leaders of the Valle Valle cartel?
A. Yes.
MS. HOULE: Thank you, Ms. Hurst, you can take that down.
Q. Directing your attention to approximately 2007, did you participate in a meeting at the home of Juancho Leon?
A. Yes.
Q. Where was Juancho Leon's home located?
A. Juancho Leon's house was located in San Pedro Sula at a neighborhood called Rio de Piedras in Honduras.
Q. Who are some of the people who were present at Juancho Leon's home for that meeting?

A. The defendant, Tony Hernandez, was there at the meeting, Franklin Vasquez was there, Oscar Martinez was there, Carlos Toledo was there, Juan Carlos Valenzuela's bodyguard was there, Hernan Hernandez was there, and so was I.

Q. Who is Hernan Hernandez?

A. Hernan Hernandez is a cousin of defendant, Tony Hernandez, and also the cousin of defendant's brother, Juan Orlando Hernandez.

Q. Was anyone armed at this meeting?

A. Yes.

Q. Who was armed?

A. The defendant Tony Hernandez was armed, Carlos Toledo was armed, Oscar Martinez was armed, Juan Carlos Valenzuela's bodyguard was armed, Hernan Hernandez was armed, and I was armed.

Q. What type of gun did you see the defendant carrying?

A. The defendant, Tony Hernandez, was carrying a pistol.

Q. What type of firearm did you see Juan Carlos Valenzuela's bodyguard carrying?

A. Juan Carlos Valenzuela's bodyguard was a carrying a pistol and assault rifle.

Q. What, if anything, did the defendant say about why Valenzuela's bodyguard was present at the meeting if Valenzuela was not there himself?

A. The defendant, Tony Hernandez, said that Juan Carlos

Valenzuela had provided Juan Carlos Valenzuela's bodyguard to him for his security during the cocaine trafficking meeting, that is for defendant Tony Hernandez's security during the cocaine trafficking meeting, because it was a cocaine trafficking meeting and to protect his person.

Q. In 2007, at the time of this meeting, were you still making those $5,000 payments to the defendant in connection with each of your cocaine shipments?

A. Yes.

Q. What, if anything, did the defendant say during this meeting about those payments?

A. The defendant, Tony Hernandez, said that he was receiving the payments for the cocaine shipments, for each cocaine shipment that was being trafficked through Honduran territory, and that as long as he continued to receive such payments, that zero problems would be encountered, that there would be zero risk of seizure of the cocaine and zero risk of the arrest of persons. And for us to continue to provide him with information about the cocaine shipments, and that he would be on the lookout to provide us with information about operations of the national police.

Q. During this meeting with the defendant in 2007, did the topic of Honduran navy ships come up?

A. During that meeting with defendant Tony Hernandez, defendant Tony Hernandez said that he would provide, that he

would give us information about naval operations by the Honduran navy.
Q. Why were you interested in information about naval operations?
A. For me, the information that defendant Tony Hernandez was providing us regarding naval operations was important such that we could prevent seizure of cocaine shipments through Honduran territory, that is, the cocaine that was coming in from Colombia by maritime route into Honduras with an ultimate destination of the United States.
Q. Between 2007 and approximately 2010, did the defendant in fact provide that information about illegal operations?
A. Yes.
Q. Did you pay the defendant for that information?
A. Yes.
Q. How much did you pay?
A. $5,000.
Q. How often did you make those $5,000 payments?
A. Each time that the defendant provided me with information about the Honduran navy operations.
Q. Before we discuss any additional meetings in 2007, I would like to talk about the specifics of the trafficking routes that you were using at that time. You testified earlier about the general route that you used to ship cocaine through different countries. Can you please remind the jury of what those

countries are?

A. The cocaine that we were trafficking would come from Venezuela to Colombia, then to Honduras and through Honduras, then going on to Guatemala, through Mexico, with a final destination of the United States.

Q. Where was that cocaine first manufactured?

A. Can you please repeat the question?

Q. Where was that cocaine first manufactured?

A. That cocaine was manufactured in Colombia.

Q. I would like to focus more specifically on the routes that you used to transport cocaine within Honduras to the border with Guatemala. I put in front of you what has been marked for identification as Government Exhibit 500.

MS. HOULE: Ms. Hurst, if you could pull that up for the Court and the parties.

In connection with your testimony today, did you prepare a set of maps demonstrating your drug route, sir?

A. Yes.

Q. Do the pages of Government Exhibit 500 contain maps of Honduras with your drug routes drawn on top?

A. Yes.

Q. Does this exhibit contain a fair and accurate representation of the drug routes that you used within Honduras?

A. Yes.

Q. Would using this exhibit today assist in your testimony?
A. Yes.

MS. HOULE: Your Honor, the government moves to use this as a demonstrative with this witness's testimony and to publish it to the jury.

THE COURT: Any objection?

MR. MALONE: No objection.

THE COURT: All right. It may be used as a demonstrative.

MS. HOULE: Ms. Hurst, please publish page 1 of Government Exhibit 500.

THE COURT: Ladies and gentlemen, the map with the markings on it is not evidence itself of anything, it is being used to illustrate the testimony of the witness, and so the markings on the map are only as good as the testimony of the witness.

You may proceed.

MS. HOULE: Thank you, your Honor.

BY MS. HOULE:

Q. Sir, in approximately 2007, what were the ways that you were bringing cocaine into Honduras?
A. In approximately 2007, cocaine would arrive in Honduras by maritime and air routes.

(Continued on next page)

Q. And were those shipments coming into Honduras at your direction?
A. Yes.
Q. Let's start please with the maritime shipments. What types of boats were you using to transport cocaine into Honduras?
A. Fishing boats and go-fast boats were being used.
Q. At what locations did those boat shipments typically first arrive in Honduras.
A. Once the shipment was received in Brus Laguna, in the Moskitia region of Honduras, then it was transported by maritime route to Tela; and then from Tela it was then moved onto a false bottom truck -- interpreter correction -- onto false bottom trucks; and from there the cocaine was transported by ground to the Guatemalan and Honduran border.
Q. And the route that you just described, is that the route that's depicted at Government Exhibit 500, page 1, which is on the screen?
A. Yes.
MS. HOULE: Ms. Hurst, could you please publish page 2 of Government Exhibit 500.
Q. Sir, did you also receive maritime shipments at a location called Balfate.
A. Yes.
Q. What route did the cocaine take after it arrived in Balfate?

A. Once the cocaine got to Balfate, it was moved onto false bottom trucks in order for it to be transported by ground to the Guatemalan border with the west side of Honduras; and then it would go through Laceiba, going through the City of Tela; from there it would go on to San Pedro Sula, going through the Naco Cortes military base; and to then continue on if we were getting to Guatemala through the trasero side; otherwise, it would continue onto Honduras main drug trafficking route in El Paraiso Copan -- interpreter correction -- in La Entrada Copan, to then move on to either the border at El Paraiso Copan or at Florido Copan.
Q. And the orange line that's shown on the screen, does that depict the route that you just described?
A. Yes.
Q. Let's turn to the plane shipments that you described. Where in Honduras did the cocaine typically first land when you were using planes?
A. When using planes the cocaine would land in the region of Sico in Honduras or San Pedro Catacamas or in the region of Gualaco, Olancho.
Q. On what type of airstrips did the cocaine land?
A. The cocaine landed on clandestine airstrips.
Q. Were these airstrips located at airports?
A. No.
Q. Were they paved?

A. No.

MS. HOULE: Ms. Hurst, could you please publish page 3 of Government Exhibit 500.

Q. Sir, you indicated that one of the principal locations where the cocaine would first land in Honduras is Sico and it traveled through to the Guatemalan border. Is the route shown with the blue line on the scene the one that you used to transport from Sico to Guatemala?

A. Yes.

Q. You said that there were two other locations where you typically would receive plane shipments, El Paraiso, Gualaco and Catacamas.

MS. HOULE: Ms. Hurst, could you please publish page 4 of Government Exhibit 500.

Q. Sir, using the map on this page can you describe for the jury the route that the cocaine would take if it landed in Gualaco or Catacamas?

A. Once the cocaine landed on clandestine airstrips in Gualaco or Catacamas, it would then be transported to Juticalpa; to then continue on and go through the capital, Tegucigalpa, making its way on to the City of San Pedro Sula; to then continue on towards the west of Honduras by going through the Naco Cortes military base; then it could make its way into Guatemala through Tarseros; and also through Honduras' main cocaine trafficking route, La Entrada Copan; to then continue

on to the border at El Paraiso Copan; or it could also continue on, on the border by the Florido Copan area.

MS. HOULE: Ms. Hurst, could you please publish page 5 of Government Exhibit 500.

Q. Sir, does this page show the four routes that you've just described?

A. Yes.

Q. It appears that all of these routes have the option of crossing into Guatemala through the location you identified as El Paraiso; is that right?

A. Yes.

Q. Could you please circle El Paraiso on the map.

MS. HOULE: For the record, your Honor, the witness has just circled the area to the right of the words El Paraiso on the left side of the map.

THE COURT: All right.

Q. Who controlled this crossing at El Paraiso?

A. Alexander Ardon, Chande, had control over that crossing at El Paraiso.

Q. I'm showing you what's been marked for identification as Government Exhibit 101.

MS. HOULE: And Ms. Hurst, if you could please pull that up for the Court and the parties.

Q. Who is shown in that photo?

A. What was the exhibit number?

Q. 101. It's in an envelope in front of you.
A. Could you please repeat the question.
Q. Who is shown in the photo?
A. Alexander Ardon, Chande.
Q. Is that a fair and accurate depiction of Alexander Ardon?
A. Yes.
MS. HOULE: Government offers 101.
MR. MALONE: No objection.
THE COURT: Received.
(Government's Exhibit 101 received in evidence
MS. HOULE: May we publish, your Honor?
THE COURT: You may.
MS. HOULE: Ms. Hurst, could you please pull it up for the jury.
Q. Who is Alexander Ardon?
A. Alexander Ardon is a Honduran cocaine trafficker who was the mayor of the town of the city of El Paraiso Copan representing the National Party of Honduras.
Q. Do you know of any nicknames for Alexander Ardon?
A. Yes.
Q. What name?
A. Chande.
Q. What is the name of Alex Ardon's cocaine trafficking organization?
A. The name is Double A.

MS. HOULE: Ms. Hurst, could you please take down that photo.
Q. I'd like to turn back to the meetings that you attended with the defendant between 2004 and 2010. You said that the defendant provided information about naval operations.
A. Yes.
Q. And you testified that the defendant made that offer in approximately 2000 --
MR. MALONE: Objection. Leading.
THE COURT: Yes. Avoid the leading, please.
Q. During your meetings with the defendant in approximately 2007 did the Puerto Castilla naval base come up?
A. Yes.
MS. HOULE: Ms. Hurst, could you please publish page 5 of Government Exhibit 500.
Q. Sir, can you please circle on the screen where the Puerto Castilla naval base is located.
MS. HOULE: For the record, your Honor, the defendant has just put a circle around the dot marked next to Puerto Castilla in the upper right side of the map.
THE COURT: Thank you.
Q. Was this Puerto Castilla naval base important to your cocaine trafficking?
A. The Puerto Castilla naval base is the largest and most important naval base in the -- on the Atlantic Coast of

Honduras. And it's an unavoidable crossing point for the cocaine shipments coming in by sea. It's important to stay up to date on the naval operations which are being held at that -- at the Puerto Castilla naval base -- or interpreter's correction -- that are being undertaken by the Puerto Castilla naval base in Honduras Atlantic.

Q. During your meeting with the defendant in approximately 2007 what, if anything, did the defendant say about that Puerto Castilla naval base?

A. The defendant, Tony Hernandez, said that he would provide information when there were operations at the Puerto Castilla naval base, whenever there were going to be cocaine seizures, so that information was extremely important in places where there were going to be operations with Honduran frigate.

Q. What is a frigate?

A. It is a Honduran Navy ship which is used to carryout operations which -- to carryout cocaine seizure operations in the Honduran Atlantic.

Q. Between 2007 and approximately 2010 did the defendant provide information about operations at that naval base?

A. Yes.

Q. Did you pay the defendant for that information?

A. Yes.

Q. How much did you pay?

A. $5,000.

Q. How often did you make those payments to the defendant?
A. I would give those payments to the defendant, Tony Hernandez, whenever he gave me information about operations at the Puerto Castilla naval base.
Q. I'd like to direct your attention to another location on Government Exhibit 500. Can you please indicate for the jury where Naco is located.
MS. HOULE: Let the record reflect, your Honor, that the witness has drawn a circle around the area just up and to the left of the word Naco on the left side of the screen.
THE COURT: So noted.
Q. What is located in that area of Naco?
A. There is a Honduran army military base in that area of Naco.
Q. Is there a checkpoint located anywhere near that base?
A. Yes.
Q. Did you typically pay the officers staffed at that Naco checkpoint?
A. Yes.
Q. Why did you pay them?
A. I would pay them so they would keep me informed about whether or not I could bring my cocaine shipments through there on the way to western Honduras.
Q. Was there any significance to this particular location for your cocaine trafficking?

A. That place, the Naco Cortes base, is significant because there is no other way to cross through or avoid it. It's important to know about any operations or checkpoints there in order -- at the base in order to avoid cocaine seizure or avoid having any cocaine shipments stopped.

Q. And looking at --

THE INTERPRETER: May the interpreter confer with her colleague?

THE COURT: Yes.

THE INTERPRETER: Thank you, your Honor.

(Interpreters confer)

THE INTERPRETER: Interpreter's addition. It was important to have information in order to know whether to suspend the cocaine shipments in order to avoid the seizure of the cocaine.

Q. And looking at the routes reflected on page 5 of Government Exhibit 500, did each of the cocaine routes that you were using go through that Naco area?

A. Yes.

Q. Have you discussed that Naco checkpoint with the defendant?

A. Yes.

Q. Approximately when did that conversation occur?

A. In approximately 2007.

Q. What, if anything, did the defendant say regarding that checkpoint?

A. The defendant, Tony Hernandez, said that he would give me information whenever the authorities were going to be in the capital of Tegucigalpa -- when the authorities from the capital Tegucigalpa would be coming to the Naco Cortes naval base and to carryout occasional operations.

Q. Why were you interested in knowing when officials from Tegucigalpa would be stationed at the Naco base?

A. It was of interest to me for the defendant, Tony Hernandez, to give me information whenever there were going to be operations carried out by the police or the military from Tegucigalpa because I did not pay those police or members of the military or bribe them in order to -- in order to traffic cocaine on that route and that way I could avoid the risk of cocaine seizures or I could reschedule sending the cocaine through that Naco Cortes military base in the future.

Q. Following this conversation with the defendant, did he provide that information about the Naco Cortes base?

A. Yes.

Q. Did you pay the defendant for that information?

A. Yes.

Q. How much did you pay?

A. I paid ten thousand dollars to the defendant, Tony Hernandez.

Q. How frequently would you make those ten-thousand-dollar payments?

A. Each time that the defendant, Tony Hernandez, provided me with information about that base at Naco Cortes.

MS. HOULE: Your Honor it looks like we're about one minute to five. I was about to turn to another topic. Would you like me to do so?

THE COURT: It's really not my practice to break early. We broke early for lunch today. I have two minutes left on the clock. But I will break anyway.

So, ladies and gentlemen, as I said yesterday I feel like I've known you all forever. You were wonderful today in getting here on time. Let's do the same thing tomorrow.

And, remember, keep an open mind. Do not discuss the case among yourselves, for example, when you get to court in the morning. Do not discuss the case with anyone. Do not do your own research or reading on any topics covered in the trial. And I'll see you here, get here, please, by quarter to, ten to at the latest, so we can get another good start at ten o'clock. Thank you. Have a great evening.

(Jury exiting the courtroom)

THE COURT: Silence, please, while the jurors are exiting the courtroom.

(Adjourned to October 4, 2019 at 10:0 a.m.)

INDEX OF EXAMINATION


Examination of: Page

MIGUEL REYNOSO

Direct By Mr. Richman . . . . . . . . . . . . . .45

Cross By Mr. Tein . . . . . . . . . . . . . . . .60

Redirect By Mr. Richman . . . . . . . . . . . . 100

GREGG MERVIS

Direct By Ms. Houle . . . . . . . . . . . . . . 102

Cross By Mr. Tein . . . . . . . . . . . . . . . 126

VICTOR HUGO DIAZ MORALES

Direct By Ms. Houle . . . . . . . . . . . . . . 127


GOVERNMENT EXHIBITS


Exhibit No. Received

350 . . . . . . . . . . . . . . . . . . . . . .47

351 . . . . . . . . . . . . . . . . . . . . . .48

1005 . . . . . . . . . . . . . . . . . . . . .49

250A through 250K and 250T . . . . . . . . . . .51

352 . . . . . . . . . . . . . . . . . . . . . .52

353 . . . . . . . . . . . . . . . . . . . . . .54

354 . . . . . . . . . . . . . . . . . . . . . .55

355 . . . . . . . . . . . . . . . . . . . . . .56

365 . . . . . . . . . . . . . . . . . . . . . .58

1 . . . . . . . . . . . . . . . . . . . . . . 106

2 . . . . . . . . . . . . . . . . . . . . . . 117

110 . . . . . . . . . . . . . . . . . . . . . 121

301 . . . . . . . . . . . . . . . . . . . . 131
303 . . . . . . . . . . . . . . . . . . . . 131
108 . . . . . . . . . . . . . . . . . . . . 133
118 . . . . . . . . . . . . . . . . . . . . 134
119 . . . . . . . . . . . . . . . . . . . . 136
105 . . . . . . . . . . . . . . . . . . . . 137
120 . . . . . . . . . . . . . . . . . . . . 143
306 . . . . . . . . . . . . . . . . . . . . 149
305 . . . . . . . . . . . . . . . . . . . . 150
311 . . . . . . . . . . . . . . . . . . . . 153
114 . . . . . . . . . . . . . . . . . . . . 154
121 . . . . . . . . . . . . . . . . . . . . 155
122 . . . . . . . . . . . . . . . . . . . . 156
101 . . . . . . . . . . . . . . . . . . . . 166

DEFENDANT EXHIBITS

Exhibit No. Received
1 . . . . . . . . . . . . . . . . . . . . .72
2 and 3 . . . . . . . . . . . . . . . . . .84
4 . . . . . . . . . . . . . . . . . . . . . .87