JA89HER1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                    v.                      15 CR 379 (PKC)

5    JUAN ANTONIO HERNANDEZ
     ALVARADO,
6
                     Defendant.
7
     ------------------------------x
8
                                            New York, N.Y.
9                                           October 8, 2019
                                            10:04 a.m.
10

11   Before:

12                      HON. P. KEVIN CASTEL,

13                                         District Judge

14                          APPEARANCES

15

16   GEOFFREY S. BERMAN,
          United States Attorney for the
17        Southern District of New York
     EMIL J. BOVE, III
18   AMANDA HOULE
     JASON RICHMAN
19        Assistant United States Attorneys

20   OMAR MALONE
     MICHAEL R. TEIN
21        Attorneys for Defendant

22
     ALSO PRESENT:  HUMBERTO GARCIA, Interpreter (Spanish)
23                  CRISTINA WEISZ, Interpreter (Spanish)
                    MERCEDES AVALOS, Interpreter (Spanish)
24                  MARCIA GOTLER, Interpreter (Spanish)
                    BRIAN FAIRBANKS, DEA
25                  MORGAN HURST, Paralegal, USAO


                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1           THE COURT:  Please remain standing for our jury.

2           THE MARSHAL:  Judge, witness on the stand?

3           THE COURT:  Yes, please.

4           (Jury present)

5           THE COURT:  Please be seated.  A programming note for

6    everyone.  Because to enable everybody to get home in time for

7    candle lighting, we are going to break today in view of the

8    religious holiday at 4 p.m.  Sunset tonight is at 6:27 p.m.  So

9    we'll break at 4.  All right.

10          Mr. Ardon, the Court reminds you that you are still

11   under oath.

12     AMILCAR ALEXANDER ARDON SORIANO, resumed.

13          THE COURT:  Mr. Bove, you may continue.

14          MR. BOVE:  Thank you, your Honor.

15   DIRECT EXAMINATION

16   BY MR. BOVE:

17   Q.  At the end of the day yesterday you were talking about the

18   murder of a drug worker named Chino in 2013.  Do you remember

19   that?

20   A.  Yes.

21   Q.  And you testified that Chino was arrested in the Colon

22   department?

23   A.  Yes.

24   Q.  And that he was in jail in 2013?

25   A.  Yes.

JA89HER1                    Ardon Soriano - Direct

1   Q.  And I think that you said he was murdered in the jail in

2   2013?

3   A.  Yes.

4   Q.  After Chino was killed, did you talk to the defendant about

5   the murder?

6   A.  Yes.

7   Q.  What did you tell him?

8   A.  I told Tony Hernandez that Chino had been murdered in jail.

9   Q.  How did the defendant respond when you told him that?

10  A.  Tony Hernandez told me that he was happy because he had

11  been the only one that knew all the information about Tony

12  Hernandez's helicopter flights.

13  Q.  Did you have any private meetings with Juan Orlando

14  Hernandez during 2013?

15  A.  Yes.

16  Q.  Where was the meeting?

17  A.  In Tegucigalpa.

18  Q.  What did Juan Orlando say to you at the start of the

19  conversation?

20  A.  Juan Orlando Hernandez told me not to run for the

21  reelection as a mayor because if I did get reelected that he

22  would not protect me.

23  Q.  Did Juan Orlando explain why he was giving you that

24  instruction?

25  A.  Yes.

1    Q.  What did he say?

2    A.  Juan Orlando Hernandez told me that there was a lot of

3    coverage in the media about my being a drug trafficker and that

4    that was why I should not run for the reelection for the

5    National Party.

6    Q.  Did Juan Orlando say anything about protection for your

7    drug trafficking if you agreed not to seek reelection?

8    A.  Juan Orlando Hernandez told me that if I, in fact, did not

9    run for reelection that he would protect me in drug trafficking

10   but that if I did become a mayor that Juan Orlando Hernandez

11   would not protect me.

12   Q.  Did you and Juan Orlando talk about the Copan department

13   during this meeting?

14   A.  Yes.

15   Q.  What did Juan Orlando say about Copan?

16   A.  Juan Orlando Hernandez asked me to finance the Department

17   of Copan for him and that Hugo, my brother, would be the deputy

18   coordinator of the campaign in Copan and that he would be the

19   coordinator in Tegucigalpa at the national level for the

20   national campaign.

21   Q.  Did you agree to do the things that Juan Orlando asked

22   during this meeting?

23   A.  Yes.

24   Q.  Did you seek reelection in the November 2013 election?

25   A.  No.

JA89HER1                    Ardon Soriano - Direct

1   Q.  Did you pay bribes in Copan to get people to support Juan

2   Orlando in connection with that election?

3   A.  Yes.

4   Q.  How much money did you spend on those bribes?

5   A.  Around $1.6 million.

6   Q.  Where did that money come from?

7   A.  That money came from the profits of drug trafficking.

8   Q.  After the meeting that you've just described, did you have

9   any meetings with Chapo Guzmán?

10  A.  Yes.

11  Q.  Where was your first meeting in 2013 with Chapo?

12  A.  The first meeting with Chapo Guzmán was in Copan at a place

13  called El Espiritu.

14  Q.  And I think you said Espiritu was the base for the Valle

15  cartel?

16  A.  Yes.

17  Q.  Before the meeting at Espiritu, did you talk to the

18  defendant?

19  A.  Yes.

20  Q.  Where?

21  A.  In Santa Rosa de Copán.

22  Q.  Where in Santa Rosa?

23  A.  I got into Tony Hernandez's car.

24  Q.  Before you got into the defendant's car in Santa Rosa did

25  you notice any security in the area?

JA89HER1                      Ardon Soriano - Direct

1   A.  Yes.

2   Q.  What did you see?

3   A.  An escort car.

4   Q.  Were you able to see the men inside the car?

5   A.  Yes.

6   Q.  What did you see?

7   A.  The men were wearing hats and rifles, rifles.

8   Q.  Did you notice anything about the hats?

9   A.  Yes.

10  Q.  What did you notice?

11  A.  That they were police.

12  Q.  After you got in the defendant's car did you see any

13  weapons?

14  A.  Yes.

15  Q.  What did you see?

16  A.  A modified AR-15.

17  Q.  Did you see any other guns inside the vehicle?

18  A.  The semiautomatic pistol that Tony Hernandez used.

19  Q.  Could you see whether the AR-15 was configured to fire as

20  an automatic weapon?

21  A.  Yes.

22  Q.  How could you tell?

23  A.  Because I took the rifle and I look at the safeties and I

24  saw the two, one for shot-by-shot and the automatic mode.

25  Q.  Did you mention Chapo inside the defendant's vehicle that

1    day?

2    A.  Yes.

3    Q.  What did you say to the defendant about Chapo?

4    A.  I told Tony Hernandez that Chapo Guzmán wanted to meet him.

5    Q.  How did the defendant respond?

6    A.  Tony Hernandez told me to tell him that, yes, what day was

7    the meeting going to be and to give him a call.

8    Q.  Did you set up a meeting between the defendant and Chapo?

9    A.  Yes.

10   Q.  And is that the meeting in Espiritu that you referred to a

11   minute ago?

12   A.  Yes.

13   Q.  About how much time passed between the conversation in the

14   car and the meeting in Espiritu?

15   A.  I don't understand the question.

16   Q.  How long did it take to set up the meeting between Chapo

17   and the defendant?

18   A.  Around some twelve days.

19   Q.  Who owned the ranch in Espiritu where the meeting was held?

20   A.  The Valle brothers.

21   Q.  And who came to this meeting at the Valle brothers' ranch?

22   A.  Tony Hernandez, Mario Calix, Primo, Chapo Guzmán, Don

23   Amado, Otto Salguero, Ronald Salguero, Arnulfo Valle, Luis

24   Valle, Hugo, my brother, and myself.

25   Q.  During the meeting did Chapo say anything about drug

1    routes?

2    A.  Yes.

3    Q.  What did Chapo say?

4    A.  Chapo Guzmán asked Tony Hernandez if they could provide him

5    with -- they could provide security for the cocaine shipments

6    that they would be transporting from the Nicaraguan border to

7    the Guatemalan border.

8    Q.  How, if at all, did the defendant respond to that question?

9    A.  Tony Hernandez told Chapo Guzmán that if Juan Orlando

10    Hernandez did win the presidency that then he could be provided

11    with that security for that cocaine shipment.

12    Q.  Was extradition discussed during this meeting?

13    A.  Yes.

14    Q.  What, if anything, did the defendant say about extradition?

15    A.  Tony Hernandez told Chapo Guzmán that for the Valle

16    brothers and for myself if Juan Orlando Hernandez did win the

17    elections that we would not be extradited to the United States.

18    Q.  Did Chapo offer anything to the defendant during the

19    meeting in Espiritu?

20    A.  Yes.

21    Q.  What did Chapo offer?

22    A.  Chapo Guzmán offered Tony Hernandez $1 million for Juan

23    Orlando Hernandez's campaign.

24    Q.  How did the defendant respond to that offer?

25    A.  Tony Hernandez told them that he would think about it.

JA89HER1                          Ardon Soriano - Direct

1   Q.  After the meeting in Espiritu did you talk to the defendant

2   again about that million-dollar offer?

3   A.  Yes.

4   Q.  What did the defendant say?

5   A.  About three days later Tony Hernandez called me and he told

6   me that he had spoken to Juan Orlando Hernandez and that, in

7   fact, they did need the $1 million for the campaign.

8   Q.  During that telephone call did the defendant say anything

9   about warnings from Juan Orlando?

10  A.  Yes.

11  Q.  What did the defendant say about warnings from Juan

12  Orlando?

13  A.  Tony Hernandez told me that Juan Orlando Hernandez had said

14  for us to be careful with cameras and pictures because of

15  phones.

16  Q.  Did the defendant say anything during the call about when

17  he wanted the payment?

18  A.  Yes.  Tony Hernandez told me that they needed the money

19  urgently because we were about six to seven weeks away from the

20  2013 elections.

21  Q.  After this phonecall did you set up another meeting between

22  the defendant and Chapo?

23  A.  Yes.

24  Q.  Where was the meeting held?

25  A.  In El Paraiso Copan.

JA89HER1                          Ardon Soriano - Direct

1    Q.  And that was where you lived?

2    A.  Yes.

3    Q.  Who arrived in El Paraiso first, the defendant or Chapo?

4    A.  Tony Hernandez got there first.

5    Q.  How did the defendant get to El Paraiso?

6    A.  I sent Melvin Pinto to La Entrada to pick up Tony

7    Hernandez.

8    Q.  Did the defendant bring anyone with him to El Paraiso?

9    A.  Yes.

10   Q.  Who did the defendant bring?

11   A.  He brought Mario Calix and Primo.

12   Q.  When the defendant arrived in El Paraiso, did you see Primo

13   with him?

14   A.  Yes.

15   Q.  Was Primo armed?

16   A.  Yes.

17   Q.  How?

18   A.  He had an M16 strapped by a belt, crossover.

19   Q.  You motioned across your chest?

20   A.  Yes.

21   Q.  What happened when Chapo arrived in El Paraiso?

22   A.  When Chapo got there we sat around the table to talk.

23   Q.  Where was the table?

24   A.  It was in the dining room area of the house.

25   Q.  Was the house yours?

JA89HER1                     Ardon Soriano – Direct

1    A.   Yes.

2    Q.   Who was at the table for this part of the meeting?

3    A.   Don Amado, Chapo Guzmán, Tony Hernandez, Otto Salguero,

4    myself, and my brother Hugo were there.

5    Q.   Was Primo in the room?

6    A.   Primo was right outside the house.

7    Q.   What about Melvin Pinto?

8    A.   They were outside by the pool.

9    Q.   At the start of the meeting in El Paraiso, did Chapo say

10   anything about protection?

11   A.   Yes.

12   Q.   What did Chapo say?

13   A.   Chapo Guzmán told Tony Hernandez about.

14             THE INTERPRETER:  Interpreter correction.

15             Chapo Guzmán spoke to Tony Hernandez about protection

16   for the Valles, protection for me, and protection for the

17   cocaine shipment throughout Honduran territory.

18   Q.   How did the defendant respond when Chapo said those things?

19   A.   Tony Hernandez told Chapo Guzmán that if Juan Orlando

20   Hernandez did win the elections that he would provide that

21   protection for the Valles, for me, such that we would not be

22   extradited to the United States.

23   Q.   Did the defendant say anything about security for cocaine

24   between Nicaragua and Guatemala as it passed through Honduras?

25   A.   Yes.  Tony Hernandez told Chapo Guzmán that he would

JA89HER1                      Ardon Soriano - Direct

1    provide security for the transportation from Nicaragua to the

2    Guatemalan border but only if Juan Orlando won the elections.

3    Q.  Did anyone exchange contact information during the meeting

4    in El Paraiso?

5    A.  Yes.

6    Q.  Who?

7    A.  Chapo Guzmán asked Tony for his number and Don Amado also

8    asked Tony Hernandez for his number.

9    Q.  Did the defendant provide his number?

10   A.  Yes.

11   Q.  Now at the beginning of your testimony yesterday you said

12   that there was a payment made during this meeting?

13   A.  Yes.

14   Q.  At this point in the meeting after the contact information

15   was exchanged where was the money?

16   A.  The money was in the car.

17   Q.  What happened with that money?

18   A.  Chapo Guzmán told Don Amado to go to the car to bring in

19   the money and we counted the money on the table.

20   Q.  Was there a million dollars?

21   A.  We counted it.  Yes.

22   Q.  What happened with the million dollars after you counted

23   it?

24   A.  We put it in a bag and Chapo Guzmán handed it over to Tony

25   Hernandez.

JA89HER1                      Ardon Soriano – Direct

1   Q.  After the meeting did the defendant ask you for any help

2   with that money?

3   A.  Yes.

4   Q.  What did the defendant ask for?

5   A.  Tony Hernandez asked me to provide him with security up to

6   La Entrada Copan.

7   Q.  Did you help the defendant transport Chapo's money from El

8   Paraiso to La Entrada?

9   A.  Yes.

10  Q.  Who traveled to La Entrada with Chapo's million dollars?

11  A.  Tony Hernandez, Mario Calix, Primo, Mario Pinto, me --

12         THE INTERPRETER:  Interpreter correction.  Melvin

13  Pinto, me, and an escort.

14  Q.  So there was a separate escort?  There was a separate

15  escort vehicle?

16  A.  Yes.

17  Q.  Who was in that vehicle?

18  A.  There were six security people in that vehicle.

19  Q.  Were you armed during the trip to La Entrada?

20  A.  Yes.

21  Q.  How?

22  A.  With an AR-15.

23  Q.  Did Primo still have the rifle strapped to his chest?

24  A.  Yes.

25  Q.  Were the guards in the escort vehicle armed?

JA89HER1                     Ardon Soriano – Direct

1   A.  Yes.

2   Q.  How?

3   A.  With semiautomatic pistols and rifles.

4   Q.  What did the defendant do when you got to La Entrada?

5   A.  There two cars were waiting for Tony Hernandez.  They got

6   in the cars and they left.

7   Q.  Did the defendant bring the money with him?

8   A.  Yes.

9   Q.  Who won the Honduran presidential election in

10  November 2013?

11  A.  Juan Orlando Hernandez won.

12  Q.  Do you know of a man named Ramon Sabillon?

13  A.  Yes.

14  Q.  Who is Sabillon?

15  A.  Sabillon used to be the chief of the National Police.

16  Q.  After the election in 2013 did the defendant say anything

17  to you about Ramon Sabillon?

18  A.  Yes.

19  Q.  What did the defendant say to you about Sabillon?

20  A.  He said that his brother, the president of the country, was

21  going to remove Sabillon as chief of the police.

22  Q.  Did the defendant say why Juan Orlando was going to remove

23  Sabillon?

24  A.  Yes.

25  Q.  What did the defendant say?

JA89HER1                    Ardon Soriano - Direct

1   A.  Tony Hernandez told me that it was because Sabillon --

2   there were some statements made about why Juan Orlando was not

3   having me arrested or Tony Hernandez arrested since we were

4   drug dealers.

5   Q.  After that conversation with the defendant were any of your

6   drug trafficking partners arrested?

7   A.  Yes.

8   Q.  Who?

9   A.  The Valles.

10  Q.  I think you said yesterday that was in 2014?

11  A.  Yes.

12  Q.  Did you talk to the defendant about the arrest of the Valle

13  brothers?

14  A.  Yes.

15  Q.  What, if anything, did the defendant say about why the

16  Valles were arrested?

17  A.  Tony Hernandez told me that the Valles had been arrested

18  because they had attempted to kill Juan Orlando Hernandez.

19  Q.  During that conversation did you ask the defendant any

20  questions about your legal status?

21  A.  Yes.

22  Q.  What did you ask the defendant?

23  A.  I asked Tony Hernandez whether just the way that the Valle

24  brothers had been arrested, if that wasn't going to happen to

25  me the same way, if I wasn't going to be arrested.

JA89HER1                         Ardon Soriano - Direct

1   Q.   How did the defendant respond to that question?

2   A.   Tony Hernandez told me that just as long as the National

3   Party was in power, then they were going to protect me and keep

4   me from being arrested.

5   Q.   Did you ever talk to Juan Orlando directly about the arrest

6   of the Valles?

7   A.   Yes.

8   Q.   When approximately was that conversation?

9   A.   Around 2015.

10  Q.   Where did you have that conversation?

11  A.   Tegucigalpa.

12  Q.   Where in Tegucigalpa?

13  A.   At the Fondo Vial office.

14  Q.   Is that where your brother Hugo worked at the time?

15  A.   Yes.

16  Q.   Who was at the meeting at the Fondo Vial?

17  A.   Tony Hernandez, my brother Hugo, Juan Orlando Hernandez,

18  and I were there.

19  Q.   During that meeting did you say anything about Chapo

20  Guzmán?

21  A.   Yes.

22  Q.   What did you say.

23  A.   I told president Juan Orlando Hernandez that Chapo Guzmán's

24  people were pressuring me because of the arrest of the Valle

25  brothers.

JA89HER1                    Ardon Soriano - Direct

1   Q.  Did you say anything about the million-dollar payment from

2   Chapo during the meeting at Fondo Vial?

3   A.  Yes.

4   Q.  What did you say about the million dollars?

5   A.  I told Juan Orlando Hernandez that that was the reason why

6   he had been paid the $1 million, to protect the Valles.

7   Q.  When you described that payment to Juan Orlando, did the

8   defendant say anything?

9   A.  Yes.

10  Q.  What did the defendant say?

11  A.  Tony Hernandez said that he had taken that money because

12  Juan Orlando Hernandez had authorized him to.

13  Q.  What, if anything, did Juan Orlando say after this part of

14  the conversation?

15  A.  Juan Orlando Hernandez said that he had not made any

16  commitment to anyone and.

17          THE INTERPRETER:  The interpreter needs to consult on

18  the next part.

19          (Interpreters consult)

20          THE INTERPRETER:  Interpreter's correction.

21          Juan Orlando Hernandez said that he had no obligation

22  to anyone and that he would return the money if he wanted it

23  back.

24  Q.  Were you invited to any other meetings with Juan Orlando in

25  2015?

JA89HER1                    Ardon Soriano - Direct

1    A.  Yes.

2    Q.  Where was that meeting scheduled to take place?

3    A.  In Tegucigalpa.

4    Q.  Did Juan Orlando show up for the meeting in Tegucigalpa?

5    A.  No.

6    Q.  Did anyone from the government come to that meeting?

7    A.  Yes.

8    Q.  Who?

9    A.  Minister Ordóñez.

10          MR. BOVE:  Ms. Hurst, if you could bring up page 4 of

11   Government Exhibit 50, please.

12   Q.  Do you see Minister Ordóñez in the second row?

13   A.  Yes.

14   Q.  Is that the man who came to the meeting in Tegucigalpa in

15   2015?

16   A.  Yes.

17   Q.  During that meeting did Ordóñez say anything about your

18   brother, Hugo Ardon?

19   A.  Yes.

20   Q.  What did Ordóñez say?

21   A.  Minister Ordóñez said that President Juan Orlando Hernandez

22   had told him that my brother, Hugo, should resign because he

23   could not take all of the talk in the media about Hugo and I

24   being drug traffickers.

25   Q.  How did you respond when Ordóñez said that?

JA89HER1                    Ardon Soriano - Direct

1    A.  I told Minister Ordóñez that I agreed to it.

2    Q.  Did Ordóñez ask you for anything else during that meeting?

3    A.  Yes.

4    Q.  What?

5    A.  Minister Ordóñez told me that President Juan Orlando would

6    still give us protection for drug trafficking and he said that

7    we had to win the Department of Copan for him because he was

8    running for reelection.

9    Q.  And when Ordóñez said that you had to win the Department of

10   Copan for Juan Orlando, what did you understand him to mean?

11   A.  That I should finance and bribe mayors to get them to vote

12   for Juan Orlando Hernandez.

13            MR. BOVE:  Ms. Hurst, you can take that down, please.

14   Q.  Following the conversation with Ordóñez, did you speak

15   directly to Juan Orlando Hernandez about the November 2017

16   election?

17   A.  Yes.

18   Q.  When approximately was that conversation?

19   A.  It was about six months before the election, around six

20   months before the election.

21   Q.  Was the conversation in person?

22   A.  Yes.

23   Q.  Where was it?

24   A.  In Santa Rosa.

25   Q.  That's in the Copan department?

JA89HER1                      Ardon Soriano – Direct

1    A.  Yes.

2    Q.  Who was at the meeting in Santa Rosa?

3    A.  Hugo my brother, Tony, Juan Orlando, and me.

4    Q.  During the meeting in Santa Rosa did Juan Orlando ask you

5    for anything?

6    A.  Yes.

7    Q.  What did Juan Orlando ask for?

8    A.  Juan Orlando Hernandez asked me to finance the National

9    Party's campaign with the --

10            THE INTERPRETER:  The interpreter needs to consult.

11            (Interpreters consult)

12            THE WITNESS:  -- through the mayors because the

13   National Party had very low numbers in the poles in those

14   departments.

15   Q.  Did Juan Orlando mention particular departments?

16   A.  Yes.

17   Q.  Which departments did Juan Orlando mention during this

18   meeting?

19   A.  Copan and Lempira.

20   Q.  Did Juan Orlando offer to do anything for you in exchange

21   for this assistance?

22   A.  Yes.

23   Q.  What did he offer?

24   A.  Juan Orlando Hernandez told me that he would still keep

25   providing us protection for drug trafficking and he said that

JA89HER1                    Ardon Soriano – Direct

| | |
|---|---|
| 1 | things were better now because my brother, Hugo, was no longer |
| 2 | a public figure. |
| 3 | Q.  Did you agree to do anything during this meeting in Santa |
| 4 | Rosa? |
| 5 | A.  Yes. |
| 6 | Q.  What did you agree to do? |
| 7 | THE INTERPRETER:  The interpreter would like to |
| 8 | clarify part of the witness's answer. |
| 9 | A.  Tony Hernandez said that they needed half a million, |
| 10 | $500,000, for the campaign in the Department of Lempira. |
| 11 | Q.  Did you give $500,000 to Tony Hernandez? |
| 12 | A.  Yes. |
| 13 | Q.  Where did that money come from? |
| 14 | A.  From drug trafficking. |
| 15 | Q.  Did you also pay bribes in the Copan department to support |
| 16 | the National Party elections? |
| 17 | A.  Yes. |
| 18 | Q.  In addition to the half a million dollars, how much money |
| 19 | did you spend in the Copan department to support the 2017 |
| 20 | elections? |
| 21 | A.  Around one million six hundred thousand lempiras. |
| 22 | Q.  Where did all of that money come from? |
| 23 | A.  From selling cocaine. |
| 24 | MR. BOVE:  Ms. Hurst, could you please bring up |
| 25 | Government Exhibit 111 and zoom in a bit. |

JA89HER1                        Ardon Soriano - Direct

1   Q.  You said yesterday that you knew this man as Primo?

2   A.  Yes.

3   Q.  I'd like to direct your attention to November of 2018.  Did

4   you have any conversations with Primo in that timeframe?

5   A.  Yes.

6   Q.  Was that conversation on the phone or in person?

7   A.  It was on the phone.

8   Q.  Where were you when you spoke to Primo on the phone?

9   A.  I was in El Paraiso, Copan.

10  Q.  Did you call Primo or did Primo call you?

11  A.  No.  Primo called me.

12  Q.  What did Primo say during the call?

13  A.  Primo asked me where I was.

14  Q.  Did Primo explain why he was asking that question?

15  A.  Yes.

16  Q.  What did Primo say about why he was asking?

17  A.  Primo told me that he was calling because President Juan

18  Orlando was asking where I was.

19  Q.  How did you respond to Primo's question?

20  A.  I told Primo that I was there in El Paraiso.

21  Q.  After you said that, did Primo ask you to do anything?

22  A.  Yes.

23  Q.  What did he ask you to do?

24  A.  Primo asked me who was with me.

25  Q.  What did you say?

JA89HER1                        Ardon Soriano - Direct

1   A.  I told him that Adonias Morales was with me.

2   Q.  What did you do next?

3   A.  I handed the phone to Adonias so he could say hi to Primo.

4   Q.  Why did you do that?

5   A.  Because during the conversation Primo did not believe that

6   I was in Paraiso.

7   Q.  Did Primo say where he thought you were?

8   A.  Yes.

9   Q.  What did he say?

10  A.  Primo told me that he thought that I was surrendering to

11  the United States.

12  Q.  How did the call end?

13  A.  Primo told me that Juan Orlando had said that there was no

14  arrest warrant or extradition order on me.

15  Q.  You testified yesterday that you did surrender later in

16  March of 2019?

17  A.  Yes.

18  Q.  At the time you surrendered what was the minimum sentence

19  you faced?

20  A.  When I surrendered my minimum sentence was 40 years to

21  life.

22  Q.  Were you charged with any murders when you first

23  surrendered and arrived in the United States?

24  A.  No.

25  Q.  After you surrendered, did you provide information to the

JA89HER1                        Ardon Soriano – Direct

1  government?

2  A.  Yes.

3  Q.  And during some of those meetings you withheld information,

4  correct?

5  A.  Yes.

6  Q.  What were the topics that you withheld some information

7  about?

8  A.  I withheld information about topics relating to Tony

9  Hernandez and Chapo Guzmán.

10 Q.  What about meetings with Juan Orlando Hernandez?

11 A.  That too.

12 Q.  Why did you initially withhold information about those

13 topics?

14 A.  I withheld that information out of fear for retaliation

15 against my family.

16 Q.  Where was your family at the time?

17 A.  In El Paraiso, Copan.

18 Q.  Did you later disclose all of your information?

19 A.  Yes.

20 Q.  And you said yesterday that you eventually pleaded guilty

21 to crimes?

22 A.  Yes.

23 Q.  You said a moment ago that at the time of your surrender

24 your mandatory minimum was 40 years?

25 A.  Yes.

1    Q.  As you sit here today, what is the mandatory minimum

2    sentence that you face?

3    A.  Life plus 30 years.

4    Q.  You said a moment ago that you were not charged with any

5    murders when you arrived in the United States?

6    A.  No.

7    Q.  How many murders were included in your cooperation

8    agreement?

9    A.  56 murders.

10   Q.  What are some of the things that you are required to do

11   under that agreement?

12   A.  The agreement requires me to tell the truth.

13   Q.  If you do that, what is your understanding of what the

14   government will do for you?

15   A.  The government would submit a 5K letter.

16   Q.  If you get that letter what would happen to your mandatory

17   minimum sentence?

18   A.  The minimum sentence would be removed.

19   Q.  Has anyone guaranteed you that you're going to get that 5K

20   letter?

21   A.  No.

22   Q.  And what is your understanding of what would be included in

23   that letter if you got it?

24   A.  The 5K letter would state my good and my bad.

25   Q.  When you say your good, what do you mean?

1   A.  Telling the truth, cooperation, and testifying.

2   Q.  And when you said that the letter would include your bad,

3   what do you mean?

4   A.  I mean the crimes that I've committed.

5   Q.  If you get a 5K letter, is the judge in your case going to

6   be required to sentence you to less jail time?

7   A.  I don't know.

8   Q.  Has anyone made any promises to you about the sentence

9   you're going to receive?

10  A.  No.

11  Q.  Who is going to decide your sentence?

12  A.  The judge.

13          MR. BOVE:  Nothing further, your Honor.

14          THE COURT:  All right.  Ladies and gentlemen, let's

15  take our midmorning recess.  Please do not discuss the case

16  among yourselves or with anyone.  Keep an open mind.  Enjoy the

17  break.  See you in ten minutes.

18          (Recess)

19          THE COURT:  Please remain standing for the jury.

20          (Jury present)

21          THE COURT:  Mr. Malone, whenever you're ready.

22          MR. MALONE:  Thank you, Judge.

23  CROSS-EXAMINATION

24  BY MR. MALONE:

25  Q.  Good afternoon, Mr. Ardon.

JA89HER1                          Ardon Soriano – Cross

1    A.  Good afternoon.

2    Q.  I represent Tony Hernandez.

3           Do you have a family, sir?

4    A.  Yes.

5    Q.  Do you have a wife?

6    A.  Yes.

7    Q.  How many kids do you have?

8    A.  Three.

9    Q.  Are they in Honduras or the United States?

10   A.  No.

11   Q.  Neither one?

12   A.  No.  They're in Spain.

13   Q.  As a part of your agreement with the government was your

14   family moved to another country?

15   A.  For safety reasons.

16   Q.  So that's a yes?  They were moved?

17   A.  For safety reasons because my family was in danger in

18   Honduras.

19   Q.  I understand, sir.

20          I want to talk to you about the kinds of things you

21   did before you reached this agreement with the government, OK.

22   A.  Yes.

23   Q.  When is the last time you saw your family?

24   A.  Around three weeks ago.

25   Q.  They came to visit you?

1    A.  Yes.

2    Q.  You told them you'd be testifying?

3    A.  I did not talk about my issue.

4    Q.  Back when you were in El Paraiso, your hometown, your

5    family was in business?

6    A.  (No response).

7    Q.  Did your family have a business, sir?

8    A.  Yes.

9    Q.  What kind of business was it?

10   A.  It was an agricultural business.

11   Q.  Farm business, right?

12   A.  Yes.

13   Q.  And, of course, while you were dealing in drugs you were

14   putting yourself out as a farmer, weren't you?

15   A.  Yes.

16   Q.  You didn't just tell people that you were involved in drug

17   trafficking, right?

18   A.  I didn't understand the question.

19   Q.  You didn't want people to know you were a drug trafficker?

20   You wanted to keep that secret?  Right?

21   A.  Yes.

22   Q.  Did you go to church when you were in El Paraiso?

23   A.  No.

24   Q.  Did you give to any charities in El Paraiso?

25   A.  Yes.

JA89HER1                          Ardon Soriano - Cross

1    Q.  The charities you gave to, you didn't tell them that you

2    were giving them drug money, did you, sir?

3    A.  No.

4    Q.  You wanted people to believe you were a legitimate

5    businessman; isn't that right, sir?

6    A.  Yes.

7    Q.  And when you became mayor in 2006 you didn't tell people

8    who elected you that you were a drug dealer, did you?

9    A.  No.

10   Q.  You wanted them to believe that you were a legitimate

11   agricultural entrepreneur; isn't that right, sir?

12   A.  Yes.

13   Q.  And you wanted your kids to believe that you were a

14   legitimate businessperson; isn't that right, sir?

15   A.  (No response)

16   Q.  Right?

17   A.  My kids knew what I did for a living.

18   Q.  They knew you were a drug trafficker?

19   A.  Yes.

20   Q.  You certainly didn't want your constituents who elected you

21   in 2006 to know you were a drug trafficker?  That's fair,

22   right?

23   A.  Yes.

24   Q.  You didn't want your mom Paula before she passed away to

25   know you were a drug trafficker, did you, sir?

JA89HER1                    Ardon Soriano - Cross

```
1    A.  She knew I was a drug trafficker.

2    Q.  Your dad knew you were a drug trafficker too?

3    A.  Yes.

4    Q.  It was a family business, sir?

5    A.  The thing is that they saw that I was getting a lot of

6    money and that's how they knew that I was a drug trafficker.

7    Q.  OK.  Did members of your family engage in drug trafficking

8    with you, sir?

9    A.  Yes.

10   Q.  And they, like you, tried to hide your drug trafficking

11   activities from the public; isn't that right, sir?

12   A.  Yes.

13   Q.  From law enforcement?

14   A.  (No response)

15   Q.  Right?

16   A.  Yes.

17   Q.  Because you didn't want to get caught?  Right?

18   A.  Yes.

19   Q.  You mentioned a little bit earlier, and it could have been

20   yesterday, that you sold or you were responsible for 250 tons

21   of cocaine being sent to the United States.  Do you remember

22   that testimony, sir?

23   A.  Yes.

24   Q.  That's five hundred thousand kilograms of cocaine?  Did you

25   ever count that?
```

JA89HER1                        Ardon Soriano – Cross

1   A.  No.

2   Q.  But you're pretty sure that it was around 250 tons of

3   cocaine, right?

4   A.  Yes.

5   Q.  And you got paid for each kilogram of cocaine you were

6   involved with, didn't you, sir?

7   A.  Yes.

8   Q.  Between, on the low end and on the high end, how much were

9   you getting paid over the course of your drug trafficking

10  career per kilogram of cocaine, sir?

11  A.  Excuse me.

12          The profit per kilo varied.

13  Q.  Varied between what, sir?

14  A.  Well it varied from five hundred to one thousand dollars

15  per kilo and if it was for transportation I was charging from

16  100 to 150 dollars for transportation of cocaine.

17  Q.  So if we do the quick math, you made millions and millions

18  and millions of dollars selling drugs; isn't that right, sir?

19  A.  I don't understand what you're saying by millions,

20  millions, and millions.

21  Q.  Let me break it down for, sir.

22          When you met with the government in preparation for

23  your testimony did you calculate how much money you made

24  selling drugs?

25  A.  Yes.

JA89HER1                    Ardon Soriano - Cross

1   Q.  How much did you make, sir?

2   A.  Around some 200 million to $250 million.

3   Q.  Over the course of your drug trafficking career you made

4   between 200 million and $250 million?  That's what you

5   calculated, correct?

6   A.  Yes.

7   Q.  What kind of things did you buy with your drug money, sir?

8   A.  I bought vehicles, equipment, ranches, houses.

9   Q.  Let's start with the fincas.  How many fincas did you buy,

10  sir?

11  A.  Around some fifteen ranches.

12  Q.  All in Honduras?

13  A.  Yes.

14  Q.  How many houses, sir?

15  A.  Around ten houses.

16  Q.  All in Honduras?

17  A.  Yes.

18  Q.  What kind of equipment did you buy, sir?

19         THE INTERPRETER:  May the interpreter confer with her

20  colleague?

21         THE COURT:  You may.

22         (Interpreters confer)

23  A.  Dump trucks, excavators, bulldozers, lowboys, equipment to

24  work with cement, hole drillers.

25         THE INTERPRETER:  And the interpreters are researching

1   two terms.

2           Trucks.

3           And the interpreter will leave one of the terms in

4   Spanish as neither interpreter is able to locate it, vibros

5   V-I-B-R-O-S.

6   Q.  All of that equipment, sir, was in connection with the

7   business that you were attempting to display to the outside

8   world as legitimate; isn't that right?

9           THE INTERPRETER:  May the interpreter provider the

10  interpretation for that term before interpreting the question?

11          THE COURT:  Yes.

12          THE INTERPRETER:  Vibros, drills.

13          THE COURT:  Thank you.

14          THE INTERPRETER:  Thank you, Judge.

15  A.  Yes.

16  Q.  And so anybody who interacted with you and saw all of this

17  equipment, dump trucks and farm equipment, they would assume

18  you were a legitimate businessperson; isn't that right?

19          MR. BOVE:  Objection.

20          THE COURT:  Sustained.  Rephrase.

21  Q.  Did your business have the -- farming business have

22  contracts with anyone?

23  A.  Yes.

24  Q.  Who did you have contracts with?

25  A.  This agricultural company had contracts with a company

JA89HER1                        Ardon Soriano - Cross

1    called Sula and with a corn company called Bachosa and

2    Chumbagua.

3    Q.  And so as far as the people on the other side of that -- of

4    those contracts you had, they assumed you were a legitimate

5    businessperson, right?

6              MR. BOVE:  Objection.

7              MR. MALONE:  I'm rephrase it, Judge.

8              THE COURT:  OK.

9    Q.  As far as the other people on the side of those contracts

10   you just mentioned, those people on the other side of those

11   contracts, you wanted them to believe that you were a

12   legitimate businessman, correct?

13   A.  Yes.

14   Q.  And you did nothing to tell them about your drug

15   trafficking activities?  That's right?

16   A.  No.

17   Q.  Now, during the course of your drug trafficking activities

18   you had cellphones, didn't you?

19   A.  Yes.

20             THE COURT:  All right.  One second.  We're going to

21   take a five-minute recess.  Ladies and gentlemen, please do not

22   discuss the case among yourselves or with anyone.  Thank you.

23             We'll be back in five minutes.

24             Let me see counsel at sidebar.

25             (Jury not present)

JA89HER1                          Ardon Soriano - Cross

1              (At sidebar)

2              THE COURT:  I don't have X-ray vision but it looks to

3      me that our sketch artist is sketching the jurors.  It's

4      possible she's sketching the back of your head.

5              MR. MALONE:  OK.

6              THE COURT:  But it didn't look that way to me.  So I'm

7      going to ask my law clerk to ask her to come on up.

8              (In the presence of the sketch artist)

9              THE COURT:  Hi.  How are you?  I'm Judge Castel and

10     you are?

11             THE ARTIST:  Christine Cornell.

12             THE COURT:  Oh, sure.  I know the name.  Now you're

13     not the only sketch artist in your family, right?

14             THE ARTIST:  My sister, Irene Cornell was --

15             THE COURT:  The news.

16             THE ARTIST:  -- radio reporter for CBS for a thousand

17     years.

18             THE COURT:  But I think I met you probably when we had

19     the courtroom illustration program back in 2014 with Liz

20     Williams and others.

21             THE ARTIST:  Yes.  Sure.

22             THE COURT:  Anyway, this is a public courtroom.  We're

23     happy you're here.  But I want to make sure that you're not

24     sketching our jurors.

25             THE ARTIST:  Of course not.  I haven't even looked at

JA89HER1                    Ardon Soriano – Cross

1  them.

2          THE COURT:  Thank you very much.  That's all I wanted

3  to do.  Enjoy.  That's all I think.

4          (Out of the presence of the sketch artist)

5          MR. MALONE:  Probably couldn't see the jurors from my

6  big head, Judge.

7          THE COURT:  That could be.  That's going to be quite a

8  sketch of the back of your head, I'll tell you.

9          MR. MALONE:  I've gotten a lot of jokes on that.

10          THE COURT:  All right.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA89HER1                      Ardon Soriano - Cross

1              (In open court)

2              (Jury present)

3              THE COURT:  Please stand for our jurors.

4              Please be seated.  I told you it would be brief.

5              Anytime you're ready, Mr. Malone.

6              MR. MALONE:  Thank you, Judge.

7    BY MR. MALONE:

8    Q.  Mr. Ardon, I think the question I posed to you before we

9    broke, if I didn't, this is what it is, did you have cellphones

10   when you were engaged in drug trafficking?

11   A.  Yes.

12   Q.  Did you have cellphones that you just used for drug

13   trafficking as opposed to legitimate things with your family,

14   for example?

15   A.  Yes.

16   Q.  The cellphone service that you had for the cellphones that

17   you used in your drug trafficking activities, what service

18   provider or providers did you use in Honduras for those

19   cellphones?

20   A.  A company called Tigo.

21   Q.  So throughout the time you were engaged in drug trafficking

22   activity your cellphone service was with Tigo; is that right?

23   A.  Yes.

24   Q.  When you were communicating with others engaged in drug

25   trafficking with you, did you text message them?

JA89HER1                         Ardon Soriano - Cross

1   A.  Yes.

2   Q.  Did you instant message them?

3   A.  I don't understand instant messaging.

4   Q.  Did you call them on the phone?

5   A.  Yes.

6   Q.  Did they call you on the phone?

7   A.  Yes.

8   Q.  Did they text you on the phone?

9   A.  Yes.

10  Q.  Did you send them pictures, for example, of things on the

11  phones?

12  A.  I don't understand pictures of things by phone.

13  Q.  OK.  For example, when a load was expected or arrived did

14  you send your other drug traffickers pictures of what to look

15  for or something like that?

16  A.  No.

17  Q.  Did you provide your co-drug traffickers with coordinates

18  as to where you might meet for something related to drug

19  trafficking?

20  A.  Yes.

21  Q.  You did that quite often; isn't that right, sir?

22  A.  Yes.

23  Q.  In your cellphones that you used for drug trafficking,

24  there were contacts in the cellphones, weren't there?

25  A.  Yes.

JA89HER1                      Ardon Soriano - Cross

1   Q.  And in your drug trafficking cellphones those contacts

2   would have been other drug traffickers you dealt with, right?

3   A.  Yes.

4   Q.  And for example you indicated that you've had communication

5   with El Chapo, right?

6   A.  I mentioned meetings with Chapo.

7   Q.  In order to meet with El Chapo you had to have -- would it

8   be fair to say you would have communicated with someone

9   associated with him in order to have meetings, right?

10  A.  Yes.

11  Q.  Because you had to set up the meeting, right?

12  A.  Yes.

13  Q.  What time you are going to meet, right?

14  A.  Yes.

15  Q.  Where you are going to meet, right?

16  A.  Yes.

17  Q.  What you're going to talk about, right?

18  A.  Yes.

19  Q.  Because El Chapo wouldn't just show up to a meeting with no

20  purpose?  You would agree with that, right?

21  A.  Yes.

22  Q.  Speaking of El Chapo, in 2013 you said there was some

23  meeting at your home in El Paraiso.  Do I have that right?

24  A.  Yes.

25  Q.  Sir, you knew in 2013 that El Chapo was the most wanted

JA89HER1                        Ardon Soriano - Cross

1  drug trafficker in the world in 2013, didn't you?

2  A.  Yes.

3  Q.  You knew there was a worldwide manhunt for El Chapo; isn't

4  that right, sir?

5  A.  Yes.

6  Q.  And you're trying to convince this jury that El Chapo met

7  with you at your home; is that right?

8          MR. BOVE:  Objection.

9          THE COURT:  Sustained.

10  Q.  Prior to that meeting in 2013 with El Chapo you

11  communicated with him, right?

12  A.  No.

13  Q.  Who did you communicate with to set up that meeting, sir?

14  A.  Don Amado.

15  Q.  Don Amado would have been one of the contacts in your

16  cellphone, right?

17  A.  Yes.

18  Q.  By the way, when you surrendered to the United States

19  government in March of 2019 did you turn over any electronic

20  devices?

21  A.  No.

22  Q.  You didn't turn over your cellphones?

23  A.  No.

24  Q.  Did you give them the cell numbers that you used when you

25  were drug trafficking?

JA89HER1                        Ardon Soriano - Cross

1    A.  No.

2    Q.  Did you give them the service provider you used for the

3    cellphones that you used for drug trafficking?

4    A.  Yes.

5    Q.  At any of your meetings with the U.S. Government in

6    preparation for your cooperation, were you ever shown records

7    of your cellphone that you used for drug trafficking?

8    A.  No.  I don't understand.

9    Q.  OK.  Let me try to break it down for you.  You met with the

10   government, the prosecutors in this case often, correct?

11   A.  Yes.

12   Q.  And at those meetings not only would the prosecutors be

13   there but the agents would be there as well, right?

14   A.  Yes.

15   Q.  And sometimes the agents would show you documents, right?

16   A.  No.

17   Q.  They never showed you any documents?

18   A.  No.

19   Q.  Did they show you pictures?

20   A.  No.

21   Q.  Let me see if I understand what your testimony is.  Are you

22   telling this jury that over the course of all the meetings you

23   had with the U.S. Attorney's Office and agents that you did not

24   get shown any documents in connection with this case?

25              MR. BOVE:  Objection.

JA89HER1                        Ardon Soriano - Cross

1              THE COURT:  Rephrase it.

2              MR. MALONE:  Yes, sir.

3   Q.  Do you recall anyone from the U.S. Attorney's Office

4   showing you any documentation in your meetings with them?

5   A.  No.

6   Q.  For example, there were some pictures that you testified

7   about yesterday, pictures of guns.  Do you remember those?

8   A.  Yes.

9   Q.  You were shown those before you came into court, right?

10  A.  No.

11  Q.  The first time you ever saw those pictures was in court

12  yesterday?

13  A.  I had seen the photos that I saw here in the court before.

14  Q.  And my question is did you see those while you were meeting

15  with the prosecutors and the agents?

16  A.  No.

17  Q.  Like the picture of the individual El Tigre, for example,

18  you had seen that picture before you came into court, right?

19  A.  Yes.

20  Q.  And pictures of Juan Orlando Hernandez and Tony Hernandez,

21  you had seen those pictures while you were meeting with the

22  prosecutors, right?

23             MR. BOVE:  Objection.

24             MR. MALONE:  I don't understand the basis, Judge.

25  It's not clear what --

1          THE COURT:  One second, please.  Which pictures are

2    you referring to, sir?

3          MR. MALONE:  OK.

4    Q.  Just to clarify, sir, other than your testimony here in

5    court you have no physical document or anything like that that

6    would support what you have said in court?  Is that fair to

7    say?

8          MR. BOVE:  Objection.

9          THE COURT:  Sustained.

10   Q.  Sir, can you point out any item of evidence other than your

11   testimony that you can say exists to support what you have said

12   to the jury?

13         MR. BOVE:  Same objection.

14         THE COURT:  Sustained.

15   Q.  All the evidence that you -- strike that.

16         You've indicated that you didn't have any cellphones

17   that you turned over to the government, right?

18   A.  I did not turn anything over.

19   Q.  Nothing, right?

20   A.  No telephones.

21   Q.  Did you turn something else over to them?

22   A.  No.

23   Q.  Did you turn over any bank records to the U.S. Government?

24   A.  No.

25   Q.  Did you turn over any money to the U.S. Government?

JA89HER1                    Ardon Soriano - Cross

1   A.  No.

2   Q.  Did you tell them where money -- the money you made was

3   located?

4   A.  Yes.

5   Q.  Had you hidden any money in the United States?

6   A.  No.

7   Q.  How much was -- strike that.

8           You indicated you told the government where your money

9   was; is that right?

10  A.  Yes.

11  Q.  Did you tell them where to go and get it?

12  A.  No.

13  Q.  Did you sign any documentation for them to go get it?

14  A.  No.

15  Q.  Was it cash?

16  A.  No.

17  Q.  What form was it?

18  A.  It was invested in equipment, in ranches, in houses, in

19  agricultural machinery.  The money was needed to purchase

20  vehicles.

21  Q.  And it was invested --

22          THE INTERPRETER:  The interpreter would ask for a

23  moment to confer with her colleague.

24          (Interpreters confer)

25          THE INTERPRETER:  Interpreter's correction.

JA89HER1                          Ardon Soriano – Cross

1          The money was used to invest in vehicles.

2   Q.  And what happened to the cash, the U.S. currency that you

3   earned, the $200 million that you earned from drug trafficking?

4   A.  It was reinvested in buying and selling drugs.  It was used

5   to bribe politicians and the police.  It was used to buy homes

6   for the poor.

7          THE INTERPRETER:  Interpreter's correction.

8          It was used to build homes for the poor and highways

9   for the poor and to give them electricity.  It was used -- it

10  was given to them to --

11          (Interpreters confer)

12          It was used to give pieces of land to family, low

13  income families, to give to them -- it was given to the low

14  income families so they could build their homes.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

JA8THER2                      Ardon Soriano - Cross

1    BY MR. MALONE:

2    Q.  Is that it?

3    A.  That's all that I recall right now.

4    Q.  So when it was time for you to make your decision to come

5    to the U.S., you're telling this jury you had no U.S. currency,

6    isn't that right?

7    A.  There was a small amount of money left.

8    Q.  You had bank accounts?

9    A.  No.

10   Q.  No drug dealers would use bank accounts, right?

11   A.  No.

12   Q.  They wouldn't, right?

13   A.  No.

14   Q.  Do you have credit cards, sir?

15   A.  No.

16   Q.  Let's talk about the city hall that you had in El Paraiso.

17   Okay?

18            THE COURT:  Just ask the question.

19   Q.  Okay.  The city hall that you had in El Paraiso, did it

20   have a heliport on top of it, sir?

21   A.  Yes.

22   Q.  And you put that heliport on top of it, didn't you?

23   A.  Yes.

24   Q.  You were responsible for that, right?

25   A.  Yes.

JA8THER2                          Ardon Soriano - Cross

1   Q.  I'm sure you didn't put the heliport on top of the city

2   hall so you could drive boats, did you?

3   A.  No.

4   Q.  You put the heliport on top of city hall so you could use

5   helicopters, isn't that right?

6   A.  I don't understand your question.

7   Q.  The reason you put a heliport on top of city hall is so

8   when you needed to use a helicopter or someone needed to visit

9   you by helicopter they could land on city hall, right?

10  A.  Yes.

11  Q.  And in El Paraiso, you, while you were mayor -- you were

12  mayor from 2006 until when, sir?

13  A.  Until 2014.

14  Q.  At some point during your term as mayor in El Paraiso you

15  had cameras placed into the entrances of the city, isn't that

16  right?

17  A.  No.

18  Q.  You had cameras in front of and around city hall?

19  A.  Yes, there was a camera across from it.

20  Q.  And you could see who came and who went, isn't that right?

21  A.  Yes.

22  Q.  And you had cameras at your home, that home that you met

23  with El Chapo at, didn't you, sir?

24  A.  No.

25  Q.  Did you turn over any video footage to the United States

JA8THER2                    Ardon Soriano – Cross

1    government from the video outside of City Hall, El Paraiso?

2              MR. BOVE:  Objection, asked and answered.  He said he

3    didn't turn over anything.

4              MR. MALONE:  Judge, it's a speaking objection.

5              THE COURT:  I'm going to allow you to ask the

6    question.  You've asked it.

7              MR. MALONE:  Yes, I did.

8              THE COURT:  I think it's implicit in the prior answer,

9    but go ahead.  If the court reporter will read back the

10   question.

11             MR. MALONE:  Thank you, Judge.

12             (Record read)

13   A.  I don't understand the question.

14   Q.  Okay, sir.  Sir, you're an honest man?

15   A.  Yes.

16   Q.  You're truthful person?

17   A.  I am under oath right now and I am only telling the truth.

18   Q.  And you've told the jury the truth yesterday and today, is

19   that right?

20   A.  Yes.

21   Q.  And so they can rely on what you have said?

22             MR. BOVE:  Objection.

23             THE COURT:  Sustained.

24   Q.  Do you feel any pressure here today, sir, to testify in a

25   certain way?

JA8THER2                      Ardon Soriano - Cross

1    A.  No.

2    Q.  So you felt no pressure here in telling the jury the truth

3    as you've spoken it in court?

4              MR. BOVE:  Objection.

5              THE COURT:  Sustained as asked and answered.

6    Q.  Now you've indicated that you were involved in some

7    murders, right?

8    A.  Yes.

9    Q.  Does an honest man commit 56 murders?

10   A.  I don't understand your question.

11   Q.  Would an honest man kill 56 human beings?

12   A.  No.

13   Q.  Would an honest man torture other individuals, like you've

14   admitted?

15   A.  No.

16   Q.  Would an honest man meet with the United States government

17   and lie to them?

18   A.  I don't understand the question.

19   Q.  When you met with the U.S. government, initially you lied

20   to them, right?

21   A.  Yes, I did.

22   Q.  So an honest man wouldn't do that, right?

23   A.  I did it because of retaliation against my family.

24   Q.  When you killed the 56 people, was that in retaliation for

25   your family?

JA8THER2                      Ardon Soriano - Cross

1    A.  No.

2    Q.  When you killed the 56 people, were you afraid of Juan

3    Orlando Hernandez, sir?

4    A.  Yes.

5    Q.  When you killed the 56 people, sir, were you worried about

6    Juan Antonio Hernandez, sir?

7    A.  No.

8    Q.  So back to my question.  When you met with the government

9    you had an opportunity to be truthful with them from the very

10   beginning, didn't you?

11   A.  Yes.

12   Q.  And prior to meeting with the government, the prosecutors,

13   the agents, your lawyer told you the worst thing you could ever

14   do is to go in that room and lie to those public servants,

15   didn't he?

16   A.  Yes.

17   Q.  And despite that warning from the lawyer of your choosing,

18   what you did was tell them an untruth, be dishonest, right?

19   A.  Yes, I withheld information.

20   Q.  So at the very least, sir, you're just reaching the area

21   where you're honest because you have been dishonest a short

22   time ago, is that fair?

23          THE COURT:  Sustained as to form.

24   Q.  You used to be a dishonest man, right?

25   A.  Yes.

JA8THER2                        Ardon Soriano - Cross

1    Q.  But now you're an honest man?

2    A.  Yes.

3    Q.  And we can trust you now, right?

4    A.  Yes.

5    Q.  Tell the jury when it was you decided to be honest.

6    A.  I decided to become honest because I decided I wanted to

7    face my problems, I wanted to remake my life, make it better,

8    and fix my problems.

9    Q.  When did you make that decision?

10   A.  That decision to start my life over was when I surrendered

11   to the United States.

12   Q.  Okay.  Let's talk about when you surrendered.  When you

13   surrendered to the United States you met with your lawyer,

14   right?

15   A.  Yes.

16   Q.  And he explained to you how the criminal justice system

17   worked in the United States, right?

18   A.  Yes.

19   Q.  And you explained to him what it was you had done in your

20   past that might have caused you to be brought to the United

21   States, didn't you?

22   A.  Yes.

23   Q.  So at some point you and your attorney made a decision that

24   you wanted to meet with the United States government, is that

25   right?

JA8THER2                          Ardon Soriano - Cross

1    A.  Yes.

2    Q.  And your lawyer explained to you that if you wanted to

3    cooperate with the United States government you would have to

4    sit down with them and tell them what you knew, is that right?

5    A.  Yes.

6    Q.  And you met with the U.S. government, right, you and your

7    lawyer?

8    A.  Yes.

9    Q.  And you told them what you knew at that time, right?

10   A.  Yes.

11   Q.  And that meeting ended, didn't it?

12   A.  Yes.

13   Q.  And then you met with them five more times regarding what

14   you knew, right?

15   A.  I don't remember how many times we met.

16   Q.  Okay.

17            MR. MALONE:  May I approach, Judge?

18            THE COURT:  You may.

19   Q.  I show you a document to see if it refreshes your

20   recollection to how many times you met with the prosecutor's

21   office when you came to the U.S.

22            THE COURT:  What is the document you have shown?  Is

23   it marked?

24            MR. MALONE:  It's marked as Defense Exhibit 103.

25            THE COURT:  Okay.

1              MR. BOVE:  It's marked for identification also as

2      3510-21.

3              THE COURT:  Take a look at the document, and you can

4      read any portion you want, and the question is not what does

5      the document say, but when you read the document you now have a

6      new and refreshed recollection on the subject that you were

7      asked about.  Do you understand?

8              THE WITNESS:  Yes.

9      Q.  Sir, do you recognize your signature on the document?

10     A.  Yes.

11     Q.  Does it refresh your recollection about you meeting with

12     the U.S. Attorney's Office multiple times in June and July of

13     2019?

14             THE COURT:  I don't think he said he didn't remember

15     meeting with the government in June of 2019, I think he said he

16     didn't remember how many times he met with the government.

17             MR. MALONE:  Yes, Judge.

18             THE COURT:  Okay.

19             MR. MALONE:  I thought I said multiple times in June

20     and July.

21             THE COURT:  But he didn't express a failure of

22     recollection on meeting them multiple times, he expressed a

23     failure of recollection on how many times.

24             MR. MALONE:  Point well taken, Judge, thank you.

25     BY MR. MALONE:

JA8THER2                          Ardon Soriano - Cross

1    Q.  You remember meeting with the prosecutor's office multiple

2    times, right?

3    A.  Yes.

4    Q.  And after each time you met with the prosecutor's office

5    until you entered into your plea agreement in August of 2019,

6    after each of those meetings that office was not ready to offer

7    you a plea agreement, was it?

8            MR. BOVE:  Objection.

9            THE COURT:  Sustained.

10   Q.  Eventually you entered into a plea agreement with the U.S.

11   government, is that right?

12   A.  Yes.

13   Q.  And that plea agreement is entered into after you have had

14   all those meetings we just discussed, right?

15   A.  Yes.

16   Q.  And prior to entering into that plea agreement with the

17   United States government, your life was looking pretty dim,

18   wasn't it, sir?

19   A.  Yes.

20   Q.  You were looking at life imprisonment potentially, right?

21   A.  Yes.

22   Q.  A minimum consecutive mandatory sentence of 40 years,

23   right?

24   A.  Yes.

25   Q.  Not seeing your family again for the rest of your life,

JA8THER2                      Ardon Soriano - Cross

1    right?

2    A.  Yes.

3    Q.  Not seeing your home country again for the rest of your

4    life, right?

5    A.  Yes.

6    Q.  When the government agreed to enter into a plea agreement

7    with you in August of 2019, your life changed, didn't it, sir?

8    A.  I don't know about that.

9    Q.  Well, it gave you hope, right?

10         That plea agreement gave you hope.

11   A.  Yes.

12   Q.  It gave you hope that you would be able to see your

13   children again, right?

14   A.  Yes.

15   Q.  It gave you hope that you would not have to spend the rest

16   of your life in jail, didn't it?

17   A.  Yes.

18   Q.  That you would not die in prison, right?

19   A.  Yes.

20   Q.  Gave you hope that you could have freedom again.

21   A.  Yes.

22   Q.  And you signed that plea agreement with the U.S. Attorney's

23   Office here in the Southern District of New York, right?

24   A.  Yes.

25   Q.  And the person who prosecuted you in that case is Mr. Bove,

JA8THER2                         Ardon Soriano - Cross

1    right?

2    A.  Yes.

3    Q.  So now that you have this plea agreement that you signed

4    that gives you the potential not to spend the rest of your life

5    in jail, Mr. Bove is a pretty important person in your life,

6    isn't that right?

7             MR. BOVE:  Objection, your Honor.

8             THE COURT:  Overruled.

9    Q.  He's important in your life, right?

10   A.  No.

11   Q.  What he thinks of what you say in court -- strike that.

12            It is important to you to make Mr. Bove happy, isn't

13   that right, sir?

14   A.  No.

15   Q.  You want him to believe that you're truthful, right?

16   A.  I am only here to tell the truth.

17   Q.  I understand.  But you understand pursuant to your plea

18   agreement that you have to provide testimony that is truthful

19   in the sole discretion of the United States Attorney's Office,

20   isn't that right, sir?

21   A.  Yes.

22   Q.  Your lawyer told you that the prosecutor's office, they're

23   the ones who determine whether you're truthful, didn't he?

24   A.  Yes.

25   Q.  And without that sentence reduction that you talked about

1    on direct examination, that 5K1 document that you talked about

2    on direct examination, if Mr. Bove or his office doesn't file

3    that 5K motion with the Court, your sentence, no matter what,

4    is life, isn't it?

5    A.  Yes.

6    Q.  And you don't want to spend the rest of your life in jail,

7    do you?

8    A.  No.

9    Q.  You don't want to die in prison?

10   A.  No.

11   Q.  So you have a better outlook on life in light of your

12   agreement with the U.S. Attorney's Office, don't you, sir?

13   A.  I don't understand the question.

14   Q.  That your life is better now that you have an opportunity

15   with this agreement to potentially have your sentence reduced.

16   A.  Yes.

17   Q.  Because you were asked on direct examination or you

18   testified on direct examination that if the U.S. Attorney's

19   Office files that motion for sentence reduction you don't have

20   a minimum mandatory sentence anymore.

21             THE COURT:  Mr. Malone, I ask you not to be

22   repetitive.  I'm going to sustain an asked-and-answered

23   objection to that.

24             MR. MALONE:  Very well, Judge.

25             THE COURT:  Please move on.

JA8THER2                          Ardon Soriano - Cross

1              MR. MALONE:  I will do that.  Yes, sir.

2      BY MR. MALONE:

3      Q.  Sir, your freedom is valuable to you, isn't it?

4      A.  Yes.

5      Q.  And you'd pretty much do anything to be a free man again,

6      wouldn't you?

7      A.  All I have to do is tell the truth to be free.

8      Q.  The fact is, sir, isn't it accurate to say that your

9      testimony boils down to the difference between you going to

10     jail for the rest of your life and Tony Hernandez?

11             MR. BOVE:  Objection.

12             THE COURT:  Sustained.

13     Q.  Sir, I want to talk to you about some of the testimony you

14     gave a little bit earlier.  Okay?

15             THE COURT:  No, just ask the question.

16     Q.  Sir, you testified earlier that you were concerned about

17     being extradited to the United States government, is that

18     correct?

19             MR. BOVE:  Objection.

20             THE COURT:  Basis?

21             MR. BOVE:  It mischaracterizes what he testified to.

22             THE COURT:  Just rephrase it.

23             MR. MALONE:  Yes, sir.

24     Q.  Sir, it's fair to say while you were still in Honduras you

25     were concerned about being extradited to the United States, is

JA8THER2                          Ardon Soriano - Cross

1    that fair to say?

2    A.  No.

3    Q.  Based on the testimony you've provided, is it fair to say

4    that you, according to you, you inquired of Mr. Hernandez

5    multiple times about whether or not you would be extradited if

6    his brother became president.  Isn't that what you said?

7    A.  Yes.

8    Q.  So you had a fear of being brought to the U.S., being sent

9    to the U.S. by the president of Honduras, isn't that right?

10   A.  No.

11   Q.  You had seen the Valles get extradited, didn't you?

12   A.  Yes.

13   Q.  There were others before the Valles, right?

14   A.  Yes.

15   Q.  The word had gotten out through the drug trafficking

16   community that President Hernandez was extraditing drug

17   traffickers, right?

18   A.  Yes.

19   Q.  And while you were mayor of Paraiso, you gave other

20   politicians the impression you were successful agriculture

21   entrepreneur, isn't that right?

22           THE COURT:  Didn't we cover this already, Mr. Malone?

23           MR. MALONE:  I had a specific question.

24           THE COURT:  Well, the jury and I have been here, so go

25   ahead.  You can ask it.

JA8THER2                          Ardon Soriano - Cross

1   Q.  Is that right?

2   A.  Yes.

3   Q.  Including Juan Antonio Hernandez and his brother, Juan

4   Orlando Hernandez, isn't that right?

5   A.  No.

6   Q.  You mentioned you had a whole bunch of conversations with

7   Tony Hernandez.  Do you recall that?

8   A.  Yes.

9   Q.  Can I assume that you do not have anything other than your

10  testimony to support that?

11          MR. BOVE:  Objection.

12          THE COURT:  Sustained.

13  Q.  You indicated that you had conversations with Juan Orlando

14  Hernandez.  Do you recall that?

15  A.  Yes.

16  Q.  You called him on his cell phone, is that what you're

17  telling the jury?

18  A.  No.

19  Q.  You just walked into his office?

20  A.  No.

21  Q.  Who set up the meeting, sir?

22  A.  Which of the many meetings that I had with the president?

23  Q.  The one you had in Tegucigalpa.

24          MR. BOVE:  Objection.  That does not narrow it down.

25          MR. MALONE:  I'll rephrase.

JA8THER2                          Ardon Soriano - Cross

1   Q.  Were any of the meetings you said you had with the

2   President of Honduras, Juan Orlando Hernandez, did you call to

3   set up any of those meetings?

4   A.  Yes.

5   Q.  From your cell phone?

6   A.  No.

7   Q.  From what phone?

8   A.  I would meet with Carlos Pineda Fasquelle whenever there

9   was some meeting with President Hernandez.

10  Q.  You indicated that the president called you on at least one

11  occasion, didn't you, sir?

12  A.  Yes.

13  Q.  According to you, he called you on your cell phone?

14  A.  No, he called me through Fasquelle.

15  Q.  Who is that person?

16  A.  Fasquelle was Pepe Lobo's campaign coordinator and Juan

17  Orlando Hernandez's campaign coordinator, and my brother was

18  Juan Orlando's campaign coordinator through Carlos Pineda.

19  Q.  So the president wouldn't even call you, some assistant

20  would call you to set up what you say were meetings with him,

21  right?

22  A.  The president would call Carlos Pineda to set up the

23  meetings.

24  Q.  And Carlos Pineda would call you, is that right?

25  A.  Yes.

JA8THER2                     Ardon Soriano - Cross

1   Q.  During your term as mayor of El Paraiso, did you ever meet

2   with any U.S. government officials as mayor?

3   A.  No.  May I say something?

4   Q.  It's up to the judge.

5           THE COURT:  No.

6           MR. MALONE:  Judge, can I show the witness a document

7   that I will mark for identification DX 104, Judge?

8           THE COURT:  All right.

9   Q.  Sir, I want to ask you to take a look at this document,

10  Defense Exhibit 104, and tell me if you recognize it.

11  A.  Yes.

12  Q.  Is it an accurate picture of you?

13  A.  Yes.

14          MR. MALONE:  Move for admission, Judge?

15          THE COURT:  Is it a fair and accurate depiction of the

16  scene in the picture?

17          THE WITNESS:  Yes.

18          MR. MALONE:  Move for admission, Judge?

19          THE COURT:  Received.

20          (Defendant's Exhibit 104 received in evidence)

21  BY MR. MALONE:

22  Q.  Showing you what is marked as Defense Exhibit 104, sir, do

23  you see that document in front of you?

24  A.  Yes.

25  Q.  Are you in that picture?

JA8THER2                        Ardon Soriano - Cross

1    A.  Yes.

2    Q.  Where was that picture taken?

3    A.  That picture was taken when the airport project in Rio

4    Mario, Santa Rita, was opened.

5    Q.  Where are you in that picture, sir?  You can touch the

6    screen and show us where you are in that picture.

7           To your left -- sorry, from the screen to your right

8    there's a gentleman in a white shirt standing -- it's to the

9    right of the picture, the gentleman next to you, who is that

10   with the glasses on?

11   A.  He is the United States ambassador.

12   Q.  When was that picture taken, sir?

13   A.  That picture was taken at the moment of the opening when

14   all the Copan, Gracias Lempira mayors were invited.  That's

15   when that picture was taken.

16   Q.  Is your brother in that picture?

17   A.  No.

18   Q.  Who are the other people in the picture, starting from the

19   far right?

20   A.  The mayor of -- I don't remember where the gentleman that

21   is next to the ambassador is mayor from.

22   Q.  Okay.  The gentleman to your right or on our left that

23   you're right next to, the gentleman with the bald head, who is

24   he?

25   A.  I don't know him.

JA8THER2                    Ardon Soriano - Cross

1    Q.  Is this the ambassador?

2    A.  Yes.

3    Q.  Was that the first time you had met him?

4    A.  Yes.  Well, that is why we were happy, we were happy when

5    we saw him, and so all of us wanted to take a picture with him,

6    because it was a pleasure for us to get to meet the ambassador.

7    Q.  And what year was that, sir?

8    A.  I don't recall.

9    Q.  Sir, you've given us history, seven, eight, nine years ago,

10   you don't recall when you took this picture with the

11   ambassador?

12   A.  I do not recall.

13   Q.  2013, perhaps?

14   A.  I don't know.

15   Q.  Did you tell the U.S. ambassador that you were a drug

16   dealer, sir?

17   A.  No.

18   Q.  Did any of his security detail pull you aside because you

19   were a drug dealer, sir?

20   A.  No.

21   Q.  He had security, right?

22   A.  Yes.

23            MR. MALONE:  If I could have a moment, Judge?

24            THE COURT:  You may.

25            (Pause)

MR. MALONE:  Judge, I still have maybe ten minutes perhaps.

THE COURT:  All right.  We'll break for lunch.  Ladies and gentlemen, please do not discuss the case among yourselves or with anyone.  Please have a pleasant lunch and please keep an open mind.

Silence.

(Jury not present)

THE COURT:  Please be seated, ladies and gentlemen, I have a word for you.

This is a public courtroom and you're all welcome to be here and I appreciate your being here.  But the reason I am so insistent on silence when my jury is exiting is for two reasons:  One, it's a matter of respect to the Court and to the jury.  That's the first reason.

The second reason is it is my responsibility to ensure the integrity of this trial and to ensure that my jury is free from any interference.  And if people on my left are talking, I can't hear whether people on my right are talking to my jurors. The only way I can ensure that this is a fair trial, free from any interference, is if I have that silence, and I will strictly enforce it.  And if we get to the point where I have to have marshals eject people from the courtroom, I will make my findings of fact and I will do so.

So please follow that instruction going forward.  I'm

JA8THER2                        Ardon Soriano – Cross

1    very serious about it.

2              Have a pleasant lunch.

3              (Luncheon recess taken)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA8THER2                        Ardon Soriano – Cross

AFTERNOON SESSION

2:06 p.m.

1    (Jury not present)

2        THE COURT:  While we're remaining standing, I have a

3    message for anyone present in this courtroom.  I received a

4    report moments ago that one or more individuals had taken a

5    photograph of a juror exiting the building.  I will ask the

6    prosecutors and the marshal service to investigate because such

7    conduct could be construed as intimidation of jurors and could

8    result in a mistrial in this case and a prosecution of the

9    persons involved for obstruction of justice.  I trust that

10   behavior will not be repeated and I will instruct the

11   government to contact the marshal service to see that there is

12   a marshal outside assigned outside the courthouse to ensure

13   that such conduct does not go on.

14       MR. BOVE:  Yes, Judge.  Thank you.

15       THE COURT:  Please remain standing for our jury.

16       (Continued on next page)

JA89HERN3                    Ardon Soriano - Cross

1                    (Jury present)

2                    AMILCAR ALEXANDER ARDON SORIANO, resumed.

3                    THE COURT:  Mr. Malone, whenever your ready.

4                    MR. MALONE:  Thank you, Judge.  May I proceed?

5        CROSS-EXAMINATION CONTINUED

6        BY MR. MALONE:

7        Q.  Mr. Ardon, when did your family move to Spain?

8                    MR. BOVE:  Objection, Judge.

9                    THE COURT:  Sustained.

10       BY MR. MALONE:

11       Q.  Did your family move to Spain pursuant to some agreement

12       with the United States government?

13                   MR. BOVE:  Judge, I object and ask to be heard at

14       sidebar.

15                   THE COURT:  All right.  Let me hear you at the

16       sidebar.

17                   (Continued on next page)

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              (At the sidebar)

2              THE COURT:  It is a yes-or-no question.  What's your

3      objection?

4              MR. BOVE:  A line of questioning related to the

5      defendant's movement of his family in response to safety

6      concerns has already raised various serious risks to those

7      people and I just want to be careful about how much further

8      down this road we're going to go.

9              THE COURT:  What's your basis for the objection to the

10     question?

11             MR. BOVE:  That it -- a 403 basis that it raises grave

12     security concerns and it's not particularly probative of

13     anything.

14             THE COURT:  I think it's a yes-or-no question.

15             MR. MALONE:  I just want to know if he received that

16     benefit as a result.

17             THE COURT:  I'm going to allow the yes-or-no question.

18             MR. BOVE:  I could just clarify on the record there

19     was no such agreement from our perspective in terms of our

20     Giglio obligations.

21             THE COURT:  Thank you.

22             (Continued on next page)

23

24

25

1          (In open court)

2          THE COURT:  Karen, if you'd be so kind as to read the

3  question.

4          (Record read)

5          THE COURT:  That's a yes-or-no question.

6          THE WITNESS:  No.

7  Q.  Did the cellphone numbers that you used for drug

8  trafficking, did you turn those cellphone numbers over to the

9  prosecutor's office?

10         MR. BOVE:  Objection.  Asked and answered.

11         THE COURT:  Sustained.

12 Q.  Did you tell the prosecutors the cellphone number that you

13 said you had for Juan Antonio Hernandez?

14         MR. BOVE:  Objection.

15         THE COURT:  Basis.

16         MR. BOVE:  He didn't say that he had a cellphone

17 number.

18         THE COURT:  I'll allow the question.

19         THE WITNESS:  No.

20 Q.  Did you keep drug ledgers for your drug activity?

21 A.  Yes.

22 Q.  Did you turn those over to the prosecution?

23         MR. BOVE:  Objection.

24         THE COURT:  Sustained.

25 Q.  Where are they?

JA89HERN3                          Ardon Soriano - Cross

1    A.  Those ledgers were handled by Melvin Pinto.  The ledgers

2    were burned.

3    Q.  You had him burn them?

4    A.  No.  They had been burned ever since I came here.

5    Q.  They were burned before you arrived here in the U.S.?

6    A.  Yes.

7    Q.  Do you remember that picture of the TH that you testified

8    about yesterday?

9    A.  Yes.

10   Q.  When was the first time you were shown a picture of that TH

11   photograph?

12   A.  I did not understand the question.

13   Q.  You know what picture I'm -- do you remember what picture

14   I'm talking about, the one with the TH on it?

15   A.  Yes.

16   Q.  When was the first time you saw that picture?

17   A.  I saw that photo around 2011.

18           MR. MALONE:  Can we pull up Mr. Ardon's plea

19   agreement, Government Exhibit 702.

20           MR. BOVE:  Your Honor, 702 is not in evidence but the

21   government does not object to it being admitted.

22           THE COURT:  Do you want to offer it into evidence?

23           MR. MALONE:  Yes, I am, Judge.

24           THE COURT:  OK.  It's received without objection.

25           (Government's Exhibit 702 received in evidence)

JA89HERN3                    Ardon Soriano - Cross

1          MR. MALONE:  Can we publish it for the jury, Judge?

2          THE COURT:  You may.

3          MR. MALONE:  Can you turn to the signature page.

4     Q.  Mr. Ardon, I'm showing you Government Exhibit 702, your

5     plea agreement.  Do you recognize your signature on that last

6     page?

7     A.  Yes.

8     Q.  And you signed it on September 27 of 2019?

9     A.  Yes.

10         MR. MALONE:  Can we go to Appendix A, please, to

11    Government Exhibit 702.  Can we put it in landscape, if

12    possible.

13    Q.  Sir, Appendix A is page one of the people you have accepted

14    responsibility for murdering; isn't that right?

15    A.  I conspired in the murder of these people.

16         MR. MALONE:  OK.  Can we look at page two of Appendix

17    A.  Landscape, please.  Thank you very much.

18    Q.  These are the other individuals you have acknowledged

19    murdering, sir; isn't that right?

20    A.  I don't understand the question.

21    Q.  OK.  In your mind is there a difference between you

22    ordering someone to be murdered and you actually pulling the

23    trigger and murdering someone?

24    A.  Yes.

25    Q.  Are you suggesting that one is better than the other or

1   less offensive than the other?

2           MR. BOVE:  Objection.

3           THE COURT:  Sustained.

4           MR. MALONE:  Can we go to page Appendix B, please.

5   Landscape.

6   Q.  Appendix B, sir, who are these people?

7   A.  Sergio Neftali Duarte, Jairo Orellana Morales.

8   Q.  Are these people that were injured or tortured?

9   A.  I don't remember.

10  Q.  You don't remember injuring these victims on Appendix B?

11  Is that what you're saying?

12  A.  No.  I don't remember.

13          MR. MALONE:  Can we go to Appendix C and put it in

14  landscape, please.

15  Q.  Sir, do you recognize these names from 1993 to 2011?

16  A.  Yes.

17  Q.  What did you do to these people, sir?

18  A.  I killed Pedro with a worker.

19  Q.  So these are additional people that you acknowledged to the

20  United States government that you participated in their murder?

21  Is that fair?

22  A.  These people are in the 56 people.

23  Q.  OK.  Did you do something in addition to what you did to

24  them that appears on Appendix A?  Why is there an Appendix C is

25  what I'm asking.

1          MR. BOVE:  Objection.

2          THE COURT:  If you know.

3    Q.  If you know.

4    A.  I don't understand.

5    Q.  Why are these people on a separate spreadsheet, if you

6    know?

7    A.  I don't know.

8          MR. MALONE:  Judge, that's all I have.

9          THE COURT:  All right.  Thank you.

10          Redirect.

11          MR. BOVE:  Thank you, Judge.

12   REDIRECT EXAMINATION

13   BY MR. BOVE:

14   Q.  You were asked some questions before lunch about whether

15   you tried to keep your drug trafficking a secret.  Do you

16   recall those questions?

17   A.  Yes.

18   Q.  Did you keep your drug trafficking a secret from the

19   defendant in this case?

20   A.  Yes.

21   Q.  What about the defendant's brother, Juan Orlando?

22   A.  I'm sorry?  I don't understand.

23   Q.  You told the defendant and Juan Orlando about your drug

24   trafficking, correct?

25   A.  Yes.

JA89HERN3                    Ardon Soriano – Redirect

1    Q.  You testified yesterday that you helped the defendant

2    transport between 30 and 40 tons of cocaine?

3    A.  Yes.

4    Q.  Your drug trafficking was actually reported in the media in

5    Honduras, correct?

6    A.  Yes.

7    Q.  You testified that Juan Orlando instructed you not to seek

8    reelection because of those news reports?

9    A.  Yes.

10   Q.  You also testified that the defendant told you that Juan

11   Orlando was removing Ramon Sabillon because Sabillon criticized

12   your drug trafficking?

13   A.  Yes.

14   Q.  And despite these media reports were you ever arrested in

15   Honduras?

16   A.  No.

17   Q.  As far as you know, was your drug trafficking ever even

18   investigated in Honduras?

19   A.  No.

20   Q.  You were asked some questions this afternoon about the 56

21   murders that you've accepted responsibility for in the United

22   States.

23   A.  Yes.

24   Q.  Were you ever arrested in Honduras for any of those

25   murders?

JA89HERN3                    Ardon Soriano - Redirect

1    A.  No.

2    Q.  As far as you know, were you ever even investigated for any

3    of those 56 murders in Honduras?

4    A.  No.  I was not investigated.

5    Q.  Now, I think you've said yesterday and this morning that

6    the Honduran National Police actually coordinated one of the

7    murders for you and the defendant; is that right?

8    A.  Yes.

9    Q.  That victim was Franklin Arita?

10   A.  Yes.

11           MR. BOVE:  Ms. Hurst, can you please bring up Appendix

12   A of Government Exhibit 702.  And highlight entry 25.

13   Q.  The murder of Franklin Arita is one of the murders included

14   in your plea agreement, correct?

15   A.  Yes.

16   Q.  And you were asked some questions today about whether an

17   honest man would commit murders.  Do you remember those

18   questions?

19   A.  Yes.

20   Q.  Have you been honest with the government about your

21   violence?

22   A.  Yes.

23   Q.  You were asked some questions about whether your life was

24   dim after you surrendered.  Do you remember those questions?

25   A.  Yes.

1           MR. BOVE:  Ms. Hurst, could you please turn to page 3

2   of the agreement.  And zoom in on the first -- page 3 of 702.

3   I'm sorry.  Zoom in on the top paragraph.

4   Q.  This part of your plea agreement says that you face a

5   mandatory minimum sentence of life imprisonment to be followed

6   by a mandatory consecutive sentence of 30 years' imprisonment.

7   Do you see that?

8   A.  Yes.

9   Q.  And you know that this agreement will be ripped up if you

10  lie at this trial, correct?

11  A.  Yes.

12  Q.  You know that if you lie at this trial there will be no 5K?

13  A.  Yes.

14  Q.  You know that if you lie at this trial you will be

15  sentenced to life plus 30 years in jail, correct?

16  A.  Yes.

17  Q.  You were asked some questions about the worldwide manhunt

18  for Chapo Guzmán?

19  A.  Yes.

20  Q.  And you testified on direct about two meetings in Honduras

21  with Chapo in 2013?

22  A.  Yes.

23  Q.  What types of security were put in place to allow Chapo to

24  enter Honduras twice during that year?

25  A.  The security that was put in place when Chapo first came

JA89HERN3                    Ardon Soriano - Redirect

1    into Honduras was composed of half of the men were from

2    Honduras and half of the men were from Guatemala.

3    Q.  Did the Honduran National Police help provide security to

4    allow Chapo to land in Honduras?

5    A.  We handled that security with our own men and the police

6    would provide us information to be sure that it was only the

7    National Police was coming into El Paraiso and none other.

8    Q.  Were roads blocked?

9    A.  The one headed to the ranch, yes, it was.  It was a private

10   road.

11   Q.  Was the security in place for Chapo armed?

12   A.  Yes.

13   Q.  How?

14   A.  With AR-15s and M16s.

15   Q.  You were asked some questions about the extradition of the

16   Valle brothers to the United States.

17   A.  Yes.

18   Q.  And you testified this morning that that happened in 2014?

19   A.  Yes.

20   Q.  And I think you said that you spoke to the defendant about

21   the extradition of the Valles, correct?

22   A.  Yes.

23   Q.  And that the defendant explained to you that Juan Orlando

24   extradited the Valles because they tried to assassinate him?

25   A.  Yes.

JA89HERN3                    Ardon Soriano - Redirect

1   Q.  You were asked some questions today about whether you

2   feared extradition.  Do you remember that?

3   A.  Yes.

4   Q.  You said you did not fear extradition, correct?

5   A.  Yes.

6   Q.  Why were you not afraid of being extradited to the United

7   States?

8   A.  Because I was protected by Juan Orlando Hernandez.

9   Q.  What about the defendant?

10  A.  Him too.

11              MR. BOVE:  Nothing further, Judge.

12              THE COURT:  All right.  You may step down.

13              (Witness excused)

14              THE COURT:  The government may call its next witness.

15              MS. HOULE:  Thank you.  With your Honor's permission,

16  the government would like to offer a stipulation and read an

17  exhibit into the -- before the jury before calling the next

18  witness.

19              THE COURT:  All right.  Is this a stipulation of fact

20  or a stipulation of testimony?

21              MS. HOULE:  It's a stipulation of fact, your Honor.

22  And it's marked as Government Exhibit 1002.

23              THE COURT:  All right.  Please proceed.

24              MS. HOULE:  Ms. Hurst, could you please publish

25  Government Exhibit 1002.

1          If you could zoom in, please, on the numbered

2   paragraphs.

3          "The parties agree that Government Exhibit 402

4   contains messages exchanged on June 23, 2016 between two men

5   (Male 1 and Male 2) using the BlackBerry Messenger application.

6          "While exchanging the messages reflected in Government

7   Exhibit 402, Male 1 used a cellphone connected to a

8   telecommunications network in Honduras, and Male 2 used a

9   cellphone connected to a telecommunications network in

10  Guatemala."

11         Ms. Hurst if you could turn to the next page, please,

12  and zoom in on the numbered paragraphs.

13         "The original communication column of Government

14  Exhibit 402 accurately reflects the actual messages exchanged

15  by Male 1 and Male 2, which were lawfully intercepted in the

16  United States pursuant to a court order.

17         "The translation column of Government Exhibit 402

18  contains true and accurate English translations of the

19  Spanish-language communications.

20         "The participant column of Government Exhibit 402

21  refers to the individual who sent the messages reflected in the

22  original communication cell of that row."

23         Your Honor, we've already offered the stipulation into

24  evidence.  We would also offer now Government Exhibit 402

25  and -- just 402.

1          THE COURT:  And the exhibit number of the stipulation
2     is?
3          MS. HOULE:  1002.
4          THE COURT:  So 1002, if it's not already in evidence
5     is in evidence without objection.  As is Exhibit 402.
6          (Government's Exhibits 1002 and 402 received in
7     evidence)
8          MS. HOULE:  Your Honor, I'd ask now that we be
9     permitted to read from Government Exhibit 402, myself reading
10    Male 1 and Ms. Hurst reading Male 2.
11         THE COURT:  All right.  That's fine.  Do you want
12    Ms. Hurst to take the witness stand or do you want to do it in
13    place?
14         MS. HOULE:  I think she's fine doing it in place, your
15    Honor.
16         Ms. Hurst, if you could publish it on the screen,
17    please.
18         And this is a BlackBerry communication on June 23,
19    2016.
20         MALE 1:  "Haven't you received one palo for deposit,
21    caus?  Have you seen those already, caus?  There are three
22    hundred."
23         Male 1 then sends a photo.
24         And, Ms. Hurst, if you could zoom in on the photo.
25    Thank you, Ms. Hurst.  You can zoom out.

JA89HERN3                    Ardon Soriano - Redirect

1       MALE 2:  "My client still has me waiting caus, caus,
2  look, that's a no but they look good.
3       MALE 1:  "Yes, caus, they are giving me 300 of those.
4  They are there at SPS already.  Caus, and one palo there.
5  Don't you have it, so that I can go do that at SPS myself?"
6       MALE 2:  "Yes, caus, be patient with me, please.  You
7  know that this had never happened to us before.
8       MALE 1:  "Yes, caus, never.  Caus, when will there be
9  something to deposit, approximately?  So that I can talk to
10 him, and I'm not bothering you.  Because I feel bad bothering
11 you, when you are always so punctual in paying me."
12      MALE 2:  "If I gave you an exact day, I would be lying
13 to you, caus, it's just that these people don't tell me.  When
14 I ciento, they are asking me for numbers.  What I do promise
15 you is that the first thing that they give me will be for you."
16      MALE 1:  "Yes, caus, help me out with that.  As soon
17 as you have something, give it to me."
18      MALE 2:  "Yes, caus, count on that."
19      MALE 1:  "So I won't take those 300, right, caus?"
20      MALE 2:  "Right now, I would like you to pay -- I
21 would like to pay you before I commit to more, caus."
22      MALE 1:  "One question, so that I don't lie to this
23 guy?"
24      MALE 2:  "Yes?"
25      MALE 1:  "He is asking me to wait -- he is asking me

JA89HERN3                     Ardon Soriano - Redirect

1  to ask you how many more days we have to wait.  That way I

2  won't bother you and I won't lie to him."

3           MALE 2:  "Well, the thing is that the people don't

4  tell me an exact day because they don't even like to say when

5  the ship leaves.  Look, what they tell me is just -- no, buddy,

6  there is no movement, but this week it will start moving just

7  fine.  God willing."

8           MALE 1:  "Yes, of course, caus, I understand that."

9           MALE 2:  "If I was managing it, you know that between

10 you and I we always tell each other what the reality is."

11          MALE 1:  "Look what the dude tells me and what you

12 tell me, I tell him.  Since this had never happened that they

13 had to wait like this, that's why.  But we have to wait, caus

14 and how."

15          MALE 2:  "Yes, caus, I understand him too.  Yes, caus,

16 we don't have any other option, but we'll be done with this

17 soon, God willing."

18          MALE 1:  "They have you waiting and you have me

19 waiting, and I have him waiting, and he has someone else

20 waiting, that's the way it goes, right?"

21          MALE 2:  "Things are safe here ha, ha, no kidding this

22 is a ladder."

23          MALE 1:  "Yes, caus, I have no doubt about that.  It's

24 just that I am the one who has to answer to him, you know,

25 because if I don't read his messages, as other people do, well

1   that's not possible.  I answer him as soon as he sends a

2   message because, if not, he might get the wrong idea, that I

3   lost something, you know.  It's my responsibility to keep him

4   posted, you know, caus."

5          MALE 2:  "Yes, caus, I'm the same."

6          MALE 1:  "He is asking me for 500 for SPS, which you

7   told me that you didn't have.  He almost started crying when I

8   told him that I didn't have any."

9          MALE 2:  "I'm hauling fucking ass caus, I swear."

10         MALE 1:  "Because he asked me whether I had 500 over

11   here."

12         MALE 2:  "I have all the money invested.  Do you think

13   that I would want to let you down?"

14         MALE 1:  "Yes.  I know caus, that if you had them you

15   would sent them to me right away."

16         MALE 2:  "With the work that you have given me?

17   Never."

18         MALE 1:  "No.  I know, caus, and neither would I to

19   him, we are in the same situation.  He is the only one who

20   gives to me, and well, why would I ever want to let him down?

21   But we are not letting anyone down, caus.  There has been a

22   delay."

23         MALE 2:  "That's right, caus.  God willing we'll be

24   done with this soon."

25         MALE 1:  "Caus, and what if I tell this man this

1  Sunday, caus?  Because he's pestering me and saying that he

2  wants me to name a day.  This way you can think of your people.

3  Whether they can solve this for you by that day."

4          MALE 2:  "Those hillbillies don't even work on

5  Sundays, caus, I wouldn't want to name a day for you because I

6  do not like to lie."

7          MALE 1:  "But as far as you know, caus, because if you

8  will -- get some paper, well, I can go leave it at SPS.

9          "And these people are stubborn, caus, asking me to go

10 and pick up 200 things.  Of the ones that I sent you a picture

11 of."

12         MALE 2:  "What I can tell you is that you should count

13 on the first thing that I get."

14         MALE 1:  "Thank you, caus."

15         MALE 2:  "You know it, caus."

16         MALE 1:  "Caus, if I grab those 200 there, send

17 someone for them tomorrow, right?  I'm going to send them to

18 see how they are."

19         MALE 2:  "But wait for us to be done with this, caus,

20 too much pressure."

21         MALE 1:  "Yes, caus, you are right."

22         MALE 2:  "This is going to calm down."

23         MALE 1:  "God willing, caus."

24         MALE 2:  "Amen."

25         MS. HOULE:  Thank you, Ms. Hurst.  You can take that

1   down.

2          Your Honor, the government calls Special Agent

3   Sandalio Gonzalez.

4   SANDALIO GONZALEZ,

5        called as a witness by the Government,

6        having been duly sworn, testified as follows:

7          THE COURT:  Ms. Houle, you may inquire.

8          MS. HOULE:  Thank you, your Honor.

9   DIRECT EXAMINATION

10  BY MS. HOULE:

11  Q.  Where do you work?

12  A.  The DEA.

13  Q.  For how long have you worked at the DEA?

14  A.  For approximately 20 years.

15  Q.  What was your first position at the DEA?

16  A.  I was a contract linguist for the DEA.

17  Q.  In what language?

18  A.  Spanish language.

19  Q.  Are you fluent in Spanish?

20  A.  Yes, ma'am.

21  Q.  What was your next position at the DEA?

22  A.  Basic agent training academy.

23  Q.  And following the academy did you become a special agent?

24  A.  Yes, ma'am.

25  Q.  What's your can current position at the DEA?

JA89HER3                    Gonzalez – Direct

1    A.   I'm a group supervisor at the bilateral investigations

2    unit.

3    Q.   In what division is the bilateral investigations unit?

4    A.   Special operations division.

5    Q.   What is the special operations division?

6    A.   Special operations division is one of DEA's divisions

7    comprised of several law enforcement agencies throughout the

8    United States to coordinate all law enforcement investigations

9    and DEA investigations worldwide.

10   Q.   For how long have you worked at the special operations

11   division?

12   A.   Approximately nine years.

13   Q.   You mentioned the bilateral investigations unit.  Has your

14   work in that unit focused on any particular regions?

15   A.   Yes, ma'am.

16   Q.   Which ones?

17   A.   Latin America.

18   Q.   On any particular countries?

19   A.   Mostly Venezuela and Honduras.

20   Q.   Directing your attention to November 22, 2018.  Did you

21   travel to Miami on that date?

22   A.   Yes, ma'am.

23   Q.   Why?

24   A.   Because on the following day we were planning to conduct an

25   arrest of one of the targets of our investigations.

JA89HER3                         Gonzalez - Direct

1    Q.  And who was that?

2    A.  Juan Antonio Hernandez.

3    Q.  Did you arrest Juan Antonio the following day?

4    A.  Yes, ma'am.

5    Q.  Do you see him in the courtroom here today?

6            THE COURT:  You can stand up.

7            THE WITNESS:  Yes, I do.

8    Q.  Could you please identify him based on where he is located

9    and an item of clothing that he's wearing?

10   A.  He's seated in the second table, third from the right.  I

11   can't see what he's wearing.  There's a TV in the way there.

12           THE COURT:  Well you've noted the location.

13   Identification is noted.

14   Q.  Turning your attention to November 23, 2018, the day after

15   you traveled to Miami.  Did you go back to the Miami Airport

16   that day?

17   A.  Yes, ma'am.

18   Q.  Is that where you arrested the defendant?

19   A.  Yes, ma'am.

20   Q.  When you first arrived at the Miami Airport did you meet up

21   with any other law enforcement?

22   A.  Yes, I did.

23   Q.  Who did you meet up with?

24   A.  I met up with my supervisor, George Papadopoulos, two DEA

25   Miami agents assigned to the airport group, and several

1   officers from the Customs and Border Protection assigned to the

2   airport.

3   Q.  Why did you meet up with Customs and Border Protection

4   officers?

5   A.  Because we were conducting an arrest at the airport and

6   that's their area.

7   Q.  Where did you go next?

8   A.  We went to the gate where the defendant was expected to

9   arrive.

10  Q.  What happened once you arrived at the gate?

11  A.  We got off the little golf cart that we took to get there

12  and walked over towards the gate.

13  Q.  What did you see once you arrived in the area of the gate?

14  A.  As I was walking towards the gate I saw the defendant and a

15  companion walking out of the jet bridge towards the counter.

16  Q.  What did you see the defendant do next?

17  A.  I saw him say something very briefly to one of the airline

18  employees at the counter and then walk away from the gate.

19  Q.  What did you see him do next?

20  A.  The defendant and his travel companion walked towards the

21  bathroom and the defendant went inside the bathroom.

22  Q.  Did you see anything before the defendant entered the

23  bathroom?

24  A.  Yes, ma'am.

25  Q.  What did you see?

JA89HER3                    Gonzalez - Direct

1    A.  As the defendant and his companion were walking towards the

2    bathroom we were kind of shadowing them and we were kind of

3    unusual police presence there so he seemed to notice that we

4    were there.

5    Q.  What happened next?

6    A.  The defendant went into the bathroom and we waited outside.

7    Q.  What did you do next?

8    A.  After a little while waiting I grew a little concerned and

9    I went inside the bathroom to look for the defendant.

10   Q.  What were you concerned about?

11             MR. TEIN:  Objection.

12             THE COURT:  Sustained.

13   Q.  What happened once you entered the bathroom?

14   A.  I went into the bathroom and I saw the defendant preparing

15   to exit the bathroom.

16   Q.  What happened next?

17   A.  So I went into the bathroom, waited a few seconds and then

18   I exited the bathroom.

19   Q.  Once you exited the bathroom, what did you see?

20   A.  I saw the defendant speaking with the officials from CBP.

21   Q.  Where did you go next?

22   A.  We went to the -- back to the jet bridge area of the gate

23   where the defendant had deplaned.

24   Q.  Why did you go to the jet bridge?

25   A.  It was a more private area and it was the way that we

JA89HER3                          Gonzalez - Direct

1    needed to take to go down onto the tarmac towards the CBP

2    vehicles and where the luggage from the planes was being taken

3    off.

4    Q.  What happened after --

5           THE COURT:  Again, CBP is?

6           THE WITNESS:  Is Customs and Border Protection.

7    Q.  What happened at the jet bridge?

8    A.  We explained to the defendant that he was under arrest and

9    we asked his travel companion if he was willing to go back to

10   the office, answer some questions, discuss the situation and

11   possibly take possession of the defendant's personal items.

12   Q.  When you communicated with the defendant at the jet bridge,

13   in what language were you communicating?

14   A.  Spanish.

15   Q.  Did you communicate with the defendant in Spanish

16   throughout that day?

17   A.  Yes, ma'am.

18   Q.  Where did you go next?

19   A.  We got into the vehicles and went to the Customs and Border

20   Protection offices at the airport.

21   Q.  What was the setup at the Customs and Border Protection

22   office?

23   A.  It was a medium size room with a bench, a counter a few

24   feet away from the bench, some desks behind the counter,

25   hallway, and a couple of closed offices on the hallway and the

JA89HER3                      Gonzalez - Direct

1    exit.

2    Q.  When you entered the offices with the defendant did you see

3    him anywhere?

4    A.  Yes.

5    Q.  Where was that?

6    A.  He was seated at the -- on the bench.

7    Q.  Did you have any communication with the defendant at that

8    point?

9    A.  Yes, I did.

10   Q.  What was said?

11   A.  I showed the defendant the arrest warrant -- his arrest

12   warrant and we reviewed it.

13   Q.  Did you leave the bench area at that time?

14   A.  Yes, I did.

15   Q.  Did you later return?

16   A.  Yes, ma'am.

17   Q.  Was the defendant still seated there when you returned?

18   A.  Yes, ma'am.

19   Q.  What, if anything, was in front of the defendant at that

20   point?

21   A.  His personal belongings.

22   Q.  Were certain of those personal belongings seized as part of

23   your arrest of the defendant?

24   A.  Yes, ma'am.

25   Q.  I'm showing you what's been marked for identification as

1   Government Exhibit 207.

2              MS. HOULE:  Ms. Hurst, if you could pull that up for

3   the Court and the parties, please.

4   Q.  What is in that bag?

5   A.  It's a Honduran passport.

6   Q.  Is that passport in the same condition as when you seized

7   it at the time of the defendant's arrest?

8   A.  Yes, ma'am.

9              MS. HOULE:  Government offers 207.

10             MR. TEIN:  No objection.

11             THE COURT:  Received.

12             (Government's Exhibit 207 received in evidence)

13  Q.  Special Agent, I have left an exhibit marked in front of

14  you for identification as Government Exhibit 205.

15             MS. HOULE:  Ms. Hurst, if you could also pull that up

16  for the Court and the parties, please.

17  Q.  What's in that bag, Special Agent?

18  A.  A diplomatic passport from the country of Honduras.

19  Q.  Is that passport in principally the same condition as when

20  you seized it at the time of the defendant's arrest?

21  A.  Yes, ma'am.

22             MS. HOULE:  The government offers 205.

23             MR. TEIN:  No objection.

24             THE COURT:  All right.  Received.

25             (Government's Exhibit 205 received in evidence)

JA89HER3                       Gonzalez – Direct

1   Q.  Was any money seized from the defendant at the time of his

2   arrest?

3   A.  Yes, ma'am.

4   Q.  How much?

5   A.  Approximately $8,000.

6   Q.  In what denomination were those bills?

7   A.  One hundred dollar bills.

8   Q.  Did you eventually move the defendant from the bench area

9   to another location within the Customs and Border Protection

10  office?

11  A.  Yes, ma'am.

12  Q.  Where did you go?

13  A.  We went into one of the side rooms in the hall.

14  Q.  Who was present in the room?

15  A.  Myself, the defendant, my supervisor, George Papadopoulos,

16  and one of the DEA Miami Airport agents.

17  Q.  At that point did you have any discussion with the

18  defendant about the charges against him?

19  A.  Yes, I did.

20  Q.  What was said?

21  A.  Again, I explained to him that he was being arrested for a

22  federal narcotics violations and weapons-related offenses.

23  Q.  Did you have any discussion with the defendant about what

24  his options were at that time?

25  A.  Yes, ma'am.

JA89HER3                     Gonzalez - Direct

1   Q.  What did you say?

2   A.  I explained to the defendant that he could cooperate or not

3   cooperate and he could plead guilty or plead not guilty to the

4   charges.

5   Q.  What, if anything, did the defendant say about whether he

6   wished to speak with you?

7   A.  He stated that he wanted to begin cooperating.

8   Q.  Where did you go next?

9   A.  From there we went to the DEA office inside the Miami

10  office.

11  Q.  Why did you switch locations?

12  A.  We were in somebody else's office and they were waiting for

13  us to finish and the DEA office had the equipment that we

14  needed in order to do the processing of the defendant.

15  Q.  What happened once you arrived at the DEA office at the

16  airport?

17  A.  We went to the room where the equipment was and

18  fingerprinted him, took his photograph, took his basic

19  biographical information.

20  Q.  Where did you next take the defendant?

21  A.  After allowing the defendant to use the restroom we went to

22  an interview room in the office.

23  Q.  Did you record your interview with the defendant at that

24  DEA office?

25  A.  Yes, ma'am.

1          MS. HOULE:  Your Honor, at this time I'd offer a

2     stipulation between the parties which has been marked for

3     identification as Government Exhibit 1003.

4          THE COURT:  Any objection?

5          MR. TEIN:  No, your Honor.

6          THE COURT:  Received.

7          (Government's Exhibit 1003 received in evidence)

8          MS. HOULE:  Ms. Hurst, if you could please publish

9     that on the screen.  And if you could focus on the numbered

10    paragraphs.

11         The parties agree as follows.

12         "On November 23, 2018 Juan Antonio Hernandez Alvarado

13    was arrested before boarding an international flight at the

14    Miami International Airport.

15         "Government Exhibit 201 is a waiver form that Juan

16    Antonio Hernandez Alvarado read, initialed, and signed after

17    his arrest.

18         "Government Exhibit 201-T is a true and accurate

19    English translation of Government Exhibit 201.

20         "Government Exhibit 403 is a disk that contains

21    segments from a videotaped interview of Juan Antonio Hernandez

22    Alvarado by agents from the U.S. Drug Enforcement

23    Administration.  The interview was conducted at the Miami

24    International Airport following the arrest of Hernandez

25    Alvarado on November 23, 2018.

1          "Government Exhibit 403-T is a transcript that

2    contains transcriptions of the Spanish-language statements in

3    the segments on Government Exhibit 403, as well as English

4    translations of those Spanish-language statements.  The

5    transcriptions, translations, and attributions contained in

6    Government Exhibit 403-T are true and accurate."

7          Your Honor, the government offers the exhibits

8    referenced in the stipulation which is 201, 201-T, 403 and

9    403-T.

10          MR. TEIN:  Without objection.

11          THE COURT:  Received without objection.

12          (Government's Exhibits 201, 201-T, 403 and 403-T

13    received in evidence)

14          MS. HOULE:  Ms. Hurst could you please now play

15    Government Exhibit 403-1.

16          (Audio/video recording played).

17    Q.  Special Agent, just so we can orient ourselves here.

18    Throughout the duration of that clip there was a man who was

19    shown principally on camera wearing a blue shirt.  Who is that?

20    A.  That is the defendant.

21    Q.  And there was someone speaking off camera who was wearing a

22    black shirt.  Was that you?

23    A.  Yes, ma'am.

24    Q.  During the course of that segment you mentioned calling a

25    Mr. Retureta.  Who is that?

JA89HER3                         Gonzalez - Direct

1    A.   It's an attorney that the defendant asked that I call prior

2    to him cooperating.

3    Q.   Were you able to reach Mr. Retureta?

4    A.   No, ma'am.

5    Q.   Did you tell the defendant that?

6    A.   Yes, ma'am.

7    Q.   What did the defendant say in response?

8    A.   That he wanted to continue, go forward and cooperate.

9    Q.   During that segment you provided the defendant with a form.

10   What was that form?

11   A.   That's a standard DEA form advice of rights.

12   Q.   When is that form used?

13   A.   It's used after someone has been arrested prior to

14   commencing an interview.

15        MS. HOULE:  Ms. Hurst, could you please publish on the

16   left side of the screen Government Exhibit 201 and on the right

17   side 201-T.

18   Q.   Special Agent, what's shown on the left side of the screen?

19   A.   The left side is the form that I read to the defendant.

20   Q.   There is a translation on the right side of the screen.

21   What are the rights that are listed there?

22   A.   Would you like me to read them?

23   Q.   Yes, please.

24   A.   "You have the right to remain silent.

25             "Anything you say can be used against you in a court

1   of law.

2           "Before being asked any questions, you have the right

3   to consult with an attorney.

4           "You have the right to have an attorney present during

5   your questioning.

6           "If you cannot pay for the services of an attorney,

7   and if you wish to have one, an attorney will be named for you

8   before you are asked any questions.

9           "Have you understood your rights?

10          "Are you willing to answer some questions?"

11  Q.  And to the left of each of the rights that you identified

12  there are initials.  Whose initials are those?

13  A.  The defendant's.

14  Q.  What did the defendant write in response to the question,

15  "Have you understood your rights?"

16  A.  "Yes."

17  Q.  And what did he write in response to the question, "Are you

18  willing to answer some questions?"

19  A.  "Yes."

20  Q.  There are several signatures at the bottom of the page.

21  What is the first signature that's listed?

22  A.  The defendant's.

23  Q.  And what is the signature below that?

24  A.  My signature under the first witness line and the second

25  witness line is my supervisor, George Papadopoulos.

JA89HER3                    Gonzalez - Direct

1    Q.  And what is the time that was listed?

2    A.  12:37 p.m.

3              MS. HOULE:  Thank you.  You can take that down,

4    Ms. Hurst.

5              And Ms. Hurst if you could please play Government

6    Exhibit 403-2 and then 403-3.

7              (Audio/video recordings played).

8              MS. HOULE:  Thank you, Ms. Hurst.

9              Could you please bring up the frame at 20 seconds in

10   Government Exhibit 403-2.

11   Q.  During this interview, Special Agent, you asked the

12   defendant, "When did you get started in that?"

13             To what were you referring?

14   A.  Drug trafficking.

15             MR. TEIN:  Objection.

16             THE COURT:  Excuse me.  Overruled.

17   Q.  Can you please read the first sentence of the defendant's

18   response listed on the screen?

19   A.  "Well, look, like I said, I told you last time, uh, several

20   people arrived in Lempira to recruit many young people."

21             MS. HOULE:  Ms. Hurst, could you please move back to

22   the left side of the screen and zoom in on it and on the right

23   side of the screen could you please bring up Government Exhibit

24   3 and zoom in on the left side of the map.

25   Q.  Special Agent, can you please circle Lempira on the map.

1           (Witness complies)

2    Q.   Looking back at the left-hand side of this screen, the

3    defendant says "I told you last time."

4           Had you met previously with the defendant?

5    A.   No, ma'am.

6    Q.   Had anyone else at the DEA met with him?

7    A.   Yes, ma'am.

8           MS. HOULE:   Thank you, Ms. Hurst.   You can take that

9    down.

10          And if you can please play Government Exhibit 403-4.

11          (Audio/visual recording played)

12          MS. HOULE:   Ms. Hurst, could you please pull up the

13   frame at zero seconds in 403-4.

14   Q.   Special Agent, who is the person who the defendant

15   identifies as his best friend during this portion of the

16   interview?

17   A.   Carlos Mauricio Toledo.

18          MS. HOULE:   Ms. Hurst, could you please move that to

19   the left side of the screen and on the right side of the screen

20   could you please publish Government Exhibit 119 and zoom in on

21   the photo.

22   Q.   Who is shown in that photo on the right side of the screen?

23   A.   Carlos Mauricio Toledo.

24          MS. HOULE:   And now on the left side of the screen,

25   Ms. Hurst, could you please move to the next frame of the video

1    which is at eleven seconds.

2    Q.  Special Agent, where does the defendant say that Carlos

3    Toledo lived?

4    A.  In the defendant's house in Tegucigalpa.

5         MS. HOULE:  Ms. Hurst, on the right side of the screen

6    could you please pull up Government Exhibit 4.  And if you

7    could zoom in, please, thank you.

8    Q.  Special Agent, can you please circle on the map where

9    Tegucigalpa is?

10        (Witness complies)

11   Q.  Looking back at the left-hand side of the screen, where

12   does the defendant say that Toledo would go to work?

13   A.  San Pedro.

14   Q.  Could you please circle San Pedro on the map, on the

15   right-hand side of the screen.

16        (Witness complies)

17        MS. HOULE:  Thank you, Ms. Hurst.  You can take those

18   down.

19        Now, Ms. Hurst, on the left side of the screen could

20   you please turn to the next frame of the video which is at 29

21   seconds.  And if you could zoom in on that.

22   Q.  The defendant identifies two individuals here, Don H and

23   Rojo.

24        MS. HOULE:  Ms. Hurst on the right side of the screen

25   can you please pull up Government Exhibit 108.

JA89HER3                          Gonzalez - Direct

1    Q.   Special Agent, who is shown on the right side of the

2    screen?

3    A.   That's Hector Emilio Fernandez a/k/a Don H.

4    Q.   I'm showing you what's been marked for identification as

5    Government Exhibit 107.

6            MS. HOULE:  Ms. Hurst, if you could please pull that

7    up for the Court and the parties.

8    Q.   Who is shown in 107?

9    A.   Victor Hugo Diaz Morales, alias El Rojo.

10   Q.   Is that a fair and accurate depiction of Diaz Morales?

11   A.   Yes, ma'am.

12           MS. HOULE:  The government offers Government Exhibit

13   107.

14           MR. TEIN:  No objection, your Honor.

15           THE COURT:  Received.

16           (Government's Exhibit 107 received in evidence)

17           MS. HOULE:  Thank you, Ms. Hurst.  Could you please

18   publish that for the jury.

19   Q.   Now that we have it on the screen for the jury, Special

20   Agent, can you identify the person on the right-hand side of

21   the screen?

22   A.   Victor Hugo Diaz Morales, alias Rojo.

23           MS. HOULE:  Thank you, Ms. Hurst.  You can take that

24   down.

25           Now, Ms. Hurst, if you could please pull up the frame

1    at 1 minute and 30 seconds of this segment.

2    Q.  Special Agent, can you please read the last sentence of the

3    defendant's statement on the screen?

4    A.  "Later on, this guy Mario Jose Calix also got involved."

5              MS. HOULE:  Thank you, Ms. Hurst.  You can take that

6    down.

7              Can you please pull up Government Exhibit 502, page 1,

8    and zoom in on the bottom row.

9    Q.  Whose photo is shown on the left side of the screen,

10   Special Agent?

11   A.  Mario Jose Calix.

12             MS. HOULE:  Thank you, Ms. Hurst.  You can take that

13   down.

14             Now, Ms. Hurst, if you could please pull up the frame

15   at 2 minutes and 1 second.

16   Q.  During this portion of the interview, Special Agent, of

17   whom were you speaking with the defendant?

18   A.  Mario Calix.

19   Q.  Can you please read your question and the defendant's

20   response?

21   A.  "When you say 'these businesses,' are you talking about

22   drug trafficking?"

23             "Defendant:  Yes."

24   Q.  Did you continue to speak with the defendant about Mario

25   Jose Calix during this interview?

1  A.  Yes, ma'am.

2           THE COURT:  All right.  At this point we're going to

3  take a very short recess because we're breaking early today.

4  Please do not discuss the case among yourselves or with anyone.

5  We'll be back in action in five or ten minutes.

6           We are in recess.

7           (Recess)

8           THE COURT:  Please remain standing for our jury.

9           (Jury present)

10           THE COURT:  Ms. Houle, any time you're ready.

11           MS. HOULE:  Thank you, your Honor.

12  BY MS. HOULE:

13  Q.  Before the break, Special Agent, I asked you if you

14  continued to speak with the defendant about Mario Jose Calix

15  during this interview?

16  A.  Yes, ma'am.

17           MS. HOULE:  Ms. Hurst, could you please play 403-5.

18           (Audio/video recording played)

19  Q.  Special Agent, did you return to discussing that

20  individual, Carlos Toledo, during this interview?

21  A.  Yes, ma'am.

22           MS. HOULE:  Ms. Hurst, could you please play 403-6.

23           (Audio/video recording played)

24           MS. HOULE:  Thank you, Ms. Hurst.

25           If you could play from the beginning of 403-6 since

JA89HER3                      Gonzalez - Direct

1   the screen cut out.

2            (Audio/video recording played)

3   Q.  Special Agent, during the interview did the defendant go on

4   to discuss his relationship with Toledo?

5   A.  Yes, ma'am.

6            MS. HOULE:  Ms. Hurst could you please play 403-7.

7            (Audio/video recording played)

8            MS. HOULE:  Ms. Hurst, I don't think that it's

9   appearing on the jury's screens.

10           THE COURT:  Did you have it or no?

11           JUROR:  Now we have it.

12           MS. HOULE:  If you could restart this segment.

13           Thank you, Ms. Hurst.

14           (Audio/video recording played)

15  Q.  Did the topic of gifts from Toledo come up at any other

16  times during this interview?

17  A.  Yes, ma'am.

18           MS. HOULE:  Ms. Hurst, could you please play

19  Government Exhibit 403-15, beginning at 24 seconds.

20           (Audio/video recording played)

21           MS. HOULE:  Ms. Hurst, could you now please play

22  403-16, starting at 31 seconds.

23           (Audio/video recording played)

24  Q.  Did the defendant return to this topic of any gifts from

25  Rojo later in the interview?

1    A.  Yes, ma'am.

2            MS. HOULE:  Ms. Hurst, could you please play 403-19.

3            (Audio/video recording played)

4            MS. HOULE:  Thank you, Ms. Hurst.  You can take that

5    down.

6    Q.  Did there come a time in the interview where you showed the

7    defendant a photo on your phone?

8    A.  Yes, ma'am.

9    Q.  What did you show him?

10   A.  I showed him a picture of a kilogram of cocaine with the

11   marking TH on it.

12           MS. HOULE:  Ms. Hurst, could you please publish

13   Government Exhibit 305 and zoom in on the photo.

14   Q.  How does this photo compare to the one that you showed the

15   defendant during the interview?

16   A.  It's the same one.

17           MS. HOULE:  Ms. Hurst, could you now please play

18   Government Exhibit 403-8.

19           (Audio/video recording played)

20           MS. HOULE:  Ms. Hurst, on the left side of the screen

21   could you please bring up the frame at 31 seconds and zoom in

22   on it and on the right side if you could bring up Government

23   Exhibit 305 and zoom in on the photo.

24   Q.  Special Agent, looking at the left side of the screen, what

25   does the defendant say about the TH kilo?

1    A.  He said, "That's a T and an H," supposedly it's Tony

2    Hernandez.

3    Q.  Did there come a time in the interview when you asked the

4    defendant when he began participating in drug trafficking?

5    A.  Yes, ma'am.

6            MS. HOULE:  Ms. Hurst, could you please play 403-9.

7            I'm sorry, your Honor.  It looks like the jury's

8    screens may have gone out again.

9            THE COURT:  Wait a minute.  We don't have it here

10   either, so.  OK.  Do you have it now?

11           JUROR:  Yes.

12           (Audio/video recording played)

13           MS. HOULE:  Thank you, Ms. Hurst.  You can take that

14   down.

15   Q.  During this interview, Special Agent, did the topic of Juan

16   Orlando's position in Congress and the presidency come up?

17   A.  Yes, ma'am.

18           MS. HOULE:  Ms. Hurst, could you please play 403-10.

19           (Audio/video recording played)

20           MS. HOULE:  Ms. Hurst, could you please now pull up

21   Government Exhibit 502 at page 4 and zoom in on the top row.

22   Q.  Special Agent, during the course of this interview did the

23   defendant discuss an individual Fredy Nájera?

24   A.  Yes, ma'am.

25           MS. HOULE:  Ms. Hurst, could you please play 403-17,

1    starting at 20 seconds.

2              (Audio/video recording played)

3              MS. HOULE:  Thank you, Ms. Hurst.  You can take that

4    down.

5    Q.  During the course of your interview did the Cachiros

6    organization come up?

7    A.  Yes, ma'am.

8              MS. HOULE:  Ms. Hurst, could you please play 403-12.

9              (Audio/video recording played)

10   Q.  I'm showing you what's been marked for identification as

11   Government Exhibit 116.

12             MS. HOULE:  Ms. Hurst, if you could pull that up for

13   the Court and the parties, please.

14   Q.  Who is shown there?

15   A.  Devis Leonel Rivera Maradiaga.

16   Q.  Does that fairly and accurately depict Mr. Maradiaga?

17   A.  Yes, ma'am.

18             MS. HOULE:  Government offers 116.

19             MR. TEIN:  No objection your Honor.

20             THE COURT:  Received.

21             (Government's Exhibit 116 received in evidence)

22             MS. HOULE:  I've also left a folder in front of you

23   marked Government Exhibit 117.  Could you open that, please.

24             Ms. Hurst, if you could publish that for the Court and

25   the parties.

JA89HER3                          Gonzalez - Direct

1   Q.  Who is shown in that photo?

2   A.  Javier Rivera Maradiaga.

3   Q.  Does the photograph fairly and accurately depict Javier

4   Maradiaga?

5            MS. HOULE:  Government offers 117.

6            MR. TEIN:  No objection.

7            THE COURT:  Received.

8            (Government's Exhibit 117 received in evidence)

9            MS. HOULE:  Ms. Hurst, could you please publish

10  Government Exhibit 116 on the left side of the screen and

11  Government Exhibit 117 on the right.

12  Q.  Special Agent, who is shown on the left side of the screen?

13  A.  Devis Leonel Rivera Maradiaga.

14  Q.  Who is shown on the right side of the screen?

15  A.  Javier Rivera Maradiaga.

16  Q.  Are they affiliated with any organization in Honduras?

17  A.  Yes, ma'am.

18  Q.  Which one?

19  A.  They are the leaders of the Cachiros organization.

20           MS. HOULE:  Thank you, Ms. Hurst.  You can take that

21  down.

22           Ms. Hurst, if you could please pull up the frame at 37

23  seconds.

24           Now Ms. Hurst, on the left side of the screen if you

25  could please pull up Government Exhibit 121 and on the right

JA89HER3                    Gonzalez - Direct

1    side 122.

2    Q.  Who is shown on the left side of the screen?

3    A.  Luis Valle Valle.

4    Q.  And who is shown on the right side?

5    A.  Miguel Valle Valle.

6    Q.  During your interview did you continue to ask the defendant

7    to identify traffickers in Honduras?

8    A.  Yes, ma'am.

9           MS. HOULE:  Ms. Hurst, could you now please play

10   403-13.

11          (Audio/video recording played)

12   Q.  During the that portion of the interview the defendant

13   mentioned a person, Mr. Pinto.  Where did the defendant say

14   Pinto was from?

15   A.  Copan.

16   Q.  Is El Paraiso located in Copan?

17   A.  Yes, ma'am.

18          MS. HOULE:  Ms. Hurst, could you please pull up

19   Government Exhibit 101.

20   Q.  Who is shown in Government Exhibit 101?

21   A.  Alexander Ardon Soriano.

22   Q.  Does he go by any alias?

23   A.  Yes.

24   Q.  What is that?

25   A.  Chande.

JA89HER3                     Gonzalez - Direct

1              MS. HOULE:  Ms. Hurst, could you please play
2      Government Exhibit 403-18.
3              (Audio/video recording played)
4      Q.  Did there come a time in the interview where the defendant
5      discussed a location where traffickers held meetings?
6      A.  Yes, ma'am.
7              MS. HOULE:  Ms. Hurst, could you please play 403-20.
8              (Audio/video recording played)
9              MS. HOULE:  Ms. Hurst, could you now please play
10     403-14.
11             (Audio/video recording played)
12             THE COURT:  All right.  With that, ladies and
13     gentlemen, we're going to call it a day.  Tomorrow there will
14     be no trial session.  For some it will be a day of religious
15     observance.  And I hope all of you have a good day tomorrow.
16     Remember the admonition not to discuss the case with anyone,
17     not to do any research of your own, nothing like that.  That's
18     what a fair trial is all about.  It's decided on what goes on
19     in this courtroom and nothing else.  So, a good holiday and I
20     will see you bright and early on Thursday morning.
21             You may find it more comfortable leaving the
22     courthouse leaving from the Worth Street exit.  You know,
23     you're down on the first floor and you see that portrait of a
24     judge, that's former Chief Justice John Marshall who was
25     appointed by John Adams to the Supreme Court.  There's a big

JA89HER3                    Gonzalez - Direct

1    oil portrait of him.  If you go down that long corridor you can

2    exit the building on Worth Street if you find that more

3    comfortable.  All right.

4              Have a pleasant one.  Thank you.

5              See you bright and early on Thursday morning.

6              (Jury not present)

7              THE COURT:  Thank you.  See you all Thursday morning.

8    Thank you.

9              One moment please.  You may be seated, counsel.

10             Mark it as a court exhibit and I will -- let me see

11   counsel at sidebar.

12             You may be seated in the back.  Court for the day is

13   adjourned except for this sidebar.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  OK.  This note is going to be marked as

3   Court Exhibit 3 and it reads, just handed to me.

4          "Dear Judge Castel:

5          "Given the uncertain outcome of this trial and the

6   severe consequences of a negative outcome for both the

7   defendant as well as the Honduran government and the country's

8   drug traffickers it occurred to me that it would be in the

9   interests of several parties to interfere with the jury either

10  in the form of persuasion or worse.  From what I have seen in

11  the trial thus far, the traffickers have the means, money, and

12  motive to try something nefarious.  What, if anything, has been

13  discussed on the government's side to assure the jury's safety?

14  This in no way affects my impartiality, nor have I mentioned it

15  to the other jury members.  I thank you for your

16  consideration."

17          And it's signed by juror no. 37.

18          "Since writing this note yesterday, myself and at

19  least one other juror noticed we were photographed at close

20  range just outside the courthouse by what appeared to be an

21  individual with no media logo or identification.  The photo was

22  taken on a cellphone."

23          All right.  So that's what I've received.  It appears

24  to me that the juror is the first alternate.

25          Flo, is that correct?  No. 37.  I think it's the first

1    alternate.

2              THE DEPUTY CLERK:  Juror 37 is 14.

3              THE COURT:  He is the second -- so he's juror no. 14.

4    And so I just note that for the record.

5              And certainly you'll notice I've mentioned to the jury

6    that they might be more comfortable exiting the other exit.

7    And I've alerted United States Marshal Mike Greco of the

8    concern that I've voiced right after the lunch break.  So

9    that's all I have to report at this stage.

10             MR. MALONE:  Judge, this is along that same security

11   intermingling line, if in the mornings when we start trial

12   there could be some mechanism at least for the lawyers to get

13   in or the jurors.  Usually you don't see it because you're in

14   chambers, but there's like a throng of those people who are

15   lined up to get their seats.  They're like jockeying for

16   position.  So what I've noticed, and I'm sure other counsel

17   noticed, the jurors kind of have to interact with that in order

18   to get in, so that's along the same lines as the Court is

19   concerned about.

20             THE COURT:  I will -- I hear what you're saying and I

21   don't have an instant answer to that.  The one thing I will say

22   is that this trial has been going on, I guess it's our fifth

23   day including jury selection, and with the exception of my

24   insisting on silence when we break the -- those in the audience

25   have been very well behaved.  I've never seen even any slight

JA89HER3                        Gonzalez - Direct

1    demonstration of anything for one side or for the other, no

2    signs, no shirts, no buttons, nothing with any message on it.

3    And I have observed on the 500 Pearl Street side, the plaza, in

4    evenings, that there are people congregated there and it looks

5    like some of the same people who have been in the courtroom.

6    We've had a reasonably full courtroom throughout the trial.

7    So -- with spectators, I'm talking about.  So your suggestion

8    is worthwhile.  But, I certainly also want to balance it with

9    not calling undue attention or concern or the like.  And the

10   fact that on the record in the presence of the jury I try to

11   treat this with a light touch doesn't mean that I'm not

12   concerned.  So I would appreciate it if you see or hear

13   anything to let me know and if you have any proposals that I

14   could act on I certainly would consider it but we have a -- we

15   have the security pavilion people would come through.  I

16   wouldn't want to start segregating groups because that just

17   calls attention.  And that's where we are as of now.

18            MR. TEIN:  Quick two questions.  One, can we please

19   have a copy of the note?

20            THE COURT:  No.  You can read it.  It's here.  It's a

21   court exhibit.  You can read it as many times as you want.

22            MR. TEIN:  And the second question is:  Was it juror

23   37 or 14?

24            THE COURT:  I think the answer is this.  The person

25   who during jury selection was juror no. 37 sits in seat 14 in

JA89HER3                    Gonzalez - Direct

1    the jury box.

2              MR. TEIN:  OK.

3              THE COURT:  Which implies that the individual is the

4    second alternate juror.  So that's that.  OK.

5              MR. MALONE:  Yep.

6              MR. BOVE:  Thank you, Judge.

7              MR. TEIN:  Thank you.  Have a good evening.

8              THE COURT:  And by all means feel free to read the

9    note.

10             (Adjourned to October 10, 2019 at 10 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3      AMILCAR ALEXANDER ARDON SORIANO

4     Direct By Mr. Bove . . . . . . . . . . . . . 442

5     Cross By Mr. Malone  . . . . . . . . . . . . 466

6     Redirect By Mr. Bove . . . . . . . . . . . . 514

7     SANDALIO GONZALEZ

8     Direct By Ms. Houle  . . . . . . . . . . . . 526

9                        GOVERNMENT EXHIBITS

10    Exhibit No.                              Received

11     702    . . . . . . . . . . . . . . . . . . 511

12     1002 and 402  . . . . . . . . . . . . . . . 521

13     207    . . . . . . . . . . . . . . . . . . 533

14     205    . . . . . . . . . . . . . . . . . . 533

15     1003    . . . . . . . . . . . . . . . . . . 536

16     201, 201-T, 403 and 403-T   . . . . . . . . 537

17     107    . . . . . . . . . . . . . . . . . . 543

18     116    . . . . . . . . . . . . . . . . . . 549

19     117    . . . . . . . . . . . . . . . . . . 550

20                        DEFENDANT EXHIBITS

21    Exhibit No.                              Received

22     104    . . . . . . . . . . . . . . . . . . 502

23         . . . . . . . . . . . . . 0

24

25