```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                        15 CR 379(PKC)

5   Juan Antonio Hernandez
    Alvarado,
6
                    Defendant.
7
    ------------------------------x
                                         Sentencing
8

9

10                                       New York, N.Y.
                                         March 30, 2021
11                                       2:00 p.m.

12
    Before:
13
                      HON. P. KEVIN CASTEL,
14
                                         District Judge
15
                          APPEARANCES
16

17  AUDREY STRAUSS
         United States Attorney for the
18       Southern District of New York
    EMIL J. BOVE
19  MATTHEW LAROCHE
         Assistant United States Attorney
20

21  PETER BRILL
    DAVID GRAY
22       Attorneys for Defendant

23  Also present:  Special Agent Brian Fairbanks, DEA

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1            (In open court; case called)

2            THE COURT:  United States v. Juan Antonio Hernandez

3    Alvarado.

4            For the government.

5            MR. LAROCHE:  Good afternoon, your Honor.  Matt

6    LaRoche and Amil Bove.  With us is Special Agent Brian

7    Fairbanks for the Drug Enforcement Agency.

8            THE COURT:  Good afternoon to you all.

9            For the defendant.

10           MR. BRILL:  Good afternoon, your Honor.

11           Peter Brill on behalf of Mr. Hernandez Alvarado.

12   Accompanying me is David Gray, an associate from my office.

13           THE COURT:  Good afternoon and Good afternoon,

14   Mr. Hernandez Alvarado.

15           Before we begin, I want to get this on the record that

16   I direct the prosecution to comply with its obligation under

17   *Brady v. Maryland* and its progeny to disclose to the defense

18   all information, whether admissible or not, that is favorable

19   to the defendant, materially to guilt or punishment and known

20   to the prosecution.  Possible consequences for noncompliance

21   may include dismissal of individual charges, or the entire case

22   or granting a new trial, professional discipline, or court

23   sanctions on the attorneys responsible.  As you know I have

24   entered a written order for fully describing the obligations

25   and possible consequences for failing to meet those obligations

1  and I direct the prosecution to review and comply.

2          Let me inquire, Mr. LaRoche, does the government

3  understand its obligations and will it fulfill them.

4          MR. LAROCHE:  It does understand those obligations and

5  will fulfill them and at least believes it has fulfilled them

6  in this case, your Honor.

7          THE COURT:  Mr. Bove, same question.

8          MR. BOVE:  Yes, your Honor.  I stand by what

9  Mr. LaRoche said.

10          THE COURT:  Thank you.

11          Mr. Brill, has the defendant received, reviewed, and

12  discussed the presentence report that was revised by Probation

13  on February 12th, 2012?

14          MR. BRILL:  Yes, your Honor.

15          THE COURT:  All right.

16          First of all, let me go through the materials I have

17  on the subject of sentencing.  I have a memorandum that was

18  filed by predecessor counsel on or about February 9th, 2020.  I

19  have a sentencing memorandum that was submitted by the

20  government on March 16th, 2021.  I have a submission from you

21  as well, which helpfully annexes letters from members of the

22  defendant's family, friends and others.

23          Do I have everything I should have on the subject of

24  sentencing?

25          MR. BRILL:  In a sense what has been submitted to the

1    Court, yes, your Honor yes.  Before we proceed Mr. Hernandez

2    Alvarado has asked me to inform the Court that he does not

3    believe he is prepared to move forward to sentencing.  I

4    informed the Court of this yesterday afternoon as well as the

5    government.  I am happy to go into it more in detail now as to

6    his concerns, but he wanted me to make that clear at the outset

7    of sentencing.

8              THE COURT:  I appreciate that very much.  The reality

9    is that the jury that convicted Mr. Hernandez returned its

10   verdict in October of 2019.  On the day the jury returned the

11   verdict, my recollection is that we set a date for sentencing.

12   Now, the date for sentencing has been adjourned understandably

13   at the defendant's request.  I have granted repeated

14   adjournments of the sentencing.

15             The time has come for the defendant to be sentenced.

16   He has had in hand the presentence report revised by Probation

17   since February, 12, 2020, over a year ago and before the

18   shutdown of the pandemic.

19             So I am not inclined to adjourn the sentencing

20   further.

21             THE COURT:  Thank you.

22             MR. BRILL:  If I may say a couple things with regard

23   to that.  I don't believe my client had the PSR quite that

24   earlier, but I don't believe predecessor counsel provided it to

25   him.  So he did get it to me.

1          Second, if your Honor would allow me to make a brief

2     record as to Mr. Hernandez Alvarado's concerns.

3          THE COURT:  Yes.

4          MR. BRILL:  Your Honor, given the fact that certain

5     members of the prosecution team in this matter had concerns

6     raised about their conduct in another matter before a different

7     judge in this court coupled with the Court's -- well, the chief

8     executive's *Brady* order and the Court's *Brady* order in this

9     specific case has raised concerns for Mr. Hernandez Alvarado in

10    this case that *Brady* material that should have been turned over

11    to him has not been turned over to him.  Mr. Hernandez Alvarado

12    has asked us on numerous occasions to go over specific aspects

13    of the 3500 material turned over to him to look for *Brady*

14    material.  He also believes that there is material that exists

15    outside the trial record that would tend to prove his innocence

16    in this matter.

17         We have spent a significant amount of time going into

18    the evidence that was available to us.  I have explained

19    without giving away anything in attorney-client privilege to

20    Mr. Hernandez Alvarado that we are not at the stage of the

21    proceeding where we can file, say, an appeal or a 2255 or even

22    a Rule 33 motion for new evidence.  We could file the Rule 33

23    motion for new evidence, but we have three years from verdict

24    to do that and so he is still well within the statute of

25    limitations on that.

1          However, we cannot go into the government's files

2    without the government's authorization to look for things that

3    may tend to clear Mr. Hernandez Alvarado.  Although, those

4    things may exist, they are certainly not within our power to

5    find them.  He is not satisfied with that answer.  As such he

6    is not satisfied with our representation and that is where we

7    find ourselves today.

8          THE COURT:  Well, thank you, Mr. Brill, for that

9    update and report.  I will note that it is just a simple

10   reality that the reason an order was entered in this case

11   relating to *Brady* material and the reason I made my oral

12   statement was as you alluded to I think you referred to it as

13   chief executive of the country.  It was actually the President

14   signing into law a statute that required that.  The statute had

15   nothing specific to do with this case.  I think you were

16   alluding to a case before Judge Nathan of this court.  I am

17   well aware of that case.  As is the case, this is not the time

18   or the place for investigations, motions, or the like.

19         There was an indictment.  There was an opportunity for

20   retained counsel to make applications to the Court.  They did

21   from time to time.  They were ruled on by the Court.  A jury

22   was empaneled.  The jury heard the evidence and the jury

23   returned its verdict.  I think long before or maybe before you

24   got involved in this case, certainly there was the motion at

25   the close of the evidence by defense counsel and the Court

1    ruled on that or it's implicitly denied.

2            So we're at a point at this stage where the time has

3    come to pass sentence.  Once sentence is passed, the judgment

4    of conviction is entered Mr. Hernandez will have the

5    opportunity to pursuance appeal to the United States Court of

6    Appeals for the Second Circuit.

7            The other item that I didn't mention that I have is a

8    March 29, 2021, letter from the government enclosing a proposed

9    forfeiture order.

10           I will ask the government, do I have everything that I

11   should have on the subject of sentencing?

12           MR. LAROCHE:  Yes, your Honor.

13           THE DEFENDANT:  (In Spanish).

14           THE COURT:  Mr. Hernandez Alvarado, you will have an

15   opportunity in the course of this proceeding to speak.  I will

16   ask you to speak or invite you to speak and you may at that

17   point address the Court and I will patiently listen to what you

18   have to say.

19           Understood?

20           Now, with regard to objections by the defendant, I

21   note that the memorandum that was filed by predecessor counsel

22   was filed before the presentence report was revised.  So that

23   is a reality here.  So the objections do not in essence address

24   the PSR that is before the Court.  I don't see drafts of the

25   PSR.  Defense counsel see them.  The Court doesn't see them.

1    And that is fair because they are finalized after hearing from

2    the parties.

3            I note on page 27 of the PSR, there were a number of

4    paragraphs that Probation reports that the defendant objects

5    to.  I guess I would ask you are these objections lodged

6    because understandably Mr. Hernandez maintains his innocence in

7    this case and therefore he is objecting to conclusions that

8    proceed from the jury's verdict; is that the premises of the

9    objections?

10           MR. BRILL:  Your Honor, primarily, yes.  Although, I

11   believe with regard to paragraph 71, there is an aggravated

12   role enhancement objection.

13           THE COURT:  We'll get to that, but thank you for

14   pointing that out.

15           I will take that up.  I was looking on page 27.  It

16   refers to 16, 17, 19, 21, 24 to 41, 47, 49 to 51.  So with

17   regard to those, the basis for the objection is they are

18   inconsistent with the claim of innocence; is that it?  It's not

19   that there is an alternate narrative that Mr. Hernandez is

20   putting forth to the Court or some correction as to what the

21   trial evidence was.  It is he objects to the extent these

22   paragraphs are inconsistent with his claim of innocence; is

23   that accurate?

24           MR. BRILL:  That is accurate, yes.

25           THE COURT:  Now, I am going to leave the paragraphs in

1    the PSR as unchanged.  There has been no argument advanced to

2    me that the paragraphs are inconsistent with the trial

3    evidence.  It is simply that defendant's view is the trial

4    evidence ought not be believed, which is contrary to the jury's

5    verdict.

6          Now, with regard to paragraph 52, the basis for the

7    objection as I understand it is not a dispute with regard to

8    the facts specifically but the claim that there is no evidence

9    that Mr. Hernandez had any knowledge and/or involvement in the

10   matter alleged in the paragraph; is that correct?

11         MR. BRILL:  That's correct, your Honor.

12         THE COURT:  What I propose do is to add that specific

13   sentence, *There is no evidence that Mr. Hernandez had any*

14   *knowledge and/or involvement in the matters alleged in this*

15   *paragraph*, at the end of paragraph 52.

16         Any objection from the government?

17         MR. LAROCHE:  No, your Honor.

18         THE COURT:  So I am going to add that paragraph 52.

19         With regard to paragraphs 55 to 57, the information in

20   paragraphs 55 to 57 I don't see any basis to strike that.  It's

21   argued that he had no knowledge or involvement with any of the

22   information.  Well, we know that is not true as to the DEA

23   interview on October 25th, 2016.

24         With regard to the disclosure of a witness' name,

25   there is no evidence that anyone other than defense counsel,

1    Mr. Hernandez, and an investigator working for the defense team

2    Chase Lalani had the information.  It is what is the fair

3    inference to be drawn from that, but I don't understand there

4    to be a basis to dispute the facts that are set forth in 55,

5    56, or 57.

6            If there is, I need to hear that.

7            MR. BRILL:  I think it conflates Mr. Hernandez with

8    those who were working for him or his attorneys at the time.

9    Mr. Hernandez's point is that the knowledge should not be

10   attributed to him and any resulting from those consequences

11   therefore should not be attributed to him.

12           THE COURT:  I understand the objection.  It will

13   stand.

14           With regard to the enhancements, I will hear you on

15   any you want to be heard on or you can, if you choose, rest on

16   the description of the defendant's position on pages 28 and 29

17   in paragraphs 64 to 73.

18           MR. BRILL:  Again, specifically as to 73 it is the

19   same argument regarding of the information.  We renew our

20   objection with regard to that.

21           Primarily as your Honor noted previously, the

22   objections are to the facts as brought out at trial are not in

23   keeping with Mr. Hernandez's understanding of the truth of the

24   matter.  So he objects on that basis.

25           THE COURT:  Understood.

1          With regard to paragraph 73, the enhancement stands.

2    Although, I base it on the disclosure of information relating

3    to the testifying witness as set forth in paragraphs 56 and 57.

4    It is based on that conduct.  So the objections to the

5    enhancements in paragraphs 64, 65, 66, 68, 71 and 73 has been

6    considered and it is rejected.  Of course, I also have the

7    benefit of predecessor's counsel memorandum on this subject.

8          MR. BRILL:  Your Honor, before we move on, may I have

9    a moment with my client?

10          THE COURT:  You may.

11          (Pause)

12          MR. BRILL:  Okay, your Honor.

13          THE COURT:  Does the government have any objections to

14    the facts set forth in the presentence report?

15          MR. LAROCHE:  No, your Honor.

16          THE COURT:  It seems to me that paragraph 47 should be

17    adjusted from 200,000 to 185,000, which reviewing the

18    submissions appears to be closer to the trial evidence.

19          Any objection from the government?

20          MR. LAROCHE:  No, your Honor.  Thank you.

21          THE COURT:  Same question for the defense, any

22    objection to my lowering the number from 200,000 to 185,000 in

23    paragraphs 47?

24          MR. BRILL:  No procedural objection, your Honor.

25    Understanding that the defendant maintains a general objection

1    to the facts brought out at trial.

2            THE COURT:  Understood.

3        I know the government has one objection to the

4    guideline calculation with regard to abuse of trust.  Do you

5    want to rely on your papers, or do you want to raise anything

6    by way of argument?

7            MR. LAROCHE:  Rely on our papers, your Honor.

8            THE COURT:  It seems to me that the abuse of trust

9    enhancement under 3B1.3 is appropriate.  It provides that if

10    the defendant abused a position of public trust in a manner

11    that significantly facilitated the commission or concealment of

12    the offense, there is a two-level increase.  A position of

13    public trust is characterized by professional or managerial

14    discretion, substantial discretionary judgment that is

15    ordinarily given considerable deference, and the position of

16    public trust must have contributed in some significant way in

17    facilitating the commission or concealment of the offense.

18    That's what the guideline provides.

19        Mr. Brill, is there anything beyond what is in the

20    written submissions that you wish to rely on with regard to

21    this enhancement?

22            MR. BRILL:  Your Honor, we suggest that Probation's

23    determination is accurate if I accept the facts brought out at

24    trial that the business was ongoing long before there was a

25    position of public trust and therefore that abuse of public

1    trust would not be triggered because any additional benefit

2    received by that public position was de minimis at best.

3            THE COURT:  Thank you.

4            It seems to me that it is appropriate here because,

5    first of all, the defendant was elected as a, if you will,

6    deputy congressperson in 2009.  Suplente, I think it is called.

7    It was after 2012 when the Honduran Constitution was amended to

8    delete the prohibition on extradition or to allow extradition,

9    that the defendant assumed the position and was elected to the

10   position of congressperson in his own right.  I believe the

11   amendment was in 2012 and he was elected in 2014.  Having this

12   position in Congress gave him greater confidence and those who

13   dealt with him in the drug trafficking business greater

14   confidence that he would not be extradited.  It gave him the

15   confidence and ability that he could meet with DEA agents in

16   2016 confident at least in his own mind that the DEA wouldn't

17   dare touch an elected congressman.

18           My recollection of the testimony is he met with Romaro

19   of the concharos to talk about rerouting government payments to

20   other concharo front companies and that was after he was

21   elected to Congress.  There, he was using his own governmental

22   position to assist with drug trafficking and also the

23   concealment of drug trafficking.  So the abuse of trust

24   enhancement is allowed.

25           Any other objection to the guideline calculation?

1          MR. LAROCHE:  No, your Honor.

2          THE COURT:  Mr. Brill, any other objection to the

3    guideline calculation?

4          MR. BRILL:  Nothing specific, your Honor.

5          THE COURT:  Thank you.

6          I adopt as my guideline calculation the guideline

7    calculation set forth in the PSR.  The defendant is at total

8    offense level 43, criminal history category one.  Further, I

9    adopt as my findings of fact the facts set forth in the

10   presentence report supplemented by the trial evidence.

11   Obviously, I was here for the trial.  I heard the evidence.  I

12   read the exhibits.  The facts of record are also part of my

13   findings of fact for this proceeding.

14         I will now give Mr. Brill an opportunity to speak on

15   behalf of the defendant and then I will give Mr. Hernandez an

16   opportunity to speak on his own behalf.

17         MR. BRILL:  Thank you, your Honor.

18         As I noted in my submission to the Court, our

19   government has made a determination that in some remote way,

20   the enforcement of the United States narcotics laws against

21   citizens of sovereign nations far removed from ours is in this

22   country's best interest.  Even if all of the evidence in this

23   case is believed, the connection to the United States it is our

24   position is tenuous.  That doesn't change the fact of course

25   that these charges were brought and a jury was seated and a

1   jury delivered the verdict it did.

2          What we are suggesting is more, I suppose, at this

3   point a public policy objection to this type of prosecution

4   where the United States decides that it can police the world to

5   rid the world what it believes to be bad actors.  The

6   government obviously has a very different view.  They believe

7   that my client had a direct negative impact on the citizens of

8   this country.  Frankly, as I have noted, I believe the citizens

9   of this country have had a direct negative impact on themselves

10  with their voracious appetite for illegal narcotics and perhaps

11  the resources of our government should be better focused on

12  helping the victims of addiction whether they are from legal or

13  illegal narcotics in this country.

14         Mr. Hernandez Alvarado is one of 12 children from a

15  very hardworking and educated family.  He has young children of

16  his own that no matter what sentence the Court imposes will no

17  doubt never see him again.  If they do ever do see him again,

18  it will be through a thick sheet of plexiglass or behind bars.

19         He will not have the life that he once had.  No doubt

20  many in this room or elsewhere believe that is an appropriate

21  result; but Mr. Hernandez Alvarado maintains that this is not

22  the man he is, not the man he was, and these are not crimes

23  that he committed.  He maintains his innocence of these crimes

24  and feels that the witnesses who testified against him were not

25  only self-motivated but motivated against him in a sufficient

1    enough way to make up as much as they could to ruin his life

2    and the life of his family, and they succeeded in doing so.  He

3    will no doubt appeal his conviction and continue to maintain

4    his innocence through this process.

5         That being said, your Honor, the suggestion that there

6    is any difference in reality between a 40-year sentence and a

7    life sentence is really specious.  He is a man in his 40s in

8    prison.  As prior counsel noted -- I am not sure where they got

9    this calculation, but I don't doubt it -- every year in prison

10   amounts to two years on the outside.  So he is unlikely to live

11   to 82 or so.  Even with good time it would be 75 or something

12   like that.  He is unlikely to make it there.  If he did, he

13   would be an old, sick and broken man at that point.

14         So I would urge the Court for whatever mercy the Court

15   has to impose the mandatory minimum sentence.  Perhaps he will

16   see the light of day outside of prison unlikely as that may

17   seem.

18         THE COURT:  Thank you, Mr. Brill.

19         Juan Antonia Hernandez Alvarado, this is your

20   opportunity to speak to address the Court directly to bring to

21   my attention any facts or circumstances that you believe I

22   should take account of in passing sentence upon you today.  If

23   there is anything you wish to say, this is the time to say it.

24         THE DEFENDANT:  Thank you, your Honor.

25         First of all, I would like to ask you whether the

1    letters that I sent to your office approximately a week and a

2    half ago reached you?

3    THE COURT:  I have a letter which has been given to me

4    that was dated or received in chambers on March 23rd, 2021.  I

5    have no other letter, unless it was referenced to something

6    that is in this envelope.

7    THE DEFENDANT:  In one of my letters, your Honor, I

8    expressed my dissatisfaction with Mr. Brill's representation

9    and it may be because of the pandemic or because of things he

10   has to tend to.  Two times and six calls like yesterday's I

11   have sent a countless number of emails that I realized because

12   of an issue that happened in Judge Nathan's chambers, you

13   issued a *Brady* order.  Since that time I have been insistently

14   writing to my attorney so that he can explain to me and so that

15   we can work on the *Brady* violations.  I haven't obtained any

16   answer until approximately two months ago.

17   The same as with the PSI, the presentence

18   investigation report, this day is the first time that I am able

19   to discuss this issue with him.  I am not able to discuss it

20   with my prior attorneys nor with him until this day.  The

21   purpose of my letters was to request from you what was my

22   attorney, Mr. Brill's, problem in tending to this matter.

23   In my meeting that I had with him two months ago, he

24   assured me that there would be no other hearing because we

25   would be working on the *Brady* violations.  I posted more than

1    five and he told me you will have an answer in 15 days.  To my

2    surprise I find out on the news that my sentence is today

3    because the government has been requesting that my sentence

4    must be issued quickly.  So all of this, your Honor, I have

5    heard through the media.

6           To my surprise yesterday when I said to my attorney,

7    Mr. Attorney, how are we going to deal with the pending *Brady*

8    violation matters he replies to me, *I don't have the power to*

9    *issue what you are asking me to review*, And we're in a country

10    that respects rights.  What I ask for I told my attorney is my

11    rights, the rights that are being given to me by this

12    government and that it guarantees.  What I ask regarding the

13    *Brady* violations of my attorney is nothing beyond the realm of

14    my case.  Everybody that I ask information of were mentioned in

15    my case because of which I am surprised I am even more

16    surprised that he tells me I was hired for your sentence and

17    not for anything else.

18           INTERPRETER:  The interpreter requests a repetition.

19           THE DEFENDANT:  He let me know that he was not going

20    to correct my other attorney's mistakes.  I am also an

21    attorney, your Honor, and I understand logically, while I am

22    not an attorney in this country, what constitutes a violation

23    and what constitutes concealment of evidence.  I understand

24    from Rule 5(f) of the procedural code of this country that what

25    you ask for is the origin of it, the progeny, of where the

1    charges can stem from.  Nothing was outside of that request.

2    Because my own he attorney, Mr. Brill, was interested in three

3    of the five points that I raised with him.  To that I was

4    satisfied because I would be able to obtain my information

5    within 15 days.  To my surprise, like I will say again, is that

6    I learned through the media that my sentence is going to be

7    issued on the 30th.  That's why, your Honor, I wrote to you

8    previously asking whether in a meeting we could address my

9    attorney's limitations to attend to my case.

10          As to my other letter, the second letter --

11          INTERPRETER:  The interpreter requests a repetition.

12          THE DEFENDANT:  I felt betrayed by the rights that

13   this country is not giving me under the Sixth Amendment.  When

14   he assured me that we would continue to work and I respectfully

15   requested whether my attorney could be replaced because the

16   year that we have been locked up has complicated the legal

17   work.  On top of that, he never replies to me.  And maybe you

18   can procure my correspondence where you were copied where I

19   make my requests.

20          INTERPRETER:  Interpreter requests a clarification.

21          THE DEFENDANT:  And I requested his representations

22   personally.  It was obviously over strategic matters, but

23   really I feel I have been deceived when I presumed that he was

24   working reviewing notes from witnesses, reviewing notes of

25   people who were mentioned in the trial, which are very

1    interesting.  And what's the rush I asked my attorney yesterday

2    to issue my sentence, to sentence me, when you told me that we

3    had work left to do.  It's difficult to be trusting an attorney

4    I don't know what he might be preoccupied with when to my

5    surprise I come and the decision is going to be made with

6    regard to my next life, my next 40 years.

7            INTERPRETER:  Interpreter requests a repetition.

8            THE DEFENDANT:  I tried to do it in a timely manner.

9    In one of the letters he issues to the Court, he maintains that

10   he observes social media when he sees I am evidently not a

11   liked person in social media.  When it surprises me more that

12   some of the letters issued by my family and children could be

13   helping me more.  What might be the intent behind that?  I

14   don't know.  When in my country that is something that I don't

15   have the words to express that because in my country that is

16   something that should be handled more privately.

17           Your Honor, I have not had the opportunity to address

18   you in lengthy a way as I am today.  First of all, because I

19   trusted my legal representatives; but I do feel that my rights

20   have been infringed.  Because of that, like I said before, I

21   requested in a timely manner of you to be able to review as you

22   said as your order was issued with regard to the *Brady*

23   violations.

24           THE COURT:  When did you make this request?

25           THE DEFENDANT:  I made it of my attorney on the first

1    day that I received --

2            THE COURT:  On the first day that you what?

3            THE DEFENDANT:  November 11 of last year.

4            THE COURT:  Thank you.

5            Go ahead.

6            You made this to your attorney; is that what you are

7    saying?

8            THE DEFENDANT:  Correct.

9            That's why, your Honor, excuse me, I requested that

10   you issue printouts of correspondence from the MCC and that way

11   you would be able to look at all of this.

12           Thank you.

13           THE COURT:  Are you finished addressing what you want

14   me to consider in passing sentence on you?

15           THE DEFENDANT:  Your Honor, in the letters I issued

16   you, I was telling you I don't feel safe because I will say

17   again --

18           THE COURT:  Are you talking about this page and a half

19   letter that was received on March 23rd; is that what you are

20   talking about?

21           THE DEFENDANT:  That's the second letter.

22           THE COURT:  What did the first letter say and where

23   did you send it?

24           THE DEFENDANT:  The first letter I sent the day

25   before -- I don't know if it was the 13th.  It was the Thursday

1   of the week before last.

2                 THE COURT:  Thank you very much.

3                 Is there anything else you want to say on the subject

4   of the sentencing?

5                 THE DEFENDANT:  No, your Honor.

6                 THE COURT:  Let me just address one or two points.  I

7   wrote this down and I believe this is what you said that I

8   issued orders "because of what happened in Judge Nathan's

9   chambers."  That's not true.  Those are not the facts.  That's

10  not what happened.  It is a matter of record in this country

11  that Rule 5(f) of the Federal Rules of Criminal Procedure was

12  amended as a result of a statute signed into law by the

13  President of the United States.  It applied to all prosecutions

14  in all federal courts coast to coast.  The statute had nothing

15  to do with Judge Nathan.  The statute was a statute that worked

16  its way through the two houses of Congress and required all

17  federal judges in all federal cases to issue the order that I

18  issued and the oral admonition that I gave at the beginning of

19  this case.

20                 If you are trying to create the impression that I have

21  some inside information and I am suspicious that there is some

22  *Brady* violation, you are wrong.  Those are not the facts.

23  That's not what has happened.  Since the day that your case

24  resulted in a verdict to the present, I have not seen one iota

25  of evidence, one indication whatsoever of any *Brady* violation

1    or *Giglio* violation in your case.  None.  Not even a basis for

2    an allegation.  Not even an insinuation.

3         It is the case that defense counsel, who was appointed

4    after your retained counsel withdrew -- and I think that was

5    your second retained counsel.  There was Mr. Rentaria before

6    the two counsel who tried the case as well -- have come up with

7    no evidence of a *Brady* violation.  If there is a *Brady*

8    violation, you will have to show it.  You'll be free to show it

9    and you will have the opportunity if you have a factual basis

10   for doing so for making a motion to correct the sentence or

11   vacate the sentence.

12        The good news, sir, is you will have a right to appeal

13   any sentence imposed in this case.  You can ask the United

14   States Court of Appeals for the Second Circuit to appoint new

15   counsel for you.  It is their practice as I understand it that

16   they would grant Mr. Brill's application to withdraw and would

17   appoint new counsel.  This new counsel, however, is not there

18   to conduct roving investigations.  They are your appellate

19   counsel.  If you have information, you should share it with

20   them.  They are not there to interview witnesses or the like.

21   The question is whether there was an error committed at your

22   trial or in your sentencing, and they will review that.

23        Now, the fact of the matter is there is a federal

24   policy that an individual should receive their sentence

25   promptly after a jury returns its verdict.  The goal and

aspiration of a detained defendant is that that sentencing

proceeding take place within six weeks of the jury's verdict.

That's what we try do.  That's part of the constitutional

promise of a speedy and public trial.

In your case, there were two things that happened.

One, I was requested by your counsel repeatedly to postpone the

sentencing date so that it could take place in a courtroom.

That is something I understand why you would want to be in a

courtroom for the sentencing and why you would have enough time

to prepare.  It is extraordinary and unusual for a sentencing

to take place a year and five months after a jury has returned

a verdict.  If I think about it in my time on the bench, I

don't believe I ever had a sentencing that has been protracted

by this length of time.  Certainly the pandemic has been a big

factor in that.

The last adjournment was one your lawyer couldn't have

told you about in advance.  You know why he couldn't tell you

about it in advance?  Because it is one that I made on my own.

Why I did make it?  Because I had a jury sitting in another

case and I did not want that jury to be reading about any

sentence that took place in this case.  I exercised the

discretion to do that.  The other case and its relationship is

a matter of record.  It's under the same Docket No. 15 CR 379

as this case.  The reasons why a judge would not want to the

proceed with the sentencing during the pendency of the jury's

1    deliberations are obvious to anyone aware of jury management

2    and insulating a jury from possible outside influences.

3         Your retained counsel submitted to me a 15-page

4    memorandum on the subject of sentencing.  Mr. Brill carefully

5    gathered or received letters from family members, including

6    your mother, and translated them.  There were siblings.  They

7    were wonderful letters.  I read each and every one of them.  My

8    recollection is I think there were something on the order of 15

9    attachments to his submission.  Each letter was translated for

10   the Court.  They are on the public docket and they can be read

11   by anyone who wants to read them.

12        This is how the procedure goes.  So, I thank you for

13   your comments.  I understand that this is a different

14   procedural system than what you may have studied when you were

15   studying law and so I sympathize with that.  I understand how

16   you must feel, but there has been no violation of *Brady* or

17   anything else that has come to my attention and it is untruth

18   to say that my order had something to do with some other

19   judge's case.

20        This is the government's opportunity to speak.

21        MR. LAROCHE:  Thank you, your Honor.

22        The defendant's statements to the Court today were

23   astonishing.  Given a chance to show even the slightest bit of

24   remorse or contrition for his abhorrent conduct, he instead

25   spent his time complaining about his attorneys.  It is

1    stunning, but it also speaks to exactly who this individual is.

2           The evidence at trial showed very clearly that the

3    defendant is a central figure in one of the largest and most

4    violent cocaine trafficking conspiracies in the world.  For 15

5    years the defendant used his social and political power to

6    operate Honduras, a country of roughly 10 million people, as a

7    virtual narco state.  He was able to do so by conspiring with

8    some of the most powerful individuals in that country,

9    including his brother, the current president of Honduras.

10          With his powerful allies, he was able to operate on a

11   monumental scale.  The defendant channeled his law enforcement,

12   military, and financial resources of the country into drug

13   trafficking.  He caused brutal acts of violence to be committed

14   without consequence.  He protected his co-conspirators from

15   extradition.  He accepted millions of dollars in drug

16   trafficking proceeds and funneled it into national party

17   campaigns in 2009, 2013, and 2017 in exchange for promises of

18   protection to drug traffickers just like himself and his

19   co-conspirators.

20          In the process he facilitated the importation of an

21   enormous amount of cocaine -- 180,000 kilograms -- that came

22   into the United States.  This is state-sponsored drug

23   trafficking.  With all due respect to Mr. Brill, this is

24   exactly the type of conduct that the government should be

25   targeting both because of the impact it has on Honduras, a

place that has suffered immensely because at least in

significant part because of violent drug traffickers like the

defendant.

A life sentence is appropriate in this case and each

of the sentencing factors support it.  The nature and

circumstances of this offense are astonishing.  As I said, this

offense involved 185 tons of cocaine.  That alone justifies a

life sentence.  The crimes involved military-grade weapons,

violence, murder, and obstruction.  Also indisputably important

factors.  What sets this apart is the depth of corruption that

involved this defendant in his co-conspirators.  He secured

protection from investigation, arrest, and extradition by

paying massive bribes to politicians like his brother and like

Soso.  Millions of dollars in drug proceeds that were paid to

them in exchange your protection.  Millions of dollars for

people like Chapo Guzman, the head of the Sinaloa cartel.  Any

drug money they could get their hands- on in exchange for

protection, they did so.

This corruption had real consequences for Honduras.

As a direct result of the defendant's crimes, Honduras is one

of the principal transshipment points for cocaine in the world.

It is also one of the most violent places in the world.  The

Lawlessness in Honduras is staggering.  By 2013, for example,

San Pedro Sula, one of the key cities that was discussed in the

trial where meetings happened, was the deadliest place in the

world -- San Pedro Sula.  Antonio Hernandez and his

co-conspirators' conduct contributed to that in a very

significant and meaningful way.

There is nothing that has been presented in the

personal characteristics of this defendant that materially

mitigates that conduct.  During this investigation alone, the

defendant repeatedly lied to the Court, to law enforcement, and

he obstructed justice.  To give a few examples in 2016 when he

knew he was under investigation by the U.S. Attorney's Office

and the DEA, he brazenly flew to the United States on a private

jet, came into a meeting with prosecutors and law enforcement

officers and had the audacity to say that he didn't know Leonel

Rivera despite the fact that he was at a meeting that was

video-recorded with Leonel Rivera.  That is the arrogance of

this individual.

His crimes are only exacerbated by the fact that his

status and privilege didn't require him to do this.  He can't

point to poverty or lack of opportunities or a need to support

his family as a basis for why he might have started drug

trafficking.  He can't claim that he had no other choice to go

forward because he did.  He came from a well-off family in

Honduras.  He speaks very highly and the letters speak very

highly of his father and how he was a good person and how he

told them not to engage in illegal activity.  He didn't need to

become a drug trafficker.  He did it because he was greedy.

1          So his history and characteristics provides no basis

2     for leniency and it is abundantly clear from his statements

3     today he has shown no remorse -- to this day he has shown no

4     remorse -- for his conduct.  He has accepted no responsibility.

5     He doesn't care clearly how his crimes have affected his

6     country.  Do in part to violent drug traffickers approximately

7     every two of three of Honduras citizens are in poverty.  The

8     response in the sentencing submission is falsely claim that the

9     cooperators in this case were no corroborated.  That is just

10    shameful conduct and reprehensible in the sense that there is

11    absolutely no recognition of the incredible seriousness of

12    these crimes.

13         The defendant's remorsefulness demonstrates why

14    specific deterrence and incapacitation are important here.  For

15    similar reasons it shows why general deterrence is a key

16    sentencing consideration.  A life sentence would send a clear

17    message that the American justice system will not tolerate this

18    type of abhorrent conduct and is resinates significantly with

19    officials in Honduras who are still on Honduras who are

20    involved in these crimes.

21         The importance of general deterrence is underscored by

22    the fact that the conspiracy has continued to function after

23    trial.  As the Court is aware and was discussed earlier,

24    posttrial violence against potential witnesses happened almost

25    immediately after trial.  Nery Lopez Sanabria, the individual

1    whose drug ledger formed a key piece of physical evidence at

2    the trial and who in that drug ledger had notations for the

3    both the defendant and his brother Juan Orlando Hernandez.

4    Lopez Sanabria was viciously murdered eight days after trial.

5    Public reporting about that shows that Chase Lalani, one of the

6    defendant's investigators and also and Jose Hernandez, one of

7    the defendant's brothers or relatives who also wrote a letter

8    for him in connection with sentencing, those two individuals;

9    went to Lopez Sanabria in prison in unauthorized visits to

10   according to his attorneys try to get information from Lopez

11   Sanabria whether he was cooperating.  That is stunning conduct

12   which supports that general deterrence is general important in

13   this case.

14        General deterrence is also important because many of

15   the defendant's co-conspirators who are publicly charged remain

16   in Honduras and nothing is happening to them.  Extradition

17   requests have been sent and they have not been honored as for

18   several individuals, we have identified in our sentencing

19   submission.

20        In short, your Honor, the defendant is uniquely bad

21   character.  He is a uniquely bad character who, along with his

22   brother, is at the center of years of state-sponsored drug

23   trafficking.  Crimes of this scale, of this magnitude they all

24   require official protection and that is exactly what the

25   defendant provided on this trial record.  He smothered Honduras

1    in corruption in order to achieve astonishing crimes, and the

2    government respectfully submits that a life sentence would send

3    the appropriate message to the defendant and other people like

4    him who have high-ranking positions who have used positions of

5    trust to the detriment of Honduras citizens.  Cocaine

6    trafficking, violence, and corruption of this magnitude has

7    consequences and it will not be tolerated in the United States

8    no matter the penetrator and we believe that a life sentence

9    would send that message.

10          Thank you, your Honor.

11          THE COURT:  Thank you, Mr. LaRoche.

12          This is the Court's statement of reasons for the

13   sentence to be imposed on Juan Antonio Hernandez Alvarado:  In

14   sentencing the defendant, I have considered all of the

15   materials that I referenced at the outset.  I have considered

16   the statements of Mr. Brill, of the defendant, and Mr. LaRoche.

17   I have considered each of the factors under Section 3553(a).  I

18   need not recount all that I have considered, but I have

19   considered all of the factors.

20          After hearing the evidence at trial, a 12-person jury

21   found beyond a reasonable doubt that Juan Antonio Hernandez was

22   a member of a conspiracy to import drugs into the United States

23   from 2004 to 2016.  In addition, the jury found him guilty of

24   conspiracy to possess a machine gun in furtherance of a drug

25   trafficking conspiracy and the substantive possession of the

weapons.  The jury also found him guilty of lying in a 2016

voluntary interview with DEA agents.

The trial evidence was strong.  The government

presented testimony from five cooperators, including Alex

Ardon, the mayor of El Paraiso Copan; Leonel Rivera, a leader

of the concharos, a drug-trafficking organization; Geovany

Rodriguez, a high-ranking Honduran national police official;

Chang Monroy, who directly purchased cocaine from the

defendant's laboratory in Columbia; Anel Rojo; Victor Yugo

Moralez, who was a confederate in drug trafficking with the

defendant.  There was also physical evidence -- photographs,

videos -- that were offered.

As a judge I am frequently called upon to impose

sentence upon individuals in the drug trade.  Some have become

retail sellers infecting neighborhoods with a substance that

destroys families and lives to addiction, disease, and violence

whether turf wars or drive-by shootings.  Some of the retail

sellers come from families where the mother was an addict or

the father was imprisoned for drug-related offenses.  In many

of these cases, the defendants are responsible for retail sales

measured in grams.  All justly receive lengthy prison

sentences.

I am also required to sentence those buying and

selling in kilo quantities.  The quantity and type of drug

plays an important part in sentencing.  I see young men from

Colombia who are caught on international waters on go-fast
boats loaded with cocaine with an ultimate designation to the
United States after transhipment through Honduras and other
countries in Central American.  These go-fast drivers typically
have little knowledge of the source of the drugs or the
distribution network beyond their known.  Many are unskilled
and impoverished and are endeavoring to support their families.
They receive lengthy sentences for their actions.

Then there is Juan Antonio Hernandez Alvarado, also
known as "Tony Hernandez."  He is 41 years of age and
reasonably fit and in good health.  He makes an excellent
appearance at least from the photographs introduced at trial.
Well dressed and wearing a warm and engaging smile.  He is well
educated.  He went to a military boarding school and received a
college degree in law.  He told you today about his background
in law.  In fact, he practiced law briefly after graduation
from the program.

His family had legitimate businesses, including a
hotel and a pharmacy in which he could have earned a good
honest living.

He was an elected member of the Honduran Congress and
could have used his considerable talents for good.  Juan
Antonio elected to go in a very different direction.

The trial of Juan Antonio unmasked many details of
international narco trafficking.  It corrupts every facet of

society and here the trafficking was indeed state sponsored.

Juan Antonio became a major facilitator of the movement of

cocaine through Honduras with an eventual destination of the

United States.  He became partner in one of the ultimate

sources of supply of cocaine laboratory in Columbia.  I think

it was Chang Monroy who testified that he alone purchased

15,000 kilos of cocaine from Tony Hernandez.  Tony Hernandez

brazenly had his own brand imprinted with the initials TH for

Tony Hernandez.

He is responsible for the murders of Franklin Arita, a

trafficker who had interrupted the supply lines of Alex Ardon

Soriano utilizing a high-ranking police official to commit the

murder, Tigre Bonilla.  He also is responsible for the death of

Chino, a member of the drug operation who had the misfortune of

having been arrested.  And because he had extensive knowledge

of the operations of the defendant, he posed a threat.  He knew

too much.  He could cooperate if he chose to do so.  It was

Juan Antonio who decided to have him killed.  And when he

received word that he had been murdered, he expressed happiness

over this.

Juan Antonio rented helicopters to drug traffickers

and supplied them with weapons and ammunition, including in one

transaction 4,000 to 6,000 pieces of ammunition for assault

weapons that were boxed in containers with the markings of the

Honduran military.  He acted as facilitator in bribes to

1   politicians, including his brother Juan Orlando Hernandez, in
2   the national party.
3           He met twice with Joaquin Guzman, "El Chapo," the
4   leader the Sinoloa cartel.  It was after the second meeting
5   that he agreed to accept the price that was being to offered by
6   El Chapo of a million dollars for Juan Orlando's campaign in
7   exchange for protection.  He, Juan Antonio, was selling
8   protection from the Honduran government in the person of his
9   brother Juan Orlando.
10          Now, El Chapo was not the only drug trafficker to whom
11  Tony Hernandez sold protection from prosecution and
12  interdiction.  In exchange to payments to him he alerted drug
13  traffickers to night vision helicopter maneuvers and radar
14  patterns that may have resulting in seizing of shipments.  By
15  the way, with regard to radar information, he charged the hefty
16  sum of $50,000 upon providing such information.
17          Facts, not speculation, enabled the government to
18  reliably estimate the quantity of cocaine for which the
19  defendant bears responsibility during the period 2004 through
20  2015 and that is 185,000 kilograms of cocaine.  At 8,000 doses
21  per kilogram, that's roughly 1.5 billion doses of cocaine.  The
22  gross income of Juan Antonio from drug trafficking during the
23  same period is reliably estimated at 138 and a half million
24  dollars.
25          The defendant and his co-conspirators were indifferent

1    in the consequences of their acts on the lives of people in

2    their own country and in this country.  A long sentence will

3    promote respect for law and will serve as a deterrent to others

4    who might engage in other similar conduct.  It will protect the

5    public from further crimes of this defendant while he is

6    incarcerated.

7         I have considered the need to avoid unwarranted

8    sentence disparities.  This man is at the highest amount you

9    can have for cocaine under the U.S. Sentencing Guidelines,

10   which is more than 450 kilograms.  That's 450 kilograms.  He is

11   criminally responsible for 185,000 kilograms.  So very few

12   defendants are sentenced in that top category.

13        I have considered the arguments presented by each side

14   on comparative sentences found in the government's submission

15   at pages 51 to 55 and the defendant's memorandum at pages 13 to

16   15.

17        I have considered the guidelines, policy statements,

18   and official commentary of the United States Sentencing

19   Commission.  I recognize that the guidelines are advisory and

20   not binding on the Court.  I acknowledge that I have variance

21   discretion.

22        Defendant faces a mandatory minimum term of

23   imprisonment of 10 years on Count One and a mandatory

24   consecutive 360-month (30-year) minimum term of imprisonment on

25   Count Two.  In other words, the sentence on Count Two by law

must run consecutive to the sentence on Count One.  So by law,
I am required to sentence him to a minimum of four years on
Counts One and Two.  Again, that is the minimum.  The maximum
term on each of Counts One, Two, and Three is life imprisonment
and on Count Four five years.

The guidelines range for this defendant is life
imprisonment plus because the law requires it the imposition of
a consecutive term of 360 months on Count Two.  The prosecution
and the Office of Probation both recommend that I impose such a
sentence.  Often I find mitigating circumstances in cases where
I would not impose a guidelines sentence and I will sentence a
defendant below the guidelines; but based upon Juan Antonio's
free choice to engage in a life of drug trafficking over a
12-year period, which affected the lives of the people in the
United States and in Honduras, a sentence of life imprisonment
is richly deserved.  By law I am required to impose the 30-year
mandatory minimum that is consecutive to that.  I will impose
forfeiture of $138,500,000 and the $400 special assessment.
The foregoing in my view is sufficient but no greater than
necessary to achieve the purposes of Section 3553(a).

Finally, this Court is under no dilution that the
sentence will end narco trafficking through Honduras.  Today's
sentence is an important step.  It is not the only prosecution
in this district of individuals accused of using Honduras as a
transit point for drugs and corrupting their government.  The

1    experience of law enforcement with other crime groups is
2    instructive.

3          Years ago law enforcement proceeded against La Cosa
4    Nostra, or the mafia, and by repeatedly going after leaders and
5    organizers of these organized crime families, their impact has
6    been weakened.  They are a shadow of what they once were.

7          Ending the movement of cocaine from Colombia through
8    Honduras, Guatemala and Mexico is a hope of all good people of
9    Honduras and the United States and other countries of the
10   Americas.  we can hope that looking back in years to come today
11   will have been an important step in eliminating the corrupting
12   influence of narco trafficking.

13         Does the defendant or his counsel have any objection
14   to the Court's statement of reasons or proposed sentence?

15         MR. BRILL:  No legal objection, your Honor.

16         THE COURT:  Same question for the government?

17         MR. LAROCHE:  No, your Honor.

18         THE COURT:  All right.

19         Juan Antonio Hernandez, it is the judgment of this
20   Court that you are hereby remanded to the custody of the United
21   States Bureau of Prisons to be imprisoned for life on Count One
22   and Count Three and 60 months on Count Four all to run
23   concurrently and a mandatory and consecutive 360-month sentence
24   on Count Two.

25         If you were ever released from prison, you will be on

supervised release for five years on Counts One to Three and
three years on Count Four.

Because I am imposing the forfeiture of 138 and a half
million dollars, there will not also be a fine.

The special assessment of $400 is imposed.

With regard to the conditions of supervised release,
you must not commit another federal, state or local crime nor
unlawfully possess a controlled substance.  You must refrain
from any unlawful use of a controlled substance.  You must
cooperate in the collection of DNA.  You must pay the
assessment in accordance with statute.  The Standard Conditions
1 through 12 are imposed.

Further, you must obey the immigration laws and comply
with the directives of immigration authorities.  You must
provide the Probation officer with access to any requested
financial information.  You must not incur new credit card
charges.

The Court orders the forfeiture of all right, title,
and interest to any and all property constituting or derived
from any proceeds the defendant obtained directly or indirectly
as a result of the offense and any and all property used or
intended to be used in any manner or part to commit and to
facilitate the commission of the offense as well as the
forfeiture of all firearms.

I am entering an order of forfeiture that more fully

1    sets forth the terms of forfeiture.

2         Mr. Hernandez, you have the right to appeal this

3    sentence I have imposed on you.  If you cannot afford the cost

4    of an appeal, you may apply for leave to appeal as a poor

5    person.  The time limits for filing a notice of appeal are

6    brief and they are strictly enforced.  If you request, the

7    Clerk of Court will prepare and file a notice of appeal on your

8    behalf immediately.

9         Do you understand all that?

10        THE DEFENDANT:  Yes.

11        THE COURT:  I hope that while you are in prison,

12   you'll reflect on your life, reflect on what you have done and

13   consider making the decision to turn your life around and

14   perhaps you can do some good for your family and your country.

15        I wish you and your family good health and peace of

16   mind.

17        Anything further from the government?

18        MR. LAROCHE:  No.  Thank you, your Honor.

19        THE COURT:  Anything further from the defendant?

20        MR. BRILL:  Your Honor, I will be filing a notice of

21   appeal on behalf of my client, and I assume I will then based

22   upon his comments today moving to be relieved.

23        THE COURT:  Yes.  That application is made to the

24   Second Circuit as you know as an experienced practitioner.

25        MR. BRILL:  Yes.

1              THE COURT:  Well, thank you all very much.

2              We are adjourned.

3              UNIDENTFIED PERSON:  God bless America.  Justice for

4    Honduras.

5                                   o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25