UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| - v. - | |
| JUAN ORLANDO HERNANDEZ, a/k/a "JOH," and JUAN CARLOS BONILLA VALLADARES, a/k/a "Tigre," | S7 15 Cr. 379 (PKC) S8 15 Cr. 379 (PKC) |
| Defendants. | |

# GOVERNMENT'S MEMORANDUM OF LAW
# IN OPPOSITION TO DEFENDANTS
# JUAN ORLANDO HERNANDEZ'S AND JUAN CARLOS BONILLA VALLADARES'S
# MOTIONS TO SEVER

Damian Williams
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Jacob H. Gutwillig
David J. Robles
Elinor L. Tarlow
Kyle A. Wirshba
Assistant United States Attorneys
    -Of Counsel-

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ........................................................................................................ **i**

**TABLE OF AUTHORITIES** ................................................................................................ **ii**

**PRELIMINARY STATEMENT** ......................................................................................... **1**

**BACKGROUND** ..................................................................................................................... **2**

      1.  CW-1 ......................................................................................................... 7

      2.  CW-2 ......................................................................................................... 9

      3.  CW-3 ....................................................................................................... 13

      4.  CW-4 ....................................................................................................... 14

**DISCUSSION** ........................................................................................................................ **15**

    A.   Applicable Law ........................................................................................ 15

    B.   Discussion ................................................................................................ 18

**CONCLUSION** ...................................................................................................................... **26**

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Richardson v. Marsh*,
     481 U.S. 200 (1987) ........................................................................... 17

*United States v. Amato*,
     15 F.3d 230 (2d Cir. 1994) ........................................................... 17-18

*United States v. Carson*,
     702 F.2d 351 (2d Cir. 1983) ............................................................. 19

*United States v. Feyrer*,
     333 F.3d 110 (2d Cir. 2003) ...................................................... *passim*

*United States v. Finkelstein*
     526 F.2d 517 (2d Cir. 1975) ...................................................... 25, 26

*United States v. Gotti*,
     No. 02 Cr. 743 (RCC), 2004 WL 602689 (S.D.N.Y. Mar. 26, 2004) ................................... 18

*United States v. Hernandez*,
     85 F.3d 1023 (2d Cir. 1996) ............................................................. 19

*United States v. Losada*,
     674 F.2d 167 (2d Cir. 1982) ............................................................. 19

*United States v. Panza*,
     750 F.2d 1141 (2d Cir. 1984) ........................................................... 18

*United States v. Pirro*,
     76 F. Supp. 2d 478 (S.D.N.Y. 1999) ............................................... 18

*United States v. Potamitis*,
     739 F.2d 784 (2d Cir. 1984) ............................................................. 19

*United States v. Richard*,
     94 F. Supp. 2d 304 (E.D.N.Y. April 20, 2000) .............................. 17

*United States v. Rosa*,
     11 F.3d 315 (2d Cir. 1993) ......................................................... 18, 24

*United States v. Salameh*,
  152 F.3d 88 (2d Cir. 1998) ........................................................ *passim*

*United States v. Sampson*,
  385 F.3d 183 (2d Cir. 2004) ............................................................ 18

*United States v. Shellef*,
  507 F.3d 82 (2d Cir. 2007) ............................................................. 17

*United States v. Shkreli*,
  260 F. Supp. 3d 247 (E.D.N.Y. Apr. 19, 2017) ................................ 27

*United States v. Turoff*,
  853 F.2d 1037 (2d Cir. 1988) ......................................................... 16

*Zafiro v. United States*,
  506 U.S. 534 (1993) ......................................................... 17, 19, 24

**Statutes**

18 U.S.C. § 924 ............................................................................... 4, 5
21 U.S.C. § 963 ................................................................................. 4

**Rules**

Fed. R. Crim. P. 8 .................................................................... *passim*
Fed. R. Crim. P. 13 .......................................................................... 17
Fed. R. Crim. P. 14 .............................................................. 17, 18, 19
Fed. R. Crim. P. 16 .......................................................................... 22

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to defendants Juan Orlando Hernandez's ("Juan Orlando") and Juan Carlos Bonilla Valladares's ("Bonilla Valladares") motions to sever their trial, which is scheduled to begin on September 18, 2023. Dkts. 515, 525. Juan Orlando and Bonilla Valladares urge the Court that it would be improper to join them in a trial or with their third co-defendant, Mauricio Hernandez Pineda ("Hernandez Pineda"). *See id.* The motions are meritless based on the law and the evidence, and the Court should deny their requests for a severance.

Juan Orlando, Bonilla Valladares, and Hernandez Pineda (the "defendants") were co-conspirators in one of the largest and most violent cocaine trafficking operations in the world. Juan Orlando used his political power, including as the President of the Honduran National Congress and the President of Honduras, to channel his country's law enforcement, military, and financial resources to support drug traffickers. As part of that conspiracy, Juan Orlando relied on the help of Bonilla Valladares and Hernandez Pineda, prominent officials in the Honduran National Police ("HNP"), to ensure that he and his drug trafficking partners remained protected from detection and arrest. For years, in exchange for lucrative bribes, the defendants worked together to abuse their official positions to import massive amounts of cocaine into the United States.

The Government's proof against the three defendants and each of their roles in this conspiracy overlaps significantly. As described further below, the Government anticipates calling at least four of the same cooperating witnesses to testify against the defendants and expects their testimony to show that the defendants worked together with common goals, shared methods, and committed the alleged offenses with mutual co-conspirators, including the

cooperating witnesses. A joint trial would obviate the need to schedule multiple jury trials with significantly overlapping proof.

Despite being part of the same conspiracy and facing the same charges, Juan Orlando and Bonilla Valladares seek to have their trials severed from each other and that of Hernandez Pineda. Their motions, which inaccurately assert that they were not part of the same conspiracy, fall far short of overcoming the strong presumption in favor of joint trials for co-conspirators. Accordingly, for the reasons set forth herein, Juan Orlando's and Bonilla Valladares's severance motions should be denied in their entirety and without any need for a hearing.

## BACKGROUND

### A. Factual Summary

For at least two decades, from 2000 until 2022, drug trafficking organizations in Honduras flourished with the support of Honduran politicians and law enforcement officials. The defendants were central to that scheme. They worked together to abuse their official positions, allow drug trafficking in Honduras to prosper under their control, and import massive amounts of cocaine into the United States. Juan Orlando, who served as the President of the Honduran National Congress from 2010 to 2014 and the President of Honduras from 2014 to 2022, used his power in Honduras to allow his drug trafficking partners to operate with impunity. Juan Orlando corrupted his country's law enforcement, military, and financial resources to support drug traffickers; allowed brutal violence to be committed without consequence; protected his co-conspirators from extradition; accepted millions of dollars from drug traffickers to finance his political campaigns and commit rampant voter fraud to win presidential elections; and, in the process, facilitated the importation of hundreds of tons of cocaine into the United States.

Juan Orlando relied on Bonilla Valladares and Hernandez Pineda—both high-ranking officials in the HNP—to ensure the success of this scheme and to help protect his drug trafficking partners, including his brother, Juan Antonio Hernandez Alvarado ("Tony Hernandez"), and multiple of the cooperating witnesses the Government anticipates calling at trial. Bonilla Valladares served in the HNP for approximately 30 years, including as a regional police chief of Honduras and then as Chief of the HNP from 2012 to 2013. Bonilla Valladares used his resources within the HNP to protect cocaine loads for drug traffickers that Juan Orlando promised to protect; provided information about law enforcement operations to those drug dealers to ensure that they could evade detection and arrest; and committed acts of violence, including murder, against rival traffickers who threatened the drug trafficking interests of Juan Orlando and Tony Hernandez. As just one example, in 2011, Tony Hernandez directed Bonilla Valladares to murder a rival Honduran drug trafficker ("Victim-1") who had attempted to prevent Tony Hernandez and others from transiting cocaine shipments toward the Guatemalan border through a particular region in Honduras. Bonilla Valladares was at the time the police chief for that region in Honduras. He used his authority and access to armed security and armored vehicles to help carry out Victim-1's murder. In return for the protection and security that he provided in this scheme, Bonilla Valladares received bribes from the Juan Orlando-aligned traffickers whom he helped protect and, in return, Juan Orlando ensured that Bonilla Valladares rose to prominence in the HNP.

Hernandez Pineda, who is a cousin of Juan Orlando and Tony Hernandez, also abused his high-ranking position with the HNP in furtherance of the conspiracy. Among other things, Hernandez Pineda provided armed security for large cocaine loads passing through Honduras belonging to traffickers aligned with Juan Orlando and Tony Hernandez; bribed other law

enforcement officers not to search his co-conspirators' cocaine-laden vehicles at security checkpoints; and tried to pressure co-conspirators who were facing charges in the United States not to cooperate against himself, Juan Orlando, or Tony Hernandez. Hernandez Pineda was a trusted member of the conspiracy whom Juan Orlando and Tony Hernandez relied on for important tasks. For example, in or around 2013, Hernandez Pineda accompanied Tony Hernandez to a meeting at which the former leader of the Sinaloa Cartel, Joaquin "El Chapo" Guzman, provided Tony Hernandez with $1 million to fund Juan Orlando's presidential campaign in exchange for Juan Orlando's continued protection of cocaine shipments across Honduras. Hernandez Pineda then personally provided armed security for Tony Hernandez to transport that payment. In exchange for his role in this conspiracy, Hernandez Pineda received hundreds of thousands of dollars in bribes from large-scale cocaine traffickers and gained the protection and trust of Juan Orlando.

### B. Charges

On September 4, 2019, Hernandez Pineda was indicted and charged with (1) from in or about 2000 up to and including in or about 2018, participating in a conspiracy to import cocaine into the United States, in violation of 21 U.S.C. § 963; (2) from in or about 2000 up to and including in or about 2018, carrying and using machineguns and destructive devices in relation to the narcotics conspiracy, in violation of 18 U.S.C. §§ 924(c)(l)(A), 924(c)(l)(B)(ii), and 2; and (3) from in or about 2000 up to and including in or about 2018, participating in a conspiracy to carry and use machineguns and destructive devices in relation to the narcotics conspiracy, in violation of 18 U.S.C. § 924(o). *See* S4 15 Cr. 379 (PKC), Dkt. 83. Hernandez Pineda was extradited from Honduras on February 11, 2020, and he made his initial appearance in this District on February 12, 2020. *See* Dkt. 131.

4

On April 29, 2020, Bonilla Valladares was charged by complaint with participating in the same narcotics and weapons offenses as Hernandez Pineda. *See* S8 15 Cr. 379 (PKC), Dkt. 1. After the most recent Honduran presidential election in January 2022 ushered in a new political party and removed many of Bonilla Valladares's co-conspirators from power, Honduran authorities arrested Bonilla Valladares on March 9, 2022. He was extradited to the United States on May 10, 2022. Bonilla Valladares made his first appearance in this District on May 11, 2022. *See* Dkt. 5. On August 9, 2022, Bonilla Valladares was charged in a three-count indictment with the same narcotics and firearms offenses alleged in the April 2020 complaint and Hernandez Pineda indictment, from in or about 2000 up to and including in or about 2022. *See* S8 15 Cr. 379 (PKC), Dkt. 448.

On January 27, 2022, the date Juan Orlando's successor as President of Honduras took office, Juan Orlando was indicted in this case. Juan Orlando was charged with participating in the same narcotics and weapons offenses as Bonilla Valladares and Hernandez Pineda, from in or about 2004 up to and including in or about 2022. *See* S7 15 Cr. 379, Dkt. 423. On February 15, 2022, Juan Orlando was arrested by Honduran authorities. On April 21, 2022, Juan Orlando was transferred into U.S. custody and extradited to the United States. Juan Orlando made his first appearance in this District on April 22, 2022. *See* Dkt. 429.

Trial for all three defendants is scheduled to start on September 18, 2023.[1]

---

[1] Prior to trial, the Government anticipates returning a consolidated trial indictment charging all three defendants in a single charging instrument. Charging each defendant in a separate charging instrument was, in part, as a result of timing and operational considerations related to seeking arrests and extraditions.

### C. The Government's Anticipated Proof at Trial

The Government expects that the proof against each of the defendants will substantially overlap and will include, among other things, the testimony of several of the defendants' co-conspirators who are now cooperating with the Government. The Government anticipates, for example, that at least four cooperating witnesses ("CW-1," "CW-2," "CW-3," and "CW-4")[2] will testify about the interconnectedness of the defendants' roles in the conspiracy.[3] The Government also anticipates offering additional evidence, including drug ledgers, Title III interceptions, and extractions from electronic devices, a significant portion of which was admitted during trials over which this Court presided against two of the defendants' co-conspirators—the October 2019 trial of Tony Hernandez and the March 2021 trial of Geovanny Fuentes Ramirez ("Fuentes Ramirez").

As described further below, the Government expects that the four cooperating witnesses will testify as follows regarding the defendants and their respective roles in the conspiracy:

---

[2] The anonymization for the Government witnesses described herein as CW-1, CW-2, and CW-3 corresponds to the numbering used in the Government's motions *in limine* for Hernandez Pineda, filed on October 28, 2022. *See* S4 15 Cr. 379 (PKC), Dkt. 427. For the Court's reference, the Government will submit a separate filing under seal specifying the identities of each of the anonymized witnesses. As described more fully below, the Government has produced to the defendants 3500 material for each of the CWs, including relevant trial testimony from November 2019 trial in *United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC) and the March 2021 trial in *United States v. Geovanny Fuentes Ramirez*, S6 15 Cr. 379 (PKC), in addition to a significant volume of additional 3500 material for certain of the CWs.

[3] The Government has summarized, in sum and substance, portions of these four cooperating witnesses' anticipated testimony to provide a few examples of the ways in which the proof against the defendants overlaps. The Government anticipates that these witnesses will testify about additional topics and that the Government will call other witnesses, and present additional evidence, at a joint trial for the defendants further demonstrating their overlapping roles in the conspiracy.

1. **CW-1**

CW-1 is a former high-ranking HNP officer who worked alongside Hernandez Pineda to protect multi-ton drug shipments in Honduras, including shipments for Tony Hernandez and El Chapo. In approximately 2016, after CW-1 had participated in this drug trafficking conspiracy for several years, Hernandez Pineda pressured CW-1 not to cooperate with U.S. law enforcement officials against Juan Orlando and Tony Hernandez. The Government expects that CW-1 will testify about Hernandez Pineda's and Juan Orlando's roles in the charged conspiracy, including the following:

First, CW-1 will describe steps he took to protect drug trafficking shipments in which Hernandez Pineda and Tony Hernandez were involved. CW-1 worked in the HNP from approximately 1994 through approximately 2015. During that period, CW-1 began providing armed security for drug shipments of another cooperating witness, CW-3. In approximately 2008, Hernandez Pineda saw CW-1 providing protection for one of CW-3's drug shipments for which Hernandez Pineda was also separately providing protection. Hernandez Pineda subsequently discussed that shipment with CW-1, complimented CW-1's performance during the course of the shipment, and began to openly discuss his criminal activity, including by confirming that he also had been protecting CW-3's drug shipments in exchange for payment. Hernandez Pineda further confirmed that he and CW-3 were both protected from law enforcement scrutiny by Tony Hernandez, that Tony Hernandez and Juan Orlando were his cousins, and that his cousins were amassing political power in Honduras. After these conversations, CW-1 and Hernandez Pineda continued to jointly provide protection for CW-3's drug loads. Several years later, Hernandez Pineda also asked CW-1 to provide him with information about law enforcement operations to protect his drug trafficking activities, which

Hernandez Pineda was carrying out with Tony Hernandez and another cooperating witness, CW-2. CW-1 subsequently provided such information to Hernandez Pineda.

Second, the Government expects that CW-1 will testify about conversations that he had with Hernandez Pineda about the protection they would receive from Tony Hernandez. In approximately 2012, the Honduran National Congress passed legislation that allowed for Honduran nationals to be extradited to the United States to face drug trafficking charges. CW-1 grew concerned about his own fate and asked Hernandez Pineda about the situation. Hernandez Pineda told CW-1 that (1) the new extradition law in Honduras was enacted in response to pressure from the United States and was intended to appease the U.S. Government; and (2) Tony Hernandez had told Hernandez Pineda that while extradition might be available in theory, it would not be enforced against him. Sometime thereafter, in approximately 2013, Hernandez Pineda took CW-1 to Tony Hernandez's home in Tegucigalpa, Honduras, which Hernandez Pineda took care of while Tony Hernandez was away. While there, CW-1 observed a closet in a guestroom with stacks of $20 bills in U.S. currency, which were packaged in the same manner as bribes that CW-1 had received in exchange for providing protection of drug shipments and information about law enforcement operations. Hernandez Pineda subsequently confirmed to CW-1 that drug-related bribe payments were paid at Tony Hernandez's house.

Third, the Government anticipates that CW-1 will testify that Hernandez Pineda instructed him not to cooperate with U.S. law enforcement against Juan Orlando and Tony Hernandez. In approximately 2016, CW-1 decided to voluntarily surrender to authorities in the United States in light of charges pending against him. Hernandez Pineda learned of CW-1's plan and took steps to track CW-1 down, including by approaching CW-1's wife at a church in Honduras. Hernandez Pineda subsequently met with CW-1 in an attempt to dissuade CW-1 from

providing information to authorities in the United States about the drug trafficking activities of Hernandez Pineda, Tony Hernandez, and Juan Orlando. Hernandez Pineda explained to CW-1 that while Juan Orlando was working to avoid the extradition of Tony Hernandez to the United States, they could no longer protect CW-1 because Juan Orlando wanted to be reelected as president of Honduras. Hernandez Pineda also warned that CW-1 could not talk about Juan Orlando, Hernandez Pineda, or Tony Hernandez in the United States because the situation was being handled at the Honduran presidential level and was therefore too sensitive. Hernandez Pineda ended the discussion by apologizing for not being able to help CW-1 and paid CW-1 approximately $500. Hernandez Pineda also stated that he was speaking with Juan Orlando to try to stop the extradition of drug traffickers to the United States, and that Juan Orlando's public support for those extraditions was only to ensure that he would be reelected as president.

## 2. CW-2

CW-2 was a mayor of a Honduran town between approximately 2006 and 2014 and a former large-scale cocaine trafficker in Honduras. As described further below, CW-2 trafficked massive quantities of cocaine with, among others, Tony Hernandez, and paid bribes to Juan Orlando to ensure that CW-2's drug trafficking activities would be protected. Hernandez Pineda and Bonilla Valladares provided protection for at least some of CW-2's shipments with Tony Hernandez. The Government expects that CW-2 will testify about each of the defendants and their respective roles in the charged conspiracy, including the following:

The Government expects that CW-2 will testify that, in approximately 2009, Juan Orlando, while running for president of the Honduran National Congress, called CW-2 to express concern that there was another candidate running for president of the National Congress. To ensure his own election, Juan Orlando directed CW-2 to bribe three Honduran congressmen

to support Juan Orlando. After CW-2 successfully bribed the congressmen to support Juan Orlando, Juan Orlando called CW-2 again to thank him. On the call, Juan Orlando stated that he was available for any favor CW-2 might need, which CW-2 understood to be a reference to protection of his cocaine trafficking from law enforcement. When Juan Orlando became President of the Honduran National Congress in 2010, Juan Orlando called CW-2 again to thank CW-2 for his support. During that call, Juan Orlando said that CW-2 would be supported by and protected from law enforcement and the military.

With Juan Orlando's backing, CW-2 became bolder in his drug trafficking, including by trafficking with Tony Hernandez. Between approximately 2010 and 2012, CW-2 and Tony Hernandez distributed approximately two or three cocaine shipments per month using helicopters, planes, boats, and trucks to transport the drugs. During this time, Hernandez Pineda played an important role in the conspiracy by providing information to CW-2 and Tony Hernandez about whether there were any police checkpoints along the drug trafficking route from Honduras to Guatemala. Many of those shipments were for El Chapo, and CW-2 interacted directly with Hernandez Pineda and Tony Hernandez to facilitate those shipments. For example, on at least two occasions in or around 2011, Tony Hernandez sold CW-2 over 1,000 kilograms of cocaine, which CW-2 then sold to El Chapo. Hernandez Pineda provided the armed police escort for those loads to be transported across Honduras, and CW-2 observed that some of the kilograms were stamped with Tony Hernandez's signature "TH" marking. Prior to these shipments, Hernandez Pineda, Tony Hernandez, CW-2, and others went to at least one meeting where it was discussed that the cocaine sold to El Chapo was intended for the United States.

In approximately 2011, while continuing to traffic massive amounts of cocaine, CW-2 came to call on the protection he was guaranteed through Juan Orlando by relying on both Hernandez Pineda and Bonilla Valladares to help transport his drugs. First, Tony Hernandez told CW-2 that he paid Hernandez Pineda to provide security for and assist with drug shipments, and that CW-2 could do the same. Shortly thereafter, CW-2 met with Hernandez Pineda, who agreed to assist CW-2's drug trafficking activity as Tony Hernandez had predicted. CW-2 paid Hernandez Pineda between approximately $100,000 and $200,000 for assistance with drug shipments, such as providing information about police operations and helping to have officers moved or replaced if they did not support CW-2's trafficking activities. Second, as described above, in or around 2011, a rival Honduran drug trafficker—Victim-1—refused to allow CW-2 and other co-conspirators aligned with Juan Orlando and Tony Hernandez to use certain routes to transit their cocaine. In response, CW-2 spoke with Tony Hernandez, who said that he would direct Bonilla Valladares to carry out Victim-1's murder. Days later, Victim-1 was murdered, and Tony Hernandez reported back to CW-2 that Bonilla Valladares had succeeded. Further, CW-2 will testify, Tony Hernandez explained that Bonilla Valladares was able to carry out the murder because of his own access to armed security and armored vehicles.

CW-2 will also testify that, in approximately 2013, Hernandez Pineda went with Tony Hernandez to meetings during which El Chapo asked Tony Hernandez whether Tony Hernandez would be able to provide continued protection for the Sinaloa Cartel's cocaine loads in Honduras. As described above, Tony Hernandez told El Chapo that, if Juan Orlando won the presidency, then Tony Hernandez would be able to provide security for the cocaine shipments and would be able to prevent the extradition of the leaders of *Los Valles*, a notorious drug trafficking organization in Honduras, and CW-2. El Chapo offered Tony Hernandez $1 million

to fund Juan Orlando's presidential campaign. A few days later, Tony Hernandez told CW-2 that he had spoken with Juan Orlando, and that they needed the $1 million for the campaign. Hernandez Pineda and CW-2 subsequently attended a meeting at which El Chapo provided Tony Hernandez $1 million for Juan Orlando's presidential campaign in exchange for Juan Orlando's continued protection of drug trafficking activities. Hernandez Pineda then personally provided armed security for Tony Hernandez to transport that money.

Also in approximately 2013, CW-2 met with Juan Orlando in private. During the meeting, Juan Orlando told CW-2 that he should not seek reelection as mayor because Juan Orlando could not continue to protect CW-2 from law enforcement if he remained a Honduran government official. In exchange for a $1 million donation to Juan Orlando's presidential campaign, Juan Orlando assured CW-2 that, if CW-2 did not seek reelection, CW-2 would continue to enjoy Juan Orlando's protection. Juan Orlando also offered to award government contracts to CW-2 in the town where CW-2 served as mayor, which would help CW-2's ongoing money laundering and improve the infrastructure in that town—including roads that could be used to transport cocaine more efficiently. Following this meeting, CW-2 spent about $1.5 million in drug trafficking proceeds to bribe politicians in Copán to support Juan Orlando.

In addition, CW-2 will testify about steps Hernandez Pineda took to protect Juan Orlando. In approximately 2018, Hernandez Pineda called CW-2 regarding media reports that CW-2 was planning to surrender in the United States. During the call, Hernandez Pineda said that Juan Orlando wanted to know if it was true that CW-2 had surrendered, or if CW-2 was still in Honduras. CW-2 confirmed to Hernandez Pineda that he was still in Honduras. Hernandez Pineda told CW-2 that CW-2 did not need to be concerned because Juan Orlando Hernandez had confirmed that there was no warrant or extradition order against CW-2. The Government

expects that CW-2 will testify that he understood that phone call as an effort by Hernandez Pineda to communicate that Juan Orlando was still protecting CW-2 and his drug trafficking activities, and that CW-2 therefore should not surrender to authorities in the United States.

### 3. **CW-3**

CW-3 is a former Guatemala-based drug trafficker who, along with Tony Hernandez and others, trafficked tons of cocaine through Honduras and Guatemala en route to the United States. CW-3 received protection for those activities from Juan Orlando, Hernandez Pineda, and Bonilla Valladares. The Government expects that CW-3 will testify about his drug trafficking and the role of each of the defendants in that trafficking, including the following:

CW-3 will testify that Tony Hernandez explained that he and Juan Orlando had influence over the HNP at the highest levels to protect drug trafficking, which was a reference specifically to the assistance provided to him and Juan Orlando by both Bonilla Valladares and Hernandez Pineda. In approximately 2010, for example, Tony Hernandez told CW-3 that Bonilla Valladares was a trusted associate of Juan Orlando and Tony Hernandez. Tony Hernandez explained that he and Juan Orlando helped Bonilla Valladares advance his position within the HNP and that Bonilla Valladares protected their drug trafficking activities in return. Tony Hernandez told CW-3 that Bonilla Valladares was extremely violent and that Tony Hernandez and Juan Orlando accordingly entrusted Bonilla Valladares with sensitive assignments, including murders. In addition to performing acts of violence on behalf of Juan Orlando and Tony Hernandez, Bonilla Valladares helped protect CW-3's cocaine trafficking by ensuring that the HNP did not interdict CW-3's cocaine shipments and by providing sensitive information about law enforcement activities to ensure that CW-3 could evade detection and arrest.

Similarly, the Government expects that CW-3 also will testify about the protection Hernandez Pineda provided for Juan Orlando and Tony Hernandez's drug trafficking activities. Tony Hernandez discussed with CW-3 that, at Tony Hernandez's direction, Hernandez Pineda protected cocaine loads transported by CW-3. In approximately 2013, CW-3, Tony Hernandez, and Bonilla Valladares's nephews transported more than 2,000 kilograms of cocaine across nine shipments. In connection with these nine shipments, a co-conspirator who was another relative of Juan Orlando, Tony Hernandez, and Hernandez Pineda, told CW-3 that he need not worry about the cocaine being seized by law enforcement in Honduras because Hernandez Pineda was providing information about any police checkpoints along the route so that those checkpoints could be avoided. Bonilla Valladares's nephews also told CW-3 that Hernandez Pineda was involved in cocaine trafficking. Specifically, Bonilla Valladares's nephews requested access to trucks with false bottoms that CW-3 used to covertly transport cocaine and told CW-3 that Hernandez Pineda would help oversee the safe transport of those cocaine shipments.

### 4. CW-4

CW-4 is a former leader of a large-scale drug trafficking organization in Honduras. The Government expects that CW-4 will testify about his corrupt interactions with both Bonilla Valladares and Juan Orlando. For example, in approximately 2003, CW-4 met with Bonilla Valladares to seek assistance in locating and killing a rival trafficker ("Victim-2"). Bonilla Valladares told CW-4 that in exchange for payment, he and other members of the HNP would locate Victim-2; track his movements; and kill him. CW-4 paid Bonilla Valladares approximately $300,000 to carry out the murder, though CW-4 eventually had someone else actually carry out the assassination.

CW-4 is also expected to testify about Juan Orlando's involvement in the same charged conspiracy. CW-4 paid bribes to powerful Honduran politicians and businessmen, including Juan Orlando, in exchange for protection and assistance for his drug trafficking and money laundering activities. For example, in 2012, CW-4 contributed approximately $250,000 to Juan Orlando's campaign through an intermediary who Juan Orlando later made a part of his presidential cabinet.

## DISCUSSION

### A. Applicable Law

Rule 8(b) of the Federal Rules of Criminal Procedure governs joinder of offenses and defendants. *United States v. Turoff*, 853 F.2d 1037, 1042-43 (2d Cir. 1988). The rule provides that an "indictment . . . may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Second Circuit has interpreted Rule 8(b) to allow joinder of offenses and defendants where two or more persons' criminal acts are "unified by some substantial identity of facts or participants or arise out of a common plan or scheme." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (quoting *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989)). In this context, courts "apply a 'commonsense rule' to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder." *United States v. Shellef*, 507 F.3d 82, 98 (2d Cir. 2007) (citing *Turoff*, 853 F.2d at 1044).

There is a "preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see* Fed. R. Crim. P. 8(b).[4] "Joint trials play a vital role in the criminal justice system." *Richardson v. Marsh*, 481 U.S. 200, 209 (1987). They promote efficiency and "generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit." *Id.* at 210. When defendants are properly joined under Rule 8, a defendant seeking severance under Rule 14 shoulders a "heavy burden of showing that joinder will result in substantial prejudice." *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994); *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (noting that to prevail on a severance motion, a "defendant must show not simply some prejudice but substantial prejudice").

The presumption in favor of joint trials is so strong that the Second Circuit has stated that the "principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993). Therefore, it is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]." *Zafiro*, 506 U.S. at 540. Rather, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of

---

[4] As described above, the Government anticipates returning a consolidated trial indictment charging all three defendants in a single charging instrument. *See supra* n.1. Nevertheless, under Rule 13, the Court "may order two or more indictments . . . to be tried together if the offenses, and the defendants if there is more than one, could have been joined in a single indictment or information." Fed. R. Crim. P. 13. Rule 13 applies the same substantive standard that applies to Rule 8(b), which is met where the acts charged are "unified by some substantial identity of facts or participants, or arise out of a common scheme or plan." *United States v. Richard*, 94 F. Supp. 2d 304, 310-11 (E.D.N.Y. April 20, 2000) (citing *United States v. Halper*, 590 F.2d 422, 428 (2d Cir. 1978)). For the reasons set forth herein, a joint trial on the defendants' separate superseding indictments would also be appropriate under Rule 13.

the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 539; *see also United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984) (explaining that prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

The presumption in favor of joint trials "is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *United States v. Gotti*, No. 02 Cr. 743 (RCC), 2004 WL 602689, at *6 (S.D.N.Y. Mar. 26, 2004). "[T]he cases are legion that there is a strong public interest in joint trials where, as here, the defendants are . . . charged in the same conspiracy." *United States v. Pirro*, 76 F. Supp. 2d 478, 483 (S.D.N.Y. 1999) (collecting cases). In conspiracy cases, the court's evaluation of the potential for substantial prejudice must take into account that once a defendant is a member of a conspiracy, "all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *Salameh*, 152 F.3d at 111. As such, the mere fact that evidence may be admitted concerning acts committed by a joined co-defendant is not, standing alone, sufficient to warrant severance. "The fact that one of several codefendants is tried for a crime not committed by another codefendant does not, without more, create the sort of miscarriage of justice that would require [severance]." *United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996).

Even where some evidence is admissible against only one defendant in a multi-defendant case, that does not necessarily require severance. The Second Circuit has repeatedly recognized that "the fact that evidence may be admissible against one defendant but not against another does not necessarily require a severance." *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983); *see also United States v. Losada*, 674 F.2d 167, 171 (2d Cir. 1982). Any spillover prejudice that

may occur as a result of trying defendants jointly is generally corrected by the court's instruction that the jury consider the guilt of each defendant individually, an instruction that jurors are presumed to be able to follow. *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir. 1984); *see also Zafiro*, 506 U.S. at 540-41. In fact, even when the "risk of prejudice is high . . . less drastic measures—such as limiting instructions—often suffice as an alternative to granting a Rule 14 severance motion." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003); *see also Zafiro*, 506 U.S. at 538-39 ("Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.").

**B.     Discussion**

Juan Orlando's and Bonilla Valladares's severance motions fall far short of overcoming the strong presumption in favor of a joint trial. The defendants are charged in the same conspiracy and with the same offenses. They conspired with each other and common co-conspirators to ensure the success of their drug trafficking scheme. As described above, the Government's proof against the defendants includes testimony from at least four cooperating witnesses who would testify about, among other things, the defendants' coordinated efforts to carry out drug shipments and to protect their drug trafficking activities.[5] The defendants are, thus, properly tried together in this case. Moreover, Juan Orlando and Bonilla Valladares have failed to demonstrate any prejudice—let alone substantial prejudice—that would warrant their severance. The Court should deny the instant motions.

As an initial matter, both Juan Orlando and Bonilla Valladares argue that they are unable to make meaningful severance motions at this time because they have not yet received 3500

---

[5] Moreover, although not dispositive here, the Government notes also that it expects to call at least three of the same expert witnesses—relating to drug trafficking routes, Honduran politics and history, and firearms—against each of the defendants.

material or sufficient discovery. Dkt. 515 at 3; Dkt. 525 at 1. That is incorrect. As Bonilla

Valladares's motion acknowledges, and as described above, there have already been two jury

trials in this matter over which this Court has presided that involved the defendants' co-

conspirators where several of the Government's cooperating witnesses, including the four

cooperating witnesses described above, have testified about the defendants. *See* Dkt. 525 at 1-2.

The Government has provided the transcripts of those cooperating witnesses' testimony to the

defendants as part of its discovery productions. There are also numerous public filings in this

case describing the defendants' conduct, including a detailed speaking indictment against Juan

Orlando, a complaint against Bonilla Valladares, and the Government's motions *in limine*

pertaining to Hernandez Pineda that summarize anticipated cooperator testimony and other

evidence. Moreover, the Government has already begun producing 3500 material, including

proffer notes for cooperating witnesses, that demonstrates the factual overlap and relationship

between the defendants in the charged conspiracy. While the Government will continue

producing additional 3500 material in accordance with its disclosure obligations and the

deadlines set by the Court, the defense is by no means in the dark about the defendants' relevant

and overlapping conduct. To the contrary, they are in the unique position of having access to a

significant amount of information concerning witness statements—through both public filings

and the Government's early disclosure of 3500 material—many months before trial, from which

they can assess potential severance concerns.

The arguments for severance that Juan Orlando and Bonilla Valladares do raise in their

motions are plainly meritless. To start, the presumption in favor of a joint trial is particularly

strong when, as here, the defendants are alleged to have participated in a common plan or

scheme. *See Salameh*, 152 F.3d at 115. As described above, the defendants were co-

conspirators in the same prolific cocaine trafficking conspiracy. Juan Orlando relied on Hernandez Pineda and Bonilla Valladares—who had access to sensitive law enforcement information, connections at drug checkpoints, and resources for transporting drug shipments—to ensure that his drug trafficking partners' shipments were secure. Hernandez Pineda encouraged certain co-conspirators not to cooperate against Juan Orlando and helped transport a $1 million bribe from El Chapo for Juan Orlando's presidential campaign. Bonilla Valladares helped carry out acts of violence against rival drug traffickers on behalf of Tony Hernandez and Juan Orlando. In exchange, Hernandez Pineda and Bonilla Valladares were paid lucrative bribes and held high-ranking law enforcement positions. Put simply, the defendants worked in concert to abuse their official positions and to ensure, for their own financial and professional success, that their drug trafficking partners were able to import massive amounts of cocaine into the United States.

The evidence that the Government expects to offer at trial to prove that conduct overlaps significantly and includes testimony from at least four cooperating witnesses about the defendants' interconnected roles. If the Court were to grant a severance, the Government would need to present duplicative testimony and evidence at two or three different trials in order to prove the same conspiracy. To do so would require a significant and unnecessary expenditure of judicial resources and result in serious inefficiency. All of the reasons that underly the strong presumption in favor of a joint trial for co-defendants charged with the same conspiracy are present here. Juan Orlando and Bonilla Valladares, therefore, must demonstrate that they would each be substantially prejudiced if they were jointly tried with their co-defendants. *See Sampson*, 385 F.3d at 190. They cannot meet that heavy burden.

Juan Orlando argues in a conclusory fashion that indictment S7 15 Cr. 379 violates Rule 8(b) because "it improperly joined offenses and defendants together," and also that he will face

prejudicial spillover in a joint trial because the jury "would be presented with evidence regarding two individuals involved in a separate conspiracy and conspiratorial acts, that have absolutely nothing to do with [him]." Dkt. 515 at 2, 4. In support of those arguments, Juan Orlando asserts that the Rule 16 discovery produced to date does not demonstrate his involvement in the charged crimes. *Id*. at 3.

Those arguments lack merit. As described above, the Government expects that its trial evidence will implicate all three defendants in the same conspiracy. Joinder under Rule 8(b) is thus entirely proper. *See, e.g.*, *Feyrer*, 333 F.3d at 114 (joinder is appropriate where criminal acts are "unified by some substantial identity of facts or participants or [arose] out of a common plan or scheme"). As to evidence demonstrating Juan Orlando's involvement in the charged conspiracy, significant aspects of the Government's allegations have been made plain in two jury trials and in numerous public filings, as reflected by the voluminous Rule 16 discovery produced to date. That evidence includes, among other things, drug ledgers seized by Honduran law enforcement in June 2018 with entries reflecting amounts and prices of drug shipments sent by Tony Hernandez and at least one other ledger containing references to "JOH"; a photograph of a kilogram bearing Tony Hernandez's initials ("TH"), which as, as described above, CW-2 also observed when Hernandez Pineda protected a drug load for Tony Hernandez; and evidence seized from one of Tony Hernandez's phones, which includes a photograph of a CZ-Scorpion Evo that has Juan Orlando's name inscribed on it. The Government also intends to offer—in addition to the cooperating witness testimony described above detailing Juan Orlando's role in the drug trafficking conspiracy—other witness testimony, including that, at an in-person meeting in or about 2013, Juan Orlando and Fuentes Ramirez agreed to conspire to "[stuff the] drugs up the gringos' noses," and, to that end, Juan Orlando provided Fuentes Ramirez with Tony

Hernandez's cell phone number to discuss coordinating drug shipments. Juan Orlando's assertion that, based on the discovery, the Government's evidence "will not relate to any crimes [Juan Orlando] is alleged to have committed" is thus facially invalid. Dkt. 515 at 3. Certainly that claim, which is flatly contradicted by a lengthy record, is not a basis for a severance. To the extent Juan Orlando is simply disputing the Government's ability to prove his involvement in that conspiracy, the proper mechanism to resolve that dispute is a trial, not a motion for severance.

Juan Orlando next argues that his trial should be severed because "evidence that is admissible against one or both of the other proposed defendants . . . will be prejudicial" to him. Dkt. 515 at 1-2. That conclusory assertion falls far short of satisfying the exacting standard required for severance. Juan Orlando does not identify the evidence to which he refers, much less explain how it would result in substantial prejudice. In any event, the law is clear that a defendant's right to a fair trial does not include the right to exclude relevant and competent evidence. *See Zafiro*, 506 U.S. at 540. Indeed, "[e]vidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial." *See Rosa*, 11 F.3d at 341.[6] To the extent Juan Orlando could identify evidence that he believes is unduly prejudicial—which, to be clear, he does not—it would be difficult to imagine allegations more prejudicial than those the Government has already made and intends to

---

[6] Juan Orlando quotes the Second Circuit's opinion in *Salameh* to note that "[p]rejudice occurs in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper." Dkt. 515 at 2. But he does not identify any such inadmissible proof, nor can he. Tellingly, Juan Orlando omits the next line in the opinion, which applies here: "This is an unlikely occurrence when all the defendants are charged under the same conspiracy count." *Salameh*, 152 F.3d at 115 (holding that the district court did not err in denying severance for defendants charged in the same conspiracy).

prove against Juan Orlando: that the president of a country co-opted his government and operated his nation as a narco-state.

Juan Orlando lastly argues that some of his co-defendants could "possibly be in a position to offer exculpatory testimony at a separate trial" if severance were granted. Dkt. 515 at 2. That is pure speculation. Juan Orlando does not describe what that testimony might entail and speculates both that his co-defendants "may have already decided to plead guilty [or are contemplating exercise that option]" and would elect to testify on his behalf. *See id*. Juan Orlando sets forth no facts upon which the Court could rely to assess the likelihood of that happening. And the sole case upon which Juan Orlando relies for this proposition, *United States v. Finkelstein*, undermines his argument. *See* 526 F.2d 517, 524-25 (2d Cir. 1975). In *Finkelstein*, the appellant argued that the district court erred in denying his request for a severance from his co-defendants because, if a severance had been granted, his co-defendants would have testified on his behalf. *See id.* The Second Circuit rejected that argument, concluding that the appellant had failed to make a "sufficient showing . . . that any of the co-defendants would have waived their Fifth Amendment privilege [to testify on the appellants' behalf] if severance had been granted." *See id.* at 524. Here, as in *Finkelstein*, "[g]iven the fact that none of the co-defendants [have yet] pleaded guilty or evidenced any intention of doing so, it is unrealistic to think that a co-defendant would be any more willing to waive his constitutional privilege against self-incrimination when called as a witness at a separate trial than he would be willing to insist upon his privilege as a defendant not to take the stand." *Id.* (citation and internal quotation marks omitted). Juan Orlando's speculative assertion that one of his co-defendants would provide exculpatory testimony if, and only if, their trials were severed falls far short of providing a basis for granting his motion. This argument should therefore be rejected.

Bonilla Valladares's motion raises similarly meritless claims and largely incorporates the arguments made by Juan Orlando. Bonilla Valladares first argues that the evidence against him will be "substantially different" than the evidence against Juan Orlando and Hernandez Pineda. Dkt. 525 at 1-2. That assertion is not consistent with the Government's allegations in this case. As described above, the Government expects that several cooperating witnesses will testify about both Juan Orlando's and Bonilla Valladares's roles in the same conspiracy and will describe the drug trafficking activities that they engaged in together. In any event, even to the extent that the Government intends to offer additional evidence against Juan Orlando that does not directly implicate Bonilla Valladares, that does not counsel in favor of severance. *Id.* at 2. The Government's proof against each defendant does not need to be exactly the same in order for joinder to be required; to the contrary, the Government need only allege that the defendants are "unified by some substantial identity of facts or participants or arise out of a common plan or scheme," *Feyrer*, 333 F.3d at 114, which the Government has more than amply done.

Nor does Bonilla Valladares explain how a joint trial will result in substantial prejudice to him. Bonilla merely asserts that there will be "substantial prejudicial spillover" because "most of the evidence in this case involves President Hernandez and his rise to power." *See id.* at 2. But Bonilla Valladares's offense conduct is part and parcel of Juan Orlando's rise to power, and vice versa: Bonilla Valladares provided protection for drug traffickers who supported Juan Orlando's campaigns and helped ensure that Juan Orlando was elected to high-ranking positions of power. In turn, Juan Orlando was able to further protect those drug traffickers, including Tony Hernandez, Fuentes Ramirez, and certain of the cooperating witnesses, and use the levers of the state, such as placing associates like Bonilla Valladares in increasing positions of authority, to ensure safe passage of narcotics through Honduras to the United States. It is against

24

this backdrop—Juan Orlando's rise to the pinnacle of Honduran power fueled by drug money, including from loads protected by Hernandez Pineda, and the specter of violence, including Bonilla Valladares's murder of Victim-1 who was a drug competitor—that this conspiracy, and the actors in it, should be evaluated. Moreover, it is well-settled that "evidence relating to acts committed by co-defendants" offered to prove the existence of the conspiracy is admissible against their co-conspirators. *Salameh*, 152 F.3d at 111. Bonilla Valladares's argument that the nature of the proof against Juan Orlando merits severance therefore fails.

Finally, Bonilla Valladares argues that there may be an "irreconcilable defense conflict" requiring severance, because "one particular defense may in fact be that [Bonilla Valladares] was investigating [Juan Orlando]" after Bonilla Valladares became Chief of the HNP in 2012. Dkt. 525 at 2 (citing *United States v. Shkreli*, 260 F. Supp. 3d 247 (E.D.N.Y. Apr. 19, 2017)). To start, Bonilla Valladares has not identified any admissible evidence he would seek to admit in order to advance such a claim. Nor would such a defense "require a jury to find one defendant guilty if that jury accepts the other defendant's defense." *Shkreli*, 260 F. Supp. at 254 (denying motion for severance on the grounds that defenses would be mutually antagonistic). Bonilla Valladares is alleged to have abused his position within the HNP for years, including the two years in which he served as Chief of the HNP, and it is entirely consistent with the Government's theory that Bonilla Valladares, like Juan Orlando, would have made public-facing efforts to appear to combat narcotics trafficking, while in reality actually protecting his drug trafficking co-conspirators. Indeed, as the Government alleged in the criminal complaint filed against him, after participating in Victim-1's murder, Bonilla Valladares publicly claimed to have been investigating the murder, and went so far as to tell local media that it was an "efficiently" carried out killing. In any event, even by its own terms, this alleged investigation would have occurred

only during a short time in the grand scheme of the conspiracy.  Thus, Bonilla Valladares has not identified any irreconcilable defense that might counsel in favor of severance.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Government respectfully requests that the Court deny the severance motions in their entirety and without a hearing.

Dated:  New York, New York
      March 22, 2023

                            Respectfully submitted,

                            DAMIAN WILLIAMS
                            United States Attorney for the
                            Southern District of New York

By:    <u>   */s/*                   </u>
                            Jacob H. Gutwillig
                            David J. Robles
                            Elinor L. Tarlow
                            Kyle A. Wirshba
                            Assistant United States Attorneys
                            (212) 637-2215 / -2550 / -1036 / -2493