# EXHIBIT A

O1IJPINC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

         v.                              15 Cr. 379 (PKC)

MAURICIO HERNANDEZ PINEDA,
JUAN ORLANDO HERNANDEZ,
JUAN CARLOS BONILLA VALLADARES,

                                      Conference

          Defendants.

------------------------------x

                                  New York, N.Y.
                                  January 18, 2024
                                  11:00 a.m.

Before:

                  HON. P. KEVIN CASTEL,

                                  District Judge

                    APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
ELINOR TARLOW
DAVID ROBLES
KYLE WIRSHBA
JACOB GUTWILLIG
     Assistant United States Attorneys

RICHARD J. MA
CORY MICHAEL GARCIA
     Attorneys for Defendant Mauricio Hernandez Pineda
     -and-
ZEMAN & WOMBLE, LLP
BY:  KEN WOMBLE

O1IJPINC

1                                  APPEARANCES CONTINUED

2     RAYMOND L. COLON
      SABRINA P. SHROFF
3          Attorneys for Defendant Juan Orlando Hernandez

4     RAOUL ZALTZBERG
      BERNARDA VILLALONA
5     CESAR DE CASTRO
           Attorneys for Defendant Juan Carlos Bonilla Valladares
6

7     Also Present:

8     Francisco Olivero, Interpreter (Spanish)
      Gabriel Mitre, Interpreter (Spanish)
9     Kayla Collins, Paralegal

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1IJPINC

```
 1              (Case called)

 2              MS. TARLOW:  Elinor Tarlow for the government.

 3              I'm joined at counsel table by Assistant United States

 4  Attorney David Robles, Kyle Wirshba, Jacob Gutwillig, and

 5  paralegal specialist Kayla Collins.

 6              THE COURT:  Good morning to you all.

 7              And for Defendant Hernandez?

 8              MR. COLON:  Good morning, your Honor.

 9              Raymond Colon.  Seated next to my right is Ms. Shroff

10  on behalf of Mr. Orlando Hernandez Alvarado, sir.

11              THE COURT:  All right.  Thank you.

12              MS. SHROFF:  Good morning, your Honor.

13              THE COURT:  Good morning, Ms. Shroff.

14              MR. ZALTZBERG:  Good morning, your Honor.

15              Raoul Zaltzberg for Mr. Bonilla.  Seated to my right

16  is my co-counsel, Bernarda Villalona.

17              THE COURT:  Mr. Bonilla, raise your hand if you can,

18  please.  Thank you.  Good.

19              MR. MA:  Good morning, Judge Castel.

20              Richard Ma, appearing on behalf of defendant number

21  three, Mauricio Hernandez Pineda seated in the well in yellow

22  furthest from you.

23              MR. WOMBLE:  Good morning, your Honor.

24              Ken Womble, also for Mr. Hernandez Pineda.

25              MR. GARCIA:  Good morning, your Honor.
```

O1IJPINC

1           Cory Garcia for Mr. Hernandez Pineda.

2           THE COURT:  Good morning to you all.

3           So this is the final retrial conference, and I thought

4    I would begin with Defendant Pineda's motion to compel

5    discovery.  And I guess the first question I would have,

6    Mr. Ma, is do you have anything you wish to add to your motion

7    papers or do you want to rest on your motion papers,

8    Mr. Womble, Mr. Ma?

9           MR. MA:  Judge, we will rest on our papers.  We will

10   certainly answer any questions you have for us.

11           THE COURT:  Thank you.

12           And from the standpoint of the government?

13           MS. TARLOW:  Nothing further from the government, your

14   Honor.

15           THE COURT:  All right.  So Defendant Pineda moves for

16   an order that the government produce all *Brady* material in its

17   possession.  He also moves to compel discovery seeking records

18   relating to the criminal record of Giovanni Rodriguez, at least

19   that's the pseudonym that he is going by in this case.  And

20   Pineda argues that the review of discovery demonstrates

21   numerous inconsistencies that constitute exculpatory evidence

22   the defense is entitled to review under *Brady*.

23           He asserts that when reviewing the statements of

24   cooperating witness Diaz Morales, he's discovered that Diaz

25   Morales' account of interactions with Pineda were so

O1IJPINC

1    inconsistent that they implicate *Brady* obligations.  Later on,

2    Pineda states that he does not seek a remedy for a present

3    *Brady* violation and only wishes to point out that, had the

4    government provided this information too close to trial or

5    failed to disclose it, it would have been a *Brady* violation.

6         The government responds that Pineda acknowledges

7    there's been no *Brady* violation, as the government provided the

8    defendant with evidence far in advance of trial.  It also

9    contends that the purported inconsistencies are merely

10   clarifications during proffer sessions.

11        So to the extent he's arguing a *Brady* violation, that

12   application is denied.  And certainly with regard to 3500

13   material and Giglio material, the government understands its

14   obligations and its obligations under *Brady* and has been orally

15   warned, and there's a written order on that effect.

16        Pineda also seeks to compel discovery of records

17   relating to the criminal record of Giovanni Rodriguez and other

18   materials pertinent to the credibility of government witnesses,

19   and he says that the government has not made a good-faith

20   effort to obtain these records relating to, basically, events

21   occurring in Honduras, Rodriguez's 2009 arrest and prosecution

22   for stealing cocaine while on duty as a police officer, a 2009

23   murder of General Julian Aristides Gonzalez, planned by

24   Rodriguez and others, and the 2013 assassination of a Honduran

25   prosecutor.  Pineda also requests any other materials pertinent

O1IJPINC

1    to impeachment or credibility of witnesses.

2            The government responds that it's under no obligation

3    to seek out potential impeachment material from other law

4    enforcement agencies, much less foreign governments that are

5    not part of the prosecution team.  Further, the government

6    states that it requested the police records and records of

7    undercover investigations for Rodriguez in 2016 and provided

8    the materials it received from the Honduran government to

9    Pineda in 2021 and that Pineda has been in possession of these

10   materials and the Tony Hernandez trial transcript which

11   discusses Rodriguez's arrest and involvement in the murder.

12           So I am denying this request for multiple reasons.

13   First of all, Pineda has had the documents since 2021 and

14   didn't request additional material till the end of

15   November 2023.  But more importantly, I agree that the

16   government has complied with its disclosure obligations.  The

17   Honduran government is not part of the government's prosecution

18   team, and the government's disclosure obligations only extend

19   to the prosecution team.  And the government has made a

20   good-faith effort to obtain materials from the Honduran

21   government, so I'm going to deny that request.

22           Now, the government seeks to implement jury-related

23   protective measures.  I'm not quite sure I understand what the

24   government has in mind.  It is my practice when I question

25   jurors in every case, including an auto wreck on the Cross

O1IJPINC

1    Bronx Expressway, a civil suit, to refer to jurors by the juror

2    number because I find that jurors tend to prefer it.  It avoids

3    the embarrassment to the Court of mispronouncing someone's

4    name, and it also makes it easier for lawyers to keep track of

5    who they may want to move to challenge for cause or exercise a

6    peremptory.  So I find the use of numbers works well for

7    everyone.  Are you asking me to do anything different than

8    that?

9            MS. TARLOW:  No, your Honor.

10           THE COURT:  Okay.  Well, that's what I plan to do and

11   I've done, I think, in every single case that I've ever tried.

12   It has happened on occasion that there's a reason why a juror's

13   name comes out, and that's absolutely fine.  And this has

14   nothing to do with anything to do with jury lists.  This is

15   only my practice in the jury selection.  And of course, I will

16   make no mention to the jury of taking any special procedure.  I

17   need not do that, and I don't intend to do that.

18           Now, the government also seeks to impose protective

19   measures for four of its witnesses.  And the only objection I

20   have to this is that in the case of one of the witnesses, it's

21   been asserted that their identity is known, has been out there

22   somewhere in the press, but that's not a reason not to grant

23   the measure as to the two individuals, a Honduran law

24   enforcement officer, and yet another individual.  So the four

25   names are in the motion papers.  I'm going to grant the

O1IJPINC

1     government's request as to these four witnesses because they

2     and their families do face a serious risk of actual harm from

3     testifying.

4             Two witnesses with valuable information about the drug

5     trafficking conspiracy at issue in this trial have been

6     murdered in Honduras.  Nery Lopez Sanabria, a drug trafficker

7     incarcerated in Honduras following the seizure of the drug

8     ledger that listed the names of Tony Hernandez and Juan Orlando

9     Hernandez discussed below was murdered in prison in Honduras.

10    The murder occurred shortly after the drug ledger was admitted

11    at Tony Hernandez's trial and Tony Hernandez was found guilty.

12            In February of 2021, Normando Rafael Lozano, a

13    co-conspirator of Tony Hernandez identified at his trial, was

14    murdered.  So I'm going to permit the four witnesses to testify

15    under a pseudonym, and, number one, the true identity will be

16    identified to the defendants, has been identified to the

17    defendants so they can investigate and conduct a comprehensive

18    cross-examination.  And unless the need arises, it does not

19    appear to me that I need to inform the jury that the witnesses

20    are testifying under a pseudonym.

21            Is there any disagreement on that from the government?

22            MS. TARLOW:  No, your Honor.

23            THE COURT:  From any defendant?

24            All right.  So that's what we'll do.

25            The government seeks to admit evidence of

O1IJPINC

1   narcotics-related political corruption, including use of drug

2   proceeds to fund political campaigns and bribe politicians and

3   law enforcement officers.

4          Is there any defendant who wishes to be heard orally

5   on this point?  All right.

6          The government have anything further to add?

7          MS. TARLOW:  No, your Honor.

8          THE COURT:  All right.  So specifically, the

9   government intends to offer evidence of bribes paid to protect

10  drug shipments.  I could go through the examples.  They're in

11  the motion papers, testimony from Giovanni Rodriguez that

12  Pineda bribed him to provide information about potential law

13  enforcement actions, testimony from Alex Ardon that Pineda

14  received $200,000 for protecting Ardon and Tony Hernandez's

15  drug shipments on numerous occasions over multiple years.

16          There are a series of examples set forth in the

17  government's motion papers, and I'm not going to recount each

18  and every one of them, testimony from Diaz Morales that he paid

19  Bonilla's nephews hundreds of thousands of dollars in drug

20  proceeds for them to secure a safe passage for cocaine

21  shipments, and the nephews paid some of those proceeds to

22  Bonilla and Tony Hernandez, and testimony from a cooperating

23  witness detailing payments of 2 million in drug trafficking

24  proceeds for Juan Orlando's campaign to become president of

25  Honduran National Congress and Pepe Lobo's campaign for

O1IJPINC

<pre>
 1   president, monthly payments to Tony Hernandez to ensure safe

 2   passage of cocaine, a million and a half U.S. bribes to

 3   politicians in Copan to support Juan Orlando, a million in cash

 4   that El Chapo provided to Tony Hernandez.

 5           The government argues it's direct evidence of the

 6   charged conspiracy.  An act that is alleged to have been done

 7   in furtherance of the alleged conspiracy is not another act

 8   within the meaning of Rule 404(b), rather, it is part of the

 9   very act charged.  Direct evidence includes evidence that is

10   inextricably intertwined with the evidence regarding the

11   charged offense or evidence that completes the story of the

12   crime on trial.

13           Take a look at the Second Circuit's Gonzalez decision

14   in 1997 and Concepcion in the Second Circuit in 1992.  The

15   alleged conspiracy in this case was the import of large amounts

16   of cocaine into the U.S. from and through Honduras.  And the

17   government alleges that Juan Orlando's role in the conspiracy

18   was to use his political power to protect drug traffickers from

19   investigation in Honduras and extradition to the United States

20   and to direct the police and military of Honduras to protect

21   certain drug shipments in Honduras.

22           So it seems to me that this evidence is evidence in

23   furtherance of the conspiracy.  It's evidence of the crime

24   charged, and I need not reach the government's alternative

25   argument that it's 404(b) evidence.
</pre>

O1IJPINC

1          Now, I'm going to start with statements made to

2     cooperating witnesses by the defendants and/or their

3     co-conspirators.  Anybody wish to be heard on this topic or do

4     they rely on their papers?  If anybody wishes to add anything

5     to their papers, please so indicate.

6          The government seeks to admit two statements which

7     took place in 2007 between Diaz Morales and a co-conspirator.

8     First, Diaz Morales told the co-conspirator that Pineda

9     provided security for drug shipments, and Pineda provided Diaz

10    Morales with information concerning law enforcement operations

11    to protect Diaz Morales's drug trafficking activities.  Second,

12    Diaz Morales told the co-conspirator that Pineda was the man's

13    cousin, a reference to the fact that Pineda is a cousin of Juan

14    Orlando.

15         The government argues that these statements are not

16    hearsay under 801(d)(2)(E).  And I'm going to admit those

17    statements under 801(d)(2)(E).

18         Under the rule, a statement is not hearsay if offered

19    against an opposing party and made to the parties'

20    co-conspirator during and in furtherance of the conspiracy.  To

21    admit a statement pursuant to this rule, the Court must find by

22    a preponderance of the evidence that, one, a conspiracy that

23    included the declarant and the defendant existed, and, two, the

24    statement was made during the course of and in furtherance of

25    the conspiracy.  These familiar principals are laid out in the

O1IJPINC

1    *Bourjaily* case decided by the Supreme Court.  483 U.S. (1987).

2              And so that is, in fact, the case, and statements are

3    going to be admitted.  Diaz Morales, co-conspirator, Pineda

4    were part of the same conspiracy to import cocaine, the

5    statements appear to be made in furtherance of that conspiracy

6    because Diaz Morales' statements convinced the co-conspirator

7    that Pineda could be trusted to work with him to protect Diaz

8    Morales' drug shipments.

9              Now, these same principles apply with regard to other

10   statements that have been tendered by the government, including

11   five statements that the government seeks to offer through Alex

12   Ardon's testimony against Pineda.  And I need not recount the

13   five statements.  They're set forth in the motion papers, but I

14   conclude that they are admissible under 801(d)(2)(E).  And they

15   also are admissible as statements against penal interest of the

16   declarant under 804(b)(3).  So I'm going to admit these

17   statements.

18             The preponderance of the evidence is likely to

19   establish that Ardon, Pineda, Tony Hernandez, Juan Orlando, and

20   El Chapo were members of the charged large-scale conspiracy to

21   import cocaine into the United States.  Pineda provided

22   protection for the drug shipments of Ardon and Tony Hernandez,

23   which shipments, including shipments of El Chapo's cocaine.

24   And Tony Hernandez told El Chapo that he would be able to

25   protect El Chapo's drug shipments and prevent Ardon's

O1IJPINC

1    extradition if Juan Orlando was elected president.  And Juan

2    Orlando through Tony Hernandez told El Chapo they needed

3    1 million for his campaign.  So the statements between Alex

4    Ardon and Tony Hernandez about Pineda establish Pineda's

5    credibility and trustworthiness to Alex Ardon.

6         Other statements involved the logistics of how to ship

7    and protect cocaine through Honduras or facilitated the

8    continuation of El Chapo's cocaine shipments through Honduras

9    by reassuring him that the loads would be protected if Juan

10   Orlando won the presidency, and one of the statements involved

11   the protection of Alex Ardon from extradition.  So I'm

12   admitting them on the basis stated.

13        Likewise, the government seeks to admit four

14   statements through the testimony of Diaz Morales in or around

15   2007.  A co-conspirator told Diaz Morales that on at least one

16   occasion Giovanni Rodriguez and Pineda were both providing

17   protection for one of the co-conspirator's cocaine shipments

18   and recognized each other.  At the time, the co-conspirator

19   expressed concern that by seeing Pineda, Giovanni Rodriguez

20   would realize that Tony Hernandez was involved in the cocaine

21   transaction.  That's one of the statements.

22        Another, prior to Diaz Morales meeting Pineda in 2010,

23   a co-conspirator told Diaz Morales that Pineda assisted other

24   drug traffickers with protection and helped them transport

25   drugs through Puerto Cortés, a poor city on the northern coast

O1IJPINC

1    of Honduras.   The co-conspirator advised Diaz Morales that

2    anything could be fixed through Pineda.

3           Another statement in or about 2013 about Diaz Morales,

4    Tony Hernandez, and others transporting about 2,000 kilos of

5    cocaine across nine shipments.  A co-conspirator told Diaz

6    Morales that they didn't have to worry about cocaine being

7    seized by law enforcement in Honduras because Pineda was

8    providing information about police checkpoints along the route

9    so those checkpoints could be avoided.

10          And in or about 2013, two Honduran national police

11   officers who were Bonilla's nephews told Diaz Morales that

12   Pineda was involved in cocaine trafficking.  Bonilla's nephews

13   requested access to a truck with fake bottoms that Diaz Morales

14   used to transport cocaine and Diaz Morales, that Pineda would

15   be overseeing their transport.

16          So I'm going to admit these under 801(d)(2)(E).  And

17   I'm reserving on whether they would also be admissible under

18   804(b)(3).

19          There are 14 statements made by co-conspirators to

20   Alex Ardon, and CW-1, and I need not recount these 14

21   statements.  They're set forth in the motion papers.  I agree

22   that statements 3, 5, 6, 7, 9, 10, 11 are admissible under

23   801(d)(2)(A), which provides that a statement is not hearsay if

24   it is offered against an opposing party and was made by the

25   party in an individual or representative capacity.

O1IJPINC

1          Each is offered against Juan Orlando Hernandez as

2     evidence of his participation in the charged conspiracy.  3, 5,

3     6, 7, 9, 10, and 11 were made by Juan Orlando Hernandez in his

4     individual capacity.  Statement 13 was made by Tony Hernandez

5     and is not admissible under this rule, but the statements are

6     admissible under 801(d)(2)(E) that Juan Orlando, Bonilla, Tony

7     Hernandez, Alex Ardon, CW-1, and El Chapo were all members of

8     the charged conspiracy and that each statement was made in

9     furtherance of the conspiracy.  And I agree and conclude that

10    each statement is admissible under 801(d)(2)(E).

11          Video recordings made by Leonel Rivera containing

12    statements by co-conspirators, and the government seeks to

13    introduce recordings of a February 2014 and March 2014 meeting

14    between Leonel Rivera, another Honduran official, and drug

15    traffickers.  And they are admissible both as statements by a

16    co-conspirator during and in furtherance of the conspiracy, as

17    well as statements against penal interest.  Statements made by

18    co-conspirators to Leonel Rivera, there are two statements made

19    to Leonel Rivera by CC-3, a Honduran drug trafficker who

20    maintained a clandestine airstrip in Honduras, and by Avila

21    Meza, a corrupt official in the Honduran National Police.

22          The government argues that the following two

23    statements are admissible co-conspirator statements under

24    801(d)(2)(E) and statements against penal interests.  And I

25    don't need to get into the full of them, but in or about late

O1IJPINC

2012 or early 2013, CC-3 told Leonel Rivera that approximately a week prior, CC-3 had received a shipment of 800 to 850 kilos of cocaine to be delivered to a clandestine airstrip that CC-3 maintained.  CC-3 previously had agreed to provide the drugs to Mexican narcotics traffickers who in turn would pay CC-3 approximately 25 percent of the value.

CC-3 told Leonel Rivera that when the plane landed, the Mexican buyers arrived, accompanied by Bonilla, along with two police patrol cars and armed officers in full police uniform.  CC-3 told Leonel Rivera that the Mexican buyers with Bonilla standing next to them paid CC-3 in cash, then loaded the drugs into two police cars which CC-3 said then left with their sirens on.  CC-3 expressed to Leonel Rivera that CC-3 was surprised Bonilla had been present for this transaction, given his position.

Also, in early 2013 Avila Meza told Leonel Rivera that Bonilla was providing protection for the drug trafficking activities of Morales.  So these were statements by conspirators in furtherance of the conspiracy.  CC-3 and Avila Meza were both conspirators in the charged conspiracy.  CC-3 operated an airstrip.  And it's statement during and in furtherance of the conspiracy.  The first statement would also come in as a statement against penal interest.

Government also seeks to offer statements Fuentes Ramirez made to Leonel Rivera in September 2020 at the MCC, and

O1IJPINC

1   these are statements the government seeks to offer under

2   804(b)(3).  Now, the first statement is in or about

3   September 2020, Fuentes told Leonel Rivera that Fuentes

4   believed he was in prison because of Juan Orlando, that prior

5   to his arrest Fuentes Ramirez and Commissioner Martinez had met

6   with a military official who said he was sent by Juan Orlando

7   who told them to sell one of Fuentes Ramirez's companies to

8   Juan Orlando so that Juan Orlando could use it to launder,

9   among other things, millions of dollars of drug proceeds.

10          I'm reserving decision on whether this is admissible

11   as a statement against penal interest.  I need to hear the

12   testimony in context before ruling on that.

13          The second statement is Fuentes Ramirez told Leonel

14   Rivera that Fuentes Ramirez met with Juan Orlando on two

15   occasions when Juan Orlando was running for reelection, paid

16   Juan Orlando approximately 450,000 lempiras both times and, in

17   exchange, received Juan Orlando's assurance that Juan Orlando

18   would support Fuentes Ramirez with anything Fuentes Ramirez

19   needed.  That's a statement against penal interest.

20          There are a series of statements that the government

21   cites made by Tony Hernandez to Diaz Morales, and I reviewed

22   the statements.  There are four in particular that I see in the

23   government's motion papers, and I conclude that these are

24   statements that are admissible as made during and in

25   furtherance of the conspiracy.  Tony Hernandez and Diaz Morales

were co-conspirators.  Each of the four statements was in
furtherance of the conspiracy.

          In the first statement, Tony Hernandez tells Diaz
Morales that if he bribes the national party campaign, he'll
obtain greater access to information from the Honduran National
Police and army, which will prevent his cocaine from being
seized.  In the second statement, Tony Hernandez describes
Bonilla's role in the conspiracy, showing that Bonilla could
protect the conspiracy's activities.

          In the third statement, Tony Hernandez explains the
status of the extradition law and how it could be delayed,
which would allow the conspiracy to continue to operate.  In
the fourth statement, Tony Hernandez told Diaz Morales that if
Juan Orlando were elected president, there would be no issues
with trafficking cocaine through Honduras.  This statement
evidences that Juan Orlando would protect the conspiracy's
operations.

          So I need not decide whether they're also admissible
as statements against penal interest, although they likely are.

          Government seeks to admit statements made by CC-1 to
CW-2.  The statements explain that in 2013, before the Honduran
presidential election, CC-1, a high-ranking member in the
Sinaloa Cartel, paid two $500,000 bribes to CC-2 to support
Juan Orlando's presidential campaign.  CW-2 provided 300,000 to
another individual who later told CC-1 the money was a final

O1IJPINC

1    push for Juan Orlando's campaign.

2              The government argues that the following statements

3    are admissible, and these are the ones cited, that in or about

4    2013, CC-2 told CC-1 that the candidate needed some

5    collaboration.  Thereafter, CC-1 told CW-2 that he gave 500,000

6    to CC-2.  In or about 2013, prior to the Honduran presidential

7    election, CC-1 told CW-2 that CC-1 delivered another 500,000 to

8    CC-2.  In or about 2013, approximately the day prior to the

9    Honduran presidential election, CW-2 gave approximately 300,000

10   to an individual who later told CC-1 that the money was to be

11   used as a last push for the president and vice president

12   elections.

13             So these satisfy the requirements under 801(d)(2)(E)

14   as co-conspirator statements made during and in furtherance of

15   the conspiracy, and they will be admitted.

16             There are also statements made to Chang Monroy.  In

17   approximately 2009, Tony Hernandez told Chang Monroy that he

18   had approximately 2 tons of cocaine in Honduras at the time and

19   that he also had access to a cocaine laboratory in Colombia

20   where he could mark kilograms with unique stamps to identify

21   his drugs, including, but not limited to, a "TH" stamp.  Tony

22   Hernandez said that he had strong relationships with Honduran

23   politicians as well as the military and police, particularly in

24   the Copan department.  Tony Hernandez also offered Chang Monroy

25   weapons, including grenade launchers, machine guns, and an FN

1    Herstal 57 pistol that he referred to in Spanish as a "cop
2    killer."

3         Secondly, on several occasions between approximately
4    2009 and 2010, Santos Tobar told Chang Monroy that the cocaine
5    they were working to distribute and import was supplied by Tony
6    Hernandez and Vergara Bonifante.  These satisfy the
7    requirements under 801(d)(2)(E) and will be admitted, and I do
8    reserve on whether they're also admissible under 804(b)(3).

9         Statements made by Honduran officials, including Juan
10   Orlando and Fuentes Ramirez, to Jose Sanchez, this is at ECF
11   554 pages 63 to 68.  There are three statements that the
12   government seeks to admit, and certainly the first and the
13   third statement are admissible as statements of a
14   co-conspirator by and during and in furtherance of the
15   conspiracy and admissible under 801(d)(2)(E).  The first
16   statement and Fuentes Ramirez's portion of statement three are
17   admissible pursuant to 804(b)(3), and statement two is
18   admissible as an admission of a party opponent under
19   801(d)(2)(A).

20        In the first statement, Barahona promises Fuentes
21   Ramirez he will intervene with law enforcement to protect
22   Fuentes Ramirez from being investigated or arrested for
23   operating a cocaine laboratory.  In the third statement, Juan
24   Orlando promises to protect Fuentes Ramirez from arrest and
25   extradition and directs him to transport cocaine with the

1    assistance of Honduras military.  One and three are the

2    statements that are admissible under 801(d)(2)(E).

3        The second statement, Juan Orlando describes

4    embezzling U.S. aid and stealing from Honduras Social Security

5    Fund.  These are arguably in furtherance of the conspiracy

6    because they are, in effect, a brag of the steps to which Juan

7    Orlando is prepared to go.  But I think more naturally, they

8    are admitted under 801(d)(2)(A) as a statement against penal

9    interest, and I admit the statement two under 801(d)(2)(A).

10        There are statements by co-conspirators to CW-3, five

11   in all, and I refer you to pages 5 through 10 of ECF 663, and

12   they are admissible under 801(d)(2)(E).  The government first

13   asserts that the conversation occurred between CW-3 and his

14   drug trafficking co-conspirators, and that's as to the first

15   conversation.  They also contend that the conversations were

16   about their ongoing drug trafficking activity and, thus, in

17   furtherance of the drug trafficking conspiracy.

18        With respect to the first statement, the conversation

19   involved the conspirators' efforts to solve the problem of an

20   airplane that had been seized because it was carrying cocaine

21   that belonged to Juan Orlando Hernandez and Tony Hernandez as

22   well as other drug traffickers.

23        The second statement involved Leonel Rivera telling

24   his co-conspirators that the Cachiros sold cocaine to the

25   Valles, that Tony Hernandez worked with the Valles and that

O1IJPINC

1    Juan Orlando supported Tony Hernandez's drug trafficking in the

2    background.  The statement involved identifying the

3    participants in the conspiracy, thus, furthering the

4    conspiracy.

5           In the third statement a high-ranking member of the

6    Sinaloa Cartel told CW-3 that he would support Juan Orlando's

7    presidential campaign, furthering the conspiracy by evidencing

8    the Sinaloa Cartel's support for Juan Orlando's activities.

9    The fourth statement involves a conversation about a bribe from

10   the Valles' drug trafficking organization to Juan Orlando's

11   campaign.  The fifth statement involves CW-3's conversations

12   about obtaining radar information to facilitate his drug

13   trafficking with the Cachiros.

14          Government seeks to offer statements by Miguel Valle

15   to CW-2.  This is ECF 663 at 11 through 13.  Miguel Valle told

16   CW-2 that he had sent two King Air planes loaded with CW-2's

17   cocaine to CC-7's airstrips in Honduras.  Valle further stated

18   that CC-7 transported those loads by land to a ranch Valle

19   owned in Honduras, and Honduran national police officers

20   including Bonilla had provided protection.

21          I find that that satisfies the conditions under

22   801(d)(2)(E).  CW-2 and Miguel Valle were both part of the same

23   narcotics trafficking conspiracy as the defendants.  CW-2

24   worked for CC-1 as a conduit between the Sinaloa Cartel and the

25   Honduran drug traffickers, and Miguel Valle trafficked drugs in

O1IJPINC

Honduras as part of the charged conspiracy.  They were made by

Valle to assure CW-2 that the cocaine in the shipment would be

protected.

          Now, there are statements that the government seeks to

offer by Carlos Alberto Vallardes Zuniga to Leonel Rivera.  And

Carlos Vallardes was a Honduran national police officer who

participated in the Cachiros drug trafficking organization led

by Leonel Rivera.  Leonel Rivera facilitated a drug shipment of

375 kilograms of cocaine from Venezuela to Honduras that was

eventually delivered to the Valles for two and a half million

U.S.  The money was seized by Honduran national police

officers, and Leonel Rivera had his associates pay a portion of

the money to Bonilla for its release.

          The government seeks to introduce Leonel Rivera's

testimony about his conversation with Carlos Vallardes about

the bribe to Bonilla under rule 801(d)(2)(E).  Specifically,

Leonel Rivera will testify that one of his coworkers — and this

is CC-9, I gather, not CC-8, correct?

          MS. TARLOW:  Yes, your Honor.

          THE COURT:  Placed the two and a half million in the

SUV, and CC-9 later recalled Leonel Rivera telling him that the

SUV's driver told CC-9 that Honduran national police officers

had stopped the SUV at gunpoint at Bonilla's direction.  Leonel

Rivera called Carlos Vallardes, and Carlos Vallardes told

Leonel Rivera that he could bribe Bonilla or try to swap the

O1IJPINC

1    SUV at the police station with a similar vehicle.  Leonel

2    Rivera told Vallardes he would bribe Bonilla, and Vallardes

3    told Rivera that Bonilla had conveyed that he wanted 500,000.

4              These qualify as co-conspirator statements made during

5    and in furtherance of the conspiracy.

6              Government seeks to offer statements made by

7    co-conspirators to CW-4.  This is 663 at 17-19.  And

8    specifically, the government identifies four such statements,

9    and I conclude that they're admissible as co-conspirator

10   statements.

11             Statement one involved the co-conspirators discussing

12   the logistics of receiving loads of cocaine from the

13   Hernandezes.  Statement two involved Cholo Ivan, El Chapo's

14   security guard, introducing Tony Hernandez to CW-4, identifying

15   the members in the conspiracy.  Statement three involved a

16   statement CW-4 overheard about where El Chapo was staying for

17   further drug negotiations.  This is a logistical conversation

18   necessary for the conspiracy to function, or at least useful

19   for the conspiracy to function.  And statement four involved El

20   Chapo's son, Ivan, instructing CW-4 to bribe an official in the

21   Honduran security forces to ensure safe protection for members

22   of the Sinaloa Cartel through Honduras.

23             I neglected to address a statement that was in the

24   government's supplemental motion made by Miguel Valle, one of

25   the leaders of the Valle organization, and I conclude that it's

O1IJPINC

1    a co-conspirator statement admissible under 801(d)(2)(E).

2    Valle told Chang Monroy that the Valles paid Bonilla roughly

3    every three months to protect their narcotics loads and

4    directly paid Bonilla or two lower-ranked officers in the

5    Honduran National Police.

6         Government asserts that the evidence will establish

7    that the Valles were co-conspirators and that the statements

8    were in furtherance of the conspiracy, as Miguel Valle

9    explained to Chang Monroy how Bonilla protected their shipments

10   and how he was compensated for that.

11        So returning to ECF 554 at 68-72, evidence of

12   Bonilla's participation in drug-related murder, the government

13   seeks to admit the testimony of Alex Ardon that Bonilla

14   murdered Victim-1 in 2011 at Tony Hernandez's direction.  The

15   government alleges that Victim-1 refused to allow Ardon to use

16   certain land to ship their cocaine.  Ardon told Tony Hernandez

17   about this, and Tony Hernandez told Alex Ardon that he would

18   direct Bonilla to murder Victim-1.  Later, Tony Hernandez told

19   Alex Ardon that Bonilla had murdered Victim-1 and was able to

20   do so because of his access to armed security and armored

21   vehicles.

22        They are admissible as co-conspirator statements.  I

23   need not reach the statements against penal interest point,

24   although probably admissible under that.  Alex Ardon and Tony

25   Hernandez were conspirators in the charged conspiracy.  The

O1IJPINC

1   conversation about them murdering Victim-1 was in furtherance

2   of the conspiracy because Victim-1 refused to allow Ardon to

3   use his land, hindering the conspiracy's operation.  Evidence

4   that Bonilla murdered Victim-1 at Tony Hernandez's direction

5   using armed security and armored vehicles is direct evidence of

6   Bonilla's role in the conspiracy, as the government alleges

7   that Bonilla protected the conspiracy's operation and

8   shipments.

9          And I do not conclude that it's excludable under 403

10  because it's evidence of the operations of the conspiracy, and

11  it bears on the nature, structure, roles in the conspiracy.

12         Next, the government seeks to admit evidence of drug

13  ledgers seized from Nery Lopez Sanabria, and this is ECF 554 at

14  72-74, and these are drug ledgers seized by Honduran police

15  from a car in which Nery Lopez Sanabria, a drug trafficker, was

16  a passenger.  The government urges that the contents of the

17  drug ledgers are admissible co-conspirator statements, and the

18  Court agrees.  The ledgers contain the initials of Juan Orlando

19  Hernandez and Tony Hernandez for various large cocaine

20  transactions and payments reflecting payments to the two of

21  them and a particular 650-kilogram drug load using a Nava

22  plane.

23         The government urges that a jury could infer that the

24  ledger belonged to Sanabria, a member of the conspiracy,

25  because the ledgers were found in the car where he also carried

O1IJPINC

1    firearms and drug proceeds.  While the government has not

2    specifically identified the author of the ledger entries, the

3    government need only show that the author is a member of the

4    conspiracy.  The person filling out a ledger entry of this sort

5    would have been a member of the conspiracy, and maintaining the

6    ledger constituted a communication during and in furtherance of

7    the conspiracy.  And I rely in part on *United States v. Ashraf*,

8    F. App'x 26, where the circuit held that the admission of a

9    drug ledger was not error, much less plain error.

10         Next, government seeks to admit electronic

11   communications by Central American drug traffickers regarding

12   cocaine bearing the "TH" stamp.  This is ECF-554 at 74-80,

13   Exhibit E, and ECF 487 at 28-34, Exhibit B.  I conclude that

14   the messages are statements against penal interest, satisfying

15   the requirements of Rule 804(b)(3).

16         The government has made a good-faith effort to produce

17   CC-5 and CC-6.  It has not been able to identify one of the

18   participants in the message.  The government has identified the

19   other participant and has attempted to extradite him, but has

20   not been able to find him in Central America.  Accordingly,

21   CC-5 and CC-6 are unavailable for the purposes of Rule

22   804(b)(3).

23         Further, their messages expose them to criminal

24   liability because they discuss past and future plans to deal

25   cocaine, along with sending images of large amounts of cocaine.

O1IJPINC

1    The messages bear the requisite indicia of reliability because

2    CC-5 and CC-6 were speaking to co-conspirators in the

3    conspiracy with no knowledge their message was being

4    intercepted.  They accordingly had no incentive to be dishonest

5    in their communications.  And I reserve on whether or not

6    they're also admissible under 801(d)(2)(E).

7            Next, electronic evidence from Tony Hernandez's cell

8    phones, that include photographs of machine guns, this is ECF

9    554 at 80-84, ECF 487 at 34-39.  Government seeks to introduce

10   evidence from Tony Hernandez's phone that includes photographs

11   of machine guns including one inscribed with Juan Orlando's

12   name, photographs of U.S. currency that testimony will

13   establish is from drug proceeds, and contact information for

14   and photographs of co-conspirators.  The government urges that

15   the photographs from Tony Hernandez's phone are direct evidence

16   of the charged offenses whose probative value outweighs any

17   danger of unfair prejudice.  The defendants seek to exclude it

18   under Rule 403.

19           I'm going to admit the evidence.  The defendants are

20   charged with using machine guns in furtherance of their

21   conspiracy to import cocaine into the United States and

22   conspiring to use machine guns in furtherance of their

23   conspiracy.  Tony Hernandez was a key figure in the conspiracy,

24   and the photographs on his phone of firearms is evidence that

25   he possessed these types of firearms in the course of the

O1IJPINC

1    conspiracy or at least that he possessed firearms.

2          Further, the photographs inscribed with Juan Orlando's

3    name is evidence that Juan Orlando possessed or had cognizance

4    of the use of the firearms in the course of the conspiracy.

5    Bonilla and Pineda contend the photographs are cumulative

6    evidence because the evidence contained in the photographs

7    could also be elicited through witness testimony.  The

8    photographs, however, corroborate the witness testimony.

9          Now, I reserve the right, depending on what's being

10   offered, to limit the introduction of cumulative evidence.  I

11   don't know how many photographs the government is seeking to

12   offer, but I will exercise my authority to exclude cumulative

13   evidence.

14         Government seeks to offer spreadsheets from CW-1's

15   laptop cataloging political bribes.  This is ECF 554 at 84-87.

16   Now, this would include contact information for Juan Orlando

17   and numerous of his co-conspirators including Tony Hernandez

18   and Pepe Lobo, Excel spreadsheets detailing Juan Orlando's use

19   of drug proceeds to commit voter fraud.

20         For example, CW-1 maintained spreadsheets recording

21   bribes he and others paid to representatives at polling sites

22   to manipulate votes in Juan Orlando's favor, which were

23   referred to as payments for trainings.  Also bribes made to

24   mayors, including each mayor's bank account information, to

25   ensure they garnered support for Juan Orlando, and three bribes

O1IJPINC

1    paid to municipalities in Copan where Juan Orlando lacked the

2    votes necessary to legitimately win the election.  Also, there

3    are numerous pictures of CW-1 with other politicians and

4    co-conspirators, including a picture of CW-1 with Juan Orlando.

5          The government argues that this evidence is admissible

6    as direct evidence against the defendants, and the Court

7    agrees.  The Excel spreadsheets document the usage of drug

8    proceeds to pay bribes to maintain political power and is

9    direct evidence that Juan Orlando conspired with traffickers to

10   maintain political power in Honduras and provide protection for

11   drug shipments in return.  The maintenance of political power

12   was a necessary requirement to further the interests of the

13   conspiracy.

14         The government next seeks to offer evidence from

15   Fuentes Ramirez's cell phone that includes photographs of

16   firearms and cash, as well as Waze data.  This is 554 at 87-92.

17   This includes contacts and electronic communications between

18   Fuentes Ramirez and members of the Honduran National Police and

19   Honduran military, data from the navigation application, Waze,

20   showing that Fuentes Ramirez traveled to the presidential

21   palace on May 29 and June 12, 2019, photographs of firearms and

22   both currency.

23         So the communications between Fuentes Ramirez and the

24   members of the Honduran National Police and the Honduran

25   military are co-conspirator statements admissible under

1   801(d)(2)(E).  The Waze application is direct evidence of the

2   conspiracy, as is the photographs from Fuentes Ramirez's phone.

3   And I reserve the right to exclude any photographs that I

4   conclude are cumulative.

5        Evidence from Gutierrez's iCloud and Instagram

6   accounts, ECF 554 at 92-94, these are photographs of Gutierrez

7   with Juan Orlando and photographs of Martinez, who's a member

8   of the Honduran National Police, with Juan Orlando and

9   photographs of firearms and large amounts of U.S. currency and

10  Gutierrez's electronic communications.  The photographs are

11  direct evidence of the charged offenses, are probative of the

12  fact that Juan Orlando had a relationship with Daniel Gutierrez

13  and Martinez.

14       The photographs of the firearms found on Gutierrez's

15  phone are admissible as direct evidence and pass muster under

16  403.  There are multiple images of an olive-colored AR-15 rifle

17  with a Navy insignia, and Jose Sanchez testified that Fuentes

18  Ramirez received a similar firearm from the Honduran military

19  after his meetings with Juan Orlando.  Again, I reserve the

20  right to restrict cumulative evidence, but I'll reserve on that

21  for trial.

22       There's an electronic communication between Gutierrez

23  and Krizia Murillo dated July 11, 2021.  In that exchange the

24  two identify a number of co-conspirators the government had

25  identified in one of its *in limine* filings.  The government

O1IJPINC

notes that the Court also admitted this exchange in the Fuentes
Ramirez trial.  I will admit it under 804(b)(3).  It exposes
the two individuals to criminal liability because specifically
identifying the co-conspirators Gutierrez and Krizia Murillo
are stating that they are involved in the conspiracy.  The
messages also bear the requisite indicia of reliability because
the conversation was between two allies in the conspiracy who
had no incentive to lie during the exchange.

          Now, there's also a motion to sever.  Anyone want to
be heard on the motion to sever beyond what's in their
submissions?

          All right.  Juan Orlando has moved for an order
directing an election of separate trials and/or counts or, in
the alternative, granting a severance of defendants based on
the pervasive and unavoidable prejudice that will result by
joinder of defendants and counts.  He asserts that he would
suffer prejudice from a joint trial, that it would outweigh the
benefits to judicial economy from a single trial.

          He does not identify what would be prejudicial to and
from a joint trial with Bonilla Vallardes and Pineda.  He
acknowledges that the Court will admit evidence in the joint
trial that is admissible only against Bonilla Vallardes and
Pineda, but does not state what that evidence is.

          Similarly, Bonilla has moved to sever his trial from
the trial of Juan Orlando and Pineda.  He argues that he would

O1IJPINC

1   be subject to prejudicial spillover of evidence because most of

2   the evidence in the case involves Juan Orlando Hernandez and

3   his rise to power.  He also contends that there may be

4   irreconcilable defense conflicts based on defenses that he was

5   investigating.

6       Even without a consolidated trial indictment, the

7   Court may order the separate cases be tried together as though

8   brought in a single indictment or information if all offenses

9   and all defendants could have been joined in a single

10  indictment or information.  This comes from Rule 13 of the

11  Federal Rules of Criminal Procedure.

12      Under Rule 8(b), two or more defendants may be charged

13  in the same indictment if they're alleged to have participated

14  in the same act or transaction or in the same series of acts or

15  transactions constituting an offense or offenses.  The Second

16  Circuit reads the language of Rule 8(b) to mean that the

17  joinder of defendants is proper when the alleged acts are

18  unified by some substantial identity of facts or participants

19  or arise out of a common plan or scheme.  That's *United States*

20  *v. Feyrer*, 333 F.3d (2003).

21      Juan Orlando, Bonilla, and Pineda are alleged to have

22  participated in the common plan or scheme, the conspiracy to

23  import large amounts of cocaine from Honduras to the United

24  States, and three defendants worked together in the conspiracy.

25  Juan Orlando relied on Bonilla and Pineda to use their senior

O1IJPINC

```
 1    positions in the Honduran National Police to protect drug

 2    shipments that financed his political campaign.  The government

 3    expects to offer testimony from several cooperating witnesses

 4    describing the role of each defendant in the conspiracy and how

 5    the defendants worked together in the conspiracy.

 6              So the motion to sever is denied.

 7              MR. COLON:  Judge, I'm sorry.  May we approach, sir,

 8    for a second?

 9              THE COURT:  Well, on the record or what?

10              MR. COLON:  Off of the record for a second.

11              THE COURT:  No.

12              MR. COLON:  I'll say it on the record.

13              As you know, Judge, I filed an application for an

14    adjournment, provided some medical documentation.  I filed that

15    motion with respect to the severance, so I just wanted to know

16    that, depending on what your decision is, may have a bearing on

17    what you're saying now, sir.

18              THE COURT:  Well, I received from you a motion to

19    continue the trial, and you filed that motion on January 10.

20    And on January 11, I ruled on that motion.

21              MR. COLON:  As a result of that, Judge, I took the

22    opportunity -- I think you allowed for a submission of

23    additional medical information.

24              THE COURT:  I made no such ruling.

25              MR. COLON:  I thought you did, Judge.
```

O1IJPINC

1        THE COURT:  I have a copy of my order right here.  I

2   have received your submission.

3        MR. COLON:  And I submitted something last night, as

4   well.

5        THE COURT:  Yes.  It was 57 pages in length, yes.

6        MR. COLON:  And I was requesting --

7        THE COURT:  I ruled on the motion.  I received your

8   submission, yes, after I ruled on the motion.  Go ahead.

9        MR. COLON:  My understanding is that my client is

10  wishing to request a change of counsel, your Honor.

11       THE COURT:  Did you read my order of January 11?

12       MR. COLON:  I did, sir.

13       THE COURT:  Did I address that in there?

14       MR. COLON:  I don't believe you, Judge.

15       THE COURT:  I believe I did.

16       MR. COLON:  But this request has been made by my

17  client just today with respect for a request for a public

18  defender or CJA representation, your Honor.

19       THE COURT:  Well, you submitted it to me on

20  January 10.

21       MR. COLON:  That's correct, your Honor.

22       But given what I saw in terms of my physician's

23  letters and the documentation, I think at this point I don't

24  think I can be ready in 30 to 45 days.  I don't know if it will

25  be six, seven, or eight months that I'll be at least declared

O1IJPINC

1    able to try this case.

2              THE COURT:  You made a motion.

3              MR. COLON:  Yes, sir.

4              THE COURT:  I ruled on the motion, and your motion

5    included your client's request.

6              MR. COLON:  Yes.

7              THE COURT:  I ruled on that in a written order that

8    was filed on ECF at 660.  I have the materials you transmitted,

9    and if you would like, you want me to treat that as a motion to

10   reconsider?

11             MR. COLON:  Yes, sir.

12             THE COURT:  I'll do that and I'll rule on it.

13             MR. COLON:  Thank you.

14             THE COURT:  All right.

15             Is there anything further from the government with

16   regard to *in limine* motions?

17             MR. COLON:  Your Honor, I think my client has an

18   additional element to this, and that's with respect to the

19   breaking down of communications and possible ineffectiveness of

20   having a single attorney representing him, as opposed to a more

21   expanded team, Judge.  So I say that because I'm concerned

22   about his ability to receive a fair trial.

23             THE COURT:  Are you making your client's claim that

24   you're an ineffective lawyer?

25             MR. COLON:  I'll let my client address the Court on

O1IJPINC

1    that, Judge, if you permit him.

2              But I think that the fact that we didn't have an

3    additional -- well, several additional members to the team

4    because of the lack of resources, that's giving my client some

5    difficulty and having what he believes is an ineffective

6    representation in terms of the manpower that we had at our

7    disposal.  I'm just letting you know, Judge.  This is what I

8    was communicated by Mr. Hernandez this morning.

9              THE COURT:  This morning he said this to you?

10             MR. COLON:  That's correct, sir.

11             THE COURT:  All right.  Mr. Hernandez, is there

12   something you want to say?

13             DEFENDANT HERNANDEZ:  Yes, your Honor.

14             I would like to ask your Honor to hear me out, please.

15   I have two crucial emergencies in my life.  One has to do with

16   the fact that I do not feel duly represented.  I am without a

17   defense, and I would like to explain that to you outside of the

18   presence of the prosecutors, if you will so allow.

19             THE COURT:  I will not.  Go ahead.

20             DEFENDANT HERNANDEZ:  May I explain, judge?

21             THE COURT:  You may.  You're welcome to.

22             DEFENDANT HERNANDEZ:  Thank you.

23             I do not have effective representation.  I cannot

24   reconcile with my attorney on certain points.  At first, we

25   worked very well together, but from six months ago until the

O1IJPINC

1    present, he has been suffering from illness.  We have almost

2    not met as we would like to during the past six months.  Today,

3    you addressed the *in limine* motions from the prosecutor.  We

4    had devised to reply to them.  And there was no reply from me,

5    and we had arranged for that.

6         I have not been allowed to see my attorney from

7    Honduras.  This is a complex case.  It's voluminous.  But there

8    are also false allegations of my status as ex-speaker of the

9    congress in Honduras, as I was also the president of Honduras.

10   So I need the presence of my Honduran attorney to help my

11   attorney with my defense, and they were never allowed to visit

12   me legally.

13        Judge, I have been requesting a laptop for one year,

14   and my attorney has it and has not been allowed to pass it to

15   me the way other defendants are allowed to have them in

16   preparation for their trials.  We had agreed with my attorney

17   to present motions regarding stipulations, also witnesses from

18   Honduras, to prepare subpoenas for witnesses here in the United

19   States, and amounts of evidence, and none of that has been

20   brought before you.

21        But besides that, something very concerning, very

22   serious to me, it's that the person who sought my attorney so

23   that my family could hire them some days ago, he expressed in

24   the media that the DEA had enlisted him to infiltrate my

25   defense, and that is not a fair trial, Judge.  That's something

O1IJPINC

1    perverse.  And I don't think that the justice system in this

2    country operates that way, as I expect that you wouldn't want

3    it to.

4           But also, Judge, that same person last week started a

5    campaign against my fundraising campaign for my defense,

6    because I have had no money to pay for it.  My daughters

7    started a campaign on a website through a platform, and this

8    person who said they infiltrated my defense, they intervened,

9    and the fundraising stopped yesterday.  I don't have money,

10   Judge.  That's why days ago I had petitioned you to assign me a

11   public attorney, and that's what I'm doing today.  It's clear

12   that my defense is inadequate and insufficient, and it's clear

13   that I cannot continue with this trial in this way without

14   having a defense.

15          And aside, on top of my attorney's illness — I have to

16   say it here, I'm sorry — his mother is also very ill and relies

17   on him, so I cannot see him.  And Judge, we were just issued an

18   enormous volume of material.  It was delivered to us late like

19   the material before the last time, also late, and it is

20   physically impossible to see it.

21          And the other important factor that I would like you

22   to know, Judge, that wasn't relayed to you by my attorney, as

23   we had agreed he would, is that among the materials we received

24   from the U.S. Attorney's Office, there was sensitive

25   information pertaining to a death threat against my family, but

O1IJPINC

1    I was only able to see it about 20 days ago.  It was in the

2    hands of the prosecutors over a year ago, and the threats in

3    Honduras have continued.

4            And unfortunately, Judge, among that same information,

5    the criminal organization that were putting together these

6    attempts against my family, according to the source of

7    information for the U.S. agency that received this information,

8    this criminal group has already killed someone, the son of a

9    former president.

10           Judge, every day I go through a terrible situation

11   because I don't know what's going to happen to my family.  It

12   was the FBI who gave that information, and they come to tell me

13   only as I'm finding the document because I was looking for the

14   material.  Is it that my family's life doesn't matter to the

15   prosecutors?  That's why I wanted you to know that, and you

16   were never informed of that.

17           I apologize, Judge, but I'm left with no other choice

18   than to ask you to appoint me a new attorney.  I thought that

19   we would be able to do it with the few resources we had in

20   order to pay my Attorney Colon what he is due, but we have been

21   unable.  So thank you for your attention, Judge, and please

22   appoint me a new public defender because the United States

23   brought me from my country to try me here, and there are rules

24   here that guarantee that essential defense for me.

25           Before the United States was constituted, the colonies

O1IJPINC

1    that were here suffered a lot because of England.  They took

2    away people to England to be tried there.  There was no way of

3    bringing witnesses over there, and they were tried by people

4    who did not even know them.  And that is why they were called

5    tyrants.  I know that your founding fathers tried to amend that

6    so that it not happen to anybody, not just me, but not anybody.

7    So, Judge, I put my trust in your judgment.  Thank you.

8              THE COURT:  Thank you very much.

9              MR. COLON:  Judge, if I may, sir?

10             THE COURT:  Yes.

11             MR. COLON:  I'm not fit to try this case with the

12   timeframe.  And I agree with my client that we were really

13   short of resources, but the confidence has broken down in terms

14   of what I could supply to him.  And so I think, quite frankly,

15   it's very hard to follow that exposition from him, but, Judge,

16   I believe I'm not fit physically to try it.  I was at one time

17   very fit to do that, and I think my client and I will never be

18   able to reconcile that, and I can't physically.

19             And I think that the information that I sent you from

20   Dr. Kirsh, who especially has known me for many years, knows

21   that I've deteriorated.  And it's interesting that my client

22   pointed that out earlier when we were talking.  Sometimes you

23   don't really see yourself in the mirror as others see you.  And

24   I support him in his petition, Judge, even though it might be

25   to some jeopardy to me.  But I physically have not been able to

O1IJPINC

1    see him as often as possible, and as the doctors noted, I'm

2    facing two maladies, both that are current, and just

3    deteriorating, quite frankly, Judge.

4              THE COURT:  Thank you very much, Mr. Colon.

5              There have been a number of accusations made by

6    Mr. Hernandez, number one, that there was a late production of

7    a large volume of materials; that there were death threats

8    against his family that were known to the government but no

9    action was taken by the government with regard to the death

10   threats; and, thirdly, I heard him state that he has reason to

11   believe that the U.S. Drug Enforcement Administration caused an

12   infiltration of his defense team.

13             Does the government have a response to that?

14             MS. TARLOW:  Yes, your Honor.

15             First, starting with respect to the defendant's

16   allegation that the government has provided late information,

17   that is not the case.  The government has been providing 3500

18   materials.  Perhaps that is what the defendant is referring to.

19   We've been providing those 3500 materials since the first

20   discovery production in this case, which was the prior trial

21   testimony of certain witnesses, since February 14 of last year.

22             We have continued to provide 3500 materials pursuant

23   to the Court's order.  We are continuing to produce those 3500

24   materials because we continue to meet with witnesses, create

25   new 3500 materials in the course of doing so.  And we are

O1IJPINC

1    reviewing our files and will continue to provide 3500 up until

2    the start of trial, but we have complied with your Honor's

3    order regarding producing 3500 materials to date.

4              Yes, your Honor?

5              THE COURT:  All right.  Is there anything you want to

6    add on 3500 material, Mr. Colon?

7              MR. COLON:  Yes, your Honor.

8              Let me just address the issue of what Mr. Hernandez

9    Alvarado just stated to the Court.

10             THE COURT:  I'm talking about 3500 material, not about

11   what Mr. Hernandez just stated to the Court.

12             MR. COLON:  No, but he referred to the 3500 material.

13             THE COURT:  He didn't refer to 3500 material actually.

14   The government has noted that it has produced 3500 material and

15   is continuing to do so on a rolling basis.  And as you know as

16   an experienced practitioner, 3500 material is often created

17   right up until and sometimes during trial.

18             MR. COLON:  But that threat against his family --

19             THE COURT:  I'm not talking about the threat.  We'll

20   get to the threat.  I'm talking about the 3500 material.

21             MR. COLON:  That's when we first saw it just in

22   December, Judge.  And this information was available to the

23   government back in December 2022 when an FBI agent filed a

24   report about this.

25             THE COURT:  I am trying to find out from you whether

O1IJPINC

1    the government failed in its discovery obligations.  Were they

2    late in production?  Do you have a claim on that basis?

3              MR. COLON:  Yes, Judge.  They were late at times on

4    production, that's right.  They were.

5              THE COURT:  Well, I'm sure they were, but I just heard

6    there was a recent production of material that should have been

7    produced earlier.  And the government has said that's not true,

8    they've produced 3500 material on a rolling basis.  You know

9    that 18 U.S.C. Section 3500 ordinarily does not require the

10   production of such material until after the witness

11   testifies --

12             MR. COLON:  I'm aware, sir.

13             THE COURT:  -- on direct.  Pursuant to Giglio, of

14   course, it has to be produced in sufficient time to be usable

15   at trial, and the government agreed to produce 3500 material on

16   a rolling basis.  So I'm going to get to death threats in a

17   minute.  I'm not up to that yet, sir.

18             So what do you want to tell me about late production

19   by the government?

20             MR. COLON:  That it has handicapped, hampered our

21   ability to review this information.

22             THE COURT:  No.  No, sir.  You have to be specific.

23   There was something that they were supposed to have produced at

24   this juncture but they failed to produce until that juncture.

25   That's the question, sir.  Tell me when.  Tell me what.

O1IJPINC

1           MR. COLON:  The material that we're receiving now, we

2      haven't been able to look at it or the material that was sent

3      to us on December 7, at least, to Ms. Greenwood and that we

4      received later on.  We haven't been able to receive those or

5      review all those 3500 materials in those discs.

6           THE COURT:  I didn't ask whether you were able to

7      review it.  I asked when you received it.

8           MR. COLON:  December 7 we were given a 3500 disc that

9      apparently contained some sort of errors.  We had to have that

10     reviewed, and that was sent -- either a new disc was sent

11     because one was blank.  Another disc I was sent after that,

12     after December 7, about maybe two weeks ago, had information or

13     incorrect passwords that had to be corrected.

14          Now, that may be something that's mechanical in

15     between the government and Ms. Greenwood, but that information

16     we have yet to get to because of the volume, your Honor, and

17     that's what caused this.  It's caused a tremendous delay, if I

18     may.  That's what I'm saying judge.  I don't have the dates

19     with me specifically, but I believe there was an order -- a lot

20     of this material is generally produced within 60 days of trial.

21     We're getting it on a rolling basis.

22          But just that one issue that he referred to, that's

23     something we should've gotten a long time ago, if it was back

24     in December 2022 and we just got that just recently within the

25     last 30 days.

O1IJPINC

1    THE COURT:  Does the government want to reply on 3500

2    material?

3    MS. TARLOW:  Your Honor, just as we previously stated,

4    that we've been producing 3500 material consistent with your

5    Honor's order.

6    I do also want to note that the government has made

7    some limited discovery productions, as well, including most

8    recently, we made a discovery production regarding certain

9    ledgers that were in the possession of another district which

10   the government just came into possession of.  We also made a

11   production of certain materials that have been provided in

12   classified discovery, which the government has now provided in

13   redacted form the unclassified portions of.  That was the

14   substantial portion of the most recent discovery productions.

15   THE COURT:  All right.  It's not my usual custom to

16   set a date on production of 3500 material.  I ask the

17   government when they will be able to produce 3500 material, and

18   then I hold the government to its pledge.  I'm not in the

19   business of coming up with a deadline different than the one

20   that's set forth in the statute.  You have a Giglio

21   responsibility, you have a 3500 responsibility.  What was the

22   commitment that the government made with regard to 3500

23   material?  You keep referring to my order.  I don't know if you

24   can cite an order.

25   MS. TARLOW:  I believe it was 60 days before the start

O1IJPINC

| | |
|---|---|
| 1 | of trial and the government could make an application for |
| 2 | delayed disclosure of certain materials, which we did, which |
| 3 | would need to be produced, I believe, at some point next week, |
| 4 | January 20 or 22. |
| 5 | THE COURT:  All right.  So what have you produced |
| 6 | later than 60 days? |
| 7 | MS. TARLOW:  Additional materials as we meet with |
| 8 | witnesses, those 3500 materials regarding our notes of those |
| 9 | meetings. |
| 10 | THE COURT:  So meetings that took place within the |
| 11 | 60-day period, not outside the 60-day period? |
| 12 | MS. TARLOW:  As well as materials related to new |
| 13 | witnesses that we have since decided to call, which may have |
| 14 | predated the 60-day period. |
| 15 | THE COURT:  All right.  So I want you to send me a |
| 16 | letter on the volume of the 3500 material that has been |
| 17 | produced and what it is in fewer than 60 days. |
| 18 | MS. TARLOW:  Yes, your Honor. |
| 19 | THE COURT:  Now, with regard to the death threat, are |
| 20 | you aware of the death threat? |
| 21 | MS. TARLOW:  Your Honor, we would ask that counsel |
| 22 | provide us with whatever the Bates number is in discovery for |
| 23 | us to review the specific threat that they're referring to so |
| 24 | that we can make sure we understand what that representation |
| 25 | is. |

O1IJPINC

|     |                                                                         |
| --- | ----------------------------------------------------------------------- |
| 1   | THE COURT:  Mr. Colon, can you do that?                                 |
| 2   | MR. COLON:  I'll try to do it with my client, your                      |
| 3   | Honor.  As I said, he wishes to not have me represent him               |
| 4   | anymore, so I'm sort of in a quandary here.  But I know exactly          |
| 5   | what we looked at about two weeks ago.                                   |
| 6   | THE COURT:  So you know about this purported death                      |
| 7   | threat?                                                                  |
| 8   | MR. COLON:  Yes, I read it.                                             |
| 9   | THE COURT:  So all I'm asking you to do is communicate                 |
| 10  | the Bates number today to Ms. Tarlow.                                    |
| 11  | MR. COLON:  Try to do that, sir, today.                                |
| 12  | THE COURT:  I'm ordering you to do it.                                  |
| 13  | MR. COLON:  Yes, sir.                                                   |
| 14  | THE COURT:  Okay.  With regard to the DEA infiltration                 |
| 15  | of the defense team, Ms. Tarlow?                                         |
| 16  | MS. TARLOW:  Your Honor, we would also ask that                        |
| 17  | defense identify specifically what they are referring to with           |
| 18  | that respect, and we can respond in kind.                                |
| 19  | THE COURT:  All right.                                                  |
| 20  | MR. COLON:  I can respond, Judge.                                      |
| 21  | THE COURT:  Pardon me?                                                 |
| 22  | MR. COLON:  I can respond, if you like.                                |
| 23  | THE COURT:  Please.                                                    |
| 24  | MR. COLON:  This infiltration involved a gentleman by                  |
| 25  | the name — and I used the word "gentleman" very loosely — Jorge        |

O1IJPINC

1   Levy, who portrayed him self as a rabbi who went down to

2   Honduras, apparently well before my representation of

3   Mr. Hernandez.  And Mr. Levy was able to infuse himself in the

4   family, discussing how he could get pardons for Mr. Tony

5   Hernandez, discussing how -- you asked me about this, Judge, so

6   I want to be as informative as possible.

7          That individual actually wrote a memo or at least had

8   a report by the DEA in which he contributed his information

9   after meeting with the family.  And of course, quite frankly,

10  defamatorily indicated that everybody in the family was

11  involved in it.  And he was a confidential informant at one

12  time, but he did this on his own in order to seek a reward,

13  right, a compensation, if he was able to flip Mr. Hernandez

14  into pleading guilty.

15         I didn't know that at the time, but he eventually

16  contacted me and he said he was referred by someone else.  And

17  we had many, many meetings over the last few months, and he

18  portrayed himself as somebody who was willing to help Juan

19  Orlando and was able to get pardons from the president at the

20  time — I think it was Donald Trump — and also that he had all

21  sorts of connections.  And he actually engaged with us for a

22  significant amount of time, possibly giving information to the

23  DEA.

24         But yes, they penetrated the defense, the family first

25  and the defense, by at least referring me and me not knowing

O1IJPINC

```
 1   what his background was.  He also was an individual with an
 2   extensive criminal history, which I didn't find out about until
 3   I received Rule 16 material about him.  So yes, he did
 4   penetrate not only the family, but the defense, in that he
 5   didn't advise me of what his real intentions were.
 6   Eventually --
 7              THE COURT:  Mr. Levy, listening to your recounting of
 8   it, sounds like an awful fellow.
 9              MR. COLON:  He is, sir.
10              THE COURT:  But let's take that as a given.  The
11   question is what is your evidence that the DEA infiltrated the
12   defense team?
13              MR. COLON:  The DEA knew who he was.  He was allowed
14   to speak with family members.  We don't know what else he gave
15   to the DEA.
16              THE COURT:  The DEA allowed him to speak to family
17   members --
18              MR. COLON:  Yes, they wrote --
19              THE COURT:  -- is that what you're saying?
20              MR. COLON:  That's what he actually said about a week
21   or so ago in public.  He made a statement in public about that,
22   that he was ordered by the DEA.  First of all, we saw the
23   report.  It was a report that was written maybe about 2019,
24   maybe 2020.  But he mentioned he made a public statement about
25   this after I found out what I read and he saw that he was being
```

O1IJPINC

excised from the defense or at least those supporters of the

defense.

          And yes, this is what he did.  And the DEA knew about

him.  We don't know to what extent that continued, but he made

that statement in public.  There's a videotape of it in which

he concedes that he was told by the DEA to do this.  Now, I'm

not saying that the government or at least the Justice

Department or the prosecutors knew anything about that, but

that's what his role was.

          He tried to give them advice about Tony and how he

could obtain pardons for him.  He even mentioned you in terms

of his circle of connections and influence, and it was quite

interesting.  I didn't believe anything that he said, but he

made that statement clear to the family on various occasions.

And I think he might have said something like that to me, as

well, but I really didn't give it too much weight.  But he

posed as someone who could do something for Tony in terms of a

pardon and a possible pardon for Juan Orlando.

          And I want to add one more thing, Judge, in terms of

something that was said here.  I went to Honduras on two

occasions.  I spoke to the family, interviewed witnesses.

          THE COURT:  When was this?

          MR. COLON:  This was in July of 2022, I think.  In

fact, I was in Honduras at the time that the former president's

son, Pepe Lobo, that his son was assassinated.  Happened to be

O1IJPINC

1    on the day that I left.  It was sometime around July 4th, 5th,

2    6th, or 7th.  Not only was I there, but I was also accused in

3    the social media — and I think it was by Mr. Levy who did it —

4    of having been the conduit for the kill or the green light on

5    Mr. Pepe Lobo's son, having received that information from my

6    client in jail.

7            That's what they said my role was, that I brought that

8    information from the MDC to Honduras in order to tell someone

9    in Honduras to assassinate Pepe Lobo's son.  What does that

10   make me now?  So even my name was mentioned in terms of what

11   would happen with respect to that murder.  Four individuals

12   were killed, all four of them were either children or related

13   to people in the political circles or the elite.

14           So this turned into basically, as we say in Spanish, a

15   *novela*, right?  Of which now I am, I guess, a complementary

16   figure in that, with respect to what happened then.  So does

17   that make me interested or at least compromised, besides my

18   physical health?  But yes, this is what they said about me

19   simply because I went down there and I was representing him.

20   That was the kind of development that perhaps the government

21   wasn't aware of, but I was caught up in that.

22           And I'll tell you something else Mr. Levy did — and

23   this could be corroborated with the Department of Justice

24   through the BOP — is that I got a call from a captain in the

25   MDC that a Mr. Levy was calling up and trying to communicate

O1IJPINC

| | |
|---|---|
| 1 | with MDC on a constant basis about a year ago and that he was |
| 2 | claiming that Mr. Hernandez had issued an order to execute him. |
| 3 | And then he was -- |
| 4 | THE COURT:  To execute who? |
| 5 | MR. COLON:  That Juan Orlando had given orders to |
| 6 | execute Mr. Levy, and that it was being passed from Juan |
| 7 | Orlando's phone, which he doesn't have, or my phone, which I |
| 8 | could not take into the facility, or a computer that we were |
| 9 | using.  Mind you, a computer that he was using that was |
| 10 | provided by MDC.  So again, this is just more to, let's say, |
| 11 | crystalize what's going on here. |
| 12 | So yes, that individual continued and continues up |
| 13 | until this day to try to undermine the defense by either |
| 14 | hacking or telling people to hack that GoFundMe account.  But |
| 15 | that individual had different roles at different times in this |
| 16 | *novela*, Judge.  So yes, I heard it, I saw it, and I was even |
| 17 | the subject of some of his chicanery. |
| 18 | THE COURT:  But this story from this individual about |
| 19 | putting a hit on your client putting a hit on somebody -- |
| 20 | MR. COLON:  Putting a hit on him. |
| 21 | THE COURT:  On him.  Was about a year ago you're |
| 22 | saying? |
| 23 | MR. COLON:  I'd say about a year, within a year.  But |
| 24 | it was debunked by BOP when the captain told me they didn't |
| 25 | have any basis to believe that he did this.  And Mr. Levy was |

O1IJPINC

1    trying to get him segregated or punished with respect to this

2    by putting him in punitive segregation, in the SHU.  And they

3    didn't give any credence, but that's how far he went trying to

4    undermine our defense, his welfare, and well-being.  And so

5    this is something that the DEA at least had some knowledge of

6    early on.  How much more knowledge they gained, I have no idea.

7            THE COURT:  But from your standpoint you didn't

8    believe this guy?

9            MR. COLON:  I didn't know what to believe.  All I know

10    is what MDC was telling me that Juan was giving orders to kill.

11            THE COURT:  Did you believe that?

12            MR. COLON:  I didn't know what to believe.  All I

13    knew, that he was in jeopardy for his security, for his safety,

14    for his well-being, Judge.  And I actually told the MDC that if

15    they wanted to look through my phone, through the computers,

16    feel free to do so.  And they didn't take me up on that offer,

17    Judge.  I can only tell you what was told to me because they

18    were getting very irritated, the fact that Mr. Levy was

19    constantly texting, emailing, calling just to get this man in

20    trouble.  And I was probably part of that scenario because I

21    was the one that was visiting him.

22            As I say, Judge, I'm going to say once again.  I think

23    you've heard me.  I'm not sure that this makes any difference

24    at this point.  Mr. Hernandez does not want me to continue,

25    especially in my physical condition and with the lack of

O1IJPINC

1    resources we have.  And I believe that his petition to you or

2    his request is sincere.  I wouldn't say this if it wasn't

3    obvious that we didn't have the resources.  The resources just

4    didn't come as they did or they're supposed to come, or at

5    least they weren't presented to me.

6           And then with me getting sick, he just does not want

7    me to try this case, that's the point, because of my condition

8    and the fact that I failed to visit him at times.  I probably

9    visited him over a hundred times in the last two years, I would

10   say, so it wasn't I was deficient in it, but when I got sick,

11   it really made a difference in my ability to see him and review

12   this material, Judge.

13           THE COURT:  Is that the COVID situation?

14           MR. COLON:  No.  COVID was just icing on the cake.

15           It had to do with what was put in the medical

16   information, which you know of.  I can say it if you want.

17           THE COURT:  No, I have it.  You're free to say

18   whatever you want to say, but I have the material you sent.

19           MR. COLON:  Right.  And it was extensive.

20           THE COURT:  Thank you.

21           MS. TARLOW:  Your Honor, if I may?

22           THE COURT:  You may.

23           MS. TARLOW:  The government at no time directed

24   Mr. Bar Levy to infiltrate the defense team.  That is simply

25   not true.  Mr. Bar Levy did participate in meeting --

O1IJPINC

1          THE COURT:  Mr. Who?

2          MS. TARLOW:  Bar Levy.

3          THE COURT:  He's referred to, I thought, as Jorge

4   Levy.  Maybe I misheard it.

5          MR. COLON:  It is Jorge Bar Levy, but he's had so many

6   aliases in his life.  I guess when he became a Renaissance man

7   and became a rabbi, his name is now Jorge Bar Levy.

8          MS. TARLOW:  He did at certain points in time

9   participate in meetings with Mr. Hernandez's family and

10   provided information to the DEA.  But again, the government in

11   no way directed him to infiltrate the defense team.  And once

12   he joined the defense team, the government did not have contact

13   with him.  He did not provide information.

14          THE COURT:  What do you mean "once he joined the

15   defense team"?

16          MS. TARLOW:  When the government learned he joined the

17   defense team.

18          THE COURT:  How did he join the defense team?  There's

19   no indication that any privileged material was shared with him,

20   so I don't know what you mean by a defense team.

21          MS. TARLOW:  Yes, your Honor.  To the extent that

22   Mr. Bar Levy was consulted in any investigatory capacity by

23   Mr. Colon, as he just described.

24          We also, I want to note for the record, we produced

25   materials relating to the information provided by Mr. Bar Levy

O1IJPINC

1    on August 5, 2022.  And therefore, the defense has been well

2    aware for more than a year and a half regarding any involvement

3    he may have had in this case.  And whatever decisions they made

4    in continuing to consult with him was of their own making, but

5    the government had put them on notice of information he had

6    previously provided to it.

7         THE COURT:  I'm going to ask you to your letter in

8    which you're going to report on material produced within 60

9    days of the trial day, I'm going to ask you to confer with your

10   contacts within the DEA and make a representation after

11   conferral as to whether there was any directions of any kind

12   given to Mr. Bar Levy with regard to obtaining information.

13        MS. TARLOW:  Understood, your Honor.

14        MR. COLON:  Judge, I'm sorry.

15        Finally, I just want to say that I don't believe I can

16   give him the defense that he needs in my current physical

17   condition or medical condition.  I think that's been confirmed

18   by three physicians, Judge, and that's my opinion.  I know how

19   I'm feeling now.  It's deteriorated over time.  I tried to be

20   in denial as to what I could do.  But I agree that I'm not

21   physically able to give him the defense he wants, Judge, and

22   that he deserves.

23        THE COURT:  Do you want to say that again?  Because

24   you've said this several times now.

25        MR. COLON:  I won't say it again, sir.

O1IJPINC

1        THE COURT:  You're welcome to, if you want to keep

2    repeating yourself.  I'm not going to stop you.

3        MR. COLON:  No.  No, sir.  No more comments, sir.

4        THE COURT:  All right.

5        Is there anything further from the government?

6        MS. TARLOW:  No, your Honor.

7        THE COURT:  Anything further from defendant Juan

8    Orlando Hernandez?

9        MR. COLON:  No, your Honor.

10       THE COURT:  Anything further from Defendant Bonilla?

11       MR. ZALTZBERG:  No, not at this time, your Honor.

12       THE COURT:  Defendant Pineda?

13       MR. MA:  No, Judge.  Thank you.

14       THE COURT:  Sir, you are who?

15       DEFENDANT BONILLA:  Juan Carlos Bonilla.

16       THE COURT:  Okay, sir.  Do you want to talk to your

17   client before he speaks?

18       MR. ZALTZBERG:  Yes, that would be great, your Honor.

19       (Counsel and defendant conferred)

20       THE COURT:  Court can come to order, please.  Please

21   be seated.

22       Yes, sir.  Mr. Bonilla, you wanted to say something?

23       DEFENDANT BONILLA:  Yes, sir.  Good morning, your

24   Honor.

25       It pleases me that you're giving me this opportunity

because I know how just and how strict with the law you are.  I
have been without liberty in the United States for about a year
and a half.  During that year and a half, I have suffered
through so many situations which it has obligated me at this
point to appeal about the lack of defense that I have.  And I
have struggled and I have listened to the prosecution from this
country about a large amount of testimony from persons that
during my career I fought against.  I would like your Honor to
know that I have not been, nor will I be a criminal.

THE COURT:  All right.  Mr. Bonilla, let me tell you
that today is not the time to discuss your defense to the
charges.  You have pled not guilty, and I pledge to you and I
pledge to each of the three defendants that you will each have
the right to testify.  No lawyer can take that away from you.
The decision to testify in this case rests with you.

You can listen to the advice of your lawyer, but the
final decision as to whether or not you take the witness stand
and tell your side of the story rests with you and you alone.
And if anyone interferes with that, you need to promptly tell
me.  Lawyers can advise you whether they think it's a good idea
or a bad idea and they can explain why, but the ultimate
decision is yours.  You also have the right not to testify, and
if you decide not to testify, no one will be permitted to draw
any inference or suggestion of guilt from the fact that you
decided not to testify.

O1IJPINC

1              But today is not the day for you to expand on the

2      reasons why you've entered a plea of not guilty in this case.

3      I accept that you have pleaded not guilty.

4              DEFENDANT BONILLA:  Correct, your Honor.

5              I myself, last year, I sent a letter to your Honor

6      where I did not feel satisfied with the defense that was being

7      provided because several situations arose during which we did

8      not agree, and that reached to the point where in the last few

9      times I saw that my attorney seemed irritated.  I respect so

10     that I can be respected.  And because of that, I have not felt

11     good.  I have also felt that my defense has not been conducted

12     in an adequate manner, logically, because we have a barrier,

13     which is the language.  And what is said to the interpreter can

14     be said in a different manner.  And also, that is why I make an

15     appeal to your Honor knowing what your will is and your

16     decisions requesting that another defense attorney be

17     appointed.

18             I make this appeal to you because of the lack of

19     defense that I feel I have.  I even brought quite a bit of

20     information during my work of almost 35 years of my career as

21     an officer of the police so that it could be analyzed, and

22     based on that a defense strategy could be based.  Likewise, I

23     have suffered threats against my family where they are in

24     different situations where they have a very low profile, and

25     that was before coming here and also afterwards.  That is why I

O1IJPINC

1   am in this situation.

2         I have also had health situations in reference to the

3   dental issues where I have spent more than six months bleeding

4   and I have not received the medical attention that I need where

5   I am.  Also, besides that, your Honor, I make an appeal to God

6   and to you so that you can analyze and review my situation

7   which I have presented, which is pro-justice and pro-truth,

8   your Honor.  Thank you very much, your Honor.

9         THE COURT:  Thank you very much.

10        Let me first say, Mr. Zaltzberg, if there's an issue

11   on the medical front, I think you know how to contact the staff

12   at the MDC.  If you don't get satisfaction and you need my

13   intervention, please let me know, and we'll see that your

14   client gets the medical attention that he needs, the dental

15   attention.

16        But I'll give you an opportunity if there's any other

17   comment you wish to make.

18        MR. ZALTZBERG:  No, Judge.  Just in addressing what

19   Mr. Bonilla said, I certainly understand there's disagreements

20   at times that come with representing any client.  Most of the

21   disagreements have to do with the way our legal system works.

22   As the Court is now aware, because I wrote to the Court, we

23   assigned Mr. De Castro to sort of come aboard to help bridge

24   the gap or offer another attorney's perspective to help

25   Mr. Bonilla understand some of the way the evidence works in

1    our case, specifically as it turns on testimony.

2                THE COURT:  I appointed Mr. De Castro as a member of

3    the Criminal Justice Act Panel to advise on pretrial matters.

4                MR. ZALTZBERG:  Yes, your Honor.

5                And as part of that — and I'm certain Mr. Castro can

6    speak for himself — he's echoed what I have tried to tell

7    Mr. Bonilla has led to some of our disagreements, just to have

8    a legal perspective and how our legal system works here,

9    including the fact that testimonial witnesses are oftentimes a

10   large part of the government's case and sometimes the only part

11   of the government's case.  And while we may not love it as

12   defense attorneys, that's how this country was built and that's

13   how it works.  And so our disagreements are on that type of

14   level.

15               In terms of my seeming irritated or anything else, I

16   always thought we had a good relationship.  I speak to his

17   family when he asks me to.  As you can imagine, your Honor,

18   with trial around the corner — and God bless the government,

19   but dropping 3500 material after 3500 material on us — I'm a

20   little more stressed than I thought I was.  But I certainly

21   have never disparaged or in any way tried to be negative with

22   Mr. Bonilla.

23               In fact, I'm positive I probably set some sort of

24   record in seeing my client.  I see him once a week, sometimes

25   twice a week with an interpreter every time.  If an interpreter

O1IJPINC

it unavailable, Ms. Villalona, who speaks Spanish, comes with

me to translate.  I have never had an issue understanding my

client.  He's never approached me saying he has an issue

understanding me.

Again, I leave it to the Court.  I certainly don't

want to make him uncomfortable, but I have, frankly, worked

very hard on his case.  I continue to work very hard on his

case.  And I certainly understand that this is a high pressure

situation.  He's facing a significant sentence here.  And I

understand that leads to a natural friction at times, but I

assure you and I know the Court's aware — I appeared before you

many times — I hold myself to a high standard.  Ms. Villalona

has helped me immensely.  Mr. De Castro, since he's come on,

has been very helpful.  But our goal is all the same, which is

to help Mr. Bonilla.

THE COURT:  Let me say that I did add Mr. De Castro

for the purpose of advising on pretrial matters, in addition to

the representation by Mr. Zaltzberg and Ms. Villalona.  And the

reality is the trial of this case begins on February 5.  Today

is the 18th of January.  There is not time to bring on a

different attorney for you in this case.  I am confident that

Mr. Zaltzberg, who correctly states has appeared before me

many, many times, will vigorously and competently represent you

in this matter.  And I hope that Ms. Villalona and Mr. De

Castro are also of assistance to you and Mr. De Castro in

O1IJPINC

giving you some perspective on the situation we are.  So I am

not doing anything in terms of appointing substitute trial

counsel or the like, and that's where we are there.

Is there anything further, Mr. Ma or Mr. Womble?

MR. MA:  Not at this time, Judge.

THE COURT:  All right.

Well, thank you all very much.  So jury selection will

begin on the morning of February 5.  I'd ask you to get here at

9:15 on February 5 in case we have any matters that we need to

take up at that time, and we're going to go day-to-day to

completion.

I haven't decided yet whether the trial day will be

9:30 to 4:30 or 10:00 to 5:00, and I'll let you know what I

decide on that.  But typically, there is one morning break of

approximately 15 minutes, a lunch break at 1:00 till 2:00, and

we end at whatever the appointed ending time is.  It is my

practice, if there's five or ten minutes on the clock and you

finish with a witness, I'm going to have you call the next

witness because that expedites the trial and displays to the

jury the Court's attentiveness to the jury's schedule.  So

that's what I anticipate here, and so your witnesses all need

to be ready.

Mr. Colon — I'll ask each of you — have there been any

plea offers sought or provided in connection with this case?

MR. COLON:  With respect to Mr. Hernandez Alvarado, we

O1IJPINC

```
 1   have not had any discussions about that.  No offers have been
 2   made by the government.
 3              THE COURT:  All right.
 4              MR. ZALTZBERG:  In regards to Mr. Bonilla, no plea
 5   offer has been made.  We received a Pimentel letter, but no
 6   official offer.  And as the Court is aware, he's currently
 7   facing life.
 8              THE COURT:  And you've communicated the content of the
 9   Pimentel letter to your client?
10              MR. ZALTZBERG:  He understands what he's facing.
11              THE COURT:  Mr. Ma?
12              MR. MA:  Judge, we have had plea negotiations with the
13   government, and we have had discussions with our client.  A
14   number of different offers were negotiated and discussed.  We
15   have no dispositions, and we're ready for trial.
16              THE COURT:  And can the government confirm the
17   accuracy of the representations?
18              MS. TARLOW:  Yes, your Honor.  That is accurate.
19              THE COURT:  Are there ongoing discussions?
20              MS. TARLOW:  No, your Honor, not at this time.
21              THE COURT:  Okay.  All right.
22              MR. MA:  If I may just add, Judge, you had indicated
23   that you have not yet decided the trial date.  To the extent
24   that you're taking requests, if I could request a 10:00 start,
25   that just makes my life a little easier with kids at home.  I
```

O1IJPINC

1     can make 9:30.  I'm just asking as a convenience.

2                THE COURT:  I understand that.  My paramount concern

3     is with regard to the jury, so that's --

4                MR. MA:  Understood.

5                THE COURT:  But I understand your request.  I'll do

6     the best I can.  All right.

7                And Mr. Colon, as I said in my order, if there's

8     anything you need, if you need any breaks, you have any

9     doctor's appointments you have to make, I certainly will

10    accommodate that, so let me know.

11               There's nothing further.  We are adjourned.  Thank

12    you.

13               (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25