O2MHHer1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                     15 Cr. 379 (PKC)

JUAN ORLANDO HERNANDEZ,

                                 Trial
         Defendant.

------------------------------x

                                 New York, N.Y.
                                 February 22, 2024
                                 9:55 a.m.

Before:

                 HON. P. KEVIN CASTEL,

                            District Judge

                   APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  KYLE A. WIRSHBA
    JACOB GUTWILLIG
    ELINOR TARLOW
    DAVID ROBLES
    Assistant United States Attorneys

RENATO CHRISTIAN STABILE
RAYMOND L. COLON
SABRINA P. SHROFF
    Attorneys for Defendant

Also Present:    Dagoberto Orrantia, Interpreter (Spanish)
                 Sonia Berah, Interpreter (Spanish)
                 Mercedes Avalos, Interpreter (Spanish)
                 Evan Frierson, Interpreter (Spanish)
                 Matthew Passmore, DEA Special Agent

O2MHHer1

(Trial resumed; jury not present)

THE COURT:  Ladies and gentlemen, I've been advised that our wonderful jurors are all present.  Unless there's any objection, it is four minutes to 10:00.  I propose to begin. Any objection from the government?

MR. WIRSHBA:  No, your Honor.

THE COURT:  From the defendant?

MR. COLON:  No, your Honor.

THE COURT:  All right.  Please bring in our jurors.

MR. WIRSHBA:  Your Honor, would you like to have the witness on the stand?

THE COURT:  Yes, please.  And the witness' name again is?

MR. WIRSHBA:  Alexander Ardón.

THE COURT:  Thank you.

MR. STABILE:  Can I put something on the record, your Honor?

THE COURT:  I think we're going to have to wait till the jurors come out.  They're in the process of coming out right now.

(Continued on next page)

(Jury present)

THE COURT:  Ladies and gentlemen, I feel like I've known you forever, and it's only Thursday and we started on Tuesday.

I want to say I'm going to put you down in the record books for having all arrived before 10 o'clock, and you're seated in the box at 9:57, by my clock.  So I applaud you for this, and I thank you.  I have, therefore, informed our cafeteria service and asked my staff to inform them to kindly not remove the morning snack until after the lunch break.  So we hope that that will be complied with.

The witness will be here momentarily, through no fault of anyone, including the witness or any party to this case.  So they're here, they're in the building, and they're in the process of arriving.  I will alert staff that they should be prepared for my jury in case they get here early.

Good morning.  Mr. Ardón, the Court reminds you that you are still under oath.

THE WITNESS:  OK.

THE COURT:  You may inquire.

MR. WIRSHBA:  Thank you, your Honor.

AMILCAR ALEXANDER ARDÓN SORIANO, resumed.

CONTINUED DIRECT EXAMINATION

BY MR. WIRSHBA:

Q.  Mr. Ardón, I believe when we last spoke yesterday, we were

discussing whether there was anyone in your family who assisted you with your cocaine trafficking. Do you remember my questions about that?

A. Yes.

Q. Who was it in your family that helped with your narcotics trafficking?

A. My brother whose name is Hugo.

MR. WIRSHBA: Ms. Collins, if we could put up Government Exhibit 116 on the left and 348 on the right. I believe both in evidence.

Q. Mr. Ardón, starting with the photograph on the left, can you identify who is on the left side of that photo and who is on the right?

A. On the left is my brother Hugo, and on the right is Juan Orlando Hernandez.

Q. And what about Government Exhibit 348 on the right-hand side? Who's on the left and who's on the right?

A. To the left is my brother Hugo and to the right is Juan Orlando Hernandez.

Q. Mr. Ardón, what was Hugo's role in your drug trafficking organization?

A. Hugo would help me to guard the cocaine shipments.

MR. WIRSHBA: Ms. Collins, if we could throw up what is Government Exhibit 3 on the computer screens, please.

Q. Mr. Ardón, when you were trafficking cocaine, after the

cocaine arrived in Honduras, what, if any, major city in Honduras was used as a trade shipment point?

A.   The city is called San Pedro Sula.

Q.   Can you circle San Pedro Sula on the map.

A.   (Witness complies.)

MR. WIRSHBA:   Let the record reflect that the witness has indicated the dot that is labeled "San Pedro Sula."

THE COURT:   So noted.

Q.   After the cocaine you were moving went to San Pedro Sula, to what department was it next transported?

A.   It was then transported to the department of Copan.

Q.   Where would it go in the department of Copan?

A.   To El Paraiso de Copan.

Q.   Is that where you were from?

A.   Yes.

Q.   Is that where you were the mayor?

A.   Yes.

Q.   Can you identify Paraiso on the map.

Let the record reflect the defendant has identified a dot labeled "Paraiso."

Mr. Ardón, what types of vehicles did you use to transport the cocaine from San Pedro Sula to El Paraiso?

A.   The transportation was done using box trucks and cattle trucks that were 22 foot long or 25 foot long.

Q.   And focusing on the box trucks for a moment, approximately

how much cocaine could you transport on a single box truck?

A.   Around 1,500 kilos.

Q.   What role, if any, did law enforcement have in the transportation of your cocaine from San Pedro Sula to Paraiso?

A.   Security.

Q.   What do you mean by "security"?

A.   Such that if there were any checkpoints on the road, that the drug shipments would not encounter any problems with the police.

Q.   What do you mean by "checkpoint"?

A.   In our countries, police checkpoints are areas where the police is stopping vehicles, searching them, asking for documents, and checking the vehicles.

Q.   And what are they looking for at these checkpoints, as you understand it?

A.   They're looking for drugs.

Q.   Which organization provided security to you for you and your drug trafficking organization?

A.   The Honduran National Police.

Q.   Where did you transport the cocaine after El Paraiso, Copan?

A.   To the Guatamalan nation.

Q.   Can you identify the border between Guatamala and Copan on Government Exhibit 3?

A.   This black line.

MR. WIRSHBA:  Let the record reflect that the witness has identified the black line near the dot labeled "Paraiso."

Q.  How far is Paraiso, Honduras, from the border of Guatamala?

A.  From El Paraiso to the border, it's about 12 kilometers, 15 kilometers.

Q.  And once the cocaine reaches the border with Guatamala where did it go next?

A.  To a city in Guatamala called Amates, Izabal.

Q.  How far is the city of Amates, Izabal, from the Honduras-Guatamala border?

A.  It's about 30 kilometers away.

MR. WIRSHBA:  Ms. Collins, you can take that down.

Q.  Mr. Ardón, who owns the properties in Amates, Izabal, to where you would bring the cocaine?

A.  Their names were Ronald Salguero and Otto Salguero.

Q.  What's the relationship between those two individuals, if you know?

A.  They're first cousins.

Q.  In Guatamala, who were you selling the majority of your cocaine to?

A.  To Don Amado.

Q.  What, if any, organization did Don Amado work for?

A.  For the Sinaloa Cartel.

Q.  How were you paid for the cocaine that you were selling to the Sinaloa Cartel?

A.   Cash in U.S. currency, dollars.

Q.   What did you understand was the ultimate destination for the cocaine that you were trafficking to Guatamala?

A.   The United States.

Q.   Why did you want to send your cocaine to the United States?

A.   Because it is paid at a better price in the United States.

Q.   You mentioned earlier that you were a mayor in Paraiso, Copan, in Honduras.  Approximately, when did you first enter politics?

A.   Around the year 2006.

Q.   When you entered politics, had you already been trafficking cocaine?

A.   Yes.

Q.   When you entered politics, what Honduran political party were you affiliated with?

A.   With the National Party.

Q.   Other than the National Party, when you entered politics, what other major political party was there in Honduras?

A.   The Liberal Party.

Q.   You mentioned that you entered politics in approximately 2006.  Did you first run for mayor in 2005?

A.   Yes, the first round of elections are in — is in 2005.

Q.   Did you win that first election for mayor?

A.   Yes.

Q.   How did you win that election?

A.   Fraud.

Q.   How did you use fraud to win the election?

A.   Bribing persons.

Q.   Which people did you bribe?

A.   I bribed voters so they would vote for me and also the persons working at the table.

Q.   When you say the people working at the table, what do you mean by "the table"?

A.   These are the people that receive the votes.  As people come in to vote, they receive them and assist them in being deposited in the ballot boxes.

Q.   Why did you pay the people who work at the table to bribe them?

A.   Because they would take the ballot forms that were —— that remained.  They would fill them out, and they would deposit them in the ballot boxes in my favor so that I would win.

Q.   When you say "the ballots that remained," do you mean the ones that weren't filled out?

A.   Yes.

Q.   What money did you use to pay for these bribes?

A.   The money that I was making from drug trafficking.

Q.   After you became the mayor of Paraiso, Copan, did you stop trafficking cocaine?

A.   No.

        MR. WIRSHBA:  Ms. Collins, if we could put up for just

the witness the parties and the Court Government Exhibit 114.

Q.   Mr. Ardón, do you see something on the screen?

A.   Yes.

Q.   What is that?

A.   It's a photograph of Don Pepe Lobo.

Q.   Is that a fair and accurate photo of Pepe Lobo?

A.   Yes.

        MR. WIRSHBA:  Your Honor, the government seeks to admit Government Exhibit 114.

        THE COURT:  Any objection?

        MR. COLON:  No, sir.

        THE COURT:  All right.  Received.

        (Government's Exhibit 114 received in evidence)

BY MR. WIRSHBA:

Q.   Mr. Ardón, what is the full name of the person who appears in this photograph?

A.   Porfirio Lobo Sosa.

Q.   What do people commonly call this individual, in your experience?

A.   Pepe Lobo or Don Pepe.

Q.   When you ran for mayor for the first time in 2005, did Pepe Lobo run for a position in Honduran politics?

A.   Yes.

Q.   What position was that?

A.   The presidency of the republic.

Q.   For which party?

A.   National.

Q.   That was your party, right?

A.   Yes.

Q.   Earlier you described fraud that you committed to help win the election in 2005.  Did you use that same fraud to help Pepe Lobo win?

A.   Yes.

Q.   In 2005, did Pepe Lobo win the presidency?

A.   No.

Q.   Who won?

A.   Mel Zelaya won.

          MR. WIRSHBA:  You can take that down, Ms. Collins.

Q.   After Pepe Lobo was defeated in 2005, did he run for president again in the next election?

A.   Yes.

Q.   And those elections are every four years, right?

A.   Yes.

Q.   So the next election, it was in 2009 for president, correct?

A.   Yes.

Q.   All right.  Prior to the 2009 election, did there come a time when you met with Pepe Lobo in private?

A.   Yes.

Q.   Approximately in what year was that?

A.   Around 2008.

Q.   Where did you meet Pepe Lobo in private for the first time?

A.   In the city of San Pedro Sula at a heliport.

Q.   What's a heliport?

A.   It's a company that works in leasing helicopters.

Q.   Is it like an airport for helicopters?

A.   Correct.

Q.   Did you discuss drug trafficking with Pepe Lobo in that first private meeting?

A.   Yes.

Q.   What did you say?

A.   I asked Don Pepe for protection from the prosecutor's office.

Q.   What other requests did you make of Pepe Lobo in that first private meeting?

A.   A position for my brother in government.

Q.   Anything else?

A.   Pavement for El Paraiso, Copan.

Q.   When you made these requests, what, if anything, did Pepe Lobo say about the defendant, Juan Orlando Hernandez?

A.   Don Pepe said to me if he won the election, he was going to make Juan Orlando president of Congress.

Q.   Why was it important that he would make Juan Orlando president of Congress with respect to these requests that you made?

MR. COLON:  Objection.

THE COURT:  Overruled, if you know.  Do you know?  Do you have knowledge on this subject, sir?

THE INTERPRETER:  May the interpreters confer?

THE COURT:  Yes.

THE INTERPRETER:  The interpreter needs to correct the interpretation of the question.

A.  My understanding is that the president of Congress is the person who signs the contracts for the paving of roads in our country, and my understanding is that they were very good friends.

MR. COLON:  Objection, your Honor.

THE COURT:  I'm going to strike the testimony.

MR. COLON:  Thank you.

THE COURT:  The last answer is stricken.

BY MR. WIRSHBA:

Q.  What did Pepe Lobo ask ——

THE COURT:  Please disregard it, ladies and gentlemen.

Q.  What did Pepe Lobo ask for in return for these three requests?

A.  Don Pepe asked me for $2 million.

Q.  When you say "dollars," do you mean U.S. dollars?

A.  Yes.

Q.  Shortly after the meeting, what, if any, payment did you make to Pepe Lobo?

A.   I sent $1 million to Don Pepe's house.

Q.   You said that Pepe Lobo said that he would make the defendant the president of Congress.  Prior to your meeting with Pepe Lobo in 2008, what had you heard about the defendant, Juan Orlando Hernandez?

            MR. COLON:  Objection to the question, your Honor.

            THE COURT:  One second now.

            Yes, how is that relevant, and where does that come from, whatever he heard?  Is it something he read in a newspaper?  Someone in town spreading gossip?  I'm going to sustain the objection.

Q.   What, if any, position did you understand Juan Orlando Hernandez to hold at the time when you were meeting with Pepe Lobo?

A.   My understanding was that he was like a congressman.

Q.   For what party?

A.   The National Party.

Q.   Did there come a time when you met in private with the defendant?

A.   Yes.

Q.   Approximately what year was it when you met him in private?

A.   Around 2009.

Q.   Where did you meet him?

A.   San Pedro Sula at the National Party headquarters.

Q.   Who was there?

A.   Don Pepe Lobo, Juan Orlando Hernandez, and me.

Q.   And did you discuss drug trafficking at this first meeting with the defendant?

A.   Yes.

Q.   Did you, the defendant, and Pepe Lobo discuss the three requests that you had made of Pepe Lobo in the prior meeting?

A.   Yes.

Q.   What were those requests that you made, in short?

A.   Protection from the prosecutor's office, the government position for my brother, and the paving for El Paraiso, Copan.

        MR. COLON:   I'm sorry.   That last part, Judge, I didn't hear it.

        THE COURT:   And paving for —— the name of the town, please?

        THE INTERPRETER:   El Paraiso, Copan.

        MR. COLON:   Thank you, your Honor.

BY MR. WIRSHBA:

Q.   Mr. Ardón, what did Juan Orlando Hernandez say about whether he would grant you these three requests?

A.   Juan Orlando said, yes, that he was going to give those things to us.

Q.   All right.   Let's talk about the things that he said that he would give to you.   Starting with protection, what did Juan Orlando Hernandez say to you about the protection that you would receive?

A.   Juan Orlando told me not to worry about the prosecutor's office, about them investigating me; that I would be given protection.

Q.   When you say the prosecutor's office investigating you, investigating you for what?

A.   For the work that I did, drug trafficking.

Q.   What, if anything, did Pepe Lobo say to you about the protection that you would receive?

A.   Don Pepe said that he would make sure that I would not be investigated.

Q.   Investigated for what?

A.   For the crime I was committing of drug trafficking.

Q.   What, if anything, did Pepe Lobo say about the police?

A.   Don Pepe said to me that if I had any problem in the department of Copan with the chief of police, that I could call them.  I could call Don Pepe for them to help me with that problem.

Q.   You said the defendant also agreed to give a job to your brother.  Which brother was that?

A.   His name is Hugo.

Q.   Is that the same brother we talked about earlier that helped with your drug trafficking?

A.   Yes.

Q.   Why did you ask for a job for your brother?

A.   To have information and to have political power in the

department of Copan.

Q.   You said the defendant also agreed to pave the roads in Copan.  Why did you want the roads in Copan paved?

A.   In order to improve the access routes because it's a mountainous area, for the benefit of the community, and to make the cocaine trafficking easier.

Q.   Why would paved roads make the cocaine trafficking easier?

A.   The cocaine would arrive faster and more securely.

Q.   And in exchange for these three things, what, if anything, did Pepe Lobo request of you at this meeting between you, the defendant, and Pepe Lobo?

A.   Don Pepe Lobo told me that he needed the other million dollars.

Q.   And following the meeting with the defendant and Pepe Lobo, did you make another payment?

A.   I made the second payment there at that meeting.

Q.   How much was that payment?

A.   $1 million.

Q.   All right.  In 2009, following your meeting with Juan Orlando Hernandez and Pepe Lobo, what, if anything, happened to then-president of Honduras, Manuel Zelaya?

A.   Zelaya, as we call him, was subject to a coup.

         MR. WIRSHBA:  Ms. Collins, if we could show the witness, the Court, and the parties Government Exhibit 115.

Q.   Mr. Ardón, do you recognize that?

A.   Yes.

Q.   What is it?

A.   A photograph of Tony Hernandez.

Q.   Is it a fair and accurate photograph of Tony Hernandez?

A.   Yes.

          MR. WIRSHBA:   The government seeks to place into evidence Government Exhibit 115.

          MR. COLON:   No objection.

          THE COURT:   Received.

          MR. WIRSHBA:   We could publish to the jury, Ms. Collins.

          (Government's Exhibit 115 received in evidence)

BY MR. WIRSHBA:

Q.   Mr. Ardón, you said this is a photograph of Tony Hernandez. Have you had private meetings with Tony Hernandez?

A.   Yes.

Q.   Before you met with him in private, did you have an understanding of what he did to make money?

          MR. COLON:   Objection.

A.   Yes.

          THE COURT:   What are you objecting to?

          MR. COLON:   His understanding again, Judge, of what he did for a living.

          THE COURT:   Lay a foundation, please.   I'll sustain the objection.

MR. COLON:  Thank you, sir.

BY MR. WIRSHBA:

Q.  Mr. Ardón, you mentioned that you were in drug trafficking for some time before 2009, is that right?

A.  Yes.

Q.  Have you spoken with other drug traffickers with whom you worked about the individual on the screen, Tony Hernandez?

A.  Yes.

Q.  What did those people tell you about what, if any, involvement Tony Hernandez had in their drug trafficking?

MR. COLON:  Objection as to other drug traffickers, unless they're members of this conspiracy.

THE COURT:  Well, why don't you lay that foundation as well.

MR. WIRSHBA:  Your Honor, I believe I asked whether these were drug traffickers with whom this individual worked, making them part of the same conspiracy.

THE COURT:  All right.  I'll allow it.  Go ahead.

A.  Yes.

Q.  And what did those other drug traffickers say?

A.  They told me that he worked with them, with the Valles.

MR. WIRSHBA:  Ms. Collins, could we show Government Exhibit 365 only to the witness, the parties, and the Court.

Q.  Do you recognize this photo, sir?

A.  Yes.

Q.  And what is this?

A.  A photo of Juan Orlando Hernandez and Tony Hernandez.

Q.  Is it fair and accurate?

A.  Yes.

MR. WIRSHBA:  The government would seek to admit Government Exhibit 365.

MR. COLON:  No objection, your Honor.

THE COURT:  All right.  Received.

(Government's Exhibit 365 received in evidence)

THE COURT:  Before you publish it, I have a question.

Mr. Ardón, did you work with the Valles?

THE WITNESS:  Yes.

THE COURT:  In drug trafficking?

THE WITNESS:  Yes.

THE COURT:  OK.  You can publish the exhibit.

MR. WIRSHBA:  Thank you, Ms. Collins.  You can take that down.  Thank you, Ms. Collins.  You can take that down.

BY MR. WIRSHBA:

Q.  Now, the Court just asked you whether you ever worked with the Valles.  I'd like to show you Government Exhibit 110 and 111, just for the parties, the Court, and the witness, please.

Do you recognize these photographs, Mr. Ardón?

A.  Yes.

Q.  What are they?

A.  A photograph of Luis Valle and Arnulfo Valle.

Q.  Are they fair and accurate?

A.  Yes.

MR. WIRSHBA:  Your Honor, the government seeks to admit Government Exhibits 110 and 111.

MR. COLON:  No objection, your Honor.

THE COURT:  Received.

(Government's Exhibits 110 and 111 received in evidence)

MR. WIRSHBA:  Ms. Collins, you may publish.

Your Honor, I understand there might be some delay. May I just ask, is it coming up on the jurors' screens?

BY MR. WIRSHBA:

Q.  Mr. Ardón, who is on the left in these two photographs?

A.  Luis Valle.

Q.  Who is on the right?

A.  Arnulfo Valle.

Q.  And what relationship do these two individuals have to each other?

A.  They are brothers.

Q.  What was the name of their drug trafficking organization that you worked with?

A.  People called it Valle Valle.

MR. WIRSHBA:  You can take that down, Ms. Collins.  If we could show just the witness the parties and the Court Government Exhibit 309.

O2MHHer1                          Ardón Soriano - Direct

Q.   Mr. Ardón, do you recognize this?

A.   Yes.

Q.   What do you recognize it to be?

A.   I recognize in this photograph Arnulfo Valle and Juan Orlando Hernandez.

Q.   Is that a fair and accurate representation of those individuals?

A.   Yes.

          MR. WIRSHBA:  Government would seek to admit Government Exhibit 309.

          MR. COLON:  I'm sorry, Judge, may I confer?

          THE COURT:  Yes.

          MR. COLON:  No objection, Judge.  Thank you.

          THE COURT:  All right.  Received.

          (Government's Exhibit 309 received in evidence)

BY MR. WIRSHBA:

Q.   Mr. Ardón —— well, Ms. Collins, you may publish that.  And if we could zoom in on the photo, Ms. Collins.

          Mr. Ardón, would you identify the individuals that you know who are depicted in this photograph.

A.   It shows Arnulfo Valle, Juan Orlando Hernandez, and also the mayor of Florida, but I cannot remember the name.  I forget.

Q.   Where in the picture amongst the individuals is Juan Orlando Hernandez?

A.   Juan Orlando is the second person whom Arnulfo Valle has his arm around.

Q.   Could you circle Arnulfo Valle on the screen, Mr. Ardón.

         Let the record reflect that the witness has identified the person in the photograph all the way on the right.

         And that would make the person next to Arnulfo Valle Juan Orlando Hernandez, is that right?

A.   Yes.

Q.   I think you identified the person next to Juan Orlando Hernandez.  Who is that on the other side?

A.   The mayor of Florida.

Q.   Where is Florida?

A.   Florida is located in the department of Copan.

Q.   Was this individual involved in drug trafficking?

A.   I believe so, because he is a family member of the Valles.

         MR. WIRSHBA:  All right.  We can take that down.

Q.   Mr. Ardón, getting back to Tony Hernandez, did you meet with Tony Hernandez shortly after the coup that you described earlier?

A.   Yes.

Q.   And where was that meeting?

A.   In Santa Rosa de Copán.

Q.   At the meeting with Tony Hernandez in Santa Rosa, what, if anything, did he say about the coup?

         MR. COLON:  Objection.  Relevance.

THE COURT:  One moment, please.

I'll allow it.

A.  Tony Hernandez told me that now the coup had taken place, it would be easier for the National Party to win and Don Pepe to become president and Juan Orlando to become president of Congress.

MR. COLON:  Objection as to the mention on the topic of a coup and the relevance to this case.

THE COURT:  All right.  Well, I'm taking it as background testimony bearing potentially on acts that may be relevant to the charges.

Go ahead.  Next question.

MR. WIRSHBA:  Thank you, your Honor.

Q.  And just, Mr. Ardón, what was your understanding of the relationship between Tony Hernandez and Juan Orlando Hernandez?

A.  They are brothers.

Q.  And when Tony Hernandez said ——

THE COURT:  Pause.

Ladies and gentlemen, I told you this already, but I just want to remind you.  You are the judges of the facts.  You decide the credibility of the witnesses.  You also decide the weight, if any, to give to any item of evidence.  The evidence is before you, but the weight you give that, if any, is up to you.  And, of course, you keep an open mind until all the evidence is in.  Then, and only then, can you assess whether

something is or not important.

All right.  Next question.

MR. WIRSHBA:  Thank you, your Honor.

Q.  When Tony Hernandez said that the coup would allow Juan Orlando Hernandez to become the president of Congress, what did he say would happen if Juan Orlando Hernandez became the president of Congress?

A.  Tony Hernandez told me that if Juan Orlando became president of Congress, then he would have access to government information.

Q.  What type of information?

A.  Information such as radar information, which is what the government uses to identify aircrafts.

Q.  Why would it be helpful to have radar information?

A.  For drug transportation by air.

Q.  And who, if anyone, was moving drugs by air?

A.  The Valles did.

Q.  Anyone else?

A.  I did.

Q.  Tony Hernandez?

MR. COLON:  Object.

A.  Yes.  Well, both Tony Hernandez and I were moving the drugs together.

Q.  All right.  Getting back to the meeting between you and Tony Hernandez, what, if anything, did Tony Hernandez ask of

you?

A.   Tony Hernandez told me that he had met some Colombians that were working with the Valles and that they would be selling him cocaine, and if I would purchase the cocaine from Tony.

Q.   How did you respond?

A.   I told Tony Hernandez that I would purchase the drugs from him.

Q.   Following this meeting in Santa Rosa, what, if any, business did you begin conducting with Tony Hernandez?

A.   I started purchasing drugs from him, cocaine.

Q.   The first time that you purchased cocaine from Tony Hernandez, approximately how much cocaine did you purchase?

A.   It was around some 280 kilos.

Q.   During the time that you trafficked cocaine with Tony Hernandez, did you see Tony Hernandez with firearms?

A.   Yes.

Q.   What firearms?

A.   With a 9 millimeter semiautomatic handgun, and on occasion I saw him with an AR-15.

          MR. WIRSHBA:  Could we show the witness, the parties, and the Court Government Exhibit 201R-60 —— excuse me, 201-R62.

Q.   Mr. Ardón, do you recognize that?

A.   Yes.

Q.   What is it.

A.   It's an AR-15.

Q.  Is that representative of the gun that you were describing earlier that you saw Tony Hernandez carrying?

A.  Yes, but it did not have the telescopic sight or the foot, as we call it.

Q.  Understood.

Your Honor, the government would seek to admit Government Exhibit 201-R62.

MR. COLON:  No objection.

THE COURT:  Received.

(Government's Exhibit 201-R62 received in evidence)

MR. WIRSHBA:  Ms. Collins, you can publish that.

BY MR. WIRSHBA:

Q.  Now, Mr. Ardón, taking a look at Government Exhibit 201-R62, I think you mentioned that this resembled the gun that you saw Tony Hernandez carry, but it didn't have a sight.  Can you identify the sight on the firearm for the jury?

Let the record reflect that the witness has identified the top portion of the photograph.

You also mentioned, sir, that it doesn't have the feet.  Can you identify the feet?

Let the record reflect that the witness has identified the left portion of the firearm sticking out from the bottom.

Otherwise, Mr. Ardón, did this — is this representative of the firearm that you saw Mr. Hernandez, Tony Hernandez, carrying?

A.   Yes.

MR. WIRSHBA:  We can take that down, Ms. Collins.

Q.   Did Tony Hernandez ever tell you, Mr. Ardón, about his possession of another type of firearm?

A.   Yes.  He told me once that he had a heavier firearm.

Q.   What firearm was that?

A.   He told me that it was an M60.

Q.   What's an M60?

A.   An M60 is a combat-grade firearm that goes through armored vehicles.

Q.   Mr. Ardón, was an election held later in 2009?

A.   Yes.

Q.   In what month?

A.   In November.

Q.   Was Pepe Lobo on the ballot in 2009?

A.   Yes.

Q.   For what position?

A.   For president.

Q.   For what, if any, position were you on the ballot?

A.   For municipal mayor.

Q.   And for what, if any, position was Juan Orlando Hernandez on the ballot?

A.   For congressman.

Q.   Did you win your election?

A.   Yes.

Q.   How did you win?

A.   Fraud.

Q.   What type of fraud?

A.   By paying people to vote for me and by paying the people that were working at the tables.

Q.   Did the defendant win his position as congressperson in that election?

A.   Yes.

Q.   Did Pepe Lobo become the president of Honduras?

A.   Yes.

Q.   After the election, as far as you know, how is it determined who will become the president of Congress of Honduras?

          MR. COLON:  Objection, your Honor.  Relevance.

          THE COURT:  Is this witness qualified to testify to this?

          MR. WIRSHBA:  Well, your Honor, I think his understanding is important for the steps that he took after this to try, if I may, to work to ensure that election went a certain way.

          THE COURT:  All right.  So this is going to be his understanding because his understanding may have influenced his actions.  It's not admitted for the truth of whether this is how a person assumes the office, but, rather, this is what this man thought.  And what this man thought may have influenced

what this man did.  On that basis, I'll allow it.

MR. WIRSHBA:  Thank you, your Honor.

Q.  You may answer the question, sir.

A.  All members of Congress vote.

Q.  Was there anyone that you knew who was running for the president of Congress?

A.  Yes.

Q.  Who was that?

A.  Juan Orlando Hernandez.

Q.  And prior to the election for president of Congress, did you speak with the defendant?

A.  Yes.

Q.  What happened?

A.  Juan Orlando called me, and he asked me to help him with the votes from the department of Copán with the congresspersons.

Q.  How did he —— what did he want your help with exactly?

A.  With the votes from the congresspersons.

Q.  How did you respond to Juan Orlando Hernandez when he asked you to secure the votes of those congresspersons?

A.  I told Juan Orlando that, OK, that I was going to call the congresspersons to have them vote for him at Congress.

Q.  Why did you believe that these congresspeople would listen to you?

A.  I had already helped them.  I had bribed them, and I had

financed a portion of their campaign.  I had provided them with political assistance in the department of —— in El Paraiso, Copán, for them to secure their seats as Congressmen.

Q.  What money did you use for that?

A.  The money that I was making from drug trafficking.

Q.  So what did you do after speaking with the defendant?

A.  I'm sorry, Mr. Prosecutor, I did not understand the question.

Q.  Not a problem.

After the defendant asked you to secure the votes of these congresspeople and you agreed, what did you do next?

A.  I called Juan Orlando Hernandez, and I told him that the congresspersons from the department of Copán would be voting for him at Congress.

Q.  Mr. Ardón, just taking one step back, before you called Juan Orlando Hernandez back, did you have conversations with these congresspeople?

A.  Yes.

Q.  What did these congresspeople say to you in response to your request?

MR. COLON:  Objection, your Honor.  Hearsay.

THE COURT:  Unless you lay a foundation.  Lay a foundation, sir.  Sustained.

MR. WIRSHBA:  Your Honor, I'm not offering this for the truth of the matter asserted.

THE COURT:  Well, what's the relevance of what these unnamed congresspeople said?

MR. WIRSHBA:  Well, your Honor, if I may proffer, the relevance is what this witness then told Juan Orlando Hernandez about what those congresspeople said and then what Juan Orlando Hernandez promised to do for the witness in response to what the witness said.

THE COURT:  All right.  It's not hearsay if it's not admitted for the truth.  If it's not admitted for the truth, you may not consider it for the truth.  So if someone tells this witness that they plan to vote for a particular candidate, they could be lying through their teeth.  They could want to deceive him.  It's not proof that they voted for who they said they were going to vote for.  But the fact that it was said may have relevance to this person's next action or future action, and on that basis, and that basis alone, I'm receiving it.

Go ahead.

BY MR. WIRSHBA:

Q.  So how did the congresspeople respond to you when you asked if they would support Juan Orlando Hernandez?

A.  The congresspeople told me that that was fine, that they were going to support Juan Orlando so that he would become president of Congress.

Q.  All right.  What did you do after you heard that from these congresspeople?

A.   I called Juan Orlando Hernandez.

Q.   What did you tell Juan Orlando Hernandez?

A.   I told him that the congresspeople were going to vote for him in Congress.

Q.   How did he respond?

A.   Juan Orlando thanked me, and he said that he was going to take care of providing protection from the prosecutor's office so that I would not be investigated, and he was going to give my brother his place in government, and he was going to provide the paving for El Paraiso, Copan.

Q.   After the 2009 election, what happened in the vote for the president of Congress?

A.   Juan Orlando Hernandez won the position in Congress.

Q.   And after the election, did your brother receive a position in government?

A.   Yes.

Q.   What position was that?

        THE INTERPRETER:  May the interpreters confer quickly?

A.   The director of Fondo Vial.

Q.   What is Fondo Vial?

A.   Fondo Vial is a government institution that is dedicated to repairing roads and paving roads.

Q.   After the election, did the government of Honduras begin paving the roads in Paraiso?

A.   Yes.

Q. All right. While you were working to ensure the defendant was elected president of Congress, were you also continuing to traffic cocaine?

A. Yes.

Q. In 2009 and 2010, who were you selling most of that cocaine to?

A. To Don Amado.

Q. And what organization?

A. The Sinaloa organization.

Q. The Sinaloa Cartel?

A. Yes.

Q. What was approximately the largest load of cocaine that you sold to Sinaloa, the Sinaloa Cartel, during this period?

A. Approximately some 2,000 kilos to 1,500 kilos.

Q. What, if any, business were you doing with Tony Hernandez at this time?

A. I was buying cocaine from him.

Q. Approximately how often?

A. Maybe once a month or twice.

Q. And approximately how much cocaine on each occasion.

A. 250, 280 kilos.

Q. And to whom would you sell the cocaine that you were purchasing from Tony Hernandez?

A. To Don Amado.

Q. Directing your attention to 2010, did you have a meeting

O2MHHer1                         Ardón Soriano – Direct

with the leader of the Sinaloa Cartel?

A.  Yes.

Q.  Who was that?

A.  Chapo Guzmán.

        MR. WIRSHBA:  Ms. Collins, if we could show the
witness, the Court, and the parties Government Exhibit 105.

Q.  Do you recognize that, Mr. Ardón?

A.  Yes.

Q.  What is it?

A.  A photograph of Chapo Guzmán.

Q.  Is it fair and accurate?

A.  Yes.

        MR. WIRSHBA:  Your Honor, the government would seek to
admit Government Exhibit 105.

        MR. COLON:  No objection, sir.

        THE COURT:  All right.  Received.

        (Government's Exhibit 105 received in evidence)

        MR. WIRSHBA:  You may publish that, Ms. Collins.

BY MR. WIRSHBA:

Q.  Mr. Ardón, you mentioned that you called this person Chapo
Guzmán.  Do some people just call this individual El Chapo?

A.  Yes.

Q.  Prior to your meeting with El Chapo in 2010, had you met
with him previously?

A.  Yes.

Q.   Did you have a meeting with El Chapo in 2007?

A.   Yes.

Q.   Where was that meeting in 2007?

A.   In El Paraiso, Copán.

Q.   At whose house?

A.   At my house.

Q.   Returning to 2010, you mentioned that you again met with El Chapo.  Where did you meet him in 2010?

A.   I met with him in the city of Guatamala.

          THE INTERPRETER:  Interpreter correction.  "In Guatamala City."

Q.   And who was there?

A.   Don Amado, Fernando, El Chapo, Ronald Salguero, Otto Salguero, and I were there.

Q.   Ronald and Otto Salguero, were those the individuals that owned the property that you sold drugs at in Guatamala?

A.   Yes.

Q.   Who is Fernando?

A.   He's a Mexican.

Q.   How did you know him?

A.   Whenever El Chapo was around, he was always with El Chapo.

Q.   At this meeting with El Chapo in 2010, what did you discuss with him?

A.   El Chapo told me that he was having problems with the drug trafficking route in Guatamala in — the cities are called

O2MHHer1                         Ardón Soriano - Direct

Esquipulas and Chiquimula.

Q.   Esquipulas and Chiquimula, are those cities on the border area between Honduras and Guatamala?

A.   Yes.

Q.   All right.  Did Chapo explain what problems he was having with his drug trafficking route there?

A.   Yes.

Q.   What did he say?

A.   Chapo told me that a cocaine load had been stolen from him on that route.

Q.   In light of these issues, what, if anything, did Chapo propose to you?

A.   El Chapo asked me if I could transport the drugs from Honduras to Guatamala via the route that I had control of.

Q.   Where did Chapo propose to deliver the drugs to you in Honduras?

A.   In a city called San Pedro Sula.

Q.   Where did he ask you to take the drugs?

A.   To take it to Guatamala to the city of Amates, Izabal.

Q.   What role would you have with respect to these drugs?

A.   Provide security for it.

Q.   And just to be clear, when Chapo was referencing drugs, what did you understand him to be talking about, what type of drug?

A.   Cocaine.

Q. How did you respond to Chapo's proposal?

A. I said yes to El Chapo, that that was all right, that we could provide security for him.

Q. Prior to this meeting with Chapo in 2010, what business were you doing with the Sinaloa Cartel?

A. I sold them cocaine.

Q. With respect to the cocaine that you purchased from Tony Hernandez, what portion of those drugs were you selling to the Sinaloa Cartel?

A. All of it.

Q. After this meeting with Chapo in 2010, what additional work had you agreed to do with the Sinaloa Cartel?

A. Provide security for them.

Q. What do you mean by "security"?

A. To transport the drugs in such a way that it would not be stolen and it would arrive safely to the destination that Chapo had requested.

Q. And who, if anyone, did you need to help you to ensure the security of those drugs?

A. Tony Hernandez.

Q. Did you organize a meeting in Honduras with Tony Hernandez?

A. Yes.

Q. Where was that meeting?

A. In San Pedro Sula.

Q. Where in San Pedro Sula?

A.   In a cafe Espresso Americano.

Q.   Is that the name of the cafe?

A.   Yes.

        MR. WIRSHBA:  Ms. Collins, if we could put up
Government Exhibit 359 for just the parties, the witness, and
the Court.

Q.   Mr. Ardón, do you recognize this?

A.   Yes.

Q.   What is it?

A.   A cafe.

Q.   Is this the cafe where you met Tony Hernandez on that
occasion?

A.   Yes.

Q.   Was this photograph taken on the day where you met with
Tony Hernandez?

A.   No, I don't know that.

Q.   Is it a fair and accurate representation of the place where
you met, however?

A.   Yes.

        MR. WIRSHBA:  Your Honor, the government would seek to
admit Government Exhibit 359.

        MR. COLON:  No objection.

        THE COURT:  Received.

        (Government's Exhibit 359 received in evidence)

        MR. WIRSHBA:  You may publish.  Thank you,

Ms. Collins.

BY MR. WIRSHBA:

Q.  Mr. Ardón, who was at the meeting with Tony Hernandez at cafe Espresso Americano?

A.  Tony Hernandez, Primo, Mario Calix, my brother Hugo, and I were there.

Q.  And who is Mario Calix?

A.  Mario Calix is a guy, a man, from the department of Gracias.

Q.  Was he involved in narcotics trafficking?

A.  Yes.

         MR. WIRSHBA:  Ms. Collins, if we could show the witness Government Exhibit 106, along with the parties and the Court.

Q.  Do you recognize this, Mr. Ardón?

A.  Yes.

Q.  What is it?

A.  It's a photograph of Primo.

Q.  Is it a fair and accurate photograph of that individual?

A.  Yes.

         MR. WIRSHBA:  The government would seek to admit Government Exhibit 106.

         MR. COLON:  One second, Judge, if I may?

         THE COURT:  You may.

         Mr. Colon, have you had an opportunity to review?

MR. COLON:  I'm sorry, Judge.  We have no objection.

THE COURT:  All right.  Received.  Thank you very much.

(Government's Exhibit 106 received in evidence)

MR. WIRSHBA:  Ms. Collins, you may publish.  Thank you.

BY MR. WIRSHBA:

Q.  You mentioned this is a photograph of someone that you knew as Primo.  Who introduced you to the person Primo that you identified in Government Exhibit 106?

A.  Tony Hernandez.

Q.  And prior to the meeting you had at cafe Espresso Americano, what, if anything, did Tony Hernandez say about this individual?

A.  Tony Hernandez had told me that he had a Primo ——

THE INTERPRETER:  Sorry, interpreter correction.

A.  Tony Hernandez had told me that he had a cousin who worked with him who was a trusted person.

Q.  Do you understand that this man Primo is the cousin of Primo that Tony had mentioned?

A.  Yes.

Q.  Do you understand this individual Primo to be the cousin of anyone else that you knew?

A.  Yes.

Q.  Who was that?

A.   Juan Orlando Hernandez.

Q.   What, if any, official position did Tony Hernandez say that Primo held in Honduras?

A.   I don't remember, except that he worked at the National Police.

Q.   Do you know the last name —— did you come to learn the last name of the individual that you knew as Primo?

A.   Yes.

Q.   What was that?

A.   Hernandez.

Q.   Getting back to the meeting at cafe Espresso Americano —— you may take that down, Ms. Collins —— what did you tell Tony Hernandez and Primo at that meeting?

A.   I told Tony Hernandez that I had had a conversation with Chapo Guzmán and that he wanted us to transport the drugs for him from San Pedro to Guatamala and that Chapo wanted us to provide security.

Q.   And when you said "security" to Tony Hernandez, what did you mean?

A.   For the drug shipments that were leaving from San Pedro to Guatamala have good protection by the people that were going to be in charge of the drugs.

Q.   When you say "protection," what sort of protection would they have?

A.   That if there were any police checkpoints on the road, for

O2MHHer1                          Ardón Soriano - Direct

them to be removed such that the cocaine shipment could travel through without any issue.

Q.   What, if anything, did you intend these individuals to carry who would be offering protection?

THE COURT:  All right.  Ladies and gentlemen —— you can ask that question again after the break —— we're going to take our midmorning break.  Please do not discuss the case among yourselves or with anyone else.  We'll be back in action in about ten minutes.  Thanks very much.

(Jury excused)

THE COURT:  We're in recess.

(Recess)

(Continued on next page)

THE COURT:  Please remain standing for the jury.

(Jury present)

THE COURT:  Please, be seated.

You may proceed.

MR. WIRSHBA:  Thank you, your Honor.

BY MR. WIRSHBA:

Q.  Mr. Ardón, before we broke for break I think we were discussing a meeting at Cafe Espresso Americano with Tony Hernandez and Primo, and at that meeting I was asking you what you intended the individuals, who would provide security for Chapo's loads, to carry.  What did you intend those individuals providing security to carry?

A.  For them to take care -- interpreter correction -- for them to handle security for them to carry guns in the vehicles necessary to escort the merchandise.

Q.  When you say "the merchandise" what do you mean?

A.  Cocaine.

Q.  And what did Tony Hernandez say in response to your request that he help provide security with guns?

A.  Tony told me that he would have Primo handle security of the drugs.

Q.  And when he said "security" what did you understand him to mean?

A.  That Primo would provide the individuals, that he would be in charge of the individuals that would be providing security

for the cocaine.

Q.   What did Primo say at this meeting about the security that he could provide?

A.   Primo said that he would be using about three vehicles, and that he would be driving the lead vehicle.  And, Primo also asked me for the phone number of the worker of mine who would be driving the truck with the cocaine.  And, he also asked for my phone number.

Q.   What, if anything, did Primo say about checkpoints?

A.   Primo said that he would handle any checkpoints that could be on the road from San Pedro to the city called Florida de Copán.

Q.   What was your understanding of why Primo would be able handle to handle any checkpoints?

A.   Because he was a police officer.

Q.   Did you understand that these individuals would be carrying firearms when they provided the security?

A.   Yes.

Q.   Did there come a time when Chapo sent a load of cocaine to San Pedro Sula?

A.   Yes.

Q.   And when Chapo sent that load, with whom did you discuss it?

A.   I discussed it with Tony.

Q.   What did you and Tony discuss?

A.   I told Tony that Don Amado had called me regarding transportation of Chapo's cocaine from San Pedro to Guatemala.

Q.   And what else did you discuss with Tony Hernandez?

A.   Tony told me that he would put Primo in charge of the transportation of the drugs.

Q.   And did that first load of cocaine come into San Pedro Sula?

A.   Yes.

Q.   And who, if anyone, provided armed security for that cocaine as it went through Honduras?

A.   Primo.

Q.   How do you know that?

A.   I saw Primo armed.

Q.   Where did you see Primo armed?

A.   At this location in Copán called Florida.

Q.   And was Florida the city in Copán that we saw the mayor of in that photograph earlier?

A.   Yes.

Q.   You said that when you saw Primo in Florida, that he was armed.  What sort of firearms was Primo carrying?

A.   They were like rifles, long guns.

Q.   And what about the other individuals with whom Primo was providing security; were those individuals armed?

A.   Yes.

Q.   How were they armed?

A.   Based on the tips of the barrels that were observed in the vehicles, I'm not sure if they were M16s or AR-15s.

Q.   Are those automatic firearms, as far as you know?

A.   Yes.

Q.   What happened to the cocaine after it reached Florida Copán?

A.   I transported it to El Paraiso Copán.

Q.   Where did you take it after that?

A.   To Guatemala.

Q.   And to whom did you sell it?

A.   El Chapo.

Q.   To El Chapo personally or the people that worked for El Chapo?  I'm sorry.  Withdrawn.

         To whom did this cocaine belong, Mr. Ardón?

A.   The Sinaloa Cartel.

Q.   So you were just providing security for this cocaine as it went through Honduras; is that right?

A.   Yes.

Q.   After this first shipment, did you, Tony Hernandez, and Primo, provide security for other shipments of Chapo's cocaine?

A.   Yes.

Q.   And during this period in 2010 and 2011, approximately how often did you, Tony Hernandez, and Primo, provide security for Chapo's cocaine?

A.   On occasion.  Twice or three times per month.

Q.   And approximately how much cocaine was in each shipment?

A.   Around -- on occasion 1,000 kilos to 1,500 kilos.

Q.   While you were providing security for Chapo's cocaine, did you continue to sell cocaine that you owned to the Sinaloa Cartel as well?

A.   Yes.

Q.   Did there come a time in 2011 when you purchased a large amount of cocaine from Tony Hernandez?

A.   Yes.

Q.   How large was that shipment?

A.   Around 1,300 kilos.

Q.   And what, if any role, did the defendant's cousin Primo have in transporting that 1300-kilo load of cocaine?

A.   He provided us with security from San Pedro Sula to Florida.

Q.   When you say "security" what do you mean?

A.   Guarding the cocaine shipment en route.

Q.   And what, if any firearms, were used to guard those cocaine shipments?

A.   Long guns such as M16s and AR-15s and short guns such as semi-automatic handguns.

Q.   You mentioned that they guarded the cocaine as it went from San Pedro Sula to Florida.  Where did the cocaine go next after Florida?

A.   I would transport it to El Paraiso Copán.

Q.   And what happened to the cocaine in El Paraiso?

A.   We would unload the cocaine, we would inspect it, and we would reload it in small vehicles.

Q.   Was that your typical practice?

A.   Yes, because the roads from Honduras to Guatemala, it is a mountainous area and it is very difficult for the trucks to travel through those roads.

Q.   And when you checked the cocaine, what, if any stamps, did you find on that particular load of 1,300 kilos?

A.   Those kilos had a stamp with initials "TH."

        MR. WIRSHBA:  Ms. Collins, if we can show the witness, the Court, and the parties Government Exhibit 305?

Q.   Mr. Ardón, do you recognize that?

A.   Yes.

Q.   What is it?

A.   It's a kilo with the "TH" initials.

Q.   Even if this is not the particular kilo that you saw, is it a fair and accurate representation of what those kilos marked "TH" looked like?

A.   Yes.

        MR. WIRSHBA:  Your Honor, the government seeks to admit Government Exhibit 305.

        MR. COLON:  No objection, your Honor.

        THE COURT:  Received.

        (Government's Exhibit 305 received in evidence)

MR. WIRSHBA:  If we can publish?

BY MR. WIRSHBA:

Q.  Mr. Ardón, what did you understand the "TH" on this kilo to stand for?

A.  Tony Hernandez' initials.

Q.  To whom did you sell the cocaine that was marked "TH?"

A.  To the Sinaloa Cartel.

MR. WIRSHBA:  Ms. Collins, if we can put up for the witness, the parties, and the Court, Government Exhibit 117?

Q.  Mr. Ardón, do you recognize what is on the screen?

A.  Yes.

Q.  What is it?

A.  A photograph of Franklin Arita.

Q.  Is it a fair representation of that individual?

A.  Yes.

MR. WIRSHBA:  Government seeks to admit Government Exhibit 117.

MR. COLON:  No objection.

THE COURT:  Received.

(Government's Exhibit 117 received in evidence)

MR. WIRSHBA:  You may publish it, Ms. Collins.

Q.  Mr. Ardón, you said this is an individual named Franklin Arita.  Who is this?

A.  A drug trafficker from the department of Copán.

Q.  And focusing your attention on 2011, did there come a time

O2M5her2                          Ardón – Direct

when you had a conflict with Arita?

A.   Yes.

Q.   What was that conflict about?

A.   Franklin Arita did not want me passing through his area
with loads of cocaine.

Q.   What, if anything, did you do in response to this conflict
with Franklin Arita?

A.   I called Tony Hernandez telling him that I had a problem in
the department of Copán.

Q.   Did you meet with Tony Hernandez, in person, to discuss
this problem?

A.   Yes.

Q.   And when you met with Tony Hernandez, in person, what, if
anything, did you tell him about Arita?

A.   I told Tony Hernandez that Franklin Arita did not want us
passing through his area loaded with merchandise.

Q.   How did Tony Hernandez respond?

A.   Tony Hernandez said to me that he had to be killed.

Q.   What else did he say?

A.   Tony Hernandez told me that he was going to speak with
Tigre Bonilla for him to take care of Tony.

Q.   Who is Tigre Bonilla?

     INTERPRETER:  Interpreter correction:  Tony Hernandez
told me that he was going to speak with Tigre Bonilla for him
to take care of Franklin Arita.

Q.   Who is Tigre Bonilla?

A.   At that time Tigre Bonilla was the chief of police of the department of Copán.

Q.   When Tony Hernandez said that he spoke with Tigre Bonilla about taking care of Franklin Arita, what did you understand him to mean?

A.   That Tigre Bonilla was going to handle killing Franklin Arita.

          MR. WIRSHBA:   Can we show the witness, the Court and the parties, what has been marked as Government Exhibit 102?

Q.   Mr. Ardón, do you recognize that?

A.   Yes.

Q.   What is it?

A.   It's a photograph of Tigre.

Q.   Is it a fair and accurate photograph?

A.   Yes.

          MR. WIRSHBA:   Your Honor, the government seeks to admit Government Exhibit 102.

          MR. COLON:   No objection, your Honor.

          THE COURT:   Received.

          (Government's Exhibit 102 received in evidence)

          MR. WIRSHBA:   You may publish it.   Thank you, Ms. Collins.

BY MR. WIRSHBA:

Q.   Mr. Ardón, did there come a time when you spoke with Tony

Hernandez again about Tigre Bonilla and Arita?

A.   Yes.

Q.   And what did Tony Hernandez say?

A.   Tony Hernandez told me that Tigre Bonilla was surveilling Franklin Arita.

Q.   And to the extent you didn't already say it, what was Tigre Bonilla's position in the Honduran government at the time when he was surveilling Franklin Arita, if you knew?

A.   He was chief of police of the department of Copán.

Q.   Did you have another conversation with Tony Hernandez after he indicated that Tigre Bonilla was surveilling Franklin Arita?

A.   Yes.

Q.   And what did you discuss in that conversation?

A.   In that conversation, Tony Hernandez told me that Tigre had called him saying that he had killed Franklin Arita.

Q.   And did you learn whether Franklin Arita had in fact been killed?

A.   Yes.

Q.   Did you learn that he had been killed?  I'm sorry.

     Was he killed?

A.   Yes.

Q.   Did you later speak with the defendant about having this individual in Government Exhibit 102, Tigre Bonilla, transferred to another location?

A.   Yes.

Q.   Was this after Tigre Bonilla killed Franklin Arita?

A.   Yes.

Q.   And why did you ask the defendant to have Tigre Bonilla transferred to another location?

A.   Because Tigre Bonilla had put a mayor from the department of Copán in jail.

Q.   Did Tigre Bonilla put this mayor in jail because of drug trafficking?

A.   No.

Q.   Why did Tigre Bonilla put this mayor in jail?

A.   Because he was in an inebriated state.

Q.   What did the defendant say in response to your request to have Tigre Bonilla transferred?

          MR. COLON:  I'm sorry, your Honor.  Can we have a year for reference here?

          THE COURT:  Yes.

          Affix a time period, Mr. Wirshba.

          MR. WIRSHBA:  Of course, your Honor.

Q.   Do you know approximately what year it was that you had this conversation with the defendant about Tigre Bonilla?

A.   I don't remember exactly whether it was in 2012.  2011 or 2012.  I don't remember.

Q.   And I think you were answering the question what did the defendant say in response to your request to have Tigre Bonilla transferred.

A.   Juan Orlando said to me that Tigre Bonilla would be taken out of the department of Copán.

Q.   And after you made this request of the defendant, was Tigre Bonilla, in fact, transferred?

A.   Yes.

Q.   After murdering Franklin Arita, did Tigre Bonilla receive a higher position in the National Police?

A.   Yes.

Q.   What position?

        MR. COLON:  Objection.  Basis for knowledge?

        THE COURT:  Yes.

        Lay a foundation, please.

        MR. WIRSHBA:  Of course, your Honor.

Q.   Mr. Ardón, after the murder of Franklin Arita, did you continue to have the Honduran National Police protect your narcotics loads?

A.   Yes.

Q.   And who, if anyone that you know, became the chief of the National Police?

        MR. COLON:  I renew my objection, your Honor.

        THE COURT:  Overruled.

A.   Tigre Bonilla.

Q.   At the time when Tigre Bonilla became the chief of the Honduran National Police, what position, if any, did the defendant hold in government?

A.  He was president of Congress.

Q.  Mr. Ardón, while you were engaging in the drug trafficking we were discussing, were you also serving as the mayor of Paraiso Copán?

A.  Yes.

Q.  And following your election in 2005 and your re-election in 2009, were you next up for re-election in 2013?

A.  Yes.

Q.  And remind us, who was the president of Honduras in 2013?

A.  Don Pepe Lobo.

Q.  Was Pepe Lobo running again as the president of Honduras?

A.  No.

MR. WIRSHBA:  Ms. Collins, if we could put up Government Exhibit 114?  I think I neglected to publish that to the jury.

Q.  Mr. Ardón, is that Mr. Pepe Lobo?

A.  Yes.

MR. WIRSHBA:  Thank you, Ms. Collins.

Q.  Mr. Ardón, in 2013, who was running for president of Honduras for the National Party?

A.  Juan Orlando Hernandez.

Q.  Did there come a time when you traveled to the defendant's home to discuss the campaign?

A.  Yes.

Q.  And with whom did you travel to the defendant's home?  I'm

sorry, withdrawn.

Q.   What were you supposed to discuss at the meeting at the defendant's home?

A.   That meeting was in order to deliver the forms of the people who were going to run for mayor and the forms of the people who were going to run for congressman.

Q.   And while you were at Juan Orlando Hernandez' house, did you have a private conversation with the defendant?

A.   Yes.

Q.   What did the defendant say in this private meeting?

A.   Juan Orlando Hernandez told me not to go for re-election as mayor because the media were talking a lot about how I was a drug trafficker and how I financed a part of Juan Orlando Hernandez' campaign.

Q.   What, if anything, did he say about why that was a problem for him, the defendant?

A.   Because he told me that it was not good for him in his campaign for him to have links to drug traffickers.

Q.   But you were a drug trafficker; right?

A.   Yes.

Q.   And had you provided money to the defendant's campaign?

A.   Yes.

Q.   Now, if you agreed not to run for mayor in 2013, what, if anything, did the defendant say about what he would do for you?

A.   Juan Orlando said to me that he was going to give me

protection so that I would not be extradited, and that he was going to leave my brother Hugo -- interpreter correction -- he was going to allow my brother Hugo to remain at Fondo Vial.

Q. When you said he was going to ensure that you had protection from being extradited, what do you mean?

A. Because since I worked in the drug trafficking business, he was not going to allow me to be extradited to the United States.

Q. And what does it mean to be extradited to the United States?

A. Extradition is when, because of drug trafficking --

MR. COLON: Objection. Basis of knowledge, someone who is not --

THE COURT: Let me see the question. One second. I will allow it.

Ladies and gentlemen, this is this witness' understanding, it's not a legal opinion. He is a lay witness, it's what his understanding of what the term means, as he used it in his testimony.

Go ahead.

BY MR. WIRSHBA:

Q. Sir, what is your understanding of extradition that the defendant said he was going to protect you from?

A. Extradition was for me not to be sent to the United States.

Q. Sent for what purpose to the United States?

O2M5her2                          Ardón - Direct

A.   Because of drug trafficking crimes.

Q.   So during this private meeting with the defendant, what, if anything, did the defendant say about other politicians in Honduras?

A.   Juan Orlando Hernandez told me that he was having the same problem with another mayor.

Q.   Did he explain what he meant by the same problem?

A.   Yes; that the other mayor was a drug trafficker.

Q.   And what, if anything, did Juan Orlando Hernandez say that he discussed with this mayor about the fact that the mayor was a drug trafficker?

A.   Juan Orlando told me that if that mayor chose to rerun to become mayor again, that he would put him in jail.

Q.   Did Juan Orlando Hernandez say where that mayor was from?

A.   From the department of Yoro.

Q.   Were you familiar with this mayor from the Yoro department?

A.   Not much.

Q.   Do you know his name?

A.   I only know his last name.

Q.   What name was that?

A.   Urbina.

          MR. WIRSHBA:   Can we show the witness, the parties, and the Court Government Exhibit 323, Ms. Collins?   Thank you.

Q.   Do you recognize that, sir?

A.   Yes.

Q.   What is it?

A.   It's a photograph of Juan Orlando Hernandez and Urbina.

Q.   Is it fair and accurate?

A.   Yes.

MR. WIRSHBA:  I would ask that it be admitted.

MR. COLON:  No objection.

THE COURT:  Received.

(Government's Exhibit 323 received in evidence)

MR. WIRSHBA:  If we can publish that to the jury,
Ms. Collins?

Q.   Mr. Ardón, could you identify in Government Exhibit 323 who
is on the left of this photograph and who is on the right?

A.   On the left it is Juan Orlando Hernandez and on the right
it's Urbina.

MR. WIRSHBA:  Thank you, Ms. Collins.  We can take
that down.

Q.   Mr. Ardón, when Juan Orlando Hernandez asked you not to run
for re-election in exchange for protection from extradition,
how did you respond?

A.   I said that that was fine.

Q.   And once you agreed not to run for re-election, did the
defendant ask you for anything else in this private meeting?

A.   Yes.

Q.   What else?

A.   To help him financially and politically in the department

of Copán.

Q.   How did you respond?

A.   I said yes.

Q.   And when he said financially in the department of Copán, what did you understand him to mean?

A.   With money.

Q.   What money?

A.   Money that I was making in drug trafficking.

Q.   Did you ultimately seek re-election in 2013?

A.   No.

Q.   Were you arrested by Honduran authorities after the election?

A.   No.

Q.   Did Urbina seek re-election in 2013?

          MR. COLON:   Objection.   How he knows that, Judge.

          THE COURT:   Pardon me?

          MR. COLON:   What is his basis of knowledge for Urbina and what did he do with respect to seeking re-elections.

          THE COURT:   He may or may not know.   We will find out.

A.   Yes.

Q.   What happened to Urbina after the election, if you know.

A.   He was arrested.

Q.   You mentioned that Juan Orlando Hernandez offered you protection from extradition.   Was it always possible to be extradited to the United States, from Honduras, for drug

crimes?

MR. COLON:  Objection.  Was it possible, Judge?
Vague.

THE COURT:  Yes.

Rephrase, please.

Q.  Mr. Ardón, are you aware of whether the laws changed with
respect to extradition in Honduras?

MR. COLON:  Objection.

THE COURT:  Basis?

MR. COLON:  His knowledge.  How he attained it.

THE COURT:  I will allow it.  We will find out.

Q.  Are you aware of whether the laws changed, sir?

A.  Yes.

Q.  And when was that?

A.  Around the year 2012.

Q.  And prior to 2012, what is your understanding of whether it
was possible for you to be extradited to the United States from
Honduras?

MR. COLON:  Once again, your Honor.  I think this is
speculation.  It needs a foundation or at least the basis of
knowledge that I don't believe this client has, quite frankly.

THE COURT:  I will be happy to discuss this with you
at the lunch break and we will do that.

MR. COLON:  Thank you, sir.

MR. WIRSHBA:  May I proceed, your Honor?

THE COURT:  You may.

BY MR. WIRSHBA:

Q.  Prior to 2012, did you have an understanding of whether it was possible for you to be extradited to the United States?

A.  No.

THE COURT:  Perhaps you could lay a foundation for the basis of the witness' interest in this subject matter that may satisfy the objection.

MR. WIRSHBA:  Of course, your Honor.

Q.  Mr. Ardón, as part of your drug trafficking activities, was there a concern that you would be arrested within Honduras?

A.  No.

Q.  Why not?

A.  Because I had protection from the government.

Q.  How did you obtain that protection from the government from arrest?

A.  Because I had bribed the government.

Q.  Who, in the government, had you bribed?

A.  Juan Orlando Hernandez and Pepe Lobo.

Q.  Did there come a time when you learned that it would be possible to be extradited to the United States from Honduras?

A.  Yes.

Q.  When you met with the defendant in his home in 2013, did you have any concerns that you would be extradited?

A.  No.

O2M5her2                          Ardón - Direct

Q.  Why not?

A.  Because Juan Orlando told me that he would protect me.

Q.  Now, after your private meeting at the defendant's house, did you continue to sell cocaine to the Sinaloa Cartel?

A.  Yes.

Q.  And did you continue to transport cocaine for El Chapo?

A.  Yes.

Q.  Did you continue to purchase drugs from Tony Hernandez?

A.  Yes.

Q.  And in 2013, did there come a time when your presence was requested at another meeting with El Chapo?

A.  Yes.

Q.  Who made that request?

A.  Don Amado called me.

Q.  And who, if anyone, did Don Amado ask you to bring to this meeting with El Chapo?

A.  Tony Hernandez.

Q.  What, if any conversations, did you have with Tony Hernandez about Don Amado's request?

A.  I told Tony Hernandez that El Chapo wanted to meet with him.

Q.  How did Tony Hernandez respond?

A.  He told me that that was fine.

Q.  Was that meeting held?

A.  Yes.

Q.   Where was that meeting held?

A.   At a place called El Espiritu in the department of Copán.

Q.   At what property in Espiritu?

A.   The Valle brothers' property.

Q.   And you mentioned the Valle brothers earlier.  What was the base of the Valle brothers cocaine operation?

A.   In El Espiritu.

Q.   And approximately how far is Espiritu from where you lived in Paraiso Copán?

A.   Some 32 kilometers, approximately.

Q.   And who was at this meeting at the Valles' property in Espiritu?

A.   Arnulfo Valle, Luis Valle, Otto Salaguero, Ronald Salaguero, Fernando, Don Amado, El Chapo, Tony, Prima, Mario Calix, my brother Hugo, Melvin Pinto, and I, were there.

Q.   And who is Mario Calix?

A.   This guy from the department of Gracias that used to work with Tony Hernandez.

Q.   And who is Melvin Pinto?

A.   A worker of mine.

Q.   And at this meeting with Chapo and Tony Hernandez, what did Chapo say?

A.   Chapo told Tony that he wanted to open new drug trafficking routes in Honduras.

Q.   How did Tony respond?

A.   Tony Hernandez said that if Juan Orlando won, that he could help him out with that.

Q.   What, if anything, did Chapo say about extradition during this meeting with Tony Hernandez?

A.   Chapo asked Tony whether the Valles or I would be extradited.

Q.   How did Tony respond?

A.   Tony said that if Juan Orlando Hernandez won, that we would not be extradited.

Q.   What, if anything, did Chapo offer to Tony Hernandez?

A.   He offered him money for the campaign.

Q.   How much money?

A.   $1 million.

Q.   U.S. dollars?

A.   Yes.

Q.   How did Tony Hernandez respond?

A.   Tony Hernandez said that, well, that he had to speak with his brother to see if he should accept the money.

Q.   Who did you understand to be referring to when he said -- Tony Hernandez said that he had to speak with his brother?

A.   Juan Orlando Hernandez.

Q.   Did you speak with Tony Hernandez after the meeting between you, Tony Hernandez, and El Chapo?

A.   Yes.

Q.   What did he say?

A.    Tony Hernandez told me that he had spoken with Juan Orlando Hernandez and that, yes, that they needed the money for the campaign.

Q.    What did you do when you learned that the defendant wanted to accept the million dollar bribe from Chapo?

A.    I called Don Amado.

Q.    And what did you tell Don Amado?

A.    I told Don Amado that Tony had called me and that, in fact, they did need the $1 million that had been offered to them.

Q.    And what did you understand they needed the $1 million for?

A.    For the political campaign.

Q.    Whose campaign?

A.    Juan Orlando Hernandez'.

Q.    Shortly after that call with Don Amado, was there another meeting with Tony Hernandez and El Chapo?

A.    Yes.

Q.    Where was that meeting held?

A.    At a property of my mother's.

        MR. WIRSHBA:    If we could show the witness, the parties, and the Court, Government Exhibit 357, Ms. Collins? Thank you.

Q.    Mr. Ardón, do you recognize this?

A.    Yes.

Q.    What do you recognize it to be?

A.    My house.

Q.  Is it a fair and accurate representation of your house?

A.  Yes.

MR. WIRSHBA:  Your Honor, I ask that Government Exhibit 357 be admitted into evidence.

MR. COLON:  No objection.

THE COURT:  Received.

(Government's Exhibit 357 received in evidence)

MR. WIRSHBA:  Ms. Collins, you may publish.

Q.  Mr. Ardón, is this the location of the meeting with El Chapo that we were just discussing?

A.  Yes.

Q.  Does this property have a name?

A.  Yes.

Q.  What name is that?

A.  Santa Eloisa.

Q.  Had you previously met with El Chapo at the same property?

A.  Yes.

Q.  When was that?

A.  Around 2007.

Q.  And in 2007, did you meet in the house that is depicted in Government Exhibit 357?

A.  No.

Q.  Why not?

A.  It had not been built.

Q.  What money did you use to build this house?

A.   Money from drug trafficking.

Q.   What happened to this property?

A.   It was seized.

Q.   Getting back to the 2013 meeting at Santa Eloisa; who was present?

A.   Don Amado, Fernando, Otto Salaguero, Ronald Salaguero, Chapo, Tony Hernandez, Mario Calix, Primo, Hugo my brother, Melvin Pinto, and I, were present.

Q.   And what happened at this meeting?

A.   Chapo delivered $1 million to Tony Hernandez.

Q.   Who brought that money to the meeting?

A.   Chapo told Don Amado to go get it from the car and he brought it to the table.

Q.   What happened to the money once it was brought to the meeting?

A.   Don Amado counted it and handed it to Chapo.

Q.   What happened next?

A.   Chapo handed it to Tony Hernandez.

Q.   And then what happened?

A.   Don Amado and Tony Hernandez exchanged phone numbers.

Q.   What happened with the money after it was handed over?

A.   Tony Hernandez asked me to provide him with security.

Q.   When you say "security" what do you mean?

A.   For me to guard him because of the money that he was carrying, because El Paraiso is a mountainous area.

O2M5her2                        Ardón – Direct

Q.  And who else, if anyone, was helping to guard that money that had just been handed from El Chapo to Tony Hernandez?

A.  Primo was there.

Q.  And what, if any firearms, were you or Primo carrying to help guard this money?

A.  AR-15 and AK-47.

Q.  Are those automatic firearms?

A.  Yes.

Q.  At the meeting in 2013 with El Chapo and Tony Hernandez in Espiritu, were the Valles present?

A.  Yes.

Q.  And as the election got closer in 2013, what, if any issues, arose with the Valles?

A.  The Valles were threatening some mayoral candidates in the department of Copán -- interpreter correction -- the Valles were making death threats to certain mayoral candidates in the department of Copán.

Q.  And were any mayoral candidates in the department of Copán killed?

A.  Yes.

Q.  What, if anything, did you do in response to this violence?

A.  I spoke with Juan Orlando Hernandez.

Q.  Where did you speak with the defendant?

A.  In Santa Rosa, Copán.

Q.  What did you say to the defendant in Santa Rosa?

A.   I told him that the Valles were making death threats to some candidates who were running for mayor.

Q.   Candidates for what party?

A.   The National Party.

Q.   How did the defendant respond when you told him that the Valles had been making death threats?

A.   Juan Orlando Hernandez told me that he was going to put them in jail.

Q.   Did you make any other request of the defendant at this meeting?

A.   Yes.

Q.   What else did you ask?

A.   I told Juan Orlando Hernandez not to communicate with Tony Hernandez about this conversation.

Q.   Why did you do that?

A.   Because Tony Hernandez could communicate what I was asking for to the Valles.

Q.   How did the defendant respond to your request not to inform Tony Hernandez of your conversation?

A.   Juan Orlando told me that that was all right, that he would not communicate it to him.

Q.   In what month was the election held later in 2013?

A.   November.

Q.   And shortly before the election, did you meet with the mayors of Copán?

O2M5her2                          Ardón – Direct

A.  Yes.

Q.  Where did you meet?

A.  In El Paraiso Copán.

Q.  Where in El Paraiso?

A.  At town hall.

Q.  And who was with you with the mayors of Copán?

A.  Hugo my brother.

Q.  And what did you discuss with the mayors?

A.  I spoke with the mayors to -- I asked the mayors -- I gave them money to bribe people to vote for Juan Orlando Hernandez.

Q.  When you say you gave them money, what type of money did you give them?

A.  I gave them lempiras, money in lempiras.

Q.  Was it cash?

A.  Yes.

Q.  Did the defendant win the election for president in 2013?

A.  Yes.

Q.  What, if any frauds, did you commit to help Juan Orlando Hernandez win the election?

A.  I gave money to the mayors for them to bribe people, and I bribed people in El Paraiso for them to vote for Juan Orlando Hernandez.

Q.  Drawing your attention to 2014, which, if any Honduran drug traffickers with whom you have worked, were arrested?

A.  The Valles.

Q.   Following the arrest of the Valles, did you speak with Tony
Hernandez?

A.   Yes.

Q.   What did you say to Tony Hernandez?

A.   I asked Tony Hernandez -- I told Tony Hernandez that
Chapo's people were asking why the Valles had been extradited
and I asked Tony Hernandez whether the same thing was going to
happen to me.

Q.   What did he say?

A.   Tony Hernandez told me, no, that the Valles had been
extradited because they had tried to kill Juan Orlando
Hernandez.

Q.   Did you tell Tony Hernandez that you had asked the
defendant to arrest the Valles?

          INTERPRETER:  May the interpreter have repetition of
the question?  I apologize.

          MR. WIRSHBA:  Of course.

Q.   Did you tell Tony Hernandez that you had asked the
defendant to arrest the Valles?

A.   No.

Q.   After this discussion with Tony Hernandez about the arrest
of the Valles, was there a trial of the Valles in Honduras?

A.   No.

Q.   What happened to them, as far as you know?

A.   They were extradited.

O2M5her2                          Ardón - Direct

Q.   To where?

A.   To the United States.

Q.   You mentioned that you had conversations with Chapo's people.  Did you have any conversations with Don Amado about the Valles?

A.   Yes.

Q.   What conversation did you have with Don Amado?

A.   Don Amado asked me why the Valles had been extradited.  I told him that I did not know but that I was going to speak to Juan Orlando Hernandez to find out what had happened.

Q.   Did you meet with Juan Orlando Hernandez to discuss the arrest of the Valles?

A.   Yes.

Q.   Where did you meet?

A.   In Santa Rosa.

Q.   And that meeting was to discuss the arrest of the Valles in Santa Rosa?

A.   That meeting was when I asked -- I made a request of Juan Orlando Hernandez because the mayors were being threatened. That was when I asked him for that also.

Q.   I understand.

     After the arrest of the Valles, did you come to meet again with Juan Orlando Hernandez?

A.   Yes.

Q.   And where was the meeting that you had after the arrest of

the Valles with Juan Orlando Hernandez?

A.   At Fondo Vial.

Q.   And where is Fondo Vial?

A.   It's located in the capital of Honduras, Tegucigalpa.

Q.   Remind us, what is Fondo Vial?

A.   Fondo Vial is a government institution that is dedicated to repairing and paving roads.

Q.   And who, if anyone, did you know that worked at Fondo Vial?

A.   My brother Hugo.

Q.   Who was at this meeting at Fondo Vial?

A.   Tony Hernandez --

          MR. COLON:  Objection, your Honor.  Can we have a year on this?

          THE COURT:  Yes.

          Please, if you will fix that?

          MR. WIRSHBA:  Of course, your Honor.  I think the defendant indicated but -- sorry, the witness -- but I'm happy to ask again.

BY MR. WIRSHBA:

Q.   Mr. Ardón, approximately what year was this meeting at Fondo Vial?

A.   I don't remember whether it was in 2014 or 2015.

Q.   And you were discussing, I think, who was at this meeting. Who was there at Fondo Vial?

A.   Juan Orlando Hernandez, Tony Hernandez, my brother Hugo,

and I, were there.

Q.   And what did you say at this meeting?

A.   I told Juan Orlando Hernandez that Chapo's people were asking me why the Valles had been extradited.

Q.   What, if anything, did the defendant say in response?

A.   Juan Orlando told me that he had extradited them because they had tried to kill him.

Q.   What, if anything, did Tony Hernandez say to the defendant at this meeting?

A.   Tony Hernandez said to Juan Orlando that he had accepted the money, the million dollars because you asked me to take it.

Q.   And when you say "you asked me", when Tony Hernandez said that, to whom was he referring, as you understood it?

A.   Juan Orlando Hernandez.

Q.   When Tony referred to "the million dollars," what did you understand him to be referring to?

A.   To the million dollars that Chapo had given Tony in El Paraiso.

Q.   Did the defendant deny that he authorized Tony Hernandez to accept the million dollars from Chapo?

A.   Juan Orlando said that he had no obligation to anyone and that if they wanted, he could return the money.  He got angry and left the meeting.

Q.   And as far as you are aware, was the money ever returned?

A.   Not that I know of.

O2M5her2                    Ardón – Direct

Q.  All right, Mr. Ardón.  Focusing your attention on 2017, was there an election that was held that year in Honduras?

A.  Yes.

Q.  When was that election held in 2017?

A.  In November.

Q.  Prior to the election, did you have a meeting with the defendant?

        THE COURT:  All right.  We are going to pause right here.  You can ask that question again after our lunch break.

        Ladies and gentlemen, please do not discuss the case among yourselves or with anyone.  Please have a very pleasant lunch and we will see you back for a 2:00 start.

        Thank you.

        (Continued on next page)

O2M5her2                         Ardón – Direct

(Jury not present)

THE COURT:  Please, be seated.

You may take the witness out.

(Witness steps down)

THE COURT:  I was simply going to say, Mr. Colon, that a witness, such as this witness, may have little familiarity with the environmental laws of Honduras but one who is testifying that they were involved in drug trafficking would logically have an interest in knowing the present status of an extradition law.

Thank you.  Enjoy the lunch break.

(Luncheon recess; continued on next page)

AFTERNOON SESSION

2:05 p.m.

(Trial resumed; jury not present)

THE COURT:  Please remain standing for our jury.

(Jury present)

THE COURT:  All right.  Please be seated.

You may inquire.

MR. WIRSHBA:  Thank you, your Honor.

AMILCAR ALEXANDER ARDÓN SORIANO, resumed.

DIRECT EXAMINATION

BY MR. WIRSHBA:

Q.  Mr. Ardón, when we broke, I think I was calling your
attention to 2017 and asking you about whether there was an
election in that year.  Was there an election in 2017?

A.  Yes.

Q.  When was that election in 2017?

A.  In November.

Q.  Prior to that election, did you have a meeting with the
defendant?

A.  Yes.

Q.  Where was that meeting?

A.  Santa Rosa.

Q.  Who attended the meeting in Santa Rosa with the defendant?

A.  My brother Hugo, Juan Orlando Hernandez, Tony Hernandez,
and I did.

Q.   And at the time of this meeting with the defendant in 2017, was your brother still working at Fondo Vial?

A.   No.

Q.   Why not?

A.   He had resigned.

Q.   Are you aware of why he resigned?

A.   Yes.

Q.   What's your understanding of why he resigned?

A.   He resigned at the request of Juan Orlando Hernandez.

Q.   Did you have a conversation with the defendant about whether Hugo could continue his work at Fondo Vial?

A.   No.

Q.   What was your understanding of about why Hugo felt he had to resign?

A.   Because the media was saying that Hugo was a drug trafficker a lot.

Q.   Was Hugo continuing to assist in your drug trafficking activities?

A.   Yes.

Q.   Getting back to the 2017 meeting with the defendant in Santa Rosa, what, if anything, did Juan Orlando request of you at this meeting?

A.   To help him out in the department of Copán with politics.

Q.   To help him out in what way with politics?

A.   Politically speaking and financially speaking.

Q.   With respect to what political campaign?

A.   With the National Party's campaign.

Q.   And was that also Juan Orlando Hernandez's campaign?

A.   Yes.

Q.   What, if anything, did Tony Hernandez say at this meeting?

A.   Tony Hernandez asked us for $500,000 for the campaign in the department of Gracias.

Q.   When you say "in the department of Gracias," where is that?

A.   It is next to the department of Copán.

Q.   And when Juan Orlando Hernandez was a congressperson, from what department was he a congressperson?

A.   Gracias, Lempira.

Q.   Is that the same location?

A.   Yes.

Q.   And what, if anything, did the defendant, Juan Orlando Hernandez, say about this $500,000?

A.   Juan Orlando Hernandez told me that he would give us his support to —— so that we would not be extradited, and that now that Hugo was no longer a public figure, that it was easier to protect us because the media was no longer talking about us.

Q.   And when you say that "we would not be extradited," who were you referring to?

A.   My brother Hugo and me.

Q.   And the defendant said that he would protect you, the two of you, from extradition, is that right?

A.   Yes.

Q.   What did you understand the defendant to mean when he said that it was easier to protect you now that Hugo was no longer in the media?

A.   Because the media was saying that Hugo and I had financed — had partially financed Juan Orlando Hernandez's campaign for the National Party and that I was a drug trafficker, and that, as such, I was not — I was not involved or I was not a member of the political base of the country.

Q.   And you and your brother, you were drug traffickers, right?

A.   Yes.

Q.   And you had been financing the defendant's cocaine, is that right — excuse me, financing the defendant's campaign, excuse me?

A.   Yes.

Q.   Did you continue to traffic cocaine even after this discussion with the defendant?

A.   Yes.

Q.   All right.  How did you respond to the defendant's proposal — I'm sorry, Tony Hernandez's proposal that you provide $500,000?

A.   I told him we would give them the funds.

Q.   Did you give them 500,000 U.S. dollars?

A.   Yes.

Q.   What money did you use to make this payment?

A.   Money that I was making from drug trafficking.

Q.   Did you meet again with the defendant after that?

A.   Yes.

Q.   Where?

A.   In Gracias, Lempira.

Q.   Where in Gracias, Lempira?

A.   At a resort.

Q.   Who was at this meeting?

A.   My brother Hugo, Tony Hernandez, Juan Orlando Hernandez, and I were there.

Q.   At this meeting at Gracias, Lempira, what, if anything, did the defendant say about the $500,000 that you had provided?

A.   They thanked us.

          MR. COLON:  Your Honor, might I approach counsel here for a second?

          THE COURT:  Yes, sure.

Q.   Mr. Ardón, was this also in approximately 2017?

A.   Yes.

Q.   All right.  What, if anything, did the defendant say about what you would receive in exchange for that money?

A.   Juan Orlando Hernandez told us that we would continue to enjoy the protection from the government that he had provided us with so that we would not be investigated or extradited.

Q.   Did there come a time when you surrendered to the United States law enforcement authorities?

A.   Yes.

Q.   When was that?

A.   March 14, 2019.

Q.   When you first surrendered to U.S. authorities, what was the minimum sentence of imprisonment that you were facing?

A.   Forty years.

Q.   Did you make a decision to cooperate with the government?

A.   Yes.

Q.   Did that cooperation involve meeting with the government to talk about your criminal activity?

A.   Yes.

Q.   By the end of that process, did you eventually disclose all of the information that you knew about drug trafficking and other criminal activity?

A.   Not at first.

Q.   But eventually did you disclose everything?

A.   Yes.

Q.   You said that at first you did not disclose everything. What did you withhold information about at first?

A.   About Juan Orlando Hernandez and about Tony Hernandez.

Q.   About Chapo?

A.   Him too.

Q.   Why did you initially withhold certain information from the government?

A.   Out of fear.

Q.   Fear for what?

A.   Retaliation.

Q.   To whom?

A.   My family.

Q.   And where was your family at the time when you began cooperating with the government?

A.   In Honduras.

Q.   Did you eventually plead guilty to all the crimes that you committed?

A.   Yes.

Q.   You mentioned that when you first surrendered, you were facing a mandatory minimum sentence of 40 years.  Now that you've told the government about your crimes and pled guilty, what is the current mandatory minimum sentence that you're facing?

A.   Life plus 30.

Q.   You mentioned that you pled guilty.  What are the crimes that you pled guilty to here in the United States?

A.   Being a leader of a drug trafficking gang, money laundering, drug trafficking, firearms, murders, and conspiracy with other drug trafficking groups.

Q.   You mentioned murder as part of your plea.  How many murders did you accept responsibility for?

A.   Fifty-six.

Q.   And how many did you personally commit?

A.   Two.

Q.   Did you take responsibility for other people who were injured but not killed during your drug trafficking?

A.   Yes.

Q.   How many?

A.   Six.

Q.   Have you participated in torture?

A.   Yes.

Q.   Did you tell the government about all those murders and all the criminal activity that you did in Honduras?

A.   Yes.

Q.   When you pled guilty, did you sign an agreement to cooperate with the government?

A.   Yes.

Q.   What's your understanding of your obligations under that agreement?

A.   To tell the whole truth, to tell about all of the crimes that I committed, to cooperate, and to testify.

Q.   All right.  As you understand it, what's the most important responsibility?

A.   To tell the truth.

Q.   Is your testimony here part of your cooperation?

A.   Yes.

Q.   If you meet your responsibilities under the cooperation agreement, what's your understanding of what the government

will do?

A. They will send a letter to the judge.

Q. What's your understanding of what the government will say in that letter?

A. They will talk about my crimes and collaboration.

THE INTERPRETER: Interpreter correction.

A. They will talk about my crimes and cooperation.

Q. When you say "crimes," does that include the crimes you committed in Honduras?

A. Yes.

Q. Does that include the times that you violated the rules of the prison where you were living?

A. Yes.

Q. What have you done to violate the rules of the prison?

A. I was involved in a fight.

Q. Anything else?

A. And I used a phone.

Q. You had a cell phone in prison, which is against the rules, right?

A. Yes.

Q. Now, if the government sends this letter, what sentence are you hoping to receive?

A. I didn't understand, Mr. Prosecutor. Excuse me.

Q. Of course.

If the government sends the letter pursuant to the

cooperation agreement, what is the sentence that you're hoping to receive from the judge?

A.   I would like time served.

Q.   Has the government promised you a reduced sentence?

A.   No.

Q.   Has anyone promised you a reduced sentence?

A.   No.

Q.   What's your understanding of who will decide what your sentence will be?

A.   The judge.

Q.   Is the government going to recommend any particular sentence?

A.   No.

Q.   Even if you get a letter from the government, is it still possible that the judge could sentence you to life imprisonment?

A.   Yes.

Q.   What happens to you if you lie during this proceeding?

A.   I'd spend the rest of my days in jail.

Q.   As you understand it, does the outcome of this trial affect whether you'll get that letter from the government?

A.   No.

Q.   As you understand it, does the outcome of this trial affect what sentence you'll receive from the judge?

A.   No.

Q.   What's the most important responsibility that you have at this trial?

A.   To tell the truth.

Q.   All right.  Mr. Ardón, you mentioned that you surrendered to U.S. law enforcement.  Before you surrendered, did there come a time in 2018 when you received a call from someone who said they were speaking on behalf of Juan Orlando Hernandez?

A.   Yes.

Q.   Who did you receive a call from?

A.   Primo.

Q.   What did Primo say when he called you?

A.   Primo said —— Primo called and said that Juan Orlando was asking whether I was surrendering to the United States law enforcement, to the DEA, because the media that morning had started their day by talking about that news.

Q.   And at the time were you surrendering to the DEA?

A.   No.

Q.   How did you respond to El Primo when he said that Juan Orlando Hernandez was asking if you were going to be surrendering?

A.   I told him no, that I was in El Paraiso, Copán.

Q.   And were you actually in El Paraiso?

A.   Yes.

Q.   What did El Primo say in response to your telling him that you were in El Paraiso?

A.   Primo said, yes, that was good, because he was worried also that I was surrendering.

Q.   And what, if anything, did El Primo say about what Juan Orlando Hernandez had told him about you?

A.   Primo told me that Juan Orlando had said that as long as he was president, he would continue to protect me; that I would not be extradited.

Q.   Protect you from what?

A.   From extradition.

Q.   For what activity of yours?

A.   Drug trafficking.

Q.   At the time you received this call in 2018, were you still trafficking cocaine?

A.   Yes.

Q.   While Juan Orlando Hernandez was in positions in the Honduran government, how many times was cocaine that you were trafficking seized by Honduran law enforcement?

A.   Not once.

Q.   While Juan Orlando Hernandez was in positions in the Honduran government, how many times were you arrested in Honduras?

A.   Not once.

          MR. WIRSHBA:  One moment, your Honor.

          (Counsel confer)

          MR. WIRSHBA:  Nothing further, your Honor.

THE COURT:  All right.  Cross-examination.

MR. COLON:  I'm sorry, Judge.  Can I have a second, please?

THE COURT:  Sure.

CROSS-EXAMINATION

BY MR. COLON:

Q.  Afternoon, Mr. Ardón, Hugo Ardón.

A.  Alex Ardón.

Q.  You're Alexander Ardón?

A.  Yes.

Q.  Apologize.  Mr. Alexander Ardón.

As you sit here today, testifying for the government, you want this jury to think that you're a Renaissance man, don't you?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  You want this jury to believe what you said in this testimony.  And you've told them, by way of the direct of the government, that you want to be sentenced to time served, correct?

A.  Yes.

Q.  And you want that in return for your testimony and your cooperation, correct?

A.  Yes.

Q.  So all these crimes you've committed, all these acts of

violence, murder, drug trafficking, you want that to be washed away so you could be set free, correct?

THE INTERPRETER:  May the interpreter ask for repetition?

A.  I'm just telling the truth and trying to get a new lease on life as a better person.

MR. COLON:  I'm sorry, Judge.  I walked away for a second because I needed to clarify something.  Could we have the interpreter repeat that?

THE COURT:  No, one moment, please.

Ms. Reporter, if wouldn't mind, please read back the witness' answer.  Thank you.

(Record read)

THE COURT:  Next question.

Q.  So you're a better person now?

A.  The time that I've spent in jail has made me change.

Q.  So you've testified that one of the main conditions here today is that you tell the truth, correct?

A.  Yes.

Q.  Now, have you ever lied in your life?

A.  Yes.

Q.  Tell the jury how many times have you lied in your life.

A.  It would be a lot.  I couldn't say.

Q.  So many that you can't say?

A.  Yes.

Q.   And you swore an oath to tell the truth because that's a requirement here and because you want the jury to believe what you have to say?

A.   I am here telling the truth.

Q.   And you're remorseful for all those crimes and sins that you have committed?

A.   Yes.

Q.   Nonetheless, you hope to have time served?

A.   Yes, if that's the judge's will, yes.

Q.   Your interest is really getting time served, not to show your remorse to society and to the victims and the families, family members that you killed?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.   All right.  So let's talk about your history somewhat, at least initially, about the first time you committed a murder.

All right.  Can you tell the jury when that was that you committed a murder for the first time in your life and how old you were.

A.   I was very young.  I don't quite remember, but I was around 18, 19 years old.

Q.   Wasn't it more like 13 or 14 years old?

A.   No.

Q.   Could you tell the jury who it was that you killed.

A.   I killed a guy that had killed my brother, and his name was

Pedro.

Q.  I'm sorry, what was that, the last part?

I'm sorry, Judge, I didn't hear the last part.

THE INTERPRETER:  The interpreter shall repeat the last part of the answer.

MR. COLON:  Thank you.

THE COURT:  With the permission of the Court.

THE INTERPRETER:  Thank you, your Honor.  I apologize. Yes, of course, your Honor.  "His name was Pedro."

BY MR. COLON:

Q.  And why did you kill him?

A.  Because he had murdered my brother.

Q.  So that had nothing to do with drugs, right?

A.  No.

Q.  So that was a revenge killing on your part?

A.  Yes.

Q.  Do you remember the second time you killed someone?

A.  Yes.

Q.  Do you remember the victim's name?

A.  Just that he went by "Compita."

Q.  Why did you kill Compita?

A.  Because he wanted to kill my dad.  He had stolen some cattle from my dad, and he wanted to kill him, and that's why I committed that crime.

Q.  You didn't feel like you should go to the police to report

whatever crimes were committed against your parents?

A.   I didn't do it.

Q.   So you took this into your own hands, and you decided to mete out justice to this individual, correct?

A.   Yes.

Q.   And, in fact, that person did not kill your mother or father, did they?

A.   No.

Q.   How old were you at the time?

A.   Around 19, 20 years old.

Q.   How old was this person that you killed?

A.   A man of about 45, 50 years old.

Q.   And the first person, how old was that person that you killed?

A.   He was about 18, 17 years old.

Q.   Thank you.

            Judge, may I just step away for a second?

            THE COURT:  You may.

Q.   In 1993 —— excuse me, withdraw it, Judge.

            What year were you born?

A.   I was born in 1975.

Q.   So those two homicides were when you were about 18 or 19 years old.  Were you arrested for those two killings?

A.   No.

Q.   I'm going to ask you about certain individuals, and you

tell —— please tell us whether that individual that you killed was an individual related to the narcotics trafficking or was it a personal affair.

You understand?

THE INTERPRETER:  Counselor, your Honor, the latter part of the question the interpreter wasn't able to hear.

THE COURT:  All right.  If you could speak up and into the microphone.

MR. COLON:  I will do that, your Honor.

Q.  I'm going to ask you about certain names with respect to the 56 people that you've killed.  We know two.  You testified about two of them.  I'm just going to give you names.  You tell the jury whether these were personal, you know, revenge killings, or they had to do with the drug trafficking.

You understand?

A.  The two individuals that I killed were because of revenge, not drug trafficking related.

Q.  Right.  So if I give you the name of Neftalí Mejía Duarte, did you kill that person, or did you order that person to be killed by someone else?

A.  I don't understand that question.

Q.  Do you remember or recall the name Neftalí Mejía Duarte?

A.  No, I do not remember the name.

Q.  How about a 2003 bystander during an attack on Sergio Neftalí Mejía Duarte?

A.   No, I do not recall.

Q.   All right.  Did you or did you not admit to that killing or that murder, make that admission to the prosecutors?

          MR. WIRSHBA:  Your Honor, perhaps I can have a moment with counsel?

          THE COURT:  Yes.

          (Counsel confer)

          MR. COLON:  Thank you.  I think the government's cleared something up for me.

Q.   Were you aware of a 2003 killing of a bystander during an attack or attempted attack on some individual where a bystander was actually killed as a result of your command or order?

A.   I do not remember.

Q.   So you don't remember telling that to the prosecutors during the course of your proffer sessions?

A.   I do not recall.

Q.   What about someone known as Chimino back in 2005?  Do you remember what the details or the facts were with respect to that killing?

A.   I remember Chimino, but I do not remember the details.

Q.   How about the son of a —— in 2006, the son of a woman by the name of Doña Lola?  Do you recall that killing?

A.   Yes.

Q.   Can you tell the jury whether you gave that order or you did that yourself personally?

A.   That guy was picked up from Paraiso by a drug trafficking gang who had asked me for permission to come into El Paraiso.

Q.   So what was your role in terms of killing that individual? Did you order one of your associates to kill him?

A.   I gave them permission to come into El Paraiso with armed individuals.

Q.   So you let these individuals come into your city or your town in order to kill the son of Doña Lola?

A.   Yes.

Q.   And you don't know why they wanted to kill him?

A.   Yes, I did know somewhat.

Q.   And why was it that they wanted to kill him?

A.   Because this guy had murdered a relative of the Valles.

Q.   All right.  So you allowed that there be a revenge killing on behalf of the Valle family?

A.   Yes.

Q.   Because not only were they your drug trafficking partners, but you were very close to them?

        THE INTERPRETER:  Your Honor, the interpreter needs the second half of the question, if she may.

        THE COURT:  Repeat the question.

Q.   Not only were the Valles your drug trafficking partners, but you were very close to them?

        MR. WIRSHBA:  Objection.  Compound.

        MR. COLON:  I'll withdraw it.

Q.   The Valles were your drug trafficking partners, correct?

A.   Yes.

Q.   Did they live in Copán?

A.   Yes.

Q.   Did you socialize with them?

A.   Yes.

Q.   How often did you socialize with them?

A.   I don't remember exactly.

Q.   How about a worker for the Jairo Orellana Morales family? Do you recall that person?

A.   Yes.

Q.   Can you tell the jury why you ordered that person's killing?

A.   I ordered the —— this killing because this guy, who was from Guatamala, was on the Honduran border at this location called La Playa controlling and keeping an eye on my drug trafficking movements in the area to then inform this Guatamalan drug trafficker, Jairo Orellana Morales, who would then steal my loads or murder me.

Q.   I see.

     How about Danny Pineda, May 2009?  Did you order the murder of Danny Pineda?

A.   I provided information about Danny Pineda.

Q.   Well, so what did you have to do with his murder?

A.   I provided information for him to be found and murdered.

Q.   And eventually he was murdered, correct, based on your information?

A.   Yes.

Q.   Now, you had no interest in whatever Danny Pineda was doing, is that correct?

THE INTERPRETER:  For the interpreter, you had no interest?

Q.   In what wrong Danny Pineda was doing.

A.   I gave the Valles information about Danny Pineda because Danny Pineda had killed one of the Valles' sisters.

Q.   So that's another of Valle Valle-related homicide, correct?

A.   Yes.

Q.   And not only was Danny Pineda killed as a result of your information, there were two law enforcement associates that were killed as well, correct?

A.   I do not recall.

Q.   You don't recall whether police officers or any other form of law enforcement that were associated with Danny Pineda were killed back in May of 2009?

A.   Yes.

Q.   All right.  So let's move to an individual by the name of Romulo Grandes Ordóñez.  We're moving to the name of Romulo Grandes Ordóñez.

THE COURT:  The first name, could you spell it, please.

MR. COLON:  R-o-m-u-l-o; Grandes, G-r-a-n-d-e-s;
Ordóñez, O-r-d-o-n-e-z.

THE COURT:  All right.  Go ahead, please.

MR. COLON:  Thank you, your Honor.

BY MR. COLON:

Q.  Tell the jury the details of that killing and what your
role was in that.

A.  I do not remember.

Q.  But that's what you told the government, right, with
respect to the number of people you killed and when you killed
them?

MR. WIRSHBA:  Objection.  Vague.

THE COURT:  Basis?

MR. WIRSHBA:  Vague, your Honor.

THE COURT:  No, I'll allow it.

BY MR. COLON:

Q.  Let's go to the name of Julian Aristides Gonzalez.
J-u-l-i-a-n; Aristedes, A-r-i-s-t-e-d-e-s; Gonzalez,
G-o-n-z-a-l-e-z.

A VOICE:  Slow down.

Q.  I'm sorry.  G-o-n-z-a-l-e-z.

You surely know who Julian Aristides Gonzalez is?

A.  Yes.

Q.  You sure do, because he was a general, was he not?

A.  Yes.

Q.  And he was actually the narcotics or anti-narcotics or drug czar for your country, was he not?

THE INTERPRETER:  For the interpreter, may the question be repeated again?

THE COURT:  Sure.  Speak into the microphone.

MR. COLON:  I'm sorry, Judge.  I'm still committing that same sin here.

THE COURT:  I understand.

BY MR. COLON:

Q.  General Gonzalez was actually the country's newly elected or selected drug czar.

THE COURT:  Wait.  Is that a question?

MR. COLON:  Yes.

THE COURT:  All right.  Put it in the form of a question.

Q.  Do you know that he was a general and he was the drug czar for Honduras?

THE INTERPRETER:  May the interpreters confer?

A.  Yes.

Q.  Essentially, he was an anti-narcotics law enforcement official in the Honduran government?

A.  Yes.

Q.  And why did you order him murdered?

A.  I did not order that killing.

Q.  Well, what was your involvement in that homicide or that

murder of General Gonzalez?

A.   I only conspired.

Q.   Conspired with whom?

A.   With some drug traffickers.

Q.   Which drug traffickers?

A.   One of their names was Wilter Blanco, the other was last name Mata, and I don't remember the others.

Q.   When you say you conspired, what did you do in terms of that conspiracy to kill General Gonzalez?  What was your role?

A.   Money.

Q.   So someone paid you to coconspire with other individuals, correct?

A.   I don't understand that question, counsel.

Q.   You got paid to do what with respect to the murder of General Gonzalez?

A.   I was not paid to kill Gonzalez.

Q.   Who paid to kill Gonzalez?

A.   I gave money to Wilter Blanco.

Q.   And so why did you want to kill General Gonzalez?

A.   The person who wanted to kill him was Wilter Blanco.

Q.   And you paid for Wilter Blanco's desire to kill General Gonzalez?

A.   I helped Wilter Blanco because we worked together as partners in the drug trafficking business.

Q.   So that was clearly a drug-related killing or

assassination, right?

A.   The problem —— the people who had issues were the general and Wilter Blanco.

Q.   Because the general was investigating you as well as Wilter Blanco?

A.   He was not investigating me.

Q.   But you worked with Wilter Blanco in the drug trafficking trade, correct?

A.   Yes.

Q.   Who did you pay to kill General Gonzalez?

          MR. WIRSHBA:  Objection.  Asked and answered.

          THE COURT:  One second, please.

          May I have the question read back, please.

          (Record read)

          THE COURT:  I think that is asked and answered.

Q.   In fact, you were involved or present at a meeting with respect to the killing of General Aristides Gonzalez.  In that meeting, you were in attendance at that meeting and so was the son of a former president of Honduras.  And that's President Zelaya, isn't that a fact?

A.   I don't remember.

Q.   The murder of a general, the anti-narcotics law enforcement official, you don't remember that meeting that you had with ——

          MR. WIRSHBA:  Objection.

Q.   —— Mr. Zelaya's son?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  You asked the question.  You got the answer.  Ask the next question.

MR. COLON:  Thank you, Judge.

Q.  How about a gentleman by the name of Chino back in 2010?  Do you recall the murder of Chino and at least five —— four other individuals?

(Counsel confer)

MR. COLON:  Thank you.  The government cleared something up.

Q.  Apparently, Chino was assaulted by someone, and five individuals that tried to kill El Chino were then murdered on your command.

MR. WIRSHBA:  Your Honor, I don't believe that was a question.

THE COURT:  Didn't sound like one.

Q.  Did you direct individuals to kill five individuals that were related to an assault on Chino?

A.  I don't remember.

Q.  How about Ismael Pinto?  Do you know who's Ismael Pinto, I-s-m-a-e-l, P-i-n-t-o, Ismael Pinto?

A.  Mr. Ismael Pinto, yes.

Q.  And who is Ismael Pinto?

A.  Mr. Ismael Pinto is a ranch owner in El Paraiso, Copán.

Q.  Were you friends with Mr. Pinto?

A.   Yes.   His son worked with me, Mr. Ismael Pinto's son Melvin Pinto worked with me.

Q.   Apparently, there was an assault or some sort of attack on Mr. Pinto, correct, at one time?

A.   Yes.

Q.   And you either gave directions to or ordered individuals to kill those —— those six individuals that tried to assault Mr. Pinto?

A.   I helped them financially.   I didn't give an order.   I helped the Pintos financially.

Q.   Well, did you pay anyone to commit these murders?

A.   No.   I helped Melvin Pinto, who was a worker of mine.   I gave him money so that they could defend themselves against this problem that they were having with others.

Q.   All right.   So you provided —— or you financed the killing of those six individuals?

A.   I gave the money to Melvin because they had killed Melvin's brother, those people.

Q.   And is it your understanding that they used that money to effectuate those killings of those individuals?

A.   Yes.

Q.   Did you have anything to do in 2011 in Copán with the murder of a law enforcement officer?

          And I should just correct something, if I may. There's actually two law enforcement officers.

A.  Could you ask me that question again, counsel?  I apologize.

Q.  Of course, Mr. Ardón.

Did you have any sort of role with respect to the murder of two law enforcement officers on or about —— in or about 2011 in Copán?

A.  I was not involved, but I do know why they were killed.

Q.  Why were they killed?

THE INTERPRETER:  The interpreter would like to correct the interpretation of the question.

A.  They were killed for having stolen a load of drugs.  I don't know if it was drugs or money that they had stolen from the Valles.

Q.  So did the Valles direct you or request that you assist them in the murder of these two law enforcement officers?

A.  No.

Q.  What was your role with respect to the killing of those law enforcement officers on behalf of the Valle family?

A.  The Valles, I don't remember if they were murdered because —— the Valles told me that they had been killed because they were thieves.  I did not participate in that killing, but the Valles did tell me why they had been killed.

Q.  So you're telling the jury that you're not responsible in any way for the killing of those law enforcement officers?

A.  I could be responsible because I knew the information.

Q.   And did you provide that information to the Valles or anyone else that would essentially result in the killing of those individuals?

A.   No, the Valles communicated it to me.

Q.   So what did you do that caused these two people to be killed?

A.   No, the Valles just informed me of it.  I was not involved in that.  I knew about the problem, but those guys had not robbed me.

Q.   So what you're telling the jury is that you had nothing to do with their deaths?

A.   I did not order those killings.

Q.   So you had nothing to do with those killings?

A.   Those killings were ordered by the Valles.

Q.   How about Fredy Antonio Madrid in February of 2011, also in Copán?  Did you have anything to do with his killing or murder?

A.   I don't remember that killing.

Q.   I'm sorry.  Do you know who Fredy Antonio Madrid was?

A.   No, I don't remember.

Q.   But this is what you told the government at one point, people that you were responsible for or had some sort of interaction with their deaths.

        MR. WIRSHBA:  Objection.

        THE COURT:  Yes.  You're asking a question, or what? What's your question?

Q.   You don't know who Fredy Antonio —— I'm sorry, Judge ——
Fredy Antonio Madrid.  You're the mayor of El Paraiso, and you
don't know who Fredy Antonio Madrid is who was killed in 2011?

THE COURT:  No, ask a question.  Sustained.  The
objection is sustained.

Q.   All right.  So how about Franklin Arita Mata?

THE COURT:  You're free to ask about that individual,
but you hadn't asked, to my recollection.

MR. COLON:  I'm sorry, Judge.

Q.   Fredy Antonio Madrid, were you in any way related to the
death of Fredy Antonio Madrid?

MR. WIRSHBA:  Your Honor, asked and answered.

THE COURT:  I'll let him ask it again.

Go ahead, because I don't recall.

Q.   Sir, did you have anything to do with the murder or death
of Fredy Antonio Madrid in February of 2011 in Copán?

A.   No, I don't remember.

Q.   Sorry.

How about Franklin Arita Mata in July of 2011?  Did
you have anything to do with his murder?

A.   Yes.

Q.   Can you tell the jury, what was your role in the killing of
Mr. Franklin Arita Mata?

A.   Yes.  I asked for Tony Hernandez's help to help kill
Franklin Arita because he was a rival drug trafficker in the

department of Copán, and he was also a dangerous drug trafficker, just like me too.

Q.  I think you testified about him earlier on, correct?

A.  Yes.

Q.  And I believe you testified that he did not want drugs to go through his territory, is that correct?

A.  Yes.

Q.  In fact, that territory that he controlled was, I guess, partially in Guatamala?

A.  It was in Honduras.

Q.  All right.  And the route was from Honduras into Guatamala, right?  Eventually the drugs would go from Honduras into Guatamala?

A.  Yes.

Q.  And those drugs that were coming from Honduras and going into Guatamala, that —— those drugs were really meant for El Chapo?

A.  Yes.

Q.  Right.  And that territory that he didn't want the Chapo drugs to go through were actually in a territory that you had very little control?

A.  The control was sort of split.  He had a *finca* in a village that I used to travel through, but the area was close to El Paraiso, which is where I was mayor.  So, practically, that drug trafficking territory was under my control.  But what

Franklin wanted was to expand his control of territory.

(Continued on next page)

THE COURT:  Madam interpreter, "finca" means, approximately:  Ranch?

INTERPRETER:  Yes, your Honor.

THE COURT:  Thank you very much.

BY MR. COLON:

Q.  Was that territory that Arita controlled Zeta territory, Z-E-T-A?

A.  No.

Q.  Isn't it a fact that the reason he didn't want those drugs to come through your territory and go into Guatemala is because the Zetas and El Chapo had conflict in that area?

A.  The Zetas' conflict was on the Honduran/Guatemalan border area that I had under my control, so they wanted control of the Izabal area, not where Franklin Arita was.

Q.  So were the Zetas -- can you explain to the jury who the Zetas were?

A.  The guy that led the Zetas in Guatemala was this guy by the name of Jairo Orellana.

Q.  Well, you agree that the Zetas and Chapo were enemies?

A.  Yes.

Q.  And that territory that was controlled by the Zetas on the Honduran/Guatemalan border, you would agree with me that that territory is not a territory that El Chapo would want to be seen in or go through; correct?

MR. WIRSHBA:  Objection.

THE COURT:  Basis?

MR. WIRSHBA:  Beyond the scope of the witness' knowledge.

THE COURT:  I will allow it.

A.  I don't understand that question, counselor.

Q.  El Chapo wanted to avoid any sort of contact with the Zetas because he knew that they would try to kill him; correct?

MR. WIRSHBA:  Objection.

THE COURT:  Basis?

MR. WIRSHBA:  Same basis, your Honor.  Calls for hearsay in addition.

THE COURT:  I will allow it.

If you know.

A.  Jairo Orellana wanted control of the border because he knew that I had control of that area both for shipments from El Chapo and my own but I was the one who had control of that area, not the Zetas.

THE COURT:  Ladies and gentlemen, we are going to take our mid-afternoon break.  Please do not discuss the case among yourselves or with anyone.  We will be back in action in about 10 minutes.

Thank you.

(Continued on next page)

(Jury not present)

THE COURT:  We are in recess.

You can take the witness.

(Recess)

THE COURT:  Before I bring the jury in, I wanted to raise a question regarding two notes that have come in from the jury.

Mr. Stabile, have you looked at the notes?

MR. STABILE:  I saw one note.  I didn't know there was a second.

THE COURT:  There are two notes.  I will read both notes.  Court Exhibit 2 is from a person who identifies themselves as juror 47:

Dear Judge Castel.  Please excuse me from jury service at this time.  I have a planned vacation cruise for my fiancée's 50th birthday from March 1 to March 12, '24.  I apologize for the inconvenience.

Court Exhibit 3 is:  Can I speak to someone about the protocol if a juror is sick?

What I propose to do is with regard to if a juror is sick, I'm going to tell the jurors that if they are unwell, they should not come in and should call.  If they are unwell and cannot come in, they should understand that the Court then has to decide whether to adjourn the trial until they are well or to excuse the juror, and if the juror is excused, they are

no longer on the jury.  But, if you are unwell, you should not come in, you could contaminate the jury and it doesn't accomplish anything worthwhile.

With regard to the planned vacation, I have consulted with the jury administrator in this district who advised me that prior to the jurors coming to this courtroom on Tuesday that she personally informed the jury array that if they were not able to serve, if they had planned vacations, that they should say so, or any other hardship reason why they couldn't serve at least for the time period in the jury notice summons or later, that they should identify themselves and she would give them a postponement.  This person did not identify themselves nor did they raise their hand in terms of questioning.

So I could do it one of two ways.  I could call the juror over to the side bar and do it at the side bar, or I could very gently say I have had a request about a vacation that would start a week from tomorrow and that, regrettably, I am not able to honor that request; it was not one that was raised when I inquired, and if it had been raised and the Court had granted the request, there would be a different juror sitting in the seat and that I am not able to accommodate that request.

Any objection from the government?

MR. WIRSHBA:  Your Honor, I believe the individual

with the cruise is an alternate; am I right about that?

THE COURT:  Yes.

Here is the thing.  I could turn around and I could say, you know what?  I'm going to wait until next Thursday and see.  By the same token, I don't think I am helping that juror out very much because if we have a run on the bank because of illness or otherwise, the answer will be no and it will sound like I said yes but I didn't say yes, I said wait and see until next Thursday.  So.

MR. WIRSHBA:  It is a very fair point.  No objection from the government, your Honor.

THE COURT:  These are not easy things to deal with.  Any objection from the defendant?

MR. STABILE:  No objection.

Can I put one other thing about jurors on the record?

THE COURT:  Sure.

MR. STABILE:  Just in an abundance of caution because my conference room -- the defense conference room and the juror room look the same if you are not paying attention -- I understand why a second juror walked into our room this morning.  There was no communication, the juror walked in, saw me, I saw him, and he turned around and left.

THE COURT:  OK.  That's fine.

MR. STABILE:  But then I did the same thing.  After lunch I wasn't paying attention and I walked into the jury

O2M5her4                        Ardón - Cross

room.

THE COURT:  OK.

MR. STABILE:  I was in there for two seconds.  I did not say a word, I turned around and walked out.  But now I understand why two jurors walked into our room because you can very easily get confused.  So I am just telling the Court.

THE COURT:  Your conference room is the jury room to --

MR. STABILE:  Our conference room, the defense conference room is the jury room directly across from --

THE COURT:  I need a courtroom number.

MR. STABILE:  It is the 26B jury room.

THE COURT:  No.  That's here.  It could be 26A. That's what I am asking you.

MR. STABILE:  That's what I believe it is.

THE COURT:  One second.

(Pause)

THE COURT:  Remind me tomorrow.  I will see whether I can get signs made up.  They're a little bit fussy in this building about signage and with the wonderful wood paneling we have but I will see what I can do.

MR. STABILE:  I will pay more attention.  I am not proposing saying anything to the jurors.

THE COURT:  Thank you.  Let's bring our jury in.

(Continued on next page)

O2M5her4                        Ardón - Cross

(Jury present)

THE COURT:  Please, be seated.

Mr. Colon, you may continue.

MR. COLON:  Thank you so much, your Honor.

BY MR. COLON:

Q.  Mr. Ardón, Alexander, I think we finished talking about Franklin Arita Mata for now.  I want to go to July 2011 in Copán.  Do you know the name "Mauro Antonio," who is allegedly an associate of Franklin Arita Mata?

A.  Yes.

Q.  How about Leonel Ramos Côrdova, allegedly an associate of Franklin Arita Mata?

A.  I don't remember.

MR. COLON:  I'm sorry, Judge.  May I take a second?

(Counsel conferring)

MR. COLON:  Thank you, Judge.

BY MR. COLON:

Q.  I think you just testified that you don't know or don't recognize the name Leonel Ramos Côrdova?

A.  No, I don't remember.

Q.  So, in July 2011, you don't know whether that individual was killed along with Mr. Mata?

A.  I don't remember.

Q.  But you do know Mauro Antonio, an associate of Franklin Arita Mata; correct?

A.   I remember the name.

Q.   So, at least at one point I think you recognize here Mr. Mauro Antonio, who was an associate of Franklin Mata.  Do you recall telling the government that Mata Arita –– Franklin Arita, Mauro Antonio, an associate of his, and perhaps another individual that you do not recognize as Leonel Ramos Côrdova, that those three people were killed together?  Do you recall telling the government that?

A.   Yes, I do remember those killings, but I don't remember the names.

Q.   OK.  But you did testify that Mr. Franklin Arita Mata was, in a sense, a rival of yours?

A.   Yes.

Q.   How is it that they were killed?  Would you please tell the jury?

A.   About Franklin Arita's killing?

Q.   Franklin Arita, as well as Mauro Antonio and another individual that you don't recognize the name of.

A.   Franklin Arita was coming from a finca that he had.  He was in an armored car and he was killed with a bazooka that blew up the car that he was in.

Q.   Was that the same fate that Mr. Mauro Antonio was a recipient of?

A.   I don't remember the names, exactly.  What I do remember, all that I remember is how Franklin Arita's murder was carried

out, along with the people who were with him.

Q.  So did you provide the bazooka for that killing?  Those killings?

A.  No.

Q.  What was your role in the killing or the murder of those two individuals?

A.  The murder of Franklin Arita was due to -- you could say it was due to a fight over territory.

Q.  But what did you do, specifically?  Did you order the murder?  Did you provide the bazooka?  Did you drive anyone and set them up so they could use armor-piercing ammunition?

A.  My participation was asking Tony Hernandez for Franklin Arita's murder.

Q.  So who actually pulled the trigger on the bazooka that pierced that armored car that they were in?

A.  Tigre Bonilla knows that.

Q.  So you are blaming this on Tony Hernandez and Tigre Bonilla basically?

A.  I'm not blaming them.  The three of us were part of that homicide.

Q.  It was a conspiracy to kill Franklin Arita Mata and whoever he was with in that vehicle that day.

A.  Yes.

Q.  Thank you.

         By the way, how did you benefit from the killing of

Mr. Arita Mata?

A.   I controlled more of the border.  I controlled more land, more territory in order to make movements in drug trafficking.

Q.   So this was all about greed on your part?

A.   I wouldn't see it that way.  In the case of Franklin Arita, if I didn't have him killed, he was going to have me killed. It was him or me.

Q.   Well, when you testified earlier about Mr. Arita Mata telling you or advising you that he didn't want you to go through his territory, you didn't mention anything about him threatening you or wanting to murder you.

A.   We drug traffickers get the message.  If you are told don't come through my territory, that means don't come through or you'll die.

Q.   You didn't say anything about him threatening you when you testified on direct?

A.   No.

Q.   Why don't you tell the jury, you wanted to eliminate your competition.  That's what this was all about.

A.   Not competition, because I don't know who was buying the drugs from him.  I don't know who he sold to.  He was not competition for me.  All of this was about him wanting to have more territory, more power in the Department of Copán.

Q.   He just told you, Mr. Arita Mata, that he didn't want you going through his territory.  He didn't say anything else.

Isn't that true?

A.  Yes.

Q.  And you gained land; correct?

A.  Yes.

Q.  You gained an additional route; correct?

A.  I had always used that route.

Q.  But you had no more competition once you eliminated him.

A.  Yes.

Q.  I left one person out, Mr. Ardón, Elvin Mejia, with respect to the Franklin Arita Mata bazooka murder?

Do you recognize that name, sir?  I apologize.  Please answer.

A.  I didn't understand the question, counselor.  I apologize. Could you ask me again?

Q.  Was Elvin Mejia, or another individual that you don't recognize, part of the four people that were killed on July 2011 as a result of a bazooka attack on a vehicle?

A.  No.  I don't remember.  I don't remember.

Q.  Fair enough.

How about an individual by the name of El Sapo of the Los Grillos gang?

A.  The Los Grillos gang?

Q.  Do you know who El Sapo is?

A.  No, I don't remember.  The Los Grillos gang?  Yes.

Q.  What was your relationship with the Los Grillos gang?  Were

they your competitors?

A.   The Grillos were a gang who worked in stealing cocaine loads or money.

          MR. COLON:  I'm sorry.  Can the interpreter repeat that answer, please, your Honor?

          THE COURT:  You may.

          MR. COLON:  Thank you.

          INTERPRETER:  The Grillos were a gang who worked in stealing cocaine loads or money.

Q.   And they were from San Pedro Sula; correct?

A.   No.  I think that -- or my memory is that they are from Ceiba.

Q.   Do you remember the cousin of an individual who is a member of the Grillos being killed in October 2011?

A.   I don't remember.

Q.   Do you know if other individuals were killed that were members of the Los Grillos gang sometime in October 2011 -- and I will count -- six individuals that were members of Los Grillos gang that were killed in the month of October, 2011?  Do you have any information or any recall of that mass killing?

          What was your role --

          THE COURT:  Interpretation please, sir.

A.   Yes, I remember.  I have information about that.

Q.   OK, so what was your role, now that you remember, of the

mass killing of six individuals that were suspected members of the Los Grillos gang?

A.   That killing was ordered by the Cachiros.

Q.   So what was your role if it was ordered by the Cachiros? What was your role?

A.   I don't remember whether it was my partner who participated in that killing, Wilter Blanco.  I don't remember exactly how we conspired in those killings.

Q.   Did you tell Wilter Blanco to kill them, those six individuals?

A.   No.

Q.   What did you do to effectuate the killing of those six members of the Grillos gang?

     MR. WIRSHBA:  Objection.  Asked and answered.

     THE COURT:  Yes.  You asked that already.

Q.   Why were those six Grillos gang members killed?

A.   Because they had stolen from the Cachiros.  I don't know if they had stolen a cocaine load or if they had stolen money from them.

Q.   Can you tell the jury who the Cachiros are or what they are?

A.   Yes.

Q.   Please do so.

A.   The Cachiros are drug traffickers, just like me, but more powerful.

Q.   Did those individuals or the Grillos gang do something to you or the Cachiros, that you know of, that precipitated this killing, this mass killing?

A.   They did something to the Cachiros.

Q.   What did they do to the Cachiros?

          MR. WIRSHBA:  Objection.  Asked and answered.

          THE COURT:  I will allow you to ask it.  Go ahead.

Q.   What did they do, what did the Grillos, those six members do to the Cachiros?

A.   I don't know.  I don't know how many members were involved there with the Cachiros, but I don't know if they stole a shipment of drugs from them or money.

Q.   So the Cachiros asked you to assist in that killing or those killings of six people?

          MR. WIRSHBA:  Objection.  Asked and answered.

          THE COURT:  Yes.  I am rereading this.  I think it is. Move on, please.

BY MR. COLON:

Q.   Nevertheless, you listed those individuals or communicated to the government that you had some sort of involvement in the killing of those individuals; correct?

A.   I do not remember exactly what I told the government such a while back.

Q.   Did you get paid for this mass killing at all?

A.   The thing is that I did not kill them.  So I couldn't have

gotten paid because I did not have them killed.

Q.  Your testimony is that you didn't have anything to do with the killing of these six people?

MR. WIRSHBA:  Objection, your Honor.  That mischaracterizes the testimony.

THE COURT:  Yes.  Rephrase your question.

Q.  Did you have anything to do with the killing of these individuals?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  That's been asked and answered.

MR. COLON:  I will move on but I'm going to mention a name, if I may, Judge, to Mr. Ardón.

Q.  Alfredo Landaverde.  Do you know who that is?

A.  Yes.

Q.  Isn't it a fact that you actually conspired with other individuals to assassinate Alfredo Landaverde?

A.  Yes.

Q.  Can you tell the jury who Alfredo Landaverde was?

A.  He was someone from human rights.

Q.  Right.  He was a human rights --

THE COURT:  Whoa, whoa.  You don't say "right."

MR. COLON:  I'm sorry, Judge.

THE COURT:  You ask a question.  All right?

MR. COLON:  I'm sorry, Judge.

BY MR. COLON:

Q.  So he was a human rights activist that actually spoke about

the narcotics traffickers in Honduras; correct?

A.  Yes.

Q.  Mr. Landaverde actually released information during a

public speaking announcement in which he listed names of drug

dealers and organizations; correct?

A.  Yes.

Q.  He also revealed information and facts about corruption in

the Honduran government?

A.  Yes.

Q.  Specifically with respect to the National Police?

A.  Yes.

Q.  And other politicians that were associates or had ties to

these drug trafficking gangs like your gang?

A.  Yes.

Q.  Did you happen to see or hear the speech or the statements

by Mr. Landaverde?

A.  About me?

Q.  His speech or his presentation, not just about you, about

drug dealers, corrupt politicians.  People of that sort.

A.  On every interview Landaverde would always talk about the

government, drug traffickers, and us.

Q.  "Us" meaning yourself and your confederates?

A.  No.  I am referring to the drug traffickers in Honduras.

Q.  But did he name you specifically?

A.  I do not remember.

Q.  And what was your role, if any, in the killing of Alfredo Landaverde?

A.  I conspired with another drug trafficking group.

Q.  What drug trafficking group was that?

A.  Wilter Blanco, and I don't remember the names of the others, but there was one by the last name Mata.

        MR. COLON:  Judge, may I just have a technical break here for a second?

        THE COURT:  Sure.

        (Pause)

        MR. COLON:  Thank you, your Honor.

Q.  Mr. Landaverde was actually a prosecutor at one time; correct?

A.  Yes.

Q.  And you decided, with a number of individuals, to assassinate him?

A.  I conspired.

Q.  Were you just an individual that made the request or were you involved at all in the killing of Mr. Landaverde, the actual killing?

        MR. WIRSHBA:  Objection.  Form.

        THE COURT:  Yes; sustained as to form.

Q.  What was your role in the killing of Mr. Landaverde, specifically?

A.  I do not remember exactly whether I gave Wilter Blanco money.

Q.  Are you aware of the fact that Mr. Landaverde had been chosen to be the next anti-narcotics czar or prosecutor?

A.  No, I am not aware.

Q.  So why did you order his killing then?

MR. WIRSHBA:  Objection.  Mischaracterizes the evidence and I think asked and answered.

THE COURT:  I recall hearing the answer also.  I could recite it from memory so I think the jury heard the answer, too.

MR. COLON:  Do you want me to continue, Judge?

THE COURT:  Pardon me?  Ask a new question.

BY MR. COLON:

Q.  What was your motive in seeing that Mr. Landaverde would be eliminated?

THE COURT:  That's what I believe you asked.

MR. COLON:  May he be allowed to answer?

THE COURT:  You did not ask that and get an answer from him?

MR. COLON:  I don't believe so.

THE COURT:  All right.  Go ahead.

THE WITNESS:  Landaverde's problem was with other drug traffickers, not with me.

BY MR. COLON:

Q.  So even though he didn't have a problem with you, you decided to be a co-conspirator in his killing?

MR. WIRSHBA:  Objection.  Argumentative.

THE COURT:  Yes.  Sustained.

Was this Mr. Landaverde the individual who named names at press conferences?

THE WITNESS:  Yes.

THE COURT:  I thought you had elicited this testimony already.

MR. COLON:  I will move on.  Thank you, Judge.

BY MR. COLON:

Q.  In 2013, what do you know of a killing of someone by the name of Chino?

A.  Yes.

Q.  Do you know what El Chino's real name was?

A.  No.

Q.  What did you have, if anything, to do with his murder?

A.  Chino was the one receiving helicopters for Tony Hernandez. When Chino was arrested, Tony Hernandez and I agreed to have him murdered.

Q.  So you want to blame this on Tony Hernandez?

A.  No.

Q.  How was El Chino murdered?

A.  He was in jail.

Q.  Did you order the killing of El Chino in jail?

A.   Yes.

Q.   And who in jail killed him?

A.   I don't know.

Q.   Well, do you know whether it was a member of the MS-13?

A.   No.

Q.   Did you pay anybody to kill El Chino?

A.   It was Wilter Blanco who handled that.

Q.   And what did El Chino do for a living?

A.   He was an employee of Wilter Blanco's and an employee of mine.

Q.   So you and Wilter Blanco decided to kill one of your employees?

A.   Yes.

Q.   Why would you decide to kill one of your employees?  What did he do?

A.   He could provide information about Tony Hernandez' helicopters.

Q.   Let me move on to 2014.  An individual by the name of José Mauricio Castillo Sanabria, a/k/a "Macho Prieto," murdered in 2014 in Copán, your department.

A.   I don't remember.

Q.   Was El Macho Prieto a rival of José Mauricio Castillo Sanabria, if you know?

A.   I do not remember.

Q.   Did either José Mauricio Castillo Sanabria or anyone

related to him have anything to do with you?

A.  I do not remember.

Q.  So you don't know why he was killed?

A.  No.  No, no, no.  I don't remember.

Q.  Nevertheless, you listed that name with the government in terms of the murders?

        MR. WIRSHBA:  Objection, your Honor. Mischaracterizing testimony.

        THE COURT:  Rephrase your question, please.

Q.  You don't know what happened with respect to the murder of a rival of José Mauricio Castillo Sanabria, in other words?

A.  No, I do not remember.

Q.  But do you know who José Mauricio Castillo Sanabria is? Was?

A.  I do not remember.

Q.  How about Douglas Salguero in 2018?  Do you recognize that name?

A.  Douglas Salguero?

Q.  Yes.

A.  Yes.

Q.  What can you tell the jury about Douglas Salguero and his demise?

A.  Douglas Salguero was murdered by a drug trafficking group in El Paraiso.

        MR. COLON:  I'm sorry, Judge.  Can I hear the last

part of that interpretation?

THE COURT:  Madam interpreter, if you can do it, please.

INTERPRETER:  Douglas Salguero was murdered by a drug trafficking group in El Paraiso.

BY MR. COLON:

Q.  Well, you were the mayor of El Paraiso; correct?

A.  In 2014?

Q.  In 2018.

A.  I was not a mayor.

Q.  Can you tell the jury why you listed him on this list?

MR. WIRSHBA:  Objection, your Honor.  Referring to documents not in evidence.

THE COURT:  Yes.

MR. COLON:  I'm sorry.

THE COURT:  Rephrase your question.

BY MR. COLON:

Q.  Where did you come up with the name of Douglas Salguero?

A.  Douglas Salguero was a young man who was murdered in El Paraiso and he was dumped in Guatemala.

Q.  Why?

A.  He had problems with a man called Orlando Pinto.

Q.  Did Orlando Pinto tell you that he wanted Douglas Salguero killed?

A.  I do not remember.

Q.   In 2018, do you remember a person by the name of Brian, last name unknown, a suspected robber that was killed in Copán in 2018?

A.   I don't remember.

Q.   Sometime in 2011 to 2015 do you know of a person first name unknown, last name unknown, victim that was identified by Wilter Neptali Blanco Ruiz?  What can you tell the jury about that?

          MR. WIRSHBA:  Objection, your Honor.  Vague.

          MR. COLON:  I will rephrase, Judge.

          THE COURT:  Please.

BY MR. COLON:

Q.   Who is Wilter Neptali Blanco Ruiz?

A.   I don't remember exactly because there is a Neptali who is in jail here in the United States but I don't –– I don't know if that's the same person.  I don't remember exactly.

          MR. COLON:  Judge, can I take a second here?

          THE COURT:  Yes.

          (pause)

Q.   I just want to know, Mr. Ardón, whether you have any information on the murders of one, two, three, four, five, six –– six individuals that were somehow associated with Wilter Neptali.  I want to know that.

A.   I don't remember.

Q.   Do you know who Sergio Neftali Mejia Duarte is?

A.  No, I don't remember that name.

Q.  How about Jairo Orellana Morales.  Do you know who that is?

A.  Yes.

Q.  Who is Jairo Orellana Morales?

A.  A drug trafficker from Guatemala.

Q.  Did you have anything to do with his killing?

(Counsel conferring)

Q.  Let me correct something here, your Honor.  Rather than murders, we are going to ask him about people who were injured in the commission of a violent crime.

Do you know who Sergio Neftali Mejia Duarte is?

A.  No, I don't remember.

Q.  You don't remember a person being injured that was an intended victim in 2003?

MR. WIRSHBA:  Objection.  Form.

THE COURT:  I am going to let the question stand.  Go ahead.

A.  I don't remember.

Q.  Do you remember an individual that was injured or wounded in 2009 by Jairo Orellana Morales?  Do you recognize that name as an individual that might have been injured or wounded in 2009?

A.  All I know about Jairo Orellana is he is a drug trafficker who is in jail here in the United States.

Q.  How about the name Juan de Jesus Madrid Deras.  In 2010, do

you recall that person being injured at all or the victim of some sort of violent act?

A.  Yes.

Q.  What can you tell us about that individual?

A.  Jesus Deras was killed in Copán but I don't remember who ordered the killing.  He was a congressman.

Q.  And was his full name Juan de Jesus Madrid Deras?

A.  I just knew him as Chungo Deras.

Q.  Is this the same congressman or deputy that you testified that you allegedly bribed in order to get Juan Orlando votes in Copán?

A.  Yes.

Q.  So the man that you bribed was somebody who you tried to kill as well?

        MR. WIRSHBA:  Objection, your Honor.  Mischaracterizes the testimony.

        THE COURT:  Rephrase it.

Q.  You bribed Mr. Jesus Madrid Deras in order to obtain his vote in the Congress on behalf of Mr. Juan Orlando Hernandez; correct?

        MR. WIRSHBA:  Objection.  Asked and answered.

        THE COURT:  It is.  The question was asked:  Is this the same congressman or deputy that you testified that you allegedly bribed in order to get Juan Orlando's votes in Copán?

        Answer:  Yes.

O2M5her4                      Ardón – Cross

MR. COLON:  Thank you.

THE COURT:  That was just three questions ago.

Please.

MR. COLON:  OK.

(Counsel conferring)

BY MR. COLON:

Q.   Johnny Perez, an associate of Fredy Antonio Madrid,

February 2011; do you recognize that person having been a

victim of violence at your hands?

A.   I don't remember that name.

Q.   How about Marlon Urrutia.  He was an associate of Franklin

Arita Mata.  Do you recall that person being injured in July of

2011?

A.   I don't remember.

Q.   Can you tell this jury about someone by the name of Byron

Santos?

A.   Byron Santos?  Yes.

Q.   What can you tell the jury about that person either being

killed or injured?

THE COURT:  Can we fix a time?

MR. COLON:  It says 2011.

THE COURT:  Never mind what it says.  I am asking

you --

MR. COLON:  2011, Judge.

THE COURT:  Thank you.

A.   Byron Santos were killed by some guys who were known as Los Juventinos in Copán.

Q.   Did you have anything to do with that gang or that group that you just mentioned?

A.   No.

Q.   And I believe that you mentioned that someone killed your brother.  Was that your brother's name:  Pablo Ardón?

A.   That was an uncle of mine, Pablo.

Q.   Was the suspected murderer of Pablo Ardón, did you have anything to do with either killing that individual or injuring him in the course of some violent act?

A.   Yes.  The person who killed Uncle Pablo, I had him killed as well.

Q.   You had him killed or you killed him?

A.   I had him killed.

Q.   And do you know how he was killed?

A.   I don't remember exactly.  I just know that he was in jail.

Q.   Do you know a person by the name of Victor, last name unknown, that was killed in 2000?

A.   I don't remember.

Q.   And finally, do you recognize the name Compita?

          INTERPRETER:  May the interpreter have a spelling?

          MR. COLON:  C-O-M-P-I-T-A.

A.   Yes.

Q.   Who was Compita?

O2M5her4                          Ardón - Cross

A.   He was a man who lived in a village that was called La Laguna.

Q.   Why was he killed?

A.   He had issues with my father.  He had stolen some cattle from my father and he had hired an assassin to kill my father, Compita.

Q.   I think initially you spoke about someone threatening your family.  Was this the same person?

A.   Yes.

Q.   Was it you that killed him or someone else?

A.   It was me.

          MR. COLON:  Judge, is this a good time to stop here?

          THE COURT:  No.

          MR. COLON:  Keep on going?

          THE COURT:  Yes, please.

          MR. COLON:  Of course.

Q.   Would you define yourself as a person for hire in terms of either executing or assassinating individuals?

          MR. WIRSHBA:  Objection, your Honor.

          THE COURT:  I will allow it.

          Go ahead.

A.   No.

Q.   Nevertheless, you were requested or asked at times to eliminate or kill people that had nothing to do with you; correct?

MR. WIRSHBA:  Objection.  Argumentative.

THE COURT:  One second, please.  Rephrase your question, if you will.

Q.  Did individuals hire you to either kill or effectuate the killing of other people that had nothing to do with you?

A.  No --

Q.  I want to go --

INTERPRETER:  One moment.

MR. COLON:  I'm sorry.

A.  On occasion, in El Paraiso, regarding what happened with Byron, the Juventinos, all that they did was ask me for authorization in that conflict that they had with Byron.  But it was the Juventinos who committed it and they just asked me for permission.

Q.  So you had that much power in Paraiso that people came to you to get your blessing to kill other people?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Sustained.

Q.  People came to you to get your approval to have other people killed.  Is that not a fact?

A.  Yes.

Q.  Sometimes you got paid and sometimes you didn't?

A.  No, I was not paid.

Q.  And did you report any of these killings to the police?

A.  No.

O2M5her4                    Ardón - Cross

Q.   Why not?

A.   Because I didn't.  I didn't do that.

Q.   You were the mayor of the City of Paraiso.

A.   Yes.

Q.   You had influence with the police.

A.   Yes.

Q.   Some of the police actually worked for you in some of the crimes you committed.

A.   Yes.

THE COURT:  We have finished our workday, ladies and gentlemen, and will pick up tomorrow morning.

A few announcements.  I thought it useful to tell you what happens or just let you know what would happen if you got sick, if one of you got sick.  If you are sick, if you are feeling unwell, please call us and tell us.  At that point what I would have to do and have to decide is whether we adjourn the trial until you are well again, or to dismiss you from the jury.  This is not like in school if you miss a day of school you come back the next day and pick up and get the homework from a classmate, as I remember.  It is not like that with a jury.

The jury is present during the entirety of the trial.  Either there would be no that trial that day or you would be dismissed from the jury.  And I hope that doesn't happen.  But, certainly, you should take good care of yourselves and let us

O2M5her4                    Ardón - Cross

know if there is an illness issue.

I was also asked a question about travel plans starting March 1. Well, you will recall that on Tuesday, when we first met, which seems like a long time ago to me, the first question I asked about was substantial hardship and the like and I entertained those who sought hardships and I was not able to grant all. And I know that is not a happy circumstance for any of you to whom I was required to turn down a request. But, no request was made with regard to the event noted in the note and I regret to say that I am unable to honor the request for that reason. I can't go and pick another juror. That's just the way it is. So, I'm so sorry.

In any event, we are moving along on pace. That's the good news. We are not falling behind. I am going to see that we continue at a good pace because I value your time. You want to get back to your lives as quickly as possible. But, we want to have a fair trial here and that's my job, to see that we meet both of those goals.

So, go home, stop thinking about the trial, have a pleasant evening, and you are a wonderful jury. Keep it up tomorrow morning and I will keep pace with you if you keep pace with me. So that's all I ask.

Thank you.

(Continued on next page)

O2M5her4                        Ardón – Cross

(Jury not present)

THE COURT:  Have a very pleasant evening.  See you tomorrow morning.

MR. WIRSHBA:  Your Honor, same time tomorrow?

THE COURT:  So you should be here at 20 to 10:00 in case there is an issue that comes up and we will start with our jury at 10:00 sharp.

MR. WIRSHBA:  Yes, your Honor.

(Adjourned to February 23, 2024 at 9:40 a.m.)

INDEX OF EXAMINATION

Examination of:                                         Page

AMILCAR ALEXANDER ARDÓN SORIANO

Direct By Mr. Wirshba  . . . . . . . . . . . . 199

Direct By Mr. Wirshba  . . . . . . . . . . . . 275

Cross By Mr. Colon . . . . . . . . . . . . . . 287

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 114   . . . . . . . . . . . . . . . . . . . . . 206

 115   . . . . . . . . . . . . . . . . . . . . . 214

 365   . . . . . . . . . . . . . . . . . . . . . 216

 110 and 111   . . . . . . . . . . . . . . . . . 217

 309   . . . . . . . . . . . . . . . . . . . . . 218

 201-R62   . . . . . . . . . . . . . . . . . . . 223

 105   . . . . . . . . . . . . . . . . . . . . . 231

 359   . . . . . . . . . . . . . . . . . . . . . 235

 106   . . . . . . . . . . . . . . . . . . . . . 237

 305   . . . . . . . . . . . . . . . . . . . . . 245

 117   . . . . . . . . . . . . . . . . . . . . . 246

 102   . . . . . . . . . . . . . . . . . . . . . 248

 323   . . . . . . . . . . . . . . . . . . . . . 256

 357   . . . . . . . . . . . . . . . . . . . . . 264