O2N5her1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    CORRECTED

            v.                               15 Cr. 379 (PKC)

JUAN ORLANDO HERNANDEZ,

                                             Trial
            Defendant.

------------------------------x

                                             New York, N.Y.
                                             February 23, 2024
                                             10:00 a.m.


Before:

                    HON. P. KEVIN CASTEL,

                                        District Judge

                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  KYLE A. WIRSHBA
     JACOB GUTWILLIG
     ELINOR TARLOW
     DAVID ROBLES
     Assistant United States Attorneys

RENATO CHRISTIAN STABILE
RAYMOND L. COLON
SABRINA P. SHROFF
     Attorneys for Defendant


Also Present:
                Dagoberto Orrantia, Interpreter (Spanish)
                Sonia Berah, Interpreter (Spanish)
                Mercedes Avalos, Interpreter (Spanish)
                Evan Frierson, Interpreter (Spanish)
                Matthew Passmore, DEA Special Agent

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

O2N5her1

(Trial resumed; jury not present)

THE COURT: Please, be seated.

Mr. Stabile, you had an application?

MR. STABILE: Yes, your Honor.

With respect to a witness that will come on in the afternoon, Miguel Reynoso, he is, just to remind the Court who he is, he is a Honduran police officer who will testify about ledgers that were recovered during a traffic stop.

THE COURT: Right.

MR. STABILE: As your Honor also knows, he testified at the --

THE COURT: Yes.

MR. STABILE: There may come a point during cross that I will ask him about a prior meeting that he had with the government and some of those meetings were in preparation --

THE COURT: In connection with Tony Hernandez.

MR. STABILE: Correct. He was prepped several times in connection --

THE COURT: And you will refer to that as another case?

MR. STABILE: Well, I will just refer to it as you met with the government on this date.

THE COURT: OK.

MR. STABILE: And I would ask that the Court instruct the government that he does not give non-responsive answers and

O2N5her1

blurt out: *Yes, and I was prepping for the Tony Hernandez trial.*

THE COURT: No, you can't create the misleading impression that it was in connection with this case. So, by asking the open-ended question, it would prompt him to say not in connection with this case, or no -- assuming that you are talking about if you want to ask him the question you have to say in this case or in any other case. You can put it that way. And I will instruct the government, conversely -- you have your instruction now, Mr. Stabile -- I will instruct the government that the witness is not to refer to the name of the defendant in the other case.

MR. WIRSHBA: Understood, your Honor. We can try to get in front of that witness to do that. Obviously the witnesses have not been prepared either way on this point.

THE COURT: Right. Well, you know, it is not relevant to any issue in the case that he was prepared for the Tony Hernandez case.

MR. WIRSHBA: Understood, your Honor. We will get in front of that witness and alert.

THE COURT: Thank you.

Now I have one matter. This morning there was a message on the voicemail machine from juror no. 14 who yesterday, at 5:00, I delivered the message to the entire jury, after hearing from counsel with regard to the juror's note

O2N5her1

which I believe is Court Exhibit no. 2, that we could not honor the request to join her fiancée on a 50th birthday cruise leaving on March 1.  I think the way I said it yesterday was that one of the jurors had a plan, it was not disclosed to the jury administrator in response to questioning, it was not raised as a hardship excuse, and that was the last word I gave yesterday.  And apologized that I would not be able to honor the request.  This morning there was a message that the juror was ill; the juror called in.  I spoke personally with the juror and expressed my regret that she was not feeling well and indicated to her that I was open to adjourning the trial until Monday.  She said that would not work because she had a doctor's appointment on Monday.  I said, Well, I could adjourn it until Tuesday.  And she said I'm feeling -- I have headaches, dizziness, and nausea.  I don't think that would work.

I propose to excuse Juror 14.  Any objection from the government?

MS. TARLOW:  No, your Honor.

THE COURT:  From the defendant?

MR. COLON:  No, your Honor.

THE COURT:  Juror 14 is excused.

MR. COLON:  I'm sorry, Judge.  May I just consult?

(Counsel conferring)

MR. STABILE:  Your Honor --

O2N5her1

THE COURT:  Well, I heard from Mr. Colon.  Do you have a different view, Mr. Stabile?

MR. STABILE:  I do.

THE COURT:  Why don't you all take a vote.  You have three counsel here, see how the vote turns out and let me know.

MR. STABILE:  Your Honor, it seems like --

THE COURT:  Well, you obviously haven't, you are just going ahead.  Who speaks for the client here?

MR. COLON:  I do, but I'm concerned about what my co-counsel has to say.

THE COURT:  Well, why don't you talk to co-counsel then.

MR. COLON:  Would you allow us?

THE COURT:  Yes.

MR. COLON:  Thank you so much.

(Counsel conferring)

MR. COLON:  Your Honor, I am going to defer to my co-counsel on this.  We had a discussion, I think we fleshed out the issue, but I think he has something to say.

THE COURT:  Go ahead, Mr. Stabile.

MR. STABILE:  Based on the conversation, your Honor, just related, it seems to me, and it seems to the defense, that this juror might be malingering because she wants to go on that cruise.  It is hard, I believe it is hard for people to predict on a Friday in what condition they will be on a Tuesday and

O2N5her1

that is what this juror seems to be doing.  We believe that if this juror is allowed to leave because she is predicting illness in the future, it might send the wrong message to the other jurors.

We don't believe that there is any reason to dismiss her at this time, and my application would be if the Court adjourned until Monday, I don't know what time her doctor's appointment is, and then see how she is doing on Monday.  If she then claims that she is too sick to continue, then we would consent to dismissing the juror but at this point, today, it seems that this juror is trying to -- I am repeating myself, but that's my application.

THE COURT:  Thank you.

Let me hear from the government.

MS. TARLOW:  Yes, your Honor.

First of all, in response to defense counsel's point, there is no indication this juror has conferred with other jurors and therefore other jurors would do similar things, even assuming that he is right that this is a pretextual reason for not coming.  There are five other alternates if this juror were dismissed and the government believes that adjournment, therefore, is not required and not warranted under these circumstances.

THE COURT:  Thank you.

Would you like to reply, Mr. Stabile?

O2N5her1

MR. STABILE:  No.  I think I have said it all.

THE COURT:  Thank you.

I am going to excuse the juror.  I find, by the preponderance of the evidence, that it's not malingering but it is a falsehood.  The reason I come to that conclusion is because I observed the juror carefully since receiving the note.  There were no indications of any illness, there was nothing in her voice which bespoke of illness, and when asked whether it would help or whether, when I said I could adjourn it until Monday, she immediately said she had a doctor's appointment.  Now, a person who was seriously ill, I would expect, would be going to the doctor on Friday.  She didn't offer a time of the appointment.  And then I jumped immediately to Tuesday.  And she said I don't think so; I have headaches, dizziness, and nausea.  The readiness to say that indicates to me that she was being untruthful.  Juror misconduct.  And I would not think that either side would want such a juror on a panel; someone who would, and I find by the preponderance of the evidence did, speak untruthfully to the Court.  And I will not delay the trial given the conversation I had.

So, you have your appellate point, Mr. Stabile.  Good luck.

MR. STABILE:  Thank you, your Honor.

MR. COLON:  Judge, if I may?  Not on this issue.  With respect to what Mr. Stabile mentioned earlier in terms of I

O2N5her1

guess a motion *in limine*, but with respect to this particular witness, I am going to ask that the same -- your decision be applied in that if I use something in colloquy from another proceeding, the trial of Mr. Hernandez, that he not mention the trial. I can just do what you said about in another case.

THE COURT: There is an awkwardness here. He is now on cross. The government is not supposed to talk to him.

MR. WIRSHBA: Your Honor, he is also in the box.

THE COURT: And he is actually in the box here.

MR. COLON: I was about to say something before he came in but then he came in.

The bottom line is he should not mention the Tony Hernandez trial.

THE COURT: And that's an application I would have been delighted to grant in a timely fashion.

MR. COLON: We can use the same instruction that you alluded to earlier about "in another proceeding." I could use that language and keep it at that.

THE COURT: You can do that in your questions but what am I supposed to do with the witness?

MR. COLON: Instruct him not to use the words "Tony Hernandez' trial."

THE COURT: Sir, Mr. Ardón, I instruct you not to use the words "Tony Hernandez" or "Tony trial," or "Tony Hernandez trial."

O2N5her1

Do you understand?

THE WITNESS:  OK.

MR. COLON:  Thank you, your Honor.

MR. WIRSHBA:  Your Honor, if I may just clarify for the witness just to make sure that the instruction is clear because I think this has been a little confusing this morning, your Honor.

THE COURT:  I am just taking Mr. Colon at his word and I followed what he asked, but go ahead.

MR. WIRSHBA:  No, I understand, your Honor.

I think the important thing to clarify for the witness is to the extent that he is asked any questions in which a fair answer would be about the prior trial, that he is permitted to reference a prior trial, a prior proceeding.  He may be asked about that prior proceeding but that he should try his best, to the extent possible, when answering truthfully, to not reference the fact that that was the trial of Tony Hernandez in particular.  And to the extent that he gets asked a question in which that is the only true answer, that he has to answer the questions truthfully and that that is ultimately what his obligation is on the stand.

THE COURT:  Mr. Ardón, if an answer to a question would cause you to make a reference to the Tony Hernandez trial, you may say "in connection with another proceeding."

Do you understand?

O2N5her1

THE WITNESS:  Yes.

THE COURT:  All right.  And if you have any question or concern about this, you may ask to speak to the Judge about it.  All right?

THE WITNESS:  OK.

THE COURT:  Thank you.

MR. WIRSHBA:  To be clear, your Honor, I want to make sure there is nothing wrong with referencing Tony Hernandez himself.

THE COURT:  No.  This is not about Tony Hernandez, it is about a case, trial, or proceeding involving Tony Hernandez.

Do you understand, Mr. Ardón?

THE WITNESS:  Yes.

MR. WIRSHBA:  Thank you, your Honor.

THE COURT:  Bring our jurors in, please.

(Continued on next page)

(Jury present)

THE COURT:  Please, be seated.

Good morning, ladies and gentlemen.  Take your time. Please, please.  Good morning, ladies and gentlemen.  I apologize for the delay in startup, that was entirely on me.  I know one of our jurors was stuck on the no. 6 train and was good enough to somehow get a message to us.  I don't know how you did it but I appreciate that.  And then you actually did get here on time.  So I want to thank you all for your cooperation.

We are ready to proceed.  You may proceed, Mr. Colon.

MR. COLON:  Good morning, your Honor.

AMILCAR ALEXANDER ARDÓN SORIANO, resumed.

CROSS-EXAMINATION

BY MR. COLON:

Q.  Good morning, Mr. Ardón.

A.  Good morning.

Q.  I would like to continue on your cross-examination and discuss various topics with you.

THE COURT:  Oh, and Mr. Ardón, the Court reminds you that you are still under oath.

THE WITNESS:  Yes.

THE COURT:  Thank you.

Q.  You testified that you had a meeting in San Pedro Sula in 2019 at the National Party headquarters; correct?

A.  Not in 2019.  2009.

Q.  Did I say '19?  I'm sorry.  2019.

At that meeting that was a National Party function where everyone in the party was present, correct?

INTERPRETER:  May the question be repeated for the interpreter?  I apologize.

Q.  That 2009 national headquarters function, almost everyone in the party was present at that function; correct?

THE COURT:  Wait, wait, wait.  What year?

MR. COLON:  2009 Judge, I'm sorry.

BY MR. COLON:

Q.  Do you want me to repeat the question?

At that 2009 national headquarters function, you testified that you were there on that particular occasion; correct?

A.  Yes.

Q.  Was that the first time you had met Pepe Lobo?

A.  No.

Q.  In fact, you had met him in 2008; correct?

A.  Yes.

Q.  And that meeting took place at a heliport?

A.  The first meeting, my first meeting with Don Pepe was in 2008, was at a heliport.  That was the first private meeting that I had with Pepe Lobo.

Q.  At that meeting Pepe Lobo asked you to provide financial

O2N5her1                          Ardón - Cross

support for the National Party campaign; correct?

A.   Yes.

Q.   And for support for all the mayors of the department of Copán?

A.   Yes.

Q.   He specifically said for the mayors of Copán?

A.   For the department of Copán.

Q.   And at one point did Mr. Lobo mention Juan Orlando Hernandez at all?

A.   Yes.

Q.   And isn't it a fact that when he mentioned Juan Orlando, the only thing that Don Pepe said was that if the National Party won the elections, that he would become the president and Juan Orlando would be the president of the Congress; correct?

A.   Yes.

Q.   Now, Don Pepe Lobo, he actually asked you for an amount, a specific amount with respect to the financial support that he was seeking; correct?

A.   Yes.

Q.   And tell the jury what that amount was.

A.   $2 million.

Q.   And you provided $2 million to him; correct?

A.   Yes, I did.  I gave it to him in two payments.

Q.   Right.  Did you send someone by the name of Elias Hernandez to take those funds to him?

A.   Yes.

Q.   And that was an associate of yours; correct?

A.   He was an employee.

Q.   And so, it would be your testimony that Mr. Elias Hernandez, that he is no relation to Juan Orlando Hernandez?

A.   No.

Q.   And you know that because he said that to you; correct?

A.   I didn't understand the question, counselor.  Excuse me.

Q.   Did he tell you that he had no relationship, familial relationship with Mr. Juan Orlando Hernandez?

A.   No, because Elias is a young man who grew up in my same town of El Paraiso and I know his roots, the roots of his family.

Q.   As far as you know, those $2 million were actually taken and received by Mr. Pepe Lobo -- taken to and received by Mr. Pepe Lobo?

A.   Yes.

Q.   And in terms of a *quid pro quo*, you asked him for something; correct?

A.   Yes.

Q.   So, in other words, in exchange for that $2 million, you expected him to provide some benefits to you and/or your organization?

A.   Yes.

Q.   In fact, you asked him, if he in fact did win the

elections, you asked him to provide protection for you, number one; correct?  And specifically, protection for your drug trafficking activity?

A.  Yes.

Q.  You also requested a position for your brother Hugo Ardón in his government?

A.  Yes.

Q.  And thirdly, you asked him for paving of the highways in Florida, I guess it is close to El Paraiso Copán?

A.  Yes.

Q.  OK.  And from what you understand, he protected you and your organization in your drug trafficking activities?

A.  Yes.

Q.  And one of the ways he protected you was by not allowing an extradition law to be passed by Congress for his signature?

        MR. WIRSHBA:  Objection, your Honor.  Calls for speculation.

        THE COURT:  No.  I will allow it.

        If you know.

A.  Excuse me, counsel.  I'm sorry to ask.  Could you repeat the question?

Q.  Of course, Mr. Ardón.

        In terms of the protection with respect to your drug trafficking activities, one of the issues or one of the benefits that you wanted was that the president at the time,

Pepe Lobo, not either promote the passage of an extradition law or accede to the United States of America's request for an extradition law that would be favorable to the United States and Honduras.

MR. WIRSHBA:  Objection.

THE COURT:  Basis?

MR. WIRSHBA:  Calls for speculation, assumes facts not in evidence, and it is a compound question, your Honor.

MR. COLON:  If I may, Judge, when you finish?

THE COURT:  Yes.  Go ahead.

MR. COLON:  The government opened up the whole issue of extradition.

THE COURT:  No, no.  Ask a question that does not have compounding in it and doesn't invite speculation.

MR. COLON:  Thank you, Judge.

BY MR. COLON:

Q.  So one of the benefits that you wanted to receive from Mr. Lobo was that he not sign the extradition law.

A.  In that meeting that we had in 2008, there were no extradition orders.  The subject of extradition was not mentioned in that meeting in that year.

Q.  Well, would you have wanted Pepe Lobo to sign an extradition law?

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  You said there was no extradition law, according to you, in existence at the time?

MR. WIRSHBA:  Objection.  I don't believe that was the testimony.

THE COURT:  Yes.  That wasn't the testimony.  You can ask a question but that wasn't the testimony, so.

Q.  Did you want an extradition law passed by the Congress and signed by the president?

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  What were all the benefits that you were requesting in terms of your protection from your drug trafficking activities?

THE COURT:  At what point in time now?

Q.  From 2008, before 2008, after 2008; retroactively, or present, or in the future.

THE COURT:  Sustained.  You have to rephrase that. Ask a time period and ask a question.

BY MR. COLON:

Q.  With respect to the extradition laws and any other benefits that you wanted to receive in terms of protection, tell this jury what were the benefits of receiving protection.

THE COURT:  At what point in time?

MR. COLON:  2008.

THE COURT:  2008.

MR. WIRSHBA:  Your Honor, objection to this question.

It starts out with "respect to the extradition laws and any other benefits" but that wasn't the testimony. If he wants to ask him what were the benefits you expected to receive, that's a proper question but this mischaracterizes the testimony.

THE COURT: In 2008, sir, were there any benefits you were expecting from any government official or body relating to extradition?

THE WITNESS: In 2008, that extradition law did not exist.

THE COURT: So your answer to my question is no?

THE WITNESS: Correct. No.

BY MR. COLON:

Q. What would you want president Lobo to do on your behalf with respect to protection?

A. So that the prosecutors office, the government would not investigate me for the work that I did, drug trafficking.

Q. And that was the Honduran government; correct?

A. Yes.

Q. And that was the United States government as well?

MR. WIRSHBA: Objection, your Honor. Calls for speculation.

THE COURT: Do you understand the question, sir?

THE WITNESS: No, I don't understand it.

THE COURT: Please restate the question.

BY MR. COLON:

O2N5her1                          Ardón – Cross

Q.   Isn't it a fact that you just did not want to be arrested for your drug trafficking activity?

A.   I did not want to be arrested for my drug trafficking crimes in Honduras in those dates.

Q.   Did you want to get arrested for drug trafficking activities in the United States?

A.   No.

Q.   So you did not want to be extradited to the United States; correct?

A.   Not at that time, because that law did not exist.

Q.   And what other benefits did you expect to receive from Mr. Pepe Lobo?

A.   I wanted a position for my brother Hugo in the government, and also the pavement for the town, since the town was 19 kilometers away from the main road, it would make access easier for my drug trafficking activities and it would also benefit the poor people of the town.

Q.   You also didn't want Pepe Lobo to seize any of your or your family's properties; correct?

A.   Correct.

Q.   And your profits or your gains from this illicit activity amounted to about $200 million; correct?

          One second, Judge, if I may?

          THE COURT:  Yes.  Sure.

          (Counsel conferring)

Q.   Can you tell the jury, Mr. Ardón, in terms of property, what types of property did you acquire as a result of your drug trafficking activity?

A.   Homes, cattle ranches, fincas where coffee was cultivated and some road construction companies, vehicles; as far as I remember.

Q.   With respect to homes, were you the title owner of all those homes?

A.   Some of the houses were the property of my siblings.  Other of the houses seized in El Paraiso Copán were houses that my siblings built there on land that had been my father's for 40 years, the land where those houses were built.

Q.   I'm going to rephrase the question.

Tell the jury how many houses you either purchased, had title to, or put in the names of other people in order to avoid seizure.

INTERPRETER:  May the interpreter clarify one thing with the witness?

MR. COLON:  Ask the Judge.

THE COURT:  Yes.

(Interpreter clarifying with witness)

A.   The house where I lived, it was not seized.  I was born in that house and I built it on my father's land.  The house, it is not in anyone's name because it's been my father's land for I don't know how many years, and in fact that's the house where

my son and wife still live.

Q.  So you are telling this jury that you only had one house that you purchased?

A.  No.  I have other houses, and the fincas were what was seized.

Q.  And who is the owner of those houses on that land that you just described?

A.  The houses that were seized are the government's property, I imagine, because those fincas were taken from me.

Q.  How many houses were seized?

A.  The house called Santa Eloisa, the house on this finca called El Limon, those were the two fincas that were seized. Then the other house was my sister's, I helped them buy that house, but those were the houses that were seized.

Q.  Did you help everyone construct those houses on the farmland?

A.  The farmland where I had the houses, those houses were built by me.

Q.  And how much money did that cost you?

A.  The house at El Limon, it is a small house, I don't really remember how much it was but it didn't cost much to build.  The house on Santa Eloisa, that was about 16 million lempiras which is the equivalent of about $600,000.  It is not an exact amount but that's an approximation.

Q.  Those are the only two houses that you spent money on

O2N5her1                          Ardón – Cross

constructing?

A.   I built a house, I purchased a house in San Pedro Sula, but I sold that house.

Q.   I am interested in knowing what you purchased it for.

A.   I purchased fincas, equipment, cars.  I built houses.  I built roads.

Q.   I didn't ask you that.  I asked you that house that you said that you purchased and sold, how much did you pay for that house that you purchased in San Pedro?

A.   I paid approximately $225,000.

Q.   And what did you sell it for?

A.   I sold it for about $500,000.

Q.   So those are the only three houses that you have either constructed on or purchased; is that what you are telling the jury?

A.   As far as I can remember.

            MR. COLON:  May I take a second, Judge?

            THE COURT:  Sure.

            (Counsel conferring)

BY MR. COLON:

Q.   You also testified that you had farms; correct?

            INTERPRETER:  May the interpreter confer with her colleague, your Honor?

            THE COURT:  Pardon?

            INTERPRETER:  May the interpreter confer with her

O2N5her1                         Ardón - Cross

colleague?

THE COURT:  Yes.

(Interpreters conferring)

A.  Yes.

Q.  Can you tell the jury how many farms you purchased?

A.  About four.

Q.  Were those all in Copán?

A.  Yes.

Q.  Can you tell the jury what you paid for each farm that you purchased?

A.  I paid about 3 million lempiras for the El Limon finca.  I do not know the equivalent in dollars.  Next to El Paraiso, I paid 2.5 million lempiras for a finca there.  And I don't remember how much I paid for the others.

MR. COLON:  May I take a second, Judge?

THE COURT:  Yes.

(counsel conferring)

Q.  So those are the only four farms that you purchased?

A.  As far as I can remember.

Q.  Did you buy any other farms in the names of any other individuals?

A.  No.

Q.  Did you gift any farms to other people?

A.  I helped my father once, to purchase a finca.

Q.  And what amount of money did you help your father with in

the purchase of that farm?

A.  Drug trafficking money.

Q.  Well, how much did that cost?

A.  My dad sold a finca that he had on the border in order to buy the finca in Santa Barbara.  I do not remember how much exactly it is that my dad paid for that finca, but I believe it was about $1 million.

Q.  Any other farms that you may have forgotten about?

A.  No, I don't remember.

Q.  Would you agree with me, Mr. Ardón, that 3 million lempiras or 3.5 million lempiras would be about $150,000?

INTERPRETER:  Your Honor, for the interpreter, what was the equivalent in dollars?  What was the equivalent in dollars?

THE COURT:  $150,000, your Honor.

INTERPRETER:  Thank you, your Honor.

MR. COLON:  I'm sorry.

THE COURT:  $150,000, is that what you are saying?

MR. COLON:  Yes, Judge.

A.  I don't know what the exchange rate is.

Q.  What was the exchange rate at the time?

A.  At the time it was around 18 or 17.

Q.  So you don't know what 3.5 million lempiras would be in dollars?

MR. WIRSHBA:  Asked and answered, your Honor.

THE COURT:  Sustained.

Q.  Just a few minutes ago you provided dollar amounts for some of those properties, did you not?

A.  Yes.

Q.  So you were able to calculate what it was in dollars then but you can't calculate what it is in dollars now?

MR. WIRSHBA:  Objection.

THE COURT:  Overruled.

A.  I'm very bad with math and I cannot give you an exact number.

Q.  But you sure knew how to count $200 million; correct?

A.  I had a calculator.

MR. COLON:  I'm sorry.  What was that, your Honor, that last interpretation?

THE COURT:  His testimony was -- I will ask the reporter to read it back.

(Record read)

Q.  OK.

Now along with houses and farms, how about cars?

A.  About cars?  I had about 10 cars.

Q.  Can you tell the jury what those cars were?

A.  You mean the make?

Q.  Yes, the makes.  Fords, Cadillacs, Mercedes Benz, Maseratis.  Name all the cars.

A.  Yes.  Toyota Hylux, as we call them there.  Prados land

cruisers; a Lexus; a Porsche.  I mostly had Ford Raptors.
Those are the makes that I remember.

Q.  So in that list you included automobiles as well as
work-related working vehicles?

A.  Personal work vehicles, yes.

Q.  You mentioned tractors; is that correct?  Did you mention
tractors?

A.  No.  I had farming tractors, I had cattle transportation
trucks, trucks to transport equipment.  I had cages for the
transportation of cattle.

        Those are the types of equipment that I had.

Q.  So let's start with your agricultural vehicles or something
like a tractor.  How many did you have?

A.  I had about three or four tractors.

Q.  How much were those tractors worth?

A.  A small tractor was worth about $35,000, a small John Deere
tractor.  A large tractor was worth about $70,000.

Q.  How many small tractors did you have?

A.  I don't remember because I would usually purchase and buy
the tractors.

        INTERPRETER:  Interpreter correction:  Purchase and
sell the tractors.

Q.  At the height of your tractor collection, how many tractors
did you have all together?

A.  I don't remember because some of the tractors belonged to

my dad as well.

Q.  I am interested in how many were yours.

MR. WIRSHBA:  Objection, your Honor; relevance.

THE COURT:  No, I will allow it.

INTERPRETER:  May the interpreter confer with her colleague, your Honor?

THE COURT:  You may.

(Interpreters confer)

A.  I don't remember how many, but I had tractors to mow through grass, I had tractors for bales, I had double-axle tractors that were used to tow trucks that would get stuck. Maybe some five to six tractors.

Q.  And all those tractors were paid for with drug proceeds; correct?

A.  Yes.

Q.  Besides tractors, what other sorts of vehicles did you purchase besides, let's say, personal use?

A.  I liked the Land Cruiser SUV, a Prado, and Toyota pickups. Those were the ones I would use.

Q.  I didn't ask you that, please.

How many cattle cars did you have, for instance, that were used to transport cattle?

MR. WIRSHBA:  Objection, your Honor.  That was exactly the question that was asked.

THE COURT:  One second, please.  I will allow it.

INTERPRETER:  May the interpreter have repetition?

Q.  How many cattle cars or trucks did you purchase in your lifetime?

INTERPRETER:  May the interpreter confer with the witness?

(Interpreter conferring with witness)

A.  The exact amount I don't know but I bought small trucks, Hinos, I bought larger trucks like some four to five trucks.  I don't know exactly.  I bought Isuzu trucks, Hino.

Q.  Can you tell the jury approximately how much money you spent in terms of purchasing all those trucks, cattle trucks, cattle cars?

THE COURT:  I'm going to sustain an objection.  The question was over a lifetime the witness has identified the trucks he recalls purchasing and that's his answer.  The probative value of the dollar amount over a lifetime is essentially outweighed by a prohibited factor in 403.

Next question.

BY MR. COLON:

Q.  How much drug trafficking proceeds did you use to purchase all these vehicles?  And I mean specifically those cattle trucks, cattle cars.

A.  No, I don't remember right now.

Q.  Would it be safe to say over a million dollars?

A.  I don't know.

Q.  Now, with respect to those trucks, I just wanted to ask you, or the vehicles that we were just talking about, all these trucks had different uses but let me ask you about dump trucks. Did you have any of those or purchase any of those?

A.  Yes.  In the beginning I said that I had a construction company.

Q.  Right.  So how many dump trucks -- withdrawn.

That construction company, when was that established?

A.  I don't remember because the person who knows more about that is my brother.  I am very ignorant as far as those matters of companies so I don't know.  My brother Hugo was the one who handled that.

Q.  You can't tell the jury when you became an owner, part-owner, joint owner, silent owner?

MR. WIRSHBA:  Objection.  Asked and answered, compound question, argumentative.

THE COURT:  Yes.  Sustained.

Q.  You don't remember when you became an owner of that business?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  I will allow it.

A.  As far as I remember, no, no, I was never owner of that company, my brother was the owner.

Q.  Did you invest any money into that company?

A.  Yes.  The money I invested, the money was mine.

Q.   And that money was drug proceeds money; correct?

A.   Yes.

Q.   And do you know how much you were earning a year from that construction company from 2008 on?

A.   Those earnings, I don't know how much it was per year.  My brother was the one who paid more attention to that.  I don't know.  It was my brother.

Q.   Did you share the profits of that construction company?

A.   Yes.  Hugo occasionally gave me earnings from the construction company.

Q.   Tell the jury what the amount of the earnings were.

A.   I don't remember.

Q.   Going back to the trucks, how much kilos could a dump truck take on?

A.   I had a dump truck that could only carry 400 kilos.

Q.   I believe you testified on direct that your dump --

         INTERPRETER:  Interpreter correction:  I had a dump truck that, by itself, could carry 400 kilos.

Q.   I believe you testified on direct that these dump trucks could carry like 750 to 800 kilos.

A.   I don't remember exactly, but the trucks that could carry that amount were the cattle trucks and the box trucks which could carry around 1,500 kilos.

Q.   So, which of those vehicles, a dump truck, cattle car, or a box truck, could carry the heaviest load?

A.   The truck that could carry the largest load was the box truck, and depending on how the load was arranged, it could carry a load between 1,500 to 2,000 kilos.

Q.   That's the box truck?

A.   Yes.

Q.   And the dumpster?

A.   The dump truck?  What I remember is that it was about 400 kilos.

Q.   And the cattle truck?

A.   Like, around 800 kilos.

Q.   And isn't it a fact that you used all three of those vehicles to transport cocaine at one time or another?

A.   I didn't understand the question.

Q.   Did you use the dump truck or any dump trucks to transport cocaine shipments?

A.   Yes.  Those trucks, I had a guy who was in charge of that equipment and it was exclusively and only for the transportation of drugs.  The drug transportation equipment was stored in a warehouse that we rented in San Pedro Sula and it was exclusively and only for transporting drugs.  It was around six to ten vehicles that were only used for transporting drugs because I didn't want anyone to see those trucks, I didn't want anyone to see those dump trucks because I wanted to make sure that the drugs were not stolen.  It was more secure -- interpreter correction -- that way my movements in drug

trafficking would be more safe.

Q.   And the cattle cars, you used those to transport cocaine as well?

A.   The cattle truck, the trucks that I used on the finca were only for use on the finca because, in my thinking, the trucks that I used for transporting drugs, I didn't want my employees who worked on the finca to see them.

Q.   And the box cars, did you use those to transport cocaine?

A.   The equipment that I had for transporting drugs, among that equipment, yes, there were about three box trucks.

Q.   Did you have cattle?

A.   Yes.

Q.   About how many cattle did you possess?

A.   I don't remember exactly.  I would buy and sell cattle.  At times I had around 1,000 or 1,500 animals, and during the rainy season I would sell and I would have about 400 animals.

Q.   Now, $200 million is a lot of money.  When you weren't buying houses or farms, cattle, tractors, box cars, what did you do with the rest of that money?

MR. WIRSHBA:  Objection, your Honor.  First, counsel was testifying so I ask that that be stricken.  And also -- I suppose the rest of the question is --  Your Honor, I ask that it be stricken:  "Now $200 million is a lot of money."

THE COURT:  That is stricken.  The rest of the question stands.

O2N5her1                           Ardón - Cross

INTERPRETER:  May the interpreter have a read of the amended question?

MR. COLON:  Ask the Judge.

THE COURT:  Yes.  No, not a read.  Restate the amended question.

BY MR. COLON:

Q.  What did you do with the $200 million that you testified to that you generated with your drug activity operation?

A.  I bought fincas, I bought cattle, cars, agricultural machinery, machinery for building roads, and I also invested a lot of money in politics.

Q.  When you say for building roads, explain to the jury what that means.  Paved the roads?  Did you buy the roads?

INTERPRETER:  May the interpreter confer with his colleague?

THE COURT:  Yes.

(Interpreters confer)

A.  In our country there is a lot of poverty.  I would build dirt roads for communities in order to have greater political power.

INTERPRETER:  The interpreter would like to amend the interpretation:  I would build dirt roads for poor communities so that they would vote for me.

Q.  How much money did you invest in those roads that you were building for poor communities?

A.  I don't know.

Q.  And the real reason you built those roads was in order to gain their vote?

A.  Yes.

Q.  And maintain your power position as the mayor of El Paraiso?

A.  Yes.

Q.  That was very important to your drug dealing activities, was it not?

A.  Yes.

Q.  Tell the jury why that was so important.

A.  It was important because these communities, which we call villages, would get to town on horseback or on foot, and by building them roads, then they would be able to buy a motorcycle or a car, or perhaps a bus line could be started to provide them with transportation so that they could have access to El Paraiso in case of an emergency, or for work reasons, or to buy the things that they needed in El Paraiso.

Q.  And you don't remember how much money you spent on those roads that you paved for the poor?

        INTERPRETER:  May the interpreter confer with her colleague?

        (Interpreters confer).

A.  No, I did not pave the roads.  What I did was I was building dirt roads which are built with the use of gravel from

O2N5her1                        Ardón - Cross

a river.

Q. And going back to that conversation in 2008, you asked Pepe Lobo for a position for Hugo in his administration; right?

A. Yes.

Q. And you asked him to appoint Pepe Lobo, specifically? I'm sorry. You asked him to appoint Hugo, specifically?

A. Yes.

Q. And he, in fact, appointed Hugo?

A. Yes.

Q. And that was before Juan Orlando Hernandez was president; correct?

A. Yes.

Q. So Juan Orlando Hernandez had nothing to do with Hugo's appointment; correct?

A. That was a decision made by Don Pepe, together with Juan Orlando Hernandez.

Q. What proof do you have that Juan Orlando Hernandez made that decision when he wasn't president of the Republic of Honduras?

A. Don Pepe and Juan Orlando told me that, both of them did, at the National Party's headquarters.

Q. Do you have any proof of that?

          MR. WIRSHBA: Objection. Asked and answered.

          THE COURT: One moment, please. I will sustain it on alternate grounds.

O2N5her1                        Ardón - Cross

By the way, how much more do you have, sir?

MR. COLON:  A significant amount.

THE COURT:  Can you tell me how much more,
approximately, in time?

MR. COLON:  An hour and a half.

THE COURT:  OK, ladies and gentlemen.  Let's take our
mid-morning recess.  Please do not discuss the case among
yourselves or with anyone else.  We will be back in action in
10 minutes.

(Continued on next page)

O2N5her1                          Ardón - Cross

(Jury not present)

THE COURT:  Mr. Colon, I'm going to ask you to tighten up the form of your questions, to tighten up your cross-examination in terms of it length, and to avoid asking questions in areas that you previously examined the witness.

MR. COLON:  Thank you.  I will, Judge.

THE COURT:  Thank you.

(Recess)

(Continued on next page)

THE COURT:  Please bring our jurors in.

(Jury present)

THE COURT:  Please be seated, everyone.

Mr. Colon, whenever you're ready.

MR. COLON:  Thank you, your Honor.

BY MR. COLON:

Q.  Mr. Ardón, moving on to the meeting in 2009 at the national headquarters of the National Party.

THE COURT:  Move the microphone closer, please.

MR. COLON:  Of course.

Q.  You met there with a bunch of individuals associated with the National Party of Honduras, correct?

A.  Yes.

Q.  And it wasn't just you and Juan Orlando and Pepe, there were hundreds of people there, correct?

A.  There were several people there.

Q.  At one time, at one point, there was a discussion between you and Pepe and —— where Pepe acknowledged that he had received the money from you, correct?

A.  Don Pepe, Juan Orlando, and I were there.

Q.  And there was a question with respect to what —— withdrawn.

When you and Pepe were discussing issues of the National Party, was there any discussion about Copán?

A.  Yes.

Q.  And Juan Orlando told you at that meeting that all that he

wanted was that the National Party mayors and candidates vote for the ticket line for all congressmen so they could have the majority within the Congress, correct?

A.  Yes.

Q.  And at that discussion, there was also a discussion or topic of Hugo being appointed a government official in Pepe's government?

A.  Yes.

Q.  In fact, Don Pepe Lobo told you that that position of director of the Fondo Vial could be given to Hugo, and that would be as highway director of Fondo Vial?

A.  Yes.

Q.  And Pepe could do that because he was the president of the republic?

MR. WIRSHBA:  Objection.  Calls for speculation, your Honor.

THE COURT:  If you know.

A.  If he won the elections, he was going to give a position to my brother.

Q.  And he, in fact, did win the election, correct?

THE INTERPRETER:  May the interpreter correct the question for the witness?

A.  Yes, he did.

Q.  And your brother was named director?

A.  Yes.

Q.  Now, with respect to a meeting that occurred, according to your testimony, at the house of Juan Orlando Hernandez in 2013, do you recall that meeting?

A.  Yes.

Q.  In fact, that wasn't just a meeting between you and Juan Orlando; there were a group of people there, correct?

A.  Yes.

Q.  In fact, it was a meeting of National Party members with respect to selecting candidates for the positions of mayors across the country?

A.  In the department of Copán.

Q.  I stand corrected, Judge.

It was just for Copán, the department?

A.  Yes.

Q.  About how many members of the National Party related to Copán were at the house?

A.  There were about four of us.

Q.  Now, Juan Orlando did not extend you an invitation personally, did he?

A.  We were invited to his personal home.  He invited us to go to his home.

Q.  He invited the group.

A.  Pineda was the campaign coordinator, and the assistant campaign coordinator was Hugo, my brother.  And Juan Orlando asked that I be at the meeting also.

Q.   Do you have any proof of that invitation?

A.   No.

Q.   Prior to that meeting at his house, had you been informed, advised from anyone in Juan Orlando's government that he did not want you to run for mayor again?

A.   Not as far as I can remember.

Q.   But you had heard that Juan Orlando did not want to support your candidacy as mayor of Copán, were you not?

         MR. WIRSHBA:  Objection.  Asked and answered.

         THE COURT:  Yes.  Sustained.

Q.   Did you have any inclination or have any knowledge at all that, before that day in Juan Orlando's house, he was not going to support your candidacy?

         MR. WIRSHBA:  Objection.  Asked and answered.

         THE COURT:  This would be someone not in the government?

         MR. COLON:  Correct.

         THE COURT:  OK.  You can ask it as to someone not in the government.  Go ahead.

BY MR. COLON:

Q.   Did anyone outside his government or prospective government when he was going to become president, did anybody else tell you, did you hear from anyone, that Juan Orlando was not going to support you in your candidacy for El Paraiso mayor?

A.   The campaign coordinator, Pineda, told me that Juan Orlando

wanted to talk with me.

Q.  Did you ask Pineda what Juan Orlando wanted to talk to you about?

A.  No.

Q.  You weren't curious that he wanted to speak to you specifically?

A.  No.

Q.  So when you came to the house, isn't it a fact that you actually intruded on Juan's private office and pushed your way into the office?

A.  No.

Q.  Isn't it a fact that the security detail assigned to Juan Orlando almost had to remove you physically?

A.  No.

Q.  So you stayed or you remained in Juan's personal office for how long?

A.  I don't remember.

Q.  But, eventually, the topic of your candidacy for mayor came up, correct?

A.  Yes.

Q.  And you did not like what Juan Orlando told you, which was he was not going to support you because he had heard about violence on your part, as well as the fact that you might be involved in narcotics trafficking in Copán?

A.  No, he did not say that.

Q.   And, in fact, you were a narcotics trafficker in Copán at the time?

A.   Yes.

Q.   And you left at the end of that conversation knowing that he was not going to support you?

A.   Yes.

Q.   But before you walked out, you turned around and said to him, "You're going to regret this decision"?

A.   No.

Q.   You were not happy that he was not going to support you for your candidacy, correct?

A.   I respected his decision, and I was not upset because he was going to continue to protect me, which is what I cared about the most, and he was going to let my brother Hugo remain in government.

Q.   Nevertheless, in 2014, once Juan Orlando became president, your father's properties were seized, correct?

A.   Yes.

Q.   That's all your father's properties, including a very big farm that he had, correct?

A.   Just one finca that my dad had.

Q.   As a result, you also lost the seat of power in El Paraiso?

A.   I was no longer mayor.

Q.   Right.  And you didn't have the influence that you had as mayor?

A.   Yes, I still did.

Q.   You mean by bribing officials?

A.   Yes.

Q.   By killing officials like a deputy from Copán by the name of Deras?

A.   I did not order that killing.

Q.   Were you involved in it at all?

A.   I don't remember.

Q.   You don't remember Mr. Deras did not feel that he should be kissing your ring as the mayor of El Paraiso?

        MR. WIRSHBA:  Objection.

        THE COURT:  Basis?

        MR. WIRSHBA:  Calls for speculation about what Mr. Deras felt.

        THE COURT:  Rephrase it, please.

Q.   Mr. Deras was not toeing the party line of Mr. Alex Ardón in Paraiso isn't that a fact?

        MR. WIRSHBA:  Objection.  Vague.

        THE COURT:  That's not the rephrasing that would result in a permissible question.  Go ahead.

        MR. COLON:  I'll withdraw that.

Q.   You had a difficult relationship with Mr. Deras?

A.   No.

Q.   But he was killed, wasn't he?

A.   Yes.

Q.  During your administration as mayor?

A.  Yes.

Q.  And we also know that after that meeting in the house of the president, your brother, Hugo Ardón, was being audited at the time, correct?

A.  No, I don't remember.

Q.  You didn't know that he was being — or you don't remember that he was being audited for misuse of public funds?

A.  No, I don't remember.

Q.  You don't remember that misuse was actually fraud and distortion with respect to contracts that were being awarded in Fondo Vial?

MR. WIRSHBA:  Objection, your Honor.  The witness has said he doesn't remember.  Now counsel just testified.

THE COURT:  Sustained.

MR. WIRSHBA:  Ask that it be stricken, your Honor.

THE COURT:  I sustained the objection to the question. The jury disregards the question.  The question is not evidence.  The jury knows how to handle it.

Go ahead, next question.

BY MR. COLON:

Q.  Do you know if Hugo was indicted for misuse of public funds in Honduras?

A.  I don't know that.

Q.  But you do know that Hugo was forced to resign?

A.   Yes.

Q.   And that was, I believe, in 2015?

A.   Yes.

Q.   While Juan Orlando was president?

A.   Yes.

Q.   And that was not consistent with what you believe the protection was that you were going to receive for bribing Pepe Lobo?

A.   I bribed both of them, Pepe Lobo and Juan Orlando.

Q.   Do you have any proof at all that you gave money to Juan Orlando?

A.   No.

Q.   I'm going to turn your attention to El Chapo.  You know who that is?

A.   Yes.

Q.   You know because you had a close relationship in terms of narcotics trafficking through Honduras and into Mexico?

A.   Yes.

          MR. COLON:  Your Honor, may I ask that we pull up ——
it's in evidence already.  It's the map of the
Honduran-Guatamalan border, basically.

          THE COURT:  Why don't you confer with counsel.

          MR. COLON:  I think it's 3.

          (Counsel confer)

BY MR. COLON:

Q.   You're very familiar with the border of Honduras and Guatamala, yes?

A.   Yes.

MR. COLON:  I want –– actually, it's the map that indicates the border of Honduras and Guatamala, not Nicaragua and Honduras.  I think it's 8.

We'll go back to 3, then.  Thank you, Judge.

BY MR. COLON:

Q.   Mr. Ardón, you're familiar with Government Exhibit 3, are you not?

A.   Yes.

Q.   Do you have any way of marking the territory between Copán and Guatamala?

A.   Yes.

Q.   Could you indicate that.  I'm sorry.

A.   (Witness complies.)

Q.   And specifically the areas of Izabal.

A.   Yes.

Q.   Is that included in that circle that you created?

A.   Approximately, because the name Izabal is not visible on the map of Guatamala.

Q.   How about Amates?

A.   Amates, Izabal, right.

MR. COLON:  Excuse me, Judge.

THE COURT:  Yes.

MR. COLON:  Your Honor, can we have Government Exhibit 5 produced for your Honor, the parties, and the witness?

THE COURT:  Say that again.

MR. COLON:  Exhibit 5, it's not to be viewed by the jury.  I want it ——

MR. WIRSHBA:  Your Honor, we're happy to facilitate that.

THE COURT:  Pardon me?

MR. WIRSHBA:  We're happy to facilitate that, your Honor.

THE COURT:  Sure.

MR. WIRSHBA:  Ms. Collins has put up the exhibit.

THE COURT:  It's up on my monitor.  What would you like to do?

MR. COLON:  I'd like to move that into evidence, your Honor.

THE COURT:  I think you maybe should ask the witness a question or something.

MR. COLON:  OK.

BY MR. COLON::

Q.  So, Mr. Ardón, can you see Exhibit 5?

A.  Yes.

Q.  Do you recognize that map to be a map of the Honduran and Guatamalan border?

A.   Yes.

Q.   Can you circle ——

THE COURT:  Whoa, whoa, whoa.

MR. COLON:  Your Honor, I move it into evidence at this point.

THE COURT:  Any objection to Exhibit 5?

MR. WIRSHBA:  No, your Honor.

THE COURT:  Received.

(Government's Exhibit 5 received in evidence)

THE COURT:  Go ahead.

BY MR. COLON::

Q.   Would you please circle, as extensively as possible, the area between around Paraiso and Los Amates.

A.   (Witness complies.)

Q.   And if one were traveling from El Paraiso to Los Amates, could you draw a line between El Paraiso and Los Amates?

A.   Yes.

Q.   Can you draw that line, please.

A.   (Witness complies.)

Q.   And in order to get from El Paraiso, Honduras, to Los Amates, Izabal, Guatamala, you'd have to cross over a river, correct?

A.   Yes.

Q.   Well, did you draw a circle?  Could you color in a circle where the river is approximately.

A.   (Witness complies.)

Q.   Is that your circle?

A.   I made a line.

Q.   Circle it.

A.   (Witness complies.)

Q.   Now, that river is called Motagua, correct?

A.   Yes.

Q.   I think the spelling would be M-a-t-a-g-u-a.  Do you recognize the name for that river?

A.   Yes.

Q.   Can you now run a line along that river from one end to the other.

A.   I don't understand.  What would that line be like?

Q.   Well, point out to the jury by drawing a line, if you can see it on the map, the Motagua River.

A.   (Witness complies.)

Q.   You just drew that line to the east, correct, to the right or the east?

A.   Yes.

Q.   Does the river run to the west, like past La Playona?

A.   The river in Playona is in Honduras and the Motagua River is in Guatamala.

Q.   Now, there's a bridge, or there was a bridge back in 2010, called the Puente Rico, P-u-e-n-t-e, R-i-c-o, right?

A.   Yes.

Q.  And can you draw a line, like, where that bridge would be connecting Honduras to Guatamala.

THE INTERPRETER:  May the interpreter confer with the witness?

THE COURT:  You may.

A.  Well, the bridge did not connect Honduras and Guatamala, because the bridge is in Guatamala.  It is not in Honduras.

Q.  So, in other words, to get to Guatamala, you have to go over the Puente Rico, correct, bridge?

A.  No, Rico belongs to Guatamala.

Q.  I see.  So — I'm sorry.

A.  The Rico bridge was damaged at the area to cross into Amates, but it is still in Guatamala.

Q.  OK.  So Amates is one of the receiving points for your drug loads heading north, correct?

A.  Yes.

Q.  So whatever you had transporting cocaine from Honduras and in Guatamala, Amates, that had to go over that bridge, the Puente Rico bridge?

A.  Yes.

Q.  Now, you testified with respect to El Chapo that you started your drug dealing activity with him in what year?

A.  My first meeting with El Chapo was around 2005.

Q.  Would it be fair to say that a good portion of your cocaine went to El Chapo?

A.   Yes.

Q.   Did he pay the best prices?

A.   Yes.

Q.   So it was very lucrative to do business with him?

A.   That was part of it.  Also, Chapo, or Chapo's people, used to tell me that if I wanted advanced payment, they would give me money in advance, if I wanted it.

Q.   Can you just tell us, in Amates —— from Amates, how the drugs travel through Guatamala?

A.   I do not know what Chapo's transportation route was like in Guatamala.

Q.   Can you draw or point to a spot on the map where Mr. Arita's drug territory was.  And please designate that with a cross —— or an X, rather.  And if you could circle it as well.

I'm sorry, did he do that yet?  I can't see on this.

A.   Yes, I did.

Q.   Could you just outline that, trace that again, please.

A.   (Witness complies.)

Q.   Now, that was in Honduras, correct?

A.   Yes.

Q.   Now can you draw a circle around the Zeta —— withdrawn.

Draw a circle around the Salgueros, the two Guatamalan nationals, their territory.

A.   (Witness complies.)

Q.   Is that a circle?  Just trace it again.  It's hard to tell.

A.   (Witness complies.)

Q.   Now, you'll agree with me that in 2010, a terrible hurricane pummeled the Honduran and Guatamalan border, as well as a significant part of Central America in 2010, correct?

A.   Yes.

Q.   Now, you're familiar with what happened because you were a resident near that river and in that area connecting Honduras and Guatamala?

A.   Yes.

Q.   And you'll agree that that bridge, the Puente Rico bridge, it was actually destroyed as a result of the Hurricane Agatha storm?

A.   Yes.

Q.   And that, basically, the only way to get from Honduras over the river to Los Amates was either swimming across the river or walking on footbridges?

A.   We had speedboats.

Q.   Right.  So either —— well, are you saying that you couldn't use footbridges as well?

A.   I don't remember.  When the bridge collapsed, we were transporting the cocaine using small speedboats to Los Amates.

Q.   I understand.  So I just want to make it clear that vehicular traffic was impossible.

A.   No, vehicles would not go through.

MR. COLON:  All right.  I'm sorry, your Honor.  We lost the map somehow, or I did.

THE COURT:  What are you asking?  Do you want it back up on the screen?

MR. COLON:  The black screen with the ——

THE COURT:  You want Government Exhibit 5 on the screen is what you're asking?

MR. COLON:  Yes, I want to keep it here, sir.

THE COURT:  Thank you.

MR. COLON:  Thank you, your Honor.

BY MR. COLON:

Q.  So you could not have vehicles traveling from El Paraiso to Los Amates?

A.  One would travel from El Paraiso to the river, and then one would cross the river by speedboat to Los Amates —— one would cross the river by speedboats.

Q.  And that's how you would transport your cocaine?

A.  Yes.  Yes, there was a finca owned by Otto Salguero where the loads would arrive to then be crossed over the river.

Q.  And you'll agree with me from 2010 until 20, let's say, 14, you had to change routes because of the destruction of that Puente Rico bridge?

A.  I continued to run the same route, except that the drugs were being crossed over by speedboat.

Q.  I understand that.

So you continued your drug dealing.  You just used boats as opposed to vehicles?

A.   To cross the river.

Q.   Right.  So between 2010 and 2014, you basically used an alternate route, and that's the riverboat that —— vessels —— seaworthy vessels —— vehicles, rather, across the river?

MR. WIRSHBA:  Objection, your Honor.  Asked and answered and a mischaracterization of testimony.

THE COURT:  Rephrase.

Q.   Between 2010 and 2014, you could only get your drugs, let's say, from El Paraiso to Amates just by riverboats or speedboats?

A.   Yes.

Q.   And that didn't stop your commerce with El Chapo?

A.   No.

Q.   But you did meet El Chapo, according to you, back in 2013 at a meeting in Copán?

A.   Yes.

THE COURT:  How much longer, Mr. Colon?

MR. COLON:  I don't even know what time it is, Judge, quite frankly.  I probably have maybe 45 minutes.  I don't know what time it is right now, but ——

THE COURT:  The time doesn't —— you should be aware of the time and your prior answer.  In any event, work down your cross-examination, get to your points, and let's move on.

BY MR. COLON:

Q. So El Chapo, according to you, arrived in El Paraiso in 2013, was it?

A. Yes.

Q. And he didn't take a boat across the river, did he?

A. No.

Q. In fact, your testimony is that he drove to El Paraiso?

A. No.

Q. There were vehicles in which he arrived with security?

A. Chapo arrived by helicopter.  His security arrived by vehicle.

Q. Do you have any pictures of his helicopter landing there?

A. No.  He would land at a location called El Mojón.

Q. And you're saying that El Chapo in 2013 landed his helicopter in Honduras?

A. Yes.

Q. You realize that El Chapo was one of the most wanted men in the world?

A. Yes.

Q. Along with Osama bin Laden, those two were the most wanted men in the world?

        MR. WIRSHBA:  Objection, your Honor.

        THE COURT:  Sustained.

Q. And El Chapo, when he came to Honduras, he went over or across Zeta territory from Guatamala, correct?

A.   I don't know where Chapo flew out of, but I do not believe that he traveled by land through Los Amates.

Q.   You don't know how he traveled from Guatamala to Honduras?

A.   I do not know what his flight plan was.

Q.   And how many helicopters were they?

A.   Only one.

Q.   Wasn't it your testimony that he had six security guards with him?

A.   I do not remember about his security, but Chapo's security was there also with Otto Salguero's and Ronald Salguero.

Q.   You realize that El Chapo had enemies in Guatamala that were willing to kill him?

A.   Yes.

          MR. WIRSHBA:  Objection, your Honor.

          THE COURT:  Overruled.

          MR. COLON:  I'm sorry, Judge, I didn't hear the answer.

A.   Yes.

Q.   And that group was the Zetas, correct?

A.   A man by the name of Jairo Orellana.

Q.   Who was aligned with the Zetas?

A.   Yes.

Q.   So he was putting himself at tremendous risk if he came from Mexico all the way to Guatamala, to Honduras?

          MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Yes, I'll sustain that.

Q.  Chapo, one of the most wanted men in the world, you're saying, made a trip from Mexico to Honduras?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  And with respect to the meeting in Honduras between yourself and El Chapo, are you saying that the Chapo brought a million dollars?

A.  Yes.

Q.  And that he gave it to Mr. Tony Hernandez?

A.  Yes.

Q.  And you don't know what Tony Hernandez did with that money, do you?

A.  No.

Q.  You didn't see any —— didn't have any observation or evidence that that money ever got to Juan Orlando Hernandez or his campaign?

THE COURT:  Strike the word "evidence," because that's not what this witness does.  Evidence is a different concept.

MR. COLON:  I'm sorry, Judge.

Q.  You had no way to prove that that money got to either the campaign or Juan Orlando?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Sustained as to "no way to prove."

Rephrase.

MR. COLON:  I'm sorry, Judge.

Q.  You had no proof ——

THE COURT:  Sustained as to "proof."

MR. WIRSHBA:  Your Honor, could we be seen at sidebar on this issue?

THE COURT:  No.

Q.  You had no indication at all that you would tell this jury that that money was received by either the campaign or Mr. Juan Orlando Hernandez?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  I'll allow it.

A.  No.

Q.  Returning to your assertion that you had to bribe three deputies or three —— three deputies of the National Party in Copán in order to get Juan Orlando elected.  You stand by that still?

MR. WIRSHBA:  Objection.  Form.

THE COURT:  Sustained.

Q.  You still stand by your statement that you had to bribe three deputies in order to get Juan Orlando elected to the president of the Congress?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  You testified that you bribed three deputies from the National Party in order to get Juan Orlando named to the

president of the Congress?

A.   Yes.

Q.   And being members of the National Party, it was their obligation to vote for a National Party candidate?

MR. WIRSHBA:   Objection, your Honor.   Vague.   Calls for speculation.

MR. COLON:   If he knows, Judge.

THE COURT:   I think the witness will understand the question, and the jury will understand the answer.   It stands.

A.   My understanding is that there were two candidates from the same party, Juan Orlando and another.

Q.   And Juan Orlando already had the majority of votes, did he not?

A.   I don't know.

Q.   He already had 71 votes.

MR. WIRSHBA:   Objection, your Honor.

THE COURT:   Yes.   Are you testifying, Mr. Colon?

Q.   How many votes did you know that either party had?

MR. WIRSHBA:   Objection, your Honor.

THE COURT:   If you know.   Do you know?

A.   I don't know.

Q.   Returning to the topic of Aristides Gonzalez and Landaverde, who you had a role in assassinating.   You had a proffer session with the government sometime in 2019, and there was a meeting in La Sabá, correct, that you were talking about

with respect to Aristedes, planning the assassination?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Sustained.  Mr. Colon, you don't make a statement and then ask a question.

MR. COLON:  I apologize.

THE COURT:  That's purporting to testify before the jury, and I'm not ⸺ I'll leave it at that.

MR. COLON:  Thank you, Judge.

Q.  You had an opportunity to meet with the prosecutors at one time, correct, with respect to the Aristedes assassination?

A.  No.

Q.  You never met with the prosecutors in June of 2019 to discuss homicides or murders that you were involved in?

MR. WIRSHBA:  Your Honor, Objection.  Vague.  I'm not sure it's clear who this witness was meeting with when he refers to "the prosecutors."

THE COURT:  If the witness understands the question, he can answer it.

A.  No, I don't understand that question.

MR. COLON:  Judge, can we ask that ⸺ may the defense have Exhibit 3510-12 depicted on the monitors, only for the Court, parties, and the witness?

THE COURT:  You understand, Mr. Colon, what the witness said is he doesn't understand the question.  Do you understand that?

MR. COLON:  I'll pose the question differently.

Q.  Do you recall a meeting with prosecutors and agents on June 19, 2019?

A.  Yes.

Q.  And do you recall that there were agents and prosecutors at that meeting?

A.  Yes.

Q.  When it came to the topic of Aristides Gonzalez and Landaverde, do you recall what you said to those prosecutors back then?

MR. WIRSHBA:  Objection, your Honor as to form, the "and/or."

THE COURT:  I did not see an "and/or" in the question.

"When it came to the topic of Aristedes Gonzalez and Landaverde, do you recall what you said to those prosecutors back then?"  Overruled.

A.  I don't remember.

Q.  Is there something that could refresh your recollection?

THE COURT:  If you'd like to show the witness something to try to refresh his recollection, you're welcome to do that.

MR. COLON:  OK.  I'd ask that 3510-12 be put on his monitor, as well as the government and the Court, but not published to the jury.

MR. WIRSHBA:  We can get you a paper copy.

MR. COLON:  I'm going to ask, your Honor, since it's a document in English, that the interpreter be allowed to interpret that which is relative to Aristides.  See if it refreshes his recollection.

THE COURT:  No, we don't do things that way, Mr. Colon.  You know that.  If you want to identify it in another manner, you may.

MR. COLON:  It's page 4 of 6, your Honor.

THE COURT:  Well, I don't know how ——

MR. COLON:  We have it ——

THE COURT:  How would the interpreter have known what you just said in the last comment, Mr. Colon?

MR. COLON:  The interpreter could look at the monitor, the portion which I'm asking that he be shown, and interpret it.  It's in a rectangular ——

THE COURT:  Now page 4 is up on the screen.  Page 1 was on the screen, sir.

MR. COLON:  I'm sorry, Judge.

THE COURT:  OK.

MR. COLON:  This is page 4.

THE COURT:  So you're asking the interpreter to read to the defendant what appears on that page but translated from the English language into the Spanish.  And at the conclusion of that, your question is:  Having read that, does it refresh your recollection on what you said to the prosecutors in

June 2019 on the subject you referenced in your prior question, is that it?

MR. COLON:  That's correct, Judge.

THE COURT:  All right.  Ladies and gentlemen, you can stand up and stretch.  The interpreter can do the interpretation.

I think I'm going to appoint a calisthenics instructor for the jury.  One of the jurors can lead the rest.  I don't know if I would advise jumping jacks.  That could get a little messy.  No situps or pushups.

All right.  The question, sir?

BY MR. COLON:

Q.  Now that the interpreter has interpreted that section for you, now do you recall or does that help you refresh your recollection as to what you said to the prosecutors on that date?

A.  Yes.

Q.  Tell the Court what you remember about what you said to the officials.

THE COURT:  No.  Take that off the screen, please.

Go ahead.

Q.  Now that you've reviewed that document or heard the interpretation from the interpreter, does that help you refresh your recollection as to what you said to them that day?

THE COURT:  He's already answered that question.

MR. COLON:  I didn't hear him, sir.

THE COURT:  All right.

Q.  So please tell ——

THE COURT:  The question was:  "Now that the interpreter has interpreted that section for you, now do you recall or does that help you refresh your recollection as to what you said to the prosecutors on that day?"  And the answer was "Yes."  And then you said:  "Tell the Court what you remember about what you said to the officials."

I'm sustaining the objection to "does that refresh your recollection as to what you said."

Q.  Does that ——

THE COURT:  And, sir, you obviously heard it because you asked the next question.

Q.  So now you remember that there was a meeting at a restaurant in La Sabá, correct?

THE COURT:  Sir, are you reading from a document?  You can ask the witness —— I told you before you started down this path that you could ask the witness what his refreshed recollection was.  You actually asked the question and then you went backwards.

So do you want to ask him what his refreshed recollection is?

Q.  What is your refreshed recollection of what you told the prosecutors that day?

A.   Who of us were at that meeting and why.

THE INTERPRETER:  May the interpreter confer?

A.   Who of us were at that meeting and why we planned that meeting.

Q.   Do you remember who was at the meeting?

A.   Yes.

Q.   Tell the jury what you remember.

A.   The Cachiros, the Valles, Hector Emilio, Neftali was there. That's all I remember.

Q.   You don't remember anybody else?

A.   I don't remember.

Q.   Do you remember if you did something to effectuate that assassination?

A.   Yes, I remember that I supported it financially.

Q.   How much was it that you supported it with?

A.   No, I don't remember.

Q.   And who did you give the money to?  Do you remember who you gave the money to?

A.   I remember that it seems to me that I gave it to Wilter Blanco.

Q.   With respect to Mr. Landaverde, do you recall if you paid any money with respect to Mr. Landaverde's assassination?

MR. WIRSHBA:  Objection, your Honor.  This was asked and answered yesterday when reviewing ——

THE COURT:  It was.  I remember.

                        Isn't that correct, Mr. Colon?

                        MR. COLON:  I think it was, Judge.  I don't know if ——

                        THE COURT:  OK.  Next question, please.

Q.   What was the amount that you paid?

                        MR. WIRSHBA:  Objection.  Same objection, your Honor.

                        THE COURT:  Yes, same ruling.

Q.   Were you concerned that Mr. Landaverde had singled you out
specifically?

                        THE INTERPRETER:  Interpreter would like to amend the
interpretation.

A.   I don't remember him having singled me out.

Q.   In 2019, was your property seized by the government of
Honduras?

A.   Yes.

Q.   And did you know that your whole family was being
investigated in 2017?

A.   No.

Q.   When did you find out that your family and you were being
investigated by Honduras for drug trafficking?

A.   Not until they seized our fincas.

Q.   In 2019?

A.   Yes.

Q.   And when did you leave Honduras from 2013 on?

                        THE COURT:  I don't understand that question either.

                        MR. COLON:  I'll withdraw it.

Q.  Did you ever leave Honduras after 2013?

A.  No.

Q.  You stayed in that country all that time until 2019?

A.  Yes.

Q.  And you stated earlier that you had a meeting at Fondo Vial with Juan Orlando Hernandez and your brother, correct?

A.  Yes.

Q.  What year was that?

A.  Around 2014, 2015.

Q.  And after you had that meeting with him, your brother resigned —— after you had that meeting with Juan Orlando at Fondo Vial, your brother resigned, correct?

A.  No, my brother resigned later.

Q.  When?

A.  On one occasion when a minister called me on behalf of the president to discuss the resignation by my brother.

Q.  Was that Roberto Ordóñez?

A.  Yes.

Q.  And why was it that you left in 2019?

A.  I surrendered in 2019.

        THE COURT:  All right.  We'll break for lunch.

        Ladies and gentlemen, please do not discuss the case among yourselves and with anyone else.

        See you back for a 2 o'clock start.  Thank you.

        Silence, please.

O2MHHER3                    Ardón Soriano – Cross

(Jury excused)

THE COURT:  We're in recess.

(Lunch recess)

A F T E R N O O N   S E S S I O N

2:05 p.m.

THE COURT:  Bring our jurors in, please.

(Jury present)

THE COURT:  Please, be seated.

Mr. Colon, you may continue.

MR. COLON:  Thank you, your Honor.

BY MR. COLON:

Q.  Mr. Ardón, before you left in 2018 for the United States, were you aware of whether or not an extradition law was passed in Honduras?

A.  Yes.

Q.  And who signed that law?

A.  Pepe Lobo.

Q.  Are you sure about that?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Yes.  That's the witness' answer.

MR. COLON:  Thank you.

Q.  The same Pepe Lobo you paid to obtain protection?

A.  Yes.

Q.  Do you know what year that was signed into effect?

A.  Around the year 2012.

Q.  With respect to Tigre Bonilla; do you know who that is?

A.  Yes.

Q.  What was his title or command in Honduras?

O2N5HER3                        Ardón - Cross

A.   He was chief of police.

Q.   And he was chief of police in Copán; correct?

A.   Yes.

Q.   He was also chief of police -- the national chief of
police; correct?

A.   Yes.

Q.   And you know that at one time he was transferred out of
Copán; correct?

A.   Yes.

Q.   And isn't it a fact that he was transferred, at your
request, by Pepe Lobo?  Yes or no, please.

A.   No.

Q.   Did you ask Pepe Lobo to transfer him from Copán?

A.   No.

Q.   When was he transferred from Copán?

A.   I do not remember the date.

        MR. COLON:  Excuse me, Judge, for a second?

        THE COURT:  Sure.

        (Counsel conferring)

Q.   With respect to your stay at the jail, any of the jails
that you have been incarcerated at, isn't it a fact that you
have been disciplined for having a sharp instrument, like a
knife?

A.   No.

Q.   You did not possess any weapons in the jail?

A.  No.

Q.  You were asked on direct whether you committed any violations in the jail in your stay here in the United States; correct?

A.  Yes.

Q.  And what were the violations?

A.  I was involved in a fight.  I have a scar because I was cut here and here.  And, I used a telephone.

Q.  Did you also have a chain with a lock on it in your possession while in the jail?

A.  No.

Q.  Your testimony is you had no weapons on you or in your possession in the jails here in the United States?

A.  No.

Q.  Did you have cell phones in your possession in the jail?

A.  Yes.

Q.  And did you know that it was unlawful for you to possess a telephone in the jail?

A.  Yes.

Q.  Was it one phone or two phones?

A.  One phone.

Q.  And you knew that was a violation of your cooperation agreement; correct?

A.  Yes.

Q.  What was the penalty for that, for the possession of those

cell phones or that cell phone, I should say.

And you said you weren't involved in a fight?

A. Yes.  I was the victim in a fight.

Q. Let me go back to the cell phone for a second.  When did you advise the U.S. Attorney's office that you had a cell phone in your possession?

A. I do not remember when I told the U.S. Attorney's office.

MR. COLON:  Sorry, Judge.

(Counsel conferring)

Q. How long did you have the telephone?

A. I do not remember.

Q. How did you get possession of the telephone?

A. These guys were renting it to me there.

Q. Did you have to pay them for that?

A. Yes.

Q. How much did you pay?

A. I was paying them $50 per hour.

Q. I'm sorry.  You don't remember how long you had it in your possession?

A. No.

Q. Who did you call?

A. My family.

Q. How many times did you call?

A. I do not remember.

Q. What did you talk about with your family?

O2N5HER3                          Ardón – Cross

A.   About how they were doing, because this was after COVID and it had been a long time since I had had communication with my family.

Q.   How is it that your phone was taken away from you?

A.   I sold that phone.

Q.   Who did you sell it to?

A.   Another inmate.

Q.   What's the inmate's name?

A.   I do not remember his name, I only knew him by his nickname.

         MR. COLON:  I'm sorry, your Honor.

         (Counsel conferring)

Q.   How much did you sell it for?

A.   4,000, I think.  $4,000 or $5,000.  I don't remember.

Q.   You are telling this jury that you sold that phone for $4,000 or $5,000?

         MR. WIRSHBA:  Objection.

         THE COURT:  Sustained.

Q.   How much did you pay for it?

         MR. WIRSHBA:  Objection.  Asked and answered.

         THE COURT:  Well, I will allow the question again.

         MR. COLON:  Should I repeat it, Judge?

         THE COURT:  No.

         Do you understand the question?

         THE WITNESS:  Yes.

O2N5HER3                      Ardón – Cross

THE COURT:  And the answer is?

THE WITNESS:  For the same amount.

BY MR. COLON:

Q.  What amount was that?

A.  About $4,000.

Q.  And did you pay that in U.S. dollars?

A.  Yes.

Q.  Did you have those dollars in your possession?

A.  No.

Q.  So how did that money get to the other individual?

A.  Through Zelle.

Q.  So you used somebody's phone or that phone to undertake a financial transaction in the jail?

A.  Yes.

Q.  Going back to the incident with the fight.  Did you say you were injured?

A.  Yes.

Q.  Was the other person injured?

A.  No.

THE COURT:  How much longer do you have, Mr. Colon?

MR. COLON:  Maybe 10 minutes.  Less.

THE COURT:  Thank you.

MR. COLON:  Thank you.

BY MR. COLON:

Q.  Isn't it a fact that you were the aggressor in that fight?

A.   I was the victim.

Q.   Now, you testified at the end of the morning session that you stayed in Honduras until 2019.  Is that what you are telling the jury?

A.   Yes.

Q.   Isn't it a fact that you actually advised prosecutors back on December 12, 2019, that you had left Honduras, in 2013, for Guatemala?

A.   I do not remember.

          MR. COLON:  Judge, may I ask, respectfully, that we post 3500 material 3510-29, and of course not for the publication to the jury but the parties and the Court and Mr. Ardón?

          THE COURT:  You may.

          MR. COLON:  My intent is to use this in order to refresh his recollection.  Now he says he doesn't remember.

          I have asked our technician here to square off or yellow highlight --

          THE COURT:  Thank you.  You have highlighted a portion on a page.  Thank you, sir.

          MR. COLON:  Right.  I think we still need one more. It is not complete though, Judge, the first couple of words are missing.

          Does the witness have that in front of him, sir?  And your Honor?

THE COURT:  He has a page that has yellow highlighting on it.

MR. COLON:  Thank you.  So I'm going to ask Mr. Ardón, I want you to -- I think we have to have that translated, your Honor.  It is a very short part of the paragraph.

THE COURT:  All right.

MR. COLON:  It is page 2 --

THE COURT:  The highlighted portion.

MR. COLON:  The highlighted portion, and I would ask to have that interpreted for him.

THE COURT:  And the question will be does that refresh your recollection that you didn't leave ah Honduras in 2019 but instead in 2013?  Is that the question?

MR. COLON:  That's right, your Honor.  Thank you.

THE COURT:  OK.  Go ahead.

INTERPRETER:  The interpreter is done, your Honor.

THE COURT:  All right.  Thank you.

BY MR. COLON:

Q.  Mr. Ardón, have you listened to the interpreter with respect to the translation?

A.  Yes.

Q.  Now, that was interpreted to you in Spanish; correct?

A.  Yes.

Q.  Right.

And does that now, having read that, having reviewed

that, does that refresh your recollection with respect to what you told either agents and/or prosecutors back on December 12, 2019, in terms of where you were after 2013?  Does that refresh your recollection now that you have had a chance to have that read to you?

MR. WIRSHBA:  Objection, your Honor, as to form.

THE COURT:  No, I'm going to allow it.

A.  I did travel to Guatemala.

Q.  Oh.  You testified earlier, in front of this jury, that you left in 2019, and all of that time before that you testified that you were in Honduras.  That's what you testified to earlier; correct?

THE COURT:  The testimony speaks for itself.  Next question.

MR. COLON:  Thank you.

Q.  And the reason why you left in 2013 was because you were afraid that Juan Orlando, having become president, was going to extradite you to the United States.

A.  I traveled to Guatemala because a finca of my father's had been seized but it had been seized in error, they were looking for a different finca.  The problem was not with me.

Q.  I didn't ask you that.  I asked you whether you were concerned or you feared that Mr. Juan Orlando Hernandez and his administration were going to extradite you to Guatemala.

THE COURT:  At what point in time, sir?

O2N5HER3                         Ardón – Cross

Q.  In 2019 -- excuse me in, 2013 when he left, sir.

A.  No.

        MR. COLON:  Sorry, your Honor.  I will take a second,
if I can.

        (Pause)

Q.  Nevertheless, you did not tell the truth earlier this
morning when you said that you had stayed the entire time in
Honduras?

A.  I traveled to Guatemala only for a couple of days.

Q.  So you lied to the jury in terms of where you went?

        MR. WIRSHBA:  Objection, your Honor.  Asked and
answered.

        THE COURT:  I will allow him to answer it.

A.  I made a mistake.

Q.  You made a mistake or you lied?

A.  No.  I made a mistake.

Q.  You realize you lied under oath.

        MR. WIRSHBA:  Objection, your Honor.

        THE COURT:  Sustained.

Q.  You had that read to you, that paragraph; correct?  And it
was interpreted to you in Spanish?

        MR. WIRSHBA:  Objection.  Asked and answered.

        THE COURT:  Sustained.

Q.  Just going back to that, to your recollection, do you
recall, after having had that read to you and interpreted for

you, that particular paragraph, that portion of that paragraph, do you recall -- does that refresh your recollection as to whether you were worried at all, in 2013 or 2014, because of Juan's government?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Overruled.

MR. COLON:  And I'm sorry, Judge, if the Court permits, perhaps the interpreter may want to, with the Court's permission, interpret that section again, if necessary?

THE COURT:  No.  It's been shown to the -- how much longer do you have?

MR. COLON:  A couple of minutes, sir.

THE COURT:  OK.

Q.  After having had that read and interpreted for you, that section of that paragraph, has that assisted you and helped you in refreshing your recollection as to whether or not or what you said about being worried?

MR. WIRSHBA:  Is this a new question, your Honor?

THE COURT:  This is a new question, I gather.

MR. WIRSHBA:  All right.

A.  No.

Q.  Does that refresh your recollection as to whether or not you told the prosecutors that you did this because your uncle's farm had been seized?

MR. WIRSHBA:  Objection.  Your Honor, the defendant

hasn't said that he doesn't remember something, so the idea that we are refreshing his recollection is not proper application of that procedure.

THE COURT:  Yes.

Did you establish that he doesn't remember whether he was worried?

BY MR. COLON:

Q.  Do you remember whether you were worried or not at the time, in 2013, when you left Guatemala?

MR. WIRSHBA:  Your Honor, that's been asked and answered and he answered he was not worried about extradition.

THE COURT:  You can ask it again.

BY MR. COLON:

Q.  Does it help you refresh your --

THE COURT:  No, no.  The question you asked a second ago.

Q.  Were you worried, in 2013, at all, so that you had to leave Honduras and go to Guatemala?

A.  No.

Q.  In fact, your father's farm had been seized; correct?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  It has been asked and answered, hasn't it, Mr. Colon?  Unless I am misremembering.  Has that been asked and answered?

MR. COLON:  My fault.  It was.

THE COURT:  Yes.

BY MR. COLON:

Q.  Mr. Ardón, do you have any records, electronic records, written records of your conversations with Juan Orlando Hernandez?

A.  No.

Q.  How about any telephone, cell phone records, electronic records of your conversations with Mr. Juan Orlando Hernandez?

A.  No.

Q.  Is anyone in any possession of any records, electronic, documental, anything of that nature that would support your testimony today?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  Did you turn over any documents to the prosecution?

A.  No.

Q.  How about any telephone records?

A.  No.

Q.  Any cell phones?

A.  No.

Q.  Any USBs?

A.  No.

Q.  Any hard drives?

A.  No.

Q.  Anything with Mr. Juan Orlando's fingerprints on it?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Sustained.

MR. COLON:  I think this is the last question, Judge.

BY MR. COLON:

Q.  Were you aware of an assassination attempt on the behalf of the Valle Valles and other drug dealers in 2012-2013?

A.  I don't remember.

Q.  How about 2014?

A.  I don't remember.

Q.  Wasn't it a fact that you helped plan an assassination attempt along with the Valle Valles against Juan Orlando Hernandez once he became president?

A.  No.

Q.  There was no assassination attempt or any assassination plan to kill Juan Orlando that you were aware of at a city or a town called La Entrada?

A.  I don't remember.

Q.  So it is possible that you were involved in such a plot and you just don't remember?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Sustained.

MR. COLON:  I don't have any further questions, Judge.

THE COURT:  Thank you.

You may redirect.

MR. WIRSHBA:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. WIRSHBA:

Q.  Mr. Ardón, do you remember being asked on cross-examination about whether you stayed in Honduras until 2019?

A.  Yes.

Q.  What year was it when you turned yourself in to U.S. authorities?

A.  2019.

Q.  Is that when you left Honduras for good?

A.  Yes.

Q.  Were you going to Guatemala as part of your regular drug trafficking activities?

A.  Yes, because my mom is from there also.  My mom is Guatemalan.

Q.  Understood.

And you testified about going to Guatemala regularly, on direct examination; right?

A.  Yes.

Q.  And you were asked about whether you were worried in 2013 or 2014 about being under investigation; is that right?  Do you remember that?

A.  Yes.

Q.  Did you return to Honduras after that trip to Guatemala?

A.  Yes.

Q.  Were you arrested in Honduras when you returned?

A.  No.

Q.  Did you meet privately with Juan Orlando Hernandez after you returned?

A.  Yes.

Q.  You were asked about a possible assassination plot by the Valle Valles.  Do you remember that?

A.  Yes.

Q.  Do you remember testifying on direct examination about how you learned about the Valle Valles' attempt to assassinate Juan Orlando Hernandez?

A.  Yes.

Q.  Who told you about that plot?

A.  Tony Hernandez.

Q.  And what, if anything, did Juan Orlando Hernandez say about that plot?

A.  Juan Orlando said that he had extradited the Valles because they had tried to kill him.

Q.  You also asked Juan Orlando Hernandez to arrest the Valles; is that right?

A.  Yes.

Q.  And then he did that; is that right?

A.  Yes.

Q.  Do you remember being asked on cross-examination about the $200 million that you made in narcotics trafficking?

A.  Yes.

Q.   Do you remember testifying that you invested part of the money into politics?

A.   Yes.

Q.   Did you invest some of that money into the campaign of Juan Orlando Hernandez?

A.   Yes.

Q.   Did you make part of that investment following your 2009 meeting with the defendant in private?

A.   Yes.

Q.   During that 2009 meeting, did you discuss the requests that you had previously made of Pepe Lobo?

A.   Yes.

Q.   Was protection from prosecution one of the things that you asked the defendant for in this 2009 meeting?

A.   Yes.

Q.   In this meeting in 2009, what did the defendant say about the protection that he would give you from prosecution?

A.   Juan Orlando told me not to worry about being investigated by the prosecutor's office.

Q.   Now, Mr. Ardón, you were asked on cross-examination about whether you had any proof that you paid bribes to Juan Orlando Hernandez.  Do you remember that?

A.   Yes.

Q.   Did you provide the bribes that you testified to?

A.   Yes.

Q.  Is your memory clear that you provided those bribes?

A.  Yes.

Q.  Do you remember being asked if you had any pictures of El Chapo at your meeting with him?

A.  No.

Q.  You don't remember when you were asked about that on cross-examination?

A.  No, no.  I don't remember, Mr. Prosecutor.

Q.  Fair to say that you don't have any pictures of El Chapo from the drug trafficking meetings that you were having with him?

A.  No.

Q.  Getting back to the money that Tony Hernandez received from El Chapo, do you remember being asked questions about that on cross-examination?

A.  Yes.

Q.  You were asked on cross-examination if you had any indication that Juan Orlando received the money from El Chapo. Do you remember being asked that question?

INTERPRETER:  Interpreter needs to correct the interpretation of the question.

A.  No.

Q.  You don't remember being asked questions on cross-examination about whether you knew that Juan Orlando received the money?

MR. COLON:  Objection.  Asked and answered.

MR. WIRSHBA:  That is all right, your Honor.  I will move on.  I withdraw the question.

THE COURT:  Sustained.  The objection is sustained.

BY MR. WIRSHBA:

Q.  Following your meeting with El Chapo and El Espiritu, what did Tony Hernandez tell you about his conversation with Juan Orlando Hernandez?

A.  He told me that Juan Orlando had said, yes, that they did need the million dollars.

Q.  Did you testify that you had a subsequent meeting with Juan Orlando Hernandez after you spoke with Tony about this and Tony accepted the money?

A.  Yes.

Q.  And at that meeting you testified that you told Juan Orlando Hernandez that Chapo's people were asking questions about extradition; right?

A.  Yes.

Q.  And when you said that, did Juan Orlando Hernandez say that he was surprised that you were talking with people that worked for El Chapo?

A.  No.

Q.  Then you testified that in that same meeting Tony Hernandez said to Juan Orlando Hernandez: *You accepted the money, the million dollars because you asked me to take it.*

Is that right?  Was that your testimony?

A.  Yes.

Q.  And did Juan Orlando Hernandez say at that meeting:  *I never authorized that?*

A.  No.

Q.  You were asked about whether or not you had cell phones in jail.  Do you remember that?

A.  Yes.

Q.  And you did; right?

A.  Yes.

Q.  And you know that you were not allowed to do that; correct?

A.  Yes.

Q.  When the government asked you about whether you possessed a cell phone in jail, did you tell the truth?

A.  Yes.

Q.  And will the judge find out about those cell phones when you are sentenced?

MR. COLON:  Objection.

THE COURT:  One second, please.  Overruled.

A.  Yes.

Q.  Do you remember being asked questions about Tigre Bonilla on cross-examination?

A.  Yes.

Q.  And you were asked whether -- you talked to Pepe Lobo about having Tigre Bonilla transferred; right?

A.   Yes.

Q.   Who was it that you spoke to about having Tigre Bonilla transferred?

A.   Juan Orlando Hernandez.

Q.   Why did you make that request of Juan Orlando Hernandez?

A.   Because he had put a mayor from Copán in jail.

Q.   And what did he put the mayor in jail for?

A.   Because he had been inebriated.

Q.   Do you remember on cross-examination when you were asked about the murders that took place while you were in Honduras that you have taken responsibility for?

A.   Yes.

Q.   Did each of those murders happen in Honduras?

A.   Yes.

Q.   Were you arrested for any of those murders in Honduras?

A.   No.

Q.   Were you ever prosecuted in Honduras for any of those murders?

A.   No.

Q.   Did some of those murders occur from 2011 to 2013?

A.   Yes.

Q.   Who was the president of the Congress of Honduras during that time?

         MR. COLON:  Objection.

         THE COURT:  Basis?

MR. COLON:  Relevance.

THE COURT:  I will allow it.

A.  Juan Orlando Hernandez.

Q.  Did others of those murders occur from 2014 to 2015?

A.  Yes.

Q.  Who was the president of Honduras at that time?

A.  It was Juan Orlando Hernandez.

Q.  And when you turned yourself in to the DEA in 2019, were you initially charged with any murders?

A.  No.

Q.  Who told the government about those murders?

A.  Mr. Prosecutor, I apologize.  I did not understand the question.

Q.  Not a problem.

Did you tell the government about those murders, Mr. Ardón?

A.  Yes.

Q.  And did you plead guilty to all of those murders?

A.  Yes.

Q.  And did you accept responsibility no matter how small your role was in the murder?

A.  Yes.

Q.  Do you remember on cross-examination you were asked about a private meeting at Juan Orlando Hernandez' house?

A.  Yes.

Q.   And was this meeting in the defendant's private office?

A.   Yes; in his house.

Q.   This is in 2014 or 2015; is that right?  Sorry, withdrawn.

          This is in 2013; is that right?

A.   Yes.

Q.   Now, when Juan Orlando asked you not to run again, what did he say about your drug trafficking?

A.   Juan Orlando told me that he would continue to protect me.

Q.   Protect you from what?

A.   For drug trafficking, that I would not be extradited.

Q.   And how did you respond when he asked you to step down?

A.   I told him that it was fine.

Q.   Why were you willing to step down?

A.   Because he told me that he would continue to protect me from the government and he also told me that Hugo would continue to be at Fondo Vial.

Q.   You said that Juan Orlando Hernandez said he would continue to protect you for your drug trafficking.  Did he also mention the reports about you in the media as being a drug trafficker?

A.   Yes.

Q.   And after he said that you are in the media as a drug trafficker and that he would protect you from prosecution by the government, did he ask you for anything?

A.   Yes.

Q.   What did he ask you for?

A.   To continue to support him in politics, financially and politically speaking.

Q.   Did you do that?

A.   Yes.

Q.   And after this meeting in which you and Juan Orlando Hernandez discussed your drug trafficking, did you have more meetings with Juan Orlando Hernandez?

A.   Yes.

Q.   And after this meeting, did you give more money to his campaign in approximately 2014 or 2015?

A.   Yes.

Q.   How much did you give?

A.   I do not remember the amount, Mr. Prosecutor.

Q.   Do you remember testifying that you gave $500,000 after meeting with Juan Orlando Hernandez?

A.   Yes, in 2016.  I apologize.  I got the year wrong.

Q.   And what did Juan Orlando agree to give you in exchange for that $500,000?

A.   Protection from the government so that I would not be extradited.

Q.   And were you ever extradited from Honduras to the United States?

A.   Yes.  No, I'm sorry.  No.  I surrendered.

Q.   OK.  So you were never extradited to the United States; is that right?

A.   Nope.

Q.   In fact, you were never arrested in Honduras; right?

A.   No, never.

MR. WIRSHBA:  Nothing further, your Honor.

THE COURT:  Thank you, Mr. Ardón.  You may step down.

MR. COLON:  Your Honor?

THE COURT:  Yes.

MR. COLON:  May I just have two questions for him?  I know it is your discretion but very short questions about the recross.  I know it is up to your discretion.

THE COURT:  Ladies and gentlemen, in a trial there is the right to a direct examination, a right to cross-examination, and a right to a redirect examination. There is no right to further examination beyond that and I'm going to deny the request.  Thank you.

Call your next witness, please.

MS. TARLOW:  The government calls Miguel Reynoso, your Honor.

MIGUEL REYNOSO,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

THE COURT:  Please be seated, state your first and last name, and spell them both.

THE WITNESS:  Miguel Reynoso.  M-I-G-U-E-L R-E-Y-N-O-S-O.

THE COURT:  Whenever you are ready, Ms. Tarlow.

MS. TARLOW:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. TARLOW:

Q.  Good afternoon, Mr. Reynoso.

A.  Good afternoon.

Q.  Where do you work?

A.  For the prosecutor's office.

Q.  In what country do you work?

A.  Honduras.

Q.  Are you assigned to any particular unit within that prosecutor's office?

A.  Yes.

Q.  Which one?

A.  The DLCN, the Dirección de Lucha Contra el Narcotráfico.

INTERPRETER:  By the interpreter:  The Office for the Fight Against Drug Trafficking.

Q.  What is your job title?

A.  Detective.

Q.  Approximately how long have you been a detective in that office?

A.  Seven years.

Q.  What are some of your job responsibilities as a detective in that office?

A.  The investigation of drug trafficking-related crimes, the

diversion of chemical components that are used to produce drugs, money laundering, and related crimes.

Q.  Now, directing your attention to June 6, 2018; were you working on that date?

A.  Yes.

Q.  What, if anything, were you instructed to do on that date?

A.  We were instructed to go to the 3rd Battalion in Naco Cortes to carry out the search of some vehicles.

Q.  Who gave you that instruction?

A.  My boss.

Q.  Did you then conduct a search of any vehicles?

A.  Yes.

Q.  You mentioned that you went to the 3rd Battalion.  What is that?

A.  It's a military base.

Q.  How many vehicles did you inspect?

A.  Three.

Q.  Did you find anything in those vehicles?

A.  Yes.

Q.  At a high level, what are some of the things that you found in those three vehicles that you searched?

A.  Guns, money, grenades, cell phones, jewelry.

          MS. TARLOW:  Ms. Collins, can you please show the Court, parties, and witness Government Exhibits 350 through 356?

Q.  Mr. Reynoso, do you see Government Exhibit 350 through 356 on your screen?

A.  Yes.

Q.  Do you recognize these?

A.  Yes.

Q.  What are they?

A.  The vehicles that were inspected and the evidence that were found in the vehicles.

Q.  Are these photographs of what you just described?

A.  Yes.

Q.  Are they fair and accurate depictions?

A.  Yes.

         MS. TARLOW:  The government offers Government's Exhibits 350 through 356.

         MR. STABILE:  No objection.

         THE COURT:  Received.

         (Government's Exhibits 350 through 356 received in evidence)

         MS. TARLOW:  Ms. Collins, please publish Government Exhibit 350.

BY MS. TARLOW:

Q.  Mr. Reynoso, what does this photograph show?

A.  The vehicles that were inspected.

Q.  Starting from the left-hand side of the photograph and moving to the right, what makes of vehicles are shown in this

photograph?

A.   Yes.   The vehicle on the left is a blue Hyundai Accent.

The one in the middle is an armored double-cab Toyota pickup.

The one on the right is a gray double-cab Volkswagen Amarok.

          MS. TARLOW:   Ms. Collins, please publish Government

Exhibit 351.

Q.   Detective Reynoso, what does this photograph show?

A.   Myself carrying out the inspection of the vehicle.

Q.   Which vehicle are you inspecting in this photograph?

A.   The Volkswagen Amarok.

Q.   Who, if anyone, had access to those three vehicles while

you were searching them?

A.   Only two more colleagues and myself.

Q.   Were those colleagues also working for the DLCN at the

time?

A.   Yes, they were colleagues of mine.

Q.   During the course of your search of the Volkswagen, did you

locate any hidden compartments?

A.   Yes.

Q.   How many hidden compartments did you locate in the

Volkswagen?

A.   Two.

Q.   Starting with the first hidden compartment, where was that

located in the Volkswagen?

A.   It was underneath the rear seat of the vehicle.

Q.  How did you initially discover that compartment?

A.  We started searching the vehicle, and in doing so, we noticed that there were certain irregularities in the vehicle, among them the floor mat, and also the fact that the seat was higher than normal.

Q.  What did you notice about the floor mat?

A.  It looked as though it had been lifted.

MS. TARLOW:  Ms. Collins, please publish Government Exhibit 352.

Q.  Detective Reynoso, what does this photograph show?

A.  Exhibit no. 1 in what was found underneath the rear seat of the vehicle.

Q.  Is this the first hidden compartment in the Volkswagen that you just testified about?

A.  Yes.

Q.  How did you access this hidden department?

A.  Through the use of tools; a metal-cutting-type of shears and a metal bar.

Q.  When you first saw this area, was it closed?

A.  Yes.

Q.  What did you then do?

A.  We used the tools and opened it up.

Q.  Can you please describe how you used the tools to open it?

A.  The tool was put in between the seat in a metal piece that is there on the side, and then we used a crowbar or a bar-type

of tool in order to break open the metal that was there.

Q.   Was this compartment sealed when you first discovered it?

A.   Yes.

Q.   Detective Reynoso, do you see the number "1" in this photograph?

A.   Yes.

Q.   Was that there when you first opened the compartment?

A.   No.  That ruler that is there and the number "1," we put those there.  It is used to identify the exhibit number and the ruler is used to show how large the evidence is.

Q.   What do you mean by to identify the exhibit number?

A.   Yes.  This is the first hidden compartment that we found so this is the first exhibit.  If later we found others we would put the no. 2 on them and so on.

          MS. TARLOW:  Ms. Collins, please zoom in on the portion of the photograph below the no. 1.

Q.   Detective Reynoso, what is depicted in this portion of the photograph?

A.   Two grenades.

Q.   How, if at all, are they packaged?

A.   Their safety or their pin is held down with adhesive tape or insulating tape.

          MS. TARLOW:  Ms. Collins, please zoom back out.

Q.   Detective Reynoso, directing your attention to the portion of the photograph above the no. 1, what is shown here?

A.   It's money.   Dollars.

Q.   How is the money packaged?

A.   It's packaged in plastic wrap we call it over there, or something similar to polypel.

Q.   Did there come a time when you counted this money?

A.   Yes.

Q.   Approximately how much money was inside this compartment?

A.   $193,220.

          MS. TARLOW:  Ms. Collins, if we could please zoom back out again?

Q.   Directing your attention, Detective Reynoso, to what is underneath the no. 1 in this picture; what is shown here?

A.   They are documents.  What is right under the no. 1 is a bag containing stenography notebooks.  There were nine regular-sized ones and two small ones, and under that were two folders containing documents, one of them had documents containing -- interpreter correction -- one document in which it was a public document in which Magdaleno Meza Funez granted -- made a grant in favor of La Quinta, and in the other there were several different documents, among those use permits and others.

Q.   Now, turning your attention to the second hidden compartment in the Volkswagen that you found, where was that compartment located?

A.   It was located in front of the passenger seat of the

vehicle in the dashboard right under where the airbag normally would be.

Q.   How were you able to access that compartment?

A.   With a switch that was found in the armored double-cab Toyota pickup vehicle.

Q.   What do you mean by a switch?

A.   It's an electronic device which when connected in the Amarok vehicle and activated, lifted the cover of the airbag.

          MS. TARLOW:  Ms. Collins, please publish Government Exhibit 353.

Q.   Detective Reynoso, what does this photograph show?

A.   It's three firearms and cell phones.

Q.   Where were the firearms and cell phones located when you first found them?

A.   There under the vehicle's air bag.

Q.   In the second hidden compartment you just described?

A.   Yes.  There.

Q.   Focusing on the middle of the three firearms in this photograph, what, if any special accessories, did it have?

A.   Yes.  It's an object, a device that is placed at the tip of the barrel of the weapon; it is commonly known as a silencer.

          MS. TARLOW:  Ms. Collins, please publish Government Exhibit 355.

Q.   Detective Reynoso, what is shown in this photograph?

A.   It is a transceiver radio, black with gray edges.  It's

Hytera brand.  It has writing on it that says "PD 609 User 08."

INTERPRETER:  Interpreter correction:  Transmitter radio.

Q.  Now turning to the Toyota that you searched, during your search of that vehicle, what, if anything, did you recover?

A.  Yes.  We found the switch that I mentioned.  We found jewelry and watches.  We found another communication radio similar to the one that I spoke about just now except that it had a different serial number, it says "User 09."

Q.  Focusing on the radio you just described, where did you find it initially in the Toyota?

A.  In the driver's seat.

MS. TARLOW:  Ms. Collins, please publish Government Exhibit 356.

Q.  Detective Reynoso, what does this photograph show?

A.  The evidence found in the vehicles.

Q.  Where was this photograph taken?

A.  In the 3rd Battalion, Naco Cortes.

Q.  Directing your attention to the bottom left of the table in this photograph, what is located there?

A.  It's the notebooks.  The bag containing the notebooks.

Q.  After you finished your search of the vehicles, where did you then go?

A.  Yes; we went to the 105th Brigade in San Pedro Sula.

Q.  What is the 105th Brigade?

A.   It's like another military base but it is also an education center of military instruction.

Q.   Did you and your colleague bring the evidence you had found in the vehicles to the 105th Brigade?

A.   Yes.

MS. TARLOW:  Ms. Collins, please show to the Court, parties, and witness what is marked for identification as Government Exhibit 319.

Q.   Detective Reynoso, do you recognize this photograph?

A.   Yes.

Q.   What does it show?

A.   The evidence found and the people arrested.

Q.   Is it a fair and accurate depiction?

A.   Yes.

MS. TARLOW:  Your Honor, the government offers Government Exhibit 319.

THE COURT:  Any objection?

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 319 received in evidence)

BY MS. TARLOW:

Q.   Detective Reynoso, you just testified this depicts the individuals arrested.  Are you referring to in June 2018?

A.   Yes.

Q.   Where was this photograph taken?

O2N5HER3                    Reynoso - Direct

A.   At the 105th Brigade, San Pedro Sula.

Q.   Directing your attention to the white table in this photograph and in particular in front of the man wearing the red shirt, what is shown there?

          MS. TARLOW:  Ms. Collins, if we could please publish Government Exhibit 319?  Sorry.

          You may proceed.

A.   Yes.  That's the bag that contained the notebooks.

Q.   Did there come a time when you left the 105th Brigade?

A.   Yes.  We went toward our office at the prosecutor's office.

Q.   What, if anything, did you transport with you?

A.   The evidence that we were just looking at.

Q.   When you returned to your office, what, if anything, did you do with the notebooks that you had seized?

A.   Yes.  We looked through them and we made photocopies of them.

Q.   Approximately how long after you completed the search of the three vehicles did you review those notebooks?

A.   Approximately -- that happened that night or in the morning of the following day.

Q.   What were you looking for when you reviewed those notebooks?

A.   Transactions relating to drugs, money laundering, and other crimes.

Q.   Did you notice any names in those notebooks?

O2N5HER3                      Reynoso - Direct

A.   Yes; several.

Q.   What are some of the names that you saw?

A.   Several were observed; among them:  Chino, Compadre, Rambo, Tony Hernandez, JOH, among others.

Q.   Focusing on "JOH" why did that stand out to you when you reviewed these notebooks?

A.   Because at that time, those were the initials of the president of Honduras.  And because of what was found and the grenades and the money, that stood out to me.

Q.   What about the name "Tony Hernandez"?

A.   Yes, that also stood out to me very much because he is a well-known politician in Honduras.

Q.   After you reviewed the notebooks, what did you and your partner next do with them?

A.   We made copies and then we packaged them.

Q.   How did you package them?

A.   Yes.  They were put in clear plastic bags, then they were sealed with tape, masking tape on all borders, and then signatures and seals were affixed on them, and then on top of the bag a sheet of paper that described the contents of the package was affixed on it.

          (Continued on next page)

BY MS. TARLOW:

Q.   Focusing on the signatures you described, where are those placed on the package?

A.   Yes, the signatures are placed along the border where the opening of the bag would be.  The opening is sealed through the use of masking tape, then the signatures are placed over that in order to be used to check and make sure that they haven't been tampered with and that the signatures are still the same.

Q.   Approximately when did you next see those notebooks?

A.   In September of 2019.

Q.   How, if at all, were the notebooks packaged at that time?

A.   Yes.  They looked the same on a general look of them.  I did not observe any signs of tampering.

Q.   Did it appear as if the bag that the notebooks were in had been opened?

A.   No.

Q.   Where did you then bring those notebooks?

A.   Here, to the Southern District of New York U.S. Attorney's Office.

Q.   Approximately when was that?

A.   In September of 2019.

        MS. TARLOW:  Your Honor, may I approach the witness?

        THE COURT:  You may.

BY MS. TARLOW:

Q.   Detective Reynoso, I've just handed you what are marked for

identification Government Exhibits 250A through 250K.  Do you recognize these?

A.   I will look.  Yes.

Q.   What are they?

A.   The notebooks that were described as part of Exhibit No. 1.

Q.   That you seized in June 2018?

A.   Yes.

Q.   Generally, how do you recognize them?

A.   Some because of their size, some because of their appearance and because of their content.

        MS. TARLOW:  Ms. Collins, please now show to the Court, parties, and witness what's marked for identification as Government Exhibit 250A-2 and 250C-2.  Ms. Collins, if you could flip through the pages.

Q.   Detective Reynoso, do you recognize these?

A.   Yes.

Q.   Are these portions of two of the notebooks you found in June 2018?

A.   Yes, they're pages from the notebooks.

        MS. TARLOW:  Your Honor, the government offers Government Exhibit 250A, 250A-2, 250C, and 250C-2.

        MR. COLON:  No objection.

        THE COURT:  Received.

        (Government's Exhibits 250A, 250A-2, 250C, and 250C-2 received in evidence)

MS. TARLOW:  Ms. Collins, can you please now publish Government Exhibit 250A-2.  Please turn to page 2.  Can you please highlight where it says "Tony Hernandez."

Ms. Collins, please now turn to page 8 of Government Exhibit 250A-2.  Can you please highlight where it says "JOH."

Ms. Collins, please now turn to page 9 of Government Exhibit 250A-2.  Please highlight where it says "JOH."

Ms. Collins, can you now please publish Government Exhibit 250C-2.  Please turn to page 2.  Can you please highlight where it says "JOH."

Your Honor, may I have a moment?

THE COURT:  Yes.

MS. TARLOW:  Nothing further, your Honor.

THE COURT:  All right.  Cross-examination.

MR. STABILE:  Thank you, Judge.

CROSS-EXAMINATION

BY MR. STABILE:

Q.  Good afternoon.

A.  Good afternoon.

Q.  You've lived in Honduras for at least 20 years of your life, right?

A.  Yes.

Q.  You were raised there, right?

A.  Yes.

Q.  And you worked there, right?

A.   Right.

Q.   You worked as a police officer, right?

A.   Yes.

Q.   You worked as a police officer for at least five years, right?

A.   Yes.

Q.   And part of the job of a police officer is to be familiar with the area you police, right?

A.   Yes.

MR. STABILE:  Andy, for the Court, counsel, and the witness only, can we have DX 25, please.

Q.   Do you see what's on your screen?

A.   Yes.

Q.   Do you recognize what that is?

A.   Yes.

Q.   What is that?

A.   It's the map of Honduras.

Q.   Is that a fair and accurate map of Honduras?

A.   Yes.

MR. STABILE:  I move the admission of DX 25.

THE COURT:  Any objection?

MS. TARLOW:  No, your Honor.

THE COURT:  Received.

(Defendant's Exhibit 25 received in evidence)

BY MR. STABILE:

Q. What area in Honduras did you work in as a police officer in — on June 6, 2018?

A. I had been assigned to the northern region of the DLCN, which included the departments of Cortés, Santa Barbara, and Yoro.

Q. On the map that's in front of you, can you circle the general area where you worked as a police officer in June of 2018.

Sorry, I think we forgot to publish that to the jury. May I publish that to the jury?

THE COURT:  You may.

MR. STABILE:  May I ask if it's on the jurors' screens, your Honor?

THE COURT:  Do you have it?  Yes.

JUROR:  It's on the screen, but there's no — like, we can't see whatever.

THE COURT:  You're not seeing squigglies on it?  All right.

THE WITNESS:  Should I do it again?

THE COURT:  Yes, please.

MR. STABILE:  I think you might have to select a highlighter along the bottom.

THE COURT:  Do you have a highlighter on the bottom there?

THE INTERPRETER:  Your Honor, may the interpreter?

MR. STABILE:  I'm told that I can do it.

THE INTERPRETER:  It is shown here on the screen of the witness.

BY MR. STABILE:

Q.  OK.  So can you see the circle I just drew, the multiple circles?

A.  No, I can't.

Q.  We'll move on.

Now, you received training as a police officer, right?

A.  Yes, as a detective.

Q.  And, by the way, were you a police officer before you became a detective, or did you become a detective right away?

A.  Only detective.

Q.  Based on your training, you know that it's important to document certain facts during a police investigation.

A.  Was that a question?

Q.  Yes.  The question is, based on your training as a police officer, you know, don't you, that it's important to document certain facts during a police investigation?  That's the question.

A.  Yes.

Q.  And when you arrest somebody, it's important to document what happens at the arrest, right?

A.  Yes.

Q.  And when you seize somebody's property, it's important to

document what happens during the seizure, right?

A.  Yes.

Q.  And when a car is stopped, based on your training and experience, you know that often the car will be searched, right?

A.  I do not understand the question.

Q.  OK.  If you search a vehicle, it's important to document where each item is found in the vehicle, right?

A.  Yes.

Q.  And it's important to document which person found each item, right?

A.  Yes.

Q.  And as a police officer, you've been trained to do these things, right?

A.  Yes, as a detective, I was trained.

Q.  Now, I think you said —— or, well, withdrawn.

You worked in the northeast region of Honduras, correct —— the northwest region of Honduras, correct?

A.  North.

Q.  And was the region you worked —— maybe you said it already, I'm sorry —— called something specific?

A.  I don't understand the question.

Q.  How many other law enforcement officers worked alongside you in the region where you worked?

A.  I do not recall.  There were several of us in the office,

but I do not recall how many.

Q.   In that northern region, you also had Honduran National Police, right?

A.   Yes, the National Police is all over Honduras.

Q.   And you also had Honduran military police, right?

A.   Yes, the military police is in several areas of Honduras. Not in as many places as the National Police, but, yes, there are many locations.

Q.   And one of those many locations is the north where you worked, right?

A.   Yes.

Q.   What year did you first become a detective?

A.   In the year of 2016.

Q.   So when this stop occurred in June of 2018, you had been a detective for two years, correct?

A.   Yes, approximately two years.

Q.   Do you know what a vetted unit is?

         THE INTERPRETER:  May the question be repeated for the interpreter, please.

Q.   Do you know what a vetted unit is, v-e-t-t-e-d?

A.   No.

Q.   Have you ever worked alongside members of U.S. law enforcement in Honduras?

A.   No.

Q.   Are you aware, based on your training and experience ——

O2MHHER4                          Reynoso - Cross

withdrawn.

Isn't it true that U.S. government entities provide intelligence to Honduran law enforcement?

MS. TARLOW:  Objection.  Relevance, your Honor.

THE COURT:  I'll sustain the objection.

Q.  During your time as a detective, have you ever stopped a vehicle based on information provided by U.S. law enforcement?

A.  Never.

Q.  Do U.S. government entities provide, based on your training and experience, training to Honduran law enforcement?

MS. TARLOW:  Objection.

THE COURT:  At what point in time?

Q.  During the time that you were a detective, from 2016 until whenever you stopped being a detective.

MS. TARLOW:  Objection based on relevance, your Honor.

THE COURT:  Sustained.

Q.  During your time working as a detective in Honduras, have you ever had any interaction with members of U.S. law enforcement?

MS. TARLOW:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  What training have you had investigating drug trafficking?

A.  We mainly receive a course in general criminal investigation, and we are also taught a course in detective work also.

THE INTERPRETER:  Interpreter correction, "detective work later."

Q.  Did you receive training —— or have you received training about interpreting drug ledgers?

A.  No.

Q.  Have you received training about how soon after obtaining evidence it should be vouchered?

A.  It's done prior to the law enforcement action that is undertaken ——

THE INTERPRETER:  Interpreter correction.

A.  That is done subsequently to the law enforcement action that is undertaken.

Q.  My question is have you received training about how quickly you should voucher evidence after it is obtained by law enforcement?

A.  There is a manual that governs us.  It's the criminal procedural manual in which ——

THE INTERPRETER:  Correction.

A.  There's a manual that governs us.  It's the criminal procedural code in which the time periods and —— in which the time periods are specified for law enforcement agents and entities to voucher the people —— to voucher the evidence and to book the people who are arrested.

Q.  OK.  So what does the manual say about the time period to voucher the evidence?

MS. TARLOW:  Objection, your Honor.  Hearsay.

THE COURT:  No, I'll allow it, if you know.

All right.  Ladies and gentlemen —— I'm sorry, go ahead.

A.  Again, there is a period of 24 hours by which time the initial hearing —— the arraignment hearing must be held, and it's in six days later the probable cause hearing must be held, at which time the evidence has to be shown.

THE COURT:  All right.  Ladies and gentlemen, we're going to take a short recess, and then we'll be back in action in ten minutes.  Thank you.

(Jury excused)

(Continued on next page)

O2MHHER4

(Jury not present)

THE COURT:  All right.  We are in recess.

MS. TARLOW:  Your Honor, may we approach for a sidebar, either now or before the jury returns?

THE COURT:  All right.  Let's do it now.

MS. TARLOW:  Thank you, your Honor.

(Continued on next page)

(Pages 459 through 461 SEALED)

(Recess)

(In open court; jurors present)

THE COURT:  Whenever you're ready, Mr. Stabile.

MR. STABILE:  Thank you, your Honor.

BY MR. STABILE:

Q.  Mr. Reynoso, how long after you obtain evidence in an investigation — withdrawn.

How long after you receive evidence in an investigation are you supposed to voucher it?

A.  That needs to be done right away.  It needs to be done as soon as possible.  It depends on the amount of evidence that you have.  And you do it in the order of the priority of the evidence.

Just as an example, in this case, we had firearms and money.  One of the priorities in this case is the firearms.  They need to be sent as soon as possible to the forensic office.

THE COURT:  Ladies and gentlemen, I want to give you an instruction at this point.  All evidence that has been received in this trial has been determined to be lawfully obtained.  Law enforcement techniques are not the concern of the jury.  They play no part in the case.  The question that you will be asked is whether or not the government has proven each element of each charged crime by proof beyond a reasonable doubt.  It's the evidence that the government has that you

consider, or the lack of evidence, and that's the basis on which you render a verdict.

Next question, Mr. Stabile.

MR. STABILE:  And, your Honor, I will move to strike the second half of his answer after the long pause.

THE COURT:  OK.  And I'll grant that.

MR. STABILE:  Thank you.

THE COURT:  Disregard the reference to firearms and money in the witness' answer.

Go ahead.

BY MR. STABILE:

Q.  When you obtain evidence like notebooks during the search of a car, according to police protocol, how quickly are you supposed to voucher it?

A.  Yes, as I said, it's in as little time as possible.  If you can, if you don't have any other evidence, then you have to do it either the same day or the next day.

Q.  You were asked on direct if you were working on June 6, 2018.  Remember that?

A.  The 6th of June?  I don't remember the question, but go ahead.

Q.  Well, you were just asked 20 minutes ago or 30 minutes ago on direct.  You don't remember being asked that?

THE COURT:  Well, wait a minute.  Wait a minute.  You asked him the question:  You were asked on direct if you were

working on June 16, 2018.  Remember that?

MR. STABILE:  I thought I said June 6.  I'm sorry.

THE COURT:  June 6, rather, 2018.  Remember that? That's what you asked him, and he answered that question already.  So asked and answered.

Q.  Were you working on June 6, 2018?

A.  Yes.

Q.  What were your duties that day?

A.  I don't remember what I had to do that day, but I was working.  I don't remember specifically what I did that day.

Q.  What shift were you working that day?

A.  We work a regular shift.  We go in at 8:00, and it depends on the hour that —— the time that we finish depends.  If we have to work during the night, we'll work during the night.

Q.  So when you said "8:00," do you mean you start at 8 a.m.?

A.  Yes.

Q.  So on June 6, 2018, at approximately 8 p.m., you remember that you were called to go to a car stop, right?

A.  Yes.

Q.  And the information —— and you went to a location where you saw three cars, right?

A.  Yes.

Q.  And the military police had stopped those cars, right?

A.  I don't know who had stopped them.  I do know that they were inside the third battalion.

Q.   Well, is the third battalion where the military police have their headquarters?

A.   Yes, there are members of the military there.

Q.   Do you know how those three cars got to that military base?

A.   No, I'm unaware of that.

Q.   And when you arrived, did you see military police?

A.   Yes, there were several military —— members of the military there.

Q.   Now, based on growing up in Honduras, has Honduras always had military police during your lifetime?

          MS. TARLOW:  Objection, your Honor.

          THE COURT:  Sustained.

Q.   When were the military police established in Honduras?

          MS. TARLOW:  Objection.

          THE COURT:  I'll allow it.  Limit your time frame.

          MR. STABILE:  Well, I'm asking him when they were established.

          THE COURT:  When did you begin working for the Honduran law enforcement, sir?

          THE WITNESS:  In 2016, I began to work for the office of the fight against drug trafficking, and this is a division of the prosecutor's office.  It's separate from the military police and the National Police.

          THE COURT:  All right.  Were the National Police in existence when you began working in 2016?

THE WITNESS:  Yes.

THE COURT:  Next question.

BY MR. STABILE:

Q.  And they were established in 2014, right?

MS. TARLOW:  Objection.

THE COURT:  Sustained.

Q.  When you arrived at the military base, how many people were being detained from the cars that were there?

A.  We arrived there, and the people who were under arrest who I saw there were ——

THE INTERPRETER:  The interpreter needs to clarify something with the witness.

A.  When we arrived ——

THE INTERPRETER:  The interpreter would like the last interpretation stricken.

A.  When we arrived there, the people who were under arrest who we saw there were there, and there were two others, I think civilians.

MR. COLON:  OK.  Can we just put up GX 350, please.

Q.  So those are the three cars that were stopped, right, on the screen?

A.  Yes.

Q.  You see the car all the way on the left?

A.  Yes.

Q.  Who is in that car?

A.   I believe there were two individuals in it.  I don't quite remember.

Q.   Male or female?

A.   I do not remember.

Q.   I guess you don't know their names?

A.   I do not remember them.

Q.   The middle car, who was in that car?

A.   When we arrived at the scene, there were no individuals in the vehicle, but the individuals who were driving the vehicles at the time of their stop were there.

Q.   In total, how many people were there who had been riding in those cars?

A.   I am unable to give you a specific number because I do not remember who was riding in what vehicles.  For instance, I do not know who was riding in the Hyundai Accent.  Once again, when we got there, when I got there, the vehicles were already on-site.  But five individuals from the two pickups were arrested.

Q.   Were the drivers of the vehicles there when you got there?

A.   The people who said that they had been riding in the vehicles at the time when the vehicles were stopped were there.

Q.   So all of the people who were riding in those vehicles at the time they were stopped were there when you arrived?

A.   Yes.

Q.   And you don't remember who was riding in the middle car, do

you?

A.  But once again, I will reiterate, I did not see the individuals arrive in the vehicles.  When I arrived there, the individuals were already there, and the vehicles were already parked there as well.

Q.  OK.  So this is my last question on this.

You don't know who was riding in what car, right?

MS. TARLOW:  Objection, your Honor.  Asked and answered.

THE COURT:  Yes, that was asked and answered quite a while ago.

MR. STABILE:  OK.

THE COURT:  Your answer is you don't know who was riding in what car, correct, sir?

THE WITNESS:  Correct.

THE COURT:  We established that quite some time ago, Mr. Stabile.

MR. STABILE:  Thank you.

BY MR. STABILE:

Q.  So all those ledgers that are sitting up there on the witness —— in the witness box, what car are they from?

A.  The notebooks were found in the vehicle that is to the right.  If you're looking at the monitor, it is the vehicle that is on the right-hand side.  It is the double-cab gray Volkswagen pickup.

Q.   When you arrived at the scene, the search had not been
conducted yet, right?

A.   No.

Q.   In fact, they called for a canine unit, right?

A.   Yes, a guide together with his dog got involved.

Q.   Well, a member of law enforcement with his dog got
involved, right?

A.   Yes, a partner of the —— within the DLCN.

Q.   And the dog alerted for the presence of something, right?

A.   Yes.

Q.   And then the cars were searched, right?

A.   It was after the alert by the dog that we found the first
hidden compartment.

Q.   And that alert by the dog happened at about 2 a.m. on
June 7, right?

A.   Yes.

Q.   So you had been there already for six hours before the
canine unit came, right?

A.   Yes.  But throughout that time, we had not yet started to
search the vehicles.

Q.   So what were you doing for six hours?

A.   We were there outside waiting for the female prosecutor to
give us the order to initiate the search.

Q.   Well, didn't you have to wait for the canine dog to alert
first?

A.   No, no, I don't think so.

Q.   So did you get the order from the prosecutor to search before or after the canine unit alerted?

          MS. TARLOW:  Objection.

          THE COURT:  Sustained.

Q.   Now, in addition to the search of this vehicle, there were other related searches that occurred on that day, right?

          MS. TARLOW:  Objection.  Relevance.

          THE COURT:  Sustained.

Q.   Did you receive, did you personally receive, information from an anonymous source regarding an individual named Nery López on June 6, 2018?

          MS. TARLOW:  Objection.

          THE COURT:  I'm going to allow it.

A.   Yes.

Q.   And did you come to learn who Nery López was?

A.   Yes.  The individual said that this individual, Nery Orlando López, known as Magdaleno Meza Fúnez, had a drug lab in La Corosa Village in Santa Rosa Minas, Quimistán, Santa Barbara.

Q.   And was that one of the people in the cars?

A.   There was an individual there who said his name was Magdaleno Meza Fúnez.

Q.   Did you ever come to learn whether or not that was his real name?

A.  No.

Q.  Is it your understanding that Magdaleno Meza is the same person as Nery López.

A.  It may be so.  In the office, some of my colleagues were doing a search in the national registry of persons and also a police database of Honduras, and there were two photos that showed similar facial features.

Q.  On June 6 or June 7, 2018, did members of law enforcement proceed to a farm owned by Nery López?

A.  My only understanding is that there was an investigative procedure done in Quimistán.

Q.  I'm sorry, where?

A.  Quimistán.

Q.  What investigative procedure was done?

A.  I do not know.  I was not involved.  As I said, that is my understanding.

Q.  Can you explain what you mean by an "investigative procedure"?

        MS. TARLOW:  Objection.

        THE COURT:  Sustained.

        MR. STABILE:  Can we please bring up for the witness and the jury GX 356, already in evidence.

Q.  On June 7, 2018, in addition to seizing evidence from those cars, were people arrested?

A.  Yes.

Q.   How many people were arrested?

A.   Five.

Q.   Who were they?

          THE INTERPRETER:  May the interpreter confer with the witness?

A.   There were several of the names that I can remember, there were Magdaleno Meza Fúnez, Erika Yulissa Bandy, Maximiliano Echeverría García, Jose Santos Lainez, and there was another one by the last Ticas.

Q.   Were these people interviewed?

A.   What do you mean by "interviewed"?  Do you mean by the media or ——

Q.   No.  Were they interviewed by members of law enforcement?

A.   No.

Q.   Did law enforcement take any statements from them?

A.   I don't think that they wanted to say anything, to talk about anything.

          MR. STABILE:  Move to strike that answer as beyond his competence.

          THE COURT:  I take it they didn't —— to the best of your knowledge, they did not make statements; is that your testimony?

          THE WITNESS:  While they were with me, no.

          THE COURT:  OK.  Next question.

BY MR. STABILE:

Q.   So can you see the photograph that is on the screen right now?

A.   Yes.

Q.   And you see in that photograph, and you testified on direct, that there were a number of cell phones that were seized from the cars, right?

A.   I don't remember having said an exact amount of — an exact number of cell phones.

Q.   Sir, looking at the photograph that's on the screen, you know that cell phones were recovered from the search of these three vehicles, right?

          MS. TARLOW:  Objection.

          THE COURT:  Overruled.

A.   Yes.

Q.   And those cell phones were searched, right?

A.   No.  At least I did not do that.

Q.   Well, do you know whether or not, as part of the investigation, these cell phones were searched?

A.   I think so.

Q.   Do you know what the results of the searches of the cell phones were?

A.   No.

Q.   And do you know if anybody in law — withdrawn.

          Was law enforcement able to identify which cell phone belonged to which person of the people arrested?

MS. TARLOW:  Objection.

THE COURT:  Basis?

MS. TARLOW:  Asked and answered.

THE COURT:  I'll allow it.  Go ahead.

A.   I have no knowledge of that.

Q.   After the search was completed at the military base, what did you then do?

A.   We went to the 105th brigade and later to our office.

THE COURT:  All right.  Do you have much more?

MR. STABILE:  It's going to go over, your Honor.

THE COURT:  How much more do you have?

MR. STABILE:  Probably an hour.  At least an hour.

THE COURT:  Ask your next question.

BY MR. STABILE:

Q.   This photograph that's on the screen, do you know what time that was taken?

A.   No, I don't remember exactly at what time it was taken, but it was in the morning.

MR. STABILE:  Can we please bring up GX 356 in evidence —— I'm sorry, no, that is 356.  GX 319 in evidence, please.

Q.   Do you recall at what time this photograph was taken?

A.   I think that it was in the afternoon hours.

Q.   And this banner that is behind the people standing in the photograph, is that —— well, withdrawn.

Q.   What is the location of where this picture is taken?

A.   The 105th Brigade San Pedro Sula.

Q.   And that's where you're stationed, right?

A.   No.

Q.   That banner that's up there in the picture, was that banner there when you arrived, or did somebody put that up just for the photo?

THE COURT:  How is that relevant, sir?

MR. STABILE:  Because, your Honor, I'm going through all of the things he did before the evidence was vouchered.

THE COURT:  All right.  I'm going to sustain the objection to that question.

Q.   Do you see on that banner ——

THE COURT:  And if it has any probative value, it is substantially outweighed by the danger of an undue waste of time.

Q.   Do you see on that banner it says in quotes "Operacíon Morazán"?  Do you see that?

A.   Yes.

Q.   What does that mean?

MS. TARLOW:  Objection, your Honor.  Relevance.

THE COURT:  I'll allow it.

A.   I don't know.  I think it's the name of a law enforcement action that they were —— that was being handled by the 105th brigade or armed forces.  I honestly don't know.

Q.  And it says "Fusina" in parentheses.  What is *fusina*?

A.  Yes.  Up above it says "Fuerza de Seguridad Interinstitucional Nacional."

MR. STABILE:  Can the translator please translate what that means in English?

THE COURT:  That's not the job of the translator, or the interpreter.

Q.  Can you explain to the jury what *fusina* is?

MS. TARLOW:  Objection.  Relevance.

MR. STABILE:  It's their exhibit.

THE COURT:  Sustained.

MR. STABILE:  Your Honor, they put the exhibit in. I'm asking questions about it.

THE COURT:  There are a lot of things in there, in the picture, that one could ask questions about, but the fact that it appears in a photograph does not make the question one that elicits relevant, probative evidence, so far as I've seen.

Next question.

BY MR. STABILE:

Q.  So when you arrived back at your headquarters with the evidence, what evidence did you have with you, you personally?

A.  We had everything that is seen on the white table.

Q.  What did you do with everything that's seen on the white table when you got back to your headquarters?

A.  We started working on it.

Q.  Well, what's the first thing you did?

A.  I believe that it was to count the money again and then, after that, I think the firearms.

THE COURT:  Ladies and gentlemen, we have finished our workweek together.  I thank you for your patience.  I think I said, I forget what day it was, I feel like I've known you most of my life.  It's even more so now.  And you have been wonderful jury.  I have a few words, though, as you leave for the weekend.  It won't take very long.

This is the time to remind you of your duties as jurors, your oath as jurors, and that is not to discuss the case with anyone.  Go home; put it out of your mind.  Monday morning will be around before you know it.  You have enough other things to think about.  Think about that.  Resist the temptation to say word one about the case to anyone.  Don't discuss it with anyone.  Don't open that door.

Be good jurors.  Be the kind of jurors you would want sitting in a case if your loved one was involved in the case or you were involved in the case.  And that means you don't fiddle around doing research, checking names, locations, looking at maps, or the like.  Not fair.  Let the evidence come out in the courtroom where both sides get to answer it.  That's the essence of fairness.  You are good jurors.  You want to be good jurors?  Do that.  Be conscientious about that.  Be proud of your service because you've done that.  Don't walk away from

this all with a guilty conscience because you didn't follow the instructions.  Follow the instructions, even when they're hard to follow.  These instructions are as hard as my asking you to get here on time, and you've done that.  So follow these other instructions.

So please have a relaxing, good weekend, and we'll be back in action for a 10 o'clock start.  The laundry, the food shopping, and everything else awaits you and awaits me too.  So have a pleasant weekend.  See you soon.

(Jury excused)

(Continued on next page)

O2MHHER4

(Jury not present)

THE COURT:  See you at 20 to 10:00 on Monday.

MS. TARLOW:  Your Honor, my apologies.  May I briefly just raise one issue with your Honor.  The government would just request the sidebars that the parties and the Court had earlier be sealed.

THE COURT:  OK.  Raquel, can you do that, please?

(Discussion off the record)

THE COURT:  Raquel, Pam, have a very good weekend.

My interpreters and the government's interpreters, please have a good weekend.

All the staff who are assisting the trial teams and the lawyers, have a good weekend.  Thank you.

MS. TARLOW:  Thank you, your Honor.

(Adjourned to February 26, 2024, at 9:40 a.m.)

INDEX OF EXAMINATION

Examination  of:                                    Page

AMILCAR ALEXANDER ARDÓN SORIANO

Cross By Mr. Colon . . . . . . . . . . . . . . . 351

Redirect By Mr. Wirshba . . . . . . . . . . . 424

MIGUEL REYNOSO

Direct By Ms. Tarlow . . . . . . . . . . . . . . 435

Cross By Mr. Stabile . . . . . . . . . . . . . . 449

GOVERNMENT EXHIBITS

Exhibit No.                                     Received

 5    . . . . . . . . . . . . . . . . . . . . . . 389

 350 through 356   . . . . . . . . . . . . . . 437

 319   . . . . . . . . . . . . . . . . . . . . . 444

 250A, 250A-2, 250C, and . . . . . . . . . . . 448

         250C-2

DEFENDANT EXHIBITS

Exhibit No.                                     Received

 25    . . . . . . . . . . . . . . . . . . . . . 450