O2QHHer1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    CORRECTED

          v.                                 15 Cr. 379 (PKC)

JUAN ORLANDO HERNANDEZ,

                                             Trial
               Defendant.

------------------------------x

                                             New York, N.Y.
                                             February 26, 2024
                                             10:00 a.m.


Before:

                    HON. P. KEVIN CASTEL,

                                        District Judge

                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  KYLE A. WIRSHBA
     JACOB GUTWILLIG
     ELINOR TARLOW
     DAVID ROBLES
     Assistant United States Attorneys

RENATO CHRISTIAN STABILE
RAYMOND L. COLON
SABRINA P. SHROFF
     Attorneys for Defendant

Also Present:   Dagoberto Orrantia, Interpreter (Spanish)
                Sonia Berah, Interpreter (Spanish)
                Mercedes Avalos, Interpreter (Spanish)
                Evan Frierson, Interpreter (Spanish)
                Matthew Passmore, DEA Special Agent

O2QHHer1

(Trial resumed; jury not present)

THE COURT:  Please be seated.

Last check, our jurors are not all here.  I understand there's an issue the government wants to raise.

MS. TARLOW:  Yes, your Honor.  The government understands that defense counsel intends to offer certain exhibits during the Miguel Reynoso's cross-examination, and the government is requesting that the Court preclude the defense from offering those exhibits.

First, the government filed a letter last night regarding what it marked as Exhibit B, which is 3519-04 of 3500 materials for Miguel Reynoso.

THE COURT:  Yes.  Does anyone have Exhibit B, the translation of the report?

MS. TARLOW:  We do, your Honor.

THE COURT:  Thank you.  I have it here.  OK.  Thank you.

MS. TARLOW:  Your Honor, the government does not believe that this report should be admitted.  There's no proper authentication for the report.  There are many, many layers of hearsay in this report.  The government was —— could not determine last night what the relevance would be for offering this report.  Defense counsel just this morning has clarified for the government that it intends to offer this report in light of information contained on page 8 of Exhibit B.

THE COURT:  All right.

MS. TARLOW:  That portion of the report describes a seeming database search by unidentified investigators that indicated that a person was found with a particular identification number, and that person had certain family members with particular names.  Defense has notified the government it intends to offer this portion of the report because some of those people's names who are family members of this individual Sinia Janeth Hernandez Rivera have initials that are consistent with Tony Hernandez and Juan Orlando Hernandez.  That is a very, very far reach.  It is also inadmissible hearsay.

So going back to page 6 of this report, the reason why this information even comes up is because there was a note in one of the ledgers that describes the acquisition of a helicopter which was linked, according to whoever wrote this report or provided the information in this report, the aircraft was linked to Tony Hernandez, and then it describes investigatory steps that were taken regarding the sale and purchase of that helicopter.  And then on the bottom of page 6, it seems like there's somewhat of a *non sequitur*.

THE COURT:  Page 6 now?

MS. TARLOW:  Yes, your Honor.

THE COURT:  All right.  I think I have your point on page 8.  I'm going to hear from Mr. Colon on this.  Go ahead.

And page 6, yes, go ahead.

MS. TARLOW:  Page 6, your Honor, seems to have that *non sequitur* that describes that there's a note discovered on June 6, 2017, which established an advance of 10,000 U.S. dollars for 55 percent of the shares of a company.  There's no clear indication of how that is related to the preceding paragraphs or the notebooks themselves.  Then there's a description that there were searches of certain databases that indicated a particular individual, Sinia Janeth Hernandez Rivera, was associated with that company.

And then continuing on to page 8, paragraph D, which is about a third of the way on page 8, that is where then there is a database search that shows this individual who appears to be related to the company, Sinia Janeth Hernandez Rivera, and her family members and that some of those family members happen to have initials that are consistent with Tony Hernandez and Juan Orlando Hernandez.

THE COURT:  All right.  Your argument under 803(8) is what?

MS. TARLOW:  Well, your Honor, several bases.  The first is that the defendant cannot properly authenticate this report writ large.  Detective Reynoso is not the author of the document.  This document is not signed.  Does not appear to be a finalized version.  There's no certificate of authenticity associated with it.

O2QHHer1

THE COURT:  Let me ask you a question.  From the internal references in the report, can you identify the date after which this report must have been created?

MS. TARLOW:  There is a date on the report, your Honor ——

THE COURT:  OK.

MS. TARLOW:  —— on the first page.  I believe it's October 18, 2018.  Let me just confirm that.  Yes, your Honor.

THE COURT:  October 27 —— I'm sorry, February 27, 2018?  Oh, I see.  There's a complaint that's February 27.  October 18 is the date of the document.

MS. TARLOW:  Correct, your Honor.

THE COURT:  All right.  Thank you.

MS. TARLOW:  There's no indication whether or not this is a final version, whether or not it was ——

THE COURT:  OK.

MS. TARLOW:  Yes, your Honor.  So that's our argument with respect to authenticity.

It also —— even if the report itself were somehow admissible under 803(8), which, as the government outlined in its letter, we do not think it is because the report itself is —— there's no evidence that it sets out an office's activities or factual findings from a legally authorized investigation as it must under 803(8)(A)(i) and (iii).  Even if the report itself met those standards, which the government does not

O2QHHer1

believe it does, it still contains within it many layers of inadmissible hearsay.  It describes investigations conducted by unidentified Honduran government officials.  The observations that those individuals had describes, as I just noted ——

THE COURT:  Well, you have —— for example, there have been reports by the CDC on the effects of certain chemicals —— I think dioxin, for example —— and they have come into evidence or an Air Force accident report on the cause of a plane crash, reports on environmental exposure to dioxin.  And I don't know that these reports identify each individual who took a specific step in the formulation of the report.

MS. TARLOW:  Yes, your Honor, those reports are categorically different from that kind of report.  Those are scientific evaluations conducted pursuant to a public agency's authority.  This is an investigative report which many people may have contributed to and may not have the hallmarks of trustworthiness that those reports your Honor just described would have.

Here, and focusing specifically on the portion that defense is arguing is relevant, this is merely a database search.  There's no indication that a database search would fall under the exception of 803(8).  There's no way to confirm the accuracy of that database.  There's no way to confirm that, in fact, it is reliable and trustworthy and says what the defense purports it to say, which is one of the hallmarks, as I

said, of 803(8), that there's a degree of reliability and trustworthiness for public records.

So, your Honor, for those reasons, the government submits that this is all inadmissible hearsay. It is also, the government believes, arguably not relevant given the argument defense wants to make as I just outlined.

THE COURT: Let me hear from Mr. Colon —— I'm sorry, Mr. Stabile. First of all, what does the defendant propose to offer?

MR. STABILE: The entire document, your Honor.

THE COURT: OK. Thank you.

And who authored the document?

MR. STABILE: Well, the signature line appears to be a woman. If I can just go to the page, your Honor. Sonia Carolina Calix, who is identified as the director of DLCN. My understanding is that that person is the witness' boss.

THE COURT: What does it mean on the first page where it says: Lawyer Claudia Erazo, chief prosecutor unit against money laundering special prosecutor against organized crime, her office? What does that mean?

MR. STABILE: So my understanding, and just for context, I received this document from the government as 3500 material. I believe what this appears to be is a report from the witness' boss to this chief prosecutor. I don't know exactly who she is, but her title is Claudia Erazo, as your

O2QHHer1

Honor said, chief prosecutor unit against money laundering, special prosecutor against organized crime.  So this appears to be a report from the witness' boss to this chief anti-money laundering and organized crime prosecutor.

THE COURT:  How do you authenticate it?

MR. STABILE:  Well, I would show it to the witness, and I would ask him if he's seen this before, if he knows how this report was written, does he believe that this is a report from his office because it is signed by his boss, and if it's made in the regular course of the business of his office.  I would ask him the purpose of it, and I would lay the foundation through Mr. Reynoso.  He could say he doesn't know, in which case that would be the end of that, I think.

THE COURT:  Why don't we get Mr. Reynoso out here.  It doesn't end the litany of questions that are raised in the government's letter of February 25, but let's get him out here and find out.

MR. STABILE:  But, your Honor, just ——

THE COURT:  Yes.

MR. STABILE:  I think it might be easier for the Court.  I handed a highlighted piece of paper, two pages, to the government.  It might assist the Court if I could just explain the relevance, because the government made it sound ——

THE COURT:  You can hand up what you want.  I'm not stopping you from doing that.

O2QHHer1

MS. TARLOW:  Would your Honor like us to bring in Mr. Reynoso now?

THE COURT:  Pardon me?

MS. TARLOW:  Would your Honor like to bring in Mr. Reynoso now?

THE COURT:  Yes.

I mean, I didn't need the highlighting.  I have it highlighted on my copy.  Do you want to see?

MR. STABILE:  I didn't know, your Honor.

THE COURT:  Come here.  I listened to what the government said very carefully, and while I'm listening to it, I marked it.  But thank you very much.

Go ahead.  Bring in the witness.

Detective Reynoso, the Court reminds you that you're still under oath.  Please be seated.

Go ahead, Mr. Stabile.

MR. STABILE:  If I can have a moment to get the document, please?

THE COURT:  Yes.

MR. STABILE:  Andy, can you put up on the screen, please, what's been marked as DX 3519-04 for the Court, counsel, and the witness, please.

MIGUEL REYNOSO, resumed.

VOIR DIRE EXAMINATION

BY MR. STABILE:

O2QHHer1

Q.   Mr. Reynoso, can you see what is on the screen?

A.   Yes.

Q.   Have you seen that document before?  And if you'd like to look at other pages, please let us know.

A.   Yes, I have seen it before.

Q.   Can you tell us what that document is, please.

A.   It's a report for the special prosecutor's office against money laundering, but I have no knowledge of this.  I did not create this.

Q.   Do you know the purpose for which this report was created?

THE COURT:  And that answer —— that question should be answered based on your knowledge rather than surmise based on a review of the documents.

A.   No.  I'm just seeing that it's directed to a lawyer from the prosecutor's office against money laundering and organized crime.

Q.   Did you provide this report to the government?

A.   No, I did not do that.

Q.   Did you have any role in providing any of the information that is contained in this report?

A.   If I could review it some.

MR. STABILE:  Your Honor, may I direct his attention to the relevant portion?

THE COURT:  Yes, why don't you do that.

MR. STABILE:  Andy, could we please show the witness

page 8, please.

Q.   Mr. Reynoso, can you see page 8 on your screen?

A.   Yes.

Q.   Directing your attention to about the top third of the page, there's a paragraph marked D, and I'd like to call your attention to that.  Can you please look at paragraph D and the information below that and tell us if you had a role in preparing that portion.

A.   I reiterate, I have no knowledge of any of this.  I did not create this.

Q.   Well, did you create any portion of this report at all?

A.   If you let me review it, perhaps, but as far as this, I have no knowledge of this.  I did not draft any of this.

Q.   Just to be clear, when you say "this," you're talking about paragraph D on page 8.  You had no role in drafting that portion, is that what you're saying?

A.   Correct.  And also the document, I did not create it.  I am unaware of its contents.

          THE COURT:  All right.  Thank you, Mr. Stabile.

          You may step down.  The witness may step down.  You can bring the —— put the witness —— unless you have any questions?

          MS. TARLOW:  No, your Honor.

          THE COURT:  All right.  The witness is excused.

          (Witness excused)

THE COURT:  I'm sustaining the objection on authentication grounds, but —— or I should say, and therefore I need not address at this juncture the other grounds argued by the government for inadmissibility.

Madam deputy, do you have ——

MS. TARLOW:  Your Honor.

THE COURT:  Madam deputy, are the jurors here?

MS. TARLOW:  Your Honor, I'm so sorry.  We have one additional thing we wanted to raise.

THE COURT:  Yes, go ahead.

MS. TARLOW:  We also learned from defense counsel last night that he intends to offer all of the notebooks that were seized on June 2018 by Miguel Reynoso.  As your Honor may recall, Mr. Reynoso, Detective Reynoso, testified he recovered nine notebooks.  The government only offered two, which contained Tony Hernandez name and the initials JOH.  Our understanding is defense counsel wants to offer the remaining notebooks because there are additional references to the initials JOH, and according to defense counsel, those references are to farming work and non-drug-related activities.

The additional ledgers amount to hundreds of pages of text.  The references to the initials of JOH are just two pages.  The government has not heard from defense counsel any articulation for why those hundreds of pages of ledgers should be admitted, because defense counsel's proposition is that

O2QHHer1

these notebooks and their references to JOH, or his initials, it seems, should be for the truth of the matter asserted; that is, that in fact payments were made to someone with the initials JOH for farming activities.  Of course, defense cannot offer something for the truth of the matter asserted without identifying an exception, which they have not identified.

The second argument, as the government understands, defense counsel is making is that they should be admitted under the rule of completeness.  With respect to that rule, of course, as your Honor is aware, under Rule 106, the rule of completeness, it doesn't somehow transform or render it admissible, evidence that is otherwise inadmissible, and only requires the admission of other statements, written or recorded, if it's necessary to explain the admitted portion to avoid misleading the jury or to ensure a fair and impartial understanding of the admitted portion.  That's *United States v. Johnson*, 507 F.3d 793.

THE COURT:  All right.  Let me hear from the defense.

MR. STABILE:  So, your Honor, in the Tony Hernandez trial, all of the notebooks were admitted.  The government now only put two of them into evidence, although the government showed the jury all of them and laid a foundation for all of them through Mr. Reynoso.  As the government said, there are other references in the notebooks that they did not put into evidence referring to JOH.  I'm not —

O2QHHer1

THE COURT:  Wait, wait.  Let's just —— so to help me out, there are nine notebooks or eight?

MS. TARLOW:  Nine, your Honor.

THE COURT:  Nine.

And the government has offered two of them, and you want to offer seven that they did not offer?

MR. STABILE:  Well, I would, but ——

THE COURT:  What are you wanting to offer?  What are you seeking to offer?

MR. STABILE:  I would offer all of them because they were part of a set.  As the government went through on Friday, they were all contained in a single envelope in a single car.  So they are part of a set.  They're not random notebooks from around the globe.

There are two in particular that I believe are especially relevant.  That would be 250B and 250K.  250K specifically has additional references to JOH.  And if you look at the entire contents of the notebook, it is very clear that it is some sort of farming notebook because there are references to cows and farms and tractors.  Now, the government may say, well, that's all just coded language, and I suppose the government can make that argument.  But we believe that it's quite clearly an actual farming notebook and that the references to JOH in there are references to paying for fumigation.

O2QHHer1

THE COURT:  Well, the government says —— and I'm sitting here listening to you and listening to them, but what I heard from them is that that is offered for the truth of its contents; that it is a farming entry, right?

MR. STABILE:  Well, it's not being offered for the truth that there were 20 cows purchased.  It's just being offered to show that it was —— the subject matter was farming.

THE COURT:  Was, in fact, farming.  In that sense, it's the truth of its contents, that it records a cattle transaction, which is a farming activity, right?

MR. STABILE:  Yes.  But I'm not interested in the cattle transaction.  That's not the ——

THE COURT:  Well, that's ——

MR. STABILE:  I'm not trying to prove the cattle transaction.

THE COURT:  I understand you're not trying to prove the cattle transaction, but you're trying to prove that it's reflecting a cattle transaction.  Not with whom, not the quantity, not the price, but it's a cattle transaction.  That's what you are offering it for, right?

MR. STABILE:  I'm offering it to show that JOH is referenced in other books, and the jury can draw inferences from that in that all these books were together.  The government only wants them to look at a couple of JOH references, and I want to say, well, but there are other JOH

references.

THE COURT:  I'll prove the point.  What if the government agreed to stipulate that JOH's initials are in other books?  Is that going to do it for you?  No.

MR. STABILE:  No.

THE COURT:  I didn't think so.  So it's dependent on the content and the truth of it, that it's a farming-related activity.  I get it.  That doesn't make it something that I don't understand why you're offering it.  I do understand it.  I understand why you're offering it, but you have to overcome the hearsay rule.  And you argue the rule of completeness and you argue what else, what else besides the rule of completeness?

MR. STABILE:  Right.  So the rule of completeness would be the jurors are seeing only portions of the books, and so they're seeing things that are out of context.  They don't have the full context of all of the books.  That's number one.

Number two, this witness has testified that he reviewed all of these notebooks, that he photocopied all of these notebooks.  And in 2018 he drew the conclusion, or it caught his attention, that there was a reference to JOH and Tony Hernandez in the books.

THE COURT:  All right.  So this is what I'm going to ask for right now.  I want the two books that have been received into evidence, and then I want the book which has the

O2QHHer1

cattle reference in it also.  If somebody can hand that up to me, that would be helpful.

MS. TARLOW:  Yes, your Honor.

MR. STABILE:  Or I could put it on the screen very quickly.

THE COURT:  That's fine.

No, I want the books.  I want the books, come to think of it.

MS. TARLOW:  Your Honor, these notebooks are in Spanish.  We do have translations of the operative portions, including the references to the initials.

THE COURT:  I'd like the translation, but in reality, the books themselves, even recognizing that they're in a foreign language, may be helpful to the Court in ruling on the issue.

MS. TARLOW:  Understood, your Honor.

Your Honor, we're giving you —— all the notebooks on top are Government Exhibit 250A, B, C, and K, which I believe were recently referenced in counsel's arguments.

THE COURT:  And A and B have been received into evidence, is that correct?

MS. TARLOW:  That is correct, your Honor.

MR. STABILE:  I thought it was A and C.

MS. TARLOW:  A and C, I'm sorry, your Honor.

THE COURT:  All right.  A and C, I have them.

O2QHHer1

I'm putting B aside, because B is not in evidence, right?

MS. TARLOW:  Correct, your Honor.

THE COURT:  And it's not the book that is being sought.

MR. STABILE:  Well, it's one of them.

THE COURT:  All right.  I got it.

Can you give me the date under which the JOH or TH references appear in A or C?

MS. TARLOW:  Yes, your Honor.  In Government Exhibit 250A, the Tony Hernandez references appear on page 2, page — sorry, your Honor.  Give me one moment.  Oh, I'm sorry.  The date, it's February 27, 2018, although it's written 27-2.

THE COURT:  Yes, I understand it.  I have it right in front of me.  Yes, go ahead.

MS. TARLOW:  7-5-2018.

THE COURT:  There's a reference to Tony?

MS. TARLOW:  Yes, your Honor.

THE COURT:  Is that what you're referring to?

MS. TARLOW:  Yes, your Honor.

THE COURT:  Go ahead.

MS. TARLOW:  5-11-2018, on the right-hand column, there are the initials JOH which are crossed out.

THE COURT:  That's adequate.

Now, in C?

O2QHHer1

MS. TARLOW:  Yes, your Honor.  In Government Exhibit C, it's 3-6-2017.  On the left-hand column are the initials JOH.

THE COURT:  All right.  If you can put that up on the screen for me, that might help me find it in the book.

MS. TARLOW:  My apologies, your Honor.  I have the translated version.  In the Spanish version it's 6-3.

THE COURT:  I have 6-3 in front of me.  I see the JOH and the line goes across the 25,000.

All right.  Now, if you will, Mr. Stabile, I'm looking at Exhibit K.  Where am I looking?

MR. STABILE:  So in K, I believe it would be page 62.

THE COURT:  That doesn't help me.  I have the diary right here.

MR. STABILE:  I know.

THE COURT:  What date?  Is there a date on it?

Maybe the government's going to help.

MS. TARLOW:  Yes, your Honor.  I believe it's 13-11-2017, and it's about little more than halfway down on the page.

MR. STABILE:  Yeah, that's right, your Honor.

THE COURT:  OK.  Now, is your point that the notebook refers to a cattle transaction, or is that JOH's initials that you're referring to; is that what it is?

MR. STABILE:  Yeah, I'm referring to the line that

O2QHHer1

says "pago JOH."

THE COURT:  I have it, yes.

All right.  And anything else?

MR. STABILE:  There are other references in that book, your Honor.

THE COURT:  All right.  Thank you.

MR. STABILE:  Would your Honor like me to call them out?

THE COURT:  I think I've seen what I need to see. Looking at this through the lens of completeness, these are individual notebooks.  The ones that the government offered into evidence, one of the notebooks begins —— it looks to me like December 20, 2016, is the first entry and goes to May 7, 2017, and then that's C.  A seems to go from January 30, 2018, to May 11, 2018.  And the notebook to which my attention has been drawn by the defense, I'll note, not that it matters a whole lot, but one is a —— A and C are spiral notebooks opening —— I guess vertically you turn the pages, and in K it's horizontal, typical book form.

For example, the second book, K, starts with January 3, 2018, and I cannot tell what date it ends —— well, it seems to have dates that go back to February 2017, August 28, 2017.  So under the rule of completeness, I do not see where K is —— it seems to be in some respects covering an overlapping period, but there is no rhyme or reason discernible

O2QHHer1

to the judge looking at it as to how A and C relate to K.  It might have been in the same police seizure, but it does not appear to me that anything in K is the completion of a statement in A or C, and I'm therefore sustaining the objection on that basis.  So that's where I am.

MR. STABILE:  Your Honor.

THE COURT:  Yes.

MR. STABILE:  There's one other basis ——

THE COURT:  Yes.

MR. STABILE:  —— for which I would ask to use the notebooks, and that is that the witness testified that he reviewed all of the notebooks ——

THE COURT:  Yes.

MR. STABILE:  —— and that JOH stood —— I'm repeating myself, but JOH stood out to him because it was the initials of the president and he was familiar with who Tony Hernandez was.

THE COURT:  Yes.

MR. STABILE:  Can I show the witness 250K and ask if the witness looked at and considered the reference to JOH in that notebook and whether that informed his conclusion that the initials JOH were of significance?

THE COURT:  Well, I've sustained the objections to admissibility.  I have not ruled on its use to refresh a witness' recollection in some respect.  I have to hear the question on that, but I'm not ruling on that.

O2QHHer1

All right.  So if the government will take possession of its books here.  Thank you.

All right.  Yes, sir.

MR. STABILE:  I'm sorry.

THE COURT:  Go ahead.

MR. STABILE:  Before I forget, I have Mr. Noah Velasquez, who is a paralegal from my office.  His name was provided to the jury.  He is assisting me with these witnesses. May he sit at counsel table?

THE COURT:  Absolutely.  I don't propose to highlight anything with the jury in that regard, if that's all right with you.

MR. STABILE:  Thank you.

THE COURT:  Bring our witnesses in, bring our jurors in.

(Continued on next page)

(Jury present)

THE COURT:  Please be seated.

Good morning, ladies and gentlemen.  Hope you had a good weekend, and I hope you followed the advice to put everything out of your mind until this morning.  It's a good thing to do.

Just to let you know, we were not goofing off or playing Canasta in here.  There were some pretrial matters that needed attending to, and doing that out of your presence saves time for you, for everyone, and it's also a little bit more relaxing than your sitting in the box listening to lawyer talk.

So without further ado, Mr. Stabile, you may inquire.

But, first, Detective Reynoso, the Court reminds you that you're still under oath.  Thank you.

MIGUEL REYNOSO, resumed.

CROSS-EXAMINATION CONTINUED

BY MR. STABILE:

Q.  Good morning, detective.

A.  Good morning.

Q.  In the afternoon of June 7, 2018, you and your partner photocopied the notebooks that you found in the car, right?

A.  It was maybe at night or the following day.

Q.  The night of June 7?

A.  Correct.

Q.  Or possibly June 8, is that what you're saying?

A.   Correct, in the morning or early morning hours.

Q.   Had you been working straight since 8 a.m. on June 6, 2018 — I'm sorry.  I meant to say had you been working straight since the morning, since 8 a.m. on June 6, at the time you copied the notebooks?

A.   Yes.

Q.   You photocopied some of the notebooks and your partner photocopied some of the notebooks, right?

A.   Yes.

Q.   And you didn't look at every page, right?

A.   Of the ones that I made copies of, I did.

Q.   Do you happen to remember which ones you made copies of specifically?

A.   No, not all of them.

Q.   But you remember seeing the initials JOH in some of the books, right?

A.   Yes.

Q.   And that stood out to you because you thought JOH stood for Juan Orlando Hernandez, right?

A.   Yes, that they could be the initials of his name.

Q.   They could be, but you didn't know that, right?

A.   Right.

Q.   And they could mean something else, right?

A.   Yes, but there was a certain particularity that was the fact that the name Tony Hernandez was also there.

O2QHHer1                      Reynoso - Cross

Q.   OK.  Because you saw Tony Hernandez, you reached the conclusion that JOH referred to Juan Orlando Hernandez, right?

A.   Could be.

Q.   And on June 7, 2018, Juan Orlando Hernandez was the president of Honduras, correct?

A.   Yes.

Q.   And you told your boss about seeing JOH written in the notebooks, right?

A.   I don't exactly remember.  I imagine that I did.

Q.   And you also discussed seeing JOH in the notebooks with your partner, right?

A.   Yes.

Q.   Do you recall your boss responding to you when you mentioned JOH in the notebooks?

            MS. TARLOW:  Objection.  Hearsay.

            THE COURT:  You can answer yes or no.

A.   No, I don't remember.

            THE COURT:  Next question.

Q.   Who was your boss at that time?

            MS. TARLOW:  Objection.

            THE COURT:  You're objecting to the question "Who was your boss at that time?"

            MS. TARLOW:  Yes, your Honor, for reasons the government has previously briefed.

            THE COURT:  All right.  Let me hear you at sidebar on

that.

MR. STABILE:  Your Honor, I can move on.

THE COURT:  All right.  Good enough.  Thank you.

BY MR. STABILE:

Q.  Do you remember any reaction your boss had when you told that person you had seen JOH in the notebooks?

THE COURT:  That's a yes-or-no question.

A.  No, I don't remember.

Q.  And did you show your boss the notebooks?

A.  I don't remember.

Q.  Did your boss ask to see the notebooks?

A.  I don't remember.

Q.  Were you instructed by your boss to do anything with the notebooks?

A.  No, I don't remember.

Q.  And after you photocopied the notebooks with your partner, what did you do with the notebooks then?

A.  They were packaged.

Q.  And what did you do with the photocopies?

A.  They were delivered to the examination department.

Q.  Did you provide the photocopies that you made to the government in this case or any other case?

THE COURT:  When you say "government," you mean the prosecutors in this case?

MR. STABILE:  Correct, your Honor.  I'm sorry.

O2QHHer1                        Reynoso - Cross

A.  These prosecutors?

        THE COURT:  Yes, the U.S. prosecutors.

A.  What I brought here were these notebooks.

Q.  But not the photocopies, right?

A.  No.

Q.  Do you know where those photocopies are today?

A.  No.

Q.  When you packaged the notebooks, did you take a photograph of the packaging?

A.  A photograph, no.

Q.  Now, after you packaged the notebooks, isn't it a fact that you did not voucher that package into evidence until June 20, 2018?

A.  I don't understand the word "vouchered."

        MR. STABILE:  Can we bring up just for the Court, counsel, and the witness DX 3519-05.  That's DX 3519-05.

Q.  Can you see the document that's on the screen, sir?

A.  Yes.

Q.  Isn't this the voucher that you and your partner both signed?

        MS. TARLOW:  Objection.

        THE COURT:  Yes, you may want to use another word because the witness indicated he doesn't know what you mean by "voucher."

Q.  Can you tell us what this document is that's on the screen?

A.   It's a chain of custody form.

Q.   And this is a record that you're required to keep as part of your duties as a detective, right?

A.   I did not create this.

Q.   Well, you —— can we go to the second page, please.

Well, you know that your signature appears on this document, right?

A.   Correct.

Q.   What is the purpose of this document?

A.   I received it before coming here in 2019.  I received it in Honduras.

Q.   But as part of your duties as a detective, are you authorized to sign this document?

A.   If I am charged with doing so, yes.  I by myself cannot go request this and bring it without authorization.

Q.   But this is a record that keeps track of what evidence is removed or placed into an evidence locker, right?

A.   Yes.

Q.   And it's a record that helps the police keep track of the evidence, right?

A.   Correct.

Q.   And there are signed entries on this document, right?

          MS. TARLOW:  Objection.

          THE COURT:  Basis?

          MS. TARLOW:  Reading a document that's not in

evidence.

THE COURT:  No, no, I'll allow that.

Go ahead.

A.  Could you rephrase it?

Q.  There are signatures on this document, right?

A.  Yes.

Q.  And those signatures are there to indicate when evidence is taken or returned to the evidence locker, right?

A.  What this indicates is who currently has the evidence and who has had it, in whose possession or under which authority the evidence is.

Q.  And the entries in this document are made at the same time that the evidence is either taken out or returned, right?

A.  Yes, when the person who receives it takes possession of it.

Q.  And police procedures require that this document be kept to keep track of the evidence, right?

A.  Yes.

Q.  Do you recognize the signatures that are on this document?

THE INTERPRETER:  May the interpreter have repetition?

THE COURT:  Yes.  You'd like to hear the question again or the answer?

THE INTERPRETER:  One part of the answer, your Honor.

THE COURT:  All right.  Go ahead.

A.  Yes.  I mean, I recognize mine — well, what is seen there

is not my signature.  It's the black area, which is where I signed.

Q.  And this is a document that's kept in the regular course of police business, right?

A.  Yes.  At the time when you have evidence and you package it, you have to deliver this chain of custody.

MR. STABILE:  Your Honor, at this time I offer DX 3519-05 into evidence.

THE COURT:  Any objection?

MS. TARLOW:  May we have one moment, your Honor?

THE COURT:  Yes.

MS. TARLOW:  Your Honor, may we confer with defense counsel for one moment?

THE COURT:  Yes.

(Counsel confer)

THE COURT:  Yes.

MS. TARLOW:  Your Honor, apologies for the delay.

We do not object subject to the portion that is in Spanish being translated into English that is not currently in the version defense counsel has shown to the witness in English, and so we would ask that we just be able to provide an English translation that would be admitted into evidence.

THE COURT:  Does that work for you, Mr. Stabile?

MR. STABILE:  Yeah, I don't have any objection to that.

THE COURT:  Subject to that caveat, it's received.

(Defendant's Exhibit 3915-05 received in evidence)

MR. STABILE:  May it be published to the jury?

THE COURT:  Yes.

MR. STABILE:  Andy, can we go to page 1.

BY MR. STABILE:

Q.  So, Detective Reynoso, you see at the top that you see that this document refers to the evidence that was seized during the search of the cars, right?

A.  Yes.

Q.  And the date of the seizure, it's highlighted for you, is June 7, 2018, at 3:55, right?

A.  Yes.

Q.  You told us that you packaged the evidence either on June 7 or June 8, right?

A.  I assisted in the packaging.

Q.  And you see, going down a little bit, that the notebooks are not placed into the evidence locker until June 20, 2018, right?

A.  Yes.

Q.  And then going below that, if you slide down a little bit, the next entry you see that the notebooks were taken out on August 2, 2018, right?

A.  Yes.

Q.  And you see that the notebooks were also taken out on

September 28, 2018.  You see that?

A.  Yes.

Q.  And you see that the notebooks were taken out on January 15, 2019.  Do you see that?

A.  Yes.

MR. STABILE:  Can we go to the next page.

Q.  And you see that the notebooks were also taken out on September 16, 2019, right?

A.  Yes.

Q.  And they were also taken out on September 20, 2019.  You see that?

A.  Yes.

Q.  And also on September 24, 2019, right?

A.  Yes.

Q.  But you told us that when you brought the sealed envelope to the U.S. Attorney's Office, the seal was still intact, right?

A.  Yes.

Q.  In other words, the original seal that you say —— in other words —— withdrawn.

In other words, the original packaging that you say you put these notebooks in on June 7, 2018, was the same exact packaging that they were in when you brought those notebooks to the U.S. Attorney's Office according to you, right?

A.  Yes, that it could be the same.

Q.  Well, it could be or it is?

A.  That it could.  I did not use a magnifying glass to check and make sure that it was not open on any area of it.

Q.  So it might have been opened before you brought it to the U.S. Attorney's Office, right?

A.  Maybe.  I don't think so, though.  I did not observe any signs that it had been opened.

Q.  But you see that the notebooks are being taken out of the evidence locker on multiple occasions.  We just went through that, right?

A.  Yes.

MR. STABILE:  OK.  We can take that down.

Q.  After June 7, 2018, did you ever discuss these notebooks with your boss again?

A.  No.

Q.  Did you ever discuss these notebooks with your partner again?

A.  To add to the previous question, I do not remember whether or not I discussed them with my boss again.

Q.  But after June 7, 2018, did you discuss these notebooks with anyone on the planet Earth?

MS. TARLOW:  Objection.  Relevance.

THE COURT:  One moment, please.  Sustained.

Q.  After June 7, 2018, when was the next time you had a conversation with anybody about these notebooks?

MS. TARLOW:  Objection.

THE COURT:  Sustained.

MR. STABILE:  Can we put up what's already in evidence, GX 250A-2, please, and can we show that to the jury as well.  Can we go to page 8 of this document, please.

Q.  This is one of the ledgers that you seized during the vehicle stop, right?

A.  Yes, it is one of the pages.

Q.  And when you saw "JOH," you already told us you thought that referred to Juan Orlando Hernandez, right?

A.  Yes.

Q.  Did you know in 2018 that President Hernandez's full name is Juan Orlando Hernandez Alvarado?

A.  Yes.

Q.  You thought JOH was a nickname for him, right?

A.  He is commonly known by those three letters, JOH.

Q.  And you also remember seeing the name Rambo in the books, right?

A.  Yes.

Q.  And did you think that was a reference to Sylvester Stallone?

A.  No.

Q.  Did you consider whether the JOH you saw in the notebooks could be Jorge Oscar Hidalgo?

A.  Once again, it also stood out to me because Tony

Hernandez's name was also there.

Q.   Is Tony Hernandez a common name in Honduras?

A.   It is common because he's a politician.  They are politicians, and they're well known by the —— to the majority of the population.

Q.   Did you consider whether JOH stood for Juan Oliver Herrera?

A.   Again, it could be.  It did —— it stood out to me, yes. And JOH could be, as you said, Juan Oliver Herrera, but the reason why it stood out to me is because Tony Hernandez's name was also there.

Q.   And it could also be José Orlando Hurtado, right?

A.   Yes.

        MR. STABILE:  Can we put up what's been marked as DX 100 for the Court, counsel, and the witness.

        Your Honor, I would like to use DX 100 for demonstrative purposes only.

        MS. TARLOW:  The government objects, your Honor, under Rule 403.

        THE COURT:  When you say a demonstrative exhibit, I don't see how —— you can demonstrate the witness' testimony with an exhibit, but this is not the witness' testimony.  I don't know what you're demonstrating that is in evidence.

        MR. STABILE:  I just want to show the witness the exhibit, and the only question will be whether or not he agrees.  I don't want to say too much because it's not in

evidence.

THE COURT:  Yes.

MR. STABILE:  Whether or not he agrees that those are possibilities.

THE COURT:  I think you can get where you want to go in a different way which does not arrive at something which is not supported by the testimony coming in as a demonstrative. And you're bootstrapping.  If you'd like, I can explain — I'll explain on a future break, but it's sustained.

MR. STABILE:  Can we take that down.

Q.  Well, Detective Reynoso, you would agree that there are hundreds of names that JOH could refer to, right?

A.  Yes.

Q.  And there are hundreds of male names that JOH could refer to and hundreds of female names that JOH could refer to, right?

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  No, I'm going to allow it.

Go ahead.

A.  Yes.

MR. STABILE:  Can we put up for the witness GX 250A-2, please, and we'll go to page 9, please.  Andy, can we just highlight the line that has JOH in it.  The whole line, please.

Q.  This is one of the JOH references that you saw in the notebooks, right?

A.  Yes.

Q. And you know that La JOH indicates JOH is a female, right?

A. Can you please ask me the question again.

Q. Yeah.  The article "la" refers to a female, right?

A. Yes.

Q. And if it was referring to a male, it would say "El JOH," right?

MS. TARLOW:  Objection.

THE COURT:  Overruled.

A. Can you please ask me the question again.

Q. Yeah.

If this was referring to a male JOH, it would say "El JOH," right?

A. Yes.

Q. Just like it's El Chapo, not La Chapo, right?

A. Yes, it could be.

Q. And La JOH could also refer to a company, right?

A. Yes.

Q. If it referred to a company, it would not be El JOH, it would be La JOH, right?

A. Yes.

MR. STABILE:  Could I have a moment, your Honor?

THE COURT:  You may.

Q. Detective Reynoso, isn't it true that the government has been helping you with a visa to stay in the United States?

A. Well, I obtained the visa in 2019.

Q.   Right.   And you got a ten-year visa, right?

A.   Yes.

Q.   And the government assisted you with that, right?

A.   I don't know.

Q.   Well, in late 2023 and early 2024, you were texting with a DEA agent, right?

         MS. TARLOW:   Objection.

         THE COURT:   One second, please.

         I'll allow it as a foundational question.

         Go ahead.

A.   Yes.

Q.   That's DEA Agent Mateo, right?

A.   Yes.

Q.   And in those text messages, you discuss with DEA Agent Mateo obtaining a visa for you and your family, right?

         MS. TARLOW:   Objection.

         THE COURT:   I'll allow it.

A.   Yes, that was one of them.

Q.   And right now you're on extended leave from your job, is that right?

A.   Yes.

         MR. STABILE:   Move to strike the rest of what he's saying, your Honor.

         THE COURT:   I can't rule on it until I hear it.

A.   I don't mean to be impertinent, but I think that —

O2QHHer1                        Reynoso - Cross

THE COURT:  All right.  You've answered the question.  Next question.

Q.  And you've also — your Honor, may I confer with counsel for a moment?

THE COURT:  Yes, sure.

(Counsel confer)

Q.  Are you a paid informant for the DEA?

A.  No.

Q.  Well, but you've had discussions with the government about becoming a paid DEA informant in the future, right?

A.  I don't remember.

Q.  Oh.

Can we show the witness what's marked as DX 3519-31 and just for the Court, counsel, and the witness.

Can you see what's on your screen?

A.  Yes.

Q.  I would just direct your attention to what is highlighted at the top.

Have you had an opportunity to read that?

A.  I don't know how to read English.

MR. STABILE:  May the highlighted portion be translated?

THE COURT:  Yes.

Q.  Have you had an opportunity to have the highlighted portion translated to you?

A.   Yes.

MR. STABILE:  OK.  We can take that down.

Q.   Having had the highlighted portion translated to you, does that refresh your recollection that you've had discussions with the government about becoming a paid DEA confidential source?

A.   I've never spoken about providing information for them.

Q.   Just to be clear, you have never had a conversation with the government about becoming a paid confidential source?

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  This time it's asked without DEA in it, so I'll allow it.

Go ahead.

A.   I don't remember.

MR. STABILE:  Andy, can we put that —— can we put 3519-31 back up on the screen.

I'm sorry, take it down, please.

Q.   Sir, you had a meeting with prosecutors on February 12, 2024, didn't you?

A.   I don't remember the date, but, yes, I have had meetings.

MR. STABILE:  Now can we put up 3519-31 for the witness.

Q.   I'll just direct your attention to the top of the document, sir.  Please let me know when you've reviewed it.

Have you reviewed it?

A.   Me?

Q.   No, has Detective Reynoso reviewed the top of the document?

            THE INTERPRETER:  The interpreter would like to

clarify.  Detective Reynoso asked, "Me?"

            MR. STABILE:  I don't understand that question.

            THE COURT:  No, that was what the witness said, "Me?"

            MR. STABILE:  OK.  Could we take that down.

Q.   Does that refresh your recollection that you met with the

government on February 12, 2024?

            THE COURT:  Pause.

       So the concept of refreshing your recollection is you

might see a newspaper article and it might be dated a certain

date.  It might be August 11, 2018.  Somebody shows you the

newspaper article and asks you:  Do you remember that this was

the front page of the *New York Times* on August 11, 2018?  And

your answer could be, yes, it refreshes my recollection or, no,

it doesn't.

       And why would it refresh your recollection?  Maybe

it's your nephew's birthday and the headline was about a trade

that the New York Yankees had just made.  And all of a sudden

you say:  You know, now it refreshes my recollection.  We were

over at the birthday party, and we were talking about this.  Or

it may be you look at this and you say:  This is *The New York

Times*.  It doesn't look like a fake headline, but it doesn't

refresh my recollection.  So those are two different answers.

       So does this refresh your recollection?  Your answer?

O2QHHer1                    Reynoso - Cross

THE WITNESS:  No.

THE COURT:  And apologies for the baseball analogy.

Q.  You understand that Juan Orlando Hernandez is, and was in 2018, a member of the National Party in Honduras.  You know that, right?

A.  Yes, he was a member, yes.

Q.  And you in 2018 and even now —— well, you in 2018 were not a member of the National Party, right?

A.  No.

Q.  "No" meaning you were not a member of the National Party, correct?

A.  Correct.

Q.  And your family did not belong to the National Party growing up, right?

A.  Uh-huh, that's right.

Q.  And it's true that you believe that there are no good politicians in Honduras, right?

A.  Of course.

Q.  That's a view that you hold, right?

A.  Right.  I'm not saying that —— I am not saying that because of the present moment it's a belief that I have.

MR. STABILE:  I have no further questions.

THE COURT:  All right.  Ladies and gentlemen, shall we go a little bit longer, or would you like your break now? We'll go.  I don't know that there will be a lengthy redirect,

O2QHHer1                         Reynoso - Redirect

but let's see.

MS. TARLOW:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. STABILE:

Q.  Detective Reynoso, you were asked questions on cross-examination about individuals who were arrested in June 2018.  Do you remember those questions?

A.  Yes.

Q.  You testified that one of those individual's names was Nery López.  Do you remember that?

A.  Yes.

Q.  Do you know his full name?

A.  Nery Orlando López Sanabria.

Q.  You testified about the fact that you were present for the packaging of notebooks in June 2018.  Do you remember that testimony?

A.  Yes.

Q.  That package with the notebooks in it was completely sealed, is that right?

MR. STABILE:  Objection.  Mischaracterizes the testimony.

THE COURT:  I'll allow it.  The witness is free to say no if that's wrong.

A.  Please ask me the question again.

Q.  When you were present for the packaging of the notebooks in

O2QHHer1                    Reynoso - Redirect

June 2018, was that package completely sealed?

A.   Yes.

          (Continued on next page)

BY MS. TARLOW:  (Continuing)

Q.  Were there signatures written on the tape that sealed that package?

A.  Yes.

Q.  When you next saw that package, that was in September 2019; is that right?

A.  Yes.

Q.  Did the package appear to be in the same condition as when it was initially sealed in June 2018?

A.  Yes, it did appear to be.

Q.  The package did not appear to have been opened?

A.  No.  No.

Q.  The signatures on the tape that sealed the package did not appear to be broken?

A.  No.  I did not observe them being broken.

Q.  And the tape also did not appear to be broken that was sealing the package?

A.  No.

Q.  Detective Reynoso, you were asked certain questions on cross-examination about potentially becoming a confidential informant for the DEA.

        Do you remember those questions?

A.  Yes.

Q.  Do you know what the DEA's intentions are regarding whether it intends to use you as a confidential source?

MR. STABILE:  Objection.

THE COURT:  I will allow it.

A.  We have never discussed matters of me becoming a confidential source of information.

Q.  You were also asked on cross-examination about taking a leave of absence.  Do you remember those questions?

A.  Yes.

Q.  Why are you taking that leave of absence?

A.  One reason is in order to come here and the other is for personal reasons.

Q.  Is it also related to your safety?

A.  Yes.

MS. TARLOW:  May I have one moment, your Honor?

THE COURT:  Yes.

MS. TARLOW:  Nothing further, your Honor.

THE COURT:  You may step down.

(Witness steps down)

THE COURT:  Ladies and gentlemen, we are going to take our midmorning break.  As always, please, do not discuss the case among yourselves or with anyone else.  We will be back in action in about 10 minutes.

Thank you.

(Continued on next page)

(Jury not present)

THE COURT:  We are in recess.  Thank you.

(Recess)

THE COURT:  The government should have its next witness on the stand when we come back.

Remain standing for our jury, please.

(Continued on next page)

O2Q5her2                         Prado - Direct

            (Jury present)

            THE COURT:  Please be seated.  The government may call its next witness.

            MS. TARLOW:  The government calls Manuel Prado.

            THE COURT:  Madam deputy.

MANUEL PRADO,

      called as a witness by the Government,

      having been duly sworn, testified as follows:

            THE COURT:  Please be seated.  State your name and spell your full name for the record, please.

            THE WITNESS:  My name is Manuel Prado.  M-A-N-U-E-L. P-R-A-D-O.

            THE COURT:  You may inquire.

            MS. TARLOW:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. TARLOW:

Q.  Good afternoon, Mr. Prado.

A.  Good afternoon.

Q.  What do you do for a living?

A.  I'm a professional translator and interpreter.

Q.  What languages do you interpret and translate?

A.  Spanish and English.

Q.  Have you taken exams testing your proficiency as an interpreter and translator?

A.  Yes, I certainly have.  I took some exams at the state

O2Q5her2                          Prado - Direct

level and then a couple of years later the federal exams.

Q. What type of exams did you take on a state and federal level?

A. Both exams have two parts; a written part first and if you pass the written part then you take the oral part.

Q. Did you pass those exams?

A. Yes. I certainly did.

Q. Approximately when did you pass those exams?

A. The state exam I passed in 2005, and the federal in 2008.

Q. I would like to switch topics and now talk about your background. Where were you born?

A. I was born in Lima, Peru.

Q. Do you now live in the United States?

A. Yes, I do. I live in Northern Virginia in the Greater Metropolitan Washington area.

Q. Approximately how long have you lived here in the United States for?

A. I have lived here in the states on two different occasions. The first occasion for about 25 years from 10 to 35, and then again from when I was 60, until the present.

Q. What languages do you now speak?

A. I speak English and Spanish.

Q. Have you received your bachelors degree?

A. Yes, I have.

Q. Where did you receive that degree?

A.   Cum laude from Columbia University.

Q.   I would like to now talk about your current work.  Are you an employee of the United States Attorney's office?

A.   No, I'm not.

Q.   Have you ever been an employee of the United States Attorney's office?

A.   No, I have never been.

Q.   Who is your current employer?

A.   Well, my own company.  I work for myself.

Q.   Generally, how do you find your interpretation and translation work?

A.   By word of mouth.

Q.   Have you worked for both prosecutors and defense lawyers in your career?

A.   Yes, I have.

Q.   Have you worked more for one than the other?

A.   Probably more for the defense.

Q.   For approximately how long have you worked as an interpreter and translator?

A.   35 years.

Q.   What languages have you interpreted and translated throughout your career?

A.   English and Spanish only.

Q.   Do you also have experience preparing what are referred to as transcripts?

O2Q5her2                          Prado - Direct

A.   Yes, I do.

Q.   Generally speaking, what is a transcript?

A.   A transcript is putting down on paper what is spoken on a recording.

Q.   I would like to talk to you about your general practices creating transcripts for audio and video recordings.  Can you please describe, briefly, the steps you would take in creating a transcript from a Spanish-language recording?

A.   Well, if it comes in a video form, generally I first rip the audio off the video and then I work with the audio sections and I go over them many times.  I have special software where I can change the speed, I can change the pitch, and a few other variants.  And then, after I think I have everything pretty well figured out, I will go back over the video or the audio one more time to make sure I have it correctly.

Q.   You said that you take or rip the audio off of the video. Does that change the audio in any way?

A.   Not that I'm aware of.  And, at any rate, I go back and listen to the video at the end.

Q.   To confirm that in fact it is the same?

A.   Correct.

Q.   Approximately how many times do you go through a given recording, in total?

A.   Well, if it's relatively difficult, over 10 times, but otherwise probably seven to eight times.

O2Q5her2                          Prado - Direct

Q.  Do you use a headset to listen to those recordings?

A.  Yes, I certainly do.  I have two specialized headsets that I alternate.

Q.  Why are those headsets special?

A.  They are very high quality audio headsets, professional audio headsets.

Q.  What do you do if you are unable to hear a portion of any given recording?

A.  If I really cannot figure it out I would put in brackets "UI" in English, which means unintelligible, and on the Spanish side I would put in brackets "II," which is *ininteligible*.

Q.  Can you please briefly describe the steps you take in translating Spanish language texts into English?

A.  Well, translating texts is a written document when you get it except for the audio clips.  But you basically get a written document that you go over a few times and you just, you translate what it says in text.

Q.  Approximately how many times do you review a given text for translations?

A.  Well, texts are not that difficult; probably four or five times, on average.

Q.  Do you sometimes receive transcripts and translations that have already been drafted?

A.  Yes, I do.

Q.  Are you sometimes asked to verify the accuracy of those

transcripts and translations?

A.   Yes.  I am asked to verify the accuracy and then to certify them.

Q.   What does that process entail to verify their accuracy. How do you do that?

A.   Well, I have to first of all read it all, but if it is an audio or video file I have to study the material, I have to play the audio, play the video and double-check everything to make sure, and as I go through I always find something that I am not in agreement with so I change it.  And then the final, I turn in the final version with my certification on it.

Q.   What is your goal when you are performing translations and transcriptions?

A.   To be as accurate and as precise as possible.

Q.   During your career, approximately how many hours of Spanish language recordings have you translated into English?

A.   Probably somewhere around 2,000 recorded hours.

Q.   During your career --

        THE COURT:  How many thousand?

        THE WITNESS:  2,000, your Honor.

        THE COURT:  Thank you, sir.

Q.   During your career, approximately how many Spanish language texts have you translated into English?

A.   Probably 5,000 texts, at least.

Q.   Approximately how many times have you interpreted Spanish

to English as a court interpreter?

A.   Probably between 40,000 and 50,000 time.

MS. TARLOW:   Your Honor, at this time the government offers Manuel Prado as an expert in the field Spanish to English transcription and translation.

THE COURT:   Without objection, you may proceed.

Q.   I would like to now talk about your work in this case. What, if anything, were you provided to review for this case?

A.   I was provided video files, audio files, text messages, and some government-type documents.

Q.   Were you also provided with draft transcripts and translations for certain of those materials?

A.   Yes, I certainly was.

Q.   What, if anything, did you do with those draft transcripts and translations that you were provided?

A.   Well, as I mentioned earlier, I have to go through them word by word, I have to listen to the audio, watch the video, double check everything, make any corrections that have to be made, and then when I am satisfied with the work, I certify it.

Q.   Do you know who prepared the initial drafts of those transcripts and translations that you were --

A.   No, generally I do not; no.

Q.   -- that you were provided in this case, Mr. Prado?

A.   No, generally I do not, no.

Q.   And with respect to this case, do you know who wrote the

O2Q5her2                    Prado - Direct

initial drafts?

A.  No, I don't.

Q.  Would that affect your review of the translations in any way?

A.  No, it wouldn't.

Q.  In verifying the accuracy of the draft transcripts and translations that you received in this case, did you depart at all from your general practices for verifying their accuracy that you just described?

A.  No, I didn't.

Q.  What did you do if the draft transcripts and translations were not accurate in this case?

A.  I would change them.

Q.  Did you verify the accuracy of every word on every draft transcript that was intelligible?

A.  Yes, I did.  Yes.

Q.  Did you verify the accuracy of every word for the draft translations for the Spanish-language text that you received in this case?

A.  Yes, I did.

Q.  Approximately how many hours did you spend reviewing the recordings that you received in this case?

A.  Probably around 250 hours or so.

Q.  Approximately how many hours did you spend reviewing the draft translations of the Spanish language text that you

received in this case?

A.   Probably another hundred hours.

Q.   What were your rates in this case, generally?

A.   Generally it is $70 an hour.

Q.   How does that compare with the rates charged by your colleagues for the same kind of work?

A.   It is commensurable.

MS. TARLOW:   Your Honor, may I approach the witness?

THE COURT:   You may.

Q.   Mr. Prado, I have placed in front of you a binder that contains the following government's exhibits:  Government's Exhibits 202R-2T through 202R-4T, 203R-10T through 203R-12T, 204R-1T, 204R-2T, 250A-2T, 250C-2T, 401A-T, 401B-T, 402, 403T through 406T, 408T through 410T, 802T through 804T, and 905T.

Do you recognize the documents contained in that binder?

A.   Yes, I do.

Q.   Generally, what are they?

A.   They are work that I have checked and certified.

Q.   Does this binder contain the translations you verified for the recordings and Spanish languages texts you that you received in connection with this case?

A.   Yes, I did.

Q.   Do the translations contained in this binder reflect accurate English translations of those materials?

A.   Yes, they're accurate.  Yes.

Q.   Do the exhibit numbers of the translations correspond to the exhibit numbers of the underlying recordings and texts so that the translation marked, for example, Government Exhibit 409T, corresponds to the Spanish language recording marked Government Exhibit 409?

A.   Correct.

Q.   In verifying the accuracy of the draft translations that you received, did you also review the accuracy of the abbreviations listed on the cover page for the translations?

A.   Yes, I do.

Q.   Are those standard abbreviations used in transcribing and translating recordings?

A.   Yes, they are.

Q.   Other than the translation work you just testified about, did you have any other involvement in this case?

A.   No.  None whatsoever.

         MS. TARLOW:  May I have one moment, your Honor?

         THE COURT:  Yes.

         MS. TARLOW:  Nothing further your Honor.

         THE COURT:  You may cross-examine.

         MR. COLON:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. COLON:

Q.   Good afternoon, Mr. Prado.

A.   Good afternoon, sir.

Q.   I am going to be short here, but if you can't hear me let me know.  OK?  And I would ask you to emphasize your voice as well.

A.   All right.

Q.   So, with respect to the evidence on the record now that's been admitted into evidence, 250A-2; do you have that with you, that binder there?

A.   What is the number again?

Q.   250A-as-in-apple 2.  I would like you to go to page --

         MR. COLON:  This binder is in evidence.

         MS. TARLOW:  Your Honor, it is not currently in evidence.

         THE COURT:  It is not in evidence.

         MS. TARLOW:  We would have no objection, your Honor, if defense counsel wants -- the government would offer the binder at this time, if defense counsel has no objection.

         MR. COLON:  No objection.

         THE COURT:  Received.  Now it is in evidence.

         And this is the translations?

         MS. TARLOW:  Yes, your Honor.

         THE COURT:  All right.

         (Government's Exhibits 202R-2T through 202R-4T, 203R-10T through 203R-12T, 204R-1T, 204R-2T, 250A-2T, 250C-2T, 401A-T, 401B-T, 402, 403T through 406T, 408T through 410T, 802T

O2Q5her2                      Prado - Cross

through 804T, and 905T received in evidence)

BY MR. COLON:

Q.  Mr. Prado, if you would take an opportunity to look at

Government Exhibit 250A-2, page 2?

A.  OK.

Q.  Now, did you have an opportunity to read that in Spanish

and translate that into English?

A.  250A-2; right?

Q.  Yes, page no. 2, specifically with the name Hernandez.

A.  Yes.

Q.  Did you compare both the ledger and your English

translation?

A.  Yes.  I believe it is here.  We are talking about a ledger;

right?

Q.  Yes.

A.  Right.

Q.  So that ledger that you were employed to translate, do you

recall that?  Do you remember having done this?

A.  Yes, I do remember it.  Yeah.

Q.  Now, in the Spanish version, which is the ledger, can you

spell out the name that's indicated that starts with -- it is

pronounced:  Hernandez.

A.  I'm not sure if I understand exactly what you mean but

there is a name of "Tony Hernandez" here.  Is that what you

mean?

Q.   Right.  In the ledger, in the Spanish language ledger.

A.   I don't know about the Spanish.

Q.   You have to look at the ledger as opposed to the translation, or at least look at the ledger now.

A.   Where would I find that, I wonder?

          MR. COLON:  I'm sorry, Judge.  May I approach?

          THE COURT:  Yes.

          (Counsel conferring)

          MR. COLON:  I'm sorry, Judge.  I'm going to need a ledger to be displayed here.

Q.   Did you have an opportunity to look at the ledger itself?

A.   Yes, I see that, yeah, in front of me on the screen.

Q.   You read the whole ledger completely, correct?  Or that page?

A.   I can see it.

Q.   Right, that's page 2; correct?

A.   It says page 1.

Q.   Do you see the name "Tony Hernandez" on the top of the page?

A.   I do.  Yes, I do.

Q.   And how would you spell Hernandez?

A.   How would I spell it or how is it spelled here?

Q.   Tell the jury how you spell Hernandez, in this case, the ledger.

          THE COURT:  Well, you would like him to tell you how

O2Q5her2                        Prado - Cross

he would ordinarily spell "Hernandez" or how he spells it in this case?

MR. COLON:  How it's spelled in the ledger on that page, Judge.

THE COURT:  That's a third question.  That's a different question.

MR. COLON:  I'm sorry, Judge.  I want him to spell out "Hernandez" on the ledger.

THE COURT:  As it is spelled on the ledger.  Thank you.

THE WITNESS:  H-E-R-N-A-N-D-E-S.

BY MR. COLON:

Q.  Right.

And you translated that; correct?

A.  Yes, I did; correct.

Q.  Do you have the translation with you?

A.  It is right there, yes.

Q.  And how do you spell Hernandez in your translation?

A.  H-E-R-N-A-N-D-E-Z.

Q.  So that's two different letters; right?  One is "S" and one is "Z," correct?

A.  Correct.

Q.  Now you try to be accurate when you review these documents?

A.  Yes, but you also have to take into account the education of the people that are writing the messages.

O2Q5her2                        Prado - Cross

MR. COLON:  Objection.  Move to strike.

THE COURT:  Stricken.

Q.  Again, I'm going to ask you, the ledger indicates letter "S."  That's what you read, correct?

A.  Correct.

Q.  In your translation you put in the letter "Z."  You substituted the letter "Z," correct?

A.  Correct.

Q.  Now, it's not your job to substitute letters in translations; is that correct?  Yes or no.

A.  You could say so.  One could say so.

Q.  That would be it's not your job; correct, sir?

A.  It is a difficult question to answer, counsel, because one has to, as a translator interpreter, we one has to use one's common sense as well.

MR. COLON:  Objection.  Move to strike.

THE COURT:  Just answer the question as best as you can.  If it is a "yes" or "no" question, please answer it that way.  All right?

Go ahead.

BY MR. COLON:

Q.  So you changed the spelling of the name?  Yes or no.

A.  Yes.

Q.  So that wasn't accurate, was it?

A.  No.

O2Q5her2                        Prado - Cross

Q.   And yet you certified that?

A.   Correct.

Q.   So let's go to 250A-2 page 8 in the ledger, and its equivalent translation.  That has got a date on it: November 5, 2018.  That was correctly translated in your translation and it says "JOH and his people."  That's your translation, correct?

A.   Yeah.

Q.   And if you look at the ledger, and it says JOH.  J-O-H I-S-U  G-E-N-T-E.  Right?  *JOH isu Gente*; is that correct?

A.   Right.

Q.   Now, *isu*, you will agree with me, is gender neutral by itself?

A.   Yes.

Q.   By itself?

A.   Yes.

Q.   And you took it upon yourself in your translation to put in or substitute the word "his;" correct?

A.   "His," yeah.

Q.   You had no reason to make it a "his," it could have been a "her;" correct?

A.   Theoretically.

Q.   So you weren't accurate there with respect to your translation, were you?

A.   I beg to differ.

Q. Well, *isu* you testified is gender neutral but here you decided on your own impetus was to put "his." You made it a male as opposed to possibly a female; correct?

A. Correct.

Q. So you weren't accurate there, were you?

A. I beg to differ.

Q. Well, *isu*, you said, is gender neutral, and you write "his" instead? That's what you wrote, right, as a translation?

A. Correct.

Q. And you certified that that was an accurate translation of an original document in a ledger that you reviewed?

A. It is.

Q. Let's go to 250A-2, page no. 9. Now, we are highlighting E-C-H-A  D-E  L-A  J-O-H; correct, sir?

A. Yes.

Q. You can see that in the ledger?

A. Yes.

Q. Now, the word *echa*. *Echa*, E-C-H-A, means what in Spanish, if you can tell us?

A. I'm not sure. I put -- in my translation it says "unknown."

Q. Are you supposed to put a designation like "unknown" on documents?

A. I can, yes.

Q. Well, so you have the right to redact or edit something

from these translations?

A.  Well, if I can't translate it what am I -- that's what I have to do.

Q.  Well, let me ask you this.  Where does it say "unknown" in Spanish in the ledger after the word *echa*?

A.  It doesn't, that's why it is in brackets.

Q.  So you put that in there?

A.  Correct.

Q.  You didn't really translate this literally; did you?

A.  Yes, I did.

Q.  Where does the word *echa* come from?  E-C-H-A, where does it come from.  What is the derivative?

A.  *Hacer*.  It comes from to do.

Q.  What does that mean in English?

A.  Counsel, I didn't know what it meant in English.  I wouldn't know what it meant in Spanish so I put there in brackets "unknown" to indicate that I didn't know.  That's what I do.

Q.  Isn't it true that the word *echa* comes from the word *echar*, E-C-H-A-R, which is throw out or remove?

MS. TARLOW:  Objection.

THE COURT:  Yes.  You are cautioned not to speculate. If you know, you know.  If you don't, you don't.

You may answer it, sir.

A.  It might, but it might mean something else as well.

Q.  Well, you don't know what it means, you are just translating the word; correct?

A.  I didn't translate the word, I put down the same original word, Spanish word.

Q.  But you will agree with me that it comes -- that there is a word that is spelled E-C-H-A-R which is to throw out or remove?

MS. TARLOW:  Objection.

THE COURT:  Well, now your question is is there such a word in the Spanish language?  Is that the question you are asking?

MR. COLON:  I guess that's it, Judge.  Thank you.

Q.  Is there such a word in the Spanish language as *echar*, E-C-H-A-R?

A.  Yes, there is.

Q.  And it means to throw out or to remove, correct?

A.  Correct.

Q.  So, if that's what this was meant to signify in English it would be to throw out to the *JOH*, to the J-O-H.

A.  No.  I don't agree with that.  There is another translation that could work here.

Q.  But your word "unknown" is not in that?

A.  It's not the translation, that's my commentary and it is in brackets.

Q.  But you are not supposed to make commentary.

A.  Yes, you are.

MS. TARLOW:  Objection.

Q.  You are supposed to decide whether --

THE COURT:  Overruled.

A.  No, you are not.

Q.  That's what it means?

The word "unknown" isn't apparent over here.  What is the word "unknown" in Spanish?

A.  Sir --

MS. TARLOW:  Objection.

THE COURT:  Sustained.  You heard the witness' testimony, Mr. Colon.

Q.  Going to H-E-C-H-O; what does that mean?

A.  Please say that again?

Q.  The word in Spanish H-E-C-H-O; what does that mean?

A.  Done.

Q.  Or made out to?

A.  Or what?

Q.  Made out to; like a receipt made out to someone.

A.  I understand the context but I don't think you are right, no.

Q.  What does that mean, H-E-C-H-O, even though it is not in the document.  If you substitute that word.  H-E-C-H-O space D-E space L-A space J-O-H; what would that mean?

MS. TARLOW:  Objection.  Relevance.

THE COURT:  Yes.  You have to lay a foundation for

that question.  You could say anything in your question and that's not relevant, so.

BY MR. COLON:

Q.  Let's move on to *la* J-O-H-.  That's a feminine translation; right?

A.  It is what?

Q.  *La*.  *La* would be a feminine?

A.  Could be.

Q.  What do you mean it could be?  It is either L-A or what else could it be?

A.  Yeah, it could be feminine.  Yes.

Q.  In fact, that's what *la* in front of another word like a name or a company, that's what it refers to, it is a company that would be a feminine, either an individual who is a woman or a company; correct?

A.  Not necessarily.  You have to look at the context.

Q.  Well, what's the context here with *la* J-O-H?  Withdrawn. Withdrawn.

A.  When you are talking about something like --

THE COURT:  The question has been withdrawn so you don't have to answer.

Next question, please.

Q.  There is nothing that indicates a --

THE COURT:  Wait.  Sir, pause.  Your next question. Go ahead.

BY MR. COLON:

Q.   There is nothing here that indicates a context here there?

A.   It's difficult because it could refer to the thing of J-O-H.

Q.   To what?  I'm sorry?

A.   It could -- one of the -- depending on the context, and I would have to study the whole document again, it could refer to the thing, whatever the thing was, of J-O-H.

Q.   Right, but you don't know whether that would be a man or a woman; do you?

A.   Or a thing.

Q.   So man, woman, or thing?

A.   Correct.

Q.   Like an animal, for instance?

A.   No.  Perhaps some project that was being put together or being built and was thrown out or whatever.  It could be anything.  It's very difficult to try to give you a good feeling of this when I don't really have the whole context to study it.

Q.   And in this case you did not have the whole context to study it, do you?

A.   Neither in that case nor right now either.

Q.   I am just asking what you are seeing in that ledger *la* J-O-H.  You don't know whether that was referring to a man, or a woman, or a thing?

A.  Correct, necessarily.

Q.  If it was male, though, it would have to be E-L; correct?

A.  In the context, you know, it could be, but it could also be talking about some thing of J-O-H so it doesn't have to be *el, la*, as female or male or a thing.  It could be a thing.

Q.  Or a male.  Or a female.

A.  I don't see -- I don't understand what you are getting at, counsel.  I did the best I could when I translated it.

Q.  I'm sure, but *la* happens to be what introduces a female generally; correct?

A.  Correct, but in Spanish sometimes you don't use all the words so that it could be a missing word in there.

Q.  We are not asking about missing words, this is what you see in front of you.

A.  That's why I didn't translate it because it is missing.

Q.  But the word is *la* and that generally applies to a female, correct?

A.  Correct.

        MR. COLON:  One second, Judge?

        THE COURT:  All right.

        (Counsel conferring)

BY MR. COLON:

Q.  And if J-O-H is a female, rather than -- let's go back to 250A-2 page 8, if we could, if you, with respect to *JOH isu gente*, what you have there is "their people;" correct?

O2Q5her2                        Prado - Cross

A.   Please repeat.

Q.   With J-O-H space I-S-U space G-E-N-T-E, it is:  JOH and their people, as well?

        MS. TARLOW:  Objection.

        THE COURT:  One second, please.

        Objection.  Basis?

        MS. TARLOW:  That's not what the document says.  It is mischaracterizing the witness.

        THE COURT:  Rephrase your question, please.

BY MR. COLON:

Q.   It could be JOH and her people or JOH and their people; correct?

A.   No.

Q.   With a *la* in front of it, it would have to be a reference to her people?

A.   I don't see a *la* on this page.

Q.   No, but given what we saw before with *la JOH*, if you connect the two then it would be her people; correct?

A.   But I wouldn't connect it because *la* could refer to a thing.

Q.   Or a woman.

A.   Perhaps.

        MR. COLON:  Thank you.

        THE COURT:  Any redirect?

        MS. TARLOW:  Yes, your Honor.

MR. COLON:  Judge, I think there is a couple of other things I may have to talk about.

THE COURT:  I thought you were finished.  You sat down.

MR. COLON:  I did, Judge.

THE COURT:  Well, I would appreciate it the next time when you finish an examination to say "no further questions" and then there won't be an ambiguity.

MR. COLON:  I'm sorry, Judge.

THE COURT:  OK.  Go ahead.

BY MR. COLON:

Q.  Now, this translation was about how many documents?

A.  I don't recall.  There were quite a few.  Maybe a hundred or so, all told.

MR. COLON:  May I step away for a second, Judge?

THE COURT:  You may.

(Counsel conferring)

MR. COLON:  I'm sorry, Judge.  That's it for now.

Thank you, sir.

THE COURT:  Any redirect?

MS. TARLOW:  Yes, your Honor.

REDIRECT EXAMINATION

BY MS. TARLOW:

Q.  Mr. Prado, in reviewing the documents that you were asked to review in connection with this case, did you find any

O2Q5her2                        Prado - Redirect

misspellings in connection with your review?

A.  Yes.  Of course.

Q.  And with respect in particular to Government Exhibit 250A-2, did you find any misspellings in that exhibit?

A.  Yes, I did.

        MS. TARLOW:  Ms. Collins, if we could please publish Government Exhibit 250A-2.

Q.  Mr. Prado, did you do your best to correct any misspellings that you found?

A.  Yes.  Of course, I would have corrected any misspellings. Of course.

        MS. TARLOW:  Now, turning to page 2, Ms. Collins?

Q.  On cross-examination you were asked questions about the spelling of the name "Tony Hernandez" here.  Do you remember those questions?

A.  Yes, I do.

Q.  And you testified that you translated "Tony Hernandez" with a Z; is that right?

A.  Yes.

Q.  Why did you do that?

        MR. COLON:  Objection.

        THE COURT:  Overruled.

A.  When you see a document like this, there are a whole lot of misspellings in the original language, one would assume that the person writing it has limited education so you do the

corrections that need to be done to be understood.

MR. COLON:  Move to strike, your Honor, as to assume.

THE COURT:  No.  I will allow it to stand.

MS. TARLOW:  May I have one moment, your Honor?

THE COURT:  Yes.

MS. TARLOW:  Nothing further.

THE COURT:  The government may call its next witness.

MR. WIRSHBA:  Yes, your Honor.  The government calls Jennifer Taul.

THE WITNESS:  May I be excused?

THE COURT:  You are excused.  Thank you very much.

THE WITNESS:  Thank you, your Honor.  Have a good day.

(Witness excused)

JENNIFER TAUL,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE COURT:  You may inquire.

MR. WIRSHBA:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. WIRSHBA:

Q.  Good afternoon, Ms. Taul.

A.  Good afternoon.

Q.  Who is your current employer?

A.  Drug Enforcement Administration.

Q.  Is that commonly referred to as the DEA?

O2Q5her2                          Taul - Direct

A.   Yes.

Q.   What's your title there at the DEA?

A.   I'm an intelligence research specialist.

Q.   What is an intelligence research specialist?

A.   We are part of the investigative team, more commonly referred to as an analyst.  We help research and investigate drug trafficking.

Q.   How long have you been with the DEA?

A.   Over 21 years.

Q.   Have you had that same role throughout your career with the DEA?

A.   I have.

Q.   And before you joined DEA, where did you work?

A.   The United States Air Force.

Q.   How long were you in the Air Force?

A.   I was in the Air Force active duty approximately four years, and then in the Air National Guard for almost four years.

Q.   What is your educational background?

A.   I have a bachelors degree in criminal justice administration.

Q.   You mentioned that you began working with DEA over 20 years ago.  When did you first begin working with that Organization?

A.   I began working with DEA through a special program.  I was in the Air National Guard put on active duty orders to sit with

O2Q5her2                     Taul - Direct

the Phoenix field division office in their intelligence group in Arizona.

Q. And what did you do with the Phoenix intelligence group?

A. I was sat next to the other DEA analysts and researched drug trafficking routes coming from Mexico into Arizona, to disrupt any loads of mostly cocaine coming around the southwest border into the United States.

Q. Was cocaine the focus of those investigations that you were conducting while in Phoenix?

A. Yes.

Q. How long were you stationed in Phoenix?

A. Approximately three years.

Q. After Phoenix, where did you go next?

A. From Phoenix I was hired on directly by the DEA, so I reported to the DEA training academy in Quantico, Virginia.

Q. Let's talk about that training. Please describe the initial training that you received in Quantico.

A. The basic intelligence research specialist course is an in-service course that runs approximately 12 weeks. They instruct on federal drug law, how to conduct investigations, report writing, charting, network analysis, working investigations with agents. Those types of --

Q. Have you taken other training while employed with the DEA?

A. Extensively.

Q. What other training have you undertaken?

A.   As technology advances I continually have to take courses in computer systems, updating our skills in that realm.  I have taken confidential source management, firearms, working with SIUs -- or Sensitive Investigative Units -- in other countries.

Q.   And during your employment with the DEA, has the DEA tested your language skills?

A.   They have.

Q.   In which language or languages have you been tested?

A.   Spanish.

Q.   According to the DEA, what is your level of fluency in Spanish?

A.   DEA rated me as fluent in speaking comprehension, reading and writing in 2005, and again in 2016.

Q.   And following your training at the DEA Academy in Quantico, what was your next assignment?

A.   I was assigned to the El Paso Intelligence Center referred to as EPIC.

Q.   What is EPIC?

A.   EPIC is a law enforcement center that has over 20 different agencies, both state, local, federal, and international partners, that are focused on threats to the United States. Their main focus is the western hemisphere, and with DEA, drugs coming up through the southwest border.

Q.   And what methods did you use to conduct those investigations while you were at EPIC?

A.  Epic was a little different than Phoenix.  Instead of working with agents on actual cases, loads being delivered next week, say, it was more collecting reports from different DEA offices and identifying who was in charge of what we would call corridors on the southwest border.  You know, there is always drug trafficking organizations are fighting for territory so it was my responsibility to identify who owned what territory coming into the United States.

Q.  And what narcotic were you primarily focused on while you were stationed in El Paso at EPIC?

A.  Cocaine.

Q.  Turning to 2006, did you leave El Paso?

A.  I did.

Q.  Where were you next stationed?

A.  Caracas, Venezuela.

Q.  What kinds of investigations did you work on in Caracas, Venezuela?

A.  We worked cocaine investigations.  There was a small group of us, I was the only analyst for the entire country so our focus was the main -- the top producers of cocaine coming through Venezuela towards the United States.

Q.  While in Venezuela, what methods did you use to conduct those investigations you have been describing?

A.  Mostly human informants.  We also collaborated with other countries, our offices in other locations.

Q.   What was the primary narcotic that you were involved in
investigating while in Venezuela?

A.   Cocaine.

Q.   Turning your attention to 2010, did you leave Venezuela?

A.   I did.

Q.   Where did you go next?

A.   Tijuana, Mexico.

Q.   What were the focus of your investigations while you were
in Tijuana?

A.   I was eventually doing the same thing, but in Tijuana our
focus was on the southern border of California, cocaine coming
from Mexico into California.

Q.   And did you use the same methods of investigation that you
have been describing from other duties?

A.   Yes.

Q.   How long were you stationed in Tijuana?

A.   Approximately three years.

Q.   And where did you go after that?

A.   I was transferred to a special assignment that was
headquartered in Northern Virginia but had me out of the
country most of the year.

Q.   When you say out of the country, where around the world
were you stationed as part of that special assignment?

A.   I spent most of my time in Afghanistan.  A solid chunk of
time in Bahrain.  I did a few months in Mexico.  And, I spent a

month in Honduras as well.

Q.  What were your responsibilities in that role as part of special assignment?

A.   It varied from place to place.  In Afghanistan, for example, I was one person on a 10-man team and as the analyst on the team it was my job to identify and locate where heroin labs were in order to dismantle them.  And the other regions it was, again, cocaine trafficking; identifying who was who in the area, who controlled it, who was moving through it.  Those sorts of things.

Q.  Directing your attention to 2015, did you leave that assignment and take on a new one?

A.  Yes.

Q.  And where were you next assigned?

A.   I transferred to DEA's Special Operations Division, or SOD.

Q.   What is the Special Operations Division?

A.   It is similar to how I described EPIC.  There are over 30 partners there, though, and instead of their main focus being western hemisphere, it is threats worldwide.

Q.  Were you assigned to any particular unit or group while you were at the Special Operations Division?

A.  Yes.  I was assigned to the bilateral investigations unit, or BIU.

Q.  What does the bilateral investigations unit do?

A.  It is a unit of investigators that kind of bridge the gap

from foreign to domestic investigations.  They are looking at the top threats of drug trafficking, weapons trafficking, money laundering, that are a threat to the united states.

Q.  While you were at the Special Operations Division at BIU, what, if any region, were you focused on?

A.  I was assigned to a group that worked investigations in the western hemisphere.

Q.  Did these investigations at BIU focus on any particular narcotic?

A.  Cocaine.

Q.  Directing your attention to 2017, did you leave BIU?

A.  I did.

Q.  What was your next assignment?

A.  I transferred to Bogota, Colombia.

Q.  While you were in Colombia, what was the focus of your investigations?

A.  My focus remained cocaine.  In Colombia, it was against the paramilitary groups that were paying the farmers growing the crops, and so it started from the inception of the cocaine -- or the coca leaf into cocaine, attacking labs, and then identifying the routes into Venezuela or the coast, on the way to the United States.

THE COURT:  With that, we are going to leave it for our lunch break.

One programming note, ladies and gentlemen.  As you

O2Q5her2                         Taul - Direct

may know, this court, the United States District Court for the Southern District of New York, has two court houses here. This court house, which is at 500 Pearl, and right directly across the street is 40 Foley Square, the older building right on the other side of Pearl Street. You are welcome to use the cafeteria on the ground floor of 40 Foley Square. You may not use the cafeteria in this building on the 8th floor. This is a procedure that we long follow for all trials so that lawyers, witnesses, and others involved in the trial are not in proximity with our jurors. So I just wanted to remind you of that. You are most welcome to go to the ground floor of 40 Foley. I am told the menu is identical so you can let me know whether that is right or not.

Have a very pleasant lunch. See you for a 2:00 start. Thank you.

(Jury not present)

THE COURT: We are in recess. Thank you.

(Continued on next page)

O2QHHer3

AFTERNOON SESSION

2:05 p.m.

(In open court; jury not present)

THE COURT:  Remain standing for our jury, please.

You may be seated.

(Jury present)

THE COURT:  All right.  Please be seated.

Mr. Wirshba, you may proceed.

MR. WIRSHBA:  Thank you, your Honor.

JENNIFER TAUL, resumed.

BY MR. WIRSHBA:

Q.  Ms. Taul, before the break, I think we were talking about your assignment after you left the BIU.  Do you remember that?

A.  Yes.

Q.  So after you left the BIU in 2017, where did you go next?

A.  To Bogota, Colombia.

Q.  And while you were in Colombia, what was the focus of your investigations?

A.  Cocaine trafficking initiated by paramilitary groups in the jungle from the coca fields to the drug labs and then the transit routes from there.  In addition to Venezuela, especially when the U.S. embassy closed in early 2019, I became the point of contact for Venezuela matter in the Andean region.

Q.  You mentioned paramilitary groups.  What do you mean by that?

O2QHHer3

A.   Groups like the FARC, ELN, they are in the region.  Some espousing political agendas using cocaine trafficking as a means to fund their activities.  Others are more flagrantly just trafficking drugs.

Q.   Directing your attention to 2021, following Colombia, what was your next assignment for the DEA?

A.   I transferred to Honolulu, Hawaii, where I am now.

Q.   Did you keep informed about drug trafficking in Central and South America despite being assigned to Hawaii?

A.   Yes.

Q.   How did you do so?

A.   I have kept relationships, both personal and professionally, with people in all the areas I've served.  I read DEA reporting.  I follow local news in the areas that I've been.  It's something, obviously, I've spent a lot of time on.  So just because I'm in Hawaii, I do like to keep up with what's going on.

Q.   During your two decades with the DEA, have you learned about how cocaine is produced?

A.   Yes.

Q.   How were you able to learn about cocaine manufacturing?

A.   I have taken classes.  I have read reports.  I learned the most from interviewing our human informants who have served as cooks, what we call cooks, or chemists in the lab actually making cocaine.  And also while assigned in Colombia, I went

with the Colombian military, their police force.  It's a military police force, special forces, that has a jungle lab setup, and they took us there for the day and showed us, from the leaf to the paste to the bricks, how everything was made.

Q.   You mentioned a —— confidential informant, I think, is what you said.  What is a confidential informant?

A.   It's a term we use for human sources.  A lot of people that do like to help us that have the type of information that we require, their identity remains confidential.  So we will call them a confidential source or an informant.  It all means just a person that we're not going to use their name in public.

Q.   And have you worked with confidential informants throughout your career with DEA?

A.   Yes.

Q.   Over the course of your career, have you worked on cases involving the seizures of boats that were transporting cocaine?

A.   Yes.

Q.   Have you worked on cases involving the seizure of airplanes that were transporting cocaine?

A.   Yes.

Q.   Over the course of your career, approximately how many investigations would you say that you've worked on as part of your career at DEA?

A.   That would be hard to quantify.  If I had to guess, I would say in the hundreds that I've contributed to.

O2QHHer3

Q.   While working on those investigations, did you learn about the routes that are commonly used to transport cocaine to the United States?

A.   Yes.

Q.   The methods of operation that drug traffickers commonly use along the way?

A.   Yes.

Q.   Did you learn about the price of cocaine along those same routes?

A.   Yes.

Q.   And about the relationships between drug traffickers in Central and South America and Mexican drug trafficking cartels?

A.   Yes.

Q.   In testifying today, will you be relying on a synthesis of all the different types of investigatory methods that you've described for the jury?

A.   Yes.

Q.   Have you previously testified as an expert in a federal trial?

A.   Once.

         MR. WIRSHBA:  Your Honor, the government moves to qualify Ms. Taul as an expert in cocaine manufacturing processes, as well as drug trafficking routes and pricing.

         MR. STABILE:  No objection, your Honor.

         THE COURT:  OK.  So qualified.

O2QHHer3

MR. WIRSHBA:  Ms. Collins, if we could show the witness, the parties, and the Court what has been marked as Government Exhibit 504.

BY MR. WIRSHBA:

Q.  Ms. Taul, do you see something on your screen?

A.  Yes.

Q.  Do you recognize this?

A.  I do.

Q.  What is it?

A.  It's a PowerPoint presentation.

Q.  Will it assist you in your testimony today?

A.  It will.

Q.  Did you assist in the preparation of this PowerPoint presentation?

A.  I did.

Q.  Did you review it for accuracy?

A.  I did.

MR. WIRSHBA:  At this time, your Honor, the government would seek to publish Government Exhibit 504 as a demonstrative to the jury.

MR. STABILE:  No objection.

THE COURT:  All right.  A demonstrative exhibit isn't the testimony or the evidence itself, but it's used to illustrate or to explain the testimony.  So just as in olden times somebody might write on a chalkboard or an easel, so you

O2QHHer3

can put something on a PowerPoint in order to explain what you're talking about.

Go ahead.

MR. WIRSHBA:  Thank you, your Honor.

Ms. Collins, you may publish to the jury.

Q.   Now, Ms. Taul, let's take a look at the first slide of this PowerPoint presentation.

Ms. Collins, if we could, next slide.

What country —— I'm sorry, Ms. Taul, what is the geographic area that is depicted on this map?

A.   This is map of South America, mostly Colombia and its neighbors.

Q.   What country is the greatest producer of cocaine in the world?

A.   Colombia.

Q.   Where is Colombia on this map?

A.   It's taking up most of the screen in the darker gray color in the middle.

Q.   Approximately how much cocaine that is consumed in the United States is produced in Colombia?

A.   Estimates range between 90 and 95 percent.

Q.   And what's depicted in this particular demonstrative, this map?

A.   This is a snapshot of coca crops over a year and how they grew in different areas.  You'll see red, a lot of yellow, and

green.  Really, all the colors are just showing where the coca crops are with, obviously, the red being an increase in coca leaf production of that year.

Q.  So what are the other colors, yellow and green, indicating?

A.  The yellow, it remains stable, and the little green you see, there's a slight decrease.

Q.  What types of places are covered by the red in this map, the places where there's an increase in cocaine in general —— in coca production, excuse me?

A.  I would say not just the red, but in all the coca crops, they are going to be places that are away from city, town, away from people, away from eyes, oftentimes hidden by the cover of jungle, trees.  Not next to main roadways or thoroughfares.

MR. WIRSHBA:  Ms. Collins, let's take a look at the next slide.

Q.  Ms. Taul, in general, what does this slide show?

A.  It's showing the process of producing cocaine generally.

Q.  At a high level, can you describe that process by which cocaine is manufactured in Colombia?

A.  Sure.  If you look at the first picture on the left of the coca fields, like any crop, you have farmers that are growing coca leaves to maturity.  Once they reach maturity, they're collected and loaded into vehicles.  They make their way to a lab, clandestine laboratory, where you see in the middle picture there for the cocaine production, there will be

O2QHHer3

55-gallon drums, chemicals like —— appears to be gasoline here mixing with the coca leaf to take out the —— the hydrochloride that they want.

I realize that I'm getting a little specific when you said a general overview.  But they go through a couple chemical processes, and then the last picture is the finished kilos of cocaine would then be sent up to the United States.

Q.  I want to focus in on one thing you said, which is "clandestine laboratory."  What is a clandestine laboratory?

A.  It's what we call where they do this manufacturing. Clandestine in nature because it is illegal.  Just like the coca crops I described, they're going to be kind of hidden out of sight, out of the way.  "Laboratory" is perhaps a word that you would think of a building or something more formal, but it's very informal.  I would imagine a tarp overhead with these drums, the cocaine, chemicals, a cook or chemist, a couple of people working there, and that's about it.  It's really very rural and basic.

Q.  You say it's rural.  Where are these clandestine laboratories typically located within Colombia?

A.  Most often in the jungle, covered, hidden by tree cover, off the beaten path.

Q.  And you mentioned that on the right in that photograph is a kilo of cocaine, I think is what you said.  What do you mean by "a kilo of cocaine"?

A.   We will say a kilo or a key, meaning the weight of that rectangle-shaped brick.  We might also call it a brick.  It's all synonymous.  It would be 2.2 pounds of pressed cocaine powder or the finished product.

Q.   So you mentioned that a kilogram weighs approximately 2.2 pounds.  How many kilograms is there in a ton of cocaine?

A.   1,000.

Q.   So in pounds, how much does a ton of cocaine weigh, if I could bother you to do a little simple arithmetic?

A.   2,200.

Q.   I see there's something marked on the top of the kilos of cocaine that are depicted in Government Exhibit 504.  What are those?

A.   Those are sometimes referred to as stamps.  So the bricks of cocaine will be wrapped as you see.  Sometimes they're the darker —— you have some darker colored wrap there or white. Sometimes they have stamps or imprints; sometimes they don't. The stamps here would be like a logo.  Sometimes you won't see them.  When I say "imprint," I mean like if you've ever had toast and you get like a stamp to press into your toast, it says "good morning" with a sun on it, the same sort of thing into the powder cocaine but inside of that wrapping.

Q.   In your experience, why is it that traffickers would use a stamp or an imprint?

A.   The logo or those stamps or imprints is brand recognition

or accountability.  Cocaine from Colombia is desirable.  You can trace it back to its origin or the transportation group that was moving it.  It's just a way to let people know where the cocaine was coming from.

Q.  And do traffickers sometimes use commonly used brands that we might know outside of the criminal context as stamps?

A.  I would say very often, yes.

Q.  All right.  Approximately how many individual doses of cocaine are in a kilogram or a single brick?

A.  In a brick of cocaine just leaving a lab, such as this picture here, it would be pure, and you're looking at between 15,000 and 35,000 individual doses.

Q.  And what happens to that number as you move along the way as the cocaine makes its way towards the United States?

A.  Well, say it lands in the United States.  Whoever has purchased, maybe they're purchasing one brick, and they want to make more to sell.  So they will cut it with other chemicals, ingredients, trying to stretch out their profit, which means they're going to sell more doses than the 15 to 35,000.

MR. WIRSHBA:  All right.  Ms. Collins, if we could take a look at the next slide.

Q.  Ms. Taul, what is this a map of?

A.  We're looking at Central America, the Caribbean, a little bit of South America, a little bit of North America.

Q.  You mentioned 90 to 95 percent of cocaine is manufactured

O2QHHer3

in Colombia.  Can you identify Colombia on this map, hopefully by drawing on it?

A.  Sure.  It is circled in yellow in the bottom right side there.

Q.  I do not see that.  Is that coming up on your screen, Ms. Taul?

A.  It is.

Q.  Do you see it?

THE COURT:  You might want to press —— let's see it.  No, there is not —— OK.  Can't help.

Flo or Stewart.

THE WITNESS:  I can describe it.  That's fine.

THE COURT:  Can you see it now on the screen?

JUROR:  Yes.

MR. WIRSHBA:  Yes, your Honor.  May I ask whether the jurors see the annotation?

JUROR:  Yes.

MR. WIRSHBA:  Fantastic.

BY MR. WIRSHBA:

Q.  Ms. Taul, it looks like you've circled something on the bottom right corner where the map is labeled "Colombia."  Is that what you intended to circle to indicate Colombia?

A.  Yes.

Q.  All right.  Now, once cocaine has been manufactured in Colombia, what are the primary, the main, routes by which that

cocaine leaves Colombia on its way to the United States?

A.   There is the Caribbean route up north to the Caribbean Sea and then also the Central America route going through Central America, Mexico, to the U.S.

Q.   Could I ask you to indicate just with a single line what you described as the Caribbean route, which is going up through the Caribbean, understanding that it will be imprecise.

Let the record reflect that the witness has drawn an arrow from the bottom right portion up through the part of the map marked "Haiti."

And then would you also, Ms. Taul, indicate on the map just in a general line what you described as the Central American route.

A.   Sure.

MR. WIRSHBA:   Let the record reflect that the witness has drawn a line from the part of the map marked "Colombia" on the bottom right through the part of the map marked "Nicaragua" and up through the United States.

Q.   Now, Ms. Taul, since 2004, approximately, what route has been more prominent?

A.   The Central America route.

Q.   How prominent is the Central American route?

A.   There are estimates of 92 to 94 percent is taking the Central American route in recent years.   Ten years ago, it was heavier towards the Caribbean route, but every year since then

O2QHHer3

it's slowly got —— more favored was the Central America-Mexico route until now it's about 92 percent.

Q.  Focusing on that Central American route, what are the principal methods of moving cocaine along that route?

A.  Air, land, and sea.

Q.  Let's start with air.  Can you describe in general the way that cocaine would move along the Central American route by air, identifying the countries along the way?

A.  Sure.  From the lab we were at with the bricks of cocaine, it would cross into Venezuela and then from there fly to —— I'm drawing on the lap, if that's OK —— fly to Central America, typically, could be Costa Rica, very heavy Nicaragua, Honduras, Honduras and Guatamala would be where they land most often.

Q.  Now I see that you've marked on the map movement from Colombia into a part of the map marked "Venezuela," is that right?

A.  That's correct.

Q.  Is that the country of Venezuela?

A.  It is.

Q.  And why is it that cocaine is first often taken to Venezuela before being put onto airplanes?

A.  That is so that the drug loads can move without interception.  Colombian airspace is monitored much more closely, and in Venezuela there are routes that are used daily without any interference from Venezuelan authorities.

O2QHHer3

Q.   You also indicated on the map through the drawing of the line there's a line from the part of the map marked "Venezuela" up to several countries in the middle of the map in Central America.  Let's go through those individually.

Is the first line further south, is that in the country of Nicaragua?

A.   Yes.

Q.   And the next one next up, is that in the country of Honduras?

A.   Yes.

Q.   And finally, what country is it that the third line is drawn into?

A.   Guatamala.

Q.   All right.  Now let's talk about the sea.

With respect to the Central American route, for maritime shipments of cocaine, can you identify the ways that the cocaine would move along that route?

A.   Sure.  From the south here, cocaine loads go out the Pacific Ocean, on that route, and then towards Central America on the north, again, to multiple countries.  This isn't indicative of everywhere they go, but that's the route that they go.

MR. WIRSHBA:  Let the record reflect that the witness has drawn a line along the bottom where it says "North Pacific Ocean" through the blue up towards Mexico and on the top from

O2QHHer3

the country labeled "Colombia" into the country labeled "Nicaragua," labeled "Honduras," and labeled "Guatamala."

Q.   And finally, Ms. Taul, land, how does land transportation come into play along the Central American route?

A.   There is the Pan-American Highway.  You could essentially drive it from Colombia up through, as I'm drawing a line.  That isn't as common, however.  It's much more common that the land takes the load where the maritime or air shipments leave it.  So if they were discarded in Nicaragua or Honduras or Guatamala, then the loads would be moved from either the fishing vessel or the airplane and then loaded into a vehicle that would then drive the rest of Central America into Mexico and into the United States.

         MR. WIRSHBA:  Let the record reflect that the witness drew a line along the yellow part of the map starting in Colombia and making its way up into Mexico.

         Now, Ms. Collins, if we could take a look at the next slide.

Q.   Ms. Taul, I'd like to talk about these three methods of transportation as they relate to Honduras.

A.   OK.

Q.   First, just to get our bearings, what is this a map of?  Which country in general?

A.   That's a map of Honduras mostly with a few of its neighbors.

O2QHHer3

Q.   All right.  Let's talk about the neighbors.

What neighbor is to the right of this screen?  What country is that?

A.   Nicaragua.

Q.   And then what about on the left?  What countries border Honduras on its west side?

A.   On the south you have El Salvador, and then on the northwest you have Guatamala.

Q.   What's the capital of Honduras?

A.   Tegucigalpa.

Q.   Can you circle that on the screen ⸺

A.   Sure.

Q.   ⸺ for the jury.

Let the record reflect that the witness has circled a star labeled "Tegucigalpa."

Then can you compare Honduras' land size to a state here in the United States?

A.   It's approximately the size of the state of Pennsylvania.

Q.   What's the population of Honduras?

A.   About 10 1/2 million people.

Q.   All right.  Let's talk about the lines that are on the screen here.

Do these lines represent the main air, land, and sea routes as it relates to the country of Honduras?

A.   They do.

O2QHHer3

Q. That's for cocaine trafficking, right?

A. Yes.

Q. And let's go through each one, starting again with air.

How are the air routes represented on this particular map?

A. In the orangish brown arrows.

Q. And in which parts of Honduras is cocaine brought in by air?

A. The least often, but still annotated here, is going to the three islands here on top, most famously Roatan. And then more often you see these other arrows coming in. They would take the loads to Gracias a Dios and Olancho.

MR. WIRSHBA: Let the record reflect that the witness has circled the area Roatan, labeled "Roatan," at the top of the map and drawn lines along two arrows depicted in orange on the right of the map.

Q. Now, Ms. Taul, you mentioned that they would come to Gracias a Dios and Olancho. What are those locations?

A. Departments.

Q. What's a department?

A. It would be similar to a state in the United States.

Q. Could you identify the Gracias a Dios department for the jury.

A. Sure.

MR. WIRSHBA: Let the record reflect that the witness

O2QHHer3

has circled the area Gracias a Dios.

And then the Olancho department, please.

Let the record reflect that the witness has identified the area of the map marked "Olancho."

Q. Now, what types of aircraft are typically used to transport cocaine by air?

A. We've seen everything from small crop dusters that maybe broke down larger loads that land in Nicaragua, so they just want to hop over the border in a crop duster, all the way up to large passenger planes at major airports. But most commonly what we're seeing are single-engine and double-engine, like, private planes. Think of a Cessna or a Piper Navajo, Seneca, something like that.

Q. What is the typical size of a cocaine load that's transported by airplane on one of these smaller aircrafts to Honduras?

A. Typical load would be 500 to 1,000 kilograms.

Q. What, if any, changes do cocaine traffickers typically make to these planes when flying cocaine into Honduras?

A. Oftentimes, they have to adjust the fuel capacity. Again, they're trying to fly undetected, and they don't need —— they don't want to have to refuel anywhere. So they will modify the fuel capacity in that way. They may take out seats to make room for more cocaine. They may make adjustments to the landing gear. They are taking off and landing on clandestine

airstrips, so rough dirt terrain.  So they make modifications to be able to handle the weight and the loads that they're carrying.

Q.  You mentioned a clandestine airstrip.  What do you mean by that?

A.  Clandestine airstrips are, like the labs, clandestine in nature.  They're going to be somewhat hidden, out of view. There's a big —— well, let's see.  There are a few areas that are very commonly known to be clandestine airstrips in Venezuela and also in Honduras where they have to cut down trees just to make enough room for this dirt strip, only along enough for the plane to take off and land from.  Sometimes they might have candles alongside each one if they're trying to also use the cover of night to help guide the pilot in and out. They're, again, not going to be near any city or a population or main highway.  They're really trying to keep it secretive so they can continue to use them.

Q.  Are you familiar with the term "tail numbers"?

A.  Yes.

Q.  What is a tail number?

A.  A tail number is aircraft registration, just like your license plate number on your vehicle.

Q.  Do different countries have different indicators for planes that are registered within that country?

A.  Every country has a designator.  It's either one or two

letters.  The United States starts with an "N."  We call them N-numbers.  Honduras would be HR.  Venezuela, YV.

Q.  And are those registration numbers printed on the aircraft typically?

A.  Yes.

Q.  Where are they printed on the aircraft?

A.  On the tail.

Q.  You've already discussed clandestine airstrips.  Are there instances in which you have seen cocaine coming into larger commercial airports as well?

A.  Yes.

Q.  And what is the frequency of the flights to clandestine airstrips as opposed to those, let's say, at a commercial airport?

A.  I don't have a percentage as precise as some of the other statistics I've discussed, but I would say a vast majority are going through clandestine airstrips just by nature of having to bribe officials and eyes on the plane.  It's just too risky to send that type —— that size of load to an airport.

Q.  Let's talk about maritime shipments.  How are maritime routes depicted on this map?

A.  With the blue arrows.

Q.  To which parts of Honduras is cocaine brought in by sea typically?

A.  The northern coast.

O2QHHer3

Q.   Can you identify the departments into which cocaine is brought?

A.   We have Gracias a Dios again, which I'm highlighting.  Also the department of Colón, the department of Atlantida, and then the department of Cortés.

          MR. WIRSHBA:  Let the record reflect that the witness has identified and circled the four topmost parts of the map that are labeled "Gracias a Dios," "Colón," "Atlantida," and "Cortés."

Q.   Ms. Taul, along that northern coastline, are there any other ports for which maritime shipments often come into Honduras?

A.   Yes.  The arrows are kind of clueing in here.  We've got Puerto Lempira.  La Ceiba is very popular, as is Puerto Cortés.

Q.   Are those by any means the exclusive places where cocaine would come in?

A.   Absolutely not.  There's a mix of an official port and also just along the coast.  It will really depend on what the safe passage is in each particular situation.

Q.   What kinds of boats do drug traffickers commonly use to send cocaine to Honduras along this northern coast?

A.   Just like aircraft, there's a wide range, from semi-submersibles, like home built submarines, all the way up to cruise ships or cargo ships, but most often they're going to be what we call pangas or go-fasts and sometimes fishing

O2QHHer3

vessels.

Q.   What is a panga or go-fast vessel?

A.   It's a very basic boat.  There's really nothing to do. Oftentimes they will paint the inside a dark blue or green to help keep it hidden from aerial view or from other boats in the sea.

The difference between a panga and what we call a go-fast is really just the engine and how fast it can go.  But they carry typically a couple of people, gasoline, and cocaine. And there's nothing to it.  There's nothing covering it.  If they see aircraft overhead or the U.S. Coast Guard, they will cut their engines and most often have a tarp to them, cover everything, and hope that they're not seen.

Q.   And with respect to the other maritime vehicles that you identified, fishing vessels or cargo ships, what, if anything, have you seen to help conceal the cocaine that's being transported along —— with those vessels?

A.   Sometimes there are, like, false flooring or there might be in the bigger vessels a bit of like a cabin that they could be in.  Oftentimes, both the go-fasts, pangas, fishing vessels, they will also have on board fishing poles, nets trying to blend in with local fishermen.

Q.   What's the typical size of a cocaine load that's transported, for example, by a go-fast boat?

A.   Typically, between 200 and 800.  It's a wide range.  I'd

O2QHHer3

say, on average, about 500 kilograms, but they can hold up to 800.  A go-fast, a thousand; a fishing vessel, up to 3,000 kilograms.

Q.  Moving along to land, what are the primary land routes that are represented —— excuse me, how are the primary land routes represented on this map?

A.  Green arrows.

Q.  I think you said earlier that along the Central American route, transportation over land is typical after one of the other methods, air or sea, is that right?

A.  That's correct.

Q.  All right.  Focusing on the two arrows that run across the country from left to right —— from right to left in green, excuse me, what do these arrow represent?

A.  This top one is the coastal route, picking up mostly what's going to be dropped off via the vessels coming from the ocean, driving from where it landed, whether that be Gracias a Dios, Colón, Atlantida, towards Cortés, towards San Pedro Sula.  And then the lower arrow here is similarly picking up perhaps more of the aircraft-laden loads from Gracias a Dios or Olanche, passing through Yoro, and then also landing in Cortés, most likely San Pedro Sula.

MR. WIRSHBA:  Let the record reflect that the witness has drawn two lines overlaying the green lines at the top of the map and in the middle of the map that runs through the city

O2QHHer3

labeled "Yoro."

Q.   Now, you mentioned San Pedro Sula.  With respect to both of these routes, is that the major shipment point through which cocaine goes?

A.   In Honduras, yes, San Pedro Sula is a major hub for cocaine trafficking.

Q.   What is the significance of San Pedro Sula in Honduran drug trafficking?

A.   It is synonymous with drug trafficking in that world. There is not a lot of law enforcement.  It has been consistently at the top of the "most dangerous cities in the world" lists, highest homicide rate.  It's really — it's really a hotbed for trafficking.

Q.   All right.  In general, where does the cocaine go once it leaves San Pedro Sula?

A.   It continues moving through Central America.  You can see the green arrows here where some might cross up here into Guatamala and then through Santa Barbara.  Copán is also well-known for cocaine trafficking.  Paraiso, the city there, there is a Border Patrol, international border crossing, and then there's another one down here in Ocotepeque.

The loads — again, these arrows are not representative of all of it.  There will be loads that go through the official international checkpoints.  Typically, those will be larger loads, and then there's a lot that goes

O2QHHer3

through just the border illegally where there isn't an actual checkpoint.

MR. WIRSHBA:  Let the record reflect that the witness has overlaid her own arrows over the arrows on the left side of the map, the one from San Pedro Sula —— the two from San Pedro Sula, as well as those out of Copán into neighboring Guatamala and the one below that.

Q.  Now, Ms. Taul, where does the cocaine go after it leaves Honduras and enters into Guatamala?

A.  From Guatamala it continues on into Mexico and then into the United States.

Q.  What, if any, influence do Mexican drug cartels have in Guatamala?

A.  They have an extensive influence not just in Guatamala but in Honduras as well.

Q.  Are you familiar with the Sinaloa Cartel?

A.  I am.

Q.  What is that?

A.  The largest drug trafficking organization in the world.

MR. WIRSHBA:  Ms. Collins, if we could go to the next slide, please.

Q.  Do you recognize who this is, Ms. Taul?

A.  I do.

Q.  Who is this?

A.  That is El Chapo, or Joaquin Guzmán.

O2QHHer3

Q.   What, if any, role did Chapo, Joaquin Guzmán, have in the Sinaloa Cartel?

A.   He ran it for many years.

Q.   From approximately 2004 to 2022, what was the largest cocaine trafficking organization in the world?

A.   The Sinaloa Cartel.

Q.   And where does the Sinaloa Cartel send the vast majority of its cocaine?

A.   The United States.

Q.   Approximately what percentage of cocaine that is imported into Honduras is destined for the United States?

A.   The vast majority, if it's in Honduras, I would say, 90 percent or so is going on to the United States.

MR. WIRSHBA:  All right.  Ms. Collins, if we could next click over to the next slide to talk about pricing.

Q.   Now, Ms. Taul, what in general does this next slide show?

A.   It's showing a snapshot of the years depicted along the bottom of the price of one brick, one kilogram, of cocaine.

Q.   Are these wholesale prices or retail prices that are depicted on the map?

A.   Wholesale.

Q.   What does that mean that they are wholesale prices?

A.   If you were to go to Costco and buy a 24-pack of Vitaminwater, you would pay a certain price.  But when Costco buys it themselves, they're buying pallets of it, and they're

O2QHHer3

paying a fraction of what you or I would pay for that smaller portion.

Q.   Along the Central American route, what currency are traffickers proceeds typically found in?

A.   U.S. dollars.

Q.   Why is that?

A.   Well, most often the cocaine is being purchased in U.S. dollars, and no matter where you go along those trafficking routes, the dollar is accepted and strongest.

Q.   When you say it's being purchased in U.S. dollars, do you mean — at what point along the route?

A.   Well, the money being sent back, most often the largest amount of that is occurring in the United States.

Q.   When the cocaine is ultimately sold to the retail customer, what currency is typically exchanged for that cocaine?

A.   U.S. dollars.

Q.   And are those same dollars the ones that are being sent back along the Central American route?

A.   Yes.

Q.   All right.  Now let's talk about the prices of the cocaine along this route.

        Taking a look along the bottom but focusing first on 2013, what do the bars above 2013 represent?

A.   It's showing the price per kilo in different countries. The light blue is representative of Colombia; the gray,

O2QHHer3

Honduras; the dark blue, Mexico; and the red, New York City.

Q. And continuing to focus on 2013, looking at the chart, what, if any, trend in prices do you see?

A. The prices increase along the route.

Q. Why would that be?

A. Basically, it's the assumption of risk. You're —— the further you go, you're opening yourself up to arrest, to attack, death. It's going to be much more costly if it's already gotten all the way to New York than if you bought it halfway through and then assumed the risk yourself.

Q. So I'd like to talk about a few of these, so let's concentrate on 2013 for a moment.

A. OK.

Q. Can you tell the jury, what was the approximate price of a kilogram of cocaine in Colombia in 2013?

A. The average in 2013 for Colombia was $2,300.

Q. What about once that cocaine reached Honduras; what was the approximate average?

A. $11,500.

Q. How about in Mexico?

A. $16,000.

Q. And in the United States?

A. $37,000.

Q. All right. Now let's take a look at 2016. What was the price in Colombia?

A.   $1,725 on average.

Q.   In Honduras?

A.   13,500.

Q.   In Mexico?

A.   17,000.

Q.   And in New York City and the United States?

A.   40,000.

Q.   I see that there's a large gap between the prices in even Mexico and Honduras and the United States.  Why would that be?

A.   There's a lot of risk involved.  Again, it's dangerous to transport cocaine.  To be able to cross it over into the United States is also much more difficult than it is to cross it into Mexico or cross it into Venezuela, for example.

Q.   So focusing on 2016 again, approximately what is the price difference between a kilogram of cocaine in New York City and one in Colombia?

A.   We're looking at about $38,000 difference per kilogram.

Q.   What about New York City and Honduras?

A.   27,000 approximately.

         MR. WIRSHBA:  Thank you, your Honor.  No further questions.

         THE COURT:  All right.  Cross-examination.

         MR. STABILE:  Yes, your Honor.  Thank you.

CROSS-EXAMINATION

BY MR. STABILE:

O2QHHer3                        Taul - Cross

Q.   Good afternoon, Ms. Taul.

A.   Good afternoon.

Q.   I'm Renato Stabile.  I'm the lawyer for Juan Orlando
Hernandez.

     So you're a DEA intelligence research specialist, is
that correct?

A.   That's correct.

Q.   Can you, just in general and in very general terms, tell us
the difference between a DEA intelligence research specialist
like yourself and a DEA special agent like the agent sitting
over here.

A.   In general, I am more office-based.  I don't do
surveillance or search warrants or make arrests.  Domestically,
it keeps us very different but working in concert.  Foreign,
obviously, we're not doing arrests and search warrants in other
people's countries, so it's almost the same.

Q.   But you just mentioned we don't do arrests in other
people's countries.  Does the DEA make arrests in other
people's countries?

A.   Sorry about that.

     No, if there is an arrest in another country through a
provisional arrest warrant or an international process that
happens — in Colombia, for example, when I was there, the
Colombian authorities make arrests.  We might assist them in
investigations, but they were the ones going to the labs,

arresting the cooks.

Q.  Does the DEA sometimes coordinate with foreign governments to effectuate the arrest of someone in a foreign country?

MR. WIRSHBA:  Objection.

THE COURT:  Yes, sustained.

Q.  You're aware that the DEA coordinates operations with foreign countries, right?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  Does the DEA ask foreign countries to arrest people?

MR. WIRSHBA:  Objection.

THE COURT:  I'll allow it.

A.  There are processes if someone's already been vetted and is wanted, say, through Interpol, there might be a conversation about apprehension and arrest.

Q.  Are you aware whether the DEA coordinates with foreign countries for the extradition of people to the United States?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  Other than being an expert witness at this trial, have you done any specific work on this case, meaning, the case involving Juan Orlando Hernandez?

A.  No, I have not.

Q.  And how many DEA intelligence research specialists are there, would you say, in the DEA?

A.   I'm not sure.

Q.   Like, hundreds or thousands?  Do you have that level of knowledge?

A.   Couple hundred could be.  I'm not exactly sure.

Q.   And out of that couple of hundred, do you have any idea if there are any who specialize in Honduras?

         MR. WIRSHBA:  Objection.

         THE COURT:  Sustained.

Q.   Well, do you specialize in Honduras?

A.   Honduras specifically isn't a specialty, no.

Q.   Well, do you specialize in narcotics operations in Honduras?

A.   Again, Honduras specifically isn't a designated specialty for me.

Q.   But would you agree that most of your —— well, let me ask you this:  How much time in your entire life have you spent in Honduras?

A.   Approximately a month.

Q.   And you spent most of your time in Central and South America in Venezuela, right?

A.   I spent time in all those places.

Q.   How much time did you spend in Venezuela?

A.   I lived there for three years.

Q.   And Colombia, years, right?

A.   Three to four years.

O2QHHer3                         Taul - Cross

Q.   Honduras, one month, right?

A.   Yes.

Q.   OK.  Did Honduras have increased success in combating drug trafficking after 2014 than it did before 2014?

          MR. WIRSHBA:  Objection.

          THE COURT:  Sustained.

Q.   Do you know whether or not the U.S. military trains Honduran armed forces?

          MR. WIRSHBA:  Objection.

          THE COURT:  Sustained.

Q.   You mentioned San Pedro Sula being a particularly dangerous place, right?

A.   I did.

Q.   And would you agree that between 2013 —— would you agree that in 2013 it was probably the deadliest city on the planet Earth?

A.   I believe it was.

Q.   And after 2013, did it become less of a deadly place?

A.   I don't remember the rankings.  I know during that time frame it was at the top of the list for quite a few years.

Q.   But, I mean, after 2014, did San Pedro Sula fall on the list of deadliest places on Earth?

A.   I couldn't say.

Q.   So you know, based on your training and experience, that drug traffickers employ a number of techniques to avoid

O2QHHer3                         Taul - Cross

detection, right?

A.  Yes.

Q.  And, for example, they speak in coded language, right?

A.  Oftentimes, yes.

Q.  And oftentimes, they speak in coded language when that's on the phone, right?

A.  Correct.

Q.  And oftentimes, they speak in coded language in their text messages, right?

A.  Correct.

Q.  And they're speaking in coded language to avoid detection by law enforcement, right?

A.  Yes.

Q.  Because they're concerned that law enforcement might be listening in on their conversations, right?

A.  That's a concern, yes.

Q.  Might have a wiretap and actually be recording their conversations, right?

A.  That's probably a concern, yes.

Q.  And they speak in coded language over text messages because they're concerned that law enforcement might obtain their text messages, right?

A.  That's a concern, yes.

Q.  And they don't want law enforcement to figure out what they're talking about, right?

A.  Correct.

Q.  So usually drug traffickers don't use people's full names in their texts, right?

A.  Usually.

Q.  They try and hide who they're talking about, right?

A.  Often.

Q.  Have you, in your experience, become aware of drug traffickers either knowing or suspecting that their phone is being tapped?

A.  Yes.

Q.  And sometimes they'll actually get a tip that their phone is being tapped.  There will be a leak, right?

A.  It's possible.

Q.  I mean, you've seen that happen over the course of your career?

            MR. WIRSHBA:  Objection.  Relevance.

            THE COURT:  I'll allow that question.

            Have you seen that over the course of your work?

A.  I'm recalling back to different investigations.  I haven't had a target in the investigations I've worked on or a suspect that was tipped off that they were being listened to.

Q.  OK.  But you've heard of that, right?

A.  Yes.

Q.  If drug traffickers know or suspect that their phone conversations are being intercepted, do they sometimes make up

stories to throw off law enforcement?

MR. WIRSHBA:  Objection.

THE COURT:  One second.

I don't think you've established a sufficient basis for that question with this witness.

Q.  Well, drug traffickers take steps to conceal their illegal activities, right?

A.  They do.

Q.  And one of those steps is to say things on a suspected —— withdrawn.

One of those things is, if they suspect that their calls are being recorded, to say things to throw off law enforcement, right?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Yes, again, the same ruling.  There hasn't been a sufficient foundation laid with this witness.  The witness testified that, best of her recollection, she never had a target who was tipped off.  And she's heard of it, that some people may have, but that's the extent of her knowledge.  So move on, please.

Q.  OK.  I'm just —— you're an expert, right?

A.  In certain things, yes.

Q.  Well, you're an expert in techniques of narcotics trafficking, right?

A.  I am.

O2QHHer3                        Taul - Cross

Q.   And you are an expert in techniques narcotics traffickers employ to avoid detection, right?

A.   Some of them.

Q.   And one of those is misdirection over phone calls, right?

THE COURT:  One second, please.  Is that a statement?

MR. STABILE:  It's a question.  I said —— I thought I said "right" at the end.

THE COURT:  I didn't hear it.  Go ahead.

Do you understand the question?

A.   Could you repeat that, please.

Q.   Yeah.

One of the things that drug traffickers will do is create misdirection over the phone, especially if they think they're being recorded.

MR. WIRSHBA:  Objection, your Honor.  This is beyond the scope of the expertise for which this witness has been qualified.

THE COURT:  I'll allow the witness to answer.

Go ahead.

A.   Misdirection, and how I would understand that, I would say no.  When you were speaking to coded language, yes.

Q.   If drug traffickers suspect that they are —— their phones are being tapped, in your experience and training, do they change the way they speak over the phones?

THE COURT:  Sustained.

O2QHHer3                          Taul - Cross

Q.   In addition to speaking in coded language, another technique that drug traffickers may employ is digging elaborate tunnels through which to transport drugs, right?

A.   Tunnels are commonly used.

          (Continued on next page)

O2Q5her4                         Taul - Cross

BY MR. STABILE:  (Continuing)

Q.  And tunnels sometimes have tracks inside of them; right?

A.  That has occurred.

Q.  Like sort of mini -- not exactly trains but there are carts on tracks inside tunnels to transport drugs; right?

A.  Yes.

Q.  And you have also heard of narco ambulances.  Have you heard about that?

THE COURT:  I will sustain as to have you ever heard of.  If you want to make it more precise than that, I might allow it.

Q.  Based on your training and experience as an expert, are you familiar with the use of narco ambulances?

A.  I haven't heard that term.

Q.  OK.  Are you familiar, based on your training and experiences -- maybe you haven't heard that term -- but drug traffickers transporting drugs in vehicles that look like ambulances to disguise what they're really carrying?  Have you heard of that?

A.  No.

Q.  How about submarines.  Have you heard of drug traffickers using submarines?

A.  Yes.

Q.  And do you know what the ant plan is?

A.  No.

Q.   OK.   Have you heard of drug traffickers taking large loads of cocaine and breaking them up into very small loads of cocaine and distributing them that way?

A.   Yes.

Q.   You are familiar with a technique called chemical masking?

A.   How do you mean?

Q.   Well, are you familiar with transporting drugs with other items that have a strong sent like chemicals to throw off drug sniffing dogs?

A.   Yes.

Q.   And are you familiar, based on your training and experience, with the use of drones to transport drugs?

A.   Yes.

Q.   Are you familiar, based on your training and experience, with the use of catapults sometimes to transport drugs across the border?

A.   Yes.

         THE COURT:  We are getting into an area where any slight probative value appears to me to be substantially outweighed by the danger of jury confusion, so --

         MR. STABILE:  Understood.

         THE COURT:  -- with regard to catapults I'm striking it.  Next question.

BY MR. STABILE:

Q.   Based on your training and experience -- withdrawn.

O2Q5her4                    Taul - Cross

You talked on direct about how the price of cocaine increases from Colombia as it makes its way up to the United States; right?

A.  Yes.

Q.  So the price of cocaine in Colombia is what, like $1,500 a kilo?

A.  You could say that.

Q.  And by the time it gets to New York City it is about $40,000 a kilo?

A.  Approximately.

Q.  But the cocaine is manufactured in Colombia; right?

A.  Often times.

Q.  So the increase in cost is based on transportation costs; is that fair?

A.  Yes.

Q.  There are no additional manufacturing costs?

A.  Correct.

Q.  And those additional transportation costs are because of all the elaborate things that drug dealers do to transport cocaine; right?

A.  Not necessarily.

Q.  You were asked about stamps on direct?

A.  Yes.

Q.  And my question is, are you familiar with stamps on cocaine?

O2Q5her4                      Taul - Cross

A.  Yes.

Q.  And you know that it's common for drug traffickers to use luxury brand stamps; right?

A.  Yes.

Q.  And you have seen stamps like Gucci; right?

A.  Yes.

Q.  Prada; right?

A.  Yes.

Q.  Rolex; right?

A.  Yes.

Q.  Louis Vuitton; right?

A.  I have seen those.

Q.  Tommy Hilfiger?

A.  No, but it wouldn't surprise me if that was one used.

Q.  Jaguar; have you seen that one?

A.  A lot of different vehicles, yes.

Q.  And luxury brand drug stamps on cocaine, that's very common; right?

A.  It's common, yes.

Q.  And in fact, the DEA has a database in El Paso that keeps track of cocaine stamps throughout the world; right?

A.  Yes.

Q.  And that's called Fountainhead; right?

A.  Yes.

Q.  And you know that you can enter a cocaine stamp in

Fountainhead and see where else that stamp has been seen throughout the world; right?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  The DEA maintains a database of cocaine stamps; right?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Sustained.  That's asked and answered, Mr. Stabile.

Q.  Can you tell us what Fountainhead is?

MR. WIRSHBA:  Objection.

THE COURT:  I think it has been answered already.  You asked the question and you said:  In fact, that's called Fountainhead; isn't it?  And the witness said:  Yes.

Move on, please.

MR. STABILE:  May I ask what Fountainhead is?

THE COURT:  The witness gave testimony and then you said:  That's in fact called Fountainhead, isn't it?  And the witness said:  Yes.

So, refer back to the testimony that the witness gave that elicited your question "and that's in fact called Fountainhead" and I think you will find the answer there.

Q.  Have you ever been shown any cocaine stamps related to this specific case?

A.  No.

Q.  Are you familiar with shoot-down laws in countries in

Central America?

A.  I'm familiar.

Q.  Well, based on your training and experience, can you tell us what shoot-down laws are?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.  Beyond the scope of the direct.

Q.  Well, how do -- what are some of the techniques foreign countries use to intercept cocaine that is being shipped on airplanes?

MR. WIRSHBA:  Objection.

THE COURT:  Basis.

MR. WIRSHBA:  Beyond the scope of the direct.  Beyond the scope of the expertise offered.

THE COURT:  The witness can answer in general terms. I will allow it.

THE WITNESS:  Would you please repeat the question?

MR. STABILE:  Yes.

BY MR. STABILE:

Q.  When there are planes in Central America transporting cocaine, can you describe for us, based on your training and experience, some of the countermeasures that Central American countries employ to stop cocaine trafficking on airplanes?

A.  Policy in Central America isn't something I am as familiar with.  In general terms, just like the aircraft registration we

discussed with the N numbers or HR numbers, along with the aircraft, there would be a filed flight plan with the destination and everything laid out as a passenger aircraft would so that anyone monitoring the airspace along the way would recognize and know that it is a legal flight.

Q.   Did you say that it is a legal or an illegal?

A.   Well, both, but legal is what I said.

Q.   But illegal flights, I assume cocaine -- withdrawn.

Do cocaine traffickers register flight plans?

A.   Sometimes.

Q.   Is that common or uncommon?

MR. WIRSHBA:  Objection, your Honor.  Government renews its objection.

THE COURT:  Basis?

MR. WIRSHBA:  Beyond the scope of the direct.  Beyond the scope of the expertise.

THE COURT:  Well, if it is beyond the scope of the expertise, the witness can say so.

THE WITNESS:  I'm sorry.  Could you please repeat that?

MR. STABILE:  Yes.

BY MR. STABILE:

Q.   Is it common or uncommon for drug dealers to file flight plans?

A.   The flights that are transporting cocaine loads, there are

O2Q5her4                        Taul - Cross

both legal and illegal flights so there are flight plans often times just as there are many without.

Q. I am just saying do you have an expert view whether one is more common than the other? That's all.

A. I would anticipate it is less common but, again, they do both.

Q. That what is less common, to file a flight plan; right?

A. Yes.

Q. You testified on direct that you have experience throughout your career with confidential informants; right?

A. Correct.

Q. And you know that confidential informants are sometimes paid by the DEA; right?

A. Yes.

Q. And the DEA has certain control measures in place to control their confidential informants; is that fair?

A. To manage the relationship, yes.

Q. Is there any policy within the DEA -- withdrawn.

        Are confidential -- withdrawn.

        Is there any policy within the DEA against DEA informants committing murder while they're working with the DEA?

        MR. WIRSHBA: Objection.

        THE COURT: Basis?

        MR. WIRSHBA: Relevance.

MR. STABILE:  It will be connected later, your Honor.

THE COURT:  Was this covered in direct?

MR. WIRSHBA:  No, your Honor.

THE COURT:  Mr. Stabile?

MR. STABILE:  Murder by informants was not but, as I said, I believe it will be connected, subsequent to this witness.

THE COURT:  But informants were covered in direct?

MR. STABILE:  Yes, she testified about her experience with confidential informants.

THE COURT:  I will allow the question.  Let me hear the question again, please.

BY MR. STABILE:

Q.  Is there any policy against DEA informants committing murder while they are working with the DEA?

A.  I'm going to qualify my answer here by highlighting the difference between an agent and an intelligence research specialist.  Intelligence research specialists don't manage confidential informants or those relationships so we are present for a lot of interviews, but as far as anything else, including the policies that govern them, I am not as familiar but I would say that I believe they cannot -- murder is not condoned.

Q.  Murder is not condoned by the DEA?

A.  Correct.

O2Q5her4                      Taul - Cross

Q.  By confidential informants?

A.  By anyone.

Q.  Is there any DEA policy against DEA informants torturing people while they're working with the DEA?

A.  I would assume.  I don't know if that's explicitly written anywhere.  Again, I don't manage confidential informants as an intelligence research specialist.

Q.  Do confidential informants sometimes continue their drug activities while working with the DEA?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

MR. STABILE:  Can we put up GX- 105, please -- sorry.

Q.  Are you familiar with whether or not drug traffickers keep drug ledgers?

A.  I am familiar with drug ledgers.

Q.  Have you seen drug ledgers?

A.  I have.

Q.  Do you have training on how to interpret drug ledgers?

A.  Not specifically.

Q.  And would you agree that drug traffickers usually write in coded language in their drug ledgers; right?

A.  It's a common occurrence.

Q.  It would be uncommon to see them write the word "cocaine" in a drug ledger; right?

A.  OK.

O2Q5her4                        Taul - Cross

Q.  I'm asking.

A.  I could agree with that.

Q.  And they don't usually mention people's real names in drug ledgers; right?

        MR. WIRSHBA:  Objection, your Honor.  The witness has said she doesn't have any training on this topic so I'm not sure what the basis would be of her answers to these questions.

        THE COURT:  I will allow the witness to answer.  Go ahead.

        THE WITNESS:  I have seen nicknames that may be not a full legal name but everyone knows who the nickname is.  I have seen those in ledgers.

        MR. STABILE:  Can we put up GX- 250A-2, which is in evidence, for the witness?  Can you go to page 7 or 8, rather?

Q.  Can you see what is on the screen?

A.  I can.

Q.  Based on your training and experience, do you see the line: "JOH equals 50,000" and then an "L"?

        Do you see that?

A.  I see that line.

Q.  Do you know what the national currency of Honduras is?

A.  Lempiras.

Q.  Do you know how lempiras would be written?

        MR. WIRSHBA:  Objection, your Honor.

        THE COURT:  One second.

O2Q5her4                        Taul - Cross

Do you know?

THE WITNESS:  No.

THE COURT:  OK.

BY MR. STABILE:

Q.  When you see, directing your attention to what is now highlighted on your screen, when it says:  JOH equals 50,000 l; would you understand that to be, based on your training and experience, 50,000 lempiras?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  In 2018 would you know, approximately, not to the penny, but in 2018, would you know, approximately, the conversion rate of dollars to lempiras?

A.  Honestly, I have no idea.

MR. STABILE:  You can take that down.  Can we now put up GX- 105?

Q.  You just testified that that's El Chapo, right?

A.  Yes.

Q.  El Chapo had a legendary reputation because he was difficult to capture.  You know that, right?

A.  That was one reason.

Q.  One reason, right.

In fact, he escaped from prison on numerous occasions; correct?

A.  He has.

O2Q5her4                        Taul - Cross

Q.   And one time he escaped from prison climbing through a hole in his shower and getting into a tunnel that was dug underneath the prison; right?  You know that.

A.   He escaped through a tunnel, yes.

Q.   On a motorcycle, right?

A.   If I recall.

Q.   OK.

     And you know that there was -- the DEA was very interested in capturing El Chapo in 2013; right?

     MR. WIRSHBA:  Objection.

     THE COURT:  Sustained.

Q.   Well, in 2013 you know that El Chapo was one of the most wanted men on the Planet Earth; right?

A.   Yes.

Q.   Do you know what the Golden Triangle is?

A.   In relation to Central America?

Q.   Yes.

A.   Yes.

Q.   What is the Golden Triangle?

A.   Northern countries of Honduras, Guatemala -- I have read about it.  I haven't really done much in that area as far as those terms.

Q.   And -- well, withdrawn.

     MR. STABILE:  Can I have a moment, your Honor?

     THE COURT:  You may.

(Counsel conferring)

Q.   Between 2014 and 2022, did the flow of cocaine through Honduras go up or down?

A.   Between 2014 and 2022 it did both, but overall it did increase; yes.

Q.   Well, did it go down in the beginning?

A.   There were certain time frames where other environmental factors or COVID perhaps paused things for a little bit, but in a general trend over those years, cocaine trafficking did increase through that Central American route which includes through Honduras.

Q.   Well, just putting COVID aside because that was -- so let's do between -- because you raise a good point.  Between 2014 and let's say 2019, did cocaine trafficking through Honduras go up or down?

A.   Up.

Q.   You say it went up between 2014 and 2019?

A.   I believe so.

Q.   What's your basis for saying that?

A.   There are statistics reported by a number of different bodies, both private and governmental, DEA reporting mostly.

Q.   Can you tell us what statistic you are relying on?

A.   No, I can't, because I haven't isolated those particular years.

Q.   But you know you have seen statistics that between 2014 and

O2Q5her4                        Taul - Cross

2019 drug trafficking through Honduras went up.  You are sure you have seen that statistic?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  Yes.  That is sustained.

MR. STABILE:  I don't have any further questions, your Honor.

THE COURT:  Any redirect?

MR. WIRSHBA:  No redirect, your Honor.

THE COURT:  Thank you very much.  You may step down.

(Witness excused)

THE COURT:  Call your next witness.

MS. TARLOW:  Your Honor, the government calls Luis Perez.

MR. STABILE:  Your Honor, I'm sorry.

THE COURT:  Yes.

MR. STABILE:  The government filed a letter last night regarding this witness.

MR. WIRSHBA:  Your Honor, perhaps this could be done outside the presence of the witness, and perhaps the jury as well.

THE COURT:  All right.  Ladies and gentlemen, let's take our mid-afternoon break.  Please do not discuss the case among yourselves or anybody else.  We will be back in action in about 10 minutes or so.

(Continued on next page)

(Jury not present)

THE COURT:  Please be seated.

MS. TARLOW:  Your Honor, I'm sorry to interrupt.  I believe that this was a motion that was filed under seal, so if we could --

THE COURT:  I haven't seen -- this was filed yesterday under seal?

MS. TARLOW:  No.  I think it was filed last week, your Honor.

MR. STABILE:  Sorry.  I may be mistaken.

THE COURT:  Is this the letter of February 21?

MS. TARLOW:  It is, your Honor.

MR. STABILE:  Sorry.  I got confused.  A different motion was filed last night.

THE COURT:  Yes.  So what is the question?

MR. STABILE:  So the government moved to preclude cross-examination of the --

THE COURT:  Yes, in a certain area.

MR. STABILE:  And so, if I could respond briefly to that?

THE COURT:  Yes.  Any particular reason why, given the sealed nature of the application, you wouldn't respond in a sealed response?

MR. STABILE:  Well, I --

THE COURT:  But you want to do it in open court,

O2Q5her4

Mr. Stabile?

          MR. STABILE:  No, I don't.

          THE COURT:  OK.  So why don't you hand up your letter.

          MR. STABILE:  I don't have a letter.

          THE COURT:  So what should I do?

          MR. STABILE:  Go to the side bar, please.

          THE COURT:  Let me hear you at side bar.

          (Pages 618-622 SEALED by order of the Court)

O2Q5her4

(In open court)

THE COURT:  We are in recess.

(Recess)

THE COURT:  Please remain standing for our jurors.

(Jury present)

THE COURT:  Please, be seated.

Ladies and gentlemen in the gallery, I have a message for you and that is:  Do you notice how quiet it was as you stood as the jury enters?  You should remain silent as the jury exits as well.  And equally important is during the testimony in this case, please do not talk among yourselves.  It is distracting and it makes it more difficult for our jury to hear the testimony.  We have been able to accommodate many spectators in this room.  If we need, for audibility purposes, to eliminate seating for several rows, then you will have to observe the trial in one of the overflow courtrooms.

This is a public trial so no one is going to be excluded, but if we cannot have this number of spectators in this courtroom without it interfering with the jurors hearing the testimony, then I will have to eliminate certain rows in the gallery and ask the spectators to kindly go to one of the overflow rooms which we will direct you to where you can comfortably hear the testimony without disturbing the jurors.

Thank you very much.

The government can call its next witness.

MS. TARLOW:  The government calls Luis Perez.

LUIS PEREZ,

    called as a witness by the Government,

    having been duly sworn, testified through an interpreter,

    as follows:

THE DEPUTY CLERK:  Please be seated and state your full name for the record.

THE WITNESS:  Luis Perez.  L-U-I-S, P-E-R-E-Z.

THE COURT:  Ms. Tarlow, you may inquire.

MS. TARLOW:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. TARLOW:

Q.  Good afternoon.  Mr. Perez.

A.  Good afternoon.

Q.  Where are you from?

A.  From Colombia.

Q.  Have you ever lived in any other countries?

A.  Yes, ma'am.

Q.  What other countries?

A.  I have lived in Honduras, in Mexico, and now in the United States.

Q.  Between approximately 2008 and 2015, how did you generally make your money?

A.  Trafficking cocaine.

Q.  Where did that cocaine come from?

A.   From South America, mainly Colombia.

Q.   What was the ultimate destination for that cocaine?

A.   The United States of America.

Q.   How did you transport that cocaine, generally, from South America to the United States?

A.   There were several ways.  Planes, helicopters, go-fast boats, and maritime shipping containers.

Q.   When you used airplanes to transport your cocaine, in what country were those airplanes generally registered?

A.   In the United States they all had a November registration.

Q.   Did the November registration refer to an N registration number associated with the plane?

A.   Yes.  It is the first letter of the registration, the N.

Q.   What countries were your cocaine shipments generally transported through?

A.   We would leave from Apure in Venezuela or Colombia, then through to Panama, from Panama to Costa Rica, from Costa Rica to Nicaragua, from Nicaragua to Honduras, from Honduras to Guatemala, from Guatemala to Mexico, and the final destination was the United States.

Q.   When you were using airplanes to transport your cocaine shipments, did you fly those cocaine shipments into particular departments in Honduras?

A.   Yes, ma'am.

Q.   Which departments were those?

O2Q5her4                      Perez - Direct

A.   To the department of Olancho, the department of Copán, and La Mosquitia.

Q.   Approximately what quantity of cocaine did you transport through Honduras?

A.   We transported around 200,000 kilos.

Q.   Over what period of time?

A.   From the year 2008 through early 2015.

Q.   In total, approximately how much money did you make from the cocaine that you transported through Honduras?

A.   Around $50 million.

Q.   Did there come a time when you provided some of that money to Juan Orlando Hernandez' presidential campaign?

A.   Yes, ma'am.

Q.   Approximately when was that?

A.   Middle of the year 2013.

Q.   Approximately how much money did you provide, in total, to Juan Orlando Hernandez' presidential campaign?

A.   Around $2.4 million.

Q.   At the time you provided those payments, were you a member of a particular drug trafficking organization?

A.   Yes, ma'am.

Q.   Which one?

A.   The Sinaloa Cartel.

Q.   Were you working for any other members of the Sinaloa Cartel at that time?

O2Q5her4                        Perez - Direct

A.   Yes, ma'am.

Q.   Who were you working for?

A.   I was working for Chapo Guzman, Mario Zambada, and Cesar Gastelum.

Q.   I want to take a step back and talk about your background. Did there come a time when you were charged with crimes in the United States?

A.   Yes, ma'am.

Q.   Were you extradited to the United States?

A.   No, ma'am.

Q.   How did you get to this country?

A.   I surrendered to the United States authorities in Belize.

Q.   Approximately when?

A.   May 2015.

Q.   After you surrendered, did you plead guilty to any federal crimes?

A.   Yes, ma'am.

Q.   When, approximately, did you plead guilty?

A.   Middle of 2015.

Q.   What crime did you plead guilty to?

A.   I pled guilty to introducing over 5 kilos of cocaine into the United States.

Q.   Did you have a cooperation agreement at the time you pled guilty?

A.   Excuse me.  Can you please repeat the question?

Q. At the time you pled guilty to the offense you just described, did you have a cooperation agreement?

A. Yes, ma'am.

Q. What were some of the things that the cooperation agreement required you to do?

A. It required me to tell the U.S. government about all the drug trafficking crimes that I was ever involved in and, above all, to never lie to the United States government.

Q. Have you since been sentenced for your crime?

A. Yes, ma'am.

Q. When, approximately, were you sentenced?

A. Late in 2015.

Q. What sentence did you initially receive?

A. 135 months.

Q. After you were sentenced, did you continue cooperating with the government?

A. Yes, ma'am.

Q. Did the government file a motion to reduce your sentence based on that cooperation?

A. Yes, ma'am.

Q. Was your sentence reduced?

A. Yes, ma'am.

Q. What was your sentence reduced to?

A. To around 75 months.

Q. Have you now served that term of imprisonment?

O2Q5her4                        Perez - Direct

A.  Yes, ma'am.

Q.  You testified earlier that you made payments to Juan Orlando Hernandez' presidential campaign.  Who did you make the first payment to?

A.  I made the first payment to this man called Mario who was the second highest ranking official in the Puerto Cortes, Honduras.

Q.  What is Porto Cortes?

A.  Porto Cortes is a maritime port that Honduras has in the City of Cortes.

        MS. TARLOW:  Ms. Collins, can we please publish Government Exhibit 3?

Q.  Mr. Perez, directing your attention to Government Exhibit 3, can you please identify on the map where Porto Cortes is located?

A.  It is on top to my left and it borders the ocean.

Q.  Is it near where the Gulf of Honduras is located?

A.  Yes.  That's correct.

        MS. TARLOW:  Your Honor, let the record reflect the witness has indicated the area on the map near the gulf of Honduras labeled "Puerto Cortes."

Q.  Before you met Mario, how, if at all, were you using Puerto Cortes?

A.  Yes, ma'am.  We did.  We would use Puerto Cortes to traffic cocaine from Colombia and Venezuela in shipping containers.

O2Q5her4                          Perez - Direct

Q.   Approximately how much cocaine did you traffic through Puerto Cortes?

A.   Around 10,000 kilos.

Q.   Turning your attention back to Mario, who first introduced you to him?

A.   Mario was introduced to us by Fredy Nájera and Fabio Lobo who is the son of the former president of Honduras.

Q.   Who is Fredy Nájera?

A.   Fredy Nájera was a congressman in Honduras.

             (Continued on next page)

BY MS. TARLOW:

Q.   Approximately when were you introduced to Mario?

A.   Late 2012 or early 2013.

Q.   Did you then communicate with Mario?

A.   Yes, ma'am, by text message.

Q.   Did there come a time when you discussed the Honduran presidential election with Mario?

A.   Yes, ma'am.

Q.   Approximately when was that?

A.   Mid-2013.

Q.   What did you discuss with Mario then?

A.   Mario wrote to us asking for financial help to finance Juan Orlando Hernandez's presidential campaign for his first term, and in that way, Mario would not only guarantee that he could continue to work at the port, but also it was very probable that he would be promoted to the highest position in the port.

Q.   What, if anything, did Mario say about what you would get in return for your financial support of Juan Orlando Hernandez's presidential campaign.

A.   We were going to receive security for the shipping containers that were arriving from South America with cocaine and information about whether they were being tracked.

Q.   What do you mean by security for shipping containers?

A.   To ensure that the containers with cocaine arrived all right to Honduras.

O2QHHer5                        Perez - Direct

Q.   Meaning that they would not get seized?

A.   Correct.

Q.   Now, you said that Mario requested financial support for the presidential campaign.  Did he say how much money he wanted?

A.   Yes, ma'am.

Q.   How much money did he request?

A.   Mario asked us for $1 million.

Q.   Did you and others provide that $1 million to Mario in response to that request?

A.   Yes, ma'am.

Q.   How many different payments did you make to him?

A.   We made two payments to him.  Each one for $500,000.

Q.   Approximately when did you make those payments?

A.   The first one in mid-2013 and the second one months after mid-2013.

Q.   Focusing on the first payment, who, if anyone, provided you with the money for that payment?

A.   Arnulfo Valle sent $500,000 that I requested of him to me in Honduras.

Q.   Did you know Arnulfo Valle by any other names?

A.   Yes, ma'am.

Q.   What were those names?

A.   "Colocho," and we also called him "El Loco."

Q.   Did you work with Arnulfo Valle?

A.   Yes, ma'am.

Q.   Doing what?

A.   Trafficking cocaine.

Q.   Over what period of time, approximately, did you traffic cocaine with Arnulfo Valle?

A.   I began trafficking with Arnulfo Valle one week after Easter week of 2012, and I stopped working with him days before the police arrested him.

Q.   What generally was Arnulfo Valle's role when you trafficked drugs together?

A.   Arnulfo Valle would handle receiving planes that were coming loaded with cocaine from the —— from the Apure in Venezuela and also receiving helicopters that were coming from South America with cocaine.  He would also handle the transportation of cocaine throughout all of the territory of Honduras, and he would also take care of receiving money that was coming from Mexico from the sale of cocaine.

        THE INTERPRETER:  May the interpreters?

        (Interpreters confer)

        THE INTERPRETER:  Interpreter correction.

A.   He would also handle receiving money, American dollars, that were coming from Mexico from the sale of cocaine.

Q.   Did Arnulfo Valle also maintain that money for you in Honduras?

A.   Yes.  Arnulfo Valle would store the money that was brought

back from Mexico, the American dollars, in Honduras.

Q.  Now directing your attention to the second payment that you made to Mario, how did you obtain the money for that second payment.

A.  I also requested that Colocho send it to San Pedro Sula for me.

Q.  Did he, in fact, do that?

A.  Yes, ma'am.

Q.  After you made the payments to Mario, did Mario tell you what he did with those payments?

A.  Yes, ma'am.

Q.  What did he tell you?

A.  He told me that he had already delivered the payments to Juan Orlando Hernandez to finance his presidential campaign for his first term.

Q.  What, if anything, did Mario say that Juan Orlando Hernandez responded?

A.  Yes, he passed along to us that he had said thank you very much for the support of his campaign.

Q.  Who passed along that information?

A.  He passed that along to Cesar and me.

Q.  Mario told you that?

A.  Yes, ma'am.

Q.  And who did Mario say said thank you very much for the contribution?

A.   Juan Orlando Hernandez.

Q.   Did there come a time when you stopped using Puerto Cortés to traffic drugs?

A.   Yes, ma'am.

Q.   Approximately when was that?

A.   Late 2013 or early 2014.

Q.   Why did you stop then?

A.   Because Cesar and I began working by trafficking cocaine in helicopters, which was faster and more effective.

Q.   What, if anything, were you concerned about at that time with respect to those helicopter shipments?

A.   Yes, we were worried that the DEA helicopter, the Black Hawks, would follow us because they were the only ones with the ability to intercept us in Honduras.

Q.   Did they ever intercept you, your helicopter shipments?

A.   Never.

Q.   Turning your attention back to Arnulfo Valle, did there come a time when you discussed the Honduran presidential elections with him?

A.   Yes, ma'am.

Q.   When, approximately, did you have that conversation first with him?

A.   Months after the middle of 2013.

Q.   What did Arnulfo Valle initially say to you about those elections?

O2QHHer5                    Perez - Direct

A.   Colocho wrote to me directly saying that he was going to have a meeting with Fabio Lobo, Juan Orlando Hernandez's brother, at a finca in Copán and that they were going to reach agreements about how they would make cocaine trafficking easier for us in Honduras.  And in exchange for that, they would be providing economic ——

          THE INTERPRETER:  Interpreter correction.

          —— they would be providing financial support to finance Juan Orlando Hernandez's presidential campaign for his first term.

Q.   You testified about the name of Juan Orlando Hernandez's brother.  What was the name of Juan Orlando Hernandez's brother?

A.   Tony Hernandez.

Q.   Was he present at that meeting with Arnulfo Valle?

A.   He was the one who Arnulfo Valle was going to meet with, Tony Hernandez, Juan Orlando Hernandez's brother.

Q.   To be clear, I think you mentioned somebody named Fabio Lobo was present at that meeting.  Did you mean to say Fabio Lobo?

A.   No, I mixed up the name.  Excuse me.

Q.   Did Arnulfo Valle describe to you how much financing he wanted for Juan Orlando Hernandez's campaign?

A.   Yes, ma'am.

Q.   How much did he ask for?

A.   He asked me for $1 million.

Q.   Did you discuss with Arnulfo Valle what Juan Orlando Hernandez could do for you in exchange for the $1 million?

A.   Yes, ma'am.

Q.   What did you discuss?

A.   I asked Arnulfo Valle to focus in that meeting on requesting that Juan Orlando Hernandez give us information, mostly information about the DEA in the United States — in Honduras, sorry.

Q.   What then happened after that conversation with Arnulfo Valle that you had?

A.   Arnulfo Valle met with Tony Hernandez, Juan Orlando Hernandez's brother, at a finca in the department of Copán where they discussed and arrived at those agreements that I have mentioned previously.

Q.   What was that agreement?

A.   Colocho wrote to me, and he told me that they had reached the agreement that Juan Orlando Hernandez, if elected, would provide us with information about the DEA's movements in Honduras.  And in exchange for this, we would give him $1 million.

Q.   Did you agree to provide him with the $1 million?

A.   Yes, ma'am.

Q.   How had you earned that $1 million?

A.   Trafficking cocaine.

Q.  After you agreed to provide the $1 million payment to Juan Orlando Hernandez, did you subsequently discuss the payment with Arnulfo Valle?

A.  Yes, ma'am.

Q.  What did Arnulfo Valle tell you?

A.  He said to me that he had already delivered the $1 million to Juan Orlando Hernandez to finance his campaign and that he had said thanks to us.  And in exchange, he had agreed to provide us with information about the DEA operations in Honduras.

Q.  Now, turning your attention back to the meeting at the finca in Copán, did you discuss with Arnulfo Valle who was present at that meeting?

A.  Yes, ma'am.

Q.  Who was present?

A.  I know that Arnulfo Valle was there; Luis Valle; Alex Rendon, who is the former mayor of the department of Copán; and one of Arnulfo Valle's employees of trust, if I'm not mistaken, Marito and Tony Hernandez.

Q.  Did there come a time when you made other payments to Juan Orlando Hernandez's presidential campaign?

A.  Yes, ma'am.

Q.  Approximately when was the next payment?

A.  Days before the presidential elections for Juan Orlando Hernandez's first term.

Q. That was in 2014?

A. Yes, ma'am.

Q. Approximately how much was that payment?

A. Around $400,000.

Q. Who did you provide that $400,000 to?

A. To the chief of security of the vice presidential candidate on the ticket for Juan Orlando Hernandez's first term.

Q. How had you met that individual?

A. I met him because we purchased a house in San Pedro Sula which happened to be owned by the chief of security for the vice presidential candidate on the same ticket as Juan Orlando Hernandez's presidential ticket.

Q. What, if anything, did you discuss with this chief of security before you provided the $400,000 to him?

A. Yes, ma'am. We discussed the fact that the only thing that Cesar and I were asking for in exchange for this was information about the DEA operations in Honduras.

Q. And why, if at all, did this individual say he needed the money?

A. Yes. He said he needed the money to give Juan Orlando Hernandez the last push so that he could win the presidential elections.

Q. How have you earned that $400,000 that you provided to him?

A. Trafficking cocaine.

Q. Now I'd like to take a step back and talk about your

O2QHHer5                              Perez - Direct

background again.

Prior to your charges in the United States, did you ever obtain false identification documents in another name?

A.  Yes, ma'am.

Q.  Why did you obtain those documents?

A.  To avoid being arrested by the U.S. authorities.

Q.  Approximately when did you obtain those documents?

A.  Approximately in the year 2012.

Q.  You testified earlier you made your money from drug trafficking.  Were you also involved in money laundering?

A.  Yes, ma'am.

Q.  When approximately did you first get involved in money laundering?

A.  Starting in approximately 2008.

Q.  Approximately how much money did you launder?

A.  Many millions of dollars.

Q.  You testified earlier that in connection with this case —— I'm sorry, in connection with your charges in the United States, you have already served your term of imprisonment, is that right?

A.  Yes, ma'am.

Q.  Do you intend to try and remain in the United States?

A.  Yes, ma'am.

Q.  How do you intend to do that?

A.  I am applying for an S visa.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O2QHHer5                         Perez - Direct

Q.   What is your understanding of how, if at all, the outcome

of today's proceeding impacts your future visa that you might

receive?

A.   None.

Q.   At the time you surrendered in connection with your U.S.

charges, where were you living?

A.   In Mexico.

Q.   Had you previously lived in Honduras during any period?

A.   Yes, ma'am.

Q.   From approximately when until when?

A.   Approximately from 2008 to early 2014.

Q.   Why did you leave Honduras then?

A.   Because the U.S. and Honduran authorities started

surveilling those individuals that were closest to us.

Q.   You're referring to the Valles?

A.   The Valles and others.

Q.   Did you continue trafficking drugs in 2014?

A.   Yes, ma'am.

Q.   How were those drugs being transported in 2014?

A.   By helicopters.

Q.   Did those helicopters land in Honduras with cocaine

shipments?

A.   All the time.

Q.   Were those helicopters registered in any particular

country?

A.   Yes, ma'am.

Q.   Which country?

A.   In the United States.

Q.   After 2014, did the Honduran National Police ever seize any of your drug shipments?

A.   Never.

Q.   Did the Drug Enforcement Administration ever seize any of your drug shipments after 2014?

A.   No, ma'am.

Q.   From approximately 2014 until your arrest in 2015 —— I'm sorry, your surrender in 2015, approximately what quantity of drugs did you transport through Honduras?

A.   Around 70,000 kilos.

Q.   From approximately 2014 until your surrender in 2015, approximately how much money did you make on those shipments?

A.   Around $25 million.

Q.   How did those profits compare to your other years of your drug trafficking in Honduras?

A.   2014 was one of the most profitable years that we experienced in the drug trafficking world.

Q.   During that same period from 2014 until your surrender in 2015, who was the president of Honduras?

A.   Juan Orlando Hernandez.

          MS. TARLOW:  May I have one moment, your Honor?

          THE COURT:  Yes.

MS. TARLOW:  Nothing further, your Honor.

THE COURT:  All right.

MR. COLON:  Excuse me, your Honor, I'd like to speak to counsel.

THE COURT:  That's fine.

(Counsel confer)

MR. COLON:  Judge, may I have one minute, please?

THE COURT:  Sure.

CROSS-EXAMINATION

BY MR. COLON:

Q.  Mr. Perez, hello there, sir.

A.  Good afternoon.

Q.  You testified that you're from Colombia originally?

A.  Yes, sir.

Q.  About how old were you when you left Colombia?

A.  Approximately 32 years old.

Q.  How did you earn a living in Colombia?

A.  Working with my family.

Q.  Working with your family doing what?

A.  Importing merchandise from China to Colombia.

Q.  Did you commit any crimes in Colombia?

A.  Yes.

Q.  Let's start at the earliest age.  What crime did you commit at the earliest age?

A.  My earliest age?

Q.   Yeah.   How old were you when you committed your first crime?   How's that?

A.   In my 20s, I'd imagine.

Q.   And what crime was that?

MS. TARLOW:   Objection, your Honor.

THE COURT:   Basis?

MS. TARLOW:   This witness is not testifying under a cooperation agreement.   There's no relevance for this.

THE COURT:   All right.   Rephrase it, please.

Q.   You said you were 20 years old when you committed a crime. Did you report that crime?

I'm sorry, did you answer?   I'm sorry.

A.   I was around 20 when I committed my first crime.   Yes, that could be.

Q.   Did you advise the government of that crime?

MS. TARLOW:   Objection.

THE COURT:   How is this relevant?

MR. COLON:   It's his criminal history, Judge.   That's all we know is what he's done in his drug trafficking days.

THE COURT:   No, I think your question was about whether he advised the government of a crime.

MR. COLON:   All right.   Initially, I started with the type of crime, but I'll ask again, Judge.

Q.   What did he advise the United States government of his criminal history in Colombia?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MS. TARLOW:  Objection.

THE COURT:  As I understand it —— why don't you first establish whether he's testifying pursuant to a cooperation agreement.

Q.  You did testify pursuant to a cooperation agreement, correct?

MS. TARLOW:  Objection.  Vague, your Honor.

THE COURT:  Ask him if he has a cooperation agreement with the government.

Q.  Do you have a cooperation agreement?

A.  Yes, sir.

Q.  One of the conditions is that you advise the government of the United States all the crimes you've committed in your life, yes or no?

A.  Correct.

Q.  So I'll ask you the question with respect to your life in Colombia from the age of 1 to 32.  What crimes —— did you advise the government, the United States government, of the crimes you may have committed in Colombia up until the age of 32 when you left?

MS. TARLOW:  Objection, your Honor.  May we be seen at sidebar?

THE COURT:  All right.  That's probably a very good idea.  Let's do that.

(Continued on next page)

(At sidebar)

MS. TARLOW:  Your Honor, this witness had a cooperation agreement.  He answered the question truthfully that he did at one point in time have a cooperation agreement, but he has since been sentenced.  He's no longer on supervised release.  And he, although, may think that a cooperation agreement extends ad infinitum, he's not actually testifying pursuant to his cooperation agreement.

THE COURT:  Was a condition of his supervised release that he comply with the terms of the cooperation agreement?

MS. TARLOW:  It may, but his supervised release is now terminated, your Honor.

THE COURT:  All right.

MS. TARLOW:  So with respect to counsel's questioning regarding any ——

THE COURT:  Silence, please.

MS. TARLOW:  With respect to counsel's questioning regarding any crimes that this witness may have committed, that questioning must fall under the normal rules of Rule 608 and 609, and he's not laying a proper foundation, and he's not advised us of why he's eliciting that testimony.

MR. COLON:  So, if I get this right, Judge ——

THE COURT:  Pardon me?

MR. COLON:  If I get this correct, the government's position is whatever he did in Colombia in terms of criminal

activity is not relevant for the jury to decide whether they're going to —— how much weight they're going to give to his testimony?

THE COURT:  Well, you'd have to have a conviction, it seems to me, that bears on truth or veracity.  Am I wrong?  It's got to meet certain criteria, and it's got to relate to truth and veracity.

MR. COLON:  But it's my understanding that, whether he's convicted or not, he has to reveal these crimes.

THE COURT:  Pardon me?

MR. COLON:  Whether he's convicted or not, he has to reveal these crimes.

THE COURT:  I think the government is representing to you and to me that this witness is not testifying pursuant to a cooperation agreement.

MR. COLON:  So therefore I'm precluded from asking him what his criminal history has been in his country?

THE COURT:  No, you can ask him, but as you would any witness, it has to have some bearing —— it doesn't come in because it's part of a cooperation agreement.

Excuse me a second.

So what the government has represented to you and to me is that once upon a time he had a cooperation agreement.  He was sentenced pursuant to that cooperation agreement, received a prison term and a term of supervised release.  There is no

prison term unfulfilled.  There is no term of supervised release unfulfilled.  And so therefore Rule 609 applies, and it has to come in under 609.

MS. TARLOW:  Or under Rule 608.

THE COURT:  Or 608.  So you can get convictions in. You can get that in under 608 or 609, but not —— if you just called —— take the last witness, Ms. Taul, or a couple of witnesses ago.  You could ask her about convictions in the last ten years that bear on her truthfulness, but you couldn't ask her about any crime she's committed since age 1 to 32, as the question was, and that's true here.

MR. COLON:  Generally, Judge ——

THE COURT:  Pardon me?

MR. COLON:  Generally, Judge ——

THE COURT:  What?

MR. COLON:  —— when people are going to be processed or developed or considered as informants, they're generally asked about everything they've done wrong.  Now, isn't, I guess, the seminal issue here his honesty?  I don't know what crimes he committed in Colombia have to do with fraud or theft. I mean, we don't know that.

THE COURT:  No, you have somebody who has a live cooperation agreement, and your deal with the government is that you will truthfully disclose your past criminal conduct. And if you breach that agreement, the government can rip up

your cooperation agreement.  And you can say, not only did this person lie to the government, but they're lying to you.  They lied to the government is what you're proving.  And it's not the crime, it's the lack of truthfulness that that reflects when there's a crime that was not disclosed to the government.  So that's what I see.

Anything the government wants to add?

MS. TARLOW:  No, your Honor.  I think ——

THE COURT:  Yes.

MR. COLON:  So therefore I'm not allowed to ask him whether he's committed any crimes having to do with fraud, dishonesty?

THE COURT:  I didn't say that.  I said you have to comply with the rule, and is it a conviction?  How old is the conviction?  You could ask him about truth or veracity, but you can't prove it collaterally unless you fall within the rule, right?  That's what I think we're dealing with.

MR. COLON:  Didn't the government open the door when they asked him about false identification?  That's a crime of dishonesty.

THE COURT:  Right, right, and you can probe that.  You can probe that.  But the point is it has to go to truth and veracity, and you can't prove it collaterally unless you're proving a conviction within ten years.  If it's more than ten years, then you have to fall within 609(b).  I'm not giving a

course on the Rules of Evidence.

MR. COLON:  I understand that.

THE COURT:  It's your responsibility to read 608 and 609 and tell me why it comes in, not me tell you what 608 and 609 provide.

MR. COLON:  I just wanted to know what you had to say, Judge, about that.

THE COURT:  Right, right.  So that's the way it is, and it flows from the fact that this is a witness who is not testifying pursuant to a cooperation agreement where you succeed in showing that he's breaching his agreement, in effect lying to the government.

MR. COLON:  Understood.

THE COURT:  Was it in this district that he was convicted?

MS. TARLOW:  No, your Honor.

THE COURT:  OK.

MS. TARLOW:  The government also would proffer that defense would need to have some good faith basis to inquire about any specific instances as well.

THE COURT:  Right.  Well, first of all, are there any — does he have any convictions for a crime relating to truth or veracity?  Other than money laundering, I guess, could impact truth and veracity.

MS. TARLOW:  Well, your Honor, he ultimately pled

guilty to conspiring to import cocaine, and that is his only conviction, I believe.

THE COURT:  Right.  That you're aware of?

MS. TARLOW:  That I'm aware of.

THE COURT:  At any time ever?

MS. TARLOW:  I believe that is accurate, but I'd want to consult my records.

THE COURT:  Do you have any factual basis to ask about any crime involving truth ⸺ any act involving truth or veracity?

MR. COLON:  Well, I guess my basis is the false identification that occurred in the United States.

THE COURT:  Yes, you can probe that to the hilt. That's fine.

MR. COLON:  And any similar acts back in Colombia, again, there may not be a conviction.

THE COURT:  But the thing is you have to have a basis to ask the question, not the hope that maybe something will fall out of the sky.

MR. COLON:  Well, if someone does it here in the United States, there's a good possibility that he has a propensity for doing that back home.

THE COURT:  We're not going on propensity.

MR. COLON:  I know, but that's ⸺

THE COURT:  All right.

O2QHHer5                        Perez - Cross

MR. COLON:  —— life experience.

THE COURT:  You can certainly explore the false identification, impersonation, that sort of thing.

MR. COLON:  Very good.  Thank you, Judge.

MS. TARLOW:  Thank you, your Honor.

(Continued on next page)

(In open court; jurors present)

BY MR. COLON:

Q.   Mr. Perez, I'm going to go into the conduct that you testified to earlier involving obtaining false identifications.

A.   OK.

Q.   I believe that occurred in 2012, is that correct?

A.   Approximately.

Q.   And where did that occur?

A.   In Honduras.

Q.   And the purpose was so that you could avoid arrest by the police of Honduras?

A.   And the police of the United States.

Q.   When you say "police of the United States," what agency were you referring to if you were living in Honduras?

A.   The DEA.

Q.   Now, what was the crime exactly?  What documents did you present false —— false identity for?

A.   Could you rephrase the question.  I don't understand.

Q.   What type of document were you trying to obtain in terms of this false identification conduct?

A.   Driver's license and passport.

Q.   So when you say "driver's license," you're talking about a Honduran national driver's license?

A.   Yes, sir.

Q.   Were you successful in obtaining that license?

O2QHHer5                          Perez - Cross

A.   Yes, sir.

Q.   And where did you do this in Honduras?

A.   San Pedro Sula.

Q.   Was that a place where you were living at the time?

A.   Yes, sir.

Q.   Did you pay for that license?

A.   Yes, sir.

Q.   Did you use someone else's identification?

A.   I think so, sir.

Q.   In other words, did you use documents that belonged to someone else?

A.   I am not certain about that, sir.

Q.   Where'd you get those documents from?

A.   I got them from Honduras, San Pedro Sula.

Q.   Well, what individual gave you or allowed you to obtain those documents?

A.   A Mexican who worked for Cesar and for me who at that time was also living in San Pedro Sula.

Q.   So that Mexican individual gave you the documentation of a Honduran national?

A.   That person, that Mexican person, was the person who had contacts in the Honduran authorities in order to falsify those documents that I falsified.

Q.   When you say the "Honduran authorities," can you tell this jury the specific authority you're referring to?

A.   The transit authority that issues the driver's license.

Q.   And how much did you pay this Mexican individual for that documentation, if any?

A.   I don't remember exactly.

Q.   Well, did you pay that individual?

A.   We paid this Mexican person a monthly rate, and that was the person who had a relationship with the Mexican —— sorry, the Honduran authorities.

Q.   So when you say you paid him a monthly rate, that was with respect to your specific transaction?

A.   No, not only that transaction.

Q.   Oh, so there was more than one transaction?

A.   Right.

Q.   Would you tell the jury, when you say more than one transaction, about how many transactions were there?

A.   Many, because he was in charge of —— or he was the one who had contacts within the Honduran government, and he facilitated various services for us.

Q.   So how much did you pay him a month?

A.   $100,000.

Q.   A month?

A.   Yes, sir.

Q.   And how long did you pay this individual to continue this false identification mill?

          MS. TARLOW:  Objection.  Mischaracterization of the

testimony.

THE COURT:  Rephrase it, please.

Q.  How much did you pay this individual for the continuing services that he provided with respect to false identification documentation?

A.  We paid him $100,000 per month, but he did not only provide us with false papers; he also gave us information about the movement of the police in Honduras and other services as well.

Q.  Can you tell the jury about how long this —— these payments went in terms of time?  Months?  Years?

A.  From the year 2008 until months before the police attempted to arrest him in Honduras.

Q.  When you say "attempted to arrest," who?

A.  That Mexican who provided us that service, or the Mexican who had contacts in the Honduran government and provided services to Cesar and me.

Q.  When did he get arrested?

A.  If I'm not mistaken, in the year 2013.

Q.  So you were paying that individual $100,000 a month to continue the false documentation crimes —— you paid that individual 100,000 a month for almost five years?

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  One moment, please.

MS. TARLOW:  Counsel's testifying.

THE COURT:  You can ask about the period of time, but

I think — well, no, I think you covered this, haven't you?

MR. COLON:  I haven't covered — well, I covered 100,000 a month, and then he was specific about how long it lasted, 2015.

THE COURT:  Yes.

MR. COLON:  So —

THE COURT:  So what haven't you covered?

MR. COLON:  I was going to ask him, how much did you pay him in total in that period?

THE COURT:  That's sustained.  It's a matter of arithmetic.  Thank you.

MR. COLON:  Do you have a — do you want me to follow up on that, Judge, what he believes that this man was paid over almost five years?

THE COURT:  Isn't that five times 100?  The jury can do that.  I can do that.  You can do that.  The witness can do that.

BY MR. COLON:

Q.  Would you agree with me that you paid him over five or $6 million?

THE COURT:  No, sustained.

Q.  So this individual that undertook these — these requests for false documentation, can you tell the jury what kind of documents he would provide to people or to your clients that needed false identification?

MS. TARLOW:  Objection.  Relevance.

MR. COLON:  I'm sorry, Judge, I'll wait for your ruling, but ——

THE COURT:  Thank you.  One second, please.

He can testify to what he knows about himself or his colleagues.  You can ask about that.

MR. COLON:  I'm sorry, Judge, could you repeat that? It was hard for me to hear.  My fault.

THE COURT:  You have to rephrase your question because it asked about provide to people.  If you want to ask him about provide to him or persons with whom he was then working, I'll allow it.  OK?

MR. COLON:  Thank you so much.

BY MR. COLON:

Q.  What sorts of documents were provided to you by this individual that you were paying $100,000 a month for?

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  I'll allow it.

Go ahead.

A.  As I said before, he did not —— we did not only pay him for false papers; he provided us with other services for which we paid him $100,000 a month.

Q.  Did he provide false passports to you?

A.  No, sir.

Q.  Did he provide anything other than driver's licenses to

you?

A.   He provided me with false Honduran documents with which I later applied for the passport and Mexican visas.

Q.   So those Mexican visas were to be used for travel between what countries?

A.   Between Honduras and Mexico.

Q.   Did he provide you with any passports to obtain United States visas?

           MS. TARLOW:  Objection.  Asked and answered.

           MR. COLON:  I'm sorry, Judge, I was very specific here.  I didn't ask that before.

           MS. TARLOW:  He testified ——

           THE COURT:  One second.

           You asked the question directly, "Did he provide false passports to you?" and he answered that question.  Now you're asking, "Did he provide you with any passports to obtain United States visas?"

           MR. COLON:  Yes, sir.

           THE COURT:  That would appear to be incorporated into your questions, unless you're asking him whether he provided a lawful United States passport; in which event I would say how could a private citizen do that?

           So do you have a factual basis for your question?

           MR. COLON:  Well, he testified that he obtained passports, Honduran passports, in order to get a Mexican visa.

Did he obtain Honduran passports in order to get a U.S. visa?

MS. TARLOW:  Your Honor, we also object on relevance grounds.

THE COURT:  You cannot ask him again whether he provided a false passport.  Do you want to phrase another question and try it?  Go ahead.

MR. COLON:  Of course.

BY MR. COLON:

Q.  With respect to money laundering —— I'll move on.

With respect to money laundering, how did you undertake money laundering?  What was the procedure or the process that you used to launder whatever the funds that you collected?

THE INTERPRETER:  May the interpreter ask for clarification?

A.  We would move it in diplomatic luggage.

Q.  Diplomatic luggage of what country?

A.  To be more specific, we moved it using people who had diplomatic passports from the country of Israel.

Q.  And about how many times did you do that?

A.  Very many.

Q.  Well, when you say "very many," at least 100 times?

A.  I can't say exactly, but very many times.

Q.  More than 100?

A.  As I said before, I can't give you an exact number, but I

O2QHHer5                         Perez - Cross

know that it was very many times.

Q.  Please tell the jury, what were the mechanics involved
here?  Did you get —— did you falsify Israeli diplomatic
passports?

A.  No, sir.

Q.  So how was it that you obtained or used diplomatic
passports from the state of Israel?

A.  We worked with people who were officials at the Israeli
embassy in Colombia.

Q.  When you say you worked with them, did you pay them money
for their —— for the diplomatic passports?

A.  I'll repeat again.  We worked with people who were
officials at the Israeli embassy in Colombia who had diplomatic
passports.

Q.  So you're talking about Israeli diplomats?

          MS. TARLOW:  Objection, your Honor.  Relevance.

          THE COURT:  Sustained.

Q.  Did you pay these diplomats?

          MS. TARLOW:  Objection, your Honor.
Mischaracterization of the testimony.

          THE COURT:  I'll allow him to ask it.

          Did you pay any diplomats?

A.  Yes, sir.

Q.  How much did you pay them?

A.  We paid them a percentage of the money that they

O2QHHer5                          Perez - Cross

transported.

Q.  When you say "percentage," what was the percentage that you paid?

A.  Three percent of the money that they transported from Honduras to Colombia.

Q.  Now, when you say you paid them, who did you pay the 3 percent to?

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  No, I'll allow it.

A.  Can you please repeat the question.

MR. COLON:  May —— Judge, may I respectfully ask that the question be read back, please?

THE COURT:  No, rephrase it.

Q.  Who did you pay the 3 percent to that was an Israeli diplomat, I would assume?

MS. TARLOW:  Objection, your Honor.

THE COURT:  Basis?

MS. TARLOW:  Form.

THE COURT:  Form?

MS. TARLOW:  Form, your Honor.

THE COURT:  No, I'll allow it.

Go ahead.

A.  To a woman who was an official of the Israel embassy in Colombia.

Q.  Was she a vice-consul?

MS. TARLOW:  Objection else.

THE COURT:  Sustained.

Q.  How long did paying off this Israeli woman that was an official of the Israeli embassy, how long did that last, that payment structure?

A.  Starting in 2008 until, if I'm not mistaken, late 2010.

Q.  Is it your testimony that the false Israeli diplomatic passports were given to non-Israelis to transport this money?

MS. TARLOW:  Objection.  Form and mischaracterization of testimony.

THE COURT:  Rephrase it, if you can.

Q.  Who used these false Israeli diplomatic passports?

A.  Nobody was using fake passports.  The woman who was transporting the money for us from Honduras to Colombia was an official of the —— of the embassy of Israel in Colombia.

Q.  So she was an Israeli diplomat, in other words?

MS. TARLOW:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  And how much —— in general, how much money would she be taking from Honduras to Colombia?

A.  Can you please be more specific?  Are you asking how long did she carry in total or how long ——

THE INTERPRETER:  Interpreter correction.

A.  How much in total or how much per trip?

Q.  How much per total?

A.   Around $150 million.

Q.   Do you know what her method of travel was with respect to that money?

MS. TARLOW:  Objection.

THE COURT:  Basis?

MS. TARLOW:  Relevance.

THE COURT:  Sustained.

Q.   How many trips did she make with respect to the money she was taking from Honduras to Colombia?

MS. TARLOW:  Objection.  Relevance.

THE COURT:  Sustained.

Q.   Do you understand that these crimes of false documents, money laundering, false Israeli diplomatic passports, you know that those are all crimes involving dishonesty?

MS. TARLOW:  Objection, your Honor.

THE COURT:  Sustained.

Q.   Were you being honest when you did these things?

MS. TARLOW:  Objection.  Vague.

THE COURT:  I'll allow it.

A.   Can you please repeat the question.

Q.   Were you being honest when you undertook these three acts of criminality?

MS. TARLOW:  Objection.  Form.

THE COURT:  I'll allow it.

A.   I'm sorry.  What three acts are you referring to?

O2QHHer5                     Perez - Cross

Q.   Were you being honest when you involved yourself or committed these acts of, you know, money laundering, false passports, and —— money laundering, false passports and identification documents?  Were you being honest in what you were doing?

A.   No, sir.

Q.   In other words, these are all based on lies, correct?

THE COURT:  Sustained as to form.

Q.   You did not tell the truth when you involved yourself in these types of activities, did you not?

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.   Now, you testified that you were a collaborator or somebody involved with the Sinaloa Cartel?

A.   Yes, sir.

Q.   And did you live in Sinaloa?

A.   Yes, for some time.

Q.   And you said you were involved with El Chapo, yes?

A.   Yes, sir.

Q.   And did you get to meet El Chapo?

A.   Yes, sir.

Q.   About how many times did you meet El Chapo?

A.   No more than four times.

Q.   And where was that that you met him each time?

A.   In Sinaloa.

O2QHHer5                         Perez - Cross

Q.   Anywhere specifically in Sinaloa?

A.   The outskirts of Culiacán.

Q.   How long did you live in Sinaloa?

A.   A few months.

Q.   From when to when?

A.   Starting in late 2011 until one week before Easter week in 2012.

Q.   How is it that you became involved with the Sinaloa Cartel?

A.   Because I started working for a man called Cesar Gastelum.

Q.   How did you start working with Cesar Gastelum?

A.   I started working for him in the year 2008 in Honduras.

Q.   What was it that you did specifically for Cesar Gastelum?

A.   I started out by laundering his money, and I later became involved in cocaine trafficking.

Q.   Now, what was his relationship to El Chapo?

A.   Who?

Q.   Gastelum, Cesar Gastelum.

A.   Cesar Gastelum was an individual that was very close to Chapo.

Q.   When you say "very close," what do you mean by that?

A.   Cesar Gastelum was one of the main suppliers of cocaine for the Sinaloa Cartel.

Q.   But how did you, a Colombian national, get involved with the Sinaloa Cartel?

          MS. TARLOW:  Objection.  Asked and answered.

O2QHHer5                          Perez - Cross

THE COURT:  Is that correct, Mr. Colon?

MR. COLON:  I didn't hear the basis for it, Judge. I'm sorry.  It's hard to ——

THE COURT:  It was that you have asked this and the witness has answered this.

MR. COLON:  Withdrawn.  I'll ask it another way.

THE COURT:  Why don't you ask a different question if you've covered the territory.  There's no objection to the form of the question.

Q.  Did you approach Mr. Gastelum or did he approach you?

A.  He approached me.

Q.  Where did he approach you?

A.  In San Pedro Sula.

Q.  So Mr. Gastelum came down into Honduras and met you there?

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  It's reiterating.  You can't reiterate. You can ask and it can be answered, but you can't reiterate.

Go ahead.  Next question.

Q.  And is it through Mr. Gastelum that you met El Chapo?

A.  Yes, sir.

Q.  How much money did you move for them?

A.  For Chapo and Cesar Gastelum?

Q.  Both, please.

A.  I moved around $500 million for the Sinaloa Cartel.

Q.  What was your compensation for the money laundering?

O2QHHer5                            Perez - Cross

A. Approximately one point, 1 percent.

Q. One percent of $500 million?

          MS. TARLOW:  Objection.  Asked and answered.

          THE COURT:  Sustained.

Q. And what did you do with the money that you earned from that money laundering venture with Gastelum and Chapo?

A. Part of it I spent and another part of it I invested in Mexico.

Q. What did you spend it on?

          MS. TARLOW:  Objection.  Relevance.

          THE COURT:  Sustained.

Q. What investments did you make in Mexico?

          MS. TARLOW:  Objection.  Relevance.

          THE COURT:  Sustained.

Q. Now, at one point you moved from money laundering, you went into the actual trafficking of narcotics, correct?

A. Yes, sir.

Q. And when was that?

A. Late 2008, early 2009.

Q. So you only did it for —— I'm sorry, you did it from 2008/2009.  How long did that last?

A. Trafficking cocaine?

Q. Yes.

A. Until right before I surrendered to the U.S. authorities.

Q. Where was it that you surrendered to the U.S. authorities?

O2QHHer5                         Perez - Cross

A.   In the year 2015.

Q.   I'm sorry.  Let me be clearer.

         Where was it?  I'm sorry, where was it that you turned yourself in to the U.S. authorities?

A.   In Belize.

         THE COURT:  Ladies and gentlemen, we're going to call it a day, and then some.  What I'm going to do is I'm going to ask the spectators in the courtroom to remain in the courtroom and not leave until our jurors have cleared the elevator lobby, and I'm going to ask for the assistance of the CSO on that.

         So we'll pick up tomorrow morning with a 10 o'clock start.  Thank you, ladies and gentlemen.  Sorry to keep you over a little.

         (Jury excused)

         THE COURT:  All right.  Please be seated.

         THE WITNESS:  May I leave now?

         THE COURT:  You may.  The witness may leave.

         (Witness temporarily excused)

         THE COURT:  All right.  You may leave.

         (Adjourned to February 26, 2024, at 9:40 a.m.)

INDEX OF EXAMINATION

Examination  of:                                        Page

MIGUEL REYNOSO

Cross By Mr. Stabile . . . . . . . . . . . . . 503

Redirect By Mr. Stabile . . . . . . . . . . . 523

MANUEL PRADO

Direct By Ms. Tarlow . . . . . . . . . . . . . 528

Cross By Mr. Colon . . . . . . . . . . . . . . 537

Redirect By Ms. Tarlow . . . . . . . . . . . . 552

JENNIFER TAUL

Direct By Mr. Wirshba . . . . . . . . . . . . 554

Cross By Mr. Stabile . . . . . . . . . . . . . 591

LUIS PEREZ

Direct By Ms. Tarlow . . . . . . . . . . . . . 624

Cross By Mr. Colon . . . . . . . . . . . . . . 643

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 202R-2T through 202R-4T,  . . . . . . . . . . 538

         203R-10T through 203R-12T,

         204R-1T, 204R-2T, 250A-2T,

         250C-2T, 401A-T, 401B-T, 402,

         403T through 406T, 408T

         through 410T, 802T through

         804T, and 905T

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 3915-05   . . . . . . . . . . . . . . . . . . . 511