O2R5her1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                           15 Cr. 379 (PKC)

JUAN ORLANDO HERNANDEZ,

                                 Trial
         Defendant.

------------------------------x

                                 New York, N.Y.
                                 February 27, 2024
                                 10:00 a.m.

Before:

                    HON. P. KEVIN CASTEL,

                                 District Judge

                      APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  KYLE A. WIRSHBA
     JACOB GUTWILLIG
     ELINOR TARLOW
     DAVID ROBLES
     Assistant United States Attorneys

RENATO CHRISTIAN STABILE
RAYMOND L. COLON
SABRINA P. SHROFF
     Attorneys for Defendant


Also Present:
          Dagoberto Orrantia, Interpreter (Spanish)
          Sonia Berah, Interpreter (Spanish)
          Mercedes Avalos, Interpreter (Spanish)
          Evan Frierson, Interpreter (Spanish)
          Matthew Passmore, DEA Special Agent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O2R5her1

(Trial resumed; Jury not present)

THE COURT:  So, we received a phone call from juror no. 9 this morning indicating that the juror has pink eye, which is also known as conjunctivitis and I propose to excuse the juror.

Any objection from the government?

MR. GUTWILLIG:  Your Honor, we have a related issue, if we could be heard at the side bar, please, that may inform the Court's decision here.

THE COURT:  All right.  I will hear you at side bar. Need I be concerned that I am going to catch something at the side bar?

MR. GUTWILLIG:  No, your Honor.

THE COURT:  If it relates is to this juror?  I don't know.

(Continued next page)

O2R5her1

(At side bar)

MR. GUTWILLIG:  Your Honor, the government has no objection to dismissing this juror for the reason the Court just stated.  We wanted to approach the side bar to flag another issue for the Court, which is that over the course of multiple days of trial, members of the prosecution team have noticed and observed that juror no. 5 appears to have been sleeping.  So we wanted to alert the Court to that and ask the Court how you would like, if at all, the government to alert the Court if we observe that again.

THE COURT:  All right.  You may stand up at a convenient moment, say:  *Just wanted to alert the Court about the issue we raised at the side bar on Tuesday morning.*

MR. GUTWILLIG:  Understood.

MR. STABILE:  Your Honor, may I make a record also?

THE COURT:  Sure.

MR. STABILE:  I have not observed juror no. 5 sleeping.  I will pay closer attention now that the government has raised this.  If she were dismissed she would be the second black female juror dismissed because alternate no. it 2 was a black female.  So I just wanted to put that on the record.

And can I also clarify the name of juror no. 9 so that we are all on the same page?

THE COURT:  They didn't go by names.

MR. STABILE:  Oh.  Just because there was original

O2R5her1

juror no. 9 -- do you mean the juror sitting in seat no. 9?

THE COURT: Yes. Exactly. Yes.

MR. STABILE: We would object.

I will just say that he is a Hispanic male and we would ask the Court to inquire if, how long it would take for his pink eye not to be contagious. I don't know much about pink eye but certainly I know that it clears up. And if the Court would inquire, we would like to keep him. So we would object.

THE COURT: OK. You can object but I mean I have done my research this morning and it is contagious as long as there is a discharge from the eye. Now, that could -- that, in some instances, can go for an extended period of time. It can be contagious before the discharge, I have read, and antibiotics do clear it up and it depends. It's conjunctivitis. It depends. But I am not inclined, with the four remaining alternate jurors, I'm not inclined to delay the trial as a result of this. If somebody called up and said I had a head cold or something, that might be entirely different situation. This is a contagious disease and I'm concerned about contaminating my other jurors.

MR. STABILE: Understood, your Honor. Just note our objection. We believe that the Court should inquire further if he has seen a doctor and if he has a specific prognosis.

THE COURT: He hasn't seen a doctor.

O2R5her1

MR. STABILE:  Well then, you know, I don't even know how he knows.

THE COURT:  Or he didn't report seeing a doctor.

MR. STABILE:  Then I don't know how he knows he has pink eye.

THE COURT:  So what are you proposing?  What?  That I compel him to see a doctor?

MR. STABILE:  That the Court inquire as to how it is he even knows he has pink eye.  I wouldn't know if I had pink eye if my eye was hurting me.

THE COURT:  I think I would know if you had pink eye and I'm not a doctor.  If I see stuff oozing out of your eye, I would take a pretty good guess that you had pink eye.

MR. STABILE:  As I said, I'm not a doctor.  The Court, respectfully, isn't a doctor and he hasn't seen a doctor.  So the fact that he said --

THE COURT:  Well, he didn't report seeing a doctor.

MR. STABILE:  So the fact that he says he has pink eye, we don't even know if he has pink eye.

THE COURT:  So what are you proposing then?

MR. STABILE:  That the Court inquire as to how he knows he has pink eye and whether or not he intends to see a doctor.

THE COURT:  And what if he says I don't intend to see a doctor and I know it because I have had it before.

O2R5her1

MR. STABILE:  He may say those things but --

THE COURT:  Listen.  We are adjourned.  You can wait right here.

(Recess)

THE COURT:  So, during the break I telephoned the juror.  The phon rang and it rang into voicemail and he did not pick up.  I left a message to call chambers and that's where we are.  So he is not home and I propose to discharge the juror.

MR. STABILE:  Well, I would ask that we wait for approximately 30 minutes.

THE COURT:  Why do you say 30 minutes?  Why not 15 minutes?  Why not an hour?  Why do you come up with 30 minutes, sir?

MR. STABILE:  I propose that as a reasonable amount of time for somebody to return a phone call from a Federal Court when he knows he is sitting as a juror.  So I would expect that 30 minutes --

THE COURT:  What I will do for you, sir, is I will make a second call to the line in the event that he was engaged on the line and that's why it went into voicemail.  I will do that.  But if he is out of his home I don't understand the rationale for waiting and delaying this trial.

MR. STABILE:  Just because most people check their voicemail when they see a missed call and he knows that he is supposed to be there so I would think he would be monitoring

O2R5her1

his phone just in case the Court would call him.

THE COURT:  Do you know if this is a landline or a cell phone?

MR. STABILE:  I would guess it's a cell phone.

THE COURT:  OK.

MR. STABILE:  Because very few people have landlines today.

MR. COLON:  Judge, if I may for a second?

THE COURT:  Yes.

MR. COLON:  My concern is if he is dismissed, we are losing another person of a protected class, a minority, Hispanic; so that would be an African American female, Hispanic male, and I'm concerned about that.  It's -- we are taking this man's word that he has conjunctivitis.  I know conjunctivitis, I have had it and it can be spread especially through contact. But that's my concern and I think we are hoping that the Court ensures that Mr. Hernandez gets a fair trial in terms of the diversity of the jury and that's my main concern at this point.

But, that aside I am also concerned about the health of everyone else, clearly, but that is someone that we are going to lose that we think can be a very pertinent part of this jury.

THE COURT:  Look.  Your point is well taken.  I said the other day when Juror 14 was dismissed that the circumstances surrounding her first claiming that she needed to

O2R5her1

go on a cruise, which was not disclosed during voir dire and not disclosed to the jury administrator, followed by the next morning calling in sick, were the indicia of juror misconduct. Nevertheless, the remedy for that is not to call the marshals out to the person's house and drag them in to court. And the same thing here. I am happy to call the phone number again. Perhaps he was on the line with somebody. I'm happy to do that. But beyond that, if the person is not picking up their phone and they report they have conjunctivitis, first of all, I take -- I didn't speak to the person, my deputy did, and I take them at face value unless and until surrounding circumstances suggest I shouldn't.

MR. COLON: Judge, I think 14, if I may, 14 was already creating a pattern. I think it was clear to all of us that she did not want to serve.

THE COURT: I agree. I am agreeing with you. I am agreeing with you. There is no indication that this juror is engaging in misconduct. My mind acknowledges that that's always a possibility but if I thought it was the possibility there wouldn't be anything I could do about that either. So, I'm happy to wait to see whether he was on a phone line waiting and to call back, but I'm not waiting for an arbitrary period of time picked out of thin air.

MR. STABILE: May we ask when he contacted the Court?

THE COURT: Flo, what time did this gentleman call?

O2R5her1

THE DEPUTY CLERK:  9:10.

MR. STABILE:  Your Honor, I will just, for what it is worth, I observed him yesterday.  I didn't see him scratching his eye, I didn't see him looking uncomfortable.  Again, I don't know how conjunctivitis works.  I have no idea.  But I will note that for the record --

THE COURT:  OK, but there are two possibilities here. I am overexplaining this to you, Mr. Stabile, because you understand this but yet you are continuing to raise it.

The two possibilities are:  He has conjunctivitis, and the other possibility is he is lying and he doesn't have conjunctivitis.

What do you want me to do in the latter situation?

MR. STABILE:  Respectfully, I think there is a third possibility that he does not have conjunctivitis, he just has a stye or something else wrong with his eye and it is not contagious and he is assuming he has conjunctivitis and is saying that.  I don't know how anybody would know if you have never had it before whether or not have you had conjunctivitis. I don't know what conjunctivitis looks like.  I know they call it pink eye, I can't tell you more than that about it and he is self-diagnosing himself.

THE COURT:  Why don't you go look at the internet because I have I looked at the Centers for Disease Control. There are circumstances under which it is safe to proceed but

O2R5her1

I'm not in a position to give this man medical advice.

MR. STABILE:  He is self-diagnosing.  We are assuming he has conjunctivitis.  I don't know.

THE COURT:  Am I in a position to tell him what he must do?  Show up here or have a doctor's note?  What are you suggesting, Mr. Stabile?  Let's take the next step here in your logic path.

MR. STABILE:  To ask him the basis for which he thinks he has conjunctivitis.  He might say I have had it five other times in my life.

THE COURT:  And what if he said I never had it before, I just think I have conjunctivitis.  Then what?

MR. STABILE:  Then I would ask him to get an actual medical diagnosis, not to just say have I conjunctivitis.

THE COURT:  If he says, *Well, I will think about that*; then what?

MR. STABILE:  Well, then we can adjourn for a day and he will either do it or he doesn't.  But I can say I have a headache and say I have a brain tumor, and that could be true or that could be not true.

THE COURT:  Sir, you are getting silly now and you are not being persuasive.  I think you are getting a little silly here.

MR. STABILE:  Well, I'm not trying to be silly, your Honor.  I am concerned about the makeup of this jury and I am

O2R5her1

concerned about dismissing an Hispanic juror and considering now watching a female black juror after we dismissed another female black juror.  Those are my concerns.

THE COURT:  OK.  You made your record.  Do you want to make it again?

MR. STABILE:  No.

THE COURT:  You had already made that record, didn't you?

And let me tell you about questioning on cross-examination.  I know the great feeling there is if you score a point on a witness.  That doesn't give you license to reiterate or to ask the same question again.  All right?  So I'm --

MR. COLON:  I don't do that on purpose.

THE COURT:  I understand.  I understand.  But think about that.

O2R5her1

(In open court)

THE COURT:  Let me raise an issue a second time.  I have called a second time and contacted my chambers and there has been no call from the juror.

We have, sitting in our courtroom, two wonderful people from our interpreters office.  Are they needed, Mr. Colon?

MR. COLON:  Perhaps at some point, Judge.  I can't say right now.  I think that the interpreters now are doing a fine job so I can't say down the road whether we are not going to need them.

May I confer?

THE COURT:  Yes, because it is a rather expensive proposition and it also precludes them from performing other services in the court house.

Just so you know, Mr. Colon, I'm not talking about the government's interpreters.  That is a different story.  I am talking about the court interpreters.  Thank you.

(Defendant and counsel conferring)

MR. COLON:  Your Honor, I'm sorry.  May I have another minute or two?

THE COURT:  You may.

(Defendant and counsel conferring)

MR. COLON:  Your Honor, it is our position that -- I think the government wants to speak.

O2R5her1

MR. GUTWILLIG:  May we have a moment to confer with counsel?

THE COURT:  Sure.

(Counsel conferring)

MR. COLON:  Your Honor?

THE COURT:  Yes.

MR. COLON:  We have conferred with our client.  We would like to keep at least one of them here with respect to our client.  Sometimes, of course, he can understand the Spanish speakers but it is really a question of the English-speaking witnesses that sometimes he doesn't -- he can't understand what they're saying.  He is trying to balance both languages.

THE COURT:  Maybe I am wrong in my recollection.  Was there interpretation yesterday for the two English-speaking witnesses?

INTERPRETER:  No, Judge.

MR. COLON:  I didn't hear, Judge.

THE COURT:  The answer is no.  There was no interpretation yesterday.  They're here to interpret for the defendant.  If the defendant does not wish the interpretation, he won't receive it.  If he wishes the interpretation, he will.  That's what they're here for.

MR. COLON:  It is basically for the English-speaking witnesses, Judge.

O2R5her1

THE COURT:  Well, that -- I'm not making myself clear. I know that.  They don't interpret the Spanish speaking witnesses, I don't believe; correct?

INTERPRETER:  We do not.  Correct.

THE COURT:  So they do not interpret the Spanish-speaking witnesses because Mr. Hernandez can hear them. But Mr. Hernandez, who the jury has learned in opening has a masters degree from I believe it is SUNY Albany -- maybe I have that wrong -- has not utilized the services of the interpreters for the two English-speaking witnesses yesterday.  We are only talking about the English-speaking witnesses.

MR. COLON:  Yes.

THE COURT:  So that was the question I was asking you, whether your client needs the services of the interpreters for the English-speaking witnesses.

MR. COLON:  Yes.

THE COURT:  So he will be using the interpreters; is that correct?

MR. COLON:  Yes.

THE COURT:  Because he didn't yesterday.

MR. COLON:  Well, it depends on what's being said, whether he can hear it properly, so it depends.  This is not a question of having it happen continuously.

THE COURT:  All right.  Well, under arrangements, because we don't know how long the day will be, we have two

O2R5her1

interpreters and sobeit.  They're at public expense and that's fine.  That's what we will do.

MR. STABILE:  Your Honor.

THE COURT:  Yes, sir.

MR. STABILE:  At the side bar, your Honor suggested that I do some internet research.

THE COURT:  Yes.

MR. STABILE:  I did do that research and I can either speak --

THE COURT:  Go right ahead.

MR. STABILE:  Based on my internet research it appears that there are several other conditions that may seem like pink eye but are separate issues, such as allergies, dry eye syndrome, COVID-19-related pink eye, iritis keratitis, a stye, or blepharitis.  That's coming from ParkSlopeEye.com but there are other sites that I am seeing that confirm -- I mean, I can read from other sites but that's just the first one that came up.

THE COURT:  Thank you very much, Mr. Stabile.

(Pause)

THE COURT:  It is now 10:36.  I have placed three phone calls to the juror's number and there has been no answer. He called chambers at 9:10 to report that he had pink eye and wasn't going to be able to come in and there have been now three calls that I have placed.  It is 10:37 now, and I have

O2R5her1

called my chambers twice to check to see whether he called chambers. He has not. And so, I am going to excuse the juror.

Any objection from the government?

MR. GUTWILLIG: No, your Honor.

THE COURT: Any objection from the defendant?

MR. STABILE: Yes, we object.

THE COURT: So now what is the objection now? I think before you said you wanted to wait 30 minutes. What do you want to do now? You still object after 30 minutes; is that it? Or what?

MR. STABILE: I don't believe it is appropriate for a juror to just -- to not show up in court and call chambers and say that he has pink eye with no medical diagnosis. And I have just read that pink eye -- that there are other eye issues that can present as possibly pink eye, and I have just looked also at the American Academy of Ophthalmology and confirms everything I said previously.

THE COURT: Would you like me to send the marshal's service out to the person's home?

MR. STABILE: Not at this point, but I do think that the Court should --

THE COURT: Well, at some point? What is the point at which I should send the marshal service out, Mr. Stabile?

MR. STABILE: If this person did not return a phone call for a 24-hour period then that might be appropriate but --

O2R5her1

THE COURT:  To send the marshals out to drag the person in?

MR. STABILE:  Not to drag them in but to question him or have him speak to the Court.  He is now ignoring the Court.

THE COURT:  What good would the marshals do in terms of this trial?

MR. STABILE:  Well, your Honor, this juror is representing that he has pink eye.  He might be at the doctor right now getting a diagnosis and I think we should await to see whether or not he in fact has pink eye before dismissing him when pink eye can present as other things.

I understand the Court's concern.  Of course if he has pink eye that would be a very important concern, but we don't know that he has pink eye; he is just saying that.  So, we object to his dismissal at this time.  We are only so far delayed 39 minutes of this entire trial because of this issue and I would suggest that we wait longer to see if this juror calls the Court and, like I said, he could be at the doctor and very likely I would think if he thinks he has pink eye, should be at a doctor getting this diagnosed one way or the other.  And it may not be pink eye and he may say, oh, I went to the doctor, it is not pink eye, and I can continue.  We would like to keep this juror and we object to his being dismissed.  And especially, your Honor, we object based upon his apparent ethnic background.

O2R5her1

(Pause)

THE COURT:  I notice the government called a witness on the translations of certain recordings.  I take it that there is not a stipulation as to the English translation of the conversations; is that correct?

MR. GUTWILLIG:  That's correct, your Honor.

THE COURT:  Thank you.

(Pause)

THE COURT:  It is now past 11:00.  I have confirmed with my chambers there has been no call in response to my message to the juror and I have now placed a fourth phone call to the juror's number and there is no answer.

Is there anything further the government wishes to state on the record?

MR. GUTWILLIG:  No, your Honor.

THE COURT:  Mr. Stabile, would you like to state something for the record?

MR. STABILE:  Yes, your Honor.

We continue to object to this juror being dismissed. The Court has already dismissed the female black juror who is alternate no. 2.  This juror is a Hispanic male.  We are concerned about the racial and ethnic makeup of the jury.  The Court suggested last week that it was willing to adjourn the trial for two days for alternate no. 2 because she expressed an illness.  The Court ultimately dismissed her.  I submit that we

should adjourn the trial for one day to see if juror no. 9 --
he is not answering the phone.  It seems reasonable, at least,
that he could be at the doctor and that we should wait to see
if there is actual evidence that he has conjunctivitis or if
that is just some self-diagnosis, especially given the internet
research I did at the Court's suggestion that indicates that
there are other things that could present as pink eye but are
not pink eye.

        And, I will just note for the Court, Mr. Hernandez is
sitting here and his left eye is quite red also but we believe
it's just a scratch to his eye, we don't believe he has pink
eye, but I will note that his left eye is quite red as well.

        So, my application is that we do not dismiss this
juror, that we adjourn the trial for one day, and we see if
this juror can continue.

        THE COURT:  Mr. Stabile, please sit down.

        I don't want to be unkind but I don't want to
misrepresent anything.  But with the exception of your
reference to Mr. Hernandez and the Court's conversation with
Juror 14, which I will address in a moment, I didn't hear
anything new from you.  Did I misunderstand something?

        MR. STABILE:  I don't know if you heard anything new.
I was just --

        THE COURT:  Thank you, because I asked you if you had
anything to add and you did helpfully add your comment about

O2R5her1

Mr. Hernandez and Juror no. 14, but the rest of it I had heard -- I believe I had heard from you before, unless I am mistaken and I am inviting you to point out if I am mistaken --

MR. STABILE:  No, I think the record is clear.

THE COURT:  -- that what you just said you had said previously with those two exceptions.

MR. STABILE:  Maybe in substance.  Not the exact words, but.

THE COURT:  Well, that's what I am asking you.

MR. STABILE:  I'm sorry.  I don't understand the question.

THE COURT:  The question was:  Did you say anything new other than your reference to Mr. Hernandez and Juror 14?  And you said:  Maybe in substance.  What I am trying to find out is did I miss something?  Was there something new I should now consider that you hadn't raised previously?

MR. STABILE:  I'm not sure, your Honor, but I think it was basically the same.

THE COURT:  Thank you very much.

With regard to Juror no. 14, I never said I would adjourn the trial for two days.  I had a juror on the phone who I believe was engaging in misconduct because the juror did not raise the vacation trip to the jury administrator who had raised the issue, and did not raise it when inquiring about a substantial hardship, but raised it the day after she was

O2R5her1

seated as a juror.  And to test the proposition of whether she was genuinely sick I asked her:  Well, what if I postpone the trial today?  And then I asked her:  Well, what if I postponed -- this was on a Friday -- what if I postpone it on Monday?  What if I postpone it on Tuesday?  I was tempted to ask what if I postpone it on Wednesday?  That was not a suggestion by me, Mr. Stabile, that I was in any way, shape, or form, entertaining the possibility of adjourning the trial for those periods of time.

I just want to make sure that the record is clear in this respect.

MR. STABILE:  Well, then I misunderstood.  I thought that your Honor was actually offering alternate no. 2 to adjourn the trial for a day or two to see if she could overcome her illness.  That was my understanding.

THE COURT:  Mr. Stabile, I do not bargain, in my position, with jurors or others.  I was inquiring and I got my answer from the juror when she said, no, even if you adjourn to Tuesday, she didn't think she would be able to make it.  So, I would appreciate your understanding that was not in any way, shape, or form, a suggestion that I would adjourn the trial. That would be an abuse of discretion, in my view.

MR. STABILE:  Understood.

THE COURT:  Please bring our jurors in.

MR. GUTWILLIG:  Your Honor, may we bring the witness

O2R5her1

in, quickly?

THE COURT:  Yes, please.

(Witness resumes the stand)

(Continued on next page)

O2R5her1                        Perez - Cross

(Jury present)

THE COURT:  Please, be seated.

Good morning, ladies and gentlemen.  The reason for the late start this morning was entirely on me and no one else.

Mr. Perez, the Court reminds you that you are still under oath.

THE WITNESS:  Yes, sir.

LUIS PEREZ, resumed.

THE COURT:  You may inquire, Mr. Colon.

MR. COLON:  Thank you, your Honor.

CROSS-EXAMINATION (Cont'd)

BY MR. COLON:

Q.  Mr. Perez, good morning.

A.  Good morning, sir.

Q.  I am going to bring you back to the issue of the false documentation and the passports.  Just one question.  You will agree with me, or at least it is your position that Mr. Juan Hernandez had nothing to do with that false documentation activity; correct?

A.  Correct.

Q.  And you will agree with me that he had nothing to do with the Israeli diplomatic official who was laundering money?

A.  Correct.

Q.  In fact, you have never met, in person, Juan Orlando Hernandez Alvarado?

A.   Correct.

Q.   But you do know that at one time he was president of the Congress of Honduras; correct?

A.   I heard something about that, yes.

Q.   And that was in at least 2013; correct?

A.   I don't know exactly what year.

Q.   Do you know that he was the president of Honduras in 2014?

A.   Yes, sir.

Q.   Now, you mentioned earlier or you testified that you were working with Mr. Cesar Gastelum; correct?

A.   Yes, sir.

Q.   Where was it that you met him for the first time?

A.   In San Pedro Sula.

Q.   What were the circumstances under which you met him?

A.   Because I was working in money laundering for Colombian drug traffickers of money going from Honduras to Colombia and I would -- it was just by chance that the people who I received the money from were almost always employees of Cesar Gastelum's in San Pedro Sula.  And one time one of his employees asked me if I only worked for Colombian drug traffickers or if I worked for other people.  I told him I was an independent worker and he asked me if I was interested in meeting Cesar Gastelum.

Q.   He was involved in trafficking narcotics obviously?

A.   Yes, sir.

Q.   And I believe you testified that the method of trafficking

narcotics was by use of airplanes?

A.   One of the ways was by plane.

Q.   And helicopters as well?

A.   Yes, sir.

Q.   And go-fast boats?

A.   Yes, sir.

Q.   And other types of maritime shipping?

A.   Yes; in shipping containers that arrived to the maritime port of Puerto Cortes.

Q.   And you will agree with me that Juan Orlando Hernandez Alvarado was never involved in any of that trafficking, at least while you were trafficking narcotics?

A.   Correct.

Q.   I believe you were involved in the trafficking of at least 200,000 kilos?

A.   Correct.

Q.   And you either earned or generated about $50 million in that activity?

A.   Around $50 million.

Q.   Now, Gastelum was a member of the Sinaloa Cartel?

A.   Yes.  He was part of the leadership of the Sinaloa Cartel.

Q.   And approximately how many years were you involved with him?

A.   From approximately 2008 until 2015, before I surrendered to sufficient authorities.

Q.   How often would you speak to him?

A.   During what time?

Q.   I'm sorry.  The period of 2008 to 2015.

A.   In the first few years, quite frequently.  In the later years, I was always with him.

Q.   When you say "always with him," what does that mean?

A.   That when he was in Honduras -- when Cesar Gastelum was in Honduras, I was with him all the time.  When he would travel to Mexico, I would travel to Mexico with him.  We pretty much lived close to each other during the whole time that Cesar Gastelum was there.

Q.   You consider yourself a confidant of Mr. Gastelum; right?

          MS. TARLOW:  Objection.  Relevance.

          THE COURT:  Sustained.

Q.   Were you aware that the Sinaloa Cartel was in conflict with the Setas?

          MS. TARLOW:  Objection.  Relevance.

          THE COURT:  Sustained.

Q.   Did you ever travel with Mr. Gastelum from Mexico back to Honduras?

A.   Yes, sir.

Q.   Can you tell the jury the mode of travel?

          MS. TARLOW:  Objection.  Vague, relevance.

          MR. COLON:  Between 2008 and 2015.  It is subject to connection, Judge, later on.

THE COURT:  Restate your question.

BY MR. COLON:

Q.  In your relationship with Mr. Gastelum, did you ever travel from Mexico to Honduras on a return to Honduras?

THE COURT:  Well, wait a minute.  A second ago when Ms. Tarlow objected on vague and relevance grounds, you said between 2008 and 2015.  Is that now dropping out of the question?

MR. COLON:  No.  I'm sorry, Judge.

THE COURT:  So restate your question.

BY MR. COLON:

Q.  Between 2008 and 2015, did you travel with Mr. Gastelum on a return from Mexico to Honduras?

MS. TARLOW:  Objection.  Asked and answered.

MR. COLON:  Well, it was objected to, Judge.

THE COURT:  I will allow it.

MR. COLON:  Thank you, sir.

THE COURT:  Go ahead.

THE WITNESS:  Yes.  The first time was one time in the year, it was one week after -- sorry -- one week before Holy Week of 2012 I traveled with Cesar Gastelum from Mexico back to Honduras.

Q.  What was the mode of travel?

A.  We traveled from Culiacan to Guadalajara by car.  From Guadalajara by plane to Tuzla Gutierrez, and from there to the

border with Guatemala at Mesilla, and from the Guatemalan border into Honduras -- sorry. Actually, the first time I need to rectify that.

From the border between Guatemala and Mexico we traveled by car to Guatemala City, and from there we took a helicopter to the department of Copán to some fincas that belonged to the Valle brothers.

Q. And so when you went to Copán, did you stay in some sort of residence or compound with the Valles or Valle Valles?

A. Not on that occasion.

Q. Now, you testified that you have actually requested or at least applied for an S Visa.

A. Correct.

Q. And I think you also testified that there weren't going to be any sort of benefits to that for you.

MS. TARLOW: Objection. Mischaracterization of testimony.

THE COURT: Just ask him a question without referencing prior testimony.

Q. What sort of benefits would you obtain if you were approved for an S Visa?

A. To continue to live in this country and in that way to stay alive.

Q. And that S Visa and that benefit is generated as a result of your testimony and your cooperation with the government;

correct?

MS. TARLOW:  Objection.  Vague.

THE COURT:  Basis?

MS. TARLOW:  Vague.

MR. COLON:  I'm sorry, Judge.  I didn't hear that last comment by --

THE COURT:  Vague.  Yes, restate the question, please. Sustained.

BY MR. COLON:

Q.  Did the government assist you in any way in your application for the S Visa?

A.  No, sir.

Q.  Did the government say that they were going to do anything for you after, let's say, you were successful in obtaining an S Visa?

A.  No, sir.

Q.  Were you offered protection in the U.S. Marshal's witness protection program?

MS. TARLOW:  Objection.

THE COURT:  Sustained.

Q.  Were you offered any money or any sort of income with respect to your cooperation in this case?

A.  No, sir.

Q.  Now, your sentence originally on another matter was 135 months; correct?

O2R5her1                          Perez - Cross

A.   For the indictment against me in the United States to which I pleaded guilty?  Yes, sir.

Q.   What district was that in?

A.   The District of Virginia.

Q.   And that 135 months was eventually reduced, on your behalf, to 75 months?

A.   Around 75 months; yes, sir.

Q.   How much time did you actually serve in jail?

A.   Around 75 months.

Q.   Given your testimony that was in the District of Virginia, you in fact cooperated with that district and those U.S. attorneys and the government in Virginia; correct?

          MS. TARLOW:  Objection.  Form.

          THE COURT:  Yes.  Sustained.

          MR. COLON:  I will withdraw that question and ask him in a different form, Judge.

Q.   Did you or did you not cooperate with that district's office, United States Attorney's office in the District of Virginia?

          MS. TARLOW:  Objection.  Relevance.

          THE COURT:  Yes.  Sustained.

Q.   Going to an individual by the name of Mario --

          THE COURT:  What you can ask is did you enter into an agreement with them to provide substantial assistance and cooperation.  You can ask that question.

O2R5her1                          Perez - Cross

MR. COLON:  Thank you, Judge.

Q.  Did you enter into an agreement to provide substantial assistance to the government in the District of Virginia?

A.  Yes, to provide substantial assistance to the government of the United States.

Q.  You cooperated or at least provided substantial assistance in the District of Virginia and here in the Southern District of New York?

MS. TARLOW:  Objection.  Compound.

THE COURT:  Yes.  It's compound, and I will allow you to ask whether he entered into an agreement and take it district by district if you will, please.

MR. COLON:  Of course, Judge.  Thank you.

(Continued on next page)

MR. COLON:  Of course, Judge.  Thank you.

Q.  So you entered into an agreement to cooperate with the District of Virginia, correct?

A.  Yes, I entered into an agreement to cooperate with the government of the United States.

Q.  And you entered into an agreement to cooperate with the government of the United States in the Southern District of New York as well?

MS. TARLOW:  Objection.

THE COURT:  No, I'll allow it.

A.  I signed an agreement to cooperate with the government in Virginia, but it was to cooperate with the United States government.  I met with several prosecutors, not only from Virginia but from Washington and New York as well.

THE COURT:  All right.  But to be clear, sir, there was not a second agreement that you entered into with any prosecutor in New York, is that correct?

THE WITNESS:  That's correct.  The only cooperation agreement that I entered into was with the prosecutors in Virginia, and I committed to helping —— to cooperating with the government of the United States.

Q.  And drawing your attention to Puerto Cortés, on or about 2012 to 2013, you're aware or you know a person by the name of Mario?

A.  Yes, sir.

Q.   And do you know that person's last name to be Cotto, C-o-t-t-o?

A.   I do not know what his last name is.

Q.   At one time you testified that you were running about —— or you did run about 10,000 kilos of cocaine through that port.

MS. TARLOW:  Objection.

THE COURT:  Basis?

MS. TARLOW:  Vague.  When he testified, where, is it this proceeding?

THE COURT:  Yes, rephrase it.

MR. STABILE:  Sure.

Q.   How long were you involved with Mario Cotto and the port of Cortés in terms of the drug trafficking activity?

MS. TARLOW:  Objection.  Mischaracterization.  The witness has not identified the last name of Mario.

THE COURT:  I'll allow the question if the witness understands it.

A.   I do not know the last name of the person whom I knew as Mario; therefore, I do not understand your question.

Q.   But you do know a Mario?

A.   Yes, I did meet a Mario who was the second in command in Puerto Cortés.

Q.   And did you contact Mario at any time?

A.   Yes, sir.

Q.   Can you tell the jury how that contact occurred.

A.   It all started when Fabio Lobo and Fredy Nájera attended a meeting with Cesar and me and others at this house in San Pedro Sula, Honduras, that we used to call El Villa.  During that meeting, Fabio Lobo and Fredy Nájera told us that they would be introducing us to Mario, who at the time was the second in command in Puerto Cortés.  In that way, the shipping of shipping containers from South America to San Pedro Sula would be facilitated for us.

Q.   So how did you get in contact with Mario?

A.   And after the meeting, Cesar Gastelum traveled to Puerto Cortés to meet with Mario and then also to check out some lots of land in Puerto Cortés that were being offered to us, to Cesar's organization, as an investment in a free zone within Puerto Cortés which would facilitate the shipping of cocaine in shipping containers from South America to Honduras.

Q.   Now, you never met Mario, correct?

A.   I did see him later on.

Q.   When?

A.   It was when we delivered the first contribution of $500,000 at the first gas station that is right before the entrance, the entry point, to Puerto Cortés, which were funds to be utilized as — for financing of Juan Orlando Hernandez's presidential campaign for his first term.

Q.   Isn't it a fact that Mario reached out to you because he needed financial assistance?

A.   Mario texted Cesar and me to ask for our financial support to finance Juan Orlando Hernandez's presidential campaign for his first term.  In that way also to guarantee that he would remain as the second in command in Puerto Cortés and also to be able to ambition having —— becoming the first in command at Puerto Cortés, in that way to facilitate the shipping of cocaine from South America to Honduras in shipping containers.

Q.   Now, you testified that you personally gave that money to Mario.

MS. TARLOW:  Objection.  Mischaracterization of testimony.

THE COURT:  Ask it as a question.

Q.   I think you testified —— I believe you testified that you and Cesar met Mario at that point and gave him the $500,000, correct?

MS. TARLOW:  Objection.

THE COURT:  I'll allow it.

A.   Cesar and I traveled to the first gas station that is right before the entry point to the city of Puerto Cortés to verify that our employee in San Pedro Sula, Fúnez, whom I had ordered to bring the $500,000, in fact, delivered the money in a car at the gas station, the first gas station at the entry point in the city of Puerto Cortés.

Q.   Now, you testified that you texted with Mario.  Do you have any proof or did you have any proof of those text messages

between you and Mario?

MS. TARLOW:  Objection with respect to the reference to proof.

THE COURT:  Yes, rephrase it.

Q.  Do you have any telephonic records of text messages between you and Mario at the time of that transaction?

A.  No, sir.

Q.  Do you have any sort of recordings of your exchange with your employee from San —— from San Pedro with respect to this transaction?

MS. TARLOW:  Objection.  Vague.  Form.

THE COURT:  I'll allow it.

A.  Would you kindly repeat the question.

Q.  Yeah.  Do you have any video recordings, any sort of electronic or audio recordings of the meeting with your employee that was transporting the money to Mario?

A.  No, sir.

Q.  Is it your testimony that Mario received the $500,000?

A.  Correct.

Q.  Isn't it a fact that that money was actually going to be provided to an individual by the name of Miguel Pastor?

A.  No, sir.

Q.  Did you donate money to Miguel Pastor's campaign?

A.  Yes, sir, for the primary campaign to choose the party candidate for the presidential —— for the presidential election

in Honduras.

Q.  So you have no proof whatsoever that that money was delivered to the campaign of Juan Orlando Hernandez, do you?

MS. TARLOW:  Objection.  Form.  Reference to proof.

THE COURT:  Yes, documentation, records, or anything other than the testimony.

MR. COLON:  Of course, your Honor.

Q.  You have no record, documentation, data about the delivery to Juan Orlando's campaign, yes or no, please?

A.  I provided the government with some notebooks which confirmed that I received the $500,000.  It shows the date in which they were provided to Fúnez, who was to bring them to the first gas station that was at the entry port of Puerto Cortés and for them to then be delivered at that point to Mario.  And these funds were to be used to finance Juan Orlando Hernandez's presidential campaign for his first term.

THE INTERPRETER:  May the interpreters?

(Interpreters confer)

THE INTERPRETER:  May the interpreter verify with the witness, your Honor?

THE COURT:  Yes.

THE INTERPRETER:  The interpretation stands with one minor correction, your Honor.  The witness said:  "The notebooks confirmed that I requested the $500,000 for them to be given to Mr. Fúnez and the date when this was done for the

funds to be then delivered to Mario at the first gas station at the entry point of Puerto Cortés, which funds were to be used to finance Juan Orlando Hernandez's campaign, presidential campaign, for his first term."

MR. COLON:  Your Honor, I'm going to move to strike as unresponsive.  I asked him specifically what documentation, data, even that ledger that indicates that that money was delivered to the campaign of Juan Orlando Hernandez.

THE COURT:  All right.  I'll allow the answer to stand, but you can follow up with your further question.

BY MR. COLON:

Q.  That ledger that you provided, isn't it true that it does not have —— does not mention at all the name of Mario or the campaign of Juan Orlando Hernandez?

A.  That is correct.  What it does show is the date on which I provided the money to Mario to finance Juan Orlando Hernandez's campaign.

Q.  So you have no personal knowledge of the money being delivered to the campaign of Juan Orlando Hernandez?

A.  I do have knowledge that Mario did confirm having received those $500,000 and then the other $500,000.  And he also confirmed that he had delivered those funds to Juan Orlando Hernandez to finance Juan Orlando Hernandez's presidential campaign for his first term.

Q.  So you don't know personally the money got to the campaign?

O2RHHer2                        Perez - Cross

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  I believe it has.

Q.  Other than Mario telling you so, you don't know whether Juan Orlando's campaign received that money?

A.  Correct.

Q.  You relied on Mario to tell you that?

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  When did you provide money to Miguel Pastor's campaign?

A.  In the year 2012, when the candidates from each party were being chosen for the presidency of Honduras.

Q.  However, you did not provide any money to Juan Orlando Hernandez's campaign with respect to 2012?

A.  Not in the year 2012, sir.

Q.  And he was the president of the Congress at the time, correct?

A.  I'm not sure.

Q.  Now, what was the role of Mr. Arnulfo Valle with respect to the delivery of campaign money?

MS. TARLOW:  Objection.  Vague.

Q.  In 2013.

THE COURT:  Do you understand the question?

A.  Could you repeat it for me, please.

Q.  In the year 2013, what was Arnulfo Valle's role in delivering money to campaigns?

MS. TARLOW:  Objection.  Vague, reference to campaigns.

Q.  2013 campaign of Juan Orlando Hernandez.

A.  In the year 2013, months after the middle of the year 2013, Arnulfo Valle wrote me directly saying that he was going to meet with Tony Hernandez at a finca in Copán to discuss agreements that would facilitate cocaine trafficking for Cesar and for me if Juan Orlando Hernandez became president.  And in exchange —— and I wrote Arnulfo Valle directly telling him to mainly focus on reaching an agreement with Juan Orlando Hernandez that, if he became president, he would provide us with information about the DEA's activities in Honduras.

Q.  So going back, though, to Mario, Arnulfo Valle's activity was independent of the $1 million that was given to Mario, correct?

MS. TARLOW:  Objection as to form.

MR. COLON:  I'll withdraw the question, Judge.

THE COURT:  Yes.

Q.  The understanding with Mario was that he asked for a million dollars, and he was provided 500,000 by one of your employees, correct?

All right.  So that —— I'm sorry, Judge.

A.  No, sir.  I provided Mario with $1 million for the purpose of financing Juan Orlando Hernandez's presidential campaign in two different payments, each one of $500,000.

Q.  Right.

THE COURT:  All right.  Ladies and gentlemen, let's stand up and stretch.  We're going to do our calisthenics.

All right.  Please be seated.

Q.  With respect to that second $500,000, did that same employee, Mr. Fúnez, deliver that $500,000 to Mr. Mario?

A.  Correct.

Q.  And, again, you have no personal knowledge of that second $500,000 being given to the campaign of Juan Orlando Hernandez?

MS. TARLOW:  Objection.  Asked and answered. Mischaracterization of testimony.

MR. COLON:  It's the second payment, Judge.

MS. TARLOW:  The witness has already testified about the 1 million.

THE COURT:  Yes, I think this has been asked and answered, but I'm going to give you the opportunity to pose that question.  The question has been asked.  The witness can answer it.

A.  After Mario received the total of $1 million through two payments, he confirmed to us that Juan Orlando Hernandez had received the money to finance his presidential campaign for his first term and that he had sent us his thanks.

Q.  Once again, you had no personal knowledge that the campaign of Juan Orlando Hernandez, other than Mario saying it to you, that that campaign received that money?

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  It has been, but I'll allow the witness to answer it again.

A.  Could you repeat the question, please.

Q.  You have no personal knowledge, other than what Mario said to you, about the campaign receiving the second amount of $500,000?

A.  I repeat, after Mario received the total of $1 million that we made to him in two payments, Mario confirmed that he had delivered the money to Juan Orlando Hernandez to finance his campaign for his first term.

Q.  Once again, did you receive —— withdrawn.

Did you receive any sort of response, reply, electronic response or a call, from Juan Orlando Hernandez's campaign that the money was received in total, the $1 million?

A.  No, sir.

Q.  And you have no personal knowledge of whether any of that money, the $1 million, was transferred to Juan Orlando Hernandez, correct?

MS. TARLOW:  Objection.  Asked and answered.

MR. COLON:  Sorry, Judge, a different question.  This is specifically to Juan Orlando Hernandez, not the campaign.

THE COURT:  You may answer.

A.  Could you repeat the question for me, please.

THE COURT:  I'll repeat it.

"And you have no personal knowledge of whether any of that money, the $1 million, was transferred to Juan Orlando Hernandez, correct?"

A.  Correct, the only confirmation that I have is that Mario confirmed to me that he had given the money to Juan Orlando Hernandez to finance his campaign for his first term.

MR. COLON:  Judge, I move to strike.  It's unresponsive.  I'm dealing only with Juan Orlando Hernandez and that —— whether Juan Orlando Hernandez received that money. Personal knowledge, sir.

THE COURT:  Yes, the question was anything other than what was confirmed to you by Mario.

A.  No, sir.

Q.  Now, Mario's role was to ensure that the containers got through the port of Cortés and move on to the United States, correct?

A.  Mario's role was to give us information that would allow us to be more efficient ——

THE INTERPRETER:  Interpreter correction.

A.  —— that would allow us to be more effective in our transportation of cocaine in shipping containers from South America to the port of Puerto Cortés.

Q.  In other words, Mario had nothing to do with the shipment of the cocaine on to the United States?

MS. TARLOW:  Objection.

O2RHHer2                    Perez - Cross

THE COURT:  Basis?

MS. TARLOW:  Mischaracterization of testimony and vague.

THE COURT:  Yes.  Sustained.

Q.  What role, if any, did Mario have with the cocaine that was being trafficked from South America to Puerto Cortés?

MS. TARLOW:  Objection.

Q.  What role did he have of it going forward and moving on to the United States?

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  Yes, you asked the questions.

MR. COLON:  I'm sorry, Judge, it was hard to hear you.

THE COURT:  Pardon me?

MR. COLON:  It was hard to hear you.

THE COURT:  OK.  Sorry.  You asked the question.

MR. COLON:  Should I continue?

THE COURT:  You can ask another question.

MR. COLON:  Yes.

Q.  Did Mario have a role in sending that drugs on to the United States?

THE COURT:  No, that was —— I sustained the objection.

MR. COLON:  OK.

THE COURT:  So rephrase your question.

Q.  What else did Mario promise that he would do for you?

A.  Mario provided us —— or facilitated for us cocaine

trafficking in shipping containers from South America to the port of Puerto Cortés.

Q.   Now, Mario also promised you that if he received a million dollars, that he would, in fact, maintain his employment there at the port and possibly be ascended to another position, that of director of the port?

MS. TARLOW:  Objection.

THE COURT:  Yes, compound.  Sustained.

Q.   Mario said that if he received a million dollars, he would become the director of the port, correct?

MS. TARLOW:  Objection.  Hearsay.

THE COURT:  I'll allow it.

Q.   Now, how long did that relationship — I'm sorry, Judge. Apologize.

A.   Mario asked Cesar and me for a million dollars in order to finance Juan Orlando Hernandez's presidential campaign for his first term.  In that way, he would continue to be second in command in the port of Puerto Cortés, and it was very likely that he would be promoted to the first in command in the port. And in that way, we could continue trafficking cocaine in shipping containers from South America to the port of Puerto Cortés effectively, or more effectively.

Q.   How long did that relationship last between you and Mario?

A.   From approximately late 2012 until 2013, when we stopped trafficking cocaine with maritime shipping containers to

Honduras.

MR. COLON:  I'm sorry, Judge, I didn't hear the last part of the interpreter.  What year?

THE COURT:  You could repeat that, please.

THE INTERPRETER:  2013.

MR. COLON:  2000?

THE INTERPRETER:  '13.

MR. COLON:  '13.

Q.  Are you aware that Mario was not ascended to the position of director of the port?

A.  I'm not sure whether he was promoted or not.

Q.  And you'll agree with me that after 2013, you never heard from Mario again, isn't that a fact?

A.  In the year 2014, I no longer spoke with Mario.

Q.  And 2014 is when you left Honduras, correct?

A.  Yes, sir.

Q.  And that's the year that Juan Orlando Hernandez became president, correct?

A.  Correct.

Q.  Because you invested a million dollars, supposedly, in his campaign?

A.  I'm sorry.  I don't understand your question.

Q.  2014, you left Honduras, correct?

A.  Correct.

Q.  And yet you paid a million dollars, according to you, for

the campaign of Juan Orlando Hernandez, correct?

A.   No, sir.  I donated approximately $2.4 million for Juan
Orlando Hernandez's presidential campaign for his first term.

Q.   And you expected the continuation of the transfers or at
least the deliveries to Puerto Cortés, correct?

A.   During what time period?  I apologize.

Q.   2013 to 2014.

A.   Yes, I did have the expectation.

Q.   And yet you left Honduras in 2014, correct?

A.   Correct.

Q.   And you fled because you were afraid that either Honduran
police under the authority of Juan Orlando Hernandez or the DEA
were going to arrest you, correct?

          MS. TARLOW:  Objection. Form.  Compound.

          MR. COLON:  I'll withdraw that and ask it a different
way, your Honor.

          THE COURT:  Yes, go ahead.

Q.   So in 2014, after you delivered a million dollars to Juan
Orlando's campaign, you left Honduras because you were afraid,
correct?

          MS. TARLOW:  Objection. Mischaracterization of the
testimony.

          THE COURT:  I'll allow it.  You can ask the question
if you want.  That's fine.  Go ahead.

A.   In 2014, I did leave Honduras.  And I did not provide

$1 million to Juan Orlando Hernandez's campaign.  I contributed $2.4 million to Juan Orlando Hernandez's campaign, presidential campaign, for his first term.

Q.  So altogether you gave Juan Orlando Hernandez's campaign in 2013, 2014, almost $2.5 million, correct?

A.  In 2013, I contributed around $2.4 million to Juan Orlando Hernandez's presidential campaign for his first term.

Q.  Nevertheless, you left Honduras because President Juan Orlando Hernandez and his police force and the DEA were going to arrest you?

        MS. TARLOW:  Objection.  Not a question.  Compound form.

        THE COURT:  I'll allow it.  I'll allow it.

A.  I left Honduras in 2014 because the DEA started harassing Honduran drug traffickers and arrested Carlos Lobo, who was very close to Cesar and me.

Q.  Well, the DEA along with Honduran police, correct?

        MS. TARLOW:  Objection.

        THE COURT:  I'll allow the question.

A.  Correct.

Q.  You testified yesterday you were scared of the DEA and the Honduran police?

        MS. TARLOW:  Objection.  Mischaracterization of testimony.  Compound.

        THE COURT:  Yes, I don't recall that testimony.  So if

you want to rephrase your question, you may.

Q.   Were you scared of the Honduran police?

A.   No, sir.

Q.   Were you scared of the DEA?

A.   Yes, sir.

Q.   You're aware that it was the Honduran police that would have to arrest you, perhaps with the assistance of the DEA?

MS. TARLOW:  Objection.

THE COURT:  Overruled.

A.   Yes, with the DEA's support, sir.

Q.   Both the DEA and the National Police?

A.   Yes, correct.

Q.   And you testified that some of the drug traffickers were being arrested in 2014, correct?

A.   When I left Honduras, one drug trafficker that was very close to Carlos and me had been arrested.  His name was Carlos Lobo.

Q.   And that was the first extradition in Honduras, correct?

MS. TARLOW:  Objection.

Q.   If you know.

THE COURT:  Do you know whether that was the first extradition, sir, from Honduras?

THE WITNESS:  No, sir, I do not know.

THE COURT:  OK.  Next question.

Q.   But that extradition occurred in 2014, correct?

O2RHHer2                        Perez - Cross

MS. TARLOW:  Objection.

THE COURT:  Sustained as to form.

Q.  If you know, that extradition occurred in 2014?

THE COURT:  What extradition?

MR. COLON:  The extradition of Carlos Lobo, your Honor, occurred in ——

THE COURT:  The question is does this witness know it happened in 2014; is that your question?

MR. COLON:  Yes, sir.

THE COURT:  Do you understand the question?

THE WITNESS:  Yes, sir.

A.  Yes, Carlos Lobo was arrested in 2014.

Q.  And that occurred during the administration of Juan Orlando Hernandez, correct?

A.  Correct.

Q.  Juan Orlando Hernandez whose campaign you paid $2.4 million to, so you say?

MS. TARLOW:  Objection.  Argumentative.  Asked and answered.

THE COURT:  Sustained.

Q.  You were very close to the Valle Valle, correct?

A.  Correct.

Q.  In fact, you did narcotics trafficking business with them?

A.  Correct.

Q.  And they were one of your biggest clients, weren't they?

O2RHHer2                         Perez - Cross

A.   No, sir.  They were — they handled the receiving of the planes that brought cocaine from South America, also helicopters, and they also transported the cocaine through Honduran territory to the department of Copán and the border of Guatamala.  They also would receive the U.S. dollars that resulted from the sale of cocaine in Mexico and that was brought back to Honduras and which was then reinvested in cocaine.

Q.   So you used their services?

A.   Correct.

Q.   You collaborated with them in narcotics trafficking?

A.   They collaborated with Cesar and me in the trafficking of cocaine.

Q.   Are you aware that their assets were seized in 2014 by the administration of Juan Orlando Hernandez?

         MS. TARLOW:  Objection.

         THE COURT:  Overruled.

A.   I'm sorry.  Whose assets?

Q.   The Valle Valle's assets?

A.   Correct.

Q.   And that worried you as well?

A.   Correct.

Q.   And you're aware of the fact that the Valle Valle were on the run from Honduran police and the DEA?

A.   Correct.

Q.   And that eventually —— I'm sorry, Judge, one second.

You're aware that the Valle Valles were actually arrested in 2014, were you not?

A.   Correct.

Q.   And how long was your relationship with the Valle Valle?

A.   I started drug trafficking with the Valle Valles starting one week after Easter week in 2012, up until days prior to the Valle Valle's arrest.

Q.   And how often would you be in contact with the Valle Valle?

A.   I was always in contact with the Valle Valle brothers.

Q.   Did you visit them in Copán?

A.   Correct.

Q.   You even stayed in Copán at times, right?

A.   I lived in one of Arnulfo Valle's fincas on the border between Honduras and Guatamala for a few months.

Q.   And are you aware of the fact that the Valle Valles plotted to kill Juan Orlando Hernandez around 2013 —— 2012 and 2013?

A.   In 2014.

Q.   In 2014, the Valle Valles attempted to kill Juan Orlando Hernandez.

THE COURT:   Is that a question?

Q.   Were the Valle Valles planning to kill Juan Orlando in 2014?

A.   In 2014, Arnulfo Valle texted me asking me if I could get him some guns that were to be used during an attempt against

the Honduran president's life, and my response was that I was not getting involved in that and that I couldn't get him anything.  That's how I became aware of that.

MR. COLON:  One second, your Honor, if I may?

THE COURT:  Yes.

(Counsel confer)

Q.  And you're aware that eventually the Valle Valles were not only arrested, but they were extradited to the United States?

A.  Correct.

Q.  When they were extradited, you were already — you had already left Honduras, correct?

THE INTERPRETER:  May the question be repeated for the interpreter?

Q.  When you left Honduras, Valle Valle had already been extradited, correct?

A.  No, sir.  I left Honduras early in 2014.

Q.  Nevertheless, you were aware that the Valle Valle had been extradited to the United States?

MS. TARLOW:  Objection.  Vague.  Doesn't reference a particular period of time when he was aware.

THE COURT:  I'll allow it.

A.  Would you kindly repeat the question.

Q.  You were aware after you left that the Valle Valles had been extradited to the United States in 2014?

A.  I left Honduras early in 2014, and if I am not mistaken,

the Valle Valles were arrested late in 2014.

Q.   Were you aware that the Valle Valles were extradited?

          MS. TARLOW:  Objection.

          THE COURT:  Basis?

          MS. TARLOW:  Again doesn't specify a time period.

          THE COURT:  Why do you have to do that?

          MS. TARLOW:  Just relevance for the chronology.

          THE COURT:  You can answer the question if you know.

A.   Can you please repeat it again.

Q.   Were you aware at any time that the Valle Valles had been
extradited to the United States?

A.   Yes, in late 2014, if I'm not mistaken.

Q.   And how did you become aware of that?

A.   In the news.

Q.   Had you been communicating with the Valle Valles after you
left Honduras?

A.   Correct.

Q.   And what did those communications involve?

          MS. TARLOW:  Objection.  Relevance.  Hearsay.

          THE COURT:  You can testify as to the general subject
matter.

A.   In general, I would discuss the trafficking of cocaine with
the Valle Valles and Arnulfo Valle.

Q.   So you continued your drug trafficking activity after you
left Honduras?

O2RHHer2                           Perez - Cross

A.   Correct.  Not only did I continue trafficking cocaine in Honduras in 2014, but also 2014 was one of my most profitable years in drug trafficking.

            MR. COLON:  Move to strike that second part of the statement.

            THE COURT:  I'll let it stand.

Q.   And who did you traffic with?

A.   During what period of time?

Q.   After you left Honduras.

A.   I was trafficking with the Valle Valle brothers and with Fredy Nájera.

Q.   Now, who is Fredy Nájera?

A.   He was a congressman from Honduras.

            MR. COLON:  Judge, may I have a second, please?

            THE COURT:  You may.

            (Counsel confer)

Q.   Fredy Nájera was a deputy in the Congress, right, in Honduras?

A.   Correct.

Q.   And are you aware what party he was a member of?

A.   No, sir.

Q.   Wasn't he, in fact, a member of the Liberal Party?

            MS. TARLOW:  Objection.  Asked and answered.

            THE COURT:  No, I'll allow it.

A.   I don't know what party Fredy Nájera belonged to.

Q.   When you continued to traffic narcotics with the Valle

Valles, was that before or after they were extradited?

A.   I trafficked with the Valle Valle brothers up until days

before the police and the DEA arrested them.

Q.   That would have been in 2014, correct?

A.   Correct.

Q.   So you stopped trafficking narcotics with them in 2014?

A.   With the Valle brothers, yes.

Q.   Who else did you traffic narcotics with after the Valle

Valles?

A.   After the arrest of the Valle Valle brothers, I trafficked

with employees of the Valle Valle brothers and I trafficked

with Fredy Nájera.

Q.   What was Fredy Nájera's role in your narcotics trafficking

activities?

A.   In what year?

Q.   In 2014.

A.   In 2014, Fredy handled lending us fincas that he had in the

department of Copán to receive helicopters that Cesar and I

sent from South America with cocaine to Honduras.

        I apologize.  In the department of Olancho, not in the

department of Copán.

Q.   When did you turn yourself in to the United States?

A.   In May of 2015.

Q.   Are you aware that Fredy Nájera was also arrested?

O2RHHer2                        Perez - Cross

A.  I think he surrendered to the U.S. authorities.

Q.  Do you know where he surrendered to?

          MS. TARLOW:  Objection.  Relevance.  Hearsay.

Q.  If you know.

          THE COURT:  Sustained.

Q.  Did you have any knowledge of Fredy Nájera's arrest?

          MS. TARLOW:  Objection.  Asked and answered.

Q.  Do you have any —— I'm sorry.

          THE COURT:  I'll allow the witness to answer.

A.  Can you repeat the question, please.

Q.  I'll withdraw that.

          When were you aware of Fredy Nájera's surrender?

A.  If I'm not mistaken, in the year 2015 or 2016.  I don't remember exactly.

Q.  And when did you begin your narcotics trafficking activity with Fredy Nájera?

A.  In late 2008 or early 2009.

Q.  How much narcotics did you traffic with Fredy Nájera?

A.  Around 50,000 kilos.

Q.  Now, in 2013/2014, you became concerned about the fact that the DEA was using Black Hawks to track illicit air traffic?

A.  Could you repeat that question for me, please.

Q.  You testified earlier that you became worried or preoccupied with the fact that the DEA was using Black Hawk helicopters and they were monitoring the activity of illicit

air transportation?

MS. TARLOW:  Objection.  Compound question.

And, your Honor, the government just wants to alert you to the issue we raised this morning.

THE COURT:  All right.  Ladies and gentlemen, let's stand up and stretch.  We only have a little bit more to go before our lunch break.

Please be seated.

The objection is overruled.

BY MR. COLON:

Q.  How much narcotics trafficking did you undertake with Fredy Nájera?

A.  In what time period?  Sorry.

Q.  For whatever period you worked with him on moving drugs from Honduras up into the United States.

A.  Around 50,000 kilos.

Q.  And how long did that relationship with Nájera last?

And he was from Olancho —— I'm sorry.  I apologize.

A.  Starting in late 2008 or early 2009.

Q.  And what department was he from?

A.  If I'm not mistaken, the department of Olancho.

Q.  What was your concern about the Black Hawks specifically?

A.  That was Cesar's and my greatest concern because that was the only way that they had to intercept the shipments of cocaine that we were bringing from South America to Honduras in

helicopters and planes.

Q.   You're talking about shipment via airplanes?

A.   Correct.  And in helicopters.

Q.   And when did you become aware that the DEA was using that resource —— the DEA was using that resource of Black Hawk helicopters?

A.   I don't know exactly, but whenever the DEA would intercept planes that were loaded with cocaine, they would always do it with Black Hawk planes —— sorry, Black Hawk helicopters.

Q.   So they may have been going back —— withdrawn.

Were they using those Black Hawk helicopters in 2012?

A.   Correct.

Q.   Did you get any information about the schedules of the Black Hawks and their surveillance, aerial surveillance?

A.   No.  The only information that we received was from the armed forces of Honduras, and the only information that we got was about the time at which the Black Hawk —— the DEA's Black Hawk helicopters would take off.

Q.   When you say you got information from the Honduran military, how was that occurring?

A.   Fredy Nájera had contacts in the police, in the Army, and in the Air Force of Honduras and contacts with people who controlled the radar in Honduras, and he was the one who informed us of these movements.

Q.   It wasn't Juan Orlando Hernandez, was it?

A.   No.

Q.   And your concern in 2012 was that the aerial surveillance by the Black Hawks could lead to either interception or a shoot down of those airplanes or helicopters, correct?

A.   Our concern was that the —— our concern was that the only way that they would be able to intercept planes coming from South America to Honduras loaded with cocaine was with the Black Hawk helicopters, because the rest of the government institutions of Honduras —— the police, the Air Force, the people who controlled the radar —— we had them under our control through Fredy Nájera.

THE INTERPRETER:  May the interpreters?

THE COURT:  You may.

THE INTERPRETER:  The interpreter needs to amend the interpretation of the previous response to add "The only way that they could intercept the planes in 2012."

MR. COLON:  I'm sorry.  Could you just repeat that, please, that last part.

THE INTERPRETER:  By the interpreter.  The year 2012 was added to the answer —— or the interpreter would like to clarify.  It was not added by the interpreter.  It was in the original answer.  The interpreter omitted it and is now rectifying that omission.

MR. COLON:  Thank you.

Q.   I'm going to move on to a meeting that occurred in Copán in

O2RHHer2                         Perez - Cross

the middle of 2013.  Do you recall that meeting in the middle

of 2013, a meeting in Copán with the Valles?

A.  The Valles and who else?  Sorry.

Q.  With Tony Hernandez.

A.  Yes, months after mid-2013.

Q.  Right.  And the meeting participants were —— was it Arnulfo

Valle and Tony Hernandez?

A.  And others.

Q.  Now, you were not present, correct?

A.  No, sir.

Q.  You found out about the meeting from Arnulfo Valle?

A.  Correct.

Q.  Right.  And in that meeting, you testified that Tony

Hernandez and Arnulfo Valle came to some sort of an agreement

with respect to narcotics trafficking?

A.  Correct.

Q.  And that agreement was with Mr. Arnulfo Valle and Tony

Hernandez, correct?

A.  The agreement was between Arnulfo Valle and Tony Hernandez

who was acting as an intermediary for Juan Orlando Hernandez.

        MR. COLON:  Move to strike that second part, Judge,

"as an intermediary."  Not what I asked.

        THE COURT:  Yes, that's stricken.

Q.  The only two individuals at that meeting were Arnulfo Valle

and Tony Hernandez, correct?

O2RHHer2                      Perez - Cross

A.   No, sir.

Q.   Who else was there?

A.   As far as I'm aware, the participants were Arnulfo Valle, Luis Valle, Alex Rendon, and a trusted employee of the Valle Valles.  If I'm not mistaken, his name was Marito.

Q.   And when you say as you may know, how was it that you knew about that?

A.   Because Colocho told me.

Q.   And who's Colocho?

A.   I'm sorry.  Colocho was a nickname, one of the nicknames, that I used to refer to Arnulfo Valle.

Q.   Arnulfo Valle.

     And Juan Orlando Hernandez was not at that meeting?

A.   No, sir.

Q.   And in that meeting, you testified that Tony requested a million dollars in exchange for information referencing the DEA in Honduras, correct?

A.   No, sir.  My testimony was that Tony Hernandez asked Arnulfo Valle for $1 million to finance Juan Orlando Hernandez's presidential campaign for his first term.  And in exchange, we required — we requested information about the DEA operations in Honduras.

Q.   Did you provide the million dollars to Tony Hernandez?

A.   I gave the order to Arnulfo Valle to provide the $1 million to Tony Hernandez to finance Juan Orlando Hernandez's

presidential campaign for his first term.

Q.   And did you provide the $1 million?

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  Past.

Q.   You did not provide the million dollars, correct?

MS. TARLOW:  Objection.

THE COURT:  First of all, you have to qualify it.
This is at what point in time and which event?  It's not clear
from your question.

MR. COLON:  Of course, Judge.

Q.   That meeting that took place with several individuals,
Arnulfo Valle, some other Valle, and Tony, at that meeting
where Tony asked for a million dollars, you did not provide the
million dollars, correct?

MS. TARLOW:  Objection.  Asked and answered.

THE COURT:  I'll allow it.

A.   During that meeting that was attended by Alexander Rendon,
Arnulfo Valle, Luis Valle, a trusted employee of the Valle
Valles whose name I believe is Marito, I gave Arnulfo Valle the
order to take $1 million from the money that he was storing for
me in Copán and then have it delivered to Tony Hernandez to
finance Juan Orlando Hernandez's presidential campaign for his
first term.

Q.   So that was your money in Copán, the $1 million, correct?

A.   Correct.

O2RHHer2                        Perez - Cross

Q.  But who did you give that order to?

MR. COLON:  Your Honor, move to strike.  I'm sorry.  I have to let the interpreter speak.  So I apologize.  Go ahead.

THE INTERPRETER:  Shall the interpreter proceed, your Honor?

THE COURT:  Please.

THE INTERPRETER:  Thank you, your Honor.

A.  I told Arnulfo Valle to take $1 million from the money that Arnulfo Valle was storing for Cesar and me in Copán and then have it —— and then provide it to Tony Hernandez to finance Juan Orlando Hernandez's presidential campaign for his first term.

MR. COLON:  Again I move to strike that answer.  I asked only whether he actually —— he only gave an order.  He did not provide the money physically.

THE COURT:  Overruled.

Q.  Did you speak to Mr. Valle about whether the money was delivered or not?

A.  I'm sorry.  What money?

Q.  The million dollars to Tony Hernandez.

A.  To finance Juan Orlando Hernandez's campaign, is that what you're referring to?

Q.  The $1 million that Tony Hernandez requested.

A.  Can you please rephrase the question.

Q.  I'll withdraw that.

O2RHHer2                         Perez - Cross

Who did you speak to about the $1 million that was ordered to be delivered to Tony Hernandez?

MS. TARLOW:  Objection.  Vague.  No reference to time, when.

THE COURT:  Yes, rephrase your question, please.

Q.  After that meeting was held and the subject of a million dollars was brought up, who did you speak to in that group of attendees that advised you that the money —— whether or not the money was delivered to Tony Hernandez?

MS. TARLOW:  Objection as to form.  Unclear which meeting is being ——

THE COURT:  It's sustained as to form.

Q.  You met with —— you spoke to Arnulfo Valle about the $1 million, correct?

A.  About the $1 million to finance Juan Orlando Hernandez's campaign, yes, sir.

Q.  I asked you about the money that Tony Hernandez requested, not about what the purpose was.  So please answer the question.

Did you ask —— did you speak to Arnulfo Valle about the $1 million and whether it was given to Tony?

MS. TARLOW:  Objection, your Honor.

THE COURT:  At what point in time?

MR. COLON:  Right after the meeting, your Honor. After the meeting occurred there was a conversation between Arnulfo Valle and him.

O2RHHer2                          Perez - Cross

THE COURT:  Right after the meeting, did you confirm whether Juan Orlando Hernandez received the $1 million?  Is that your question?

MR. COLON:  No, sir.

THE COURT:  All right.  Then I misunderstood.

MR. COLON:  It's whether Tony Hernandez received the money.

THE COURT:  Oh.  And the question is, right after the meeting with whom?

MR. COLON:  Between the Valle Valles and Ardón and Tony Hernandez in Copán where Mr. Hernandez, Mr. Tony Hernandez, requested a million dollars.

THE COURT:  And you want to know right after that meeting, did he confirm with Tony Hernandez that he ——

MR. COLON:  With Mr. Arnulfo Valle.

A.  Yes, sir.  Arnulfo Valle did confirm to me that $1 million had been delivered to Tony Hernandez to finance Juan Orlando Hernandez's presidential campaign for his first term.

THE COURT:  All right.  With that, we're going to break for lunch, ladies and gentlemen.  Please do not discuss the case among yourselves or with anyone else.

Mr. Colon, how much longer do you have with this witness?

MR. COLON:  Half an hour.

THE COURT:  I'm sorry?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O2RHHer2                    Perez - Cross

MR. COLON:  Half an hour, 30 minutes or so.

THE COURT:  Thank you.  Thank you.

All right.  We'll be back in action at 2 o'clock.

(Jury excused)

THE COURT:  All right.  We're in recess.

(Lunch recess)

O2R5her3                         Perez - Cross

A F T E R N O O N   S E S S I O N

2:20 p.m.

THE COURT:  Please remain standing for our jury.

(Jury present)

THE COURT:  Please be seated.

Mr. Colon, whenever you are ready.

MR. COLON:  Thank you, your Honor.

BY MR. COLON:

Q.  With respect to the money that was allegedly given to Tony Hernandez, isn't it a fact that you have no way to document that you provided that money to him?

MS. TARLOW:  Objection as to form.

THE COURT:  I will allow it.

A.  Correct.

Q.  You have no video or audio recordings?

A.  Correct.

Q.  You have no text messages or BBM messages?

A.  Correct.

Q.  You have nothing in the iCloud that would prove your allegation that he was given millions of dollars?

A.  Correct.

Q.  By the same token, you have no visual or audio recordings of the campaign receiving money.

A.  Correct.

Q.  You have no documentation that proves that the campaign

actually received that money, the campaign of Juan Orlando Hernandez.

A. Correct.

Q. No text messages or BBM that the campaign received money?

MS. TARLOW: Objection. Asked and answered. Form.

THE COURT: I will allow it.

A. Can you please repeat the question?

Q. You have no text messages or BBM messages that the campaign received the money?

A. Correct.

Q. And you have no text messages or BBM that Juan Orlando received any money from your group?

A. Correct.

Q. You have no documentation that Juan Orlando received any money from your narcotics trafficking organization?

THE COURT: Didn't you ask that?

MR. COLON: I'm sorry, Judge. Sometimes I forget, but it is possible. I will rephrase it and go on to the next question.

THE COURT: Please.

BY MR. COLON:

Q. You have no hard proof that Juan Orlando received any sort of contribution or money for the campaign?

MS. TARLOW: Objection as to reference of hard proof.

THE COURT: Sustained.

O2R5her3                          Perez - Cross

Q.   You have no proof that Juan Orlando received money from the
campaign?

          MS. TARLOW:   Objection regarding proof.

          THE COURT:   Yes.   We have been through this several
times about the problem with the word "proof" versus other ways
of expressing things.   You know this, Mr. Colon.

          MR. COLON:   Of course.   I'm sorry, Judge.

          THE COURT:   Ask your next question, please.

Q.   You have no documentation whatsoever that Juan Orlando
received campaign funds?

          MS. TARLOW:   Objection.   Asked and answered.

          THE COURT:   That's been asked and answered, so.

Q.   You testified earlier that during 2014 none of your
drugs -- on direct -- that none of your drugs were seized by
the Honduran government; correct?

A.   Correct.

Q.   But in fact you had already left Honduras at the beginning
of 2014?

          THE COURT:   Sustained.   Let me see you at side bar.

O2R5her3                           Perez - Cross

(At side bar)

THE COURT:  You do understand that a witness is not permitted to deliver a narrative; correct?

MR. COLON:  Yes.

THE COURT:  So the only questions or only testimony that the witness gave was in response to a question.

MR. COLON:  Yes.

THE COURT:  So do you not find it a little bit misleading to say:  You testified before that no drugs were seized in 2014.  He says:  That's right.  And then you say:  But you left in early 2014.

That doesn't sound a little bit misleading to you?

MR. COLON:  I'm not trying to mislead.

THE COURT:  I know that.  I didn't suggest that for a second, Mr. Colon.  I am just saying a fair-minded person, wouldn't you think that is misleading?

MR. COLON:  What I am trying to show the jury is that it's a question that -- let me just put it this way.  If he leaves in 2014 --

THE COURT:  Right.

MR. COLON:  -- he goes to another country.

THE COURT:  Right.

MR. COLON:  He may not have had any drugs of his in Honduras at the time.

THE COURT:  Right.  No, no.  The point is about his

O2R5her3                        Perez - Cross

prior testimony.  That's the part that is misleading.

MR. COLON:  But I think that was, wasn't it, Judge?

THE COURT:  Well, I just said if he is asked:  Did any drugs get seized in 2014, the answer would be no.

MR. COLON:  And my argument --

THE COURT:  But the way you asked your second question was didn't you testify that no drugs were seized in 2014.

MR. COLON:  Yes.

THE COURT:  And isn't it true you left in early 2014, leaving the implication that you were deceptive with the jury in your testimony.  Your question and the answer stand, OK?

MR. COLON:  That wasn't my intent.  It was just to show that --

THE COURT:  Mr. Colon, I am not challenging your intent.

MR. COLON:  OK.

THE COURT:  I am challenging the impression that your questioning is leading which is misleading.  So, please be conscious of that.

MR. COLON:  OK.

THE COURT:  And please avoid repetitious questioning. I know you are not intending to be repetitious.

MR. COLON:  I'm not.

THE COURT:  But intent is not the sole standard here.

MR. COLON:  I understand, Judge.

O2R5her3                          Perez - Cross

THE COURT:  Thank you.

(In open court)

BY MR. COLON:

Q.   Mr. Perez, do you have any documentation, at all, that your drug profits were the highest that they could be at any time in 2014?  And I'm sorry, by that I mean written documentation.

A.   There may be some notebooks, not all of them, about the -- interpreter correction -- with the accounting of the cocaine that I trafficked in 2014.

Q.   Did you provide those some notebooks to the government?

A.   Correct.

Q.   I said did you.

A.   If I did what?  Excuse me.

Q.   Did you provide any of those documents to the government that indicated how much drug profits you made --

          MS. TARLOW:  Objection; asked and answered.

Q.   -- in 2014.

          THE COURT:  I believe you asked this as a general question but I'm going to allow your question to stand.

          MR. COLON:  Thank you, Judge.

A.   I provided the DEA with one notebook that contained the accounting of the cocaine that I trafficked in 2014.

Q.   You did not provide all the notebooks; correct?

A.   Correct.

Q.   Did you provide any bank records to support your testimony?

A.   No, sir.

O2R5her3                     Perez - Cross

MR. COLON:  May I have a moment, sir?

THE COURT:  You may.

(Counsel conferring)

BY MR. COLON:

Q.  I think I am almost finished, Judge.  This question here is about whether or not Mr. Perez paid any money to the U.S. government in terms of restitution.

A.  Correct.

Q.  Did you pay any money to the U.S. government?

A.  I paid the fine that was imposed on me.

Q.  What fine was that?

A.  I was imposed a fine of $1 million.

Q.  I'm sorry.  Was that $1 million or $1 billion?

A.  $1 million.

Q.  And you paid that off?

A.  Yes, sir.

Q.  Do you have any assets that you have not disclosed to the United States government, any illicit assets?

MS. TARLOW:  Objection.

THE COURT:  The witness answered.

A.  No, sir.

MR. COLON:  No further questions, Judge.  Thank you.

THE COURT:  Redirect.

MS. TARLOW:  Yes, your Honor.

REDIRECT EXAMINATION

BY MS. TARLOW:

Q.  Mr. Perez, you have completed your term of imprisonment; is that right?

A.  Yes, ma'am.

Q.  After you served your term of imprisonment, were you supervised by a probation officer?

A.  Yes, ma'am.

Q.  Are you still being supervised in any way by that probation officer?

A.  No, ma'am.

Q.  Is that because your sentence has been completed?

A.  Correct.

Q.  Now, you testified that you were trying to obtain what is referred to as an S-visa; is that right?

A.  Yes, ma'am.

Q.  You stated on cross-examination the government is not helping you with that visa.  Were you referring to the prosecutors in this case when you said that?

A.  I was referring to the fact that the prosecutors in this case are not helping me with that S-visa.

Q.  Did the Federal Bureau of Investigation submit your S-visa application on your behalf?

A.  Correct.

Q.  How, if at all, does the outcome of this case impact your application?

O2R5her3                        Perez - Redirect

A.   It does not have any effect on it whatsoever.

Q.   Now, you were asked some questions on cross-examination about payments that you made to Miguel Pastor.

          Do you remember those questions?

A.   Yes, ma'am.

Q.   Did you provide payments to multiple different politicians to support their elections in Honduras?

A.   Yes, ma'am.

          THE COURT:  Please stand up and stretch.  Thank you.

Q.   Did it matter what political party those politicians were aligned with?

A.   Not at all.

Q.   Why did you make those donations generally?

A.   We were seeking to contribute to the campaign of anyone who was going to win.

Q.   Was that so that they would protect your drug trafficking activities?

A.   Correct.

Q.   You were asked some questions on cross-examination about messages that you exchanged with Mario.  Do you remember those questions?

A.   Yes, ma'am.

Q.   Those conversations were in 2013; is that right?

A.   Yes, ma'am.

Q.   Do you still have your phone from 2013?

A.   No, ma'am.

Q.   Do you still have access to those messages from that phone?

A.   No, ma'am.

Q.   You were asked some questions on cross-examination about whether you had any recorded audio or video of Tony Hernandez receiving a $1 million payment for Juan Orlando's campaign.  Do you remember those questions?

A.   Yes, ma'am.

Q.   When you provided the money for that payment, were you cooperating with the government at that time?

A.   No, ma'am.

Q.   When you were operating as a drug trafficker, did you usually video or audio record payments you would make, including bribes?

A.   Never, ma'am.

Q.   Why not?

A.   Because I had no interest in recording them.

Q.   Now, you testified on cross-examination about providing a notebook to the Drug Enforcement Administration.  Do you remember that testimony?

A.   Yes, ma'am.

Q.   At the time of your surrender with respect to your U.S. charges, were you in possession of all the notebooks that you had used in 2014?

A.   No, ma'am.

Q.  Directing your attention to the $1 million payment that you gave to Mario for Juan Orlando's campaign, did you discuss that payment with Mario after you had provided it to him?

A.  Yes, ma'am.

Q.  Did Mario say he had spoken with Juan Orlando Hernandez regarding that payment?

A.  Yes, ma'am.

Q.  What did Mario say that Juan Orlando Hernandez had responded?

A.  Mario wrote to me and Cesar and he confirmed that he had paid the million dollars -- he had made the million dollar contribution to Juan Orlando Hernandez' campaign for his first term, and he sent us his thanks.

Q.  Whose thanks?

A.  Juan Orlando Hernandez'.

Q.  Now, turning your attention to the $1 million payment you made for Juan Orlando Hernandez' campaign that the Valles provided, you testified on cross-examination that Arnulfo Valle discussed with Tony Hernandez an agreement to facilitate drug trafficking.  Do you remember that?

A.  Yes, ma'am.

Q.  Did Arnulfo Valle tell you whether Juan Orlando Hernandez had approved that agreement?

A.  Yes, ma'am.

Q.  What did he tell you?

A.   Arnulfo Valle confirmed that Juan Orlando Hernandez was in agreement -- interpreter correction -- Arnulfo Valle confirmed to me that Juan Orlando Hernandez had agreed to provide information about the DEA's movements in Honduras in order to facilitate cocaine trafficking for us in Honduras.

Q.   At the time you authorized the $1 million payment for Juan Orlando Hernandez, who were you working for?

A.   The Sinaloa Cartel.

Q.   Who is the head of the Sinaloa Cartel at that time?

A.   Chapo Guzman and Mayo Zambada.

Q.   After you left Honduras in 2014, you continued trafficking drugs; is that right?

A.   Yes, ma'am.

Q.   Were you concerned at that time about the Honduran National Police seizing your shipments?

A.   No, ma'am.

Q.   Why was that?

A.   Because since we had reached an agreement with Juan Orlando Hernandez, I felt that we had greater support from the Honduran military.

Q.   You were asked questions on cross-examination about whether Juan Orlando was involved in trafficking drugs with you.  Do you remember that?

A.   Yes, ma'am.

Q.   Did Juan Orlando Hernandez physically help you transport

narcotics?

A.   No, ma'am.

Q.   Did you pay bribes to him to protect your trafficking?

          MR. COLON:  Objection.

A.   Yes.

          MR. COLON:  The bribes were paid to the campaign.  The allegation is that they were paid to the campaign, not to Juan Orlando.  My objection is that the allegation is that the bribes were paid to the campaign, not Juan Orlando.

          THE COURT:  It's a question.  Overruled.

A.   Could you repeat the question, please?

Q.   Did you pay bribes to Juan Orlando Hernandez to protect your drug trafficking?

A.   Yes, ma'am.

Q.   Was that to make sure your shipments would not be seized?

A.   Correct.

Q.   To make sure that you would not be arrested in Honduras?

A.   Correct.

Q.   And after Juan Orlando Hernandez became president in Honduras, were any of your shipments seized?

A.   Never.

Q.   After Juan Orlando Hernandez became president in Honduras, were you arrested?

A.   No, ma'am.

Q.   Before you surrendered in 2014 and 2015, was your drug

trafficking successful in Honduras?

A.   I surrendered in the year 2015, and the year 2014 was one of my most profitable years in drug trafficking.

          MS. TARLOW:  May I have one moment, your Honor?

          THE COURT:  You may.

          (Pause)

          MS. TARLOW:  Nothing further.

          THE COURT:  You may step down, sir.

          Please call your next witness.

          THE WITNESS:  Thank you, your Honor.

          MR. GUTWILLIG:  Your Honor, the government calls Leonel Rivera Maradiaga.

DEVIS LEONEL RIVERA MARADIAGA,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

          THE COURT:  You may inquire.

          MR. GUTWILLIG:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. GUTWILLIG:

Q.   Sir, where are you from?

A.   From Honduras, sir.

Q.   Where in Honduras?

A.   The department of Colon, sir.

Q.   Where do you live now?

A.   In prison, sir.

Q.   Were you extradited to the United States?

A.   No, sir.

Q.   How did you get to the United States?

A.   I surrendered to the United States government, sir.

Q.   When, approximately, did you surrender?

A.   In approximately January of 2015, sir.

Q.   What were you doing immediately before you surrendered?

A.   I was a DEA informant, sir.

Q.   When you say DEA, do you mean Drug Enforcement Administration?

A.   Correct, sir.

Q.   When, approximately, did you begin working with the DEA?

A.   In November of 2013, sir.

Q.   After you surrendered into the United States in approximately January of 2015, did you plead guilty to any crimes?

A.   Yes, sir.

Q.   Did you make that plea pursuant to a cooperation agreement with the government?

A.   Yes, sir.

Q.   What crimes did you plead guilty to?

A.   Conspiracy involving 5 kilograms or more of cocaine, sir.

Q.   Did you plead guilty to other crimes as well?

A.   Yes, sir.

Q.   What are those?

A.   Being the leader of a gang of drug traffickers, possession of military-grade weapons, murder, and money laundering, sir.

Q.   As you sit here today, do you face a mandatory minimum sentence?

A.   Yes, sir.

Q.   What is that mandatory minimum sentence?

A.   Life plus 30 years, sir.

Q.   You mentioned that you were the leader of a drug trafficking organization.  Did that organization have a name?

A.   Yes, sir.

Q.   What was the name?

A.   The Cachiros, sir.

Q.   Were the Cachiros responsible for transporting cocaine within Honduras?

A.   Yes, sir.

Q.   Approximately how many tons of cocaine did you distribute before beginning to cooperate with the DEA?

A.   Approximately, between 130 and 150 tons of cocaine, sir.

Q.   What is your understanding of where that cocaine was being sent?

A.   The file destination was the United States, sir.

Q.   You mentioned weapons.  Did you and other members of the Cachiros use weapons during these drug trafficking activities?

A.   Yes, sir.

Q.   What types?

A.   AK-47s, AR-15s, grenade launchers, flamer mines, handguns among others, sir.

Q.   During your participation with the Cachiros, did you commit or were you involved in murders?

A.   Yes, sir.

Q.   How many murders are you responsible for?

A.   78, sir.

Q.   Does that include murders that you personally committed, as well as murders that you ordered others to commit?

A.   Yes, sir.

Q.   Were other people injured but not killed in connection with those murders?

A.   Yes, sir.

Q.   How many?

A.   15, sir.

Q.   Did you participate in torture with the Cachiros?

A.   Yes, sir.

Q.   Did other people help the Cachiros protect your cocaine?

A.   Yes, sir.

Q.   What are some of the types of people who helped the Cachiros, do that?

A.   Politicians, the military, the National Police, judges, prosecutors, mayors, among others, sir.

Q.   How did you get those types of people to help the Cachiros?

A.   By bribing them, sir.

Q.   Where did the money you bribed them with come from?

A.   It came from drug trafficking, sir.

Q.   Are you familiar with an individual named Juan Orlando Hernandez?

A.   Yes, sir.

Q.   Who is he?

A.   He was president of the National Congress of Honduras, sir.

Q.   Did he hold any other political offices in Honduras?

A.   Yes, sir.

Q.   What office?

A.   He was president of the republic, sir.

Q.   What name or names do you know that individual by?

A.   John, J-O, or Juancho, sir.

Q.   Was Juan Orlando one of the politicians you bribed?

A.   Yes, sir.

Q.   You mentioned J-O a moment ago.  What did that stand for?

A.   Juan Orlando, sir.

Q.   You mentioned that Juan Orlando was one of the politicians you bribed.

A.   Yes, sir.

Q.   What did you bribe him with?

A.   Money, sir.

Q.   Approximately when did you do that?

A.   That happened in 2012, sir.

Q.   How much money did you provide?

A.   $250,000, sir.

Q.   How was that delivered?

A.   It was sent to Tegucigalpa, sir.

Q.   To whom was it delivered?

A.   To Juan Orlando's sister Hilda Hernandez; sir.

Q.   What, if anything, did you expect in return for that bribe?

A.   To protect the Cachiros organization, myself, and my brother Javier Rivera who were the leaders, from arrest to continue to provide the companies that we used in money laundering with government contracts and to continue to protect us in drug trafficking, sir.

Q.   Did you also know Juan Orlando by the nickname "JOH"?

A.   Yes, sir.

Q.   I will refer to that individual as the defendant today.

A.   OK, sir.

Q.   Who were the leaders of the Cachiros?

A.   Myself and my brother Javier Rivera, sir.

          MR. GUTWILLIG:  Ms. Collins, could you please publish for the witness, the Court, and counsel what is marked as Government Exhibit 109?

Q.   Do you recognize this?

A.   Yes, sir.

Q.   What is it?

A.   It's my brother Javier Rivera, sir.

          MR. GUTWILLIG:  The government offers Government

Exhibit 109.

MR. COLON:  No objection.

THE COURT:  Received.

(Government's Exhibit 109 received in evidence)

MR. GUTWILLIG:  Ms. Collins, could you please publish?
And you can take that down.  Thank you.

BY MR. GUTWILLIG:

Q.  When, approximately, did you become involved in drug
trafficking?

A.  Approximately in 2002, sir.

Q.  And what types of drug trafficking activities, generally,
were you involved in with the Cachiros?

A.  We were receiving cocaine that came from Colombia, we were
transporting the cocaine from one location to another, and we
were protecting it, sir.

Q.  You said you were protecting it.  Did you help transport
drugs through Honduras?

A.  Yes, sir.

Q.  Generally, from where and to where did you transport drugs
in Honduras?

A.  There were occasions on which planes loaded with cocaine
would land in Puerto Lempira; from Puerto Lempira the drugs
were transported to the department of Colon, and from the
department of Colon they were transported to Espiritu Copán,
sir.

Q.   And based on your understanding, what was the ultimate destination of those drugs?

A.   The United States, sir.

Q.   Did you work with other drug traffickers in Honduras?

A.   Yes, sir.

Q.   Did you sometimes traffic drugs together?

A.   Yes, sir.

Q.   Did you sometimes commit murders together?

A.   Yes, sir.

Q.   Did you sometimes bribe politicians together?

A.   Yes, sir.

          MR. GUTWILLIG:  Ms. Collins, can you please publish what is in evidence Government Exhibit 110?

          Your Honor, the government notes the matter it raised at the side bar today.

          THE COURT:  Yes.  OK.  Thank you.

Q.   Sir, who is that?

A.   A drug trafficker, sir.

Q.   Who?

A.   Luis Valle, sir.

          MR. GUTWILLIG:  Ms. Collins, can you please publish what is in evidence as Government Exhibit 111?

Q.   Do you recognize this?

A.   Yes, sir.

Q.   Who is it?

O2R5her3                              Rivera Maradiaga - Direct

A.   Arnulfo Valle, sir.  He is Luis Valle's brother.

Q.   Do you know that individual's full name?

A.   Yes, sir.

Q.   What is that?

A.   Miguel Arnulfo Valle.

Q.   Did you work with the Valles in drug trafficking?

A.   Yes, sir.

Q.   Approximately when did you begin to do that?

A.   Approximately in 2002.

Q.   And until approximately when did you do that?

A.   Approximately through 2013, sir.

Q.   What types of things did you do with the Valles?

         INTERPRETER:  May the interpreter clarify something
with the witness, your Honor?

         THE COURT:  You may.

A.   I started out transporting cocaine from one point to
another for them.  Then I would sell them cocaine and then I
would also commit murders for them, sir.

Q.   Did Arnulfo Valle ever talk with you about the defendant?

A.   Yes, sir.

Q.   Approximately when was that?

A.   Approximately in 2010, sir.

Q.   At that time did the defendant hold a position within the
Honduran government?

A.   Yes, sir.

O2R5her3                           Rivera Maradiaga – Direct

Q.   What position was that?

A.   He was the president of Congress, sir.

Q.   During this conversation, did Miguel Valle show you a picture?

A.   Yes, sir.

Q.   How did he show you?

A.   On the phone, sir.

          MR. GUTWILLIG:  Ms. Collins, could you please publish what I believe is in evidence as Government Exhibit 309?

Q.   Do you recognize this?

A.   Yes, sir.

Q.   What is it?

A.   It's a photograph, sir.

Q.   Is that the photograph Miguel Valle showed you?

A.   Yes, sir.

Q.   Do you recognize some of the people in that photograph?

A.   Yes, sir.

Q.   Starting from the right, do you recognize that person?

A.   Yes, sir.

Q.   Who was that?

A.   Miguel Arnulfo Valle, sir.

Q.   And then the second from the right; who is that?

A.   Juan Orlando Hernandez, sir.

Q.   Do you recognize the other two individuals in the photograph?

O2R5her3                           Rivera Maradiaga - Direct

A.   I only recognize one of them, sir.

Q.   Which one?

A.   The last one on the left.

Q.   Who is that?

A.   He is --

          INTERPRETER:  May the interpreter, your Honor?

          THE COURT:  You may.

A.   He is Miguel Arnulfo's brother-in-law, sir.

Q.   When Miguel Valle showed you this picture, did he say where
it had been taken?

A.   Yes, sir.

Q.   What did he say?

A.   He said, Look, buddy.  You know, I gathered with Juan
Orlando Hernandez at the World Cup.

Q.   What, if anything during this conversation, did Miguel
Valle say about bribing the defendant?

A.   That Juan Orlando had asked Arnulfo Valle that upon telling
him that Juan Orlando was going to be running for president of
Honduras, he had asked Arnulfo Valle if he could support him,
if he could support his candidacy, sir.

Q.   Did he say what "support" meant in that context?  And by
"he" I mean Miguel Valle.

A.   Yes, sir.

Q.   What did he say?

A.   That he wanted money for his campaign, sir.

Q. When you say "he," who are you referring to there?

A. Juan Orlando, sir.

Q. Shifting gears for a moment, you mentioned that you worked with other drug traffickers. Do you know an individual by the name Nery Sanabria?

A. Yes, sir.

Q. Who is that?

A. A drug trafficker, sir.

Q. Do you know that individual by any other names?

A. Yes, sir.

Q. What name or names?

A. Wilson and Primo, sir.

Q. Did you ever speak with Sanabria?

A. Yes, sir.

Q. Approximately when did you speak with him?

A. In approximately 2012, sir.

Q. How did you speak with him?

A. Over the phone, sir.

Q. Who, if anyone, introduced you to Sanabria?

A. A worker of mine did, sir.

Q. When you spoke with Sanabria, what did you discuss?

A. Wilson wanted us to receive some small planes loaded with cocaine that were coming from Colombia for him, the planes were going to land on this clandestine air stip in La Mosquitia, sir.

O2R5her3                         Rivera Maradiaga - Direct

Q. What, if anything, did Sanabria ask you for in connection with that?

A. That we received the planes that were landing loaded with cocaine, sir.

Q. Did you ultimately receive that cocaine load?

A. No, sir.

Q. Did you have an individual named Pollo who worked for you?

A. Yes, sir.

Q. What sorts of things did Pollo do for you?

A. Pollo was in charge of getting providers, drug traffickers from Colombia, sir.

Q. When you say providers, providing what?

A. They provided cocaine, sir.

Q. Did you ever speak with Pollo about Sanabria?

A. Yes, sir.

Q. Approximately when was that conversation?

A. That was approximately in 2012, sir.

MR. GUTWILLIG: May I have one moment, please, your Honor?

THE COURT: You may.

(Counsel conferring)

MR. GUTWILLIG: Thank you, your Honor.

Q. Do you know an individual named Milo?

A. Yes, sir.

Q. Who was Milo?

O2R5her3                         Rivera Maradiaga - Direct

A.  Milo was a drug trafficker and sicario from the Valle Cartel, sir.

Q.  Did you speak with Milo about Nery Sanabria, sir?

A.  Yes, sir.

Q.  Approximately when was that?

A.  Approximately in 2013, sir.

Q.  What did Milo say about Sanabria, sir?

A.  That they had just lost a client.

Q.  Could you please explain what that means?

A.  Milo was worried because a drug lab of Nery Sanabria's had just been seized in La Entrada, Copán, sir.

Q.  Who, if anyone, did Milo say Sanabria worked with in drug trafficking?

A.  Yes; the Valles' Cartel, sir.

Q.  Any other individuals?

A.  Yes, sir.

Q.  Who?

A.  That he was Tony Hernandez' partner, sir.

Q.  Who is Tony Hernandez?

A.  Juan Orlando Hernandez' brother, sir.

Q.  You mentioned that Milo was a sicario.  What does sicario mean?

A.  That he killed people, sir.

Q.  Do you know an individual who goes by Sentado?

A.  Yes, sir.

Q.   Who is Sentado?

A.   He was a drug trafficker, sir.

Q.   How did you learn that?

A.   From the Valles Cartel, sir.

Q.   Are you familiar with an individual named Alex Ardón?

A.   Yes, sir.

Q.   Who is Alex Ardón?

A.   He was a drug trafficker, sir.

Q.   Did you know him by any other names?

A.   Yes, sir.

Q.   What name or names?

A.   Commander.

Q.   Do you know whether Alex Ardón held a political position with Honduras?

A.   Yes, sir.

Q.   What position?

A.   Mayor, sir.

Q.   Did you ever meet Alex Ardón?

A.   Yes, sir.

Q.   Approximately when?

A.   Between 2011 and 2012, sir.

Q.   Where did you meet Alex Ardón?

A.   I met him at a wake that was for a woman who had just been killed who was a sister of the Valle Cartel, sir.

Q.   Did Alex Ardón have a brother?

A.   Yes, sir.

Q.   What was his name?

A.   Hugo Ardón, sir.

Q.   Do you know whether Hugo Ardón held a position within the Honduran government?

A.   Yes, sir.

Q.   What position was that?

A.   He was the president of Fondo Vial, sir.

Q.   Did you ever meet with Hugo Ardón?

A.   Yes, sir.

Q.   Did you pay him bribes?

A.   Yes, sir.

Q.   For what?

A.   In exchange for him giving government contracts from -- interpreter correction -- in exchange for him giving us contracts from the government of Honduras to the companies that we had for laundering money, sir.

Q.   Have you heard the name Byron Ruiz?

A.   Yes, sir.

Q.   Who is that?

A.   A drug trafficker, sir.

Q.   How do you know that person is a drug trafficker?

A.   Because he worked with Moncho Mata, sir.

Q.   Approximately when was Byron Ruiz a drug trafficker?

A.   In 2010, approximately, sir.

Q.  Have you heard the name Fredy Nájera?

A.  Yes, sir.

Q.  Who is that?

A.  Another drug trafficker, sir.

            (Continued on next page)

BY MR. GUTWILLIG:

Q.  How do you know that?

A.  Because I worked with him, sir.

Q.  Did Fredy Nájera traffic drugs to any particular location in Honduras?

A.  Yes, sir.

Q.  Where was that?

A.  In the department of Olancho, sir.

Q.  Did Fredy Nájera have a position in politics in the Honduran government?

A.  Yes, sir.

Q.  What was that?

A.  A congressman in the National Congress, sir.

Q.  You testified earlier that you bribed politicians.

        Ms. Collins, could you please publish what's in evidence as Government Exhibit 114.

        Do you recognize that individual?

A.  Yes, sir.

Q.  Who is that?

A.  Porfirio Lobo Sosa, sir.

Q.  Do you know that person by any other names?

A.  Yes, sir.

Q.  What name or names?

A.  Pepe Lobo.

Q.  Have you met Mr. Lobo in person?

A.  Yes, sir.

MR. GUTWILLIG:  Ms. Collins, you can take that down. Thank you.

Q.  When, approximately, was the first time you met Porfirio Lobo?

A.  In approximately 2009, sir.

Q.  At that time, did Porfirio Lobo hold a position within the Honduran government?

A.  Yes, sir.

Q.  What was that position?

A.  He was president of Congress, sir.

Q.  And at the time you met him, was he running for another political position?

A.  Yes, sir.

Q.  What position?

A.  President of the republic, sir.

Q.  Was he a member of a particular political party?

A.  Yes, sir.

Q.  Which one?

A.  The National Party, sir.

Q.  Prior to that meeting, had you paid a bribe to Porfirio Lobo?

A.  Yes, sir.

Q.  Approximately when did you do that?

A.  In late 2009, sir.

Q.   How much was the bribe for?

A.   Approximately between 250,000 and $300,000, sir.

Q.   Who paid that bribe to Porfirio Lobo?

A.   My dad, Isidro Rivera; my mother, Esperanza Maradiaga; Pepe Lobo's brother, Ramon Lobo; and Juan Gomez, sir.

Q.   You mentioned that you met with Porfirio Lobo for the first time in approximately 2009.  During that meeting, generally what did you discuss?

A.   What Pepe spoke about was that Pepe was going to protect us so that my brother and I would not be arrested.  He was going to protect us so that we could continue trafficking drugs.  He was going to give us government contracts for our companies, one of which had already been founded for us to launder money, and he was going to protect us so that we would not be extradited to the United States, sir.

Q.   What, if anything, did you have to do in exchange for all that?

A.   Bribe him, sir.

Q.   With what?

A.   With money, sir, from drug trafficking.

Q.   Following that meeting, did you pay another bribe to Porfirio Lobo?

A.   Yes, sir.

Q.   For approximately how much?

A.   Again between 250,000 and $300,000, sir.

O2RHHer4                    Rivera Maradiaga - Direct

MR. GUTWILLIG:  Ms. Collins, could you please publish for the witness, Court, and counsel what's marked as Government Exhibit 112.

Q.  Do you recognize that?

A.  Yes, sir.

Q.  What is it?

A.  A photograph, sir.

Q.  A photograph of who?

A.  Of Fabio Lobo, sir.

MR. GUTWILLIG:  Government offers Government Exhibit 112.

MR. STABILE:  No objection.

THE COURT:  Received.

MR. GUTWILLIG:  Ms. Collins, could you please publish.

(Government's Exhibit 112 received in evidence)

BY MR. GUTWILLIG:

Q.  Who is Fabio Lobo?

A.  He's Pepe Lobo's son, sir.

Q.  Did Fabio Lobo help the Cachiros?

A.  Yes, sir.

Q.  Initially, how did he do that?

A.  In the beginning he began by giving us government contracts to the company INRIMAR for laundering money, sir.

Q.  What was INRIMAR?

A.  INRIMAR was a company that the Cachiro cartel had that was

devoted to road construction, sir.

Q. What did you use that company for?

A. To launder money, sir.

Q. What did you do in return for Fabio Lobo in exchange for those contracts?

A. I would bribe him, sir.

Q. Between approximately 2010 and 2013, did you bribe Fabio Lobo?

A. Yes, sir.

Q. What did you bribe him with?

A. With money, proceeds from drug trafficking, sir.

Q. Approximately when did Porfirio Lobo complete his term as president of Honduras?

A. In 2013, sir.

Q. In addition to granting the Cachiros government contracts, did Fabio Lobo assist the Cachiros in other ways?

A. Yes, sir.

Q. Did he assist the Cachiros with drug trafficking?

A. Yes, sir.

Q. How did he do that?

A. He would receive small airplanes that were coming loaded with cocaine at the airstrips.  He would provide security for said cocaine loads as they were transported from the airstrip to Espiritu, Copán, and he would accompany with his security detail so that we would not be arrested by any — at any police

checkpoint.

Q.   When you say "provide security," what do you mean?

        THE INTERPRETER:  May the interpreter correct the interpretation.  Instead of security detail, "presidential security detail."

Q.   Why did Fabio Lobo have a presidential security detail?

A.   Because he was President Pepe Lobo's son, sir.

Q.   When you say "provide security," generally what do you mean by that in context of moving drug shipments?

A.   That when the trucks would head out, sometimes we would use trucks with false bottoms in which we would hide the cocaine. When they would go from Colon to Espiritu, Copán, Fabio would go along with us —— interpreter correction —— Fabio would go ahead of us with the security team that he had with us. Sometimes he would go ahead; other times he would go behind; other times he would go along with me to help with the truck.

Q.   Did Fabio Lobo also provide you with other information?

A.   Yes, sir.

        MR. GUTWILLIG:  Ms. Collins, could you please publish for the witness, Court, and counsel what's marked as Government Exhibit 330.

Q.   Do you recognize that?

A.   Yes, sir.

Q.   What is it?

A.   It's a photograph, sir.

Q.   Do you recognize the individuals in that photograph?

A.   Yes, sir.

Q.   Who are they?

A.   Starting from the right, it's Pepe Lobo, the former president of the republic; the second person is Tinoco Pacheco; and the third person is Juan Orlando Hernandez, sir.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our midafternoon break.  Please do not discuss the case among yourselves or with anyone.  We'll be back in action in ten minutes.

Thank you.

(Jury excused)

(Continued on next page)

O2RHHer4                        Rivera Maradiaga - Direct

(Jury not present)

THE COURT:  All right.  The witness may step down.

Please be seated.  So I have a question for the government.  I realize it's Tuesday, but after Mr. Rivera, how many witnesses do you have left?

MR. GUTWILLIG:  May I have one moment, your Honor?

THE COURT:  Yes, sure.

MR. GUTWILLIG:  Approximately seven to ten witnesses, your Honor.

THE COURT:  Of the seven to ten, how many are cooperators?

MR. GUTWILLIG:  Approximately three, your Honor.

THE COURT:  Thank you very much.

And the noncooperators, are any of them long witnesses?

MR. GUTWILLIG:  No, your Honor.

THE COURT:  Thank you.

I don't propose to say anything to the jury today, but I may ask you a similar question tomorrow or Thursday to give our jurors an idea of where we are.

MR. GUTWILLIG:  Understood, your Honor.

THE COURT:  Thank you.  We're in recess.

(Recess)

THE COURT:  You may be seated.

(Continued on next page)

O2RHHer4                          Rivera Maradiaga - Direct

(Jury present)

THE COURT:  All right.  Please be seated.

Mr. Gutwillig, whenever you're ready, you can continue.

MR. GUTWILLIG:  Thank you, your Honor.

When we left off, I was about to offer Government Exhibit 330, which I'll do now.

THE COURT:  Any objection?

MR. COLON:  No, your Honor.

THE COURT:  Received.

(Government's Exhibit 330 received in evidence)

BY MR. GUTWILLIG:

Q.  You testified before we left off that you recognized the individuals in this picture.  Starting on the right-hand side, could you please identify them.

A.  Porfirio Lobo Sosa, Tinoco Pacheco, and Juan Orlando Hernandez, sir.

THE COURT:  All right.  Next question.

Q.  You mentioned a moment ago that Fabio Lobo helped you in drug trafficking.  What, if anything, did Fabio Lobo say to you about Pacheco Tinoco?

A.  That Pepe Lobo, Fabio Lobo's dad, had put Tinoco Pacheco at Fabio's disposal so that if the Cachiros encountered any problems, he could just call Tinoco Pacheco and that he would address it.  He would take care of it, sir.

Q.   Who was Tinoco Pacheco?

A.   He was the military general that was in charge of intelligence and the president's security, sir.

Q.   What type of information did he provide to the Cachiros.

A.   Whenever police officers were coming from Tegucigalpa to the department of Colón, he would let us know through Fabio. Tinoco Pacheco would basically —— would inform us or provide us with the information that, if we had anything illegal in any properties, we had to remove it because operations were coming to Colón, sir.

        MR. GUTWILLIG:  You can take that down, please, Ms. Collins.

Q.   You spoke a couple minutes ago about moving those drug loads.  Do you recall that?

A.   Yes, sir.

Q.   Could you please describe how you moved those drug loads that you talked about with Fabio Lobo.

A.   When we, the Cachiros cartel, received loads of cocaine that were coming from Colombia, some would land by plane on clandestine airstrips, others would come by sea on go-fast boats.

Q.   When you received that cocaine, how did you transport it?

A.   We would transport them on occasion on trucks, sir, trucks that had false bottoms, hidden compartments.

Q.   What kind of trucks?

A.   Short trucks, long trucks, cattle trucks, tractor-trailers.

Q.   Were you armed when you transported these drugs?

A.   Yes, sir.

Q.   With what?

A.   Because the security detail that Fabio Lobo had with him was used, they would mostly use AR-15s, sir.

Q.   When you transported drugs for the Cachiros, what types of weapons did you use to protect those?

A.   I would always be followed by a truck that was carrying heavy guns, sir, such as grenade launchers, RPG-7s, AK-47s, AR-15s, and short guns, sir.

Q.   Approximately how many people would be with you or with the drug load?

A.   It varied.  Whenever it was a small load, and by that I mean 400 to 500 kilos, I would usually be accompanied by around 15 to 30 individuals, sir.

Q.   Were all of those individuals armed?

A.   Yes, all of them, sir.

Q.   With what?

A.   With AR-15s and short guns, sir.

Q.   You testified a few minutes ago about a drug trafficker named Byron Ruiz.  I believe you said that you were aware he was trafficking drugs in approximately 2010, is that correct?

A.   Yes, sir.

Q.   Did he continue trafficking drugs after 2010?

A.  Yes, sir.

Q.  How do you know that?

A.  Through another drug trafficker, sir.

Q.  What did that other drug trafficker tell you about Byron Ruiz?

A.  He told me that Byron was working in the department of La Mosquitia and the department of Olancho, sir.

Q.  Are you familiar with an individual named Cinco?

A.  Yes, sir.

Q.  Who is Cinco?

A.  A Colombian drug trafficker, sir.

Q.  Did you ever speak with anyone about Cinco?

A.  Yes, sir.

Q.  Who did you speak with about Cinco?

A.  With Miguel Arnulfo Valle, sir.

Q.  What, if anything, did Miguel Valle tell you about Cinco?

A.  Miguel Arnulfo Valle told me that Cinco sold several loads of cocaine to the Valle brothers, sir.

Q.  Did Miguel Valle say anything to you about where Cinco was based?

A.  At the time, he was in San Pedro Sula, sir.

Q.  Approximately when was that?

A.  That was approximately in 2012.

Q.  Was Cinco later located somewhere else?

A.  What I learned through Miguel was that they had him in the

area of La Entrada, Copán, sir.

Q. Do you know where Cinco provided the cocaine from that he gave to the Valles?

A. Yes.

Q. Where?

A. It was coming from Colombia, sir.

Q. Have you heard the name Edgar Ríos? I'll withdraw that.

Do you know an individual by the name of Pluto?

A. Yes, sir.

Q. Who is Pluto?

A. Pluto was a drug trafficker, sir.

Q. Did you traffic drugs with Pluto?

A. Yes, sir.

Q. Approximately when did you do that?

A. Approximately between 2012 and 2013, sir.

Q. Do you know whether Pluto is alive?

A. He is dead, sir.

Q. Approximately when did Pluto die?

A. Approximately in 2013.

Q. Do you know how he died?

A. He was murdered, sir.

Q. Do you know who murdered him?

A. Yes, sir.

Q. Who?

A. Geovanny Fuentes and Metro, sir.

Q.   When you say "Metro," who does Metro refer to?

          THE INTERPRETER:  May the interpreter confirm with the witness?

          THE COURT:  You may.

A.   He was a drug trafficker.  His name was Melvin Sandres, sir.

Q.   Did Melvin Sandres, or Metro, work with Geovanny Fuentes?

A.   Yes, sir.

Q.   Did you traffic drugs with Geovanny Fuentes?

A.   Yes, sir.

Q.   We'll come back to that later.

          You mentioned the nickname Metro for Melvin Sandres.  Does that have any particular significance?

A.   Yes, sir.

Q.   What is that?

A.   Melvin was nicknamed Metro because he had lots of connections in the Honduran metropolitan police, sir.

Q.   I'd like to change topics.

          Directing your attention to 2012, are you aware of a change to the law in Honduras in 2012?

A.   Yes, sir.

Q.   What was that change?

A.   The extradition law to extradite drug traffickers from Honduras to the United States was signed, sir.

Q.   Were there Honduran national elections in 2013?

O2RHHer4                    Rivera Maradiaga - Direct

A.  Yes, sir.

Q.  Did those elections carry any particular significance for you?

A.  Yes, sir.

Q.  What was that significance?

A.  Related to extradition, sir.

Q.  How so?

A.  That drug traffickers were going to be extradited to the United States, sir.

Q.  What did that mean for you with respect to the 2013 elections?

A.  That I needed to bribe the candidates from different political parties that were running to become president of the republic in order to avoid my extradition and the extradition of members of the Cachiros cartel to the United States, sir.

Q.  You testified previously about Fabio Lobo.  In approximately 2012, were you working with Fabio Lobo in drug trafficking and money laundering?

A.  Yes, sir.

Q.  During that time period, did you discuss politics with Fabio Lobo?

A.  Yes, sir.

Q.  At that time, was Porfirio Lobo president of Honduras?

A.  Yes, sir.

Q.  Did there come a time when Fabio Lobo indicated to you who

Porfirio Lobo's preferred candidate was for president in the 2013 elections?

A.  Yes, sir.

Q.  Who was that?

A.  Juan Orlando Hernandez, sir.

Q.  What did Fabio say to you about Juan Orlando Hernandez?

A.  Fabio said that his dad sent us a message —— his dad, Porfirio Lobo Sosa —— that we had to bribe Juan Orlando Hernandez, support him, so that he could become the next president of the republic, sir.

        MR. GUTWILLIG:  Ms. Collins, could you please publish for the witness, Court, and counsel what's marked as Government Exhibit 361.

Q.  Do you recognize that?

A.  Yes, sir.

Q.  What is it?

A.  Porfirio Lobo Sosa and Juan Orlando Hernandez, sir.

        MR. GUTWILLIG:  Government offers Government Exhibit 361.

        MR. COLON:  No objection.

        THE COURT:  Received.

        (Government's Exhibit 361 received in evidence)

        MR. GUTWILLIG:  Please publish, Ms. Collins.

BY MR. GUTWILLIG:

Q.  Could you please identify the individual on the right side

of the photograph.

A.   Porfirio Lobo Sosa, sir.

Q.   And the person on the left side of the photograph.

A.   Juan Orlando Hernandez, sir.

          MR. GUTWILLIG:   Thank you, Ms. Collins.

Q.   Thereafter, did you support Juan Orlando's campaign for president of Honduras?

A.   Yes, sir.

Q.   After your conversation with Fabio Lobo about supporting the defendant, did there come a time when you were invited to a birthday party?

A.   Yes, sir.

Q.   Whose party?

A.   President Porfirio Lobo Sosa's brother's.

Q.   What is that person's name?

A.   Ramon Lobo Sosa, sir.

Q.   Did you know that person by any nicknames?

A.   Yes, sir.

Q.   What nickname?

A.   Moncho Lobo, sir.

Q.   Approximately when were you invited to this birthday party?

A.   In approximately 2012, sir.

Q.   Who invited you?

A.   Oscar Nájera and Juan Gomez, sir.

Q.   Who is Juan Gomez?

O2RHHer4                          Rivera Maradiaga – Direct

A.   He was a politician, sir.

Q.   What type of politician was he?

A.   He was the politician who was the governor of the department of Colón.

Q.   Did he belong to a particular political party?

A.   Yes, sir.

Q.   What party?

A.   The National Party, sir.

Q.   You mentioned an individual named Oscar Nájera a moment ago.  Who was Oscar Nájera?

A.   He was a politician, sir.

Q.   Did he hold any particular office in Honduras?

A.   Yes, sir.

Q.   What office?

A.   Congressman in the National Congress, sir.

Q.   Was he a member of any particular party?

A.   Yes, sir.

Q.   Which one?

A.   National Party, sir.

Q.   Approximately how long have you known Oscar Nájera?

A.   Since approximately 1996, sir.

Q.   Did Oscar Nájera provide support to the Cachiros?

A.   Yes, sir.

Q.   Approximately when did Oscar Nájera begin providing support to the Cachiros?

A.   From approximately 2010 onward, sir.

Q.   What types of support did Oscar Nájera provide to the Cachiros?

A.   Oscar — interpreter correction — he would give us information from the police to protect the Cachiros cartel, me and my brother Javier Rivera, so that we would not be arrested in the department of Colón.  Occasionally, I would call Oscar Nájera so that he would move police checkpoints so that I could pass through with drugs, guns, or money, sir.

Q.   What, if anything, did you do in return for that protection from Oscar Nájera?

A.   I would bribe him, sir, with money.

Q.   Where did that money come from?

A.   From drug trafficking, sir.

          MR. GUTWILLIG:  Ms. Collins, could you please publish for the witness, Court, and counsel what's marked as Government Exhibit 322.

Q.   Do you recognize that?

A.   Yes, sir.

Q.   What is it?

A.   A photograph, sir.

Q.   Do you recognize the individuals in that photograph?

A.   Yes, sir.

Q.   Who are they?

A.   Oscar Nájera is on the right, sir.

MR. GUTWILLIG:  Government offers Government Exhibit 322.

MR. COLON:  No objection.

THE COURT:  Received.

(Government's Exhibit 322 received in evidence)

MR. GUTWILLIG:  Ms. Collins, could you please publish.

BY MR. GUTWILLIG:

Q.  You just mentioned that the individual on the right is Oscar Nájera.  Who is the individual on the left?

A.  Juan Orlando Hernandez, sir.

Q.  Thank you.

Turning your attention back to the birthday party, did you attend the birthday party?

A.  No, sir.

Q.  And to be clear, I'm referring to Moncho Lobo's birthday party.

Why didn't you attend?

A.  Because I spoke with my brother Javier Rivera, and he said that he was going to go, sir.

Q.  Did he go?

A.  Yes, sir.

Q.  How do you know that?

A.  When they were there at that birthday party, my brother Javier called me on the phone.

Q.  Was there a reason that you and Javier sometimes did not

travel together?

A.  Yes, sir.

Q.  What was that reason?

A.  Because we protected ourselves that way.  I would stay in one location with armed people, and my brother would go somewhere else.  That way we wouldn't be together, sir.

Q.  You mentioned that Javier called you from Moncho Lobo's birthday party.  Did he call you on the phone?

A.  Yes, sir.

Q.  For approximately how long were you on the phone with Javier that day?

A.  Between approximately 20 and 30 minutes, sir.

Q.  What did he say while you were on the phone?

A.  What my brother Javier told me over the cell phone, he said:  Look, brother, I am here at Moncho Lobo's birthday party, and I'm here with Juan Orlando Hernandez.

Q.  Did Javier say that he spoke with Juan Orlando Hernandez at the birthday party?

A.  Yes, sir.

Q.  What did Javier say about what he had spoken about with the defendant?

A.  What my brother Javier Rivera said to me was:  Look, brother, I've spoken with Juan Orlando Hernandez, and I asked him whether he was going to continue supporting us in drug trafficking.  I said that we were worried because the

extradition law is —— the extradition law was coming, and I asked him if he was going to continue to protect us so that we would not be extradited and if he would continue giving us government contracts so that we could launder money to the company INRIMAR.

Q. Did Javier tell you how the defendant responded?

A. Yes, sir.

Q. What was that?

A. Juan Orlando's response to my brother was that if we, he and I, supported him with money for his campaign, that we could count on him for each thing that Javier had asked him for.

Q. Did Javier say whether he had made arrangements with the defendant to meet at a later date?

A. Yes, sir.

Q. What did he say?

A. What Javier said was that Juan Orlando had said to him that he would be expecting him in Tegucigalpa for him to take the money to him and that they would speak at that point, sir.

Q. Did you see or speak with any other individuals while the birthday party was happening?

A. Yes, sir.

Q. Who?

A. Other drug traffickers, sir.

Q. Are you familiar with an individual named Neftali?

A. Yes, Neftali Duarte Mejia, sir.

Q.   Did you traffic drugs with Neftali Duarte Mejia?

A.   Yes, sir.

Q.   For approximately how long did you do that?

A.   From approximately 2002 until 2013, sir.

Q.   Did Neftali also assist you with paying bribes to politicians?

A.   Yes, sir.

Q.   And prior to that, any particular politicians?

A.   Yes, sir.

Q.   Who?

A.   Porfirio Lobo Sosa, sir.

Q.   While he was at the birthday party, did you speak with Neftali on the phone?

A.   Yes, sir.

Q.   What did he say?

A.   What Neftali said was:  Look, buddy, here I am with Juan Orlando Hernandez.  And he showed him to me because he had video called me, and I saw that Juan Orlando Hernandez was there, Juan Orlando Hernandez and other drug traffickers were there at the birthday party.

Q.   When you say he "video called me," what do you mean by that?

A.   Neftali made a video call to me, sir.

Q.   Were you able to see other people when he video called you?

A.   Yes, sir.

Q. You mentioned the defendant. What did you see of the defendant on the phone?

A. What I saw was that Neftali had his arm around him like this, right next to him, and with his other hand he was showing him to me on the phone, sir.

Q. Who is "him"?

A. Juan Orlando Hernandez, sir.

Q. Did you see other individuals?

A. Yes, sir.

Q. Who did you see?

A. I saw other drug traffickers, sir.

Q. What were their names?

A. Eliel Sierra was there, Ramon Mata, Moreno Blanco, Wilter Blanco, Chinda Montes, Tom Montes, Pipi Montes, among others, sir.

Q. Did the Cachiros traffic drugs with all those persons?

A. Yes, sir.

Q. Did you see on the phone where those people were?

A. Yes, sir.

Q. What did you see?

A. They were —— there were several tables right next to each other, and they were sitting there like in a meeting, sir.

Q. What did the room look like?

A. It was like a private room, sir.

Q. You mentioned Chinda a moment ago. Who is that?

O2RHHer4                         Rivera Maradiaga – Direct

A.   She was a drug trafficker, sir.

Q.   Did you work with her in drug trafficking?

A.   Yes, sir.

Q.   What was Chinda's full name?

A.   Rosenda Montes.

Q.   Did you speak with Chinda on the phone while she was at the birthday party?

A.   Yes, sir.

Q.   For approximately how long?

A.   Approximately some 20 minutes, sir.

Q.   While you were on the phone, what did Chinda say?

A.   What Chinda said was:  Look, son, here I am with all these people, and here with all of us is Juan Orlando Hernandez, who's going to be the next president of the republic.  And along with all my children, we've given him $300,000 for his campaign through Moncho Lobo.

Q.   Following this birthday party, did there come a time when you met with Oscar Nájera?

A.   Yes, sir.

Q.   Approximately how long after the party?

A.   That was approximately three days later, sir.

Q.   Where did you meet?

A.   In Oscar Nájera's residence, sir.

Q.   Who was there?

A.   I was there, Javier my brother was there, and Oscar Nájera

was there.

Q.   Where was Oscar Nájera's residence located?

A.   In the department of Tocoa, Colón, sir.

Q.   Generally, at that meeting what did you discuss?

A.   During the meeting, we discussed that we were going to be going to Tegucigalpa to meet with Juan Orlando Hernandez to deliver the moneys that had been agreed during the birthday party to him.

Q.   What, if anything, did Oscar Nájera say about his own political aspirations?

A.   Oscar Nájera said that he wanted to become president of Congress, sir.

Q.   Did he ask for the Cachiros' support?

A.   Yes, sir.

Q.   What did you understand by support to mean?

A.   A support was when the Cachiros cartel, that being my brother and I, bribed politicians using drug trafficking money, sir.

Q.   Did Oscar Nájera say whether he had been at Moncho Lobo's birthday party?

A.   Yes, sir.

Q.   What did he say?

A.   That Oscar Nájera and Juan Gomez had been at the birthday party, and while there, they had had a discussion with Juan Orlando Hernandez to meet up in Tegucigalpa, sir.

Q.  During this meeting with Oscar Nájera and Javier, did Oscar Nájera call anyone?

A.  Yes, sir.

Q.  Did you hear the call?

A.  Yes, sir.

Q.  How did you hear the call?

A.  When Oscar Nájera made the call, he made the call on the speakerphone, and he put the telephone on the table, sir.

Q.  Who did Oscar Nájera call?

A.  Juan Orlando Hernandez, sir.

Q.  What did Oscar Nájera say on the call?

A.  Oscar Nájera greeted Juan Orlando, and he said:  Leader, how are you?  Here I am with our friends so that we can meet in Tegucigalpa as agreed.

Q.  What did you understand the "friends" to refer to?

A.  Oscar Nájera was referring to me and my brother Javier Rivera, sir.

Q.  Did the defendant respond?

A.  Yes, sir.

Q.  What did he say?

A.  What I heard Juan Orlando say was:  Yes, come here, and as agreed, we will talk here.

Q.  Did a meeting with the defendant later take place?

A.  Yes, sir.

Q.  Approximately how long after?

A.   That was quick, about two, three days later, sir.

Q.   Did you have a worker named Fernando?

A.   Yes, sir.

Q.   Did you give Fernando anything ahead of that meeting?

A.   Yes, sir.

Q.   What did you give him?

A.   I gave him $250,000, sir.

Q.   Did you see the money?

A.   Yes, sir.

Q.   How was it packaged?

A.   It was packaged in dollars, sir.

Q.   Did you give Fernando any instructions about what to do with that money?

A.   Yes, sir.

Q.   What instructions did you give him?

A.   For him to get the money out from where it was stored in a false bottom truck and then make the delivery to Tegucigalpa, sir.

Q.   Did Fernando in fact go to Tegucigalpa?

A.   Yes, sir.

Q.   How do you know that?

A.   When Fernando was in Tegucigalpa, he called me on the phone, sir.

Q.   What happened with that money?

A.   Fernando delivered it to my brother Javier Rivera and Oscar

Nájera.

Q.  Do you know what Javier Rivera and Oscar Nájera did with that money?

A.  Yes, sir.

Q.  How do you know?

A.  Because Javier told me, sir.

Q.  What did they do with that money?

A.  They handed it to Juan Orlando's sister Hilda Hernandez, sir.

Q.  What did Javier ask for in return when he provided that money to Hilda Hernandez?

A.  Javier told me that he told Hilda Hernandez for her to tell Juan Orlando that the bribe money was in exchange for his continued protection from extradition of us, for him to continue to protect us in drug trafficking, for him to continue to provide government contracts to INRIMAR for money laundering, and for him to continue to provide us with police information, sir.

Q.  Approximately when was this?

A.  That was approximately in 2012, sir.

Q.  When Javier paid this bribe, what, if anything, did Hilda Hernandez say in response?

A.  Javier told me that Hilda's response was that her brother, referring to Juan Orlando, was a man of his word, and that based on the conversation that Javier had with Juan Orlando

Hernandez, everything that had been promised to him would, in fact, take place. And so that he could count on Juan Orlando Hernandez coming through with all his promises.

Q. Was the defendant physically present for that meeting with Javier and Oscar Nájera?

A. No, sir.

Q. Did Hilda Hernandez say why he was not there?

MR. COLON: Objection. She's not a member of the conspiracy.

MR. GUTWILLIG: Your Honor, there's been testimony that Hilda Hernandez accepted a bribe on behalf of Juan Orlando Hernandez. I think we've established that she was part of the conspiracy.

THE COURT: I'm going to allow it.

A. Sir, can you please repeat the question.

Q. Yes.

What, if anything, did Hilda Hernandez say about why the defendant was not physically present at that meeting?

A. Hilda Hernandez said that the reason why Juan Orlando Hernandez was not present during the meeting was because he was busy attending a meeting at the National Congress, sir.

Q. What, if any, reaction did Hilda Hernandez have to receiving dollars?

A. Her reaction was that of some concern Javier told me.

Q. What, if anything, did Javier say about changing the

currency of those dollars?

A.   Javier and Oscar Nájera agreed, in order to alleviate the lady's concern so that she wouldn't be scared and so that she would accept the funds, that Oscar Nájera would exchange the funds in Tegucigalpa into national Honduran money, being lempiras, sir.

Q.   Are you familiar with a part of the United States government known as OFAC?

A.   Yes, sir.

Q.   Does OFAC stand for the Office of Foreign Asset Control?

A.   Yes, sir.

Q.   Did OFAC ever sanction the Cachiros?

A.   Yes, sir.

Q.   More than once?

A.   Yes, sir.

Q.   How many times?

A.   Two times, sir.

Q.   Were both of those times in the same year?

A.   Yes, sir.

Q.   During what year did OFAC impose those sanctions?

A.   In 2013, sir.

Q.   After OFAC imposed the sanctions, did any part of the Honduran government seize assets from the Cachiros?

A.   Yes, sir.

Q.   What part of the Honduran government?

A.   OABI, sir.

Q.   What is OABI?

A.   It is a Honduran agency established by the government for the seizure of assets, sir.

Q.   Did other people help you avoid the seizure of certain of your assets?

A.   Yes, sir.

Q.   What, if anything, did Fabio Lobo do to help you avoid seizure by OABI?

A.   What Fabio Lobo did was that he provided us with a list of all of the Cachiro cartel's properties that were about to be seized.

Q.   What, if anything, did Oscar Nájera do to help you avoid seizure by OABI?

A.   He helped us by providing us with documents for the properties that were going to be seized, sir.

Q.   What kinds of things did you hide?

A.   My brother and I hid guns, several kilos of cocaine.  We hid documents and we hid money, sir.

Q.   Did you hide weapons?

A.   Yes, sir.

Q.   Did you hide cars?

A.   Yes, sir.

Q.   Did you hide money?

A.   Yes, sir.

O2RHHer4                        Rivera Maradiaga - Direct

Q.  Did you hide computers?

A.  Yes, sir.

Q.  Were you able to do this in part because of the help of Fabio Lobo and Oscar Nájera?

A.  Yes, sir.

Q.  Did you begin cooperating with the DEA after the Cachiros were designated by OFAC?

A.  Yes, sir.

Q.  You testified about this earlier.  Could you please remind the jury of when, approximately, you began cooperating with the DEA.

            MR. COLON:  Objection.  Asked and answered.

            THE COURT:  You may translate.

            THE INTERPRETER:  The question was translated for the witness, your Honor, but there has been no response.

            THE COURT:  All right.  You may respond, sir.

A.  Thank you, sir.

            Can you please repeat the question, sir.

Q.  Could you please remind the jury of approximately when you started cooperating with the DEA.

            MR. COLON:  Objection.  Asked and answered.

            THE COURT:  Overruled.

A.  That was in November 2013, sir.

            THE COURT:  All right.  Ladies and gentlemen, that ends our workday.  Thank you very much for your patience.

I'm going to give you an update on schedule probably at the end of the day tomorrow or maybe on Thursday.  But we're on schedule, and we're doing very well.  So that's where we are as of now.

Have a pleasant evening.  See you tomorrow.

(Jury excused)

(Continued on next page)

O2RHHer4

(Jury not present)

THE COURT:  Please be seated.

I just want to put it on the record that this morning I excused Juror No. 9; that was juror No. 33 during voir dire. I previously excused Juror 14, who was No. 47 during voir dire. And I've confirmed with my chambers that as of 5:01, there was no returned phone call from Juror No. 9 to chambers, neither my law clerk who is in chambers nor the voice mail.

See you tomorrow morning.

I'm going to ask our spectators to have a seat, and you'll be notified when you can leave the courtroom.

(Adjourned to February 28, 2024, at 9:40 a.m.)

INDEX OF EXAMINATION

Examination  of:                                      Page

LUIS PEREZ

Cross By Mr. Colon . . . . . . . . . . . . . . . 694

Redirect By Ms. Tarlow . . . . . . . . . . . . . 747

DEVIS LEONEL RIVERA MARADIAGA

Direct By Mr. Gutwillig  . . . . . . . . . . . . 753

GOVERNMENT EXHIBITS

Exhibit No.                                       Received

 109    . . . . . . . . . . . . . . . . . . . . . 759

 112    . . . . . . . . . . . . . . . . . . . . . 773

 330    . . . . . . . . . . . . . . . . . . . . . 778

 361    . . . . . . . . . . . . . . . . . . . . . 785

 322    . . . . . . . . . . . . . . . . . . . . . 789