O2SHHer1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                      15 Cr. 379 (PKC)

JUAN ORLANDO HERNANDEZ,

                                Trial
        Defendant.

------------------------------x

                              New York, N.Y.
                              February 28, 2024
                              9:55 a.m.

Before:

                  HON. P. KEVIN CASTEL,

                            District Judge

                    APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  KYLE A. WIRSHBA
    JACOB GUTWILLIG
    ELINOR TARLOW
    DAVID ROBLES
    Assistant United States Attorneys

RENATO CHRISTIAN STABILE
RAYMOND L. COLON
    Attorneys for Defendant

Also Present:   Francisco Olivero, Interpreter (Spanish)
               Dagoberto Orrantia, Interpreter (Spanish)
               Mercedes Avalos, Interpreter (Spanish)
               Evan Frierson, Interpreter (Spanish)
               Matthew Passmore, Special Agent

O2SHHer1

(Trial resumed; jury not present)

THE COURT:  Good morning.  I understand there's an issue that somebody wanted to address.

MR. GUTWILLIG:  Yes, your Honor.  We were hoping to take that up at the sidebar.

THE COURT:  OK.  Fine.

(At sidebar)

THE COURT:  All right.  Mr. Gutwillig.

MR. GUTWILLIG:  Yes, your Honor.  We wanted to follow up on the matter that we noted for the Court at the sidebar yesterday morning about Juror No. 5.

The Court had asked us, when we noticed if Juror No. 5 was sleeping, to say something to the effect of "We'd like to note the issue that we raised at the sidebar."  The government's concerned by continuing to do that it may become apparent to the other jurors or others what that is about.  And the government just wanted to note that yesterday members of the trial team again observed Juror No. 5 sleeping, including specifically during a significant portion of Luis Perez's redirect, and we wanted to note that for the Court that we noticed that multiple times yesterday.

MR. STABILE:  May I?  I disagree that this juror has been sleeping for substantial portions or any portions of the trial testimony.  After the government raised the issue yesterday, I observed her carefully.  I saw her engaged with

her eyes open, nodding at things, smiling at times, looking around, taking notes. And so I disagree factually with the government that this juror, who I will note is a black woman, is sleeping or not paying attention or not taking her duties as a juror seriously in any way.

THE COURT: I observed —— my observations were much closer to what Mr. Stabile has described. I've been watching her, and she has been animated in her expressions, turning her head, moving her head. I have noticed moments where it looked to me —— I couldn't exactly see from the angle —— that her eyes may have been closed. And I, of course, watched intently because if that condition remained for more than 15, 20 seconds, I would do what I have done, which is, "Ladies and gentlemen, let's stand up and stretch." Before I really could do that, I noticed that, no, then all of a sudden her head moved or her hand moved.

So that's what I've observed, and I will continue to monitor. But I see —— what are you proposing, Mr. Gutwillig?

MR. GUTWILLIG: It's just a procedural matter, your Honor. We don't want to say every time ——

THE COURT: Then what are you proposing? You've explained what you don't want to do. What you haven't explained is what you want to do.

MR. GUTWILLIG: Yes, your Honor. Perhaps it could be something a little bit less obvious.

O2SHHer1

THE COURT:  Like tugging on your ear?

MR. GUTWILLIG:  Well, perhaps the government could notify the Court's clerk or deputy in some way that we are observing that to then notify the Court.

THE COURT:  How would you do that?

MR. GUTWILLIG:  I think we would just indicate to one of those individuals ——

THE COURT:  Like a big wink or something?

MR. COLON:  I'm sorry, Judge, why don't we just make a general pronouncement about I know this trial is long.  It's good to keep your eyes open.  I'm probably the one closest to her at the end of the table, and I'm watching her all the time.  And sometimes I watch you watch the jury as well when you peek over.  I think she's just closing her eyes to think.  She's not sleepy, I don't believe.

MR. STABILE:  May I make one other observation, your Honor?

THE COURT:  Sure.

MR. STABILE:  I'll just note for the record that she does wear glasses and she does have bangs that come down to about her eyes.  So it's not always —— and I've been looking at her ——

THE COURT:  Right.

MR. STABILE:  It's not always possible to see whether her eyes are open or closed because of those features.

O2SHHer1

THE COURT:  I agree with that because I've been looking, and I'm saying to myself, Is she sleeping now?  And I'm watching, and I'm ready to jump up on my feet, "Let's stand up and stretch," and all of a sudden she'll move her hand or move her head, or what have you.  I'm just not getting this.  So I'm going to continue to watch.  Counsel are invited to continue to watch, and those are my observations.

In terms of signaling, I don't think the jury —— first of all, if you noticed, when you say that, I don't say, "Oh, stand up, everybody."  No, I've been subtle about it, and you've gone on.  Maybe I've let you ask a question and then I say it.  So the horror story is really not a horror story there.  This is not a situation where the government is being forced to say, "I'm raising the matter I raised at the sidebar," and then the Court abruptly stops everything and has the jury stand up.  That's not what's happened here.

So thank you.

(In open court)

THE COURT:  Our jurors are ready, and we'll have you stand when they're at the door.  You can remain seated for now.

(Continued on next page)

(Jury present)

THE COURT:  Please be seated.

Good morning, ladies and gentlemen.  It's good to see you.  I even see one or two smiles, which are always welcome.  Thank you.

Thank you for enabling us to get a good start, and so rather than going on and on, we're going to hear from the witness.

Mr. Rivera, the Court reminds you that you are still under oath.

THE WITNESS:  Yes, sir.

THE COURT:  Mr. Gutwillig, whenever you're ready.

MR. GUTWILLIG:  Thank you, your Honor.

DEVIS LEONEL RIVERA MARADIAGA, resumed.

DIRECT EXAMINATION

BY MR. GUTWILLIG:

Q.  Before we move forward, I'd like to ask you one question about a topic we covered yesterday.

Yesterday you testified about a birthday party for Moncho Lobo in approximately 2012.  Do you recall that?

A.  Yes, sir.

Q.  And you testified that while Neftali Duarte was at the party, you spoke with him on the phone, is that correct?

A.  Yes, sir.

Q.  What, if anything, did Neftali say to you about what he had

given the defendant?

A.  What Neftali was telling me over the phone was that he had already given $100,000 to Mr. Juan Orlando Hernandez and that he had put his campaign helicopter at his disposal, sir.

Q.  When you say "his campaign helicopter," could you please clarify what you mean by that.

A.  Yes.  That Neftali Duarte Mejia had assigned the helicopter that he owned to Juan Orlando Hernandez for his political campaign so that he could fly it.

Q.  What political campaign?

A.  The one that he was running in to become president of the republic, sir.

Q.  Before you began cooperating with the DEA in approximately November of 2013, were any of your drug loads ever seized in Honduras?

A.  None, sir.

Q.  Were you ever arrested in Honduras?

A.  No, sir.

Q.  Switching topics, did there come a time when you were approached by someone named Tony Hernandez?

A.  Yes, sir.

MR. GUTWILLIG:  Ms. Collins, could you please publish what's in evidence as Government Exhibit 115.

Q.  Who is that?

A.  Tony Hernandez, sir.

Q.   Approximately, when were you approached by Tony Hernandez?

A.   In 2014, sir.

Q.   Was that approximately around the time that the defendant had become president?

A.   Yes, sir.

Q.   What, if anything, did Tony Hernandez want from you?

A.   What Tony Hernandez wanted was to work with me in drug trafficking and also to get some government contracts that were owed by the Pepe Lobo administration to the company that I had for money laundering, INRIMAR, sir.

Q.   At that time do you know whether Tony Hernandez was working with any drug trafficking organizations?

A.   Yes, sir.

Q.   Any in particular?

A.   Yes, sir.

Q.   Which one or ones?

A.   Yes, he was working with the cartel of the Valle Valle brothers, Miguel Arnulfo Valle and Luis Valle, and he was also working with the Nery Sanabria, aka Wilson, cartel.

Q.   Directing your attention to February of 2014, did you in fact meet in person with Tony Hernandez?

A.   Yes, sir.

Q.   Prior to that meeting, had Tony Hernandez conveyed a request to you?

A.   Yes, sir.

Q.   Through who had that why been conveyed?  Who is ——

A.   Through Comisionado Avila Meza and also Tony Hernandez's lawyer and friend Oscar Ramirez, sir.

Q.   Who is Avila Meza?

A.   Avila Meza was a drug trafficker, sir.

Q.   Did Avila Meza also hold a position within the Honduran police?

A.   Yes, sir.

Q.   What position was that?

A.   He was a police comisionado, sir.

Q.   Did you work with Avila Meza in drug trafficking?

A.   Yes, sir.

Q.   Did you commit acts of violence along with Avila Meza?

A.   Yes, sir.

Q.   Did those acts of violence include murder?

A.   Yes, sir.

Q.   Who was Oscar Ramirez?

A.   Oscar Ramirez was a drug trafficker, sir.

Q.   And through Avila Meza and Oscar Ramirez, what request from Tony Hernandez was conveyed to you?

A.   That Tony Hernandez wanted $100,000 up front, sir.

Q.   For what?

A.   In exchange for Juan Orlando's administration to pay INRIMAR's contracts.

Q.   Where did the meeting with Tony Hernandez take place?

A.   In Tegucigalpa, sir.

Q.   Where in Tegucigalpa?

A.   At a Denny's restaurant, sir.

Q.   When you arrived at the Denny's what, if anything, did you notice outside?

A.   I saw several armed military men on the parking lot, sir.

Q.   What were they armed with?

A.   A bunch of long guns, AR-15s, from what I could see, sir.

Q.   Did you go inside the Denny's?

A.   Yes, sir.

Q.   Who was there when you arrived?

A.   Tony Hernandez was there and the engineer from our construction company, INRIMAR.

Q.   Where did you sit?

A.   I sat at the table, sir.

Q.   Who sat with you at the table?

A.   Across from me was Tony Hernandez, and to my right was the INRIMAR engineer, sir.

Q.   Pausing here for a moment, as part of your cooperation with the DEA, did you make video recordings?

A.   Yes, sir.

Q.   How did you do that?

A.   I was using several objects for recording, sir.

Q.   Any in particular?

A.   A watch, sir.

Q.   Did you provide those video recordings to the DEA?

A.   Yes, sir.

Q.   Did you record other people?

A.   Yes, sir.

Q.   What types of people did you record?

A.   I recorded corrupt politicians who were accepting bribes. I was recording police officers.  I was recording sicarios.

THE INTERPRETER:  By the interpreter, "hitmen."

A.   I was recording drug traffickers, among others, sir.

Q.   Did you record this meeting with Tony Hernandez?

A.   Yes, sir.

MR. GUTWILLIG:  Ms. Collins, could you please publish for the witness, Court, and counsel what's marked as Government Exhibit 401-4.

Q.   Do you recognize that?

A.   Yes, sir.

Q.   What is it?

A.   It is part of the recording I made, sir.

Q.   Is it a still shot from that recording?

A.   Yes, sir.

Q.   The government —— well, and who do you see in that picture?

A.   Tony Hernandez, sir.

MR. GUTWILLIG:  Government offers Government Exhibit 401-4.

THE COURT:  Received.

(Government's Exhibit 401-4 received in evidence)

MR. GUTWILLIG:  Please publish, Ms. Collins.

BY MR. GUTWILLIG:

Q.  Where was this taken?

A.  Inside the Denny's restaurant, sir.

Q.  And looking at the bottom right of the image, could you please read the date.

A.  It was in 2014, sir.

MR. GUTWILLIG:  Ms. Collins, could you please publish for the witness, Court, and counsel what's marked as Government Exhibit 401-5.

Q.  Do you recognize that?

A.  Yes, sir.

Q.  What is it?

A.  It's an image of the video I made, sir.

MR. GUTWILLIG:  Government offers Government Exhibit 401-5.

THE COURT:  Any objection?

MR. COLON:  No objection.

THE COURT:  Received.

(Government's Exhibit 401-5 received in evidence)

MR. GUTWILLIG:  Ms. Collins, would you please publish.

BY MR. GUTWILLIG:

Q.  You testified a moment ago that this is a still shot from that recording, correct?

A.   Correct, sir.

Q.   Directing your attention to the individual in the blue shirt, who is that?

A.   That's Tony Hernandez, sir.

Q.   And directing your attention now to Tony Hernandez's, what appears to be his left hand, do you see what he's holding?

A.   Yes, sir.

Q.   What is that?

A.   They are documents, sir.

Q.   What types of documents?

A.   They are the contracts that the engineer from the company INRIMAR had given him.

          MR. GUTWILLIG:  You can take that down.  Thank you, Ms. Collins.

Q.   You mentioned INRIMAR.  What is INRIMAR?

A.   INRIMAR was a company that the Cachiros cartel had founded. It was a company that built roads and that we used to launder money, launder money from the government, sir.

Q.   Could you please describe generally how you used INRIMAR to launder money from the government.

A.   We —— Pepe Lobo would make government contracts, and then 5, 10, or 20 percent of the value of the contract was paid up front with drug trafficking money.  And then when the contract's term was up, the government would come, and they would make a deposit into the bank that we used to launder

O2SHHer1                        Rivera Maradiaga – Direct

money for the INRIMAR company.

Q.   Generally speaking, what did you discuss at the meeting with Tony Hernandez?

A.   Well, first, I had had a meeting with Avila Meza and Oscar Ramirez at a hotel.  And what Oscar Ramirez had told me was, he said:  Look, buddy, talk to –– speak openly with Tony Ramirez –– interpreter correction –– speak openly with Tony Hernandez, because that is what he wanted to hear.  What Tony Hernandez wanted to hear was that we were going to give Tony Hernandez work so that he could work in drug trafficking with me.

Q.   Did you provide Tony Hernandez a bribe at that meeting?

A.   Yes, sir.

Q.   How much?

A.   It was $50,000, sir.

Q.   Mr. Rivera, do you have any recordings of Juan Orlando Hernandez?

A.   No, sir.

Q.   After your meeting with Tony Hernandez, did you become aware of a plan to kill the defendant?

A.   Yes, sir.

Q.   When, approximately, did you first learn about that plan?

A.   That was close to the time of the elections and –– the election and after the election.

Q.   Are you referring to the presidential election?

A.   Yes, sir.

Q.   So approximately early 2014?

A.   Yes, sir.

Q.   How did you first learn about this plan?

A.   I first heard about it through Milo, the sicario and worker for the Valle Valle cartel, the Valle brothers.

Q.   What did Milo tell you about this plan?

A.   Milo said that Arnulfo Valle and Luis Valle wanted to kill President Juan Orlando Hernandez, and they wanted to kill his brother Tony Hernandez because, before Juan Orlando Hernandez became president, he had taken drug trafficking money from them, and now he wasn't answering their calls on the cell phone when the Valle brothers would call Tony or Juan Orlando Hernandez, sir.

Q.   Did Milo or the Valles also say whether the defendant had been seizing properties of the Valles?

A.   Yes.  When I met with Luis Valle and Arnulfo Valle, the two brothers of the Valle cartel, that was what was going on. Several of their properties had already been seized.

          THE INTERPRETER:  May the interpreters?

          THE COURT:  Yes.

          THE INTERPRETER:  Interpreter correction.  Instead of that was what was going on, "they were angry."

Q.   Were you asked to help in this murder plot?

A.   Yes, sir.

Q.   Did you agree to help the Valles murder the defendant?

A.   No, sir.

Q.   Why not?

A.   Because, first, it was not —— it didn't cross my mind to kill my partner because I had already bribed him, and secondly, at that point I was working with the DEA, sir.

Q.   Do you know an individual named Reynaldo Ekonomo?

A.   Yes, sir.

Q.   Did Reynaldo Ekonomo work with the Valle cartel?

A.   Yes, sir.

Q.   Did you discuss the assassination plot with Reynaldo Ekonomo?

A.   Yes, sir.

Q.   Had you met Ekonomo before that conversation?

A.   Yes, sir.

Q.   When, approximately, had you met Ekonomo?

A.   In approximately 2004, sir.

Q.   In approximately 2004, did you ask Ekonomo for help with something?

A.   Yes, sir.

Q.   What did you ask him for help with?

          MR. COLON:  Your Honor, I'm sorry.  May we have a date or time frame?  I'm sorry.

A.   I had hired the services of Mr. Ekonomo so I would not be arrested, because at that time I had an arrest warrant from an attempted murder that had just happened.

Q. When approximately ——

MR. COLON: I'm sorry, your Honor, may we have a year or time frame?

MR. GUTWILLIG: Your Honor, I believe the witness already testified to this.

Q. But approximately when did this conversation take place?

Sorry, may I clarify? The conversation with Ekonomo about helping you not get arrested.

A. That was in 2004, sir.

MR. COLON: Thank you.

Q. Did Ekonomo agree to help protect you from the investigation and arrest?

A. Yes, sir.

Q. Did you pay him a bribe?

A. Yes, sir.

Q. How much?

A. It was approximately between 40 and $60,000, sir.

Q. Who was the victim of that murder?

A. They were Coqui Ramos and Margarita Lobo, a security guard at the hospital, and two other people were injured, sir.

Q. Were you ever arrested?

THE INTERPRETER: Interpreter correction, "two or three other people were injured, sir."

Q. Were you ever arrested in connection with that murder?

A. Never, sir.

Q.  Let's go back to 2014.  Did you meet with Ekonomo in person to discuss the assassination plot against the defendant?

A.  Yes, sir.

Q.  Where did you first meet Ekonomo in 2014?

A.  In San Pedro Sula at a restaurant, sir.

Q.  At the beginning of that meeting, what, if anything, did Ekonomo say?

A.  What Ekonomo said was that he was going to meet with Juan Orlando Hernandez around that time, and he was going to take advantage of the rumors that were circulating about how the Cachiros cartel and others wanted —— and other cartels wanted to kill Juan Orlando Hernandez at that time.  So Reynaldo Ekonomo said that in exchange for that, in exchange for a bribe, he would speak to Juan Orlando Hernandez.

THE INTERPRETER:  May the interpreters, your Honor?

(Interpreters confer)

THE INTERPRETER:  Interpreter correction.  Instead of Cachiros cartel, "Valles cartel."

THE COURT:  All right.  Pause.

Would any of the jurors like a short break?  We can take a short break if —— yes, OK.  Let's do that.  We'll be back in action in ten minutes.

(Jury excused)

THE COURT:  We're in recess for ten minutes.

(Recess)

(Jury present)

THE COURT:  Please be seated.

Ladies and gentlemen, anytime anybody needs a comfort break or even an extra comfort break, just give me a hand signal, and we'll do it.

So whenever you're ready, Mr. Gutwillig.

MR. GUTWILLIG:  Thank you, your Honor.

BY MR. GUTWILLIG:

Q.  When we left off, you were talking about a conversation you had with Reynaldo Ekonomo in 2014.  Briefly, during that conversation, which cartel did Ekonomo say that he had learned — well, I'll withdraw that.

What did Ekonomo say about what he had heard about a plot to kill the defendant?

A.  What Ekonomo said was:  Hey, leader, there are rumors that the Cachiros cartel and the Valles cartel want to kill Juan Orlando.  If you want, I have a meeting, I am going over there soon, and if you want, I can put you on the phone with him so that you can talk to him and clarify it.

Q.  What did you say in response to when Ekonomo said that he had heard that the Cachiros were trying to kill the defendant?

A.  My response was:  Sir, at no time did I want to kill the president of the republic.  In fact, I supported him with the different congressmen from different departments, including you all.  So please explain to him that at no time did I want to

harm him.

Q.   Prior to this plot, had the defendant been protecting the Valles cartel?

A.   Yes, sir.

Q.   How do you know that?

A.   Through Milo and through the Valles, sir.

Q.   And what did the Valles tell you before this about the defendant protecting them?

A.   That when Juan Orlando Hernandez was protecting them in drug trafficking, they had made a lot of money thanks to that protection and that they had bribed him several times.

Q.   And this was before you had this conversation with Ekonomo, correct?

A.   Correct, sir.

Q.   When Ekonomo offered to speak to the defendant on your behalf, did he ask for anything in return from you?

A.   Yes, sir.

Q.   What did he ask for?

A.   What Ekonomo wanted was $60,000, a house in Tegucigalpa, and an SUV, sir.

Q.   Did you provide Ekonomo anything?

A.   Yes, sir.

Q.   What did you provide him?

A.   What I gave Ekonomo on that occasion was between 40 and $60,000 and a white Tahoe SUV, sir.

Q.  After your meeting with Ekonomo, did he call you later that day?

A.  Yes, sir.

Q.  How did that call begin?

        MR. COLON:  Your Honor, may we have a time frame for this conversation, please?

        MR. GUTWILLIG:  I believe the witness has already testified that this was in early 2014.

Q.  Is that correct?  When did this conversation take place, approximately?

        THE INTERPRETER:  May the interpreter first give the English rendition of the very long answer given by the witness?

        MR. GUTWILLIG:  Yes.

A.  When the cell phone —— my cell phone that I had rang, he answered —— well, I answered, and then Ekonomo responded to me. It was Ekonomo's number.  He said:  Leader, here I am with Juan Orlando.  I've spoken to Juan Orlando about what you told me in the meeting that we had.  I'm going to put Juan Orlando on speakerphone, and Juan Orlando is only going to listen.  He is not going to speak.  And you can clarify to him what the situation is involving you all wanting to kill Juan Orlando.

Q.  Briefly, I believe you've already testified, but approximately when did this conversation take place?

A.  That was in 2014, sir.

Q.  What, if anything, did you respond to Ekonomo on the phone?

A. Oh, OK, leader, that's good. Put him on for me, I said.

Q. What did you say next?

A. I started saying — firstly, I greeted Juan Orlando Hernandez, and then I said something along the lines of: Leader, how are you? I wanted to clarify the rumors that you have heard about the Cachiros wanting to kill you. And I said: At no time has it ever crossed my mind to want to kill you.

May I continue?

Q. Yes. What else did you say?

A. And I said to him: Remember, leader — and I was addressing Juan Orlando Hernandez — that I have supported you through several congressmen in the department of Colón, through Oscar Nájera. I have supported your campaign in Olancho, Yoro, through Milton Pinto, in Yoro through Mayor Arnaldo Urbina, in Cortés through Ekonomo. At no time have I wanted to harm you.

Q. After you finished speaking, what, if anything, did Ekonomo say?

A. And then Ekonomo said: Look, leader, I'm going to hang up now, and I'll be meeting with you soon. But Juan Orlando right now is satisfied with the explanation that you have just given him that you have not attempted against his life. He is happy, and he is now satisfied with the explanation that you have just given him.

Q. After this call, did you later speak with Ekonomo about the plot to kill the defendant?

A.   Yes, sir.

Q.   Approximately how much later?

A.   It was early the next day, sir.

Q.   And on that call, what, if anything, did Ekonomo say about the plot?

A.   Ekonomo said to me that Juan Orlando was now satisfied, as a result of the explanation that I had given him, that I had no intention of killing Juan Orlando, sir.

Q.   You testified a moment ago about Arnaldo Urbina.  Who is Arnaldo Urbina?

A.   A drug trafficker, sir.

Q.   In approximately 2014, did Arnaldo Urbina hold a position within the Honduran government?

A.   Yes, sir.

Q.   What position was that?

A.   He was a mayor, sir.

Q.   Where was he a mayor?

A.   In the department of Yoro, sir.

Q.   Was he a member of a particular political party?

A.   Yes, sir.

Q.   Which one?

A.   The National Party, sir.

         MR. GUTWILLIG:  Ms. Collins, could you please publish for the witness, Court, and counsel what's marked as Government Exhibit 308.

Q.  Do you recognize this?

A.  Yes, sir.

Q.  Do you recognize any of the individuals in that photograph?

A.  Yes, sir.

Q.  Who do you recognize?

A.  I recognize Arnaldo Urbina and Juan Orlando Hernandez, sir.

          MR. GUTWILLIG:  Government offers Government
Exhibit 308.

          MR. COLON:  No objection.

          THE COURT:  Received.

          (Government's Exhibit 308 received in evidence)

BY MR. GUTWILLIG:

Q.  Directing your attention —— and if you could please
publish, Ms. Collins.

          Directing your attention to the photograph, where do
you see Arnaldo Urbina?

A.  On the right-hand side, sir.

Q.  And if you could indicate on the screen, perhaps by drawing
on it, which person.

          The record please indicate —— reflect that the witness
has identified the individual on the right wearing a navy
shirt.

          And then could you please identify where you see Juan
Orlando Hernandez in that photograph.

A.  To the left of Arnaldo Urbina, sir.

MR. GUTWILLIG:  If the record could please indicate that the witness has identified the individual in the center wearing a white shirt as Juan Orlando Hernandez.

You can take that down, please, Ms. Collins.

Q.   Was Arnaldo Urbina one of the politicians you bribed?

A.   Yes, sir.

Q.   What did you give him?

A.   Money, sir.

Q.   In exchange for what?

A.   In exchange for information from the government; in exchange of them receiving planes loaded with cocaine in the department of Yoro; in exchange for violence; in exchange for having them as allies, sir; and in exchange of being provided with messages from Juan Orlando Hernandez, sir.

Q.   Where did the money you gave Arnaldo Urbina come from?

A.   It was drug trafficking proceeds, sir.

Q.   Directing your attention to March of 2014, by that point you were cooperating with the DEA, correct?

A.   Yes, sir.

Q.   At approximately that time, did you meet in person with Arnaldo Urbina?

A.   Yes, sir.

Q.   What, generally, was the purpose of that meeting?

A.   Well, the purpose was, sir, that I had sent Juan Orlando Hernandez a message asking for his continued protection in drug

O2SHHer1                        Rivera Maradiaga - Direct

trafficking and also to see if Juan Orlando Hernandez could

provide us with a clandestine airstrip that he had.

Q.  Did you record this meeting?

A.  Yes, sir.

         MR. GUTWILLIG:  Ms. Collins, could you please publish

for the witness, Court, and counsel what's marked as Government

Exhibit 409-1.

Q.  Do you recognize this?

A.  Yes, sir.

Q.  What is it?

A.   Images from the recording that I made, sir, including

Arnaldo Urbina.

         MR. GUTWILLIG:  The government offers Government

Exhibit 409-1.

         MR. COLON:  No objection.

         THE COURT:  Received.

         (Government's Exhibit 409-1 received in evidence)

         MR. GUTWILLIG:  May I have a moment please, your

Honor?

         THE COURT:  You may.

         MR. GUTWILLIG:  Could you please publish, Ms. Collins.

BY MR. GUTWILLIG:

Q.  Who is the individual in this photograph?

A.  Arnaldo Urbina, sir.

Q.  Is this from a recording you made of Arnaldo Urbina?

A.  Yes, sir.

MR. GUTWILLIG:  Ms. Collins, could you please play, without sound, for the witness what's marked as Government Exhibit 409.

Q.  Do you recognize that?

A.  Yes, sir.

Q.  What is it?

A.  It is the video that I recorded when I was with Arnaldo Urbina, sir.

MR. GUTWILLIG:  Your Honor, the government offers Government Exhibit 409.

THE COURT:  Any objection?

MR. COLON:  No, your Honor.

THE COURT:  Received.

(Government's Exhibit 409 received in evidence)

MR. GUTWILLIG:  Your Honor, at this time the government also formally offers Government Exhibit 409T, which I believe was offered subject to connection for the underlying video being admitted.

THE COURT:  Any objection?

MR. COLON:  No, your Honor.

THE COURT:  Received.

(Government's Exhibit 409T received in evidence)

MR. GUTWILLIG:  Ms. Collins, could you please play that for the jury with sound.

(Video played)

MR. GUTWILLIG:  Ms. Collins, could you now please publish Government Exhibit 409T.  If you could please go down to the second page.

BY MR. GUTWILLIG:

Q.  Is this a translation of the video that we just saw?

A.  Yes, sir.

THE COURT:  I think you mean transcription?

MR. GUTWILLIG:  A transcription and the translation, your Honor.

THE COURT:  Thank you.

Q.  So directing your attention, I'll read the first line where Urbina says, "I'm asking you because I asked Juan, Juan was in," and then on line 3, "on Wednesday, he was in Yoro."

Who does Juan refer to here?

A.  He's referring to Juan Orlando, sir.

MR. GUTWILLIG:  If you could please zoom back out, Ms. Collins.

Q.  And then on line 5, Urbina says, "Yes, he was with me for a while."  And on line 7 he says, "And we talked once again about the situation."

What is your understanding of what the situation was?

A.  The situation was a message that I had sent to Juan Orlando asking if he was going to continue to protect us in drug trafficking, sir.

Q.   When Urbina says, "He was with me for a while," what do you understand that to mean?

A.   That Juan Orlando had been in a meeting with Urbina in Yoro, sir.

Q.   Now, directing your attention to line 9:  "So then he said to me:  'Well, then, mayor,' he said to me, 'as long as the men remain discreet,' he said to me, 'there won't be any problems,' he said to me."

What is your understanding of who "he" is here?

A.   Juan Orlando, sir.

Q.   And who is "me"?

A.   Arnaldo, sir.

Q.   And Arnaldo Urbina was the mayor of Yoro, correct?

A.   Yes, sir.

MR. GUTWILLIG:  You could zoom back out, please, Ms. Collins.

Q.   Line 11 says, Urbina says, "There will be a problem when there is no discretion."

What do you understand "a problem" to mean here?

A.   Well, the problem here is that —— refers to Juan Orlando Hernandez suggesting that if the Cachiros continue to work in drug trafficking and there was no complaint and that there was not much noise made when the shipments would come in and that if, as a cartel, there was discretion on our part, then he would have no problem in continuing to protect the Cachiros

cartel in their activities, sir.

MR. COLON:  Your Honor, move to strike.  Calls for speculation on the part of Mr. Hernandez.

THE COURT:  All right.  One second, please.

That's the witness' testimony in response to the question, and you'll have your opportunity on cross-examination.

Go ahead.

MR. GUTWILLIG:  If you could please zoom back out, Ms. Collins.

Q.  At that time you were cooperating with DEA, correct?

A.  Yes, sir.

Q.  You were not trafficking drugs, correct?

A.  No, sir.

Q.  Was Arnaldo Urbina involved in narcotics trafficking at that point?

A.  Yes, sir.

MR. GUTWILLIG:  Thank you, Ms. Collins.  You can take that down.

I'd now like to publish for the witness, Court, and counsel what is marked as Government Exhibit 409A-1.  409A-1T — I'm sorry, 409A-T.  I'm sorry again.  Scrolling down, Ms. Collins.

Q.  Do you recognize this, Mr. Rivera?

A.  Yes, sir.

Q.   Is this both a transcript and translation of a different portion of your conversation with Arnaldo Urbina?

A.   Yes, sir.

        MR. GUTWILLIG:  Your Honor, at this time the government offers Government Exhibit 409A-T, which is this, and then also the underlying corresponding video clip, which will be 409A.

        THE COURT:  Any objection?

        MR. COLON:  No, your Honor.

        THE COURT:  It's received.

        (Government's Exhibits 409A and 409A-T received in evidence)

BY MR. GUTWILLIG:

Q.   Directing your attention to line 3 —— may I have a moment to confer with counsel, please?

        THE COURT:  Yes.

        MR. COLON:  Judge, may I take a second here?

        THE COURT:  Sure.

        MR. GUTWILLIG:  Yeah, Ms. Collins, if you could please publish Government Exhibit 409A-T.

BY MR. GUTWILLIG:

Q.   And directing your attention to line 3, it says —— You say: "Let's try and get the airstrip that he owns in Lempira, buddy."

        Had you previously learned about an airstrip in

Lempira?

A.   Yes, sir.

Q.   Approximately how long before this recording with Arnaldo Urbina had you learned about that?

A.   Months before, sir.

Q.   Who had you learned about that from?

A.   From Mr. Juan Gomez, sir.

Q.   Who is Juan Gomez?

A.   He was a politician, sir.

Q.   Is the defendant from the Lempira department in Honduras?

A.   From the department of Colón, sir.

Q.   Understood.

     What did Juan Gomez tell you about this conversation about an airstrip in Lempira?

A.   Juan Gomez told me that a member of the military from around there in Colón had told Juan Gomez that Juan Orlando and Tony Hernandez had an airstrip there in the area of Lempira and that they had received helicopters loaded with money there and several planes loaded with cocaine.

          MR. COLON:  Objection, your Honor.

          THE COURT:  Basis?

          MR. COLON:  Move to strike that military individual. There's no evidence that that person was a member of this conspiracy, your Honor, and therefore not reliable.  Not Juan Gomez, the military that provided that information to Juan

Gomez.  Without —— without that individual, Juan Gomez would not have known that, sir.

THE COURT:  I'm going to let the answer stand, although I'll hear you on the next break.

Go ahead.

Q.  Did you ever see that airstrip?

A.  No, sir.

Q.  Do you know whether it existed?

A.  Yes, sir.

Q.  And the only way you know that is through Juan Gomez, correct?

A.  Yes, sir.

MR. GUTWILLIG:  Could you please zoom back in, Ms. Collins.

Q.  Directing your attention line 6, Arnaldo Urbina says: "Remember that today the highly trusted man inside the department," and then line 8, "would be then, yes, huh, because, buddy, he'll cut me off."

Directing your attention to "highly trusted man," who does that refer to?

A.  There he is referring to the highly trusted man that Juan Orlando had, sir.

Q.  Does that refer, based on your understanding, to the military official you mentioned a few moments ago?

A.  Correct, sir.

Q.   And directing your attention to "he'll cut me off," what do you understand that to mean?

A.   That that member of the military that Juan Orlando Hernandez had and who was a trusted person of his, as a representative of the airstrip and the person in charge of it — interpreter correction — as a representative of the airstrip and the person in charge of landing planes there, that he was a very protective person, and he would not give any other drug traffickers the opportunity to use that airstrip.

Q.   OK.

MR. COLON:   Your Honor, once again I renew my motion to strike that.  That military person was not — I believe not a member of this conspiracy.  I'm going to renew my motion with respect to that statement and ask it be stricken.

THE COURT:   It's denied without prejudice.

MR. GUTWILLIG:   Ms. Collins, could you please put back up Government Exhibit 409T and go to the next page, please.

Q.   Directing your attention back to lines 9 and 11 where Arnaldo Urbina says, "There won't be any problems," is it your understanding there that Arnaldo Urbina is referring to his own drug trafficking?

A.   Yes, sir.

Q.   Generally, how did Arnaldo Urbina engage in drug trafficking?

And, Ms. Collins, you can take that down.  Thank you.

A.  Arnaldo Urbina would receive planes loaded with cocaine that were coming from Colombia.  He would receive them on an airstrip, clandestine airstrip, that Arnaldo had.

May I continue?

Q.  Before you began —— I'm sorry.

THE INTERPRETER:  Interpreter correction, "in the department of Yoro."

Q.  Before you began cooperating with the DEA, did you engage in drug trafficking with Arnaldo Urbina?

A.  Yes, sir.

Q.  Did Arnaldo Urbina have brothers?

A.  Yes, sir.

Q.  What were the names?

A.  One of their names was Fernando Urbina.  The other's name was Michael Urbina.  And the other's name I don't remember, sir.

Q.  Did you also traffic drugs with Fernando Urbina?

A.  Yes, sir.

Q.  Did there come a time after this meeting you recorded with Arnaldo Urbina in March of 2014 when you met with Fernando Urbina?

A.  Yes, sir.

Q.  Where was that meeting?

A.  That was in Yoro, on the outskirts of Yoro at a *finca* that Fernando Urbina had, sir.

Q.  Approximately how long was that after your recorded meeting with Arnaldo Urbina?

A.  Like months later, sir.

Q.  At that meeting, did you discuss politics with Fernando Urbina?

A.  Yes, sir.

Q.  Generally, what did you discuss about politics?

A.  What Fernando said was that his brother Arnaldo Urbina was a little bit concerned and angry because Juan Orlando Hernandez had ordered him to no longer participate in politics as the mayor of Yoro, sir.

Q.  Did he say why the defendant ordered Arnaldo Urbina not to participate in politics anymore?

A.  Yes, sir.

Q.  What did Fernando say about that?

A.  That what was concerning Juan Orlando was that if Arnaldo Urbina continued as the mayor of Yoro, it would affect Juan Orlando in the next —— in the upcoming elections that he had to be president.  He said for him not to do it because Arnaldo Urbina was very hot in that area.  It was public knowledge that Arnaldo Urbina was a drug trafficker because it was in the media, on the Internet, and all over the news in Honduras.

Q.  Do you know whether at some point after that there was a law enforcement action taken against Arnaldo Urbina?

A.  Yes, sir.

Q.   What happened?

A.   Some of his properties in the department of Yoro were seized, sir.

Q.   Did Arnaldo Urbina remain in politics prior to his properties being seized?

A.   Yes, sir.

Q.   Did there come a time where Arnaldo Urbina was arrested?

A.   Yes, sir.

Q.   Approximately when was that?

A.   In 2014, sir.

Q.   Was that after this conversation you had with Fernando?

A.   Yes, sir.

Q.   You testified earlier about someone named Fabio Lobo.

A.   Yes, sir.

Q.   While you were cooperating with the DEA, did you continue communicating with Fabio Lobo?

A.   Yes, sir.

Q.   Did you, along with the DEA, attempt to get Fabio Lobo to engage in a drug transaction with you?

A.   Yes, sir.

Q.   At that time —— well, when approximately was this?

A.   That was approximately 2014, sir.

Q.   And at that time was Fabio Lobo still involved in drug trafficking?

A.   Yes, sir.

MR. COLON:  I'm sorry, your Honor, can we have a more specific time frame?  I know that the witness testified 2014, but something along —— a month or season or period?

Q.  Approximately when in 2014 was this?

A.  I don't remember, sir.

Q.  In approximately 2014, did Fabio Lobo agree with you to engage in a drug transaction?

A.  Yes, sir.

Q.  Prior to this, you had trafficked drugs with Fabio Lobo, correct?

A.  Yes, sir.

Q.  As part of this event, when you were cooperating with the DEA, did you ask Fabio Lobo to travel anywhere?

A.  Yes, sir.

Q.  Where did you ask him to travel?

A.  To Haiti, sir.

Q.  Do you know whether he traveled to Haiti?

A.  Yes, sir.

Q.  Approximately when was that?

A.  That was approximately in 2015, sir.

Q.  Did you ask Fabio Lobo to go to Haiti as part of your cooperation with the DEA?

A.  Yes, sir.

Q.  Was Fabio Lobo arrested in Haiti?

A.  Yes, sir.

O2SHHer1                        Rivera Maradiaga - Direct

Q.   Approximately when was that?

A.   That was approximately in 2015, sir.

          MR. GUTWILLIG:  Ms. Collins, could you please publish
what's in evidence as Government Exhibit 113.

Q.   Who is that?

A.   A drug trafficker, sir.

Q.   What is that person's name?

A.   Geovanny Fuentes, sir.

          MR. GUTWILLIG:  Thank you, Ms. Collins.

Q.   When approximately did you meet Geovanny Fuentes?

A.   Approximately around 2009, 2010, sir.

Q.   Did you traffic cocaine with Geovanny Fuentes?

A.   Yes, sir.

Q.   Between approximately what years did you traffic cocaine
with Geovanny Fuentes?

A.   Approximately in 2012, sir.

Q.   I'm sorry, for approximately what range of years did you
traffic drugs with Geovanny Fuentes?

A.   Approximately from 2009 to 2013, sir.

Q.   Generally speaking, what kind of drug trafficking work did
you do with Geovanny Fuentes?

A.   Geovanny Fuentes had control of a clandestine airstrip in
the department of Colón where airplanes loaded with cocaine
coming from Colombia were landed.  He was also protecting the
cocaine as it was transported from one location to another, for

instance, from the department of Colón to Espiritu, Copán, or from the department of Cortés to Espiritu, Copán.  And he would protect ⸺ he would provide protection for the shipment of cocaine to prevent them from being stolen, sir.

Q.  Did he provide protection with weapons?

A.  Yes, sir.

Q.  What kind of weapons?

A.  The weapons that I saw Geovanny Fuentes use were AR-15s, AK-47s, grenade launchers, and short handguns with laser sights, sir.

Q.  Did Geovanny Fuentes have a drug trafficking partner?

A.  Yes, sir.

Q.  Who?

A.  Melvin Sandres, also known as Metro.

Q.  Did you have a familial relationship with Melvin Sandres?

A.  Yes, sir.

Q.  What was that?

A.  He was my cousin, sir.

Q.  Did Sandres introduce you to Geovanny Fuentes?

A.  Yes, sir.

Q.  Directing your attention to approximately 2009 or 2010, did there come a time when Geovanny Fuentes approached you to engage in drug trafficking?

A.  Yes, sir.

Q.  Who was there?

A.   I was there, Metro was there, Geovanny Fuentes' security was there, and also my security, sir.

Q.   When you say "security," what do you mean by that?

A.   Armed bodyguards that accompanied us both.

Q.   At that meeting, did Geovanny Fuentes make any proposals to you?

A.   Yes, sir.

Q.   What, if anything, did Geovanny Fuentes say about a cocaine lab?

A.   Geovanny Fuentes said that he had a drug lab to process cocaine, but that Geovanny Fuentes wanted me to invest some money so that the base, that being a chemical that is used in cocaine production, to be brought in from Colombia, sir.

Q.   When you say "process," what do you mean by that?

A.   Where the kilos of cocaine were manufactured, sir.

Q.   Did Geovanny Fuentes say where that cocaine laboratory was located?

A.   Yes, sir.

Q.   Where did he say?

A.   On a mountain, sir.

Q.   Any particular location?

A.   In the department of Cortés.  The name of the mountain was Cerro Negro, sir.

Q.   Did Geovanny Fuentes say anything about the land on which that cocaine laboratory was located?

A.   Yes, sir.

Q.   What did he say?

A.   That that land belonged to a businessman, a rice farmer from the area, sir.

Q.   Did he say the businessman's name?

A.   Yes, sir.

Q.   What was the name?

A.   Mr. Fuad, sir.

Q.   Did Geovanny Fuentes say whether the cocaine lab was guarded?

A.   Yes, sir.

Q.   What did he say about that?

A.   Geovanny said —— he said to me:  Look, buddy, so that you don't change your mind about investing, I have security there. I have MS-13 members there.  I have police officers there.  I have members of the military and others there, sir.

Q.   You mentioned MS-13.  What is MS-13?

A.   MS-13 is a gang that is based there in Honduras, sir.

Q.   Did Geovanny Fuentes say whether the individuals guarding the lab were armed?

A.   Yes, sir.

Q.   With what?

A.   They had AR-15s, grenade launchers, AK-47s, and short guns, sir.

Q.   Did he say approximately how many people were guarding the

cocaine lab?

A.   Yes, sir.

Q.   Approximately how many did he say?

A.   That he had approximately between 20 and 30 people there, sir.

Q.   At first did you agree to invest in the cocaine lab?

A.   No, sir.

Q.   Thereafter, did Geovanny Fuentes re-approach you about working together?

A.   Yes, sir.

Q.   Approximately how much later was that?

A.   That was approximately in 2012, sir.

Q.   At that time, did you meet with Geovanny Fuentes and Melvin Sandres?

A.   Yes, sir.

Q.   At that meeting, did Geovanny Fuentes mention a boat mechanic?

A.   Yes, sir.

Q.   Did you know who the boat mechanic was?

A.   Yes, sir.

Q.   Did the boat mechanic owe you money?

A.   Yes, sir.

Q.   Approximately how much?

A.   Between 20 and $30,000, sir.

Q.   Prior to that meeting, had you told Geovanny Fuentes to do

O2SHHer1                          Rivera Maradiaga - Direct

anything about the boat mechanic?

A.  No, sir.

Q.  At that meeting, did Geovanny Fuentes show you a picture of the boat mechanic?

A.  Yes, sir.

Q.  What did Geovanny Fuentes show you?

A.  He showed me a photo on the cell phone of the boat mechanic where he was dead, bloody, and on the side of the road, sir.

Q.  Did Geovanny Fuentes say who had killed the boat mechanic?

A.  Yes, sir.

Q.  Who did he say had killed him?

A.  That he had been killed by Geovanny Fuentes, Metro, and some police officers, sir.

Q.  After that, did you begin working in drug trafficking with Geovanny Fuentes?

A.  Yes, sir.

Q.  Why did you decide to work with him then?

A.  Well, I decided to bring him into the Cachiros, sir, because, given the person that had been murdered, I knew that if our cartel ran into some sort of issue where there was an attempt to try to steal our cocaine or some money, some of our drug trafficking money, I knew that Geovanny Fuentes and his people would be ready to respond to any situation that might come up, sir.

Q.  In your drug trafficking with Geovanny Fuentes,

approximately how many loads of cocaine did you work on together?

A.   Approximately three loads, sir.

Q.   And approximately how much cocaine was involved in those three loads?

A.   Approximately some 1,500 kilos, sir.

Q.   Were those shipments protected?

A.   Yes, sir.

Q.   Who provided the protection?

A.   Geovanny Fuentes, sir.

Q.   What kind of protection did Geovanny Fuentes provide?

A.   He assigned armed people to go ahead of the truck that was carrying the drugs and also behind the truck when it was —— when the truck was traveling from the department of Colón to Espiritu, Copán, sir.

Q.   Did you personally see some of the weapons these shipments were armed with —— or protected with?

A.   Yes, sir.

Q.   What weapons?

A.   They had AR-15s, grenade launchers, AK-47s, and short guns, sir.

Q.   You mentioned approximately three shipments.  Approximately when did these three cocaine loads you worked on with Geovanny Fuentes take place?

A.   That was approximately between 2012 and '13, sir.

Q.   You mentioned that Geovanny Fuentes controlled an airstrip.
Did you also traffic drugs with Geovanny Fuentes by plane?

A.   Yes, sir.

Q.   Directing your attention to approximately 2012, did you
work on a cocaine shipment with Geovanny Fuentes then that
arrived by plane?

A.   Yes, sir.

Q.   Approximately how much cocaine?

A.   Approximately between 400 and 500 kilos, sir.

Q.   Where did that cocaine come from?

A.   That cocaine was coming from Punto Fijo, Venezuela, sir.

Q.   Do you know who sent that load of cocaine?

A.   Yes, sir.

Q.   Who?

A.   Jack, a Guatamalan drug trafficker, sir.

Q.   Did you work in drug trafficking with Jack?

A.   Yes, sir.

Q.   And on other occasions did Jack also send cocaine by plane?

A.   Yes, sir.

Q.   What was the Cachiros' role in this drug shipment?

A.   We received the plane that was coming with cocaine from
Punto Fijo, Venezuela.  The Cachiro cartel received the plane
on a clandestine airstrip that was in the department of Colón.

       I apologize.  It was in the department of Cortés.

Q.   Did that airplane have a registration number?

A.   Yes, sir.

Q.   What was it?

A.   It had a November registration, sir.

Q.   All right.  Can you explain what you mean by "November registration."

A.   When it has the initials NV, that means November, and that is a United States registration, sir.

Q.   When you say "United States registration," are you referring to where the airplane is located —— I'm sorry, please withdraw that.

         When you say "United States registration," are you referring to where that location is?

A.   Yes, sir.

Q.   And where are airplanes with N or November registrations registered?

A.   In the United States, sir.

Q.   What happened with that cocaine shipment when it landed in Honduras?

A.   As it was landing, a Honduran plane got up close to it and shot at it, but it managed to land on the clandestine airstrip.

Q.   And after the drugs arrived, what happened to them?

A.   The drugs were taken out of the plane, and they were transported by Geovanny Fuentes to Espiritu, Copán, sir.

Q.   Who did Geovanny Fuentes deliver the drugs to?

A.   It was delivered to the Valle cartel, sir.

Q.   And did you speak with the Valles to confirm that they had received that shipment?

A.   Yes, sir.

Q.   Before we move on, are you familiar with the term "Nava"?

A.   Yes, sir.

Q.   What does that refer to?

A.   It refers to a plane that is called a Navajo, sir.

Q.   What type of plane is a Navajo?

A.   It's a piston-engine plane, sir.

Q.   Have you used a Navajo plane or Navajo-type plane to send or receive drugs before?

A.   Yes, sir.

          MR. GUTWILLIG:  Ms. Collins, could you please publish what's in evidence as Government Exhibit 902.

Q.   Who is the individual in that picture?

A.   Geovanny Fuentes, sir.

Q.   Did Geovanny Fuentes have contacts within the Honduran police?

A.   Yes, sir.

Q.   What, if anything, did Geovanny Fuentes say to you about that?

A.   What Geovanny told me was that he had members of the National Police, members of the military police, among others, sir.

Q.   Did Geovanny Fuentes mention an individual named

Comisionado Martinez?

A.   Yes, sir.

Q.   Approximately when was that?

A.   That was in approximately 2012, sir.

Q.   Is comisionado a position within the Honduran National Police?

A.   Yes, sir.

Q.   What, if anything, did Geovanny Fuentes say about Comisionado Martinez?

A.   That comisionado was the person whom Geovanny Fuentes had for any sort of problem if —— for any sort of problem that arose.  If they stopped a truck that was loaded with cocaine, the police stopped them, or any sort of situation, Geovanny would just call Comisionado Martinez, and he would resolve it.

          (Continued on next page)

BY MR. GUTWILLIG:   (Continuing)

Q.  Did you Geovany Fuentes also have political contacts?

A.  Yes, sir.

Q.  Did he ever mention to you the mayor of Choloma?

A.  Yes, sir.

Q.  What name did he tell you?

A.  Polo Crivelli, sir.

Q.  Taking a step back to the cocaine shipment from Jack we talked about a few minutes ago, during that shipment, transporting the cocaine, did one of your workers have a problem with law enforcement?

A.  Yes, sir.

Q.  What happened?

A.  Oh.  When one of my workers was surveilling the road where the truck loaded with cocaine was going to pass by, he was stopped by the police, sir.

Q.  Was that worker armed when he was stopped by the police?

A.  Yes, sir.

Q.  What did you do when you learned that your worker had been arrested?

A.  I called Geovany Fuentes immediately, sir.

Q.  And what, if anything, did Geovany Fuentes say?

A.  What Geovany Fuentes said to me was, Oh look, buddy.  Just wait.  I'm going to call Polo Crivelli, the mayor of Choloma, for him to talk to the police officer that arrested him, so

that he will let him go.

Q. Did the call end after that?

A. No, sir.

Q. What else did you Geovany Fuentes say?

A. After that, Geovany Fuentes called back and said that he had spoken with Polo Crivelli but that the police officer who had stopped my worker wasn't answering the phone, sir.

Q. And to be clear, you are talking about two separate phone calls there; correct?

A. Yes, sir.

Q. What did Geovany Fuentes ultimately tell you happened with your worker?

A. In the end, Geovany Fuentes told me that he had called Comisionado Martinez and Comisionado Martinez had called the police officer who had arrested my worker and that he had let him go, sir.

Q. You testified earlier that during your first meeting with Geovany Fuentes he mentioned his cocaine lab; is that correct?

A. Correct, sir.

Q. Did he later re-approach you about that cocaine lab?

A. Yes, sir.

Q. Approximately when was that?

A. That happened in approximately 2013, sir.

Q. How did that meeting come about?

A. We met in San Pedro Sula, sir.

Q.   Who was there?

A.   Metro was there, I was there, Geovany Fuentes, Geovany Fuentes' security, and my security were there.

Q.   What, if anything, did Geovany Fuentes say about his cocaine lab?

A.   That the police had shown up and that they had seized his drug lab, sir.

Q.   Prior to his lab being seized, did Geovany Fuentes say anything about whether he learned about the raid ahead of time?

A.   Yes, sir.

Q.   What did he say about that?

A.   What Geovany Fuentes said was that the police had warned him that they were going to show up at the drug lab but Geovany Fuentes had already taken all of the cocaine out of the drug lab so the police -- all that the police found were just the tools that they used to work there, the molds where they made the cocaine, because all of the cocaine, Geovany Fuentes had removed it.

Q.   Did you learn that Geovany Fuentes' cocaine lab had in fact been raided?

A.   Yes, sir.

Q.   After this conversation with Geovany Fuentes, when he told you about the drug lab raid, did there come a time when you again spoke with Geovany Fuentes after the raid?

A.   Yes, sir.

Q.   Approximately how long after the raid was that?

A.   That was months later, sir.

Q.   Where did you meet?

A.   In San Pedro Sula, sir, across from Sencol, a piece of land that I had in San Pedro Sula.

Q.   Who was there?

A.   Oh, Metro was there, I was there, Geovany Fuentes, the detail that Geovany Fuentes had, and my security were there, sir.

Q.   Did Geovany Fuentes say anything about a police officer who had been involved in the raid on his drug laboratory?

A.   Yes, sir.

Q.   What did he say about the police officer?

A.   What Geovany Fuentes said was that Geovany, Metro, and both of their security had caught that police officer.  They caught the police officer at a disco that Metro had and they had taken him to the area of Tikal maya and killed him.  They had gotten the truth out of him and killed him there.

Q.   When you say "gotten the truth out of him", what did Geovany Fuentes mean by that?

A.   Geovany Fuentes meant that that police officer was the police officer who was in charge of the investigation of the drug lab at the time that they seized it and that that police officer had told Geovany Fuentes that he had not mentioned Geovany Fuentes' name, nor had he mentioned Fuad Jarufe, sir.

Q.  What, if anything, did Geovany Fuentes say his reaction was to not being identified as part of the investigation?

A.  What Geovany Fuentes said was:  Wow.  Look, buddy.  I'm happy that they did not mention the name of the businessman that we have as a partner in drug trafficking.  They didn't mention Fuad Jarufe.  I'm happy about that.

Q.  In order to get that information, did Geovany Fuentes tell you that he had tortured the cop?

A.  Yes, sir.

Q.  Did Geovany Fuentes tell you how he killed the cop?

A.  Yes, sir.

Q.  What did he say?

A.  Geovany Fuentes said that they had tortured the cop, that they had stuck pins in his fingers, that they had beat him up, that they had tortured him until he finally told the truth, sir.

Q.  Did Geovany Fuentes say how he and his partners had killed the cop?

A.  Yes, sir.

Q.  What did he say?

A.  That at the end they had shot him in the head, sir.

Q.  Did Geovany Fuentes work with drug trafficking organizations outside Honduras?

A.  Yes, sir.

Q.  Which one or ones?

A.   With the Sinaloa Cartel, sir.

Q.   How do you know that?

A.   Because other drug traffickers said it, sir.

Q.   Are you familiar with an individual named Javier Choloma?

A.   Yes, sir.

Q.   Who is Javier Choloma?

A.   Javier Choloma was a Honduran politician, sir.

Q.   And what, if anything, did Javier Choloma tell you about Geovany Fuentes' drug trafficking?

A.   What Javier Choloma said was that Geovany Fuentes and Metro had a partner who is cousins with El Chapo Guzman from the Sinaloa Cartel, sir, and he said that he was buying all the drugs that Geovany Fuentes and Metro were receiving, sir.

Q.   When you said "he was buying," who are you referring to there?

A.   It's referring to the buyer whose name was Juan Guzman, sir.

Q.   Did Juan Guzman go by any nicknames?

A.   Yes, sir.

Q.   What nickname?

A.   Juanito, sir.

Q.   Was Juanito Guzman a member of any drug trafficking organization?

A.   Yes, sir.

Q.   What organization?

A.   The Sinaloa Cartel, sir.

Q.   Directing your attention to approximately 2013, did you have a conversation with Geovany Fuentes about a transaction where cocaine would be shipped by boat?

A.   Yes, sir.

Q.   How did that come about?

A.   Well, Geovany Fuentes, Metro, and Javier Choloma came to meet with me in San Pedro Sula at the same location where we had met.

Q.   What, if anything, did they ask you for at that meeting?

A.   What Geovany Fuentes, Metro, and the others I mentioned wanted was for me to give them a loan of approximately a million and a half to two million dollars for them to invest on that load that was coming from Colombia, sir.

Q.   Approximately how much cocaine was in the load coming from Colombia?

A.   They were talking about approximately 2,000 kilos, sir.

Q.   Where was that load supposed to arrive in Honduras?

A.   In the department of Cortes at the port, sir.

Q.   What particular location?

A.   Cortes.  Cortes, sir, at the port where ships come in.

Q.   At Puerto Cortes; correct?

A.   Correct, sir.

Q.   Did you ultimately invest in that load?

A.   No, sir.

Q.   You worked in drug trafficking with Geovany Fuentes.  Do you know any of Geovany Fuentes' family members?

A.   Yes, sir.

Q.   Did Geovany Fuentes have sons?

A.   Yes, sir.

Q.   What were their names?

A.   Christian and Geo, if I remember, sir.

Q.   Approximately when did you stop trafficking drugs with Geovany Fuentes?

A.   Approximately in 2013, sir.

Q.   Did you have a falling out with Geovany Fuentes?

A.   Yes, sir.

Q.   Did you murder his partner, Melvin Sandres?

A.   Yes, sir.

Q.   Did you attempt to murder Geovany Fuentes?

A.   Yes, sir.

Q.   Was this before you started cooperating with the DEA?

A.   Yes, sir.

Q.   Directing your attention to approximately February or March of 2020, did you learn at that time that Geovany Fuentes was in the United States?

A.   Yes, sir.

Q.   What did you do with that information?

A.   I gave it to the DEA agents, sir.

Q.   Do you know whether Geovany Fuentes was then arrested in

the United States?

A.   Yes, sir.

Q.   Was he arrested?

A.   Yes, sir.

Q.   Was he arrested in the United States?

A.   Yes, sir.

Q.   Approximately how long was that after you provided the information to the DEA?

A.   Days later, sir.

Q.   In addition to the Cachiros in the Sinaloa Cartel, do you know whether Geovany Fuentes worked with any other criminal organizations?

A.   Yes, sir.

Q.   Any in particular?

A.   Yes, sir.

Q.   Which one or ones?

A.   The MS-13 gang, sir.

Q.   You mentioned MS-13 earlier.  Does MS-13 operate in Honduras?

A.   Yes, sir.

Q.   Did you work with MS-13?

A.   Yes, sir.

Q.   What type of criminal activity does MS-13 do in Honduras?

A.   They are a gang who work in killing people, in robbing homes and businesses, and drug trafficking, sir.

Q.   Did the Cachiros work with MS-13?

A.   Yes, sir.

Q.   Approximately when did the Cachiros start working with MS-13?

A.   Approximately in 2004, sir.

Q.   And until approximately when did the Cachiros work with MS-13?

A.   Approximately until 2013, sir.

Q.   Did MS-13 help you and the Cachiros in drug trafficking?

A.   Yes, sir.

Q.   What sorts of things did they do for you in drug trafficking?

A.   They were receiving the planes that were landing loaded with cocaine on clandestine air strips, and they were providing security for those loads when they were being transported from location to location, sir.

Q.   When you say provide security, what do you mean by that?

A.   When the trucks that were carrying the cocaine, the drugs, from one location to another, MS-13 members that were armed would drive ahead of the truck and also behind the truck on strategic locations, sir, to prevent the drugs from being stolen.

Q.   Did you see some of these trucks?

          INTERPRETER:  For the interpreter, may the question please be repeated?

Q.   Did you see some of these trucks?

A.   Yes, sir.

Q.   And what were the MS-13 members transporting drugs armed with?

A.   Those people were always carrying AK-47s, sir.

Q.   Do you know someone named Vaquero?

A.   Yes, sir.

Q.   Who was Vaquero?

A.   He was a Mara Salvatrucha member, an MS-13 member, sir.

Q.   Did Vaquero ever talk to you about Geovany Fuentes?

A.   Yes, sir.

Q.   What did Vaquero say about Geovany Fuentes?

A.   That Geovany Fuentes and the head of the MS-13 were great friends and that this boss of the MS-13 had people escorting Geovany Fuentes' drug lab, that he had armed MS-13 members providing security for it, and that they were in fact providing security for Geovany Fuentes' drug lab, and also his house.

Q.   Approximately when was this conversation?

A.   That was approximately in 2013, sir.

Q.   You mentioned a leader of MS-13.  Who were you referring to?

A.   I was referring to Porky, sir.

Q.   Who is Porky?

A.   Porky was, is the leader of the MS-13 in Honduras, sir.

Q.   Have you ever met Porky in person?

A.  Yes, sir.

Q.  Approximately when was that?

A.  That was approximately in 2004, sir.

Q.  At that time did you ask Porky to do anything for you?

A.  Yes, sir.

Q.  What did you ask him to do?

A.  To murder Coqui Ramos, a drug trafficker, who had killed my brother, sir.

Q.  Did Porky, in fact, murder Coqui Ramos?

A.  No, sir.

Q.  Why not?

A.  Because Coqui Ramos did not show up at the location where Porky was surveilling him, he did not show up at the finca, and that is why he did not murder him, sir.

Q.  After 2004, did you ask MS-13 to help you with other murders?

A.  Yes, sir.

Q.  Did members of MS-13 help you with murders?

A.  Yes, sir.

Q.  Who, if anyone, was your primary contact in MS-13?

A.  Chele Volqueta, sir.

Q.  Where did Chele Volqueta fit in in the hierarchy of MS-13 in Honduras?

A.  He was the no. 3, sir.

Q.  The no. 3 in Honduras; correct?

A.   Yes, sir.

Q.   Did MS-13 help you in a particular location in Honduras?

A.   Yes, sir.

Q.   Where was that?

A.   Tegucigalpa, San Pedro Sula, and Colon, sir.

Q.   I would like to change topics.  Mr. Rivera, you are currently in custody at the Putnam County Correctional Facility; correct?

A.   Yes, sir.

Q.   Were you previously in another prison in the United States?

A.   Yes, sir.

Q.   Which one?

A.   I was at MCC Manhattan, sir.

Q.   Are you referring to the Metropolitan Correctional Center?

A.   Yes, sir.

Q.   While you were at the MCC, did there come a time when you saw Geovany Fuentes?

A.   Yes, sir.

Q.   Approximately when was that?

A.   That was in the year of the pandemic, sir; 2020.

Q.   Approximately how many times did you see Geovany Fuentes in the MCC?

A.   It was some two times, sir.

Q.   Do you have an understanding of whether that was supposed to happen?

A.   Yes.   That was not supposed to happen, sir.

Q.   And you have since been moved to a different jail; correct?

A.   Correct, sir.

Q.   Did you expect to see Geovany Fuentes at the MCC?

A.   No.   Never, sir.

Q.   Where in the MCC did you see him?

A.   In the unit where I was, sir.

Q.   And where, specifically, did you see him?

A.   Coming out of the bath where I was.   I was in the baths and I came out and he was in the cell beside, next to it, sir.

Q.   Did Fuentes approach you to begin talking?

A.   Yes, sir.

Q.   When you saw him in the MCC, did Geovany Fuentes describe any meetings he had had in Honduras with the defendant before Geovany Fuentes' arrest in the United States?

A.   Yes, sir.

Q.   Approximately how many meetings did Geovany Fuentes say he had with the defendant?

A.   Two meetings, sir.

Q.   Focusing on the first, what, if anything, did Geovany Fuentes say about the first meeting he had with the defendant when he was still in Honduras?

A.   What Geovany Fuentes said was that he had met -- interpreter correction -- what Geovany Fuentes said was that Geovany Fuentes, Fuad Jarufe, and Juan Orlando, had met at a

house in Choloma that Fuad had, sir.

Q.  At that meeting, what, if anything, did Geovany Fuentes say he had given to the defendant?

A.  What Geovany Fuentes said was that he had bribed Juan Orlando Hernandez with 450,000 lempiras, sir.

Q.  What, if anything, did Geovany Fuentes say about this second meeting he had with the defendant when he was still in Honduras?

A.  What Geovany Fuentes said was that Fuad Jarufe and Geovany Fuentes had traveled to the capital of Honduras to Tegucigalpa and over there they had bribed Juan Orlando again, sir.

Q.  Did Geovany Fuentes say whether he expected anything from the defendant in exchange for these bribes?

A.  Yes, sir.

Q.  What did he say he expected in exchange for these bribes?

A.  That Juan Orlando had said that he was going to protect him so that he would not be extradited to the United States, he was going to protect him so that he would not be arrested in Honduras, and that he was going to protect him when he was working -- as he continued to work in what he did, which was drug trafficking, sir.

Q.  And Geovany Fuentes was arrested in the United States; correct?

A.  Yes, sir.

MR. GUTWILLIG:  May I have one moment, please, your

Honor?

THE COURT:  Yes.

(Counsel conferring)

Q.  At the beginning of your testimony you said that you surrendered in the United States; correct?

A.  Yes, sir.

Q.  What were you charged with when you surrendered?

A.  With a conspiracy involving five kilograms or more of cocaine, sir.

Q.  What was your mandatory minimum sentence at that time, based on that charge?

A.  It was a minimum of 10 years, sir.

Q.  At the time you surrendered, were you charged with any murders in the United States?

A.  No, sir.

Q.  At the beginning of your testimony you said you pled guilty to more crimes than the drug importation.  What crimes were those?

A.  Possession of military-grade weapons, murder, being the leader of a drug trafficking gang, money laundering, and a conspiracy involving five kilograms or more of cocaine, sir.

Q.  What mandatory minimum sentence do you face now?

A.  It's life plus 30 years, sir.

Q.  How many murders did you accept responsibility for as part of your plea agreement?

A.   78 people, sir.

Q.   What are some of the things that you are required to do as part of your cooperation agreement?

A.   To tell the truth, sir, and to testify each time that the prosecutor's office asked me to, sir.

Q.   If you do that, if you tell the truth, what is your understanding of what the government will do for you?

A.   My understanding is that they would write a 5K1 letter for me, sir.

Q.   What is your understanding of what that letter would contain?

A.   The good and bad that I have done, sir.

Q.   Has anyone guaranteed that you will receive that letter from the government?

A.   No, sir.

Q.   If you do receive that letter, what is your understanding of how it would impact your mandatory minimum sentence?

A.   Reduction of my sentence, sir, and the judge can give me a sentence below the mandatory minimum, sir.

Q.   If you do receive that letter, is the judge required to sentence you below your mandatory minimum?

          MR. COLON:  Objection.

          THE COURT:  Basis?

          MR. COLON:  As to what the judge is supposed to --

          THE COURT:  Pardon me?

MR. COLON:  As to what you are supposed to do, your Honor, or required to do.

THE COURT:  Overruled.

A.  No, sir.

Q.  Has anyone made any promises to you about what sentence you will receive?

A.  No, sir.

Q.  Who is going to decide your sentence?

A.  His Honor, sir.

Q.  The letter you mentioned a minute ago, the 5K letter, does the outcome of this trial matter to whether you will receive that letter?

A.  No, sir.

Q.  What matters?

A.  What matters is that I tell the truth and that I testify every time the prosecutor's office asks me to, sir.

Q.  And when you testify, what is the most important thing you have to do?

A.  The most important thing, sir, is to tell the truth.

MR. GUTWILLIG:  May I have a moment, please, your Honor?

THE COURT:  Yes.

(Counsel conferring)

MR. GUTWILLIG:  No further questions.

THE COURT:  Ladies and gentlemen, we will break for

O2S5her2                     Rivera Maradiaga - Direct

lunch.

Please be seated, everyone in the courtroom.

As always, please do not discuss the case among yourselves or with anyone.  We will be back in action for a 2:00 start.  Thank you.

Please stand for the jury exiting.

(Continued on next page)

(Jury not present)

THE COURT:  Ladies and gentlemen, the spectators may leave today.  That's not the general rule but the jurors are eating in today, so therefore the spectators may leave at this point, you do not have to wait for the jurors to leave the court house.

(Continued on next page)

AFTERNOON SESSION

2:00 p.m.

(In open court; jury not present)

THE COURT:  Please be seated.

Any objection from the government from proceeding?

MR. GUTWILLIG:  No, your Honor.  We can get the witness on the stand.

THE COURT:  All right.  But I wanted to —— I had some matters I wanted to raise.

First of all, with regard to —— just one moment.  I'm bringing the witness in.

There was an objection with regard to a statement made by an individual associated with the military regarding the landing of planes or aircraft with money or cocaine —— or/and cocaine, I should say.

Is that right, Mr. Colon?

MR. COLON:  That's correct, your Honor.

THE COURT:  Yes.  Well, I'll hear from the government, but my preliminary reaction is that it is a reasonable inference that would support the Court's finding that the military individual, whose name is not identified, was a member of the conspiracy because he is reporting to a known drug trafficker the fact that planes with money and cocaine are arriving on a certain strip.

MR. COLON:  Well, that's what the witness is trying to

assert. We just don't know who that individual is and if he really is a member of the conspiracy. He may have contacted this individual and spoken to him because that was someone that was close to the president, but we don't know whether that individual is actually a coconspirator. He's just giving him information about —— about that.

By the way, that airstrip is run by the military. It's not owned by Mr. Hernandez.

But the point is, Judge, that there's nothing in there to indicate by that colloquy that this individual's a member of the —— a member of the conspiracy. That's what he would like everyone to believe, but there's no evidence of it because we don't even know who that is.

THE COURT: I'll give the government the opportunity to respond briefly.

MR. GUTWILLIG: Your Honor, as the Court acknowledged, the particular name or identity of the individual who made the statement is not relevant in this calculus. The testimony was that this person who made the statement was a trusted individual, and the testimony was that this was a trusted individual of the defendant who managed and controlled an airstrip where drugs and money were delivered. That is properly admitted as a coconspirator's statement, and the government would submit that it should not be stricken from the record.

O2SHHer3

THE COURT:  All right.  I conclude that it was during and in furtherance of the conspiracy.

I have another matter I want —— I'm going to stand by my ruling.  I have another matter I wanted to take up with counsel at the sidebar.

(Continued on next page)

(Pages 878 through 880 SEALED)

(At sidebar)

THE COURT:  Go ahead.

MR. COLON:  Judge, I need to refer to some of the direct testimony when Mr. Gutwillig starts asking questions about the witness' understanding.  Now, we don't have that in hand in terms of the transcript, so I would have to ask the court reporter to look for the word "understanding," and when Mr. Gutwillig asks what is your understanding of what was meant by — I think it's — by Mr. Urbina —

THE COURT:  One second now.

MR. COLON:  It had to do —

THE COURT:  I thought I had an application for LiveNote.

MR. STABILE:  We have LiveNote.

THE COURT:  So I have LiveNotes too, and I have a copy of the transcripts in this case on LiveNotes.

MR. COLON:  So I think —

THE COURT:  I have yesterday's transcript and the day before because I'm a subscriber to LiveNotes, as you are.

MR. STABILE:  Yes.

MR. COLON:  Mr. Stabile's going to look for that so I can — but I'm going to have to slide over to the defense table to read it out loud.

THE COURT:  That's not a problem.

MR. COLON:  I just want to make sure.

O2SHHer3

THE COURT:  That part is fine.  He's going to find it for you, and then you will need to be in front of his computer to ask the question.

MR. COLON:  That's right.

THE COURT:  Not a problem whatsoever.  Thank you.

MR. COLON:  Thank you so much, your Honor.

(Continued next page)

(In open court; jurors present)

THE COURT:  You may be seated, sir.

(Jury present)

THE COURT:  All right.  Please be seated.

We're just going to give Mr. Colon another minute to get things set up.

For planning purposes, tomorrow there will not be a lunch menu, but there will be an afternoon snack.  I thought the weather warranted the lunch.

JUROR:  Thank you.

MR. COLON:  One second, Judge, if I may.

THE COURT:  Sure.

DEVIS LEONEL RIVERA MARADIAGA, resumed.

CROSS-EXAMINATION

BY MR. COLON:

Q.  Good afternoon, Mr. Rivera Maradiaga.

A.  Good afternoon, counsel.

Q.  Can you hear me?

A.  Perfectly well, sir.

Q.  Thank you.  Keep your voice up.  I'm going to ask you questions, and I'm going to ask you on several of those questions to answer yes or no.  However, of course, Judge Castel will decide ——

THE COURT:  Mr. Colon, just ask your first question.  All right?

Q.  So you testified that you had executed a plea agreement at one time with this district, the Southern District of New York, correct?

A.  Correct, sir.

Q.  In that plea agreement, one of the conditions was that you tell the truth?

A.  Correct, sir.

Q.  At one point in your testimony on direct this morning, the issue of a meeting with Tony Hernandez came up at Denny's restaurant.  Do you recall that?

A.  Yes, sir.

Q.  And this morning you testified that the subject matters that were discussed at that meeting at the Denny's restaurant with Tony and, I believe, a gentleman by the name of Oscar Ramirez and a gentleman by the name of Avila was drug trafficking and contracts.  That's what you testified to this morning, correct?  Yes or no?

A.  Partially, sir.

Q.  All right.  You spoke about Tony being involved with you in drug trafficking, correct?

MR. GUTWILLIG:  Objection, your Honor.  Would ask counsel to clarify whether this was related to the meeting or generally.

Q.  Are you referring to the meeting?

THE COURT:  Repeat it as a full question.

MR. COLON:  I'm sorry, Judge?

THE COURT:  Repeat it as a full question so he doesn't have to take a piece of a comment and then a question and kind of put them together.

MR. COLON:  I understand.

Q.  You testified that one of the subject matters that you discussed with Tony was —— at this meeting was drug trafficking?

So you did not talk about ——

THE COURT:  Whoa.

MR. COLON:  I'm sorry, Judge.  I apologize.

A.  What was spoken about were documents relating to government contracts.  As far as drug trafficking, that was discussed in the meeting with Oscar Ramirez and Avila Meza at the hotel, sir.

Q.  So you did not have any sort of conversation with Tony about drug trafficking?

THE COURT:  At where or when?

Q.  At the meeting in Denny's that day.

THE COURT:  Thank you.

A.  No, sir.

Q.  That conversation of drug trafficking was only with Mr. Ramirez at that day in Denny's?

MR. GUTWILLIG:  Objection.  The witness testified that his conversation with Ramirez was prior to the meeting.

THE COURT:  Rephrase it.  Government is right.

Q.  So there was no conversation about drug trafficking at that meeting in Denny's?

MR. GUTWILLIG:  Objection.  Asked and answered.

THE COURT:  I'll allow it.

Go ahead.

A.  Repeat the question, please, sir.

Q.  There was no conversation, or conversations, about drug trafficking at that meeting at the Denny's restaurant that day?

A.  The only conversation with Tony Hernandez was about the contracts.  The conversation regarding drug trafficking had happened with Oscar Ramirez at the hotel, sir.

Q.  And Mr. Hernandez was not president — was not present during that conversation, correct?  Talking about Tony.

A.  Which Hernandez are you speaking about, sir, because I don't know if you're speaking about Tony or Juan Orlando.

Q.  I'm talking about Tony Hernandez.

A.  Repeat the question, please.

Q.  I'm sorry.  That conversation at the hotel with Mr. Ramirez was solely you and Mr. Ramirez there, correct?

You're saying Tony Hernandez —

THE COURT:  Whoa, whoa.

MR. COLON:  I'm sorry, Judge.  I'm jumping.

THE COURT:  The record should reflect Mr. Colon, because of his fluency, appears to be anticipating the

translation of the answer before the answer has been

interpreted or translated for the rest of the courtroom.

      MR. COLON:  I apologize.

      THE COURT:  That's all right.  Just work on that, if you will, please.

      MR. COLON:  I will.

A.  At the hotel, sir, Avila Meza and I were there as well as Oscar Ramirez, Tony Hernandez's personal lawyer.

Q.  You didn't testify to that this morning, did you?

      MR. GUTWILLIG:  Objection, your Honor.

      THE COURT:  Establish whether he was asked about that this morning.

Q.  Were you asked about who was at the hotel that we're talking about, the hotel where you talked about drug trafficking?  Were you asked that this morning by the government?

A.  What the government asked me and what I answered was who had been at the hotel.

Q.  Now your statement or your testimony is that Tony Hernandez was at the hotel that morning?

      MR. GUTWILLIG:  Objection, your Honor.  The witness has testified —

      THE COURT:  Overruled.  Overruled.  It's a question.

Q.  Was that your testimony that Tony Hernandez was at the hotel that morning with you?

MR. GUTWILLIG:  Objection, your Honor.  The witness has —

THE COURT:  I've already ruled on that question.

Q.  So it was Oscar Ramirez, yourself, Avila Meza, and Tony Hernandez, yes?

THE COURT:  What was, Mr. Colon?

MR. COLON:  In the hotel, in the hotel, Judge.

THE COURT:  A meeting at the hotel?

MR. COLON:  Yes, before Denny's.

THE COURT:  Do you understand the question, sir?

THE WITNESS:  Yes, yes, sir.

THE COURT:  You can answer.

A.  As I said before, at the hotel, the meeting in the hotel, before the meeting at the Denny's, the people who were there were myself, Avila Meza, and Oscar Ramirez, sir.

Q.  Thank you.

Now, when was that meeting at the hotel held?

Do you remember the —

A.  That was in 2014, sir.

Q.  Do you remember the month?

A.  It was early in the year, sir.

Q.  2014, correct?

A.  Correct, sir.

Q.  Do you remember whether it was January or February or March?

MR. GUTWILLIG:  Objection, your Honor.  The witness has already answered that he remembers it was early in the year.

THE COURT:  No, I'll allow that.  He's suggesting a month to find out where early in the year it is.  That's fine.

Go ahead.

A.  I don't remember the month, sir, but I do remember that it was early in 2014.

Q.  It was after you had already decided that you were going to cooperate with the drug enforcement agency —— or administration, correct?

A.  I was already a DEA informant, sir.

Q.  All right.  So did you have a recording device at the hotel?

A.  I had it at that point, sir.

Q.  And you did not record that conversation that you had with Mr. Ramirez and Mr. Avila Meza?

A.  I did not record it, sir.

Q.  Now, Tony Hernandez was not there, correct?

THE COURT:  Asked and answered.  Asked and answered.

Q.  And so ——

THE COURT:  So, Mr. Colon, please avoid repetitive questions.  Go ahead and ask your next question.

MR. COLON:  Thank you, your Honor.

Q.  So once you had that conversation, you headed over to

Denny's, correct?

A.   Correct, sir.

Q.   I just want to clarify.  So the first time you actually met with Tony Hernandez was in the Denny's restaurant, correct?

A.   Correct, sir.

Q.   Now, Mr. Ramirez, according to you, was Mr. Tony Hernandez's attorney, correct?

A.   That was what Ramirez told me, was that he was a personal friend of Tony Hernandez.

Q.   Was he an attorney?

A.   That was what he said, that he was a lawyer, sir.

Q.   And you chose not to record that conversation?

A.   I did not record it, sir.

Q.   And then you moved on to Denny's and you recorded that conversation and that exchange, correct?

A.   I recorded what was going on inside, sir.

Q.   And you'll agree with me that Mr. Hernandez had not raised the subject of drug trafficking at all during the conversations that you taped at Denny's?

THE COURT:  I think you've asked that question, Mr. Colon.

Mr. Gutwillig.

MR. GUTWILLIG:  Objection.  Asked and answered.

MR. COLON:  I believe, Judge, I didn't phrase it that way.

THE COURT:  No, you didn't, but you asked the question.  And I know the answer because I was here and I listened to it, and so does the jury.  Next question.

And we had this conversation after yesterday, so today I'm going to really insist that you not ask duplicative questions.

BY MR. COLON:

Q.  And when you spoke to Mr. Hernandez about the contracts, what was it that you requested of him?

A.  We conversed there, and Tony Hernandez said that he was going to expedite the payment of the money that the Honduran government owed to the INRIMAR company that we had for laundering money, sir.

MR. COLON:  Move to strike, your Honor.  I didn't ask what Tony Hernandez said.  I asked what he requested of Tony Hernandez, respectfully.

THE COURT:  I'll let it stand.  Go ahead.  Next question.

Q.  What did you say to Tony Hernandez that you wanted?

A.  What I said to Tony Hernandez was the same thing that Oscar Ramirez had been asked to pass along to him, was that Tony Hernandez was to expedite the payment of the contracts that the government had with INRIMAR, sir.

Q.  And after that conversation, you left Denny's?

A.  Correct, sir.

Q.   You testified that there was a $50,000 bribe that was paid that day?

A.   Yes, sir.

Q.   Did you video that payment?

A.   No, sir.

Q.   Your video —— your video watch, I believe it was, that you had?

A.   Yes, sir.

Q.   That video watch was working, correct?

A.   Perfectly well, sir.

Q.   It was working fine before the meeting?

THE COURT:  No, no, you've asked that.

Q.   Was it working fine before the meeting?

THE COURT:  You've established the watch was working. Next question.  It was working before, during, and after the meeting and wasn't used.

Is that your testimony, sir?

THE WITNESS:  Yes, your Honor.

THE COURT:  Next question.

Let me see you at the sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  Did you really ask, And after that, did you leave the restaurant?

MR. COLON:  Yes, I did.

THE COURT:  I think you know that he's left the restaurant.

MR. COLON:  I wanted to ask him about whether the watch worked before ——

THE COURT:  No, I'm talking about —— I'm going back a few questions ago, Mr. Colon.

MR. COLON:  Yeah.

THE COURT:  You have to tighten it up.  Asking whether after the meeting he left the restaurant, he's not still in the restaurant, so you know he left the restaurant.  If you want to ask him something else like did you go someplace after, do you remember where you went after the restaurant, that's different.  And the same way here.  Was the watch working?  Yes.  Was it working before the meeting?  Yes.  Was it working after?  No.  Can't do that.  So you're going to be over at the sidebar quite a bit unless you tighten it up and move it along.

MR. COLON:  Judge, if I may?

THE COURT:  You may.

MR. COLON:  I've posed yes-or-no questions to him, and he goes on to a narrative, and he does this continuously.

THE COURT:  Sir, that is not the problem with

repetitive questions.

MR. COLON:  I understand.

(Continued on next page)

(In open court; jurors present)

BY MR. COLON:

Q.  Mr. Diaz Maradiaga, when you left the restaurant, where did you go?

A.  I went to my finca, sir.

Q.  You testified earlier that $50,000 was provided to Mr. Hernandez that day?

A.  Correct, sir.

Q.  Do you have any sort of documentation that Mr. Hernandez was given that money or received that money?

A.  No, sir.

Q.  Who was it that provided that money to Mr. Hernandez?

A.  His personal friend Oscar Ramirez, sir.

Q.  Did Mr. Ramirez give you any evidence —— not evidence, strike —— withdrawn —— give you any information as to whether he had recorded the transaction?

A.  No, sir.

Q.  Did he say whether there was any video or audio at all?

THE COURT:  That's sustained.  It's encompassed in the question, did he give you any information as to whether he had recorded the transaction?  Ask the next question.

Q.  Now, what, if anything, did Mr. Hernandez do for you in terms of your contracts?

A.  I don't know, sir, because I did not see that man again.

Q.  That was the end of the transaction as far as you were

concerned?

A.   I never heard from Tony Hernandez again, sir.

Q.   When you say you never heard from him, do you mean ever again?

          MR. GUTWILLIG:  Objection.  Asked and answered.

          THE COURT:  Sustained.

Q.   Did you ever see Tony Hernandez again?

A.   No, sir.

Q.   Was your company INRIMAR?

A.   Yes, sir.

Q.   Did you hire an attorney to represent you in litigation against the government?

          MR. GUTWILLIG:  Objection.  Vague.  Which government?

          MR. COLON:  The government of Honduras.

          THE COURT:  Restate your question.

Q.   Did you ever hire an attorney to represent your company in litigation against the government of Honduras with respect to those contracts that were the subject of the meeting at the Denny's restaurant?

A.   No, sir.

Q.   Were you ever awarded the money for those contracts?

A.   No, sir.

Q.   Did you do anything to recover that money from Tony Hernandez?

A.   Not at all, sir.

Q.   I'm going to move to the subject of the assassination plot that you were made aware of with the Valles Valles.

A.   OK, sir.

Q.   When was that assassination plot made known to you?

A.   That was on three occasions, sir.

Q.   Can you tell the jury what those three occasions were.

     Are those three separate —— I'm sorry.

A.   That was with Milo, through Milo, who was the Valles' sicario, and Ekonomo Hernandez when he and I talked at the meeting, and the Valles, sir.

Q.   Those are three separate occasions?

A.   Yes, sir.

Q.   Do you know when those occasions occurred?

A.   That was in 2014, sir.

Q.   What month, if you know?

A.   I do not remember, sir.

Q.   Do you know what the details of the assassination plot were?

A.   What I know is what Arnulfo, Luis Valle, and Milo told me, sir.

Q.   Do you know why they wanted to assassinate Mr. Hernandez Alvarado, the president?

A.   Yes, sir.

Q.   Can you tell the jury.

A.   Because Luis Valle and Miguel Arnulfo Valle told me that

they wanted to murder Juan Orlando Hernandez because he was not picking their —— picking up their calls whenever they want call him, and also that after they had bribed him with so much drug trafficking money, they could not locate either Juan Orlando or Tony Hernandez.

Q.   That's because Mr. Hernandez, that's Juan Orlando Hernandez, did not do what they wanted him to do, is that correct?

A.   Please repeat the question, sir.  I did not understand it.

Q.   The reason —— was not the reason that they were mad at Mr. Juan Orlando Hernandez, the president-elect, was because he was not picking up the phone and he was not doing what they wanted him to do?

A.   As far as I understood, counselor, based on what Luis Valle and Arnulfo Valle explained to me, was that Juan Orlando was not answering their calls after they had bribed him with so much drug trafficking money, sir.

Q.   Isn't it a fact that they were mad because around midyear in 2014, the government of Honduras, while Mr. Hernandez was president, actually seized their profit —— their properties and assets?

A.   There were three reasons, sir:  Firstly, sir, as far as I can understand from what Luis Valle and Arnulfo Valle explained to me, was that after they had bribed the president of the republic with so much drug trafficking money, because Juan

Orlando Hernandez had helped them in drug trafficking together with the Valle cartel, he was not picking up their calls. He was not facing them after he had received so much money from them in bribes from the Valles. And lastly, and you're right, sir, their properties had been seized.

Q. By the way, do you have any proof or any documentation, audio or video, of the bribes that the Valle Valle allegedly paid to Mr. Juan Orlando Hernandez?

MR. GUTWILLIG: Objection.

THE COURT: Basis?

MR. GUTWILLIG: Reference again to proof in the question.

THE COURT: I'm going to allow it this time.

Go ahead.

A. The only proof that we as drug traffickers had was the word of a drug trafficker to another drug trafficker, sir.

Q. In other words, no, you have no solid proof like audio, video, or documentation?

MR. GUTWILLIG: Objection.

THE COURT: Yes. Well, it's either asked and answered or if it's not asked and answered, it's objectionable as to form. So go ahead.

Q. You have no proof ——

THE COURT: No, no, go ahead. It's sustained. Go ahead with your next question.

Q.   Did you take seriously the plot to murder, assassinate, Mr. Hernandez?

A.   Can you please rephrase the question, sir.  I don't understand it.

Q.   Did you believe that the Valle Valles were going to carry out the assassination plot against Mr. Orlando Hernandez Alvarado?

A.   They were going to kill him, sir.

Q.   All right.  And as a result of that, you decided to disagree with them that you were going to support that plot, correct?

A.   There were a couple of things, sir.  Number one, I was already working with the DEA; secondly, I had already bribed Juan Orlando Hernandez in the past using drug trafficking money; and, third, killing the president of the republic had not crossed my mind, sir.

Q.   You just testified that you had already bribed him before.  Are you referring to the bribe that involved Hilda Hernandez, the sister?

A.   Correct, sir.

Q.   We'll come back to that later.

        But you decided that, since you took it seriously, that you were going to reach out to Mr. Ekonomo?

A.   Yes, sir.

Q.   Yet you testified this morning that Mr. Hernandez was

already one of your partners, Mr. Juan Orlando Hernandez was one of your partners, right?

A.  He was already a Cachiros.  I saw it because he had already accepted drug trafficking bribes.  He had already accepted money from the Cachiros cartel, sir.

Q.  Well, since you considered him already a partner, why didn't you just contact him yourself?  Why did you use an intermediary?

A.  Regarding that question, sir, first, I had already had Hilda Hernandez, whom I had already bribed, sir.  There was no need to go looking for Mr. Juan Orlando because I already had her as a contact.  Also, there were other contacts who were drug traffickers and who were colleagues of his, such as Arnaldo Urbina and Oscar Nájera.  So there was no need for me to get him in front of me.  Also because he had already relayed messages to me through his allies, sir.

And there was a personal contact with Juan Orlando during that birthday party of Moncho Lobo, which was, in fact, a personal contact with the other Cachiros partner who was my brother Javier Rivera, sir.

MR. COLON:  Your Honor, move to strike unresponsive.  I didn't ask him a question.

THE COURT:  One second, please.  You asked him a "why" question, and he gave his answer to a "why" question.  It stands.

Q.   The fact is that you had contact and you knew Hilda Hernandez and you decided not to contact a family member of his who you had had a transaction with?

A.   I never met Hilda Hernandez.  It was my brother Javier Rivera who met her.  And a personal contact has already been made by Javier Rivera with this politician, sir.

Q.   But you didn't tell Javier to tell Hilda Hernandez that the Valle Valle were concocting a plot to kill her brother?

A.   Why, sir?  When Juan Orlando was bribed, it was 2012, sir.

Q.   But you could have told Javier when you found out about the plot so he could tell Hilda.  That would have been the most direct route.

          MR. GUTWILLIG:  Objection.  Form.

          THE COURT:  Yes, rephrase it, please.

Q.   You did not tell Javier to warn Hilda that the Valle Valles were planning to kill Juan Orlando.

          MR. GUTWILLIG:  Objection.  Asked and answered.

          THE COURT:  Sustained.

Q.   Do you know whether that information about the plot ever got to Juan Orlando?

A.   What Ekonomo said?  Yes, sir, that's why I sent Ekonomo out to clarify things with Juan Orlando.

Q.   And who was Ekonomo?

A.   Ekonomo was a drug trafficker, a politician, and an ally of Juan Orlando's.

Q.  So you felt that he was the best person to use as a conduit of that information?

A.  He was very close to Juan Orlando, sir.

Q.  You didn't tell Tony Hernandez about the plot, did you?

A.  No, sir.

Q.  And you actually had met Tony Hernandez before?

A.  Yes, sir.

Q.  And you decided you didn't need to tell Tony, is that it?

MR. GUTWILLIG:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  Tony who you met with in the early part of 2014.

THE COURT:  Sustained.

Q.  Do you know of any other plots to kill Juan Orlando Hernandez?

A.  No, sir.

Q.  Now, in terms of your testimony, isn't it a fact that you have prepared with the government and the U.S. Attorney's Office almost 100 times in the last ten years?

A.  It was many times, sir, but I don't know how many.

Q.  Over ten years, you don't have a recollection of how many times you spoke to prosecutors or agents?

MR. GUTWILLIG:  Objection.  Asked and answered.

THE COURT:  I'll allow him to probe.

A.  Repeat the question, please, sir.

Q.  In the last ten years, you don't have any recollection of

how many times you've spoken to either U.S. Attorneys or agents?

A.  I do have a recollection of it, sir, and my recollection is that we have met many times.

Q.  When was the last time you met with the U.S. Attorney's Office and agents to prepare for this case?

A.  All these past few days we have been meeting, sir.

Q.  When you say "these past few days," how many days?

A.  Approximately yesterday, the day before yesterday, the day before that.  We've met many times.

Q.  And before these last few days, how many times?

A.  We've met several times, sir.

Q.  Were you represented by an attorney at that point during those meetings?

        MR. GUTWILLIG:  Objection.  Time frame.  Relevance.

        THE COURT:  I'm going to sustain the objection as to relevance.

Q.  Were these meetings held in Spanish as well?

A.  The meetings were always held in English and always translated by the woman who is here and the man who is here and several other translators, sir.

Q.  Let's move to the amount of money or profits that you made in your drug trafficking activity.

        Can you tell the jury how much you actually made in profits over the last, well, 10 to 15 years that you trafficked

in narcotics.

A.   It was not 15 years, sir, it was 13.

Q.   How much money did you make?

A.   Approximately some $55 million.

Q.   And isn't it a fact that that money or those properties ——
withdrawn —— that some of that $50 million was actually seized
by the government of Honduras?

A.   Several properties were seized, sir.

Q.   Of the $50 million, how much was seized?

        THE COURT:  By whom?

        MR. COLON:  By the government of Honduras, Judge.

A.   Repeat the question for me, please.

Q.   Of the $50 million, how much of that was seized either by
the government of Honduras or the United States of America?

        THE COURT:  Sustained.

Q.   Again, how much money was seized by the government of
Honduras?

A.   I don't know the amount, but what they seized were
properties.

Q.   So you're telling the jury that the $50 million were not
seized by the government of Honduras?

        MR. GUTWILLIG:  Objection.

        THE COURT:  Sustained.

Q.   What happened to the $50 million?

A.   It was not 50 million, sir.

Q.  How much was it?

Do you have any ——

THE COURT:  Whoa, whoa.

MR. COLON:  I'm sorry.

A.  Of the approximately $55 million, what happened with that money was that I bought many properties.  I bought luxury cars.  I bought a lot of gold.

Of the 55 million, I paid many bribes.  I paid $250,000 as a bribe to Juan Orlando Hernandez.  I took 50,000 to bribe Tony Hernandez.  I took 800,000 to pay to Juan Orlando Hernandez's allies.  I bribed Oscar Nájera.  I bribed Pepe Lobo.  I gave Pepe Lobo about $600,000.  He was Juan Orlando Hernandez's political ally.  There were other bribes paid to Fabio Lobo so that he would in turn bribe the chief of intelligence that Juan Orlando Hernandez had when he was president of Congress, Tinoco Pacheco, among other things.

Q.  Is there any money left over?

A.  Yes, sir.

Q.  Would you tell the jury where that money is.

A.  There's money left over in properties, sir.

Q.  And where are those properties?

A.  One of them is located in a country in Central America.  The other is located in the capital, Tegucigalpa.  Another is located in the department of Colón.

Q.  When you say "Central America," what countries are those

properties located in?

THE COURT: What's the relevance of that?

MR. COLON: Goes to his honesty, Judge.

THE COURT: Sustained. Yes, sustained. Go ahead.

Q. What is the value of all those properties that you indicated that you have in Honduras and other countries?

A. I haven't done the math, sir, because I don't know what they are valued at, sir. They would have to be appraised, sir.

Q. Did you ever deposit cash that was left over in Honduran banks?

A. The bank that we had for money laundering, of course, sir, that was Banco Continental. The money that came from Honduras' corrupt government was deposited there into INRIMAR's accounts.

Q. Did you have any cash anywhere in the world that's ——

MR. GUTWILLIG: Objection. Relevance. Asked and answered.

THE COURT: Sustained.

Q. Is there anything you have not revealed to the U.S. government of whatever money you made from the drug trafficking?

A. The government knows everything, sir.

Q. So you've told them everything?

MR. GUTWILLIG: Objection. Asked and answered.

THE COURT: Sustained.

Q. Mr. Diaz Maradiaga, you testified that you had taken

responsibility for 78 murders, correct?

A.  Yes, counsel, but my name is not Diaz, it's Devis.

Q.  I'm sorry.  Mr. Leonel Devis Rivera Maradiaga.

A.  Correct.

Q.  You testified that you committed, or at least participated in, at least 78 murders, correct?

A.  Yes, sir.  I participated in 78, sir, along with the whole Cachiros cartel.

Q.  Of those 78 murders, did you personally kill someone?

A.  Yes, sir.

Q.  Of those 78, how many did you personally kill?

A.  I participated in one killing, sir, and one shootout.

Q.  Did that shootout result in any deaths?

A.  Yes, sir.

Q.  How many deaths occurred or resulted from that shootout?

A.  Some five to six deaths, sir.

Q.  Were those police officers or civilians?

A.  They were civilians, sir.

Q.  Were they intended victims?

A.  I don't understand.  Could you ask me from —— in another way, please.

Q.  Was your intention to kill those individuals?

A.  Yes, sir, that was the intention because those people had killed a friend of the Cachiros cartel, sir.

            MR. COLON:  I'm sorry, Judge.  One second, please.

THE COURT:  Yes.

Q.  I'm going to go, not through all 78 murders, I'm going to go through a list of some of the victims that you admitted to having been involved in their deaths.

A.  All right, sir.

THE COURT:  Please make sure there's a question, Mr. Colon.

Q.  Do you know who Jorge Anibal Echeverría Ramos is?

A.  Yes, sir.

Q.  Is he also known as Coqui?

A.  Yes, sir.

Q.  Why did you kill Coqui?

A.  Coqui's killing was ordered because Coqui had murdered a brother of ours, sir.

Q.  So that was a revenge killing?

A.  Yes, sir.

Q.  You did not ask the authorities for an investigation of the — for investigation of the matter in which your brother was killed?

A.  I don't understand your question, sir.

Q.  Withdrawn.

So you took justice into your own hands, correct?

A.  Yes, sir.

Q.  You did not ask the police for help?

MR. GUTWILLIG:  Objection.  Asked and answered.

THE COURT:  I'll allow it.

A.  Could you please ask me the question again, sir.

Q.  You did not request assistance from the police?

A.  No, sir.

Q.  How about in 2005 or '6, a daughter of Tonio Velasquez?

A.  Yes, sir.

THE COURT:  Excuse me.  There's no question pending.

Q.  Do you know who Tonio Velasquez is?

THE INTERPRETER:  For the interpreter, counselor, the first name?

MR. COLON:  Tonio, T-o-n-i-o.

A.  Yes, sir.

Q.  Who is Tonio Velasquez?

A.  He was a drug trafficker, sir.

Q.  And why did you kill his daughter?

A.  The daughter was not the target, sir.  The goal was to kill Tonio Velasquez.

Q.  How old was Tonio Velasquez's daughter when she died?

A.  I don't know, sir.

Q.  Was she an adult or a child?

A.  She was a child, sir.

Q.  About how old, more or less?

A.  I don't know, sir.

Q.  How did you kill that young lady?

A.  I did not kill her, sir.

Q.  How was she killed?

A.  I reached an agreement with Eliel Sierra to kill him, sir. We planned Tonio Velasquez's murder, and then Tonio was supposedly going —— well, we gave the job to a sicario.

Q.  Was she the victim of a shooting?

A.  Supposedly, Tonio was in the car, but Tonio was not in the car, sir.  His daughter was.

Q.  Did you eventually kill Tonio Velasquez?

A.  No, sir.

Q.  What did Tonio Velasquez do to you that you wanted to kill him?

        THE INTERPRETER:  May the interpreter clarify something with the witness, your Honor?

        THE COURT:  You may.

A.  Tonio Velasquez was trying to steal a shipment of cocaine that Eliel Sierra had, and there was also rivalry over a trip that Tonio Velasquez and his brother did for —— in the Cachiros, sir.

Q.  So Tonio Velasquez was just competition, correct?

A.  At that time there was competition in the transportation of drugs, sir.

Q.  With respect to Ismael Landaverde, do you recall his murder?

A.  Yes, sir.

Q.  Now, he was not a drug dealer, obviously?

A.   Can you please repeat the question, sir.

Q.   Ismael Landaverde was not a drug trafficker?

A.   Ismael Landaverde was a drug trafficker, sir.

MR. COLON:  I'm sorry, Judge, may I just take a second, please?

THE COURT:  Sure.

BY MR. COLON:

Q.   How was Ismael Landaverde killed?

A.   Ismael Landaverde was a drug trafficker from Bonito Oriental who had a rivalry with another drug trafficker who was a friend of mine, Neftali Duarte Mejia, sir.

Q.   Was that in another department?

A.   What, sir?

Q.   The rivalry.

Yeah, but ——

A.   The rivalry was over drug trafficking, sir.

Q.   But where was that rivalry, what department?

A.   That was in Bonito Oriental and Sico, Colón, sir.

Q.   So he was not your rival?

A.   He was a rival of my friend and drug trafficking partner, sir.

Q.   Do you know the name of your Yorleny Sánchez?

A.   Yes, sir.

Q.   About March of 2010, why was Yorleny Sánchez killed?

A.   The lady was not the target, sir.  Her husband was.

Q.   So you killed or had killed an innocent bystander?

A.   The target was her husband, sir, as I said before.  The lady happened to be there, and she was injured.

Q.   How about Ana Yarixza Escobar Bonilla in June of 2011?  Did you kill that individual or have that individual killed?

A.   I don't remember, sir, because at times the Cachiros cartel would order the killing of persons, and there were other people there that were not known to us, sir.

Q.   But you were the head of the Cachiros, so you had to give the order, correct?

A.   My brother and I were, sir.  And, yes, we would give the orders when people were ordered to be killed, sir.

Q.   You don't know why this woman was killed?

A.   I did not know her, sir.

        THE COURT:  All right.  Ladies and gentlemen, let's take our midafternoon break.  Please do not discuss the case among yourselves or with anyone.

        We'll be back in action in ten minutes.  Thank you.

        (Jury excused)

        (Continued on next page)

(Jury not present)

THE COURT:  Please be seated.

I have draft jury instructions which I'm going to mark as the next court exhibit, which would be Court Exhibit 4, and hand them out to each side.  When would it be convenient for the government to give its comments on the jury instructions?

MS. TARLOW:  Would Friday be acceptable to your Honor?

THE COURT:  All right.  And for the defense?

MR. COLON:  I'm sorry, Judge.  Can I consult?

THE COURT:  Sure.

MR. COLON:  Judge, can we ask for the following Monday?  They're going to submit them on Friday.  Can we ask for Monday?

THE COURT:  Well, I was going to have you both submit on Monday morning.  Does that work?

MR. COLON:  Yeah, that works.

THE COURT:  All right.  So you'll have your comments in by 9 a.m.  They should be uploaded to ECF by 9 a.m. Monday morning.

Will that work for you, Mr. Colon?

MR. COLON:  Yes, sir.

THE COURT:  All right.  For the government?

MS. TARLOW:  Yes, your Honor.

THE COURT:  OK.  That's great.

Just so it's clear, I want them ⸺ should be in a

O2SHHer3

separate letter, and you should note the page where the comment is or change or objection.  OK?  Thank you.

I've had folks who've tried to be helpful by inserting it, and it gets totally confused.  I expect to get two letters, one from the government, one from the defense, uploaded by 9 o'clock Monday morning.

MS. TARLOW:  Yes, your Honor.

THE COURT:  Thank you.

(Recess)

THE COURT:  See if our jury is ready.

(Jury present)

THE COURT:  Please be seated.

Mr. Colon, you may continue.

MR. COLON:  Thank you, Judge.

BY MR. COLON:

Q.  Mr. Maradiaga, with respect to those murders that we were talking about before, I want to continue with the name of Judith Aleman Banegas.  Do you know who that is?

A.  Yes, sir.

Q.  Who was Jude Aleman Banegas.

A.  She was a lady that used to live in the department of Colon, sir.

Q.  Do you know what she did for a living?

A.  No, sir.

Q.  Why was she killed?

A.  Because my brother, Javier Rivera, had heard that this lady was speaking ill of the Cachiros Cartel, sir.

Q.  What did your brother Javier say that she was speaking ill of the Cachiros?

A.  I don't remember, sir.

Q.  Wasn't she in fact a prosecutor?

A.  I don't know, sir.

Q.  Do you know who killed her?

A.  Yes, sir.

Q.   Who was that?

A.   A cousin of mine, sir.

Q.   How did he kill Ms. Banegas?

A.   She was killed in Tegucigalpa, sir.

Q.   Tegucigalpa is not in your department, is it not?

A.   No, sir.

Q.   Do you know why she was killed in Tegucigalpa?

A.   What I remember is that the lady used to live in Tegucigalpa and Colon, sir.

Q.   Do you know Alfredo Landaverde?

A.   Yes, sir.

Q.   And who was Alfredo Landaverde?

A.   Alfredo Landaverde had a position like what I remember is that he was the chief of an organization that was anti-narcotics, as I remember, sir.

Q.   Was he an anti-narcotics activist?

A.   Yes.  He worked with a government agency, sir, like in intelligence.  Something like that.

Q.   He was not a drug trafficker, was he?

A.   No, sir.  As far as I knew, no.

Q.   So what did he do to incur your wrath?

          MR. GUTWILLIG:  Objection.  Argumentative.

          THE COURT:  Overruled.

A.   Can you please repeat the question, sir?

Q.   What did he do to incur the wrath of the Cachiros?

A.   I met with Ramon Matta Waldurraga in Tegucigalpa, and with his partner Eduardo, to plan the murder of Mr. Landaverde, sir.

Q.   So tell the jury what you did with respect to the planning of the killing of Mr. Landaverde.

A.   I introduced the sicarios to Ramon Matta Waldurraga for Mr. Landaverde to be killed.

Q.   But why, exactly.

A.   The reason, sir, based on what Mr. Matta told me, was that Mr. Landaverde had been speaking ill of Ramon Matta and also his father who had been extradited years before, Mr. Matta Walduragga, and he was also speaking ill of the bankers, the owner of Banco Continental, sir.

Q.   What did he say exactly other than he was speaking ill? What does that mean?

A.   What Mr. Landaverde was saying was that Mr. Matta Walduragga and his father, who had been extradited to the United States years prior, were drug traffickers, sir.

Q.   Well, that was true, wasn't it?

A.   That was right, sir.

Q.   There was nothing that wasn't true about what he was saying.

        MR. GUTWILLIG:  Objection.  Asked and answered.

        THE COURT:  Sustained.

Q.   Isn't it a fact that he went on national Honduran television and made a speech to the country that -- wasn't that

the event that got you so mad that you had him killed?

MR. GUTWILLIG:  Objection to form.

THE COURT:  I will allow it.

A.  Can you please repeat the question, sir?

Q.  Isn't it true that what that you and the rest of your co-conspirators were mad at was the fact that he went on national television and denounced the cartel and its members?

A.  As I said, he had been speaking ill of the owner of the Banco Continental and also of the Walduragga father and son saying that they were drug traffickers, sir.

Q.  I didn't ask you that.  I asked you whether or not that national speech he gave or interview, isn't that what triggered your anger?

A.  It triggered anger in everything and that is right, sir, he was talking on TV.

Q.  And because --

INTERPRETER:  May the interpreters confer?

THE COURT:  Yes.

INTERPRETER:  May the interpreter correct her interpretation:  What triggered everyone's anger was that right, sir, the fact that he was talking on TV.

Q.  And that gave you cause to kill him?

A.  Yes, sir.

Q.  Do you remember the name Anibal Barrow?

INTERPRETER:  May the last name be repeated for the

interpreter?

Q. Sure. Barrow. B-A-R-R-O-W.

A. Yes, sir.

Q. Sometime around July 2013, isn't it a fact that you had him killed?

A. Yes, sir.

Q. But before you had him killed, you actually tortured him, correct?

A. No, sir.

Q. Well, you actually cut him up into pieces, did you not?

        MR. GUTWILLIG:  Objection, your Honor.

        THE COURT:  Basis?

        MR. GUTWILLIG:  The witness has answered that he did not torture this victim.

        THE COURT:  Well, I will allow the question.

A. Can you please repeat it?

Q. The killing involved -- I will ask it a different way.

        The killing of Mr. Barrow involved cutting him up into pieces?

A. I will explain how the killing of Mr. Barrow had happened, sir.

        I met with Liser, my cousin, and he told me that he had spoken to my brother, Javier Rivera, about a news reporter who was speaking ill of the Cachiros saying that we were drug traffickers, and my brother Javier Rivera, Liser, and I,

decided to kill the reporter.  And what ended up happening was my brother, Javier Rivera and I, hired the sicarios, and one of the them was Luben Zelaya, who was a police Comisionado and Carlos Valladares, and they were ordered to kill him but Anibal, they were ordered to commit a killing -- interpreter correction -- they were ordered to commit a killing, but Anibal Barrow was not the target, sir.

Q.  Who was the target?

A.  I do not remember the name, sir, but it was a different reporter.

Q.  Is it your testimony that Anibal Barrow was not tortured?

A.  I do not know how the sicarios killed him, sir.

Q.  You testified on direct that you had participated in torture, did you not?

A.  Yes, sir.  I testified that I had tortured somebody, not that I tortured Anibal Barrow, sir.

Q.  Who was it that you tortured?

A.  A kidnapper, sir.

Q.  When you say you tortured him, was that a very slow process?

A.  Yes, sir.

Q.  And you were the torturer?  Other?

A.  I and other drug traffickers, sir.

Q.  Like who?

A.  Eliel Sierra, sir.

THE COURT:  Ladies and gentlemen, I have allowed the testimony of this witness on direct examination about the killings in which he was involved as bearing on his credibility and, likewise, I have allowed the defense to explore it on that basis because it may have some bearing on whether there is a bias or whether the testimony was truthful or not truthful. But, that is the relevance of this testimony.

Next question.

BY MR. COLON:

Q.  Eventually that person was killed, correct?

A.  Yes, sir.

Q.  Was that person cut into pieces?

A.  I don't remember that, sir.

Q.  Aristedes Gonzalez; do you know who that was?

A.  Yes, sir.

Q.  Was he a general?

A.  Yes, sir.

Q.  He was the head of the war on drugs in Honduras; correct?

A.  Yes, sir.

Q.  Do you recall what year he was killed?

A.  Yes, sir.

Q.  What year?

A.  He was killed in 2009, sir, the same year that we bribed Porfirio Pepe Lobo.

Q.  And why did you kill General Aristedes Gonzalez?

A.   The general was killed at the request of Fredy Nájera, an ally of Juan Orlando Hernandez, because he had raided some clandestine air strips in San Esteban Olancho, sir.

Q.   That was back in 2009.  According to your testimony he wasn't an ally with Juan Orlando until 2012, correct?

        MR. WIRSHBA:  Objection, your Honor.  Just to clarify, who ally refers to.  He wasn't an ally.  Who is he an ally there.

        THE COURT:  Rephrase your question.

BY MR. COLON:

Q.   You testified earlier that Juan Orlando became your partner in 2012 after that meeting at the heliport with Hilda Hernandez?

        MR. GUTWILLIG:  Objection, your Honor. Mischaracterizing the testimony.

        THE COURT:  Ask your question.  You don't need a paragraph of explanation.  Ask a question.

Q.   The killing of Aristedes Gonzalez, was that a collective decision by the Cachiros and other drug dealers?

A.   Correct, sir.

Q.   What was your role in the killing of Aristedes Gonzalez?

A.   My role was seeking out other drug traffickers for them to participate in the murder, sir.

Q.   Did you pay for the assassins to kill General Gonzalez? All you did was support the assassination of the general?

INTERPRETER:  Counsel.

A.  It was another drug trafficker who paid.  I made the alliance between the assassins and the person who ordered the killing of the general, sir.

Q.  So you were the middleman in this assassination plot?

A.  Yes, sir.

Q.  Bringing your attention to Sonia Marlen Ramos Montes.  Do you know who that is?  And November 2013.

A.  Yes, sir.

Q.  Now, who was Sonia Marlen Ramos Montes?

A.  She was a drug trafficker, a thief, and at the same time she was the partner of my -- the romantic partner of my brother Javier Rivera; they had had an affair.

Q.  In fact, she was your sister-in-law, wasn't she?

A.  Yes, sir.

Q.  And you had her killed for what reason?

A.  That woman's killing was ordered because a cousin of Sonia's Tom Montes, sought me out saying that this woman, Sonia Ramos, had stolen 300 kilograms of cocaine and also killed a worker of his.

Q.  Are you saying that Sonia Montes actually killed someone?

MR. GUTWILLIG:  Objection.  Relevance.  Asked and answered.

THE COURT:  Sustained as to relevance.

Q.  Who did Sonia Montes kill?

MR. GUTWILLIG:  Objection.  Relevance.

THE COURT:  Same ruling.

Q.  Isn't it a fact that Sonia Montes moved to Canada in order to request political asylum there?

MR. GUTWILLIG:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  Isn't it a fact that she was going to give information or cooperate with Canadian or American authorities?

MR. GUTWILLIG:  Objection, your Honor.  Relevance.

THE COURT:  Sustained.

Q.  So you killed her simply because Mr. Tom Montes asked you to kill her?

A.  That was the reason, sir.

Q.  Did you testify just now that she was your sister-in-law?

MR. GUTWILLIG:  Objection.  Asked and answered.

THE COURT:  Also going to sustain it on relevance.

Q.  How long was she with your brother?

MR. GUTWILLIG:  Objection, your Honor.  Relevance.

THE COURT:  Sustained.

Q.  Did she have a child with your brother?

MR. GUTWILLIG:  Objection, your Honor.  Relevance.

THE COURT:  Sustained.

Q.  Did you feel any remorse for having killed her?

THE COURT:  I will allow it.

A.  No, sir.

Q.  During the course of your violence, you also committed crimes that involved individuals being injured or wounded; correct?

A.  Yes, sir.

Q.  I'm going to draw your attention to the killing of a security guard at a hospital, back in October of 2003, and the intended target was Jorge Anibal Echeverria Ramos.

Do you recall that?

A.  Yes, sir.

Q.  And that individual, Jorge Anibal Echeverria Ramos, that was actually Coqui; correct?

A.  Yes, sir.

MR. COLON:  One second, Judge?

(Counsel conferring)

Q.  I'm sorry.  That was Coqui, correct?

A.  Yes, sir.

Q.  So that individual was a security guard that had nothing to do with your conflict with Coqui?

A.  Correct, sir.

Q.  How about in 2004 an individual by the name of Ramos, also known as "Cui."  Do you recall that person being wounded or injured?

A.  I don't remember that name, sir.

Q.  Do you remember a name in 2004, also called Ramos and also known as Flaco, that was injured or wounded?

O2S5her4                          Rivera Maradiaga - Cross

A.   I don't remember, sir.

Q.   How about another Ramos, also known as Cayito.  Do you recall whether he was injured or wounded?

A.   Yes, sir.

Q.   And why was it that he was injured or wounded?

A.   Because they were relatives of Coqui Ramos, sir.

Q.   So you tried to kill them simply because they were relatives of Coqui Ramos?

A.   Yes, because remember that it was about revenge.  They had killed my brother, sir.

Q.   So you decided to enact violence on other family members that weren't involved in the conflict with Coqui Ramos?

        MR. GUTWILLIG:  Objection.  Asked and answered. Mischaracterization of the testimony.

        THE COURT:  Yes; sustained.

Q.   Why did you decide to shoot those individuals that weren't involved in the conflict with you and Coqui?

        MR. GUTWILLIG:  Objection.  Mischaracterization of the testimony.

        THE COURT:  I will allow the question to stand.

A.   I did not shoot them, sir.

Q.   You directed somebody to shoot them?

A.   Yes, sir.

Q.   Did you feel any remorse about those individuals being wounded?

A.   Not at the time, sir, but now I am sorry for everything that I did, but I'm also sorry for having bribed the corrupt politicians in the government of my country, Juan Orlando Hernandez, Porfirio Lobo Sosa, Tony Hernandez, corrupt police officers, members of the military like Tinoco Pacheco who, instead of having taken those bribes, they should have caught us because we were a dangerous band of -- interpreter correction -- because we were a dangerous gang of drug traffickers but, instead, they allied with us and became members of the Cachiros Cartel and took bribes that were drug trafficking proceeds.

MR. COLON:  Move to strike, your Honor, everything that was unresponsive to my question in which he goes on to cite all the bribes that he paid.  He has done this several times, Judge, and I ask --

THE COURT:  You asked an open-ended question:  Did you feel any remorse about those individuals being wounded?  That's not the kind of question that is susceptible to a yes or no answer.  Overruled, and motion to strike denied.

Q.   So today you have remorse for the killing of the Ramos family members?

THE COURT:  Reiteration.

Q.   With respect to a 2005-2006 event in which Edwin Salvador was injured or wounded; do you recall that?

A.   Yes, sir.

Q.   What happened to Edwin Salvador that he is one of the people on the list?

MR. GUTWILLIG:  Objection.  List?  Form.

THE COURT:  Tighten that up, please.

Q.   Edwin Salvador.  You know who he is, correct?

A.   Yes, sir.

Q.   What occurred with him being either injured or wounded?

A.   Edwin Salvador was a partner of mine in drug trafficking and also in the killing-for-hire who, at the end of it all, wanted to kill me, sir.

Q.   Why did he want to kill you?

A.   Because he was being paid, sir.

Q.   What does that mean?

A.   He was being paid to either kill me or turn me in, sir.

Q.   Who paid him?

A.   Pedro Pablo, a police officer, sir.

Q.   So what happened to in terms of what someone did to him to wound or injure him?

A.   Can you please repeat the question?

Q.   What did you do or have done to Edwin Salvador?

A.   He was ordered killed, sir.

Q.   Was he eventually killed at all?

A.   Yes, sir.

Q.   Was it as a result of your request?

A.   Yes, because he wanted to kill me, sir.

Q. Do you know, in 2006, an individual known as Champa?

A. Yes, sir.

Q. And what happened to Champa?

A. Champa was also injured, sir.

Q. Was that injured or wounded?

A. Wounded, sir.

Q. Wounded. He got shot at?

A. Yes, sir.

Q. But the intent was to kill him?

A. Yes, sir.

Q. Why?

A. Because he was Edwin Salvador's bodyguard, sir.

Q. 2005 or 2006, Alex Velasquez. Who is that?

A. He was a drug trafficker, sir.

Q. What did you do with Alex Velasquez?

A. He was injured, sir.

Q. Wounded by a bullet?

A. Yes, sir.

Q. Why?

A. Rivalry over shipments of cocaine, sir.

Q. How about Juan Ramon Salgado. What happened to him?

A. He was killed, sir.

Q. So initially wounded, is that it, and then died? Or was he -- what happened to him that he might have been wounded?

        MR. GUTWILLIG: Objection, your Honor. Relevance.

Form.  And asked and answered.

THE COURT:  Yes.  Sustained.

Q.  How about Carlos Ramirez back in 2008?  Do you know who that is?

A.  I don't remember, sir.

Q.  About 2008 Hernan Paz.  What happened to Mr. Paz?

A.  I do not remember him, sir.  He might have been a third-party who was with targets whose murder had been ordered, sir.

Q.  May 2008, Jesus Orellana; was he one of the people that was hired to kill you?

A.  I don't remember, sir.

Q.  And Santos Blandin, May 2008; why he was he injured or wounded?

A.  All these people that you have just mentioned, sir, were people that were with an enemy of ours who had killed a friend of ours in the department of Colon.

Q.  Ismael Landaverde, was he wounded?

A.  I explained that previously, sir, about Ismael Landaverde.

Q.  How about 2009, someone by the name of Orlin.  O-R-L-I-N.

A.  Yes, sir.

Q.  Why was he injured or wounded?

A.  I don't remember the year, sir.

Q.  Well, who was he?

A.  He was the enemy of a drug trafficker, sir.

Q.   How about 2010, someone by the name of Cardona?

A.   I turned him in to other drug traffickers, sir.

Q.   What did he do to be turned in to other drug traffickers?

          MR. GUTWILLIG:  Objection, your Honor.  Relevance.

          THE COURT:  I will allow it.

A.   I don't know, sir.

Q.   And how about someone by the name of, or also known as "Mantequilla," a/k/a "Whitebread"?

A.   He was a drug trafficker, sir.

Q.   And did you direct someone to kill him?

A.   Yes, sir.

Q.   Was he eventually killed?

A.   Yes, sir.

Q.   How about someone by the name of Jun Osorto, a/k/a "Hector A. Portillo," a/k/a "Zorro," a/k/a "El Gato Negro," April 2010.

A.   I did not know him, sir, but guns that I had lent were used to kill him by these bodyguards, and this was ordered by Oscar Alvarez and Flores Maradiaga, sir.

Q.   So you are an accessory to that act?

          MR. GUTWILLIG:  Objection.

          THE COURT:  Sustained.  He said what he did.  The rest is a legal conclusion.

Q.   And the name "Juan Orsoto" came up earlier, but I believe was he the bodyguard for someone?  I will withdraw, I will

withdraw.

Do you remember the bodyguard of Juan Orsoto?

A.  I've already answered that, sir.  Juan Orsoto and his bodyguards, I did not know him, sir.

Q.  Now, you started working for the DEA sometime in November of 2013; correct?

A.  Yes, sir.

Q.  And where were you when you made that decision to start cooperating with the DEA?

A.  I was in San Pedro Sula, sir.

Q.  Did you meet with DEA agents in San Pedro Sula?

A.  We met in several cities, sir, in several countries.

Q.  Well, tell the jury what cities and what countries.

MR. GUTWILLIG:  Objection, your Honor.  Relevance.

THE COURT:  Sustained.

Q.  How many times did you meet, in November, with DEA agents?

THE COURT:  Of what year, sir?

MR. COLON:  Of 2013, Judge.

A.  Should I answer?

THE COURT:  You may.

A.  Please repeat the question, sir.

Q.  How many times did you meet with DEA agents in 2013 with respect to your cooperation?

A.  I do not remember, sir, but we have met many times starting in 2013, to date.

Q.  When you met with DEA agents, were you accompanied by an attorney?

MR. GUTWILLIG:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  Did you sign anything when you met with those DEA agents in November 2013?

MR. GUTWILLIG:  Objection.  Relevance.

THE COURT:  I will allow it.

A.  Please repeat the question.

Q.  In 2013, did you sign any documents with the DEA agents with respect to your prospective cooperation?

THE COURT:  In November of 2013 you are asking?

MR. COLON:  Yes, sir.  We are still in November.

THE COURT:  Please ask a complete question.

MR. COLON:  Of course.

THE COURT:  Go ahead.

BY MR. COLON:

Q.  In November 2013, did you sign any documentation during the course of that month when you met with DEA agents?

A.  I don't remember, sir.

Q.  Was there a translator or an interpreter present, rather, at those meetings in 2013?

A.  Yes, sir.

Q.  When was the formal decision made that you would become a cooperating witness with the DEA agents?

MR. GUTWILLIG:  Objection, your Honor.  Vague.

Q.  If you know.

MR. GUTWILLIG:  Made by who?

THE COURT:  Do you want to rephrase the question?

Q.  Were you signed up to be a cooperator with a DEA agent?

MR. GUTWILLIG:  Objection, vague.  There is no time frame presented here.

THE COURT:  Would you like to know when he signed his cooperation agreement?  Is that what you are asking?

MR. COLON:  I want to know whether he signed anything in November of 2013 that was not a cooperation agreement.

THE COURT:  I think you asked him that question and he said he didn't remember.

MR. COLON:  OK.

THE COURT:  Next question.

BY MR. COLON:

Q.  When did you sign your cooperation agreement with the DEA?

A.  Once I surrendered to the DEA, sir, to the U.S. government.

Q.  That would have been, what, January 2013?

A.  No, sir.

Q.  When was that?

A.  That was months later, I believe it was in 2015 in October.  In the month of October, something like that.

Q.  So is it your testimony that you went from November '13 to October 2015 without any sort of written documentation of your

cooperation?

A.  Please repeat the question, sir.

Q.  Is it your testimony that from November 2013 to October 2015, you were a confidential informant of the DEA without any written documentation?

        MR. GUTWILLIG:  Objection, your Honor.  Form and mischaracterizing the testimony.

        THE COURT:  I will sustain the objection.

Q.  Were you being paid by the DEA in 2013?

A.  Please repeat the question.

Q.  In 2013, were you receiving any compensation or being paid by the DEA?

A.  No, sir.

Q.  How about 2014?

A.  No, sir.

Q.  How about 2015?

A.  No, sir.

Q.  So you were working for them for free?

        MR. GUTWILLIG:  Objection.  Asked and answered. Argumentative.

        THE COURT:  Sustained.

Q.  Did you receive any sort of reward or any sort of remuneration for your services as a cooperator?

        MR. GUTWILLIG:  Objection.  Asked and answered. Vague.

THE COURT:  I will allow it.

A.  Can you please repeat that again, sir?

Q.  Did you receive any sort of reward or remuneration with respect to your services from November 2013 to October 2015?

A.  No, sir; because it was not the DEA's idea to seek me out, I sought the DEA out because I had documents, proofs, videos to show, that demonstrated things about the corrupt politicians and police officers and the military of my country, sir, so I decided to reach out to the U.S. government to show the proof that I had, sir.

MR. COLON:  May I take a second, Judge?

THE COURT:  You may.

(Counsel conferring)

BY MR. COLON:

Q.  You turned over many USBs to the DEA when you met them in November of 2013; correct?

So, but you --

THE COURT:  Whoa.

MR. COLON:  Sorry, Judge.

A.  I handed over several to them but I don't remember the date.  From the time I began my cooperation I handed over various information that I had gotten about the narco-politicians, members of the military, and other drug traffickers, sir.

THE COURT:  Ladies and gentlemen, that concludes our

workday.  I want to go over a few points with you.

Now, we really feel like we have been together for a long time.  So, you have heard this before but it is useful to reiterate --

you don't have to translate this, the witness can step down.  Thank you very much.

THE WITNESS:  (In English)  Thank you.

THE WITNESS:  Thank you.

THE COURT:  You have heard me say many times do not discuss the case among yourselves or with any other person; you will have the opportunity and duty to do that during the deliberations in this case.  I also instructed you and I instruct you again, you are not to read anything in the newspapers or elsewhere about the case; not to listen or view any reporting.  You are not to conduct any research.  You are not to Google or conduct any other search on any name, event, terminology, laws, legal concepts, or any matter touching in any way upon the trial.

Do not send or receive any communications about the case.  This includes texting, e-mailing, blogging, posting information on social network sites or using any other electronic communications to discuss or even mention the case. This means no communication with fellow jurors, lawyers, witnesses, or anyone.  If it becomes necessary to send the court a note about something you saw or heard, or about any

other matter, do not share the content of the note with your fellow jurors.

You are not allowed to speak to anyone about the case. If you are approached by anyone to speak about it, politely tell them that the judge has directed you not to do so.  If any person seeks to contact you about the case, you are required to report the incident promptly to me.

Be sure that I am informed if any person you know comes into the courtroom.  It is a public trial so this could happen, but it is important that you are not hearing from them what happened in the court while the jury was not present.

The attorneys, the defendant, and the witnesses are not permitted to talk to the jury outside the courtroom.  They may not even offer a friendly greeting, so if you happen to see any of them outside the courtroom, they will not and should not speak to you.  Please take no offense, they're only acting properly.

So I just want to remind you of that.  Have a pleasant evening.  See you tomorrow morning.  We will be back in action and I will do any work to move the case along efficiently and fairly.

Thank you.

(Continued on next page)

O2S5her4                        Rivera Maradiaga – Cross

(Jury not present)

THE COURT:  With the exception of the court personnel, no one may leave the courtroom until the CSOs, the officers have determined that the jurors have cleared the elevator lobby on this floor.

You may be seated.  We are in recess.

(Adjourned to February 29, 2024 at 9:40 a.m.)

INDEX OF EXAMINATION

Examination of:                                          Page

DEVIS LEONEL RIVERA MARADIAGA

Direct By Mr. Gutwillig . . . . . . . . . . . 811

Cross By Mr. Colon . . . . . . . . . . . . . . 883

GOVERNMENT EXHIBITS

Exhibit No.                                          Received

 401-4   . . . . . . . . . . . . . . . . . . . 817

 401-5   . . . . . . . . . . . . . . . . . . . 817

 308   . . . . . . . . . . . . . . . . . . . . 829

 409-1   . . . . . . . . . . . . . . . . . . . 831

 409   . . . . . . . . . . . . . . . . . . . . 832

 409T   . . . . . . . . . . . . . . . . . . . . 832

 409A and 409A-T   . . . . . . . . . . . . . . 836