O2T5her1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                           15 Cr. 379 (PKC)

JUAN ORLANDO HERNANDEZ,

                                        Trial
          Defendant.

------------------------------x

                                 New York, N.Y.
                                 February 29, 2024
                                 10:00 a.m.

Before:

                    HON. P. KEVIN CASTEL,

                               District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  KYLE A. WIRSHBA
     JACOB GUTWILLIG
     ELINOR TARLOW
     DAVID ROBLES
     Assistant United States Attorneys

RENATO CHRISTIAN STABILE
RAYMOND L. COLON
SABRINA P. SHROFF
     Attorneys for Defendant


Also Present:
              Dagoberto Orrantia, Interpreter (Spanish)
              Sonia Berah, Interpreter (Spanish)
              Mercedes Avalos, Interpreter (Spanish)
              Evan Frierson, Interpreter (Spanish)
              Matthew Passmore, DEA Special Agent

(Trial resumed; Jury not present)

THE COURT:  Please remain standing for our jury.

(Jury present)

THE COURT:  Please, be seated.

Good morning, ladies and gentlemen.  I hope you didn't get caught in the rain last night, although it was coming down at various points.  We are back in action and the answer is to get back to work, so that's what we are going to do.  That is the best way to address this.

So, Mr. Rivera, the Court reminds you that you are still under oath.

THE WITNESS:  Yes, sir.

DEVIS LEONEL RIVERA MARADIAGA, resumed.

THE COURT:  Mr. Colon.

MR. COLON:  Good morning, your Honor.  Thank you, sir.

CROSS-EXAMINATION

BY MR. COLON:

Q.  Mr. Rivera, before we go on to the topic of your DEA service --

THE COURT:  Mr. Colon, ask a question, please.

MR. COLON:  I was, Judge.  There was a little pause back there.

Q.  Mr. Rivera, going back to the Denny's for a second and the $50,000 that you provided for Mr. Tony Hernandez, what was the source of that money?

Case 1:15-cr-00379-PKC   Document 750   Filed 03/18/24   Page 3 of 156   943

O2T5her1                     Rivera Maradiaga – Cross

A.  Repeat the question, sir?  I didn't understand.

Q.  What was the source of the money, the $50,000 that you testified to that you gave Tony Hernandez?

A.  The money was from drug trafficking, sir.

Q.  That was your money?

A.  Yes, sir.

Q.  Thank you.

Now, moving on to the period when you began your DEA cooperation, you testified yesterday that you gave them many USBs; correct?

A.  Yes.  Several documents, information about drug traffickers, politicians, and others, sir.

Q.  Those USBs had video and audio recordings?

A.  Yes, sir.

Q.  And some of those USBs had recordings of politicians; correct?

A.  Yes, sir.

Q.  And one of those politicians was Mauricio Villeda of the liberal party; correct?

A.  I recorded several politicians, sir, from different parties, sir.

Q.  I just want to make sure this is clear.  Those videos contained video recordings, video/audio recordings from at least 2009 to 2013?

A.  I don't remember the dates, sir, but it is there on the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O2T5her1                          Rivera Maradiaga – Cross

videos.

Q.  Do you know how far back it went, if you can recall?

A.  I don't remember the dates, sir, because I started recording before I met with the DEA, sir.

Q.  Is it fair to say that it went back a couple of years?

A.  I don't remember, sir, because there were several recordings.

Q.  You will agree with me that there were other politicians besides Mr. Villeda; correct?

A.  It's there on the recordings, sir.

Q.  With respect to Mr. Villeda, did you bribe him?

A.  Yes, sir.

Q.  What did you ask in return for that bribe?

A.  I don't remember, sir.

Q.  Was there a politician by the name of Carlos Zelaya that you bribed?

A.  Yes, sir.

Q.  And he was the head of the Libre Party?

A.  Yes, sir.

Q.  By the way, just to go back for a second, how much did you bribe Villeda?

A.  It was -- my memory is it was between $200,000 and $250,000, sir.

Q.  And in terms of other politicians, did you bribe Oscar Nájera?

A.   Yes, sir.

Q.   And you bribed him for $500,000; right?

A.   I don't remember the amount but there were several bribes, sir.

Q.   You will agree with me that on those videos that you took -- well, that you recorded at that time that you -- that they became part of the USBs, in those videos that you handed to the DEA, there were no recordings of the defendant Mr. Juan Orlando Hernandez Alvarado; were there?

A.   Correct, sir.  I don't have -- I did not have any video of Juan Orlando, sir.

Q.   In fact, you didn't have any videos of Tony Hernandez in those USBs, did you?

          MR. GUTWILLIG:  Objection, your Honor.  Asked and answered and mischaracterizing the testimony.

          MR. COLON:  I believe this is only from --

          THE COURT:  Ask your next question.  I am overruling it.  Go.

          MR. COLON:  Thank you.

Q.   And you didn't have any videos of Hilda Hernandez?

A.   No, sir.

Q.   And you didn't have any videos of Ana Hernandez?

A.   No, sir.

          MR. COLON:  Judge, a second, please?

          THE COURT:  Yes.

(Counsel conferring)

Q.  I just wanted to make sure you had no videos of Tony Hernandez in the USBs that you gave the government.

THE COURT:  That's an entirely different question. That's an entirely different question, Mr. Colon.

MR. COLON:  I will withdraw it and come back, if I may.

Q.  On those videos that were on the USBs that you gave to the government in December 2015, you had no videos of Tony Hernandez; correct?

MR. GUTWILLIG:  Objection, your Honor.  Vague; USBs you gave to the government in 2015?  The witness has not testified to that.

THE COURT:  I'm going to allow it.  Go ahead.

A.  I had videos of Tony Hernandez, sir.

Q.  I'm talking specifically about the videos, the USBs that you gave in December of 2013 going backwards for a couple of years, there were no videos of Tony Hernandez back then.

MR. GUTWILLIG:  Objection.  Relevance.  Also objection, the witness has not testified that he gave USBs in December of 2013.

THE COURT:  Do you have a basis for your claim about USBs in December of 2013?

MR. COLON:  He handed, your Honor, USBs to the government.

O2T5her1                    Rivera Maradiaga – Cross

THE COURT:  Do you have a basis for that?

MR. COLON:  He testified that he handed USBs to the government that he had collected over the years before the Denny's 2014 meeting.

THE COURT:  Your question was phrased in terms of December 2015.

MR. COLON:  I'm sorry?

THE COURT:  Initially your question was based as to December 2015.

MR. COLON:  '15, Judge, you said?

THE COURT:  Yes.

MR. COLON:  No, I meant '13.  I'm sorry.

THE COURT:  And then -- what is the basis for the government's objection as to 2013?  Is there a basis?

MR. GUTWILLIG:  There is no basis for that objection, your Honor.

THE COURT:  OK.  The question that was asked related to 2015, as I have looked at the transcript, so rephrase it, please, and let's move on.

MR. COLON:  Sure.

BY MR. COLON:

Q.  With respect to the USBs that you handed to the government in December 2013, going backwards a couple of years, isn't it a fact that you had no videos of Tony Hernandez in those USBs that you gave the government in 2013?

A.   From the time I started working as a DEA informant from 2013 to 2014, I did deliver many recordings but I don't remember the exact date that I delivered them.

Q.   Before you met with Mr. Hernandez in February or March of 2014, and you take from that day, before that there were no other videos of Tony Hernandez that were in your possession? Yes or no.

A.   I don't remember, sir.  As I said before, there were several recordings that I handed over to them but I don't remember the exact date.

Q.   Nevertheless, would you agree with me that you took dozens, if not hundreds of videos, before you actually started cooperating with the DEA?

A.   I don't remember how many recordings I made, sir, but before I became a DEA informant I already had a bunch of recordings, sir.

Q.   And the reason you made those recordings were so that you could use them against your co-conspirators in the event you needed them down the road?

         MR. GUTWILLIG:  Objection, your Honor.  Vague.

         THE COURT:  I will allow it.

A.   Repeat that again, please, sir?

Q.   The reason why you taped your co-conspirators, partners as you called them, was because you wanted to have evidence or proof or documentation of what you were doing with them in the

future, in case you wanted to use it against them?

A.  When I started making those recordings it was because of a recommendation that a man made to me.  He told me to start recording corrupt politicians, members of the military, police, and all the drug traffickers who had anything to do with drug trafficking.  And I followed his advice and started to record.

Q.  In fact, that gentleman was Mr. Sabillón, correct?

A.  Repeat the question, sir?

Q.  That man or that gentleman that gave you that advice was Mr. Sabillón, head of the National Police?

A.  The person who gave me that message was a cousin of mine, sir.

Q.  And that cousin of yours told that you, you could use that to extort the politicians if they didn't give you what you wanted; right?

A.  No, sir.

          MR. COLON:  Your Honor, may I step to the side here for a second?

          THE COURT:  Yes.

          (Counsel conferring)

          THE COURT:  Mr. Colon.  It is 10:39.  We just have started our day, practically, and I would ask that you have your questions prepared before you get to court so that we don't have to have extended delays like this.

          MR. COLON:  I'm sorry, Judge.

BY MR. COLON:

Q.  Do you recall -- you said your cousin -- I'm sorry.  You said your cousin advised you that Sabillón -- I'm sorry.  Withdrawn.

Was it your cousin that advised you that Sabillón was recommending that you use those videos in order to extort your politicians?

MR. GUTWILLIG:  Objection.  Mischaracterizing the testimony.

THE COURT:  I think it is a question and you are objecting on mischaracterizing testimony?  I don't think it referred to testimony.

MR. GUTWILLIG:  Understood, your Honor.

THE COURT:  Go ahead.

A.  What my cousin told me, sir, was for me to start taping recordings, not just of politicians but also of drug traffickers, sicarios, and everyone who had engaged in drug trafficking with me, sir.

Q.  And --

A.  Excuse me.

Q.  Isn't it a fact that -- I'm sorry.  Go ahead.

A.  It was to have proof later on, if I decided at some point to cooperate with the DEA, because I had already told my cousin that I intended to cooperate.  In Honduras, it is common for politicians to accept drug trafficking money and then turn

around and say they never took it, so I recorded them not to extort them but to make it known that these corrupt politicians were doing this; not all of them, but some, in Honduras.

Q.  Didn't you tell the government, on August 27, 2015 at a proffer, that Sabillón sent a message to your cousin Primo, or Avila, after OFAC listed you, that you should use the videos to threaten the politicians in case they didn't do what you wanted them to do?

A.  What Primo told me, sir, was to record politicians and everyone involved in drug trafficking so that I could have evidence in the future, sir.

Q.  And did your cousin get that from Mr. Sabillón, that advice or recommendation?

THE COURT:  If you know.

A.  Yes, sir.

Q.  Thank you.

Now, those video recordings that you made, prior to 2014, you made them with a watch that you had purchased?

A.  I was using several devices, sir.

Q.  Can you tell the jury what those devices were?

A.  They were watches, pens, and hats.

Q.  Did you use them daily or only when you were having scheduled meetings with these politicians?

A.  I would use them during different meetings, sir.  Whenever I was meeting with narco politicians, whenever I was meeting

with drug traffickers, and when I was meeting with other individuals, sir.

Q.   And you wanted to be very diligent in what you were doing?

A.   What I was doing was recording, sir.  I had no experience doing it, but what I was doing was recording all narco politicians and drug traffickers, sir.

Q.   With respect to Carlos Zelaya, that politician from the Libre Party, what did you ask of him?

A.   Well, what I had asked him and other traffickers there at the meeting, sir, was because Carlos Lobo was very interested in recovering the properties that had been seized from him.

Q.   Carlos Lobo was one of your drug trafficking partners?

A.   Yes, sir.  He was a drug trafficking partner that had also bribed Juan Orlando, sir.

        MR. COLON:  Your Honor, I move to strike the second part.  That is not responsive to what I asked him with respect to, you know, bribing Juan Orlando.

        THE COURT:  Yes.  I'm going to strike that portion which says that Carlos Lobo also bribed Juan Orlando.  You are to disregard that, ladies and gentlemen.

        Go ahead.  Next question.

        MR. COLON:  Thank you, your Honor.

BY MR. COLON:

Q.   How much money did you give Carlos Zelaya?

A.   Approximately between $100,000 and $200,000, sir.

Q.   And Carlos Zelaya is the brother of the former Honduran
President Mel Zelaya?

A.   Yes, sir.

Q.   Now, moving forward to the party of Ramon Moncho Lobo.

A.   Yes, sir.

Q.   Do you recall that occasion?

A.   Yes, sir.

Q.   And who is Ramon Moncho Lobo?

A.   He is Porfirio Lobo Sosa's brother, sir.

Q.   You testified that amongst the attendees there was
Mr. Hernandez?

A.   Yes, sir.

Q.   Was Ricardo Alvarez there as well?

A.   I did not see him, sir.

Q.   You said there were some of your drug trafficking partners
at that party?

A.   Yes, sir.

Q.   But there were also other politicians; correct?

A.   I don't know, sir.

Q.   About how many people were at the party?

A.   I don't know, sir, because I wasn't there.  The only thing
I did was see what Neftali Duarte Mejia showed me, and Juan
Hernandez was there, sir.

Q.   In fact, the person that went on your behalf was your
brother Javier; correct?

A. Correct, sir.

Q. And you sent him so that he can report on what was going on at the party; right?

A. Of what was going on with Juan Orlando, sir.

Q. And did he have a recording device on him at all?

A. No, sir.

Q. Did he have his telephone with him?

A. I don't know, sir, if his phone had a recording feature but I do know that Neftali Duarte Mejia's phone did, sir.

Q. But did your brother have a phone?

A. Yes, sir, and it was over that phone that I spoke with my brother, sir.

Q. Did he call you or did you call him?

A. He called me, sir, when he was there at the party.

Q. And how long did you talk for?

A. That was approximately for 20 to 30 minutes, sir.

Q. Do you know whether he was able to take a picture with his phone?

A. I don't know, sir.

Q. And Neftali Duarte Mejia was there as well?

A. Yes, sir.

Q. It is your testimony that you spoke to Mr. Duarte Mejia as well?

A. Yes, sir.

Q. And at one time you received a video call from Mr. Duarte

O2T5her1                        Rivera Maradiaga – Cross

Mejia?

A.   The moment that I started having the conversation with Neftali Duarte Mejia it was on video, sir.

Q.   And you testified that he let you see, gave you a visual of the party; correct?

A.   Yes.  He pointed the camera to where Juan Orlando and the other drug traffickers were, sir.

MR. COLON:  Indicating for the record that the witness raised his right hand, moved it from left to right on two or three occasions, and then put it down.

Q.   So he was giving you a panoramic view of people in the party?

A.   He focused on Juan Orlando and the drug traffickers, sir.

Q.   You don't know whether he took a picture of Juan Orlando and the other drug dealers, did you?

A.   What I saw on the video was that Neftali Duarte Mejia had his arm around Juan Orlando, sir.

Q.   Did you receive a still picture of Neftali Duarte Mejia embracing Juan Orlando?

A.   Neftali Duarte Mejia sent me a picture over the phone, sir.

Q.   Do you have that picture with you?

A.   No, sir, because I used to change phones fairly frequently and that's how the photo showing Juan Orlando and drug trafficker Neftali Duarte Mejia was lost.

Q.   Didn't you think that that picture of Neftali Duarte Mejia

and Juan Orlando was important to you?

A.  No, sir; because I knew that we were bribing Juan Orlando Hernandez, that we were going to be bribing Juan Orlando Hernandez, and that didn't matter to me.  I was not interested in the photo, sir.

THE COURT:  Mr. Rivera, when was this event that you are testifying about?

THE WITNESS:  That was in 2012, your Honor.

THE COURT:  Thank you.

Next question.

BY MR. COLON:

Q.  2012, that's the same year that you allegedly sent $250,000 to Juan Orlando's campaign to be given to his sister; correct?

A.  Not allegedly, sir.  The $250,000 was sent to him, sir.

Q.  The point is that was 2012, the same year that you sent those -- allegedly sent those $250,000 for the campaign of Mr. Juan Orlando Hernandez?

THE COURT:  Sustained.  That's not a question.

Q.  2012, when this party took place, is the same time that that 2012 event, with Hilda Hernandez scenario, that we talked about earlier.

MR. GUTWILLIG:  Objection, your Honor.  That's not a question.

THE COURT:  Yes, that's not a question either. Sustained.

MR. COLON:  Yes, sir.

Q.  You were asked about the 2012 donation or contribution to the campaign of Juan Orlando Hernandez on direct, the meetings you had with Hilda Hernandez and Oscar Nájera.  Do you remember that?

A.  Yes, sir.

Q.  That meeting with Hernandez took place in 2012; correct?

A.  Please repeat the question, sir?  I got a little confused.

Q.  The meeting with Hilda Hernandez and Oscar Nájera at the heliport, that was in 2012; correct?

MR. GUTWILLIG:  Objection, your Honor.  The witness did not testify that the meeting happened at a heliport.  Mischaracterizing the testimony.

Q.  Where did the meeting happen, sir, with Hilda Hernandez and Oscar Nájera?

A.  In Tegucigalpa.

Q.  That meeting in Tegucigalpa between Hilda Hernandez and Oscar Nájera and your brother Javier, that occurred in 2012; correct?

MR. GUTWILLIG:  Objection.  Asked and answered.

THE COURT:  It was asked, then there was a request to repeat the question, then it was reasked in a different form, so I'm going to allow it.

A.  Could you repeat it again, sir, please?

Q.  That meeting in 2012, between Hilda Hernandez, Oscar

Nájera, and Javier your brother, occurred in 2012; correct?

A.  Yes, sir.

Q.  And that's the same year that Ramon Moncho Lobo's parties took place; correct?

THE COURT:  That's been asked and answered.  That was the question I asked.

MR. COLON:  OK, sir.  I just wanted to bring him back to those two events.

THE COURT:  Well, you can't repeat questions.

MR. COLON:  I will ask another question, Judge.

BY MR. COLON:

Q.  Now that was an important political figure for you, was he not, Juan Orlando Hernandez?

A.  My understanding, from what Pepe Lobo told me through Fabio Lobo -- interpreter correction -- what Pepe Lobo told me through Fabio, was that we had to bribe Juan Orlando Hernandez because Juan Orlando Hernandez was the person who was going to run for president of the republic, sir.

Q.  So, he was important to you, wasn't he?

A.  Yes.  Because of what Pepe Lobo had told me, since I had already bribed Pepe Lobo, I was going to bribe whichever candidate he chose and the candidate he chose was Juan Orlando Hernandez, sir.

Q.  So the answer is yes, correct?

A.  He was important because Pepe Lobo had made that

recommendation to me, sir.

Q.  And, nevertheless, you failed to preserve the picture that Neftali Duarte Mejia sent to you that included Mr. Juan Orlando Hernandez and Neftali Duarte Mejia embracing?

MR. GUTWILLIG:  Objection.  Asked and answered.

THE COURT:  Sustained.

How much longer do you have, Mr. Colon?

MR. COLON:  I would say less than half an hour.  Half an hour, say.

THE COURT:  Ask your next question, please.

Q.  Now, drawing your attention to the meeting in 2012 in Tegucigalpa, you said?

A.  Yes, sir.

Q.  I'm going to bring you back to that meeting with Hilda. Your testimony was that you sent $250,000 to Hilda Hernandez; correct?

A.  I sent a worker of mine so that that worker of mine would deliver it to my brother Javier Rivera, and my brother Javier Rivera would deliver it directly to Hilda Hernandez, sir.

Q.  Why didn't you go and take that money to Hilda Hernandez?

A.  Because the other leader of the Cachiros Cartel was going, my brother, Javier.  It was the same.  He also represented the Cachiros Cartel, sir.

Q.  And you trusted your brother; correct?

A.  One hundred percent, sir.

Q. And you trusted your brother with respect to whatever he was going to tell you what occurred in the meeting?

A. I trusted him as well, sir, and I trusted Oscar Nájera because Oscar Nájera was also at the meeting.

Q. You trusted Oscar Nájera, you said?

MR. GUTWILLIG: Objection. Asked and answered.

THE COURT: Sustained.

Q. How much did you trust -- may I proceed?

INTERPRETER: Your Honor, by the interpreter, the microphone is dead. If you want, I can continue and just try to project or we can wait.

THE COURT: I think you are fine. You can proceed.

INTERPRETER: OK.

BY MR. COLON:

Q. Would you say you trusted Oscar Nájera a hundred percent?

A. Not in Oscar Nájera, sir, not one hundred percent, because Oscar Nájera was a politician and all politicians in Honduras are liars, just like Juan Orlando Hernandez.

MR. COLON: Objection.

A. I trusted my brother.

MR. COLON: Move to strike.

THE COURT: Stricken as to Juan Orlando Hernandez. Please disregard, ladies and gentlemen.

Q. And so, Mr. Rivera, at that meeting were you told exactly the place where the meeting took place, the locale, not just

the city?

A.   Yes, sir.

Q.   What was the locale?

A.   It was at Hilda Hernandez' house, sir.

Q.   Are you sure about that?

          MR. GUTWILLIG:  Objection, your Honor.

          THE COURT:  Sustained.

Q.   Who told you that?

A.   My brother Javier Rivera, sir.

Q.   Are you familiar with Tegucigalpa?

          Did he give you --

A.   I have gone a couple times, sir, but I'm not very familiar with it.

Q.   Did he give you a location, address for where that house was located?

A.   He only said at Hilda Hernandez' house, sir.  They were supposed to meet Juan Orlando Hernandez there but Juan Orlando Hernandez was not there.  Hilda Hernandez was.

Q.   And your brother told you that the money was delivered to Ms. Hernandez?

A.   Yes, sir.

Q.   Do you recall exactly what your brother told you?

A.   Yes, sir.

Q.   What was that?

A.   What my brother said was that when he -- when Javier

delivered that money to Hilda Hernandez, that woman was concerned because the money was in dollars.  She didn't want to accept it like that.  So, what they agreed on, with Oscar Nájera, was that Oscar Nájera was going to exchange it and Oscar Nájera would give it to the woman.  That was at the request of Oscar Nájera and Hilda Hernandez.

Q.  Do you recall whether your brother received some sort of receipt or document indicating that they had received that money?

A.  No, sir.  What I remember is that my brother said that he had delivered the money to the lady and Oscar Nájera, sir.

MR. COLON:  Your Honor, I would ask that we post 3502-03 for the Court and counsel only.  No one else except the Court and counsel.

Q.  Are you aware that your brother Javier, at one time --

MR. GUTWILLIG:  Objection, your Honor.  Approach side bar?

THE COURT:  Yes.  Why don't we take this at the side bar.  Ladies and gentlemen, stand up and stretch.

(Continued next page)

(At side bar)

THE COURT:  Mr. Colon, why is the document up on the screen --

MR. COLON:  Not for the jury --

THE COURT:  -- followed by the question:  Were you aware that?

MR. COLON:  That was for counsel.

THE COURT:  No, I thought it was up on the witness' screen.  It has been taken off on my screen.  It was not on the witness' screen?

MR. COLON:  I didn't ask for that.  I said Court and counsel.

THE COURT:  OK.

MR. COLON:  I didn't ask for him to see it.

THE COURT:  So why am I seeing this document as you ask a question:  Were you aware that?  What was the reason for that?

MR. COLON:  Well, I wanted to reference something that I was going to ask him and I didn't know whether you should see it or not so I put it up there.  I asked him for you to see it, Judge.

THE COURT:  For who to see it?

MR. COLON:  For yourself and the Court, so you see what I was referring to.

THE COURT:  Well, you haven't done that once in

questioning, neither has the government.

MS. SHROFF:  Your Honor, I'm sorry.

THE COURT:  In this trial it hasn't happened.  I don't understand what that is about.

MR. COLON:  I had a document that was -- that I was using, Judge, so I had a basis for the next series of questions that I was going to ask him.

MR. GUTWILLIG:  Your Honor, I apologize.  May I have a second with Mr. Colon?

THE COURT:  Yes.

MS. SHROFF:  Sorry about that, your Honor.

THE COURT:  That's all right.

(Counsel conferring)

MR. COLON:  I'm sorry, Judge.  I made a mistake.  I should have shown it to the witness first and asked him if he recognizes this document.

THE COURT:  Are you offering this document?

MR. COLON:  Well, there is a -- it is contradicted in this document as to where many facts -- what facts had occurred.

THE COURT:  That didn't answer my question.

MR. COLON:  I would offer it, Judge.

THE COURT:  So you were trying to lay a foundation with this witness whether he had seen this document?

MR. COLON:  Yes, sir.

THE COURT:  OK.  Let me hear the government's objection.

MR. GUTWILLIG:  Just to be clear, this document is 3500 material for a different witness, for Javier Rivera Maradiaga.

THE COURT:  All right.

MR. GUTWILLIG:  Counsel is of course free to show the witness whatever he would like to, but the witness has not said that he doesn't remember anything and I want to be very careful, especially with somebody else's 3500, that counsel does not start reading from things that are not in evidence and note that this is not his 3500 material.

THE COURT:  I think we are offbase here.  If you have a question which elicits an "I don't recall," then you may show the witness a document and ask him whether it refreshes his recollection whether it is his 3500 material or anybody's 3500 material.  I'm so old that when I was in law school the example that was used that you could use a matchbook cover to try to refresh somebody's recollection.

MR. COLON:  Yes.

THE COURT:  So, please proceed in that fashion.

(Counsel conferring)

MR. COLON:  Thank you, Judge.

THE COURT:  You're welcome.

(In open court)

MR. COLON:  Thank you, your Honor.

Q.  Mr. Rivera, didn't your brother Javier tell you that Ms. Hernandez, Hilda Hernandez, took off without the money?

A.  He didn't say that, sir.

Q.  And at another point at another time he also said that she was not given the money.

THE COURT:  That doesn't sound like a question to me, sir.

Q.  Did your brother say to you that he did not give her the money?

A.  What my brother told me, sir, was that he had given her the $250,000, sir.

Q.  Did he ever say to you that he didn't remember whether he gave her the money?

A.  He told me, with certainty, that he had given her the $250,000.

Q.  Is it possible that your recollection of what he said could be different from what he would say?

MR. GUTWILLIG:  Objection.

THE COURT:  Sustained.

Q.  I'm going to move to, if I may, your Honor, to the --

THE COURT:  Just ask the next question, please.

MR. COLON:  Yes, sir.

Q.  With respect to the meeting you had in a car with the mayor

O2T5her1                          Rivera Maradiaga - Cross

of Yoro, the department of Yoro involving the mayor of that

town --

        THE COURT:  Sustained.

Q.   Do you recall the time you were in the vehicle with

Mr. Urbina, the mayor of Yoro?

A.   Yes, sir.

Q.   And he was the mayor of the town; correct?

A.   Of the town of Yoro, sir.

Q.   And what party affiliation, did he have?

A.   With Juan Orlando Hernandez' party, sir, the National

Party.

Q.   How many occupants were in the car?

A.   I don't remember, sir.

Q.   Well, who was driving?

A.   I was next to Urbina, sir.  I don't remember that.

Q.   Whose car was it?

A.   I don't remember, sir.

Q.   Were you taping or recording?

A.   I recorded the mayor, sir.

Q.   There was no one else in the back seat?

A.   I don't remember, sir.

Q.   Isn't it a fact that --

        MR. COLON:  I mean, this actually happens to be 409T I

am referring to, your Honor, it is a transcript, it is in

evidence.

I would like to refer to page 5, if you could put that up, Andy.

And I am looking at page 15 and it is Section 140 where there is a conversation between Rivera and Soto.

MR. GUTWILLIG:  Can we please take this down, your Honor?  I don't think this is in evidence.

THE COURT:  Is it in evidence, Mr. Colon?

MR. COLON:  I believe it is.

MR. GUTWILLIG:  Can we have a moment to confer, your Honor, please?

THE COURT:  Please.

(Counsel conferring)

MR. COLON:  I'm going to withdraw that request, your Honor, for putting up 409T.

BY MR. COLON:

Q.  With respect to the conversation you had with him that day, at one point you offered to Mr. Soto to give Juan Orlando or send Juan Orlando -- withdrawn --

You offered to have Juan Orlando invest in a couple of kilos; correct?

A.  I don't remember, sir.

MR. GUTWILLIG:  May I have a moment to confer with counsel, your Honor?

THE COURT:  You may.

(Counsel conferring)

MR. COLON:  I'm going to pose a different question, Judge, if I may.

Q.  Mr. Rivera, at one point you asked Mr. Urbina if Juan Orlando would be interested in getting or receiving a couple of kilos or investing in a couple of kilos of cocaine; correct?

A.  I don't remember that, sir.

Q.  Do you recall Mr. Urbina saying to you that he would be taken to jail if he did anything like that?

A.  I don't remember, sir.

MR. COLON:  May I approach, sir?

THE COURT:  You may.

MR. COLON:  Judge, the document that I ask be published to the witness is 409A-T, Judge.

THE COURT:  A-T?

MR. COLON:  Yes, A-T.

THE COURT:  Any objection?

MR. GUTWILLIG:  No, your Honor.

THE COURT:  Go ahead.

BY MR. COLON:

Q.  Does the witness have that before him?

A.  No.

(Continued on next page)

Q.  Can you take a look at page 2, what's in evidence as Government Exhibit 409-A-T, and --

THE COURT:  There is nothing on the screen, sir.

MR. COLON:  It's not up?

THE COURT:  No, sir.

MR. GUTWILLIG:  Your Honor, we're happy to publish that exhibit if that's helpful.

THE COURT:  Government's offering to publish it if you'd like, Mr. Colon.

MR. COLON:  Yes.  I've asked, with the Court's permission, that he publish that, and I'd like the witness to read it or have it read to him in his original language if he needs that assistance, Judge.  Line 1 and line 2.

THE COURT:  You're not going to show him rest of the document?

MR. COLON:  Not right now.  Well, I can show him the rest of the document, but I want this area, this particular section.

THE COURT:  I understand.  Can you show him the rest of the document?

MR. COLON:  Can you please show him the rest of the document.

Q.  Does that document refresh your recollection as to what you said that day?

A.  Yes, sir.

Q.  What did you say exactly?  What did you say?

THE COURT:  Do you want him to read?

MR. COLON:  Yes, please read it.

THE COURT:  It's in evidence, but you can read it. You're asking him to read it aloud?

MR. COLON:  I was waiting to see if --

Q.  Read it aloud if you could, the first line.

A.  Leonel Rivera it says on number 1.  "Buddy, do you think that Juan Orlando wants to invest in that for a couple of kilos for him?"

Number 2.  Laughs, Urbina laughs.  "Buddy do you want for this man to bring me along with him buddy?"  Says Urbina.

Q.  I just asked you number 1 and 2 for now.  So, what you understood him to say was, in line 2, was that --

THE COURT:  No.  What's your question?

Q.  When you said that to him, his reaction was that he didn't want to go to jail, correct?

A.  What I understand from reading the document is that Urbina was telling me that Juan Orlando was saying that if we were discrete in drug trafficking, that there would be no problem then.

MR. COLON:  Move to strike.  That's not what I asked.

Q.  With respect to what Mr. Urbina said and meant when he said buddy doesn't want for this man to bring me along with him, buddy, that what he feared was going to jail if he even

O2T3HER2                        Rivera Maradiaga - Cross

mentioned the kilos offer that you made.

A.  Please repeat the question, sir.

Q.  With respect to what Mr. Urbina said in line 2 was that he was concerned about going to jail if he made that offer to the president.

          MR. GUTWILLIG:  Objection, your Honor.  That was not a question.

          THE COURT:  Ask a question.

Q.  What your understanding of what he said with respect to that answer, was that he was not -- that he was concerned about going to jail if he made that offer, wasn't he?

          THE COURT:  And "he" being who?

Q.  Mr. Urbina.

          THE COURT:  Go ahead.

A.  I did not understand that, sir.

Q.  You didn't understand what it meant to say when he said in Spanish what he said?

A.  No, sir.

Q.  What does the word *me lleve*, those two words together, what do those words mean?

A.  Well, to me, it could mean that he could take him out on a walk or he could bring him to a political rally.  It could have various meanings, sir.

Q.  Or take him to jail, correct?

A.  He could take him anywhere, sir.  That's not what I

understood.

Q.  Taking him to jail is a possibility, correct?

MR. GUTWILLIG:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  You also with the conversation that you had that day, isn't it a fact that you believed that Mr. Urbina was the man you trusted in the Department of Yoro?

A.  That who trusted, sir?

Q.  Did you trust Mr. Urbina?

A.  But trusted him how, sir?

Q.  As a fellow narcotics trafficker.

A.  Well, when I was working with Mr. Urbina, yes, I trusted him, because he never let me down when we did cocaine loads together, sir.

And I also trusted him when he relayed a message from Juan Orlando to me, sir.

MR. COLON:  Move to strike that part of the answer, Judge.

THE COURT:  The latter part is stricken.  Please disregard.

Q.  If you needed something done, you would go to Mr. Urbina, correct?

A.  Yes, sir.

Q.  And he was important to you?

A.  Yes, he was an important drug trafficker, and he and I had

worked together for several years in drug trafficking, sir.

THE COURT:  Mr. Colon, how much longer do you have?

MR. COLON:  Couple of minutes, Judge.  Not more than five.

THE COURT:  Thank you.

Q.   What would you trust him to do for you?

A.   Well, I trusted him to relay messages, to receive the cocaine shipments on clandestine airstrips, to provide security for the cocaine when it was transported from one location to another, just as he had been doing, sir.

MR. COLON:  Just two questions just to follow up on something, Judge, and then I'm done.

Q.   With respect to the issue of paying -- of bribing the politicians that you said and then taping them so that you could use taping against them.  Why would you have to record them and extort them if you already bribed them?

MR. GUTWILLIG:  Objection.

THE COURT:  Sustained.

Q.   You testified that you bribed these politicians, correct?

A.   Yes, I bribed the politicians, sir.

Q.   You thought if you bribed them, you'd get what you wanted, correct?

A.   The purpose was, I mean, if we were bribing a politician, it was in order to get results.  It was for them to help us make money in drug trafficking, to help protect cocaine

shipments to help us by giving us information from the government about when there were police checkpoints or when there were several police officers or when any of the Cachiros Cartel's properties were going to be raided.  That was why we paid these bribes, to count on the protection of the narco politicians.

Q.  Please yes or no.  In order for you not to be extradited, correct?

A.  It was -- there were several elements to that, sir.  One part was to not be extradited, but that was before I was working with the DEA.  Once I was working with the DEA, I was a DEA informant, I didn't care about being extradited anymore.

The narco politicians who I bribed always kept their word.  I surrendered voluntarily to the DEA.  No politician ever arrested me or extradited me.  They made good on their word.

Q.  Mr. Rivera, you weren't extradited or arrested because you were working with the DEA and they needed you to set up politicians; yes or no?

MR. GUTWILLIG:  Objection.

THE COURT:  Sustained as to form.

Q.  The DEA needed you to go out and tape people so that that could provide evidence for them, correct?

MR. GUTWILLIG:  Objection.  Calls for speculation.

THE COURT:  Rephrase it.

Q.   You went to work for the DEA in Honduras from December 2013 on, correct?

A.   I was an informant for the DEA, sir.

Q.   So you were a value to them if you stayed out there in Honduras and spoke to politicians and videoed them?

         MR. GUTWILLIG:  Objection.  Calls for speculation.

Q.   Were you not?

         THE COURT:  I'll allow that.

A.   I don't know what the DEA thought.  But remember that I started recording before I was a DEA informant.  Then once I was a DEA informant, I don't know what they saw as valuable. But, remember that I was a DEA informant, and the proof of that is that I delivered videos, documents, evidence about narco politicians, drug traffickers, and other people to them, sir.

Q.   Yes or no, please.  And they told you to continue to do that, correct?  Yes or no?

         MR. GUTWILLIG:  Objection.  Vague.  Continued to do what?

Q.   Continued to video and tape record.

         THE COURT:  Do you understand the question, sir?

         THE WITNESS:  No, your Honor.

Q.   The DEA directed you to continue videotaping and recording politicians; did they not?

A.   I gave them information, sir.  Not just about politicians, but about drug traffickers and other people, sir.

Q.   You continued that for almost two years, correct?

A.   I did that in approximately 2013 and 2014, and yes, sir.

And as I said before, I was not only recording politicians, I

was recording drug traffickers, and any people who were

committing crimes with me.

Q.   You would not have been able to do that if you were

arrested or detained by Honduran authorities, correct?

A.   No one arrested me, sir.  I did what I did, one, out of my

own initiative, and then I gave what I had to the DEA.  And no

one arrested me, because I was bribing corrupt politicians and

they made good on their word.  That's what I was paying them

for.  And no one arrested me.

Q.   And while you were working with the --

          THE INTERPRETER:  The interpreter omitted one thing at

the end.

A.   No one arrested me.  I surrendered to the DEA.

Q.   Right.  And from the inception in November 2013, while you

were working for the DEA, you actually killed three

individuals, correct?

A.   When I was in conversations, before I was working with the

DEA, those events occurred.

Q.   You actually killed Melvin Sandres, a political rival of

Wendy Caballero, and Sonia Marlen Ramos-Montes your

sister-in-law.  That's what you will actually did while working

for the DEA; yes or no?

MR. GUTWILLIG:  Objection, your Honor.

THE COURT:  The witness can answer the question if he knows.

A.  I don't remember, sir, but when I started, that had been before.

Q.  Those were Melvin Sandres, a political rival of Wendy Caballero, and Sonia Marlen Ramos-Montes.

THE COURT:  That's not a question.

Q.  That's who you killed when you started to work for the DEA?

MR. GUTWILLIG:  Objection.  Asked and answered, argumentative, counsel's testifying.

THE COURT:  It's asked and answered.

Q.  When did you start talking to the DEA?

A.  In November of 2013, sir.

Q.  Right.  And in November of 2013 is when those three people were killed; was it not?  Yes or no?

A.  I don't remember the dates, sir.

MR. COLON:  May I approach the witness, please?

THE COURT:  You may.

Q.  I want you to take a look at this document.  Look at the yellow line at the bottom.

Does reading that document refresh your recollection as to when those people were killed?

Does it refresh your recollection of when those people died?

THE COURT:  Counsel.

A.  It was in 2013, but I remember it was in the same month, but it was before I started talking to the DEA.

Q.  And that month was November of 2013, correct?

A.  Yes, sir.

MR. COLON:  One second, Judge.

Your Honor, I have one more thing, so I asked for five minutes, but the colloquy here lasted a little longer with the answers of the witness.

THE COURT:  Ask your question, please, sir.

Q.  You testified that you -- yesterday that you didn't recall how many properties were seized, correct?

A.  Yes, sir.

Q.  And some of the properties that were seized were from family members, correct?

A.  Yes, sir.  They were several front properties we had, sir.

Q.  Among them were Santos Isidro Rivera Cardona, those were one of those straw purchasers?

MR. GUTWILLIG:  Objection.  Vague.  Straw purchasers? And relevance.

THE COURT:  I'll allow the witness to answer if he understands.

A.  Repeat it again, sir?

Q.  I am going to read you some names of the people that you put properties in the name of them.  Your properties that you

owned that you put them in other people's names.

MR. GUTWILLIG:  Objection, your Honor.  That's not a question.

MR. COLON:  I'm going to ask it.

Q.  Do you know who Santos Isidro Rivera Cardona is?

A.  Yes, sir.

THE COURT:  I have no idea what the question is.  You were asking him whether he knows the person?  Is that the question?

Q.  Yes.  Who is that?

THE COURT:  That's a different question now.

MR. COLON:  I'm sorry, Judge?

THE COURT:  What is the question, sir?

Q.  Do you know who Santos Isidro Rivera Cardona is?

A.  I already answered, sir, that I do.

Q.  Who is it?

A.  That was my dad.

Q.  How about Diana Consuelo Morillo Santos?  Who is that?

A.  Diana?

Q.  Diana.

A.  I don't remember, sir.

Q.  Who is Marlena Isabel Cruz Quitanilla?

A.  Oh.  She's my sister-in-law, sir.

Q.  How about Javier Alberto Rivera Maradiaga?

MR. GUTWILLIG:  Objection, your Honor.  Relevance.

THE COURT:  I'll allow it.

Q.  Who is Javier Alberto Rivera Maradiaga?

A.  My brother, sir.

Q.  How about Efrain de Jesus Maradiaga Turcios?

A.  A cousin of mine, sir.

Q.  And who is Jose Angel Maradiaga Lopez?

A.  An uncle of mine, sir.

Q.  How about Esperanza Caridad Maradiaga Lopez?

A.  My mom, sir.

Q.  How about Mayra Liset Rivera Maradiaga?

A.  My sister, sir.

Q.  Did all those individuals, if you recall, did all those individuals have properties seized by the Honduran government in September of 2013?

A.  Yes, sir.

Q.  Were those properties actually your properties, which you had put in the name of other individuals; yes or no?

A.  Some of them, sir.

Q.  And how about businesses, like Empresa de Transportes de Nortes?

THE COURT:  How about certain businesses?  That's not a question.

Q.  How about certain corporations?

THE COURT:  That's not a question either.

Q.  Were there corporations that you owned that were your

corporations but were under someone else's name or ownership?

A.  We used several fronts, sir.

Q.  Was one of those fronts Empresa de Transportes de Nortes S.A.?

A.  I don't remember, but we had several companies, sir.

Q.  How about Palma del Bajo S.A.?

A.  My brother had several companies, sir, and I had the other ones.  I remember mine, sir.

Q.  How about Ganaderos y Agricultores del Norte?

A.  Yes, sir, that was a front company that we had for laundering money with Banco Continental, sir.

Q.  How about a company in the name of Jose Angel Maradiaga Lopez?

A.  What do you mean by how about?  I don't understand the question.

Q.  Angel Maradiaga Lopez.  Was he the owner of some properties?

A.  Yes, sir.

Q.  And who is he?

A.  He is an uncle of mine, and I already told you that.

Q.  How about a company called Inversiones Turisticas Joya Grande?

A.  That was mine, sir.

Q.  Were the banks that were used, Atlantida Bank, was that one of them?

A.  We had several accounts with several banks, sir.  But the main one was Banco Continental, sir.

Q.  Did you have accounts in Atlantida Bank?

A.  I do not remember, but we did have accounts with several banks, sir, but the main one was Banco Continental.

Q.  How about BAC Honduras?

A.  I don't remember about the other banks, sir, but I do remember Banco Continental, sir.

Q.  You don't remember Occidente Bank?

MR. GUTWILLIG:  Objection, asked and answered, relevance.

THE COURT:  Sustained.

Q.  Do you know how many properties or corporate entities were actually seized from your family in September of 2013?

A.  There were several, sir.

Q.  You don't remember exactly?

A.  No, sir.

MR. COLON:  May I approach, sir?

THE COURT:  You may.

MR. COLON:  Thank you.

Q.  I want you to take a look at this document in its entirety. I'm going to fold one page, and here is the document.  Do you need the interpreter to help you.  I'd like you to take a look at that document in its entirety.

MR. GUTWILLIG:  Your Honor, just for the record, I

understand this is Defense Exhibit 200.

MR. COLON:  Yes.  Exhibit 200 for identification.

MR. GUTWILLIG:  It is a document that is in Spanish that was provided by the defense to the government last night.

Q.  Do you know what that document is, by any chance?

A.  It is a document that says it comes from the Institute of Assets, sir.

MR. GUTWILLIG:  Objection.

THE COURT:  No.  You just can't read from -- I can read from the document also.  The question is, do you know what that document is or where it comes from or anything about the document?

THE WITNESS:  I don't know anything about it, sir.

THE COURT:  Next question.

MR. COLON:  May I approach?  I can show him the page, Judge.

THE COURT:  Sure.

Q.  I'm showing you a page with a folded, a creased corner, and looking at that document, I'm pointing to the top of that document, there is a number there in terms of how many properties were seized.

MR. GUTWILLIG:  Objection, your Honor.

THE COURT:  How much longer do you have, sir?

MR. COLON:  That's it, Judge.

THE COURT:  Are you finished?

MR. COLON:  I believe so.

THE COURT:  All right.

MR. COLON:  I want him to answer that question, if it refreshes his recollection as to how many properties were seized.

THE COURT:  Does it refresh your recollection, sir?

THE WITNESS:  No, sir.

THE COURT:  Next question.

Q.  Isn't a fact that 118 properties were seized from your family and yourself?  I mean properties or companies.

A.  Yes, sir, many properties were seized, including INRIMAR, which is the company that we the Cachiros Cartel used to launder money from the government, sir.

Q.  Didn't you in fact --

THE COURT:  Ladies and gentlemen, we'll take our midmorning recess.  Please do not discuss the case among yourselves or with anyone else.  We'll be back in 10 minutes. Thank you.

(Jury excused)

THE COURT:  We're in recess.

(Recess)

(Jury present)

THE COURT:  We need the witness.  Please be seated. Mr. Colon.

MR. COLON:  Yes, Judge.  Thank you.

BY MR. COLON:

Q.  Mr. Rivera, at a prior proceeding in this very courthouse, I believe before Judge Schoenfeld, and under oath, were you asked this question and did you give this answer.  This is page 44 of 62, line 18:

"Q. You were aware that seizures took place during the president's admission, were you not?"

MR. GUTWILLIG:  Your Honor, objection.  If he's trying to refresh his recollection, he can certainly do that, but I'm not sure what this is.

THE COURT:  On what basis are you proceeding?

MR. COLON:  Impeachment, sir.

THE COURT:  Impeachment of what testimony?

MR. COLON:  Of what, what, sir?

THE COURT:  What testimony of this witness are you impeaching?

MR. COLON:  He testified today that he was in fact aware of the fact that properties were seized in September 2013 today.  At prior proceedings, he gave a different answer, sir.

THE COURT:  Let's hear the question and the answer. Go ahead.

"Q. You were aware that seizures took place during the president's administration, were you not?"

Line 19.  Excuse me.  Answer line 20.  "No, sir, there were nothing that belonged to us was seized.  The president

came through on his promise that we would not be touched as long as he was president.  We weren't extradited and actually he set up his son as a middleman who would be able to protect us, help us, the Cachiros, which was my brother and me."

Were you asked that question and did you give that answer?

THE COURT:  Do you recall, sir?

THE WITNESS:  No, sir.

THE COURT:  Okay.  Next question.

Q.  The president at the time that your properties were seized was actually Pepe Lobo, correct?

A.  Yes, sir.

Q.  So it was under that president that those properties were seized, and you made the decision, shortly thereafter, to start cooperating with the DEA, correct?  Yes or no?

A.  When I decided, sir, to start cooperating with the DEA, was when OFAC listed the Cachiros Cartel, sir.

Q.  And the first extraditions from Honduras to the United States occurred in 2014 under the administration of Juan Orlando Hernandez Alvarado; is that correct?  Yes or no?

MR. GUTWILLIG:  Objection.  Counsel is testifying.

THE COURT:  It is a question.

A.  Yes, sir.

Q.  That first extradition was Carlos Lobo, correct?

A.  The first -- that was the first extradition, yes, sir, it

was Carlos Lobo.  But, I turned Carlos Lobo in with the help of the DEA.  It was the DEA who told the Honduran police where to locate Mr. Carlos Lobo, based on the information that I had provided.  I did not see Juan Orlando arrest Carlos Lobo.

Q.  Carlos Lobo was one of your partners, correct?

A.  Yes, he was a drug trafficker, sir.

Q.  And the Valle Valles were also extradited shortly thereafter in 2014 under the administration of Juan Orlando Hernandez Alvarado, correct?

A.  Yes, sir.

Q.  And the Valle Valles were partners of yours as well, correct?

A.  They were partners of mine and of Tony Hernandez's, sir.

MR. COLON:  Move to strike the answer with respect to Tony Hernandez, sir.

THE COURT:  Granted.  Stricken.

Q.  And what other partners of yours were extradited under the administration of Juan Orlando Hernandez Alvarado?

A.  I don't remember, sir.

Q.  Were any of your partners extradited after 2014, 2014 until 2022?

A.  Several of them, sir.

Q.  Could you tell the jury how many and who they were?

A.  I do not remember, sir.

Q.  You said there were many.

A.   There were several, sir.

MR. COLON:  One second, your Honor, please.

Your Honor, I'd like DX 205, Defense Exhibit 205 to be put up only to the Court, counsel, and the witness, sir. Respectfully.

THE COURT:  What's the question?

Q.   Looking at Defendant's 205, Mr. Rivera, does looking at that chart or what's on there, does that refresh your recollection as to what, if any, were your partners and were they extradited under the administration of Juan Orlando Hernandez?

THE COURT:  That's compound.  Why don't you --

Q.   Looking --

THE COURT:  I don't think the witness said he didn't remember who his partners were.

MR. COLON:  I think he said he didn't remember how many were extradited.

THE COURT:  That's a different question.  Why don't you ask him whether it refreshes his recollection.

Q.   So, does this refresh your recollection as to the individuals that you were partners with being extradited?

THE COURT:  At what time period, sir?

Q.   From 2014 to 2022.

A.   I do not remember the dates, sir.

Q.   Well, how many were extradited that were your partners from

your list?  Does that refresh your recollection of how many there were and what their names were?

A.  There are several here, sir.

Q.  We talked about Carlos El Negro Lobo, correct?

A.  Yes, it was his information that I provided to the DEA, and then the DEA gave that information to the national police about the house where he was arrested, sir.

Q.  Luis Alonso Valle Valle.  Does it refresh your recollection as to whether he was extradited?

MR. GUTWILLIG:  Objection.  Asked and answered.

MR. COLON:  I'm specific here, Judge.

THE COURT:  I'm going to allow it.  Go ahead.

A.  Yes, sir.

Q.  And Miguel Arnulfo Valle Valle, was he your partner?

A.  Yes, sir.

Q.  Was he extradited?

A.  Yes, sir.

Q.  How about Hector Emilio Fernandez Rosa, also known as Don H, was he your partner?

A.  Yes, sir.

Q.  Was he extradited?

A.  Yes, sir.

Q.  How about Noe Montes Bobadilla, was he your partner as well?

A.  Yes, sir.

Q.  Was he extradited?

A.  Yes, sir.

Q.  How about Juving Alexander Suazo Peralta, also known as Chancleta, was he your partner?

A.  Yes, I also gave his information to the DEA, and the DEA showed the national police where he was located so that he could be arrested, sir.

Q.  Was he extradited?

A.  Yes, sir.

Q.  How about Ludwig Criss Zelaya Romero?

A.  I also gave his information to the DEA for him to be extradited, sir.

Q.  Was he extradited?

A.  Yes, sir.

Q.  Marlen Griselda Amaya, was she your partner and was she extradited?

A.  No, I do not remember who that lady is.

Q.  How about Wilmer Alonso Carranza Bonilla, was he your partner and was he extradited?

A.  I do not remember him, sir.

Q.  How about Jose Adalid Amaya Argueta, was he your partner and was he extradited?

A.  I do not remember him, sir.

Q.  How about Carlos Emilios Arita Lara, was he your partner and was he extradited?

O2T3HER2                      Rivera Maradiaga - Cross

A.   Yes, sir.

Q.   For both questions, partner and extradited?

A.   Yes, sir.

Q.   Juan Carlos Arbizo, a/k/a Lanchita, was he your partner?

A.   Yes, sir.

Q.   Was he extradited?

A.   I also gave his information to the DEA, sir.

Q.   Thank you.  How about Sixto Obed Argueta Garcia, was he your partner?

A.   I do not remember him, sir.

Q.   How about Jose Raul -- I've got some a problem here in terms of what's on the bottom.  It's obscuring the names.  I am going to move, your Honor, so I can clarify.

          Jose Raul Amaya, was he your partner?

A.   I do not remember him, sir.

Q.   How about Jairo Aly Arias Mejia, also known as King Arthur, was he your partner and was he extradited?

A.   I do not remember him, sir.

Q.   How about Jose Inocente Valle Valle, was he your partner and was he extradited?

A.   Yes, sir.

Q.   How about Sergio Neftali Mejia Duarte, El Compa, was he your partner and was he extradited?

A.   Yes, sir.

Q.   How about Arnulfo Fagot Maximo, was he your partner and was

he extradited?

A.   Yes, sir.

Q.   How about Roberto de Jesus Soto Garcia, was he your partner and was he extradited?

A.   I do not remember him, sir.

Q.   How about Jeffrey Guzman Tovar, was he your partner and was he extradited?

A.   I do not remember him, sir.

Q.   Finally Aristides Diaz, was he your partner and was he extradited?

A.   I don't remember him, sir.

Q.   All these individuals were extradited after you started cooperating with the DEA, correct?

          MR. GUTWILLIG:  Objection, your Honor.

Q.   If you know?

          MR. GUTWILLIG:  He's already answered he doesn't know whether some of these individuals were extradited.

          MR. COLON:  Of those people he does know, Judge.

          THE COURT:  I'll allow the question.

          THE INTERPRETER:  May the question be repeated for the interpreter, please, your Honor.

Q.   Are those people that are portrayed in that exhibit, were all those people extradited that you know, if you know, extradited after you were cooperating with the DEA?

          THE COURT:  Sustained as to form.  That's not in

evidence.  If you want to ask him about the individuals who he testified to as having been extradited, you can ask him that question, sir.  But not the question you asked.

Q.  And those individuals that you just pointed out that you extradited, were extradited under the administration of Juan Orlando Hernandez, correct?

A.  I don't understand the part where you say that I extradited.

Q.  All those -- sorry.  All those individuals that you pointed out that were extradited, were all extradited under the administration of Juan Orlando Hernandez Alvarado, correct?

A.  Yes, sir.

Q.  Because before 2014, no one had been extradited from Honduras to the United States, correct?

A.  I don't know that, sir.

Q.  But you feared being extradited, correct?

A.  I did not fear being extradited, sir, because that was the reason why I was bribing politicians, military officials, police officers.  I had no fear of extradition, sir.

Politicians came through, sir, because I was not extradited.  I surrendered to the DEA, sir.

Q.  You surrendered because you were fearful of being extradited.

MR. GUTWILLIG:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  You didn't have to surrender because you thought you were being protected, weren't you?

A.  I was protected by politicians, sir, and I did not fear extradition.  When I decided to surrender to the DEA, was because I was listed by OFAC, sir.  But, I did not -- I had bribed politicians, so I was sure that I would not be extradited.

Q.  You really weren't protected because the government of Honduras seized your properties in September of 2013, correct?

MR. GUTWILLIG:  Objection.  Argumentative.

THE COURT:  Sustained.

Q.  The fact is that the government of Honduras seized your properties in September 2013?

MR. GUTWILLIG:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  That's not what you wanted the government of Honduras to do, was to seize your property?

MR. GUTWILLIG:  Objection.

THE COURT:  I'll allow that.

Did you want the government of Honduras to seize your property?

THE WITNESS:  I did not want that, sir.

Q.  And the reason for bribing them was because you didn't want them to seize your properties, correct?

MR. GUTWILLIG:  Objection.  Vague.  "Them"?

THE COURT:  I'll allow it.

A.  Repeat the question, please, sir.

THE COURT:  The only thing I must say is I think, Mr. Colon, that you inquired as to the motivation or the alleged motivation for paying bribes to politicians during your cross-examination.  I believe you already inquired into that. Is that correct?

MR. COLON:  Yes, sir.

THE COURT:  Then move on.

Q.  The bottom line, sir, was that you didn't run away.  You got chased away by the policies of Juan Orlando Hernandez. Isn't that a fact?

MR. GUTWILLIG:  Objection.  Argumentative.

THE COURT:  Sustained.

Q.  It's Juan Orlando Hernandez who led you to surrender to the DEA, correct?

MR. GUTWILLIG:  Objection, your Honor.

THE COURT:  Overruled.

A.  Not at all, sir.

Q.  You gave him $250,000 for protection that your properties would not be seized, and you still took off.

MR. GUTWILLIG:  Objection, your Honor.  Form, not a question.

THE COURT:  I'll allow it to stand.  Go ahead.

A.  Repeat it, sir?

Q.  Mr. Rivera Maradiaga, you surrendered because of the policies of Mr. Juan Orlando Hernandez Alvarado; isn't that true?

THE COURT:  That's not the question you asked.  Are you withdrawing the prior question?

MR. COLON:  Yes.

Q.  Mr. Rivera, you surrendered --

THE COURT:  You already asked the question.  I asked you whether you were withdrawing the prior question and you answered that.  So you have a question pending.

A.  No, sir.

Q.  You gave him $250,000 so your properties could not be seized, correct?

A.  I gave Juan Orlando Hernandez $250,000 so that he would protect us, so we wouldn't be extradited, to get police information, and to continue in drug trafficking, our work.

Q.  But he didn't do what you wanted him to do for those $250,000, correct?

A.  Of course he did, sir.  He didn't extradite me.  He didn't put me in jail in Honduras.

Q.  But it was Juan Orlando as president of the congress that passed the extradition and the seizure laws that led to your properties being seized.  That's a fact, correct?

A.  I don't know if he passed those laws, but he did make good on his word to me, sir, as president of congress.  He was

president of congress when he accepted those bribes, sir.

He would have arrested me if he had not accepted the bribe.

He didn't arrest my brother when he was bribing Juan Orlando Hernandez's sister, sir.

MR. COLON:  Move to strike that entire answer, sir.

THE COURT:  I'll allow the answer to stand to the extent that the witness answered your question "I don't know if he passed those laws."  That stands.  The rest I'll strike.

Q.  Mr. Rivera Maradiaga, you filed -- you had the FBI file an S visa application for you, correct?

A.  I don't remember, sir.

Q.  You don't have a pending application for any sort of immigration relief here in this country?

MR. GUTWILLIG:  Objection, your Honor.  Relevance.  Basis?

MR. COLON:  That's a benefit, Judge.

MR. GUTWILLIG:  May we approach at the sidebar, your Honor?

THE COURT:  I mean if you want to open this door, go right ahead, Mr. Colon.  It's up to you.

MR. COLON:  Can we approach at the sidebar?

THE COURT:  Yes.

(Continued on next page)

(At the sidebar)

MR. COLON:  Your Honor, I asked whether or not he was -- an applicant or an FBI application had been filed for him with respect to an S visa or any other immigration relief. That's what I want to know.

THE COURT:  Okay.  I said you can ask it.

MR. GUTWILLIG:  Your Honor --

THE COURT:  You can ask it.  You can ask it.

MR. GUTWILLIG:  Your Honor --

THE COURT:  You heard what I said.

MR. COLON:  Yes.

THE COURT:  So go ahead.  Ask it.

MR. COLON:  I want to hear the government's position.

THE COURT:  Well, maybe I don't.

MR. COLON:  Okay.

THE COURT:  Mr. Gutwillig.

MR. GUTWILLIG:  Your Honor, just to clarify, I don't know what counsel's basis is for inquiring about this.  I would ask that he identify what that is for a couple things.  One is that the DEA is the relevant agency, not the FBI.  And I think the question about immigration benefits could be confusing to the jury.  The witness is still under a cooperation agreement. Counsel may be inquiring similar to what happens with a prior witness, but that is not this witness.  So I'd ask counsel to identify his basis for this question.

THE COURT:  Do you have a good faith basis for the question?  And what is it?

MR. COLON:  I believe someone of this magnitude is someone that the United States government might be predisposed to give him some sort of S visa witness protection program, some sort of relief, so he doesn't have to go back to his country.  That's what I'm looking for.  Is that going to be a reward or a benefit for his cooperation.

MR. GUTWILLIG:  Your Honor, that's entirely speculative.

THE COURT:  Then --

MR. GUTWILLIG:  There is no basis for that.

THE COURT:  If there is no basis for it, then the answer will be no.

MR. GUTWILLIG:  Understood.  I think that line of questioning is just confusing because there is no basis for it at all.  We have produced voluminous 3500 material.

THE COURT:  The best way to get to the bottom of that is have him ask the question, and then the answer is no, and then you're done.

MR. GUTWILLIG:  Understood.

THE COURT:  If it was left up in the air, you wouldn't want to clarify it and ask him were you made any promises on immigration?  I don't understand that position.  But I will say this.  If this opens a door, the door is open.

(In open court)

THE COURT:  Ms. Reporter, would you be so kind as to read back the last question.

(The record was read)

THE COURT:  You may answer.

A.  Repeat it, please, sir?

Q.  I'm going to withdraw that question and ask the following question.

Have you been made any promises by the United States government to stay in this country after you're sentenced?

A.  No, sir.

Q.  Are you afraid to return to Honduras, sir?

A.  Yes, sir.

Q.  That's why you surrendered to the United States.  Thank you.  Correct?

A.  I surrendered to the United States to show all of the evidence that I had about drug traffickers, all of the corrupt politicians, including Juan Orlando and Tony Hernandez, among others.  That was why I surrendered, sir.

MR. COLON:  No further questions.

THE COURT:  Ladies and gentlemen, we'll take our lunch break.  Please do not discuss the case among yourselves or with anyone.  We'll be back in action at 2 o'clock.  Thank you.

(Jury excused)

(Continued on next page)

THE COURT:  Let me see counsel at sidebar.

(At the sidebar)

THE COURT:  The job of a trial judge includes managing the time of the jury, when the jury is to arrive in the morning, when they take their breaks, when they have lunch, and when they adjourn for the day.  In making those decisions, the Court relies on the good faith responses of counsel.  There's always an allowance for the unexpected, unanticipated, or even an inability to accurately estimate the length of time that one might take in questioning a witness.

The answers that were given to me in response to my inquiries about length of time were so out of the realm of plausible and reasonable time expectations, as bespeak of a different motivation.

At approximately 10:39 this morning I asked counsel how much longer so I could time a break, and the answer was 30 minutes.  And then I asked at a later time and I got increasingly shorter estimates, down to five minutes, and then finally, before the break, it was I have one more question.

That's not true.  There were several different new lines of inquiry.  It's not as if there was an unexpected answer from a witness that prompted a new line of inquiry.

And so, I put this on the record because it may be at some point important to make findings about a pattern, a pattern that precedes the impanelment of this jury.  So I just

O2T3HER2

wanted to put this on the record.

Anybody want to respond?

Okay.  We're in recess.

(Luncheon recess)

(Continued on next page)

A F T E R N O O N   S E S S I O N

2:10 p.m.

THE COURT:  Let's remain standing for our jurors.

(Jury present)

THE COURT:  Please, be seated.

Good afternoon, ladies and gentlemen.  Please let me know how the weather is in the jury box.  I realize yesterday it got very cold in the courtroom.  That was because Flo was not here to take care of the temperature control, and Stuart and Mary Kate don't quite have that down, nor do I.  That is why Flo is indispensable to the process.  So, you will let me know if you want to turn up or down.

Mr. Gutwillig, whenever you are ready.

MR. GUTWILLIG:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. GUTWILLIG:

Q.  Mr. Rivera, do you recall when on cross-examination you were asked questions about your cooperation with the DEA?

A.  Yes, sir.

Q.  Your cooperation with the DEA began in approximately November of 2013; is that correct?

A.  Yes, sir.

Q.  Did you begin cooperating with the DEA after the Cachiros were designated by OFAC?

A.  Yes, sir.

O2T5her3                         Rivera Maradiaga – Redirect

Q.   Is OFAC part of the Honduran government?

A.   No, sir.

Q.   Is OFAC part of the United States government?

A.   Yes, sir.

Q.   As part of your cooperation, did you provide video recordings to the DEA?

A.   Yes, sir.

Q.   Did you provide other information to the DEA?

A.   Yes, sir.

Q.   Did you provide information to the DEA that led to arrests?

A.   Yes, sir.

Q.   Did you provide information to the DEA that led to the arrest of Fabio Lobo?

A.   Yes, sir.

Q.   Did you traffic drugs with Fabio Lobo?

A.   Yes, sir.

Q.   Did you provide money to Fabio Lobo to bribe politicians?

A.   Yes, sir.

Q.   Where was Fabio Lobo arrested?

A.   In Haiti, sir.

Q.   Approximately when was Fabio Lobo arrested in Haiti?

A.   Between 2015 and '16, sir.

Q.   Was Fabio Lobo extradited from Honduras?

A.   No, sir.

Q.   Did you provide information that led to the arrest of

Geovany Fuentes Ramirez?

A.  Yes, sir.

Q.  Where was Geovany Fuentes Ramirez arrested?

A.  In the United States, sir.

Q.  Approximately when was Geovany Fuentes Ramirez arrested?

A.  Between 2019 and '20, sir.

Q.  Was Geovany Fuentes Ramirez extradited from Honduras?

A.  No, sir.

Q.  You testified on cross-examination that you're scared to go back to Honduras.  Do you remember that?

A.  Yes, sir.

Q.  Are you aware of any immigration benefits that you are receiving from the United States government?

A.  No, sir.

Q.  Are you scared to go back to Honduras because you are testifying in this case?

A.  Yes, sir.

Q.  You testified yesterday about multiple conversations you had with Geovany Fuentes Ramirez about his cocaine lab.  Do you remember that?

A.  Yes, sir.

Q.  Approximately when did you meet Geovany Fuentes Ramirez?

A.  That happened approximately between 2009 and 2010, sir.

Q.  Did he approach you about his cocaine lab at approximately the same time?

A.   Yes, sir.

Q.   Did you also speak with Geovany Fuentes about the cocaine lab later in approximately 2013?

A.   Yes, sir.

Q.   And prior to that conversation with Geovany Fuentes, had you learned that his cocaine lab had, in fact, been raided?

A.   Yes, sir.

Q.   You did not learn that from Geovany Fuentes; correct?

A.   Yes, sir.

Q.   I'm sorry.  You did or did not learn from Geovany Fuentes about the fact of the lab having been raided?  Withdrawn.

      Did you learn about the fact of the lab having been raided before you spoke to Geovany Fuentes about it?

A.   Yes, sir.

Q.   You were asked on cross-examination about an extradition law that was passed in Honduras in 2012; do you remember that?

A.   Yes, sir.

Q.   Who was the president of Honduras when that law was passed?

A.   Porfirio Lobo Sosa, sir.

Q.   2012 was the year that your brother Javier Rivera attended a birthday party with the defendant; correct?

A.   Correct, sir.

Q.   Was your brother a drug trafficker?

A.   Yes, sir.

Q.   Did your brother commit murders?

A.   Yes, sir.

Q.   Did your brother discuss drug trafficking at that birthday party with the defendant?

A.   Yes, sir.

Q.   Was your brother Javier Rivera arrested at the birthday party?

A.   No, sir.

Q.   Were there other drug traffickers at the birthday party?

A.   Yes, sir.

Q.   Who?

A.   Eliel Sierra, Neftali Duarte Mejia, Wilter Banco, Moreno Blanco, Chinda Montes, Tom Montes, and others were there, sir.

Q.   Did they discuss drug trafficking at the birthday party?

A.   Yes, sir.

Q.   Did some of them tell you that they discussed drug trafficking with the defendant at the birthday party?

A.   Yes, sir.

Q.   Were any of those drug traffickers arrested at the birthday party?

A.   None, sir.

Q.   2012 was also the year that the Cachiros provided $250,000 to the defendant's sister, Hilda Hernandez, for his presidential campaign; correct?

A.   Yes, sir.  Correct, sir.

Q.   When Javier delivered the $250,000 to Hilda Hernandez, did

Hilda Hernandez call the defendant on the phone?

MR. COLON:  Objection.

THE COURT:  Basis?

MR. COLON:  If he knows.

THE COURT:  If you know.

A.  Yes, sir.

Q.  Hilda Hernandez talked to the defendant on the phone during that meeting, correct?

A.  Correct, sir.

Q.  Was Javier Rivera at that meeting when he gave $250,000 to Hilda Hernandez?

A.  No, sir.

Q.  Was your brother Javier Rivera, ever arrested in Honduras?

A.  Never, sir.

Q.  And after that $250,000 bribe was paid in 2012 until you began cooperating with the DEA in approximately November of 2013, did you continue trafficking drugs?

A.  Yes, sir.

Q.  During that time period, approximately how many times did you traffic drugs?

A.  Tens of times, sir.

Q.  Where did you traffic drugs during that time period?

A.  We would receive cocaine loads from Colombia and we trafficked them in Honduras, sir.

Q.  And during that time period, what was the approximate

amount of drugs that you trafficked through Honduras?

A.  In total, sir, it was between some 130 and 150 tons, sir.

Q.  Did you traffic those drugs with the help of the Honduran police?

A.  Yes, sir.

Q.  And again, referring to that time period of 2012 when you began cooperating with the DEA in November of 2013, did you traffic those drugs with the protection of politicians in Honduras?

A.  Yes, sir.

Q.  And during that time period, did you traffic drugs with the help of the military in Honduras?

A.  Yes, sir.

Q.  And during that time period, was your drug trafficking protected by weapons?

A.  Yes, sir.

Q.  During that time period, were you ever arrested?

A.  No, sir.

Q.  Did you begin cooperating with the DEA because of the defendant?

A.  No, sir.

Q.  Did you surrender to the United States because of the defendant?

A.  No, sir.

        MR. GUTWILLIG:  May I have a moment, please, your

Honor?

THE COURT:  Yes.

(Counsel conferring)

BY MR. GUTWILLIG:

Q.  During that time period, from 2012 after the $250,000 bribe was provided, until you began cooperating with the DEA in November of 2013, was your drug trafficking protected by the defendant?

A.  Yes, sir.

Q.  During that time period, were you ever worried about getting caught?

A.  Never, sir.

MR. GUTWILLIG:  No further questions, your Honor.

THE COURT:  All right.  You may step down.

THE WITNESS:  (In English)  Thank you, sir.

THE WITNESS:  Thank you, sir.

(Witness excused)

THE COURT:  Government may call its next witness.

MR. ROBLES:  Your Honor, the government calls Andréa Santos.

INTERPRETER:  Your Honor, there is an exhibit here.

THE COURT:  That's up to the parties to retrieve it. Thank you.

ANDREA SANTOS,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ROBLES:

Q.   Good afternoon, Ms. Santos.

A.   Good afternoon.

Q.   Where are you from?

A.   Honduras.

Q.   In what country do you live in now?

A.   The United States.

Q.   Approximately what year did you move to the United States?

A.   2016.

Q.   When you came to the United States in 2016, did you have a visa to enter the United States?

A.   Yes.

Q.   Have you since overstayed that visa?

A.   Yes.

Q.   Ms. Santos, since moving to the United States, have you been back to Honduras?

A.   No.

Q.   Why not?

A.   Out of fear.

Q.   Do you intend to apply for an S Visa?

A.   Yes.

Q.   Have you spoken to prosecutors about starting that application process?

O2T5her3                        Santos -Direct

A.   Yes.

Q.   Ms. Santos, when you lived in Honduras, what city did you
live in?

A.   San Pedro Sula.

Q.   Do you know what MS-13 is?

A.   Yes.

Q.   What is that?

A.   A gang.

Q.   Have you ever met any members of MS-13?

A.   Yes.

Q.   Have you spoken to any members of MS-13 in person?

A.   Yes.

Q.   What country were you in when those conversations with
members of MS-13 took place?

A.   In Honduras.

Q.   Were you ever a member of MS-13?

A.   No.

        MR. ROBLES:  I ask that Government Exhibit 118 be
shown to counsel, the Court, and the witness, please.

        THE COURT:  All right.

Q.   Ms. Santos, do you recognize what is on the screen?

A.   Yes.

Q.   What is that?

A.   It's an individual.

Q.   Do you know that person?

O2T5her3                        Santos -Direct

A.  Yes.

Q.  Who is it?

A.  Alexander Mendoza.

Q.  Have you met Mr. Mendoza in person before?

A.  Yes.

Q.  Is that a true and accurate photo of Mr. Mendoza?

A.  Yes.

        MR. ROBLES:  The government offers Government Exhibit 118.

        MR. COLON:  No objection.

        THE COURT:  Received.

        (Government's Exhibit 118 received in evidence)

        MR. ROBLES:  Ms. Collins, if you could please publish that for the jury?

BY MR. ROBLES:

Q.  Ms. Santos, do you know Mr. Mendoza by any other names?

A.  Yes.

Q.  What name is that?

A.  Alexander Mendoza.

Q.  Does he go by any nicknames?

A.  Yes.

Q.  What nickname is that?

A.  Porky.

        MR. ROBLES:  Ms. Collins, you can take that down. Thank you.

O2T5her3                           Santos -Direct

Q.   If I refer to Mr. Mendoza as Porky today, will you know who I am talking about?

A.   Yes.

Q.   Do you know whether Porky is in a gang?

A.   Yes.

Q.   What gang is that?

A.   MS-13.

Q.   Ms. Santos, approximately what year did you first meet Porky?

A.   2004.

Q.   Was that in Honduras?

A.   Yes.

Q.   What city were you in when you met Porky?

A.   San Pedro Sula.

Q.   After you met Porky, did you develop a friendship with him?

A.   Yes.

Q.   Did there come a time when you lived together?

A.   Yes.

Q.   Did there come a time when you became financially dependent on Porky?

A.   Yes.

Q.   For approximately how long did you live with Porky?

A.   One year.

Q.   Ms. Santos, you testified a moment ago that Porky was a member of MS-13.  Without telling me what anybody said to you,

O2T5her3                           Santos -Direct

how, if at all, did you learn that for the first time?

A.   Through some photos.

Q.   What did you see in those photographs?

A.   It was he and other persons were on that photo making gang signs with their hands.

Q.   Had you seen people making those gang signs before?

A.   Yes.

Q.   And did you know that those gang signs were associated with MS-13?

A.   Yes.

Q.   Did there come a time when you moved out of Porky's house?

A.   Yes.

Q.   After you moved out, did you stay in touch with Porky?

A.   Yes.

Q.   Did you speak to him by phone?

A.   Yes.

Q.   Did you speak to him in person?

A.   Yes.

Q.   Ms. Santos, I want to direct your attention now to approximately 2007.  Did there come a time when Porky asked you to help package any drugs?

A.   Yes.

Q.   What type of drug was that?

A.   Crack.

Q.   Did you do it?

O2T5her3                         Santos -Direct

A.  Yes.

Q.  Why did you do it?

A.  Out of fear.

Q.  Ms. Santos, did you initially withhold that information from the government during meetings with prosecutors?

A.  Yes.

Q.  Why did you do that?

A.  Out of fear.

Q.  And sitting here today, have you now told the government the full extent of any involvement you may have had with helping Porky package any drugs?

A.  Yes.  Everything.

Q.  Ms. Santos, I want to direct your attention now to approximately 2012.  Did you see Mr. Mendoza in person around that time?

A.  Yes.

Q.  Is it fair to say that by 2012 you had developed a close relationship with Porky?

A.  Yes.

Q.  When you were with Porky in approximately 2012, did you ever hear him speaking with other members of MS-13?

A.  Yes.

Q.  And did you ever see them meeting in person?

A.  Yes.

Q.  In general terms, what were the types of things that you

would hear Porky speaking to other members of MS-13 about?

A.   Drugs, guns, killings.

Q.   And based on the conversations that you heard, do you know whether Porky held any leadership position within MS-13?

MR. COLON:  Objection.

THE COURT:  Basis?

MR. COLON:  Hearsay.

MR. ROBLES:  Your Honor, I believe these are issues that were previously briefed before the Court.

THE COURT:  Yes.  Overruled.

Q.   Ms. Santos, based on the conversations that you heard between Porky and other members of MS-13, did you have an understanding of whether Porky held a leadership role within the gang?

A.   Yes.

Q.   What role was that?

A.   Boss.

Q.   What about those conversations led you to believe that Porky was the boss of MS-13?

A.   Because of the things that they were discussing, the way in which they spoke, and because he was making the decisions.  All decisions.

Q.   Ms. Santos, did you ever hear Porky speaking to someone that used the name Anwar?

A.   Yes.

O2T5her3                    Santos -Direct

Q.   Who is Anwar?

A.   A gang member.

Q.   Was he in MS-13?

A.   Yes.

Q.   And generally, what were the conversations between Porky and Anwar about?

A.   They would always discuss drugs, guns, people who were in jail that had been arrested.

Q.   Ms. Santos, did you ever hear Porky speaking to someone called David Campbell?

A.   Yes.

Q.   And what were those conversations about?

A.   Drugs, money.

Q.   Do you know what, if any role, David Campbell had in MS-13's drug operation?

A.   Yes.

Q.   What role was that?

A.   He was the supplier of the drugs.

Q.   When you say drugs, what type of drug are you referring to?

A.   Cocaine.

Q.   And did you know David Campbell by any other names?

A.   Tio Sam or Flaco.

Q.   Had you ever heard David Campbell referred to as Viejo Sam?

A.   Yes.  Viejo, Flaco, or Tio Sam.

Q.   And are those names that Porky would use?

O2T5her3                     Santos -Direct

A.   Yes.

Q.   Ms. Santos, based on the conversations that you heard between Porky and other members of the MS-13, did you come to learn whether MS-13 worked with any other drug traffickers in Honduras?

A.   Yes.

Q.   Who were those other drug traffickers?

A.   The Valles and the Cachiros.

Q.   What role, if any, did the Valles play in MS-13's drug operation?

A.   The Valles were selling drugs to the MS-13.

Q.   When you say "drugs" are you referring to cocaine?

A.   Yes.

Q.   And what role, if any, did the Cachiros play in MS-13's drug operation?

A.   They were selling drugs to MS-13.

Q.   Did you ever hear Porky and David Campbell talking about the Valles and the Cachiros?

A.   Yes.

Q.   What did you hear them say?

A.   That they did not have drugs and that they were going to have to buy, either from the Valles or the Cachiros.

Q.   Do you know what, if anything, MS-13 did to help the Cachiros and the Valles?

A.   They were protecting them.

Q.   When you say "protecting them," what do you mean by that?

A.   They would provide people to them to protect the roads and the drugs.

Q.   Ms. Santos do you know whether MS-13 used any particular house for their drug trafficking?

A.   Yes.

Q.   Where was that house located?

A.   Santa Monica.

Q.   Is that a neighborhood of San Pedro Sula?

A.   Yes.

Q.   Have you ever been to that house?

A.   Yes.

Q.   What, if anything, did you observe at that house?

A.   Guns.

Q.   What type of guns?

A.   Long guns.

Q.   When you say long guns, are you referring to rifles?

A.   Yes.

Q.   Ms. Santos, during the conversations that you heard between Porky and other members of MS-13, did you ever hear them discussing bribes to Honduran police officers?

A.   Yes.

Q.   Based on those conversations, what was your understanding of why members of MS-13 were bribing Honduran police officers?

A.   To protect the drugs at checkpoints, to protect the drugs

O2T5her3                          Santos -Direct

and to be able to get any of them that had been incarcerated, out.

Q.  Ms. Santos, during those conversations did you ever hear the name "Tigre Bonilla"?

A.  Yes.

Q.  Based on your understanding, was Tigre Bonilla a police officer?

A.  Yes.

Q.  And when you heard Tigre Bonilla's name being mentioned, what was the general topic of those conversations?

A.  Drugs and prisoners, people in jail.

Q.  What, if anything, do you recall Porky telling other members of MS-13 about Tigre Bonilla?

A.  They would talk on the phone and he would say to them "call Tigre Bonilla because he is going to resolve that.  He knows exactly what to do."

Q.  What did you understand that to be a reference to?

MR. STABILE:  Objection.

THE COURT:  Basis?

MR. STABILE:  The relevance of the witness' understanding of somebody else's conversation.

THE COURT:  No.  It's what she understood, so that I will allow.  Thank you.  Overruled.

A.  Like if somebody had been arrested, if one of them had been arrested, then they would just call Tigre Bonilla and Tigre

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Bonilla would get the person out of jail, or if it had to do with drugs, they would always call Tigre Bonilla and he took care of it.

Q.   Ms. Santos, directing your attention to approximately 2013, did you ever hear Porky and Anwar speaking about Tigre Bonilla at the house in Santa Monica?

A.   Yes.

Q.   What do you recall about that conversation?

A.   I remember that Anwar called Mr. Mendoza and he told him that the issue had been resolved and that thanks to Tigre Bonilla, they would now be able to meet.

Q.   Based on the conversations that you heard between Porky and Anwar, what did you understand the issue to have been?

          MR. STABILE:   Same objection.

          THE COURT:   Overruled.

A.   Because Mendoza had told me that for one month now they had no drugs and as far as I understood, Tigre Bonilla got the drugs for them because that is what he had told me, that they did not have the drugs.  And so, when he said that the issue had been resolved on the call between Mendoza and Anwar, that was my understanding.

Q.   Ms. Santos, directing your attention again to approximately 2013, did you ever hear Porky speaking directly to Tigre Bonilla?

A.   Yes.

Q.   How did you know that Porky was speaking to Tigre Bonilla at the time?

A.   Because his phone was on speaker phone and the name Tigre Bonilla appeared on his screen, and when he was speaking to him he would tell him "Tigre, help me with this," "Tigre do this with me, Tigre."

Q.   That conversation between Porky and Tigre Bonilla, what was it about?

A.   Like about drugs.

Q.   What do you recall them speaking about during that conversation?

A.   Well, they were talking about these drugs that were supposed to be going through a checkpoint in Ceibita and Tigre Bonilla was telling Mendoza not to worry, that the drugs would go through without any problem whatsoever, like normal.

Q.   And after you heard this conversation, did you hear Porky speak again with Tigre Bonilla about this particular drug shipment?

A.   Yes.

Q.   What do you recall about that conversation?

A.   Something like the drugs had gotten lost, and Mendoza called Tigre and told him that he was going to kill him.

Q.   What, if anything, did Tigre say in response?

A.   He told him not to worry, that he would compensate him for what had gotten lost.

O2T5her3                        Santos -Direct

Q.   Do you know whether Tigre ever compensated Porky for that lost drug shipment?

A.   Yes.

Q.   How do you know that?

A.   I saw what he sent him.

Q.   What did Tigre send to Porky?

A.   Guns.

Q.   Where were those guns?

A.   In Santa Monica in a car.

Q.   When you say "guns" what types of guns were they?

A.   Long and big.

Q.   How do you know that Tigre Bonilla sent those guns to Porky?

A.   Because Mendoza called him and thanked him, and he told him that he had already received them, and thanks.  And then Tigre Bonilla's response was you're welcome, and that this would not be the first or the last deal that they would do together.

Q.   Ms. Santos, approximately what year was the last time that you saw Porky?

A.   2014.

Q.   Is fear of Porky one of the reasons you haven't gone back to Honduras?

A.   Completely so.

          MR. ROBLES:  Your Honor, may I approach the witness?

          THE COURT:  You may.

O2T5her3                         Santos -Direct

MR. ROBLES:  Actually, your Honor, before I do that, I would ask that the government be permitted to read a stipulation into the record.

THE COURT:  Sure.  First of all, is this a stipulation of fact or testimony?

MR. ROBLES:  Fact, your Honor.

THE COURT:  Ladies and gentlemen, a stipulation is an agreement between the parties to the action that a certain fact is so.  You must accept that fact as having been established. The weight, if any to be given to that fact, is entirely up to you as a jury.

You may proceed.

MR. ROBLES:  Thank you, your Honor.

And Ms. Collins, if you could please pull up Government Exhibit 1003 for Court and counsel?

Your Honor, the stipulation, which is marked Government Exhibit 1003, reads as follows:

Government's Exhibits 403 through 406 are true and accurate copies of portions of audio recordings of Spanish-language phone calls that were intercepted by Honduran law enforcement officials in Honduras.  The content of each intercepted communication was recorded at the time of the communication, along with the date and time of the communication.

Government's Exhibits 403T through 406T are

O2T5her3                    Santos -Direct

translations of Government's Exhibits 403 through 406.  Each

transcript contains a header that truly and accurately reflects

the date of the intercepted phone call.

          Your Honor, at this time I offer Government Exhibit

1003.

          THE COURT:  Any objection?

          MR. STABILE:  No objection.

          MR. COLON:  No.

          THE COURT:  Received.

          (Government's Exhibit 1003 received in evidence)

          MR. ROBLES:  Your Honor, may I approach the witness?

          THE COURT:  You may.

          MR. ROBLES:  Thank you.

BY MR. ROBLES:

Q.  Ms. Santos, I handed you a disk that is marked Government

Exhibit 403 to 406.  Do you recognize that disk?

A.  Yes.

Q.  What is it?  What is on it?

A.  Calls.

Q.  Are those phone calls that you listened to?

A.  Yes.

Q.  And are your initials on that disk?

A.  Yes.

Q.  Are those fair and accurate portions of the recordings that

you listened to?

O2T5her3                    Santos -Direct

A.  Yes.

Q.  Ms. Santos, did you recognize the voices that were on those calls?

A.  Yes.

Q.  Did you hear Porky's voice on those calls?

A.  Yes.

Q.  Did you hear David Campbell's voice on some of those calls?

A.  Yes.

Q.  And did you hear Anwar's voice on some of those calls?

A.  Yes.

Q.  In one of those calls was there a female voice that you weren't able to recognize?

A.  Yes.

Q.  There is also a binder in front of you marked Government's Exhibits 403T to 406T.  Have you reviewed what is in that binder?

A.  Yes.

Q.  Did you review that before testifying today?

A.  No.

Q.  The contents -- the transcripts that are in the binder, did you review those before testifying today?

A.  Yes.  I apologize.

Q.  No problem.

        And did you, while you were reviewing those transcripts, were you also listening to the corresponding audio

O2T5her3                         Santos – Cross

calls that were associated with each of those transcripts?

A.  Yes.

Q.  When you listened to the audio recordings, did you confirm that the participants that are listed on each of the transcripts are in fact the people whose voices you recognized?

A.  Yes.

MR. ROBLES:  Your Honor, at this time the government offers Government's Exhibits 403 through 406 and the associated transcripts Government's Exhibits 403T to 406T, which were previously admitted, subject to connection.

THE COURT:  Any objection?

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibits 403 through 406 and 403T through 406T received in evidence)

MR. ROBLES:  One moment, your Honor?

(Counsel conferring)

MR. ROBLES:  Nothing further, your Honor.

THE COURT:  All right.  Cross-examination.

CROSS EXAMINATION

BY MR. STABILE:

Q.  I really only have a couple of questions for you, ma'am.

Approximately how many phone calls, in total, did the government have you listen to?

A.  Around four.  I don't remember very well how many there

O2T5her3                    McNamara - Direct

were.

Q.   But about four phone calls in total; is that correct?

A.   Yes.

         MR. STABILE:  OK.  I have no further questions.

         THE COURT:  Any redirect?

         MR. ROBLES:  No, your Honor.  Thank you.

         THE COURT:  You may step down.  Thank you.

         (Witness excused)

         THE COURT:  You can call your next witness.

         MR. GUTWILLIG:  The government calls Special Agent
Daniel McNamara.

 DANIEL McNAMARA,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. GUTWILLIG:

Q.   Good afternoon, Special Agent McNamara.  Where do you work?

A.   For the Drug Enforcement Administration.

Q.   Approximately when did you begin working for the DEA?

A.   Approximately 2013.

Q.   If you wouldn't mind leaning into the microphone, Special
Agent McNamara?

A.   2013.

Q.   When did you first become a special agent with the DEA?

A.   In 2015.

O2T5her3                         McNamara – Direct

Q.   And prior to that, what position did you hold at the DEA?

A.   I was an intelligence analyst.

Q.   As a special agent, do you belong to any particular division?

A.   I do.

Q.   What division is that?

A.   The Special Operations Division.

Q.   For approximately how long have you worked in the Special Operations Division?

A.   A little over two years.

Q.   Do you work in any particular unit within the Special Operations Division?

A.   The Bilateral Investigations Unit.

Q.   And has your work in the Bilateral Investigations Unit focused on any particular region?

A.   Western hemisphere.

Q.   Are you familiar with an individual named Alexander Mendoza?

A.   I am.

Q.   Does that individual have an alias?

A.   He does.

Q.   And what is that?

A.   Porky.

Q.   In preparation for your testimony today, did you review transcripts and translations of certain intercepted calls in

O2T5her3                        McNamara - Direct

which Mendoza or Porky participated?

A.   I have.

          MR. GUTWILLIG:  Ms. Collins, can you please publish what is in evidence as Government Exhibit 403?

Q.   Looking at your screen there, do you recognize -- could you please read the date of the recording?

A.   June 5, 2015.

Q.   And the participants?

A.   Alexander Mendoza and an unidentified female.

          MR. GUTWILLIG:  Ms. Collins, can you please go to the next page to line 3?

Q.   Special Agent McNamara, if you could please read Mendoza? I will read, if you could read line 3, please?

A.   Just now they reported a big mess they have in Ceiba, Santa Barbara in a bunch of places looking for Wilter and other properties.

Q.   And then to line 5, could you please read that?

A.   Yes. Santa Barbara, Ceiba.  They are getting to the in 3 places.

Q.   And then I will go down, line 11 it says:  People are talking.  Oh no.

          MR. GUTWILLIG:  Ms. Collins, could you please go to the next page?

Q.   Line 15, could you please read what Mendoza says there?

A.   And the gringos aren't even expecting him over there. How

do they say it?  We'll lessen your punishment.

Q.  And then now to line 17 Mendoza says:  But the real punishment is shame.

Could you please read what follows on line 19 for what Mendoza says?

A.  What a mess.  Let's see.  If it pans out.  Where the sister lives because I --

MR. GUTWILLIG:  Ms. Collins, can you please go down to line 29?

Q.  I will read line 29, special agent.  Mendoza writes:  Oh my goodness.  Juan Orlando.  If you only knew how Juan Orlando is also -- and besides, I doubt that he -- I doubt that he will last from now until June in -- because they picked up a call from Tigre Bonilla because Tigre Bo -- oh no.  This son of a bitch.  H and the -- *si* -- we signed -- they have a radio station over there.

Special Agent McNamara, can you please read what Mendoza then says on line 31?

A.  Recording where they are delivering to Juan Guillermo.  Uh, it appears that H gave him $6 million and El Valle gave him 5. And Tigre Bonilla would pay the rent and some and when they conducted a search on H, on Hector Emilio.

Q.  And then could you please continue with what Mendoza said on line 33?

A.  They had stolen a watch that was worth 50,000 Euros with

O2T5her3                    McNamara - Direct

diamonds and pearls and he said to the guy that he wants, he could do the favor of recovering the thing and the man then went to get the thing from the place where --

MR. GUTWILLIG:  Ms. Collins, can you please go to line 35?

Q.  I will read this one, Special Agent McNamara.  Mendoza says:  And called the officials.  How is it possible that no -- those guys buddy -- the guy was carrying -- and because of that, $5 million for German's head.  And I told him, "And who is giving the 5 million?"  "Oh, and how do you think?"  He told me that H's wife doesn't know what is going on or what the deal is.  She tells me, "With H's money."  "Oh.  They didn't take everything away from him, huh?"  "Oh," I tell him.  Well, I don't give a damn what happens.  And when they left, when they left, the minister that Juan Orlando named, came in?

MR. GUTWILLIG:  Ms. Collins, can you publish what is in evidence as Government Exhibit 404T?

Q.  Special Agent McNamara.  Can you please read the date of this recording?

A.  June 19, 2015.

Q.  And could you please read the participants?

A.  David Campbell and Alexander Mendoza.

MR. GUTWILLIG:  Ms. Collins, can you please go to the next page?

Q.  Special Agent McNamara, I will read the portions where it

said "David Campbell."  If you could please read the portions where it says "Mendoza."

On line 2 Campbell says:  Bernardo, I already found out with the man over there.  Hello?

A.   Mendoza:  Ah-ha.  You already -- everything?

Q.   Right now, the man says he will charge us 150 bucks for the bags.

A.   Um hum.

Q.   150 bucks.

A.   Something.  Something important.

Q.   Ah-ha.  Tell me.

A.   They are searching for Byron Ruiz.  They just informed me, the ones who are with the Americans there, that they heard Juan Orlando give orders to shoot him, because he seems that he works for a bro.  Byron Ruiz worked for a brother of the president Juan Orlando.

MR. GUTWILLIG:  Ms. Collins, could you please go to the next page?

Q.   And what does Mendoza say on line 11?

A.   And that the president assigned an elite police team to kill him.

Q.   Damn.

A.   Because its inconvenient if the Americans catch him and take him away.

Q.   Damn.

A.  And Byron Ruiz escaped and is on the run because he realized that he is going to -- that they threw him under the bus.

Q.  Damn that's bad news.  But is it already on the -- the -- the -- the -- the -- news and everything?

A.  Hmm, no.  I was just informed, and I believe it's because you will see that that man only one has -- has --

MR. GUTWILLIG:  Ms. Collins, can you please publish what is in evidence as Government Exhibit 405T?

Q.  Special Agent McNamara, can you please read the date of the recording?

A.  September 29, 2015.

Q.  And could you please read the participants?

A.  David Campbell and Alexander Mendoza.

MR. GUTWILLIG:  Ms. Collins, can you please go to the next page?

Q.  And again, I will read Campbell if you could please read Mendoza:

You know that those ones are already in the business, right?

A.  Because that's what Americans are interested in.  They had a long time to go.

Q.  It was in the suitcase, right?

A.  Yes.  And that fat man will be expensive for them.  They eat even if.

Q.   Exactly.  Yes.

A.   The -- you will see how many years he will be in jail, how much they will spend on food there.

Q.   On line 10, could you please read line 10, Special Agent McNamara?

A.   He doesn't like to give -- to give anybody anything to eat, bro.

         MR. GUTWILLIG:  Could you please go to the next page, Ms. Collins?

Q.   So, directing your attention now to line 17, could you please read what Mendoza says there?

A.   They are playing cat and mouse.

Q.   And then Mendoza on line 18, please?

A.   Cat and mouse, because those guys delivered all the routes, all the green.

Q.   And then Campbell on line 20 says:  The route the president has.

         Could you please read Mendoza on line 21?

A.   Ah.

Q.   The route the president has, so.

         MR. GUTWILLIG:  Ms. Collins, could you please go to the next page?

A.   Yes, he gifted it to him.

Q.   Yes.  That was the deal.

         MR. GUTWILLIG:  Ms. Collins, can you please publish

what is in evidence as Government Exhibit 406T?

Q.  Special Agent McNamara, could you please read the date of the recording?

A.  November 18, 2015.

Q.  And the participants?

A.  Alexander Mendoza and Anwar.

MR. GUTWILLIG:  Ms. Collins, if you could please go to the next page?

Q.  Special Agent McNamara, I will read Anwar, if you could please read Mendoza.

On line 1 Anwar says:  And how much?  Or tell me how much you need to get in and we will find a way.

A.  But how it is to go and ask about the route and -- and we can find out on which -- on which side to come, and so that we can arrange things with the friends we have.

Q.  Unidentified says:  Yes.

If you could please, again, reading at line 4 with Mendoza?

A.  Well, I can give you a truck line this.  Like this.  Like this.  Oh brother.

Q.  And then continuing on to line 5, please?

A.  Tigre Bonilla would even let it go as contraband, come on, through the border like that.

Q.  $5,000.

A.  I will put it on your house bill.

MR. GUTWILLIG:  Thank you, Ms. Collins.

Q.  Special Agent McNamara, have you reviewed public filings in this case?

A.  I have.

Q.  Directing your attention to May 28 of 2019, are you aware of a public filing in this case made on that date?

A.  I am.

Q.  Did that filing reveal anything related to allegations against Juan Orlando Hernandez?

A.  It did.

Q.  Was that the first time such allegations had been made public in a filing by the government?

A.  It was.

Q.  And directing your attention also to June 12 of 2019, are you aware that a public filing was made in this case on that date?

A.  I am.

Q.  Did that filing also involve topics relating to the ones you just mentioned?

A.  It did.

MR. GUTWILLIG:  Your Honor, at this time the government would like to read a stipulation marked Government Exhibit 1001.

THE COURT:  Fact or testimony?

MR. GUTWILLIG:  Both, your Honor.

THE COURT:  I told you what a stipulation of fact is. A stipulation of testimony is an agreement by the parties that if a particular person was called as a witness, they would testify in the manner described in the stipulation.  You must accept the fact that the person would so testify.  But the weight, if any, to be given to it, is entirely up to you, ladies and gentlemen.

MR. GUTWILLIG:  Ms. Collins, would you mind putting that stipulation on the screen for the witness, Court, and counsel?

Your Honor, at this point I am going to read part of the stipulation.

THE COURT:  All right.

MR. GUTWILLIG:  It is hereby stipulated and agreed, by and between the United States of America by Damian Williams, United States Attorney, Jacob Gutwillig, David Robles, Elinor Tarlow, and Kyle Wirshba, Assistant United States Attorneys, and Juan Orlando Hernandez, by and through his attorneys, Raymond Colon, Esq., and Renato Stabile, Esq., that --

And Ms. Collins, if you can please go down to paragraph 3?

-- On March 1, 2020, Geovany Fuentes Ramirez was arrested before boarding an international flight at Miami International Airport.  In connection with Ramirez' arrest, law enforcement officers lawfully seized from Ramirez, among other

O2T5her3                      McNamara - Direct

things, an iPhone cell phone ("the Ramirez iPhone").  If called to testify, Joseph Suszko, an investigative technology specialist with the Drug Enforcement Administration, would testify that (A) Government Exhibit 204 is the Ramirez iPhone; and (B) Government Exhibit 204R is a disk that contains a report and related files that were lawfully extracted from the cellphone marked Government Exhibit 204, and are true and accurate copies of data and records from Government Exhibit 204.

Government Exhibit 204-R contains Government Exhibit 204-R1, Government Exhibit 204-R2, Government Exhibit 204-R50, Government Exhibit 204-R100, Government Exhibit 204-R101, Government Exhibit 204-R102, Government Exhibit 204-R103, Government Exhibit 204-R104, Government Exhibit 204-R105, Government Exhibit 204-R106, Government Exhibit 204-R107, Government Exhibit 204-R108, Government Exhibit 204-R109, Government Exhibit 204-R110, Government Exhibit 204-R111, Government Exhibit 204-R112, Government Exhibit 204-R150, Government Exhibit 204-R151, Government Exhibit 204-R152, Government Exhibit 204-R153, Government Exhibit 204-R154, Government Exhibit 204-R155, Government Exhibit 204-R156, Government Exhibit 204-R157, Government Exhibit 204-R158, Government Exhibit 204-R159, Government Exhibit 204-R160, Government Exhibit 204-R161, and Government Exhibit 204-R200.

Ms. Collins, if you can please go down now to the

O2T5her3                        McNamara - Direct

final paragraph of the stipulation?

It is further stipulated and agreed that this stipulation marked Government Exhibit 1001, and the government exhibits referenced in the stipulation, may be received into evidence at the trial in the above-referenced matter, subject to objections by the defendant other than authenticity and without the defendant waiving any other rights.

At this time, the government offers Government Exhibit 1001.

THE COURT:  Any objection?

MR. STABILE:  No objection.

(Government's Exhibit 1001 received in evidence)

THE COURT:  And are you offering the exhibits referenced within the stipulation?

MR. GUTWILLIG:  I am offering some of them, your Honor.

THE COURT:  OK.  So only the ones you are identifying or the ones you have identified?

MR. GUTWILLIG:  Some of ones that are identified in the stipulation.

THE COURT:  You will offer them at some other point?

MR. GUTWILLIG:  Yes, your Honor.

THE COURT:  Do you have anything much more to your direct?

MR. GUTWILLIG:  Uh...

O2T5her3                    McNamara - Direct

THE COURT:  Let's take our mid-afternoon break.

Ladies and gentlemen, please do not discuss the case among yourselves with anyone.  Back in action in about 10 minutes.

(Jury not present)

THE COURT:  We are in recess.

(Recess)

(Continued next page)

(In open court; jury present)

THE COURT:  Please be seated.

I realized I didn't wish you all a happy leap year day, or as they used to call it in the olden times, Sadie Hawkins Day.  If you don't know what that means, ask someone, you'll find out.  It is kind of an interesting story.

All right.  You may continue.

MR. GUTWILLIG:  Thank you, your Honor.

BY MR. GUTWILLIG:

Q.  Before we left off, Special Agent McNamara, you had just testified that you were aware of public filings in this case on May 28 and June 12, 2019.  And that you were aware that a filing on May 28, 2019, was the first time that certain allegations had been made public against Juan Orlando Hernandez by government filing.

MR. GUTWILLIG:  Ms. Collins, can you pull up for witness, the Court, and counsel what's marked for identification as Government Exhibit 204-R200.

Q.  Do you recognize that?

A.  I do.

Q.  Is that information from Fuentes Ramirez's cell phone?

A.  It is.

Q.  Does that reflect data from a particular application used on that cell phone?

A.  It does.

O2T3HER4                        McNamara - Direct

Q.   Which application?

A.   Waze.

Q.   Based on your experience as a special agent, on your work generally, what is Waze?

A.   It is a navigation application on phones.

Q.   What does Waze data reflect?

A.   Locations and GPS coordination.

          MR. GUTWILLIG:  The government offers Government Exhibit 204-R200.

          MR. STABILE:  No objection.

          THE COURT:  Received.

          MR. GUTWILLIG:  Can you please publish.

          (Government's Exhibit 204-R200 received in evidence)

Q.   Special Agent McNamara, directing your attention to line 4. Could you please read the date there in what's effectively the middle column.

A.   5/29/2019.

Q.   Referring to May 29 of 2019?

A.   Correct.

Q.   And then looking on the right most column, could you please read the information above location information.

A.   Casa Presidencial Honduras.

Q.   Then directing your attention to line 5.  And again, could you please read the date.

A.   May 29, 2019.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

Q.   And again on the right, could you please read the location.

A.   Casa Presidencial Honduras.

Q.   Directing your attention to line 6.  Could you please read the date.

A.   May 29, 2019.

Q.   And the location, please.

A.   Casa Presidencial Honduras.

Q.   And could you please go to line 8.  And could you please read the date.

A.   May 29, 2019.

Q.   And the location?

A.   Casa Presidencial Honduras.

Q.   And then to line 9, please.  And the date, please.

A.   May 29, 2019.

Q.   And the location?

A.   Casa Presidencial Honduras.

          MR. GUTWILLIG:  Now Ms. Collins, could you please go to line 25.

Q.   Special Agent McNamara, are you aware of a public filing in this case dated June 12, 2019?

A.   I am.

Q.   Could you please read the date in the middle column.

A.   June 12, 2019.

Q.   And the information on the right-hand side.

A.   Casa Presidencial Honduras.

Q.   Could you please go to line 26.  And the middle, please.

A.   June 12, 2019.

Q.   And the information on the right?

A.   Casa Presidencial Honduras.

Q.   Thank you.

     MR. GUTWILLIG:  Ms. Collins, could you please put up for the witness, Court, and counsel what's marked as Government Exhibit 204-R50.

Q.   Do you recognize this, Special Agent McNamara?

A.   I do.

Q.   Is it contact information stored on Geovanny Fuentes Ramirez's phone?

A.   It is.

     MR. GUTWILLIG:  The government offers Government Exhibit 204-R50.

     MR. STABILE:  No objection.

     THE COURT:  Received.

     (Government's Exhibit 204-R50 received in evidence)

     MR. GUTWILLIG:  Ms. Collins, could you please go to line 2.

Q.   And Special Agent McNamara, could you please read what's next to "name."

A.   Comanche.

Q.   And line 3, could you please read what's next to "name."

A.   Comicionado Martinez.

Q.   And then line 6.  Could you please read what's next to name.

A.   Comicionado Martinez.

Q.   Line 10.  And could you please read what's next to the name.

A.   Fuad Jarufe.

Q.   And then line 16, please.  Could you please read what's next to name before the parenthesis.

A.   Julio Barahona.

Q.   Line 18, please.  And could you please read what's next to name.

A.   Mel Zelaya.

Q.   Then down to line 19, please, and can you please read that.  What's next to "name"?

A.   Polo.

          MR. GUTWILLIG:  Now, Ms. Collins, could you please go to row 15.

Q.   Could you please read what's next to "name" there.

A.   Juanorlandohernandez@gmail.com.

Q.   Could you please go to line 21.  Could you please read what's there.

A.   Presidente Juan Orlando.

          MR. GUTWILLIG:  Ms. Collins, you can probably pull up lines 22 and 23 together.

Q.   Could you please read what's next to "name" in line 22.

A.   Presidente Juan Orlando.

Q.   On line 23.

A.   Presidente Juan Orlando.

Q.   Is this contact information from Geovanny Fuentes's cell phone?

A.   Correct.

        MR. GUTWILLIG:  Can you please publish what's marked as 204-R1.  And 204-R1-T.

Q.   What is this, Special Agent McNamara?  I'm referring to Government Exhibit 204-R1.

A.   Contact data.

        MR. GUTWILLIG:  Ms. Collins, can you go on to the next page.

Q.   Special Agent McNamara, is this an electronic communication on Geovanny Fuentes's cell phone?

A.   It is.

        MR. GUTWILLIG:  The government offers Government Exhibit 204-R1 and now formally offers Government Exhibit 204-R1-T which was previously offered subject to connection.

        MR. STABILE:  No objection.

        THE COURT:  Received.

        (Government's Exhibit 204-R1, 204-R1-T received in evidence)

        MR. GUTWILLIG:  Ms. Collins, can you please publish 204-R1-T.

Q.   And Special Agent McNamara, could you please read the date.

A.   November 18, 2019.

Q.   And the participants, please.

A.   Comanche and Geovanny Fuentes.

MR. GUTWILLIG:   Ms. Collins, can you please go to the next page.

Q.   So Special Agent McNamara, I will read Comanche, if you could please read so Geovanny Fuentes.   I'll start on line 1. "The son of extradited Arnulfo Valle Valle is murdered in Copan.   The victim is businessman Josue Caceres."

A.   "Arnulfo's son was nailed."

Q.   "Yeah, man, he was hit."

A.   "The competition or the cops."

Q.   "It's the end for these people, Comanche.   I think that's true because they won't settle down and keep a low profile. They want to create the impression that nothing has happened."

A.   "Yes, man, when Toro was no longer around, when the main boss departs, that's where they are left acting wildly.   That's what happened to the bombing guys, that's why he wants to screw them all."

MR. GUTWILLIG:   Ms. Collins, could you please pull up for the witness, Court, and counsel what's marked as Government Exhibit 204-R2 and 204-R2-T.

Q.   Special Agent McNamara, with respect to Government Exhibit 204-R2, is that an electronic communication from Geovanny

O2T3HER4                    McNamara - Direct

Fuentes's cell phone?

A.   It is.

        MR. GUTWILLIG:  Your Honor, the government offers Government Exhibit 204-R2, and also formally 204-R2-T which was previously offered subject to connection.

        MR. STABILE:  No objection.

        THE COURT:  Received.

        (Government's Exhibit 204-R2, 204-R2-T received in evidence)

        MR. GUTWILLIG:  Ms. Collins, can you please publish Government Exhibit 204-R2-T.

Q.   And Special Agent McNamara, could you please read the date there at the top.

A.   February 25, 2020.

Q.   And the participants, please.

A.   Comicionado Martinez and Geovanny Fuentes.

Q.   And could we please go down to line 3, it says "Gio sends his regards."

        Based on your review, do you understand of who Gio refers to?

A.   That's one of Geovanny Fuentes's sons.

Q.   Can we now go down to lines 25 and 26.  Geovanny Fuentes writes, "Colonel, how are we doing?  Do you still have that code to do the erasing?"

        Now can we please go down to lines 35 and 37.  And 35

is from Comicionado Martinez, and it says:  First step series of numbers if it is tapped.  Second step series of numbers if the calls are being forwarded.  Third step series of numbers to untap the calls.  Then there is an emoji from Geovanny Fuentes.

Can you please read what's in line 37.

A.  "To see if you have been tapped already."  Series of numbers.  "You will see the IME and if you see /1 you have been tapped once and so on."

Q.  Special Agent McNamara, based on your review, what is Comicionado Martinez providing instructions here to do?

A.  To try and avoid wiretaps.

MR. GUTWILLIG:  And Ms. Collins, could we please go back to the first page on this translation.

Q.  What was the date of this chat?

A.  February 25, 2020.

MR. GUTWILLIG:  And Ms. Collins, could you please pull up next to this paragraph 3 of Government Exhibit 1001 which is the stipulation in evidence.

Q.  And Special Agent McNamara, could you please read the first sentence of the third paragraph in Government Exhibit 1001.

A.  "On March 1, 2020 Geovanny Fuentes Ramirez was arrested before boarding an international flight at Miami International Airport."

Q.  Thank you.

MR. GUTWILLIG:  Ms. Collins, can we now go back to

Government Exhibit 204-R2-T, and down to line 56.  And could you please pull up next to this what's marked as Government Exhibit 204-R21, which is a subset of this exhibit, which the government now offers.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 204-R21 received in evidence)

Q.  Directing your attention to the image on the right, Special Agent McNamara.  Could you please read the name under the picture on the left of that.

A.  Alexander Mendoza.

Q.  Could you please read the alias.

A.  Porky.

Q.  And on the right, could you please read what's under that photograph?

A.  Viejo Dan.

MR. GUTWILLIG:  Now, Ms. Collins, can we please go back to line 55 on 204-R2-T.

Q.  And at the top, at line 5, what is written in the square brackets, Special Agent McNamara?

A.  Voice note.

Q.  Now directing your attention down below about midway through here, it says "UM2: it is an elite police team, they had even, even, even told him not to capture him but to kill him since the Americans already.  The Americans want him

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

already and since he knows that Juan Orlando betrayed him."

MR. GUTWILLIG:  And Ms. Collins, could you please pull up next to this exhibit Government Exhibit 404-T at line 11 and line 13.

Q.  And Special Agent McNamara, could you please read what Mendoza says in line 11 of Government Exhibit 404-T.

A.  "And that the president assigned an elite police team to kill him."

Q.  And line 13, please.

A.  "Because it's inconvenient if the Americans catch him and take him away."

MR. GUTWILLIG:  Now, back to Government Exhibit 204-R2-T, Ms. Collins.  Could you please go to lines 59 and 60. I'm sorry.  59 through 61.  I apologize.

Q.  I'll read Comicionado Martinez, if you could please read Geovanny Fuentes.

On line 59.  "it is a shit show."

A.  "Yes, it's going to be a disaster.  It's going to be a fucking disaster."

Q.  Based on your review of this communication, does this reference the voice note that preceded it in the chat?

A.  It does.

MR. GUTWILLIG:  Thank you, Ms. Collins.

Q.  In your review of materials on Geovanny Fuentes Ramirez's phone, did you identify images of firearms?

A.  I did.

MR. GUTWILLIG:  Your Honor, the government offers Government Exhibits 204-R100 through 204-R112.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 204-R100 through 204-R112 received in evidence)

MR. GUTWILLIG:  Ms. Collins, could you please publish what's now in evidence as Government Exhibit 204-R100.

Q.  Special Agent McNamara, is this an image that was stored on Geovanny Fuentes Ramirez's phone?

A.  It is.

Q.  What is it?

A.  Pictures of assault rifles.

MR. GUTWILLIG:  Ms. Collins, could you please publish Government Exhibit 204-R102.

Q.  What is this?

A.  An assault rifle.

MR. GUTWILLIG:  Could you please publish Government Exhibit 204-R103.

Q.  What's that?

A.  Colt AR-15.

MR. GUTWILLIG:  Could you please publish Government Exhibit 204-R105.

Q.  What is that?

A.  Picture of a shotgun.

MR. GUTWILLIG:  Could you please publish Government Exhibit 204-R106.

Q.  What is that?

A.  Picture of a pistol and magazines.

MR. GUTWILLIG:  Could you please publish Government Exhibit 204-R108.

Q.  What is that?

A.  Shotgun.

MR. GUTWILLIG:  Could you please publish Government Exhibit 204-R111.

Q.  What is that?

A.  Pistol.

Q.  In your review of materials on Geovanny Fuentes Ramirez's phone, did you identify images of cash?

A.  I did.

MR. GUTWILLIG:  Government offers Government Exhibit 204-R159.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 204-R159 received in evidence)

MR. GUTWILLIG:  Ms. Collins, can you please publish.

Q.  What is that?

A.  Cash.

Q.  In your review of materials on Geovanny Fuentes Ramirez's

phone, did you identify images of Juan Orlando Hernandez?

A.  I did.

MR. GUTWILLIG:  Ms. Collins, could you please pull up for the witness, Court, and counsel what's marked as Government Exhibit 204-R151.

Q.  What is that?

A.  A picture of Juan Orlando Hernandez.

MR. GUTWILLIG:  Government offers Government Exhibit 204-R151.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 204-R151 received in evidence)

MR. GUTWILLIG:  Ms. Collins, can you please publish. You can take that down.  Thank you.

Q.  Directing your attention to January 8 of 2021, did the government make a public filing in this case on that date?

A.  They did.

Q.  Did that public filing identify certain co-conspirators anonymously?

A.  It did.

Q.  Did it do that by using the convention CC followed by a dash?

A.  It did.

Q.  And along with the public filing, was there an appendix filed under seal identifying the true identities of those CCs?

A.   It did.

Q.   Special Agent McNamara, based on your review, did the public filing reference a green machine gun?

A.   It did.

Q.   And in substance, what did it say about the green machine gun?

A.   It said that Geovanny Fuentes was given the green assault rifle from a high-ranking Honduran military official.

           MR. GUTWILLIG:  At this time I'd like to read a stipulation, Government Exhibit 1007.  Ms. Collins, if you could please pull it up for the witness, Court, and counsel.

           Government Exhibit 1007 says:  It is hereby stipulated and agreed by and between the United States of America by Damian Williams, United States Attorney, Jacob Gutwillig, David Robles, Elinor Tarlow and Kyle Wirshba, and Juan Orlando Hernandez, by and through his attorneys, Raymond Colon, Esq., and Renato Stabile, Esq., that:

           Government Exhibits 901 through 911 are true and accurate copies of electronic records stored in the Apple iCloud account gfuentes10@iCloud.com and maintained by Apple on its servers, and which were stored by Apple in the ordinary course of its business.

           It is further stipulated and agreed that this stipulation, marked Government Exhibit 1007, and the government exhibits referenced in this stipulation may be received into

O2T3HER4                    McNamara - Direct

evidence at the trial in the above-referenced matter subject to objections by the defendant other than authenticity and without the defendant waiving any other rights.

The government offers Government Exhibit 1007.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 1007 received in evidence)

Q.  Special Agent McNamara, have you reviewed certain of the contents of this iCloud account?

A.  I have.

MR. GUTWILLIG:  Ms. Collins, could you please pull up for the witness, Court, and counsel Government Exhibits 905 and 905-T.

Q.  And Special Agent McNamara, is this Government Exhibit 905 an electronic communication stored in this iCloud account?

A.  It is.

MR. GUTWILLIG:  Your Honor, the government offers Government Exhibit 905 as well as 905-T which previously was offered subject to connection.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 905, 905-T received in evidence)

MR. GUTWILLIG:  Ms. Collins, could you please publish Government Exhibit 905-T.

Q.  And Special Agent McNamara, could you please read the date

O2T3HER4                      McNamara - Direct

of this communication.

A.   January 11 and 12, 2021.

Q.   Could you please read the participants.

A.   Geovanny Gutierrez and Krizia Murillo.

Q.   Who do you understand Geovanny Gutierrez to refer to?

A.   Gio, the son of Geovanny Fuentes.

Q.   And based on your review, are the contents of this iCloud account his?

A.   Yes.

Q.   Directing your attention to line 29.  Could you please read what Murillo writes there.

A.   "Dude, how do they know about the green rifle?"

Q.   Based on your review of the January 8, 2021, public filing in this case, who do you understand "they" to refer to?

A.   The government.

Q.   And directing your attention again to the public filing on January 8 of 2021, did that filing identify the CC-13, then the commander of the 105th military brigade as the individual from whom Geovanny Fuentes received the green machine gun?

A.   It did.

Q.   Based on your review of the underlying key that was filed under seal along with that filing, is CC-13 Hector Orlando Fonseca?

A.   It is.

          MR. GUTWILLIG:  Ms. Collins, can you please pull up

O2T3HER4                    McNamara - Direct

next to this Government Exhibit 204-R50.

Q.   Special Agent McNamara, is 204-R50 contact information stored in Geovanny Fuentes's phone?

A.   It is.

       MR. GUTWILLIG:  Ms. Collins, could you please go down to line 11 of 204-R50, and could you zoom in on the name there, please.

Q.   And Special Agent McNamara, could you please read what's next to "name."

A.   General Ponce Fonseca.

Q.   Again, Special Agent McNamara, the identity of the co-conspirators was not public at the time of the January 8, 2021 filing, correct?

A.   Correct.

Q.   It was also not public by January 11 or 12, 2021, correct?

A.   Correct.

Q.   Directing your attention back to now line 1 of Government Exhibit 905-T.  Could you please read what Krizia Murillo writes.

A.   "CC-10 Julio Barahona."

Q.   And based on your review of the appendix not filed publicly, was Julio Cesar Barahona in fact listed as CC-10?

A.   Yes.

Q.   Now directing your attention to lines 5 and 6, could you please read those.

A.   "CC-1 Melvin Saberes Sandres."

Q.   Who do you understand that to refer to?

A.   Sandres.

Q.   Melvin Sandres, correct?

A.   Correct.

Q.   Directing your attention to line 9 it says Edgar.  Who do you understand Edgar to refer to?

A.   Edgar Rios.

Q.   Does Edgar Rios have a nickname?

A.   He does.

Q.   What is that?

A.   Pluto.

Q.   Directing your attention to line 11.  Could you please read what Murillo writes there.

A.   "So, are they bringing them back to life or what the heck."

Q.   Special Agent McNamara, are Melvin Sandres and Edgar Rios deceased?

A.   They are.

Q.   Now, directing your attention to line 8.  Could you please read what Gio writes there.

A.   "All of them are there."

Q.   Based on your review of the public filing and filing under seal, what do you understand "all of them are there" to mean?

A.   The co-conspirators.

Q.   Now, directing your attention to line 10.  Could you please

read what's there.

A.  Juancho is CC-4.

Q.  Is Juancho a nickname for Juan Orlando Hernandez?

A.  It is.

Q.  Based on your review of the non-public appendix included with the public filing, was Juan Orlando Hernandez in fact identified as CC-4 in that filing?

A.  He was.

Q.  Again, Special Agent McNamara, at the time of this communication, was that sealed appendix public?

A.  No.

Q.  In your review of Geovanny Gutierrez's iCloud account, did you identify images of firearms?

A.  I did.

MR. GUTWILLIG:  Your Honor, the government offers Government Exhibits 904 and 906.

MR. STABILE:  No objection.

THE COURT:  Received.

MR. GUTWILLIG:  Ms. Collins, could you please publish Government Exhibit 904.

Q.  Special Agent McNamara, what do you recognize in that picture?

A.  Two assault rifles and a pistol.

MR. GUTWILLIG:  And Ms. Collins, could you please publish Government Exhibit 906.

O2T3HER4                        McNamara - Direct

Q.   What do you recognize in that picture?

A.   Pistol.

Q.   In this iCloud account, did you also identify images of cash?

A.   I did.

          MR. GUTWILLIG:  Government offers Government Exhibit 907.

          MR. STABILE:  No objection.

          THE COURT:  Received.

          (Government's Exhibit 907 received in evidence)

          MR. GUTWILLIG:  Ms. Collins, could you please publish Government Exhibit 907.

Q.   What is this?

A.   Bundles of cash.

          MR. GUTWILLIG:  Now, Ms. Collins, could you please pull up for the witness what's marked as Government Exhibit 908 and 909.

Q.   Special Agent McNamara, are these contact information stored in Geovanny Gutierrez's iCloud account?

A.   They are.

          MR. GUTWILLIG:  The government offers Government Exhibits 908 and 909.

          MR. STABILE:  No objection.

          THE COURT:  Received.

          (Government's Exhibit 908, 909 received in evidence)

Q.   Directing your attention to 908.

Ms. Collins, lines 3 and 4, please.

It says Comicionado Melvin Salcedo on both lines.

Ms. Collins, can you please pull up lines 10 and 11. And Special Agent McNamara, what does it say on lines 10 and 11?

A.   Comicionado Martinez and Comicionado Martinez 2.

MR. GUTWILLIG:  Can we please go to line 14.  And there it says Fuad Jarufe.

Ms. Collins, could you please pull you up for the witness, Court, and counsel what's marked as Government Exhibit 1006.

At this time I'd like to read a stipulation, your Honor.

THE COURT:  Yes.

MR. GUTWILLIG:  It is hereby stipulated and agreed by and between the United States of America by Damian Williams, United States Attorney, Jacob Gutwillig, David Robles, Elinor Tarlow and Kyle Wirshba, and Juan Orlando Hernandez, by and through his attorneys, Raymond Colon, Esq., and Renato Stabile, Esq., that:

Government Exhibits 801 through 808 are true and accurate copies of electronic records stored in the Instagram account DanielFG15 maintained by Facebook Inc. ("Facebook") on its servers and which were stored by Facebook in the ordinary

course of its business.

If could you please go to the next page.

It is further stipulated and agreed that this stipulation, marked Government Exhibit 1006, and the government exhibits referenced in this stipulation, may be received into evidence subject to objections by the defendant, other than authenticity, and without the defendant waiving any other rights.

Government offers Government Exhibit 1006.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 1006 received in evidence)

Q.  Special Agent McNamara, did you also review some of the contents of Gutierrez's Facebook account?

A.  I did.

MR. GUTWILLIG:  And Ms. Collins, could we please pull up for the Court, the witness, and counsel Government Exhibit 808.

Q.  What is this, Special Agent McNamara?

A.  Instagram record.

MR. GUTWILLIG:  And now, Ms. Collins, if you could please focus on vanity name there at the bottom.

Q.  Could you please read that.

A.  DanielFG15.

MR. GUTWILLIG:  Government offers Government Exhibit

O2T3HER4                    McNamara - Direct

808.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 808 received in evidence)

MR. GUTWILLIG:  Ms. Collins, could you please pull up for the witness, Court, and counsel what's marked as Government Exhibit 801.

Q.  Did you see pictures of firearms in Gutierrez's Facebook account?

A.  I did.

MR. GUTWILLIG:  Government offers Government Exhibit 801.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 801 received in evidence)

MR. GUTWILLIG:  Please publish.

Q.  Do you recognize that, Special Agent McNamara?

A.  It is a green assault rifle.

MR. GUTWILLIG:  And Ms. Collins, if you could please pull up for the witness, Court, and counsel what's marked as Government Exhibit 802 and 802-T.

Q.  Do you recognize that?

A.  I do.

Q.  What is it?

A.  Pictures of bundles of cash.

O2T3HER4                    McNamara - Direct

MR. GUTWILLIG:  Government offers Government Exhibit 802 as well as 802-T which was previously offered subject to connection.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 802, 802-T received in evidence)

MR. GUTWILLIG:  Ms. Collins, can you please publish Government Exhibit 802-T.

Q.  And what do you see there, Special Agent McNamara?

A.  Same bundles of cash.

Q.  And what does it say in the text on the bottom?

A.  "Sunday fun day.  Happy payday Sunday."

Q.  And now, Government Exhibit 803 and 803-T.  Do you recognize these?

A.  I do.

Q.  What are they?

A.  Assault rifles and pistols.

MR. GUTWILLIG:  The government offers Government Exhibits 802.  I'm sorry.  803 and 803-T.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 803, 803-T received in evidence)

MR. GUTWILLIG:  Ms. Collins, can you please publish Government Exhibit 803-T.

Q.  What do you see in that picture?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Same assault rifles and pistols.

Q.   Could you please read the translation at the bottom.

A.   "The prettiest thing you'll see today."

        MR. GUTWILLIG:  Now Ms. Collins, if you could please pull back up what's in evidence as Government Exhibit 1001, and I'll read paragraph 1.

        On November 23, 2018, Juan Antonio Hernandez Alvarado, a/k/a Tony Hernandez, was arrested before boarding an international flight at the Miami International Airport.  In connection with Tony Hernandez's arrest, law enforcement officers lawfully seized from Tony Hernandez a Samsung cell phone, ("the Tony Hernandez Samsung phone") and an iPhone cell phone ("the Tony Hernandez iPhone").

        If called to testify, Enrique Santos, an investigative analyst with the U.S. attorney's office, would testify as to the following about the phones.

Q.   Special Agent McNamara, did you review the contents of two of Tony Hernandez's cell phones?

A.   I did.

Q.   Did you see contact lists on those cell phones?

A.   Yes.

        MR. GUTWILLIG:  And Ms. Collins, could you please pull up what's marked as Government Exhibit 202-R1 which is a subset of Government Exhibit 202 -- I apologize.

        Could you please pull up what's Government Exhibit

202R1-1.

Q.  And looking there at the first contact, in line 40, could you please read what's next to "name," Special Agent McNamara.

A.  Oscar Najera.

MR. GUTWILLIG:  And then, Ms. Collins, if you could please zoom back out.

Q.  And then on line 84, next to "name" it says Hugo Ardon.  In your review of Tony Hernandez's cell phones, did you see images of firearms?

A.  I did.

MR. GUTWILLIG:  The government offers Government Exhibit 201-R58.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 201-R58 received in evidence)

MR. GUTWILLIG:  Could you please publish, Ms. Collins.

Q.  What is that?

A.  Assault rifle.

MR. GUTWILLIG:  The government also offers Government Exhibits 201-R63, 202-R50, 202-R59, 202-R65, and 202-R84.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 201-R63, 202-R50, 202-R59, 202-R65, 202-R84 received in evidence)

MR. GUTWILLIG:  Ms. Collins, can you please publish

Government Exhibit 202-R50.

Q.   What is that?

A.   Pistol.

Q.   And Government Exhibits 202-R59, what is that?

A.   Assault rifle.

Q.   Government Exhibit 202-R65, what is that?

A.   Assault rifle.

Q.   Government Exhibit 202-R84, what is that?

A.   Pistol.

         MR. GUTWILLIG:  And now to the extent I hadn't
already, the government offers or actually, Ms. Collins, can
you please display for the witness, Court, and counsel what's
marked as Government Exhibit 202-R88.

Q.   What is that, Special Agent McNamara?

A.   Bundles of cash.

         MR. GUTWILLIG:  The government offers Government
Exhibit 202-R88.

         MR. STABILE:  No objection.

         THE COURT:  Received.

         (Government's Exhibit 202-R88 received in evidence)

         MR. GUTWILLIG:  Ms. Collins, can you please publish.

Q.   And Special Agent McNamara, were all of these pictures of
firearms and cash on Tony Hernandez's cell phones?

A.   They were.

         MR. GUTWILLIG:  You can take that down.  Thank you.

Q.  Did you also review electronic communications on Tony Hernandez's cell phones?

A.  I did.

MR. GUTWILLIG:  Government offers Government Exhibits 202-R2 through R4 and their corresponding translations, which were previously offered subject to connection.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 202-R2 through R4 and their corresponding translations received in evidence)

MR. GUTWILLIG:  Ms. Collins, could you please pull up Government Exhibit 202-R3-T, segment 5.

Q.  And the date here is February 6, 2018.  I'll read Tony Hernandez, if you can please read Santos.  I am going to start on line 4.

"Just here saying hi.  Are you at the armory?"

A.  "Yes, I am here so I can go."

MR. GUTWILLIG:  Could you go to the next page, please, Ms. Collins.  And then to segment 6.

Q.  If you could please read Santos starting in line 1.

A.  "Good morning, counselor, we went to try out the Kel-Tecs and the problem is that every five projectiles you have to give the magazine a little bump so that the projectiles will come into place.  I've read it in the instructions and I tried them like that and they worked.  Try it like that and let me know."

MR. GUTWILLIG:  And the next page, please, Ms. Collins.  Tony Hernandez -- I'm sorry, Ms. Collins, to segment 9, please.

Q.  And in the first communication dated March 9, 2018, what do you see there on the right, Special Agent McNamara?

A.  Picture of an assault rifle.

Q.  Tony Hernandez then writes, "You did not tell me anything."

What does Santos respond on line 3?

A.  "Do you like it?"

Q.  On the next page, please, Ms. Collins.  Tony Hernandez writes "yes."  If you could please read Santos.

A.  "Next time I will bring a .17 caliber one."

MR. GUTWILLIG:  Ms. Collins, could you please pull up for the witness what's marked as Government Exhibit 402.

Q.  And is this the translation of a BlackBerry message, Special Agent McNamara?

A.  It is.

MR. GUTWILLIG:  The government offers Government Exhibit 402.  I believe the translation that's contained in it was previously offered subject to connection.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 402 received in evidence)

Q.  Going to the next page.  If you could please publish.  And directing your attention there to line 2.  What do you see?

A.  A kilo of cocaine.

Q.  Do you see any markings on that kilo of cocaine?

A.  I do.

Q.  What are the mashings?

A.  It looks like a T overlaying an H.

MR. GUTWILLIG:  Thank you, Ms. Collins.

Your Honor, I'd like to read a stipulation.
Government Exhibit 1010.  Ms. Collins, if you can please pull
that up.

THE COURT:  All right.

MR. GUTWILLIG:  It is hereby stipulated and agreed by
and between the United States of America by Damian Williams,
United States Attorney, Jacob Gutwillig, David Robles, Elinor
Tarlow and Kyle Wirshba, and Juan Orlando Hernandez, by and
through his attorneys, Raymond Colon, Esq., and Renato Stabile,
Esq., that:

On April 21, 2022, Juan Orlando Hernandez, the
defendant was flown from Tegucigalpa, Honduras, to Westchester
County Airport, where he was first brought into the United
States.  The Westchester County Airport, located in White
Plains, New York, is in the Southern District of New York.

It is further stipulated and agreed that this
stipulation, marked Government Exhibit 1010, may be received
into evidence at the trial in the above referenced matter.

The government offers Government Exhibit 1010.

O2T3HER4                       McNamara - Direct

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 1010 received in evidence)

MR. GUTWILLIG:  With apologies, the government would like to read stipulation 1008.

THE COURT:  All right.

MR. GUTWILLIG:  The preamble is the same.  The first substantive paragraph says:  Government Exhibits 1201 and 1202 are true and accurate copies of electronic records stored in the Google LLC ("Google") account with the name Juan Orlando Hernandez Hernandez, and account ID 696971046930 maintained by Google on its servers, and which were stored by Google in the ordinary course of its business.

It is further stipulated and agreed that this stipulation marked Government Exhibit 1008 and the government exhibits referenced in this stipulation may be received into evidence at the trial in the above-referenced matter, subject to objections by the defendant other than authenticity and without the defendant waiving any other rights.

The government offers Government Exhibit 1008.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 1008 received in evidence)

MR. GUTWILLIG:  Ms. Collins, can you please pull up Government Exhibit 1201.

Q.   What is this, Special Agent McNamara?

A.   Google subscriber information.

MR. GUTWILLIG:  Government offers Government Exhibit 1201.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 1201 received in evidence)

MR. GUTWILLIG:  Ms. Collins, if you could please publish.  Thank you, Ms. Collins.

Q.   Special Agent McNamara, did the materials you reviewed include any of the defendant's electronic devices?

A.   Not that I recall.

Q.   And did you review any communications written by the defendant?

A.   Not that I recall.

MR. GUTWILLIG:  Ms. Collins, if we could please pull back up Government Exhibit 1001, and I'll read from paragraph 2.

On or about September 11, 2019, Hugo Ardon surrendered into United States custody and was arrested.  In connection with Ardon's arrest, law enforcement officers lawfully received from Ardon, among other things, an Apple laptop ("the Ardon laptop").  If called to testify, Kevin Tian, an employee with the Berkeley Research Group, would testify that Government Exhibits 203 is the Ardon laptop and it identifies some

exhibits.

Q.  Special Agent McNamara, did you review contact information stored on this laptop?

A.  I did.

MR. GUTWILLIG:  And the government offers Government Exhibits 203-R2, 203-R8, and 203-R1.

THE COURT:  Any objection?

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 203-R2, 203-R8, 203-R1 received in evidence)

MR. GUTWILLIG:  Ms. Collins, could you please publish what's marked as Government Exhibit 203-R2.

Q.  Special Agent McNamara, what is that?

A.  A contact of Tony Hernandez.

MR. GUTWILLIG:  Ms. Collins, could you please publish Government Exhibit 203-R8.

Q.  What is that?

A.  A contact for Fabio Lobo.

MR. GUTWILLIG:  And could you please publish Government Exhibit 203-R1.

Q.  What is that?

A.  Contact for Juan Orlando.

MR. GUTWILLIG:  Now, Ms. Collins, could you please leave this up, and pull back up next to it Government Exhibit

204-R50 at line 21.  If you could please zoom in on line 21.

Q.  And Special Agent McNamara, is Government Exhibit 204-R50

contact information from Geovanny Fuentes's cell phone?

A.  It is.

Q.  And is Government Exhibit 203-R1 contact information from

Hugo Ardon's laptop?

A.  Yes.

Q.  Now, could you please read the last four digits of the

phone number in 203-R1.

A.  6777.

Q.  And now going down to line 21 of 204-R50, could you please

read the last four digits next to "mobile" in the third column.

A.  6777.

Q.  And are the seven digits of that phone number the same,

Special Agent McNamara?

A.  They are.

        MR. GUTWILLIG:  And Ms. Collins, could you please pull

up Government Exhibit 1201.  And put that next to 204-R50,

please.  For 204-R50 can we go down to line 15.

Q.  And Special Agent McNamara, in the Google document, could

you please read the e-mail there.

A.  Juanorlandohernandez@gmail.com.

Q.  And then in line 15, from the contact information on

Geovanny Fuentes' cell phone, can you please read the name

there?

A.   Juanorlandohernandez@gmail.com.

MR. GUTWILLIG:  May I please have a moment, your Honor.

THE COURT:  You may.

MR. GUTWILLIG:  I neglected to offer Government Exhibit 202-R21.  Government offers that now.

MR. STABILE:  No objection.

THE COURT:  Received.

(Government's Exhibit 202-R21 received in evidence)

MR. GUTWILLIG:  No further questions, your Honor.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. STABILE:

Q.   Good afternoon, Agent.  You were just asked just at the end there some questions about a phone number 992-6777.  Do you remember those questions?

A.   I do.

Q.   You remember that phone number was attributed to Juan Orlando Hernandez, right?

A.   I do.

Q.   Do you know if that is his personal phone number, or if that is a phone number that appears on a presidential website; do you know?

A.   I don't.

Q.   Okay.  You also were asked questions about

Juanorlandohernandez@gmail.com.  Do you remember that?

A.  I do.

Q.  Do you know if that's his personal Gmail or if that is some campaign Gmail that's available to the public; do you know?

A.  I do not.

Q.  You were asked some questions about some recordings with Porky.  Do you remember those?

A.  I do.

Q.  Those were all partial recordings that were entered into evidence, right?

A.  I don't know.

Q.  Well, did you listen to those at any time?

A.  Some of them, yes.

Q.  Do you know if the portions that were offered here at this trial were complete or partial?

A.  I only reviewed partial.

Q.  Just to be clear, what was entered -- what was entered into evidence as GX 403 to 406, are those partial recordings or full recordings?

A.  I only know what was reviewed and entered into evidence.

Q.  I understand that.  But I am asking you before you got here today, did you review full recordings or only the portions that the prosecutors gave to you?

           MR. GUTWILLIG:  Objection.  Asked and answered.

           THE COURT:  I'll allow it.

A.  I only reviewed what was shown here today.

Q.  So you never listened to the full recording of 403, 404, 405 or 406, correct?

A.  Correct.

Q.  By the way, do you happen to be fluent in Spanish?

A.  I'm not.

Q.  So just to be clear, you listened to Spanish recordings?

A.  I reviewed the translations.

Q.  So you only reviewed the translations, right?

A.  Correct.

Q.  You only reviewed the translations that the prosecutors sitting here gave you to review, right?

A.  I only prepared what I was reviewing myself.  So I only followed up what I previously reviewed.

Q.  Right.  Which was given to you by the prosecutors here in this courtroom, right?

A.  They were provided previously from the case team.

Q.  You had no ability to listen to the recordings and know what was being said, right?

A.  I was never --

        MR. GUTWILLIG:  Objection, your Honor.  Relevance.

        THE COURT:  No, I'll allow it.

A.  I never reviewed any live recordings.

        MR. STABILE:  Can I have a moment, your Honor?

        THE COURT:  Sure.

O2T3HER4                        Lobo – Direct

Q.   You were shown some Waze entries for Geovanny Fuentes, do you remember that?

A.   I do.

Q.   And they indicated Casa Presidencial, right?

A.   They did.

Q.   Do you have any idea if he was inside Casa Presidencial or outside Casa Presidencial?

A.   No.

Q.   Waze doesn't tell you that, right?

A.   It is just a navigation app.

             MR. STABILE:  I don't have any other questions.

             THE COURT:  Any redirect?

             MR. GUTWILLIG:  No, your Honor.

             THE COURT:  Please step down.  And call your next witness.

             (Witness excused)

             MR. ROBLES:  The government calls Fabio Lobo.

             THE COURT:  You may inquire.

 FABIO LOBO,

      called as a witness by the Government,

      having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ROBLES:

Q.   Good afternoon, Mr. Lobo.

             Where are you from?

O2T3HER4                        Lobo - Direct

A.   Honduras.

Q.   Where did you come from this morning?

A.   From prison.

Q.   What prison is that?

A.   Essex County Correctional Facility.

Q.   Why are you in prison?

A.   Serving a sentence.

Q.   What are you serving that sentence for?

A.   Drug trafficking.

Q.   Mr. Lobo, did you in fact engage in drug trafficking?

A.   Yes.

Q.   Where were you when you participated in drug trafficking?

A.   In Honduras.

Q.   Have you since pled guilty to a drug trafficking crime?

A.   Yes.

         MR. ROBLES:  Ms. Collins, if you could please pull up
Government Exhibit 114 which is in evidence for the parties,
the jury, and the witness, please.

Q.   Mr. Lobo, do you recognize what's on the screen?

A.   Yes.

Q.   Who is that?

A.   Porfirio Lobo Sosa, Pepe Lobo, my father.

         MR. ROBLES:  Ms. Collins, you can take that down.
Thank you.

Q.   Mr. Lobo, did your father hold any political positions in

O2T3HER4                        Lobo - Direct

Honduras?

A.   Yes.

Q.   What positions were those?

A.   The first position was president of the national congress of Honduras.  The second position was president of the Republic of Honduras.

Q.   Approximately what years was your father president of Honduras?

A.   2010 to 2014, end of 2014.

Q.   Do you mean the beginning of 2014?

A.   Yes, he handed over, he turned over his position the 27th of January of 2014.

Q.   Mr. Lobo, while your father was president of Honduras between 2010 and 2014, did you participate in drug trafficking?

A.   Yes.

Q.   Did you meet any politicians in Honduras as a result of your father's political positions?

A.   Yes, sir.

Q.   Mr. Lobo, looking around the courtroom, do you recognize any of those politicians here today?

A.   Yes, sir.

Q.   Who do you recognize?

A.   Mr. Juan Orlando Hernandez Alvarado.

Q.   Mr. Lobo, can you please describe where Juan Orlando Hernandez is seated and describe an article of clothing that

O2T3HER4                      Lobo - Direct

he's wearing.

A.  He is the man wearing glasses, a blue tie, a white shirt, and dark suit.

            THE COURT:  Identification noted.

            MR. ROBLES:  Thank you.

Q.  Mr. Lobo, do you know Juan Orlando Hernandez by any nicknames?

A.  Yes.

Q.  What nickname is that?

A.  JOH.

Q.  If I refer to Juan Orlando Hernandez as the defendant, will you know who I'm talking about?

A.  Yes.

Q.  Mr. Lobo, approximately when did you first meet the defendant?

A.  In early 2002, sir.

Q.  Since you've known the defendant, what, if any, political positions has he held?

A.  He was a congressman in the national congress of Honduras within which he was -- he held the position of secretary general of the national congress of Honduras.

Q.  Did the defendant hold any other political positions, after being secretary of the congress?

A.  Yes.  He was later president of the Republic of Honduras for two terms.

Q.   Prior to becoming president, was he the president of the Honduran national congress?

A.   That's correct, sir.

Q.   Mr. Lobo, can you describe in general terms what your relationship was like with the defendant in Honduras?

A.   Mr. Juan Orlando Hernandez and I had a very close relationship.  An extremely personal relationship.

Q.   Mr. Lobo, in connection with your drug trafficking, did you ever pay any bribes to Honduran politicians?

A.   Yes, sir.

Q.   Who did you pay those bribes to?

A.   To Mr. Juan Orlando Hernandez.

Q.   Approximately how many times did you pay bribes to Juan Orlando Hernandez?

A.   Two times.

Q.   What was the reason that you were providing bribes to the defendant?

A.   One reason was because of our friendship; and two, for his political campaign, because at that time he was running for president of Honduras.

Q.   What, if anything, were you hoping to receive in return for the bribes that you were providing?

A.   Political favors.  One reason was political favors, and another was information and support.

Q.   When you say --

O2T3HER4                          Lobo – Direct

THE INTERPRETER:  Interpreter correction.

One thing was political favors and the other was information and support.

Q.  When you say information and support, information and support for what?

A.  First for my drug trafficking activities.

Q.  What political position did the defendant hold when you paid him these bribes?

A.  He was running for president of the republic.  He was president of the national congress of Honduras.

Q.  When you paid the defendant these bribes, where did that money come from?

A.  From my drug trafficking activities.

Q.  Mr. Lobo, at the time that you paid these bribes, were you working with any particular drug traffickers?

A.  Yes.

Q.  Who were you working with?

A.  With the Cachiros Cartel.

Q.  Who were the Cachiros?

A.  They were a drug trafficking group from the northern coast of Honduras.

MR. ROBLES:  Ms. Collins, if you could please show the parties, the Court, and the witness Government Exhibit 108, please.

Q.  Mr. Lobo, do you recognize the person on the screen?

A.   Yes.

Q.   Who is that?

A.   He is Devis Leonel Rivera Maradiaga.

Q.   Is that a true and accurate representation of Mr. Maradiaga?

A.   Yes.

          MR. ROBLES:   The government offers Government Exhibit 108.

          MR. STABILE:   No objection.

          THE COURT:   Received.

          (Government's Exhibit 108 received in evidence)

          MR. ROBLES:   Ms. Collins, can you please publish Government Exhibit 108 next to Government Exhibit 109, which is already in evidence.

Q.   Mr. Lobo, do you recognize the person in Government Exhibit 109 on the right-hand side of the screen?

A.   Yes.

Q.   Who is that?

A.   He is Javier Heriberto Rivera Maradiaga.

Q.   What, if any, relationship did these individuals have to each other?

A.   They're brothers.

Q.   What role, if any, did they have in the Cachiros?

A.   They are the leaders, the leaders of the Cachiros Cartel.

Q.   Mr. Lobo, at any time did you ever speak to the defendant

about your drug trafficking work with the Cachiros?

A.   Yes.

Q.   Mr. Lobo, approximately when was the first time that you ever had any discussion with the defendant about drug trafficking?

A.   2009.

Q.   Mr. Lobo, apart from the bribes that you gave to the defendant, were you aware of whether any other drug traffickers also gave money to the defendant?

A.   Yes.

Q.   How did you come to learn that?

A.   I was told in a meeting that I had with one of the leaders of a cartel, the Sinaloa Cartel, that he was going to contribute to Juan Orlando Hernandez's campaign.

Q.   Did you ever discuss with the defendant a contribution to his campaign from the Sinaloa cartel?

A.   Yes.

Q.   What did you defendant tell you?

A.   That he had received a contribution from some people from Sinaloa.

Q.   Mr. Lobo, we're going to come back to these topics in a bit more detail, but I want to take a step back and ask you a little bit about your background first.

How old are you?

A.   51 years old.

Q.   How far did you go in school?

A.   University studies.

Q.   What, if any, profession did you have in Honduras?

A.   An attorney and a notary in Honduras.

Q.   As a lawyer in Honduras, did you hold any particular positions?

          THE INTERPRETER:  May the question be repeated for the interpreter.

Q.   Of course.  As a lawyer in Honduras, did you hold any particular position?

A.   Yes.

Q.   What position was that?

A.   I was a judge at the supreme court of Honduras.

Q.   What types of matters did you handle as a judge in Honduras?

A.   Criminal matters with adult and juvenile violaters of the law.

Q.   When you say the supreme court, are you referring to a local court in Honduras as opposed to the supreme court of the country?

A.   That's correct.

Q.   During approximately which years were you a judge in Honduras?

A.   2000 to late 2009.

Q.   Mr. Lobo, you testified earlier that you were involved in

O2T3HER4                    Lobo - Direct

drug trafficking in Honduras.  Approximately when did that start?

A.   In 2010.

Q.   Was that the first year of your father's presidency?

A.   Yes.

Q.   Did you start working with the Cachiros around that time?

A.   Yes.

Q.   When you first met the Cachiros, how, if at all, were you going to help them?

A.   With contracts from the government of Honduras.

Q.   What is your understanding of why the Cachiros wanted your help obtaining government contracts?

A.   To launder the money that they were making in drug trafficking.

Q.   Why did you think that you could help the Cachiros obtain these government contracts?

A.   I had the ability and the connections necessary to help them.

Q.   Were those connections you had as a result of being the son of the president?

A.   Yes.

Q.   Did you in fact help the Cachiros obtain government contracts?

A.   Yes.

Q.   What, if anything, did you receive in return?

A.   Payments.

Q.   Mr. Lobo, was your father ever involved in conversations related to the Cachiro's money laundering?

A.   Yes.

Q.   Mr. Lobo, did your father ever receive campaign contributions from the Cachiros?

A.   Yes.

Q.   Did your father provide protection for the Cachiros in exchange for those campaign contributions?

A.   Yes.

Q.   Did that include protection from extradition?

A.   Yes.

          MR. ROBLES:  Ms. Collins, if can you please pull up for the witness, the Court, and the parties what's marked as Government Exhibit 310.

Q.   Mr. Lobo, do you recognize what's on the screen?

A.   Yes.

Q.   What is that?

A.   It is a photograph at the presidential palace of Honduras.

Q.   Do you see yourself in that photograph?

A.   Yes.

          MR. ROBLES:  The government offers Government Exhibit 310.

          MR. STABILE:  No objection.

          THE COURT:  Received.

(Government's Exhibit 310 received in evidence)

Q.   Mr. Lobo, what is Casa Presidencial?

A.   It is the house where the administration formed by the president, the vice president, and other government officials are.

Q.   Is that the house where the president works out of?

A.   Yes.

Q.   Mr. Lobo, who is the person on the far left of this photograph?

A.   Mr. Javier Heriberto Rivera Maradiaga.

Q.   What is Javier wearing in the photograph?

A.   He's wearing a white shirt.

Q.   Is Javier in the middle of the screen or the middle of the photo?

A.   That's correct.

Q.   It appears that this person you've identified as Javier has his arm around somebody.  Who is that person that he has his arm around?

A.   My father.

Q.   Is that Pepe Lobo?

A.   Correct.

Q.   Javier, is that one of the leaders of the Cachiros?

A.   Yes.

Q.   On the far left of the photograph, the person with his arms crossed in front of him, who is that?  With the darker shirt

O2T3HER4                    Lobo - Direct

on.

A.    That's me, Fabio.

MR. ROBLES:  Ms. Collins, you can take that down. Thank you.

THE COURT:  Ladies and gentlemen, we're going to call it a day.  Thank you.  We end our week tomorrow.  We'll end strong.

I should have better information on where we are by the end of the day, but I think we're making good progress.

So, have a pleasant evening, put the case out of your mind.  As I always say, do not discuss the case among yourselves or with anyone, and see you for a good 10 o'clock start tomorrow morning.

(Jury excused)

THE COURT:  With the assistance of our court security officers, I ask that everyone except court staff remain in the courtroom until our jurors have cleared the elevator lobby on this floor.  Thank you.  Please be seated.

(Adjourned until May 1, 2024, at 10 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

DEVIS LEONEL RIVERA MARADIAGA

Cross By Mr. Colon . . . . . . . . . . . . . . . 942

Redirect By Mr. Gutwillig . . . . . . . . . .1004

 ANDREA SANTOS

Direct By Mr. Robles . . . . . . . . . . . . .1012

Cross By Mr. Stabile . . . . . . . . . . . . .1029

 DANIEL McNAMARA

Direct By Mr. Gutwillig . . . . . . . . . . .1030

Cross By Mr. Stabile . . . . . . . . . . . . .1079

 FABIO LOBO

Direct By Mr. Robles . . . . . . . . . . . . .1082

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 118    . . . . . . . . . . . . . . . . . . .1014

 1003     . . . . . . . . . . . . . . . . . .1027

 403 through 406 and 403T . . . . . . . . .1029

        through 406T

 1001     . . . . . . . . . . . . . . . . . .1042

 204-R200    . . . . . . . . . . . . . . . .1045

 204-R50    . . . . . . . . . . . . . . . . .1047

 204-R1, 204-R1-T    . . . . . . . . . . . .1049

 204-R2, 204-R2-T    . . . . . . . . . . . .1051

 204-R21    . . . . . . . . . . . . . . . . .1053

204-R100 through 204-R112   . . . . . . . . .1055

204-R159    . . . . . . . . . . . . . . . . .1056

204-R151    . . . . . . . . . . . . . . . . .1057

1007    . . . . . . . . . . . . . . . . . . .1059

905, 905-T    . . . . . . . . . . . . . . . .1059

907   . . . . . . . . . . . . . . . . . . . .1064

908, 909    . . . . . . . . . . . . . . . . .1064

1006    . . . . . . . . . . . . . . . . . . .1066

808   . . . . . . . . . . . . . . . . . . . .1067

801   . . . . . . . . . . . . . . . . . . . .1067

802, 802-T    . . . . . . . . . . . . . . . .1068

803, 803-T    . . . . . . . . . . . . . . . .1068

201-R58   . . . . . . . . . . . . . . . . . .1070

201-R63, 202-R50, 202-R59, 202-R65, 202-R84  1070

202-R88   . . . . . . . . . . . . . . . . . .1071

202-R2 through R4 and their corresponding translations 1072

402   . . . . . . . . . . . . . . . . . . . .1073

1010    . . . . . . . . . . . . . . . . . . .1075

1008    . . . . . . . . . . . . . . . . . . .1075

1201    . . . . . . . . . . . . . . . . . . .1076

203-R2, 203-R8, 203-R1    . . . . . . . . . .1077

202-R21   . . . . . . . . . . . . . . . . . .1079

108   . . . . . . . . . . . . . . . . . . . .1088

310   . . . . . . . . . . . . . . . . . . . .1093