O345her1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

      v.                              15 Cr. 379 (PKC)

JUAN ORLANDO HERNANDEZ,

                              Trial
          Defendant.

------------------------------x

                              New York, N.Y.
                              March 4, 2024
                              10:05 a.m.

Before:

                  HON. P. KEVIN CASTEL,

                              District Judge

                    APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  KYLE A. WIRSHBA
     JACOB GUTWILLIG
     ELINOR TARLOW
     DAVID ROBLES
     Assistant United States Attorneys

RENATO CHRISTIAN STABILE
RAYMOND L. COLON
SABRINA P. SHROFF
     Attorneys for Defendant


Also Present:   Francisco Olivero, Interpreter (Spanish)
                 Dagoberto Orrantia, Interpreter (Spanish)
                 Mercedes Avalos, Interpreter (Spanish)
                 Evan Frierson, Interpreter (Spanish)
                 Gabriel Mitre, Interpreter (Spanish)
                 Evan Frierson, Interpreter (Spanish)
                 Matthew Passmore, DEA Special Agent

            SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

O345her1

(Trial resumed; Jury not present)

THE COURT:  Well, while we are waiting, let me understand -- are we waiting?

THE DEPUTY CLERK:  No.  The jurors are here.

THE COURT:  I am going to bring our jurors in.  We will take up matters on the next break.

Bring the witness out, please.

(Continued on next page)

(Jury present)

THE COURT:  Good morning, ladies and gentlemen.

I am talking a wild guess that the weekend flew by. Mine did.  Yesterday was gorgeous weather.  First half of the day I was sawing down tree branches from the storm and digging holes for a kind of fertilizer called Holly-tone that you put in in March, and then the second half of the day I was recovering from all of that, and Saturday in the rain I had a 7-year-old grandson's birthday party.  So, for me, it was a good weekend.  Had the chores in between, as always.  And I am sure each of you could recount your weekend and all the things you got done and didn't get done and meant to get done, but I appreciate your being here with smiles and I know that is smiles of fortitude and determination to see your duty through, for which I appreciate.

So, Mr. Rodriguez, the Court reminds you that you are still under oath.

Mr. Stabile, you may continue when are you are ready.

GIOVANI RODRIGUEZ, resumed.

MR. STABILE:  Thank you, your Honor.

CROSS EXAMINATION (Continued)

BY MR. STABILE:

Q.  When we left off on Friday we were talking about how you lied at your criminal trial in Honduras; right?

A.  Right.

O345her1                              Rodriguez - Cross

Q. And that was 2010; right?

A. Yes, approximately.

Q. And you have now admitted that you were in fact guilty of what you were charged of in 2010; right?

A. Right.

Q. And that you bribed a judge to have your conviction vacated in 2010; right?

A. I used the influence of a friend in order for him to help me resolve charges that were pending resulting from abuse of authority and a violation of a public official's duties.

Q. Now I want to fast forward to 2016. That was the year that you were taken into custody by the DEA; right?

A. I was never arrested. I surrendered myself. I went to the U.S. embassy and I was never arrested in Honduras, I willingly went to the U.S. embassy and I surrendered, and there I was taken under custody by the DEA but I was never arrested.

Q. Right. The DEA came to Honduras to get you; right?

A. No.

        MR. ROBLES: Objection.

        THE COURT: No, I will allow the question.

A. No, they did not go there to get me. I went to the U.S. embassy and they have personnel there. When I went to the embassy there was a DEA agent there and he coordinated it all and I told him that I was surrendering voluntarily because of charges that had been filed against me.

Q.   In 2016 did you go on national television?

A.   I don't remember.

Q.   Oh.  You don't remember going on a television show with Renato Alvarez?

A.   I think so.  I'm not sure.  I don't remember.

Q.   How many times in your life have you been on TV?

A.   Well, on several occasions, because whenever I was on assignment -- interpreter correction -- because there were assignments for which I was the speaker for the police officer, and I was there to provide information about the operations that we were carrying out in different areas.  But wherever I was, my role was that of a speaker of the police and therefore I was on TV on several occasions.

Q.   OK, but how many times have you sat down in a TV studio and given an on-air interview?  How many times in your life?

A.   Many times.  Many times.  I was on Radio America where I had a program where I would appear for one hour receiving reports from citizenships.  Also, on HRN I also had a one-hour program where I would just provide information about several police operations that were ongoing.

        So, I used to appear on TV programs, yes, in order to provide information about what was being done in different areas.

Q.   Sir, in 2016 you went on Renato Alvarez, in police uniform, and proclaimed your innocence of the 2010 charges; didn't you?

A.  No, I don't remember.  What I do remember is that I didn't want any exposure on myself, however some of my colleagues did. I did not give any statements.  I do not remember that but I do remember that I did not give any statements.

MR. STABILE:  Your Honor, may I approach the witness?

THE COURT:  You may.

MR. STABILE:  May I bring a laptop and headphones for him?

THE COURT:  Yes.  Speak aloud, Mr. Stabile.

Q.  Sir, I'm going to play something for you through the head phones and ask you to watch something on the computer screen. OK?

THE COURT:  And Mr. Stabile, am I correct that the end product here will be the question:  Does this refresh your recollection?

MR. STABILE:  Absolutely.

THE COURT:  Thank you.

A.  What was that, counselor?

Q.  I am going to play something for you on the computer and I am asking you to listen to it and watch it.

(Video played)

Q.  I am now going to play one other thing for you?

THE COURT:  Have these been marked for identification?

MR. STABILE:  They have -- yes, they have and they've been provided to the government as --

THE COURT:  What are they marked for identification as?  Just take a moment so we have a good record here.

MR. STABILE:  So, the first thing I played is DX 208-1.

THE COURT:  For identification?

MR. STABILE:  Identification only; and the second thing I am going to play is DX 208-2, and these are --

THE COURT:  For identification?

MR. STABILE:  For identification, and these are --

THE COURT:  No.  That's sufficient.

MR. STABILE:  I'm sorry.

MR. ROBLES:  Your Honor, can we have counsel put on the record the time stamps for those clips so that the government is aware?

THE COURT:  Actually, I'm not sure that's relevant. If the time stamps were last night, what is that probative of?

MR. ROBLES:  I apologize, your Honor; the actual portions that are being shown to the witness is what I mean.

THE COURT:  Oh.  I'm sorry.

MR. ROBLES:  That's what I meant.

THE COURT:  I misunderstood you.

MR. ROBLES:  Sorry about that.

THE COURT:  OK.  So this is where in the range.

MR. STABILE:  I have to go back to my notes.

THE COURT:  That's fine.  I misunderstood what the

government was asking for.

MR. STABILE:  The second thing I am playing is 27:25 to 27:41.  I have to double-check first time stamp but I will get that to the government.

THE COURT:  OK.  Thank you.

(Video played)

BY MR. STABILE:

Q.  Were you able to see and hear clearly?

A.  Yes.

Q.  Does that refresh your recollection that in 2016 you went on-air with Renato Alvarez and gave an interview?

A.  I do not remember if it was in 2016 but I did do that to address or to discuss the charges that had been filed against me in La Mosquita.

THE COURT:  No.  Strike -- I do not remember if it was 2016 but I did give an interview; is that correct?

A.  Yes.  Yes.

THE COURT:  Next question.

Q.  In that interview you are in full police uniform; correct?

A.  Yes.

Q.  And in that interview you are claiming for everyone listening that you have a clean track record as a police officer; right?

THE COURT:  You are asking him whether he recalls that.

MR. STABILE:  Yes.

THE COURT:  All right.

A.  Yes, yes.

Q.  And you told everybody who would be listening to that interview that you were not a drug trafficker; right?

A.  What I am doing there is clarifying the 2009 case from La Mosquita.  That's what I am doing.

Q.  And you were guilty in that case; right?

A.  I was found guilty of a charge for the violation of public official's duties and abuse of authority.

Q.  Right.  For stealing drugs; right?

A.  Yeah.  Yeah.

Q.  And then you went on TV and said you were innocent; right?

MR. ROBLES:  Objection.  Asked and answered.

THE COURT:  No, I will allow it.

Go ahead.

A.  Yes.  What I was affirming there was the type of operation that was carried out in La Mosquita.  That was what I was talking about.

Q.  You were lying in that interview; right?

A.  Yes, but as far as that situation, I have already clarified that to you.  I was saying that to back up the type of operation that was being carried out.

MR. STABILE:  Move to strike everything after the word "yes."

THE COURT:  Granted.

Q.  Now you worked for the Honduran National Police for about 26 years; right?

A.  Approximately.

Q.  And you were also a lawyer in Honduras; right?

A.  Yes.  I received a degree in law but I never practiced.  I never worked as a lawyer, I graduated from university but I couldn't do it because I was a police officer, I couldn't practice.

Q.  And as a lawyer and police officer in Honduras, you understood how the legal system works in Honduras with respect to criminal laws; right?

A.  Yes.

Q.  And you know that the extradition law that allowed for the extradition of Honduran citizens was passed in 2012; right?

A.  Yes.

Q.  And you were charged with crimes here in the United States in June of 2016; right?

A.  Approximately.

Q.  And you were charged with drug trafficking crimes; right?

A.  Yes.

Q.  At the time you were charged in the United States, you knew that people had been extradited from Honduras to the United States; right?

MR. ROBLES:  Objection.  Calls for hearsay.

THE COURT:  Overruled.  Not admitted for the truth. Go ahead.

A.  Repeat, please?

Q.  At the time you were charged with drug crimes in the United States, you knew that people had been extradited from Honduras to the United States; right?

A.  Yes.  I think so.

Q.  And after you were indicted in the United States for drug crimes, you knew you were going to be extradited; right?

A.  No, but I was still hopeful -- interpreter correction.

No.  I was still hopeful that I wouldn't be because Mauricio Hernandez had told me that he was backed up by Juan Orlando and Tony Hernandez, so when I met Mauricio Hernandez for the last time I talked to him about that and I said, brother, please talk to the president, or talk to Tony Hernandez so that he will talk to the president to see if I can avoid being extradited, and then that was when he told me that he couldn't do that because I had already been -- because criminal charges had already been filed against me in the United States so there was nothing that could be done, the president couldn't do anything because that would mean going against the United States and it would make him look bad.

Q.  And in fact Juan Orlando Hernandez did nothing to help you avoid extradition; right?

A.  Yes.  Well, the thing is that what El Primo -- Mauricio

Hernandez -- told me, was that he couldn't do it, even if he wanted to, because -- he was still committed to us and he was still backing us up but he couldn't do it because at that point the charges had already been filed, it was out of his hands.

MR. STABILE:  Move to strike everything after the answer "yes," and at this point, your Honor, I would also ask for instruction to the witness to be responsive to the questions, otherwise I think my estimate on Friday is going to go way, way over.

THE COURT:  Yes, I will grant your application to strike everything after the word "yes" in response to the last question.  And as I have told the jury time and time again, when I strike something, they're to disregard it.

The Court instructs the witness to listen to the words of the question and if the question can be answered, simply and truthfully with "yes," "no," "I don't know," "I don't recall," then your answer should be that specific and that brief and you may not, in the cross-examination phase, explain your answers. OK?

THE WITNESS:  OK.

THE COURT:  Next question.

BY MR. STABILE:

Q.  You signed an agreement with the DEA in July of 2016; right?

A.  I didn't sign an agreement, just a surrender.  I didn't

sign any agreement, I just went to surrender, nothing else.

MR. STABILE:  Can we put up DX 3512-23 for Court, counsel, and the witness?

Q.  Can you see what is on the screen, sir?

A.  Yes.

MR. STABILE:  Andy, can we go to the last page?

Q.  Can you see the last page?

A.  Yes.

Q.  You see that you signed an agreement -- withdrawn?

MR. STABILE:  Andy, can we go to the first page, please?

THE COURT:  Are you offering the document?

MR. STABILE:  Not at this time, no.  I'm using it to refresh only.

THE COURT:  Then you can't quote from the document.

MR. STABILE:  I'm sorry, your Honor.  That's why I withdrew the question.

Can you please read the two highlighted portions on the screen?  And I would ask the translator to translate them to the witness.

INTERPRETER:  The two portions have been interpreted for the witness, counsel.

MR. STABILE:  OK, Andy, we can take it down.

Q.  Does that refresh your recollection that you signed an agreement with the DEA in July of 2016?

O345her1                        Rodriguez - Cross

A.   Yes, but I didn't actually remember that.

Q.   OK, but you remember it now; right?

A.   Yes.  I think so.

Q.   I'm sorry?

A.   I think so.

Q.   And in that agreement you agreed to travel to the United States with the DEA; right?

A.   Yes.

Q.   And in fact you met with the DEA in Honduras in July of 2016; right?

A.   No, I only met with one agent, that was the agent who handled my custody and it was just for the purpose of telling him that I was going to surrender.

Q.   Is that the agent sitting in this courtroom at the government's table?

          MR. ROBLES:  Objection.  Relevance.

          THE COURT:  Overruled.

A.   No.

Q.   Did the DEA agent put handcuffs on you in Honduras?

A.   Yes.  In fact, when I was transported on the plane, they handcuffed my hands and feet on the plane.

Q.   And they put you on a DEA plane; right?

A.   Yes.

Q.   And they flew you to the United States in handcuffs; right?

A.   Yes.  Yes.

THE COURT:  That was asked and answered.

Q.  As a lawyer and police officer, you know that if you are charged with a crime in Honduras you cannot be extradited to the United States; right?

MR. ROBLES:  Objection.

THE COURT:  Basis?

MR. ROBLES:  Relevance, and beyond the scope of the witness' knowledge.

THE COURT:  If the witness knows the witness can answer.

INTERPRETER:  May the interpreter have repetition of the question, please?

Q.  You know as a lawyer and as a police officer that if you are charged with a crime in Honduras you cannot be extradited to the United States; right?

A.  No.  If by my own authority and myself personally, if I go personally to surrender, my understanding is that I can.

Q.  That was not my question.  My question was:  As a lawyer and police officer, you know that if you are charged with a crime in Honduras you cannot be extradited to the United States; right?

THE COURT:  The witness did answer your question, sir. Next question.

Q.  After you were arrest -- withdrawn.

After you were handcuffed by the DEA in Honduras and

brought to the United States, you learned that your property was seized in Honduras; right?

A.   Days after I had been in custody here in the United States, yes, I received communication.  I think that I did but I don't remember the date or anything like that.  But it was -- I did find out after I was detained.

Q.   Right.  You found out that your house was seized in Honduras; right?

A.   Yes.

Q.   And you also found out that three lots of land were seized in Honduras; right?

A.   Yes.

Q.   And are you aware of anything that Juan Orlando Hernandez did to prevent the seizures of your properties?

A.   Well, I don't know what efforts might have been made.  I don't know about that.

Q.   When you are released from prison in 2011 -- well, withdrawn.

     Were you released from prison in 2011?

A.   Yes.  Approximately.

Q.   And then you were reinstated as a police officer; right?

A.   Yes.

Q.   And who was the president of Honduras in 2011?

A.   I don't remember.

Q.   Well, you know it was not Juan Orlando Hernandez; right?

A.   I don't remember.  I really don't know if Juan Orlando was in Congress.  I don't remember if Juan Orlando was president of Congress.  I really don't know.

Q.   I'm not asking you about president of Congress, I'm asking you about president of Honduras.  So my question is you know that in 2011 Juan Orlando Hernandez was not the president of Honduras; right?

MR. ROBLES:  Objection.  Asked and answered.  He said he didn't know.

THE COURT:  No, I'm going to allow it.

A.   I don't remember.  I don't really know.  It's been so long that I don't remember.

Q.   Don't you know that Pepe Lobo was the president of Honduras in 2011?

A.   Yes, I do know that Pepe Lobo was the president of Honduras but I could not remember the term.  I do not remember the terms of the presidents of Honduras.

Q.   Who was Juancho Leon?

INTERPRETER:  For the interpreter what was the spelling?

Q.    Juancho, J-U-A-N-C-H-O, Leon, L-E-O-N.

A.   I believe he is a Guatemalan drug trafficker, I think.

Q.   That you worked with, right?

A.   No, not directly.  I worked with Rojo.  I think that Rojo was working with him.  I worked directly with Rojo and Hector

Emilio but not with him.  It was Rojo with whom I interacted directly.

Q.   Your cousin is Ruben Mejia; right?

A.   Yes; was, because he has since passed away.

Q.   In 2013, Mr. Mejia asked for help in finding someone to commit a murder; right?

A.   Yes.

Q.   He told you that -- withdrawn.

The person he wanted to kill was named Orlan Chavez; right?

A.   Right.

Q.   And Orlan Chavez was a prosecutor in Honduras, right?

A.   Right.

Q.   And Mr. Mejia, your cousin believed that Orlan Chavez was investigating him; right?

A.   Right.

Q.   And that's why he wanted that prosecutor killed; right?

A.   I believe so.  Yes.

Q.   And you were a high-ranking police officer at that time in 2013; right?

A.   I was a police officer, yes, but I was not a high-ranking police officer because in Honduras a high-ranking officer is a general.  My rank was up there, yes, I was a comisario but I was not a high-ranking police officer, that would be a general.

Q.   You told Mr. Mejia that you could help with the murder;

right?

A.   Right.

Q.   And you went to a Lawyer you knew who was able to find assassins; right?

A.   Right.

Q.   The lawyer's name was Wilmer; right?

A.   Yes.  Right.

Q.   And three months after you spoke with the lawyer Wilmer, he told you that he had found people to kill Orlan Chavez; right?

A.   I do not remember how long it was, but yes, it was true.

Q.   And after you spoke with the lawyer Wilmer about having Orlan Chavez killed, Orlan Chavez was killed; right?

A.   Right.

Q.   And Wilmer, the lawyer, called you to tell you that the job was done; right?

A.   Right.

Q.   The killing happened by the national soccer stadium; right?

A.   Right.

Q.   And it was done by two men riding on a motorcycle; right?

A.   I think so.

Q.   And as a police officer, you know that two men riding on a motorcycle is a common way to carry out killings in Honduras; right?

A.   Yes; it is one of the ways.

Q.   And in fact, as a police officer and a lawyer, you know

O345her1                    Rodriguez - Cross

that there was a law enacted in Honduras outlawing two men riding on a motorcycle together; right?

A.   I do not remember.

Q.   A month after Orlan Chavez was killed, Mr. Mejia paid you $20,000; right?

A.   I think so.

Q.   And previously you told the government something different; right?

A.   No.  No.  I did admit to the government -- I did admit to this before the government.  I told the government about this. I told them the truth about this in exactly the way that you have said it.  I did admit to the killing of the prosecutor.  I told them that in fact it was done.  I did not give them all the details but what's important is that I did admit to the killing and my involvement in it.  I did.

Q.   But you didn't give them all the details; right?

A.   No, I did not give them all the details.  I did what was most important which was to admit to the killing.  Details were not necessary at that point but I did what was most important, admit to the killing.

Q.   In fact, you previously told the prosecutors that you were only paid $5,000; right?

A.   No, I don't remember.  The thing is that I do not remember amounts, I do not remember how much it was.

Q.   Well, how many times in your life have you been paid for

O345her1                    Rodriguez - Cross

participating in a murder?

A.   Nah, just on that one opportunity, one chance.

Q.   But you can't remember the amount you were paid; right?

A.   Right.

          MR. STABILE:  Andy, can we bring up DX 3512-54 page

2 -- I'm sorry.  Take that down, please.  Yes, can we put up

DX 3515-54, page 2, for just the Court, counsel and the

witness, only.

          Can the translator please translate what is

highlighted on the screen?

          INTERPRETER:  May the interpreter proceed, your Honor?

          THE COURT:  You may.

          INTERPRETER:  The interpreter is done, your Honor.

          THE COURT:  All right.  And the question is?

Q.   The question is, does that refresh your recollection that

you previously told the government that you were paid $5,000 to

find --

          THE COURT:  Let me see you at the side bar.

O345her1                    Rodriguez - Cross

(At side bar)

THE COURT:  Is the document in evidence?

MR. STABILE:  No, sir.

THE COURT:  Are you offering it into evidence?

MR. STABILE:  No, your Honor.

THE COURT:  Then don't read from it.  Do you understand?

MR. STABILE:  I was not reading from it, your Honor. I was not reading from it.

THE COURT:  You think that's proper examination? Apparently, yes.

MR. STABILE:  Well, apparently; yes.

THE COURT:  It's not.

MR. STABILE:  I was asking if it refreshed his recollection.

THE COURT:  It's not proper examination, sir.

(In open court)

THE COURT:  The question is stricken.

BY MR. STABILE:

Q.  You have known Fabio Lobo since about 2009, 2010; right?

A.  Yes.  I saw him on that occasion, only once.  Only once I can remember.

Q.  And you of course knew, when you knew him, that Fabio Lobo was the son of the president of Honduras Pepe Lobo; right?

A.  Right.

Q.  After you got out of prison for stealing 143 kilos of cocaine, you asked Fabio Lobo for help rejoining the police department; right?

A.  Right.  Not immediately when I left court, that's when I was reinstated to the police immediately.  This is now in 2013 for an assignment, I was asking him for help for an assignment through the director of police.

Q.  You didn't ask Fabio Lobo for help rejoining the police force, sir?

A.  No, I don't remember the date.  I believe that I met him, I think, in around 2014, 2013 or '14.  In 2010 I was in jail.  In 2010 and 2011 or so is when the killing of General Aristedes took place and I was in jail for all those events but did meet Fabio Lobo in around 2013 or 2014, not in 2010.

MR. STABILE:  Move to strike the portion of the answer referring to General Aristedes as unresponsive.

THE COURT:  Granted.

Q.  Don't you remember asking Fabio Lobo to speak with the chief of police in Honduras on your behalf?

A.  Yes, I did, but it was to ask him to help me get an assignment.  I wanted a specific assignment.  It was not about my reinstatement because I had already been reinstated in 2011.  I did meet Lobo in 2014 only on that one occasion and then we did not see each other until we were entrapped.

MR. STABILE:  Can we please put up, Andy, DX-3512-60, page 1?

MR. ROBLES:  Objection.  The witness hasn't said he doesn't remember these events.

THE COURT:  Yes.  Is this for the purpose of refreshing his recollection?

MR. STABILE:  Yes.

THE COURT:  Sustained.

MR. STABILE:  Take it down, please.

Q.  Don't you remember asking Fabio Lobo for helping rejoining the police department after you got out of prison?

MR. ROBLES:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  You also met with Fabio Lobo and other police officers to discuss drug trafficking with Mexicans and the Cachiros; right?

A.  We only met on one occasion when we were entrapped.  It was for about 17 minutes, it was very quick.  That was the only

time that I saw him again.

Q.   Well, after you were brought by the DEA from Honduras to the United States, weren't you cellmates with Fabio Lobo for approximately four months between 2017 and 2018?  Do you remember that?

A.   Yes, I did come to the unit where Lobo was, yes.

Q.   No, but my question is don't you remember that you were actually cellmates with Fabio Lobo in jail.

A.   Yes.

Q.   And for about a year, you and Fabio Lobo were in the same unit in jail; right?

A.   Yes.

Q.   And in fact your wife and Fabio Lobo's wife have been in touch with each other; right?

A.   No.  They coincided one time when my wife came to visit and his wife came to visit.  There they met each other due to the fact that they were both Honduran but that was it.  Just when they came to visit Lobo and me but they were not in contact after that.  That's false.

Q.   But they came to the jail together to visit you and Fabio Lobo; right?

A.   No, they did not arrive together.  My wife was staying with a family member and then she came and they ran into each other there but they had never seen each other before.  They ran into each other in the same way that family members of inmates will

do, and they meet at that point and interact at that point and share solidarity with each other and then a relationship might start.  But they had never seen each other before then.

Q.  Well, have they seen each other after?

          MR. ROBLES:  Objection.  Relevance.

          THE COURT:  I will allow it.  If you know.

A.  No, no.  They have not seen each other.

Q.  You know that for sure?

          MR. ROBLES:  Objection.  Asked and answered.

          THE COURT:  You asked a question.  You got the answer. Now you are impeaching the answer you got?  Is that what this is?  Sustained.

Q.  Don't you remember telling the prosecutors, on a prior occasion, that after you got out of prison for stealing 143 kilos of cocaine, it was Fabio Lobo who you asked for help rejoining the police force?

          MR. ROBLES:  Objection.  Asked and answered.

          THE COURT:  Yes.  That question was asked quite some time ago, about four minutes ago.

          MR. STABILE:  I was just asking him if he remembers saying something different.

          THE COURT:  That's a different question now?

          MR. STABILE:  Yes, your Honor.

          THE COURT:  All right.  I will allow it, based on your representation.

A.   No.  No, because that, when I met Lobo, that was in 2014 and at that point I didn't need help.  Immediately, once I got out of jail because of how my case had been resolved, I was reinstated in the police, I didn't need anyone's help with anything because I was reinstated immediately.  The only thing was that I had a -- the only thing was at that point I had an injunction against me, and for that reason I had to go to the court to give my signature every Friday.

          MR. STABILE:  Can we show the witness, Court, and counsel, 3512-60 page 1?

Q.   I would direct the witness' attention to the middle of the page and I would ask that the translator just translate what is highlighted.

          THE COURT:  Now, this is not for refreshing recollection?

          MR. STABILE:  It is.  The question will be if he recalls telling the prosecutors something different on a prior occasion.

          THE COURT:  Yes, and the witness did not have a failure of recollection.  I'm reading the answer.  If you want to argue that at the side bar you are welcome to do so, Mr. Stabile.

          MR. STABILE:  Well, I asked him if he recalled telling a prosecutor something different and he said "no" and now I would like to ask the question after he has been refreshed.

THE COURT:  You asked him:  Don't you remember telling the prosecutors on a prior occasion thus and so, and he answered that without claiming a failure of recollection.  Your question now is don't you recall telling the prosecutors something different?  That's convoluted, among other things.  You asked him if he recalled something and he answered, so you are trying to imply that there is a failure of recollection here when he answered your question directly so I'm sustaining the objection.

BY MR. STABILE:

Q.  When you were taken into custody by the DEA in 2016 was Fabio Lobo also taken into custody at that time?

A.  No, I don't know.  And I was not taken into custody, I went voluntarily to the American embassy.  I was never taken into custody and I know that because I personally went.

THE COURT:  It is 11:09.  How much longer do you have, Mr. Stabile?

MR. STABILE:  I think no more than 15 minutes.

THE COURT:  I thought you had about a half an hour left on Friday.

MR. STABILE:  I did, but the answers have been quite lengthy, I believe.

THE COURT:  Please proceed, sir.

MR. STABILE:  I will move it along, your Honor.

BY MR. STABILE:

Q.  You pled guilty in August 2017; right?

A.  Yes.  I think so.  Approximately.

Q.  And in your plea agreement you were facing 40 years in jail; right?

A.  Yes.  I had an offer of a mandatory minimum of five years and a 40-year maximum, the B offer.

Q.  And after you pled guilty, you decided then to start cooperating with the government; right?

A.  I don't remember the time but, yes, it was after I had pled guilty that I made that decision but I don't remember exactly how much time.

Q.  OK.  When you made that decision you had several meetings with the government before you were given a cooperation agreement; right?

A.  Correct.  I don't remember the meetings but I was with them.

Q.  Before the government gave you a cooperation agreement, you had several meetings with the government to tell them the information that you would be willing to give them; right?

A.  Right.

Q.  And after you had several meetings with the government and told the government what you would say, it's only then that they offered you a cooperation agreement; right?

A.  Yes.

Q.  And you got your cooperation agreement in September 2018;

right?

A.   Well, I don't remember the date but, yes, I entered a cooperation agreement.

Q.   And in your cooperation agreement you are required to plead guilty to certain crimes; right?

A.   Right.

Q.   And your agreement says that you won't be prosecuted for other crimes; right?

A.   For the crimes that I admitted to in the agreement?  Yes. So -- well, I mean, that depends on whether I fulfill the agreement.

Q.   Well, one of the crimes that you are not being prosecuted for is participating in the murder of a prosecutor in 2013; right?

A.   Well, that's a crime that -- well, my understanding is that that crime didn't happen in the United States, it happened in my country so I don't know what the law says about that, if I really can be prosecuted for that.  I don't know what international public law says about that but I think that everything that I have admitted to are things that I should be judged for here because of all of the years I have spent in jail but I don't know if there is an agreement, an international agreement between Honduras and the United States. If that's the case, all of the crimes that I have committed should be things that I should be held responsible for because

if there is an international agreement, that's above the Constitution of the Republic but I think that I am paying for those things that I made statements about.

MR. STABILE:  Move to strike everything after the word "no" in that answer.

THE COURT:  Well, I'm not sure that there is the word "no" in that answer.

MR. STABILE:  I forgot.  Maybe he said yes.  I will ask a different question.

Q.  Nobody has ever prosecuted you --

THE COURT:  Sir -- sir -- remember what I instructed you?

THE WITNESS:  Yes.  Yes.

THE COURT:  Please try to follow that instruction.

THE WITNESS:  OK, OK.  All right.  Very well, your Honor.

BY MR. STABILE:

Q.  You have never been prosecuted for the murder of Orlan Chavez; correct?

A.  Well, I don't know.

Q.  Well, part of your -- withdrawn.

You didn't plead guilty to the murder of Orlan Chavez; right?

A.  In Honduras?  I mean, I was in jail here in the United States.  I don't know if there is an indictment against me or

something.  I was in jail.

THE COURT:  Sir, the question was:  You didn't plead guilty to the murder of Orlan Chavez; right?

Is that correct or is that incorrect?

THE WITNESS:  No.  Not in Honduras.

THE COURT:  Sir -- sir -- the question was:  You didn't plead guilty to the murder of Orlan Chavez; correct?

And do you understand that question?

THE WITNESS:  Yes.

THE COURT:  Can you please answer it?

THE WITNESS:  No.

THE COURT:  Thank you.  Next question.

BY MR. STABILE:

Q.  You provided the government with information about many different people; isn't that right?

A.  Yes.

Q.  And under your plea agreement with the government, you can be asked to be placed in the witness protection program; right?

A.  Well, I don't know if that's possible.

Q.  Sir, but it's in your cooperation agreement that you can ask to be placed in the witness protection program.  That's in your Cooperation agreement; correct?

THE COURT:  You asked him whether he knows it is in the agreement?  Is that the question you are asking?

MR. STABILE:  Yes.

A.   Actually, I am not aware of all of the benefits.

Q.   Did you sign your cooperation agreement?

A.   Yes.

Q.   Did you have a lawyer when you signed it?

A.   Yes.

        THE COURT:  Do you want to identify the document?  Are you offering it into evidence?

        MR. STABILE:  Yes.  Well, I don't know if I am offering it into evidence yet.  It will be based on his answers.

BY MR. STABILE:

Q.   Did you read your cooperation agreement before you signed it?

A.   Yes, of course, but I do not remember all of its content or all of its points, but I did sign it.

        MR. STABILE:  OK.  Can we please put up for the Court, counsel, and the witness, DX 3512-30?

Q.   Sir, can you see what is on the screen?

A.   Yes.

        MR. STABILE:  Andy, can we go to the last page?

Q.   That's your cooperation agreement on the screen; right?

A.   Right.

        MR. STABILE:  Andy, can you go back a page, please?  One more page?  Page 6, please?  Sorry.  If you can go back two pages?  Right there.

Q.  I am directing your attention to the second paragraph and I would direct your attention to what is highlighted and I would ask that the translator translate the portions, the sentences that have the highlighted language in it.

INTERPRETER:  May the interpreter proceed, your Honor?

THE COURT:  You may.

INTERPRETER:  Thank you.

(Text interpreted)

INTERPRETER:  Done, your Honor.

BY MR. STABILE:

Q.  Does that refresh your recollection that you can ask for witness protection as part of your cooperation agreement?

A.  Yes.

MR. STABILE:  Your Honor, at this time I offer DX 3512-30 into evidence.

MR. ROBLES:  No objection.

THE COURT:  Received.

(Defendant's Exhibit  3512-30 received in evidence)

MR. STABILE:  Can this be published to the jury at this time?

THE COURT:  Yes, sure.

MR. STABILE:  Andy, you can publish it with the callout.  You can take it down.

THE COURT:  Well, pause now, because that's pretty dense text.  If you are going to show it to the jury, let the

jury read it.

(Pause)

THE COURT:  OK, ladies and gentlemen?  Next question.

MR. STABILE:  You can take down that blowout, Andy.

Q.  And you also know that as part of your cooperation agreement you can get what is known as a 5K letter from the government; right?

A.  Correct.

Q.  And you understand that if you get a 5K letter, the Judge can give you any sentence at all; right?

A.  That's right.

Q.  You could get a sentence of one day in jail.  Withdrawn.

You could get a sentence of time-served; right?

A.  Right.

Q.  And you understand if you get a sentence of time-served, you could walk out of court on the day of sentencing; right?

A.  Right.

Q.  You are hoping to get a sentence of time-served; right?

A.  Right.

Q.  You understand that in order to get that 5K letter you must provide substantial assistance to the government; right?

A.  Right.

Q.  You have already tried to be released from prison; isn't that true?

A.  Right.

Q.   And you asked the Court to release you during COVID; right?

A.   Right.

Q.   And you asked to be released during COVID so that you could go live with a relative on Long Island; right?

          MR. ROBLES:  Objection.

          THE COURT:  Overruled.

A.   Right.

Q.   You have been fired from the Honduran National Police; correct?

A.   Right?

Q.   And you have filed a wrongful termination claim against Honduran National Police; right?

          INTERPRETER:  May the interpreter confer with a colleague?

A.   Correct.

Q.   Because you believe you have been wrongfully terminated from the police department; right?

A.   Not because I say so, it is because the law says that I was not -- that I was not supposed to have been fired until a Judge reviewed a matter and reached a resolution on the case, a decision on the case, I should have only been suspended.  So I was wrongfully terminated and I am fighting this case based on on my labor rights.  Based on the law I should be reinstated into the National Police.  This was done wrongfully and unlawfully.

O345her1                     Rodriguez - Cross

Q.   You don't think that participating in the murder of a prosecutor disqualifies you from being a police officer?

A.   Not for as long as there is no decision after a trial and even after there is an appeal process before the Supreme Court. That is what the police law says, I cannot be fired or disqualified.

                (Continued on next page)

BY MR. STABILE:

Q.  And you're hoping to still receive your police pension, right?

A.  Right.  It is because a —— my right under the labor laws. I worked with the National Police for over 26 years.

THE INTERPRETER:  Correction, "close to 26 years."

THE COURT:  Sir, did you have trouble understanding my instruction?

THE WITNESS:  The reason, your Honor, is that I believe that the questions that are being asked of me need an explanation so that they can be understood by everybody.

THE COURT:  So the question I just asked you was, did you understand the instruction I gave you?

THE WITNESS:  Yes.

THE COURT:  You didn't answer that when I asked you that question just now.

THE WITNESS:  Yeah.

THE COURT:  You understand the instruction?

THE WITNESS:  Yes, your Honor.

THE COURT:  Please follow it.

THE COURT:  OK.

MR. STABILE:  Your Honor, I have no further questions.

THE COURT:  OK.  Redirect?

MR. ROBLES:  Very brief, your Honor.

REDIRECT EXAMINATION

BY MR. ROBLES:

Q.  Mr. Rodriguez, you were asked on cross-examination on Friday about your relationship with Mauricio Hernandez Pineda. Do you remember that?

A.  Yes.

Q.  During those questions, you were asked how you knew that the defendant and Tony Hernandez were related to Mauricio Hernandez Pineda.  Do you remember that?

A.  Right.

Q.  Was it your testimony that Mauricio Hernandez Pineda told you that he was related to the defendant and Tony Hernandez?

A.  Yes.

Q.  Now, you'd known Mauricio Hernandez Pineda since about 1991, is that right?

A.  Right.

Q.  You became very close with him over time, is that right?

A.  Right.

Q.  Did you ever have any reason to doubt what Mauricio Hernandez Pineda was telling you?

MR. STABILE:  Objection.

THE COURT:  I'll allow it.

A.  No.

Q.  Is what Mauricio Hernandez Pineda told you about the defendant and Tony Hernandez consistent with what Rojo also told you about them?

MR. STABILE:  Objection.

A.  Yes, that's right.

Q.  You were asked earlier today ——

THE COURT:  Wait a minute.  You made an objection?

MR. STABILE:  Yes.

THE COURT:  I didn't hear you, sir.

MR. STABILE:  I'm sorry, sir.

THE COURT:  In fact, it didn't show up in the record until just now, after the witness answered.

MR. STABILE:  I'm sorry, sir.

THE COURT:  What was the basis?

MR. STABILE:  The basis was relying on a different witness to bolster his answer about Mr. Pineda.

THE COURT:  One second, please.

Overruled.

Q.  Mr. Rodriguez, you were asked earlier today about having lied about your involvement in your stealing cocaine in 2009. Do you remember that?

A.  Yes.

Q.  And you did lie initially about that, right?

A.  Right.

Q.  Having met with the government in connection with your attempt to cooperate, have you now disclosed to the government the full extent of your involvement in stealing those drugs in 2009?

A.   Yes.

Q.   Have you also disclosed to the government the full extent of your involvement in coordinating the murder of Orlan Chavez?

A.   Yes.

Q.   Mr. Rodriguez, will those crimes be presented to the judge that sentences you?

A.   Yes.

Q.   And that's in your cooperation agreement too, right?

A.   Right.

          MR. ROBLES:  Ms. Collins, can you please pull up Defense Exhibit 3512-30 at the bottom of page 3.  If you could please zoom in to the bottom third of that last paragraph.

Q.   Mr. Rodriguez, does this paragraph –– withdrawn.

          This paragraph includes the crimes that you've admitted to the government, is that right?

A.   Right.

Q.   Do you remember being asked on cross-examination a moment ago that you wouldn't be further prosecuted for any of these crimes?

A.   Right.

Q.   Mr. Rodriguez, these are crimes that are going to be presented to the judge when you're sentenced, right?

          MR. STABILE:  Objection.  Asked and answered.

          THE COURT:  Sustained.

          MR. ROBLES:  Ms. Collins, can you please go to page

No. 4 at the top of the page and zoom in on the first full paragraph, please.

Q.  Mr. Rodriguez, in Defense Exhibit 3512-30, which is in evidence, at the top of page 4 it says that all the conduct set forth in subsections (1) through (4) of the preceding paragraph constitute either relevant conduct or other conduct of the defendant that the Court may consider at the time of sentencing.

Does that mean that the Court is going to consider all the crimes you've admitted to the government when you're sentenced?

MR. STABILE:  Objection.

A.  Yes.

MR. STABILE:  It's not what the document says, and this witness is incompetent to testify as to what the Court will consider.

THE COURT:  I haven't heard what the answer is.

MR. STABILE:  I was objecting to the question.

THE COURT:  You can inquire as to the witness' understanding.

MR. ROBLES:  Understood, your Honor.

Q.  Mr. Rodriguez, is it your understanding that in your cooperation agreement it says that the crimes that you have admitted to the government will be considered by the judge that sentences you?

A.   That's correct.

Q.   Mr. Rodriguez, if you were to lie under oath, would that break your cooperation agreement, to your understanding?

A.   Yes.

Q.   Mr. Rodriguez, you were also asked about having pled guilty to a drug trafficking crime on cross-examination.  Do you remember that?

A.   Yes, I remember.

Q.   As part of that drug trafficking crime, did you provide information is to Mauricio Hernandez Pineda, police information to him?

A.   Yes.

Q.   Do you recall approximately how much Mauricio Hernandez Pineda paid you in exchange for that information?

A.   I do not remember, but he did pay me some money.  I do not remember the amount.

        MR. ROBLES:  Ms. Collins, can you please pull up for the Court, the witness, and the government 3512-55 at page 3.

        And if you could zoom in on the bottom third of the first full bulleted paragraph.

        Your Honor, I'd ask that the interpreter read that to the witness to see if it refreshes his recollection.

        THE COURT:  All right.

        THE INTERPRETER:  The interpreter's finished.

        MR. ROBLES:  Thank you.

Ms. Collins, you can take that down.

Q. Mr. Rodriguez, having reviewed that document, does it refresh your recollection as to approximately how much Mauricio Hernandez paid you in exchange for information?

A. Yes.

Q. Approximately how much did he pay you?

A. Between approximately 3,000 and $4,000.

Q. Mr. Rodriguez, between 2012 and 2016, you were never arrested by Honduran authorities, right?

A. Yes, that's right.

Q. And during this time, you were providing police information to Mauricio Hernandez Pineda, right?

A. Yes, that's right.

Q. And Mauricio Hernandez Pineda, to your understanding, was using that information in furtherance of drug trafficking, right?

A. Correct.

Q. And despite providing this information to a police officer, you were never extradited to the United States, right?

A. Right.

MR. ROBLES:  One moment, your Honor.

No further questions.

THE COURT:  All right.  You may step down, sir.

Ladies and gentlemen, we'll take our midmorning break. Please do not discuss the case among yourselves or with anyone.

O34HHer2                     Rodriguez - Redirect

We'll be back in action in ten minutes.  Thank you.

(Jury excused)

(Continued on next page)

O34HHer2

(Jury not present)

THE COURT:  Please be seated.

What's next?

MR. ROBLES:  Your Honor, the government's next witness is firearms enforcement officer John Miller.

THE COURT:  Let's talk about that.

When I got Mr. Stabile's letter over the weekend, I was grateful that there were no photographs of helicopters or tanks, because I had visions of all of this coming into my courtroom, and then I learned from the government that was not the case.

So what is the government planning on using with this witness?

MR. ROBLES:  Your Honor, so there are four exemplar firearms that we'd propose showing to this witness.

THE COURT:  Tell me what they are.

MR. ROBLES:  It's an M16, which is a weapon that many of the government's witnesses have testified about; an AK-47, which is, again, a weapon the government's witnesses have testified about; an M60; and an RPG.

THE COURT:  Let's take the M16.  Well, first of all, on Mr. Stabile's list is a reference to M4.  Is there going to be an M4 or M16?

MR. ROBLES:  An M16, your Honor.

THE COURT:  And M16 and AK-47, are they — will the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O34HHer2

testimony be that these weapons are capable of repeated fire through the single pull of a trigger?

MR. ROBLES:  That's right, your Honor.

THE COURT:  Now, the next weapon was what?

MR. ROBLES:  An M60.  There was testimony from Alex Ardón about Tony Hernandez having an M60.  It's a different type of machine gun that the witness will also testify about, you know, testify about the features that make it an automatic weapon that is different in kind from the other two.

THE COURT:  All right.  And the final one was?

MR. ROBLES:  An RPG, essentially, a rocket, your Honor.  The witness will testify about what makes it a destructive device, and there was testimony in the record about that.

THE COURT:  All right.  As stated is there a remaining objection?

MR. STABILE:  Yes, your Honor.  I believe even bringing in —— I think the last item is an RPG, is a rocket propelled grenade.  There's no dispute ——

THE COURT:  No, it's a grenade launcher.

MR. STABILE:  Oh, oh, sorry.

THE COURT:  Yes.

MR. STABILE:  There's no dispute in this case from the defense that these serious weapons were used in furtherance of the conspiracy.  There is no dispute that they are capable of

O34HHer2

inflicting the damage they're capable of.  The government is perfectly capable of displaying photographs of them, to which we will not object, and the government has displayed photographs.  And to have these, what I would deem, scary-looking weapons that most people don't see in their everyday lives brought into court, when they're not even actual weapons that were recovered from the conspirators they're just exemplars, I think, quite frankly, your Honor, this is going to be a big show.  This is the government's last witness.  This is how they want to close the show, and it's just being done for prejudice and shock value and all of those reasons.

THE COURT:  All right.  Thank you.

I will simply say that when I got Mr. Stabile's letter, I couldn't —— I agreed with his arguments, and now I've come to learn from the government's letter that they submitted, together with the argument just presented, that there's a legitimate need to show and demonstrate why these isolated exemplars, three of the exemplars, meet the definition of machine gun under the statute, which is anything but obvious. It's not an obvious matter.  So I will allow that.  And similarly, the RPG launcher is the sole weapon that the government is seeking to show that falls within the definition of destructive device.

What I'm going to allow or require the government to do is this is done one by one.  When the witness completes his

testimony or her testimony as to that weapon, the weapon is returned to a place out of the sight of the jury so that at no point is more than one weapon shown in the presence of the jury.

MR. STABILE:  Your Honor.

MR. ROBLES:  Your Honor, just logistically, there's a case that the weapons are in right now, and we can ask the witness to open the case, pull one out, close it, and display it.

THE COURT:  That's fine.

MR. ROBLES:  I think, just as a matter of logistics, the case will likely have to be sort of there by the witness box.

THE COURT:  Figure it out.

MR. ROBLES:  OK.

THE COURT:  Thank you.

MR. STABILE:  Your Honor, can I say one other thing?

THE COURT:  Yes.

MR. STABILE:  I understand your Honor's point that there's a reason to bring the guns in to show the jury how they work, but unless they're actually going to start firing these weapons, there's no difference from showing them a photograph and describing how they fire and holding it up.  They're not going to do an actual demonstration in the courtroom of how these weapons fire.  So for that reason, you know, I'm just

O34HHer2

adding another point to my objection that there's really no practical difference between the photograph and the actual weapon other than to scare people.

THE COURT:  Thank you.

We're in recess.

(Recess)

(Continued on next page)

O34HHer2                    Miller - Direct

(Jury present)

THE COURT:  All right.  Please be seated.

The government may call its next witness.

MR. ROBLES:  Thank you, your Honor.

The government calls firearms enforcement officer John Miller.

THE COURT:  One moment, please.

JOHN MILLER,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE COURT:  All right.  You may inquire.

MR. ROBLES:  Thank you.

DIRECT EXAMINATION

BY MR. ROBLES:

Q.  Mr. Miller, if it's OK with the Court, I'm going to ask you to get a little closer to the microphone.

Mr. Miller, are you currently employed?

A.  Yes, I am.  I'm a firearms enforcement officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

Q.  Is that commonly known as ATF?

A.  Yes, it is.

Q.  How long have you been with the ATF?

A.  I've been employed at the ATF about two years.

Q.  What are your duties and responsibilities as a firearms enforcement officer?

O34HHer2                    Miller - Direct

A.  As a firearms enforcement officer, when a firearm is used in a crime, it is sent to one of us to evaluate and examine and then make a determination on that firearm and how federal law applies to that specific firearm.

Q.  Does that include classifying whether a firearm constitutes a machine gun?

A.  Yes, it does.

Q.  Does it include classifying whether a particular weapon constitutes a destructive device?

A.  Yes, it does.

Q.  Have you received any training at the ATF related to the identification and classification of firearms?

A.  Yes, I have.  A large portion of the FEO basic training course is devoted to the classification of firearms, how the federal definitions apply to those firearms, and as well as operating systems, how the firearms function.

Q.  You mentioned FEO.  Is that short for firearm enforcement officer?

A.  Yes.

Q.  Have you received any training in the design and operation of firearms?

A.  Yes, I have.  That is a large portion of the FEO basic class as well.

Q.  Can you describe in a bit more detail some of the training that you've received.

A.   Several hours of classroom training in reference to firearms operation.  A portion of the training is we have to write 11 white papers covering different historical firearms or first-of-their-kind firearms and their operation systems.

Q.   Are you familiar with the term "armorer certification"?

A.   Yes, I am.

Q.   What is that?

A.   An armorer certification is a certification you receive from a specific —— usually a specific company or manufacturer on a specific firearm, like if you go to the company Colt and sit through their armorer's class for the AR-15, you would receive advance instruction over a one- or two-day period on that specific gun.  And what that does is it gives you a higher level of knowledge on that specific firearm as compared to a regular everyday user of that firearm.

Q.   And do you hold any armorer certifications?

A.   Yes, I do.  I hold upwards of 30 armorer certifications.

Q.   Does ATF have any tools and resources it uses to identify and classify particular firearms?

A.   Yes, based out of Martinsburg, we have the National Firearms Collection.  Inside that collection we have approximately 13,000 firearms of different types that we use to help identify lesser known firearms or use in comparison photographs.

        In addition to that, we have a small library that

O34HHer2                    Miller - Direct

houses about three to 4,000 books and publications covering different firearms, different manufacturers, and such.

Q. In connection with your work for the ATF, do you provide training to others?

A. Yes, I do. A large portion of the FEO job is providing training to other members of the ATF, other first responders that might want training on specific firearms or machine gun conversion devices.

Q. Approximately how many firearms have you examined in your career?

A. In the past two years, it's fast approaching a thousand firearms. I don't have the exact number, but I've done 400 since October 1 of last year.

Q. Have you examined handguns?

A. Yes, I have.

Q. Have you examined rifles?

A. Yes.

Q. Have you examined shotguns?

A. Yes, sir.

Q. Have you examined semiautomatic weapons?

A. Yes.

Q. What about automatic weapons?

A. Yes, I have.

Q. Have you examined grenade launchers?

A. Yes.

Q.   Have you examined grenades?

A.   Not with the ATF, but prior to the ATF, I spent 25 years as a bomb technician.  And during that time, explosives ordnance was a large portion of my job.

Q.   Mr. Miller, what is an RPG?

A.   An RPG is a Russian or communist-manufactured anti-tank weapon.

Q.   Have you examined RPGs?

A.   Yes, I have.

Q.   What did you do before you joined the ATF?

A.   Previous to coming to ATF, I spent 15 years as an explosives specialist, or bomb technician, with the Department of Homeland Security.

Q.   What were some of your duties and responsibilities in that role?

A.   We provided first response to specific airports if the airport personnel found a suspicious package or something they thought as an IED, or improvised explosive device.  We provided training for state, federal, and local first responders on IED awareness, explosive hazards, and terrorist methodologies.

Q.   Did you receive specific training on how to identify those explosive devices?

A.   Yes.

Q.   Mr. Miller, have you served in the military?

A.   Yes, I have.

Q.  Approximately when did you serve in the military?

A.  From 1996 to, I believe it was, either 2006 or 2007.

Q.  What was your position in the military?

A.  I was explosive ordnance disposal technician.

Q.  What did you do in that role?

A.  I was basically a bomb technician for the military.

Q.  Mr. Miller, what does a bomb technician do?

A.  So specifically in the military, a bomb technician has the responsibility for that military installation.  We would respond to suspect packages or if an IED was found on base.  In addition to that, we would respond for any found — what's called a UXO, or unexploded ordnance.

In addition to that, when I was stationed at For Campbell, we had responsibility for 23 counties in western Kentucky and the entire state of Tennessee.  And what we would do with that response area is any police department or locality that did not have a bomb squad of their own, we would respond and take care of the bomb for that jurisdiction.

Q.  While you were in the military, did you receive training in operating firearms?

A.  Yes, I did.

Q.  Do you have any other law enforcement experience?

A.  I do.  I spent a couple of years as a sheriff's deputy in Tennessee.

Q.  Approximately when did you do that?

A.   It was when I was — during my reserve time in the military.  The early 2000s, 2000 to 2002 maybe.

Q.   Have you testified as an expert in court before?

A.   Yes, sir, I have.

Q.   Approximately how many times?

A.   Three previous times.

Q.   When was the most recent time that you testified as an expert?

A.   December of 2023.

Q.   Was that here in New York?

A.   Yes, it was.

          MR. ROBLES:  Your Honor, I offer Mr. Miller as an expert in firearms, machine guns, and destructive devices.

          MR. STABILE:  No objection.

          THE COURT:  OK.  So qualified.

Q.   Mr. Miller, are you familiar with the different parts of a firearm?

A.   Yes.

Q.   Are you familiar with the different parts of a piece of ammunition?

A.   Yes, I am.

          MR. ROBLES:  Ms. Collins, can you please pull up for the Court, the witness, and the parties Government Exhibits 612 and 600 for identification.

Q.   Mr. Miller, do you recognize what's on the screen?

O34HHer2                    Miller - Direct

A.  Yes.

Q.  Generally, what's on the screen?

A.  So on the left-hand side, Exhibit 612 is a cutaway rough drawing of a semiautomatic handgun.

Q.  And what about Exhibit 600?

A.  It is a line drawing cutaway of a single round of ammunition.

Q.  Are these fair and accurate depictions of the components of a firearm and a piece of ammunition?

A.  Yes, they are.

Q.  Will they assist you in your testimony today?

A.  Yes.

          MR. ROBLES:  The government offers Government Exhibit 612 and 600.

          MR. STABILE:  No objection.

          THE COURT:  Received.

          (Government's Exhibits 600 and 612 received in evidence)

          MR. ROBLES:  Ms. Collins ——

          THE COURT:  Pull the microphone closer, Mr. Stabile, so I'll be able to hear you.

          MR. STABILE:  I'm sorry.

          THE COURT:  Thank you.

          MR. ROBLES:  Ms. Collins, please publish Government Exhibit 612.

O34HHer2                      Miller - Direct

Q.   And, Mr. Miller, what are we looking at here in Government Exhibit 612?

A.   So this is a cutaway of the internal workings of a firearm with, obviously, the different nomenclature for the individual components of that firearm.

Q.   What type of firearm is depicted in this exhibit?

A.   Semiautomatic handgun.

Q.   In very general terms, can you please describe the basic components and functions of this gun.

A.   Yes.  So the muzzle, which is listed on the far left, would be where the bullet or projectile exits from the firearm.  On the far right you have the hammer, which is what would strike the firing pin to ignite that cartridge or that case of ammunition.  The grip is where you would hold it with your hand.  The magazine is what holds the ammunition and that is inserted into the grip.  The trigger is what activates the hammer.  And the trigger guard is what protects the trigger from being accidentally hit.

Q.   You mentioned a moment ago that this is a semiautomatic handgun.  What does it mean for a gun to be semiautomatic?

A.   So a semiautomatic handgun or semiautomatic firearm in general is a firearm that automates a portion of the firing process.  Basically, when you pull the trigger, it fires one round and it goes through a cycle of operations.  So it will fire a cartridge, extract and eject that cartridge, pick up a

O34HHer2                        Miller - Direct

new cartridge, and then insert that cartridge into the chamber.

Q.   Would someone need to press the trigger again to get
another bullet out of the gun?

A.   Yes.   The semiautomatic is for one function of the trigger.

Q.   Now, what is the difference between a semiautomatic gun and
an automatic gun?

A.   So an automatic handgun or automatic rifle would automate
that entire process as long as you kept the trigger pulled to
the rear.   So it would repeatedly go through that cycle, that
firing cycle, and fire that round of ammunition, extract or
pull that case out of the chamber, pick up a new round, insert
it, and fire that again until you released off the trigger or
it ran out of ammunition.

Q.   So, in other words, if someone held down the trigger, would
an automatic firearm continue shooting until it ran out of
ammunition?

A.   Yes, until it ran out of ammunition or received a
malfunction.

        MR. ROBLES:   Ms. Collins, can you please pull up
Government Exhibit 600.

Q.   Mr. Miller, what are we looking at in Government
Exhibit 600?

A.   This is a cutaway live drawing of a round of ammunition.

Q.   What are some of the components of this round of
ammunition?

A.   So component 1 would be the projectile or bullet; No. 2 would be the cartridge casing that holds —— basically holds all the components together; 3 would be the propellant powder; 4 is the rim of the cartridge; and 5 is the primer.

Q.   What is the propellant powder?

A.   The propellant powder is a pyrotechnic powder that, once it receives a spark from No. 5, the primer, it ignites, and that rapid expansion of gas pressure is what uncorks the bullet or projectile from the cartridge case and moves it down the barrel.

Q.   Understood.

         Ms. Collins, can you please pull up for the witness, counsel, and the Court Government Exhibits 201-R65, 202-R69, 202-R74, and 202-R79.

         Mr. Miller, do you recognize what's on the screen?

A.   Yes, I do.

Q.   What are they?

A.   These are various models of handguns.

Q.   Are they true and correct representations of other handguns that you've examined?

A.   Yes, they are.

         MR. ROBLES:  Government offers Government Exhibits 201-R65, 202-R69, 202-R74, and 202-R79.

         MR. STABILE:  No objection.

         THE COURT:  Received.

(Government's Exhibits 201-R65, 202-R69, 202-R74, and 202-R79 received in evidence)

MR. ROBLES:  Ms. Collins, can you please publish that for the jury.

BY MR. ROBLES:

Q.  Mr. Miller, are the firearms that are depicted in these government exhibits semiautomatic firearms?

A.  Yes, all of these would be semiautomatic unless modified into machine guns.

Q.  How would someone modify a handgun into a machine gun?

A.  So maybe it's R65, the Glock handgun, it can be modified into the machine —— into a machine gun with the addition of a Glock switch or a Glock chip machine gun conversion device.

Q.  And if they're not modified into a machine gun, would these firearms operate in the same way as the semiautomatic firearm you just described a moment ago?

A.  Yes, they would.

MR. ROBLES:  Ms. Collins, can you please pull up what is in evidence as Government Exhibit 202-R50 and Government Exhibit 204-R104.

Q.  Mr. Miller, do you recognize these exhibits that are already in evidence?

A.  Yes, I do.  They're two semiautomatic handguns.

Q.  And would these operate in the same way as the semiautomatic handgun you testified about a moment ago?

A.  Yes, very similar.

Q.  Can you tell what type of handgun is depicted here?

A.  The one on the left appears to be maybe a CZ, and the one on the right appears to be a Beretta 92FS.

Q.  Generally, what type of ammunition would the semiautomatic handguns take?

A.  Pistol caliber ammunition, 9 millimeter, .40 cal, or .40 Smith & Wesson.  But it would definitely be handgun ammunition.

Q.  OK.  Do these semiautomatic handguns often use 9 millimeter ammunition as well?

A.  Yes, 9 millimeter is probably one of the more common rounds for a handgun.

        MR. ROBLES:  Ms. Collins, can you please pull up Government Exhibit 906 in evidence.

Q.  Mr. Miller, do you recognize what's on the screen?

A.  Yes.  It is a Glock handgun.

Q.  Is there something different about this gun than the other guns that you testified about a moment ago?

A.  There is what appears to be a 50-round drum magazine and a stick magazine as well that is of a higher capacity than a standard magazine.

Q.  What is a drum magazine?

A.  A drum magazine is a magazine that's usually — it's in a round shape.  Sometimes it can be two round shapes pushed together.  And it just allows you to hold a — more rounds of

O34HHer2                    Miller - Direct

ammunition in a smaller footprint versus a longer stick-style magazine.

Q.  Is the same true, although to a lesser extent, with the extended magazine that you testified about a moment ago as well?

A.  Yes.  The magazines on the left likely hold 15 to 17 rounds.  The longer magazine would hold upwards of 20 to 25, possibly 30.  And the drum magazines are usually 50 or greater.

Q.  Thank you.

Ms. Collins, you can take that down.

Mr. Miller, what is an M16?

A.  An M16 is a standard —— or was the standard issue weapon for the United States military for upwards of 50 years.

Q.  Have you brought an exemplar M16 with you today to explain to the jury how this type of firearm works?

A.  Yes.

Q.  Is that firearm unloaded?

A.  Yes, it is.

Q.  Meaning it has no ammunition, correct?

A.  Correct, no ammunition.

Q.  And has the exemplar M16 that you've brought been made safe to bring it into the courtroom and courthouse?

A.  Yes, it has.

Q.  How so?

A.  So the armorer checked it before it was loaded into the

box, I personally checked it, and then the court security officer checked those as well.

MR. ROBLES:  Your Honor, we've marked an exemplar M16 as Government Exhibit 605 and would offer it through Mr. Miller as an aid to the jury with the Court's permission.

THE COURT:  All right.  Ladies and gentlemen —— Mr. Stabile?

MR. STABILE:  I just renew my objection.

THE COURT:  OK.  Overruled.

Ladies and gentlemen, this is just a demonstrative exhibit to explain the witness' testimony, and it may not be considered for any other purpose.

Go ahead, sir.

BY MR. ROBLES:

Q.  And, Mr. Miller, just to be clear, this is something you brought as an example and not a weapon that was recovered in this case, correct?

A.  Yes, sir, correct.  All of these firearms are from the National Firearms Collection.

Q.  Mr. Miller, in the box next to you, can you please pull out Government Exhibit 605 next to the jury box.

Let the record reflect the witness has pulled out Government Exhibit 605 and has sat back in the witness stand to show the exhibit to the jury.

Mr. Miller, can you please walk the jury through the

O34HHer2                    Miller – Direct

different parts of the M16 by displaying those parts to the jury.

A.  Yes, sir.  This is the buttstock of the firearm.  This is the grip.  This is the trigger.  This is the selector that allows you to select between modes, whether it be safe, semi, or full auto.  This is the magazine well where the magazine and ammunition would go.  Rear sight, front sight.  This is the muzzle where the bullet would exit.  This is the barrel.

Q.  And, Mr. Miller, is this classified as an automatic weapon?

A.  Yes, it is.  This is a machine gun.

Q.  What feature makes the M16 an automatic weapon?

A.  Inside of this M16 there is an auto sear that controls the automatic function of this firearm.

Q.  And you said that there was a selector switch.  Where is that?

A.  Right here.

Q.  What does that permit a user of this weapon to do?

A.  So the selector switch allows the user to go from safe to the middle selection, which is semiautomatic, or fully to the rear in the 3 o'clock position, which is the automatic position.

Q.  What does the safe position mean?

A.  That means that it's a mechanical safety.  So, theoretically, no round of ammunition should fire when the trigger is pulled when it is on safe.

Q.   When it is in semiautomatic mode, will it only fire one bullet with each pull of the trigger?

A.   Yes, one round for a function, single function of the trigger.

Q.   When it's in automatic mode, what would happen with the single pull of the trigger?

A.   So a single pull of the trigger if the trigger was held fully to the rear would fire all 30 rounds in the magazine.

Q.   Are you familiar with the term "firing range"?

A.   Yes, I am.

Q.   What does that mean?

A.   So firing range is the effective distance and maximum distance of a particular firearm.

Q.   What is the approximate firing range on an M16?

A.   So on this model —— it varies from model to model, but on this model, about 550 to 600 meters.

Q.   Are you familiar with the term "rate of fire"?

A.   Yes, I am.

Q.   What does that mean?

A.   Rate of fire is a theoretical number that means how many rounds a firearm could fire if it had an infinite supply of ammunition and would have no malfunctions in a one-minute time period.

Q.   What is the approximate rate of fire for an M16?

A.   Dependent upon the model, it varies, but anywhere from 700

O34HHer2                    Miller - Direct

to 900 rounds a minute.

Q. What are some of the common uses and advantages to the M16?

A. So the M16 family of weapons was primarily developed for the military. It's lightweight. It's composite. You don't have to worry about, like, wood furniture or stocks rotting off or swelling under pressure. It's very lightweight compared to older firearms, and it shoots a lightweight high-velocity bullet.

Q. Mr. Miller, you can put that away. Thank you.

Let the record reflect the witness has put Government Exhibit 605 away.

Ms. Collins, can you please publish Government Exhibits 202-R65 and Government Exhibit 204-R100 which are in evidence.

Mr. Miller, do you recognize what's on the screen?

A. I do.

Q. What types of weapons are shown on the screen?

A. These are AR-type firearms or it's a possibility that they could be a version of the M16 as well, some of them.

MR. ROBLES: Ms. Collins, can you please show the Court, the witness, and the government Government Exhibit 606-P and Government Exhibit 204-R103.

Q. Mr. Miller, do you recognize what's on the screen?

A. Yes, I do.

Q. What's on the screen?

O34HHer2                    Miller - Direct

A.   606 is a AR-15, and 103 states on the receiver of the firearm that it is an AR-15 as well.

Q.   Are these true and accurate representations similar to firearms that you've examined before?

A.   Yes, they are.

MR. ROBLES:   The government offers Government Exhibit 606-P and Government Exhibit 204-R103.

MR. STABILE:   No objection.

THE COURT:   Received.

(Government's Exhibits 606-P and 204-R103 received in evidence)

MR. ROBLES:   Ms. Collins, you can publish that.

BY MR. ROBLES:

Q.   Mr. Miller, what's the difference between the AR-15 and the M16 that you just displayed for the jury?

A.   The AR-15 is a semiauto version of that same or similar weapon system that was designed for the civilian market or individual everyday ownership.

Q.   And can AR-15 fire automatically?

A.   It can.   The AR-15 can be modified into an M16.

Q.   So is it common —— is it normally a semiautomatic weapon?

A.   It is.   As it comes from the factory, they are semiautomatic weapons.

Q.   How would someone modify the semiautomatic AR-15 to an automatic AR-15?

O34HHer2                        Miller - Direct

A.   So it can be modified through the addition of an M16 auto sear, in which case you have to do some machining work to some of the firearms.  Some of them, it's just two holes to put the auto sear in.  And there are several 3D-printed or metal drop-in auto sears.

Q.   Sorry, what is an auto sear?

A.   An auto sear is the component that controls the automatic function of the firearm.

Q.   What are some of the common uses and advantages of the AR-15?

A.   So the AR-15, again, is a civilian version of the M16.  It can be used for hunting.  It can be used for home defense.  You know, again, it's a very lightweight weapon shooting a high-velocity lightweight bullet.

Q.   What is the rate of fire on the AR-15?

A.   On the AR-15, it's tough to say.  It would depend upon the individual shooter and how fast they could pull the trigger.

Q.   What about the firing range?

A.   The firing range is going to be the same as the various models of the M16, about anywhere from 500 to 700 meters.

            MR. ROBLES:  Ms. Collins, you can take that down.  Thank you.

Q.   Mr. Miller, what is an AK-47?

A.   An AK-47 is the standard issue rifle for Russian troops, Chinese troops.  Foreign militaries a lot of times will use the

AK-47 as their main battle rifle.

Q. What are the basic parts of an AK-47?

A. The basic parts of the AK-47 are a lot like the M16. You have a buttstock, muzzle, a grip, sight systems, and a place or magazine well where your ammunition would go.

Q. Have you brought an exemplar AK-47 with you today to explain to the jury how this gun works?

A. Yes, I have.

Q. Has it been made safe?

A. Yes.

Q. Does it have any ammunition in it?

A. It does not.

MR. ROBLES: Your Honor, we've marked an exemplar AK-47 as Government Exhibit 607 and would offer it as an aid to the jury with the Court's permission.

THE COURT: All right.

MR. STABILE: Same objections.

THE COURT: All right. Overruled. Thank you.

MR. ROBLES: Let the record reflect the witness has pulled up Government Exhibit 607 and has it in the witness box.

BY MR. ROBLES:

Q. Mr. Miller, can you please explain to the jury by pointing to the various parts of this firearm what the different features and functions are of an AK-47.

A. Yes. This is the buttstock. This is where you would grip

the firearm.  This is where the magazine would go that holds the ammunition.  This is the selector lever on an AK, rear sight, front sight, muzzle, and barrel.  And this is a hand guard or hand grip.

Q.  Is this classified as an automatic weapon?

A.  This is a machine gun, yes.

Q.  OK.  Are there different modes that you can switch on an AK-47?

A.  Yes, there are.  On an AK-47, all the way up with the selector is safe, middle is automatic, and all the way down to the bottom is semiautomatic.

Q.  Was the AK-47 designed for any particular use?

A.  Yeah, the AK-47 was designed for the Russian military to replace their World War II rifles.

Q.  What is the firing range on an AK-47?

A.  It's somewhat shorter than the M16.  It's about four to 500 meters.

Q.  What about the rate of fire?

A.  Rate of fire for this is around 600 rounds a minute.

Q.  Mr. Miller, you can put that away.  Thank you.

Let the record reflect the witness has put away Government Exhibit 607.

Mr. Miller, what is a Galil?

A.  A Galil fills the same role as the M16 and the AK-47 does. It's just the main issue rifle that was developed by the

Israeli military.

MR. ROBLES:  Ms. Collins, can you please show the witness, the Court, and counsel what's marked as Government Exhibit 608-P for identification.

Q.  Mr. Miller, do you recognize what's on the screen?

A.  Yes, I do.

Q.  What is that?

A.  That is a Galil rifle.

Q.  Is that an exemplar Galil rifle?

A.  Yes.  It did come from the National Firearms Collection.

Q.  Is that a true and accurate representation of the exemplar Galil rifle from ATF?

A.  Yes.

MR. ROBLES:  Government offers Government Exhibit 608-P.

MR. STABILE:  I'm sorry, I was conferring with the defendant.  No objection.

THE COURT:  All right.  Received.

(Government's Exhibit 608-P received in evidence)

MR. ROBLES:  Ms. Collins, can you please publish that.

BY MR. ROBLES:

Q.  What is the difference between the Galil and the AK-47?

A.  There's very little different between the two of them really.  They both operate on an almost identical firing system and operations system and almost an identical auto sear system.

O34HHer2                    Miller - Direct

Q.   Can you switch between modes on a Galil?

A.   Yes.  If you look on the photo above the grip where you have S, A, and R, that is the left-hand side of the grip, and that's where you would select between the modes of safe, automatic, and semiautomatic.

Q.   Is a Galil a machine gun?

A.   Yes, it is.

Q.   Was the Galil designed for a particular use?

A.   Yes.  The Galil was designed for the Israeli military to be their primary rifle.

Q.   What is the rate of fire on a Galil?

A.   It's similar to the other firearms.  It's about 600 rounds a minute.

Q.   What about the firing range?

A.   This one in particular is 556.  So it's going to be about the same as the M16, about anywhere from five to 700 meters.

Q.   What is an M60?

A.   An M60 is the general purpose machine gun that the United States military used from the early Vietnam War up until ── it's still in service now in some capacities.

Q.   Have you brought an exemplar M60 with you today to help explain to the jury how it works?

A.   Yes, I have.

Q.   Have you made it safe?

A.   Yes.

Q.  Does it have any ammunition?

A.  It does not.

MR. ROBLES:  Your Honor, we've marked as exemplar M60 as Government Exhibit 609 and would offer it as an aid to the jury with the Court's permission.

THE COURT:  All right.

MR. STABILE:  Same objection.

THE COURT:  Same ruling.  Received.

BY MR. ROBLES:

Q.  Mr. Miller, can you please pull out Government Exhibit 609.

Let the record reflect the witness has pulled out Government Exhibit 609 and has it in the witness box.

Mr. Miller, can you please show the jury the basic features and functions of the M60 that you're holding.

A.  Yes.  This is the buttstock.  Again, the grip.  The selector for the M60 is on this side located in about the same spot as the M16.  This is the bolt handle.  This is the top cover.  This is where the ammunition would go.  On this particular firearm, the ammunition is fed through on links, and it comes in from the left-hand side.  And the empty cartridges are ejected from the right-hand side up here.  These are your sights.  The muzzle where the bullet would exit.  This is a bipod.  And this is the hand guard and heat shield.

Q.  Mr. Miller, is this an automatic firearm?

A.  Yes, it is.  This is a machine gun.

Q.   You testified a moment ago about a selector switch.  Does that allow you to switch between semiautomatic and automatic modes?

A.   Not on this firearm, no.  It is automatic or safe only.

Q.   How many rounds of ammunition can fit in that firearm?

A.   So belted ammunition, ideally, you would want to keep it to 250-round belts, but, theoretically, as long as you could get the ammunition linked together, it would feed.

Q.   You mentioned a belt.  What is that?

A.   So a standard belt of ammunition for this again would be the individual cartridges linked together by what's called a disintegrating link.  So after the ammunition is stripped from the link, loaded into the barrel, and fired, the action on the gun will throw a single link and the cartridge out of the —— eject them out of the side of the firearm.

Q.   What differentiates the M60 from the M16 and the AK-47 that you testified about earlier?

A.   So this is designed to fill a different role on the battlefield.  Obviously, it takes a much larger round of ammunition than the M16 and AK-47 do.  The distance for this one is about 1,100 meters.  And the rate of fire is somewhat slower, anywhere from 550 to 650 rounds a minute.  And this is designed to bridge the gap between an issued service rifle and a heavy machine gun.

Q.   You said it takes a larger round of ammunition.  What would

a larger round of ammunition — what does a larger round of ammunition have the capability to do that a smaller round does not?

A.  So with a larger round of ammunition and a wider variety of ammunition for this firearm, the heavier bullet and more powder behind that bullet allows this to defeat light armored threats, vehicles, light structures, things of that nature, whereas the M16 bullet would have a harder time penetrating those obstacles.

Q.  Does that mean that a round from an M60 could pierce an armored vehicle?

A.  Depending upon the armored vehicle, yes.

Q.  You can put that away.  Thank you.

Let the record reflect the witness has put away Government Exhibit 609.

Mr. Miller, you testified about this earlier, but what is an RPG and what is it used for?

A.  An RPG is used to defeat armored vehicles, tanks, you know, armored structures on the battlefield, like bunkers, vehicles, things like that.

Q.  Have you brought an RP — an exemplar RPG with you today to help explain to the jury how it works?

A.  Yes, I have.

Q.  Have you made it safe?

A.  Yes, I have.

Q.  How so?

A.  The rocket that is with it is inert, meaning that it has no explosives, no propellant and no primer.

MR. ROBLES:  Your Honor, we've marked as an exemplar RPG Government Exhibit 610.  Offer it as an aid to the jury with the Court's permission.

THE COURT:  All right.

MR. STABILE:  Same objection.

THE COURT:  All right.  Same ruling.  Received as a demonstrative.

BY MR. ROBLES:

Q.  Mr. Miller, can you please pull out Government Exhibit 610.

Let the record reflect the witness has pulled out Government Exhibit 610 and has it in the witness box.

Mr. Miller, can you explain to the jury the basic features and functions of the RPG.

A.  Yes.  So this is an RPG-7.  This is the exit or where the back blast from the rocket would come from.  This is the heat shield.  This is the section that would sit on top of your shoulder.  You would grip it like this with this portion up on your shoulder.  This is the trigger, the hammer, and these are the sights for the RPG front and rear.

Q.  And what is the item that is sitting on top of the jury box?

A.  This is a PG-7 rocket or a mock-up of a PG-7 rocket, and

this is what would go inside of the RPG launcher.

Q.  What would cause that rocket to be expelled from the RPG that you're holding?

A.  So once the hammer —— when you pull the trigger, the hammer goes up, strikes the firing pin, the firing pin hits a primer similar to what's on a round of ammunition.  That primer then would then set off the booster motor.  The booster motor would expel this rocket from the RPG launcher similar to a kid's model rocket but at a much greater rate.  Once that motor burned out, the sustainer motor on this piece of ordnance itself would kick in and carry it to the target.

Q.  Is an RPG classified by the ATF as a destructive device?

A.  It is.  The ATF classifies the launcher itself as a destructive device, and any live ammunition would also be classified as a destructive device.

Q.  What makes these two items a destructive device?

A.  So the RPG launcher itself has a bore over a half inch in diameter and is a nonsporting firearm.  This would be —— if live, would be a piece of explosive ordnance.  An explosive ordnance meets the definition for a destructive device.

Q.  If fired, how far can that rocket go?

A.  So this rocket has a self-destruct on it, and it would self-destruct around 900 meters from the initial firing point.

Q.  Approximately how much damage could that rocket cause when fired?

A.    This has what's called a shaped charge in it, this particular rocket, and that shaped charge is designed to defeat up to four or five inches of cold-rolled armor.

Q.    Mr. Miller, you can put away Government Exhibit 610.  Thank you.

Let the record reflect the witness has put away Government Exhibit 610.

Mr. Miller, what is a grenade?

A.    I'm sorry, sir?

Q.    What is a grenade?

A.    A grenade is an explosive device developed for the military that is hand thrown.

Q.    How does it work?

A.    So there's — dependent upon the model, there is some sort of ignition source, whether it be a pull ring or a cocked striker under a spoon.  Once you remove the safety and allow the spoon to come up, that striker acts similarly to a firearm. The striker would hit a primer, and that primer would start a six- to seven-second delay, sometimes three to four seconds. It depends upon the model of the grenade.  Once that safety burned down, it would set off an explosive initiator, and that initiator would set off main charge explosives in that grenade.

Q.    Do grenades constitute destructive devices under the ATF's classification system?

A.    Yes, they do.

MR. ROBLES:  Ms. Collins, would you please pull up what is in evidence as Government Exhibit 352.  If you could please zoom in on the bottom portion of this photograph.

Q.  Mr. Miller, do you recognize what's on the screen?

A.  Yes.  Those appear to be two hand grenades.

Q.  Would those operate in the same way as the grenade that you just testified about a moment ago?

A.  Yes, they would.

Q.  Thank you.

You can take that down.

What is a grenade launcher?

A.  A grenade launcher fills a gap on the battlefield.  It allows a soldier to shoot a grenade further than he could throw one by hand, basically.

Q.  What, if anything, makes a grenade launcher a destructive device?

A.  So your standard 40-millimeter grenade launcher is a destructive device because it too has a bore over a half inch in diameter.

Q.  What is a bazooka?

A.  Bazooka is a slang term for original the M1 and M20 rocket launchers that the United States military used during World War II.

Q.  Are bazookas classified as destructive devices?

A.  Yes, they are.

Q.   What is a Claymore mine?

A.   A Claymore mine is a defensive land mine.  It's used to initiate ambushes or protect a defensive perimeter.  The mine itself has about a pound and a half of C4 plastic explosives in it and approximately 700 metal ball bearings.

Q.   How does the mine work?

A.   Once you place the blasting cap in the mine and set that blasting cap off, the blasting cap initiates the explosives. The explosives go through their process.  You get a rapid expansion of gas pressure, and that force will take the 700 ball bearings and push them outward in a fan shape like a large shotgun shell.

Q.   What is the approximate blast radius for a Claymore mine?

A.   There's several blast radiuses on a Claymore mine.  The general blast radius is 100 meters all the way around it in a circle.  There is a 50-meter kill radius to the direct front of the mine, and then a 250-meter hazard range out of the front of the mine.

Q.   And are Claymore mines classified as destructive devices?

A.   Yes, they are.

Q.   What makes them a destructive device?

A.   The pound and a half of explosives inside of it.

         MR. ROBLES:  Ms. Collins, can you please pull up what is in evidence as Government Exhibit 201-R62.

         Your Honor, I'd like to read in a portion of a

stipulation that is in evidence.

THE COURT:  All right.

MR. ROBLES:  This is Government Exhibit 1001. Government Exhibit 201 is the Tony Hernandez Samsung phone, and Government Exhibit 201-R is a disc that contains —— and I'll go to page No. 2 of this stipulation —— contains Government Exhibit 201-R62.

Q.  Mr. Miller, what is Government Exhibit 201-R62 on the screen?

A.  It is an AR-type firearm, so a firearm based off the AR-15. This one in particular looks to have a barrel approximately maybe ten inches, which would put it into the category of a short-barreled rifle.

Q.  Can you tell by looking at this photograph whether this is a semiautomatic or an automatic weapon?

A.  I cannot.  There's a possibility that it could be either/or.

Q.  And is that based —— could someone turn this semiautomatic weapon into an automatic weapon?

A.  Yes.

Q.  How so?

A.  Again you could add the standard M16 auto sear or you could add the additional drop-in auto sear.

Q.  Thank you.

Ms. Collins, can you please pull up what is in

O34HHer2                     Miller - Direct

evidence as Government Exhibit 353.

Mr. Miller, do you recognize what's on the screen?

A.   Yes.

Q.   What is this?

A.   Three handguns, which the one in the middle has a silencer attached to it.

Q.   What does a silencer do?

A.   A silencer muffles or diminishes the sound of a firearm.

Q.   And based on your review of this photograph, do these appear to be semiautomatic or automatic firearms?

A.   These appear to be semiautomatic firearms.

MR. ROBLES:  Ms. Collins, can you please pull up Government Exhibit 354 in evidence.

Q.   Mr. Miller, do you recognize what's on the screen here?

A.   Yes, it appears to be the same three firearms from the previous photo.

MR. ROBLES:  Ms. Collins, can you please pull up Government Exhibit 204-R105, and that's already in evidence.

Q.   Mr. Miller, do you recognize what's on the screen?

A.   Yes, it appears to be a Mossberg probably 500 pump-action shotgun.

Q.   What is a pump-action shotgun?

A.   Pump-action shotgun is a —— you know, a standard shotgun where you, as the shooter, manipulate the action.  It's a manual-action firearm.

O34HHer2                    Miller - Direct

Q.   Is that a semiautomatic or an automatic?

A.   Neither.  It is a manual action, meaning you pull the trigger and then you physically work the action of the firearm to put it through the cycle of operations.

MR. ROBLES:  Ms. Collins, can you please pull up Government Exhibit 204-R108.

Your Honor, at this time I'd ask to read a portion of Government Exhibit 1001.  It's a stipulation that's in evidence.

THE COURT:  Please proceed.

MR. ROBLES:  On March 1, 2020, Geovanny Fuentes Ramirez was arrested before boarding an international flight at Miami International Airport.  In connection with Ramirez's arrest, law enforcement officers lawfully seized from Ramirez, among other things, an iPhone cell phone.  If called to testify, Joseph Suszko, an investigative technology specialist with the Drug Enforcement Administration would testify that Government Exhibit 204 is a Ramirez iPhone and that 204-R is a disc that contains —— and I'll paraphrase here —— various files to include Government Exhibit 204-R108 and also Government Exhibit 204-R105 that Mr. Miller just testified about.

Q.   Mr. Miller, what is on the screen as Government Exhibit 240-R108?

A.   It appears to be another pump-action shotgun.

MR. ROBLES:  The government offers Government

O34HHer2                        Miller - Direct

Exhibit 204-R108.

            MR. STABILE:  No objection.

            THE COURT:  Received.

            (Government's Exhibit 204-R108 received in evidence)

            MR. ROBLES:  Ms. Collins, can you please publish that for the jury.

            Thank you.  You can take that down.

            Can you please pull up now, Ms. Collins, Government Exhibit 201-R63 that is in evidence, which is another item from the Tony Hernandez Samsung phone.

BY MR. ROBLES:

Q.  Mr. Miller, what is depicted on the screen as Government Exhibit 201-R63?

A.  This is a shotgun as well but this is a semiautomatic shotgun.

Q.  What makes this shotgun a semiautomatic shotgun?

A.  So on the fore-end you can tell that it's not a manually operated firearm, that it's going to be either gas or recoil operated or possibly inertia operated.  But, again, that is all semiautomatic functioning.

Q.  Thank you.

            Ms. Collins, you could take that down.

            Can we please pull up Government Exhibit 803 that's in evidence.

            THE COURT:  How much longer do you have?

MR. ROBLES:  Less than five minutes, your Honor.

THE COURT:  All right.  Go ahead.

Q.  Mr. Miller, do you recognize what's on the screen?

A.  Yes, I do.  These are AR-type firearms that would be classified as a short-barreled rifle.

Q.  Can you tell whether these are semiautomatic or automatic firearms?

A.  No, not based off these photos.  I cannot.  They could be semiautomatic, but they could also be automatic firearms.

MR. ROBLES:  Ms. Collins, you can take that down.

Can we please pull up Government Exhibit 201-R58, which is in evidence, another —— which is another item from the Tony Hernandez Samsung phone.

Q.  Mr. Miller, do you recognize what's on the screen?

A.  Yes, this is an FS2000.

Q.  What type of gun is an FS2000?

A.  It is very similar to the M16 and the AK-47 in that it was developed by FN to be a primary issue rifle for militaries and police departments.  This one in particular is based off what's called a bullpup design, meaning that the magazines load behind the trigger.  That's why it's kind of odd or futuristic shaped.

MR. ROBLES:  Ms. Collins, can you please pull up Government Exhibit 202-R59 in evidence, which is another item from Government Exhibit 202, the Tony Hernandez iPhone.

Q.  Mr. Miller, do you recognize what's on the screen?

O34HHer2                    Miller – Direct

A.   I do not recognize this firearm.

Q.   What does it appear to be?

A.   It appears to be a 9 millimeter or possibly smaller semiautomatic firearm.

          MR. ROBLES:  One moment, your Honor.

          No further questions.

          THE COURT:  All right.  How long is your cross?

          MR. STABILE:  I have no questions of this witness.

          THE COURT:  All right.  You may step down.

          The government may call its next witness.

          (Witness excused)

          MR. ROBLES:  Your Honor, the government rests.

          THE COURT:  All right.  Ladies and gentlemen, that concludes the government's case.  We're going to break for lunch.  It's 1:02, so let's figure on 2:02.  And have a very pleasant one.  Thank you.

          (Jury excused)

          (Continued on next page)

O34HHer2

(Jury not present)

THE COURT:  All right.  Has the defense provided notice to the government of its next witness?

MR. STABILE:  Yes, your Honor.

THE COURT:  Who is your next witness?

MR. STABILE:  Our next witness will be brigadier general of the Army Tulio Armando Romero Palacios.

THE COURT:  Who do you have after that?

MR. STABILE:  Brigadier general of the Air Force retired Xavier Rene Barrientos.

THE COURT:  All right.  Mr. Colon, you wanted to make a motion at this time, is that correct?

MS. SHROFF:  May I have a second?

THE COURT:  Yes, sure.

MS. TARLOW:  Your Honor, we also note, with respect to the defense witnesses, the government received very limited 26.2 materials.  They're extremely bare bone.  They don't describe the substance of the witness' testimony, and so the government may need to take —— have sidebars or raise things with your Honor on the fly, ad hoc, because it didn't really have advance notice of the substance of the testimony regarding the admissibility.

THE COURT:  All right.  But the defense is representing that they've turned over their 3500 material on these two witnesses?

O34HHer2

MR. STABILE:  I have, your Honor, yes.

THE COURT:  Pardon me?

MR. STABILE:  Yes, I'm representing that, yes.

THE COURT:  OK.

MR. COLON:  Your Honor, the defense —— I'm sorry, Judge.  The defense respectfully moves for the Court to dismiss the entire indictment, each and every element of it, each and every charge, for failure on the government's part via Rule 29 to make a —— for judgment of acquittal as well, your Honor.

THE COURT:  All right.  Any response from the government?

MS. TARLOW:  Yes, your Honor.  There's more than sufficient evidence for a reasonable jury to find the defendant committed Counts One through Three beyond a reasonable doubt.

With respect to Count One, the government offered through witness testimony evidence that the defendant participated in meetings with drug traffickers regarding their drug trafficking activity; that he received bribes in exchange for providing them with protection.  There was also witness testimony that drugs were transported with planes and helicopters using N-register numbers.  There was non-witness —— excuse me, there was evidence that was not based on witness testimony about the defendant's involvement in the drug conspiracy, including drug ledgers with the defendant's initials, recorded calls in which the leader of MS-13

participated discussing bribes that the defendant received and video recordings discussing the defendant's instructions regarding the conspiracy.

With respect to Counts Two and Three, there was testimony from the defendant's coconspirators regarding how they protected their drug shipments with firearms, testimony about ——

THE COURT:  It's more than firearms.

MS. TARLOW:  —— machine guns and destructive devices, your Honor.

THE COURT:  All right.  Which machine guns and destructive devices?

MS. TARLOW:  That include AK-47s, AR-15s, and rocket-propelled grenade launchers, as well as M16s.

THE COURT:  All right.

MS. TARLOW:  Your Honor, there also was testimony about and photographs showing what was seized from one of the defendant's drug trafficking partners in 2018.  As your Honor will remember, that was Nery López Sanabria.  And the seizure included grenades, which is a machine destructive device that one witness testified about.  There was also testimony that the defendant himself went to at least one meeting with security who was armed with firearms to obtain drug trafficking proceeds.

Finally, the parties have entered a stipulation

O34HHer2

regarding that the defendant was first brought to the United States after he was extradited.  That in and of itself is sufficient to establish that venue is proper in the Southern District of New York.

THE COURT:  Mr. Colon, anything in response?

MR. COLON:  Your Honor, respectfully, we would ask that you allow us a two-week extension in which to file a written submission with respect to Rule 29.

THE COURT:  All right.  Well, I'm going to rule on the Rule 29 motion as of this point in time, and the motion is denied, of course without prejudice in the event you need to make a motion at a later point in the case.

MR. COLON:  Thank you, Judge.

THE COURT:  OK.  We're in recess.  Thank you.

(Lunch recess)

O345her3

A F T E R N O O N   S E S S I O N

2:05 p.m.

THE COURT:  Please, be seated.

MS. TARLOW:  Your Honor, at some point when convenient for the Court, the government wanted to address its motion regarding the preclusion of the defense experts.

THE COURT:  Yes.  We are going to talk about that.

MS. TARLOW:  Thank you, your Honor.

(Continued on next page)

(Jury present)

THE COURT:  Please be seated.

The defense may call its first witness.

MR. STABILE:  Thank you, your Honor.  The defense calls Brigadier General Tulio Armando Romero Palacios.  We are getting the witness, your Honor.

THE COURT:  For future reference, please have the witnesses available to have them take the stand before the breaks, if you will.

MR. STABILE:  Will do.

THE COURT:  Thank you.

MR. STABILE:  We would like to use the services of the court translator, please.

TULIO ARMANDO ROMERO PALACIOS,

     called as a witness by the Defendant,

     having been duly sworn, testified through the interpreter,

     as follows:

THE DEPUTY CLERK:  State your name and spell your full name for the record.

THE WITNESS:  Tulio Armando Romero Palacios.  T-U-L-I-O, A-R-M-A-N-D-O, R-O-M-E-R-O, P-A-L-A-C-I-O-S.

MR. STABILE:  May I inquire?

THE COURT:  You may inquire.

DIRECT EXAMINATION

BY MR. STABILE:

O345her3                      Romero Palacios - Direct

Q.  General Romero, where are you currently employed?

A.  I am a brigadier general and I am assigned as the advisor to the chief of staff of the armed forces.

Q.  For how long have you been many that position?

A.  I have been there for two years.

Q.  Where were you born, sir?

A.  San Pedro Sula.

Q.  Is that in Honduras?

A.  San Pedro Sula?  Yes.

Q.  And when did you first meet Juan Orlando Hernandez Alvarado?

A.  In 1983 in the military academy at Liceo Militar del Norte. We were classmates.

        INTERPRETER:  The interpreter could spell -- should the interpreter spell that?

        THE COURT:  Yes, please.

        INTERPRETER:  L-I-C-E-O, M-I-L-I-T-A-R, D-E-L, N-O-R-T-E.

Q.  Approximately how old were you when you met Juan Orlando Hernandez Alvarado?

A.  13 years old.

Q.  Do you know his family?

A.  At the time, no.

Q.  But since that time have you come to meet members of his family?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

A.   Yes.

Q.   Do you know how many brothers and sisters he has?

A.   There are 17 siblings.

Q.   Do you know whether or not Mr. Hernandez is married?

A.   Yes, he is married to the attorney Ana Garcia.

Q.   And do you know how many children they have together?

          MR. WIRSHBA:  Objection.  Relevance.

          THE COURT:  Sustained.

Q.   Do you know Tony Hernandez?

A.   Yes.

Q.   At what age did you first meet -- how old was Tony
Hernandez when you first met him?

A.   I do not remember.

Q.   Was he an adult or a child?

A.   A child.

Q.   Do you know how much younger Tony Hernandez is than Juan
Orlando Hernandez, approximately?

A.   10 years.

Q.   Now, you said you attended military academy with Juan
Orlando Hernandez; correct?

A.   Yes.

Q.   And in terms of your own background, where did you attend
school after that military academy?

          INTERPRETER:  I'm sorry.  Could the interpreter hear
the last part of your question?

Q.   Yes.  After the military academy that he attended with Juan Orlando Hernandez, where did general Romero next go to school?

A.   I went to study at the general academy of Honduras–excuse me, interpreter correction -- I went to study at the Military Academy of Honduras General Francisco Morazan.

Q.   Did you graduate?

A.   Yes, I graduated.  I graduated in 1990.  Should I continue?

Q.   Well, what did you do after graduation?

A.   I continued with my military career.  I reached the rank of sub-lieutenant, then lieutenant.  I took the classes that I needed to reach the next rank of captain, and thus successively until I reached the rank of general.  I also have a degree in business administration, a degree in military sciences, and a masters in business administration with a concentration in personnel.

Q.   Have you received military decorations over the course of your career?

A.   Yes.  I received the medal of behavior -- interpreter's correction -- received the bronze conduct medal, the silver conduct medal, the gold conduct medal, the first class honorable medal -- interpreter's correction -- it's the medal of merit conduct, the merit conduct medal second class, the merit conduct medal third class, and a distinguished service medal.

          MR. STABILE:  I would like to put up, Andy, on the

screen for the Court, counsel, and the witness, what's been marked as DX 214.

Q.  Sir, can you see what is on your screen?

A.  Yes.

Q.  What is on your screen?

A.  To the right there is a DX --

MR. WIRSHBA:  Objection, your Honor.  Withdrawn.

Q.  Let me withdraw and ask a different question.

Do you recognize the photograph on the screen?

A.  Yes.

Q.  Who is in that photograph?

A.  Myself.

Q.  How are you dressed?

A.  I am dressed in the A-uniform that the military in Honduras uses.

MR. STABILE:  At this time I would offer DX 214 into evidence.

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  Did there come a time, General, when you provided security for Juan Orlando Hernandez?

A.  Yes.

Q.  When did you first start providing security for Juan Orlando Hernandez?

A.  September of 2010.

Q.   And what was Mr. Hernandez' government position in September of 2010?

A.   President of the Honduran National Congress.

Q.   Were you in charge of his security at that time or did you have some other role?

A.   I had a superior, a boss above me, and I was the personal aide-de-camp of the president.

Q.   Starting in September 2010, how frequently did you provide security to Mr. Hernandez?

A.   24/7.

Q.   Were you with him virtually every day?

A.   I was not personally there 24 hours but I had other officers, troops who were 24/7 with him.

Q.   Can you describe the security that was provided to Mr. Hernandez while he was the president of Congress, starting in 2010?

A.   President Hernandez had an officer who was an aide-de-camp for 24 hours and he had a team of 14 men, permanently every day.

Q.   While he was the president of Congress, where did Mr. Hernandez live?

A.   In altos de San Ignacio in Palmeras, Tegucigalpa.

Q.   Are you familiar with that house?

A.   Yes.

Q.   On a daily basis, can you describe for the jury how

security was provided to Mr. Hernandez, starting in the morning until he returned at night in the evening?

MR. WIRSHBA:  Objection.  Asked and answered and relevance.

THE COURT:  One second, please.  No, I will allow it.

INTERPRETER:  Could the interpreter hear the question again?

THE COURT:  Yes.

Pam, if you could read the question, please.

(Record read)

A.  There was a group of officers and troops who were serving. They provided 24-hour service.

Q.  And when he left his home in the morning, who would be with him?

A.  The officer who was providing the service and the team of 14 men who would move with him.

Q.  Did he have any special vehicle that he used?

A.  Yes.

Q.  Can you describe that vehicle?

A.  It was a Land Cruiser vehicle.

Q.  Was there anything unique to that Land Cruiser?

MR. WIRSHBA:  Objection, your Honor.  Relevance.

THE COURT:  Sustained.

Q.  How many other vehicles would travel with that Land Screwier?

O345her3                    Romero Palacios – Direct

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  What were the requirements for protecting Mr. Hernandez in terms of whether or not he could be left alone?

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  Overruled.

INTERPRETER:  Could the interpreter hear the question again?

THE COURT:  Yes.

Pam?

(Record read)

A.  We could not leave him alone due to the responsibilities that we had.

Q.  Did the security team escort him to meetings?

A.  Yes.

Q.  And when you got to a meeting, what would the security team do?

A.  They reviewed the place, the people who would enter the place, and they coordinated with the attendants in reference to the entering of persons.

Q.  Did Mr. Hernandez have a daily agenda?

A.  Yes.

Q.  Did you receive a copy of that agenda?

A.  Yes.

Q.  How far in advance would you receive that agenda?

MR. WIRSHBA:  Objection, your Honor.  Relevance.

THE COURT:  Overruled.

A.  A week in advance.

Q.  Are you personally familiar with the presidential palace, otherwise known, I guess in Spanish, as Casa Presidencial, in the capital of Honduras?

A.  Yes.

Q.  Have you been there before?

A.  Yes.

Q.  Approximately how many times have you been there?

A.  For eight years.

MR. STABILE:  Can we please put up for the Court, counsel, and the witness DX 209?

Q.  General Romero, are you also familiar with the Ministry of Foreign Affairs of Honduras?

A.  Yes.

Q.  How are you familiar with it?

A.  In the beginning of 2017, a government -- interpreter's correction -- a building belonging to a ministry, the construction of it began.  Once that was started to be built, during that construction, a lot of dust and noise was produced, so the president decided to move the presidential palace to the Ministry of Foreign Affairs.

Q.  What year was that?

A.  In 2017.

Q.   And in 2019, do you know where President Hernandez had his office?

A.   In this building where the ministry of foreign affairs was.

Q.   And in 2020, where did President Hernandez have his office?

A.   Right there.

Q.   Right where, sir?

A.   At the Ministry of Foreign Affairs.

Q.   Based on your familiarity with Tegucigalpa, do you know the relative distance between Casa Presidencial and the Ministry of Foreign Affairs?

A.   Between four and five kilometers.

Q.   Have you driven between those buildings before?

A.   Yes.

Q.   Directing your attention to DX 209, can you see that?

A.   Yes.

Q.   Is that a fair and accurate map of a portion of Tegucigalpa?

A.   Yes.

Q.   Does that map fairly and accurately depict the location of Casa Presidencial?

A.   Yes.

Q.   Does that map fairly and accurately depict the location of the Ministry of Foreign Affairs?

A.   Yes.

Q.   Does that map fairly and accurately depict the distance

O345her3                        Romero Palacios - Direct

between Casa Presidencial and the Ministry of Foreign Affairs?

A.  Yes.

        MR. STABILE:  I offer DX 209.

        MR. WIRSHBA:  No objection.

        THE COURT:  Received.

        (Defendant's Exhibit  209 received in evidence)

        MR. STABILE:  Can we please publish for the jury?

        THE COURT:  Yes.

Q.  General Romero, did you actually see President Hernandez
when he was working in the Ministry of Foreign Affairs?

A.  Yes.

Q.  Was that in 2019?

A.  Yes.

Q.  Did you also see him working there in 2020?

A.  Yes.

        MR. STABILE:  We can take that down, please.

Q.  Did you ever accompany, as a member of his security,
Mr. Hernandez, when he met with members of the United States
DEA?

A.  Where?

Q.  In Honduras.  I'm sorry.  That's right.

        In Honduras, did you accompany President Hernandez to
meetings with members of the DEA?

A.  No.

Q.  Did you ever accompany him to the U.S. Embassy in Honduras?

O345her3                    Romero Palacios - Direct

A.   No.

Q.   Do you know a place called Graneros Nacionales?

A.   Yes.

Q.   Where is that located?

          INTERPRETER:  Can the interpreter have that repeated?

A.   Choloma Cortes, Honduras.

Q.   And have you been to Graneros Nacionales?

A.   Yes.

Q.   Approximately how many times have you been there?

A.   Twice.

Q.   Were you accompanying president -- withdrawn.

          Were you accompanying Mr. Hernandez when you went to
Graneros Nacionales?

A.   Yes.

Q.   By what mode of transportation did you arrive there?

A.   Helicopter.

Q.   Where did you land the helicopter?

A.   In a field behind Graneros Nacionales.

Q.   Did you accompany Mr. Hernandez inside Graneros Nacionales?

A.   I entered with him, I left him with the gentleman, and then
I left.

          Interpreter's correction:  And then I exited.

Q.   Let's talk about the first time.  Approximately when was
that?

A.   I do not remember.

Q.   Can you describe what happened when you entered Graneros Nacionales with Mr. Hernandez?

A.   A short gentleman was there, he welcomed the president, and they sat down and I exited.

Q.   Do you know who the gentleman was?

A.   Yes; Fuad Jarufe.

Q.   And who was he in relation to Graneros Nacionales?

A.   He was the owner of Graneros Nacionales.

Q.   Did Mr. Hernandez have a meeting with him?

A.   Yes.

Q.   Where was the meeting?

A.   In the office of Mr. Jarufe.

Q.   Did you enter the office before Mr. Hernandez did?

A.   No.

Q.   Did you go into the office at all?

A.   Yes.

Q.   Why did you go into the office?

A.   Because of my responsibility and for his security.  Once the gentleman welcomed him, then I exited.

Q.   And by the gentleman you mean Mr. Jarufe; correct?

A.   Yes.

Q.   Was there anybody else in that office?

A.   No.

Q.   Approximately how long were they in the office together?

A.   20, 25 minutes.

Q.   What happened after the meeting ended?

A.   The president bid farewell, we went out to the helicopter, and we left for Tegucigalpa.

Q.   Do you know why Mr. Hernandez was meeting with Mr. Jarufe?

A.   No.

Q.   Do you know if Mr. Jarufe had any position in politics?

A.   No, he did not have one.  He was a businessman.

Q.   Do you know whether or not he was a financial supporter of Mr. Hernandez' political party?

A.   No.

Q.   Turning to the second time you were at Graneros Nacionales, do you know approximately when that was?

A.   I don't recall.

Q.   But was it, were both of these meetings during the time when Mr. Hernandez was the president of Congress?

A.   One was when he was President of Congress, and the other when he was president of the republic.

Q.   Now turning to the second meeting; how did you arrive to the second meeting?

A.   In a helicopter.

Q.   And what happened at the second meeting?

A.   The same thing as the first one.

Q.   Can you describe the area where this meeting was held?

A.   It's an office that's not so large where there is one desk and one, like, little living room.

Q.  And what is outside of that office?

A.  One is the entrance to the vehicles and the other one is where the silos where the rice grains are kept, the silos.

Q.  Did Mr. Hernandez' security detail change from when he was president of Congress to when he was president of Honduras?

A.  Yes.

Q.  How did it change?

A.  At the Congress there were only 10 officers and 70 soldiers.  At the presidency, 57 officers, 500 men.

Q.  When Mr. Hernandez was the president of Honduras, when he would go out in public, how many men were personally with him?

A.  Two teams, 14 men.

Q.  When Mr. Hernandez was out in public, did people try to approach him?

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  One second, please.

INTERPRETER:  Your Honor, I'm sorry.  The interpreter did not hear your ruling.

THE COURT:  I haven't ruled yet.

INTERPRETER:  Apologies, your Honor.

THE COURT:  Sustained.

BY MR. STABILE:

Q.  When Mr. Hernandez was out in public, did the security team allow people to approach him?

MR. WIRSHBA:  Objection, your Honor.

O345her3                       Romero Palacios - Direct

THE COURT:  I will allow it.

A.  Yes.

Q.  When Mr. Hernandez was out in public when he was the president of Honduras, did people ask to take pictures with him?

A.  Many people.

Q.  Did that happen nearly every day?

A.  Whenever he was at events, people always asked to have their pictures taken with him.

Q.  In your presence, how many photographs do you think Juan Orlando Hernandez took with people?

A.  Many.

Q.  Would thousands be a good approximation?

A.  Yes.

MR. STABILE:  Andy, for the Court, counsel, and the witness only, can we put up DX 217?

Q.  General Romero, can you see what is on the screen?

A.  Yes.

Q.  What is on the screen?

A.  President Hernandez exercising, President Hernandez walking around a town in Honduras, and the photo of President Hernandez below is him at an event outside of the country.

Q.  And do you see yourself in those photos?

A.  Yes.

Q.  Are these photos representative of his security detail?

A.   Yes.

MR. STABILE:  I offer DX 217.

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  I will allow it.

(Defendant's Exhibit  217 received in evidence)

MR. STABILE:  May DX 217 be published for the jury?

THE COURT:  Yes.

BY MR. STABILE:

Q.   In these photographs, is this typically how the security team would move with Mr. Hernandez?

A.   Yes.

Q.   And are there other members of the security team that we are not seeing in these photographs?

A.   Yes.

MR. STABILE:  We can take that down, please.

Q.   Did you ever travel with Mr. Hernandez to DEA headquarters in the United States?

A.   Yes.

Q.   Do you know where DEA headquarters in the United States is?

A.   Yes.

Q.   Where?

A.   Washington.

Q.   Did you travel with Mr. Hernandez to the White House?

A.   Yes.

Q.   Were you present when Mr. Hernandez met with any U.S.

presidents?

A.   No.

Q.   How frequently would you travel with Mr. Hernandez to the United States on official business?

              MR. WIRSHBA:  Objection, your Honor.

              THE COURT:  Sustained.

Q.   Do you know an individual named Alex Ardón Soriano?

A.   Yes.

Q.   How do you know him?

A.   I know him personally and I know him through television media.

Q.   And did he hold a political position in Honduras?

A.   He was the mayor of El Paraiso Copán.

Q.   And what about Hugo Ardón Soriano; do you know who that is? Hugo Ardón Soriano.

              INTERPRETER:  Apologies, interpreter correction:  Hugo Ardón Soriano.

A.   Yes.

Q.   And who is he in relation to Alex Ardón Soriano?

A.   Brother.

Q.   And did Hugo Ardón Soriano hold any government position?

A.   The first year of the president --

              INTERPRETER:  I'm sorry, your Honor.  The interpreter would like to consult.

              THE COURT:  Yes.

(Interpreters consulting)

A.   He was the director of the Transportation Fund.

Q.   Can you describe what the Transportation Fund is?

A.   The Transportation Fund is in charge of repairing and building roads in Honduras.

Q.   And for how long was Hugo Ardón Soriano in that position?

A.   Probably for 14 months.

Q.   And why did his position end?

A.   I do not know.

Q.   Were you present for meetings between Alex Ardón, Hugo Ardón, and Mr. Hernandez?

A.   No.

Q.   Well, were you ever present at events where the Ardóns were present and Mr. Hernandez was present?

A.   Only one event that Alexander Ardón attended.

Q.   And what was that event?

A.   An event at the president's house, a political event.

Q.   How many people were at that event?

A.   About 40.  Between 40 and 50 people.

Q.   Did you observe Alex Ardón meet in private with Juan Orlando Hernandez?

A.   No.  There was no private meeting.  It was with the entire group.

Q.   Would the security team have permitted a private meeting between Alex Ardón and Mr. Hernandez?

O345her3                       Romero Palacios - Direct

MR. WIRSHBA:  Objection.  Calls for speculation.

THE COURT:  I will allow it.

A.  Probably.

Q.  Do you know who Leo Rivera is?

A.  Yes.

Q.  Did you ever observe him meeting with Mr. Hernandez?

A.  No.

Q.  Do you know who his brother Javier Rivera is?

A.  Yes.

Q.  Did you ever observe him meeting with Mr. Hernandez?

A.  No.

Q.  How about the Valle Valles.  Do you know who they are?

A.  Yes.

Q.  Did you ever see them meeting with Mr. Hernandez?

A.  No.

Q.  Do you know who Geovany Fuentes is?

A.  Yes.

Q.  Did you ever see him meeting with Mr. Hernandez?

A.  No.

Q.  Do you know what Fabio Lobo?

A.  Yes.

Q.  Who is Fabio Lobo?

A.  He is the son of ex-president Porfirio Lobo Sosa.

Q.  Do you know him fairly well?

A.  No.

Q.  Did you also provide security for Pepe Lobo?

A.  No.

Q.  Did you ever see Fabio Lobo meet with Mr. Hernandez?

A.  Yes.

Q.  How many times?

A.  One time when we arrived at Olancho.  We landed on a soccer pitch.  We were on our way to an event with the president and a welcoming committee arrived for him, and Fabio Lobo was in that welcoming committee.

Q.  At that time did Mr. Hernandez and Fabio Lobo have a private meeting?

A.  No.

Q.  Did Mr. Hernandez get into Fabio Lobo's car?

A.  No.

Q.  Based on your personal observations, did Mr. Hernandez have a close relationship with Fabio Lobo?

        MR. WIRSHBA:  Objection.

        THE COURT:  No, I will allow it.

A.  There was no relationship with Fabio Lobo.

Q.  Now, I think you testified that you met Tony Hernandez when he was a child; is that right?

A.  When he was a child.

Q.  About how old were you -- well, what would you say the age difference is between you and Tony Hernandez?

A.  10 years.

Q. Would you see Tony Hernandez over the years from the time you first met him until 2022?

A. Yes.

Q. And would you sometimes have text messages with Tony Hernandez?

A. Yes.

Q. And why would you be communicating with Tony Hernandez?

A. Sometimes to advise him.

Q. Based on your personal observations, how close was the relationship between Tony Hernandez and Juan Orlando Hernandez?

A. It was not so close.

Q. How frequently did you observe Tony Hernandez with Juan Orlando Hernandez?

A. Very few times. Two times at the most.

Q. Did you ever accompany Mr. Hernandez to the home of Fabio Lobo?

A. No.

Q. Do you have any awareness of Mr. Hernandez going to Fabio Lobo's home?

MR. WIRSHBA: Objection, your Honor.

THE COURT: Yes. Sustained.

Q. Did you ever have occasion to call Mr. Hernandez on the telephone?

A. Yes.

Q. And did you have his phone number?

A.  Yes.

MR. STABILE:  May I have just one moment, your Honor?

(Counsel conferring)

Q.  Are you familiar with the number 504-999-2477?

A.  That's the phone number that President Hernandez had up until about 2012.

Q.  And then did he get a different phone number?

A.  Yes.

Q.  And did you have is -- well, did he have one other phone number or two other phone numbers?

A.  He had one different number.

Q.  And was that the number you would call if you wanted to reach him personally?

A.  Yes.

Q.  And as you sit here right now, do you remember that phone number?

A.  No.

MR. STABILE:  May I approach the witness, your Honor?

THE COURT:  You may.

Q.  I am showing you something and I would direct your attention to where my finger is pointing and ask you to take a look at that.  Having looked at what I just showed you, does that refresh your recollection as to Mr. Hernandez' phone number after 2012?

A.  Yes.

Q.  And do you recall what that phone number is?

A.  3172 -- don't remember.

Q.  OK.  Well, after 2012, if you wanted to reach
Mr. Hernandez, would you call 504-999-2677?

        MR. WIRSHBA:  Objection.  Asked and answered.

        THE COURT:  No.  You can answer it.

A.  I called the other number.

Q.  And in 2019, specifically, if you wanted to reach Juan
Orlando Hernandez, would you call 504-999-2677?

        MR. WIRSHBA:  Objection.  Asked and answered.  2019 is
after 2012.

        MR. STABILE:  There is evidence of very specific time
periods in this case, your Honor.

        THE COURT:  Well, the witness has already testified
that that's the phone number that President Hernandez had up
until 2012 and you elicited that he got a different phone
number after that date, so I'm going to sustain the objection
to the question.

BY MR. STABILE:

Q.  General Romero, do you know whether or not the phone number
504-999-2677 became publicly available?

A.  I don't have knowledge of it.

        THE COURT:  Previously, Mr. Stabile, in your
questioning, you referred to 504-999-2477.  Are they two
distinct phones?

MR. STABILE:  No, I appreciate that, your Honor.  I misspoke.

THE COURT:  Which time did you misspeak?

MR. STABILE:  Whatever time I used "24" was I misspoke.

THE COURT:  Thank you.

BY MR. STABILE:

Q.  Are you familiar with the e-mail address juanorlandohernandez@gmail.com.

A.  Yes.

Q.  Was that an e-mail that was used by Mr. Hernandez?

A.  Yes.

Q.  Was that gmail kept secret?

A.  No.

Q.  If Mr. Hernandez made changes to his daily agenda, would you be aware of those changes?

A.  Yes.

MR. STABILE:  May I have a moment, your Honor?

THE COURT:  You may.

(Counsel conferring)

BY MR. STABILE:

Q.  To your knowledge, General Romero, did Juan Orlando Hernandez own an air strip?

A.  No.

MR. STABILE:  I have no further questions.

THE COURT:  Any cross-examination?

MR. WIRSHBA:  Yes, your Honor.

CROSS EXAMINATION

BY MR. WIRSHBA:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  You have known the defendant for a long time; is that right?

A.  Yes.

Q.  Since high school?

A.  Yes.

Q.  Since you were approximately 13 years old; right?

A.  Yes.

Q.  And your career, it has largely followed the defendant's rise in politics; correct?

A.  Yes.

Q.  So from 2009 to 2013, the defendant, he was the president of the Honduran National Congress; right?

A.  No.

Q.  What years was he the president of the National Congress?

A.  From 2010 to 2013.

Q.  OK.  I thought that's what I said but if I got it wrong, I apologize.

From 2010 to 2012, you were the sub-chief of the special security for the National Congress; is that right?

O345her3                        Romero Palacios – Cross

INTERPRETER:  Can the interpreter hear the question again?

Q.  Of course.

In 2010 to 2012, you were the sub-chief of the special security for the National Congress; is that right?

A.  Yes.

Q.  In that role you worked for the defendant; right?

A.  I worked for the armed forces providing security services to the president of the National Congress.

Q.  Which was the defendant; right?

A.  The defendant from what?

Q.  Juan Orlando Hernandez was the president of the National Congress at the time; right?

A.  He was the president of the Congress in 2010.

Q.  And you got promoted from that position; right?

A.  Negative.

Q.  Well, from 2012 to 2013 did you become the chief of the special security for the National Congress?

A.  No.

Q.  Did you ever become the chief of special security for the National Congress?

A.  Yes.

Q.  What year was that?

A.  2012 to 2013.

Q.  And at that time, when you went from the sub-chief to the

chief, Juan Orlando Hernandez was the president of the National Congress; right?

A.   Yes.

Q.   Then in 2013 the defendant ran for president, right?

A.   Yes.

Q.   He won, correct?

A.   Yes.

Q.   And you got a new job, didn't you?

A.   I did not get a new job.  The armed forces assigned me.

Q.   I see.  So you got a new assignment; correct?

A.   Yes.

Q.   And in 2013 you got moved from the National Congress to the Presidential Honor Guard; correct?

A.   Yes.

Q.   And in that role you continued to guard Mr. Juan Orlando Hernandez; right?

A.   The structure changed.

Q.   OK, but it was still your job to protect Juan Orlando Hernandez; true or not true?

A.   Yes.

Q.   And you also, it was your job to protect the president's family; right?

A.   Yes.

Q.   So from 2014 to 2019 you were the chief intelligence officer for the Presidential Honor Guard; right?

A.   Yes.

Q.   And in 2019 you got a new role; right?

A.   Yes.

Q.   The defendant was still the president; wasn't he?

A.   Yes.

Q.   And in 2019 you became the sub-chief of the whole honor
guard; right?

A.   Yes.

Q.   And in 2020 you got a new role again; right?

A.   Yes.

Q.   You became the chief of the honor guard?

A.   Yes.

Q.   And Juan Orlando Hernandez, he was still the president;
wasn't he?

A.   Yes.

Q.   So in this role you were responsible for protecting him; is
that right?

A.   Yes.

Q.   It was your job to make sure that nothing bad happened to
Juan Orlando Hernandez; right?

A.   Yes.

Q.   And you took that job very seriously.

A.   Yes.

Q.   You were asked on direct examination about the protocols
for security; do you remember that?

A.  Yes.

Q.  And the protocol was for someone to be with the president at all times; true?

A.  Yes.

Q.  But you, personally, you weren't with the president at all times, were you?

A.  Correct.

Q.  And you said that you got the daily agenda about a week in advance; is that right, sir?

A.  A week before, not a week in advance.

Q.  OK.  You received the agenda a week before the events were to happen; correct?

A.  Yes.

Q.  But sometimes things changed, didn't they?

A.  Yes.

Q.  Now, you also have a personal relationship with Juan Orlando Hernandez; don't you?

A.  Yes.

Q.  So in addition to getting these new roles while you followed him around, you also increased in rank; right?

A.  The time that I had been in the armed forces allowed for my promotion.

Q.  In 2015 your rank increased to lieutenant colonel; right?

INTERPRETER:  Sorry.  Could the interpreter hear the date again?

Q.   2015.

A.   Yes.

Q.   That was while you were working for the Presidential Honor Guard; correct?

A.   Yes.

Q.   And what rank are you now?  You are a brigadier general; is that right?

A.   Brigadier general.

Q.   And when the defendant left office, what was your rank?

A.   The same.

Q.   How many ranks are between lieutenant colonel, what you became in 2015, and brigadier general?

A.   Colonel, only one.

Q.   And you received that rank as well, that promotion in rank as well while the defendant was the president of Honduras; right?

A.   Yes.

Q.   Getting back to 2015, did you celebrate your promotion to lieutenant colonel?

A.   Yes.

Q.   Did the media do stories for the party that you held for your promotion?

A.   Not the news media but the social media networks.  Some of the photos that were taken during that party were shown.

          MR. WIRSHBA:  I would like to take a look at one of

those photos.  Could we show the witness and the parties and Court what is marked as Government Exhibit 1303?

Q.  Do you recognize that, sir?

A.  Yes.

Q.  Is that one of the photos that you are talking about?

A.  That was the promotion to colonel, from lieutenant colonel to colonel.

MR. WIRSHBA:  Your Honor, the government offers Government Exhibit 1303.

MR. STABILE:  Object to relevance.

THE COURT:  Sustained.  Lay a foundation.

BY MR. WIRSHBA:

Q.  Sir, you socialized with the defendant; is that right?

A.  Yes.

Q.  So at this party, which was about your promotion, you took photographs; didn't you?

A.  Yes.

Q.  And in this photograph you are pictured; right?

A.  Yes.

Q.  Your wife is pictured; right?

A.  Yes.

Q.  Juan Orlando Hernandez is pictured; correct?

A.  Yes.

Q.  And the first lady, Juan Orlando Hernandez' wife, is also pictured; isn't she?

O345her3                      Romero Palacios - Cross

A.   Yes.

          MR. WIRSHBA:   Your Honor, the government offers Government Exhibit 1303.

          MR. STABILE:   Same relevance objection.

          THE COURT:   Sustained.

BY MR. WIRSHBA:

Q.   Well, let's talk about the defendant's wife.   She was at this party for you; right?

A.   Yes.

          THE COURT:   Pause, pause, pause.   Pause, please.

          MR. WIRSHBA:   Of course, your Honor.

          THE COURT:   We are going to take our mid-afternoon break.   Please do not discuss the case among yourselves or with anyone.   Back in action in 10 minutes.   Thank you.

          (Continued on next page)

(Jury not present)

INTERPRETER:  Your Honor?

THE COURT:  Yes.

INTERPRETER:  The witness asked the interpreter:  What I should do?

THE COURT:  Asked the interpreter a question?  You can't ask questions.  Sorry.

We are in recess.

(Continued on next page)

THE COURT:  Remain standing for the jury, please.

(Continued on next page)

(Jury present)

THE COURT:  Please be seated.

You may continue.

MR. WIRSHBA:  Thank you, your Honor.

BY MR. WIRSHBA:

Q.  Sir, when we broke, I think we were talking about a party that you had for your promotion that was attended by Juan Orlando Hernandez.

Do you remember that?

A.  Yes.

Q.  I think the question that I had posed to you was about whether you had responsibilities for protecting Juan Orlando Hernandez's wife as well.

A.  Yes.

Q.  You've also known her for a long time, right?

A.  No.

Q.  Was the defendant's mother in attendance at your party?

MR. STABILE:  Your Honor, object to this as going beyond the scope.

THE COURT:  I'll allow it.

Go ahead.

A.  I don't remember.

MR. WIRSHBA:  All right.  Can we show the witness what

has been marked as —— the witness, the parties, and the Court what has been marked as Government Exhibit 1302.

If we could scroll down, Ms. Collins, there.  You can keep scrolling down.  Oh, no, I'm sorry.  Up a page.

Q.  Sir, if I could ask you to review this portion here.

THE COURT:  All right.  This is —— what's the exhibit number?

MR. WIRSHBA:  This is Government Exhibit 1302, your Honor.

THE COURT:  All right.  Do you see the circled portion on the document?

THE WITNESS:  Yes.

THE COURT:  Go ahead.

BY MR. WIRSHBA:

Q.  Please read that to yourself, if you don't mind.  Let me know when you're done.

A.  All right.

MR. WIRSHBA:  You can take that down, Ms. Collins.

Q.  Does that refresh your recollection as to whether the defendant's mother was at your party?

A.  Yes.

Q.  She was, right?

A.  The entire family was invited.

Q.  The entire Hernandez family was invited, is that right?

A.  No, his closest siblings.

Q.  And his mother, right?

A.  Yes.

Q.  All right.  Now, your wife was also in attendance at this party, right?

A.  Yes.

Q.  She also has a role in the government, or had a role in the government, right?

A.  No.

Q.  Has she ever worked in Puerto Cortés?

A.  At a private company.

        THE INTERPRETER:  The interpreter will request a repetition of the name.

A.  Central American Port Authority.

Q.  In that role, she is partly responsible for things coming into the port, right?

A.  No.

Q.  All right.  Now, you have a visa to enter the United States, is that right, sir?

A.  Yes.

Q.  And you got that visa at the U.S. embassy in Honduras, correct?

A.  Yes.

Q.  When you secured that visa, you provided information about yourself, is that right?

A.  Yes.

Q.  You told the truth when you provided that information?

A.  Yes.

Q.  You wrote that your phone number was 31705781, right?

A.  Yes.

Q.  That is your phone number, right?

A.  No.  I've changed it now.

Q.  I see.  But when you applied for your visa, that was your phone number, correct?

A.  Yes.

Q.  All right.  Now, you mentioned that you were with the defendant when he was engaging in his presidential duties. Were you also with him when he was campaigning?

A.  Yes.

Q.  And in addition to attending campaign rallies, he would also meet with local politicians, right?

A.  Yes.

Q.  And he often used a helicopter to assist him when doing so, right?

A.  Yes.

Q.  Did you also accompany him on international trips?

A.  Yes.

Q.  In 2010, the defendant went to the World Cup, right?

A.  I saw a photograph, but I did not accompany him.

Q.  Do you know that he went to the World Cup that year?

            MR. STABILE:  Objection.

THE COURT:  Basis?

MR. STABILE:  Calls for hearsay.

THE COURT:  Overruled.

A.  I realized it when I saw the photographs.

MR. WIRSHBA:  Can we put up Government Exhibit 309 in evidence.

Q.  Is this one of the pictures that you saw, sir?

A.  Yes.

Q.  And is Juan Orlando Hernandez the second from the right in this photograph?

A.  Yes.

Q.  And with his arm around Juan Orlando Hernandez, that's Arnulfo Valle, right?

A.  No, I don't know.

Q.  Do you remember testifying on direct about whether or not the defendant ever had any meetings with the Valles?

A.  I answered that he did not.

Q.  Were you present for this meeting?

A.  No.

MR. WIRSHBA:  You can take that down, Ms. Collins. Thank you.

Q.  Now, you mentioned that Casa Presidencial on direct examination.  Do you remember that?

A.  Yes.

Q.  All right.  You said that there was construction near Casa

O34HHer4                        Romero Palacios – Cross

Presidencial, is that right?

A.  Yes.

Q.  Was Casa Presidencial itself under construction at that time?

A.  The civic center is what was in construction.  It is next to the presidential palace.

Q.  The presidential palace itself, it was not under construction, correct?

A.  Correct.

Q.  In fact, there were people who continued to work at Casa Presidencial, right?

A.  Everything was moved from the presidential palace to the ministry of foreign affairs.

Q.  To the best of your knowledge, were people still working at Casa Presidencial during this time period?

A.  No.

Q.  Now, you mentioned that you went to Graneros, right?

THE INTERPRETER:  Interpreter would like a repetition of that name.

MR. WIRSHBA:  Of course.  Graneros.

A.  Yes.

Q.  And when you went to Graneros, were you armed?

A.  Yes.

Q.  Was the other security that you were there with armed?

A.  Yes.

Q.   Did that include sidearms?

A.   No, designated weapons.

Q.   So long guns?

A.   Long guns and sidearms that the presidential guard uses.

Q.   Now, you weren't in the meeting that the defendant —— that the defendant had at Graneros, right?

A.   Not inside the meeting.

Q.   So you don't know who else might have entered the meeting after you left, correct?

A.   Before I entered —— when the president is going to enter, it is protocol to make sure that the location is safe where the president is going to go in.

Q.   Then you left the meeting, right?

A.   Yes.

Q.   And so you don't know whether anyone else came into that meeting after you left, correct?

A.   I stayed at the doorway.  No one else came in.  Only the president and the gentlemen there were left.

Q.   I see.  So you don't know what they discussed.  You don't have personal knowledge of what they discussed, right?

A.   That's right.

Q.   And you don't know if anything was exchanged between the participants in the meeting, right?

A.   No, no, no.

Q.   All right.  You testified that you knew Alex Ardón, right?

A.   From having seen him.

Q.   And you've also seen Hugo Ardón, right?

A.   Yes.

Q.   You said that you knew that Hugo was the head of Fondo Vial, is that correct?

A.   Yes.

Q.   And you knew that Hugo Ardón had that position before Juan Orlando Hernandez became president, right?

A.   Yes.

Q.   And Hugo Ardón kept that position until 2015, correct?

A.   Probably.

Q.   All right.  Now, you also knew Hugo Ardón from the 2013 election, right?

A.   From having seen him.

Q.   Because he had a role in the defendant's presidential campaign, correct?

A.   No.

Q.   Hugo Ardón was not the campaign coordinator for Copán?

        MR. STABILE:  Objection.  Asked and answered.

        THE COURT:  Let me see.

        I'll allow it.

A.   I am not aware.  That was not my job.

Q.   But did you see Hugo Ardón at campaign events?

A.   No.

Q.   Did you see Alex Ardón at campaign events?

A.   No.

Q.   All right.  Alex Ardón, he was the mayor of El Paraiso, right?

A.   Yes.

Q.   And you remember that there were articles in the media about how he was a drug trafficker, right?

A.   Yes.

Q.   There were articles in the media about how Hugo Ardón was a drug trafficker, right?

A.   Yes.

Q.   And isn't it true that the defendant told Alex Ardón not to run for mayor again in 2013?

A.   I am unaware of the political side of it.

Q.   Those articles linking Alex Ardon, Hugo Ardón to drug trafficking, those articles, they came out before 2013, right?

A.   I don't recall.

Q.   Do you remember Juan Orlando Hernandez meeting with Arnaldo Urbina?

        THE INTERPRETER:  The interpreter requests the name repeated.

        MR. WIRSHBA:  Of course.  Arnaldo Urbina.

A.   Yes.

Q.   Arnaldo Urbina, he was the mayor of Yoro, right?

A.   Yes.

Q.   There were also articles linking Arnaldo Urbina to drug

trafficking, correct?

A.   I don't recall.

Q.   Did Arnaldo Urbina run for mayor of Yoro in 2013?  Do you remember?

A.   Yes.

Q.   And he won, right?

A.   Yes.

Q.   Alex Ardon, he didn't run for mayor in 2013, right?

A.   I don't know.

Q.   Alex Ardon, to the best of your knowledge, he wasn't arrested in 2013, right?

A.   That's right.

Q.   He wasn't arrested in 2014, was he?

A.   Right.

Q.   He wasn't arrested in 2015, correct?

A.   I think he turned himself in to United States authorities in 2015.

Q.   Well, setting aside when he turned himself in, Arnaldo Urbina, he did get arrested in Honduras, right?

A.   Yes.

Q.   That was shortly after he won the election for mayor of Yoro, right?

A.   Of Yoro?  I don't remember the exact date.

Q.   But it was after the election, right?

A.   I don't remember.

Q.  All right.  Now, you said that you knew who the Valles were, right?

A.  Yes.

Q.  They're drug traffickers, right?

A.  That's what was said in Honduras.

Q.  Geovanny Fuentes Ramirez, you also know who that is, right?

A.  Yes.

Q.  He's also ——

A.  Through the media.

Q.  All right.  And he's also a drug dealer, right?

A.  According to the media.

Q.  Are you familiar with an individual named Edwin Archaga Carias?

A.  Edwin?

Q.  Edwin.

A.  No.

        MR. WIRSHBA:  Could we show the witness and the parties and the Court what is marked as Government Exhibit 366.

Q.  Sir, do you recognize the person with the —— who is highlighted in this photo?

A.  Yes.  I heard the name differently.  That's why I said no.

Q.  I see.  No problem.

        What is this person's name?

A.  Edwin Archaga Carias.

Q.  I apologize.  My pronunciation of Spanish names is

admittedly very poor.

Also in this photograph is Juan Orlando Hernandez, right?

A.  Yes.

Q.  And is Carias part of the Presidential Honor Guard?

A.  Yes.

MR. WIRSHBA:  Your Honor, the government seeks to admit Government Exhibit 366.

MR. STABILE:  Object to relevance.

THE COURT:  All right.  I'll allow it.  Proceed.

(Government's Exhibit 366 received in evidence)

BY MR. WIRSHBA:

Q.  Now, sir, there was a scandal surrounding this person being on the Presidential Honor Guard, right?

A.  Correct.

Q.  But this person, they worked on the Presidential Honor Guard that you led, correct?

A.  He was assigned as a major to the armed forces, and he worked on the Presidential Honor Guard with us.

Q.  You were the chief of the Presidential Honor Guard, right?

A.  Yes.

Q.  So this person worked for you while he was engaging in his duties with the Presidential Honor Guard, right?

A.  Yes.

Q.  And this person is cousins with someone else named Archaga

Carias, right?

A.   He — he — this other person, he used the surnames of that person in the national civil registry so that he could pass himself off as being related to Major Archaga Carias, but he is not a cousin.

Q.   So the scandal was that this individual was related to someone who is better known as Porky, right?

A.   Yes.

Q.   Now, when you started working for Juan Orlando Hernandez — you can take that down, Ms. Collins — when you started working for Juan Orlando Hernandez, that's when he became — that's when he was the president of Congress, right?

A.   Yes.

Q.   And where did Juan Orlando Hernandez live at the time?

A.   Palmeras de San Ignacio.

Q.   Did you have a role in securing the defendant's homes while you were working for the National Congress?

A.   Of his home.

Q.   And also that same responsibility for his home when you were with the Presidential Honor Guard?

A.   Yes.

Q.   And if he had more than one home, you would have responsibility for protecting more than one home, right?

A.   No.

Q.   So if the defendant went to other homes that he owned,

would he bring his presidential security with him?

MR. STABILE:  Objection.  Assumes facts not in evidence.

THE COURT:  One second.

No, it's a question.  I'll allow it.

A.  All movements that the president made was with his security.

Q.  OK.  I'll come back to this in a second.

But just to circle back to the scandal that we were talking about earlier, can we put up Government Exhibit 118, please.

This is a photo of the individual we were talking about earlier, Porky, right?

A.  You mentioned him.  I said that he was not a relative of Major Archaga's.

Q.  OK.  But he is the head of MS-13 in Honduras, right?

A.  According to the media, yes.

MR. WIRSHBA:  OK.  We can take that down.

Q.  Getting back to the defendant, isn't it true that in 2011 the defendant purchased another home?

A.  No.

Q.  You don't remember him purchasing a home in Hato de Enmedio in Tegucigalpa?

A.  No.

Q.  Isn't it true that in 2013, the defendant's wife purchased

a home in Miami?

A. Yes.

Q. Have you ever been to that home in Miami?

A. Yes.

Q. That was for personal trips, right?

A. No.

Q. You were there in your official capacity protecting the president while you were in the United States?

A. I accompanied him, but those in charge of his security there were the Secret Service.

Q. Right. So you weren't there to provide security protection, right?

A. I always accompanied him, but those in charge of it in the country was the Secret Service.

Q. OK. We can get back to the defendant's properties.

In 2013, right before the election, didn't the defendant purchase another home in Tegucigalpa?

A. Not that I know of.

Q. Do you remember a home the defendant had in Villa Las Palmeras neighborhood in Tegucigalpa?

A. San Ignacio Palmeras is the residential community where he lives.

Q. Isn't it true that he bought that home in 2013?

A. When I arrived for him in 2010, he already lived in that home.

Q.   OK.  What about 2014?  Did he acquire another home in Santa Lucia?

A.   Negative.

Q.   You've never been to his home in Santa Lucia?

A.   Negative.

Q.   Well, were you still working with the defendant when his properties were seized by Honduran authorities?

A.   I finished with him on January 27, 2022.

Q.   Do you remember when Honduran authorities seized properties from the defendant?

A.   Yes.

Q.   You were still in touch with his family at that time, right?

A.   Yes.

Q.   And Honduran authorities, they seized 33 properties from the defendant and his family, right?

A.   I'm unaware of it.  I don't know the amount.

Q.   You knew that there were a number of properties that were seized?

A.   Yes.

Q.   And there were businesses seized too, right?

A.   Not his.

Q.   But there were businesses of his family that were seized, right?

A.   Yes.

Q.  There were eight of them that were seized, correct?

A.  I don't know the number.

Q.  There were also vehicles that were seized from the defendant and his family, right?

A.  The family.  As far as the president, I —— not to my understanding.

Q.  There were 16 vehicles seized, right?

A.  I don't know.

Q.  You talked about Tony Hernandez on direct examination, didn't you?

A.  Yes.

Q.  You and Tony Hernandez, you were friendly, right?

A.  No.

        MR. WIRSHBA:  One moment, your Honor.

        (Counsel confer)

Q.  Do you have a friendly relationship with Tony Hernandez?

A.  No.

Q.  All right.  When did you find out that Tony Hernandez was trafficking drugs?

A.  I never learned that he trafficked with drugs.

Q.  Do you remember the media talking about how Tony Hernandez was a drug dealer as early as 2014?

A.  Yes.

Q.  Do you remember articles about how Tony Hernandez was involved in a helicopter that got seized by authorities that

was carrying drugs?

A.   Yes, I read the article, but it wasn't Tony Hernandez.

Q.   That article was in 2016, right?

A.   I don't remember the date, but I do remember the news.

Q.   And do you remember the news that the Valles had identified Tony Hernandez as a drug trafficker?

A.   No.

Q.   All right.  You said that the news began as early as 2014. Was Tony Hernandez arrested in 2014?

          MR. STABILE:  Objection.

A.   I don't remember what day ——

          THE COURT:  One second.  Stop.

          MR. STABILE:  Objection.  That mischaracterizes what he just testified to.  He said it was not Tony Hernandez in 2014.

          THE COURT:  Rephrase your question, please.

          MR. WIRSHBA:  Of course, your Honor.

BY MR. WIRSHBA:

Q.   Do you remember testifying that Tony Hernandez was in the media as being connected with drug trafficking as early as 2014?

A.   I heard the news, but I don't remember the date.

Q.   Well, nonetheless, was Tony Hernandez arrested in 2014 to the best of your knowledge?

A.   The date I don't remember, but I do know that he was

arrested in the United States.

Q.  Was he arrested during the —— Juan Orlando Hernandez's first term?

A.  Probably.

Q.  He wasn't arrested in Honduras, though, was he?

A.  No.

Q.  And he wasn't extradited from Honduras to the United States, right?

A.  Correct.

Q.  He was arrested in Miami, correct?

A.  Correct.

Q.  After traveling there on a visa, right?

A.  Correct.

Q.  Now, you said that the defendant and Tony Hernandez, they had only met twice while you were working for the defendant, is that right?

A.  Correct.

        MR. WIRSHBA:  I'd like to show the witness what's in evidence as Government Exhibit 365, if we could, Ms. Collins.

Q.  This is Tony Hernandez with the defendant, right?

A.  Correct.

Q.  Were you here for this meeting?

A.  Negative.

Q.  All right.  When the defendant was president, was it in the news that Tony Hernandez's associates were also drug dealers?

A.   Not associates.  I learned that he was a friend of some people who were involved with drug dealing.  I told the president, and he said to me, call him and tell him to get away from those people.

Q.   Was Alex Ardón one of those people?

A.   I don't remember if it was Alex Ardón.

Q.   Who was the person that you found out was associated with Tony Hernandez who was a drug dealer?

A.   I was only told that he was at social gatherings with people, without knowing any names.

Q.   I see.

     So Tony Hernandez attended social gatherings, you learned, with drug traffickers, is that right?

A.   Yes.

Q.   And the media was saying that he was involved in drug trafficking, right?

A.   That came out later on.

Q.   So when the president asked you to call Tony Hernandez and say not to associate with drug dealers, that was before any news came out in the media, is that right?

A.   Correct.

Q.   So after the defendant gives Tony Hernandez this warning, then the news starts coming out about how he's a drug trafficker, correct?

A.   I don't remember.

Q.  Did Tony Hernandez keep associating with those same people who were drug traffickers?

A.  I don't know.

Q.  Well, you did talk to Tony, right?

A.  I talked to him two or three times, I think.

Q.  Did you text with him?

A.  Yes.

Q.  On two or three occasions, that's your testimony?

A.  I don't remember.  I really don't remember, but it was only a few times that I texted with him.

Q.  Did you know that when Tony Hernandez was arrested, U.S. authorities seized his phone?

A.  Yes, I saw the news.

Q.  And did you know that U.S. authorities searched that phone and found messages on it after his arrest?

          MR. STABILE:  Object.  Objection.  His basis of knowledge would be hearsay.

          THE COURT:  Yes, lay a foundation here.

          MR. WIRSHBA:  Sorry, your Honor.  I'll withdraw the question.

          If we could put up Government Exhibit —— just for the witness, the parties, and the Court, Government Exhibit 202-R2-U.

Q.  Do you see what's on your screen, sir?

A.  Yes.

Q.   Are these the messages that were exchanged between you and Tony Hernandez?

A.   Yes.

Q.   That's your phone number at the top where it says "Colonel Romero P.," right?

A.   Yes.

Q.   And that's Tony Hernandez's phone number where it says "Tony Hernandez owner," right?

A.   Correct.

          MR. WIRSHBA:  All right.  If we could just quickly scroll through these messages for the witness, that would be very helpful.

          THE COURT:  Are these in evidence?

          MR. WIRSHBA:  No, your Honor, they are not, and they're not published to the jury.

          THE COURT:  Thank you.

          MR. WIRSHBA:  Can I have one moment, your Honor?

          THE COURT:  Yes.

          (Counsel confer)

          MR. STABILE:  Your Honor, I understand that they're scrolling through pages, but if he's not going to be asked questions about this, I think he has to be given an opportunity to read the document.

          THE COURT:  Well, I agree.  I don't know whether this is offered to refresh his recollection on some point and if so,

what, or whether this is to lay a foundation for the admission of the document.  So I'm waiting to see.

MR. STABILE:  OK.

THE COURT:  But your point is well-taken.

MR. STABILE:  Thank you.

BY MR. WIRSHBA:

Q.  All right.  I'd like to display —— we can take this down, Ms. Collins.

I'd like to display for the witness Government Exhibit 202-R2, if we could.

Do you see what's on the screen, sir?

If we could display that for the witness, Ms. Collins.

THE COURT:  It's on the witness' screen.

MR. WIRSHBA:  Thank you, your Honor.

Q.  Do you recognize this to be a redacted version of the document that we were just looking at?

A.  Yes.

MR. WIRSHBA:  All right.  If we could go to the next page, Ms. Collins.

THE COURT:  Ladies and gentlemen, what does "redacted" mean?  Redacted means that a portion of a document is not relevant to the proceeding, and therefore, it is properly covered.  So unredacted would be the clean document with nothing covered.  Redacted would mean the document with certain portions covered because it is appropriate to cover them.

You're not to speculate why a document is redacted or requested that it be redacted. The redactions should be assumed to be proper. And what you consider is the portions of the document that are not redacted that you can see and read.

All right.

BY MR. WIRSHBA:

Q. Sir, looking at what's on the screen now, these are some of the messages between you and Tony Hernandez, correct?

A. Yes.

MR. WIRSHBA: Your Honor, at this time the government would seek to offer Government Exhibit 202-R2, as well as what has been offered and accepted subject to connection, 202-R2-T.

MR. STABILE: Objection. Relevance. Hearsay. I'm not sure what the hearsay exception is here if it's between Tony Hernandez and this witness.

MR. WIRSHBA: Your Honor, this is already in evidence.

Perhaps I should speak with my colleagues. Just give me one second, your Honor.

(Counsel confer)

MR. WIRSHBA: Your Honor, my understanding is this document is already in evidence, so the government would seek to display for the witness Government Exhibit 202-R2-T, and can we go to page 2.

THE COURT: Is this document in evidence?

MR. WIRSHBA: Yes, your Honor.

THE COURT:  OK.

BY MR. WIRSHBA:

Q.  Now, Mr. Romero, what I'm —— excuse me, Mr. Palacios, what I'm displaying on the screen here is a portion of that chat with translations.  OK?

A.  Yes.

Q.  And this is a photograph of a firearm that you sent Tony Hernandez on January 29 of 2018, right?

A.  Yes.

Q.  And you wrote immediately after sending this firearm, "Hahaha," right?

A.  Yes.

Q.  And Tony responded, "It's awesome," correct?

A.  Yes.

Q.  All right.  Now, in addition to joking about guns, you had more substantive conversations about money, is that right?

A.  No.

Q.  You ever talk with Tony about people whose money was being seized?

A.  No.

Q.  Let's take a look at page 4 of this document, if we could, which is labeled "Segment 2."

        These are more conversations between you and Tony Hernandez, right?

A.  It's a warning that I gave Tony Hernandez ——

Q. Sir, sir —

A. — because he was meeting people.

Q. Sir, that wasn't my question. My question was, is this more of the conversation between you and Tony Hernandez?

A. Yes.

Q. All right. In this conversation, it starts with you saying, "Wilkin Santiago Montalvan's bank accounts are frozen," right?

A. Correct.

Q. And you said, "Look," right? Correct?

A. Correct.

Q. And then Tony Hernandez, he said, "Wow, thank God, Leader. No involvement," is that right?

A. Correct.

Q. Now, when he said "no involvement," was he referring to his own involvement in whatever caused the seizure of the bank accounts or your involvement?

A. The portion that is no involvement mean that there was no relationship that he had to do with it; that he was not involved.

Q. So Tony Hernandez was telling you that he had no involvement with this particular individual, right?

A. Correct.

Q. He said thank God he had no involvement, right?

A. Yes.

Q.   All right.  You talked with Tony Hernandez right up until the time when he got arrested, right?

A.   Yes.

Q.   You even talked with Tony about whether it was safe for him to travel to the United States, didn't you?

A.   Yes.

         MR. WIRSHBA:  If we could display just for the witness, the parties, and the Court Government Exhibit 202-R2-1.

Q.   Now, sir, this is another portion of that same chat, is that right?

         And before you answer that question, Ms. Collins, if we could scroll down.  And to the next page.

         Is that correct, sir?

A.   Yes.

         MR. WIRSHBA:  All right.  The government offers 202-R2-1.

         MR. STABILE:  Object if it's not in evidence already. Again, I'm sorry.  I object under 803.  I don't know what the hearsay exception is here if it's a chat between Tony Hernandez and this witness.

         MR. WIRSHBA:  Your Honor, these are coconspirators' statements.  The government has already offered certain of these chats as coconspirator statements and offer these under the same exception.

O34HHer4                    Romero Palacios - Cross

THE COURT:  Both the statements of both Mr. Hernandez and the witness on the stand?

MR. WIRSHBA:  At the very least Mr. Hernandez, your Honor.

THE COURT:  OK.  I'll take the statements of Mr. Hernandez under the cited rule, and I will take the statements of the witness at this point not for the truth of their content, but because it was part of the conversation and it helps explain the statements of Tony Hernandez.

Go ahead.

MR. WIRSHBA:  So the government seeks to offer the exhibit under your Honor's ruling in that circumstance.

THE COURT:  Received.

(Government's Exhibit 202-R2-1 received in evidence)

MR. WIRSHBA:  Ms. Collins, if we could display for the parties, the Court, and the witness Government Exhibit 202-R2-1-T.

Your Honor, the government seeks to offer Government Exhibit 202-R2-1-T, which is a translation of what the Court just admitted as Government Exhibit 202-R2-1.

THE COURT:  All right.  And the statements of this witness are not offered for the truth of their content but for the fact that they were said because it gives understanding to what Tony Hernandez had to say.

MR. STABILE:  Your Honor, my only objection would be

was this translation one of the translations that was put into evidence when the translator was here?  I just don't recall.

MR. WIRSHBA:  I can clarify that, your Honor.  It was not.  This is not.  The government would seek to admit this subject to connection to the extent that we are required to offer it through a translator at a later time.

MR. STABILE:  Well, I object to the translation.

MR. WIRSHBA:  Your Honor ——

MR. STABILE:  And the government has rested.

MR. WIRSHBA:  Your Honor, the government did not know at the time it called its translator what witnesses would be called by the defense.  This exhibit has become more relevant now that the defendant has called the witness to the stand who can speak to the content of these messages, and the fact that the government has not yet brought a translator before the Court should not preclude the government from offering the exhibit and the translations in a format that can be easily comprehended by the parties and the jury.

MR. STABILE:  Your Honor, if I could.  Before the government rested, the government knew that we were calling this witness.  So the government was certainly aware that it had these chats and did not seek to offer this translation before it rested.

THE COURT:  I'll allow you to use the other exhibit and ask the interpreter to translate.  Use the exhibit with

redactions.  Go ahead.

MR. WIRSHBA:  Understood, your Honor.  No problem.

Ms. Collins, could we bring up Government Exhibit 202-R2-1 again.

All right.  Ms. Collins, if we could scroll down to where there's no redaction.

BY MR. WIRSHBA:

Q.  Sir, do you see this first message that's unredacted?  It says "Tony Hernandez."

A.  Yes.

Q.  And that was on November 13 of 2018 at approximately 3:19 p.m., right?

A.  Yes.

Q.  Can you read that message, that first message.

I'm sorry, sir, can you read it out loud.

A.  "One question.  What can I do to know if I'm able to travel to the U.S. with this pending nonsense?  I don't know."

Q.  And then the response to that was "Hahaha," right?

A.  Yes.

Q.  And then what did Tony Hernandez say after that?  Can you read it out loud.

A.  "I don't owe anything, but you know what politics is like."

Q.  Let's go to the next page.

Am right that Tony Hernandez sends a question mark?

MR. STABILE:  Your Honor, I'm sorry.  I believe the

last two lines were misread.  It was not a response from him, according to the text.  It was Tony Hernandez saying "jajaja" again, not him.  If we could go back to the page.

MR. WIRSHBA:  I'm happy to go back, your Honor, but I don't believe that I said it was him.

MR. STABILE:  He said the response.

MR. WIRSHBA:  I'm happy to go back, your Honor.

Ms. Collins, could we return to the previous page.

BY MR. WIRSHBA:

Q.  So it was Tony Hernandez who laughed "hahaha" in response to his first message right?

A.  Yes.

Q.  And it was Tony Hernandez who sent the next message that you read, right?

A.  Correct.

Q.  Let's take a look at the next page.

Tony Hernandez then sent a question mark, right?

A.  Yes.

Q.  Sir, I didn't ask any question other than that he sent a question mark.

And your response after that was, I am —— can you read it out loud, please.

A.  "I'm going to ask Aldana, hold on."

Q.  All right.  Aldana, that's Carlos Alberto Aldana Zelaya, right?

A.  Yes.

Q.  And at the time, he was the head of the DNII, correct?

A.  Yes.

Q.  That's the Honduran national Directorate of Investigation and Intelligence, correct?

A.  Yes.

Q.  And because Tony Hernandez asked you, you're asking the head of the DNII whether Tony Hernandez can travel to the United States, right?

A.  Correct.

Q.  All right.  After that Tony Hernandez responded, right?

A.  Yes.

Q.  Can you read that response.

A.  "Please, and I'd like to explain an interesting matter to you."

Q.  And then did Tony Hernandez say something next?

A.  "Maybe you can see me tomorrow."

Q.  How did Tony Hernandez respond to that message?

A.  Before?

Q.  No, no, the following message, what did he say?

A.  "To create jobs and settle several things."

Q.  So Tony Hernandez, he's asking for a meeting with you, right?

A.  Yes.

Q.  Did you see him the next day?

A.   No.

Q.   OK.   Let's move on.

Going to the next part of this conversation, focusing in on the message from 8:48:06 p.m., the second from the bottom, who sent that message?

A.   I did.

Q.   What did you say?

A.   "Night, brother."

Q.   And then did you send another message that same minute?

A.   Yes.

Q.   What did you say?

A.   "There is no problem for you traveling to the U.S."

Q.   You never saw Tony Hernandez again, right?

A.   Right.

Q.   Because he got arrested when he got to the U.S., correct?

A.   Correct.

MR. WIRSHBA:   Nothing further, your Honor.

THE COURT:   All right.   Redirect?

MR. STABILE:   Yes, thank you.

Can we please put back up on the screen GX 202-R2. Thanks.   And can we go to the second page.   And can we go to the third —

REDIRECT EXAMINATION

BY MR. STABILE:

Q.   Well, first of all, General Romero, do you see what's on

the screen?

A. Yes.

Q. And can you explain what's going on in this conversation?

A. Once I met with Tony, he asked me if I had a 1911 gun to sell to them.

Q. To sell to who?

A. Tony asked saying he wanted a gun like that.

Q. Do you know whether or not Tony Hernandez was licensed to carry firearms?

A. I did not have such an intimate relationship with him like that to be asking him whether he had a license or not.

Q. Going to the next page, can you explain what's going on in this part of the conversation.

A. There I'm telling Tony that Samuel would be the one who might know about the gun.

Q. And who's Samuel?

A. Samuel was another representative of Lempira, of the state of Lempira.

        MR. STABILE:  Can we go to the next page.

Q. OK.  This is Segment 2.  Can you see that?

A. Yes.

Q. And can you see the portion "Wilkin Montalvan's bank accounts are frozen"?  Do you see that?

A. Yes.

Q. And reading down to the whole conversation, can you just

explain to the jury what this conversation's about.

A.   That conversation was because I had received information that Tony was meeting with this person, and I told him that I had received information about this guy taking missteps and that he should stop meeting with him.

Q.   Then after that, his — this person's accounts were frozen, right?

A.   Correct.

Q.   And so are you basically telling Tony, see, I told you so?

A.   That's correct.

Q.   You were asked about properties that were seized from Juan Orlando Hernandez's family.  Do you remember those questions?

A.   Yes.

Q.   Is it your understanding that all of those properties and bank accounts all belonged to Juan Orlando Hernandez?

A.   Some to his siblings, yeah.  To his siblings and another to his mom.

Q.   And he had 17 siblings, right?

A.   Yes.

Q.   And there were 30 properties seized, right?

A.   I don't know the amount.

Q.   You were asked about — on cross-examination you were asked about providing protection to Mr. Hernandez's family, right?

A.   Yes.

Q.   Who were his family members that you provided protection

to?

MR. WIRSHBA:  Objection, your Honor.  Relevance.

THE COURT:  I'll allow it.

Go ahead.

A.  His wife, his daughters, his mom, two sisters, and Tony.

Q.  You were asked about your military ranks.  Do you remember those questions?

A.  Yes.

Q.  And can you just remind the jury, what is your current rank in the military?

A.  I'm a brigadier general.

Q.  And you've had that position for two years, is that right?

A.  I've been, yes, two years in that position.

Q.  And has Mr. Hernandez been the president of Honduras for the last two years?

A.  No.

Q.  In fact, the opposition party is in power right now, correct?

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  I'll allow it.

Go ahead.

A.  That's correct.

Q.  And you haven't been demoted, have you?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

O34HHer4                      Romero Palacios - Redirect

Q.   Who's the current president of Honduras?

A.   President Xiomara Castro.

Q.   And who is her husband?

          MR. WIRSHBA:   Objection.   Relevance.

          THE COURT:   Sustained.

Q.   You were shown a picture of the World Cup with
Mr. Hernandez and some other people.   Do you remember that?

A.   Yes.

Q.   When Mr. Hernandez takes photographs with people, are those
— do you consider those meetings?

A.   No.

Q.   Does he have meetings with every person he takes a
photograph with?

A.   No.

Q.   Was there any particular significance to that World Cup for
Honduras?

A.   I was not with Mr. — with President Hernandez at the time.

Q.   But isn't it true that Honduras doesn't always make it to
the World Cup, so it's special when it does?

A.   Yes.

Q.   Do you recall being with Mr. Hernandez in Santa Rosa,
Copán?

A.   Yes.

Q.   And do you recall that that was a party meeting, a
political party meeting?

A.    Yes.

Q.    Do you recall Alex Ardón showing up at the meeting?

A.    The meeting started, but he was not allowed in.

        MR. WIRSHBA:  Objection, your Honor.  This line of questioning is beyond the scope of the cross.  This could have been addressed on direct.

        THE COURT:  I'll allow it.

        Go ahead.

        THE WITNESS:  May I drink water?

        THE COURT:  You may.

A.    Can you repeat it, please.

Q.    Yeah.

        You said that Alex Ardón was not allowed in.  Can you describe the circumstances of what happened?

A.    There was information with regard to him being at a different meeting with other mayors.  The president began the meeting.  Once the meeting was ongoing, he then arrived at a gate, and we were told that he was there with the other mayors. So President Hernandez sent to say that he should not be allowed in, and he sent two other people to receive them.

        MR. WIRSHBA:  Objection, your Honor.  Hearsay.  The government renews its objection that this could have been addressed on direct, and it was not.

        THE COURT:  I'll allow it to stand.

        Go ahead.

Q.   Are you finished with your answer or do you have more?

A.   He did not enter the meeting.

          MR. STABILE:  Can I have one moment, your Honor?

          THE COURT:  Yes.

Q.   You've known Mr. Hernandez since you were 13 years old, right?

A.   Correct.

Q.   You've known him your whole life since then, right?

A.   After we graduated from school, we separated because he went on with his university life and I with my military career.

Q.   But you've known him for many, many years, right?

          MR. WIRSHBA:  Objection.  Asked and answered.

          THE COURT:  I'll allow it.

A.   Yes.

Q.   Has he ever asked you to lie for him?

          MR. WIRSHBA:  Objection, your Honor.

          THE COURT:  I'll allow it.

A.   Never.

Q.   Did you come here to court to lie under oath for Mr. Hernandez?

          MR. WIRSHBA:  Objection.

          THE COURT:  Yes, that's sustained.

Q.   Have you lied in your testimony today?

          MR. WIRSHBA:  Objection.

          THE COURT:  That's sustained also.

MR. STABILE:  I have nothing further.

THE COURT:  All right.  You may step down, but I'm going to ask you to pause for a moment, sir.

Ladies and gentlemen, have a pleasant evening.  Sorry we spilled over just by a few.  See you tomorrow morning same time.  Do not discuss the case among yourselves or with anyone.

(Jury excused)

(Continued on next page)

(Jury not present)

THE COURT:  All right.  No one except court employees or contractors may leave until the elevator lobby clears.  So I'm going to ask you to wait till you get the signal in the back of the courtroom.  In the meantime, please be seated.

So I have the correspondence with regard to the expert witnesses.  Let me, first of all, inquire when you propose to call the experts.

MR. STABILE:  Tomorrow.

THE COURT:  OK.  Let me hear from the government.

MS. TARLOW:  Yes, your Honor.  The government would seek to preclude both proposed expert witnesses for the reasons outlined in its motion.  As the government stated in its motion, the notices were untimely.  Mr. Romero, the first witness, was first named as a potential witness on February 28, which was ten days after trial started.  Notice for him was not —— formal final notice was not provided until March 1, which was last Friday, the same day that the government —— sorry, the day before the government rested in its case, and expert notice for Mr. Espinoza was provided on the same date.

As we've outlined in our letter to your Honor, cases —— courts have found that when such belated notice has been given, it is not fair to the government for the government to prepare in response to those experts.  So that's the first point.

Even if those notices had been provided in a timely fashion, the government still believes that the Court should preclude their testimony.

With respect to Mr. Romero, his proposed testimony should be precluded under Rule 702 and 703 because it's not proper expert testimony. The defendant has described several things about which he would testify which are based on his own personal experience, it appears, and therefore, it is not his expert testimony —— there's no expert opinion embedded in any of his assertions. He is not relying on any kind of underlying facts or data as the defendant has described or any kind of scientific methodology as required under the Rules of Evidence. To the extent that he is relying on things that he has heard from others, such as, for example, his proposed testimony that international leaders recognize Juan Orlando Hernandez's victory in the presidential elections, that is just plainly inadmissible hearsay.

The second reason for which the Court should preclude his proffered testimony on the merits is that he's failed —— the defendant has failed to explain the relevance of this testimony. There has been very limited evidence that the government has put in this case about the presidential —— any potential fraud associated with the potential presidential elections in 2013 and 2017. As your Honor will recall, there was one witness, Alex Ardón, who testified that he used drug

trafficking money to bribe certain individuals in a particular municipality. There's no basis for Mr. Romero to testify more generally and categorically about election processes and security measures nationally.

With respect to Mr. Espinoza's testimony, as the government outlined, the government submits that the disclosure doesn't satisfy the Rules of Evidence because it does not give sufficient specificity and merely states that he would testify about the purpose, interpretation, and application of certain statutes. It doesn't describe in the notice what specifically he would say about those statutes, and the notice does not describe how he would be qualified to render an opinion on those statutes given that he is a lawyer in Honduras.

THE COURT: All right. Mr. Stabile.

MR. STABILE: Thank you, your Honor.

So, of course, it is not my normal practice to provide expert notice as late as I did, but I think, as the Court is well aware, and I don't want to beat a dead horse, I've been in this case for five weeks.

THE COURT: Well, you're not standing up to argue the circumstances that are relevant to Mr. Stabile as opposed to anybody else, so that's really not a relevant consideration here, is it?

MR. STABILE: Well, your Honor, I'm just explaining myself to the Court that ——

THE COURT:  Well, I'm not accusing you of any wrongdoing, and I don't think the government has accused you of affirmative wrongdoing in this instance.  They argue that, under Rule 16, the notice is late.

MR. STABILE:  OK.

THE COURT:  And you will recall that in my order of December 16, I noted that you had made an application on November 15 for a continuance, and in denying that application, I noted — and your stated reason was so you could identify experts.  I noted, in particular, the obligations under 6(a)(1)(G)(iii) and 2, and the fact that the defendant's disclosure must be sufficiently before trial to provide a fair opportunity for the government to meet the defendant's evidence, and it is for the Court to decide whether to order a continuance or to prohibit the party from introducing in evidence the material not disclosed or make whatever other order it deems just under the circumstances.

Now, that was my order of February 16.  Go ahead.

MR. STABILE:  Yes, your Honor.  So, in addition, the government during this trial has elicited quite substantial evidence of election fraud.  It was not just through Mr. Ardon.  It was also through their very first witness, José Sánchez.  And the first example of that is in the trial transcript page 117, lines 2 to 14, and Mr. Sánchez is asked:
"Q.  What topic were the defendant and Fuad Jarufe discussing?

O34HHer4

"A.   The results of the election.

"Q.   What, if anything, did Fuad Jarufe say?

"A.   In his vulgar way of speaking that he had, he said —— excuse my language —— 'Fuck Juan Orlando.  I didn't really think that shit was going to happen.'

"Q.   What did you understand was going to happen?

"A.   That Mr. Juan Orlando Hernandez would win.

"Q.   Did the defendant respond?

"A.   Yes.

"Q.   What did he say?

"A.   Mr. Juan Orlando said:  'Just so you can see, Mr. Fuad, when there's a will, there's a way.'"

Obviously, the implication is that he did something to steal the election or that there was some sort of election fraud.

The next example under José Sánchez is on page 159 of the trial transcript, line 7 to 14, and he's asked:

"Q.   You were present during the course of election fraud in 2014?

"A.   I was involved in polling people on the streets to see what they were saying about him.  He himself would ask me what people were saying when I would get back to the office.

"Q.   But, again, you have no documentation to prove that there was electoral fraud during the 2014 presidential campaign?

"A.   No, I have no evidence, but the fraud did take place."

Then he's asked on page 159, lines 20 to 23:

"Q.  Do you have, once again, any documentation, physical proof, of electoral fraud that you just testified that you believe occurred?

"A.  No."

Then we go to Alex Ardón, which the government referenced, and I can go through the citations, but I think —— I think we all remember that Alex Ardón gave quite extensive testimony.

THE COURT:  Go ahead.  No, go ahead.  What's the testimony?

MR. STABILE:  OK.  So Alex Ardón, starting on page 204, lines 20 to 25, through page 205, lines 1 to 19. Question to Mr. Alex Ardón:

"Q.  You mentioned that you entered politics in approximately 2006.  Did you first run for mayor in 2005?

"A.  Yes.  The first round of elections are in —— is in 2005.

"Q.  Did you win that first election for mayor?

"A.  Yes.

"Q.  How did you win that election?

"A.  Fraud.

"Q.  How did you use fraud to win the election?

"A.  Bribing persons.

"Q.  Which people did you bribe?

"A.  I bribed voters so that they could vote for me and also

O34HHer4

the persons working at the table.

"Q.   When you say the people working at the table, what do you mean by the 'table'?

"A.   These are the people that receive the votes.  As people come in to vote, they receive them and assist them in being deposited in the ballot boxes.

"Q.   Why did you pay the people who work at the table to bribe them?

"A.   Because they would take the ballot forms that were —— that remained.  They would fill them out.  They would deposit them in the ballot boxes in my favor so that I would win.

"Q.   When you say 'the ballots that remained,' do you mean the ones that weren't filled out?

"A.   Yes."

Then Alex Ardón on page 207, lines ——

THE COURT:  One second, please.

Now, your point with Mr. Sánchez was that the government brought this out?

MR. STABILE:  The government initially brought it out and then there were follow-up questions on cross.

THE COURT:  What was the part that —— so how do I know what —— if your point is the government opened some door here, how do I know what's the government's and what's you?

MR. STABILE:  Oh, well, I can clarify that, your Honor.

O34HHer4

THE COURT:  Well, I mean, I'm not understanding it from the way you're presenting it.

MR. STABILE:  Well, but, your Honor, it's not just —— just the testimony.  The indictment is filled with allegations of election fraud.  I won't read it all, but paragraph 2, paragraph 3, paragraph 4(c), paragraph 4(d), paragraph 5(i), paragraph 5(l) in the indictment all have references to this defendant.

THE COURT:  All right.  So let me ask the government, what's the relevancy point?  There's a timeliness point and there's a competency point.  I'm not asking about that, so confine your answer to the relevancy point.

MS. TARLOW:  Yes, your Honor.  Well, with respect to the testimony that has been elicited, I think defense counsel discussed testimony from Alex Ardón about ——

THE COURT:  No, no.

MS. TARLOW:  Sorry.

THE COURT:  Mr. Stabile just mentioned the indictment.

MS. TARLOW:  I'm sorry, your Honor.

THE COURT:  Why don't you start with the indictment.

MS. TARLOW:  Yes, your Honor.  The indictment, of course, is not evidence.

THE COURT:  Pardon me?

MS. TARLOW:  The indictment, of course, is not evidence.  The government does not expect to send back the

allegations that defense counsel just described to the jury.

THE COURT:  Why?  Because of this motion, or what?  Is there something else you're not going to send back to the jury in the indictment?  Let me know now.

MS. TARLOW:  Your Honor, I believe the indictment that defense counsel's referring to is a speaking indictment that describes in detail allegations as opposed to a version of the indictment that merely has statutory allegations.

THE COURT:  Forgive me.  Is there more than one indictment of this defendant?

MS. TARLOW:  No, your Honor, there is not.

THE COURT:  So there is no speaking indictment and indictment with statutory allegations.  Can we agree that there are no two indictments?

MS. TARLOW:  Correct, your Honor.

THE COURT:  OK.  So I don't know what you're talking about.

MS. TARLOW:  Understand.  The government intended to propose, and we have not previously proposed for your Honor, providing a trial indictment which would merely state the statutory allegations as opposed to describing more general speaking allegations regarding the defendant's conduct.

THE COURT:  When did you decide this?

MS. TARLOW:  Your Honor, we have not provided it to your Honor, and so I'm informing your Honor now that that is

O34HHer4

what the government intends to do and, therefore, in response to defense counsel's argument.

THE COURT:  Has the elevator lobby cleared?

A VOICE:  Yes.

THE COURT:  Sir, you may leave.

(Witness excused)

MS. TARLOW:  Your Honor ——

THE COURT:  Yes.

MS. TARLOW:  —— I believe the government provided a letter that said we would provide a version of the indictment which redacted the speaking portions of that indictment.

THE COURT:  You believe what?

MS. TARLOW:  The government provided a letter, I believe, last night that ——

THE COURT:  To whom?

MS. TARLOW:  To your Honor.

THE COURT:  I see.

MS. TARLOW:  But we are now raising it again, only in response to defense counsel's point regarding the indictment.

With respect to the additional points raised by defense counsel, if I may respond to those.

THE COURT:  I didn't let him finish.  Maybe I should let Mr. Stabile finish, then.

Go ahead.

MR. STABILE:  I'm sorry.  I lost track.

O34HHer4

THE COURT:  You were doing Mr. Ardón.

MR. STABILE:  Oh, yes, Mr. Ardón.  Oh, yes.

THE COURT:  You made the point about the people at the table as well as bribing voters.  Go ahead, next point.

MR. STABILE:  Mr. Ardón goes on to say, and this is the transcript page 207, lines 5 to 8, he's asked questions: "Earlier you described" ——

THE COURT:  By whom?  By whom?

MR. STABILE:  I don't have it written, but I do believe this is direct.

THE COURT:  OK.  Go ahead.

MR. STABILE:  I believe it is, your Honor.
"Q.  Earlier you described fraud that you committed to help win the election in 2005.  Did you use that same fraud to help Pepe Lobo win?
"A.  Yes."

Then he's asked on page 226, lines 19 to 25, spilling over to page 227, lines 1 to 3:
"Q.  How did you respond to Juan Orlando Hernandez when he asked you to secure the votes of those congresspersons?
"A.  I told Juan Orlando that, OK, that I was going to call the congresspersons to have them vote for him at Congress.
"Q.  Why did you believe that these congresspeople would listen to you?
"A.  I had already helped them.  I had bribed them, and I had

O34HHer4

financed a portion of their campaign.  I had provided them with political assistance in the department of in El Paraiso, Copán, for them to secure their seats in Congress."

Then on page 267, line 24 to 25, going over to page 268, lines 1 to 22:

"Q.  And shortly before the election, did you meet with the mayors of Copán?

"A.  Yes.

"Q.  Where'd you meet?

"A.  In El Paraiso, Copán.

"Q.  Where in El Paraiso?

"A.  At town hall.

"Q.  And who was with you with the mayors of Copán?

"A.  Hugo, my brother.

"Q.  What did you discuss with the mayors?

"A.  I spoke with the mayors to —— I asked the mayors —— I gave them money to bribe people to vote for Juan Orlando Hernandez.

"Q.  When you say you gave them money, what type of money did you give them?

"A.  I gave them lempiras, money in lempiras.

"Q.  Was it cash?

"A.  Yes.

"Q.  Did you the defendant win the election for president in 2013?

"A.  Yes.

O34HHer4

"Q.   What, if any, funds did you commit to help Juan Orlando Hernandez win the election?

"A.   I gave money to the mayors for them to bribe people, and I bribed people in El Paraiso for them to vote for Juan Orlando Hernandez."

That's all I have on that point in the record.

MS. TARLOW:   Thank you, your Honor.

With respect to the portions of Alexander Ardón's testimony, defense counsel quoted about providing bribes to individuals who ran tables at elections.  That was with respect to Alexander Ardón's own election in 2005.  It did not have anything to do with the defendant's presidential elections about which defense counsel proposes the expert would testify.

With respect to the additional portions of Mr. Ardón's testimony, he testified about bribes that he would give to voters to try and influence their votes.  That is not what this expert would be testifying about.  The expert is proposed to be testifying about security measures with respect to the tabulation of the votes, not with respect to campaign financing.  And therefore, it's simply not relevant and has no bearing on the issues at this trial of whether or not the defendant conspired to import narcotics into the United States and used firearms in connection with that charge, and it's merely a sideshow.

MR. STABILE:   Your Honor, this is certainly not about

campaign financing.  This is about what happens at the actual election tables.  And Mr. Ardón is saying that he is going up to the election tables, bribing people that work at the tables, bribing voters, and right now ——

THE COURT:  No, no, no.  This is a very important point because I read the disclosure carefully myself, and my recollection of the testimony was in relation to bribing mayors, bribing fellow congressmen, bribing voters, and I don't see where the testimony of this witness would exclude the possibility or speak to the possibility of bribing voters, bribing members of the National Congress, bribing mayors.  I don't see that here in the disclosure.

Now, with regard to the people working at the tables, the government proffers that this related to the 2005 election of Ardón as mayor.  Are they wrong?

MR. STABILE:  In the testimony where he specifically mentions bribing people that worked at the tables, it appears that he is referencing his 2005 election.  But, your Honor, the testimony didn't come in quite so clear, and there's certainly an inference that he was doing things, bribing people, on behalf of Juan Orlando Hernandez.  So I think that's a very thin line.  But also ——

THE COURT:  No.  But, specifically, I'm making a point, and it's based on what the government has said.  There is the one reference to tables.  Everything else that has been

referred to is, I would assume, unlawful and improper and maybe even criminal conduct. I'm not arguing with that, and that is, bribing a voter, bribing a mayor to bribe voters, bribing national congressmen to vote for somebody.

But this witness is talking about other things, like how citizens fill out ballots by hand, sign their ballots, deposit them in corresponding ballot boxes, and then sign a voting notebook where a citizen's name and identification photograph appears. Now, I don't mean to imply that that's all he says, but I don't see where his testimony speaks to the possibility that someone, before they come to the polls, has been bribed.

Now, it may be very difficult to detect bribery. I'm not faulting the expert, that the expert has done something wrong because he can't speak to bribery. But that's a different species of election fraud than allowing an unregistered voter, if we're talking about this country at least, an unregistered voter to vote or a person to vote twice or to vote without signing the requisite documents. All of those things — blank votes, null votes, irregular or unintelligible marks, etc., etc. — that's not what this case and the testimony in this case has been about.

MR. STABILE: Well, your Honor, I think there's, respectfully, an assumption that's being made that the people are somehow being bribed before the election as opposed to as

they're walking up to the ballot box.  It's unclear exactly where this ——

THE COURT:  OK.

MR. STABILE:  So for jurors to evaluate what is really going on in these elections, they have no basis to evaluate whether that's likely possible.  And there's also the testimony again from José Sánchez which was on direct in which he's saying Mr. Juan Orlando said, "Just so you can see, Mr. Fuad, where there's a will, there's a way," when they're talking about the election, implying that he's engaging in fraud.  And then they've heard all this testimony about the ways you can commit fraud in Honduran elections, and they have no facts, they have no basis, they have no knowledge on which to evaluate that.

So that's why we want to call an election expert to explain to them the election process.  I understand there may be portions, such as the recognition of his election by other countries, there may be portions that your Honor would strike.  But in terms of just basically explaining what happens at a polling station in Honduras, how did the elections work, what do people have to do —— in the United States we all know, you know, you walk in, you sign your name, you're handed —— everybody knows the process.  But the folks here don't know what the process is in Honduras, and we're just asking for an expert to explain that to them.

O34HHer4

THE COURT:  All right.  You have something you wanted to add?

MR. STABILE:  Yeah.  Yes, sir.  If your Honor is inclined to deny calling Mr. Romero, could we at least have a *Daubert* hearing on it at some point tomorrow?

THE COURT:  Thank you for that request.

What would —— I don't understand where the *Daubert* rule has anything whatsoever to do with the objection asserted by the government.  Maybe you could explain this to me.

MR. STABILE:  The purpose of holding a hearing is so that your Honor could evaluate what this witness was going to say and perhaps narrow the scope of what expertise he would offer to the jury.

THE COURT:  I don't really think that's the application of *Daubert* principles, but maybe I'm wrong. Listen, I'm all ears.  I'm happy to listen to any argument you wish to make.  You've, I think, done a good job of making your arguments.  If there's something you want to add, I'm happy to hear you on it.  If not, I'll hear from the government.

MR. STABILE:  No, I don't have anything to add.

THE COURT:  OK.

MS. TARLOW:  Your Honor, with respect to defense counsel's argument that this testimony is relevant concerning the bribes, there was no testimony from the witnesses by the government about when the bribes occurred that they would be

outside of the election polls, that they'd be in the vicinity of any security measures, and so it's pure speculation that the expert's testimony would bear on any issue that has been testified about, let alone the actual elements of the crime at issue in this case.

THE COURT:  Thank you.

MR. STABILE:  Well, I just —— I agree, there's been no testimony any way.  Nobody knows where these bribes occurred.  Nobody knows how they occurred.  Nobody knows really anything other than bribes were paid to rig an election.

THE COURT:  Thank you.

All right.  So let me give you my ruling with regard to Mr. Romero.  I want to find out if the government has anything else to say before I rule.

MS. TARLOW:  No, your Honor.

THE COURT:  I want to find out if the defendant has anything else to say before I rule.

MR. STABILE:  No, your Honor.  Thank you.

THE COURT:  OK.  All right.  So I've considered the expert disclosure of Carlos Romero, which was received at some point, I think, yesterday, was it?  Yesterday.  And I already indicated in my order of February 16 that there is a timeliness requirement under Rule 16, and where there isn't a time limit set, the disclosure must be sufficiently before trial to provide a fair opportunity for the government to meet the

O34HHer4

defense.

So I conclude that the disclosure is untimely.  The witness would be taking the stand tomorrow, and the government would be expected to cross-examine the witness.  But in this particular instance, the timeliness is not determinative because, having presided over this trial and what I heard, even before I heard argument today, was instances of bribery, bribery of mayors, bribery of voters, bribery of members of the National Congress, political favors, and the like.  And I do not find that —— in fact, I find that the testimony of the expert is principally, if not exclusively, devoted to matters other than bribery of voters.  To say that when there's testimony that voters are bribed and mayors are bribed, that does not exclude the possibility that the act of bribery took place in a voting center in the presence of voting officials is a little bit absurd.  It's the equivalent of saying you did not exclude that it was done on national television.  You did not exclude that it was done in the public square in the presence of many witnesses.  That's true, but the testimony does not support the proposition that this was an irregularity that took place in a voting center except for the one instance that appeared to relate, from the context of the testimony, to Mr. Ardón's 2005 election.

So if and to the extent the testimony of Carlos Romero has any probative value here, it's substantially outweighed by

the danger of jury confusion and waste of time, so it's excluded.

I will hear with regard to Mr. Espinoza. Let me hear the government's objection.

MS. TARLOW: Thank you, your Honor.

As we stated, we believe that Espinoza's notice was not sufficient. It merely states that Mr. Espinoza would testify about the purpose, interpretation, application of 21 different laws, but it doesn't describe at all what Mr. Espinoza would testify regarding the purpose, interpretation, application of those laws.

It further —— the notice also does not explain how Mr. Espinoza would be qualified. I believe it states that he was a lawyer and he ran his own —— he was the founder of a law firm in Tegucigalpa in Honduras. It does not describe that he has any role in the Honduran legislature or otherwise has any relevant experience that would qualify him as an expert to testify about the purpose, interpretation, or application of those laws. It would be the equivalent, as we stated in our letter, of allowing an American prosecutor, defense attorney to testify as an expert regarding Title 18 statutes, which is plainly not permissible for them to do as an expert witness.

THE COURT: Let me hear Mr. Stabile.

MR. STABILE: Well, your Honor, the difference is if it were Title 18, the Court would be responsible for

O34HHer4

instructing the jury on what the law is, and of course, we would not call an American lawyer to explain the law to the jury. These are foreign laws that are beyond, respectfully, the purview of the Court. They're Honduran laws.

This man is a lawyer. I won't go through his credentials. It's in our disclosure. And the government's entire thesis of the case is that Mr. Hernandez was running a "narco-state" and that all of the laws that he passed and all of the measures were just a front and a facade and misdirection because he was really protecting drug traffickers. And the jury should be able to hear all of the laws that this expert will just go through. He's not going to go into great detail, but he's going to explain what laws were passed while Mr. Juan Orlando Hernandez was the president of Congress, was the president of Honduras. And this is such a unique case that the defendant on trial is physically the person who signs each of these laws.

THE COURT: Let me ask you whether you have English translations of the statutes.

MR. STABILE: So I'm not sure is the answer. I know — I certainly have the Spanish versions, but it's not that I would be seeking to introduce the laws themselves into evidence. I would be asking this witness about certain laws. I would ask him: Are you familiar, for example, with decree 26-2010? And I expect that he would say yes, and I would then

O34HHer4

say:  Can you tell us what that is and when it was passed?  And he would briefly summarize what that law was and when it was passed, and the jury would see —— and I would also ask him to explain, how does a bill become a law —— we know that in the United States, but jurors might not know it in Honduras —— and who is responsible for signing that, and does Mr. Hernandez have veto power, what is that process, and did he sign these laws.  Yes, the fact that they're laws means that he signed them.  So that would be the testimony.

THE COURT:  Yes.  Do you want to find out if there are English translations, or do you know the answer?

MR. STABILE:  If you permit me to text someone, I could text ——

(Counsel confer)

MR. STABILE:  Well, we could ask the expert, but I was going to suggest I could text my paralegal and ask.  That may be the fastest way.

THE COURT:  Well, if you want to ——

MR. STABILE:  I just don't know.

THE COURT:  I don't care who you ask.  Find out if there are English translations.

MR. STABILE:  OK.  Could we have a moment, please?

THE COURT:  Yes.

Ms. Tarlow, can you point me to the letter that discusses the trial indictment?  What letter is that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MR. ROBLES:  Your Honor, I'll look up the docket.  It was filed last night around 10 p.m. or so.  It was the letter with the proposed changes to the Court's jury instructions.  I believe the first paragraph of the letter, last sentence, made a reference to it.

THE COURT:  I see.

MR. STABILE:  While we await Ms. Shroff, your Honor, I have checked with my paralegal.  I am told we do not have English translations of the laws.  So, your Honor, the answer is no, we do not have complete translations of these.

THE COURT:  OK.  Thank you.

All right.  Anything else, Mr. Stabile, you want to add?

MR. STABILE:  The only thing I would add, and I know I have a tendency to occasionally repeat myself, but I don't think having English translations is really dispositive because, as I said, this witness, who is fluent in Spanish and can read the laws in Spanish, will testify through a translator as to what these laws are, on a general level what they say, and when they were enacted in that process.  That would be his testimony.

THE COURT:  All right.  Let me hear from the government.

MS. TARLOW:  Yes, your Honor.  With respect to some of the items that have been noticed in defense counsel's expert,

O34HHer4

Mr. Espinoza, we just lack sufficient information. For example, he states that he will testify about the process by which a bill becomes a law and the relevant political actors in enacting Honduran law. We have no idea who that refers to, what that means. And there's no basis to think that this individual, who is a lawyer and a founder of a law firm, would be an expert in the process by which a bill becomes law or who the relevant political actors were in enacting those Honduran laws.

To the extent that this purported expert is just saying that laws were passed, he is not an expert. He should not be qualified as such. And to the extent that he's just paraphrasing laws, that would be impermissible testimony. Because he cannot testify as an expert about when or why the laws could be passed, just providing portions of the laws divorced from that information makes it plainly irrelevant and have no context for it to be offered as evidence in this trial.

THE COURT:  Does the government have English translations of the statutes?

MS. TARLOW:  We do not, your Honor.

MR. STABILE:  Your Honor, just so that your Honor understands, I provided these statutes weeks ago. In fact, we were negotiating with the government to enter into a stipulation because, as you've noticed, they have not called their Honduran expert in this trial, and they wanted to enter

O34HHer4

certain information through stipulation.  And my response was, sure, but can we put —— stipulate that these are the actual laws that were enacted and the dates?  And they refused to do that.  And at that time I gave them all of the laws that I talked about in this expert notice disclosure, so they've known exactly what this was for a long time.

THE COURT:  Well, I didn't think you were in this case weeks ago.  I thought your point was you just arrived.

MR. STABILE:  Well, yes, but the stipulation that we were discussing was I think at least a week before trial started.

THE COURT:  All right.  So this is —— anything else anybody wants to say?

MS. TARLOW:  No, your Honor.

MR. STABILE:  No, your Honor, but I would renew my offer to just stipulate that these laws were enacted and that's it.

THE COURT:  I understand.  Thank you.

That sounds wonderful to me, but when you're proposing a stipulation, it would seem to me that it would be incumbent on you, not incumbent on the government, to provide the English translations.  I would not allow —— I certainly would not allow, if there were an objection, the titles of the statutes to come in.  So here is the specific problem.  There are statutes such as decree 254-2013, General Law for the

Superintendents for the Application of Trust Assessments; and 26-2010, Law on the Definitive Confiscation of Assets of Illicit Origin; 18-2017, New Organic Law for the National Police.  Now, because of the late notice, the government doesn't have the English translations.  The English translations were not provided in connection with the stipulation, and I'm just imagining how one would go about cross-examining the expert to say, well, that's just a law of general application.  It could apply to drug dealing, but it could apply to 25 other things or more, and so therefore —— or not even apply to drug trafficking.  I don't understand how one could conduct an intelligent cross-examination.

And, yes, yes, if you turned around right now and had said to me you had the English translations, and they've been provided to the government, they've had them for some period of time, the two topics of conversation would be —— how are you prejudiced would be one of them and, secondly, would be, well, maybe you can stipulate to them.  So that can't happen at this stage of the game.  I will make the point clear that I am not ruling on whether or not, for example, a witness such as the defendant, if he elects to take the stand, would be foreclosed from testifying as to this statute.  That I'm not ruling on.

But in the context of the requirement under Rule 16, and even though you were able to identify the statutes, you did not provide a translation and haven't, in that interim period

O34HHer4

from first providing this proposed stipulation which was some weeks ago, provided an English translation. So on that basis I am not going to allow the expert to testify.

What else?

MS. TARLOW: Nothing from the government, your Honor.

THE COURT: Anything else from the defense?

MR. STABILE: No. Thank you, your Honor.

THE COURT: All right. See you tomorrow morning, 10 o'clock. You have another expert and then what?

MR. STABILE: Well, I don't have any experts now.

THE COURT: No, I'm sorry, another general, the ——

MR. STABILE: I have two other fact witnesses.

THE COURT: OK.

MR. STABILE: Two other generals.

THE COURT: All right. I assume that you have been in active discussions with your client as to whether he's going to take the stand in this case?

MR. STABILE: Yes.

THE COURT: All right. So when will you be in a position to advise whether your client's going to take the stand?

MR. STABILE: I think, you know, we were awaiting the Court's rulings on our experts, and now it's a different discussion. So I think tomorrow.

THE COURT: OK. Thank you very much.

MR. STABILE:  Your Honor.  Your Honor, can I ask a housekeeping question?

THE COURT:  Yes, sure.

MR. STABILE:  If we were to finish testimony in the morning, would we be expected to sum up in the afternoon or would you give us overnight?

THE COURT:  First of all, I haven't had the discussion.  Have a seat.

How long does the government think it wants for closing arguments in this relatively short trial which is now in its tenth day, which is two weeks.

MR. GUTWILLIG:  Your Honor, in recognition of the length of the trial, the government would request two and a half hours for its summation and 45 minutes for its rebuttal summation.

THE COURT:  What?

MR. GUTWILLIG:  Understood, your Honor.  But I don't think it will take that long.

THE COURT:  Oh, oh, I should just give you four hours and 15 minutes and just trust me, Judge, I think I can do it in somewhat less.  That doesn't work, Mr. Gutwillig.

Let me hear from the defense.  What does the defense have in mind?

MR. STABILE:  Well, I had in mind whatever the government was going to ask for —— to match whatever thing the

O34HHer4

government ——

THE COURT:  No.

MR. STABILE:  Two hours.

MS. SHROFF:  Your Honor, may I just remind the Court we do need a jury charge conference.

THE COURT:  Yeah, I have the letters.

MS. SHROFF:  Thank you.

THE COURT:  All right.  We'll talk about the letters and we'll try and get you even a redraft based on the letters, and then we can talk about what also needs to be discussed.

But to put it this way —— well, first of all, it seems to me that in this case, which is not a big document case, it's only a testimony case, that it's reasonable to give the government an hour and 45 minutes for its initial closing argument, the defense an hour and 45 minutes, and the government 30 minutes for rebuttal.  And then I can get my charge in and the jury can get the case, and we can do this all on Wednesday, assuming that the defense rests tomorrow.

MR. STABILE:  Can I please have two hours since they get a rebuttal?  Can I please have two hours?

THE COURT:  Well, then can they please have two hours and 15 minutes?

MR. STABILE:  No, they already have more time.

THE COURT:  No, this is hondeling with the judge. When you turn around they're going to want to hondel.  I

O34HHer4

understand.  You both, like two prize fighters hugging for a break in the middle of the ring, you'd both be happy to have three hours a side and, your Honor, we'll try and do better. Maybe we can do it in less than that.

So it seems to me that the time periods I've indicated are reasonable, and if somebody wants to make a pitch that they're not reasonable, I'll hear the pitch, but not just unspecified and vague pleas of can I have more.

MR. STABILE:  My only pitch is that there is a lot of cooperator testimony to walk through.

THE COURT:  Sure.

MR. STABILE:  And, of course, I'll walk through contradictions and all kinds of things, but —— so that's why I would ask for two hours specifically.

THE COURT:  Well, I am trying to manage the jury's time, and I think that time limits that I've set are reasonable, and they will require each side to be efficient in their presentations.  So that's where I am.

Have a good evening.  See you tomorrow.

(Adjourned to March 5, 2024, at 9:40 a.m.)

INDEX OF EXAMINATION

Examination  of:                                    Page

 GIOVANI RODRIGUEZ

Cross By Mr. Stabile . . . . . . . . . . . . .1238

Redirect By Mr. Robles . . . . . . . . . . . 1274?

JOHN MILLER

Direct By Mr. Robles . . . . . . . . . . . . .1286

 TULIO ARMANDO ROMERO PALACIOS

Direct By Mr. Stabile . . . . . . . . . . . .1329

Cross By Mr. Wirshba . . . . . . . . . . . . .1354

Redirect By Mr. Stabile . . . . . . . . . . .1395

GOVERNMENT EXHIBITS

Exhibit No.                                      Received

 600 and 612   . . . . . . . . . . . . . . . .1293

 201-R65, 202-R69, 202-R74,  . . . . . . . . .1297

        and 202-R79

 606-P and 204-R103 . . . . . . . . . . . . .1304

 608-P  . . . . . . . . . . . . . . . . . . .1308

 204-R108   . . . . . . . . . . . . . . . . .1321

 366   . . . . . . . . . . . . . . . . . . . .1374

 202-R2-1   . . . . . . . . . . . . . . . . .1390

DEFENDANT EXHIBITS

Exhibit No.                                      Received

 3512-30   . . . . . . . . . . . . . . . . . .1269

 209   . . . . . . . . . . . . . . . . . . . .1339

217      . . . . . . . . . . . . . . . . . .1345