O313HER1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                    v.                    15 Cr. 379 (PKC)

JUAN ORLANDO HERNANDEZ,

                                          Trial
              Defendant.

------------------------------x

                                          New York, N.Y.
                                          March 1, 2024
                                          10:00 a.m.


Before:

                    HON. P. KEVIN CASTEL,

                                          District Judge

                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  KYLE A. WIRSHBA
     JACOB GUTWILLIG
     ELINOR TARLOW
     DAVID ROBLES
     Assistant United States Attorneys

RENATO CHRISTIAN STABILE
RAYMOND L. COLON
SABRINA P. SHROFF
     Attorneys for Defendant

ALSO PRESENT:

                    Dagoberto Orrantia, Interpreter (Spanish)
                    Sonia Berah, Interpreter (Spanish)
                    Mercedes Avalos, Interpreter (Spanish)
                    Evan Frierson, Interpreter (Spanish)
                    Matthew Passmore, DEA Special Agent

O313HER1

(Trial resumed; jury not present)

THE COURT:  Good morning.  We had a conversation on the record while I think Mr. Rivera was on the stand, and the indication was that the government had two cooperators, at least as of that point in time, two cooperators and five -- three cooperators and five non-cooperators.  Three cooperators and seven non-cooperator witnesses.

Mr. Lobo would be one of the cooperating witnesses, leaving two cooperator witnesses left.  And yesterday we had two non-cooperator witnesses, leaving five non-cooperator witnesses left in the government's case, subject to any last-minute determinations not yet made on people to call, etc.

So am I right?  Also, Mr. Lobo is the tenth witness in this case by my calculation.

MR. GUTWILLIG:  Yes, your Honor.  So I think where we are now is that the government expects potentially one to two additional cooperators, and one to two additional non-cooperating witnesses, and that the government could rest as early as Monday.

THE COURT:  All right.

MR. GUTWILLIG:  Apologies.

THE COURT:  The non-cooperator witnesses, the direct testimony is what, 45 minutes, an hour in length?

MR. GUTWILLIG:  Something around that, your Honor.

THE COURT:  All right.

O313HER1

MR. GUTWILLIG:  When I say Monday, your Honor, I mean potentially by the end of the day Monday, depending on the length of cross.

THE COURT:  All right.  Thank you.  We can bring our witness in and we can bring our jurors in, please.

THE INTERPRETER:  Your Honor, may the interpreter give the witness an instruction about the equipment?

THE COURT:  Yes.

THE INTERPRETER:  Thank you.

(Jury present)

THE COURT:  Please be seated.

Good morning, ladies and gentlemen.  I've promised you an update.

If you remember, we started with jury selection on Tuesday, February 20, and then we had opening statements on the 21st of February, and then our first witness.

The witness who is presently on the stand, by my calculation, is the tenth witness in this trial.  And I'm advised that after this witness completes his testimony, the government anticipates that it will have one or two additional cooperator witnesses, and one or two additional non-cooperator witnesses, and as to the non-cooperator witnesses, they indicated that the direct testimony would be something in the neighborhood of 45 minutes to an hour.

Now, I received an estimate of when the government

felt it might be resting its case. And it was optimistic, and I don't know that it's going to be quite this way, they thought it could be as early as the end of the day on Monday. We shall see about that.

I've told you already that in a criminal trial, a defendant has no burden of proof, has no obligation to call witnesses. The burden rests entirely on the government, not on the defendant.

I do not know and will not inquire at this stage as to whether or not the defendant wishes to put on a case of any sort. I for my part have furnished the parties with my proposed final instructions on the law, so that we don't have later delays in trying to sort such things out.

This case is important to the defendant. This case is important to the government. And I, as the judge, and you, as the jury, are going to see this case through to completion, because it's also important to the American judicial system that we see it through to completion. And my job, as I said the first day we met, is to do my very best in having that done efficiently and also fairly. That's what I'm trying to do and will continue to do the best I know how.

And I know you are doing the best you know how, because I see you paying attention to the evidence, taking notes, being here early, so I know you understand.

But I wanted to let you know this, because I promised

I would.  That's the best information I have.

Mr. Lobo, the Court reminds you that you are still under oath.

 FABIO LOBO,

called as a witness by the Government,

having been previously sworn, testified with the aid of an

interpreter as follows:

DIRECT EXAMINATION (Continued)

BY MR. ROBLES:

Q.  Good morning, Mr. Lobo.

A.  Good morning.

Q.  Mr. Lobo, you testified yesterday that you helped the
Cachiros obtain government contracts for their drug
trafficking.

Did you help the Cachiros' drug trafficking in any
other ways?

A.  Yes, in their drug trafficking operations.

Q.  What did you do specifically to help the Cachiros' drug
trafficking operation?

A.  I was helping them by providing them with all the
information they needed for their drug trafficking.

Q.  What type of information?

A.  Intelligence information.

Q.  Who were you receiving that intelligence information from?

A.  I was receiving it from Colonel Mario Amaya and Roberto

O313HER1                           Lobo - Direct

Pacheco Tinoco.

Q.   Who is Roberto Pacheco Tinoco?

A.   Chief of intelligence in Honduras.

Q.   Aside from providing information to the Cachiros, did you help them in any other ways in their drug trafficking?

A.   Yes, sir.

Q.   What did you do?

A.   I was transporting the drugs with my people, sir.

Q.   When you say "your people," who are you referring to?

A.   The security detail that was assigned to me personally.

Q.   Why did you have security detail assigned to you?

A.   Because I was the son of a president.

Q.   What was your security detail compromised of?

A.   My security detail compromised of police officers and military personnel.

Q.   Did you personally help transport some of those drugs with your security detail?

A.   Yes, sir.

Q.   Were you and your security detail armed when you transported these drugs for the Cachiros?

A.   Yes.

Q.   With what types of firearms?

A.   Long and short guns.

Q.   When you say long guns, what are you referring to?

A.   M16s.

Q.  When you say short guns, what are you referring to?

A.  9 millimeters.

Q.  Mr. Lobo what was your understanding of where those drugs were going, ultimately?

A.  The United States of North America.

Q.  When you started working with the Cachiros during your father's presidency, did you have any conversations with members of the Cachiros about who, if anyone, they were working with to traffic drugs?

A.  Yes.

Q.  What did you learn?

A.  That they were working with the Valles and Mr. Tony Hernandez.

Q.  What specifically did they say about Tony Hernandez?

A.  The Cachiros told me that Tony Hernandez was the face of the operation, and that his brother, Juan Orlando Hernandez Alvarado, was backing him up in the shadows.

Q.  At the time you learned this position, what political position, if any, did the defendant have?

A.  He was the president of the national congress of Honduras.

Q.  Mr. Lobo, were you ever arrested in connection with your drug trafficking with the Cachiros?

A.  Yes.

Q.  Where did that arrest take place?

A.  In Haiti.

O313HER1                    Lobo - Direct

Q.   Approximately when did that arrest take place?

A.   May 2015.

Q.   Why did you go to Haiti?

A.   To pick up a payment.

Q.   Was that a payment related to drug trafficking?

A.   Yes.

Q.   Who, if anyone, told you to go to Haiti?

A.   Mr. Devis Leonel Rivera Maradiaga.

Q.   After you were arrested in Haiti, were you brought to the United States?

A.   Yes.

Q.   Did you plead guilty in the United States?

A.   Yes.

Q.   What crime did you plead guilty to?

A.   Drug trafficking.

Q.   After you pled guilty, did you attempt to minimize your role in drug trafficking to the judge that was going to be sentencing you?

A.   Yes.

Q.   Approximately when were you sentenced?

A.   Approximately in 2017.

Q.   Mr. Lobo, at your sentencing proceeding, did you talk about your father in front of the judge?

A.   Yes.

Q.   What did you say?

A.   That he had no involvement whatsoever in my personal affairs.

Q.   Was that true?

A.   No.

Q.   Why did you say it?

A.   So that I would not implicate my father in my personal affairs, because it is hard to talk about your father.

Q.   Mr. Lobo, how much time did you receive at your sentencing?

A.   24 years.

Q.   Are you currently serving that sentence?

A.   Yes.

Q.   I want to focus now on your relationship with the defendant.

     You testified earlier you met in approximately 2002. Can you describe how you met?

A.   At the time, he was starting out as a congressman for the department of Lempira.

Q.   Just to backtrack for a moment about your sentencing again. When you said you didn't want to have your father involved in your personal affairs, were you referring to drug trafficking?

A.   Yes, sir.

Q.   You said you met the defendant when he was a congressman. Was your father involved in politics at the time you met the defendant?

A.   Yes, sir.

Q.   When you met the defendant, what political position did your father have?

A.   At the time he was president of the national congress.

Q.   Based on your observations, what was the relationship like between your father Pepe Lobo and the defendant?

A.   The relationship between my father and Juan Orlando Hernandez was a normal one, just like that among other congressmen in the national congress.

Q.   Were they members of the same political party?

A.   Yes.

Q.   What party was that?

A.   The National Party of Honduras.

Q.   Did your father and the defendant also have a personal relationship?

A.   It was a normal relationship, just like the relationship that exists between congressmen at the national congress.  The only difference was that at the time, he was the secretary of congress.

        MR. ROBLES:  Ms. Collins, can you please pull up for the witness, the Court, and the parties what's marked as Government Exhibit 362.

Q.   Mr. Lobo, do you recognize what's on the screen?

A.   Yes, sir.

Q.   What's on the screen?

A.   To my left, with the blue shirt, is Mr. Juan Orlando

Hernandez.  And to the right is my father wearing a white T-shirt.  No, I'm sorry, he is wearing a white shirt.

Q.  Is that a true and accurate photo of your father and the defendant?

A.  Yes, sir.

MR. ROBLES:  The government offers Government Exhibit 362.

MR. COLON:  No objection.

THE COURT:  Received.

(Government's Exhibit 362 received in evidence)

Q.  Mr. Lobo, can you tell where this photo was taken?

A.  Yes, sir.

Q.  Where is that?

A.  It's at the Casa Presidencial.

MR. ROBLES:  Thank you, Ms. Collins.  You can take that down.

Q.  Mr. Lobo, after you met the defendant, how often did you speak to him?

A.  Very often.

Q.  Where would these conversations take place?

A.  In the national congress, at my house, or on political campaigns.

Q.  Prior to approximately 2009, what were the types of things you spoke to the defendant about?

A.  We spoke about political subjects and personal subjects.

Q.  How, if at all, did your relationship with the defendant develop over time?

A.  With the passage of time, Mr. Juan Orlando Hernandez and I developed a good relationship.

Q.  What do you mean by a good relationship?

A.  That I would ask him for personal favors as well as political ones.

Q.  What were the types of personal favors you asked the defendant for?

A.  One personal favor that I remember very well was that I asked Mr. Juan Orlando Hernandez at an event at the Honduras Maya Hotel, I said I wanted to be the chief of staff of CODEFOR, a government institution of Honduras that is in charge of the forests.

Q.  Did the defendant agree to try to help you get that position?

A.  Yes.

Q.  Did you ultimately receive that position?

A.  No, I ultimately did not receive it.

Q.  Mr. Lobo, over time, is it fair to say you began to confide in the defendant?

A.  Yes.

Q.  Based on your conversations with the defendant, did you believe that he confided in you?

        MR. COLON:  Objection.

THE COURT: I'll allow it.

A. Yes. Because over the course of time, as I said, we developed a good relationship.

Q. Mr. Lobo, prior to approximately 2009, did you ever speak with the defendant about any political aspirations he had, if any?

A. Yes, that's right.

Q. What do you recall about that conversation?

A. At an event we had, he told me, at a national party event, a celebration we were having, at an event we had, a celebration of the national party of Honduras, he told me he wanted to be president of Honduras. That he said Leader Lobo, I want to be president for two terms.

Q. Mr. Lobo, you used the name Leader Lobo. What does "leader" mean?

A. Normally within our party or within other parties, we refer to each other as leader. It's a name that's used within political parties, the word leader.

THE COURT: Sir, you can get a little bit closer to the microphone there. Thank you.

Q. Mr. Lobo, you testified earlier that the first time you spoke to the defendant about anything to do with drug trafficking was in approximately 2009.

Where did that conversation take place?

A. That's correct, it was in 2009. At a restaurant in the

capital Tegucigalpa.

Q. What was the name of that restaurant?

A. El Patio Restaurant.

Q. Who, if anyone, told you to go to that restaurant?

A. Mr. Juan invited me to have dinner at that time.

Q. When you say Mr. Juan, what are you referring to?

A. Juan Orlando Hernandez Alvarado.

Q. When you got to the restaurant, who, if anyone, did you see there?

A. Upon arrival to the restaurant, I encountered Juan Orlando Hernandez Alvarado, his brother Tony Hernandez, and there was another person there.

MR. ROBLES: Ms. Collins, can you please publish for the Court, the jury, and the witness Government Exhibit 115.

Q. Mr. Lobo, do you recognize the person on the screen?

A. Yes.

Q. Who is that?

A. Tony Hernandez.

Q. What relation, if any, does Tony Hernandez have to the defendant?

MR. COLON: Objection.

THE COURT: Overruled.

A. Tony Hernandez is Juan Orlando Hernandez Alvarado's brother.

MR. ROBLES: Ms. Collins, you can take that down.

Q. You mentioned there was another person at the dinner.  Had you met that person before?

A. No.

Q. Did anyone introduce you to this person at the dinner?

A. Juan Orlando Hernandez introduced him to me.

Q. What was the name that the defendant provided for this person to you?

A. Cinco.

Q. At this dinner what, if anything, was discussed?

A. They were discussing a plane that had been seized in Roatán.  They were discussing who would take responsibility for that plane at that time.

Q. Did anyone describe what was on the plane?

A. Mr. Juan Orlando did.

Q. What did the defendant say at the dinner was on the plane?

A. Their conversation was that they were talking about merchandise.

Q. And you testified that they were discussing who would take responsibility for the plane.  What do you recall the defendant saying, if anything, about taking responsibility for the plane?

A. The costs should be shared among all of them, and that he alone would not take on the costs.

Q. When this conversation took place, what political position did the defendant have, if any?

A. Congressman.

Q.   During this conversation, did the defendant say anything to you, specifically, about the plane?

A.   They told me -- well, I heard that the plane had merchandise in it, and that later on, a person who needed my services was going to call me.

Q.   What was your profession at the time that you participated in this dinner?

A.   Attorney.

Q.   Did you hold any particular position as an attorney at the time of this dinner?

A.   Yes.

Q.   What was that?

A.   Judge.

Q.   Mr. Lobo, after the dinner, did there come a time when you in fact received a phone call from someone about this plane?

A.   Yes.

Q.   Approximately how long after the dinner did you get a phone call?

A.   Approximately two days later.

Q.   Who called you?

A.   A man who said that his name was El Sentado.

Q.   Had you met this man before?

A.   No.

Q.   What, if anything, did Sentado tell you on the phone call?

A.   He told me that he was the person about whom I had been

told who was going to get in touch with me, and he said that we should set up a meeting.

Q. Did you in fact set up a meeting with Sentado?

A. Yes. On that call, we agreed on a place and day to meet.

Q. Where did you meet?

A. In a place called Siguatepeque, which is between Tegucigalpa and San Pedro Sula.

Q. Did you meet at a particular location?

A. Yes.

Q. Where did you meet?

A. In a place called Gloria Hotel and Restaurant.

Q. What, if anything, did Sentado tell you at this meeting?

A. When I arrived to the meeting, we greeted each other. He introduced himself. And we spoke, and he said that he wanted me to help him to recover a plane that had been seized in Roatán that had 1,200 kilograms of cocaine in it, and that it was a King 200.

Q. Is a King 200 a type of airplane?

A. Yes.

Q. Did Sentado tell you who, if anyone, the cocaine belonged to?

A. Yes. He told me that it belonged to a partnership between the Hernandez brothers, the Valles, and another person who was Colombian.

Q. When you say the Hernandez brothers, who are you referring

to?

A. I'm referring to Mr. Juan Orlando Hernandez Alvarado and his brother Tony Hernandez.

Q. Did Sentado tell you where the plane had been coming from?

A. Yes.

Q. Where did it come from?

A. Colombia.

Q. Did you agree to help Sentado?

A. Yes.

Q. What specifically had Sentado asked you to do to help him with the plane?

A. To help him recover the plane.

Q. What, if any, steps did you take to help recover the plane?

A. I made the steps of getting in touch with friends in the military and police and judges at that time.

Q. Were those contacts that you had as a result of your position as a judge?

A. Yes.

Q. Were you ultimately able to help out with this plane?

A. No.

Q. Why not?

A. Because at the time, my father, Porfirio Lobo Sosa, was running for president of Honduras. And people were going to question what the interest might be of the son of a presidential candidate, what interests there could be by him on

a plane that had been seized loaded with cocaine.

Q.  And had the plane already -- withdrawn.

What did you learn about where the plane was going to when you were trying to help recover the plane?

A.  The plane had been seized in Roatán, and it was coming from Colombia.

Q.  After you took these steps, did you ever speak with the defendant about your efforts to help recover the plane?

A.  Yes.

Q.  Approximately how long after you made these efforts did you speak to the defendant?

A.  Approximately five to ten days later.

Q.  What did you tell the defendant?

A.  I told him that I had been unable to help his friend with his request, and he said to me, Leader, I ask you to be discrete.

Q.  Did this conversation happen over the phone or in person?

A.  The conversation was over the phone.

Q.  Did there come a time when you spoke to the defendant in person about this plane?

A.  Yes.

Q.  Where did that conversation take place?

A.  In my home.

Q.  What do you recall about that conversation?

A.  I told Juan Orlando that the plane that had been seized was

carrying cocaine, and he again said to me, Leader, please, please, I ask you, be discrete.

Q.  Did you ever speak with the defendant again about this plane?

A.  No, sir.

Q.  Mr. Lobo, have you ever heard of Puerto Cortés?

A.  Yes.

Q.  What is that?

A.  It is a Honduran maritime port.

Q.  Directing your attention to approximately 2012.  Were you ever asked to help facilitate drug trafficking at Puerto Cortés?

A.  Yes.

Q.  Who asked you to help with Puerto Cortés?

A.  Some individuals, an individual from Mexico, from the Sinaloa Cartel.

Q.  What was that person's name?

A.  Cesar Gastelum.

Q.  Who, if anyone, introduced you to Cesar Gastelum?

A.  Mr. Fredy Renan Najera Montoya.

Q.  Who is that?

A.  At the time he was a congressman.

Q.  Did you in fact meet with Cesar Gastelum in person about Puerto Cortés?

A.  Yes.

Q.  Approximately how many times?

A.  On approximately two occasions.

Q.  Focusing on the first meeting, where did that take place?

A.  In the city of San Pedro Sula.

Q.  Who was at that meeting?

A.  The people present during that meeting were Fredy Renan Najera Montoya, Mr. Cesar Gastelum, someone else whose name I don't remember, Eduardo, and then there was also somebody else whose name I don't remember, and I was there.

Q.  Generally, what was discussed at this meeting?

A.  Don Cesar asked me to help him so that the port could be used for cocaine drug trafficking through shipping containers that were coming from Colombia.

Q.  Did you agree to help him?

A.  Yes.

Q.  Did you receive anything for agreeing to help Cesar Gastelum?

A.  Yes.

Q.  What did you receive?

A.  Payment.

Q.  For approximately how much?

A.  The amount was $50,000.

Q.  I want to focus now on the second meeting.

     Where did that take place?

A.  Again in San Pedro Sula.

O313HER1                          Lobo - Direct

Q.   Did it take place in a particular location in San Pedro Sula?

A.   Yes, at a house that belonged to Don Cesar.

Q.   Generally, what was discussed at this meeting?

A.   At that time, the coordination of the arrival of the shipping containers with cocaine was discussed.  I also provided him with the names of the individuals that would be helping at the port, so that the drugs would arrive without any issues.

Q.   Were you given anything at this meeting?

A.   Yes.

Q.   What were you given?

A.   A payment.

Q.   For how much?

A.   $100,000.

Q.   Was the defendant's name ever brought up at this meeting?

A.   Yes.

Q.   Who mentioned the defendant's name?

A.   Mr. Cesar Gastelum.

Q.   What did Cesar Gastelum say?

A.   That he would be making a contribution to the campaign, that he would be supporting Juan Orlando Hernandez's campaign.

Q.   Was the defendant campaigning for president at that time?

A.   Yes.

Q.   Did Cesar Gastelum say specifically why he was going to

contribute to the defendant's campaign?

A.   Such that when Juan Orlando Hernandez became president, he could expect his support.

Q.   Is that what he said specifically or is that what you understood based on your conversations with Cesar Gastelum?

A.   That's what I understood.  He told me he would be contributing to the campaign.

Q.   Mr. Lobo, you testified earlier that you bribed the defendant twice.

Did those bribes occur during the defendant's presidential campaign?

A.   Correct.

Q.   Where did that money come from?

A.   The money came from the profit I made from drug trafficking.

Q.   Was that drug trafficking with the Cachiros?

A.   Yes.

Q.   I want to focus on the first bribe to the defendant.

How much money did you give to the defendant?

A.   $200,000.

Q.   Did you give the money directly to the defendant or to somebody else?

A.   Through somebody else.

Q.   Who was that other person?

A.   His sister, Hilda Hernandez.

Q. Had you met Hilda Hernandez before you gave her this money?

A. Yes.

Q. Where did you provide this money to Hilda Hernandez?

A. In Tegucigalpa, at a heliport in Tegucigalpa.

Q. Who, if anyone, were you with when you gave this money to Hilda Hernandez?

A. With Javier Heriberto Maradiaga Rivera.

Q. Is that one of the leaders of the Cachiros?

A. Yes.

Q. Why were you giving money to Hilda Hernandez?

A. As a contribution to her brother's campaign, Juan Orlando Hernandez's campaign.

Q. What, if anything, were you hoping to receive in exchange for that contribution?

A. That once he became president, I would receive favors from him.

Q. What types of favors?

A. Political favors or other favors that would be helpful in my drug trafficking.

Q. What, if anything, did Hilda Hernandez do when you gave her the money?

A. She called Juan Orlando.

Q. How do you know she called the defendant?

A. Because at that moment I spoke with him over the phone.

Q. What did you and the defendant speak about?

O313HER1                        Lobo - Direct

A.   I told him that I was contributing to his political campaign.

Q.   What did the defendant say?

A.   He said to me thanks very much.

Q.   Did you tell the defendant that you were with Javier Maradiaga?

A.   No, sir.

Q.   Mr. Lobo, after this phone call, did you ever speak with the defendant about your work with the Cachiros?

A.   Yes, sir.

Q.   Where did that conversation take place?

A.   At my home.

Q.   Where was your home?

A.   Juticalpa Olancho.

Q.   How did the topic of the Cachiros come up during that conversation?

A.   At that moment, he told me that he had learned that I was working with the Cachiros, and I told him that I was.  We were discussing several topics, and in the midst of that, we started talking about the Cachiros.

Q.   Did the topic of the campaign contribution that you had given to Hilda Hernandez come up?

A.   Yes, sir.

Q.   What do you recall the defendant saying?

A.   Thanks very much, Leader.  Thanks very much for your

contribution to my campaign.

Q.   Mr. Lobo, directing your attention to approximately 2013. Did there come a time when you met with the defendant at a hotel?

A.   Yes, sir.

Q.   What hotel was that?

A.   The Honduras Maya Hotel, sir.

Q.   Why were you at the Honduras Maya Hotel?

A.   I was attending a party event.

Q.   And did you discuss campaign contributions with the defendant?

A.   Yes.

Q.   What, if anything, did the defendant say?

A.   We discussed several topics, among them politics, and he told me that he had some good friends that would be contributing to his political campaign.

Q.   What did you understand the defendant to mean when he said good friends that would be contributing to his campaign?

A.   People that were making money in drug trafficking.

          MR. COLON:  Objection.

          THE COURT:  That's what you understood he was referring to?

          THE WITNESS:  Yes, sir.

          THE COURT:  I'll let the answer stand.

Q.   At the time you had this conversation with the defendant,

O313HER1                         Lobo - Direct

had you already met with Cesar Gastelum about Puerto Cortés?

A.   Yes.

Q.   Mr. Lobo, you testified earlier about Tony Hernandez.

I want to direct your attention to approximately 2013. Did there come a time when you met with Tony Hernandez in person?

A.   Yes.

Q.   Where did that meeting take place?

A.   In Tegucigalpa.

Q.   Was it at a particular location?

A.   In Tony's house.

Q.   Did you and Tony go anywhere that day?

A.   Yes.

Q.   Where did you go?

A.   We headed towards Tegucigalpa and San Pedro Sula at a gas station that is there.

Q.   Had Tony Hernandez asked you to come with him?

A.   Yes.

Q.   What, if anything, did Tony Hernandez say you were going to go do?

A.   He just told me we should go there, that he was expecting somebody.

Q.   Whose vehicle did you take?

A.   An SUV.

Q.   Whose SUV was it?

O313HER1                         Lobo - Direct

A.   Mr. Tony's.

Q.   Where did you go?

A.   We went to a Shell gas station that is on the highway out of Tegucigalpa towards the northern coast.

Q.   On this trip to the Shell gas station, were you armed?

A.   Yes.

Q.   With what type of weapon?

A.   A 9-millimeter.

Q.   Was Tony Hernandez armed?

A.   Yes.

Q.   What type of weapon did Tony Hernandez have?

A.   A 9-millimeter.

Q.   What, if anything, happened when you got to the Shell gas station?

A.   We went inside the food mart once we got to the gas station.  I got a refreshment and a snack, so did Tony, and then Tony told me that we should wait there for a bit because he was expecting somebody.

Q.   What, if anything, happened next?

A.   We waited there for a while, like five to ten minutes, and then a vehicle arrived and Tony went out.  He said wait for me here a minute, and Tony went out, and the vehicle parked, and I saw that a person got out, and handed him a black bag.

Q.   What type of vehicle was it that arrived?

A.   A pickup.

Q.   How many doors did the pickup have?

A.   Four doors.

Q.   What color was the bag?

A.   A large blue bag.

Q.   Did there come a point when you went outside of the food mart?

         THE INTERPRETER:  The interpreter would like to amend the prior answer about a black bag.  That was an interpreter error.

         MR. ROBLES:  No problem.

Q.   Mr. Lobo, did there come a time when you went outside of the food mart?

A.   Yes.

Q.   What happened when you went outside?

A.   The person who was there who had given Tony the blue bag greeted me.  He said Wilson.

Q.   Did he introduce himself as Wilson?

A.   Yes.

Q.   What, if anything, did you hear Wilson say to Tony Hernandez?

A.   Once Tony had taken the bag and put it in the rear of his SUV, he said to me that the friends had sent them.

         MR. ROBLES:  Ms. Collins, can you please publish for the witness, the Court, the jury, and the parties Government Exhibit 319, which is in evidence.  And if you could please

zoom in on the person in the blue polo shirt.

Q.  Mr. Lobo, do you recognize what's on the screen?

A.  Yes.

Q.  Who do you recognize that to be?

A.  Wilson.

Q.  Is that the Wilson that you observed give Tony Hernandez the bag?

A.  Correct.

            MR. ROBLES:  Thank you, Ms. Collins.  You can take that down.

Q.  Did you leave the gas station with Tony Hernandez then?

A.  Yes.

Q.  Did you ask Tony Hernandez any questions on the drive back from the gas station?

A.  I asked him what was in the bag.  And he opened up the bag and I said, oh, wow, what a ton of money.  And how much is it? And he said $4 million.

Q.  Did Tony Hernandez say where the money had come from?

A.  Yes.

Q.  What did Tony Hernandez say?

A.  That it was from the friends, the friends, the Valle Valles.

Q.  Did Tony Hernandez say what the money was for?

A.  Yes, that it was for his brother Juan's campaign.

Q.  Was the money packaged in any particular way?

A.  Yes.

Q.  How was it packaged?

A.  In plastic.

Q.  Had you seen money packaged that way before?

A.  Yes.

Q.  In what context?

A.  Rephrase the question for me please?

Q.  How had you seen money packaged like that before?

A.  Oh.  In the payments that I received, the payments that had been made to me on some occasions.

Q.  What type of currency was it?

A.  It was hundred dollar bills.  American dollars.

Q.  Did Tony Hernandez speak to anyone on the drive back from the gas station?

A.  Yes.

Q.  Who did Tony Hernandez speak to?

A.  He put the phone on speaker and he called Juan.  He said that he had the package that the friends had sent, the Valle Valles.

Q.  Did he say the Valle Valles specifically or did he just say the friends?

A.  The Valles.  I asked him who they were.

Q.  You had asked Tony Hernandez who the money came from, right?

A.  Yes, sir.

Q.  So you understood Tony to be meaning the Valles when he told the defendant that the money had come from the friends?

A.  Correct.

Q.  What did the defendant say in response to Tony Hernandez?

A.  He said all right, that's good, that's good.  And he also said I'm here with Leader Lobo, Attorney Lobo, and so I said hello to him as well at that point.

Q.  Where did you and Tony Hernandez go with that money?

A.  We went back to his house.

Q.  What, if anything, did you see Tony Hernandez do with the bag of money once you got back to Tony Hernandez's house?

A.  He drove his car into the garage, and he got the blue bag out of the rear of his vehicle, and put it into a room.

Q.  Did you ever speak with the defendant about this trip?

A.  No.

Q.  Mr. Lobo, you testified earlier or yesterday about a conversation you had with the defendant regarding a contribution from the Sinaloa Cartel.  Do you recall that?

A.  Yes.

Q.  Where did that conversation take place?

A.  At my house.

Q.  What, if anything, did the defendant say to you?

A.  That he had or that he was going to receive support from some Mexican people from Sinaloa.

Q.  Had you been discussing campaign contributions with the

O313HER1                       Lobo - Direct

defendant during this conversation?

A.  Yes.

Q.  When the defendant said that he was going to be receiving contributions from people in the Sinaloa Cartel, who did you believe the defendant was referring to?

A.  To Mr. Cesar Gastelum.

Q.  Why did you think that?

A.  Because in the last meeting that I had with Mr. Cesar Gastelum in San Pedro Sula, he told me he was going to contribute to Juan Orlando Hernandez's campaign.

Q.  Mr. Lobo, directing your attention to approximately 2013. Did there come a time when you spoke to the defendant inside your car?

A.  Yes.

Q.  Where were you when that conversation took place?

A.  At that time, Mr. Juan Orlando Hernandez had just finished giving a political speech that was pretty much the close of his campaign in Juticalpa Olancho.

Q.  How did it come to be that the defendant was in your car?

A.  I had him called over.  He was about to get in his helicopter, and at that point I had him called over to my car.

Q.  When you called the defendant over, was he with his security detail?

A.  Yes.

Q.  Could you tell whether any members of that security detail

were armed?

A.   Yes.

Q.   With what types of weapons?

A.   His security detail was carrying long guns and short guns.

Q.   When you say long guns, what are you referring to?

A.   By long guns, I am referring to M16s.

Q.   When the defendant got in your car, what, if anything, did you ask him for?

A.   I asked Juan Orlando for two things.  One, that once he was president, he support me with government projects.  And two, that once he was president, he also support me with radar and logistical information for my drug trafficking.

Q.   Were you working with the Cachiros at that time?

A.   Yes, sir.

Q.   Who, if anyone, did the defendant tell you to contact during that conversation?

A.   He said to me -- he gave me the name of the person who I should get in touch with about the government projects, and he gave me the name of the person who would give me the logistical support, who was General Julian Pacheco Tinoco.

Q.   And what was General Pacheco Tinoco's position at the time?

A.   At that time, General Pacheco Tinoco had the position of chief of intelligence of Honduras.

Q.   Had you spoken with Pacheco Tinoco before this conversation?

A.   Yes.

Q.   Why did you need the defendant's help then with Pacheco Tinoco?

A.   Because normally, when the administration changes in our country, the officials will either continue in their positions or they will be removed.  So, I needed General Pacheco Tinoco if he was to continue in his position, I needed information from him.

Q.   Did the defendant confirm that Pacheco Tinoco could help you?

A.   Yes.

Q.   You said that you wanted help with radar information and logistical support.  What did you need that information and support for?

A.   So that the drugs coming from Colombia would not have any problems once they arrived in the territory of Honduras.

        THE COURT:  Mr. Robles, how much longer do you have?

        MR. ROBLES:  No more than 30 minutes, your Honor.

        THE COURT:  We'll take our midmorning break.  Ladies and gentlemen, please do not discuss the case among yourselves or with anyone else.  We'll be back in action in 10 minutes. Thank you.

        (Jury excused)

        THE COURT:  We are in recess.  Thank you.

        (Recess)

O315her2                    Lobo - Direct

THE COURT:  I understand from the defense that there is an update on the Spanish-English interpreters.

MS. SHROFF:  Yes, your Honor.

I spoke to Mr. Hernandez.  We really appreciate the two Court-appointed interpreters being here but we don't think it is necessary.  Should there be a reason for him to require one of them, we can send a note to Flo and have one brought back.

THE COURT:  Mr. Hernandez, did you hear what your lawyer said?

THE DEFENDANT:  Yes, I did.

THE COURT:  Do you agree with that?

THE DEFENDANT:  I do.

THE COURT:  With the thanks of the Court, the two court interpreters are excused from the trial.

Thank you very much.

INTERPRETER:  Thank you, your Honor.

INTERPRETER:  Thank you, your Honor.

THE COURT:  Please bring our jury in.

THE DEPUTY CLERK:  Jury entering.

(Continued on next page)

O315her2                          Lobo - Direct

(Jury present)

THE COURT:  Please, be seated.

Mr. Robles, you may proceed.

MR. ROBLES:  Thank you, your Honor.

BY MR. ROBLES:

Q.  Mr. Lobo, before the break you testified about a conversation you had with the defendant in your car.  Did you offer to provide the defendant anything in exchange for what you had asked him for?

A.  Yes.

Q.  What did you offer the defendant?

A.  To give him a percentage of the profit.

Q.  Did you agree to contribute to his campaign?

A.  Yes.

Q.  And after this conversation, did there come a time when you in fact gave the defendant a campaign contribution?

A.  Yes.

Q.  What did you give the defendant?

A.  $250,000.

Q.  Where were you when you gave the defendant that money?

A.  Tegucigalpa Olancho.

Q.  Were you at a particular location?

A.  In my home.

Q.  Where did that money come from?

A.  From my drug trafficking profits.

Q.  What did you see the defendant do, if anything, when you gave him the money?

A.  I showed him the contents of the backpack, and then he put it in his SUV.

Q.  And when you say you gave the defendant money, what type of currency was that?

A.  U.S. dollars.

Q.  Was that in actual cash?

A.  Yes.

Q.  Was the defendant's security detail there at the time you gave him this cash?

A.  Yes.

Q.  Were they armed?

A.  Yes.

Q.  With what types of firearms?

A.  With long guns and short guns.

Q.  What do you mean by long guns?

A.  M16 rifles.

Q.  You testified a moment ago that the defendant told you to reach out to General Pacheco Tinoco.  Did you in fact get in touch with Pacheco Tinoco after this conversation with the defendant?

A.  Yes.

Q.  Approximately how many times did you meet with Pacheco Tinoco?

O315her2                        Lobo - Direct

A.   On approximately three occasions.

Q.   Focusing on the first two meetings, where did those take place?

A.   In Tegucigalpa at the general's office.

Q.   And during those first two meetings, was it just you and General Tinoco?

A.   Yes.

Q.   What, if anything, did you ask General Tinoco for?

A.   Logistical support information.

Q.   And support and information for what?

A.   For my drug trafficking activities.

Q.   Did Tinoco ask for anything in return?

A.   Yes; a commission.

Q.   Mr. Lobo, focusing now on the third meeting, did you bring anyone to that meeting with General Tinoco?

A.   Yes.

Q.   Who did you bring?

A.   Two members of the Sinaloa Cartel.

Q.   Why did you bring those people to meet with General Tinoco?

A.   They wanted General Tinoco's support.

Q.   Who had introduced you to those people?

A.   Mr. Devis Leonel Rivera Maradiaga.

Q.   What happened at that that third meeting with General Tinoco?

A.   During that third meeting with General Tinoco at his

offices in Tegucigalpa, when he started talking with the individuals, he got up abruptly and he left and went to his office.

Q.   What, if anything, do you recall Tinoco saying?

A.   General Tinoco said to me:  It's a trap, Lobo.  It's a trap.

Q.   Mr. Lobo, did there come a time when you learned that the people you brought to meet with General Tinoco were actually DEA informants?

A.   Yes, sir.

Q.   Did you know that at the time that you brought them to meet with General Tinoco?

A.   No, sir.

Q.   Did you ever speak with the defendant about this third meeting with General Tinoco?

A.   Yes.

Q.   Where did that conversation take place?

A.   That was during a lunch in my home in Juticalpa.

Q.   What, if anything, did the defendant say to you in that conversation?

A.   He told me General Tinoco called me and he told me about what happened during the meeting that you had with him.

Q.   What, if anything else, did the defendant say to you during that conferring?

A.   He told me that we needed to be careful with these type of

individuals, and that before bringing these sort of individuals in it was necessary for me to ask them for an identification so that they could be looked into as to their identity and where they were coming from.

Q.  Did the defendant explain why he was telling you to be careful with these sorts of people?

A.  Because that could create a problem for the general, for him, and me.

Q.  Can you describe what the defendant's tone was like during this conversation?

A.  Juan Orlando's tone was of some anger.

Q.  What did you say in response to the defendant?

A.  I said:  I'm sorry.  I'm sorry.  I did not know who they were.

Q.  I want to direct your attention now to approximately 2014. Did there come a time when you spoke to any members of the Cachiros about certain of their properties?

A.  Yes.

Q.  And, generally, what did you speak to the Cachiros about?

A.  They asked me to provide them with information about the properties that were going to be seized from them.

Q.  Did you agree to help them?

A.  Yes.

Q.  Did you speak to anyone on behalf of the Cachiros?

A.  Yes.

Q.   Who did you speak to?

A.   I spoke with Mr. Juan Gomez.

Q.   Who was that?

A.   A frontman of the Cachiros.

Q.   And did you speak to anybody by the name of Umberto Palacios Moya?

A.   Yes, sir.

Q.   Who was that?

A.   At the time he was the director of OABI.

Q.   Who is OABI?

A.   OABI is an Honduran agency that is in charge of seizing the properties that are of an unlawful source.

Q.   Did you ever speak to the defendant about the seizure of the Cachiros properties?

A.   Yes.

Q.   What, if anything, did the defendant say to you?

A.   That I should do what I needed to do and that if there was any help that could be provided, that I should reach out to him.

Q.   Did you end up needing to rely on the defendant to help the Cachiros with their property seizures?

A.   Yes.

Q.   In what way?

A.   His help; that if I couldn't do this at a hundred percent, that I would need his help.

Q.   And did you speak to Umberto Palacios Moya again about these properties?

A.   Yes.

Q.   And did Palacios Moya help with you any information?

A.   Yes.

Q.   What did Palacios Moya give you?

A.   The names of the properties that were about to be seized from them, the accounts, so that they would be able to take the money out of the banks.

Q.   And did you provide that information to the Cachiros?

A.   Yes.

Q.   And having received that information from Palacios Moya, is it fair to say that you didn't need to then rely on the defendant to help the Cachiros with their properties?

A.   That's correct.

Q.   Mr. Lobo, I want to change topics now, finally to your cooperation.  After you were sentenced in 2017, did there come a time where you reached out to the DEA?

A.   Can you please repeat the question?

Q.   Mr. Lobo, after you were sentenced in 2017, did there come a time when you reached out to the DEA?

A.   Yes.

Q.   Was that in approximately 2022?

A.   That's correct.

Q.   And were you serving your prison sentence at that time?

O315her2                    Lobo - Direct

A.   That's correct.

Q.   Why did you reach out to the DEA?

A.   I wanted to cooperate with the U.S. government.

Q.   And in connection with that cooperation, were you hoping to receive a lower sentence than the one you are currently serving?

A.   Yes.

Q.   After you reached out to the DEA, did you begin meeting with prosecutors with the U.S. Attorney's office in New York?

A.   Yes.

Q.   During your initial meetings with the prosecutors, did you tell the government all the information you knew or only some of it?

A.   Just some of it.

Q.   Did you eventually disclose to the government the full extent of your criminal conduct?

A.   Yes.

Q.   Did you also disclose the full extent of your knowledge of the criminal conduct of others?

A.   Yes.

Q.   Did that include the defendant?

A.   Yes.

Q.   Did that include your father?

A.   Yes.

Q.   Mr. Lobo, did you recently enter into an agreement with the

government concerning your cooperation?

A.   That's correct.

Q.   Based on your understanding, what is the most important thing that that agreement requires you to do?

A.   The most important responsibility or requirement is that I tell the truth and nothing but the truth.

Q.   And if you comply with the terms of that agreement, will you have an opportunity to be re-sentenced?

A.   That's correct.

Q.   If you are re-sentenced, are you guaranteed to get a lower sentence than the one you are currently serving?

A.   That depends on the judge.

Q.   Who determines your sentence?

A.   The Honorable Judge.

Q.   Has anyone made any promises to you about what sentence you will receive if you do get re-sentenced?

A.   No.

Q.   Mr. Lobo, what happens if you lie today?

A.   I will be charged with new charges.

Q.   And could that result in additional prison time beyond the 24-year sentence that you are currently serving?

A.   Correct.

Q.   Mr. Lobo, does the verdict of this trial have any impact on whether or not you get re-sentenced?

A.   No, sir.

Q.   Prior to your arrest in 2015, were you ever concerned that you would be arrested in Honduras?

A.   No.

Q.   Why not?

A.   Because I had the support and the ideal person to help me -- Juan Orlando Hernandez -- and other friends in government.

Q.   Mr. Lobo, were you aware that an extradition law was passed in Honduras in 2012?

A.   That's correct.

Q.   After that law was passed, did you bribe the defendant?

A.   No.

Q.   The bribes that you testified about earlier, did they occur during the defendant's 2013 presidential campaign?

A.   That's correct.

Q.   To your knowledge, was the defendant aware of your involvement in drug trafficking?

A.   Yes.

Q.   Were you ever concerned about being extradited?

A.   No.

Q.   Were you ever extradited to the United States?

A.   No.

         MR. ROBLES:  A moment, your Honor?

         (Counsel conferring)

BY MR. ROBLES:

Q.  Mr. Lobo, to your knowledge, did the defendant have any involvement with your arrest in 2015 in Haiti?

A.  No.

          MR. ROBLES:  One moment, your Honor?

          (Pause)

          MR. ROBLES:  No further questions.

          THE COURT:  Cross.

          MR. COLON:  May I inquire, your Honor?

          THE COURT:  You may.

          MR. COLON:  Thank you.

CROSS EXAMINATION

BY MR. COLON:

Q.  Good afternoon, Mr. Lobo.

A.  Good afternoon.

Q.  I want to talk to you about the preparation that you undertook with respect to this testimony; correct?

A.  Yes.

Q.  Do you recall when you first made the decision to cooperate with the government?

A.  2022.

Q.  And you were actually sentenced in 2016, correct?  Or 2017 I believe it was; correct?

A.  Exactly.

Q.  Right.

          So you took six years to think about cooperating with

O315her2                     Lobo - Cross

Q.  the government; correct?

A.  Yes.

Q.  And when you decided to cooperate, you were here in New York?

A.  I was in prison in Coleman low, Florida.

Q.  So you had to come up from Florida to cooperate?

MR. ROBLES:  Objection.  That is not a question.

THE COURT:  Sustained.

Q.  Where did you actually cooperate for the first time, sir?

A.  Here in New York.

Q.  Thank you.

And when you were sitting for those sessions, did you have a translator or interpreter?

A.  Correct.

Q.  Was it any of these two interpreters, if you recall?

MR. ROBLES:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  You had at least one interpreter, sir?

MR. ROBLES:  Objection.  Asked and answered and relevance.

THE COURT:  Asked and answered; sustained.

MR. COLON:  I'm sorry, Judge.  One second?

THE COURT:  Yes.

(Counsel conferring)

Q.  And in any case, if I may, were you accompanied by an

attorney at all?

MR. ROBLES:  Objection.  Relevance.

THE COURT:  I will allow it.

A.  Yes.

Q.  And without saying what your conversations were, you understood that -- withdrawn.

You had the interpreter help you with your communications with the attorney?

MR. ROBLES:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  When you sat down for the first time, were there individuals like myself, for instance, asking you questions on cross-examination?

MR. ROBLES:  Objection.  Vague.

THE COURT:  I'm going to sustain that as to form. There is no one quite like you, Mr. Colon.

MR. COLON:  I take that.  Thank you, Judge.

INTERPRETER:  May the interpreter have repetition?  I apologize.

Q.  Did you meet with the prosecutor, sir?

A.  Of course.

MR. ROBLES:  Objection, vague.  "Prosecutor" and time frame.

THE COURT:  Sustained.

Q.  You began the process of cooperation; correct?

O315her2                        Lobo - Cross

A.   Correct.

Q.   Were you asked questions and did you give answers, sir?

A.   Yes.

Q.   You were asked to speak about your drug trafficking history; correct?

A.   Yes, sir.

Q.   And as you were asked before in your direct testimony, you minimized, somewhat, some of your activity as a drug trafficker?

        MR. ROBLES:  Objection.  Not a question.

        THE COURT:  I will allow it.

A.   Repeat the question for me, counsel?  Excuse me.

        THE COURT:  The question was:  And as you were asked before in your direct testimony, you minimized, somewhat, some of your activity as a drug trafficker?

        And you can take this as a question:  Is that correct?

A.   No, I did not minimize.

Q.   You failed to tell the prosecutors the entire history of your drug trafficking; is that not a fact, sir?

A.   I told them everything.

Q.   On the direct you said that you did not tell them everything you knew about your drug trafficking history.

        MR. ROBLES:  Objection.

        THE COURT:  At what point in time?

        MR. ROBLES:  Mischaracterizes the testimony.

Q.   Initially, sir.  When you were first in your proffer session, sir.

A.   I don't understand your question very well, counsel.  Could you rephrase it, please?

Q.   When you first met with the prosecutors in your proffer session, your cooperation; isn't it true that you did not tell them about your father's knowledge of your drug trafficking activity?

A.   Remember that these sessions take place according to the questions that one is asked by the government.  In my personal case it was a series of multiple sessions and there are subjects that come out little by little.  You can't necessarily say everything in the first meeting.

Q.   Mr. Lobo, you withheld your father's role; did you not?

        THE COURT:  At which point in time, sir?

Q.   Throughout the proffer session; the first few proffer sessions, sir, until confronted by the prosecutors.

A.   As I said, that develops in accordance with the questions that are asked and each subject comes out in accordance with the questions that are asked in the session, not necessarily in the first session.

Q.   So you are telling this jury now that you were waiting until the prosecutors asked you about your father's role or confronted you with his role?  Is that what happened?

A.   Excuse me.  Rephrase the question?

Q.  Are you telling this jury that the only reason you didn't reveal your father's role was because you were waiting for them to confront you with what he had done or knew about your drug trafficking activity?

A.  No.  Remember, as I said before, that comes out as the questions are asked and as information comes out in the session.

Q.  So you are telling this jury now that you did not withhold information on your father; correct?

THE COURT:  At what point in time?  At what point in time?

Q.  Throughout the proffer sessions until you were confronted by the prosecutors.

MR. ROBLES:  Objection.  Asked and answered.

THE COURT:  I will allow it.

A.  I did not withhold information from them.

Q.  You testified earlier that you were fearful of telling them the truth; correct?

MR. ROBLES:  Objection.  Mischaracterizes testimony.

THE COURT:  You can ask it as a question.

Is that correct?  Is that what you testified to previously?

INTERPRETER:  By the interpreter, I'm not sure the question was fully interpreted, your Honor, before the objection.

THE COURT:  All right.  At what point in time are you asking about?  Are you talking about at the time he entered the plea of guilty or are you talking about some subsequent form of time?

MR. COLON:  At the point in time he was in the proffer session, your Honor.

THE COURT:  So this is after he pled guilty.

MR. COLON:  After he pled guilty, right.

A.  Please repeat the question for me.

MR. COLON:  I will withdraw it and I will ask another question.

Did you or did you not, in this courthouse, state to Judge Schofield, that your father had nothing to do with what you did in terms of committing crimes of drug trafficking?

THE COURT:  Did you set a point in time for that?

Q.  At the time you were being sentenced, Mr. Lobo, when you were before Judge Schofield, did you or did not state on the record, under oath, that your father had nothing to do with your drug trafficking activity or knew about your drug trafficking activity?

A.  Correct.

Q.  Right.

So at that point in time you actually did not tell the truth to the judge under oath?  Yes or no.

A.  No.

Q.   You told the judge the truth at that point?

A.   At the time, counselor, when I spoke before the Judge, I did, I minimized my participation in order to obtain a lower sentence than the 24 years.  I minimized my participation.

Q.   So you minimized your participation to the Judge, under oath, at the time of sentencing; correct?

A.   Correct.

Q.   So, in other words, you lied to the Judge, under oath, at your sentencing?

A.   At the time I minimized my participation.

Q.   Because you wanted to get a lesser sentence; correct?

A.   That's correct.

Q.   And after the sentencing, when you first started to talk to the prosecutors, again, you did not reveal the full extent of your role or your father's knowledge?

         MR. ROBLES:  Objection.  Asked and answered.  Vague as to time period.

         THE COURT:  Yes.  That's been asked and answered.

Q.   So when was it that you finally decided to tell the prosecutors about your entire criminal history and drug trafficking?

A.   I'm sorry, counselor.  Can you please repeat the question?

Q.   When did you decide to tell the prosecutors and the U.S. government about the entire history of your criminal drug trafficking activity?

A.   2022.

Q.   And at that time did you reveal what your father's knowledge was of your drug trafficking activity?

A.   At the time when I entered into a cooperation with the government, yes.

Q.   And what did you tell the prosecutors about your father's drug trafficking activity or knowledge of drug trafficking activity when you finally made that decision?

A.   That was covered during direct questions by the government, counselor.

          THE COURT:  Sir, did you understand the question?

          THE WITNESS:  Yes.  He asked me and I answered his question.

          THE COURT:  The question was:  What did you tell the prosecutors about your father's drug trafficking activity or knowledge when you finally made that decision.

A.   That I told the U.S. government everything.

Q.   Wasn't it a fact that you told the government about your father's involvement for the first time on January 25, 2023?

A.   I do not remember the date.

Q.   Was it about a year ago, sir?

A.   I do not remember, sir.

          MR. COLON:  If I may, Judge?

          THE COURT:  You may.

Q.   What, in fact, did you tell the prosecutors about your

father's knowledge of your drug trafficking activity?

MR. ROBLES:  Objection.  Asked and answered.

THE COURT:  No, I'm going to allow it.

A.  Please rephrase the question.

Q.  What, in fact, did you tell the prosecutors and the U.S. government of your father's knowledge of your drug trafficking activity?

A.  I do not remember.

Q.  Did you tell the prosecutors that your father accepted bribes from drug traffickers?

A.  Yes.

Q.  Did you tell the government how many times he accepted bribes from drug traffickers?

A.  I do not remember, sir.

Q.  Did you tell the prosecutors how much money your father was paid by drug traffickers?

INTERPRETER:  May the interpreter just have a moment?

A.  No.  I have no knowledge of that.

Q.  So your testimony is that you never revealed to the prosecutors and the U.S. government how much your father was paid by drug traffickers in Honduras?

A.  No.

Q.  And you never told the prosecutors and the U.S. government who paid your father; correct?

A.  No, I have no knowledge of that.  And I apologize,

counselor. When you are referring to drug traffickers, what are you referring to?

Q. I'm referring to your associates and partners like the Valle Valles or the Cachiros.

A. The partners that I worked with were the Cachiros.

Q. And did the Cachiros pay your father bribes?

A. Yes.

Q. How much did they pay him?

A. I don't know, sir.

Q. Were you present when they did that?

A. No, sir.

Q. How did you know that they paid your father?

MR. ROBLES: Objection. Calls for hearsay.

THE COURT: Not necessarily -- well, I'm going to allow it.

A. Because Mr. Juan Gomez told me. He was working with the Cachiros.

Q. What did Juan Gomez tell you about how much they paid your father?

A. He did not say how much, sir.

Q. Did he say how many times he paid your father?

A. No, sir.

Q. And you and your father are estranged at this point, correct, in time?

MR. ROBLES: Objection. Relevance.

THE COURT:  I will allow it.

A.  Yes, sir.

Q.  Now, you testified earlier that you knew Mr. Juan Orlando Hernandez very well; correct?

A.  Correct.

Q.  You knew him so well that you trusted him more than you trusted your father; correct?

A.  Correct.

Q.  Now, do you have any pictures that you can show the jury as to, let's say, any family affairs or holidays you enjoyed with Mr. Juan Orlando Hernandez' family?

A.  Mr. Juan Orlando Hernandez knows very well my relationship with him.  In fact, let me explain this to you, counselor. When I met Mr. Juan Orlando Hernandez in 2002, he had nothing. Nothing.  He used to go to Congress in his wife's car, which I remember was a double-cab, white Mazda.

MR. COLON:  Move to strike the answer, your Honor.

THE COURT:  Sustained.  Stricken.

MR. COLON:  I'm sorry, Judge.

(Counsel conferring)

BY MR. COLON:

Q.  Again, once again, do you have any pictures of your celebrations of parties or, say, events at Mr. Juan Orlando Hernandez' house at any time?

A.  Which house, sir?

O315her2                          Lobo - Cross

Q.   In his house.

A.   In my home I have them.

Q.   Right.

         Do you have them here for the jury to see them?

         MR. ROBLES:  Objection.

         THE COURT:  Overruled.

A.   I, at this moment, I am in prison, sir.  I have been in prison for nine years.  I don't have them handy.

Q.   Do you have anything at all to corroborate that you went to Mr. Juan Orlando's house at any time in your relationship?

         MR. ROBLES:  Objection.

         THE COURT:  Sustained.

Q.   Did you ever go out to dinner with Mr. Juan Orlando Hernandez?

A.   Yes.

Q.   How many times in your relationship?

A.   Several times.

Q.   Can you tell us what Mr. Juan Orlando Hernandez' favorite restaurant is?

         MR. ROBLES:  Objection.  Relevance.

         THE COURT:  Overruled.

A.   We usually like to go to El Patio and other restaurants.

Q.   Did you celebrate any holidays with Mr. Juan Orlando Hernandez?

A.   I do not remember, sir.

Q.  How about any anniversaries?  Did you celebrate any anniversaries with him, sir?

A.  Please rephrase the question.  What type of anniversaries are you referring to?

Q.  Your anniversary, his anniversary, weddings, birthday parties.

A.  Gatherings.

        MR. ROBLES:  Objection.

        THE COURT:  Pardon me?

        MR. ROBLES:  Objection.  Form.

        THE COURT:  I will allow it.

A.  Gatherings.  Of course.  Yes.

Q.  In fact, you were not allowed to go to Mr. Hernandez Alvarado's house; isn't that a fact?

A.  I was not allowed?  What are you referring to?

Q.  You were never at Mr. Juan Hernandez' house for any sort of social gathering.

A.  Actually, he used to come to my house.

Q.  And you were members both of the National Party; correct?

A.  Yes.

Q.  In fact, you were such good friends that when you asked him to give you a job or a position heading the Department of Forestry, you did not get that job; correct?

A.  May I tell you why?

Q.  No.  I asked you a question.  Even though -- I will

withdraw that question.

Even though you requested Mr. Hernandez Alvarado's assistance in getting a position with the Department of Forestry, you did not get that job that you asked him to help you get.

A.   Because I preferred to be a Judge, I opted to have a judicial career.  I changed my mind about that.  It was my own decision.

Q.   Tell the jury, you did not get the job; you were rejected, correct?

A.   I did not want the job.

Q.   Now, you were asked questions with respect to political favors.  What kind of political favors were you asking him for aside from drug trafficking favors?

A.   Types of political favors?  Can you please rephrase the question?

Q.   What type of political favors did you ask Mr. Juan Orlando to do for you?

A.   Several.

Q.   Tell the jury what kind.

A.   For members of my party.

Q.   You did not ask him to help you with the money laundering of contracts; correct?

A.   Yes.

Q.   What you asked him for was things that were, let's say,

pertaining to your local community; correct?

A.   At a national level.

Q.   Tell the jury like what, at the national level, favors were you asking for.

A.   Favors for road -- interpreter correction -- favors for people in the construction of roads, so that the companies whose names I gave him would be awarded government contracts for those companies to carry out projects in different parts of Honduras.

Q.   When was that?  What year was that?

A.   But can I ask you a question, counsel?

THE COURT:  No.

Next question.

Q.   When was it that you asked him for his assistance in government contracting?

A.   Are you referring to when he was president of Congress or president?

Q.   Let's say when he was president of the Congress, that period.  I'm sorry, that would be 2010 to 2013.

A.   Correct.

Q.   Tell the jury what you asked him for with respect to the contract.

A.   I asked him for a lot of help.

Q.   However, those contracts that you were getting assistance for, you wanted him to help you with, were actually contracts

for your Cachiros partners which involved money laundering; correct?

A.   Correct.

Q.   Because that's what you were doing for the Cachiros.  You were helping them launder money so that they could get contracts paid in turn for their work on the public roads?

A.   Yes.

Q.   And about how much money did you help, assist the Cachiros in laundering over the years that you represented them?

A.   A lot of money.

Q.   And for that you actually used your father's contacts; correct?

A.   My contacts.  My contacts.  Because I had all sorts of people in government positions like Juan Orlando Hernandez.  I had the ability and the authority to get those contracts.

Q.   Your father was a supreme authority in Honduras; correct?

A.   What do you mean by supreme authority?

Q.   He held the highest office in the land in Honduras; isn't that a fact, sir?

A.   The same as Juan Orlando Hernandez, sir.

          MR. COLON:  Move to strike, your Honor.

          THE COURT:  Yes; stricken.

          Can you answer the question that was asked?

Q.   Your father had the power --

          THE COURT:  No.

Can you answer the question that was asked, sir?

A.   Could you rephrase it?

Q.   Your father had the power -- withdrawn, Judge.

Your father had the most authority that anybody could have in Honduras to help you in obtaining those contracts; correct?

MR. ROBLES:  Objection.

THE COURT:  Sustained.

Q.   Juan Orlando Hernandez was the president of the Congress, correct, from 2010 to 2013; correct?

A.   Correct.

Q.   And your father was the president; correct?

A.   Correct.

Q.   So your father had more power than Juan Orlando Hernandez, did he not?

A.   Yes.

Q.   And how much did you receive in exchange for your money laundering advocacy on the Cachiros' contracts?

A.   I don't have an exact total.

Q.   And over how many years did you do that?

A.   From 2010, until the day of my arrest, 2015.

Q.   Now I'm going to draw your attention to your testimony about a meeting that you had with Hilda Hernandez at a heliport.  Do you remember that?

A.   Yes, sir.

O315her2                        Lobo - Cross

Q. And it was your testimony earlier in this court today, you testified that you were there with just one individual, Javier Rivera Maradiaga; correct?

A. Correct.

Q. And it is your testimony that you provided $200,000 -- you -- you provided $200,000 to Ms. Hernandez; correct?

A. Yes, sir.

Q. And did you arrive by yourself that day or were you accompanied?

A. I arrived with Javier to the heliport. I was coming back from a trip, I was coming from the northern coast.

Q. Now, did you provide the entire $200,000?

A. Yes, sir.

Q. And in what form did you give Ms. Hernandez the money?

A. Wrapped in plastic wrap.

Q. What did you give her? What kind of currency did you give her?

A. American dollars in hundred dollar bills. Bundles of hundred dollar bills.

Q. When you gave her that money, the $200,000, that was for his campaign; correct?

A. Yes, sir.

Q. Isn't it a fact that that money actually went to Miguel Pastor?

A. I don't know, sir.

O315her2                    Lobo - Cross

Q.   You don't know or you don't remember?

A.   That money went to Juan Orlando Hernandez.

Q.   Is that why you went to Port Cortes that day?

          MR. ROBLES:  Objection.  Vague.  Mischaracterizes testimony.  Time period.

          THE COURT:  Fix a time period on it.

Q.   What year was that that you went to Port Cortes?

A.   I was at Puerto Cortes on two occasions.

Q.   On two occasions.  Can you tell what the other occasion was?

A.   Are you referring to Puerto Cortes itself?  Could you rephrase the question?  Because Puerto Cortes, I went several times.  The meeting in San Pedro Sula I went twice.

Q.   Can you tell the jury what you went to Puerto Cortes for?

          MR. ROBLES:  Objection, your Honor.  Vague as to time period.  The witness testified he went several times to Puerto Cortes.

          MR. COLON:  Sorry, Judge.  I need a second here.

          THE COURT:  Yes.

          (Counsel conferring)

BY MR. COLON:

Q.   You went to Puerto Cortes to meet who?

          MR. ROBLES:  Same objection, your Honor.

          THE COURT:  Yes.

Q.   2012, 2013.

O315her2                    Lobo - Cross

A.   I went to meet some members of the Sinaloa Cartel.

            MR. COLON:  I'm sorry.  Can I get that answer back,
your Honor?  It was hard to hear?

            THE COURT:  Pam?

            (Record read)

            MR. COLON:  Thank you.

BY MR. COLON:

Q.   When you went to meet with members of the Sinaloa Cartel,
did you meet with Miguel Pastor as well?

A.   Correct.

Q.   What was the purpose of you meeting with Miguel Pastor?

A.   We went to the meeting.  We went to the last meeting as
well.

Q.   What was the purpose of that meeting?

A.   To provide them with help.

Q.   Actually, the Sinaloa Cartel wanted to move cocaine through
Puerto Cortes; correct?

A.   Yes, sir.

Q.   You felt that --

            THE COURT:  Can you please get closer to the
microphone, Mr. Lobo?  Thank you.

            Go ahead.

Q.   You felt that Miguel Pastor could assist you in moving that
cocaine through Puerto Cortes?

A.   We were going to do it together.  It wasn't so important

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O315her2                    Lobo - Cross

that Miguel Pastor be at that meeting.  I could have gone alone as well.

Q.  But you didn't go alone; did you?

A.  I invited Miguel Pastor.

Q.  And who was Miguel Pastor?

A.  He was the minister of SOPTRAVI; public works, transportation, and housing.  It's a government institution in Honduras that handles projects in Honduras.

Q.  So he would be of assistance to you in moving cocaine through Puerto Cortes?

A.  Yes.

Q.  And did you meet with Miguel Coto at that point during the meeting in Puerto Cortes?  Strike that, Judge.  I'm sorry. Withdraw that.  It is Mario Coto, sir.

A.  No.

Q.  Did you pay any money to Mr. Pastor?

A.  Don Cesar Gastelum paid Miguel Pastor, not Fabio Lobo.

Q.  He paid Mr. Pastor?

A.  Yes.

Q.  Do you know who Mario Coto was?

A.  I don't remember.

Q.  Isn't it a fact that he was assistant director of the Puerto Cortes?

        MR. ROBLES:  Objection.  The witness says he didn't know.

THE COURT:  No, I will allow it.

A.  I don't remember.

Q.  You were -- withdrawn.

That was during the -- we will talk about 2012 and 2013 now, and Puerto Cortes and Mr. Pastor.

You were pretty friendly with Mr. Pastor; correct?

A.  That's correct; as well as Juan Orlando Hernandez.  My friendship with Juan Orlando Hernandez was closer because I had known him for longer.

Q.  So you were better friends with Mr. Juan Orlando Hernandez?

A.  Yes, sir.

Q.  Nevertheless, the money you gave to Mr. Pastor was for his campaign for president; correct?

MR. ROBLES:  Objection.  Mischaracterizes the testimony.  The witness didn't say he paid Pastor.

THE COURT:  It's a question.

Q.  Even though you were good friends with Mr. Juan Orlando Hernandez Alvarado, you actually gave campaign money to Mr. Miguel Pastor?

A.  Rephrase the question.  What type of money are you referring to?  The money that Cesar Gastelum gave to Miguel Pastor?

Q.  You gave money to Miguel Pastor?  Yes or no.

A.  I did not.  Cesar did.

Q.  Isn't it a fact that you gave money to Miguel Pastor for

O315her2                     Lobo - Cross

his campaign?

MR. ROBLES:  Objection.  Asked and answered.

THE COURT:  No, I'm going to allow it.

A.  Don Cesar did, just like he gave money to Juan Orlando Hernandez.

Q.  From the period of 2012 to 2013, going into that presidential election, isn't it true that Mr. Hernandez and Mr. Pastor were competing for the presidential candidacy for president of Honduras?

A.  They were not competitors.  At the time, Juan Orlando Hernandez had greater support as a candidate.

Q.  But you gave money to Mr. Pastor, not Mr. Hernandez.

MR. ROBLES:  Objection.  Asked and answered.

THE COURT:  Overruled.

A.  Please rephrase the question, counselor?

Q.  Even though you were best friends with Mr. Hernandez, you gave campaign contributions to Mr. Pastor, did you not?

A.  No.

Q.  That's what you are telling this jury?

MR. ROBLES:  Objection.

THE COURT:  Sustained.

Q.  Who did you support in the campaign for the presidency, or that particular post in the Honduran election of 2014?

A.  I was supporting Juan Orlando Hernandez and Miguel Pastor.

Q.  You decided to support both of them at the same time?

A.   My party -- and you have to remember that the party does not belong to one individual person, it has several members -- and my party decided to support Juan Orlando as their only candidate.

Q.   In fact, though, you were a member of Miguel Pastor's political group; correct?

A.   A member of the National Party.

Q.   Mr. Pastor had his own faction inside the National Party and you were a member of that faction; correct?

A.   I was a member of the National Party of Honduras, sir.

Q.   And what faction of the party were you a member of?

A.   The Honduran National Party.

Q.   You don't want to tell the jury what faction you were part of; is that the case?

          MR. ROBLES:  Objection.

          THE COURT:  Sustained.

          Ladies and gentlemen, we will break for lunch.  Please do not discuss the case among yourselves or with anyone.  We will be back in action at 2:00.  Thank you.

          And everyone in the courtroom is to remain seated until our jurors clear the elevator lobby.  Thank you.

          (Jury not present)

          MS. SHROFF:  Your Honor, with the Court's permission, may I piggyback on Mr. Colon's --

          THE COURT:  One second.

THE WITNESS:  Am I coming back at 2:00?

THE COURT:  The answer, sir, is yes.  Are you due some place else, sir?

THE WITNESS:  No, sir.

THE COURT:  OK.

MS. SHROFF:  Your Honor, may I have the Court's permission to just raise one matter?  I would be piggybacking on an objection that the Court sustained.

THE COURT:  OK.  Sure.

MR. ROBLES:  Your Honor, should the witness --

THE COURT:  Excuse the witness, please.

(Witness steps down)

THE COURT:  Please be seated.

MR. GUTWILLIG:  Thank you, your Honor.

THE COURT:  Is this as to the last witness?

MS. SHROFF:  Yes, your Honor.

THE COURT:  That's up to Mr. Colon to argue.  I'm not going to have two lawyers doing the same witness.

MS. SHROFF:  May I just have a moment, your Honor?

THE COURT:  Sure.

(Counsel conferring)

MR. COLON:  Your Honor, if I may, when I asked the witness questions about his prep, I inquired as to whether this was the same group of interpreters and the same group of prosecutors.  These two groups, prosecutors and interpreters,

were involved in his preparation or his proffers for a

significant amount of time and that goes to, I think, I

believe, a certain level or risk of bias giving the --

THE COURT:  What ruling are you challenging?

MR. COLON:  The fact that you sustained their

objections when I asked questions about did you meet with these

prosecutors or have these interpreters.

THE COURT:  I believe you are mistaken, sir.

Mr. Colon, you were here, correct?

MR. COLON:  Yes, sir.

THE COURT:  So you dot need to consult on this.  I

sustained the objection as to interpreter.  That's not

relevant.

MR. COLON:  How about prosecutors, sir?

THE COURT:  I might have sustained an objection to

form but I didn't sustain -- I don't recall sustaining an

objection on relevance grounds to the identity of the

prosecutors.  If I did, I'm going to let you ask that question

after the lunch break because it may be relevant.  I don't

disagree with that.  However, I do take issue with you and I

don't intend to change my decision with regard to interpreters,

that's not relevant.  So, I don't understand your point.

MR. COLON:  Well, the relevance has to do with the

prosecutors moreso.

THE COURT:  Where did I sustain an objection on

relevance as to the identity of the prosecutors?  I'm not aware of having done that.  If you can point to that -- you have LiveNote here -- you can read from my ruling if you would like to, but is the government aware of my sustaining an objection on relevance grounds to prior meetings with prosecutors?

MR. ROBLES:  No, your Honor.  I recall it being as to the interpreters.

THE COURT:  That's what I recall also.  That's what I ruled on.  It was a relevance objection as to the interpreters and I sustained it and I adhere to that ruling.  I recall no such ruling as to prosecutors.

We are in lunch break.  And if you want to find it over the break and point to me where I made a ruling on relevance as to prosecutors, I would sure be curious to see it.

Thank you.

(Continued on next page)

AFTERNOON SESSION

2:00 p.m.

(In open court; jury present)

THE COURT:  Please be seated.  Mr. Colon, you may inquire.

MR. COLON:  Thank you, Judge.

BY MR. COLON:

Q.  Mr. Lobo, when you took the Mexicans to General Pacheco Tinoco's office, isn't it true that he ran you and the Mexicans out of his office?

A.  Correct.

Q.  Because he was mad, he was actually offended you would even bring up the subject of drug trafficking with him, correct?

A.  The informants.

Q.  That's correct.  The informants talked about bringing drugs into the country, correct?

A.  Correct.

Q.  And the three to five days later, you were at Olancho near your home when there was a funeral at that time, correct?

A.  I do not remember, sir.

Q.  At one time, you found out that your father had told -- rather, Juan had told your father what had happened with the Mexicans at his office, correct?

A.  Juan Orlando spoke to me about that, sir.

Q.  Juan Orlando said he had spoken to your father about that,

correct?

A.  No, sir.

Q.  But did you tell your father that you had actually brought the Mexicans there for mining?

A.  For mining, yes, sir.

Q.  So you didn't tell your father of why you brought the Mexicans there.

A.  The Mexicans were there to speak with Tinoco.  The one who discussed the meeting with me was Juan Orlando Hernandez.

          MR. COLON:  I'm sorry, Judge, can we have that repeated?  The answer please?  That answer, Judge.  I couldn't hear it.

          (The record was read)

Q.  When you spoke to Juan Orlando, what did you tell the jury that Juan Orlando said to you?

A.  I told the jury?  I told the jury that Juan Orlando Hernandez had told me that I needed to be careful in bringing those kinds of people in, that before doing -- bringing them to General Tinoco, I should have asked for identification from them, so that General Tinoco, Juan Orlando Hernandez, and myself would not be affected.

          MR. COLON:  Your Honor, may I have a second, please.

          THE COURT:  Yes.

Q.  Do you recall what you told the prosecutors on December 15, 2015, with respect to what happened with the Mexicans at

General Pacheco's office, and specifically what Juan Orlando said to you?

A.  I do not remember.

MR. COLON:  Your Honor, can we have 3543-23, page 3, posted for the Court, posted for the counsel and the Court and also for Mr. Lobo.

I'd like to ask him, I guess it has to be interpreted of course because it's in English.  I'd like to ask him if that section that's highlighted refreshes his recollection as to what he told prosecutors on December 15, 2015.

THE COURT:  One second now.  Okay.

THE INTERPRETER:  Should the interpreter proceed, your Honor?

THE COURT:  Yes, thank you.

(Pause)

THE INTERPRETER:  Ready, your Honor.

THE COURT:  All right.

Q.  Mr. Lobo, did you understand the interpretation?

A.  I do not remember.

Q.  That doesn't refresh your recollection what you told the prosecutors on that day?

MR. ROBLES:  Your Honor, I'd ask that it be taken down from the witness's screen, the document.

THE COURT:  You can take the document down.  Go ahead.

A.  No, sir.  It's been too long since.

Q.   What he really wanted to warn you was those people could be problems for you and they would kill you, correct?

A.   He said that.

Q.   I didn't ask a question.

You're familiar with the process of the extradition law in Honduras?

A.   No.

Q.   Do you know that it was Mr. Juan Orlando Hernandez that actually as president of the congress was the one that sponsored that legislation?

A.   Yes.

Q.   And it was under Juan Orlando Hernandez's administration that he signed the extradition law into effect, correct, in 2014?

A.   Correct.

Q.   And under Juan Orlando Hernandez -- you were a judge in Honduras, under Juan Orlando Hernandez, the first extraditions, the only extraditions of non-Hondurans came under him and the first one was Carlos Lobo, correct?

A.   Correct.  The first extradited individual was Carlos Arnaldo Lobo.

Q.   The reason he was the first Honduran that was extradited was because your father refused to extradite Hondurans to the United States; isn't that correct?

A.   No.

Q.   What did your father do to extradite Hondurans?

          MR. ROBLES:  Objection.  Relevance.

          THE COURT:  I'll allow it.

A.   Please repeat the question.

Q.   What did Pepe Lobo, your father, do to extradite Hondurans

to the United States for drug trafficking?

A.   He did carry out some extraditions.  The first person he

extradited was Carlos Arnaldo Lobo, as I just said.

Q.   Just a few minutes ago you said it was Juan Orlando

Hernandez that carried out the first extradition in 2014.

A.   Correct.  He signed the law.

Q.   Juan Orlando Hernandez, correct?

A.   Correct.

Q.   So it was not your father that extradited Carlos Lobo.

          THE COURT:  Why don't you take a moment and talk to

co-counsel.

          (Counsel conferring)

Q.   Mr. Lobo, your father refused requests from the United

States government to extradite Carlos Lobo on three occasions

while he was president in 2013; correct?  Yes or no?

          MR. ROBLES:  Objection.  Beyond the scope of the

witness's knowledge, your Honor.

          THE COURT:  I can't hear you.

          MR. ROBLES:  I'm sorry, your Honor.

          Beyond the scope of the witness's knowledge.

MR. COLON:  Your Honor, I'm sorry.

THE COURT:  He may say "I don't know."  We'll find out.  Overruled.

A.  I don't know, sir.

Q.  You were a judge in Honduras, were you not?

A.  Right.

Q.  You handled criminal cases as a judge in Honduras, did you not?

A.  Yes, sir.

Q.  And you're telling this jury that you don't know about the extradition laws in Honduras?

MR. ROBLES:  Objection.

THE COURT:  Sustained.

Q.  Do you know whether your father refused three requests from the United States government to extradite Carlos Lobo; if you know?

MR. ROBLES:  Objection.  Asked and answered.

THE COURT:  You've asked that I believe.

Q.  Do you know how many individuals from Honduras were extradited under the administration of Juan Orlando Hernandez?

A.  Two individuals.  The Valle brothers.

Q.  Right.  And those were partners of yours, were they not?

A.  No.  The Valles were Juan Orlando Hernandez's partners.

MR. COLON:  Move to strike.

THE COURT:  Overruled.

Q.  Didn't you have narcotics trafficking activity with the Valles?

A.  Only with the sister, Digna Valle.

Q.  That's one of the Valles, correct?

A.  Yes.

Q.  She was extradited, correct?

A.  I don't remember, sir.

Q.  You were arrested in 2015?

A.  Correct, sir.

Q.  In Haiti, correct?

A.  Correct, sir.

Q.  And how long were you in a Haitian jail?

A.  I do not remember.

Q.  Were the surroundings comfortable in the Haitian jail?

        MR. ROBLES:  Objection.  Relevance.

        THE COURT:  Sustained.

Q.  It was not a fun experience to be in the jail there, correct?

        MR. ROBLES:  Objection.  Argumentative.

        THE COURT:  Sustained.

Q.  You suffered in that jail, correct?

        MR. ROBLES:  Objection.

        THE COURT:  Sustained.

Q.  You did not like the fact that you had been arrested in Haiti, correct?

MR. ROBLES:  Objection.

THE COURT:  Sustained.

Q.  When you were arrested in Haiti, you blamed Juan Orlando Hernandez for that arrest at one time, correct?

A.  No.

Q.  In fact, you actually told your wife that you were mad that you were arrested in Haiti.

A.  No.

Q.  You wanted to take it out on him, on Juan Orlando Hernandez at that point, correct?

A.  At no time, sir.

Q.  When he was president of Honduras, you were hoping he would help get you out of jail, correct?

A.  No, sir.

Q.  Especially because you were such good friends.

A.  No, sir.

Q.  Did you tell your wife that you were mad at Juan Orlando Hernandez?

A.  No, sir.

Q.  If you know, it was under Juan Orlando Hernandez that the seizures laws were passed, correct?

MR. ROBLES:  Objection.  Relevance to this witness's knowledge.

THE COURT:  Overruled.

A.  I don't remember, sir.

Q.  Were you living in Honduras in 2014?

A.  Yes, sir.

Q.  And as a former judge, weren't knowledge of the extradition laws important to you?

            MR. ROBLES:  Objection.  Relevance.

            THE COURT:  Sustained.

            MR. COLON:  Did you say "sustained," sir?

            THE COURT:  I did.

Q.  Getting back to all the money that you paid to Juan Orlando Hernandez.  Do you have any documentation to support your testimony that you gave him money in the form of bribes?

A.  The documentation is our word.  For us, the documentation is our word.  We don't need documents, sir.

Q.  In other words, you have no documentation to support your testimony that you paid him money.

A.  He knows that I paid him money.

            MR. COLON:  Move to strike, your Honor.

            THE COURT:  Sustained.

Q.  Once again, you have no documentation to prove that you gave him a bribe.

A.  No, sir.

Q.  And you have no audio, like in terms of a recorded phone call, that you gave him a bribe and he accepted that money, correct?

A.  Correct, sir.

O313HER3                         Lobo - Cross

Q.  You have no video recording of you having given him a bribe, correct?

A.  If I could have access to my phone that I had at that time, my phone number is in there, along with his phone number.

MR. COLON:  Once again, Judge, move to strike, please.

THE COURT:  Granted.  Stricken.

MR. COLON:  I'm sorry, Judge?

THE COURT:  Granted.  Stricken.

MR. COLON:  Thank you.

Q.  You have no video at all about the transactions that you did or testified to with respect to Juan Orlando Hernandez, correct?

A.  Correct.

Q.  And you have no telephone recordings, audio telephone recordings of your conversations with Juan Orlando Hernandez, correct?

A.  I don't have recordings, but I do have his phone number, sir.

Q.  You don't have a phone that you could give to the government so they could come on and be displayed or proffered as evidence, do you?

A.  I don't.  I don't have that right now.

Q.  You don't have any photographs of your payments to Mr. Juan Orlando Hernandez?

A.  No, sir.

Q.   You have no text messages or BBM messages that you could provide to the jury that supports your testimony that you bribed Mr. Juan Orlando Hernandez, correct?

A.   There are some text messages speaking about Juan Orlando between me and some cartel members.

Q.   Can you produce them for the jury, please?

        MR. ROBLES:   Objection.

        THE COURT:   Sustained.

        Next question.

Q.   Did you provide any text messages to the government?

A.   I don't remember right now, sir.

Q.   You testified that the name the nickname you had for Juan Orlando Hernandez was JOH, correct?

A.   Yes.   Juan or JOH.

Q.   So just since you're such good friends, that's the only nickname you have for him, JOH, right?

A.   Or leader.

Q.   Or leader.

        But JOH is the more favorable one, correct?

A.   Everyone uses that.

Q.   Thank you.

        MR. COLON:   I'm sorry.   May I approach the government, please, sir?

        THE COURT:   Yes.

        (Counsel conferring)

MR. COLON:  Your Honor, we're trying to pull up a defense exhibit so it could be shown to the witness.

THE COURT:  How much longer do you have on cross?

MR. COLON:  10.

THE COURT:  10 minutes you said?

MR. COLON:  I think I have half an hour, sir.

THE COURT:  I thought I heard you say 10.

MR. COLON:  That was my co-counsel and I talking, Judge.  It will be less than 30.

Q.  I'd like Defense Exhibit 250 marked for identification shown to the witness only.

Have you had a chance to review that exhibit that's not in evidence?

A.  Rephrase the question?

Q.  I'm sorry.  It's actually Exhibit 250, your Honor.  I'm sorry.

Have you had an opportunity to review this exhibit, what's depicted in it?

A.  No.

Q.  Do you need more time, sir?

THE COURT:  Let me hear the question that comes after the review of the exhibit so maybe we can shortcut this.  Go ahead.

Q.  Mr. Lobo, you actually named -- you gave the number two. Would you like to change your answer in terms of how many

people were extradited?

MR. ROBLES:  Objection.

THE COURT:  In other words, looking at this exhibit, does it refresh your recollection as to the number of persons who were extradited when?

MR. COLON:  2014 on.

A.  Somewhat.

THE COURT:  All right.  You may testify as to your refreshed recollection.  What is it?

MR. ROBLES:  Your Honor, can the exhibit be taken down?

THE COURT:  Please take the exhibit down.  Thank you. Yes, and go ahead, sir.

THE WITNESS:  What is the question?

THE COURT:  The question, sir, you said it refreshed your recollection somewhat.  And I'm now asking you what is your refreshed recollection?

THE WITNESS:  People who were extradited?

Q.  Yes.

A.  What are you asking?

Q.  Does that refresh your recollection as to the number of people that you recall were extradited?

A.  Yes, some of them.  Some of them when I was in Honduras.

Q.  Was it more than two?

MR. ROBLES:  Objection, your Honor.  Relevance to this

witness's recollection of how many people were extradited.

THE COURT:  I'm going to allow it.

A.  I don't remember.  I only remember that the Valle brothers were extradited and Carlos Arnaldo Lobo.  As for the rest, I was in prison.

MR. COLON:  That last part, Judge, as for what?  What was that, sir?

THE COURT:  Rebecca, please read back the answer.

(The record was read)

MR. COLON:  Judge, can we put 250 up for a second, please.

THE COURT:  You may.

Q.  Do you recall whether Luis -- we covered Carlos Lobo.  Do you recall whether Luis --

THE COURT:  You don't have to put it back up for this witness.  Put it up for yourself.  Take it down for the witness.  Go ahead.

Q.  How about Luis Alonso Valle Valle?

THE COURT:  Ask a question.  Not "how about."

MR. COLON:  Sorry, Judge.

Q.  Luis Alonso Valle Valle.  Do you recall whether he was extradited?

A.  I did see that in the media.

Q.  How about Miguel Arnulfo Valle Valle, do you recall whether he was extradited?

MR. ROBLES:  Objection, your Honor.  Relevance and the answer is based on hearsay.

Q.  After 2014, these are the names I am going to cite off respectfully.

MR. ROBLES:  Objection.

THE COURT:  What is the relevance of whether he knows or doesn't know who else was extradited?

MR. COLON:  I'll withdraw.

THE COURT:  Okay.  Next question.

Q.  Do you have any text messages with respect to communications with Tony Hernandez, sir?

A.  Yes, sir.

Q.  Did you produce those to the government?

A.  No, sir.

Q.  How about text messages with the Valle Valles?

A.  No, sir.  I didn't know them at that time.

Q.  Did you have in your possession text messages with the Cachiros?

A.  Yes, sir.

Q.  Did you provide them to the government, sir?

A.  I don't remember, sir.

Q.  Did you have any text messages with the Sinaloa Cartel members?

A.  Yes, sir.

Q.  Did you provide that to the government, sir?

O313HER3                         Lobo - Cross

A.   Yes, sir.

Q.   You provided it to the government?

          THE COURT:   Sustained.

Q.   When did you provide it to the government?

A.   I don't remember the date, sir.

Q.   Did you have any audio recordings at all with Mr. Tony Hernandez?

A.   No, sir.

Q.   Did you have any audio recordings with the Valle Valles?

A.   Only with Mrs. Digna Valle, sir.   I saw her in person.

Q.   Did you provide those audio recordings of Ms. Valle to the government, sir?

A.   No, sir.

Q.   How about the Cachiros, did you have any audio recordings with respect to Cachiros?

A.   I don't remember, sir.

Q.   Did you have any video recordings of your interactions or your drug trafficking activity with Mr. Tony Hernandez?

A.   No, sir.

Q.   You didn't have any video recordings at all with the Valle Valles, correct?

A.   No, sir.

Q.   And no video recordings of your activity with the Cachiros, correct?

A.   With the Cachiros, I did, sir.

Q.   Did you provide that to the government?

A.   Yes, sir.

Q.   Was that when it involved the Mexicans going to Pacheco
Tinoco's office, sir?

A.   Correct.

Q.   That's all you provided to the government, correct?

A.   Correct, sir.

Q.   With respect to the gas station ride that you took with
Tony Hernandez; do you recall that?

A.   Yes, sir.

Q.   Whose car was driven to that gas station?

A.   I don't know whose it was, sir.

Q.   Did you drive Mr. Hernandez to the gas station?

A.   I went in his car, sir.

Q.   What kind of vehicle did he have?

A.   An SUV, sir.

Q.   And when he asked you to take him to the gas station, he
brought back a blue bag to the car, correct?

A.   A blue backpack.

Q.   A blue backpack?

          THE INTERPRETER:  May the interpreter clarify
something with the witness, your Honor.

          THE COURT:  Yes.

          THE INTERPRETER:  Interpreter correction.

          A blue duffle bag, a big one.

O313HER3                        Lobo - Cross

Q.   Can you show to the jury about how long that blue duffle
bag was in terms of by extending your arms.

          MR. COLON:  If the Court permits him, sir.

          THE COURT:  Yes.

A.   Big.

          MR. COLON:  About 3 feet, Judge?

          THE COURT:  I would say 4.

          THE WITNESS:  More.

Q.   Was it 4 feet?

A.   Over 4.

          THE COURT:  That's the witness's testimony.  Go ahead.

Q.   4 feet.  And from where you're sitting now let's say to
where the top of the -- the top of the stand over there, can
you just indicate how high that would have been.

          What's the height of that bag, sir, if you can?

A.   Big.

Q.   Could you please, if you could demonstrate to the jury how
tall that was.  How high it was.

A.   Long.

Q.   That's the width.

A.   And tall.

          THE COURT:  Two-and-a-half to 3 feet, something like
that.

Q.   You're telling the jury that there was --

A.   Approximately.

Q.  And you're telling the jury that there was $4 million in a duffle bag that that's size?

MR. ROBLES:  Objection.  Form.

THE COURT:  Sustained as to form.

Q.  Is it your testimony that the $4 million was in that duffle bag?

A.  4 million.  Not 4 and a half.  4 million.

Q.  That $4 million was in a bag which the length was about 4 feet, and the height was about two-and-a-half feet.  Correct?

THE COURT:  That's not what the witness's testimony is.

Q.  How high was the bag, sir?

MR. ROBLES:  Objection.  Asked and answered.

Q.  Was it two-and-a-half feet high?  Is that correct?

A.  Approximately.

Q.  And your testimony is that $4 million fit in that bag. That would be your testimony.

MR. ROBLES:  Objection.  Asked and answered.

THE COURT:  I'll allow it.  Go ahead.

A.  It is in a large duffle bag, as it was, in hundred dollar bills.  There were approximately 40 bundles in hundred dollar bills.

Q.  You didn't count all the money in that bag, did you?

A.  No, sir.

Q.  So you really don't know how much money, if any, was in

there?

A.  I took Tony's word for it.  He told me there were 4 million.  It was not my responsibility to count the money.

MR. COLON:  Move to strike, Judge.

THE COURT:  No.  I think that's a fair answer.  Go ahead.

Q.  You had no personal knowledge of what was in that bag, correct?

MR. ROBLES:  Objection.  Asked and answered.

Q.  In terms of the amount of money.  You had no personal knowledge of the amount of money that was in that bag, correct?

MR. ROBLES:  Objection.  Asked and answered.

THE COURT:  He's already answered the question.

Q.  That was a very heavy bag; was it not, sir?

A.  I did not hold it.  Tony held it in his hands, in his arms.

Q.  You didn't help him carry that; did you not?

A.  No, sir.

Q.  Did you have any communications with Javier Rivera Maradiaga?

A.  Many, sir.

Q.  Do you have any text messages with Javier Rivera Maradiaga?

MR. ROBLES:  Objection.  Asked and answered with respect to the Cachiros, your Honor.

THE COURT:  You've covered this already.  And you asked about videos and documents.

MR. COLON:  I'm sorry, Judge.  I left out Mr. Javier's name.

THE COURT:  He was, was he not, subsumed within the Cachiros?

MR. COLON:  Yes, he was, sir.

THE COURT:  Okay.

Q.  Do you have a Rule 35 agreement with the government?

A.  Yes.

Q.  And that Rule 35, what it would allow the Court is to reduce your sentence if the judge feels so inclined to do so, correct?

A.  Yes.

Q.  And you're hoping that you get as low a sentence as possible, correct?

A.  Yes, sir.

Q.  You would desire to get time served, correct?

A.  Correct, sir.

Q.  And you're doing that now, by testifying against Juan Orlando Hernandez, correct?

A.  Correct, sir.

Q.  One of your best friends, correct?

A.  Yes, sir.

MR. COLON:  Your Honor, I have no further questions.

THE COURT:  All right.  Redirect?

MR. ROBLES:  One moment, your Honor.

THE COURT:  Yes.

MR. ROBLES:  Very brief, your Honor.

REDIRECT EXAMINATION

BY MR. ROBLES:

Q.  Mr. Lobo, you were asked on cross-examination about your arrest in 2015.  Do you remember that?

A.  Yes.

Q.  And that arrest was in Haiti, right?

A.  Correct.

Q.  And it was Leonel Rivera, one of the Cachiros, who told you to go to Haiti, correct?

A.  Correct.

Q.  And do you remember being asked about your sentencing in 2017 on cross-examination?

A.  Correct.

Q.  By the time you reached out to the DEA in 2022, you were already serving that sentence, right?

A.  That's correct.

Q.  And after you reached out to the DEA, you started meeting with prosecutors, correct?

A.  Correct.

Q.  Mr. Lobo, during those initial meetings, you didn't tell the government everything you knew, right?

A.  Right.

Q.  Sitting here today, now have you told the government the

full extent of your involvement in criminal activity?

A.   Yes.

Q.   Does that include criminal activity with the defendant?

A.   Yes, sir.

Q.   Mr. Lobo, you were also asked on cross-examination whether you have any text messages between you and members of the Cachiros; do you remember that?

A.   Yes, sir.

          MR. ROBLES:   Ms. Collins, can you pull up for the witness, the parties, and the Court what's marked as Government Exhibit 410.

Q.   Mr. Lobo, I am going to ask you to take a moment to review both pages of this exhibit.

          (Pause)

A.   Yes, sir.

          MR. ROBLES:   Ms. Collins, if you can go to the next page, please.

A.   Yes, sir.

Q.   Mr. Lobo, is Government Exhibit 410 a set of text messages between you and Leonel Rivera, one of the Cachiros?

A.   Correct, sir.

          MR. ROBLES:   The government offers Government Exhibit 410 along with Government Exhibit 410-T, which is the corresponding English translation, which was previously offered subject to connection.

MR. COLON:  Objection.  Relevance.

THE COURT:  Basis?

MR. ROBLES:  Your Honor, he was specifically asked whether or not he had text messages with the Cachiros.  And the relevance of these text messages will be apparent from the questioning.

THE COURT:  Overruled.

MR. COLON:  Sidebar, Judge?

THE COURT:  No. Overruled.

(Government's Exhibit 410, 410-T received in evidence)

MR. ROBLES:  Ms. Collins, can you please publish Government Exhibit 410-T.

Q.  Mr. Lobo, the text messages that you reviewed, do those concern conversations you had with Leonel Rivera about properties that were being seized from the Cachiros?

A.  Yes, sir.

Q.  In those text messages, did you confirm you had spoken with the defendant?

A.  Yes, sir.

MR. ROBLES:  Ms. Collins, if you could please go to page 3 in Government Exhibit 410-T and zoom in on line number 19.

Q.  Mr. Lobo, when you said "with JO," who is JO?

A.  Juan Orlando Hernandez Alvarado.

MR. ROBLES:  Ms. Collins, can you please go to line

O313HER3

number 24.

Q.  Mr. Lobo, when you said that he should support them, that they've already taken enough.  Are you talking about that the defendant should support the Cachiros?

A.  Correct, sir.

MR. ROBLES:  Thank you, you can take that down.

Q.  Mr. Lobo, you were asked about an extradition law on cross-examination.  Do you remember that?

A.  Yes, sir.

Q.  That law was passed in 2012, right?

A.  Correct.

Q.  You paid bribes to the defendant in 2013, right?

A.  Yes, sir.

Q.  And you had conversations with the defendant about your drug trafficking in 2013?

A.  Yes, sir.

Q.  Did the defendant ever arrest you?

A.  No, sir.

Q.  Did the defendant ever extradite you?

A.  No, sir.

MR. ROBLES:  One moment, your Honor.

No further questions.

THE COURT:  All right.  You may step down, sir.

(Witness excused)

THE COURT:  Call your next witness.

MR. ROBLES:  Your Honor, the government calls Giovani Rodriguez.  Your Honor, I understand the marshals may need a moment to facilitate the witness.

THE COURT:  Maybe we'll take our midafternoon recess. Please do not discuss the case among yourselves or with anyone. Back in action in 10 minutes.

(Jury excused)

THE COURT:  We're in recess.  Thank you.

(Recess)

(In open court; jury present)

THE COURT:  Please be seated.

Government may call its next witness.

MR. ROBLES:  Thank you, your Honor.  The government calls Giovani Rodriguez.

GIOVANI RODRIGUEZ,

    called as a witness by the Government,

    having been duly sworn, testified through the interpreter

    as follows:

DIRECT EXAMINATION

BY MR. ROBLES:

Q.  Good afternoon, Mr. Rodriguez.

A.  Good afternoon.

Q.  Where are you from?

A.  From Honduras.

Q.  Did you come from prison earlier today?

O313HER3                      Rodriguez - Direct

A.   Yes.

Q.   How long have you been in prison?

A.   Seven years, seven months.

Q.   Why are you in prison?

A.   For a drug trafficking conspiracy by the United States.

Q.   Did you in fact engage in drug trafficking?

A.   Yes.

Q.   Where were you when you did that?

A.   In Honduras.

Q.   When you engaged in drug trafficking in Honduras, where were the drugs going?

A.   To the United States.

Q.   Was that drug cocaine?

A.   Yes.

Q.   Between approximately what years were you involved in drug trafficking?

A.   From approximately the year 2004 until the year 2016.

Q.   While you lived in Honduras, did you have a particular profession?

A.   Yes.

Q.   What profession was that?

A.   I was a police officer.

Q.   Were you a police officer at a particular agency?

A.   Yes.

Q.   What agency was that?

A.   The National Police of Honduras.

Q.   Did you traffic drugs while you were a police officer in Honduras?

A.   Yes.

Q.   Did you work with any other police officers in the Honduran National Police to traffic cocaine?

A.   Yes.

Q.   Who were some of those police officers?

A.   Mauricio Hernandez Pineda, Juan Manuel Avila Meza.

Q.   Are those just some of the police officers you worked with?

A.   Yes.

Q.   Generally speaking, as a member of the Honduran National Police, what did you do to help traffic cocaine?

A.   Basically, provide drug traffickers with information, protection, and security.

Q.   When you say you provided drug traffickers with information, what type of information did you provide?

A.   Information about police checkpoints on the routes that they moved through, and information about general police operations at the national level.

Q.   When you say that you helped provide protection for drug traffickers, what do you mean by that?

A.   Well, I mean that we escorted the drugs, along with other people, police officers and civilians, we would escort and accompany them along the route from their point of origin to

O313HER3                    Rodriguez - Direct

their destination.

Q.  When you provided protection for these drug shipments, were you armed?

A.  Yes.

Q.  Were other people armed as well?

A.  Yes.

Q.  What types of firearms did you and others have when you provided protection for drug shipments?

A.  We would carry short guns, 9 millimeters, and long guns, M16s, Galils, AR-15s.

Q.  And the M16s, the AR-15s, the Galils, are those weapons you had access to as members of the Honduran National Police?

A.  Yes, that is a fact.  They were service weapons issued to us as police officers.

Q.  Mr. Rodriguez, did there come a time when you surrendered to U.S. authorities?

A.  Yes.

Q.  Approximately what year did you surrender to U.S. authorities?

A.  In approximately the year 2016.

          (Continued on next page)

BY MR. ROBLES:  (Continued)

Q.  At the time that you surrendered, had you been charged with crimes here in the United States?

A.  Yes.

Q.  Had you learned about those charges before turning yourself in?

A.  Yes.

Q.  And after you surrendered to U.S. authorities, did there come a time when you entered into a cooperation agreement with the government?

A.  Yes.

Q.  In connection with that cooperation agreement, did you plead guilty to any particular crimes?

A.  Yes.

Q.  What crime did you plead guilty to?

A.  Drug trafficking conspiracy and firearms.

Q.  Are you testifying today pursuant to your obligations under that cooperation agreement?

A.  Yes.

Q.  And in connection with that cooperation agreement, did you admit to the government other crimes that you have committed throughout your life?

A.  Yes.

Q.  Did that include a murder?

A.  Yes.

Q.  Who was murdered?

A.  Mr. Orlan Chavez.

Q.  When was Orlan Chavez murdered?

A.  In approximately the year 2013.

Q.  Did that happen in Honduras?

A.  Yes.

Q.  Who was Orlan Chavez?

A.  Orlan Chavez was a prosecutor assigned to the anti-drug trafficking prosecutor's office in Honduras.

Q.  What did you do to participate in the murder of Orlan Chavez?

A.  Basically, I was hired to find people to kill him.

Q.  And did you find people to kill him?

A.  Yes.

Q.  Why did you participate in that murder?

A.  Well, basically because he was investigating a cousin of mine; that was the person who told me to do it.  He was investigating us in drug trafficking.

Q.  And did you personally carry out the murder or did the people you found carry out the murder?

A.  The people who we found.

Q.  Mr. Rodriguez, when did you begin your career as a police officer in Honduras?

A.  In approximately the year 1991.

Q.  Were you a member of the Honduran National Police until

your surrender in approximately 2016?

A.  Yes.

Q.  Can you describe the ranks that you held during your career as a police officer in Honduras?

A.  I studied at the National Police academy for four years and I graduated as a sub inspector and then I was an inspector and then I was a sub comisario and comisario and then sub comisionado.

Q.  As a member of the Honduran National Police, were you issued any particular firearms?

A.  Yes.

Q.  Are those the firearms you testified about a moment ago?

A.  Yes.

Q.  You testified that as a member of the National Police you trafficked cocaine.  Aside from police officers, who were some of the drug traffickers that you worked with directly?

A.  It was Victor Hugo Diaz Morales, Reuben Mejia, among others.

MR. ROBLES:  Ms. Collins, can you pull up for the witness, the parties, and the Court, what is marked as Government Exhibit 104?

Q.  Mr. Rodriguez, do you recognize what is on the screen?

A.  Yes.

Q.  What is that?

A.  Victor Hugo Diaz Morales.

Q.  Is that a true and accurate picture of Victor Hugo Diaz
Morales?

A.  Yes.

          MR. ROBLES:  The government offers Government Exhibit
104.

          MR. STABILE:  No objection.

          THE COURT:  Received.

          (Government's Exhibit 104 received in evidence)

          MR. ROBLES:  Thank you.  Ms. Collins, you may publish.
Thank you.

Q.  Mr. Rodriguez, did you know this individual by any
nicknames?

A.  Yes.

Q.  What nickname was that?

A.  Rojo.

          MR. ROBLES:  Thank you, Ms. Collins.  You can take it
down.

Q.  Approximately when did you start working with Rojo?

A.  In approximately 2005.  Beginning in 2005.

Q.  What were some of the things that you did to help Rojo in
his drug trafficking?

A.  Provide him with information and protect and provide
security for the drug shipments.

Q.  When you say you provided security, can you describe what
that security actually looked like?

A.   Well, the security basically looked like this:  Beginning in the place where the drugs arrived, its point of origin in the part of Atlantida, Honduras, we would accompany it around the whole route and escort the drugs with several vehicles in order to inform about police checkpoints and also to provide security so that the drugs would not be stolen and they would arrive to their final destination.

Q.   And when you say you would provide security, was that armed security?

A.   Yes.

Q.   Did that include the guns you referenced earlier?

A.   Yes.

         MR. ROBLES:  Ms. Collins, can you please publish what is in evidence as Government Exhibit 3?

Q.   Mr. Rodriguez, do you recognize what is on the screen?

A.   Yes.

Q.   Can you please describe the drug route that you would typically provide protection for?

A.   Well, we would leave from the department of Atlantida and go along the main road -- well, we would first receive the drugs that were coming by sea in Atlantida, that was the point of origin, and then we would go by land along the main road passing through Tele Atlantida to San Pedro Sula.  From there we would go through the department of Santa Barbara, and from there on to the department of Copán, especially the town of

O315her4                         Rodriguez – Direct

El Paraiso.  That was the destination.

Q.  Mr. Rodriguez, when you were transporting cocaine across Honduras, what types of vehicles were used to transport the cocaine?

A.  Well, the vehicles that carried the cocaine were heavy-duty vehicles.

Q.  When you say a heavy-duty vehicle, what do you mean by that?

A.  A dump truck-type of vehicle.

Q.  And where, specifically in the truck, would the cocaine be stored?

A.  There was a hidden compartment, a false bottom that was under the cargo area of the dump truck so there was a false bottom there where the drugs would be put in.

        MR. ROBLES:  Ms. Collins, you can take that down. Thank you.

Q.  Approximately how many drug shipments did you protect for Rojo?

A.  Many.

Q.  Did you ever have any conversations with Rojo about where the cocaine was going?

A.  Yes.

Q.  And what would Rojo tell you?

A.  Well, he said that the cocaine was going to the United States through the department of Copán.  From the department of

Copán it would go to Guatemala, from Guatemala to Mexico and the ultimate destination was the United States.

Q.   While you were protecting drug shipments for Rojo, did you ever speak to him about who, if anyone else, he was working with?

A.   Yes.

Q.   What did Rojo tell you?

A.   Rojo told me that he was working with Tony Hernandez -- with Tony Hernandez and Mauricio Hernandez Pineda, his cousin. He was working with the two of them, and basically that he was being supported by Tony Hernandez.

Q.   When you say Mauricio Hernandez Pineda was his cousin, who was Mauricio Hernandez Pineda related to?

A.   He was cousins with Tony Hernandez and Juan Orlando Hernandez.

Q.   What, specifically, did Rojo tell you was Mauricio Hernandez Pineda's role in the drug operation?

A.   Well, Mauricio Hernandez Pineda was doing the same work that I was doing; he was providing protection and security for the drug shipments.

          MR. ROBLES:  Ms. Collins, can you please publish Government Exhibit 106 that is in evidence?

Q.   Mr. Rodriguez, do you recognize what is on the screen?

A.   Yes.

Q.   Who is that?

A.   Mauricio Hernandez Pineda.

Q.   When did you first meet Mauricio Hernandez Pineda?

A.   Approximately, in the year 1991.

MR. ROBLES:  Ms. Collins, you can take that down.
Thank you.

Q.   Where did you meet him?

A.   At the National Police Academy.

Q.   Was Mauricio Hernandez Pineda also a police officer?

A.   Yes.

Q.   And did you join the police academy together?

A.   Yes.

Q.   Can you please describe what your relationship was like
with Mauricio Hernandez Pineda?

A.   Very, very close.

Q.   What do you mean by that?

A.   Well, that from the very beginning we became very close.
There was a close friendship between the two of us since the
very moment that we started the academy, and as the years went
on we developed this very, very close friendship that was a
relationship of trust between us.

Q.   And did you maintain that close relationship with Mauricio
Hernandez until your surrender in 2016?

A.   Yes.

Q.   Did there come a time when you saw Mauricio Hernandez
providing protection for any of Rojo's drug shipments?

O315her4                      Rodriguez - Direct

A.   Yes.

Q.   Approximately when did you first see this happen?

A.   Approximately in the years 2005, 2006.

Q.   What, specifically, did you see Mauricio Hernandez Pineda
doing?

A.   Well, basically the same thing that I was doing.  He was
escorting and providing custody for a drug shipment; security.

Q.   Can you tell whether Mauricio Hernandez Pineda was armed?

A.   Yes.

Q.   With what types of firearms?

A.   Short guns and long guns.

Q.   What do you mean by long guns?

A.   By long guns I am referring to a rifle-type of gun, that
being an M16 or a Galil, which at the time were the National
Police's service weapons.

Q.   Did you ever speak to Mauricio Hernandez about providing
protection for Rojo's drug shipments?

A.   Yes.

Q.   And what did you speak about?

A.   Well, basically that he was working for Rojo and that he
had the support of Tony Hernandez, who was also part of the
organization with which we were working at the time.

Q.   Did the name "Juan Orlando Hernandez" ever come up in those
conversations?

A.   Yes.

Q.  What did Mauricio Hernandez Pineda tell you about Juan Orlando Hernandez?

A.  Well, again, that Tony Hernandez and Juan Orlando Hernandez were protecting us, that we had their support.

Q.  Did you ever protect any of the same drug shipments as Mauricio Hernandez Pineda?

A.  Yes.

Q.  I want to direct your attention now to approximately 2009. Did there come a time when you were arrested in Honduras?

A.  Yes.

Q.  Approximately when in 2009 did that arrest occur?

A.  Approximately in the month of June.

Q.  What were you arrested for?

A.  I was arrested because of a mission that we were carrying out in La Mosquita.  It was really an illegal mission, we were trying to make it look like it was not.  We were trying to make it look like it was an investigative police mission but it was not, it was an illegal mission.

Q.  Is La Mosquita an area of Honduras?

A.  Yes, it's the department of Gracias a Dios.

Q.  And during that mission, did you steal anything?

A.  Yes.

Q.  What did you steal?

A.  143 kilos of cocaine.

Q.  Were you with other police officers when you stole these

143 kilos?

A.  Yes.

Q.  And when you were arrested in connection with this incident, did you spend any time in jail in Honduras?

A.  Yes.

Q.  Approximately how much time did you spend in jail after you were arrested in approximately June 2009?

A.  Approximately two years.

Q.  After you were arrested in Honduras, did you have a trial?

A.  Yes.

Q.  Did you testify at that trial?

A.  Yes.

Q.  Did you testify truthfully at your trial?

A.  No.

Q.  What did you lie about?

A.  Well, basically I lied about the type of operation that we were carrying out, like trying to make it look like it was a legal mission, a lawful mission.  But that was not the case.

Q.  Why did you lie?

A.  To keep my job.

Q.  Is it fair to say it was also to avoid going to jail?

A.  Yes.

Q.  In connection with your cooperation agreement here in the United States, did you tell the government that you previously lied at your trial in Honduras?

O315her4                        Rodriguez - Direct

A.   Yes.

Q.   After your trial in Honduras, were you convicted?

A.   Yes.

Q.   What crime were you convicted of?

A.   Abuse of authority and violation of public official's duties.

Q.   Did there come a time when those convictions were overturned?

A.   Yes.

Q.   What, if anything, did you do to ensure that your convictions would be overturned?

A.   I sought out a friend and his influence in order to reach a favorable resolution.

Q.   Did Mauricio Hernandez Pineda ever visit you while you were in jail in Honduras?

A.   Yes.

Q.   What would you talk about when he visited you in jail?

A.   Well, he went to show solidarity because of what I was going through and he told me that he was at my disposal.

Q.   After you spent time in prison in Honduras, were you reinstated to the Honduran National Police upon your release from prison?

A.   Yes.

Q.   Was that in approximately 2011?

A.   Yes.  Approximately.

O315her4                        Rodriguez - Direct

Q.   What position were you given in the Honduran National
Police after you were released from prison?

A.   I became the assistant director of operations and training
of the National Police.

Q.   What, if any information, did that position give you access
to?

A.   I had access to all information relating to all National
Police operations, the plans of operations, and the orders of
operations at a national level; access to all the countrywide
information.

Q.   After you were released from prison in Honduras, did you
engage in cocaine trafficking again?

A.   Yes.

Q.   How soon after you were released from prison did you start
trafficking cocaine again?

A.   Immediately.

Q.   Did anyone approach you about participating in cocaine
trafficking after you were released from prison?

A.   Yes.

Q.   Who was that?

A.   Mauricio Hernandez.

Q.   What, if anything, did Mauricio Hernandez ask you to do?

A.   Yes.  He told me that he needed my help, for me to provide
him with as much information as possible that I had access to
regarding routes and police operations, for me to keep him

informed because he wanted to stay in the know-how.

Q.   Did Mauricio Hernandez Pineda tell you who, if anyone, he was working with at the time?

A.   Yes.

Q.   Who did he say he was working with?

A.   With Ardón, the Mayor from El Paraiso.

Q.   Did Ardón have any nickname?

A.   Yes.

Q.   What nickname was that?

A.   Chande.

Q.   Did Mauricio Hernandez Pineda also mention Tony Hernandez?

A.   Yes; that they were also working with Tony Hernandez and Tony Hernandez was protecting them.

Q.   What, if anything, did Mauricio Hernandez Pineda tell you that Tony Hernandez and Ardón were doing with the money that they were receiving from drug trafficking?

A.   Well, basically the money that Ardón was giving to Tony Hernandez was being given to Juan Orlando Hernandez for party expenses, National Party campaign expenses, and we also counted with the support of Juan Orlando in his protection in whatever we might need.

Q.   Did Mauricio Hernandez Pineda promise you anything in return for helping him with his drug trafficking?

A.   Yes.

Q.   What did he promise you?

A. I would be promoted, promote me.

Q. And were you also promised any money?

A. I was also.

Q. Did you agree to help Mauricio Hernandez Pineda?

A. Yes.

Q. What was your understanding of what Mauricio Hernandez Pineda was going to do with the information that you planned to provide to him?

A. Well, use it for drug trafficking.

Q. After you agreed to help provide information to Mauricio Hernandez Pineda, did you actually do so?

A. Yes.

Q. And did that happen until approximately you surrendered in 2016?

A. Yes.

Q. Approximately how many times did you provide information to Mauricio Hernandez Pineda?

A. Many times.

Q. Where would you typically give Mauricio Hernandez Pineda this information?

A. We would meet at a house that was Tony Hernandez' property.

Q. Did you also meet in other locations as well?

A. Yes.

Q. Were you paid when you provided Mauricio Hernandez Pineda this information?

O315her4                        Rodriguez - Direct

A.   Yes.

Q.   Were you paid in U.S. dollars?

A.   Yes, in dollars.

Q.   And during these conversations that you had with Mauricio Hernandez Pineda about when you were providing information, did Juan Orlando Hernandez' name come up?

A.   Yes.

Q.   What are some of the things that Mauricio Hernandez Pineda would tell you about Juan Orlando Hernandez?

A.   Well, that we were protected and supported by Juan Orlando Hernandez; that Juan Orlando Hernandez had total power and absolute control and that I needn't worry because if anything happened, Tony Hernandez and he were backing us up in any sort of situation.

Q.   After you started providing information to Mauricio Hernandez Pineda, did there come a time when you received a promotion within the Honduran National Police?

A.   Yes.

Q.   What was that promotion?

A.   I was promoted to sub comisionado in the police.

Q.   In order to get that promotion, were any particular approvals needed, to your knowledge?

A.   Yes.  It needed to be approved by the National Congress.

Q.   Approximately what year was your promotion first submitted for approval?

O315her4                         Rodriguez - Direct

A.   My memory is that it was approximately the year 2013, 2012. I don't remember.

Q.   Did you eventually get that promotion?

A.   Yes.

Q.   Did you ever speak to Mauricio Hernandez Pineda about the promotion that you got?

A.   Yes.

Q.   What did he tell you?

A.   Well, basically he said that he had spoken with Tony Hernandez about the promotion and that Tony Hernandez, in turn, was going to speak to Juan Orlando Hernandez for him to give the order to the commission.  There was a commission regarding promotions, a security commission within the National Congress, and he told me that I would be promoted and not to worry.

Q.   Mr. Rodriguez, you testified a moment ago that one of the locations where you provided information to Mauricio Hernandez was at Tony Hernandez' home.  Where was that home?

A.   That house was located Colonia Modelo, that's in Tegucigalpa.

Q.   Who did you go there with?

A.   With Mauricio Hernandez.

Q.   Approximately how many times had you been to that house?

A.   I went several times.

Q.   Was Tony Hernandez ever there?

A.   No.

O315her4                    Rodriguez - Direct

Q.   Why did you and Mauricio Hernandez Pineda go to Tony Hernandez' house if he wasn't there?

A.   Because Mauricio Hernandez Pineda managed the house, he had the keys to the house, he would go there.

Q.   Did you ever have social gatherings at that house?

        INTERPRETER:   The interpreters need to correct the final answer.  Instead of "he would go there," "he would use it."

Q.   Did you ever have social gatherings at that house?

A.   Yes.

Q.   Who would attend those social gatherings?

A.   Prostitutes.

Q.   Did there ever come a time when you saw money in Tony Hernandez' house?

A.   Yes.

Q.   Where did you see that money?

A.   I saw it in one of the bedrooms of the house.

Q.   How was the money packaged, if at all?

A.   In plastic.

Q.   Had you ever seen money packaged that way before?

A.   Yes.

Q.   When had you seen money packaged like that before?

A.   In drug trafficking.

Q.   And the money you saw, was it U.S. dollars?

A.   Yes.

Q.  Can you describe approximately how much money you saw?

A.  Well, it came up approximately to the height of my waist and there were several packages -- interpreter correction -- there were several bundles, stacked one on top of the other understand but it came up approximately to my waist.

Q.  Did you ever speak with Mauricio Hernandez Pineda about what, if anything, Tony Hernandez was doing with the money being earned through drug trafficking?

A.  Yes.

Q.  Did those conversations sometimes occur when you were at Tony Hernandez' house?

A.  Yes.

Q.  What did Mauricio Hernandez Pineda tell you that that money was being used for?

A.  Well, Mauricio Hernandez Pineda told me that that money, Tony Hernandez was giving it to Juan Orlando Hernandez to finance the National Party's campaign.

Q.  Mr. Rodriguez, were you aware that an extradition law was passed in Honduras in 2012?

A.  Yes.

Q.  After that law was passed, did you continue providing information to Mauricio Hernandez Pineda about police operations?

A.  Yes.

Q.  Were you ever arrested at any point between 2012 and when

you surrendered in 2016?

A.   No.

Q.   I want to direct your attention now to approximately 2016 when you learned of U.S. drug charges.  What did you do as a result of learning that information?

A.   Well, I saw the news of the charges on the TV, on the news, and I got in touch personally with the United States embassy, and from there I was put in touch with a DEA agent and I told him that I was willing to surrender to the authorities.  And from that point I -- from that point he said that he would inform the prosecutors here in the U.S. and from that point I would be under their protection.

Q.   Why did you decide to surrender?

A.   Well, it was a personal decision that I made because of the charges.

Q.   Before you surrendered in 2016, did there come a time when Mauricio Hernandez Pineda approached you?

A.   Yes.

Q.   What, if anything, did he say to you?

A.   Well, he said that he was sorry about what was happening, but basically he told me to be careful with regard to what I was going to do here with the authorities in the United States, that I not mention to them what he, Tony Hernandez, and Juan Orlando Hernandez were doing in Honduras because that could be very dangerous for me.  He told me to be careful with that.

Q.   Did the topic of extradition come up during this conversation?

A.   Yes.

Q.   What did Mauricio Hernandez Pineda say to you, if anything, about that?

A.   Well, he told me that basically it was because of what was going on.  I asked him if anything could be done to stop extradition and he said that nothing could be done and that, in fact, Juan Orlando had approved -- interpreter correction -- in fact, Juan Orlando had passed the extradition law due to pressure from the United States, but Juan Orlando's thinking at the time was to get rid of extradition in Honduras.

Q.   And to be clear, Mr. Rodriguez, were you extradited or did you surrender?

A.   No, I surrendered personally.

Q.   And was this the last time that you spoke to Mauricio Hernandez Pineda?

A.   Yes.  I think so.

Q.   After you were charged by U.S. authorities, were you ever arrested by authorities in Honduras?

A.   No.

Q.   And after you surrendered, did you arrive in the United States?

A.   Yes.

Q.   Did you plead guilty once you arrived in the United States?

O315her4                    Rodriguez - Direct

A.   Yes.

Q.   Approximately what year did you first plead guilty?

A.   In approximately toward the end of 2017 or beginning of 2018.  I don't really remember, but it was approximately at that time, between those two years.

Q.   What crime did you plead guilty to?

A.   Drug trafficking conspiracy.

Q.   And at the time that you first pled guilty, what was your understanding of the mandatory minimum sentence that you faced?

A.   Five years.

Q.   And what was the maximum sentence that you faced when you first pled guilty?

A.   40 years.

Q.   After you first pled guilty, did you begin meeting with the government?

A.   Yes.

Q.   What were you hoping to achieve by meeting with the government?

A.   Well, to obtain a cooperation agreement.

Q.   Did you eventually plead guilty to the cooperation agreement that you testified about earlier?

A.   Yes.

Q.   Having pled guilty to that cooperation agreement, what mandatory minimum sentence do you now face?

A.   15 years.

Q.   And what is the maximum sentence that you now face under your cooperation agreement?

A.   Life.

Q.   What are some of the things you are required to do under that cooperation agreement?

A.   Well, testify as a witness, testify truthfully, and not commit any more crimes.

Q.   If you comply with the terms of your cooperation agreement, what is your understanding of what the government will do?

A.   Well, the government will give me a 5K1 letter.

Q.   What is your understanding of what goes into that letter?

A.   That letter contains my bad -- the bad things that I have done and the good things.

Q.   When you say the bad things, does that include crimes that you admitted to the government during meetings?

A.   Yes.

Q.   Does that include crimes that the government learned about because you told them about them?

A.   Yes.

Q.   Has anyone guaranteed you a 5K letter?

A.   No.

Q.   What is your understanding about what that 5K letter does?

A.   Well, the 5K1 letter breaks through the mandatory minimum.

Q.   Is the judge required to sentence you to something below that mandatory minimum even if you get the 5K letter?

A.  No.

Q.  Has anyone made any promises to you about what sentence you will receive?

A.  No.

Q.  What happens if you lie today?

A.  The government tears up my cooperation agreement.

Q.  And does that mean that you face at least a 15-year mandatory minimum sentence?

A.  Yes.

Q.  Mr. Rodriguez, does the verdict of this case have any impact on whether or not you get that 5K letter?

A.  No.

Q.  While you were working with Mauricio Hernandez Pineda and providing him information, were you ever worried about being extradited?

A.  No.

Q.  Were you ever worried about being arrested by Honduran authorities?

A.  No.

Q.  Why not?

A.  Well, because we were being supported by Juan Orlando and Tony Hernandez so I was counting on that.

        MR. ROBLES:  One moment, your Honor?

        (Pause)

        MR. ROBLES:  No further questions.

THE COURT:  All right.  Cross-examination.

CROSS EXAMINATION

BY MR. STABILE:

Q.  So, you never met Juan Orlando Hernandez; right?

A.  Right.

Q.  And you never met Tony Hernandez; right?

A.  Right.

Q.  And you claim that you went to a house that belonged to Tony Hernandez; right?

A.  Right.

Q.  And you saw prostitutes there; right?

A.  Right.

Q.  But you never saw Tony Hernandez there; right?

A.  Right.

Q.  Was there a big "TH" on the front door?

A.  No, but I was told by his cousin that this was his house.

Q.  Right.

And you never saw anything in the home that indicated in any way that the home belonged to Tony Hernandez; right?

A.  Right.

Q.  Did you ever ask why Tony Hernandez was never in his own house?

A.  No.

Q.  When you saw that stack of money, when was that?

A.  At some point.  I don't remember.

O315her4                         Rodriguez - Cross

Q.  20s or 100s?

A.  What I did see was in twenty dollar bills.

Q.  Now, Juan Manuel Avila Meza was a police officer; right?

A.  Right.

Q.  And a lawyer also; right?

A.  Right.

Q.  And you have known him since 1991; right?

A.  Right.

Q.  And he was your lawyer at times; right?

A.  Yes, right.

Q.  And you knew that he also worked for the Cachiros; right?

A.  Right.

Q.  And you and your lawyer Mr. Meza participated in drug trafficking together; right?

A.  Right.

Q.  Now, Mauricio Hernandez Pineda told you that he was Juan Orlando Hernandez' cousin; right?

A.  Right.

Q.  And you don't know if that's true; right?

A.  The truth is that throughout our 30-year relationship, from the very beginning he told me that he was cousins with him, and they were also from the same place, from Gracias Lempira, and he would constantly say that he was cousins with Tony Hernandez and Juan Orlando Hernandez.  And throughout the 30 years of our relationship, in our engagement in the police agency, he would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

always say it, repeat it, and reconfirm it.

Q.  Right, but you met him in 1991; right, Mr. Pineda --
withdrawn.

You met Mr. Pineda in 1991, right?

A.  Starting in 1991.

Q.  Right.  So in 1991 he was telling you he was cousins with
Juan Orlando Hernandez?

A.  Not -- well, see.  Remember that we started the academy in
1991, and so throughout our career he would talk about this
because remember that Juan Orlando Hernandez was a Congressman,
he was in a position of power, so people tend to brag whenever
they have family members or know people that are in a position
of power.

Q.  OK, but this is just something that he told you; right?

A.  Right.

Q.  And he asked you to help him and Pineda help -- withdrawn.

Mr. Pineda asked you to help him with drug
trafficking; right?

A.  Right.

Q.  And he asked you to provide him with information; right?

A.  Right.

Q.  Even though he was the cousin, supposedly, of Juan Orlando
Hernandez; right?

A.  Right.

Q.  Even though he was supposedly the cousin of Tony Hernandez;

right?

A.  Right.

Q.  So instead of going to his cousins he went to you for information; right?

A.  No, because I was the one who had access to police information, not Tony Hernandez or Juan Orlando Hernandez at that level.  Because there are people in charge of the police department within each department, and so they actually seek people that they could trust and who are in charge.  And remember that Juan Orlando Hernandez and Tony Hernandez were not going to do this directly, they would not face you, they would not come and confront you about things, they would look for a middle person.  They would send a person that they trusted in order to approach situations and seek the information.

Q.  So you had the best information to provide to drug dealers; right?

A.  It was department information that was obtained at the department level and it was important information that I possessed and that I had access to because, otherwise, if he had used a different individual, then he would have been exposing himself.

Q.  So, according to you, Mr. Pineda was working with Tony Hernandez; right?

A.  Right.

Q.   And he was working, and according to Mr. Pineda, Tony

Hernandez was also working with Alex Ardón; right?

A.   Right.

Q.   Now, when Juan Orlando Hernandez was president you know

that Mr. Pineda lost his job in the police department; right?

A.   Right.

Q.   That was in 2018; right?

A.   I do not remember.  I was already in jail by that time.  I

have been in jail since 2016 so I do not remember because I was

in jail.  When you are being in jail here, there is no access

to information from our country, the information is very

limited.  We only have access to our family members.

Q.   So starting in 2005 you worked for a drug trafficker named

Rojo; right?

A.   Yes.

Q.   And you would provide security for the transportation of

Rojo's drugs; right?

A.   Yes.

Q.   While you were a police officer; right?

A.   Yes.

Q.   And you did this about 20 or 30 times; right?

A.   Yes.  Many times.

Q.   And who was the president of Honduras in 2005?

A.   Well, I don't remember.

Q.   Ricardo Maduro; right?

A.   I think so.  The thing is that during those years, Juan
Orlando was an influential Congressman in the National
Congress.  He always maintained a certain hegemony within the
National Congress.  That is what was going on.

            MR. STABILE:  Move to strike his answer after "yes."

            THE COURT:  The answer was "I think so," and I will
strike everything after that.

Q.   Now, while, you were a Honduran National Police officer you
were arrested for stealing drugs; right?

A.   Yes.

Q.   Is that was in 2009; right?

A.   Yes.

Q.   And while you were on duty as a police officer, you were
directed by your chief of police to go to La Mosquita with a
group of officers; right?

A.   Yes.

Q.   And you went there to intercept a load of drugs; right?

A.   No.  What it was, was actually an undercover mission or an
undercover operation.  Actually, the information had come from
a subordinate officer.  Apparently he had given that
information to the general director of investigation for him to
approve the mission, but actually what we were seeking to do
was to profit from the mission in that place and that was what
happened.

Q.   And so when you got to that place you were with 10 other

O315her4                        Rodriguez - Cross

officers about; right?

A.  Yes.

Q.  And a gun battle broke out; right?

A.  Yes.

Q.  And you seized 143 kilos of cocaine; right?

A.  Yes.

Q.  And at first you detained some of the people that you had the gun battle with; right?

A.  Yes.

Q.  And then you released them; right?

A.  Yes.

Q.  And you were arrested for stealing that 143 kilos; right?

A.  Yes.

Q.  And the person who led the investigation that led to your arrest was General Julian Aristedes Gonzalez Isaias, right?

A.  No.  Actually, the people who arrested us were the uniform police in La Mosquita.  At that time there was just one officer there from the anti-drug trafficking office, no one else, and so it was the National Police who arrested us and got a warrant from the prosecutor's office.  It was not the general at that time who arrested us, it was not him.

Q.  But General Gonzalez was involved in your prosecution; right?

A.  He participated in the investigation, he did not participate in our prosecution.  The prosecution was carried

O315her4                        Rodriguez - Cross

out by the National Police in La Mosquita and the prosecutor's office.

Q.   Right.  And then General Gonzalez was assassinated; right?

A.   Yes.

Q.   Now, you went to prison in Honduras; right?

A.   Yes, I was in prison.

Q.   And Rojo, the drug dealer you worked with, paid for your lawyer; right?

A.   Yes.

Q.   And you had a trial; right?

A.   Yes.

Q.   And you testified at your trial; right?

A.   Yes.

Q.   And you were under oath; right?

A.   Yes.

Q.   Just like you are right now; right?

A.   Yes.

Q.   And at your trial you testified that the mission to recover drugs was legal; right?

A.   Yes.

Q.   And that was false; right?

A.   Yes.

Q.   You also testified that the mission to recover drugs had been authorized by the director of the investigative police force; right?

A.   Yes.

Q.   And that was another lie under oath; right?

A.   Yes.

Q.   And you also testified at your trial that the mission to recover drugs was an undercover mission; right?

A.   Yes.

Q.   And that was false?

A.   Yes.

Q.   And you also testified that the reason that you had not notified local authorities about the mission was because it was an undercover mission; right?

A.   Yes.

Q.   And that was another lie.

A.   Yes.

Q.   And you also testified at your trial that the only things seized were some guns; right?

A.   Yes.

Q.   And that was another lie; right?

A.   No.  We did have the guns with us.  When we were arrested we had the guns, they had been seized.

Q.   Well, but you testified that the only thing seized were some guns; right?

A.   Yes.  It was the guns.  Right.

Q.   And that -- well, you testified that the only things seized were the guns because you were hiding the cocaine; right?

O315her4                        Rodriguez - Cross

A.   Yes.

Q.   And that was a lie?

A.   Yes.

Q.   Now, you were convicted, despite your lies under oath, of abusing your authority; right?

A.   Yes.

Q.   And after you were convicted you had a friend speak with the judge; right?

A.   Yes.

Q.   After your friend spoke with the judge, your conviction was vacated; right?

A.   Yes.

Q.   Do you know what your friend did with the Judge to get your conviction vacated?

A.   Well, I don't know.  He must have used some sort of influence.  Between the two of them they reached an understanding but the resolution was favorable for me.

Q.   By influence do you mean cash?

A.   Probably.  I don't know.

Q.   Could be; right?

A.   Could be.

        THE COURT:  Well, the witness has testified probably, so.

Q.   That criminal trial you had, that was in 2010; right?

A.   Yes.  It was.  Approximately.  I don't remember.

Q.   And who was the president of Honduras in 2010?

A.   I don't -- I don't remember.  It was -- I don't remember.

Q.   You know it wasn't Juan Orlando Hernandez; right?

A.   No, no.  It was not Juan Orlando Hernandez.

Q.   OK.  So you worked for the Honduran National Police for about -- well, withdrawn.

MR. STABILE:  Your Honor, despite my best efforts, I don't believe I will finish within the next few minutes and this would be a reasonable --

THE COURT:  How much longer do you have?

MR. STABILE:  It could be -- your Honor, it could be 30 to 40 minutes.

THE COURT:  Thank you very much.

Ladies and gentlemen, this concludes our workweek and my advice to you is to put this case out of your mind.  I don't think I need to repeat this but I am going to say it anyway.  Do not discuss it with anyone whatsoever.  Do not do any searches.  You are a great jury, you are conscientious, you are working hard.  Keep up the good work.  Stay safe, stay healthy.  If you need to put a face mask on if you go to a party or stay away from the person who is coughing, please do that, because I want to see you all back bright and early for a 10:00 start on Monday and we will finish our work together.

So, enjoy the weekend.

(Continued on next page)

O315her4                    Rodriguez - Cross

(Jury not present)

THE COURT:  Have a pleasant weekend.

(Adjourned to March 4, 2024 at 9:40 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 FABIO LOBO

Direct By Mr. Robles . . . . . . . . . . . . .1100

Cross By Mr. Colon . . . . . . . . . . . . . .1142

Redirect By Mr. Robles . . . . . . . . . . . .1191

 GIOVANI RODRIGUEZ

Direct By Mr. Robles . . . . . . . . . . . . .1195

Cross By Mr. Stabile . . . . . . . . . . . . .1223

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 362    . . . . . . . . . . . . . . . . . . . .1106

 410, 410-T    . . . . . . . . . . . . . . . .1193

 104    . . . . . . . . . . . . . . . . . . . .1202