O355her1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v.                                    15 Cr. 379 (PKC)

JUAN ORLANDO HERNANDEZ,

                                      Trial
              Defendant.

------------------------------x

                                      New York, N.Y.
                                      March 5, 2024
                                      10:00 a.m.


Before:

                    HON. P. KEVIN CASTEL,

                                      District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  KYLE A. WIRSHBA
     JACOB GUTWILLIG
     ELINOR TARLOW
     DAVID ROBLES
     Assistant United States Attorneys

RENATO CHRISTIAN STABILE
RAYMOND L. COLON
SABRINA P. SHROFF
     Attorneys for Defendant


Also Present:
              Dagoberto Orrantia, Interpreter (Spanish)
              Sonia Berah, Interpreter (Spanish)
              Matthew Passmore, DEA Special Agent

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

O355her1

(Trial resumed; Jury not present)

THE COURT:  Good morning.  Please, be seated.

First of all, I'm going to have my law clerk hand out a marked-to-show-changes version of the jury instructions based on my review of the letters of the parties and we will have an opportunity to discuss that at a convenient moment with everyone.

Second of all, let me bring you up to date on a juror situation, that is marked as Court exhibit -- Flo?

THE DEPUTY CLERK:  5.

THE COURT:  5.  OK.

I will bring you up to date on a juror's situation. This morning my law clerk was on the phone with a juror who indicated that she was in the hospital and I hope, politely, asked my law clerk to tell the juror that the judge wished to speak to her directly.  And I spoke to the juror and she advised that she had been admitted to Harlem hospital.  They don't know what it is.  She doesn't know whether it's stomach. She doesn't think it's heart based on what they preliminarily said, but she doesn't know and she was, you know, she sounded to me she didn't sound bad, she said she was with her brother -- I think she said she was with her brother at the hospital -- and that they were going to keep her overnight, they were admitting her to the hospital, and depending on what they found, she could be discharged the next day.  And I said

O355her1

to her: *Look, I could adjourn the trial today and resume tomorrow at noon or I could seat an alternate.  What do you think I should do?*  I want to quickly add, the responsibility is mine, I know that.  It is not the juror's responsibility and whatever the juror's answer is, it's not controlling on me.  I'm aware of that.  But I'm trying to, in a telephone call, as a non-medical person who is talking to a juror who has been admitted to the hospital but doesn't have a diagnosis, I am trying to determine the seriousness of the situation.  And without hesitating she said:  *I think you should put an alternate in*.  And she said she expressed sadness about this but she said, and this is her words -- not probably the word that you might use or I might use -- but she said, *the situation is too vague,* meaning uncertain, unknowable.  That's the way I interpreted her use of the word "vague."

The juror is juror no. 5.  And I will state on the record that I know of no means or ability to ascertain a person's age based on visual inspection, it doesn't work like that in life, and sometimes I am very surprised find out somebody's age.  But my honest assessment of the person's age is she is in her late 70s or some point into her 80s.  I don't believe she is any younger than that.  I could be wrong, I don't have a date of birth, but that's part of the circumstances.

So, my assessment is that I should excuse this juror

O355her1

and seat an alternate.  I will hear from each side.

Government?

MR. ROBLES:  Your Honor, the government has no objection.

THE COURT:  The defendant?

MR. STABILE:  May I confer for one moment?

THE COURT:  Sure.  You may.

(Counsel conferring)

MR. STABILE:  Your Honor, we request that the Court adjourn the trial until noon tomorrow to see if this juror is able to continue given her statement that the situation is vague.

As we all know in life, sometimes you believe it is a serious condition or could be a serious condition and it turns out to be quite unserious or really nothing.  We just don't know at this point.  We are now in truly the home stretch in the last two or three days of trial.  We would like to keep the jury the way they are and so that is our request.

THE COURT:  Thank you, Mr. Stabile.

The Court is going to excuse the juror.  I have given the reasons for that already.  I will add that she was -- had sufficient personal indications of being unwell that caused her to go to a hospital.  The hospital, upon examining her, did not say: *Go home, take a pill, rest up.*  They admitted her to the hospital.  That requires a medical decision.  And there are two

O355her1

possibilities, one is the hospital will discharge her and the other is that the hospital will not discharge her.  If you assume that the hospital did discharge her, that does not mean that the circumstance that caused her to feel unwell and caused her to go to Harlem Hospital would abate.  So it may be something not requiring a hospitalization but it doesn't mean that the condition abates and so that, coupled with the age of the juror and the juror's own advice to me, I adhere to my decision to excuse the juror.  Thank you.

There is another matter I want to take up.  Yesterday I dealt with issues concerning expert testimony and with regard to the expert Núñez Espinosa, I gave my reasons for excluding the testimony.  I wish to expand on my reasons and I do so now.

Even if the expert designation had been made in a timely fashion, even if translations had been furnished, I would conclude that any probative value of the testimony was substantially outweighed by the danger of confusion of the issue, jury confusion.  And I rely in this regard on case law from the Second Circuit including *United States v. Dawkins*, 999 F.3d 767, 792-93, and that's a 2021 decision.  There the Court was talking about the prohibition in 404(B)(1), that with certain exceptions, evidence of any crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character.  And the Court went on to say, more to the

O355her1

point here, a defendant may not seek to establish his innocence through proof of the absence of criminal acts on specific occasions no less than evidence of defendant's prior bad acts used to show that he committed the crime charged, such good act evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts, i.e., if we make the exact propensity inference that Rule 404(b)(1) is designed to prohibit.  And the Court made these observations in the context of a defendant in a criminal case who sought to call then University of Arizona head basketball coach Sean Miller and Louisiana State University head basketball coach Will Wade, as witnesses to prove that Dawkins had "relationships" with much more powerful coaches than the assistant coaches he was charged with bribing, and that he made no attempt whatsoever to bribe the more influential coaches.  And that testimony was included. In fact, I have noted in another context in this case the Second Circuit in *United States v. Mustafa*, 753 F. App'x 22, in which they cited to their own decision in *Doyle*, 130 F.3d 523, where the Second Circuit, speaking of its own prior ruling, this Court has previously upheld a district court's decision to exclude testimony of a defendant's cooperation with intelligence authorities that had no bearing on crimes charged or risk confusing the jury with extraneous matters.

Here the specific problems with the evidence is as follows:  The evidence in this case, whether it is believed by

O355her1

the jury or it is not believed, is evidence of instances of specific drug trafficking organizations making contributions to the campaign of Juan Orlando Hernandez in exchange for actions that would facilitate or allow that drug operation to continue to operate, and it would operate in part by supplying information which would enable the drug trafficking organization to evade detection.  This was not, and the evidence thus far, at least on the government's case, was not evidence that there was coordinated bribery or attempts at bribery to allow generalized and undifferentiated drug trafficking to always take place within the borders of Honduras by anybody who chose to do so.  It was a targeted attempt to get the defendant to cause law enforcement to look the other way for these drug trafficking organizations, not all drug trafficking organizations of any type, at any time, engaged in any drug trafficking operation, and therefore, the fact that the defendant signed into law various decrees or statutes is of slight probative value and it does raise the danger of jury confusion.

So this is an alternate ground for my exclusion of the testimony of Núñez Espinosa and I will note that the Court has not restricted, unless it was an objection to form or other evidentiary problem with the question, has not restricted questioning on the application of or the fear of a particular defendant of extradition, whether they were fearful of

O355her1

extradition or weren't fearful of extradition, and whether they were aware or weren't aware of whether an extradition statute had been adopted and when it had been adopted.  So, that's my supplement to my prior ruling on the particular question.

MR. STABILE:  Your Honor?

THE COURT:  Yes.

MR. STABILE:  I'm sorry.  There is a bit to unpack in what your Honor just said.

THE COURT:  A what?

MR. STABILE:  There is a little bit to unpack in terms of the legal ruling.  Can I confer with the defendant to explain to him, legally, what your Honor has just ruled?

THE COURT:  Can we do this on a break so I can bring the jury in?

MR. STABILE:  We can, your Honor.  I just ask that -- yes.  Of course.

THE COURT:  So let's do that then.

MR. STABILE:  Can I put the witness on the stand?

THE COURT:  Yes, please.  This is your next witness; is that right?

MR. STABILE:  Yes, your Honor.

THE COURT:  I will let you put your witness on the stand and then we will get our jurors and have them come out.

So, for the record, juror no. 5 is excused.

(Continued on next page)

O355her1

(Jury present)

THE COURT:  Please be seated.  Ladies and gentlemen, I don't want you to be overly concerned but I heard from juror no. 5 this morning and respecting privacy, I will simply say that she was unwell and did a smart thing, went to the hospital, and the hospital has admitted her.  She doesn't know whether it will just be overnight or what the circumstance will be, and after speaking to her she is excused from the jury.  I personally spoke to her.  And I will say that, you know, she was sad that she had gotten ill.  And so, that is the case but the good news is that she is alert and it's not what they call an acute situation, as best as I could tell.

So that's what I know and you now know what I know in general terms and so she has been excused.

The defense may call its next witness.

MR. STABILE:  Thank you, your Honor.  The defense calls Brigadier General Javier Rene Barrientos Alvarado.

XAVIER RENE BARRIENTOS ALVARADO,
    called as a witness by the Defendant,
    having been duly sworn, testified through the interpreter,
    as follows:

THE DEPUTY CLERK:  Please state your name and spell it for the record.

THE WITNESS:  Yes.  My name is Javier Rene Barrientos Alvarado.  J-A-V-I-E-R, Javier.  Rene, R-E-N-E.  Barrientos is

B-A-R-R-I-E-N-T-O-S, Barrientos.  A-L-V-A-R-A-D-O, Alvarado.

MR. STABILE:  May I inquire?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. STABILE:

Q.  Good morning, General Barrientos.  What is your current position?

A.  At present, I am honorably retired.  In December I finished 35 years of service in the Air Force.

Q.  And what was your last position in the Air Force?

A.  The last post that I had was in 2019, 2020, and 2021, is the commander general of the Air Force.

Q.  Is that the highest position in the Honduran Air Force?

A.  Correct.

Q.  When did you -- do you know Mr. Juan Orlando Hernandez Alvarado?

A.  Yes, I do know him.

Q.  When did you first meet him?

A.  I met him in 1983 at the military school.

Q.  How old were you when you met him?

A.  14 years old.

Q.  And was General Romero also at the school at that time?

A.  Yes.  Yes, we were colleagues; yes.

Q.  After high school, what did you do?

A.  After the military high school I entered the academy of the

O355her1                        Barrientos - Direct

Honduran Air Force and I graduated as military pilot in 1988 and I was assigned at the military academy from 1989 until 1996 as a flight instructor for the cadets.

Q.  And then after you were a flight instructor for the cadets, what did you do?

A.  Armando Escalon Espinal base in San Pedro Sula, I was assigned there from 1996 until 2000.

Q.  And what type of flight training did you receive between 1996 and 2000?

A.  I received training there as a combat pilot in the airplane A-37B Dragonfly, it's a light attack plane and close air support.

Q.  So is it fair to say that you were a fighter pilot?

A.  Correct.

Q.  Are there any other jet planes that you learned how to fly?

        MR. ROBLES:  Objection; relevance.

        THE COURT:  Sustained.

Q.  What did you do after 2000?

A.  After that I was assigned to Hector Caraccioli Moncada base in the center north part of Honduras.  There I received training as a combat pilot in a Northrop F-5.

Q.  What kind of a plane is an F-5?

        MR. ROBLES:  Objection; relevance.

        MR. STABILE:  Your Honor, I can make a proffer at the side bar.

THE COURT:  I will allow it, subject to connection, but get to the connection quickly.

Q.  What kind of plane is an F-5?

A.  It is an interceptor plane.

Q.  What is the top speed of an F-5?

A.  1.6 mach.

Q.  How presently did you fly F-5s between 2000 and 2010?

MR. ROBLES:  Objection; relevance.

MR. STABILE:  I can make a proffer.

THE COURT:  Pardon me?  No, I am asking you to connect it up quickly, if you will, please.

MR. STABILE:  Well, I will, your Honor, I just need to lay a foundation otherwise it won't --

THE COURT:  Well, connect it up.

MR. STABILE:  I'm sorry.  Can I have the answer read back?  I was distracted.  Withdrawn.  Can I ask the question again?

THE COURT:  Sure.

BY MR. STABILE:

Q.  Between 2000 and 2010, how frequently did you fly the F-5?

A.  Between 2000 and 2010 we flew at least once a week.

Q.  And where would you be flying the F-5?

THE COURT:  I'm not going to allow to you do this unless you are going to connect this up to the case.  Connect it up to the case or I'm striking the testimony.

O355her1                         Barrientos - Direct

MR. STABILE:  I will connect it to the case, your Honor, but I believe it requires a foundation.  Your Honor, I can proffer why this witness is --

THE COURT:  Mr. Stabile, I don't want to get to the end of this and find out we spent 10 minutes on irrelevant matters so please connect it up.

MR. STABILE:  OK.

BY MR. STABILE:

Q.  Were there any other times in your career that you flew F-5s in Honduras?

A.  Yes.  Until 2015 I flew the F-5s.

Q.  And up until 2015, until 2015, how frequently did you fly F-5s?

MR. ROBLES:  Objection.

THE COURT:  Sustained.

Q.  Are you familiar with the radar systems of Honduras?

THE COURT:  Sustained.

MR. STABILE:  Your Honor, may I please have a side bar?

THE COURT:  Pardon me?  I have given you the opportunity to connect it up and you resisted.

MR. STABILE:  Your Honor, this is the connection.  The radar is the connection.  There has been specific testimony --

MR. ROBLES:  Objection.

MR. STABILE:  -- about radar.

MR. ROBLES:  Can we do this at side bar, your Honor?

THE COURT:  No.  I will allow the question.

Go ahead.

BY MR. STABILE:

Q.  Are you familiar with the radar systems of Honduras?

A.  Yes, of course.  Yes.

Q.  How is it that you are familiar with the radar systems of Honduras?

A.  Well, I am from the Honduran Air Force and being the head of the Air Force I know how it operates.

Q.  Was there functioning radar in Honduras between 2010 and 2015?

A.  No, there wasn't.  To be exact, between 2004 and 2015 there was no radar.

Q.  And do you know why that was?

A.  Because the radar that we had ended its useful life.

MR. STABILE:  Can I have a moment, your Honor?

THE COURT:  You may.

(Counsel conferring)

MR. STABILE:  I have no further questions.

THE COURT:  You may cross examine.

CROSS EXAMINATION

BY MR. ROBLES:

Q.  Good morning, General Barrientos.

A.  Very good morning, Mr. Prosecutor.

O355her1                    Barrientos - Cross

Q.   You know Juan Orlando Hernandez, the defendant, very well;
right?

A.   Yes.

Q.   You have been close friends since you were 14 years old;
right?

A.   In 1985 when we graduated, he went to university and 25
years went by until 2010, when we again met.

Q.   OK, but you were childhood friend, right, in school?

A.   Yes.  Of course.

Q.   And you were also childhood friends with Tulio Palacios
Romero; right?

A.   Correct.

Q.   The three of you were close as children; right?

A.   Yes.  Of course.

Q.   And you know that Mr. Romero came to be appointed the head
of the president's security detail; right?

A.   He was not the head, he was the sub-head.  I was the head
because I was not allowed to explain.  In 2010 --

Q.   Sir, it was a yes or no question.

A.   In 2010 and 2011, the armed forces assigned me to the
National Congress and I was the head of security for the
president Juan Orlando.

Q.   So both you and Mr. Romero were part of the security detail
at one point; right?

A.   Correct.

O355her1                        Barrientos - Cross

Q.   And in 2012 you were promoted to commander, right, of a squadron in the Air Force?

A.   It is not a promotion.  I was assigned because I had my grade.

Q.   You were assigned --

A.   I was already a lieutenant colonel.

Q.   When you were assigned to that position, the defendant was the president of the Honduran National Congress; right?

A.   Correct.

Q.   And you held that position until around 2015; right?

A.   No.  I was there in 2010 and 2011.

Q.   At one point when the defendant was president, you were appointed to the second highest position in the Air Force; right?

A.   Correct.

Q.   That was around 2016?

A.   Correct; January of 2016.

Q.   And then, in February 2019, while the defendant was president, you were made the general commander of the Honduran Air Force; right?

A.   Correct.

Q.   And that was a position you held until about 2021; right?

A.   In December of 2021.

Q.   Now, you testified on direct examination that for over a decade Honduras didn't have a radar system; is that right?

O355her1                    Barrientos – Cross

A.   That is very correct.

Q.   There was no way to track airplanes in the sky in Honduras between 2004 and between; is that your testimony?

        MR. STABILE:  Objection.  That is not what he said.

        THE COURT:  I will allow it.

        Go ahead.

A.   Not with our radars.

Q.   How did commercial planes land in Honduras in those 10 years?

A.   Commercial airplanes, there are civilian radars at each airport.

Q.   So there was radar information available about flights coming in and out of Honduras; right?

A.   Yes, but what --

        MR. ROBLES:  Your Honor, I ask that the remainder be stricken.

A.   -- the radar that is military and a radar that is a civilian radar, and the difference is that the military radar can receive any metal thing that is flying and the civilian radars cannot do that, they can only do it with the transponder on the plane.

        MR. ROBLES:  One moment, your Honor?

        (Counsel conferring)

Q.   General Barrientos, you are related to the defendant; right?

O355her1

A.   False.

Q.   So back to -- well, so when the Honduran military, between 2004 and 2015 was flying, when the Honduran Air Force was flying its planes in Honduras, it had no way to detect what other planes were in the airspace?

A.   Correct.

MR. ROBLES:   No further questions.

A.   They could not.

MR. ROBLES:   No further questions?

THE COURT:   Redirect?

MR. STABILE:   No redirect.

THE COURT:   Thank you, sir.   You may step down.   Thank you.

(Witness excused)

THE COURT:   Call your next witness.

MR. STABILE:   May I go get him, your Honor?

THE COURT:   Yes.

MR. STABILE:   He is across the hall.

WILLY JOEL OSEGUERA RODAS,
     called as a witness by the Defendant,
     having been duly sworn, testified through the interpreter,
     as follows:

THE WITNESS:   State your name and spell it for the record, please.

THE WITNESS:   Good morning.   I am Willy Joel Oseguera

O355her1                        Oseguera Rodas - Direct

Rodas.  W-I-L-L-Y.

MR. STABILE:  May I inquire?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. STABILE:

Q.  Good morning, General Oseguera.

A.  Good morning.

Q.  What is your current position?

A.  At present, I am the advisor to the joint chiefs of staff to the president.

Q.  Do you know the defendant Juan Orlando Hernandez?

A.  Yes, I know him.

Q.  When did you meet him?

A.  The first time was in 2003.

Q.  After high school, can you tell us what your education and training are?

A.  After high school?

Q.  Yes; after you graduated high school, can you tell us what you did after that?

A.  I didn't graduate from military high school.

Q.  No, but what did you -- can you describe your military training for us?

A.  I graduated from high school in 1985, and then '86 I entered the military academy and I graduated in '89 as the highest person in my promotion.  I had the opportunity of

O355her1                    Oseguera Rodas - Direct

assisting West Point for 15 days because I was in first place.

Q.   And after that, did you hold positions in the military?

A.   Initially as a sub-lieutenant I was the commander of a squadron and as a lieutenant commander of the company, and I had the opportunity of joining the Operation Liberty in Iraq as the head of the joint chiefs.

Q.   What branch of the military were you in?

A.   In the Army as an officer in the special forces.

Q.   What was the highest position you attained in the Army?

A.   I was commander of the Army for 45 days.

Q.   Can you explain why you were only the -- when you say the commander of the Army, were you the highest-ranking officer in the Army?

A.   Just of the Army, yes.

Q.   And why is it that you were in that position for 45 days?

A.   There was a change of government and it is the responsibility of the president or the executive branch to make that decision.

Q.   And once there was a change in government, what position did you have?

A.   I was advisor to the head of the joint chiefs of staff.

Q.   In your career, did you hold any positions leading teams against narco-trafficking?

A.   Several units having to do with the fight against drug dealing.

O355her1                    Oseguera Rodas - Direct

Q.  I just want to focus on leadership positions.  What
leadership positions did you hold fighting narco-trafficking?

A.  I was sub-commander of the 15th battalion of the special
forces.

Q.  As sub-commander of the 15th battalion of the special
forces, what were your duties as it pertains to
narco-trafficking?

A.  Initially, the sub-commander takes the commander's place
and we carried out operations in the department of Colon,
Honduras.  We were searching for clandestine landing strips,
cocaine plantations, and the remaining structures from other
criminal structures.

Q.  Approximately what year or years was that?

A.  In 2015.

Q.  Did you have any other leadership positions combating
narco-trafficking?

A.  Yes.  Of course.

Q.  Can you tell us what they were?

A.  In 2016 and 2017 I was the commander of the first battalion
of the special forces.

Q.  And can you describe the anti-narco-trafficking operations
that you led?

            MR. ROBLES:  Objection, your Honor.  Relevance.

            THE COURT:  One second, please.  No, I am going to
take it, subject to connection.

Go ahead.

INTERPRETER:  The interpreter has to repeat the question.

A.   The first battalion of the special forces has responsibilities throughout the country.  We provided special forces groups so they could assist the prosecutor's office to the National Police, the Technical Agency for Criminal Investigation, and any other organization that would request support of the special forces.

Q.   Did you have any other leadership positions leading teams against narco-traffickers?

A.   In 2020 and 2021 I was the commander of the Military Police for Public Order.

Q.   And in that position, what were your responsibilities as they relate to narco-trafficking?

MR. ROBLES:  Objection.  Relevance.  I don't believe there has been a connection yet.

THE COURT:  Yes.  I'm still taking it subject to connection.

Q.   I can rephrase the question, if you would like.  As the commander of the military police, what operations did you lead to combat narco-trafficking?

A.   The military police has 10 battalions and each unit has a different territorial responsibility.  Each one of them received instructions from requests, requests from different

state agencies that fought against criminal structures against any criminal structure that had to do with any drug dealing, organized crime, and any other model that was attacking citizen safety.

Q.  Based on your training and experience, are you familiar with the extradition laws of Honduras?

A.  Yes.

Q.  And after 2014, if somebody was arrested in Honduras, could they be extradited to the United States?

MR. ROBLES:  Objection.

THE COURT:  I will allow it.

MR. ROBLES:  Your Honor, move to strike the prior testimony which was not connected to the case.

THE COURT:  All right.  I will allow it.

BY MR. STABILE:

Q.  If somebody is arrested in Honduras, can they be extradited to the United States?

A.  As long as the United States is requesting extradition.

Q.  But I mean if somebody is first arrested in Honduras on a Honduran charge, can they be extradited to the United States?

MR. ROBLES:  Objection.  Asked and answered.

THE COURT:  No, I will allow it.

INTERPRETER:  Could you please read the question back for the interpreter, please?

Q.  If somebody is arrested in Honduras on a Honduran charge,

can they be extradited to the United States?

MR. ROBLES:  Objection, your Honor.  Relevance as to this witness' knowledge.

THE COURT:  I'm going to allow it.

Go ahead.

A.  No.

Q.  Why not?

A.  In the agreement that we signed, if a person is extradited with charges in our country, he will be extradited when he finishes serving for the charges that he has been accused of.

Q.  In your leadership positions combating narco-trafficking, did you ever receive an instruction from Juan Orlando Hernandez not to go after the Cachiros?

A.  Never.

Q.  But Leo Cachiros wasn't arrested in Honduras.  Why is that?

MR. ROBLES:  Objection, your Honor.

THE COURT:  Overruled.

A.  According to the information that we received from the higher-ups.

MR. ROBLES:  Objection, your Honor; hearsay.

THE COURT:  Yes.  Well, he didn't really answer the question but alluded to information that were received from the higher-ups.

Next question.

Q.  Did you have an understanding --

O355her1                        Oseguera Rodas - Direct

A.   I never received information.

MR. STABILE:  Withdrawn.

THE COURT:  All right.  He has answered the question.

Q.   If Leo Cachiros had been arrested in Honduras, could he have been extradited to the United States?

MR. ROBLES:  Objection.  Calls for speculation.

THE COURT:  Sustained.

Q.   Do you know why Leo Cachiros was not extradited -- withdrawn?

MR. ROBLES:  Objection.

MR. STABILE:  Well, I withdrew it, so.

Q.   Do you know why Leo Cachiros was not arrested in Honduras?

MR. ROBLES:  Objection.

THE COURT:  I will allow it.

A.   Charges were brought against him in the country that he could not be extradited.

Q.   Do you know why Alex Ardón was not arrested in Honduras?

MR. ROBLES:  Same objection, your Honor.

THE COURT:  I will allow it.

A.   I don't know exactly why, but I can assume that it is for the same reason.

MR. ROBLES:  Objection, your Honor.  I ask that that be stricken.

THE COURT:  That is stricken.  The jury is to disregard the answer.

Q.  Were you ever given any direction by Juan Orlando Hernandez not to arrest the Ardóns?

A.  Never.

Q.  Were you ever given any direction by Juan Orlando Hernandez not to investigate MS-13?

A.  Never.

Q.  Did you investigate MS-13?

A.  Of course I did.

Q.  Did you ever get any direction from Juan Orlando Hernandez not to investigate anyone?

A.  I never received an instruction, such instruction, neither from him nor from my superiors.

Q.  I just have one last area to ask you about.  When you were the commander of the military police, did you have responsibility for setting up checkpoints?

A.  Yes.  Of course.

Q.  What types of checkpoints are there in Honduras?

A.  Checkpoints have similar characteristics everywhere.  We install permanent checkpoints and temporary checkpoints.  It depends on the threat that we received and the information we have regarding the threats.

Q.  And regarding the -- withdrawn.

        Were you responsible for -- withdrawn.

        With regard to the temporary checkpoints, how frequently would those change?

A.   It would vary depending on the threat; it could be after an hour, after a day, or after a week.

Q.   Who had responsibility for setting up temporary checkpoints in each department of Honduras?

A.   The battalion commanders have their areas of responsibility.  They can make the decision of setting them up or receive an order from the office that I directed.

MR. STABILE:  Can I have a moment, your Honor?

THE COURT:  Sure.

(Counsel conferring)

INTERPRETER:  The interpreter wishes to make one correction at the beginning.  The witness' name is W-I-L-L-Y, not one L, two Ls.

Thank you.

THE COURT:  Is that what the witness said?

THE WITNESS:  Yes.

THE COURT:  Thank you.

Q.   Were you responsible for enforcing the anti-drug trafficking laws of Honduras?

A.   Yes.  The military police and the units that I directed had that responsibility.

Q.   Were you ever directed by Juan Orlando Hernandez not to enforce the anti-narco-trafficking laws?

A.   Never.

Q.   Can you describe some of the most significant

narco-trafficking laws that you enforced?

MR. ROBLES:  Objection.

THE COURT:  I will allow it.

Go ahead.

A.   There were laws that were instituted as well as some institutions that had, as their goal, to attack all of the criminal structures.  Right now I can remember the law that restricts private property.  I also remember a law that was presented before the Congress to ensure that two people did not ride the same motorcycle; the law that led to the creation of the national anti-extortion forces, later on it was called the National Force Against Maras and Gangs; the law that created the military police; the law that created state intelligence; the extradition law.

Those are the ones I can recall at present.

Q.   And do you know the time period during which those laws were enacted?  In general, not the exact dates, the time period.

A.   Some of them were enacted from 2010 to 2014, and others between 2014 and 2017.

MR. STABILE:  I have no further questions.

THE COURT:  Thank you.

Cross-examination?

MR. ROBLES:  No cross-examination, your Honor.

THE COURT:  You may step down, sir.

O355her1

(Witness excused)

THE COURT:  Call your next witness.

MR. STABILE:  May we have a moment to confer, your Honor?

THE COURT:  Sure.

I tell you what.  Ladies and gentlemen, let's take our mid-morning break.  Please do not discuss the case among yourselves or anyone.  We will be back in action in 10 minutes.

(Continued on next page)

O355her1

(Jury not present)

THE COURT:  Please, be seated.

I wanted to address the defendant directly, and I think, Mr. Hernandez, we may have had this conversation once before but I want to have it with you once again, and that is the defendant in a case has the right to testify in his own defense.  He also has the right not to testify and if he elects not to testify.  I will instruct the jury that they may draw no inference or suggestion of guilt from the fact that the defendant decides not to testify.

Do you understand all of that?

THE DEFENDANT:  (In English)  Yes, I do.

THE COURT:  Also, lawyers may give their advice or opinion on the subject of whether their client should testify at a trial but the decision to testify or not testify rests entirely with you, sir, as the person who is charged in this case.

Do you understand that?

THE DEFENDANT:  (In English)  Yes, I do.

THE COURT:  And no lawyer and no one may prevent you from testifying if it is your desire to do so.

Do you understand that?

THE DEFENDANT:  (In English)  I do.

THE COURT:  We are in recess.  Thank you.

(Recess; continued next page)

O35HHer2

THE COURT:  Please be seated.

Bring our jury in, please.

THE MARSHAL:  Your Honor, I'd like to seat the witness before the jury comes in.

THE COURT:  OK.

THE MARSHAL:  The defendant.

THE COURT:  We'll let the defense call him from the table.  That's fine.

No, you guys, I'm sorry.  Yes, Mr. Hernandez, you'll have to come up.  I apologize.

(Discussion off the record)

THE COURT:  All right.  Bring our jurors in.  You can remain seated until the jurors come.

(Continued on next page)

O35HHer2                    Hernandez Alvarado - Direct

(Jury present)

THE COURT:  All right.  Please be seated.

The defense may call its next witness.

MR. COLON:  Your Honor, the defense calls Juan Orlando Hernandez Alvarado, sir.

THE COURT:  All right.

JUAN ORLANDO HERNANDEZ ALVARADO,

     the defendant called as a witness, in his own behalf,

     having been duly sworn, testified through the

     Spanish-language interpreter as follows:

DIRECT EXAMINATION

BY MR. COLON:

Q.  Could you please state your name, your full name, for the jury.

A.  Juan Orlando Hernandez Alvarado.

Q.  Mr. Hernandez, where were you born?

A.  In Gracias, Lempira.  That's Honduras.

Q.  Is that a department of the country of Honduras?

A.  Lempira is a department in Honduras, what would be called an electoral district here, to choose a deputy.

Q.  And what kind of home did you live in for the first five years of your life?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Sustained.

Q.  Who were your parents, sir?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  What was your public school education, sir?

A.  Kindergarten in Gracias, Lempira; Juan Lindo School in Gracias, Lempira; the military high school in San Pedro Sula; Autonomous University of Honduras in Tegucigalpa; SUNY Albany here in New York.

Q.  What was your first profession?

MR. WIRSHBA:  Objection.

A.  Attorney.

THE COURT:  I'll let it stand.

Go ahead.

Q.  What kind of law did you practice, sir?

A.  Criminal, civil, and mercantile.

Q.  And how many years had you practiced law?

A.  Some eight years.

Q.  And after —— withdrawn.

Did you have another profession after your law career?

A.  Well, I was elected to a deputy to the National Congress.

Q.  When you say you were a deputy in the National Congress, was that one of the branches of government?

A.  Yes, it is the legislative branch.

Q.  Were there any other branches of government in Honduras?

A.  Judicial, executive, and later on the public ministry of Honduras was created, which is the equivalent to the general

attorney of the state, which is not a part of the executive branch in Honduras.  It's independent.  Some consider it a fourth branch of government.

Q.  Moving on to your career in Congress.  When were you elected to the position of deputy or congressman in Honduras?

A.  1998.

Q.  And how long were you a congressman?

A.  Four terms, four years each.

Q.  What positions did you hold in the Congress, sir?

A.  Well, I was the deputy chief of the delegation of my party, then I was secretary of the National Congress, which is a post chosen by the Congress.

Q.  What was the term of the position secretary of the Congress?  How many years did that last?

A.  Two years and I was reelected, so altogether four years.

Q.  And what were your duties and responsibilities as secretary ——

MR. WIRSHBA:  Objection.  Relevance.

Q.  —— of the Congress?

THE COURT:  Sustained.

Q.  What other positions did you hold beyond secretary of the Congress?

A.  Well, I had the opportunity of communicating with citizens in —— come out of the Congress, listen to their concerns, and be a means of communication between the Congress and its

citizenry.

MR. WIRSHBA:  Objection, your Honor.  Nonresponsive.
Move to strike.

THE COURT:  I'll allow it to stand.

Next question.

Q.  What role did you take on after that position, sir?

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  No, I'm going to allow it.

Go ahead.

A.  Then I was secretary of my party, and I was doing the same
thing, going out to the different parts of the country and to
listen to the people.  And then I became president of the
Congress.

Q.  What party was it that you were referring to that you
became secretary of the party?

A.  National Party.

Q.  You just testified that you also became president of the
Congress, yes?

A.  Correct, sir.

Q.  And what was the term of that presidency of the Congress,
sir?

A.  Four years.

Q.  Can you tell the jury the functions of that particular
position, sir?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  I'll allow it.

A.  Represent the Congress as its top representative and in the same way name the deputies in what here in the United States would be considered legislative committees, decide what bill should be sent on to voting, also direct the sessions of the Congress, build a consensus so as to create a situation that a law will be made into a law, listen to the citizens, and also have a relationship with the other branches of the government.

Q.  In your early years in those positions, what was your priority with respect to Lempira?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Yes.  I don't understand the question.

Q.  What sort of legislation were you promoting or supporting, sir?

MR. WIRSHBA:  Objection, your Honor.  Relevance as to the question in general and vague.

THE COURT:  Yes, sustained.

Q.  When did you attain the position of president of the Congress?

A.  2010, 23rd of January.

Q.  And how long did that position last?

A.  Four years.

Q.  What were you concerned most about when you were president of the Congress?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  Can you tell the jury what sort of laws you may have sponsored or passed during your tenure as president of the Congress.

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  What legislation was approved under your term as president of the Congress, sir?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  Did you sponsor the extradition law, sir?

A.  In January 2010, I introduced a reform to the Constitution that led to the creation of the law that then went on to provide for this law of seizure.

MR. WIRSHBA:  Objection, your Honor.

A.  Sorry.  When I began as president of the Congress, I had a legislative agenda that included the reforms of the Constitution to allow for the extradition of Hondurans that had to do with narco-trafficking, terrorism, and organized crime, also the law of seizure of assets, the creation of courts against organized crime, special tax to strengthen the institutions of public security.

THE COURT:  Mr. Hernandez, I hate to cut you off.  Do you remember what the question you were asked was?

THE WITNESS:  Yes.

THE COURT:  What was the question?

THE WITNESS:  What was the legislative agenda that I was putting forth when I began in my tenure?

THE COURT:  No, sir, that was not the question.

THE WITNESS:  I'm sorry, sir.

THE COURT:  The question was —— if you could read it, Raquel, I would appreciate it.

(Record read)

THE COURT:  That was the question you were asked, Mr. Hernandez, and I'm going to have to instruct you, as I've instructed other witnesses.  Listen to the words of the question.  Make sure you understand it.  If you understand it, answer it.  If it can be answered yes or no, you should do so.  If your answer is you don't recall or you don't know, that's a perfectly acceptable answer if truthful.  All right?

THE WITNESS:  Correct, your Honor.

THE COURT:  All right.  Next question.

MR. WIRSHBA:  Your Honor, the government moves to strike as nonresponsive.

THE COURT:  All right.  I'm going to let the answer stand.

Next question, please.

BY MR. COLON:

Q.  Did you pass a seizure law?

A.  Correct, sir.

THE COURT:  Well, I'm going to sustain as to form unless you want to elicit testimony that, as president of the Congress, he has the power to pass a law.

MR. COLON:  I will.  Thank you.  I'll establish that.

Q.  Mr. Hernandez, did you have, as president of the Congress, the authority, the power, to pass a law?

A.  Only the Congress through the majority that is required by law.  But there is no way for a law to be voted on unless the president decides if that's OK.

Q.  Did you have the authority to put legislation up for the president to review and make a decision whether he was going to sign or veto that law?

A.  Correct.

Q.  Was there any other way to promote, support, or pass legislation in Honduras?

MR. WIRSHBA:  Objection.  Vague.

THE COURT:  I'll allow it.

A.  The only way for a law to be approved is through the National Congress and the power of veto or signature on the part of the president of the republic.  But when there is a constitutional reform, that is only the authority of the Congress of the republic and no one else's.

Q.  Besides the extradition law, did you pass or sponsor a seizure law?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  Was a law passed allowing for the deprivation of property of illicit gains?

A.  Yes, a law to freeze or to seize assets of a criminal origin against any organized crime.

Q.  Did you sponsor, promote, or pass a cybersecurity law, sir?

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  What decrees were produced under your tenure at the —— as the president of the Congress, sir?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  Did you sponsor, pass, or promote an antiterrorism law, sir?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  What laws did you pass with respect to national security and public safety in Honduras?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  With respect to the extradition law and the seizure law, were those laws signed by President Pepe Lobo?

A.  All measures to go against the cartels, organized crime were backed by the National Congress, and the president of the republic did not veto them, only the reform to extradition was

not his responsibility; therefore, he did nothing.

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Yes.  Mr. Hernandez, I'm going to ask you to do your best to follow the instruction I gave you before. Listen to the words of the question, answer the question and nothing else, and wait for the next question.

Go ahead.

MR. WIRSHBA:  Government moves to strike.

THE COURT:  I'll let the answer stand.

Go ahead.  Next question.

BY MR. COLON:

Q.  And those laws were signed into —— or enacted under Pepe Lobo in the fall of 2013, correct?

MR. WIRSHBA:  Objection.  Vague.  Which laws, your Honor?

THE COURT:  Sustained as to form.

Q.  With respect to the terrorism —— withdrawn.

With respect to the extradition and seizure laws, those were signed into effect by Pepe Lobo in the fall of 2013, correct, sir?

A.  Correct, but they were not applied.

Q.  When you say they were not applying, you mean they were not implemented?

MR. WIRSHBA:  Objection.

A.  Correct, sir.

THE COURT:  I'll allow it.

Go ahead.

Q.  Can you give the jury an example of what was not implemented under the extradition law?

A.  Two years after the reform to allow for extradition, a friendly country requested three times the extradition of a citizen, and it was never granted.

Q.  What country was that, sir?

A.  The United States.

Q.  And who was the subject of that extradition, of those three extradition requests?

A.  Carlos Lobo, the associate of Leonel Cachiro.

Q.  And what was Pepe Lobo's position with respect to the extradition of Carlos Lobo, if you know?

MR. WIRSHBA:  Objection, your Honor.  Hearsay.

THE COURT:  Sustained.

Q.  Did Pepe Lobo follow through and extradite Carlos Lobo?

MR. WIRSHBA:  Objection, your Honor.  Form.

THE COURT:  I'll allow it.

Go ahead.

A.  No.

Q.  What was your reaction to the fact that Pepe Lobo did not accede to the request of the United States to extradite Carlos Lobo?

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  With respect to the seizure laws and the seizure law specifically in September 2013, was that law implemented against any particular organization or criminal gang?

A.  Yes, sir.

Q.  And what was that criminal gang or entity that had its property seized?

A.  It was the largest operation ever done in Central America, 600 million ——

THE COURT:  No.

A.  —— from loss Cachiros.

THE COURT:  Sir, the question was, "And what was the criminal gang or entity that had its property seized?"  Do you understand that question?

THE WITNESS:  Yes.  The Cachiros.

THE COURT:  Just please answer that question.  And the answer is?

THE WITNESS:  The organization Los Cachiros.

THE COURT:  Next question.

BY MR. COLON:

Q.  Do you know how much property —— what was the value of the property or assets that were seized from the Cachiros, if you know?

A.  Yes, we knew it.  It was estimated to be around $600 million.

Q.   And at the time that that seizure was made, was Pepe Lobo informed of the fact that those properties and assets were being seized?

MR. WIRSHBA:  Objection.  Hearsay.  Relevance.

THE COURT:  Sustained as to relevance.

Q.   Was Pepe Lobo in the country at the time of the seizure in 2013 —

MR. WIRSHBA:  Objection.

Q.   — seizure of the Cachiros?

A.   No, sir.

THE COURT:  I'll let the answer stand.

Q.   Why is it that the seizure occurred while Pepe Lobo was absent from the country?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.   Was president of the Supreme Court, Avilez, present in the country at the time those seizures were effectuated?

THE COURT:  Sustained.

Q.   What, if any, obstacles did you incur when you sponsored the extradition and seizure laws?

MR. WIRSHBA:  Objection, your Honor.  Vague.  Form.

THE COURT:  Yes.  Rephrase your question.

MR. COLON:  Of course, Judge.

Q.   Mr. Hernandez, did you receive threats when you sponsored these extradition and seizure laws, sir?

THE COURT:  Well, I don't know if there's been any testimony about sponsoring the laws.  Sustained as to form.

Q.  When the laws were passed, did you receive any threats after these laws were passed?

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  Did there come a time when you ran for election, for the election to the office of the president of the country, sir?

A.  Yes, sir.

Q.  And what party did you represent at that time when you ran for president in 2013?

A.  National Party.

Q.  And who won that election?

A.  The National Party.

Q.  You were the candidate?

A.  Yes.

Q.  Was that a fair election, sir?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Sustained.

Q.  Did you have any indication that that election was not fair and properly held, sir?

MR. WIRSHBA:  Objection, your Honor.  Calls for hearsay.  Relevance.

THE COURT:  Sustained.

Q.  Who authorized the first extradition ever in the history of

Honduras?

A.  I don't remember the past centuries, but in recent times, it was during my administration.

Q.  Were Honduran nationals subject to extradition before you became president of Honduras?

A.  Before 2012, a century went past and the extradition of Hondurans was prohibited.

Q.  Can you tell the jury ——

THE COURT:  Sir, I don't think you answered the question.  After 2012, were Honduran nationals subject to extradition?

THE WITNESS:  (In English) After?

THE COURT:  After.

THE WITNESS:  I apologize, your Honor.

THE COURT:  You don't need to apologize, because I put the date in the question.

THE WITNESS:  After 2012, extradition was allowed.

THE COURT:  Thank you.

BY MR. COLON:

Q.  Prior to 2012, were Honduran nationals subject to extradition, sir?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  It has been, but I'll allow you to ask it again.

Go ahead.

A.   No.

Q.   Can you tell the jury what the principal narcotics or drug trafficking organizations were in Honduras when you became president?

A.   The Valles, the Cachiros, Don H's organization, the Ardóns, among others.

Q.   Was the Don Montes a cartel?

A.   Yes, the Montes family in Colón.

Q.   Where did the Cachiros operate out of?

          MR. WIRSHBA:  Objection, your Honor.  Relevance.

          THE COURT:  I'll allow it.

A.   Initially, in the Atlantic region, and then they extended themselves throughout the country.

Q.   You testified about Don H, or Don H organization, correct?

A.   Correct, sir.

Q.   What did the H stand for?

A.   Hector Emilio.

Q.   And where did that cartel operate from?

A.   Between the Copán zone and the central zone in the country.

Q.   How about the Ardón cartel?

A.   It was based in El Paraiso, Copán, but it had its relationship with Copán with Wilter Blanco.

Q.   How about the Don Montes cartel?

A.   In Colón.

Q.   Did any cartels operate in San Pedro Sula?

A.   Yes, the majority had representatives there.

Q.   What organizations or units of government did you utilize in trying to eradicate drug trafficking in Honduras during your presidency, your first years of presidency from 2014 to 2018, sir?

A.   We had created the military police.  We began the reform of the military police and other units were created there, like the Tigres, the tigers.

THE INTERPRETER:  Correction, "the National Police."

A.   And the Technical Agency of Criminal Investigation was created, which is the equivalent of the FBI here.  The national Force Against Maras and Gangs; the national Department  of Investigation and Intelligence, among others; and FUSIL, the national security inter-institutional force, FUSIL, was also created.

THE INTERPRETER:  Correction, FUSILA.

(Interpreters confer)

THE INTERPRETER:  Interpreter's correction, "FUSINA," F-U-S-I-N-A.

A.   And the defense council and national security.

Q.   And what was the collective task of all those organizations or units of government?

A.   To eradicate the violence created by drug dealing and the gangs and maras.

Q.   When you say "maras," what do you mean?

A.  Mainly MS-13 and 18 and other smaller ones, such as the Grillos and others that existed at the time.

THE COURT:  Question from the Court to the interpreter.  What does the word "matas" mean?

THE INTERPRETER:  Maras.

THE COURT:  Maras, I see.  Can you spell that, please?

THE INTERPRETER:  M-a-r-a-s.

THE COURT:  Thank you.

Next question.

Q.  Did the MS-13, the 18th Street gang operate drug trafficking organizations, sir?

A.  That's what we were informed at the defense and security council.

Q.  Who were the Valle Valles?

A.  It was a family criminal organization that operated in Copán.

Q.  Did any of those cartels besides MS-13 and the 18 Street, did any of those cartels utilize the service of the MS-13 to carry out assassinations, if you know?

A.  Yes, sir.

Q.  Did those organizations, those cartels, use MS-13 to transport drugs?

A.  That was reported to me in the last few years.

Q.  Who was the head of the Cachiros, sir?

A.  Two men, two brothers, the Devis Leonel Rivera and Javier

Eriberto Rivera.

Q.  Leonel Rivera who testified here just a few days ago, sir?

A.  Yes, sir.

Q.  Did you ever meet with the Cachiros' leaders Leonel or Javier Rivera Maradiaga?

A.  Never.

Q.  With respect to the Valle Valles, did you ever meet with any of the heads —— withdrawn.

Who were the leaders of the Valle Valles, if you can name some of the names of those —— of that family?

A.  Luis, Arnulfo, Dana.  Luis is one; Arnulfo, another; and Dana.  And another brother whose name I don't remember at this moment.

Q.  Did you ever have a meeting with any of the Valle Valles?

A.  No.

Q.  Let me just go back to the Cachiros.

Did you ever have any telephone conversations with the Cachiros?

A.  Never.

Q.  Did you ever have any telephone conversations with the Valle Valles?

A.  No.

Q.  Who were the heads of the Ardón cartel?

A.  Alexander Ardón.

Q.  Did he have a brother that was also part of the cartel?

A.   That's what I learned in the last years.

Q.   Did you ever meet with Alexander Ardón?

A.   Yes, sir.

Q.   Did he have a position in the Honduran government?

A.   He was the mayor of El Paraiso, Copán, municipality.

Q.   Can you tell the jury about approximately how many times you met with Alex Ardón.

A.   It must have been maybe four times that we happened by chance to meet up at certain gatherings.

Q.   Can you tell the jury during what time period that was that you met with him?

A.   From 2009 to 2014, the beginning of 2014.

Q.   What was —— you testified he was mayor of Paraiso?

A.   Yes, sir.

Q.   So he was a member of the National Party, right?

A.   Correct.

Q.   And what was it —— what duty did you have to meet with mayors in Honduras, mayors of the National Party?

        MR. WIRSHBA:  Objection, your Honor.

        THE COURT:  I'll allow it.

A.   Well, it was my obligation as president of the Congress to hear the citizens, and the mayors were also citizens.  I never invited him personally.

Q.   Can you describe for the jury the times that you actually met with Mr. Ardón, Alex Ardón.

A.   When there were mayors' meetings, specifically meetings of Copán, party meetings, and on one occasion when he came to my house.

Q.   Can you describe for the jury whether he was invited by you personally.

A.   No, sir.

Q.   Who was it that invited him to your house on that occasion?

A.   It was the head of my party's delegation.

Q.   And when did that meeting occur?

A.   Approximately 2012.

Q.   And where was that meeting held?

A.   At my home.

Q.   How many people were in attendance at the meeting?

A.   Sixty, 70.

Q.   Did there come a time when you and Mr. Ardón were alone in a room?

A.   I was making a phone call, and he entered.

Q.   Did you invite him to come in?

A.   No, sir.

Q.   What were the circumstances of him going into the room?

A.   He came in to complain to me about why I would not allow him to continue being the candidate for mayor.

Q.   And did you, in fact, not want him to be candidate for mayor of Paraiso?

A.   Correct, sir.

Q.  Now, that's the same Alex Ardón that testified here a few days ago, correct?

A.  Correct, sir.

Q.  And why did you not want to sponsor his request or petition to be a candidate for the mayor of El Paraiso?

A.  Because I had heard that he was linked to illegal activities.

Q.  What kind of illegal activities?

A.  Contraband of goods to Guatamala, and it was also being said that he was linked to drug dealing back then.

Q.  Did you tell him the reasons why?

A.  Yes, I told him.

Q.  And what did you say to him?

A.  That I wasn't going to include him in the group of my candidates for mayor.  And he asked me why, and I told him that I had information that he might be linked to illegal activities.

Q.  Did he ask you for proof of your allegations?

A.  Yes.  He complained to me, and he said to me:  Do you have any evidence?

Q.  And what did you say in return?

A.  That I didn't have any, but it was my decision not to include him as mayor.

Q.  What was his reaction?

A.  It was very violent.  He was yelling.

Q.  Describe for the jury what he did or said.

A.  He argued that he was a businessman in agriculture.  That I was being unjust in not including him.

Q.  Did he say anything else?

A.  Yes.  He said I was going to be very sorry about that decision.

Q.  Now, did you have phone calls with Mr. Ardón during the course of your interaction with him?

A.  No, sir.

Q.  Was there another time when you met with Mr. Ardón, following — withdrawn.

What year was this that you met with him in your house?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  And when was the next time you had a meeting or some sort of encounter with Mr. Ardón?

A.  At some party meetings.

Q.  By the way, did you ever tell Mr. Ardón that if he didn't run as a candidate for Paraiso, that you would protect him?

MR. WIRSHBA:  Objection.  Leading.

THE COURT:  I'm going to allow it.

THE INTERPRETER:  I'm sorry, could the interpreter request to have the question read back?

Q.  Did you at any time tell Mr. Ardón that you would protect

him if you did not run for mayor of Paraiso?

MR. WIRSHBA:  Objection.  Hearsay.

THE COURT:  I'm going to allow the question to be answered.

A.  Never.

Q.  Was there another meeting or encounter with Mr. Ardón after that second meeting?

A.  A mayors' meeting in the department of Corquín, Copán.

Q.  And what was the reason for that meeting in Copán?

A.  A group of mayors led by Mr. Ardón were pressuring me so that I would reconsider my decision.

Q.  And about how many mayors were there?

A.  Twenty-eight.

Q.  Was Mr. Ardón invited to that meeting?

A.  I was the invited person.

Q.  Did there come a time when Mr. Ardón showed up at the meeting?

A.  Yes.

Q.  Can you tell the jury the circumstances of him showing up at the meeting.

A.  He used another candidate to tell me that if he was not invited, then 11 of them would leave to another party.

Q.  Did you take that as a threat?

A.  Yes, sir.

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  I'll allow it.

Q.  Was there another meeting with Mr. Ardón and other individuals after that meeting?

A.  We had programmed another meeting in Santa Rosa de Copán, and he boycotted it.

Q.  What was the purpose of that meeting?

A.  Beginning to structure our message for our campaign in the Copán department.

Q.  Was he invited to that meeting?

A.  No, sir.

Q.  Did he join the meeting in any way?

A.  He tried to force himself into the meeting.

Q.  How was he prevented from joining the meeting?

A.  He alleged that he was the mayor, that he had a right to be there, and that he was a member of the party.

Q.  Who prevented him from coming to the meeting?

MR. WIRSHBA:  Objection, your Honor.  Hearsay.

THE COURT:  I'll allow it.

A.  I gave the order.

Q.  And who effectuated the order?

A.  The security detail at the event, as well as the organizers.

Q.  With respect to Hugo Ardón, can you tell the jury what his position in government was, if he had any?

A.  He was the director of Fondo Vial from 2010 through 2015.

Q.   And who placed him in that position?

A.   It's a board of directors comprised of ministers and people from the private sector in Honduras, but I understand that it was the president who at the time put his name forth.

Q.   And who was that president at the time that put his name forward for that position?

A.   Pepe Lobo.

Q.   You had nothing to do with that placement in that job, did you?

A.   Nothing to do with it.

Q.   And what was the mission of the Fondo Vial?

A.   Mainly to provide maintenance for roads that are in outlying areas, in outlying areas and back.

Q.   When you say "Fondo Vial," what's the translation of that word?

A.   It's a fund for roads.

Q.   And what powers did Mr. Hugo Ardón have in terms of the roads and highways of Honduras?

A.   To grant contracts for their maintenance and some emergency works, contracts.

Q.   Did the Cachiros receive contracts from Fondo Vial?

A.   That's what I understand.

Q.   How about the Ardóns, if you know, did they receive contracts from Fondo Vial?

A.   I don't know.

Q.   And who had the power to authorize those contracts?  What individual in Fondo Vial?

A.   Hugo Ardón.

Q.   When we speak about contracts, do you know what amount of dollars we're talking about in terms of the awarding of those contracts?

A.   No, I can't give you any details about that.  I don't know.

Q.   What year was Mr. Ardón placed in that position?

A.   I think it was in 2010.

Q.   When you became president in 2014, Fondo Vial, and that part of the government, fell under your purview, correct?

A.   The responsibility of who?

MR. COLON:  I'm sorry.  I didn't hear that, sir, your Honor.

THE COURT:  If you could read that back, Raquel, what the witness said.

(Record read)

Q.   Responsibility of Mr. Ardón.

A.   Well, he was already appointed during the administration of Pepe Lobo, and during my administration, he continued.

Q.   Is it fair to say that you inherited Mr. Hugo Ardón in that position?

MR. WIRSHBA:  Objection.  Leading.  Asked and answered.

THE COURT:  I'll allow it.

A.   It is correct.  It is correct, sir.

Q.   Did there come a time when Mr. Ardón was investigated for contract fraud?

A.   Ever since we began our government, I requested an audit with everything that had to do with public infrastructure.  I signed an agreement with international transparency.

          MR. WIRSHBA:  Objection, your Honor.

          THE COURT:  Yes, you've answered the question.

          Next question.

Q.   You testified just now that you commissioned an audit of the infrastructure elements of Honduras?

          MR. WIRSHBA:  Objection, your Honor.  Relevance. Counsel's testifying.

          THE COURT:  Yes, sustained.

          MR. COLON:  Withdrawn.

Q.   Did you commission any audits of the infrastructure elements of the country?

          MR. WIRSHBA:  Objection.  Relevance.

          THE COURT:  Sustained.

Q.   Was Mr. Ardón's Fondo Vial audited, sir?

A.   By the request made to international transparency ——

          MR. WIRSHBA:  Objection, your Honor.

A.   —— a request made on the second day that I began my government.

          THE COURT:  The question was, was Mr. Ardón's Fondo

Vial audited, sir?  And the answer is?

THE WITNESS:  Yes.

THE COURT:  Thank you.

Next question.

Q.  What entity audited the Fondo Vial?

A.  International transparency Honduras and the international account committee.

Q.  And did they come to a conclusion with respect to the integrity of that Fondo Vial?

MR. WIRSHBA:  Objection.  Calls for hearsay.

THE COURT:  No, I'll allow it.

A.  Correct.  That is why we closed down that institution in the following years, and we requested his resignation.

Q.  Did Mr. Hugo Ardón resign?

A.  It took some time, but he did resign.

Q.  Did you have a conversation with him about his resignation?

A.  No, sir.

Q.  Who was it that advised him of his need to resign?

A.  One of the ministers who was a member of the board of directors who could investigate him.

Q.  Did you ever accept a bribe from either Alex Ardón or Hugo Ardón?

A.  No, sir.

Q.  Did you ever provide protection for either Alex Ardón or Hugo Ardón in terms of their drug trafficking activity?

A.  No, sir.

Q.  With Don Hector Emilio, did you ever receive bribes from Hector Emilio and his cartel?

A.  No, sir.

Q.  Did you ever promise Hector Emilio that you'd protect his cartel?

A.  No, sir.

Q.  Did you ever meet with Don Hector Emilio?

A.  No, sir, I don't know him.

Q.  The Don Montes cartel, did you ever promise to protect them?

A.  No, sir.

Q.  Did you ever receive a bribe from the Don Montes cartel?

A.  No, sir.

Q.  How about the Valle Valles?  Did you ever accept a bribe from them?

A.  No, sir.

Q.  Did you ever promise to protect them?

A.  No, sir.

Q.  In fact, there came a time when the Valle Valles wanted to take your life, isn't that a fact?

A.  I was informed of that by the FBI, sir.

Q.  Can you tell the jury of other plots to kill you as a result of your agenda against drug traffickers.

        MR. WIRSHBA:  Objection.

THE COURT:  Yes, sustained.

Q.  Were you aware of any plots to kill you during the past or recently, sir?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  Were the Valle Valles extradited?

A.  Yes, sir.

Q.  Who was the president when they were extradited?

A.  I was, sir.

Q.  Were the Don Montes extradited?

A.  Yes, sir.  I don't know how many, but I know two or three.

Q.  Were the Cachiros extradited?

A.  No, sir.

Q.  Did the U.S. government ever request the extradition of the Cachiros?

A.  No, sir, and I asked them about it.

MR. WIRSHBA:  Objection, your Honor.  Strike as nonresponsive.

THE COURT:  Yes, the last part is stricken.

Q.  Did you make any request to any government official about extraditing the Cachiros?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Sustained.

Q.  Were the Ardóns extradited?

A.  No, sir.

Q.   Did the United States request their extradition?

A.   No, sir.

Q.   While you were president?

A.   The United States did not request it.

Q.   What would have happened if you —— if your government had arrested the Cachiros ——

MR. WIRSHBA:  Objection.  Calls for speculation.

THE COURT:  Sustained.

Q.   In terms of an extradition by the United States, what would have happened if you —— if your government extradited —— if your government, rather, arrested the Cachiros?

MR. WIRSHBA:  Objection.  Same objection, your Honor. Calls for speculation.

THE COURT:  Sustained.

Q.   The law and the policy of the government of Honduras was that —— did you ever —— withdrawn.

Did you ever reject a U.S. request for an extradition of a Honduran subject?

A.   My policy was that any request of extradition made by the United States was to be granted.

Q.   While you were president, did you accede to the request by the United States to extradite Honduran nationals, all Honduran nationals, that they requested?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  One second now.

Yes, sustained.

Q.  Was there any Honduran national that you refused to extradite while you were president?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  Did you ever receive bribes —— rather, withdrawn.

Did you ever pay bribes to people or Honduran citizens in order to get elected?

A.  No, sir.

Q.  Can you name the individuals that you extradited on behalf of the United States?

A.  Carlos Lobo, Arnulfo Valle, Luis Valle, Don Montes, Hector Emilio Fernandez Rosa, Juan Carlos Arvizu, Wilter Blanco.  I don't remember the other names, but it was around 24 extraditions that were granted and three that are still being sought by the authorities and law enforcement, if my memory is correct.

MR. COLON:  Your Honor, may I ask that Defense Exhibit C, as in Charlie, be posted for counsel, the Court, and Mr. Hernandez, please, sir?

THE COURT:  Sure.

MR. COLON:  Thank you, sir.

Q.  I want you to take a look at that.  It's been posted in front of you.  Is that, what you see on the screen, Defense Exhibit C, does that help you recollect as to who —— or refresh

your recollection and help you recollect as to who was extradited during the course of your administration, sir?

A.   Yes, sir.

THE COURT:  All right.  You may take it down now.

Q.   Did you recognize the individuals in those —— in what was posted, sir?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Yes.  Sustained.  You can ask him what his refreshed recollection is.

Q.   Does that refresh your recollection ——

THE COURT:  He already said it does refresh his recollection.  You can ask him what his refreshed recollection is.

Q.   Now that it has refreshed your recollection, sir, does that help you remember some of the individuals that you extradited?

A.   I remember the first ones, because later it became just like an ordinary procedure, and I almost don't remember them.

MR. WIRSHBA:  Objection, your Honor.  Move to strike as nonresponsive.

THE COURT:  Stricken.

Q.   You mentioned the Ministerio Público.  What's the equivalent of Ministerio Público, MP?

THE COURT:  Objection.

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  I'm going to allow the question.

Go ahead.

A.   The equivalent could be the Attorney General's Office or what you call here the DOJ, but there's a very important difference.

THE COURT:  Listen.  Sustained.  If it's not the equivalent, then your answer should be, no, I can't identify what the equivalent is.  If it is the equivalent, then your answer's yes.

Q.   What is the function of the ministerio público?

MR. WIRSHBA:  Objection.

THE COURT:  Overruled.

A.   To investigate and prosecute crime.

Q.   Does the president of Honduras have the authority or the power to tell the ministerio público who to investigate?

A.   The public ministry in Honduras is independent.  It is not part of the executive branch, which is led by the president of the republic.

MR. WIRSHBA:  Objection.

A.   The attorney general's elected by the National Congress.

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  That's really not responsive to the question.  Does the president of Honduras have the authority to tell the ministry público who to investigate?  Can you recommend someone for investigation?

THE WITNESS:  Yes, they can make suggestions.

O35HHer2                        Hernandez Alvarado – Direct

THE COURT:  The president can?

THE WITNESS:  The president through his secretaries of state and security, sir.

THE COURT:  Thank you.

Next question.

Q.  Did you ever order the ministerio público to investigate anyone?

A.  The president of the republic cannot order the public ministry.

THE COURT:  All right.  Ladies and gentlemen, we're going to take our midafternoon break —— lunch break.  Yes, I'm getting ahead of myself.  We're going to take our lunch break. As always, please do not discuss the case among yourselves or with anyone.  We'll be back in action at five minutes after 2:00.

(Jury excused)

THE COURT:  All right.  We're in recess.  Thank you.

(Lunch recess)

O355her3                    Hernandez - Direct

A F T E R N O O N   S E S S I O N

2:15 p.m.

(Jury present)

THE COURT:  Please, be seated.

THE DEPUTY CLERK:  Wait, there are two more.

THE COURT:  Sorry.  Thank you, Flo.

Please, be seated.

Mr. Colon, whenever you are ready.

MR. COLON:  Thank you so much, your Honor.

BY MR. COLON:

Q.  Mr. Hernandez, you know who Fabio Lobo is; correct?

A.  Correct.

Q.  You saw him testify here just a few days ago?

A.  That's right.

Q.  Were you close to Fabio Lobo?

A.  No.

Q.  Why not?

A.  I had many differences with him.

Q.  Like what, for instance?  Tell the jury.

A.  His behavior.

Q.  When you say his behavior, what do you mean by that?

A.  He did not like to work and he liked easy money.

Q.  In fact, he had never been to your house; is that correct?

A.  Never.

THE COURT:  Try to avoid leading, please.

O355her3                        Hernandez - Direct

MR. COLON:  I'm sorry, Judge.

Q.  Had he ever been to your house, sir?

THE COURT:  The question has been asked and answered. I allowed the question to stand.

MR. COLON:  I'm sorry.  Thank you, Judge.

THE COURT:  Next question.

BY MR. COLON:

Q.  Had you ever been to his house?

A.  No.

Q.  Did you ever share holidays together?

A.  No.

Q.  Did you ever have dinner with him?

A.  No.

Q.  You heard testimony about a meeting that Mr. Lobo had or attempted to have with Pacheco Tinoco.  Remember that?

A.  Yes.

Q.  And do you recall what happened during that meeting, from the testimony?

THE COURT:  Wait a minute.  Wait a minute.  Wait a minute.  Sustained as to "from the testimony."

Q.  There came a time when Mr. Fabio Lobo took two Mexican nationals to the office of Pacheco Tinoco.  Do you remember that?

MR. WIRSHBA:  Objection as to form.

THE COURT:  I will allow it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   I was informed by General Pacheco of that meeting.

Q.   Did you tell Fabio Lobo's father Pepe Lobo about what happened at that meeting between Mr. Pacheco Tinoco and the two Mexican nationals?

            MR. WIRSHBA:  Objection.  Hearsay.

            THE COURT:  That's a yes or no question.  Overruled.

A.   Yes.

Q.   Did you confront Fabio Lobo of that meeting?

A.   Yes.

Q.   What did you say to Fabio Lobo?

            MR. WIRSHBA:  Objection.  Hearsay.

            THE COURT:  Sustained.

Q.   Did you scold Fabio Lobo?

A.   Yes.

Q.   Did Fabio Lobo tell you the truth about why he went to that meeting with those two Mexican nationals?

            MR. WIRSHBA:  Objection, your Honor.

            THE COURT:  Sustained as to form.

Q.   What did Fabio Lobo tell you about why he went to meet Pacheco Tinoco with the two Mexican nationals?

            MR. WIRSHBA:  Objection; hearsay.

            THE COURT:  Sustained.

Q.   Fabio Lobo lied to you about why he went with the two Mexican nationals to see Pacheco Tinoco?

            MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Basis?

MR. WIRSHBA:  Knowledge; calls for hearsay.

MR. COLON:  State of mind, Judge.

THE COURT:  Sustained.  Sustained.

BY MR. COLON:

Q.  Moving on to the party that you attended for Ramon Lobo.
Do you recall that?

A.  Yes.

Q.  And what was the occasion for that party?

A.  It was the birthday of Mr. Ramon Lobo.

Q.  How did you know Ramon Lobo?

A.  He had been a deputy during the time that I was deputy too.

Q.  Deputy from where?

A.  From Colon.

Q.  And what was his relationship to Pepe Lobo?

A.  Brother.

Q.  And the relationship to Fabio Lobo?

A.  Uncle.

Q.  Was he a member of the National Party?

A.  Yes.

Q.  Were you invited to that party?

A.  Yes.

Q.  And where was that party held?

A.  At a place called Bonito Oriental in Colon.

Q.  Was that held in a building or was that held outside?

O355her3                        Hernandez - Direct

A.   In an open field.

Q.   Were you ever in a room with anyone on that occasion?

A.   No.

Q.   How many people, if you recall, attended that party?

A.   200 to 250 people.

Q.   How long did that party last?

A.   I don't know because I left early.

Q.   About how long were you at the party?

A.   One hour, approximately.

Q.   Did you have any conversations with drug traffickers?

A.   No, sir.

Q.   Did you take any pictures with drug traffickers?

A.   No, sir.

Q.   Who was in attendance at the party?  What kind of people were there?

          MR. WIRSHBA:  Objection as to form.

          THE COURT:  Overruled.

A.   Well, the president at that time was invited, several deputies, mayors, and also the mayor of Tegucigalpa, Ricardo Alvarez was there.

Q.   Did you have a security detail accompanying you?

A.   Yes.

Q.   Did you ever meet Mr. Sanchez, who testified at this trial, before?

A.   Yes.  The witness that you mentioned?  I don't know him but

I now remember him.  The first one who testified?

Q.  Mr. Sanchez who testified at this trial.

A.  No, no.  I have never met him.

Q.  Have you ever spoken to him?

A.  No.

Q.  Do you know what Mr. Fuad Jarufe is?

A.  Yes, sir.

Q.  Who was Mr. Fuad Jarufe?

A.  He was a businessman from the northern coast of Honduras who was in the business of the storage of grains, mainly rice.

Q.  How well did you know him?

A.  Well, not a lot, but I did visit him.  I would visit him at his office at that place called Choloma.

Q.  And why was it important for you to visit him?

A.  Well, it is a main center for rice processing in Honduras and one has to be monitoring the prices.  And obviously for political reasons.

Q.  Did you ever accept a bribe from Mr. Fuad Jarufe?

A.  No, sir.

Q.  Did you ever exchange anything with Mr. Fuad Jarufe?

A.  Nothing personal ever, but he did contribute to the National Party.

Q.  Did you ever have -- withdrawn.

Did you ever receive a bribe from El Chapo?

A.  Never.

O355her3                         Hernandez – Direct

Q.  Did you ever meet El Chapo?

A.  Never.

Q.  Did you ever meet anyone who was an agent or rather one of El Chapo's narcotics traffickers?

A.  No.

Q.  Did you ever speak to El Chapo?

A.  Never.

Q.  Did you ever speak to anyone who was representing himself as a member of El Chapo's cartel?

A.  No.

Q.  Do you recall the name of the mayor of Yoro in Honduras?

A.  Yes, sir.

Q.  What was his full name?

A.  Arnaldo Urbina.

Q.  Did you have meetings with Mr. Arnaldo Urbina?

A.  Yes, sir.

Q.  Why did you meet with Mr. Urbina?

A.  Well, he was a mayor, and he was also a candidate for mayor.

Q.  When was the last time that he was candidate for mayor?

A.  2013.

Q.  Did you support him for his candidacy for mayor of Yoro?

A.  He was the candidate of my party when I was a candidate, too.

Q.  Were you aware of his drug trafficking activity?

A.  No, sir.

Q.  By the way, did you own an air strip in lempiras?

A.  No, sir.

Q.  Was there an air strip in lempiras?

A.  Yes.  A small aerodrome was built there.

Q.  And who was in charge of that air strip?

A.  The armed forces of Honduras.

Q.  And who was that air strip -- withdrawn.

Who was the president when that air strip was commissioned?

A.  Pepe Lobo.

Q.  So, did you have any interest at all in that air strip?

A.  We were interested in developing the national tourism industry and that was one of the air strips.

Q.  So how many air strips were built with respect to that tourism program around that time?

A.  There was one built in Copan Ruinas, the archeological cites in Copán and then Tela was built on the Atlantic coast, another one was built in Choloteca on the Pacific, and one was repaired in Catacama, Olancho.  And they were designed to bring short, one-hour flights from Roatan to that air strip.

Q.  With respect to the Cachiros, why didn't you arrest the Cachiros?

A.  Because they were in a cooperation process with the United States.  They began to cooperate in December 2013, however,

their properties were seized in September 2013, and during my government, approximately $1 billion were seized from them --

MR. WIRSHBA:  Objection, your Honor.

A.  -- certified by the U.S. as well.

THE COURT:  Yes.

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  One moment, please.  Yes.  Striking after "December 2013," the rest of it is stricken.

Next question.

BY MR. COLON:

Q.  Why didn't you arrest the Ardóns?

A.  I asked the prosecutor at the time why they weren't arrested and he said that they were the objective of the United States.

Q.  Did you ask the United States for assistance in the war on drugs and fighting the narcotic traffickers in Central America?

A.  Yes, sir.

Q.  What did you ask the United States for?

A.  In the first opportunity, I asked the head of the southern command of the United States.  It was Easter week and I had just been sworn in as president -- interpreter correction -- a few weeks before and I had just been sworn in as president.

Q.  Who was the commander of South Comm that you spoke to, sir?

A.  With General John Kelly.

Q.  He was a four-star general at the time?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Sustained as leading.

Q.  Who was John Kelly?

A.  John Kelly was the highest-ranking officer in the southern command, and then I met him as chief of Mr. Trump's cabinet and as Homeland Security Secretary.

Q.  How many meetings did you have with General Kelly?

A.  Many.

Q.  When you say many, can you tell the jury approximately how many over the span of your two administrations?

A.  15 to 20.

Q.  And where did those meetings take place?

A.  The first was a very private meeting in Miami.

Q.  What did you discuss there with him?

MR. WIRSHBA:  Objection, your Honor; calls for hearsay.

THE COURT:  You can testify as to the general subject area of the meetings.

A.  I asked General Kelly to help us in our fight against drug trafficking and building a marine shield in the Atlantic and a land shield in the frontier, in the Honduran frontiers or borders, to avoid the drug flow that was coming from South America, going through Honduras, passing through Mexico, and reaching the U.S.

MR. WIRSHBA:  Objection, your Honor; goes well beyond

the topic of the general topic of the meeting and the government requests that it be stricken.

THE COURT:  I'm going to allow it to stand.  Next question.

Q.  What was Honduras' role with respect to the maritime shield?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Basis?

MR. WIRSHBA:  Vague.

THE COURT:  I will allow it.  Go ahead.

A.  To coordinate with our armed forces and specifically with the Naval forces with the fleet that General Kelly could deploy in the route that comes from Honduras -- from Colombia through Venezuela and then to Honduras.  And also to be part of the unified task force that they have in Key West.  I brought the whole Honduran Army counsel -- security counsel to that meeting at Key West and that day we named the head of the unified task force to work with the United States.

Q.  And when you say deploy, deploy forces or personnel for what purpose?

A.  To avoid that drugs arrive to Honduras through the maritime route in South America.  The first year of my presidency we established something called the Chorti Maya force, and General Kelly had helped to set that up in the borders between Honduras and Guatemala.  And the Southern Command had also set up an

elite force that we called The Tigres -- The Tigers -- and General Kelly also became a companion when we visited both chambers -- both law chambers in the United States, the lower chamber and the higher chamber.

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Mr. Hernandez, the question was:  And when you say deployed, deployed forces or personnel, for what purposes?  So, that's the question you should answer.  You have answered it and you leave it at that and await the next question.

THE WITNESS:  (In English)  OK.

THE COURT:  Next question.

Q.  What was Honduras' contribution to the land shield?

THE COURT:  How is that different than what the witness just testified as to the deployment of forces?

MR. COLON:  I think it is a different question, Judge.  What was the manpower that --

THE COURT:  Sustained.

Q.  -- that Honduras --

THE COURT:  Sustained.  Next question.

Q.  Were there any other, either special programs or operations, that John Kelly collaborated on with Honduras?

MR. WIRSHBA:  Objection.

THE COURT:  Basis?

MR. WIRSHBA:  Calls for hearsay.

THE COURT:  I will allow it.

A.  General Kelly was key in convincing both the House of Representatives and the Senate in the United States to build what finally was the component in the fight against drug trafficking and violence in Honduras which was an important part of the alliance for prosperity with President Obama --

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  All right.

A.  -- the vice president --

THE COURT:  Mr. Hernandez, remember what I have told you.  The question that you were asked was:  Were there any other either special programs or operations that John Kelly collaborated with Honduras?  And I allowed the question.  That does not permit you to go into a speech about the programs or why they were important or how they came about.  You are to name the programs and then we see what the next question is.

Do you understand?

THE WITNESS:  I understand, your Honor.

THE COURT:  Go ahead.  Do you have another question?

BY MR. COLON:

Q.  Did you finish naming any of the programs?

A.  Alliance for Prosperity in the Northern Triangle in South America.

Q.  What was the purpose of that program?

A.  To avoid irregular migration towards Honduras, to attack

drug dealing violence, to create opportunities for income and employment, strengthen the institutions of Honduras and Guatemala, and the plan of Honduras was the basis for all of this.  And finally, it was approved by the United States Congress.

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Mr. Hernandez, you heard the instruction I gave.  Where does that come in to the answer to the question?  It doesn't.  OK?  Listen, a lot of things went on in the United States.  A lot of things went on in Honduras.  This trial is focused on certain matters and the questions that I am allowing in this trial need to be focused on those matters.  So, please, listen to the questions and answer only what is asked or I will do what I am doing now, which is striking the last sentence of your answer.

THE WITNESS:  (In English)  May I say something, sir?

THE COURT:  No, sir.

THE WITNESS:  OK.

THE COURT:  No, sir.  And the purpose for the rules is that we have a question that is asked and then the other side gets to decide whether that question will elicit proper testimony.  And if they don't object, then the answer comes in.  But for that to be a fair rule of how a trial is conducted, the answer has to be limited to the question because then the person who is hearing the question wouldn't know whether or not

O355her3                          Hernandez – Direct

they had a valid objection if they're getting information that goes beyond the question.  So that's why we have that rule and that's the rule I am enforcing.

Go ahead, Mr. Colon.

MR. COLON:  Thank you, your Honor.

BY MR. COLON:

Q.  Did you meet with government officials in the United States during your tenure as president of the Honduras?

MR. WIRSHBA:  Objection.

THE COURT:  Overruled.

A.  Yes, sir.

Q.  Did you meet with the FBI?

A.  Yes, sir.

Q.  Did you meet with Homeland Security?

A.  Yes, sir.

Q.  Did you meet with the DEA?

A.  Yes, sir.

Q.  How many times did you visit Washington and meet members of the government?

THE COURT:  During what time period?

MR. COLON:  In his administration; 2014 to 2022.

THE COURT:  Thank you.

MR. COLON:  Both administrations, Judge.

THE COURT:  Well, what's the time period?

MR. COLON:  2014 to 2022, sir.

O355her3                          Hernandez - Direct

THE COURT:  Thank you.

A.  Many times, sir.

Q.  Tell the jury what many times means.

A.  35, 40 times.

Q.  Did you pay a visit to the White House?

A.  Yes, sir.

Q.  Did you meet any presidents, sir?

A.  Yes, sir.

Q.  What presidents did you meet?

MR. WIRSHBA:  Objection.

THE COURT:  I don't know that this is relevant to anything.  We have the testimony he visited the White House, he met a number of presidents.

MR. COLON:  Thank you, sir.

THE COURT:  Next question.

MR. COLON:  Thank you.

BY MR. COLON:

Q.  I want to move to the area of reform.  Strike that. Withdrawn, Judge.  I'm sorry.

I have a question with respect to radars.  Did you request support with respect to obtaining radars from the United States?

MR. WIRSHBA:  Objection, vague.

A.  Yes, sir.

THE COURT:  I will allow it.  Go ahead.

A.   Yes, sir.

Q.   Did you receive any assistance from the United States in obtaining radars?

         MR. WIRSHBA:  Objection.  Relevance.

         THE COURT:  Sustained.

Q.   Did you purchase radars from the United States?

         MR. WIRSHBA:  Objection.

         THE COURT:  Sustained.

         MR. COLON:  Should I ask another question, sir?

         THE COURT:  Are you asking me?

         MR. COLON:  I didn't hear what you said.  I don't know if you said anything.

         THE COURT:  I said "sustained."

         MR. COLON:  Thank you, sir.

BY MR. COLON:

Q.   Did Honduras have functioning radars while you were president of Honduras from 2014 to 2022?

A.   When I began as president we didn't have any radars that were functioning so we acquired some.  I don't remember, they arrived at the end of 2014 or during 2015.

Q.   Were you able to purchase radars from a country other than the United States?

         MR. WIRSHBA:  Objection.  Relevance.

         THE COURT:  Sustained.

Q.   Why were radars important to the drug trafficking

interdiction?

MR. WIRSHBA:  Objection.

THE COURT:  I will allow it.

A.  Before I became president, I understood that a tremendous amount of illegal drugs were coming from Colombia and Venezuela and landing in Honduras.  If my memory doesn't fail me, it was 80 percent of the drugs that were arriving, and those small planes were flying around like flies in Honduras.  And many of those shipments meant great pain and dead people and many of the Honduran people were not aware of that.

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  All right.  You have answered the question.  Next question.

Q.  Did you implement any anti-money laundering laws while you were president of Honduras from 2014 to 2022?

A.  We implemented the law to seize assets and also the law against money laundering.  We adopted the best international practices regarding anti-money laundering and Honduras is now an example of that in the region.

Q.  Did you happen to meet with any officials from the United States embassy during your tenure as president from 2014 to 2022?

A.  Yes.  Very often, sir.

Q.  And did you discuss the topic of drug trafficking in Honduras?

A.   That was our main subject.

Q.   Are you familiar with the term "OFAC"?

A.   Yes, sir.

Q.   What was your familiarity with OFAC?  What do you know it to be?

A.   It is an office of the Treasury Department.  We began to work with them when the first companies and offices were designated in Honduras.

Q.   When you say it's the Department of Treasury, what country are you referring to?

A.   The United States Treasury Department.

Q.   I'm going to direct your attention to the topic of assassinations in Honduras.  Who was Alfredo Landaverde?

A.   A great Honduran gentleman.

Q.   Well, what was his job?

A.   I met him while he was the advisor to a committee on security in the Honduran Congress during my presidency -- when I was the president of the Congress.  Interpreter correction.

Q.   How many times did you meet with Mr. Landaverde?

          MR. WIRSHBA:  Objection.  Relevance.

          THE COURT:  Sustained.

Q.   What was Mr. Landaverde's role with respect to outing narcotics traffickers?

          MR. WIRSHBA:  Objection.  Relevance.

          THE COURT:  One second, please.  Sustained.

Q.   Was Mr. Landaverde assassinated, sir?

          MR. WIRSHBA:  Objection.  Relevance.

          THE COURT:  Sustained.

Q.   What was Mr. Landaverde's title or job description?

          MR. WIRSHBA:  Objection; relevance.

          THE COURT:  Sustained.

Q.   How about General Aristedes Gonzalez; who was he?

A.   Aristedes Gonzalez was known as the drug czar in the United
States for the United States -- Honduras --

          INTERPRETER:  I would like the witness to repeat his
answer, your Honor.

          THE COURT:  Yes, you may.

A.   General Aristedes Gonzalez was the drug czar in Honduras,
and drug dealers and policemen ordered his murder in December
of 2009, if my memory doesn't fail me.

          MR. WIRSHBA:  Objection, your Honor.

          THE COURT:  The question was:  How about General
Aristides Gonzalez, who was he?  That was the question that was
asked.  All right?  So confine -- you actually answered it when
you said general Aristedes Gonzalez was the drug czar in
Honduras.  That was perfectly fine.  And I am striking the
balance of the answer.

          THE WITNESS:  OK.

          THE COURT:  Next question.

Q.   Was he able to perform his duties as drug czar?

MR. WIRSHBA:  Objection, your Honor; relevance.

THE COURT:  Overruled.

A.  He was a very successful man during his tenure until he died.

THE COURT:  Next question.

MR. COLON:  I'm sorry.  Did he say, your Honor, he passed?

THE COURT:  What?

MR. COLON:  I didn't hear the answer, sir.

THE COURT:  All right.  Well, you have LiveNote there, why don't you check your LiveNote.

BY MR. COLON:

Q.  Who is -- one second, if I may, your Honor?  Who is Anibal Barrow?

A.  Anibal Barrow?

Q.  I'm sorry.

A.  He was a Honduran journalist, very critical --

MR. WIRSHBA:  Objection, your Honor; relevance.

THE COURT:  Yes.  Sustained. Stricken.

Q.  Were there assassinations of government officials or anti-narcotics activists in Honduras while you were president?

MR. WIRSHBA:  Objection, your Honor; relevance.

THE COURT:  Sustained.

MR. COLON:  It goes to the mind of the witness, sir.

THE COURT:  I will allow it for that purpose.  He can

answer it yes or no.

A.   Yes.  Terribly so, yes.

          THE COURT:  Next question.

Q.   Why were you concerned?

          MR. WIRSHBA:  Objection.

          THE COURT:  Sustained.

Q.   Moving toward the topic of the Ministerio Publico, who was the minister of the Ministerio Publico?

A.   You are talking about the head of the institutions?

Q.   Yes.

A.   The attorney general of Honduras.

Q.   Did you ever tell him to investigate the Cachiros?

A.   When I was president of the Congress I told him that first time.

Q.   Did you ever tell him to investigate the Ardóns?

A.   I asked him if they were investigating them already and he said that, yes.

Q.   Did your campaign receive drug funds, to your knowledge?

A.   As far as I know?  No, sir.

Q.   Did you receive any money from the campaign -- any drug money or illicit narcotics-related money or funds?

A.   No, sir.

          MR. WIRSHBA:  Your Honor, can we have a side bar, briefly?

          THE COURT:  No.

Q.   Did you take an initiative with respect to police reform in Honduras when you became president?

A.   Yes, sir; because when I was president of the Congress, it did not go then but it did function once I became the president.

          MR. WIRSHBA:  Objection, your Honor.

          THE COURT:  Everything after "yes, sir" is stricken.

Q.   Could you please explain to the jury what you did in terms of the police reform?

          MR. WIRSHBA:  Objection; relevance.

          THE COURT:  Sustained.

Q.   Did you have -- what's the reason why you had to initiate a police reform in Honduras?

          MR. WIRSHBA:  Objection.

          THE COURT:  Sustained.

Q.   Was there corruption in the National Police force?

A.   Yes, sir.

Q.   Was it of a concern to you that there was corruption in the National Police force?

          MR. WIRSHBA:  Objection.

A.   Yes, sir.

          MR. WIRSHBA:  Your Honor, if I may, is the interpreter going to be used to interpret the question?  The witness is answering before the interpreter on some occasions.

          THE COURT:  So, Mr. Hernandez, wait for the

interpreter to interpret and then respond.  Do you understand?

THE WITNESS:  (In English)  Yes, sir.

THE WITNESS:  Yes, sir.

THE COURT:  Next question.

Q.  Were you concerned about the corruption in the police force?

MR. WIRSHBA:  Objection, relevance.

A.  Yes, sir.

MR. WIRSHBA:  Your Honor, if I may?

THE COURT:  One second, please.

MR. WIRSHBA:  Of course.

THE COURT:  Yes, that is going to stand.  Next question.

Q.  Was the corruption related to narcotics trafficking in Honduras?

A.  In great part, yes.

Q.  But what was the police force, the National Police force when you became president, what was the size of it; sir?

MR. WIRSHBA:  Objection; relevance.

THE COURT:  Sustained.

Q.  Did you end up firing or terminating Honduran National Police that you suspected or that the country suspected were -- withdrawn.

Did you terminate -- withdrawn.

Did any agency undertake investigations into the

corruption -- narcotics-related corruption by the Honduran National Police?

A.   Two agencies, sir.

Q.   Which agencies were those?

A.   The Commission for Police Reform, which I appointed, and the Public Ministry of Honduras.

Q.   What were the results of those investigations in terms of whether police were terminated or fired from their jobs?

          MR. WIRSHBA:  Objection, your Honor.

          THE COURT:  Sustained.

Q.   Were the National Police a significant element of the anti-narcotics drug trafficking operations?

          MR. WIRSHBA:  Objection; vague.

          THE COURT:  Pam, could you read back that question, please?

          (Record read)

          THE COURT:  You may answer it.

A.   At the beginning?  No, sir.

          MR. COLON:  May I, Judge, just for a second?

          THE COURT:  Yes.

          (Counsel conferring)

BY MR. COLON:

Q.   Did you create another police force within the structure of the government of Honduras in the period of 2014 to 2022?

          MR. WIRSHBA:  Objection, your Honor.

THE COURT:  I will allow it.

Go ahead.

A.  We created three new ones, sir.

Q.  What were those?

A.  Within the National Police the Tigres force; within the public ministry the Technical Agency of Criminal Investigation; and in the armed forces the Armed Police for Public Order.

Q.  And why did you create those three entities?

MR. WIRSHBA:  Objection.

THE COURT:  Sustained.

Q.  Starting with the first entity, can you repeat the name of it?

A.  Tigres force.

Q.  What was the function of the Tigres force?

A.  It was a special tactics team.

MR. COLON:  I'm sorry, Judge.  Can we have that repeated?  The noise -- I'm sorry.

THE COURT:  The question was what was the function of the Tigres force and the answer was it was a special tactics team.

Next question, counsel.

MR. COLON:  Thank you.

Q.  How about the second entity you mentioned; what is the name of that again?

A.  The Criminal Investigation Technical Agency of the Public

Ministry.

Q.  And what was the function of that entity?

        MR. WIRSHBA:  Objection, your Honor.

        THE COURT:  Sustained.

Q.  What was their job?

        THE COURT:  I sustained the objection, sir.

Q.  How about the third entity, sir?

        MR. WIRSHBA:  Same objection, your Honor.

        THE COURT:  Sustained.

Q.  Did you have any family members that died during the course of your administration in the government?

        MR. WIRSHBA:  Objection, your Honor.

        THE COURT:  Sustained.

Q.  Who is Hilda Hernandez?

        MR. WIRSHBA:  Objection, your Honor.

        THE COURT:  Overruled.

A.  My sister.  She is deceased.

        THE COURT:  Sir, that wasn't part of the question, was it?

        THE WITNESS:  (In English)  I'm sorry.  I'm sorry.

        THE COURT:  Who was Hilda Hernandez?

        THE WITNESS:  (In English)  My sister.

BY MR. COLON:

Q.  Was she a member of your cabinet, sir?

A.  Not on the cabinet but she was director of communications.

Q.   And how long did she work for you, sir?

        MR. WIRSHBA:  Objection.  Relevance.

        THE COURT:  I will allow it.

A.   Four years, until she passed away.

Q.   How was it she passed away?

        MR. WIRSHBA:  Objection, your Honor.

        THE COURT:  Sustained.

        MR. COLON:  Judge, may I step aside?

        THE COURT:  Sure.

        (Counsel conferring)

Q.   Did you ever talk to your sister Hilda Hernandez about receiving bribes?

        MR. WIRSHBA:  Objection, your Honor; calls for hearsay.

        THE COURT:  I will allow it.

A.   As a member of the campaign team she received precise instructions as how to collect funds for the campaign and to avoid their being from illegal sources.

        MR. WIRSHBA:  Objection, your Honor; move to strike as non-responsive.

        THE COURT:  I will allow it to stand.

        Next question.

Q.   Do you know whether your sister ever received any money from the Cachiros?

        MR. WIRSHBA:  Objection, your Honor.

O355her3                    Hernandez - Direct

A.  No, sir.

          MR. WIRSHBA:  Objection, your Honor.  Beyond the scope
of the witness' knowledge.

          THE COURT:  I think the question was:  Does he know.
Overruled.

A.  No, sir.

Q.  Did your campaign receive cash contributions from 2014 to
2022, your campaign for president?

          THE COURT:  If you know.

A.  Those who wanted to contribute cash had to deposit it in a
bank and register -- identify themselves as to who they were.

Q.  What was the preferred mode of campaign contributions for
your campaign for president?

A.  As far as I recall it was checks from citizens or
businessmen contributing to the campaign.

          MR. COLON:  May I just take a second, Judge?

          THE COURT:  You may.

          (Counsel conferring)

Q.  Did the campaign keep ledgers or books?

A.  Yes, sir.

Q.  And were those ledgers or books reviewed by campaign
officials?

          MR. WIRSHBA:  Objection, your Honor.

          THE COURT:  Sustained.

Q.  Were you audited at all?

MR. WIRSHBA:  Objection, your Honor.

A.  Yes, sir.  Yes, sir.

THE COURT:  Basis?

MR. WIRSHBA:  Your Honor, the government has a relevance objection but once again raises the witness is not waiting for the translation and waiting for the objection to be ruled on, your Honor.

THE COURT:  Next question, please.

And Mr. Hernandez, wait for the translation.  Thank you.

BY MR. COLON:

Q.  What was done with those ledgers?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Basis?

MR. WIRSHBA:  Lacks foundation.

THE COURT:  Overruled.

Q.  What was done with those ledgers?

A.  Well, an internal and an external audit is done with those books and they were also handed over to the electoral authority in the first election, and in the second one to the office called Office of Supervision of Campaigns, better known as Clean Politics.

Q.  Did you ever receive campaign contributions that were given to you personally?

A.  Sometimes I was present but they were given to those in

charge of the campaign.

MR. COLON:  May I consult, Judge?

THE COURT:  Yes.

(Counsel conferring)

BY MR. COLON:

Q.  Did you receive any campaign contributions from the Cachiros?

MR. WIRSHBA:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  How about the Valle Valles; did you receive any campaign contributions from them?

MR. WIRSHBA:  Objection; asked and answered.

THE COURT:  Sustained.

Q.  Did you promise any of the cartels that you would protect them during your candidacy and your presidential campaigns?

MR. WIRSHBA:  Objection; asked and answered.

THE COURT:  I will allow it.

A.  On the contrary, sir.  The promise was that we were going to terminate them.

Q.  Did you promise them, the cartels that is, that you were not going to seize any of their properties or assets?

A.  No, sir.  On the contrary.

Q.  Did you promise any of the cartels and its members that you were not going to extradite them?

A.  No, sir.

O355her3                        Hernandez - Direct

Q.   With respect to Tony Hernandez, did you tell the Ministero
Publico -- the attorney general -- to investigate your brother
Tony Hernandez?

A.   Yes, sir.

Q.   Was Tony Hernandez arrested?

A.   Here in the United States in 2018.

Q.   Who encouraged Tony Hernandez to go to the United States
and meet with the DEA?

A.   I did, sir.

Q.   Why did you encourage him to go to the United States and
meet with the DEA?

A.   Because there were rumors about him, and as his brother I
said to him, look for an attorney and go and face that problem.

Q.   How many times did he go to the United States after you
told him to go to the United States and meet with the DEA?

A.   As far as I recall, once.

Q.   Were you close to Tony Hernandez?

A.   There was a difference of over 10 years in age between us
and I left to go to school when I was 13 years old.

Q.   Did you conspire with Tony Hernandez to commit drug
trafficking crimes?

A.   No, sir.

Q.   Did you conspire with anyone else, Tony Hernandez -- beyond
Tony Hernandez -- to commit narcotics-related drug trafficking
crimes?

A.   Can you repeat the question, please?

Q.   Did you conspire with anyone, other than Tony Hernandez, to commit drug trafficking crimes?

A.   No, sir.

        THE COURT:  How much longer do you have, Mr. Colon?

        MR. COLON:  Maybe five minutes, sir.  I'm sorry, Judge.

Q.   Did you have any relationship at all with El Chapo?

        MR. WIRSHBA:  Objection; asked and answered.

        THE COURT:  Sustained.

Q.   Did you conspire with El Chapo to commit drug trafficking crimes?

A.   No, sir.

Q.   I think you testified earlier that you had never met with El Chapo; correct?

A.   Correct.

Q.   Did anyone give you a million dollars from the Sinaloa Cartel?

        MR. WIRSHBA:  Objection; asked and answered.

        THE COURT:  I will allow him to answer it.

A.   No, sir.

Q.   What entity in your government pursued the MS-13 gang in Honduras during your tenure as president of Honduras?

A.   Several, sir.

Q.   Which was the principal entity or unit of your government

that went after the MS-13's drug trafficking activities?

A.   It was a unit of a joint task force between the public ministry and the National Force Against Gangs and Maras.

Q.   What role did the military police play in investigating and arresting MS-13 gang members who were involved in drug trafficking?

          MR. WIRSHBA:   Objection.   Relevance.

          THE COURT:   Sustained.

Q.   Were any properties or assets seized from the MS-13 gang?

A.   The two avalanche operations were aimed at seizing property of MS-13.

          (Continued on next page)

Q.   And with respect to the gang named 18, or 18 Street, were they also targets of the government in terms of arresting for drug trafficking activity?

A.   Yes, sir, and all the cartels.

Q.   And at the end of your administration, did your efforts — were your efforts successful in reducing narcotics trafficking in Honduras?

         MR. WIRSHBA:  Objection.

         THE COURT:  Sustained.

Q.   Mr. Hernandez, you were arrested in, I believe, 2022, sir?

A.   Yes, sir.

Q.   Where did that arrest take place?

A.   I exited my house to turn myself over to the police.

Q.   Did the police force you out of your house or did you leave voluntarily?

         MR. WIRSHBA:  Objection.  Relevance.

         THE COURT:  Overruled.

A.   Voluntarily.

Q.   Did you attempt to flee?

A.   No, sir.

Q.   Were you offered asylum by any country in Central America?

         MR. WIRSHBA:  Objection, your Honor.

         THE COURT:  Sustained.

Q.   Did any country recommend that you leave Honduras?

         MR. WIRSHBA:  Objection, your Honor.

O35HHer4                     Hernandez Alvarado – Cross

THE COURT:  Sustained.

MR. COLON:  One second, Judge.

Your Honor, respectfully, would there be an opportunity to take an afternoon break, and I can finish up after break?

THE COURT:  No.

MR. COLON:  I have no further questions.

THE COURT:  All right.  Ladies and gentlemen, we're now going to take our midafternoon break.  Please do not discuss the case among yourselves or with anyone.  We'll be back in action in ten minutes.  Thank you.

(Jury excused)

THE COURT:  We're in recess.

(Recess)

THE COURT:  Remain standing for the jury, please.

(Jury present)

THE COURT:  All right.  Please be seated.

Mr. Wirshba, you may inquire.

MR. WIRSHBA:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. WIRSHBA:

Q.  Good afternoon.  You were a politician in Honduras for many years, is that right?

A.  Yes, sir.

Q.  And you participated in several elections during the course

of your time in Honduras, correct?

A.  Yes, sir.

Q.  Now, before those elections, you needed to campaign, is that true?

A.  Yes, sir.

Q.  And that required you to travel around the country, is that right?

A.  Yes, sir.

Q.  One of the ways that you would travel around the country was by helicopter, correct?

A.  Yes, sir.

Q.  Now, once you were elected president, you were the president of Honduras for eight years, is that true?

A.  Yes, sir.

Q.  You testified you met with ministers in your own government, right?

A.  Could you please repeat that.

Q.  In that role as president, did you meet with ministers in your own government?

A.  Yes, sir.

Q.  And you met with other heads of state, correct?

A.  Yes, sir.

Q.  You traveled abroad to some of those meetings, right?

A.  Correct.

Q.  And you would highlight some of those meetings for the

public, is that correct?

A.  Yes, sir.

Q.  Would you agree with me that these are normal things that a president does?

          MR. COLON:  Objection.

          THE COURT:  Overruled.

A.  Yes, sir.

Q.  And on direct you talked about some of the largest drug traffickers in Honduras.  Do you remember that?

A.  Yes, sir.

Q.  You knew that the Valles, they were one of the largest drug trafficking organizations in Honduras, correct?

A.  Yes, sir.

Q.  The Cachiros were some of the largest drug traffickers, right?

A.  Yes, sir.

Q.  The Ardóns were large drug traffickers in Honduras?

A.  That's what I declared today.

Q.  You know that Byron Ruiz was also a major trafficker in Honduras, right?

A.  I didn't know that, sir.

Q.  All right.  You didn't include Tony Hernandez on your list, did you?

A.  No, sir.

Q.  OK.  We'll get back to him.

You and Pepe Lobo, you were in the same party, weren't you?

A.   Yes, sir.

Q.   And you worked for Pepe Lobo when he was the president of the National Congress, right?

A.   I worked for the Congress, sir.

Q.   Well, you were the secretary of the Congress while he was the president of the Congress, correct?

A.   I was secretary of the Congress.

Q.   At the same time that Pepe Lobo was the president of the Congress, correct?

A.   That is correct.

Q.   And then you were president of the National Congress while he was the president of the republic, right?

A.   Correct.

Q.   He accepted bribes, right?

A.   I don't know.

Q.   You don't know whether he took money from drug traffickers?

A.   I don't know.

Q.   Were you here when you heard Fabio Lobo say that he accepted bribes?

A.   I heard that from Fabio Lobo.

Q.   But you don't know whether that's true?

A.   No, I don't know, sir.

Q.   All right.  You remember that you testified about hearing

before you became president about some of the largest narcotics traffickers in Honduras, right?

A.   Yes, sir.

Q.   So that was before you took office in 2014 you had heard about these traffickers, right?

A.   Could you repeat that, please.

Q.   So you had heard about the most significant drug traffickers in Honduras before you took office in 2014, right, that was your testimony?

A.   I would hear about some.

Q.   And one of the ones you heard about was the Ardóns, right?

A.   I heard about the Ardóns in 2012, that they might be linked to illegal activities.

Q.   When you say criminal activities, you mean drug trafficking, right?

A.   Those were the rumors.

Q.   All right.  And that's both Ardóns, right?  That was Alex Ardón, correct?

A.   The one I heard about was Alex Ardón.

Q.   So you didn't hear anything about his brother Hugo Ardón, is that your testimony?

A.   I barely identified him.

Q.   Well, my question to you, sir, is did you hear, prior to becoming president, that Hugo Ardón might be involved in drug trafficking?

A.  I hadn't heard about him, sir.

Q.  All right.  So before you became president, Alex Ardón came

to your home, right?

A.  Correct.

Q.  And at that point you had already heard that Alex Ardón was

involved in drug trafficking, right?

A.  There were rumors.

Q.  Well, you asked him not to run for mayor again based on

those rumors, right?

A.  Correct.

Q.  So it was because there were rumors that he was a drug

trafficking that you asked him not to run, right?

A.  Not only that, sir.

Q.  But you confronted him about the rumors that he was a drug

trafficker, right?

A.  Not only that, sir.

Q.  But that was one of the things that you talked to him

about, am I right?

A.  Not only that, sir.

Q.  Mr. Hernandez, I'm asking a simple yes-or-no question.

Was one of the things that you spoke to Mr. Ardón

about the fact that you had understood that he was involved in

drug trafficking?

MR. COLON:  Objection, Judge.  Which Ardón are we

talking about here?

MR. WIRSHBA: Of course, your Honor.

Q. Isn't it true that one of the things that you spoke with Alex Ardón about at your house was that he was involved in drug trafficking?

A. I told him that there were rumors that he was involved in illegal activities.

Q. Drugs, right?

A. Rumors about drugs, among other things.

Q. OK. Was Hugo at the meeting at your house?

A. No, sir.

Q. Have you been in the same room with Alex and Hugo together?

A. Never, sir.

Q. After this meeting at your house, Alex, he remained a member of your party, right?

A. I don't know, sir.

Q. Well, did he come to party meetings at later times, yes or no?

A. Sometimes he tried to come and they wouldn't let him in. Sometimes he would come in; sometimes not.

Q. And there were mayors that spoke to you about him, right, that was your testimony?

A. That those mayors said that he was going to go with them to enter another party.

Q. So at the time when those mayors spoke to you, he was still a member of the National Party, right?

A.  I don't know, sir, because he was already bringing up the idea that he was going to defect to another party.

Q.  Well, Hugo was certainly a member of your party, right?

A.  I didn't know that either, sir, because he was very close to his brother.

Q.  So Hugo and Alex were very close and you knew that, correct?

A.  Until that moment when they talked about going to another party, I viewed them as being close.

Q.  And Hugo, he was a member of your government, right?

A.  When I began in my government, he already had that position.

Q.  Right.  He was the head of Fondo Vial, right?

A.  Yes, sir.

Q.  But he also had a role in your 2013 campaign, didn't he?

A.  Not that I recall.

Q.  You don't remember that Hugo was the deputy director of the campaign in Copán?

A.  Not that I recall, sir.

Q.  Now, after Alex Ardón came to your house, did Alex run for mayor again in 2013?

A.  I don't recall, sir.

Q.  You testified that Arnaldo Urbina was the mayor of Yoro, right?

A.  Yes, sir.

MR. WIRSHBA:  Ms. Collins, could we bring up Government Exhibit 323, please, in evidence.

Q.  This is you and Mr. Urbina together, right?

A.  Yes, sir.

Q.  And Mr. Urbina, he ran for reelection in 2013, didn't he?

A.  I don't remember if it was for reelection or if it was the first time, but he did run.

Q.  And he won, right?

A.  Yes, sir.

Q.  And you won that election, didn't you?

A.  Yes, sir.

Q.  And he was arrested after the election, isn't that right?

A.  Yes, sir.

Q.  And following the election in 2013, Alex Ardón, he was not arrested, right?

A.  I don't know, sir.

Q.  Well, do you remember whether Alex Ardón was arrested in Honduras in 2014?

THE INTERPRETER:  May I ask him to repeat?

A.  The only thing that I know is that after my election in 2014, he fled to Guatamala for fear of being arrested in Honduras.

Q.  That's something that you heard during the course of the trial?

A.  That was known throughout the whole west in Honduras, in my

country.

Q.  But then he came back to Honduras, right?

A.  I don't know, sir.

Q.  Well, you saw him after that, didn't you?

A.  I don't recall.

Q.  Didn't you testify that you saw him in 2015, sir?

A.  I saw Hugo Ardón when I sent to have him told that he should give up his post.

Q.  That wasn't my question.

Did you testify on direct examination that you saw Alex Ardón as late as 2015?

A.  I had some meetings, but I don't remember exactly where.

Q.  My question was do you remember testifying about the time of those meetings.

Do you remember testifying earlier that you saw Alex Ardón as late as 2015?

A.  I don't recall, sir, but if you show it to me and I said it, I don't recall.

Q.  Understood.

All right.  You testified that you knew Fuad Jarufe, right?

A.  Yes, sir.

Q.  He was also a member of the National Party, is that right?

A.  Well, he was a contributor to the National Party.

Q.  And he owned an accounting firm, right?

A.   No, not that I know, sir.

Q.   He owned Graneros Nacionales, though, right?

A.   Yes, but that was a company to keep foodstuffs, mainly rice.

Q.   Right.  And you testified that you went there, right?

A.   Yes, sir.

Q.   You said that you went there to check on the price of rice, is that right?

A.   Sometimes I heard what rice buyers and rice sellers said, because that's a very sensitive subject in Honduras, the price of food.

Q.   But you also —— you went to Graneros to raise money from Mr. Jarufe, right?

A.   He would send the money through the bank to our account with the party.

Q.   But you went to talk to him about raising money, true or not true?

A.   I don't recall that I talked about that to him.

Q.   So I'm right that Fuad Jarufe was a pretty significant contributor to the National Party, right?

A.   He was a regular contributor.

Q.   But you don't remember ever having conversations with him about the money that he was providing to the party?

A.   My campaign team and the party team spoke to him about that.

Q.   I see.

So when you would go and visit Mr. Jarufe, all you discussed was the price of rice, is that right?

MR. COLON:  Objection.

THE COURT:  Overruled.

A.   The price of grains and basically the sensitive subject of the price of violence.

THE INTERPRETER:  Sorry.

A.   The price of basic grains and also the matter of violence.

Q.   But not money, right?

A.   Not that I recall.

Q.   You've met Geovanny Fuentes Ramirez, haven't you?

A.   No, sir.

MR. WIRSHBA:  Could we put up Government Exhibit 902, Ms. Collins.

Q.   Does this help you remember —— does the individual on the screen help you remember whether you've ever met Geovanny Fuentes Ramirez?

MR. COLON:  Objection.

THE COURT:  Overruled.

Does it refresh your recollection?

A.   No, sir.

Q.   Have you ever met his children?

A.   I've known so many children during my lifetime, sir, and particularly as president and as a candidate.

Q.   OK.  Well, I'll see if I can refresh your recollection.

Ms. Collins, could we put up Government Exhibit 910.

MR. COLON:  Your Honor, objection.  He doesn't recall.

THE COURT:  I think he just said he wants to put it up to see whether it refreshes his recollection, if I heard him correctly.

MR. COLON:  I don't think he said he didn't recall.

THE COURT:  Pardon me?

MR. COLON:  I don't believe he said he didn't recall.

THE COURT:  I see.

MR. WIRSHBA:  I'm happy to ask the question again, your Honor.  I don't believe that the witness answered the question.  He was nonresponsive.  I'm happy to ask again.

THE COURT:  Go ahead.

BY MR. WIRSHBA:

Q.   Do you remember ever meeting the children of Geovanny Fuentes Ramirez?

A.   I don't remember, sir.

MR. WIRSHBA:  Ms. Collins, can we put up Government Exhibit 910.

Q.   Mr. Hernandez, do you remember seeing this during the trial?

A.   I don't recall, sir.

Q.   You don't remember seeing this during trial?

A.   I don't recall.

Q.  All right.  That is you in the middle, though, right?

A.  It looks like me, yes.  It's that the picture is not very clear.

Q.  So you're not sure whether that's you in the middle of this photo?

A.  Well, it looks like it is me.

Q.  The person to your right, that — you heard testimony that that was one of Geovanny Fuentes Ramirez's children, right?

MR. COLON:  Objection.  Question.

THE COURT:  Yes, sustained.

MR. WIRSHBA:  Your Honor, I'm sorry, the basis for the objection?

THE COURT:  Well, the basis for the ruling is —

MR. WIRSHBA:  The ruling, yes, your Honor.

THE COURT:  — you can't impeach him based on what he heard in this courtroom as testimony from another witness.

MR. WIRSHBA:  Yes, your Honor.

BY MR. WIRSHBA:

Q.  Do you remember, sir, hearing testimony that these were the children of Geovanny Fuentes Ramirez?

A.  Sir, that I'm aware of, no, I don't know.

Q.  Do you remember hearing that testimony is the question, Mr. Hernandez?

MR. COLON:  Objection.  Asked and answered.

THE COURT:  I don't know that it was answered, but go

ahead.

A.  No, sir.

MR. WIRSHBA:  OK.  We can take that down.

Q.  Mr. Hernandez, do you remember when José Sánchez testified that you said that you wanted to stay in power for 20 years?

A.  Yes.

Q.  Did you say that?

A.  No, sir.

Q.  But you did change the Constitution of Honduras to stay in power, right?

MR. COLON:  Objection.

THE COURT:  Overruled.

A.  I didn't do it, sir.

Q.  When you first ran for president in 2013, the Constitution only allowed a Honduran president to serve for one term, right?

A.  Correct, sir.

Q.  And to the best of your knowledge, that's why Pepe Lobo didn't run for reelection in 2013, right?

MR. COLON:  Objection.  Relevance.

THE COURT:  I'll allow it.

Go ahead.

A.  I don't know, sir.

Q.  All right.  But when you were president, that rule changed, right?

A.  The Supreme Court of justice passed a resolution.

Q.   And that resolution allowed you to run for another term, right?

A.   That resolution allowed that any citizen of Honduras could vote once more for a person who had already been president, the same as was happening for mayors and congressmen —— for mayors and congressmen.

Q.   But you were the president at the time that that changed happened, right?

A.   And there were four other ex-presidents who could also be candidates.

Q.   That wasn't my question.

My question was you were the president at the time that change happened, right?

A.   When that happened, it was a resolution that came from the court respecting the rights of the citizens.

Q.   And you were the president, right?

A.   When that happened, yes.

Q.   All right.  So you did run again in 2017, correct?

A.   First I was a candidate of my party and then I competed with other seven candidates to be president, if I recall the number properly.

Q.   So the answer to my question is, yes, you ran for president again in 2017, right?

A.   Yes, my party had me run.

Q.   And your party had you run again in 2021, right?

MR. COLON:  Objection.

A.  No, sir, that's not correct.

MR. COLON:  There's no good faith basis for that.

THE COURT:  To the question?

MR. COLON:  That's correct, sir.  There's no evidence that that came out in any testimony.

MR. WIRSHBA:  Your Honor, I'm happy to move on.

THE COURT:  Move on, please.

BY MR. WIRSHBA:

Q.  Mr. Hernandez, you testified on direct about the extraditions that you worked on.  Do you remember that?

A.  I gave testimony about the extraditions that took place when I was president, sir.

Q.  But extradition, that isn't the only way to prosecute drug traffickers, am I right?

A.  That's correct.

Q.  In fact, extraditions, they have to come from another country into Honduras, right, the request?

A.  That's correct, sir.

Q.  You'll agree with me that drug trafficking is also illegal under Honduran law, right?

A.  That's correct.

Q.  And you have a police force in Honduras, right?

A.  Correct.

Q.  You testified about several new police forces that were

formed while you were president, right?

A.   That's correct.

Q.   And you have prosecutors in Honduras, don't you?

A.   That's correct.

Q.   And those Honduran prosecutors, they prosecute people for drug crimes, right?

A.   That's correct.

Q.   Now, all the people that were extradited, they were extradited for sending cocaine to the United States, is that right?

          MR. COLON:  Objection.

A.   That's correct.

          MR. COLON:  Specify, Judge, please.

          THE COURT:  One second, please.

          MR. WIRSHBA:  I can narrow my question, your Honor.

          THE COURT:  If you will, please.

          MR. WIRSHBA:  Of course.

BY MR. WIRSHBA:

Q.   All the people that you testified about on direct that were extradited, they were extradited for sending cocaine to the United States, right?

A.   Correct.

Q.   Because you'll agree with me that the vast majority of the cocaine that enters Honduras is sent to the United States, correct?

MR. COLON:  Objection.

THE COURT:  Overruled.

MR. WIRSHBA:  I'm sorry.  Did the witness answer the question?  Perhaps I didn't hear.

THE COURT:  I didn't hear.

A.  Can you repeat it, please, Mr. Prosecutor.

Q.  Of course.  Of course.

You'll agree with me that the vast majority of the cocaine that enters Honduras goes to the United States, right?

A.  Yes, sir.

Q.  All right.  Do you remember Alex Ardón testifying that he had meetings with Chapo and with Mario Calix?

A.  I don't remember having him mention Mario Calix.  I do not remember him, sir.

Q.  But you do know who Mario Calix is, right?

A.  I know several Mario Calixes.

Q.  How about the Mario Calix that's the deputy mayor of Lempira?  Do you know him?

A.  He was a deputy mayor.

Q.  All right.  And that's ——

A.  Not of Lempira, but of Gracias.

Q.  I apologize.  Of Gracias, Lempira, right?

A.  Yes.

Q.  And that's your hometown, right?

A.  Yes, sir.

Q.  Now, you said on direct that you accepted every extradition request, is that right?

A.  That's correct.

Q.  Isn't it true that a request for Mario Calix's extradition was sent in September 2019?

A.  Yes, sir, and immediately we sent it on to the Supreme Court of Honduras.

Q.  So that request is still pending, right?

A.  As far as I understand, there's a proceeding that took place already in the Supreme Court of Honduras.

Q.  But he has not yet been extradited, correct?

A.  I don't know that, sir.

Q.  There were other people who the United States government requested extradition that have not been extradited during your time, right?

MR. COLON:  Objection.

THE COURT:  Basis?

MR. COLON:  Not the testimony, sir.

THE COURT:  All right.  Well, it's a question.  Let's find out the answer.

A.  I don't know that, sir.

Q.  What about the extradition ——

A.  What I ——

Q.  I think you said you don't know that, right?

A.  What I do know ——

Q.  Well, Mr. Hernandez, I asked a question, and I think you've answered it.  You don't know.  I'm going to ask about some specific people.

A.  Very good.

Q.  All right.  So isn't it true that there was a request for Carlos Urbina Soto's extradition in December of 2018?  Is that true or not true?

A.  The only one I know about, he's already extradited here.

Q.  And that's Arnaldo Urbina, right?

A.  And the extradition was granted when I was president.

Q.  OK.  So do you know that the U.S. government sent a request for Carlos Urbina Soto in December 2018?

A.  I don't know, sir.

Q.  Do you know that the U.S. government sent a request for Miguel Urbina Soto, another family member of Arnaldo Urbina, in December 2018?

A.  All of the extradition requests that came in to us were sent to the Supreme Court of Honduras, all of them.

Q.  OK.  But they weren't granted while you were president, is that right?

          MR. COLON:  Objection.

          THE COURT:  Overruled.

A.  I don't know, sir.

Q.  Wasn't the request for Tigre Bonilla sent while you were president?

A.   And immediately the office of foreign relations sent it on to the Supreme Court of justice.

Q.   But it wasn't granted until 2022, after you left office, right?

A.   That is something to do —— that has to do with the Supreme Court of justice of Honduras, the respect for the judges.

Q.   You remember that you were describing other people who you did successfully extradite during direct examination, right?

A.   Yes, sir.

Q.   And you testified that you —— one of those people that you extradited was Wilter Blanco, right?

A.   I recall that he was extradited from Costa Rica to Honduras.

Q.   So when you testified on direct that he was extradited from Honduras, that was incorrect, right?

A.   When I was consulted about the fact that Wilter Blanco was being extradited from Costa Rica to Honduras and they told me that the request came from the United States, I told them the policy is to send all of them that are requested by the United States.

Q.   So he was not extradited from Honduras, right, true or not true?

A.   What I recall is that I told them to extradite him from Costa Rica to Honduras because the United States was requesting him.

Q.   I'm asking a yes or no, sir.  Was Wilter Blanco extradited from Honduras to the United States, yes or no?

MR. COLON:  Objection.  Asked and answered, sir.

THE COURT:  Hasn't been answered.  You may answer.

A.   What I recall, sir, is that he was being extradited from Costa Rica to Honduras.

Q.   So the answer to my question is, no, that he was not extradited from Honduras to the United States, correct?

MR. COLON:  Objection.

THE COURT:  Basis?

MR. COLON:  I believe that's not the testimony, sir.

THE COURT:  All right.  Overruled.

A.   Well, then I don't remember it well, sir.

THE COURT:  No, no.  Do you know whether Wilter Blanco was extradited from Honduras to the United States during your term as president of Honduras, yes or no?

THE WITNESS:  I don't remember it.

THE COURT:  Next question.

Q.   All right.  Well, I'd like to show you —— let's show just the parties, the Court, and the witness Government Exhibit 1379, if we could.  Could we scroll down to the bottom there.  Scroll up one.  I'm sorry.  Leave it there.  I apologize.

Mr. Hernandez, do you see something on the screen?

A.   Yes.

Q.  Could you read the portion that I have circled on the screen, please, sir.

A.  Yes, sir.

MR. WIRSHBA:  We can take that down, Ms. Collins.

Q.  Mr. Hernandez, does that refresh your recollection as to whether Mr. Blanco was extradited from Honduras to the United States?

A.  It refreshes my memory of the fact that Costa Rica was requested to send him to the United States, and so that's what I understood.  That's why I said that.

Q.  I'm sorry.  Did it refresh your recollection as to whether Wilter Blanco was extradited from Honduras to the United States?  That's a yes-or-no question.

THE INTERPRETER:  I'm sorry, interpreter correction, "and Honduras approved it."

Q.  OK.  So I'm happy to move on.

Now, you mentioned earlier the Supreme Court.  Who appoints the justices to the Supreme Court?

A.  The National Congress by a two-thirds vote on the proposal of several institutions and guilds in Honduras.

Q.  Mr. Hernandez, isn't it true that the president nominates the justices of the Supreme Court?

A.  No, sir.

Q.  Was Julio Cesar Barahona one of the members of the Supreme Court that was nominated during your administration?

A.  No, sir.

Q.  All right.  You extradited Arnulfo Valle to the United States, is that right?

A.  He was extradited while I was president.

Q.  As well as Luis Valle, right?

A.  Correct.

Q.  And that was after they formed a plan to assassinate you. That's what you testified to?

A.  The U.S. and Honduras were already looking for them before the FBI told me about the assassination.

Q.  All right.  In fact, the Valles had also been committing other acts of violence in Copán, right?

A.  I imagine so.

Q.  They killed National Party politicians in Copán, right?

A.  They committed many illegal acts.

Q.  Is it true that they killed National Party politicians who were running for elected office in Copán?

A.  I don't remember specifically.

Q.  Well, the Valles, they supported candidates from a party other than the National Party, is that right?

A.  Narco traffickers do not have a party, sir.

Q.  Well, sometimes they support candidates, don't they?

A.  They support all of them, or at least they try.

Q.  Including you, right?

A.  No, do not make a mistake.

Q.  All right.  So when you said that they "support all of them," you meant all of them except for you, is that right?

A.  I had a policy against all those people because I could not stand them.  They did a lot of damage to my country.

Q.  I see.

So your testimony is you were the only honest politician in Honduras, is that right?

MR. COLON:  Objection.  Argumentative.

THE COURT:  Yes, sustained.

Q.  All right.  Let's get back to the Valles.

Ms. Collins, could we put up Government Exhibit 309.

You recognize this photo, don't you, Mr. Hernandez?

A.  I first came to see it here, sir.

Q.  You've never seen this photo before you came to court?

A.  No, no.

Q.  Wasn't this photograph circulating in the Honduran media?

MR. COLON:  Objection.  Speculation.

THE COURT:  Pardon me?

MR. COLON:  Speculation and argumentative, sir.

THE COURT:  Overruled.

Q.  You can answer the question, Mr. Hernandez.

A.  No, I don't remember it, sir.

Q.  Did you ever comment on this photo publicly?

A.  I don't remember, sir, and I only came to remember it recently that there was a debate about whether it was a photo

montage or not.

Q.   When you say "a photo montage," do you mean —— do you mean that it was faked?

A.   That was the debate that occurred there, and that's why I recall recently that I saw it.

Q.   Well, Mr. Hernandez, that's you in the middle of the photo, right?

A.   Yes, that is my face.  And if you will notice, it looks clearer than the other three.

Q.   Well, Mr. Hernandez, you're the one in the photo.  Do you remember taking this picture?

          MR. COLON:  Objection.  Asked and answered.

          THE COURT:  Overruled.

          MR. COLON:  Asked and answered, sir.

          THE COURT:  Overruled.

A.   I have thousands of photos taken of me.

Q.   But you're sure this one's fake, right?

A.   I don't know, sir, because I took photographs with so many people, thousands.

Q.   Well, let's explore the photo.

          There was testimony —— do you remember testimony from Leo Rivera that he learned this was taken at the World Cup in 2010?

A.   Who are you talking about, sir?

Q.   Leo Rivera Maradiaga, he testified that this was taken at

the World Cup in 2010.  Do you remember that?

A.  Yes, but that is Leo Rivera.

Q.  Well, did you attend the World Cup in 2010, Mr. Hernandez?

A.  Yes, sir.

Q.  You attended matches, right?

A.  Yes, sir.

Q.  And you attended matches wearing this very T-shirt, did you not?

A.  That T-shirt for us Hondurans is, sir, like a national uniform.

Q.  That wasn't my question, Mr. Hernandez.

My question was did you attend soccer matches at the 2010 World Cup wearing that T-shirt?

A.  With that shirt on like almost all Hondurans.  It is our uniform.

Q.  So the answer is, yes, you did attend soccer matches wearing that T-shirt, right?

A.  Yes, sir.

Q.  And the reason you're concerned about this photo being fake is because you know who that is whose arm is around you, don't you?

MR. COLON:  Objection.

THE COURT:  Overruled.

A.  Sir, I had no idea.  Until my attorneys showed that photo me recently, I said to them I don't have any idea about it

until they told me about it.

Q.  Do you know who is all the way on the right in this photograph, Mr. Hernandez?

A.  I'm not sure, sir, but I see a resemblance.

Q.  To Arnulfo Valle, right?

A.  No, I was referring to the one on the left.

Q.  OK.  Well, let's talk about the one all the way on the right.  Is that Arnulfo Valle?

A.  On this left side, no, I don't know.

Q.  So I'll make sure that I'm clear about who we're speaking about, Mr. Hernandez.

The person that I'm circling with his arm around you is Arnulfo Valle, right?

MR. COLON:  Judge, if I may.

THE COURT:  Yes.

MR. COLON:  We need to finish the translation.

THE COURT:  Yes, please wait for the translation.

THE WITNESS:  (In English) I'm sorry, sir.

THE COURT:  Yes, go ahead.

MR. WIRSHBA:  Your Honor, should I re-ask the question?

THE COURT:  Re-ask the question.

MR. WIRSHBA:  Yes, of course.

BY MR. WIRSHBA:

Q.  Mr. Hernandez, the individual that I circled in the photo

with his arm around you, that is Arnulfo Valle, right?

A.  Sir, I don't know Mr. Arnulfo Valle.

Q.  Didn't you testify on direct that you knew before coming into office all the most important traffickers in Honduras?

A.  We knew the names of the organizations, sir.

Q.  And you extradited Arnulfo Valle, right?

A.  Yes, but I never met him.

Q.  And Arnulfo Valle, he tried to kill you, right?

A.  But that doesn't make him an acquaintance of mine.

Q.  Well, the question is do you recognize him, Mr. Hernandez?

MR. COLON:  Asked and answered.  Objection.  Asked and answered, sir.

THE COURT:  Yes, I think the witness has answered that.

MR. WIRSHBA:  Understood, your Honor.

Ms. Collins, we can take that down.

All right.  Ms. Collins, could we bring up Government Exhibit 204-R200, please, in evidence.

Q.  Mr. Hernandez, do you remember seeing this exhibit at the trial?  This is the Waze data from Geovanny Fuentes Ramirez's phone.

A.  I don't —— I cannot see it clearly, but I do remember that the location for the embassy in Honduras is there, the embassy of the United States, in the building of the presidential home of Honduras.  The presidential house is the office.

Q.   OK.   This Waze data, you'll remember, reflects that Geovanny Fuentes Ramirez entered Casa Presidencial on May 29 of 2019, right?

MR. COLON:   Objection.   That's not the testimony, sir.

THE COURT:   All right.   Do you want to rephrase that?

MR. WIRSHBA:   Of course, your Honor, I'm happy to do so with respect to the exhibit.

THE COURT:   Yes.

BY MR. WIRSHBA:

Q.   So, Mr. Hernandez, taking a look at the exhibit —— Ms. Collins, if we could focus in on items 4, 5, 6 —— you just testified that you remember that the Waze data reflected that there were entries for Casa Presidencial, right?

A.   No, sir, I didn't say that.

Q.   You didn't just testify that you remember that the data had the American embassy and the Honduran embassy and Casa Presidencial?

A.   Now you said it right.   It includes the American embassy, the U.S. embassy.

Q.   Mr. Hernandez, this exhibit reflects the Casa Presidencial Honduras, right?

MR. COLON:   Objection, Judge.   The exhibit speaks for itself.   There's no indication that there was any —— premises.

THE COURT:   Overruled.   There wasn't an answer to that question that I can see.

Q.  It says Casa Presidencial, right?  I'm circling it for you.
True or not true, Mr. Hernandez?

A.  I don't remember it that way, sir.

Q.  No problem.

        Do the words that I circled on the screen,
Mr. Hernandez, does that say "Casa Presidencial Honduras"?

A.  Yes, but it doesn't say that he entered there.

Q.  OK.  So the answer to my question is yes, right?

        MR. COLON:  Objection.

        THE COURT:  Overruled.

Q.  And over here it says "Searched times."  Do you see that?

A.  Yes, sir.

Q.  And it has a date, right, May 29 of 2019, right?

A.  Yes, sir.

        MR. WIRSHBA:  Ms. Collins, could we go to the next
page.  The next page, Ms. Collins.  And I think one more —— oh,
no.  I apologize.  Here it is.  Can we zoom in on 25 and 26,
please.

Q.  Mr. Hernandez, this says that again there was a search for
Casa Presidencial Honduras, right?

A.  Just to understand, sir, are you saying that there was a
search or that Casa Presidencial was entered?

Q.  Well, Mr. Hernandez, I think I said that this reflects a
search, right?

A.  Yes, now I understand.

Q.   All right.  And it reflects that that search happened on June 12 of 2019, correct?

A.   Yes, sir.  But it was not Casa Presidencial at that moment at that place.

Q.   I see.  Because you weren't working at Casa Presidencial during that time period, is that your testimony?

A.   All of the offices at Casa Presidencial were moved to another building, which is the building of the foreign relations.

Q.   So you weren't using Casa Presidencial during that period, during May and June of 2019, right?

          MR. COLON:  Objection.  Asked and answered.

          THE COURT:  No overruled.

A.   No, sir, perhaps we were going to visit the construction of the civic center, which was seven or eight meters away.

Q.   But in May and June of that year, you weren't using Casa Presidencial for any purpose, correct?

A.   Not that I recall, sir.

Q.   All right.  And you remember when Mr. Palacios, he testified about that yesterday, right?

A.   Yes, sir.

Q.   He also said that you weren't using Casa Presidencial during that period in May and June of 2019, right?

A.   Yes, I remember, sir.

Q.   He actually said that it wasn't being used from 2017

through 2019, is that right?

MR. COLON:  Objection.

THE COURT:  Yes, ask the witness the question about when it was being used.

MR. WIRSHBA:  Of course, your Honor.

THE COURT:  Sustained.

Q.  Mr. Hernandez, was Casa Presidencial being used in 2018?

A.  I don't know, sir.  What I know is that I covered matters or covered subjects at the ministry of foreign relations four kilometers from there.

Q.  So to the extent that you were speaking to media, that would not have been at Casa Presidencial.  That's your testimony, right?

A.  No, sir.  Sometimes we'd go to visit the construction that was in front of Casa Presidencial.  I'm not certain.

Q.  But not inside, right?

A.  I don't remember.

Q.  You don't remember whether or not you entered Casa Presidencial from 2017 —— from 2018 to 2019?

MR. COLON:  Objection.  Asked and answered.

THE COURT:  I'll allow it.

A.  I don't remember, sir.

MR. WIRSHBA:  All right.  Let's put up for the witness, the parties, and the Court Government Exhibit 1367 and 1368, please, if we could, Ms. Collins.

O35HHer4                          Hernandez Alvarado – Cross

Q.   Do you see those on the screen, Mr. Hernandez?

A.   Yes, sir.

Q.   Those are from your Facebook account, right?

            MR. COLON:  Objection to Mr. Wirshba testifying.  Is that a question or a comment?

            THE COURT:  I believe it's a question, but —— that is a question.  You may treat it as such.

A.   I'm not certain, sir.

            MR. WIRSHBA:  All right.  Your Honor, the government would seek to admit Government Exhibit 1367 and 1368 subject to connection.

            MR. COLON:  Objection.

            THE COURT:  Basis?

            MR. COLON:  No foundation.

            THE COURT:  Sustained.

            MR. WIRSHBA:  Well, your Honor, if I may?

            THE COURT:  Yes.

            MR. WIRSHBA:  The government intends to lay a foundation at the next available opportunity, which would be on rebuttal, that these were publicly available.  And we're prepared to call a witness to that effect to allow us ——

            THE COURT:  That sounds like it will be sufficient.

            MR. WIRSHBA:  Your Honor, I ask the ability to admit these subject to connection so that I may ask questions about them of this witness.

MR. COLON:  Your Honor.

THE COURT:  I'm sustaining the objection.

MR. COLON:  Thank you.

THE WITNESS:  But, sir, Mr. Prosecutor, this is not Casa Presidencial.  If it were so ——

MR. COLON:  I'm sorry, your Honor.  I didn't hear a question.

THE COURT:  All right.  Do you have your LiveNotes open, Mr. Colon?  Take a look.

MR. COLON:  I don't see a question, sir.  The objection was sustained.  I didn't see a question.

THE COURT:  All right.  Let's get a question, then.

MR. WIRSHBA:  Of course, your Honor.

Ms. Collins, could we put up Government Exhibit 1376, please, for the witness, the parties and the Court.

BY MR. WIRSHBA:

Q.  Now, Mr. Hernandez, this is from your Facebook, right?

MR. COLON:  Objection.

A.  Yes, it seems so.

THE COURT:  Basis?

MR. COLON:  Mr. Wirshba is testifying, sir.

THE COURT:  It's a question, I take it.  Is that correct?

MR. WIRSHBA:  And the witness answered it, your Honor. He said it appears so.

THE COURT:  All right.

A.  I didn't say it was true.

Q.  Mr. Hernandez, do you recognize yourself in this photo?

A.  Yes, it seems that it is me.

Q.  And this meeting happened, right?

MR. COLON:  Objection, Judge.  What meeting?  Could we have some specificity?

THE COURT:  Well, the meeting depicted in the picture.

Go ahead.  Next question.

Q.  Did the meeting that's depicted in the picture occur, Mr. Hernandez?

A.  I don't remember, sir.

MR. WIRSHBA:  All right.  Your Honor, the government seeks to offer 1376.

MR. COLON:  Same objection as before, your Honor.

THE COURT:  Let me look at the testimony.

All right.  Now, Mr. Hernandez, this is from your Facebook, right?

Mr. Colon, an objection.

Answer:  Yes, it seems so.

I'll receive it.

(Government's Exhibit 1376 received in evidence)

MR. WIRSHBA:  You may publish that.

BY MR. WIRSHBA:

Q.  Mr. Hernandez, do you see what's on the screen here?

A.   Yes, sir.

Q.   This photograph, it was taken at Casa Presidencial, right?

A.   Yes, it seems so, sir.

Q.   And the date, it's on the top, it says June 14 of 2019, is that right?

A.   Yes, it says June 14 there.

Q.   And that's two days after the Waze data that we examined indicated a search by Geovanny Fuentes Ramirez to Casa Presidencial, right?  Correct?

A.   I don't recall the previous date.

Q.   Do you remember telling the jury that you didn't go inside Casa Presidencial during this time period?

          MR. COLON:  Objection, Judge.  That's not the testimony.  I believe it was that they went to visit a construction site.

          THE COURT:  Overruled.

Q.   Would you like me to repeat the question?

A.   Please.

Q.   Do you remember telling the jury that you didn't go inside Casa Presidencial during this period in May and June of 2019?

A.   I was referring to the fact that the person who had looked at the Waze application had not entered Casa Presidencial. That's what the technician said that came here to speak, the expert.

Q.   So you were in Casa Presidencial during June 2019, is that

correct?

A.  I don't remember, sir.

MR. WIRSHBA:  Could we put Government Exhibit 1346 on the left and Government Exhibit 204-R200 on the right.  Thank you, Ms. Collins.  And can we go down, please, and maybe zoom in on 25 and 26.

Q.  So, Mr. Hernandez, is it correct that you were at Casa Presidencial two days after this Waze data reflects that Geovanny Fuentes Ramirez searched for that location in Waze?

A.  I don't know, sir.  I see that the post says June '19.

THE INTERPRETER:  Correction, "June 2019."  And now to interpret what he said.

A.  But I don't know if it reflects that the date that appears there is June 14, 2019, in the video.

Q.  So it's your testimony that the video might have the wrong date.  Is that what you're saying?

MR. COLON:  Objection.  Not his testimony.

MR. WIRSHBA:  Your Honor, I asked if —— I'm trying to clarify his testimony.

THE COURT:  Yes, overruled.

A.  What I'm saying is that the post says June 14.  What I'm not certain about is if the video was recorded on June 14.

Q.  Let me ask a different question.

Isn't it true that your Facebook photo posted a photo of you at Casa Presidencial two days after the data that's here

reflects that Geovanny Fuentes Ramirez searched for Casa Presidencial, true or not true?  Mr. Hernandez, it's a yes-or-no question.

A.   The date coincides by two days as you're saying.

Q.   OK.   Thank you.

Now, during this time ——

THE COURT:  Mr. Wirshba, how much longer do you have in your cross-examination?

MR. WIRSHBA:  If I may just have one moment, your Honor?

THE COURT:  Yes.

MR. WIRSHBA:  Thank you.

(Counsel confer)

MR. WIRSHBA:  Your Honor, I would say, and I'm estimating here, 30 to 45 minutes, your Honor.

THE COURT:  All right.  Ladies and gentlemen, we're going to call it a day, and there are several things I want to tell you about tomorrow.

So, first of all, what we're going to do is finish up with this witness, the cross-examination and then redirect of this witness.  Following that, we are going to have a closing statement by the government.  The defendant is not required, defense counsel is not required, to make a closing statement, but they have advised me that they wish to do so.  So there will be a closing statement on behalf of the defendant.

Because the government is the only party in this case who bears the burden of proof, the government gets to deliver a rebuttal summation, and so I anticipate there will be a rebuttal summation as well.  Following that, you will receive my instructions on the law governing this case, and after that deliberations begin.

So tomorrow you will have your lunch provided for you.  And the question that I have for you is would it be convenient to start tomorrow morning at 9:30?  Can we do that?  Any objection?

OK.  So let's have a good 9:30 start.  You've been outstanding in terms of getting here on time.  We're just going to move it up so that we can get through the cross and the redirect.  This assumes, of course, that there's no rebuttal case by the government.  They'll have an opportunity to tell me at the appropriate juncture, but assuming there is no rebuttal case, that's what the schedule will be tomorrow.

So you haven't heard it all.  There's more to the cross and the redirect, and then there is the parties' opportunity to sum up.  And as you know already, the closing statements, the summations, are not evidence.  They're the parties' views of what the evidence shows.

Please be safe.  Stay healthy.  Do not discuss the case among yourselves or with anyone else.  And what time tomorrow morning?

JUROR:

JURORS:  (Collectively) 9:30.

THE COURT:  9:30.  See you then.  Thank you.

(Jury excused)

(Continued on next page)

O355her5

THE COURT:  You may step down, sir.

What I propose to do now, if you will be seated, is we are going to take a 15-minute break.  You can look over the rather modest changes to the draft jury instructions, there was not very much to change, and then I will hear the parties on the jury instructions.  All right?  So see you in 15 minutes.  See you at 5:15.

(Recess)

THE COURT:  Please, be seated.

MR. COLON:  Your Honor, if I may?

THE COURT:  Yes.

MR. COLON:  Respectfully, would it be possible for my client to leave so that the marshals can take him back to the facility?

THE COURT:  Yes.  Absolutely fine.

Is that already with you Mr. Hernandez?

THE DEFENDANT:  (In English) Yes, if you don't need me.

THE COURT:  Here is the thing.  You have a right to be present but you can, if you want to, voluntarily waive that right and that's up to you.  Have you spoken to your lawyer about waiving that right?  Or do you want to speak to him right now?  Why don't you speak to him right now.

(Defendant and counsel conferring)

THE DEFENDANT:  (In English)  That's OK, Judge.

O355her5

THE COURT:  All right.  Thank you, Mr. Hernandez, and you understand you are waiving it for all purposes and for all time, your presence here for this conference?

THE DEFENDANT:  (In English)  Yes.  Yes.

THE COURT:  Have a pleasant evening.

THE DEFENDANT:  (In English)  Thank you.

(Defendant not present)

THE COURT:  I think the first change I have is on page 7 and my recollection is it is prompted by a request of the defendant.  I am looking for the defendant's letter -- conduct of counsel, it comes up on the old Section IV but what defense counsel is looking for actually appeared under Role of the Court.

Any objection to the change I am making?  Mr. Colon, any objection?  Ms. Shroff?

MS. SHROFF:  No, your Honor; no objection.

THE COURT:  And that is in satisfaction of the first point under conduct of counsel in Roman IV.

Any objection from the government?

MR. ROBLES:  No, your Honor.

THE COURT:  The next point I guess in the defendant's letter comes up under sympathy and bias, and the request from the defense was that I put in "or political views" and I have done so.  So I assume the defense has no objection, correct?

MR. COLON:  No, sir.

O355her5

THE COURT:  And any objection from the government?

MR. ROBLES:  No, your Honor.

THE COURT:  Now, the next one, direct and circumstantial evidence, a proposed instruction on guilt by association.  I had included originally the charge in connection with conspiracy and what I have done is -- let me first get to that page.  Here, on page 51, I have made an edit to make it plain that it is not sufficient that the defendant is associated with the person who committed a crime and I have included the language "with regard to aider and abettor."  That is in addition to the language that appears under the conspiracy charge.

Any objection?

MS. SHROFF:  No, your Honor, but may I just ask that on page 51, the Court consider adding the word "found."  In order for a defendant to be found guilty of the offense...

THE COURT:  Just one second.  On 51?

MS. SHROFF:  Yes, your Honor.

THE COURT:  Yes.  I think that's an improvement.  Any objection to the change on 51 from the government --

MR. ROBLES:  No, your Honor.

THE COURT:  -- including Ms. Shroff's amendment?

MR. ROBLES:  That's right.

THE COURT:  That's fine.

Then bias of witnesses.  I have made the change, I

O355her5

just need to see where it is.

LAW CLERK:  Page 17.

THE COURT:  Page 17.  So you will see I have included in the first sentence of the bias of witness instruction the concept of anger or resentment which is what was sought by the defense and the balance of what the defense has requested is otherwise already included in the charge.

Any objection from the defendant?

MS. SHROFF:  No, your Honor.  Thank you.

THE COURT:  Any objection from the government?

MR. ROBLES:  Your Honor, respectfully, it is the government's position that the language, as initially drafted, captured anger or resentment in the word hostility, and adding anger or resentment at the request of the defense, given what they opened on with revenge being their theme, sort of reinforces to the jury the sort of theme of the defense is trying to put forward here in a way that, respectfully, we think is unnecessary to the charge, given that it already included the word "hostility."

THE COURT:  What you have pointed out to me is I am probably being sloppy grammatically and it should be not hostility, affection, anger or resentment, but rather should be hostility, anger, resentment, or affection, and with that change in ordering, I will give the instruction.

Any objection from the defendant to the reordering?

O355her5

MS. SHROFF:  No, your Honor.  None at all.  Thank you.

THE COURT:  The defense proposes that I remove the evidence of other wrongs or acts and that is not limited to the acts of the defendant but could include a co-conspirator.  I will take it out if the defense wants it out and the government has no objection.

Does that remain the defense's request?

MS. SHROFF:  Actually, your Honor, I think it should remain in.

THE COURT:  All right.  Stuart, you took it out.

LAW CLERK:  We have it in brackets.

THE COURT:  What page is it?

MS. SHROFF:  24.

THE COURT:  The reason I left it in brackets is because I thought it warranted being discussed.

Does the government have a position on it?

MR. ROBLES:  We don't, your Honor.  We defer to the Court on this.

THE COURT:  Now, here is the question, Ms. Shroff.  You have heard evidence of other acts.  Should it read:  Allegedly committed by an alleged co-conspirator?  Or should it be by a defendant and/or his alleged co-conspirators?

MS. SHROFF:  No, your Honor.  I think defendant should come out, it should be about the alleged co-conspirators.  The Court is correct there is no wrong acts attributed to Juan

O355her5

Orlando Hernandez.

THE COURT:  So the proposal would be to take out the brackets in the heading and then it would be "committed by" and insert the word "an" and strike "defendant and/or his" so it would read:  Allegedly committed by an alleged co-conspirator.

MR. ROBLES:  Your Honor, if I can be heard for one moment?

THE COURT:  Or by alleged co-conspirators I should say.  Yes?

MR. ROBLES:  The only concern I have with that, your Honor, and I apologize for flagging it just now, is there was evidence of acts that were acts in furtherance of the conspiracy that were not committed by the defendant permanently.

THE COURT:  Yes.

MR. ROBLES:  My worry that I wanted to flag for the Court is that the jury could misinterpret this to think that, for example, other individuals carrying guns and things of that nature could not be attributed to the defendant in terms of their deliberations and what they would use to determine whether he is guilty.

THE COURT:  Let's see.  First of all, framed that way, can somebody give me an example of a bad act by a co-conspirator or defendant that was not in furtherance or during the conspiracy?

O355her5

MR. ROBLES:  I would say that certain of the murders that the defense probed on for some of the government's cooperating witnesses were not in furtherance of the conspiracy.

THE COURT:  Yes, that's probably right.

MS. SHROFF:  Your Honor, I think actually the defendant's -- the murders were in furtherance of the conspiracy.  People upset drug dealers by seizing their drugs, or taking their drugs, or not doing what they wanted and they were killed and the next time the load would go through.  That is precisely the act of a conspirator.

THE COURT:  Yes, that could be, but here is the reality:  That it was elicited, quite appropriately, that in the case of one cooperator there I believe there were 46 murders, another cooperator 76 murders -- maybe you have my numbers wrong -- and a third, there were I think two murders. There may have been probing in some instances of whether they were during and in furtherance of the conspiracy but not in all instances.

MR. ROBLES:  And just to make a factual record for the Court here, an example that comes to mind, I believe one of the cooperators testified that he killed someone when he was 18 because they had murdered his brother.  That would be an example of a murder that would not be in furtherance of the drug conspiracy.

O355her5

MS. SHROFF:  The brother was a drug trafficker, as was he, and he was murdered because he was a drug trafficker so of course it is in furtherance of the conspiracy.

THE COURT:  No, but Ms. Shroff, this didn't come in under the heading of drug murders or murders in furtherance of the conspiracy.  They were acts that were covered by, as I understand it, a plea agreement by a cooperator.  I must say, Ms. Shroff, the import of what you are saying, if you are correct, is that I should take the entirety of the instruction out, which is what your co-counsel has asked for.  So, if you would like that I guess I could do it but --

MS. SHROFF:  Your Honor, I apologize.  What was the Court's proposal?  May I have that again?

THE COURT:  OK.  Well, one second, because I haven't finished.

(Pause)

THE COURT:  I will read the charge, in total, as revised:

I will later instruct you on the law of conspiracy in which you will learn about the import of acts done by a co-conspirator during and in furtherance of the conspiracy. But, apart from these acts, there was evidence of other acts allegedly committed by alleged co-conspirators that were not in furtherance of the conspiracy charged against the defendant. That evidence was received for a limited purpose.  The evidence

O355her5

of other prior acts was admitted either as background to the events charged in the indictment or for the limited purpose stated by the Court at the time the evidence was admitted.  You may consider it only for that limited purpose.

MR. ROBLES:  That works for the government, your Honor.  Thank you.

MS. SHROFF:  That works for us too, your Honor.  Thank you.

THE COURT:  OK.

MS. SHROFF:  Your Honor, would the Court consider saying "admitted as either background or impeachment evidence"?

MR. ROBLES:  Your Honor, I don't think 404(b) speaks to impeachment.

MS. SHROFF:  OK.  You can say character evidence then.

THE COURT:  Well, it's for the limited purpose stated by the Court at the time the evidence was admitted if there was such a limited purpose.  That's it.  So, the instruction will stand as I wrote it.  So, I'm not accepting that amendment.

Uncalled witnesses, equally available.  I have added on page 26 at the end of the charge:  The burden of proof is entirely on the government.

Any objection from the defense?

MS. SHROFF:  No, your Honor.

THE COURT:  From the government?

MR. ROBLES:  No, your Honor.

O355her5

THE COURT:  So that concludes the defendant's letter. The government proposed that I take out statements of the defendant because their position -- this is page 20 -- there are none.

Any objection from the defendant?

MS. SHROFF:  No, your Honor.

THE COURT:  And then with regard to venue I have, I guess, rewritten it sort of in line with how the government has laid it out and you can take a moment to hook at the re-do. Any objection from the defendant?

MS. SHROFF:  No, your Honor.

THE COURT:  And I take it no objection from the government?

MR. ROBLES:  That's right, your Honor.

THE COURT:  Now, with regard to the existence of the conspiracy, I believe what I had in the charge as originally written covered the entire waterfront of what is necessary. What page is it on now, Stuart?  Can you tell me?

LAW CLERK:  Page --

MS. SHROFF:  31?

THE COURT:  What page?

MR. ROBLES:  32, your Honor.

THE COURT:  32?  Thank you.  So, the first full paragraph encompasses everything that is in the additional language that the government proposes and they point out, well,

O355her5

I did give it to them in the Tony Hernandez case and I believe that's true, but the concepts are all there.

MS. SHROFF:  Your Honor, I think the Court's charge, as written, is proper and no changes need to be made.

THE COURT:  Is there any concept that you can identify in your additional language that is not already there?  I know it may be more poetic and more to your liking and you certainly have your ability to point to the language in your closing argument, but --

MR. ROBLES:  Your Honor, we thought it was helpful, explanatory language, particularly in a case like this where the defendant may not have actually met in person with any of his co-conspirators, so the Court's explanation that co-conspirators don't have to sit around a table, physically be together to conspire, we thought would be helpful for the jury in this type of case.  It is the same reason why it was appropriate in the Tony Hernandez and Geovany Fuentes Ramirez cases but, of course, we defer to the Court.

THE COURT:  Let me just see now.

MS. SHROFF:  Your Honor, actually, you have that language on page 32.  You say:  Conspirators do not usually reduce their agreements to writing, nor do they publicly broadcast their plans.  Express language or specific words are not required to indicate assent or attachment to a conspiracy. And then you give the most damning of all lines:  From its very

O355her5

nature, a conspiracy is also invariably characterized by secrecy, which makes detection difficult.

I am sure the government would like that additional verbiage because it is verbiage that helps them but it is extra verbiage and the Court's conspiracy language here is concise and perfectly sufficient for the jury.

THE COURT:  I think it is.  I'm going to leave it as-is.

Now, let me ask the government with regard to conscious avoidance.  Does the government contend that at this stage of the game the conscious avoidance charge is warranted?

MR. ROBLES:  Your Honor, I do think on the current record, particularly with what came in today at trial on the defendant's direct examination and also on cross-examination, that a conscious avoidance charge is likely appropriate.  The defendant testified that, the question was:

Did your campaign receive drug funds, to your knowledge?

His response was:  As far as I know, no, sir.

And the defendant explained he had people in charge of his campaign who vetted his campaign contributions and handled tracking where the money was coming from.  To the extent the defendant is challenging his knowledge of receiving campaign contributions from drug traffickers, we do think that a conscious avoidance instruction would be appropriate.  We do

O355her5

think that the proper factual predicate has been established in this case that the defendant would be aware that he was receiving campaign contributions from drug traffickers.  There were several witnesses who testified about bribing the defendant directly and indirectly, there are photographs of the defendant with drug traffickers including one that was testified about today with Arnulfo Valle at the World Cup, there was another with Arnaldo Urbina who is a mayor, with the defendant.

So, we do think that on the current record it would be appropriate to give this charge.  We defer to the Court on this.

THE COURT:  Let me hear from the defendant.

MS. SHROFF:  Thank you, your Honor.

Your Honor, even the government equivocates and says it is likely appropriate because they know, given the facts in this particular case, conscious avoidance is not relevant at all.  Let me just explain why.

Mr. Juan Orlando Hernandez' testimony is not that he wasn't present, that he didn't have knowledge of what the government is saying vis-à-vis him being present at certain meetings, that he didn't have knowledge of what was happening. What he is saying to the jury in his testimony is that it actually never happened.  He is not saying I didn't have knowledge, he is saying:  What you are trying to say I did is

O355her5

actually false. That is what his testimony was.

To the extent that the government has elicited testimony that Mr. Juan Orlando Hernandez himself received bribes, he is not saying I had no knowledge of that. What he is saying is it never happened. That's different. He is not talking about knowledge.

THE COURT: Well, those are two different things. You are right.

MS. SHROFF: Right.

THE COURT: You are right in the theoretical concept but not -- it doesn't sound like you are right in terms of the testimony that actually came in at trial.

MS. SHROFF: I am happy to address the testimony that Mr. Robles just referred to, OK?

THE COURT: Yes.

MS. SHROFF: What he asked is were you aware that other people received bribes. Well, no.

THE COURT: No, I don't think that was the question.

MS. SHROFF: As far as -- your Honor, he was asked if, for example, he knew about his sister getting bribes. And he said no. But that doesn't mean he avoided knowing that his sister was at meetings, or he avoided knowing that his sister was part of his campaign. He simply said no. I did not have -- not that I had no reason to know, I did not know of any such fact.

O355her5

And of course a campaign is going to keep books.  Of course a campaign is going to have an auditor.  Of course a campaign is going to have other people who run their numbers.  That's like every corporation.  That's the same thing for, unfortunately, Obama's campaign and Trump's campaign.  Are we really suggesting that these presidential candidates sit there and tally up the numbers?  No.  He is not saying I avoided knowledge, I never went to any meeting, I didn't read the books.  He is saying that is somebody else's job.  That should not lead to an instruction on conscious avoidance.  Conscious avoidance kicks in when somebody is saying to a jury or is putting out there that there was every reason for me to have this knowledge but I simply closed my eyes and avoided it.

THE COURT:  That's not when the charge is appropriate, when a defendant says I closed my eyes.  Then the charge would never be given.

MS. SHROFF:  No, no, no.  I meant when the facts show that.  I didn't mean when the defendant says that.  For example, if somebody is paid $50,000 to move a cabinet from 161st Street to the airport.  You know that moving a cabinet is not going to get that you much money, there has to be something inside the cabinet, the knowledge of which you are avoiding, something like that.  But there is no such testimony in this case.  This is not a conscious avoidance case.

THE COURT:  Let me hear the testimony again, please

O355her5

that you are relying on.

MR. ROBLES:  (reading)

"Q  Did your campaign receive drug funds to your knowledge?

"A  As far as I know, no, sir."

And your Honor, the Second Circuit is very clear that a conscious avoidance instruction is appropriate when a defendant claims to lack some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance.  That's U.S. v. Gabriel, 125 F.3d 89. I think that's exactly what is going on here.

MS. SHROFF:  No, he is asked a question.  The question that was put to him was:  Did your campaign receive drug funds to your knowledge?  Every question is about a person's knowledge.  Only as far as you know.  This is an inartful question.  Had he asked the question:  As far as you know, did your campaign receive drug funds?  And the answer would be no. Did your campaign receive drug funds?  The answer would be no. He is not avoiding knowledge, it's a poorly-worded question. He is not saying anything other than I have no personal knowledge that my campaign received drug funds.  They're not saying to you -- there is no follow-up question saying, well, you were in the room and six duffel bags were left at your feet; correct?

THE COURT:  No, no, no.  That's not what conscious avoidance requires, or that's not what is required for the

O355her5

charge to be triggered.

So if, for example, you know that your sister is meeting with individuals and you make it a point of never asking about receipt of funds for the campaign because you strongly suspect that the answer to that would be "yes" and you don't want to know that.

MS. SHROFF:  Right, but there is no such testimony. He said he never had any idea that his sister met the Cachiros. In fact, he said she never met with the Cachiros.  He is not saying that I avoided receiving knowledge.

THE COURT:  No, no, no.  But that's not what triggers the requirement of the charge, the defendant saying they avoided knowledge.  If that were the case, the charge would never be given.  When would you ever have a defendant saying I was avoiding knowledge?

MS. SHROFF:  But the defendant could take steps to avoid knowledge.  There is no such steps taken here.  There is no testimony, for example, that he stopped asking his sister who she was meeting with.  There is no such testimony that he didn't interact with his sister on certain days because he knew what errands she was going to run.  There is no such testimony that he didn't engage with other people who were running his campaign.  There is no such testimony that he never reviewed any books.  And they are free to ask him all of these questions tomorrow.  They are free to, and if he says no, no, no, I would

O355her5

never review or audit, I would never read a book or I would never ask anybody who they met with, that is different.  Then there is some indicia that he avoided knowledge.

THE COURT:  Let me tell you, I will wait until after the close of testimony tomorrow but let me also point out to you that if it were to come to pass, if it were to come to pass that I concluded that I wasn't going to give the instruction, if the closing opens the door, I will give the instruction.

MS. SHROFF:  Fair enough, your Honor.

THE COURT:  Is there is no green light to argue lack of knowledge because the Judge said he isn't giving the instruction.

MS. SHROFF:  Fair enough, your Honor.

THE COURT:  But I was going to say, I'm not ruling on whether I am giving that.  I'm going to wait until the close of evidence tomorrow and then I will make a preliminary ruling, as it stands, prior to closing.

MS. SHROFF:  That's fine, your Honor.  Your Honor, may I raise one last thing?

THE COURT:  Yes -- well, before you get on to that.

Go ahead.

MR. ROBLES:  I wanted to point to one more thing in the record that supports this.

THE COURT:  Right.

MR. ROBLES:  This is from cross-examination today:

O355her5

"Q   Well, sometimes they -- meaning drug traffickers -- support candidates, don't they?

"A   They support all of them, or at least they try.

"Q   Including you; right?

"A   No, don't make a mistake."

        We think this is evidence that the defendant knew that drug traffickers were bribing politicians all over Honduras and that he was turning a blind eye to it.

        MS. SHROFF:  No.  He is saying that the other politicians were being bribed.  He is just turning around and saying I wasn't bribed.  Whether you like the testimony or not, that's not willful blindness.

        THE COURT:  Ms. Shroff, the reality is, based on what I have heard, I am likely going to give the instruction but I will wait until the close of evidence tomorrow to make a final ruling whether it comes in based on the evidence rather than the argument.

        MS. SHROFF:  Thank you, your Honor.  Just one last thing?

        THE COURT:  One last point.

        MS. SHROFF:  Yes, your Honor.  Just on page 26 rolling over to 27.

        THE COURT:  Sure.

        MS. SHROFF:  The defendant did testify so you should take out the "not testify."

O355her5

THE COURT:  Yes, we have to take out the brackets. Thank you very much.

MS. SHROFF:  You are welcome.

THE COURT:  Thank you.  We will do that.

Thank you, all, very much.  Thank you, Pam.  We are adjourned.

(Adjourned to March 6, 2024 at 9:15 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 XAVIER RENE BARRIENTOS ALVARADO

Direct By Mr. Stabile . . . . . . . . . . . .1442

Cross By Mr. Robles . . . . . . . . . . . . .1446

 WILLY JOEL OSEGUERA RODAS

Direct By Mr. Stabile . . . . . . . . . . . .1451

JUAN ORLANDO HERNANDEZ ALVARADO

Direct By Mr. Colon . . . . . . . . . . . . .1464

Cross By Mr. Wirshba . . . . . . . . . . . . .1535

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1376    . . . . . . . . . . . . . . . . . . .1571