O36HHer1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                 v.                          15 Cr. 379 (PKC)

JUAN ORLANDO HERNANDEZ,

                                             Trial
                    Defendant.

------------------------------x

                                             New York, N.Y.
                                             March 6, 2024
                                             9:45 a.m.


Before:

                    HON. P. KEVIN CASTEL,

                                             District Judge

                          APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  KYLE A. WIRSHBA
     JACOB GUTWILLIG
     ELINOR TARLOW
     DAVID ROBLES
     Assistant United States Attorneys

RENATO CHRISTIAN STABILE
RAYMOND L. COLON
SABRINA P. SHROFF
     Attorneys for Defendant

Also Present:    Francisco Olivero, Interpreter (Spanish)
                 Gabriel Mitre, Interpreter (Spanish)
                 Matthew Passmore, Special Agent

O36HHer1

(Trial resumed; jury not present)

THE COURT:  We're going to mark the trial indictment as it's been referred to as the next court exhibit, which will be 6, and the verdict sheet —— do you have the verdict sheet?

MR. ROBLES:  I do, your Honor.

THE COURT:  Hand that up as 7.

And you can represent that you have provided both to the defense?

MR. ROBLES:  We have, your Honor.  The trial indictment that your Honor has we had initially proposed doing a redacted version of it.  What we did, with consent of the defense, was just removed the portions ——

THE COURT:  I understood.  I had heard that before, but thank you very much for flagging that.

All right.  Please remain standing for our jury.

Any objection from the defense to either the redacted indictment or the verdict sheet?

MS. SHROFF:  Your Honor, I haven't finished reviewing the redacted indictment, but I should be done by about 11:00.

THE COURT:  That's fine.  Thank you.

(Continued on next page)

(Jury present)

THE COURT:  Please be seated.

Thank you, ladies and gentlemen, for the early start. I appreciate that.  And let's get to work.

Mr. Hernandez, the Court reminds you that you're still under oath.

Mr. Wirshba, whenever you're ready.

MR. WIRSHBA:  Thank you, your Honor.

JUAN ORLANDO HERNANDEZ ALVARADO, resumed.

CROSS-EXAMINATION CONTINUED

BY MR. WIRSHBA:

Q.  Mr. Hernandez, good morning.  When we broke yesterday, we were talking about Casa Presidencial.  Do you remember that?

A.  Yes, sir.

MR. WIRSHBA:  Ms. Collins, if we could put up on the screen Government Exhibits 13 —— this is just for the parties, the Court, and the witness —— Government Exhibits 1371-R and 1377-R, please.

Q.  Mr. Hernandez, do you see what's on the screen?

A.  Yes, sir.

Q.  Are you depicted in both of these photographs, sir?

A.  Yes, sir.

Q.  And do you recognize the room where both of those photographs were taken?

A.  Yes, sir.

MR. WIRSHBA:  Your Honor, the government seeks to offer Government Exhibits 1371-R and 1377-R.

THE COURT:  Any objection?

MR. COLON:  No objection.

THE COURT:  Received.

MR. WIRSHBA:  Could we display that for the jury, Ms. Collins.

(Government's Exhibits 1371-R and 1377-R received in evidence)

BY MR. WIRSHBA:

Q.  All right.  Mr. Hernandez, that photograph on the left, 1371-R, is that room that you are standing in, is that in Casa Presidencial?

A.  Yes, sir.

Q.  And the one on the right, 1377-R, is that also from Casa Presidencial, sir?

A.  Yes, sir.

MR. WIRSHBA:  We can take those down, Ms. Collins.

Q.  Mr. Hernandez, Tony Hernandez is your brother, is that right?

A.  Yes, sir.

Q.  He was a member of the National Party, correct?

A.  Yes, sir.

Q.  That was your party too, correct?

A.  Yes, sir.

Q.  Tony Hernandez, he became a congressperson in Honduras in 2014, right?

A.  Yes, sir.

Q.  All right.  And he became a congressperson from the same department where you were a congressperson before you became the president of Honduras, right?

A.  That's correct.

Q.  And that's your home department, right?

A.  That's correct.

Q.  You testified yesterday that you told the public ministry to investigate Tony Hernandez.  Do you remember saying that?

A.  Yes, I referred that matter to the attorney general.

Q.  Approximately when did you do that?  In what year?

A.  I don't remember exactly, but it was when the first rumors began to emerge.

Q.  Do you remember that those first rumors, they began to emerge in 2014, is that right?

A.  I don't remember exactly.

Q.  Do you remember learning that when the Valles were arrested, they spoke about your brother?

A.  No, sir, I do not recall that.

Q.  You don't remember that when the Valles were arrested, they said that your brother trafficked drugs with Alex Ardón?

          MR. COLON:  Objection.  Asked and answered.

          THE COURT:  No, I'll allow it.

A.   I do not remember, sir.

Q.   This was covered extensively in the media, wasn't it?

         MR. COLON:   Objection.

         THE COURT:   One second.   One second.

         Overruled.

A.   I don't remember, sir.

Q.   You don't remember that there were media articles in which it was alleged that the Valles said that Alex Ardón trafficked with the brother of the man?   You don't remember that?

         MR. COLON:   Objection, Judge.   Asked and answered.

         THE COURT:   Sustained.

Q.   Do you remember that it was Ramon Sabillon who was the one who interviewed the Valles?

A.   Among others to Alex, yes.

         MR. COLON:   Objection.   No foundation to that question, sir.

         THE COURT:   Overruled.

Q.   And Ramon Sabillon, he was the head of the national police in 2014, is that right?

A.   That's correct.

Q.   And you fired him, right?

A.   The minister of security fired him.   There was an investigation due to a lack of funds ——

         THE INTERPRETER:   The interpreter would like a slight repetition.

A.   There was a lack of funds regarding the investigation of the operation to investigate the Valles.  That was done by the — that was the attorney general's office.

Q.   So after Mr. Sabillon interviewed the Valles, he was fired, right?

A.   No, sir, that is not how it happened.

Q.   That's not my question.  My question is a temporal one about time, what came first.

Isn't it true that after Mr. Sabillon interviewed the Valles, he was then fired?  True or not true?

A.   That is not true.  He was fired because the public ministry investigated a matter of lack of funds into the investigation of the Valles, and the trial was conducted.

Q.   Mr. Hernandez, your lawyer's going to have an opportunity to ask you additional questions, but if you could focus on my question.

MR. COLON:  Objection.

THE COURT:  Yes, just ask the question, please.

Q.   Mr. Hernandez, Robert Sabillon was fired after he interviewed the Valles, right?

A.   Robert or Ramon Sabillon?

Q.   Ramon Sabillon.  I'm sorry if I misspoke.

A.   Yes, it was a long time after.

Q.   There were other rumors about Tony Hernandez circulating in the media in 2016, is that right?

A.   Yes, sir.

Q.   There was an official, Santos Rodriguez Orellana, who connected him with an helicopter that had been seized that was used for drug trafficking, right?

THE INTERPRETER:  The interpreter requests you repeat the question, please, counsel.

MR. WIRSHBA:  Of course.

THE COURT:  And don't use the pronoun in it because it's confusing.  So state the full question.

MR. WIRSHBA:  Of course, your Honor.

Q.   Isn't it true that in 2016 the media reported that Santos Rodriguez Orellana connected Tony Hernandez with a helicopter that had been seized that was used for drug trafficking?

A.   I don't remember, sir.

MR. COLON:  Objection.

THE COURT:  Pardon?

MR. COLON:  Objection.  Hearsay.

THE COURT:  Hearsay.

Ladies and gentlemen, when somebody is being asked about media reports, as this question asks, the answer to the question is not received for the truth of its content, the truth of any media report.  None of us want to be judged by the content of a media report, accepting it as true, but a party is entitled to elicit an awareness of a media report because it may have influenced actions that were or were not taken in

response to the media report.

All right.  Next question.  And the objection is overruled.

MR. WIRSHBA:  I'm sorry, your Honor.  I just —— did the witness have an opportunity to answer that question?

THE COURT:  He did.  He said I don't remember.

MR. WIRSHBA:  OK.

Q.  So you remember that there were media reports.  You just don't remember what they were.  Is that your testimony?

MR. COLON:  Objection.  Asked and answered, sir.

THE COURT:  Sustained as to form.

Q.  Do you remember that Mr. Santos Rodriguez Orellana was dishonorably discharged from the military after 2016?

THE INTERPRETER:  The interpreter would like to consult.

A.  I don't remember, sir.

Q.  So even prior to these news articles, isn't it true that others who worked in your administration told you that they believed Tony Hernandez to be associated with drug traffickers?

A.  No, sir.  I asked that they proceed to investigate him.

Q.  Do you remember when Mr. Palacios testified just two days ago here in court?

A.  Yes, sir.

Q.  And do you remember when he said that before there were news reports about Tony Hernandez's involvement in drugs, he

O36HHer1                    Hernandez Alvarado - Cross

told you that he learned that Tony Hernandez had been
socializing with drug traffickers, right?

A.  Effectively, he was in meetings where he was being sought,
and that's why he was asked to distance himself from those
people.  But I did not know that he was involved in any drug
trafficking.

Q.  So you learned that Tony Hernandez was in meetings with
other drug traffickers, is that right?

MR. COLON:  Objection, your Honor.  Misstates the
testimony.

THE COURT:  No, this is a question.

Go ahead.

A.  That's why I referred him to be investigated.

Q.  It's your testimony that he was being asked by those drug
traffickers to participate in drug trafficking in those
meetings, right?

A.  No, I never knew of that, sir.

MR. WIRSHBA:  Just give me one second, your Honor, if
I may.

(Counsel confer)

Q.  OK.  You know that he was being sought by drug traffickers
at those meetings, is that right?  Tony Hernandez, to be clear.

A.  Can you repeat it, please.

Q.  Of course.  I'm sorry I was unclear.

Isn't it true that Tony Hernandez was being sought by

drug traffickers in those meetings?

A.   I just learned that sometimes there were social gatherings, and I think that's inappropriate.  I think that distance should be kept from those people.

Q.   Mr. Hernandez, didn't you just testify that those drug traffickers sought Tony Hernandez in those meetings?

A.   Drug traffickers normally seek anyone because they are seeking to entrap and seeking to gain benefit.

Q.   Is it yes or no, those drug traffickers sought Tony Hernandez at the meetings that you learned about?  Yes or no?

A.   They were seeking him.  I don't know why.  The fact is that it was dangerous ——

THE INTERPRETER:  Interpreter requested repetition.

A.   It was dangerous, and that's why those relationships had to be cut off.  That's what he was always being told.

Q.   You say he was always being told.  So you've told him that on multiple occasions, is that right?

A.   I told him multiple times.

Q.   So Tony Hernandez's relationship with these drug traffickers, it went on for more than just one meeting, is that right?

A.   I don't know, sir, because I did not have a close relationship on a daily basis with him.

Q.   But you knew enough about these meetings that you had to give him multiple warnings, is that right?

A.  I warned him two or three times.

Q.  And it's your testimony that just because of this socializing with drug traffickers, you decided to refer your brother to potential prosecution, is that right?

THE INTERPRETER:  The interpreter will request a repetition, your Honor.

A.  The rumors in the media caused me to tell him that he should seek an attorney and take up that matter with the DEA agents and the prosecutors, which is effectively what happened. And also, before that I informed the prosecutor and I told the attorney general that they should proceed and investigate him.

Q.  So you told the attorney general they should investigate in 2014, right?

A.  There was a time.  I don't remember exactly, but it is a conversation we had with the attorney general multiple times.

Q.  And it was when the media first came out that you had that conversation with the attorney general, right?

A.  I don't remember exactly, but it was as a result of it appearing in the media.

Q.  And Tony Hernandez, he didn't go meet with the DEA in Miami until 2018, is that right?

A.  I don't remember exactly, counsel, but I believe it was 2016.

Q.  It's your testimony that you made that referral to the attorney general based solely on the media reports, is that

O36HHer1                        Hernandez Alvarado – Cross

right?

A.  I preferred to be cautious and not lend space to something like that.  I preferred to get ahead of it.

Q.  Now, in 2014 you were already the president of the republic, right?

A.  Yes, sir.

Q.  And you testified yesterday that a priority of yours was anti-narcotics trafficking, right?

A.  The violence resulting from the cartels and the Maras and, obviously, drug trafficking.

Q.  So you had meetings about anti-narcotics trafficking with people that worked for you, right?

A.  Yes, sir.

Q.  And you had ——

THE COURT:  One moment, please.

When you refer to "Maras," are you referring to Mara Salvatrucha, MS-13?

THE WITNESS:  Yes.

(In English) And 18.

(Through the interpreter) Yes, sir, and the Mara 18.

THE COURT:  Thank you.

THE WITNESS:  And other smaller ones.

BY MR. WIRSHBA:

Q.  And, Mr. Hernandez, you had Honduran intelligence reporting to you about narcotics trafficking, right?

A.   I had meetings.  I had general information about it, but I didn't have specifics about operations.  I left that to those conducting the operations.

Q.   So it's your testimony that no one in your administration ever came to you and told you that they had information about how Tony Hernandez was involved in drug trafficking, is that right?

A.   When I learned of rumors, I asked that they investigate and that they go forward.

Q.   Did anyone in your administration come to you and say that they had information about how Tony Hernandez was a drug trafficker, yes or no?

A.   When I heard those rumors, I said, if there's anything there, go ahead.  Nobody is above the law.

Q.   Mr. Hernandez, my question is did anyone in your administration come to you and tell you that they had information that Tony Hernandez was a drug trafficker?  It's a yes-or-no question.

A.   I asked about the rumors, and I told them to proceed.

Q.   Mr. Hernandez, I'm asking a yes-or-no question.  I would ask that you confine your answer to yes or no to the extent that you can.

A.   I don't recall, sir.  When the subject was touched upon, I said if there's something there, go forward.

Q.   So you don't remember whether anyone in your administration

ever came to you with evidence that Tony Hernandez is a drug

trafficker.  That's your testimony?

MR. COLON:  Objection.  It's asked and answered.  He

doesn't remember, sir.

THE COURT:  I'll allow it.

A.  Well, when we talked about that subject, sir, I surely told

them to go forward if there was anything there.

Q.  So you do remember talking about that subject with people

that worked for you, is that right?

A.  I raised the subject with them, sir.

Q.  The question is did anyone come to you and tell you that

they had information that Tony Hernandez was a drug trafficker?

That's yes, no, or I don't remember.

MR. COLON:  Objection, your Honor.  Argumentative,

sir.

THE COURT:  No, I'll allow it.

Go ahead.

A.  What I was told, sometimes there were meetings about people

who might be linked to drug trafficking.

Q.  And did anyone ever raise Tony Hernandez in those meetings

— withdrawn.

Tony Hernandez was raised in those meetings, right?

A.  Meetings that I had with our ministers.

Q.  Yes, Mr. Hernandez, was Tony Hernandez raised in meetings

that you had with your ministers?  That's the question.

O36HHer1                        Hernandez Alvarado – Cross

A.   Yes, we spoke about it.

Q.   And those ministers, they brought information to you that Tony Hernandez was involved in drug trafficking, right?

A.   That he was in meetings with people that he shouldn't be with.  That's what we talked about.  And I said proceed, investigate, and if there's anything there, then refer it to the public ministry.

Q.   So the ministers brought you information that Tony Hernandez was in meetings with drug traffickers, correct?

A.   The phrase that I heard was that he was in meetings with people that he shouldn't be.  No names ever came up.  The only name that I did hear was Wilkin Montalvan.

Q.   When you referred him for prosecution, it was for potential prosecution for drug trafficking crimes, right?

A.   That they investigate him all around, and if there was anything there, to go ahead.

Q.   Including for drug trafficking crimes, right?

A.   For any matter, sir.

Q.   All right.  Approximately when do you think you had these meetings with your ministers in which they raised Tony Hernandez's meetings with people that he shouldn't be with?

A.   I don't remember exactly, sir, but there were times when rumors would come up in the media, and then sometime forward it would come up again.  It was like that.

Q.   Do you remember testifying yesterday about your meeting at

O36HHer1                        Hernandez Alvarado – Cross

your house with Alex Ardón?

A.   Yes, sir.

Q.   And you told him that he couldn't run for mayor because of the rumors that were happening in the media, right?

A.   That's correct, sir.

Q.   Now, when these rumors came up about your brother in meetings with your ministers, did you ask Tony Hernandez to step down as a congressperson?

          THE INTERPRETER:   The interpreter would like to consult.

A.   When he sought to gain reelection as a candidate, I told him that he could not until that was cleared up, and it didn't happen.

Q.   But you didn't ask him to resign, did you?

A.   No, sir, because there was a presumption of innocence.  And it is by election that the population elects him.  He's not appointed.

Q.   But Alex Ardón was not entitled to that same presumption of innocence based on media reports, right?

A.   Alex Ardón wanted to be a candidate, and I did not carry him on my ballot.  And that's what I did with Tony when he sought to run for reelection again.

Q.   And that's ——

A.   And that's what I did with the one who wanted to run for mayor in Gracias, Lempira.

THE INTERPRETER:  I'm sorry, the interpreter requests a repetition.  Apologies.

Q.  And you told Alex Ardón you wouldn't carry him on your ticket because you knew he was a drug trafficker, right?

A.  I told him that there were rumors.  He asked me if I had any proof.  I told him no.  But as a candidate, I faced the decision of having him alongside me or not.

Q.  Get back to Tony Hernandez for a second.  Did Tony Hernandez campaign with you?

A.  It's possible, but very little.  I don't recall.

Q.  Do you remember whether he provided support to your campaign?

A.  I don't remember, sir.

Q.  Do you remember whether he helped raise money for your campaign?

A.  I don't remember, sir.

Q.  Did you hear the testimony here in court about how he helped to raise money for your campaign?

A.  Yes, I did hear it, sir.

Q.  And then he provided that money to individuals for your campaign or to yourself, right?

A.  No, sir.

Q.  Now, you mentioned that Tony Hernandez went to go talk to the DEA, right?

A.  That's right, sir.

Q.   And you said you thought that was around 2016?

A.   Yes, I said that it might be around that year.

Q.   And he returned from that trip to meet with the DEA back to Honduras, right?

A.   Yes.  My understanding is that he went to meet with the DEA and the prosecutors, and then he returned to Honduras.

Q.   And he wasn't arrested when he returned to Honduras, is that right?

A.   No, sir.

Q.   But then in 2018 he traveled back to Miami, right?

A.   Yes, sir.

Q.   And when he traveled back to Miami, he was arrested in the United States, correct?

A.   Yes, sir.

Q.   He wasn't extradited, right?

A.   No, sir, the United States never sought him.

Q.   And he didn't turn himself in to the United States government, right?

A.   My understanding is that he went —— when he went to speak with the DEA and the prosecutors, he went there whatever —— regardless of what the result would be.

Q.   That was in 2016, right?

A.   I don't recall exactly, but I think it was around that year.

Q.   Well, it was prior to the last trip that he took to Miami

when he got arrested, right?

MR. COLON:  Objection.  Question is actually not a question.  It's a statement.

THE COURT:  One second, please.

Yes, rephrase that question.  I don't understand it.

MR. WIRSHBA:  Of course.

Q.  The last time that he went to Miami, he —— withdrawn.

When he went to Miami to go meet with the DEA, he returned before leaving for Miami again when he was arrested, right?

THE INTERPRETER:  Could the interpreter hear the question again.

MR. WIRSHBA:  Of course.

Q.  When Tony Hernandez went to Miami in 2018, that was after he had already went to meet with the DEA and returned to Honduras, right?

A.  Could you repeat, prosecutor, please.

Q.  I'll withdraw the question.

Isn't it true that Tony Hernandez, he wasn't traveling to Miami to turn himself in to U.S. authorities, right?

MR. COLON:  Objection.  Your Honor, assumes a fact not in evidence, sir.

THE COURT:  I'll allow it.

A.  I do not know, sir.

Q.  Did Tony Hernandez tell you that he was flying to Miami to

turn himself in?

A.  No, sir.

Q.  Now, even after his arrest in Miami, you didn't seize Tony Hernandez's properties, did you?

A.  I do not remember, sir.  That is done by the public ministry.  They request it.  But properties were taken from him, yes.

Q.  Not until after your administration was over, right?

A.  During my administration, properties were taken from him.

Q.  Now, you continued to deny that he was a drug trafficker even after he was arrested, is that right?

        THE INTERPRETER:  Could the interpreter hear the question again.

        MR. WIRSHBA:  Of course.

Q.  You continued to deny that Tony Hernandez was a drug trafficker even after he was arrested, correct?

A.  I never knew that he was, sir.

Q.  And you went on TV and you denied that he was a drug trafficker, right?

A.  I — I always said that he should be investigated, and if there was something, they could go ahead, because no one is above the law.

Q.  But you went on TV and you denied that he was a drug trafficker, true or not true?

A.  I said that based on my knowledge.  I did not know that he

was a drug trafficker.

Q. But also didn't tell anyone that you had already asked the public ministry to investigate him, right?

A. Yes, many people knew, sir.

Q. You didn't say that on TV, did you?

A. I do not remember, but I probably must have said it. That was my policy, sir.

Q. All right. You testified that you and Tony Hernandez, you were not close, right?

A. Sir, we had a difference of ten years. And when I left my home, I believe that he was three years old and I was 13. And perhaps I would return to my home three or four times per year. Therefore, we did not grow up together.

Q. But before he was arrested, you assigned him part of your security detail, is that right?

A. No, no, sir, I did not.

Q. Do you remember when Mr. Palacios testified that the presidential honor guard guarded Tony Hernandez?

THE INTERPRETER: The interpreter needs a — to hear the first — the question before that again. The interpreter would need to hear the — ask if he could hear the question before again.

THE COURT: All right. So, Raquel, if you will —

MR. COLON: Objection, your Honor.

THE COURT: — read back the last — the question

before the last question and the answer and then the pending question, if you will.

MR. COLON:  Your Honor, please note my objection when this is read.

THE COURT:  OK.  Thank you.

(Record read)

THE INTERPRETER:  Your Honor, the interpreter needs to correct the translation for that previous question.

MR. COLON:  Your Honor, if I may.

THE COURT:  One second.  One second.  We're going to get a corrected translation.

MR. COLON:  Your Honor, I renew my objection.

THE WITNESS:  No, sir, I have never provided a security personally.

THE COURT:  All right.  And that was the answer to the question before, But before he was arrested you assigned him part of your security detail, is that right?  That's a question I have for the interpreter.  Was that the answer to that question?

THE INTERPRETER:  Yes, your Honor.

THE COURT:  OK.  That's what I needed to know.  Thank you.

MR. COLON:  My objection, your Honor, is as to the impropriety of asking or requesting my client to recall testimony that's been elicited.

THE COURT:  I'm going to sustain your objection because it was not —— it assumed that it was the testimony without inquiring whether it was the testimony.  So I'll sustain it as to form.

MR. WIRSHBA:  If I may have one moment, your Honor.

THE COURT:  Yes.

(Counsel confer)

THE COURT:  Mr. Wirshba, just ask your question.  You'll have an opportunity in closing argument.  If you have certain testimony you want to bring to the attention of the jury, you can do that.  Just ask your question and move on.

MR. WIRSHBA:  Absolutely, your Honor.

Q.  To the best of your knowledge ——

THE COURT:  Do you have much longer, sir?

MR. WIRSHBA:  I do not.

THE COURT:  OK.

BY MR. WIRSHBA:

Q.  To the best of your knowledge, was Palacios ever working as a security for your brother?

A.  As well as I know, no, sir.

Q.  All right.  You began campaigning for the 2013 election in approximately 2012, right?

A.  That could be so, sir.

Q.  All right.  And that meant that you were traveling around the country, as you said yesterday on direct examination,

O36HHer1                      Hernandez Alvarado – Cross

during that time, right?

A.   Yes, sir.

Q.   And it costs money to travel around the country, right?

A.   Yes, sir.

Q.   And you raised money from all over the country, did you not?

A.   Not throughout the whole country, sir.

Q.   But you did raise money from drug traffickers for your campaign, didn't you?

A.   Never, sir.  That was completely prohibited.

Q.   And you raised drug —— you got drug trafficking proceeds to fund your campaign, didn't you?

A.   No, sir.

Q.   Well, you heard Alex Ardón testify that he gave you a bribe, didn't you?

          MR. COLON:  Objection, your Honor.  Improper question, sir.

          THE COURT:  You can ask him whether he remembers that testimony.  It's not whether the testimony is true or false.

          MR. WIRSHBA:  Understood, your Honor.

Q.   Do you remember hearing Alex Ardón testify that he gave you a bribe?

A.   He is a professional liar, sir.

Q.   So it's your testimony that he lied when he said that?

A.   He has never given me money, sir.

Q.  Did you hear the testimony when Fabio Lobo said that he gave you a bribe?

MR. COLON:  Objection.

THE COURT:  Basis?

MR. COLON:  Same basis as before.

THE COURT:  Overruled on the same basis.

A.  I heard three different versions from Fabio Lobo.

Q.  Mr. Hernandez, that wasn't the question.

The question is did you hear Fabio Lobo testify that he gave you a bribe, yes or no?

A.  I heard that he testified —— when he testified that, but he is a liar, sir.

Q.  All right.  Did you hear the testimony when José Sánchez said that Geovanny Fuentes Ramirez gave you a bribe?

THE INTERPRETER:  Could the interpreter hear the question again?

MR. WIRSHBA:  Of course.

Q.  Did you hear the testimony of José Sánchez who said that Geovanny Fuentes Ramirez gave you a bribe?

A.  That is also false testimony, sir.

Q.  And you also heard the testimony of Leonel Rivera Maradiaga say that he gave a bribe to your campaign, right?

A.  Note that what —— note, please, that what Rivera Maradiaga is contrary to what Fabio said and supposedly they are making reference to the same thing.  It is —— one can see that they're

both of them lying.

Q.  So, Mr. Hernandez, the answer to my question is, yes, you heard the testimony of Leonel Rivera Maradiaga that he paid a bribe to your campaign?

A.  I heard from them false testimony, sir.

Q.  And you also remember the testimony of Luis Perez saying that he paid a bribe to your campaign, right?

A.  That is false testimony, and he is saying that he did it, and he didn't do that.

Q.  So your testimony is that all of these individuals, Alex Ardón, Fabio Lobo, José Sanchez, Leonel Rivera, and Luis Perez, they're all lying?

THE INTERPRETER:  The interpreter requests the question again.

MR. WIRSHBA:  Of course.

Q.  It's your testimony that all of these individuals —— Alex Ardón, Fabio Lobo, José Sanchez, Leonel Rivera Maradiaga, and Luis Perez —— they're all lying, right?

A.  They all have motivation to lie, and they are professional liars.  They were so before and now.

Q.  So you're the only one that's telling the truth.  That's your testimony today?

A.  I am telling you here that I have not received money from them, sir.

MR. WIRSHBA:  No further questions, your Honor.

THE COURT:  All right.  Thank you.

Redirect.

MR. COLON:  Your Honor, can we take a five-minute break, sir?

THE COURT:  I'll tell you what.  Ladies and gentlemen, we'll stand up and stretch, and then we'll see whether we can do this, and then we'll take our break, unless somebody needs a break now.  If you'd like a break now, we'll take one, and we'll give Mr. Colon an opportunity to get organized.

All right.  Please be seated.

MR. COLON:  May I inquire, your Honor?

THE COURT:  You may.

MR. COLON:  Thank you, sir.

REDIRECT EXAMINATION

BY MR. COLON:

Q.  Mr. Hernandez, with respect to the extradition process, can you tell the jury how the extradition process actually works in terms of the branches of government, sir?

A.  When a request for extradition is submitted, in this case to the government of Honduras through the ministry of foreign affairs, what here would be the Department of State, that department is part of the executive branch led by the president of the republic.  Afterward, that request is sent to the court of justice.

THE INTERPRETER:  Interpreter's correction.

A.   To the Supreme Court of justice.  Then the Supreme Court selects one of its judges as a judge, then selects other three as a Court of Appeals.  Once the judge sees the case, he then can order the arrest of that person, and the order is made to the police or to whoever he deems best.  Once the person is captured, then the judicial process starts, and the person with their attorney has the right to fight the extradition. Finally, the judge makes a decision whether he will grant the extradition or not.

In some cases, when that person has already been indicted in the Honduran courts, then the extradition is subject to the end of that judicial process or the sentence. That is called deferred extradition.  And, finally, when the judge makes —— grants the order that the person can be extradited, then the person can appeal to the Court of Appeals. Then the National Police gives that person to the police of the other country, in this case the United States.

Now, in the case of Honduras, since we started, the DEA works very closely with the national police and with the TIGRES force, which I created, and a unit in Honduras called the Sensitive Cases Unit.

So before the request for extradition arrives, the DEA is already working closely with our teams in reference to the persons that need to be arrested.

Q.   Is there a timeline or deadline for the Honduran Supreme

Court to finalize this process?

A.   Not precisely, sir.  That could take time.  But generally, Honduras has been very quick.

Q.   Does the president have a role in the extradition process?

A.   Yes, sir.  When the president receives from the ministry of foreign affairs, they could select not to send the extradition request to the courts, as happened under the previous president with Carlos Lobo.

Q.   At any time in your presidencies, your two administrations, did you ever reject a request from the foreign ministry to proceed with an extradition, sir?

A.   No, sir.  All of them were sent along to the Supreme Court, and it was my policy that all such requests should be granted.

Q.   Did you ever sit on an extradition request or delay it?

A.   Never, sir.

Q.   Mr. Hernandez, did you know of every extradition request sent by the foreign —— by a foreign country, sir?

A.   At the beginning of my extradition, yes, sir ——

THE INTERPRETER:  Interpreter needs a correction.

A.   At the beginning of my administration, yes, sir.  After that, it became normalized.

Q.   Was that because you set the historical precedent of being the first president to implement extraditions?

A.   Also that, but also because before 2010, before I was a candidate for president, I proposed that extradition should be

made possible in Honduras.  We amended the Constitution after 100 years of extraditions not being permitted.

MR. WIRSHBA:  Objection, your Honor.

A.  And that is why the cartels and the Maras not only threatened me but also tried to assassinate me.  They assassinated Fredo Landaverde because he had called for it publicly, and I asked him to continue pressuring Congress until we were able to achieve it.

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Mr. Hernandez, please try and confine your answers to the specific question that was asked.  Remember our discussion yesterday.

I'm going to allow the witness' answer to stand.  Next question.

MR. COLON:  Thank you, your Honor.

Q.  Were you familiar with the extradition request of Mario Calix?

A.  I learned of it through the media, sir.

Q.  Did you receive a request from the foreign ministry with respect to Mario Calix?

A.  The minister had orders to send all extradition requests to the ministry of justice within a period of 72 hours.

Q.  Did you receive a request for extradition with respect to Mario Calix, sir?

THE INTERPRETER:  I'm sorry.  The interpreter can't

you hear you.  Would you please repeat.

MR. COLON:  Of course.

Q.  Did you receive a request for the extradition of Mario Calix, sir?

A.  The ministry of foreign relations did receive it, sir.

Q.  Did you receive it, sir?

A.  I personally did not.

Q.  Was Mario Calix extradited to the United States, sir?

A.  I do not know, sir.

Q.  With respect to Wilter Blanco, do you recall that name?

A.  Yes, sir.

Q.  Did Honduras request the extradition, Honduras, did it request the extradition of Mr. Blanco?

A.  What I recall is that I received information that Wilter Blanco had been detained in Costa Rica; that Honduras was requesting him because the United States had made a request of Honduras.

Q.  Was Wilter Blanco a Honduran citizen?

A.  Yes, sir.

Q.  And what was your role in facilitating the extradition of Wilter Blanco to the United States?

A.  My instruction was that if he was being sought, then his extradition to the United States should proceed.

Q.  Does the president nominate the justices of the Supreme Court?

A.   The National Congress votes for the judges to the Supreme Court of Honduras by a two-thirds vote.

MR. COLON:  If I may just take a second, sir.

THE COURT:  Sure.

MR. COLON:  Your Honor, I request that Government Exhibit 309 be posted.  It's in evidence, sir, but I'd like to show it to counsel and Mr. Hernandez, please.

THE COURT:  All right.  So you're asking the government to pull it up?

MR. COLON:  Please, thank you.  And show it to the jury —— or publish it to the jury as well, sir.

Q.  I want you to take a look at that picture which is in evidence, government exhibit.

Did anyone in your government take that picture, sir?

A.  I don't think so, sir.

MR. COLON:  We can take it down, your Honor.  Thank you.

Q.  Do you recall, Mr. Hernandez, being asked questions about the party of Ramon Lobo?

A.  Party?

Q.  Yes.

THE INTERPRETER:  The interpreter needs to correct himself.

A.  Yes, sir.

Q.  The subject of the party involving Ramon Lobo, do you

recall being asked questions about the birthday party?

A.   Yes, sir.

Q.   Was that party reported to the Honduran newspapers or the press?

A.   I don't know, sir.

Q.   You don't recall whether that party or that event was reported in the press or any sort of local media, sir?

         MR. WIRSHBA:  Objection.  Asked and answered.

         THE COURT:  Sustained.

         MR. COLON:  Your Honor, may I consult with the government for a second?

         THE COURT:  You may.

         (Counsel confer)

         MR. COLON:  Sorry, your Honor.  It's going to take a second.

         THE COURT:  Take your time.

         MR. COLON:  Your Honor, I'd like to refer to Defense Exhibit 224.  It's not in evidence, but I'd like to —— I would request that it be posted to the counsel, the Court, and the defendant, Mr. Hernandez.

BY MR. COLON:

Q.   Mr. Hernandez, looking at that exhibit, Defense Exhibit 224, have you ever seen this picture before?

A.   Yes, I remember it, sir.

Q.   Do you know who that is a picture of?

A.   Yes, sir.

Q.   Do you recall the setting of that picture?  Without giving an answer, do you recall the setting of that picture?

A.   Yes, sir.

Q.   Who's in the right side of the picture, sir?

A.   That's me, sir.

Q.   And who's in the left side?

A.   Ricardo Alvarez.

MR. COLON:  Your Honor, I'd move to move that picture into evidence, sir.

MR. WIRSHBA:  Objection.  Your Honor.  First of all, relevance.  Also, there's text in here that there's been no testimony about what that is.  The government would object to the text as hearsay.

THE COURT:  All right.

MR. COLON:  I'd be willing to edit all of the ——

THE COURT:  The text can be redacted.  There we are.

Any objection?

MR. WIRSHBA:  Your Honor, I think the entire exhibit is still there.  I guess if it is redacted before it is ——

THE COURT:  It's redacted.  That's the only portion that will go to the jury.  All right.

Ladies and gentlemen, you understand there's a newspaper article that's in the Spanish language.  That's not what Mr. Colon is offering.  It's a photograph.

MR. COLON:  That's it.

THE COURT:  There's no objection to the photograph?

MR. WIRSHBA:  No, your Honor.

THE COURT:  OK.  Received.

(Defendant's Exhibit 224 received in evidence)

MR. COLON:  Thank you so much, your Honor.

BY MR. COLON:

Q.  Mr. Hernandez ——

Could we publish that to the jury, please, sir.

Mr. Hernandez, now that Defense Exhibit 224 is in evidence, do you recall now what that picture was depicting, what event that was depicting?

A.  Yes, sir.

Q.  What was being depicted and where in that picture?

A.  This was in Colón department, and it was the first meeting between Ricardo Alvarez and myself.

Q.  What was the event, sir?

A.  A birthday party for Ramon Lobo.

Q.  Can you tell the jury who that is sitting next to you to your right.

A.  He had been my opponent in the primary elections of my party.

Q.  What's his name, sir?

MR. WIRSHBA:  Objection, your Honor.  Relevance.  This goes beyond the scope of the cross-examination.  There were no

inquiries about this birthday party.

THE COURT:  I'll allow it.

Go ahead.

Q.  What's the ——

A.  Ricardo Alvarez, sir.

Q.  Was Ricardo Alvarez a drug dealer?

A.  Not to my knowledge, sir.

Q.  What position did he hold in the Honduran government?

A.  He became vice president of Honduras.

Q.  Was Ricardo Alvarez requested as an extraditee of the United States?

MR. WIRSHBA:  Objection, your Honor.  Renew my objection to relevance of this line of questioning and beyond the scope of the cross.

THE COURT:  Yes, sustained.

Q.  And how long were you and Ricardo Alvarez at that party, sir?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  That's sustained.

Q.  Is that the only picture that you recall seeing of that party?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Overruled.

THE INTERPRETER:  The interpreter requests you repeat the question, please.

MR. COLON:  Yes.

Q.  Mr. Hernandez, is that the only picture you recall seeing about that party, that event, sir?

A.  Yes, sir.  It was because after a year of competing against each other, we were sitting down for the first time, and that is why the media captured it.

MR. COLON:  We can take that down, your Honor.  Thank you.  I'm sorry.  I need another second, Judge.  Thank you, sir.

Your Honor, making reference to Government Exhibit 1376, I believe it's in evidence, and 1368, I believe both of those are in evidence, sir, if I'm not mistaken.

THE COURT:  What's the question?

MR. COLON:  Just want to post that for the ——

MR. WIRSHBA:  Your Honor, 1368 is not in evidence. The government has no objection to its admission.

THE COURT:  All right.  If you want to offer it.

BY MR. COLON:

Q.  With respect to 1376 ——

THE COURT:  Is that the one in or not in evidence?

MR. COLON:  1376.

MR. WIRSHBA:  That's in evidence, your Honor.

MR. COLON:  It's in evidence, yes.

THE COURT:  All right.

(Continued on next page)

BY MR. COLON:

Q.  Do you recognize that picture?

A.  Yes, sir.

Q.  Is that picture taken in the Casa Presidencial?

A.  Yes, sir.

Q.  And that particular room that that picture was taken, does it have some significance for Honduras?

MR. WIRSHBA:  Objection.  Relevance.

THE COURT:  Sustained.

Q.  What is the name of that room, sir?

MR. WIRSHBA:  Objection; relevance.

THE COURT:  Sustained.

MR. COLON:  I can connect it, Judge, subject to connection.

THE COURT:  No.  Sustained.

Q.  What is that room used for?

A.  It's a ceremonial room, sir, and it is a special site for many Hondurans.

Q.  Do guests and VIPs go to that room and have their pictures taken?

A.  Dignitaries, presidents, and heads of state attend there, and Hondurans that are able to, ask to have their picture taken there.

Q.  Do you receive non-dignitary visitors in that room, sir?

MR. WIRSHBA:  Objection, your Honor; relevance.

THE COURT:  I will allow it.

A.  Yes, sir.

THE COURT:  I think the witness already answered that question, though.  He said:  Dignitaries, presidents, and heads of state attend there, and Hondurans that are able to, ask to have their picture taken there.

So that's already been answered.

BY MR. COLON:

Q.  Is that the only function of that room, sir?

A.  At least during my presidency, practically, yes, that's what it was for.

Q.  Did, at any time, you receive Mr. Geovany Fuentes at the Casa Presidencial?

A.  No, sir.  And moreover, I don't know him.

MR. COLON:  We can take that down, your Honor.

Q.  With respect to Tony Hernandez your testimony was that you had heard rumors about his meeting or associating with undesirable individuals; correct?

A.  Yes, sir.

Q.  Did you believe those rumors?

A.  That he might meet with some people that he shouldn't? Yes.

Q.  What did you do when you heard the rumors?

A.  I explained to my family that we should speak to him because he was not careful enough.  He was too trusting.  And

besides, with these political positions, any person might seek to take advantage.

Q.  And when you testified earlier on cross that Tony Hernandez' properties or assets were seized, did that occur under your administration?

A.  Yes, sir.  One part, yes; and other parts that he held jointly with his siblings were seized more recently.

Q.  That's the 33 properties that was referred to by the government?

INTERPRETER:  The interpreter requests clarification of the number that was posed in the question.

Q.  Was that approximately 33 properties that was referred to by the government in its cross-examination?

A.  The prosecutor yesterday alleged that 30 properties had been seized from me, which is not correct, that's not precise.

Q.  Let's go to the issue of your properties, sir.  Back in 2022 and beyond that, after you were extradited to the United States at the time of your extradition, sir, how many houses or homes did you own?

MR. WIRSHBA:  Objection, your Honor.  This was not addressed on cross-examination.

MR. COLON:  Sorry, Judge.  They opened the door.  They talked about the seizures of his properties.

MR. WIRSHBA:  Your Honor, this is a prior witness that discussed these topics.  This topic was not addressed with this

witness on cross-examination.  It is beyond the scope of the cross.

THE COURT:  In this instance I'm going to allow the question.

Go ahead.  And Mr. Colon, I'm going to ask you to confine yourself to topics covered on the cross.

MR. COLON:  Thank you, Judge.  I apologize.

THE COURT:  That's all right.  I'm going to allow this.  Go ahead.

BY MR. COLON:

Q.  Let me just repeat the question.  How many homes did you own at the time you were extradited?

A.  One dwelling in Tegucigalpa and one dwelling in Gracias, which is my native city.  I never had four properties like the prosecutor said yesterday.

Q.  How did you obtain the ownership of the house in Gracias?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Sustained.

Q.  Did you purchase the house in Gracias?

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Sustained.

MR. WIRSHBA:  Your Honor, when there is an objection pending, if the witness could be asked to hold off on answering until your Honor resolved the objection?

MR. COLON:  I will slow it down, Judge.  Thank you.

THE COURT:  Next question, Mr. Colon.

BY MR. COLON:

Q.  The house in Tegucigalpa, was that the second house you own, sir?

MR. WIRSHBA:  Objection.

THE COURT:  That's a different question.  I will allow it.  Go ahead.

INTERPRETER:  Can you repeat the question, counsel; the interpreter requests.

THE COURT:  I'm going to sustain it as to form.  I don't understand the question as phrased.

BY MR. COLON:

Q.  Did you own a house in Tegucigalpa?

THE COURT:  I thought he said he did.  One dwelling in Tegucigalpa.  He testified to that.

MR. COLON:  It is the second one, I believe he --

THE COURT:  And one dwelling in Gracias.

MR. COLON:  Thank you.

THE COURT:  He testified to that just moments ago.

MR. COLON:  I will move on.

THE COURT:  Go ahead, sir.

BY MR. COLON:

Q.  Any other homes that you owned at the time?

MR. WIRSHBA:  Objection; asked and answered.

THE COURT:  Asked and answered.  Sustained.

Q.  How many vehicles did you own?

        MR. WIRSHBA:  Objection.  Beyond the scope of the cross.

        THE COURT:  Sustained.

Q.  Did you receive money in the form of bribes from Alex Ardón, sir?

A.  No, sir.

Q.  Did you provide him protection?

A.  No, sir.  The political protection that he had, I am the one who took it away and I asked the attorney general of Honduras to investigate him and to indict him if they had the evidence.  And I asked the authorities of the United States whether they had information whether they were going to ask for him to be extradited.

        MR. WIRSHBA:  Objection.

        THE COURT:  Yes.

        Mr. Hernandez, you recall, we have had this discussion, right?  Do you recall the discussions?

        THE WITNESS:  (In English)  Yes, sir.

        THE COURT:  And the question that you were asked was: Did you provide him protection?  Now, I'm going to let the answer stand but I'm going to ask you to kindly follow my instruction.

        THE WITNESS:  (In English)  Thank you.

BY MR. COLON:

Q.  Did you receive money in the form of bribes from Fabio Lobo, sir?

A.  No, sir.

Q.  Did you provide him with protection from extradition?

A.  No, sir.

Q.  In fact, Mr. Lobo was arrested in Haiti; was he not?

A.  It is correct.  That is how it was planned.

Q.  Did you do anything to interfere in the extradition or removal from Haiti to the United States with respect to Fabio Lobo?

A.  No, sir.

Q.  José Sanchez; did you receive money in the form of a bribe from José Sanchez?

A.  No, sir.

Q.  Did you interfere at all with any extradition request related to Geovany Fuentes, sir?

A.  No, sir.  I am the one who was in favor of the extraditions with other representatives.

Q.  Did you receive bribes from Leo Maradiaga, either directly or indirectly, sir?

A.  No, sir.

Q.  Did you provide protection for Leonel Maradiaga?

A.  To the contrary, the laws that we --

MR. WIRSHBA:  Objection, your Honor.

THE COURT:  Do you want me to tell the translator not

to translate it?

MR. WIRSHBA:  No, your Honor.

THE COURT:  OK.  Then wait until the translator is finished.

MR. WIRSHBA:  Understood.

THE COURT:  And keep that in mind for next time, as well.

A.  To the contrary, the laws that we implemented led to the seizing of the largest amount of properties of that person and that Cartel was dismantled.

MR. WIRSHBA:  Objection.

THE COURT:  Mr. Hernandez --

THE WITNESS:  (In English)  Sorry, sir.  I --

THE COURT:  I'm going to strike the answer beyond -- no, I'm just going to strike the answer.

MR. COLON:  May I ask the question again, sir?

THE COURT:  You may.

Q.  Did you receive money in the form of a bribe from Mr. Leo Maradiaga?  Yes or no.

THE COURT:  No.  The witness answered that.

Q.  Did you provide protection for Mr. Maradiaga; Leo Maradiaga?

A.  No, sir; to the contrary.

Q.  And with respect to Mr. Luis Perez, did you receive money in the form of a bribe from Mr. Luis Perez?

A.   No, sir.  I do not know him.

Q.   You were asked on cross-examination about whether all these individuals that I just named were not telling the truth; correct?

A.   Yes, I remember.

Q.   Is that your testimony right now, that they were not telling the truth?

A.   They are professional liars.  That is so.

Q.   With respect to Mr. Tigre Bonilla, did you appoint him as the national director of the police?

A.   He was the director of the National Police under President Pepe Lobo.

Q.   Did you keep him on when you assumed the office of the presidency of Honduras?

A.   I ordered his removal as police director and we assigned it to another person.

Q.   With respect to Count One of the indictment, sir, did you commit the crimes that have been presented in Count One, sir?

          MR. WIRSHBA:  Objection, your Honor.

          THE COURT:  Overruled.

A.   No, sir.

Q.   With respect to Count Two, and the crimes presented in that charge, did you commit the crimes as noted or presented in Count Two, sir?

A.   No, sir.

O365her2                        Hernandez - Redirect

Q.   With respect to Count Three, did you commit the crimes that have been outlined or presented in Count Three of the indictment, sir?

A.   No, sir.

          MR. COLON:  May I just consult for one second, sir?

          THE COURT:  Yes.

          MR. COLON:  I'm almost done here.

          THE COURT:  Yes.

          (Counsel conferring)

          MR. COLON:  Nothing further, your Honor.  Thank you.

          THE COURT:  Thank you.

          Ladies and gentlemen, we are going to take our mid-morning break and we are going to set up for closing arguments in this case.  Please remember, the case is not over. Do not discuss the case among yourselves or with anyone.  We will be back in action in 10 minutes.

          Thank you.

          (Continued on next page)

O365her2

(Jury not present)

THE COURT:  Please be seated.  And when the jury returns, I will ask the defense if they have any other evidence or witnesses.  And the answer will be?

MR. COLON:  No, sir.

THE COURT:  Then I will ask the government whether they have a rebuttal case.  And the answer will be?

MR. WIRSHBA:  Your Honor, we may.  It will be very, very short, less than half an hour.

THE COURT:  What is the answer?  You just heard they're going to rest.  The answer is either yes or no.

MR. WIRSHBA:  May I have a moment to consult with my team?

THE COURT:  You may.  You may.

(Counsel conferring)

THE COURT:  The defendant may step down.  Thank you.

(Witness excused)

MR. WIRSHBA:  Thank you, your Honor.

THE COURT:  Yes, sir.

MR. WIRSHBA:  Your Honor, the government will not have a rebuttal case.

THE COURT:  Thank you.  We are in recess.

MS. SHROFF:  Your Honor, the defense will have rested when the jury comes back.  Will the Court allow the defense to make its Rule 29 now?

O365her2

THE COURT:  Yes.  That's fine.

MS. SHROFF:  Thank you, your Honor.

The defense, having rested, Mr. Juan Orlando Hernandez moves for a judgment of acquittal pursuant to Federal Rule 29.

Thank you.

THE COURT:  I will give the government a brief opportunity to respond.  You rely on the argument at the close of the government's case?

MR. GUTWILLIG:  Yes, your Honor; we rely on the same argument.

THE COURT:  The motion is denied.  We are in recess.

(Recess)

THE COURT:  Does the defense need the interpreter for closing arguments?

MR. COLON:  Yes, sir.

THE COURT:  Well, how is this going to work then?

MR. COLON:  We have the --

THE COURT:  So the defendant is going to listen through the headphones?

MR. COLON:  Yes, sir.

THE COURT:  OK.  Thank you very much.

The question shouldn't be surprising because most of the testimony of English-speaking witnesses, the record should reflect, the defendant did not use an interpreter.

MR. COLON:  I understand that, sir.  You are correct.

O365her2

But given the fact that there is going to be a lot of legal jargon, legal explanations, that's why we ask.

THE COURT:  That's fine.  I just wanted to make sure the record was clear as to why.

Last night I heard extensive argument on the issue of the conscious avoidance charge and I am now prepared to rule.

MS. SHROFF:  Your Honor, I think the government has an update for the Court.

MR. ROBLES:  Your Honor, we discussed it further internally.  We are, for the time being, withdrawing the request, but with the Court's permission, would potentially seek to renew it, depending on what the defense argues at closing.  To the extent the Court is inclined to give the request, we have additional language that we would propose for the Court and I have copies here.

THE COURT:  If you are withdrawing the request, that's it, unless the defense is seeking it.

MS. SHROFF:  No, your Honor.

THE COURT:  OK.  So it is withdrawn.

MS. SHROFF:  Thank you.

THE COURT:  Move the podium.  Have you placed the podium where you want it?

MR. WIRSHBA:  Yes, your Honor.

THE COURT:  All right.

MS. SHROFF:  The Court had asked me about the

O365her2

objections, any objections to the redacted indictment.

THE COURT:  Yes.

MS. SHROFF:  The defense would ask that the "a/k/a JOH" be stricken from the caption and from the entire indictment sent to the jury.  But other than that, we have no objection.

THE COURT:  That's overruled.

Anything else?

MS. SHROFF:  No, your Honor.  Thank you.

THE COURT:  Thank you.  And you have looked at the verdict form?

MS. SHROFF:  I have looked at the verdict form, your Honor.

THE COURT:  Is there any objection to it?

MS. SHROFF:  There is not, your Honor.

THE COURT:  Thank you.

Bring our jury in, please?

(Continued on next page)

O365her2

(Jury present)

THE COURT:  Please be seated.

Mr. Colon, does the defendant have anything else?

MR. COLON:  No, sir.

THE COURT:  The defense?

MS. SHROFF:  Your Honor, the defense rests, your Honor.

THE COURT:  Thank you.

MS. SHROFF:  Thank you.

THE COURT:  Does the government have a rebuttal case?

MR. GUTWILLIG:  No, your Honor.

THE COURT:  That, ladies and gentlemen, is the close of the evidence but the case is not over.  As I told you at the beginning of the case, each side has an opportunity to sum up as to what they believe the evidence shows.  The defendant has no burden to give a closing argument, they need not do anything in a criminal trial.  I have been advised that the defense does wish to give a closing argument.

Remember what I said before.  Closing arguments are not evidence, they are the parties' view of what they believe the evidence shows.  If any lawyer states a fact which is contradicted by your recollection of the evidence, it is your recollection of the evidence that controls and you will have the ability to request a read-back of testimony and you will have the exhibits in the jury room with you.

Now, I have instructed the attorneys as to what instructions I will be giving at the close of the case.  They may, therefore, say:  *I expect that Judge Castel will instruct you that*... but if any lawyer states a principle of law at odds with the instructions I give you in my final instructions, it is my final instructions you must follow.

With that, Mr. Gutwillig, you are going to present for the government?

MR. GUTWILLIG:  Yes, your Honor.

THE COURT:  As I told you, because the government has the burden of proof, they will have an initial closing, then the defendant will have a closing, and the government, because it has the burden of proof, will have a rebuttal closing.

Go ahead.

MR. GUTWILLIG:  The defendant, Juan Orlando Hernandez, is a drug trafficker.  He is a drug trafficker on a massive scale.  He abused his power as the president of Honduras to, as he put it in his own words, shove the drugs right up the noses of the gringos, the Americans, and they wouldn't even realize it.  For years he got away with that.  But now he's here, in an American courtroom, to face justice for his crimes against United States.  And you heard how he did it.  Cocaine-fueled bribes, millions in dollars in drug money from some of the largest cocaine traffickers in the world.  He protected their drugs with the full power of the state; the military, the

police, and the justice system.  And all the while he and his partners were sending ton after ton of cocaine to the United States.  That, ladies and gentlemen, is why we are here today.

The defendant protected the people who made him president and kept him in power and, ladies and gentlemen, you know their names:  Alex Ardón and his brother Hugo; Tony Hernandez, the defendant's brother; Geovany Fuentes Ramirez, the murderous drug trafficker the defendant partnered with; former President Pepe Lobo and his son Fabio.  None was ever arrested in Honduras, none was ever extradited to the United States.  They stayed quiet, they stayed loyal, and they stayed untouchable in Honduras.  Years of cocaine trafficking and all with the defendant's protection.  Not a cocaine load seized, not an arrest made, and no fear of either of those things happening.  And he did all of this -- all of it -- while claiming to fight the flow of the cocaine that destroys lives here in the United States.

He put on a good show, publicly anyway, and that continued right here in this courtroom, ladies and gentlemen. He tried to sell you the same lie right over there.  This morning and yesterday, under oath, the defendant told you that no one is above the law.  That includes him.  And make no mistake, the drug traffickers he stood up to were the ones who threatened to expose him, who jeopardized his false legitimacy and his grip on power.  But behind closed doors you know

O365her2                          Summation - Mr. Gutwillig

exactly what he was doing, he was giving safe haven to his drug trafficking partners, the ones who fueled his rise, the one who kept him in power, truckload after truckload, plane after plane, ton after ton.  That is how they did it.  Cocaine. Money.

The defendant told you that he was cracking down on drug trafficking and corruption but you know that is not true. That is not the real Juan Orlando Hernandez.  Not the one behind closed doors.  Not the one you heard about at trial for the last couple weeks.  The real Juan Orlando Hernandez, that's the one who the evidence showed was at the center of one of the largest and most violent cocaine trafficking conspiracies in the world who allowed hundreds of thousands of kilograms of cocaine to reach the United States, who committed crimes against this country.  That is what the evidence showed.  And today, ladies and gentlemen, we are going to walk through it.

Before I go any further, let me say just a few words about the charges to give some context as you help consider the evidence as I review it.  We will get into the details but, put simply, the crimes are drug trafficking and using guns; drugs.

In Count One, the defendant is charged with agreeing with others to import five kilograms of cocaine into the United States.  That's right.  The question for you is whether he agreed and whether the quantity of the crime involved more than 5 kilograms of cocaine.  You already know that it involved a

lot more than that.

Count Two and Count Three:  Guns.  These related to the use of weapons to protect all of that cocaine and, as you heard, that included things called machine guns and destructive devices, which is really just a fancy word for dangerous weapons like grenades and rocket-propelled grenade launchers. The evidence shows that the defendant used the Honduran police and military to protect his co-conspirators -- his partner's cocaine -- and that the traffickers themselves used those extraordinarily dangerous weapons to protect it, to protect the money they made from it, to bribe the defendant.

We will come back to the charges later and Judge Castel will instruct you on the law at the end of the case, but for now, as we go along, please keep this in mind with respect to Counts Two and Three.  The defendant's participation in a drug trafficking conspiracy with people he knew to be armed, including with machine guns and destructive devices, that makes him guilty of Counts Two and Three.  With that backdrop, let's talk about the evidence.

Let's talk about how it shows that the defendant committed the crimes he is charged with, how the evidence proves that he is guilty beyond a reasonable doubt.

Remember the testimony from the witnesses who saw the defendant's decades-long crimes.  You have three separate witnesses who had multiple face-to-face meetings with the

defendant; Alex Ardón, Fabio Lobo, Jose Sanchez.  Ardón told you how the defendant's political rise was fueled with cocaine money.  Fabio Lobo gave you in inside personal look into that period as the defendant succeeded Fabio Lobo's father first as president of National Congress and then as president of the republic.  And José Sanchez was in the room where the defendant partnered with a violent cocaine trafficker.  You heard from other witnesses, too, and they told you other parts of the same events:  Member of the Sinaloa Cartel, a member of the Honduran National Police, and a massive Honduran drug trafficker, Leonel Rivera, who gave you a firsthand account of how he and others supported the defendant for police protection.  These people toll you exactly how the conspiracy worked and you saw all the other evidence backing it up.

In the opening, defense told you there was none.  No recordings, no text messages, no videotapes, no bank records but that's not the trial you saw.  The trial you saw, that one had drug ledgers with the defendant's initials in them, intercepted calls from the leader of MS-13 -- Mara Salvatrucha -- a dangerous gang, in which that leader is talking about the defendant gifting drug routes, taking bribes, and assigning an elite police team to kill a drug trafficker so that he does not get exposed.  You have also got electronic messages, videos, pictures, and that's on top of all the testimony that you heard.

You heard from the defendant, too.  Now, as I expect Judge Castel will instruct you, and already has, the defendant has no burden at this trial.  None.  He doesn't have to do a thing.  The burden of proof is always with the government and we embrace that burden, we want it.

I also expect that Judge Castel will tell you to use your experience and your judgment and your common sense when you are evaluating credibility of the witnesses who you saw testify to determine whether they were credible.  And you should do the same thing with the defendant.  You should treat him like any other witness.  You saw him up there today and yesterday.  He confirmed what the government's witnesses already told you.  For example, he went to Juancho Lobo's birthday in 2012.  He heard rumors that Oscar Ardon was a drug trafficker.  He heard that his brother Tony Hernandez was a drug trafficker.  He heard that he was hanging out with the wrong crowd.  His ministers brought him information about Tony Hernandez.  He visited Fuad Jarufe at Graneros.  His sister was involved in his campaign.  And he also said that all of them -- all Honduran politicians -- got bribes.  Just not him.  Never him.

Ladies and gentlemen, what the defendant said up there on the stand, those are half truths and you know they're half truths because you heard the government's witnesses say the other half.  That's because he was trying to explain the

O365her2                    Summation – Mr. Gutwillig

unexplainable.  That picture of him from the 2010 World Cup, the one what Arnulfo Valle's arm draped around him, the defendant is said it appeared to be him in the picture.  Ask yourselves whether he appeared to be telling the truth.  You should scrutinize his testimony, just like you should for any other witness, and when you do, you will find that it does not hold up and that's because a half truth is a lie.

Now, let's take a step back.  The defendant committed crimes against the United States, and you heard from witnesses, including the defendant, that the drugs were coming here.  Before we move on to the evidence establishing his guilt of the crimes, it's important to place into context where all the cocaine came from and how it gets here.

This, on your screens, is what is called the Central American drug route.  Nearly all the cocaine in the Western Hemisphere is produced in Colombia and Honduras is a critical point on its journey to the United States.  It is a relatively small country of approximately 10 million people right in the middle of that cocaine pipeline.  That's why the business of trafficking drugs and transporting it is so lucrative.

Cocaine arrives on the eastern side of Honduras by air and boat into ports like Puerto Cortes which you all heard about.  Then, and as you heard, it is guided and taken by traffickers, police, and military across Honduras, in armored vehicles, with machine guns.  Think about that.  There were

O365her2                    Summation - Mr. Gutwillig

armored trucks loaded with drugs traveling across Honduras.  It is not a big country.  Of course the defendant knew about it.  He was the president.  And under his leadership, Honduras was a springboard for cocaine from Colombia to Guatemala, into Mexico, and to the United States.  And it was big business.

This shows you how the money was made and why it is so important for traffickers to get their cocaine here.  Why it was so important to the defendant; it is how he funded his campaigns, how he got elected, and how he stayed in power

A kilo of cocaine is worth only about $3,000 in Colombia.  By the time it reaches the United States, a single kilogram can be worth $40,000.  Let's put that into context.  Take a thousand-kilo shipment of cocaine, you have heard a lot about those.  A thousand kilos, at $40,000 a pop, is $40 million.  Now think about how many times you heard that.  Alex Ardón told you he moved 250 tons of cocaine.  That is billions of dollars.  That is why this is so important and that is where the millions of dollars that the defendant received in bribes that put him in power and helped him stay there, that's where it all came from, from sending cocaine to the United States.

Now let's go through the evidence, and as we do, please keep in mind what you are looking for:  Evidence that the defendant agreed with other people to send cocaine to the United States and that those drugs were protected by dangerous

weapons, evidence that the defendant protected his drug trafficking partners, and that they used guns moving those drugs.  Evidence that showed Alexander Ardón became a powerful drug trafficker, so powerful that he became a partner of the Sinaloa Cartel.  He was elected to political office because of the defendant.  The Sinaloa Cartel funded the defendant's campaign.  Fabio Lobo was driving around in a motorcade with the Cachiros armed with 20 to 30 people with machine guns transporting cocaine under the defendant's protection.  Geovany Fuentes Ramirez had a cocaine lab that worked for the defendant.  That is what the evidence shows.  Those were the defendant's partners.

Let's start with Alex Ardón.  Alex Ardón was a drug trafficker.  And he became a mayor to protect his cocaine business.  He protected Hernandez' cocaine and eventually he protected El Chapo's cocaine, too.  Alex Ardón, ladies and gentlemen, he maintained his political position through violence and drug trafficking.  And when it became too public, too much of a liability for the defendant, the defendant told Ardón not to run for mayor again, to get out of politics.  So he didn't.  And he told you that he wasn't upset because he got what he really wanted, which was to be able to keep selling drugs and be protected from arrest, investigation, and extradition.  That, in a nutshell, is what Alex Ardón said.  He was one of the defendant's most prolific, most successful

co-conspirators. And he moved 250 tons of cocaine to the United States because the defendant protected him. Let's look at some of his testimony in more detail.

Ardón told you that beginning in about 2000 he trafficked hundreds of tons of cocaine which he protected with automatic weapons like AR-15s, AK-47s, bazookas and traveling in armored cars, like the one he saw Tony Hernandez carrying. You see that on the screen on your right.

Ardón explained in detail where in Honduras he received cocaine and how he transported it, how the Honduran National Police helped him protect that cocaine, and that he was sending it to the Sinaloa Cartel so that it could be sold into the United States because, as Ardón said and as you learned throughout this trial, there is a better price here.

Ardón met the defendant in person for the first time in approximately 2009. That was when the defendant was running for president of National Congress and Pepe Lobo was running to become president. And they agreed, the defendant and Pepe Lobo, would protect Ardón from prosecution for his drug trafficking, give his brother a job in the government, and pave roads in El Paraiso to facilitate that drug trafficking. In exchange, Ardón gave them millions of dollars of drug money including right there at that meeting. $1 million. The defendant forgot that one when he was on the stand. That was in 2009.

As the defendant became more powerful, as he became president of the Congress, so did Ardón.  He became a narco-politician just like the defendant.  With the defendant's promise of protection, Ardón became a more powerful drug trafficker, too.  So powerful that he started working with Chapo Guzman -- El Chapo -- the head of the Sinaloa Cartel, which Ardón did, along with Tony Hernandez the defendant's brother, and Mauricio Hernandez Pineda, the defendant's cousin.  And by the way, ladies and gentlemen, Pineda, that's the same cousin, the Honduran National Police Officer who told Giovani Rodriguez years later they were protected by the defendant and he warned him not to cooperate.  He gave the same warning to Alex Ardón, not to cooperate, not to expose the defendant when there were rumors of Ardón surrendering.

That just goes to show you, ladies and gentlemen, how much the defendant did not want his partners going anywhere. He wanted to keep them close, protected, next to him.

Ardón was so connected to the defendant that in 2013 El Chapo himself gave $1 million to Tony Hernandez for the president's presidential campaign, given to the defendant's co-conspirators and transported through the mountains of El Paraiso, guarded by automatic weapons.

Now, pause on Alex for a moment.  Do you remember Luis Perez, former Sinaloa Cartel member who testified?  He told you exactly where that $1 million came from; that he discussed it

O365her2                        Summation - Mr. Gutwillig

with Arnulfo Valle, that he got $1 million of the Sinaloa Cartel's drug money, and that he gave instructions to deliver it to finance the defendant's campaign.  Tony Hernandez told me he had spoken with Juan Orlando Hernandez and, yes, they needed money for the campaign.  Chapo delivered $1 million to Tony Hernandez.  It matches up.  And he told you more about Sinaloa's support for the defendant.  Luis Perez told you in total the Cartel gave the defendant approximately $2.4 million for his presidential campaign and that the defendant's first year in office, 2014 to 2015 was one of his best drug trafficking years ever.  It was a banner year for selling drugs.

Ladies and gentlemen, that's how it happened.  That's how this all happened.  Take a moment to think about it.  OK?  This isn't just a story of a crooked politician who accepted bribes from drug traffickers.  And, by the way, that would be bad enough, enough that the defendant helped Ardón get elected as mayor, helped his brother Tony become a powerful drug trafficker and eventually a member of Congress himself.  But the evidence showed more, it showed how the leader of Honduras -- the defendant -- joined with the leader of the Sinaloa Cartel, El Chapo.  That's how it happened.

So, that's Alex Ardón, drug trafficker, National Party mayor, partner of Tony Hernandez and the Sinaloa Cartel, partner of the defendant.  And when Alex Ardón was testifying,

he told you that there was significant poverty in Honduras, that he built dirt roads for poor communities so that they would vote for him and so that he could move his cocaine.  Alex Ardón was just a mayor.  The defendant was the president.  He didn't build dirt roads for votes.  By protecting his drug trafficking partners like Ardón with the full power of the state, the defendant paved a cocaine super highway to the United States protected by machine guns, grenade launchers, and other weapons of war.  And if you believe Alex Ardón, the defendant is guilty on all counts.  If you didn't hear another minute of testimony, Ardón's word alone would be enough.  But, you have more.

You could find the defendant guilty across the board just on the basis of Fabio Lobo's testimony too.  You heard all about how Fabio Lobo's history, in some ways, is the opposite of Alex Ardón's.  Ardón got his start in drugs and then moved to politics.  Fabio Lobo was in a position of privilege.  The son of the former president of Honduras, Pepe Lobo, another former Honduran president involved in cocaine trafficking, and Fabio Lobo leveraged his contacts to traffic drugs.  Fabio Lobo is the son of the former president testifying against his father's successor.  Just think about that.  That is exceptional.  Fabio had a window into the defendant's world that nobody else could have given you.

Fabio Lobo met the defendant in 2002, more than two

O365her2                      Summation - Mr. Gutwillig

decades before the defendant's rise to the top of political power in Honduras. He was there as the defendant moved from congressman to president of the National Congress, to president. He was there. And when I say he was there, I mean right there, exactly. The picture on the screen. There is a picture of Fabio Lobo inside Casa Presidencial. He is standing on the far left and Pepe Lobo, the president, and Javier Rivera Maradiaga, one of the leaders of Cachiros, are standing shoulder to shoulder in the middle. And befitting his position and access, Fabio Lobo had a personal relationship with the defendant.

In 2009, before he was President of Congress, the defendant invited Fabio to dinner at El Patio, where Fabio said he and the defendant typically went out to eat. At the dinner were the defendant, Tony Hernandez, and a Colombian drug trafficker name Cinco. They talked about a plane that had merchandise and asked for Fabio, who was then a judge, to help them out. A couple days later, Fabio learned why -- another drug trafficker called Fabio and told him that the plane had crashed in Roatan loaded with 1,200 kilograms of cocaine. Whose was it? The Hernandez brothers', the defendant and Tony, the Valles, and the Colombian traffickers. And when Fabio later spoke to the defendant about that plane at Fabio's house, the defendant asked him to be discrete. Discrete. Remember that word, the defendant used it more than once.

Fabio told you about his two meetings at Puerto Cortes. You see Puerto Cortes on the map there, it is the largest shipping port in Honduras. It is the one within driving distance to Geovany Fuentes' cocaine factory. Fabio said he had two meetings at Puerto Cortes, both with Cesar Gastellum, a member of the Sinaloa Cartel, and a main drug supplier of El Chapo where the Cartel provided drug money to the defendant's campaign. And Luis Perez was at those meetings, too. At the same time. Luis Perez described how he made two different $500,000 payments to an official at the Puerto Cortes that went to the defendant's campaign. These two people are taking about the same thing, ladies and gentlemen, they're corroborated.

Fabio also told you about the $200,000 he gave to the defendant's sister, Hilda Hernandez, who told you -- who the defendant told you was involved in his campaign -- at a heliport in Tegucigalpa with Javier Rivera, one of the leaders of the Cachiros, in 2013, for the defendant's campaign in exchange for political favors or other favors that would be helpful in my drug trafficking. This is one of two bribes you heard about going to Hilda Hernandez. This $200,000 at the heliport from Javier Rivera and Fabio, and the $250,000 from Javier Rivera and Oscar Nájera that Leonel Rivera told you about.

And of course, ladies and gentlemen, you heard about

the millions of dollars in the duffel bag, Fabio told you about it in detail.  He met with Tony Hernandez, he drove to the gas station, he went inside, he got a snack, he came outside, and he saw Wilson.  Pause.  Remember that name.  Wilson is the same person as Nery Sanabria, the same person as Magdaleno Meza.  We will come back to that later but remember why.  Those drug ledgers you saw, the ones that were seized in a car next to weapons and grenades and cash, those were Nery Sanabria's drug ledgers -- Wilson, Magdaleno Meza -- the ledgers with the defendant's initials in them, and Tony Hernandez', reflecting the payments they both received for drug shipments.

Back to Fabio Lobo.  Fabio told you how big the bag was on the stand.  He said that there were hundred dollar bills inside, bundles of cash, just like the pictures on Tony Hernandez' phone, like the waist-high stack Geovany Rodriguez saw in Tony Hernandez' house.  The cash proceeds from sales of tons and tons of cocaine.

Now, ladies and gentlemen, Fabio Lobo told that you it was for $4 million.  Let's flash forward now.  You heard about this same bribe on an intercepted call, the participants didn't know anybody was listening, years later, in 2015.  It is one of those calls from Alexander Mendoza -- Porky -- the leader of MS-13 in Honduras, talking about millions of dollars in bribes that the defendant received.  It is right there on the screen. El Valle gave him 5.

This is a private conversation with MS-13 members years later, ladies and gentlemen, years after Fabio told you this happened. And it's not important whether it is $4 million or $5 million. Here is what is important. The point is that the defendant received that money from drug traffickers. You heard about it from Fabio Lobo and you saw it on a recorded call with different people years later. Ladies and gentlemen, that is damning proof.

Before we move on I would like to say a brief word about Tony Hernandez, one of the defendant's principal co-conspirators. By now you know that Tony was a big drug trafficker. He worked with Alex Ardón, Fabio Lobo, the Cachiros, and others. And you also know that he played a supporting role. He was not the main character in the defendant's drug trafficking conspiracy. Tony's rise as a drug trafficker was because of the defendant. Because of the defendant's power. That's what allowed Tony to become a powerful drug trafficker and a member of Congress. It's the same story as Fabio Lobo.

Fabio Lobo launched his drug trafficking career through his political contacts as well, through his proximity to power. So, too, did Tony Hernandez.

That, ladies and gentlemen, is how the defendant ended up with bricks of cocaine with his little brother's initials on them being sold to the Sinaloa Cartel. You see them right

there on your screen.  Because the defendant was the one

protecting him, the defendant made sure he could traffic drugs,

the defendant made him a congressman.  That's why Tony

Hernandez was checking with the defendant's old friend General

Palacios -- you saw him on the stand -- to find out whether the

coast was clear for Tony to travel to the United States because

he knew he was safe in Honduras.  He was safe under the

defendant's protection.  But he also knew that he did not have

the same protection here in the United States so he tried to

find out.  And as you heard the defendant state on the stand,

he was not careful enough.

Like Tony Hernandez, Fabio Lobo was politically

connected, in Honduras, with the defendant.  And with that

support, Fabio moved from funneling government contracts to the

Cachiros to helping them move cocaine shipments with the help

of his security detail and their AR-15s because the security

detail that Fabio Lobo had was used.  They would mostly use

AR-15s, sir.  I would always be followed by a truck that was

carrying heavy guns, such a grenade launchers, RPGs, AK-47s,

AR-14s and short guns.  Whenever it was a relatively small

load, small -- 400 to 500 kilos, $40,000 a piece in the United

States, I would usually be accompanied by 15 to 30 people.

That's what Fabio Lobo was doing.  And the defendant knew it.

No wonder he protected Fabio.  And when Fabio needed more from

the defendant to make sure that all that valuable cocaine was

safe?  He told him to go to a general, General Pacheco Tinoco; he is there in the middle of your screen, the National Director of Intelligence an Investigation to get information to avoid drug seizures.  And Fabio did, but Fabio wasn't careful.  And the defendant took him to task.  *Be discrete.*  There is that word again.  *Be discrete*, he told him.  Don't-get-caught.  As long as he did that, Fabio Lobo would have no problems with the defendant and the defendant could protect Fabio's partners, too, the Cachiros.  There is the message right there.

There were a lot of questions about text messages and proof, things supposedly that the government didn't have.  You saw the messages from 2014 between Fabio Lobo and Leonel Rivera where Fabio writes, in August of 2014, well into the defendant's first year as president that he spoke with "JO about helping the Cachiros avoid property seizures."

Ladies and gentlemen, in closing, I expect that the defense is going to say a lot about extradition, the law that was passed in 2012.  Remember, Fabio Lobo bribed the defendant in 2013.  He told the defendant it was drug trafficking money.  The defendant said I see you've been working with the Cachiros.  Fabio made this money by escorting drugs around Honduras in his motorcade armed with machine guns.  He spoke with the defendant in 2014 about not seizing the Cachiros properties, that's the message on your screen, and you have that in black and white in those messages.  Fabio and the Cachiros, protection from JO.

The defendant knew about this.  How could he not?  The only thing the defendant had nothing to do with was Fabio's arrest.  Fabio was arrested in Haiti in 2015.  He wasn't extradited to the United States.  When he left Honduras he left the umbrella of the defendant's protection.  That is when he got caught and arrested, not before.  2015.

(Continued on next page)

MR. GUTWILLIG:  (Continued) So that's Alex Ardón and Fabio Lobo.  And let me be clear.  We are not, not, asking you to approve of what these men are admitted to doing.  Mr. Robles told you straight away in opening that you would hear about horrendous acts of violence.  You saw Alex Ardón march through 56 murders on the witness stand, ones that he's being held accountable for.  It's difficult to wrap your mind around.

And Fabio Lobo, just like the president, just like the defendant, he took advantage of his proximity to power to partner with massive violent drug traffickers, the Cachiros, Leonel Rivera, to move tons of cocaine.  He was literally using his security detail to do it.  He, like the defendant, was abusing the power of the state.  So don't approve of what they've done, but they know what happened because they were there in El Paraiso, in Casa Presidencial as the defendant rose to power.  They were there as he went from driving his wife's car to Congress to getting $4 million in a duffle bag from the Valles to becoming the president of Honduras.  Alex and Fabio were there.  That is why they're important witnesses.

This morning the defendant called them professional liars.  They were professional drug traffickers, just like the defendant.  The only difference is that the defendant was a politician too, and a crooked one.

And you don't have to take Ardón's and Fabio's word for it.  You have a third eyewitness, a third eyewitness to the

defendant's crimes.  He's not a drug trafficker.  He's not a murderer.  He's not a corrupt politician.  He was the government's first witness on the stand.  For a moment, forget about the other testimony.  If you believe José Sanchez — and you saw him up there testifying, you saw the evidence corroborating his testimony — if you believe José Sanchez, the defendant is guilty, end of story.

José Sanchez told you about two private meetings between the defendant, who was running for the presidency, and Geovanny Fuentes Ramirez, a violent, murderous drug trafficker.  And in that meeting, he told you that the defendant told Fuentes Ramirez that he wanted Fuentes Ramirez's cocaine lab to work for him.  He told you that he was going to protect Fuentes Ramirez's drugs with the full power of the police and the military.  He gloated that he was going to eliminate extradition.  And he gave Fuentes Ramirez his brother Tony Hernandez's cell phone number so that Fuentes Ramirez could put him at Mr. Tony's disposal.  And then at the end, the defendant said that together they would shove the drugs up the noses of the gringos, and they wouldn't even realize it.  The Americans.

You heard that at the end of the first meeting, Fuentes gave the defendant $15,000 and, at a second meeting, another $10,000.  And of course, Fuentes gave the defendant something much more valuable than that, access to his cocaine lab hidden in the mountains and within driving distance of

Honduras' largest port, Puerto Cortés. That's the one you keep hearing about. That's where Fabio paid bribes. That's where Luis Perez told you he paid bribes. That's where Leonel Rivera said he was going to receive a 2,000-kilo shipment of cocaine. That's Puerto Cortés. That is what the defendant wanted, that the cocaine would come in safely, it could be moved through Honduras, and it could be sent to the United States.

I guess that's what the defendant meant when he said he went to Graneros to check on rice prices. And, ladies and gentlemen, you heard and saw how José Sanchez described those meetings. You saw how he described it in his boss' office, sitting in a blue armchair, the defendant Fuentes Ramirez at a round table, a mini bar, a bathroom. He described the scene in detail. The defendant's own words: José, exchange these for me. Exchange my drug money. How the defendant stirred his drink as José Sanchez counted it up.

And you saw José Sanchez. He told you that he was scared, and he was scared with very good reason. He told you that he gave recordings of the defendant to two people, to Marlen Vanegas, a prosecutor, and to Christian Ayala, another man, and he told you what happened to them. They were murdered. Prosecutor Marlen Vanegas said that she had delivered the recordings to the attorney general in Chinchilla, and one month later she was killed. Also, Christian Ayala, did you learn anything about Christian Ayala? That he had been

murdered when he was getting home approximately two weeks after he got the tape.

Ladies and gentlemen, these people were murdered because they had evidence of the defendant. That's what happened. That's what you heard. And after these meetings between the defendant and Geovanny Fuentes, Sánchez found a box of military supplies in Graneros. Remember, Graneros was a rice company. The military supplies were from the 105th military brigade. And inside, military uniforms, police uniforms, bulletproof vests, police badges. José Sanchez said he saw Fuentes Ramirez later with a green military-grade rifle that he said he got from one of his military friends after the meetings with the defendant, after the defendant promised his protection. José Sanchez told you that Geovanny Fuentes wasn't in the Honduran military, wasn't a cop.

And, ladies and gentlemen, you don't just have José Sanchez's testimony on this point. Remember those private electronic communications from Fuentes' son where he confirmed it? Days after the government alleged in a public filing for the first time that the defendant was a member of this conspiracy and after his meetings with the defendant, Fuentes Ramirez was protected by high-ranking members of the Honduran military and received a green submachine gun from him. Fuentes Ramirez's son, another member of the conspiracy, in private electronic communications, communications they had no reason to

believe would be made public, let alone talked about at this trial, wrote: "Dude, how do they know about the green rifle?" Think about that, "How do they know about the green rifle?" "They" is us. "They" is the prosecutors. How did we find out about that green gun? People don't make that comment in private communications about things that aren't true. Use your common sense.

And here's another snippet from the same communication. All of them are there. All of the coconspirators —— CC-4, Juancho, the defendant —— they were all there years later in private electronic communications, and you know that the defendants and Fuentes Ramirez's partnership continued for years. José Sanchez told you about their meetings in 2013 and the protection Fuentes Ramirez received after that. Just look at Fuentes Ramirez's cell phone seized in 2020 in the United States. For that time in between, ladies and gentlemen, not arrested, not extradited, pumping out cocaine from his laboratory under the defendant's protection.

And you remember this, ladies and gentlemen, data showing Casa Presidencial, the presidential palace, in 2019, the day after the defendant was first identified as a coconspirator in this investigation, then a couple weeks later. Quite a coincidence. And it was one that the defendant could not explain away on the stand. He couldn't even admit that June 12 and June 14 are two days apart, much less that he was

O36HHer3                      Summation – Mr. Gutwillig

at Casa Presidencial both days.

Fuentes' cell phone also had the defendant's phone number and email address, and he had something else in his phones too: pictures of his children with the defendant. Ladies and gentlemen, that's not just a photo op with a politician.  It's the defendant with his drug trafficking partner's kids.  Fuentes Ramirez wasn't just a campaign donor. He was a violent drug trafficker.  There were pictures on his phone with his children, with the defendant.

Today the defendant told you he never met Geovanny Fuentes.  José Sanchez never murdered anybody.  He doesn't have a deal with the government.  He left Honduras because he feared for his life.  He put the defendant and his drug trafficker partners at risk, and José Sanchez knew full well what happened to people who did that.

So you have José Sanchez's testimony too.  More devastating proof of the defendant's guilt, a witness who doesn't fit anywhere near the box that the defense tried to paint the government's case into in opening.  He's backed up by electronic communications he wasn't even involved in, electronic data he had nothing to do with, backed up by seized materials from a phone that wasn't his.  And that is not all, because José Sanchez is backed up by another unlikely source, Leonel Rivera.

Leonel Rivera told you a lot about drug trafficking in

Honduras —— everyone he worked with, everyone he bribed, the dozens of murders he committed.  But here's the other thing he said, and it's just as true now.  You don't have to approve of what Leonel Rivera did.  You just have to decide whether he's telling the truth.  And when you look at all the other evidence, you will find that he is backed up.  Here is how you know.

José Sanchez, an accountant, and Leonel Rivera, a massive drug trafficker, said the same things on important details.  José Sanchez told you that Geovanny Fuentes had a cocaine lab in Cerro Negro; Leonel Rivera told you the same thing.  José Sanchez said the lab got raided by law enforcement; Leonel Rivera told you the same thing.  José Sanchez told you that he saw Geovanny Fuentes with military-grade weapons; Leonel Rivera told you the same thing.  Ladies and gentlemen, you see some of those weapons on your screen.  Those are from Geovanny Fuentes' cell phone.  That is more corroboration.  José Sanchez and Leonel Rivera are two people you'd expect not to have a whole lot in common, but they sure agreed about Geovanny Fuentes, the defendant's drug trafficking partner.

José Sanchez told you about Fuentes bringing money to Graneros, seeing him with guns, delivering money to his cocaine lab, and his meetings with the defendant.  Leonel Rivera, he gave you the other side of that story, from the drug

O36HHer3                    Summation - Mr. Gutwillig

trafficker's perspective.  José Sanchez told you how the defendant sent Julio Cesar Barahona, president of the Honduran Supreme Court, to clean up Fuentes' record after the lab raid.

Leonel Rivera, he told you how Fuentes told him a different story about how he cleaned up the mess, a different story, ladies and gentlemen.  The one that Leonel Rivera told you that Fuentes told him is that Fuentes dealt with this by kidnapping a cop who was involved in the raid, torturing him until he was satisfied, until he was satisfied that his involvement, Fuad Jarufe's involvement —— Fuad Jarufe, the defendant's benefactor —— weren't part of the investigation. And when he had satisfied himself, he shot the cop in the head.

Those are flip sides of the same coin, ladies and gentlemen.  That's how you draw a straight line from the defendant's protection to the drug trafficking and violence that happened as a result.  And, remember, Geovanny Fuentes, the one who murdered that cop, killed a boat mechanic and left him by the side of the road, had a cocaine lab guarded by MS-13 sicarios armed with machine guns, the one who transported thousand dollars of kilograms of cocaine through Honduras, he was the defendant's partner.  He was the one who kept paying the defendant bribes.  He was never arrested in Honduras.  He was never extradited to the United States.  He was arrested in March of 2020 in Miami International Airport.  Ladies and gentlemen, that is seven years, seven years, after those

meetings with the defendant happened.  The defendant was president most of those years, but he was protected.  Geovanny Fuentes was protected by the defendant.

Leonel Rivera gave you the inside story about Geovanny Fuentes and about other drug traffickers too.  He told you about the Valles bribing the defendant, the Cachiros bribing the defendant, a birthday party in 2012 with the who's who of narcotics traffickers, and he told you in the end exactly what he did with all of his drug money.  And he, ladies and gentlemen, is the person who would know what to do with drug money:  Of the 55 million, I paid many bribes.  I paid 250,000 as a bribe to Juan Orlando Hernandez.  I took 50,000 to bribe Tony Hernandez.  I took 800,000 to pay Juan Orlando Hernandez's allies.  That's what he did with the drug money.  You don't have to approve of what Leonel Rivera has done.  When you think about it, you'll find that it's corroborated by other witnesses, like José Sanchez, who had nothing to do with what he was up to.

All of this, ladies and gentlemen, is corroborated by other evidence in the case, evidence like what the defendant did when he became president, his partnerships with Alex Ardón, Fabio Lobo, Geovanny Fuentes, Leonel Rivera, and other drug traffickers worked.  And in November of 2013, he was elected president of Honduras.  As he said, where there's a will, there's a way.  That way?  Drug money, millions of dollars of

it.  And once in office, he wanted to make sure he stayed there.  He did that by making sure his drug trafficking partners stayed in line, that they stayed quiet, that they were discrete.  Just think about Alex Ardón and Arnaldo Urbina.  They're both National Party mayors, they were both drug traffickers, and they were both the defendant's partner, but they made different choices.  Eventually, Alex Ardón got out of politics because the defendant told him to, because he was attracting too much attention.

Arnaldo Urbina got the defendant's warning too, and you remember that recording.  "So he said to me:  'Well, then, mayor, as long as the men remain discrete, there won't be any problems.  There will be a problem when there is no discretion.'"  There's the word again, "There will be a problem when there is no discretion," and Urbina did not listen.  He got arrested.  But Alex Ardón, he stayed in the defendant's good graces.  He continued to traffic massive amounts of cocaine.  None of his loads was ever seized, and he was never arrested, never extradited.  Think about that.  It's just like Geovanny Fuentes.  Alex Ardón surrendered into United States custody in 2019, years after the defendant heard rumors, in his words, that Ardón was a drug trafficker.

The defendant was president for most of those years, ladies and gentlemen, and Ardón trafficked literal tons of cocaine with his protection.  In a small country, 10 million

people, one of the most prolific cocaine traffickers in the world operated for years with absolute immunity. He played his role, he paid his partner, he kept the defendant happy, and he got to keep selling drugs.

Before we move on, I'd like to say a few words about the Valles. It was around this time in 2014 when the defendant became president that Urbina, you just heard, became too loud. That the Valles did the same thing. Now, I expect you'll hear that the Valles were drug traffickers and that they were extradited to the United States under the defendant's administration. No dispute. You'll hear more about that in closing from the defense, I am sure.

So it's important that you remember all the facts about the Valles and the full timeline of their rise and fall in Honduras. Their partnership with the defendant and their extradition to the United States is exactly the point of how this all worked. The Valles were the defendant's partners as far back as 2010.

Ladies and gentlemen, you've seen this picture. There's Arnulfo Valle on the right, together with the defendant at the World Cup. The photograph the defendant said he heard of but couldn't remember. Arnulfo Valle showed Leonel Rivera that photograph in 2010, one drug trafficker to another, and he said that the defendant would be running for president and that he, Arnulfo Valle, had spoken with the defendant about

O36HHer3                        Summation - Mr. Gutwillig

supporting his campaign.  You heard about the millions of dollars in bribes that the Valles provided to the defendant, the 1 million from Chapo, the millions of dollars in a duffel bag to Tony Hernandez.  And, sure, ladies and gentlemen, perhaps the defendant took lots of pictures at the World Cup, but Arnulfo Valle, he was a massive drug trafficker, and he funneled the defendant boatloads of money for protection.

Ardón told you something equally as important, how the defendant's partnership with the Valles went south.  The Valles started making death threats to some National Party politicians, candidates for mayor.  And that, ladies and gentlemen, was bad for business, bad for drug trafficking and politics.  And you heard what the defendant did.  He started seizing their properties.  The Valles didn't hold up their end of the bargain, and the defendant needed to act.

Disputes happen in every context, ladies and gentlemen, and as you heard at this trial, in the cocaine trafficking world, those disputes can turn deadly.  So in response, the Valles did what drug traffickers sometimes do: They turned to violence and they tried to kill the defendant.

Use your common sense, ladies and gentlemen.  The defendant and the Valles didn't go in together on a rental property.  They didn't co-invest in a small business.  The Valles trafficked tons of cocaine with the defendant's protection, and they bribed him with drug money.  Violent drug

traffickers and a politician, when things went bad, which they did, they reacted with what they knew how to do: Violence for the Valles, power of the state for the defendant. That's what happened here. And their falling out does not erase the years of crime that preceded it before they turned on each other.

Ladies and gentlemen, you bet the defendant wanted the Valles out of Honduras, but he didn't do that to fight drug trafficking. He had been taking drug trafficking bribes from the Valles for years. No, he did that to save his own skin, to teach them a lesson, and to show his other partners how this was going to work. You don't follow the rules; you pay the punishment. Alex Ardón, Hugo, Fabio, they obeyed the rules; the Valles, they didn't.

Now let's take a pause here and remember how else you know that the defendant's partnership with drug traffickers worked, that it was successful. This is exactly what was on those intercepted calls you saw, the ones from Alexander Mendoza, Porky. And you heard from Ms. Santos up there. She lived with Porky, heard Porky talk about MS-13's work with traffickers like the Valles and the Cachiros and about the corrupt police chief, Tigre Bonilla, who protected those drugs.

And then you saw what Porky said. We're going to look at these calls. Porky was the leader of MS-13 in Honduras. Think about the significance of this. Think about this evidence. Private conversations in 2015 while the defendant

was president, because the defendant did not change his stripes when he got into office; just doubled down.

Here's a call from June of 2015.  Look at what Porky says here:  I doubt that he'll last from now until June, because they picked up a call from Tigre Bonilla, the corrupt police chief, the one who Tony Hernandez directed to take care of, to kill a drug trafficking rival who was interfering with Tony's and Ardón's drug shipments.  Think about what this means.  The leader of MS-13 in Honduras is telling somebody that the defendant wouldn't last until June because a call with another coconspirator was intercepted, one who carried out a murder for the conspiracy.  The only reason this would matter, the only reason the defendant wouldn't survive until June, is because it showed the defendant's involvement in the conspiracy, the same one.  Tony, Alex, Tigre Bonilla, it's the same one, ladies and gentlemen.  This, this message right here, is devastating proof of his guilt.

And then the next line in the call.  It appears that H gave him $6 million and El Valle gave him five, and Tigre Bonilla would pay the rent.  We talked about this one before.  This is the call from 2015 where Porky is talking about taking millions of dollars in bribes to the defendant from the Valles, 6 million from Hector Emilio, five from the Valle.  Black-and-white proof of the defendant's guilt.  It lines up with what Fabio told you about the duffel bag and the drug

O36HHer3                         Summation – Mr. Gutwillig

money that Tony Hernandez got from Wilson, the same person as Nery Sanabria and Magdaleno Meza and one of the Valles workers. Those drug ledgers you saw from JOH and TH, remember, those were his.  We'll come back to that.

Then right after, talking about those millions of dollars in bribes, Porky says Juan Orlando made them negotiate, more money, and that the campaign was financed but the Americans already know it.  That's why he's not giving him much help.  This is 2015.  The Americans know the Valles and Hector Emilio are drug traffickers.  So even though they gave the defendant millions of dollars in drug money, he's not giving them much help because they're too visible, because it could all come crashing down.

The defense wants you to believe that the defendant can't be guilty because he extradited drug traffickers from Honduras.  Sure, there were some drug traffickers extradited from Honduras while the defendant was president, but not the ones he cared about.  The ones he cared about, they stayed safe.  He protected them, and he protected himself.

Let's turn to another call just to see how far the defendant would go to protect himself.

On the top left of your screen, everyone should read it, Porky says:  They are searching for Byron Ruiz.  They just informed me, the ones who are with the Americans there, and they heard Juan Orlando give orders to shoot him, because it

seems that he worked for a —— Byron Ruiz worked for a brother of President Juan Orlando, and that the president assigned an elite police team to kill him because it's inconvenient, inconvenient, if the Americans catch him and take him away.

It is inconvenient for the defendant if the Americans catch him and take him away because he could be exposed. That's why it's inconvenient. What this shows is that the defendant gave orders to his people, the ones with the Americans, to shoot and kill, to keep Byron Ruiz silent, and to keep himself safe, to maintain his grip on power. That was 2015.

And remember where else you saw audio intercepted from the Porky wire about the defendant sending an elite hit squad to kill Byron Ruiz? In Geovanny Fuentes' phone. Ladies and gentlemen, this is Government Exhibit 204-R21. It's a conversation between Geovanny Fuentes and one of his corrupt police contacts, Comisionado Martinez, in 2020, when the defendant is still president of Honduras. Ladies and gentlemen, if there's one thing Leonel Rivera knows, it is drug trafficking, and he told you that Byron Ruiz was a drug trafficker.

Let's look at line 44. It's an elite police team. They'd even told them not to capture him but to kill them since the Americans want him already. And since he knows that Juan Orlando betrayed him, betrayed him, and at the same time he's

O36HHer3                          Summation - Mr. Gutwillig

ordering him killed.  Do you understand me?

And later:  President Juan Orlando Hernandez has a mentor, a brother whose name is Ronnie Hernandez, and they have him pinned down with them.  And that if the Americans grab him, Juan Orlando will be exposed.

This is already a war over there, not about narcos, but about power.  This was five years later, five years after the call with Alex Mendoza, and Geovanny is still talking about it in private messages, still talking about the defendant being exposed for his drug trafficking, the same drug trafficking he was doing the entire time in between.  If the Americans find out.

When you think about the defendant's testimony about all of his visits to visit people in the United States, think about what he really thought.  "It's going to be a disaster," that's his partner's thought.  And that disaster, ladies and gentlemen, that disaster was the defendant being exposed and his connections with drug traffickers being known, a disaster for the defendant and a disaster for his partners, because he and his partners had a deal.  The ones who stuck with the defendant, the ones who didn't attract too much attention, they got to keep selling drugs.

From the defendant:  "Just look right here."

David Campbell, another MS-13 member.

Line 22:  "The route like the president has, so" —

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

"Yes, he gifted it to him."

"That was the deal."

Ladies and gentlemen, this is Porky, the MS-13 leader, saying that the defendant gifted a drug route. It does not get any more clear-cut than that. He didn't just allow the flow of drugs. He helped it happen. He controlled it. And as you've heard in this case, it came with conditions: Routes to make money as long as you're not too loud about it. If you play the cat-and-mouse game right, like the defendant did.

So, ladies and gentlemen, we've covered years, years, of the defendant's crimes: The bribes from Ardón in 2009; from Leonel Rivera in 2012; from Fabio Lobo, Geovanny Fuentes, the Valles, and El Chapo in 2013; Rivera's recording with Urbina in 2014; the intercepted calls in 2015; Tony Hernandez's cell phone, 2018; Geovanny Fuentes' cell phone, 2020. That's years and years of drug trafficking.

So that, ladies and gentlemen, that was the government's case. The defense's case, his old friends testified and the defendant did too. You heard about laws, meetings, initiatives in Honduras, the extradition law, the seizure law. These are the things that the defendant was doing in public. Visiting the United States to meet with people is an entirely reasonable and unremarkable thing for a Central American president to do. But remember, none of that, none of it, undoes the defendant's drug trafficking, what we just

talked about, for years and years and years and years, what he was doing in private, behind closed doors.

So the defense case doesn't change a thing about the evidence you heard, and it doesn't change that the defendant was at the center of a sweeping cocaine conspiracy that involved the use of machine guns and destructive devices.

So now, ladies and gentlemen, with that backdrop, let's go to a specific day during the conspiracy, during the defendant's second term as president.

The date is June 6, 2018.  That is the date that Nery Sanabria's drug ledgers were found.  Ladies and gentlemen, Detective Reynoso has no dog in this fight.  He reported for duty, searched some cars, and in those cars found guns, money, grenades, cell phones, and jewelry, and of course, he found those ledgers in a hidden compartment of the car next to almost $200,000 in cash and grenades.

You see the notebooks right there on your screen. They are drug ledgers, and you know whose ledgers they are: Nery Sanabria, Magdaleno Meza, Wilson.  It's the same person. Detective Reynoso told you that one of the individuals who had been in the cars that were searched gave his name as Magdaleno Meza Fúnez; that in one of the notebooks, ledgers, Detective Reynoso found a document with the name Magdaleno Meza Fúnez. And he also told you about information he received that day. Information said this individual, Nery Orlando López, known as

Magdaleno Meza Fúnez, had a drug lab in La Corosa Village in Santa Rosa, Minas.

Ladies and gentlemen, Leonel Rivera knew this person, this drug trafficker Nery Sanabria, as Wilson too, so did Fabio Lobo.  And Leonel Rivera told you more.  That Sanabria, or Wilson, once spoke with Rivera about a drug deal.  Wilson wanted the Cachiros to receive small planes filled with cocaine that were coming from Colombia to clandestine airstrips in La Mosquitia, Honduras.  Leonel Rivera also told you what a Nava is, a Navajo, a small plane to deliver loads of cocaine.  It's right there in Sanabria's ledgers, top right quarter, "11/5/2018, Nava."

Leonel Rivera also told you that Sanabria's drug trafficking partners were the Valles and Tony Hernandez.  And ladies and gentlemen, "TH" is all over these ledgers and so is "JOH," Juan Orlando Hernandez.  That is not a coincidence.  And there's Sanabria, right there, in front of the table with all the cash and guns.  You know how you know that?  Because Fabio Lobo identified him for you.  He identified him as the same person who gave him the big duffel bag at the gas station back in 2013.  That was five years before Detective Reynoso found those drug ledgers.  That is years of cocaine trafficking in between.

Ladies and gentlemen, you know those references in Nery Sanabria's notebooks, Nery Sanabria's drug ledgers, to

O36HHer3                        Summation - Mr. Gutwillig

JOH, you know that they're references to Juan Orlando Hernandez, just like the ones to TH are to his brother Tony Hernandez. You know that because Nery López Sanabria, Magdaleno Meza, Wilson, all the same person, had been drug trafficking for years with the Valles, with Tony Hernandez, and with the defendant. You heard about him from multiple witnesses at trial. It's not a coincidence.

Ladies and gentlemen, those ledgers are consistent with all of the other evidence you have in this case, and you have a lot of it. You have testimony from José Sanchez, Alex Ardón, Fabio Lobo, and all of the other witnesses, the Sinaloa Cartel members, the former Honduran cop, Leonel Rivera. You have intercepted calls. You have electronic communications, and you have drug ledgers. You have photos of firearms, money, contact information connecting the defendant to large-scale violent drug traffickers. That's the evidence. That's what you've seen and heard at this trial. And all that evidence proves that the defendant is guilty of the charges.

So let's take a moment and talk about those charges now.

THE COURT: You have ten minutes left.

MR. GUTWILLIG: Starting with Count One, Count One is the drug trafficking conspiracy, the conspiracy to import cocaine into the United States. Judge Castel will instruct you on the law. And of course, what he says controls, but I expect

O36HHer3                     Summation - Mr. Gutwillig

Judge Castel will instruct you that there are three so-called objects of the conspiracy.  That means there are three ways to accomplish the conspiracy: import cocaine, distribute cocaine knowing it would be imported, or distribute cocaine using a U.S.-registered aircraft.  The first two are straightforward. For the third, Leonel Rivera told you that he transported cocaine, including with Geovanny Fuentes, using an N-register, or U.S.-registered aircraft, which I expect Judge Castel will instruct you is enough to satisfy that object.

Importantly, for the defendant to be guilty on Count One, you need only find that the defendant conspired to achieve one of these objects, though the evidence proved all three. Basically, what these objects boil down to is was there an agreement to import cocaine into the United States?

And, ladies and gentlemen, there is no magic to the term "conspiracy."  As I expect Judge Castel will instruct you, conspiracy is an agreement in any form.  Doesn't need to be a formal contract, just one that you can infer using your common sense.  And here are the questions for you to consider:

Was there an agreement by one of the three ways or objects to import cocaine into the United States?

Second, did the defendant knowingly and intentionally join that conspiracy?

And then you'll be asked what's called a special interrogatory, basically just another question to consider

during your deliberations.  And I expect that one of the special interrogations Judge Castel will ask you is whether this offense involved at least five kilograms of cocaine.

Ladies and gentlemen, you know that it did.  You know that this conspiracy involved thousands of kilograms of cocaine.  And you have a tremendous amount of evidence that there was an agreement to import cocaine into the United States and that the defendant joined it.  I'm not going to re-review all of the evidence.  We just did that.  But as a reminder, you've got testimony from the three witnesses who had face-to-face meetings with the defendant, you've got testimony from the other witnesses, and you have all of that other evidence I just described —— the wire calls, the ledgers, the drug routes, the elite police hit squad.  You've got all of that, ladies and gentlemen.  You know that there was an agreement to send cocaine to the United States and that the defendant joined it.  He was right at the center of it, and he's guilty on Count One.

There's also no question, ladies and gentlemen, that the drug trafficking conspiracy involved guns.  It involved the weapons we talked about at the outset.  Here's what I expect Judge Castel will say for Count Two:  First, that you need to find there was a drug trafficking conspiracy.  That's just Count One.  And second, whether the defendant possessed or caused somebody else to possess a firearm in connection with

that crime.

And with respect to Count Two and also Count Three, I expect that Judge Castel will ask you another special interrogatory:  If you find that the offense was committed, did it involve a machine gun or a destructive device?  Judge Castel will give you definitions for those.  You'll hear that for these purposes, a machine gun means a gun capable of being fired in automatic mode, and destructive device means the weapons you heard about from Officer Miller —— RPGs, bazookas, rocket-propelled grenade, and Claymore mines.

And remember, as I said earlier, for Count Two, the defendant can be guilty even if he did not personally carry a gun.  He can be guilty if he intentionally caused somebody else to do that or if he actively participated in a drug trafficking crime with advance knowledge that somebody else would have a machine gun or destructive device.  As I expect you'll hear from Judge Castel, this is a concept called aiding and abetting.  Put another way, if the defendant caused others to be armed with machine guns and grenade launchers or actively participating in the drug trafficking conspiracy charged in Count One with advance knowledge that somebody would have those weapons, he's guilty of Count Two.  That's all.

Count Three is similar.  And you know he did this in any number of ways.  Alex Ardón, Fabio Lobo, and Leonel Rivera told you how they transported drugs across Honduras guarded by

AK-47s, AR-15s, and grenade launchers. Ladies and gentlemen, for goodness sake, Fabio Lobo's were protected by his security detail. They had all these weapons. It was a security detail for the son of the president. Of course the defendant knew that this was happening, these drugs were moving through Honduras in armored cars with weapons. There is no way, ladies and gentlemen, that he could not have known.

Leonel Rivera told you he was doing the same thing with Geovanny Fuentes. And he described the battalion of weapons that Fuentes had guarding his cocaine labs and guarding their cocaine shipments, the cocaine that came from Cerro Negro that the defendant partnered with him on, and that Fuentes Ramirez received military help, the green rifle, "Dude, how did they know about it?" And you know that Fuentes' partnership with the defendant continued well past that, 2019, 2020, until his arrest.

You heard from a former HNP officer about how drugs were transported across Honduras. You heard about Tony Hernandez toting around an assault rifle, trafficking drugs. And Nery Sanabria's ledgers, the one with the defendant's initials in them, they were found in a car next to grenades. All those weapons, ladies and gentlemen, all those guns, they were to protect the defendant's drug trafficking partners.

Count Three is similar to Count Two. It's another weapon's charge, and this one is a conspiracy, an agreement,

like we talked about before, an agreement between two or more people to use these types of weapons in furtherance of a drug trafficking conspiracy.  And for all the reasons we already talked about with respect to Count Two, the defendant is guilty of Count Three also.

Ladies and gentlemen, you'll also be instructed about a concept called venue, and that is an easy one.  The parties stipulated that when the defendant was arrested, he was first brought to Westchester airport, which is located within the Southern District of New York.  And I expect that Judge Castel will tell you that that satisfies the venue requirement for all counts.

Ladies and gentlemen, we've been together for a while now.  Before I sit down, let me leave you with a few final words.  The defendant thought that he had everyone fooled.  He thought that he could hide behind extraditing some drug dealers, passing some laws, giving speeches, taking some trips, all the while he provided the violent drug traffickers and corrupt politicians who were close to him —— Ardón, Fuentes, Fabio, Tony —— men who trafficked untold amounts of cocaine into this country and ravaged their own with corruption and violence.

Over the course of this trial, you heard sweeping evidence about drug trafficking, corruption, and violence.  It was truly astonishing the scope, but the reason we're here, the

reason that you as a jury are here is to decide whether the defendant committed crimes against the United States, whether he agreed with people to send cocaine here and whether they protected that cocaine with firearms, including assault rifles, machine guns, and destructive devices. You will find that the evidence shows he did.

THE COURT: Bring it to a close, please. Your time is up.

MR. GUTWILLIG: Ladies and gentlemen, the defendant was the president of Honduras, but in the end, he's just a drug dealer, one who sent massive amounts of cocaine to this country. Hold him accountable. Find him guilty.

Thank you.

THE COURT: All right. Ladies and gentlemen, we're going to take our lunch break. Now, your lunch is provided today. I have a question for you. It's 1:25. Would it be convenient to you to start up at 2 o'clock? If you want more time, just say so, but if that would work for you with lunch having been brought in, let's do that, then, OK?

So we'll pick up at 2 o'clock. Keep an open mind. There's more to come. Do not discuss the case among yourselves or with anyone. Thank you.

(Jury excused)

THE COURT: See you all set up and ready to go for a prompt 2 o'clock start. Thank you. (Lunch recess)

O365her4

A F T E R N O O N   S E S S I O N

2:10 p.m.

THE COURT:  While we check on our jury, the government has a laptop on which admitted evidence will be loaded?

MR. WIRSHBA:  Yes, your Honor.

THE COURT:  And that includes evidence that the defendant has offered into evidence?

MR. WIRSHBA:  That's correct, your Honor.

THE COURT:  The defense can look at that laptop before it goes in the jury room?

MR. WIRSHBA:  Of course.

THE COURT:  On the next break?

MR. WIRSHBA:  We are facilitating that, your Honor.

THE COURT:  OK.  Good.

(Continued on next page)

(Jury present)

THE COURT:  Please, be seated.

Ladies and gentlemen of the jury, I hope that I am not the cause of indigestion on your part and I do appreciate your spirit of cooperativeness.

I would just remind our spectators that they must remain silent at all times.  In part, any noise in the back of the courtroom interferes with the ability of people inside the well, including our jurors and lawyers, from hearing exactly what is transpiring so it is essential that if you need to speak, go outside.

Thank you very much.

Whenever you are ready, Mr. Stabile.

MR. STABILE:  Thank you, your Honor.

May it please the Court, counsel, sir, ladies and gentlemen:

New York City is where I grew up.  And I have lived here my entire life.  And when I spoke with you in my opening statement, I asked you to use your common sense in listening to the evidence but I also asked you to use your good old-fashioned New York street smarts.  And whether you were born here or whether you moved here, you are all New Yorkers now and that's why you are allowed to serve on this jury.  And there are a lot of great things about New York but one of the greatest things is that it's not easy to fool New Yorkers.

O365her4                    Summation - Mr. Stabile

There is just something different about this place and so for my time speaking with you today, I really want to talk to you more as New Yorkers than I want to speak to you as jurors because there are just so many things in this case that when you look at them, they really just make you scratch your head.

One thing the government just said in summation was of course the president knew about it, he was the president. That's their argument.  Is that evidence?

I want to start by reminding you of what you saw, and as I said in my opening, more importantly, did not see in this case, and when I told you in the opening and what actually happened is you would expect, in a case like this, with the former president of Honduras on trial, that you would see Mr. Hernandez on video.  There was no video.  You would expect to hear Mr. Hernandez on audio.  There was no audio.  You would expect to see financial records.  You didn't see financial records.  You would expect specific details about the supposed information that was being given.  Where were these checkpoints?  How is the information communicated?  We will talk about the non-existent radar.  How come none of the meetings have any specific dates?  You were getting testimony like, well, it was in 2012 or 2013.  That is a pretty wide range.  No specific details.  No specific dates.  Unbiased witnesses.  Were there unbiased witnesses?  Well, there are a couple but we will talk about them but most of the people who

came in here had some sort of agenda.  Text messages between any of these supposed drug dealers and Mr. Hernandez, you didn't see that.  And signs of wealth, taking all these bribes, being in bed with drug dealers.  As I told you in the opening, no fancy cars, no Rolls Royce, nothing like that.  No signs of wealth.

What did you get?  Well, you got a bunch of photographs that the government tried to characterize as meetings.  Meetings.  *When you had that meeting with the defendant.*  He is the -- did the system go down?

Can you still see the screen?

JUROR:  No.

MR. STABILE:  Your Honor, can we have a moment?

THE COURT:  Yes.

MR. STABILE:  You got these photographs of, quote unquote, meetings.  Look at some of them.  Why are some of them cropped, especially in the lower left.  They are like cutting out the people in the background because you know what happens when the president is walking around Honduras, there are crowds of people, throngs of people.  People are jumping in to take photos with him.

You saw some other evidence besides photographs, right?  There were the photos, you saw ledgers, you saw the TH brick which we are going to talk about.  You saw text messages. You saw phone calls.

O365her4                    Summation - Mr. Stabile

But if you took all of those things they didn't really add up to much; right?  If you just had those things, if you just had some photographs of the former president with a bunch of people, if you had these ledgers with a couple of "JOH" entries -- and we will talk about why "JOH," they didn't talk about it, we are going to talk about it -- if you just had this photograph of a TH brick and some texts and these phone calls with passing references and you don't even know what they mean, they really wouldn't add up to anything.

What the government is relying on to bring all of this together is the word of people who I told you they were going to bring in to court.  So what you got as support was witness after witness who either have a severe motive to lie, a story that made no sense, or both.  But remember, if you add up all of the testimony that these cooperating witnesses brought, zero plus zero, plus zero, plus zero, equals zero.  If you are going to really credit their testimony, I might as well sit down now. But you saw who these people were.

Let's start with the government's first witness, José Sanchez, the accountant, from Graneros Nacionales.  Amazingly, he claimed that he had a video of the president of Honduras taking cash, hand-to-hand, from a known drug dealer.  At that point you must have said, wow, the defense attorney must have been totally wrong.  He didn't know about this video, there is a video of the president.  Could there be any piece of evidence

O365her4                        Summation – Mr. Stabile

on the Planet Earth more devastating than a video of the president taking cash from a drug dealer?  You would think you would guard evidence like that with your life.  You would think that you would not put the only copy in a suitcase.  You would think that you would not put the only copy in the mail.  You would think that you would maintain a copy some place very, very safe like a safe deposit box, or buried out in the woods someplace, or with a trusted friend where you always knew if you lost the other copies you could go back and get that copy if you needed to.

But, armed with the supposed lights out, I mean, this would have been lights out, smoking gun evidence, José Sanchez mysteriously loses all of it.  He loses three USB keys?  How is that possible?  Did this really happen?  Did he really lose three USB keys?

So the government wants to suggest to you that, well, two prosecutors where he sent USBs to were murdered and that is somehow related to Mr. Hernandez.  But that still doesn't answer the question of where the USB keys were.  Were the prosecutors carrying those USBs in their pockets at the time they were murdered?  Why didn't anybody find USB keys in their office?  There is no evidence linking Mr. Hernandez to the murder of those two prosecutors.  They want to suggest that but there is no evidence of that.  But remember, the government's own witness, Giovani Rodriguez, he paid a hitman to kill a

O365her4                          Summation - Mr. Stabile

prosecutor who was investigating his cousin.  Unrelated, but it happened.

Look.  Prosecutors prosecute and investigate a lot of people.  Lots of people maybe have motive to kill them.  And if these phantom USB keys really exist, right, if they really did exist, did you hear any evidence about how Mr. Hernandez would have known about them?  It is just all speculation.  I mean, it's interesting to think about but it is just all speculation.  And you would think that after two prosecutors were murdered, José Sanchez would have guarded that last USB key with his life or made more copies but he claims he just put it into his suitcase.

You would also think that if José Sanchez had information about the president receiving bribes, he would write down the specific date somewhere, it would be burned into his memory.  At least he would be able to narrow it down to a month, he would be able to tie it to a holiday or a season or his birthday or his spouse's birthday.  Instead, you got some generalized approximation of the date.  And that's a common theme in this case, vague references to meetings that happen sometime in 2013 or 2014, sometime in 2012.  Not tied to anything specific.  And make no mistake, that is by design.  That is by design because if any one of the government's witnesses actually gave a specific date then Mr. Hernandez would be able to look in his daily agenda and see where he was.

But they won't give you a specific date, that's extremely dangerous for them because then he could say oh, I was in Washington, D.C. that day.  I was in Europe that day.  There is not one specific date that anybody has ever given you.

Now, Mr. Sanchez said that he was an accountant.  You would think that as an accountant, surely he kept financial records.  Surely he had a cancelled check.  Surely he had a spreadsheet.  Surely he had a bank record to show the supposed checks he used to turn that cash he said Geovany Fuentes was giving to Mr. Hernandez, to turn that into some sort of legitimate payment; right?  The government claims that, well, even drug traffickers keep ledgers of their financial transactions.  But this accountant didn't?  You saw no cancelled checks.  There were supposedly monthly checks going to Mr. Hernandez.  Did you see a monthly check?  Did you see a spreadsheet?  Did you see a bank statement?  He had no explanation, this was his testimony.

*So, in addition to not having any of the evidence to provide, you didn't give them any sort of bank receipts or transaction, financial transactions that occurred.*

*That's correct.*

And then he came to court and he swore that he was telling the truth about everything and when he was asked about his own criminal conduct, you know, like maybe being complicit in sitting down with a drug dealer and the president and

engaging in some sort of money laundering scheme, what did he tell you?  I have committed no crimes.  He couldn't be honest with himself if this really happened.

So it is OK to come in here and point the finger but not accept responsibility?  Is that credible?  And why is he in the room?  You heard testimony that Mr. Hernandez did visit Graneros on two occasions to meet with Mr. Santos' boss.  And General Romero, Mr. Hernandez' head of security confirmed that.  But he also confirmed that nobody else was in the room during those meetings and that nobody entered the room.  No José Sanchez and, more importantly, no Geovany Fuentes.

And speaking of Geovany Fuentes, the government made a big deal about his supposed Waze data.  We went off on a side show on the Waze data showing that he was at the presidential palace in 2019.  Well, where is Geovany Fuentes' Waze data from Graneros?  Did you see that?  How come the government has no Waze data for that?  They have his phone.  They got the other Waze data.

How come the government doesn't have a single text message or phone record between Mr. Fuentes and anyone at Graneros showing that they communicated, that he knew the president was going there?  How did he know that Mr. Hernandez was going to be there?  There is zero evidence of any communications.  The reason you don't see that is because Geovany Fuentes was not there.  There is nothing to back it up

other than José Sanchez' say-so.  There is no evidence that he was there and that is, again, a common theme -- a lot of talk, no corroboration.  And it is that lack of corroboration that prevents the government from proving its case beyond a reasonable doubt.

And, better yet, the government and Mr. Sanchez want you to believe that he, Mr. Sanchez the accountant, was the trusted fly on the wall during some of the most secret conversations imaginable involving the president.  Why would a rice company accountant be granted access to those types of conversations?  Yeah, I understand maybe he would be given a check and asked to do something or asked to engage in some financial transaction.  I can understand that.  But why is he sitting in the room while this is going on?  Why would anybody do that?

What about that other claim?  I mean, it is not really so relevant, it is not even clear what it is supposed to show but that claim that he stumbled into his boss' office looking for stationery and found that box of empty military equipment.  What was that?  That didn't make sense.

Some of us have experience working in an office so let's think this through.  Do boxes of stationery usually live in your boss' office or the CEO's office?  Remember, Graneros Nacionales is one of the largest rice companies in Honduras, it is not some mom and pop shop, and so when you need paper for

the Xerox machine do you go into the CEO's office to find it? What was he really doing?

And then you heard this evidence about this 2011 raid on Sero Negro that Mr. Sanchez testified about and he claimed that Mr. Hernandez sent the president of the judiciary to the rescue of Geovany Fuentes after his drug lab got raided.  Well, if he was already protecting Geovany Fuentes, why would Fuentes' property have been raided?  He is protecting him. That's not very good protection.

And then you heard there was another payment to the president of the judiciary.  How does that make any sense?  He is already paying him, why he is now paying him?  If anything, he should be getting a refund.

Finally, Mr. Sanchez told you nonsensical stories about things that Mr. Hernandez supposedly said.  He claimed that Mr. Hernandez he had he was going to stay in power for 50 years.  Did that happen?  Of course not.  He stepped down after his second term.  He said Mr. Hernandez was going to eliminate the extradition laws.  Did that happen?  No.  He used the extradition laws.

So that's how the government's case started and it didn't really get much better from there.  It started with José Sanchez but then we came to the real heart of the government's case, the cooperators, the people I promised you they were going to bring out here.

O365her4                     Summation - Mr. Stabile

Now, look.  I'm not going to spend my time going through all of their murders, torture, tons of cocaine, everything else.  We have all heard enough about that but collectively -- collectively -- what did these people do that you saw here?  224 murders, 1,000 tons of cocaine, four life sentences collectively, plus 84 years.  This was a cast of characters the likes of which you have never seen before and the likes of which you will never see again so long as you shall live.

You all know -- you all know -- the most famous Maya Angelou quote:  When someone shows you who they are, believe them the first time.

Throughout the trial, these people have told you that they are liars.  These people have told you that they are murderers.  These people have told you that they kill for revenge, they kill for business reasons, and sometimes they kill for no reason at all.  And so when Leo Rivera was asked what proof he had of bribes being paid to Mr. Hernandez, what did he say?  Well, the only proof that we, as drug traffickers had, was the word of a drug trafficker to another drug trafficker, sir.

You know what's funny?  It is Fabio Lobo kind of had the same line.  He said, when he was asked: *Do you have any documentation?  Do you have any support?*

*Oh, the documentation is our word.  For us, the*

*documentation is our word, we don't need documents, sir.*

And this from Mr. Ardón:  *Do you have any proof at all that you gave money to Juan Orlando?*

*No.*

And yet the government comes in here and says, well, just put their murders and lies and other crimes aside, put it aside.  They're telling the truth now.

You can't put it aside because, quite frankly, there is no place to put it.  So I'm not asking you to do anything other than believe these people.  Believe these people when they tell you who they are.  They showed you and they told you who they are.  So, please, believe them.  A leopard doesn't change its spots just because it signs a piece of paper.  They couldn't assassinate him with their guns so they're here to assassinate him with their lies.  But it is not just that you can't believe them, the entire premise of the government's case makes no sense when you look at the facts.

The government claims that these drug dealers gave cash to Mr. Hernandez either directly or through people to help him win elections and buy protection.  Was there any actual evidence in this case of election fraud?  Did you see any specifics whatsoever?  Did anybody tell you specifically, other than Ardón saying it, did anybody tell you anybody was bribed or a ballot box was stuffed?  Or was it just the words "election fraud" with zero support?  And if they did do all of

those things, that they did pay all that money, they certainly didn't get their money's worth.  Because if you look at the chronology and if you look at what actually happened here, take a look.  Luis Perez told you oh, I paid $2.4 million in 2013.  And then the government referenced it in their closing and he had the best year ever, $25 million, best year ever.  Great.  And then 2014, he flees Honduras.  You were having the best year ever, you just paid him $2.4 million, why are you fleeing?  And then his parters, the Valles are getting extradited in 2014.  So, that $2.4 million didn't really do him a lot of good.  It wasn't a sound investment.  It didn't amount to anything.  But this is what you see repeated over and over.

Leo Rivera of the Cachiros.  He says oh, yeah, I paid $250,000 in 2013.  Well, then he immediately starts cooperating with the DEA.  He is a DEA cooperator as of November of 2013.  And then 2013 he is investigated, he has property seized.  Is that a good investment of $250,000?

Alex Ardón, over $500,000 between 2013 and 2017.  What happens to him?  Well, he gets forced out as mayor, Mr. Hernandez kicks him out.  He flees Honduras, he goes to Guatemala, he is investigated, he has property seized in 2019.  And then 2019 he surrenders to the DEA.  Did he get his money's worth?

Valle Valle, $4 million, supposedly.  $4 million in 2013.  Property seized the next year, in 2014.  And, you have

heard a lot about this:  A plot to murder Mr. Hernandez.  Well, you just gave him $4 million, why would you be murdering him?  You just paid the man $4 million for protection and now you are out to kill him?  And then he gets extradited in 2014.

This is what actually happened.  So when Mr. Hernandez actually does become the president of Honduras, why do all these criminals suddenly scatter like a bunch of cockroaches when the light goes on after supposedly paying these millions of dollars?  After Luis Perez had his best year ever.  Not only do their stories make no sense, they contradict each other in ways that show that they are aligned.  Remember, the truth is easy to keep straight.  Lies are a lot tougher.

Look at what happened between Fabio Lobo and Leo Rivera when they were both telling you stories about paying money to Mr. Hernandez' sister Hilda, supposedly.  Well, their stories don't match up.  Go back and look at the evidence, look at the transcript.  Leo Rivera is telling you it is a $250,000 bribe.  Fabio Lobo is saying, no, it is $200,000.  Leo Rivera is saying it was Cachiros money.  Fabio Lobo said, no, it was my money.  Leo Rivera is telling you, oh yeah, it happened at Hilda's house and then you heard about a heliport.  Going to a heliport?  How do you mess that up?  Leo Rivera said, well, my brother Javier went with Oscar Nájera.  And then Fabio Lobo said no, no, I went with Javier Rivera.  And then Leo Rivera said there was no call with Mr. Hernandez.  And then Fabio Lobo

told you that story about, oh yeah, we called and, you know, Mr. Hernandez was on the phone and we told him what we were doing. And then Leo Rivera said that Hilda refuses to accept dollars, right, she doesn't want to take dollars, she doesn't want to have U.S. dollars. That's not what Fabio Lobo says. He says oh, yeah, she accepted the dollars. Facts matter. Details matter. When you don't pay attention to the details, people get wrongly convicted.

Here is another one and they referenced this on their summation just a moment ago. They showed you that picture of stacks of hundreds from Tony Hernandez' phone and they're like, yeah, that's the money that he got paid in that $4 million, the stacks of hundreds. Right? And then they try to tell you that Giovani Rodriguez confirmed it because when he went to that house to meet up with prostitutes, that was supposedly Tony Hernandez' house, although Tony Hernandez is nowhere to be found, he tells you, oh, yeah, I went upstairs and in the closet I saw a stack of money.

Here is the problem. They showed you a picture of hundreds, they said that's the stack of money. Check the testimony. I am going to give you the cite, check the testimony. Giovani Rodriguez, he said oh, it was 20s. But they're trying to draw a connection between those two. I told you I will tell you the cite, it is page 1224 of the transcript, lines 1 to 2. They're trying to mix you up.

Details matter.

Now, you might be saying well, but some of their stories were similar, that must be proof of something, but remember you heard plenty of testimony at this trial about how these people know each other.  It is not like 10 different people who don't know each other are coming out of different places giving similar stories and then you say, well, these people don't know each other.  How could their stories possibly match up unless these things really happened?  That would be interesting.

But what did you learn in this case?  You have probably heard the expression "six degrees of separation" before but with these drug traffickers there are zero degrees of separation.  They all work together, you heard that over and over and over again.

Starting with Leo Rivera who is working with the DEA, and we will talk about why do you think he is not getting extradited.  He is working for the DEA, of course he is not getting extradited.  But look at the network.  His brother, he works with the Sorianos, they work with Fuentes.  There was evidence in this case.  The Cachiros Cartel, the Valle Valle Cartel, the Ardón Cartel all worked together.  The Cachiros and Valle Valves were partners in the drug trafficking.  Leo Rivera then meets with the Valles to discuss the plot to assassinate Mr. Hernandez in 2014.  Then you heard in 2012 the Cachiros

work with Geovany Fuentes on a cocaine shipment by plane that was sold to the Valles. You heard about that. Between 2011 and 2012, Lee Rivera met with Alex Ardón at the wake of the sister of the Valle Valves. You heard about that.

That's how interconnected these people are. They aren't 10 people coming out of nowhere and magically have the same story. They're a group of people who are all talking with each other. And the second Giovani Rodriguez got out of jail in 2011, he told you that he started trafficking with the Ardóns. And then Giovani Rodriguez was fuzzy on that until he got reminded. He got out of jail and asked Fabio Lobo to get him a better assignment in the Honduras police force. But remember, they're also cellmates here in the United States. They are cellmates for four months and then they spend a year in the same unit together. You think they didn't have time to get their story straight, to get on the same page?

Fabio Lobo was a partner of the Cachiros and drug trafficking for years who were partners with the Valles. Luis Perez is a member of the Sinaloa Cartel who has made partners and cocaine smuggling in Honduras with the Valle Valles. And Alex Ardón testified that he sold most of his cocaine to the Sinaloa Cartel. And as for Porky, the leader of MS-13 in Honduras, they all told you he was the muscle, he is arranging hits on behalf of them. He is providing security. And Ms. Santos came in here, she was here very briefly but she came

O365her4                          Summation – Mr. Stabile

in and she testified about Porky's partnership with the Cachiros and the Valle Valves and how MS-13 would protect their shipments and buy their cocaine and they were both workers for the cartels and customers of the cartels.

This chart is important for another reason as well because all of these people are falling under this umbrella of the DEA working with Leo Rivera.  He is working with the DEA since November of 2013 before Mr. Hernandez is the president. He is with the DEA, he is with them.  He is with them.  But they want you to think that Mr. Hernandez was protecting him. He is with them.  He is working for them.  Of course the U.S. isn't going to seek his extradition.  That would be stupid.  He is a high-level and extremely valuable informant on the ground in Honduras.

So who is protecting who here?  And once you realize that and once you realize all of these connections, you realize that there was no way that the United States was going to ask for his extradition, they weren't going to ask for the extradition of his brother Javier, they weren't going to ask for the extradition of his partners like the Ardóns or Porky or Fabio Lobo or anyone else on this chart.  Because if you are working with the DEA, what are you there for?  You are there to gather information.  So what, are we going to set you up to gather information and then strip away all the people you are working with?  that would be extremely dumb.  So they leave him

in place and leave all of these people in place.  In fact, they use -- you learn that they use Leo Rivera to set up Fabio Lobo, the son of the president.  They used Leo Rivera to set him up.  All these people working together.

Now, look.  A hundred percent, there is a conspiracy in this case but it is not the conspiracy the government is talking about.  It is a conspiracy among all of these drug dealers to get their revenge on Mr. Hernandez for destroying their drug empires and now they want to drag him in to jail with them, they're reaching out from behind the bars.  Based on everything you have heard, there is absolutely no reason to think that the United States, that if the United States had asked for the extradition of the Ardóns or the Cachiros or Porky or Geovany Fuentes, Mr. Hernandez would have said no.  He would have done everything and anything to get them out.  The United States never asked.  They just asked questions like, oh, were you extradited?  No.  Did anybody ask?  No.

So, was he really protecting them?  And you bet Mr. Hernandez extradited the Valles after they put a hit out on him.  Putting a hit out on the president is a very good way to attract attention but, more importantly, you heard that that information that they put out a hit on him came from the FBI, it came directly from the FBI.  The United States made an extradition request to get them out of the country and they were extradited.  No problem.  In fact, great.  Couldn't be

happier.  Ask for the Cachiros, they're next.  Ask for the Ardóns.  But now we know why they didn't ask for them.

And if Mr. Hernandez is such a good friend of the drug dealers, why are the Valles putting a hit out on him?  You heard about no extradition requests for Leo Rivera, for Javier Rivera, for Alex Ardón.  But here is the flipside -- there is always a flipside -- you also heard testimony in this case that in Honduras, if you are arrested by the Honduran authorities, you cannot be extradited to the United States until your case is over.  We had testimony about that.

So this is now a no-win situation for Mr. Hernandez.  If he doesn't arrest people, he gets criticized for not arresting people in Honduras.  But watch this.  If he did arrest people, he would have been criticized for blocking their extradition to the United States and then you would be hearing a different argument, you would be hearing Mr. Hernandez prevents people from being extradited by arresting them in Honduras; he brings charges against them in Honduras to keep them in Honduras, to prevent them from going to the United States.  It's no-win.  There is nothing he can do right that they're not going to have an argument with.

Here is another reason why you know that Mr. Hernandez is definitely not protecting anyone.  You heard about a wiretap on Porky's phone and you received partial recordings of transcripts, snippets of phone calls from the Leader of MS-13

in Honduras.  If Mr. Hernandez is protecting the cartels, how come there is a wire on the leader of MS-13?  He is protecting them.  Why is there a wire up?  It is not their wire, they can't wiretap people in a foreign country, it is a Honduran wiretap.  I'm the leader of MS-13.  Obviously the leader of MS-13 is going to be speaking with his clients like the Ardóns, the Cachiros, Sinaloa, the people he is protecting.  Why in the world would he want a wire up on the leader of MS-13?

And by the way, did you see any evidence of him actually protecting people?  Was there any evidence that he ever intervened on anybody's behalf, that he ever gave anybody information?  Did he protect that corrupt police officer Giovani Rodriguez who forgot going on TV to lie about his crimes in Honduras, bribing the judge?  No.  Of course not.  He didn't step in and do anything.  Even though that guy thought he was doing to.  He thought he had his protection.  He did nothing.  There is no evidence he even knows who that person is.

I want to just talk a little bit about this business about surrendering that everybody surrendered to the United States because the only reason they surrendered, quite frankly, is because they knew that Mr. Hernandez was coming for them.

This is one of the most telling quotes from the entire trial from Mr. Hernandez: *Did you promise any of the cartels that you would protect them during your candidacy and your*

*presidential campaigns?*

A  *On the contrary, sir.  The promise was that we were going to terminate them.*

That's who he is.

Now, you heard what surrender looks like.  The way the government was making it sound it is like these people got on a plane on Jet Blue or something and flew into Miami and walked into the DEA's office.  But Giovani Rodriguez talked to you about how surrender worked with him.  First he got charged in the United States and the DEA goes down to Honduras to get him. He is placed in handcuffs and leg shackles and he is flown back to the United States on a DEA plane.  That description is probably very different than the impression you were getting when you heard about people self-surrendering to the United States.

Now, they were all clearly trained to say that they don't know what sentence they're going to receive, they're trained to say that the Judge will consider the good and the bad.  They were all trained to say that the most important thing is that they speak the truth, they were all trained to say that if they commit any new crimes or lie about anything, their cooperation agreement gets ripped up and they don't get their 5K letter.

You saw that isn't true.  None of the witnesses who admitted to lying in their meetings with the government were

charged with the crime of lying to federal agents that gets ignored. Alex Ardón had a fight in jail, nothing happened to him. Then he had a cell phone in jail, nothing happened to him. And then, did you like his explanation of why he needed a cell phone in jail? He said to call his family. What? To call his family? There are phones in jail if you want to call your family. You don't need a cell phone to call your family. Why do you need a cell phone in jail? Well, to continue drug dealing. To continue putting out hits. To continue being a criminal. Those would be good uses of a cell phone in jail, not to call your family.

By the way, did his cooperation agreement get ripped up? No. Did you see any phone records about who he was calling? Was he calling his family? Who knows.

He and Leo Rivera, they had committed so many murders that they couldn't even remember. Why couldn't they remember? Because it really doesn't matter in terms of their sentencing. 50 murders, 60 murders, 80 murders. What difference does it make? They all told you they were hoping to get time-served. These people are telling you they are hoping to get time-served. Not just a hope. You can infer that that is what they're expecting, not just a hope. That's what they said on the witness stand when they were asked the question directly. And then maybe they'll go into the witness protection program and be somebody's neighbor. And then Alex Ardón tells you that

O365her4                    Summation - Mr. Stabile

he is a changed man.  He tells you, well, I am just telling the truth and trying to get a new lease on life.  The time I have spent in jail has made me change.  And Leo Rivera is killing people -- killing people -- the same month he starts cooperating with the DEA, including his own sister-in-law in Canada.  And when he was asked, do you feel any remorse for having killed her?  He says no, sir.  Giovani Rodriguez is so remorseful he is going on TV claiming his innocence after bribing a judge and now he is fighting to get his police pension in Honduras.  No problem.

Do they care about telling the truth?  Do they care about how many murders they accepted responsibility for?  Do they care if the government charges them with perjury for lying?  Of course not.  And in some ways, you can't blame them. It can't get any worse for them.  They are already facing life plus 30.  What are they going to get?  Double life?  They might as well go for it.  And what choice do they have?  There is no plan B here.  If they don't cooperate and give the government something big, the only other way they're leaving jail is in a coffin.

There is an expression a drowning man will grab even the end of a sword, meaning if you have no hope, you will do anything.

Look, you have a lot of tough questions ahead of you, I don't envy you I am sure any more than you envy me but where

do we draw the line here as a society?  Because if we don't draw it here, then where do we draw it?  Or is there a line?  Maybe there is no line.

How many murders are too many?  One?  Two?  Ten?  Fifty?  Two hundred?  How many tons of cocaine are too many?  How many lies are too many?  How many scams are too many?  How many years in jail are too many before you say I have had enough, I'm not going with this, I'm not believing these people.

Remember, these people are complete strangers to you.  They are complete strangers to you, you have never met them before.  Imagine if you met them out in a bar or in a Starbucks and they told you about some of things they did.  You would run.  You would not continue talking to them and you certainly wouldn't rely on them for anything.  Just because we are here in a nice room with wood paneling and a flag in the corner, don't treat them any differently than you would treat these people on the street.

Let me just remind you of one more thing before I move on from this.  These men were all trained to tell you that the outcome of this trial has no effect on whether or not they get their 5K letters or whether or not they get time-served.  Well, if that's true, and the outcome has no effect, why do they get sentenced after this case?  After the verdict is returned?  They want you to think that the outcome has no effect on what

will happen to them but do you think that they really believe that?  That's the question.

You know, I promised you at the beginning that you would see a copy of their cooperation agreements and I'm the one who put it into evidence and here it is on the screen and you can take a look at it.  And, you know, I went through this in the opening statement, that they're guaranteed no further prosecutions for anything that is in the letter, witness protection, that these prosecutors will speak to other prosecution offices on their behalf and the 5K letter, but the other thing that I told you in the opening that I want to point out for you is that the only way that they get the 5K letter is if they provide substantial assistance.  You do not get a 5K letter for telling the truth.  Now, there are provisions in here that says you have to tell the truth and be truthful in everything you do.  But you get a 5K letter for providing substantial assistance to the prosecution.

So let me move on to some of the other evidence you heard from the young detective named Miguel Reynoso.  A couple of points on him.  First, you heard evidence of the nine notebooks that were seized during the traffic stop recovered from the car, and you learned that after he was awake for more than 24 hours he sealed the notebooks in a plastic bag and he told you after he did that the bag was put away, it wasn't opened again until he brought it up to New York and opened it

with these prosecutors in their office.  But what is going on with the voucher that is up on the screen?  What was that all about?  You see and you heard that this stop and the seizure was on June 7, it is highlighted for June 7 at 3:55.  How come nothing is vouchered until June 20th?  Where is this stuff?  He didn't have an explanation for where that was.  And if this stuff stayed sealed in an evidence locker somewhere and it was never unsealed until it was brought to New York, what are these other entries for?  People are just taking a sealed bag in and out to, what, look at it and say, oh, that's still sealed?  OK.  Oh, still sealed.

Look, I don't know what was going on, I just have this document.  This document is in evidence but this is what was going on.  It's hard to explain, it's hard to imagine what was going on with the sealed bag of evidence but this is what you have.

Then he told you that he saw the initials JOH in the ledgers.  And now you know where I am going to go with this and they didn't talk about it at all, which was kind of shocking.

First of all, you know and he admitted that JOH could be anyone, male or female.  There is a very long list of names and in fact he testified that, yeah, JOH could be hundreds of different people with names that would fit JOH.  Right?  And he admitted that directly.  But then you saw in the ledgers the "La JOH" and you saw when the government puts this up they put

a red box around the JOH but they leave out the "La."  Right?
"La JOH" we had testimony on this, either refers to a female or
to a business.  We don't know.  One thing we do know for sure
is that it does not refer to a man and that it could not refer
to Mr. Hernandez.  He would not be La JOH.  Remember, El Chapo,
not La Chapo.  It is not La JOH for him.

And so then what was going on with the government's
translator?  Look, I don't think the government's translator is
like a bad person.  I don't think he came in here just to lie.
But when he was asked directly, you know, when you see this JOH
with the La JOH, you don't know what that is.  It could be a
woman, could be a thing, and he says correct.  But yet, in his
translation -- can we get this up -- yet in his translation,
despite the fact that it says La JOH, he translates JOH *isu*
*gente* into JOH and his people, knowing that that's the one
thing it can't be.  It can be JOH and her people.  It could be
JOH and its people.  But the one thing it cannot be, is JOH and
his people.

What else did you see?  You saw him change Hernandes
with an S to Hernandez with a Z.  And when he was asked were
you being accurate when he did that, he had to admit that he
wasn't.  Again, is he like a bad person?  I'm not saying that.
But he was doing translations for the government and he did
translations that support their theory.

So when you look at the translations and you know you

are going to have a bunch of translations that you can look at, remember when you review his other translation because he was here to put all those translations into evidence, just think, are these legitimate or are these slanted toward the government?  Sometimes people can only see what they want to see.

Here is something else about the ledgers that is interesting.  It is the money.  You know, there are references in the ledgers and you can look at them and you should look at them, where you see dollar signs and then you also see the word "lempiras" and you also see the "L" written after some of these numbers.  And, you know, did you hear any evidence about what the exchange rate between dollars and lempiras is?  I tried to ask their DEA expert Jennifer Taul but she said she didn't know.  She just didn't know.  So, I guess we don't know.  But if we don't know and you see lempiras, is that one dollar?  Is that fifty dollars?  Is it a thousand dollars?  You got zero evidence in this case about the exchange rate.  So pay attention, if you are going to look at these ledgers since you have no evidence of the conversion rate, what are these payments really about?  How much are they, really?  Are they payments of $200 U.S. dollars to La JOH?  That's bribing the president of Honduras?  You have no idea what those amounts are.  And, look, the amounts that have the La JOH, take a look and see if they're in the lempiras or if they're in dollars.

O365her4                    Summation - Mr. Stabile

They have the burden of proof I don't have the burden of proof. They could have put in evidence about the exchange rate. Their expert had no idea. OK, so she had no idea.

And speaking of Jennifer Taul, they flew her in from Hawaii. Did you catch that? There are no other DEA analysts qualified on the east coast, you had to bring somebody in from Hawaii who then, when we ask on cross-examination, she is not even a Honduran expert. She spent time in Venezuela, she spent time in Colombia. She spent, in her life, a month in Honduras. And she told you about the means and methods that drug dealers use to avoid detection and we talked about planes, we talked about tunnels, we talked about drones, we talked about submarines, we talked about helicopters, trucks, code names.

And then she also told you -- and I would show it to you on the screen, if I could -- but she also told that you in her experience it was common for drug dealers to use luxury brand logos on bricks of cocaine. Did you hear any evidence about people putting their actual initials on it? Why would you do that? After doing all of these things, getting submarines, are you going to go out and buy a submarine to transport cocaine but let me make sure I put my initials on it?

Did you hear any evidence of drugs seized in Honduras -- actually seized, not a photograph on somebody's phone -- actually seized in Honduras with a TH stamp? You saw a photo from when, who knows; from where, who knows; who took

O365her4                    Summation - Mr. Stabile

it, who knows.  That wasn't presented.

Look, not putting your initials on bricks of cocaine is kind of drug dealing 101.  When you are drug dealing here is a tip:  Do not put your initials on the drugs.  I know it's tempting because if they get lost somebody might return them to you but it is bad for business.  Obviously the "TH" stands for Tommy Hilfiger.  Ms. Taul told you, yes -- Gucci, Prada, Rolex, of course.  Tommy Hilfiger she agreed could be one.

Was there any evidence that Tony Hernandez -- think about this, this is the Tony Hernandez brand, right?  The TH, was there any evidence that Tony Hernandez was a name brand in the cocaine business?  That anybody wanted to buy the special Tony Hernandez cocaine?  That there were people in New York going around saying, hey, you got that Tony Hernandez cocaine?  There is no evidence of that.  Why would he brand it as -- nobody knows who Tony Hernandez is in New York or in the United States.  So what?  The Tony Hernandez cocaine?

(Continued on next page)

MR. STABILE:  (Continued) And then you also heard about something called Fountainhead, which was a DEA database in El Paso specifically designed to keep track of cocaine stamps associated with different drug traffickers.  Did you hear anything else about Fountainhead?  Did you hear anything about Fountainhead being used to determine if this cocaine brick, this picture, was linked to Tony Hernandez or if this cocaine, the TH brick, was found someplace else in the world or was found in Honduras or was found in Colombia or was found anywhere?  The DEA has the resources.  She told you they maintain a database.  When they see "Gucci," they try and track it throughout the world.  When think see "Prada," they try and track it.  It's a technique.  It's a legitimate technique, but didn't hear any evidence about that.

She also talked to you about the use of code names, and she told you, yeah, drug dealers speak in coded language to avoid detection by law enforcement because they're concerned that law enforcement might be listening in on their conversations and that they don't usually use people's full names in texts, texts, and that they try and hide what they're really talking about.  Think about all the code names you heard in this case:  Porky, El Negro Lobo, Metro, Rojo, Rambo.  But when you're talking about the president, your main partner in crime, your main man, the guy you're bribing, let's be sure to use his full name.  That's the right time to throw caution to

the wind.  When you decide, nah, we don't need a code name for him.  We'll just mention him by name on the phone, in our texts.

There's somebody else with an alias who you heard about in this case, El Chapo.  El Chapo supposedly traveled to Honduras to personally deliver a bag of cash to Tony Hernandez.  Now, you did not hear a lot about El Chapo.  It was just, I think, maybe one reference or two references.  But what did their DEA expert have to say?  Well, she testified that El Chapo was one of the most wanted men in the world at the time he is supposedly entering Honduras with a bag of cash to hand to Tony Hernandez.  Does it sound, from what you heard in this courtroom, that El Chapo is going to be entering another country carrying cash to go to a meeting with a bunch of other drug —— El Chapo himself is going with the cash?  That's his job?  Would he take that kind of risk when he's the most wanted drug dealer on the planet Earth?

You heard that he flew in by helicopter.  Well, you also heard that Luis Perez was afraid of the DEA Black Hawks.  There were DEA Black Hawks flying around in Honduras, but El Chapo said, no, let's take the helicopter today.  It makes —— I'm not trying to make fun because it's too serious.  And I know I'm —— you know, my tone gets sarcastic sometimes, but I'm not trying to make light of it.  I'm just trying to talk to you straight and ask you to use your common sense and your New York

street smarts and ask yourself, is this making any sense to you?

Now, here's something else that we saw from Jennifer Taul. There was some chart. Actually, at the time I was questioning her, I didn't get this chart, but then I looked at it at night. She told you that and her testimony was that the price of cocaine goes up as it becomes more difficult to traffic, right? I see that there's a large gap between the prices in Mexico and Honduras and the United States. Why would that be? Answer, there's a lot of risk involved. Again, it's dangerous to transport cocaine, to be able to cross it over into the United States. It's also much more difficult than to cross it into Mexico or cross it into Venezuela. Fair enough.

And I asked her, you know, it's the transportation costs that drive up the price after you manufacture the brick, because once you have the brick, like, it doesn't matter, right? You have the brick and everything else is transportation costs.

This I really do need on the screen.

So this was her chart. She created this chart, and look at what happens. I'm just going to isolate a part of it for you. Look at what happens between 2013 and 2016. Now, remember, Juan Orlando Hernandez becomes the president. He's elected at the end of 2013, and then he comes into office in 2014, right? Look at what happens to the difference in prices.

Now, you'll see that the prices go up across the board.  Actually, Colombia goes down, but look at what happens between 2013 and 2016.  So you have a price drop of 25 percent.  Mexico goes up 6 percent.  New York goes up 8 percent.  Ready?  The price in Honduras goes up by more than double anyplace else.  Why?  Because it was getting harder to transport.  Why?  Because of him.

This is their chart.  The numbers don't lie.  This is not my chart.  They put this into evidence.  And as I said, I actually didn't get it the first day.  I had to look at it, and I was like, wait a second, this is exactly consistent with what we've been telling you, that he dropped the hammer on them.  And so between 2013 and 2016, the price is jumping up more than double any of the other places on their chart.

And, by the way, they may stand up and say, oh, but you see the price then went down in 2021.  So why is that?  Why is the price going down?  Maybe he loosened up on, you know, intercepting drugs.  There's a little thing called COVID-19 that happened.  People weren't exactly in a party mood.  People weren't going to bars and restaurant.  Look, cocaine's a party drug.  Less demand, yeah, the price went down.  But in the operative period where there's no COVID-19, you see what's happening.  The price in Honduras is getting jacked up.

Now, before I get to this, let me just talk about Luis Perez, and I'm going to spend very little time on him because

he admitted he never met Juan Orlando Hernandez.  He's another drug trafficker.  And what really would have maybe stuck out to you is that he sounded like he was reading a script.  He said a lot of things about how he made multiple payments to Mr. Hernandez in exchange for protection.  He's the guy that had his best year ever and then leaves the country for some reason.  But the government just wants to gloss off —— gloss over that he said he never meets this man.  He never, ever meets this man.  He's paying money to someone, but he never meets this man.  And there's no evidence and he never said he ever paid Mr. Hernandez himself, and there's no real evidence that money was ever actually delivered.

Let me just talk briefly about Andrea Santos.  She came in here to identify some voices.  She wasn't a bad person.  She didn't come in here with any particular agenda.  I think I asked her two questions.  But she testified about remembering conversations from ten years ago.  Think about where you were in your life ten years ago.  Can you remember specific verbatim conversations that you had and pinpoint them to a specific year ten years ago?  Think about 2014 or 2013.  Can any of you think of a specific verbatim conversation that you know that you had in 2014 so well that you'd be prepared to swear under oath the year it happened and the contents of the conversation?  That is what the government is asking you to believe here.

And better yet, think about conversations from ten

years ago that you overheard two other people having.  She wasn't testifying about conversations she was in.  She was testifying about conversations she heard other people having.  Can you remember conversations that you heard other people having ten years ago with enough specificity and accuracy to swear under oath as to their contents?

Not only that, but she told you that she knew that Porky was the leader of MS-13.  So even if you say, well, but they were talking about drug dealing, of course that's going to stick out.  Not to her.  She knows who Porky is.  He's probably having drug dealing conversations all the time for all she knows, right?  It's not going to be any big shock to her, but she's remembering with such specificity these conversations.  Again, I'm not saying she's a bad person.  I don't know what her motivations are.  I'm not accusing her of coming in here to lie to you.  I don't know.  But what I do know is that her testimony is kind of hard to believe.

So Leo Rivera, he's the man who —— he's the one working for the DEA, so he's their guy.  He's their guy on the ground starting in November of 2013.  And he's a man who spends years of recording narco politicians, and this is what he said in his testimony.  He had a conversation with somebody and some man told him to start recording corrupt politicians, members of the military, police, and all the drug traffickers who had anything to do with drug trafficking.

OK.  Great.  And then he starts recording for the DEA.  And you would think that when Leo Rivera starts recording for himself and then when he starts, even better, recording for the DEA, that he would be as motivated as he's ever going to be.  At the time he signs up with the DEA, he is going to be motivated.  And you would think that he would do everything and anything to deliver something valuable to the DEA.  Why?  To prove his worth.  To say, guys, this is a good deal for you.  Keep it going.  Let's keep it going.  Because as long as they keep it going, they're not arresting him.  They're not indicting him.  He has every incentive to keep feeding the machine, keep giving them stuff, so he wants to give them good stuff.

So then he goes to this Denny's meeting with Tony Hernandez, supposedly, to talk about drugs.  And is there any conversation about drugs on that recording?  No.  Does he record Tony Hernandez talking about bribes?  No.  Does he record his handing over $50,000 in cash to Tony Hernandez?  No.

And then, if you can believe this, he tells you, oh, yeah, the $50,000 was my own money.  But you're working for the DEA.  They're not giving you the front money?  They're not marking the bills or something?  They're not conducting an investigation?  They know you're going to meet with the president's brother, and you had to put up your own $50,000?  The DEA didn't have marked $50,000 for this supposed bribe?  It

makes no sense, and it makes no sense because it isn't true. It didn't happen.

All right. The Denny's meeting. No mention of drugs on the recording, no mention of Juan Orlando Hernandez on the meeting, no video of this supposed $50,000 payment. Why go through the trouble of having this meeting in Denny's to record a bribe and then not record the bribe? Maybe because it didn't happen. Out of the thousands of recordings that Leo Rivera provided to the DEA, he has no recordings of Mr. Hernandez. He claims to have made bribes to Mr. Hernandez. So where are the recordings, right? If I'm recording narco politicians and if I'm cooperating with the DEA, you can bet that the No. 1 target, the No. 1 target I want to deliver on a silver platter to them, is the president of Honduras, if I can deliver that, but no recordings.

In fact, Leo Rivera told you that he deleted incriminating evidence even though he supposedly bribed Mr. Hernandez. Does that make sense? He was asked about a picture of Juan Orlando Hernandez and a drug trafficker, Neftali Duarte Mejia, and what he did he say? Oh, I changed cell phones, so I don't have that. That's convenient.

Just one last thing. I don't know if you caught this when he was testifying. The government asked him if he knew Mr. Hernandez by any other names other than Juan Orlando, and his response was really telling. I think some of you probably

caught this.  He said John, Jo, or Juancho.  He didn't say JOH. And so the questioning goes on.  The questioning goes on, and then at some point the government says:  Do you also know Juan Orlando by the nickname JOH?  And of course, he says:  Yes, sir.  I don't know what name he knew him by or didn't know him by, but he went off script there.  He forgot the playbook.  He forgot that they need him to be JOH because that's what's in the ledgers.  They see JOH wherever, so he's got to be JOH. But the guy forgot, and the prosecutor had to throw him a life preserver.

Let me talk briefly about Agent McNamara.  He talked to you about a multitude of records that were taken from Geovanny Fuentes' phone, his text messages, his calls, they had his iCloud account, his Waze GPS data.  If you take the FDR Drive tonight and drive by the United Nation, you might get a hit on Waze for the United Nation.  Does that mean you went inside the United Nation?  Of course not.

But you would think, if Geovanny Fuentes actually went into the presidential palace at the time they claim he did, there will some sort of record to show you, right?  There would be a sign-in sheet.  Remember, this is the Honduran White House we're talking about.  This is the Honduran White House.  There might be a sign-in sheet.  There might be surveillance video, security video.  There might be an ID that was issued to him. Maybe somebody took a picture of his ID.  You all know you need

an ID to get into lots and lots of buildings. You think you need an ID to get into the White House, or the Honduran White House? Probably. But you don't see any evidence. They just want to, you know, suggest, show you the Waze data, right?

This is what you saw. This was their report. This was the big moment, right? This means something. But then you heard testimony that in 2019 Mr. Hernandez's office was not there. It was two miles away. It was someplace else. And we put this map in for you and we showed you the distance. Now they came back and they said, well, but there are pictures there. Well, there are no pictures of him sitting at his desk. There are pictures of him in ceremonial-type rooms. Remember, the building itself was not under construction. The building next door was under construction, and there was dust and noise, and so they didn't want to deal with it. So they moved two miles away during 2019 and 2020.

And who did we bring to tell you that? We brought you a brigadier general of the Honduran military, flew all the way from Honduras. He came here to lie to you about that? That's what was going on here? You saw the man. You saw General Romero. You can evaluate his demeanor. He was military through and through. He is a serious man. He is all business. He did not fly from Honduras to put on some charade that they didn't really move or that they did move when they really didn't.

O36HHer5                        Summation - Mr. Stabile

Then you saw Mr. Hernandez's contact information in Geovanny Fuentes' phone and you saw that phone number, which we had to bring General Ramirez here to say, look, that is an old phone number.  That's the phone number that he used in 2010. He hasn't used it since then.

By the way, did you even see any phone records showing Geovanny Ramirez texting that number, calling that number?  No, they show you a contact and want you to speculate, imagine things that might be happening.  Not evidence.  It's a suggestion.  It's speculation.  One thing it definitely isn't is proof beyond a reasonable doubt, and we'll get to that in just a second.

Then they wanted to show you, well, but he had his Gmail account.  He had his Gmail account.  What's his Gmail? Did you catch it?  Juanorlandohernandez@gmail.com.  You never would have guessed that, right?  OK.  So that's his Gmail.  By the way, did you see any emails from Mr. Fuentes to Juan Orlando Hernandez?  Zero.  You saw zero.  They just want you to infer things.

Now, you did see some texts.  You did hear some conversations between drug traffickers, and let's take a look. You saw this where DEA Agent McNamara testified that these were drug traffickers talking about how to avoid wiretaps.  Drug dealers aren't stupid.  They know their business.  They know they're getting tapped.

Here they are.  Here's evidence of them actually talking about it, and when Special Agent McNamara was on the stand, he said:  Do you see them providing instructions of what to do here?  And he says:  Yeah, try to avoid wiretaps.  They know that their wires are up.  That's why they speak in code, but for some reason they don't speak in code when they're talking about him.  You know why?  Because he's not in.  They may be talking about him.  And as I told you in the opening, he's not some random person.  He's the president of Honduras.  Does anybody in this room talk about the current president of the United States?  Do you know him personally?  No.  You talk about him.  You might even have strong opinions about him.  You might even state facts about him that you believe or you read or you think.  Is that evidence?

Let's look at some of these other text messages.  These are claims about this, you know, sending an elite police team, right, to kill this Byron Ruiz, this mysterious figure, Byron Ruiz, which you see in both of these text messages.  Did you see Byron Ruiz's death certificate?  Did you hear any evidence that he was actually killed?  For all you know, he's alive and well.  Don't you think if they actually had evidence that an elite hit team went out to get him that they would have showed you that evidence?  I guess they weren't very elite.  There's no evidence he's dead.

And look at how inconsistent it is.  They're talking

O36HHer5                              Summation – Mr. Stabile

about — sorry.  They're talking about the Americans are on his tail, on the left, to capture him, and they sent an elite team to have him killed.  And then on the other side, they're searching for Byron Ruiz.  They just informed me, the ones who are with the Americans, they heard Juan Orlando gave orders to shoot him because it seems that he works for, Byron Ruiz, works for the brother of the president.

What does any of this mean?  It's just talk as far as you know.  There's no evidence that anything was actually done.  And I encourage you to read these texts and do what the government did, read them with each other, right.  You can do a little role-play and you can read the conversations.  They're gibberish.  You're going to see unintelligible, dot, dot, dot, all kinds of things.  They're snippets.  They're out of context.  You don't know what these people are talking about.  They half make sense.  Some don't make any sense.

What about this exchange?  These cooperating witnesses know the game.  They know how to do it.  They know how to get that golden ticket, that 5K, so that they don't have to serve the time that they should.  Look at these messages:  The gringos aren't even expecting him over here.  How do they say?  We'll lessen their punishment.  They know the deal.  They think that the Americans are stupid.  It's crazy.  All right.  Tell me.  What's going on?  What are they paying you?  And what can I help you, man, so you already exchanged me for somebody else.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

They're talking about the game that gets played.  How they're going to mess with the Americans, how they're going to mess with the gringos.  So, please, I encourage you, read the translations.  Go through it.

Let me talk to you about Fabio Lobo.  The government wants you to believe that Fabio Lobo is an honest individual who came here ready to tell the truth.  Now, why would the government, who itself conceded that Lobo has lied countless times, want you to believe him now?  Well, because now he serves their purpose.  He lied about his father's participation in drug trafficking.  He lied about his own participation in drug trafficking.  He lied —— he withheld information he had about other cartels.  His lies went on for years.

So why did it change?  It changed because now he wants to get out of prison.  You heard he was sentenced to 24 years, and he served six years.  He's like, I got to get out of here.  What can I do to get out of here?  One thing you can do, you are the son of a former president.  You probably could plausibly try to say something about this man.

So that's the plot.  And remember, he's in jail with Giovani Rodriguez.  They're talking.  Who knows who else he's talking to.  He knows some of the other players.  He knows what's going on.  He didn't have a change of heart.  He got sick of being in jail.

And he wants you to think that he's a close friend of

O36HHer5                          Summation - Mr. Stabile

Mr. Hernandez just because he's the son of a former president, but you saw him.  Did he look like Mr. Hernandez's contemporary?  No, he's a kid next to Mr. Hernandez.  Mr. Hernandez is a contemporary of his father.  He's not hanging out with Fabio Lobo the way he wanted you to think.

And General Romero told you, he said, look, first of all, I would not leave Juan Orlando Hernandez alone with anyone, right, unless he was standing right outside the door or something, because that was his responsibility.  He had presidential protection responsibility.

And then when —— and here it is.  You saw it, right?  We showed you these.  This is how —— this is how a president walks around.  This isn't any big surprise.  I didn't really have to put these into evidence, but I wanted you to get a sense of what his security detail looks like —— looked like, in Honduras, not —— pretty much what you would expect, right?  And these are just the people you see.  General Romero told you that there's, like, an expanded team that you don't see in these photographs.  There are other people, of course, just exactly as you would expect.  But when General Romero was asked, did Mr. Hernandez get into Fabio Lobo's car?  No.  Of course not.  There was no relationship with Fabio Lobo.

Let me turn to Tony Hernandez, because at the beginning of this case, I told you —— and you did, in fact, hear a lot about Tony Hernandez —— and I told you I'm not here

to defend Tony Hernandez.  I am not his lawyer.  This is not his trial.  But I'm going to make a few comments because the government hopes that if they keep repeating the name Tony Hernandez, you will take it as a given that his brother is somehow involved also.  That is classic guilt by association, and that is not fair.

Tony Hernandez is ten years younger than Mr. Hernandez and one of 17 siblings.  Did Mr. Hernandez care about his brother?  Of course.  Was he involved in drug trafficking with him?  Of course not.

And General Romero told you, based on your personal observations —— and, yes, they know each other since childhood, and the government says it like it's a bad thing.  We should all have childhood friends who are willing to step up.  That's a bad thing that they know each other for years and years?  It's not a bad thing.  He knows him well.  So he was able to talk about his life, and he was able to talk about the fact that Tony Hernandez and Juan Orlando Hernandez have a relationship that is not so close.

So what you heard about Tony Hernandez, if you choose to believe it —— again, I am not here to defend him —— is that he took money from drug dealers and told them that —— give me the money, and I'll make sure that Juan Orlando Hernandez, my brother the president, is going to protect you.  Is it so difficult to imagine that Mr. Hernandez's kid brother was going

around convincing people to give him money and then just putting it in his own pocket?  That's like one of the oldest tricks in the book.  Give me some money, and it will buy you influence with my brother the president.  Does that really seem farfetched, or does it seem that that is the more likely explanation?

Let me briefly talk to you about radar, because I know there was a moment a couple of days ago where you were like, why is the head of the Honduran Air Force in court?  The head of the Honduran Air Force, well, he came because there were these repeated references of getting "radar information."  And even though it doesn't make a lot of sense, in other words, what —— if I'm a drug dealer and I want to pay money for radar information, what is that information?  That there's radar?  You know, you didn't get —— it's like everything else in this case.  People say things, but you get no explanation.  But you had person after person getting up there.  This was —— Alex Ardón got up there.  He said in 2010 he paid for radar information.  And he was asked, why would it be helpful to have radar information?  For drug transportation by air.  I don't know what that means.

Luis Perez:  We were friends with people who controlled the radar in Honduras.  That was from 2012.  If you look a little higher in his testimony, you'll see that he's referencing 2012.

O36HHer5                    Summation - Mr. Stabile

Fabio Lobo, same thing:  Oh, we wanted help with radar information.  This was in 2013.

So we brought to court Brigadier General Barrientos, the commanding officer of the Honduran Air Force, a fighter pilot himself, to tell you that Honduras did not have functioning radar from 2004 to 2015.  Who fixed the radar?  That man.  In 2015 he bought three radar units for Honduras so that they could pick up the drug planes.

Checkpoints.  You heard witnesses talk about checkpoints as if there's only one road in Honduras.  And you heard multiple witnesses say, well, you know, we've got checkpoint information.  But did you get any specific details about what they got?  Was there one episode where any witness got on there and said, yeah, you know, we were transporting drugs —— oh, that's our radar screen —— we were transporting drugs from point A to point B, and we were alerted that there was a checkpoint.  And so what we did is we diverted and we went around and we did whatever.  You didn't hear any specific details about how that worked.  What checkpoint information did they get?

And you also heard that there are temporary checkpoints and there are permanent checkpoints.  Well, let's talk about the temporary checkpoints.  You heard that checkpoints can move hourly, daily, weekly.  And think about what would have had to happen for drug traffickers to have that

information.  There would have to be phone calls, multiple communications:  Where's the checkpoint?  It's here.  OK.  Thanks.  Let me call my guys driving the truck.  A whole series of phone traffic.  Where are those call records?  Where are those text records?  Where are all the communications that you would need to avoid a checkpoint?  You didn't get it because they're making things up.  They weren't — they didn't — that didn't happen.  They can't give you any details about it.  They didn't give you any.  It's their responsibility to bring those details to you.  They didn't do that because they don't have it, because then if you start making up checkpoints, then, watch, again, you could get records from the military.  No, there were no checkpoints there, right?  So don't get into the specifics.  That's the name of the game for all of these cooperators.  Keep it vague.  Keep it surface.  You can't get blown up if you do that.  Nobody can call you out.  Nobody can challenge you.  And they get away with it.

Now, finally, you heard the testimony from Mr. Hernandez himself, and absolutely he had no obligation to testify.  He had the right to sit here and not say a word, but he wanted to speak up.  He wanted to set the record straight.  Just like he stood up to these drug dealers in Honduras, there was no way that he was going to sit here and let them lie about him in court and say nothing.  That was not going to happen.  He has been fighting these people for years, and he was not

going to stop fighting now.

So, yes, he took the stand so that they can't get away with this, so that they can't get back onto the street by peddling these stories.  That's who he is.  You wouldn't expect anything different from him.

And I already showed you the quote, but I'll repeat it because I really think it's the truest and best line in this entire trial.  "The promise was that we were going to terminate them."  They knew that, and he did that.  They're all in jail.  Whether they were extradited or whether they ran into the arms of the United States, every single major drug dealer in Honduras is in jail.  That's the bottom line, and now they want to drag him into jail with them.

And you heard testimony about all the things that he did.  Remember in my opening I showed you a timeline and I said there's going to be evidence of this, and there was.  And I would put it up because I have it, of course, on a slide, but when he was in the National Congress, there was the reform of the Constitution to allow for extradition.  There was the law for the seizure of assets.  There was the creation of ports against organized crime.  There was a special tax to strengthen institutions for public security.  There was a law allowing for deprivation of property of illicit gangs.

When he was the president:  24 extraditions, military police of public order, reform of National Police, TIGRES

O36HHer5                         Summation – Mr. Stabile

unit, Technical Agency of Criminal Investigation, national anti-extortion forces, national force against Maras and gangs, national Department of Investigation and Intelligence, national security interinstitucional force FUSINA, and the prohibition of two men on motorcycles, and we heard a little testimony about why that was.

And so what do you see in the text messages?  Oh, here they are.  This is what I told you you would see, and this is what you heard testimony about.

And what was the result of all of these things?  Well, look at the text messages.  Government wants to spin them one way, but look at what these drug dealers are saying:  "It's the end for these people, comanche.  Prosecutors and adding Mr. Ramirez, they are crucifying me.  They are crucifying me.  It's a shit show."  Excuse my language.  "It's a fucking disaster."

Of course the government is going to call him a liar, but you got to look him in the eye.  You got to judge his demeanor.  You got to hear how he responded to questions.  Was he being evasive?  If anything, he was trying to give too much information.  That was his problem during his testimony.  He was trying to say too much, not hold back.  He was trying to give too many details.  He wants you to hear it all.  He wants you to hear everything.  You heard his testimony about meeting with the DEA, Department of Homeland Security, U.S. Embassy,

O36HHer5                          Summation – Mr. Stabile

White House.  But the government wants you to believe that he's just — and they called him this — that he's just some drug dealer trying to fool the United States.  But if that were true, why go to all these meetings?  Why make it look so good?  Your predecessors didn't seem to do all of those meetings.  Why make such an effort?

And the government tried to cross-examine him on the fact that there were some extraditions that went to the Honduran Supreme Court.  Remember, drug dealers have lawyers too.  There are lawyers in Honduras that will help them fight extradition.  So, yes, cases can end up in the Supreme Court.  And just because the U.S. seeks extradition, just because Honduras takes steps to honor those requests, it doesn't mean that it just happens immediately.  Things can get into the court system.  Their lawyers are going to fight like heck to prevent them from getting extradited.  Don't be fooled into thinking that extradition is something where the U.S. snaps its fingers and people magically appear in the courtroom.  Some cases are going to take more time than others.  But you didn't hear any evidence, zero, zero evidence, that Mr. Hernandez refused any extradition request of the United States.

But it's all for show.  Why not just stay home and count your drug money?  Why bother doing all this?

Look, as I said, you did hear a lot about Tony Hernandez.  I just want to say, please, please, do not hold him

responsible for anything that Tony Hernandez may have done.

THE COURT:  All right.  You have nine minutes left.

MR. STABILE:  The defendant is presumed innocent, and you take that presumption with you into the jury room.  The default in this case is the presumption of innocence.  It is the baseline, and it takes a lot to change it.  The government bears the highest burden in our legal system: proof beyond a reasonable doubt.  There are no maybes, could bes, or even probablies in this case.

So when the United States government walks into court without enough evidence and wants you to convict somebody, you get to say no.  You get to take a stand.  It is one of the few things as citizens that we have 100 percent complete control over.  Nobody can tell you how to vote in an election and nobody can tell you how to vote as a juror.  They don't have a say.  I don't have a say.  Most respectfully, the judge doesn't have a say.  Only you have a say in this verdict.  That's why the jury system in the United States is so important.

I am a proud American lawyer and you can be a proud American, but that doesn't mean that you blindly have to accept everything that the United States does.  One of the things that makes America so great is that we have the freedom to be critical.  We have the freedom to speak out.  We have the freedom to call it like we see it, to stand up and say something and do something when we see something that isn't

right and not be afraid of the repercussions. You're in that position right now. You get to stand up. You get to make the decisions. You get to draw the lines in this case. You get to decide if there's a line after which you're no longer going to accept the testimony as true, and you get to decide whether or not you reject and say, no, I reject this. When you overlook the details and let anything pass for evidence, that is when people get wrongfully convicted.

If you have the slightest amount of reasonable doubt, the very slightest amount, I mean —— let me just —— the very slightest amount, right, if you have that amount of reasonable doubt, it is a not guilty verdict. If you have that amount of reasonable doubt —— I put some numbers on the screen. If you have .0000, and I can't say them all, 1 percent reasonable doubt, that is a not guilty verdict because they have to get beyond a reasonable doubt. I didn't make that up. That's the law.

So when you go into that jury room, you'll have a verdict form. We are asking you to check not guilty for all three counts. And if you find him not guilty on Count One, you must find him not guilty on Count Two, on Count Three, because they depend on Count One. We are not asking you for two out of three. We're asking you for not guilty on all three counts. This man has been wrongfully charged. I'm asking you not to make this a wrongful conviction. I'm asking you to find him

not guilty on all counts.

This is not going to be an easy decision.  There may come a moment in the jury room where you will have a crisis of conscience when the hour comes and each of you has to look deep into yourselves, look at your own conscience, and make that decision.  You will return with a verdict, and we will all leave each other for the last time.  And then you will go home, and you will see your family and will return to your lives.  And when the sun sets on that day that you reach your verdict, the best verdict that you can reach, I hope that it is the right verdict for you and the one that lets you rest easy.

Thank you.

THE COURT:  All right.  Thank you, Mr. Stabile.

Ladies and gentlemen, we'll take a brief recess.  When you're finished with the recess, which should be ten minutes or so, please flip your light on.  We have a 30-minute rebuttal summation and then my instructions on the law.

Thank you.

(Jury excused)

THE COURT:  All right.  We are in recess.  Thank you.

(Recess)

THE COURT:  Remain standing for the jury, please.

(Jury present)

THE COURT:  All right.  Please be seated.

Is the government going to make a rebuttal summation?

MS. TARLOW:  Yes, your Honor.

THE COURT:  All right.  Please be seated.

MS. TARLOW:  Thank you, your Honor.

Ladies and gentlemen, you just heard defense counsel make a lot of arguments.  I want to take a step back and talk to you about what the evidence actually shows in this case.

The defendant took millions of dollars in bribes from drug traffickers, bribes that fueled his rise to power, and in return he gave those drug traffickers access to information about drug operations, access to military in Honduras.  He helped protect their drug shipments, and he helped protect them.  He knew exactly what he was doing, and he knew that it was wrong.

Now, it is the government's burden alone to prove the charges beyond a reasonable doubt, and we embrace that burden. The defense is not required to make a single argument, but when they do, it is your duty to scrutinize those arguments carefully, to ask yourself whether those arguments make any sense.  They don't, so let's talk about why.

I'm going to start with one of the last arguments that defense counsel raised.  Defense counsel just stood up here and argued that the defendant tried to fight drug trafficking in his country.  Ladies and gentlemen, the defendant was the president of Honduras.  Do you think that he was going to publicly say, I am the president of Honduras.  I support drug

trafficking?  Do you think that his official presidential policies would be I want to make sure that lots of cocaine gets sent to the United States?  Of course not.

And defense counsel said why did he make such an effort?  Why did he meet with people to talk about drug trafficking?  Well, he needed to make it seem like he was trying to fight drug trafficking, that he was trying to stop the cocaine that was ravaging his country, that was flooding into the United States.  And here's the thing.  It just doesn't matter if the defendant agreed to extradite some drug traffickers or pass some laws or put into place some programs that were supposed to fight drug trafficking, because you heard and you saw the evidence, the witnesses, the recordings, the photographs, the drug ledgers.  You heard about how behind closed doors he supported drug trafficking, how he told one of his drug trafficking partners, in words that he never thought would be uttered in a courtroom, that he wanted to shove the drugs right up the noses of the gringos, the Americans.

And you heard from the government's expert witness how the volume of cocaine through Honduras went up during the defendant's presidency, from 2014 through 2022.  You heard from other witnesses how it was the most profitable year in Honduras for drug trafficking for the Sinaloa Cartel.  And witness after witness told you how no drugs were seized in Honduras.  That is devastating evidence that shows the defendant worked closely

with some of the most powerful drug traffickers in Honduras.

Now let's talk about a few of the specific things that the defendant claims he did to fight drug trafficking. I want to talk about the extraditions. You've heard a lot about those. You heard the defendant supported a law to extradite drug traffickers, but it wasn't because he was so intent on making sure that justice needed to be served. You heard from many different witnesses who came in here, and they told you the defendant felt pressure to support a law allowing extradition, but he really wanted to eliminate it after it was put into place. And he assured them that that law, it wasn't for his people, it wasn't for the traffickers he protected, it wasn't for the ones who stayed quiet and who stayed in his good graces.

And you know that was true because you also heard about who the defendant approved for extraditions. He extradited the traffickers who were causing him trouble, the Valles, for example. For a time, the Valles gave him money, and he protected them. But then what happened? You heard they tried to murder mayors in Copán. They started drawing too much attention to themselves. He seized their properties, and then they tried to assassinate him. Their extradition doesn't show that the defendant was tough on crime. It shows he was tough on his enemies. The Valles were extradited because they lost the protection of the defendant.

And you heard about how the defendant wasn't exactly the rubber stamp for extraditions that he said he was. You heard what happened to the people in his inner circle, how they were treated differently. You heard from five drug traffickers who were part of that protected crew. Not a single one of them was extradited to the United States. Why? You know the answer to that, because the defendant was on their side. They operated untouched.

You also heard about other Honduran drug traffickers who were not extradited, the defendant's close allies; his family; Tony Hernandez, his brother who was a drug trafficker; Fuentes Ramirez who the defendant worked with to traffic drugs; Mauricio Hernandez Pineda, his cousin who helped protect Tony Hernandez's shipments. Not a single one of those traffickers was extradited to the United States. Does that seem like just a coincidence? Of course not. They also had the defendant on their side.

(Continued on next page)

MS. TARLOW:  (Continuing)

And you heard about how extradition requests were made when the defendant was in office, that there were still pending three, four years after he was in office; how requests to extradite Tigre Bonilla, the man who helped murder a drug trafficking rival Mario Calix, the mayor of his hometown who attended the meeting where Chapo gave the $1 million bribe for his election and all the others were in 2018 and 2019, how by the time the defendant left office in 2022, those requests, they were still pending.  So the defendant's use of extradition was selective and it was intentional.  It just didn't apply to those who he wanted to keep safe.

Defense counsel also stood up here and made an argument about how that there were no arrests in Honduras because he didn't make any arrests because then that would mean he couldn't extradite them.  That just doesn't square with evidence that you heard.  You heard a witness testify, say that in fact arrests could be made, they would serve their imprisonment but then they could be extradited.  That is just consistent with the evidence in this case and it is not an excuse for the defendant.

Defense counsel also argued that the traffickers who gave him bribes never got any benefits.  But you heard concrete things that he did for him.  You heard about how with the defendant's help the Cachiros received advance warnings from

the military about operations.  You heard in recorded phone conversations that the defendant gave a gift of a drug trafficking route to the Cachiros.  You heard that the Sinaloa Cartel's drug trafficking thrived the first year that the defendant took office in 2014, it was their most profitable year yet.

You heard the defendant helped expunge Fuentes Ramirez' record after his drug lab was raided, helped him get military supplies like that green rifle.  You saw military contacts in Fuentes Ramirez' phone just like the defendant promised that he would give him.  And you heard the drug traffickers who testified at this trial that with the defendant on their side, they had nothing to fear.  Their shipments were never seized, they were never arrested, and they were never extradited.

Was that because the defendant, the president of Honduras, really couldn't have anyone investigated or arrested? Couldn't have any drugs seized?  That just defies common sense. And you heard about what happened to those who didn't obey, who didn't fall in line, how Arnaldo Urbina didn't follow the defendant's orders to keep a low profile how he ran for election and he was arrested.  We talked about the Valles, how we extradited them.  How the defendant gave orders to shoot Byron Ruiz.  That was the person, the drug trafficker was mentioned in the recording that we have been talking about

today, the person who worked with Tony Hernandez, and how the defendant was worried that he and his brother would be exposed.

The defendant had the power of the military, the police. He used it when he wanted to and he used it against whoever he wanted to.

Defense counsel also just got up here and spent a long time trying to convince you that the witnesses in this case were liars, that they had reasons to lie. And he started with José Sanchez.

Now, you will remember José Sanchez was the first witness in this case and his testimony was devastating for the defendant. He took that stand and he told you how he was an accountant in Honduras and that he fled Honduras after he saw the meetings where Fuentes Ramirez, that Honduran drug trafficker and the defendant, talked about their drug trafficking activities, that he no longer felt safe in Honduras.

Defense counsel tried to argue that Mr. Sanchez shouldn't be believed, it wasn't believable that he would be there, but he told you very specifically about why he was there, the purpose he was there, that he was there to exchange the U.S. dollars into lempiras because the defendant was concerned about having U.S. dollars and he was there to help with the transactions of the cash.

Why would he make something up like that? Ask

yourself that.  Why would he make that up?  If he were lying, wouldn't he come up with some bigger, more elaborate role for hisself?  Why would he make up the tiny role?  And he talked about the specifics of that meeting in such great detail.  AUSA Gutwillig told you, and you will remember, where the furniture was placed and who was where.  How could he make that up and why would he make that up?  Ask yourself, what would his incentive be to make something like that up?

I want to talk about the other witnesses that defense counsel has focused on including the cooperating witnesses.  And those cooperating witnesses, some of them, have done terrible things.  There is no question about that.  But those are the defendant's partners, that is why the witnesses are testifying.  It would be easier if the government could always call girl scouts and choir boys as their witnesses but unless those girl scouts happen to be sending massive quantities of cocaine to the United States, or riding around in armored trucks with machine guns, they just aren't going to be in a position to tell you about what the defendant did.  So people who have committed serious crimes are the ones who know about the defendant's serious crimes.  That is just how it works.

Let's talk about the defense counsel argued that they had some incentive to lie.  You heard these witnesses tell you that they have every incentive to tell you the truth.  They cannot lie in court.  If they do lie, they are facing more

time.  So ask yourself the more important question:  What is the one hope that these witnesses have of getting out of prison?  Testify truthfully.  That is it.  Period.  End of story.  If they lie, we rip up their cooperation agreement. The judge is required to sentence them to at least their mandatory minimum.  You heard that that is life plus 30 years for Alex Ardón.  The same for Leonel Rivera.  If Fabio Lobo lies, he can be charged with another crime, perjury.  He is already serving a 24-year sentence.  Rightfully so.  He used his proximity to power to traffic huge amounts of drugs, just like the defendant, and just like Fabio Lobo's father.  But he got on the stand in this courtroom full of strangers and he implicated his father, another former president, in drug trafficking.  Think about that for a second.  Do you think he wanted to do that?  Do you think he would have done that if he were just lying about the defendant?  Of course not.  These witnesses had an incredible incentive to tell the truth.  If they lie even once, they gain nothing and they lose everything.

Think about the risks they have taken to just testify here.  They were terrified to come forward with their information about the defendant, they knew it would mean exposing his massive cocaine operation, and why would they put themselves through all of that risk if they were just going to lie and spend the rest of their lives in jail?

By the way, if all of these witnesses were going to

lie, wouldn't they have done a better job of it? If their goal was to just make up stories to frame the defendant as defense counsel has suggested, wouldn't they have made up better stories? Wouldn't Giovanni Rodriguez, that Honduran national police officer, have said he had face-to-face meetings with the defendant about trafficking cocaine?

Wouldn't Alex Ardón have said that he trafficked drugs directly with the defendant and not Tony Hernandez?

Wouldn't Luis Perez have told you that he gave his campaign contributions directly to the defendant?

Wouldn't Fabio Lobo have told you that he picked up the millions of dollars from the Valles with Juan Orlando and not Tony Hernandez?

Your common sense tells you they didn't say those things because it wasn't the truth, they said those things because it was. They had every incentive to tell the truth and their only hope of getting a reduced sentence is by doing so.

Now, you also know they were telling the truth because their testimony fits together in big and small ways. Defense counsel tried to poke some holes in their testimony, I'm just going to talk about one of them. I think he mentioned something about radar information and that Fabio Lobo and Luis Perez had to be lying because there was no radar information in Honduras. I am sure you remember that argument.

Now, you heard an officer take the stand and say that

there was no radar used by military in Honduras.  Do you really believe that, that airplanes were flying around without any radar, zooming around in the sky at high speeds?  That sounds really dangerous.  And in any event, even if you were to believe that, Luis Perez told you something.  He said he started using helicopters in 2014 and 2015.  That was around when the defendant's own witness said they did get radar information so it would be consistent.

Now let's talk about some other ways that the witnesses corroborate each other.

There were five witnesses who testified about their drug trafficking with the defendant.  Defense counsel said that there were zero degrees of separation, that they all were tightly interwoven, they must have collaborated and colluded with each other.  That's just wrong because you heard really small details -- I am sure you have heard when you are paying attention -- that showed how far apart in fact some of them were.  Let's talk about a few of them.  OK?

Fabio Lobo and Luis Perez, they told you about certain meetings that where they were both at and where the Sinaloa Cartel discussed that they would be giving campaign contributions to the defendant.  Now, you will remember Fabio Lobo, he listed off a number of names at that meeting and he said, oh, there was someone else, I can't remember his name, I'm not sure who he was.  That was Luis Perez.  Do you think

that they knew each other and they collaborated and colluded when Fabio Lobo took the stand and couldn't even remember the other witness' name?

I'm going to give you another example.  Alex Ardón testified about the meeting when he got the $1 million bribe from Chapo from the Sinaloa Cartel for the defendant.  And you also heard Luis Perez, how he on behalf of the Sinaloa Cartel, was the source of that money, how he provided that $1 million.  And he told you that he heard secondhand, through the Valles, about the meeting that it happened, that the money had been given, that the defendant had promised protection in return to the Sinaloa Cartel.  And he said some of the people who were at the meeting and he said there was the mayor of El Paraiso, "Alex Rendon."  Now, you know that was Alex Ardón, right?  They weren't colluding, they didn't know each other very well, it was a mistake he made and those are the kinds of mistakes that you know he was telling the truth.

There were other consistencies, many consistencies in the witness' testimony, I won't go through all of them but there was a common theme that the witnesses said that the defendant told them that they had to be discrete.  Witness after witness said that, they couldn't be too loud, and that when they would be discrete they would be rewarded.

You also heard how the witnesses' testimony was corroborated by other forms of evidence in this case.  I'm

going to give you a few examples.  You heard a recording where two MS-13 members talked about how Leonel Rivera had received drug trafficking routes from the defendant as a gift.  I mentioned those before.  Those recordings were in 2015 after Leonel Rivera had already surrendered.  Do you think he was telling them what to say on the recordings directing them from prison?  Of course not.

And you heard a recording where two MS-13 members talked about how the defendant had received drug bribes from the Valles, millions of dollars, the same bribes that Fabio Lobo and Luis Perez told you that they had given to the defendant.  Do you think that was just a coincidence?

And wait, one more coincidence before we move on.  In 2018, a drug trafficker in Honduras gets caught with guns, grenades and a ledger that just so happened to contain the defendant's initials.  That would be an incredible series of coincidences.  That would be impossibly bad luck for the defendant because it isn't possible.  It is absurd.  These aren't just coincidences, there is overwhelming evidence from entirely independent sources that show the defendant is guilty.

Now, defense counsel spent a lot of time hypothesizing about the types of evidence that could exist to show the defendant's guilt and I expect that Judge Castel, whose instructions control, will tell you that the government does not need to prove its case in any particular way.  There is no

requirement that the government do any of the things that defense counsel has suggested the government should have done. The government has the burden of proving the defendant's guilt beyond a reasonable doubt.  That is our responsibility, the burden never changes.  But let's talk about the types of evidence that defense counsel says were missing.

First, defense counsel mentioned the recordings of meetings with the defendant and in particular he focused on the recordings that José Sanchez said existed.  But you heard what happened to those recordings.  You heard José Sanchez tell you that he gave them to the Honduran prosecutors and the Honduran prosecutors were murdered.  Do you really think that the recordings themselves survived?

Now, José Sanchez also said he had a copy of the recording and it got lost.  Now, ask yourself again, do you think that José Sanchez was lying about that?  Do you think he would have told us that the recording existed only just to say that he had lost it and that that was a lie?  That just doesn't make sense.

Defense counsel also talked about recorded phone conversations, e-mails, or messages.  You heard that the defendant conducted his meetings in person, that he discussed his plans to protect drug traffickers in person.  Doesn't that make sense to you, that the president of a country wouldn't want to get caught on the phone or in an e-mail planning to

take drug bribes?

Mr. Hernandez was careful.  He was trying to be discrete, the same way he told the drug traffickers who he protected that they needed to be.

Defense counsel also talked about how you didn't see any records of the defendant's bank accounts showing the bribes he received and how that supposedly means he wasn't receiving any bribes.  But this is just common sense.  When people use bank accounts, what do you think those records look like?  Do you think they go to the teller with their little deposit slip and write "bribe from Chapo" in the memo line?  Do you think they send wire transfers to their cocaine suppliers with the subject:  "Payment for drugs"?  Of course not.

Defense counsel argued that there were no specific details from the cooperating witnesses and that's how you know that they were lying.  But you did hear specific details, you heard --

THE COURT:  You have nine minutes left.

MS. TARLOW:  Thank you, your Honor.

You heard about where meetings took place, you heard about how money was transferred, you heard about very specific things that they remembered because these were important memories in their lives.

Defense counsel also said you didn't see any drugs on the table.  Well, you know the answer to that one.  You know

why there are no drugs on the table.  Because the defendant made sure of it.  He made sure that it were no seizures.  He controlled a massive cocaine operation.  He used his power and authority of the presidency to make sure cocaine wasn't seized.

Now I want to talk about some of the evidence that you did see aside from witness testimony and we have talked a little bit about it.  Let's talk about the drug ledgers, the drug ledgers that were seized in June 2018.  The defendant's initials were on multiple pages of that ledger.  They were on a page that AUSA Gutwillig showed you that said Expenses Received for a Nava Job, a Navajo airplane loaded with cocaine.  Do you think that his name was listed there because the drug trafficker had to repay him for fuel for maintenance of a plane?  Of course not.  That was a payment in connection with that shipment.

Defense counsel raised a lot of arguments about why the initials "JOH" wouldn't refer to the defendant in this case but then also argued that you should ignore the drug ledgers because they must have been tampered with in some way when they were taken out of the vault.  But they can't have it both ways.  It can't be that "JOH" doesn't refer to the defendant and that "JOH" was added somehow to the notebooks to frame him.  That doesn't make sense.  It is not surprising they tried to make all of those arguments because those ledgers are devastating evidence.

Defense counsel argued that "JOH" referred to someone else because on one page the word "La" was in front of "JOH" so it must be a reference to a woman.  But you heard the expert witness that that could be modifying something other than the initials JOH, it could be referring to something of JOH, something that JOH had, not JOH himself.

And let's talk about how you know that it was JOH in those ledgers.  You heard those were his initials that were used to commonly refer to him.  And you also know it was him because of the context in the rest of the ledgers.  You saw the ledgers have reference after reference to Tony Hernandez, the defendant's brother and drug trafficking partner.  You heard from multiple witnesses that Tony Hernandez was drug trafficking partners with Wilson, the person who those drug ledgers were seized from.  And you heard that Wilson gave the defendant millions of dollars for the defendant's campaign so it makes sense that it was him in those ledgers.

Defense counsel also argued that the ledgers were tampered with because they were removed from the vault, but Detective Reynoso told you that when he seized the letters he reviewed them, and after he reviewed them he saw the defendant's initials on them, right afterwards.  So it doesn't matter it if they were taken in and out of the vault because the initials were there on the day that the ledgers were seized.

I want to talk about a few other pieces of evidence you saw that were not witness testimony.  You saw messages and recordings about how the defendant was helping his drug partners, the message between Fabio Lobo and Leonel Rivera where they talked about how the defendant was going to help the Cachiros avoid property seizure, a video of Leonel Rivera and another drug trafficker talking about how the defendant said everything would be OK with their situation, their drug trafficking.  And you saw those recorded phone conversations, the ones about how the defendant had received drug bribes, those are Government Exhibit 403 through 406.

You will remember some key points.  They discussed that the defendant received millions of dollars from drug traffickers.  The phone conversations talked about the defendant had gifted, as I said, drug trafficking routes to the Cachiros to use to transport their cocaine and the people on those calls talked about how the defendant gave orders to shoot another drug trafficker because the defendant was worried the drug trafficker would get caught and expose the defendant. Those calls were explicit, they were not ambiguous as defense counsel has argued, they leave nothing to your imagination. They are devastating proof of the defendant's guilt.

And you will remember what happened when those calls were leaked, when they became public.  You saw a message between Fuentes Ramirez, the Honduran drug trafficker who the

defendant met with and received bribes from.  He had exchanges and he said these calls have been leaked, this is going to be a disaster.  Why?  Because they were all in it together, because it risked exposing all of them, including the defendant.

Now, the defense talked about the standard here beyond a reasonable doubt but to hear the defense talk you would think that that standard is an impossible one to meet.  It is not.  It is not meant to be.  The standard is not guilty beyond all doubt, it is guilty beyond a reasonable doubt.  That is our responsibility -- the government's -- and we embrace it.  But keep this in mind:  It is the same standard that is applied every day in criminal cases across the country.  It is the standard that has been applied in every criminal case in the history of this country.  It is not magic, it is just what the evidence shows and you have seen that evidence again and again in this trial.  The videos, the photos, the witness testimony, the drug ledgers, the messages.  You know that it all fits together to show that the defendant is guilty beyond a reasonable doubt, that for years the defendant exploited the political system in Honduras to protect the drug trafficking business that he and his partners operated.  He used the military to protect cocaine shipments, he used the police to try and murder rivals and protect cocaine shipments, he used his own power to protect his drug trafficking allies.  But all of that power and prestige mean nothing in this courtroom.  It

O365her6                        Charge

is time for you to hold the defendant accountable for his

crimes, to return a verdict of guilty.

THE COURT:  Thank you, Ms. Tarlow.

Members of the jury:  You have now heard all of the

evidence in the case, as well as the final arguments of the

parties.  We have reached the point where you are about to

undertake your final functions as jurors.  You have paid close

attention to the evidence and I am confident that you will act

together, with fairness and impartiality, to reach a just

verdict in this case.

It has been my duty to preside over the trial and to

decide what testimony and evidence was relevant under the law

for you to consider.  My duty at this point is to instruct you

as to the law.  It is your duty to accept these instructions of

law and to apply them to the facts as you determine them.

If any attorney has stated a legal principle different

from any that I state to you now in my instructions, it is my

instructions that you must follow.  You must not substitute

your own ideas of what the law is or ought to be.  You are not

to infer from any of my questions or rulings, or anything else

I have said or done during this trial, that I have any view as

to the credibility of the witnesses, the weight, if any of the

evidence, or how you should decide this case.

I will give you the typed text of these instructions

for your use in the jury room.  It is possible that there is a

slight variance between the words I have spoken and the typed text that I will give you.  It is the words I have spoken that control over the typed text.

As members of the jury, you are the sole and exclusive judges of the facts.  You pass upon the evidence, you determine the credibility of the witnesses, you resolve such conflicts as there may be in the testimony.  You draw whatever reasonable inferences you decide to draw from the facts as you have determined them.  You determine the weight of the evidence.

You have taken the oath as jurors and it is your sworn duty to determine the facts and to follow the law as I give it to you.  It is the duty of attorneys to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible.  Therefore, you should draw no inference from the fact that an attorney objected to any evidence, nor should you draw any inference from the fact that I sustained or overruled an objection, nor should you draw any inference from any statement I have made to counsel.  It is my job to supervise the ordinary conduct of the trial.  That's what I do.

Your verdict must be based solely upon the evidence developed at trial or the lack of evidence.  The parties in this case are entitled to a trial free from prejudice about a party's race, religion, national origin, sex, age, or political views.

Our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.  You must resist jumping to any conclusion in favor or against a witness or party based upon unconscious or implicit bias.  Unconscious or implicit biases are stereotypes, attitudes, or preferences that we have that can affect how we evaluate information or make decisions.

Similarly, under your oath as jurors, you are not to be swayed by sympathy.  Once you let fear, prejudice, bias, or sympathy interfere with your thinking, there is a risk that you will not arrive at a just and true verdict.  Your verdict must be based upon the evidence or lack of evidence and the Court's instructions on the law.

The fact that the prosecution is brought in the name of the United States of America entitles the government to no greater and no lesser consideration than accorded to any other party it a litigation.  All parties, whether the government or an individual, stand as equals under the law.

The defendant in this case is Juan Orlando Hernandez, who has entered a plea of not guilty to the indictment.  As I told you before, the law presumes the defendant to be innocent of all charges against him.  The defendant is to be presumed by you to be innocent throughout your deliberations until such time, if ever, that you, as a jury, are satisfied that the government has proven the defendant's guilt beyond a reasonable

O365her6                      Charge

doubt.

The presumption of innocence alone is sufficient to require an acquittal of a defendant unless and until, after careful and impartial consideration of all the evidence, you as jurors are convinced unanimously of the defendant's guilt beyond a reasonable doubt.

The question that normally comes up is, what is reasonable doubt?  The words almost define themselves.  It's a doubt founded in reason and arising out of the evidence or the lack of evidence.  It is doubt that a reasonable person has after carefully weighing all the evidence.  Proof beyond a reasonable doubt must, therefore, be proof of such a convincing nature that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs.

Proof beyond a reasonable doubt is not proof beyond all possible doubt.  Reasonable doubt is a doubt that appeals to your reason, your judgment, your experience, your common sense.  It's not caprice, whim, or speculation.  It's not an excuse to avoid the performance of an unpleasant duty.  It is not sympathy for a defendant.

The government must prove each and every element of the crimes charged beyond a reasonable doubt.  The burden never shifts to a defendant, the law never imposes upon a defendant in a criminal case the burden of calling any witnesses or producing any evidence.  The fact that one party called more

witnesses and introduced more evidence does not mean that you should find in favor of that party. It is the quality of the evidence that matters.

If, after a fair and impartial and careful consideration of all of the evidence you can honestly say that you are not satisfied of the guilt of a defendant, that is if you have such a doubt that would cause you, as a prudent person, to hesitate before acting in matters of importance to yourself, then you have a reasonable doubt. In that circumstance it is your duty to return a not guilty verdict for the defendant.

On the other hand, if after a fair and impartial consideration of all the evidence you can honestly say that you are satisfied of the guilt of the defendant and that you do not have a doubt that would prevent you from acting in important matters in the personal affairs of your own life, then you have no reasonable doubt. Under that circumstance, you should return a guilty verdict for the defendant.

The evidence in this case is the sworn testimony of the witnesses, the exhibits received into evidence, and the stipulations made by the parties. By contrast, the questions of the lawyer are not evidence. It is the witnesses' answers that are evidence, not the questions standing alone by the themselves.

Testimony that has been stricken or excluded by me is

not evidence and may not be considered by you in rendering your verdict.  If I have instructed you that evidence is received for only a limited purpose, then it may be considered only for that limited purpose.

Arguments by lawyers are not evidence because the lawyers are not witnesses.  What the lawyers have said to you in their opening statements and in their closing arguments is intended to help you understand the evidence.  If your recollection of the facts differs from the lawyers' statements, it is your recollection that controls.  It is for you alone to decide the weight, if any, to be given to the testimony you have heard and the exhibits you have seen.

Generally there are two types of evidence that you may consider in reaching your verdict.  One type is direct evidence.  Direct evidence is when a witness testifies about something he or she knows by virtue of his or her own senses, something he or she has seen, felt, touched, or heard.

Circumstantial evidence is evidence from which you may infer the existence of certain facts.  Let me give you an example to help you understand what is meant by circumstantial evidence.

Now, assume that all the shades were closed in this room, in fact that the draperies were shut so that you could not see whether it was daylight out, or snowing, or raining, or anything else.  Assume that you were sitting here and it was a

O365her6                    Charge

nice day when you came to court in the morning.  Assume that the doors to the court house or the courtroom opened and in walks somebody with an umbrella which is dripping wet.  Then, a few minutes later, another person enters with a wet raincoat.

Now, you cannot look outside the courtroom and you cannot see whether or not it is raining so you have no direct evidence of the fact.  But on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.

That's all there is to circumstantial evidence.  You infer on the basis of reason and experience and common sense from one established fact the existence or non-existence of some other fact.  Circumstantial evidence is of no less value than direct evidence.  The law makes no distinction between direct evidence and circumstantial evidence.  It simply requires that your verdict must be based on all the evidence presented.

You have had the opportunity to observe all the witnesses.  It is now your job to decide the credibility of the witnesses.  How believable they are.  You are the sole judges of the credibility of each witness and of the importance of his or her testimony.  You should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, the impression the witness made when testifying, and any other matter in evidence that may help you

O365her6                     Charge

decide the truth and importance of each witness' testimony.  In other words, in assessing credibility, you may size up a witness in light of his or her demeanor, the explanations given, and all other evidence in the case.  In making your credibility determinations, use your common sense, your good judgment, and your everyday experiences in life.

In deciding whether or not a witness was truthful, you may ask yourself:  How did the witness appear?  Was the witness candid, frank, and forthright?  Or did the witness seem evasive or suspect in some way?  How did the way the witness testified on direct examination compare with how the witness testified on cross-examination?  Was the witness consistent or contradictory?  Did the witness appear to know what he or she was talking about?  Did the witness have the opportunity to observe the facts he or she testified about?

If you believe that a witness knowingly testified falsely concerning any important matter, whether at trial or in a prior proceeding, you may distrust the witness' testimony concerning other matters.  You may reject all the testimony or you may accept such parts of the testimony that you believe are true and give it such weight as you think it deserves.

The testimony of a witness may be discredited by showing that the witness testified falsely concerning a material matter or by evidence that at some other time the witness said or did something or failed to say or do something

O365her6                    Charge

which is inconsistent with the testimony the witness gave at this trial.

Evidence of a prior inconsistent statement may not be considered by you as affirmative evidence of the fact asserted in the statement or the defendant's guilt.  Evidence of a prior inconsistent statement is placed before a jury for the more limited purpose of helping the jury decide whether to believe the testimony of the witness who contradicts himself.  If you find the witness made an earlier statement that conflicts with his or her trial testimony, you may consider that fact in deciding how much of his or her testimony, if any, to believe.

If you believe that a witness has been discredited in this matter, it is exclusively your right to give the testimony of that witness whatever weight you think it deserves.  In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake, whether the inconsistency concerns an important fact or whether it had to do with a small detail, whether the witness had an explanation for the inconsistency, and whether that explanation appealed to your common sense.

In deciding whether to believe a witness you may take account of any evidence of hostility, resentment, anger or affection that the witness may have towards the defendant or the government.  You may consider any evidence that a witness may benefit in some way from the outcome of the case and any

loyalty, incentive, or motive that might cause the witness to shade the truth.  You should carefully scrutinize all the testimony of each witness' circumstance under which he testified and any other matters in evidence that may help you decide the truth and importance of each witness' testimony.  It is your duty to consider whether the witness has permitted any bias or interest to color his or her testimony.

In short, if you find that a witness is biased, you should view his or her testimony with caution, weigh it with care, and subject it to close and searching scrutiny.

It is for you to decide from your observations in applying your common sense and experience and all other considerations mentioned whether the possible interest of any witness has intentionally or otherwise colored or distorted his or her testimony.  You are not required to disbelieve an interested witness.  You may accept as much of his or her testimony as you deem reliable and reject as much as you deem unworthy of acceptance.

You have heard testimony of law enforcement officers. The fact that a witness may be employed by federal, state, or local government as a law enforcement officer does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.  It is fair for you to consider whether the testimony of a law enforcement witness has been colored by a

personal or professional bias or interest in the outcome of the case. It is your decision, after reviewing all of the evidence, whether to accept the testimony of the law enforcement witnesses and to give that testimony whatever weight, if any, you find it deserves.

You have heard testimony from witnesses who testified that they were involved in certain crimes and are cooperating with the government in the hope of receiving a lower sentence. The law allows the use of such testimony. The testimony of a cooperating witness may alone be enough to establish the elements of a crime if the jury believes that the testimony establishes the elements beyond a reasonable doubt.

A cooperator's testimony should be scrutinized with greater care than testimony of an ordinary witness and viewed with particular caution when you decide how much of that testimony to believe. It does not follow, however, that simply because a person has admitted to participating in one or more crimes, that he is incapable of giving truthful testimony.

The fact that a witness is cooperating with the government may be considered by you as bearing upon his credibility. You may consider whether a cooperating witness, like any other witness called in this case, has an interest in the outcome or is biased in favor or against the defendant or the government and, if so, whether it has affected his or her testimony.

It is no concern of yours why the government made an agreement with a particular witness.  Your sole concern is whether a witness has given truthful testimony.

In evaluating the testimony of a cooperating witness you should ask yourself whether the witness would benefit more by lying or by telling the truth.  Was his testimony made up in a way because he believed or hoped that he would somehow receive favorable treatment by testifying falsely?  Or did he believe that his interests would be best served by testifying truthfully?  If you believe that the witness was motivated by hopes of personal gain, was the motivation one that would cause him to lie or was it one that would cause him to tell the truth?  Did this motivation color his testimony?

Like the testimony of any witness, cooperating witnesses' testimony should be given the weight that it deserves in light of the facts and circumstances before you taking account of the witness' demeanor, candor, the strength and accuracy of recollection, background, and the extent to which his testimony is or is not corroborated by other evidence in the case.

The instructions I gave you on witness credibility apply to cooperating witnesses.  You have heard testimony from government witnesses who have pleaded guilty to charges arising out of the same facts that are at issue in this case.  You are instructed that you are to draw no conclusions or inferences of

O365her6                        Charge

any kind about the guilt of the defendant from the fact that a prosecution witness pleaded guilty to similar charges.  The decision of that witness to plead guilty was a personal decision that he made about his own guilt.  It may not be used by you in any way as evidence against or unfavorable to the defendant on trial here.

You have heard testimony from expert witnesses -- a witness.  An expert witness is a witness who, by education or experience, has acquired learning or experience in a specialized area of knowledge.  Such a witness is permitted to give his opinion as to relevant matters in which he professes to be an expert and give his reasons for his opinions.  Expert testimony is presented to you on the theory that someone who is experienced in a specialized field can assist you in understanding the evidence or in reaching an independent decision on the facts.  Your role in judging credibility applies to experts as well as other witnesses.

One or more witnesses in this trial testified using the Spanish language.  The testimony was translated for you by a court-certified interpreter.  Even if you speak Spanish, you are obligated under the law to accept, as binding, the translations of witness testimony provided to you by the court-certified interpreter.

In this case you have heard evidence in the form of stipulations of testimony.  A stipulation of testimony is an

O365her6                    Charge

agreement between the parties that, if called as a witness, the person would have given certain testimony.  You must accept as true that the witness would give that testimony.  However, it is for you to determine the effect to be given to that testimony.

In this case you have heard evidence in the form of stipulations of fact.  A stipulation of fact is an agreement between the parties that a certain fact is true.  You must regard such agreed upon facts as true.  The weight or importance of the fact is a matter for you, the jury, to decide.

Among the exhibits in the case some documents are redacted.  Redacted means that part of the document was covered.  You are to concern yourself only with the part of the item that has been admitted into evidence.  You should not consider any possible reason why the other part of it has been covered.

You have heard testimony about evidence seized in connection with certain searches conducted by law enforcement officers or otherwise obtained by law enforcement.  Evidence obtained from these searches was properly admitted in this case and may be properly considered by you.  Such searches were appropriate law enforcement actions.

Video and audio recordings of various foreign language conversations have been admitted into evidence and the

O365her6                        Charge

transcripts of English translations of those foreign language recordings have been admitted into evidence.  You have heard the testimony of a witness who translated the recordings and that testimony should be judged as you would any other witness testimony.  I instruct you that these recordings were made in a lawful manner, that no one's rights were violated, that the government's use of this evidence is lawful, and that it was properly admitted into evidence.  Of course, it is for you to decide what weight, if any, to give to this evidence.

There is no legal requirement that law enforcement agents investigate crimes in a particular way or that the government prove its case through any particular means.  While you are to carefully consider the law enforcement evidence introduced by the government, you are not to speculate as to why they used the techniques they did or why they did not use other techniques.  The government is not on trial.  Law enforcement techniques are not your concern.  Your concern is to determine whether on the evidence or lack of evidence the defendant's guilt has been proven beyond a reasonable doubt.

Now, I will later on in these instructions instruct you on the law of conspiracy in which you will learn about the import of acts done by a co-conspirator during and in furtherance of the conspiracy.  But, apart from these acts, there was evidence of other acts allegedly committed by co-conspirators that were not in furtherance of the conspiracy

charged against the defendant. That evidence was received for limited purpose. The evidence of other prior acts was admitted either as background to events and charged in the indictment or for the limited purpose stated by the Court at the time the evidence was admitted. You may consider it only for that limited purpose.

You have heard evidence during the trial that witnesses have discussed the facts of the case and their testimony with the lawyers before the witnesses appeared in court. You may consider that fact when you are evaluating the witness' credibility. There is nothing either unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he or she will be questioned about, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them in court. Such consultation helps conserve your time and the Court's time. In fact, it would be unusual for a lawyer to call a witness without such consultation.

The government has presented exhibits in the form of demonstrative evidence. These demonstrative exhibits were used to illustrate certain evidence and they should be considered as illustrating the underlying evidence. And I am thinking, for example, there was a firearms witness and he used demonstrative exhibits to illustrate his testimony.

Some of the people who may have been involved in

events leading to this trial are not on trial. There is no requirement that all members of a conspiracy charged be prosecuted or that all members be tried together in the same proceeding. You may not draw any inference, favorable or unfavorable, from the fact that any person, in addition to the defendant, is not on trial here. You also may not speculate as to the reasons why other persons are not on trial. Those matters are wholly outside your concern and have no bearing on your function as jurors.

There are people whose names you heard during the course of the trial who did not appear to testify. I instruct you that each party had an equal opportunity or lack of opportunity to call any of the witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what that witness would have testified to had they been called. Their answer should not affect your judgment in any way. You should remember my instruction, however, that the law does not impose on the defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. The burden of proof is entirely on the government.

In this case, the defendant decided to testify. You should examine and evaluate his testimony just as you would the testimony of any witness with an interest in the outcome of the case. You should not disregard or disbelieve his testimony simply because he is charged as a defendant in the case.

O365her6                    Charge

Similarly, you should not accept or believe his testimony simply because he is charged as a defendant in the case.

I instruct you that anything you may have seen or heard about this case outside of the courtroom is not evidence and must be disregarded. Indeed, as I have instructed you throughout the case, you may not read, view, or listen to any media or press report or internet or social media posting about this case, or about the people or issues referred to during this trial. Your verdict must be based solely on the evidence or the lack of evidence that came out in this courtroom and the court's instructions on the law.

Ladies and gentlemen, what I am going to do at this point is adjourn until tomorrow morning. I have more to go on my instructions and you can approach it with a fresh mind in the morning. I am going to go through, for example, each of the substantive counts in the case, instruct you on the law, and then give you some final instructions.

So, why don't we go back to starting at 10:00 tomorrow morning. I think that is more convenient. That is what we will do. And I will probably have something on the order of a half an hour, 45 minutes of instructions to give you and then, and only then, will the case be given to you for consideration and for deliberations. So, until the case is in your hands, you must keep an open mind and you must not discuss the case among yourselves or with anyone else. I will see you tomorrow

O365her6                    Charge

morning for a fresh 10:00 am start.

Thank you, ladies and gentlemen.

(Jury not present)

THE COURT:  So spectators should remain, court personnel may leave, and have a pleasant evening.  I will see you tomorrow morning at 10:00.

Thank you.

(Adjourned to March 7, 2024 at 10:00 a.m.)

INDEX OF EXAMINATION

Examination  of:                                        Page

JUAN ORLANDO HERNANDEZ ALVARADO

Cross By Mr. Wirshba . . . . . . . . . . . . . .1600

Redirect By Mr. Colon . . . . . . . . . . . . .1625

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 1371-R and 1377-R   . . . . . . . . . . . . . .1601

DEFENDANT EXHIBITS

Exhibit No.                                        Received

 224   . . . . . . . . . . . . . . . . . . . . .1633